Judge *Judge Green*

# CIVIL CASE NO. *79-271*

*Luevano, et al.*

VERSUS

*Constance Horner, et al.*

VOL. *I* OF ____

FROM *5/8/87* TO *6/5/87*

| DEPOSITIONS | |
|---|---|
| TRANSCRIPTS | |
| EXHIBITS | |
| OTHER | |

| DATE | COURT CLERK'S MEMORANDUM | JUDGE |
|---|---|---|
| | | |
| | | |
| | | |
| | *Temporary Jacket* | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                   )
                                            )
    individually and on behalf of           )
    all others similarly situated,          )
                                            )
                          Plaintiffs,        )
                                            )
              v.                             )    C. A. No. 79-0271
                                            )
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                 )
    Management, et al.,                      )
                                            )
                          Defendants.        )

FILED

MAY 8 - 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### PLAINTIFFS' OPPOSITION TO THE NATIONAL TREASURY EMPLOYEES' UNION'S MOTION TO INTERVENE, AND ITS MOTION FOR INJUNCTIVE RELIEF

Plaintiffs oppose the motion of the National Treasury Employees' Union to intervene in this action, and oppose its Motion for Injunctive Relief.  The grounds of plaintiffs' Opposition are:

1. The National Treasury Employees' Union ["NTEU"] has not identified any interest in this action sufficient to support a motion to intervene, either as of right or by permission.

2. The only proper interests of the NTEU with respect to the use of Schedule B authority involve the interpretation and application of the civil service laws, questions which are not involved in this lawsuit.

3. The NTEU has protected its proper interests by successfully prosecuting its own lawsuit against the Office of Personnel Management.  The NTEU was not certified as a class representative in that action, and was denied back pay and other

individualized relief for the violation of the civil service rights of its members.

      3. The only Schedule B interests involved in the <u>Luevano</u> lawsuit are the interests of blacks and of Hispanics, who are members of a certified class, in the interpretation and application of the Consent Decree herein, and of Title VII of the Civil Rights Act of 1964, as amended.  The NTEU does not represent blacks and Hispanics in this action, does not itself have a cognizable interest in the interpretation and application of the Consent Decree herein, and with respect to this lawsuit does not have a cognizable interest in the interpretation and application of Title VII.

      4. The NTEU's motion for injunctive relief herein is not proper, because it is not a party.

      5. The NTEU's motion to intervene in this action does not conform to Rule 24(c) of the Federal Rules of Civil Procedure, and does not conform to Rule 108(j) of the Rules of this Court, because the NTEU has not filed its proposed Complaint in Intervention.

      6. The <u>Luevano</u> plaintiffs' proposed form of Order on their Motion for a Determination that the Use of Schedule B Authority for Hiring Does Not Constitute an "Alternative Examining Procedure" Within the Meaning of the Consent Decree, and on their Motion for Injunctive Relief, is attached to this Opposition as Attachment A.  The NTEU's proposed form of Order on its motion for injunctive relief is attached hereto as Attachment B.

7. A comparison of the two forms of proposed Order shows that the NTEU is requesting substantive relief virtually identical to that requested by the Luevano plaintiffs. Compare ¶¶ 1-5 and 7 of the Luevano plaintiffs' proposed Order with ¶¶ 1-5 and 7 of NTEU's proposed Order. To the extent that the NTEU might be considered as having any cognizable interest in the outcome of the Luevano plaintiffs' Motion, which the Luevano plaintiffs dispute, then these interests are clearly being protected by the Luevano plaintiffs.

8. The only real difference between the Luevano plaintiffs' proposed Order and the NTEU's proposed Order arises in ¶ 6 of the Orders. The Luevano plaintiffs had requested that the defendants enquire of each agency given Schedule B authority, to find out if there have been layoffs of Schedule B employees or if there are layoffs pending. NTEU has a general set of interrogatories which it wants submitted to each agency, and wants each agency to submit interrogatories ("survey") each present and former Schedule B employee as to whether they "suffered any negotiative [negative?] effect arising from Schedule B status", whether they were discouraged from applying for competitive jobs, and whether their progress had been slowed through their career ladders.

9. On the face of its proposed form of Order, the purpose of NTEU's intervention is merely to seek discovery in Luevano of factors supporting individualized relief for the use of Schedule B in violation of its members' civil service rights.

- 3 -

Because this Court has already entered judgment in NTEU's case,
the information obtained could only be used on its appeal from
the denial of individualized relief.

10. We do not know why NTEU did not seek such discovery
in its own lawsuit, but the <u>Luevano</u> plaintiffs oppose NTEU's
intervention in this lawsuit as a "stalking horse" for its
appeal.  NTEU's rights should be a resolved in its own case, and it
should address the Court in its own case as to any discovery it
feels it needs.

> Respectfully submitted,
>
> WILLIAM L. ROBINSON
> RICHARD T. SEYMOUR
> Lawyers' Committee for Civil
>   Rights Under Law
> 1400 'Eye' St., N.W., Suite 400
> Washington, D.C. 20005
> (202) 371-1212
>
> JULIUS LeVONNE CHAMBERS
> CHARLES STEPHEN RALSTON
> GAIL J. WRIGHT
> 99 Hudson Street, 16th Floor
> New York, New York 10013
> (212) 219-1900
>
> BARRY L. GOLDSTEIN
> ELAINE R. JONES
> 806 - 15th Street, N.W., #940
> Washington, D.C. 20005
> (202) 638-3278
>
> JOHN H. ERICKSON
> Erickson, Beasley & Hewitt
> 12 Geary Street
> Eighth Floor
> San Francisco, Calif.  94108
> (415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
     & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
     Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                    Attorneys for Plaintiffs

Dated: June 5-6, 1987

- 5 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

F I L E D

MAY 8 _ 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,     )
                                  )
    individually and on behalf of     )
    all others similarly situated,     )
                                    )
                Plaintiffs,     )
                                    )
           v.                  )  C. A. No. 79-0271
                                    )
CONSTANCE HORNER, Director,     )
    U.S. Office of Personnel     )
    Management, et al.,          )
                                    )
                Defendants.     )

ORDER GRANTING PLAINTIFFS' MOTION FOR A DETERMINATION
THAT THE USE OF SCHEDULE B AUTHORITY FOR HIRING DOES
NOT CONSTITUTE AN "ALTERNATIVE EXAMINING PROCEDURE"
WITHIN THE MEANING OF THE CONSENT DECREE, AND GRANTING
PLAINTIFFS' MOTION FOR AN INJUNCTION

This matter comes before the Court on plaintiffs'
Motion for a determination that the use of Schedule B authority
for hiring does not constitute an "alternative examining proce-
dure" within the meaning of the Consent Decree and does not
affect the period for retention of the Court's jurisdiction,
requesting the Court to take judicial notice of the proceedings
and evidentiary materials in National Treasury Employees Union v.
Horner, C.A. No. 84-2573 (D.D.C.), appeal pending, and requesting
an injunction. It appears, from the Motion and its accompanying
attachments and supporting Memorandum, and from the response of
the defendants, that the Motion is well taken. It is therefore
hereby

ORDERED, that:

1. The Court hereby takes judicial notice of the
proceedings and evidentiary materials in National Treasury
Employees Union v. Horner, C.A. No. 84-2573 (D.D.C.), appeal

ATTACHMENT A

<u>pending</u>.

2. Based on its interpretation of the Consent Decree, the factual materials submitted by the parties to the Court prior to the grant of final approval to the Consent Decree, the Order of November 19, 1981 granting final approval to the Consent Decree, the proceedings and evidentiary materials in <u>National Treasury Employees Union v. Horner</u>, and the principles of remedial law under Title VII, the use of Schedule B hiring authority is not an "alternative examining procedure" within the meaning of the Consent Decree, and the promulgation and/or use of Schedule B hiring authority shall not be considered in determining the period for the retention of jurisdiction.

3. The defendants shall immediately convert all Schedule B appointees to competitive status.

4. The defendant class member U.S. Department of the Navy shall not lay off any Schedule B appointee at its Jacksonville, Florida facilities without prior approval of this Court, based on a motion by defendants, an opportunity for plaintiffs to respond, and an adequate evidentiary record.

5. The defendant class member U.S. Department of the Navy shall immediately reinstate in Schedule B status, with full back pay and other benefits, all Schedule B appointees who took temporary appointments to postpone the dates of their layoffs or separations from employment, and shall within ten days from the date of this Order certify its compliance to the Clerk of this Court, attaching to the certificate copies of the notifications given to each Schedule B appointee at its Jacksonville, Florida

facilities.  Copies of the certificate and its attachments shall
be served on all counsel of record.

6. The defendants shall enquire of each agency given
Schedule B authority, at each facility given such authority at
any time from 1982 to date, to find out if there have been other
such layoffs or if there are any such layoffs now pending.  This
survey shall be completed as quickly as possible, but in no event
later than forty-five days after the date of this Order, and the
defendants shall report the results of the survey to plaintiffs
and to the Court as soon as possible thereafter, but in no event
later than sixty days after the date of this Order.

7. Nothing in this Order shall be construed to prevent
the defendants from complying with this Order by modifying
Schedule B by (a) making Schedule B hiring decisions competi-
tively, on an unassembled basis; (b) giving Schedule B hires
status, rights, and privileges identical to those formerly
accorded to PACE hires; (c) giving Schedule B hires retention
rights, in the event of a reduction in force, identical to those
formerly accorded to PACE hires; and (d) giving Schedule B hires
opportunities for noncompetitive "career ladder" promotions
identical to those formerly accorded to PACE hires.

This the _____ day of _____, 1987.


JOYCE HENS GREEN
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
         individually and on behalf      )
         of all others similarly         )
         situated,                       )
                                         )
             Plaintiffs,                 )
                                         )
         v.                              )    C.A. No. 79-0271
                                         )
CONSTANCE HORNER, Director               )
                                         )
         U.S. Office of Personnel        )
         Management, et al.,             )
                                         )
             Defendants.                 )
                                         )

FILED

MAY 8 – 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORDER GRANTING PLAINTIFFS' MOTION FOR A
DETERMINATION THAT THE USE OF SCHEDULE B
AUTHORITY FOR HIRING DOES NOT CONSTITUTE
AN "ALTERNATIVE EXAMINING PROCEDURE" WITHIN
THE MEANING OF THE CONSENT DECREE, AND GRANTING
PLAINTIFFS' AND INTERVENOR'S MOTIONS FOR AN INJUNCTION

This matter comes before the Court on plaintiffs'
Motion for a determination that the use of Schedule B
authority for hiring does not constitute an "alternative
examining procedure" within the meaning of the Consent Decree
and does not affect the period for retention of the Court's
jurisdiction; plaintiffs' request that the Court to take
judicial notice of the proceedings and evidentiary materials
in National Treasury Employees Union v. Horner, C.A. No.
84-2573 (D.D.C.), appeal pending; and plaintiffs' and
intervenors'

ATTACHMENT B

- 2 -

request for an injunction. It appears, from the motions and accompanying attachments and supporting Memoranda, and from the response of the defendants, that the motions are well taken. It is therefore hereby

ORDERED, that:

1. The Court hereby takes judicial notice of the proceedings and evidentiary materials in <u>National Treasury Employees Union v. Horner</u>, C.A. No. 84-2573 (D.D.C.), <u>appeal pending</u>.

2. Based on its interpretation of the Consent Decree, the factual materials submitted by the parties to the Court prior to the grant of final approval to the Consent Decree, the order of November 19, 1981, granting final approval to the Consent Decree, the proceedings and evidentiary materials in <u>National Treasury Employees Union v. Horner</u>, and the principles of remedial law under Title VII, the use of Schedule B hiring authority is not an "alternative examining procedure" within the meaning of the Consent Decree, and the promulgation and/or use of Schedule B hiring authority shall not be considered in determining the period for the retention of jurisdiction.

3. The defendants shall immediately convert all Schedule B appointees to competitive status.

- 3 -

4. The defendant class member U.S. Department of the Navy shall not lay off any Schedule B appointee at its Jacksonville, Florida facilities without prior approval of this Court, based on a motion by defendants, an opportunity for plaintiffs to respond, and an adequate evidentiary record.

5. The defendant class member U.S. Department of the Navy shall immediately reinstate in Schedule B status, with full back pay and other benefits, all Schedule B appointees who took temporary appointments to postpone the dates of their layoffs or separation from employment, and shall within ten days from the date of this Order certify its compliance to the Clerk of this Court, attaching to the certificate copies of the notifications given to each Schedule B appointee at its Jacksonville, Florida facilities. Copies of the certificate and its attachments shall be served on all counsel of record.

6. The defendants shall require of each agency given Schedule B authority, at each facility given such authority at any time from 1982 to date, to identify (1) the names and addresses of each employee hired with this authority; (2) every employee who has been RIFed; (3) every employee who has been terminated; (4) every employee who has resigned pending termination; and to supply a breakdown by activity and job series of the number of employees hired, number eventually converted to the competitive service, the length of time to conversation to GS-9 and the status of employees not

- 4 -

converted.  Each agency shall also survey each present and
former Schedule B employee to determine (1) whether they
suffered any negotiative effect arising from Schedule B
status; (2) whether they had been discouraged from applying
for particular transfers or promotions to competitive jobs;
or (3) whether their excepted status had slowed their
promotion through the career ladder.  This information shall
be completed as quickly as possible, but in no event later
than forty-five days after the date of this Order, and the
defendants shall report the results of the survey to
plaintiffs, intervenors and to the Court as soon as possible
thereafter, but in no event later than sixty days after the
date of this Order.

7.  Nothing in this Order shall be construed to
prevent the defendants from complying with this Order by
replacing Schedule B with an alternate system which (a) makes
hiring decisions competitively, and (b) gives PAC hires
status, rights, and privileges identical to those formerly
accorded to PACE hires.

This the _____ day of _____, 1987.


                              _____
                              JOYCE HENS GREEN
                              United States District Judge

<u>Certificate of Service</u>

I certify that I have, on this night of June 5-6, 1987, served a copy of plaintiffs' foregoing Opposition to the National Treasury Employees' Union's Motion to Intervene in this case and Motion for Further Injunctive Relief, its attachments, the Memorandum in support, and the proposed form of Order on counsel of record for the defendants and on counsel for the NTEU by mailing copies to them at the following addresses:

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
    Room 3509
Washington, D.C. 20530

James S. Green, Esq.
U.S. Office of Personnel Management
1900 E Street N.W.
    Room 7450
Washington, D.C. 20415

Lois G. Williams, Esq.
Clint D. Wolcott, Esq.
National Treasury Employees Union
1730 K Street N.W.
    Suite 1101
Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
        Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                          Plaintiffs,        )
                                             )
                  v.                         )    C. A. No. 79-0271
                                             )
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                 )
    Management, et al.,                       )
                                             )
                          Defendants.        )

FILED

MAY 8 _ 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
THE NATIONAL TREASURY EMPLOYEES' UNION'S MOTION
TO INTERVENE, AND ITS MOTION FOR INJUNCTIVE RELIEF

Plaintiffs oppose the motion of the National Treasury
Employees' Union to intervene in this action, and oppose its
Motion for Further Injunctive Relief.

First, the NTEU has no proper interest in this action.
As plaintiffs' Opposition demonstrates, the NTEU's real interest
in intervention seems to be to get discovery which it can use to
argue, on the appeal of its own case, that the denial of back pay
and other individualized relief there was improper.  It is not
right to use this litigation as a "cover" to seek discovery which
it never sought in its own case, for the purpose of advancing its
own case.

To the extent that NTEU has positions it wishes to
assert in this action, or believes that it has expertise which
could benefit the Court and the parties, it is free to seek
recognition as an amicus curiae and comment upon matters relating
to Schedule B.  The Luevano plaintiffs would have no objection to

such participation.

No case has been made, however, for intervention as a party with the right to file motions. The Luevano plaintiffs are not seeking any relief which is inconsistent with that already provided to the NTEU in its own case; the NTEU's repetition of virtually all of the substantive portions of the Luevano plaintiffs' proposed form of Order makes clear that there is no conflict between our positions and, thus, no need for the NTEU to intervene.

The NTEU suggests that the ongoing litigation over the defendants' use of Schedule B authority in this action could result in a determination that the practices are proper, and that it therefore needs to protect itself, because such a determination would adversely affect its own case. The fallacy in its argument is that Luevano cannot possibly result in a finding that the use of Schedule B authority was lawful under the civil service laws; the civil service laws are not involved in Luevano. If there is any determination adverse to the Luevano plaintiffs, it would have to be a determination that the Consent Decree does not require "alternative examining procedures" to be competitive, and that use of Schedule B authority accordingly can constitute an "alternative examining procedure" within the meaning of the Consent Decree.

That is the question at stake in Luevano, and it is a question in which NTEU has only a bystander's interest. There is no question that OPM has treated Schedule B as a noncompetitive procedure, and that fact cannot possibly change as a result of

litigation herein over the meaning of the Consent Decree.

NTEU also worries that the <u>Luevano</u> plaintiffs are seeking to have Schedule B employees who are both "excepted" and "competitive". NTEU Memorandum at 9. This statement is surprising. It should be obvious to NTEU that ¶ 7 of plaintiffs' proposed Order speaks merely of allowing OPM to <u>modify</u> Schedule B to make it a competitive procedure in substance and in form. We do not understand how NTEU could object to changes in Schedule B which correct the inferior status of Schedule B appointees, which make the appointees competitive from the outset in all respects, and which answer every one of NTEU's concerns.

<u>Second</u>, NTEU has not complied with Rule 24(c), F.R.Civ.P., which requires that "[t]he motion ... shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Local Rule 108(j) also requires that a motion to intervene as a party "shall be accompanied by an original of the pleading setting forth the claim or defense for which intervention is sought."

NTEU's motions should be denied.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

- 3 -

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _Richard T. Seymour_
    RICHARD T. SEYMOUR
    Bar No. 28100

                    Attorneys for Plaintiffs

Dated: June 5-6, 1987

- 4 -

JUN 8 - 1977

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )          Civil Action
                                   )          No. 79-0271 (JHG)
CONSTANCE HORNER, Director.        )
    Office of Personnel            )
    Management, et al.,            )          FILED
                                   )
        Defendants.                )          MAY 18 1987
_____)

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' UNOPPOSED MOTION FOR AN EXTENSION
OF TIME TO RESPOND TO PLAINTIFFS' MOTION REGARDING
THE USE OF SCHEDULE B HIRING AUTHORITY,
AND MEMORANDUM IN SUPPORT THEREOF

Defendants, by their undersigned counsel, move for a 17-day extension of time, to and including June 5, 1987, to respond to Plaintiffs' Motion For A Determination That The Use Of Schedule B Authority For Hiring Does Not Constitute An "Alternative Examining Procedure" Within The Meaning Of The Consent Decree, And Motion For Injunctive Relief. Plaintiffs' counsel has consented to this extension.

Plaintiffs' motion raises important and complex issues regarding the termination date of the Consent Decree in this case. Defendants' response requires extensive consultations with officials of the Office of Personnel Management, not all of whom are presently available. Accordingly, defendants respectfully suggest that a brief extension is warranted. A proposed Order is attached.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

*Richard E. Greenberg /gp*
RICHARD E. GREENBERG

*Barbara Ward /gp*
BARBARA WARD

*Jeffrey S. Paulsen*
JEFFREY S. PAULSEN
Room 3336 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-2791

- 2 -

<u>Certificate of Service</u>

I certify that, on May /8 , 1987, I served a copy of the foregoing Defendants' Unopposed Motion For An Extension Of Time to Respond To Plaintiffs' Motion Regarding The Use Of Schedule B Hiring Authority, and Memorandum In Support Thereof, by first-class mail, postage prepaid, on:

> Richard T. Seymour
> Lawyer's Committee For Civil
>   Rights Under Law
> Suite 400
> 1400 "Eye" Street, N.W.
> Washington, D.C.  20005

Jeffrey S. Paulsen

RECEIVED

MAY 18  4 01 FM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

MAY 18 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al</u>.,           )
                                       )
          Plaintiffs,                  )
                                       )
          v.                           )      Civil Action
                                       )      No. 79-0271 (JHG)
CONSTANCE HORNER, Director.            )
     Office of Personnel               )
     Management, <u>et</u> <u>al</u>.,         )
                                       )
          Defendants.                  )
_____)

**FILED**

MAY 20 1987

JAMES F. DAVEY, Clerk

<u>ORDER</u>

Based upon Defendants' Unopposed Motion For An Extension Of
Time to Respond To Plaintiffs' Motion Regarding The Use Of
Schedule B Hiring Authority, And Memorandum In Support Thereof,

IT IS ORDERED that defendants' motion is granted and that
defendants may have until June 5, 1987 to respond to plaintiffs'
motion.

Dated: _May 19, 1987_

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        individually and on behalf )
        of all others similarly    )
        situated,                  )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )     C.A. No. 79-0271-JHG
                                   )
CONSTANCE HORNER, Director,        )
        U.S. Office of Personnel   )
        Management, et al.,        )
                                   )
                Defendants.        )
_____)

FILED

MAY 22 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION'S
MOTION TO INTERVENE

        Pursuant to Federal Rule of Civil Procedure 24(a) and

(b) and Local Rule 108(j), the National Treasury Employees

Union (NTEU) moves to intervene in the above-captioned

compliance and injunction proceedings.  As is explained in

the attached motion for injunctive relief and memorandum of

points and authorities, NTEU represents the parties and

proposed class members in National Treasury Employees Union

v. Horner, No. 84-2573-JHG (D.D.C. Feb. 27, 1987), appeal

pending, No. 87-5102.  NTEU seeks the protection of

employees' rights recognized in that action and injunctive

relief in addition to, but consistent with, the relief sought

by the plaintiffs on May 8, 1987.

- 2 -

NTEU files this motion to intervene as of right
because it has an interest which, as a practical matter, may
be impaired or impeded by the disposition of this case and is
distinct from the interest of the plaintiffs.  Fed. R. Civ.
P. 24 (a)(2).

If intervention as of right is not granted, NTEU
alternatively requests permission to intervene pursuant to
Rule 24(b)(2), as there are questions of law and fact in
common between this case and NTEU v. Horner, supra.

Respectfully submitted,

Lois G. Williams
Director of Litigation
D.C. Bar No. 365894

Clinton D. Wolcott
Assistant Counsel
D.C. Bar No. 343202
National Treasury Employees
Union
1730 K Street, N.W.
Suite 1101
Washington, D.C. 20006
(202) 785-4411

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY 22 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Angel G. Luevano, <u>et al.</u>,                  )
                                                 )
                                                 )
                                                 )
         individually and on behalf              )
         of all others similarly                 )
         situated,                               )
                                                 )
                  Plaintiffs,                    )
                                                 )
              v.                                 )    C.A. No. 79-0271-JHG
                                                 )
CONSTANCE HORNER, Director,                      )
     U.S. Office of Personnel                    )
     Management, <u>et al.</u>,                  )
                                                 )
                  Defendants.                    )
_____ )

## NATIONAL TREASURY EMPLOYEES UNION'S MOTION
## FOR FURTHER INJUNCTIVE RELIEF

Intervenor, NTEU, moves that the injunctive relief
requested by the plaintiffs be granted and that it be
expanded to include further information-gathering
responsibilities on the part of the defendant.

As is explained in the accompanying memorandum of points
and authorities, NTEU asserts that OPM should be required to
determine accurately the adverse effect on employees who were
in Schedule B PAC positions pursuant to Federal Personnel
Manual Letter 213-32. NTEU has proposed specific information
which is necessary to this determination and had incorporated
it in a proposed order, which is attached.

- 2 -

Wherefore, NTEU requests that its request for injunctive relief be granted.

Respectfully submitted,

Lois G. Williams
Director
Litigation Department, D C Bar #365894

Clint D. Wolcott
Assistant Counsel
National Treasury Employees
Union        DC Bar # 343202

Dated: 5/22/87

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )        FILED
        individually and on behalf   )
        of all others similarly      )      MAY 22 1987
        situated,                    )
                                     )    CLERK, U.S. DISTRICT COURT
                Plaintiffs,          )      DISTRICT OF COLUMBIA
                                     )
        v.                           )    C.A. No. 79-0271-JHG
                                     )
CONSTANCE HORNER, Director,          )
        U.S. Office of Personnel     )
        Management, et al.,          )
                                     )
                Defendants.          )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF NTEU'S MOTION TO
INTERVENE AND MOTION FOR INJUNCTIVE RELIEF

I.   INTRODUCTION

        The plaintiffs in this action have filed a motion

requesting that the Court interpret the scope and meaning of

the consent decree which settled the case over five years

ago.  They also seek injunctive relief to eliminate fears

that employees are suffering by the defendants' method of

implementing the decree and to put employees in the position

they would be in had the defendants complied with their

responsibilities.

        The National Treasury Employees Union (NTEU) is the

plaintiff in a related case, National Treasury Employees

Union et al. v. Horner et al., C.A. No. 84-2573-JHG (D.D.C.

2

opinions Oct. 15, 1986 and Feb. 27, 1987), appeal pending,
No. 87-5102 (NTEU). NTEU seeks to intervene in this case to
protect the interests of the NTEU plaintiffs, to clarify
certain legal issues raised by the Luevano plaintiffs'
motions, and to request that the injunctive relief requested
by the plaintiffs be expanded. Specifically, NTEU believes
that OPM must be required to account for all adverse effects
which have arisen from their failure to follow the Luevano
consent decree and the law.

The reexamination of the Luevano consent decree is the
latest chapter in the long history of efforts by the Luevano
plaintiffs to replace the discriminatory PACE hiring exam
with legal selection procedures, and by intervenor NTEU to
ensure that the discredited PACE exam is replaced by a system
which comports with law and protects employees' basic
rights. This Court's February 27 decision in NTEU explains
the illegalities and unfairness inherent in the OPM's 1982
decision to abandon the promises it made in the Luevano
consent decree and implement non-competitive "Schedule B"
hiring for entry level professional jobs. The Luevano
plaintiffs' motion for injunctive relief demonstrates that
this unfairness is not merely theoretical; Schedule B
employees are being injured by their inferior status and no
one, not even OPM, knows the extent of the harm.

NTEU v. Horner was filed as a class action on behalf

3

of all Schedule B employees.  See, Amended Class Action
Complaint, No. 84-2573.[1/]  It was transferred to this Court
as a case "related to" Luevano and the Court's decision
explicitly recognizes that the two cases arise out of the
same events.  See NTEU, supra (orders Nov. 20, 1984, Oct. 15,
1986, Feb. 27, 1987).

The classes and interests represented by the two
groups of plaintiffs are overlapping, yet distinct.  The
Luevano plaintiffs originally sought to vindicate the civil
rights of
black and Hispanic applicants denied employment by a
discriminatory hiring examination.  Title VII of the Civil

---

1/  On January 18, 1985, the Court granted NTEU's Motion to
Enlarge the time for filing a motion for class certification
and ordered that the motion be filed within thirty days
following the resolution of dispositive motions.  NTEU's
summary judgment motion was granted February 27, 1987 and OPM
filed its appeal on March 24, 1987.  NTEU expects to file a
motion for class certification if the district court regains
jurisdiction of the case after the disposition of the
government's appeal and its cross-appeal.

4

Rights Act of 1984, 42 U.S.C. 2000e, et seq; see Luevano v.
Campbell, 93 F.R.D. 68, 73 (D.D.C. 1981). At this stage, the
Luevano plaintiffs seek to protect original class members who
have gained employment pursuant to the consent decree and to
ensure that the decree is properly construed and
implemented. See plaintiffs motion for determination and
injunction.

The NTEU class consists of all Schedule B employees,
including hired blacks and Hispanics, and seeks to protect
class members' rights under the civil service laws. 5 U.S.C.
2101, et seq.. It is clear, however, that the goal of both
plaintiffs is the same: a non-discriminatory hiring and
employment system which affords employees the civil service
rights and protections formerly granted to those hired under
the PACE exam. See plaintiffs' memorandum at 6-7.

NTEU moves to intervene in Luevano for several
reasons. First, the Court's determination of the meaning of
the consent decree may affect the relief ordered in NTEU on
February 27, 1987. See. infra, p. 8-9.

5

Second, the plaintiffs' motion does not set forth all of the
defects of Schedule B employment and NTEU wishes to expand on
this discussion.  See infra, p. 11-12; plaintiffs' motion at
11-12, par. 15.  Finally, NTEU believes that the injunctive
relief requested by the plaintiffs, while appropriate, should
be expanded to fully protect Schedule B employees from
arbitrary agency action and to determine if past abuses have
occurred.  See infra p. 14-15.

NTEU believes that its participation in these
proceedings will assist the court in addressing the concerns
of the Luevano plaintiffs and in fashioning relief which is
practical and effective.  OPM must not be permitted to act as
if its obligations under Title VII are inconsistent with the
civil service laws, or that its unilateral implementation of
inferior jobs status for entry level professionals somehow
satisfied the requirements of either statutory scheme.

II.  NTEU Has A Right To Intervene In This Action

There are four criteria relevant to establishing a
right to intervene in an action:  (1) the motion must be
timely; (2) the intervenor must claim an interest relating to
the transaction which is the subject of the action; (3) the
interest must be subject, as a practical matter, to being
impaired or impeded by the action, and (4) intervention may
be denied if the applicant's interest is adequately
represented by the existing parties.  Fed. R. Civ. P.

6

24(a)(2); <u>Cook v. Boorstin</u>, 763 F.2d. 1462, 1466 (D.C. Cir 1985); <u>Foster v. Gueory</u>, 655 F.2d 1319 (D.C. Cir. 1981). NTEU here meets each of these criteria for intervention.

    A.  <u>The Motion is Timely</u>

    There are no specific time deadlines for filing a motion to intervene. Rather, timeliness is determined "from all the circumstances, including the purpose for which intervention is sought . . . and the improbability of prejudice to those already in the case." <u>Foster, supra,</u> quoting <u>National Resources Defense Council v. Costel,</u> 501 F.2d 904, 907 (D.C. Cir. 1977).

    Here, NTEU has moved to intervene in the remedial stage of the case 10 days after receiving a copy of the plaintiffs' motion which reopened the consent decree. As far as NTEU is aware, this is the first request for declaratory or injunctive relief the plaintiffs have filed since NTEU filed its challenge to Schedule B hiring authority in 1984. This is, therefore, our first opportunity to intervene.

    Intervention at the relief stage, even after final judgment, is appropriate "where substantial problems in formulating relief remain to be resolved." <u>Hodgson v. United Mine Workers of America</u>, 413 F.2d 118, 129 (D.C.Cir 1972). The purpose of NTEU's intervention is to participate in the formulation of relief directly related to the relief sought in <u>NTEU</u>, not to reopen any issues resolved by the consent

7

decree.  Under these circumstances, there will be no

prejudice to the position of any present party caused by our

participation.  In fact, this proceeding and the relief

sought by the Luevano plaintiffs flow directly from the

disputes and relief requested in NTEU and we have, therefore,

been actively participating in the resolution of the

questions voiced here for some time.

###    B.  The NTEU Plaintiffs Have An Interest
       in this Transaction

The NTEU and Luevano claims all involve OPM's decision to

substitute the PACE examination with non-competitive Schedule

B hiring authority.  The "transaction" at issue is identical.

The differences are in the scope of the classes and the

statutory interests protected.  There can be no doubt that

the NTEU plaintiffs have an interest in the fate of Schedule

B hiring authority; abolishing the unnecessary use of

Schedule B is the focus of their claim.

In any event, the interest test is not applied strictly;

rather, it "is primarily a practical guide to dispose of

lawsuits by involving as many apparently concerned persons as

is compatible with efficiency and due process." Foster,

supra at 1324, quoting Nuesse v. Camp, 385 F.2d 694, 700

(D.C.Cir. 1987).  It is certainly both practical and

efficient for the Court to hear NTEU's position concerning

OPM's administration of Schedule B hiring authority at the

8

same time it considers the views of the Luevano plaintiffs,
rather than totally bifurcating the civil rights and civil
service issues presented.

C.  The NTEU Plaintiff's Interest May Be
    Impeded Or Impaired By The Disposition
    Of This Case.

Both the determination and the injunctive relief
requested by the plaintiffs may affect the rights of the
plaintiffs in NTEU.  Where both the potential intervenor and
plaintiffs "challenged the same practices of the defendants,
and the trial court's consideration of the plaintiffs' claims
could result in a determination that the practices" are
legitimate, intervention is proper.  Cook, supra at 1467;
Foster, supra.

The Luevano plaintiffs have requested a determination
that OPM is improperly considering Schedule B to be an
"alternate examining procedure" under the consent decree.
One of OPM's primary defenses to NTEU's challenge to Schedule
B hiring authority was that the Luevano decree demanded the
abolishment of the PACE exam.  See NTEU, supra, (Feb. 27
opinion) at 9.  NTEU did not understand OPM to be claiming at
that time that the Schedule B exemption from competitive
procedures was itself an "examination," a position they are
apparently now taking with regard to this action.  If the
Court agrees that Schedule B is an acceptable "examination"
procedure, this will undermine NTEU's position that OPM's
procedures do not satisfy 5 U.S.C. 3303 and 3350 and affect

9

the meaning of the Court's order that OPM establish
examinations.  NTEU, supra, (Feb. 27 Order) at 13-14.  This
finding would significantly impair the NTEU plaintiffs'
interests.

The Luevano plaintiffs' proposed order also contains some
unclear terminology which could adversely affect the rights
of the NTEU plaintiffs.  That order would allow OPM to make
"Schedule B hiring decisions competitively, on an unassembled
basis."  Proposed order, paragraph 7(a).  Schedule B is, by
definition, an exception to competitive procedures.  5 C.F.R.
213.101(a).  Employees cannot be both "excepted" and
"competitive" at the same time.  See Harrison v. Bowen,
F. 2d. No. 86-5168 (D.C.Cir. April 3, 1987 ), slip op. at 8.
To the extent that this language would allow OPM to justify
Schedule B hiring as "competitive" it undermines the relief
ordered by the court in NTEU.

Finally, any general findings by the Court concerning the
appropriateness of Schedule B and its application will have
an important practical impact on the NTEU claims.  First,
legal principles set forth could have a stare decisis effect
on later NTEU claims.  Second, any regulatory arrangements

10

approved by the Court would be difficult to undo at a later

time.  See Cook, supra at 1467.  These general effects, in

themselves, are sufficient to confer a right to intervene on

the NTEU plaintiffs.

    D.  The Luevano Plaintiffs may not Adequately
        Represent the Interests of NTEU.

The potential intervenors' burden to establish

"inadequacy of representation" is minimal.  They need only

prove that the representation "may" be inadequate and the

burden is satisfied where the cases differ slightly and

separate relief is sought.  Cook, supra at 1467; See,

Trbovich v. UMWA, 404 U.S. 528, 538 n.10.

As NTEU explained, supra at 4, the classes represented by

it and the Luevano plaintiffs are overlapping, but not

coextensive, and the statutory rights which are asserted are

distinct.  While NTEU is convinced that employee civil rights

and civil service rights are consistent, it is important that

the Court consider the interplay of these rights in

fashioning relief.

NTEU's request for further injunctive relief also

demonstrates that its participation will assist in adequately

protecting all employees' rights.  The Court and all

plaintiffs need to know the extent of the damage suffered by

employees forced to begin their federal careers with inferior

Schedule B status and rights.  The discovery that certain

11

Schedule B employees were scheduled for layoff, and the implication that many other adverse job actions could be taking place without the defendants' knowledge, see plaintiff's motion para. 19-26, dictate that OPM be required to account fully for the status of those hired under Schedule B.

NTEU has establish the prerequisites for intervention as of right under Rule 24(a)(2). Our motion to intervene should, therefore, be granted.

III.  Permissive Intervention by NTEU is also Appropriate

Even if the Court finds that NTEU has not established the prerequisites to intervention as of right, we should be permitted to intervene pursuant to Fed. R. Civ. P. 24(b)(2). This action and NTEU have both "question[s] of law [and] fact in common." Both arise out of the same administrative action and turn on the legality of that action. The Luevano plaintiffs' request that the Court take judicial notice of the record and findings in NTEU illustrates that point, as does the Court's discussion of Luevano in its opinion in NTEU.

IV.  The Luevano Plaintiffs Motion Understates the Harm to Employees Caused by the Imposition of Schedule B Employment.

With respect to the merits of the Luevano plaintiffs' motion, NTEU has several claims which it requests the court to consider. In addition to the potential conflicts between

12

this case and NTEU concerning the possible status of Schedule

B as an examination, see supra at 9, NTEU wishes to point out

that the Luevano plaintiffs' motion omits an important aspect

of the inferiority of Schedule B employment. In addition,

NTEU is requesting that the plaintiffs' request for

injunctive relief be expanded. See infra, section V.

The Luevano plaintiffs' motion sets out the

characteristics of Schedule B employment which render it

inferior to competitive employment. Plaintiffs' motion,

para. 15.[2] This description accurately describes four

defects of Schedule B employment, but totally ignores a

critical problem: Schedule B employees have no adequate

appeal rights in the event they are removed from their jobs

for alleged misconduct or poor performance. NTEU, October 15

decision at 4; Harrison v. Bowen, supra, slip op at 11-12.

_____

2/  One of the inferior aspects of Schedule B employment, the
requirement that the employee compete with outsiders for
promotion from GS-7 to GS-9, may be affected by a recently
issued Executive Order allowing agencies to convert Schedule
B employees non-competitive to  GS-9 positions.  See,
plaintiffs motion, paragraph 15(c); Executive Order 12596
(May 7, 1987), reprinted in 52 Fed. Reg. 17537 (May 11,
1987).  While the precise effect of this order may be
clarified by regulation, it appears only partly to address
this defect of Schedule B employment.  The order facilitates
conversion, but it does not require it, leaving employees
subject to management discretion and delay.

13

The lack of procedural rights under Schedule B is
critical. The threat of summary termination lends itself to
coercive supervisory behavior and, even when not exercised,
may subtly taint the employment relationship. Further,
summary termination is more likely to be misused than other
termination procedures, such as Reduction-in-Force (RIF),
because disciplinary proceeding begin internally with the
first level supervisor, while RIF's are generally imposed
from above.

OPM's refusal to set up a system to monitor the progress
of Schedule B appointees makes it likely that improper
removals of Schedule B employees would simply not come to
light. See, plaintiffs' motion, paragraph 26. Employees who
are removed and told that they have no procedural recourse
are unlikely to contact either OPM or the plaintiffs in these
cases for a report on their status. More likely, they would
contact a personnel officer or union official who would
explain their lack of rights. In addition, employees are
often granted the option of resigning in lieu of termination,
an option which would be more appealing to an employee with
no effective right to challenge a termination. Thus, it is
likely that the lack of appeal rights has harmed many
Schedule B employees.

   V.  The Injunction Requested By Plaintiffs Should Be
       Expanded

NTEU supports the Luevano plaintiffs' proposed injunctive

14

relief. However, NTEU believes that the scope of the
injunction should be more extensive than that proposed by the
plaintiffs. This request is supported by the plaintiffs'
evidence that Schedule B employees are, in fact, suffering
the predicted effects of their inferior status, such as
RIF's, and this Court's holding in NTEU that OPM has not
justified its departure from competitive procedures and its
apparent abandonment of the Luevano consent decree.

The most basic request made by the Luevano plaintiffs is
that OPM be ordered to convert immediately all Schedule B
employees to the competitive service. Order, Paragraph 3.
Immediate conversion will prevent future abuses and put
employees in a status much closer to the status they would
have been in had OPM followed the consent decree.

This Court ordered conversion as part of the relief in
NTEU. See, NTEU, supra, slip op. at 20. This relief was
stayed pending appeal on March 30, 1987, but it is
significant to note that OPM's only objection to that aspect
of the relief was that it would be "disruptive" and
"confusing" to reconvert employees should the decision be
reversed. NTEU, supra, defendants' motion for stay pending
appeal at 2,9. As NTEU noted in response, OPM has the
ability to eliminate confusion simply by clearly notifying
managers and employees of the basis for its actions. NTEU's
response at 8.

The Court has already determined that the conversion of
these employees is appropriate. The RIF actions uncovered by

15

the plaintiffs greatly strengthens the argument that this conversion must take place sooner, rather than later.

Next, the Luevano plaintiffs have requested that OPM be ordered to "survey" agencies to determine whether there have been other layoffs such as the RIF proposed at the Navy Department. NTEU believes that OPM should be forced to give a much more detailed accounting of the fate of the Schedule B hires.[3] OPM should be required to determine just how seriously this inferior status has affected particular employees, rather than be allowed to simply look the other way and then claim not to see a problem. This determination should involve seeking information from both agencies and Schedule B employees themselves. This information retrieval process will not be burdensome, because each agency's Schedule B hiring is specifically approved by OPM, who can easily retrace the approval process to inquire as to those hired.

The Luevano plaintiffs and NTEU have identified five areas in which Schedule B status is inferior and OPM should determine whether this inferiority has had an adverse effect

_____

3/ OPM estimates that approximately 11,200 Schedule B appointments were made between January 1, 1983 and June 30, 1986 and that approximately 4,490 employees remained in Schedule B PAC positions as of September 30, 1986. NTEU v. Horner, declaration of Curtis Smith in support of Motion to Stay, para. 6.

16

on employees.  OPM should be required to identify the names
and addresses of each individual hired as a Schedule B
employee.  OPM should then be required to identify:

>    1.   every employee who has been RIFed;
>
>    2.   every employee who has been terminated; and
>
>    3.   every employee who has resigned pending
>         termination;

Further, OPM should be required to supply a breakdown by
hiring activity and job series of the number of employees
hired, number eventually converted to the competitive
service, the current length of time to conversion to GS-9 and
the status of employees not converted.

The schedule B employees and former employees should be
surveyed to determine:

>    1.   whether they suffered any negative effect
>         arising from schedule B status;
>
>    2.   whether they had been discouraged from applying
>         for particular transfers or promotion to
>         competitive jobs; and
>
>    3.   whether their excepted status had slowed their
>         promotion through the career ladder.

NTEU believes that the acquisition of this information
will allow all parties and the Court to determine the extent
of the injury caused by OPM's illegal use of Schedule B
authority.

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

MAY 22  5 16 PM '87

17

CONCLUSION

For the foregoing reasons, NTEU requests that its motion to intervene and motion for further injunctive relief be granted.

Respectfully submitted,

Lois G. Williams
Director of Litigation
D.C. Bar No. 365894

Clint D. Wolcott
Assistant Counsel
D.C. Bar No. 343202
National Treasury Employees
Union
1730 K Street, N.W.
Suite 1101
Washington, D.C. 20006
(202) 785-4411

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached Motion to Intervene and Motion for Injunctive Relief, with accompanying memorandum, was mailed, first class, on May 22, 1987 to:

Richard T. Seymour
Lawyers Committee for Civil
  Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C. 20005

Barbara L. Ward
U.S. Department of Justice
Civil Division
Tenth & Pennsylvania Avenue, N.W.
Room 3509
Washington, D.C. 20530

James S. Green
Office of Personnel Management
1900 F Street, N.W.
Washington, D.C. 20415

_____
Clinton D. Wolcott





FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520  •  733 FIFTEENTH STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 24, 1983

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

      Re:  <u>Luevano v. Devine</u>:  <u>Monitoring</u>

Dear Barbara:

    We have performed calculations of adverse impact for
each of the PACE job categories, using the measure "appoint-
ments from all sources" required by ¶ 8(b)(1) of the Consent
Decree for all job categories still subject to the PACE.  On
the basis of the six-month data already provided to us, there
is adverse impact in the following job categories; if not
reversed by the statistics for the second half of 1982, the
government was in violation of the Decree as to these job
categories:

    1.  <u>Personnel Management, GS-0201</u>

    At the Navy Department, there is adverse impact against
both blacks and Hispanics under the 80% rule.* A total of 35
appointments were made, of whom 2 were black and none were
Hispanic.  The two black appointments were 5.7% of the total,
and this is only 48.0% of the standard applicable to blacks.
The Hispanics were 0% of the total.  No use of the special
programs was made for blacks or for Hispanics, although one
white Co-op student was hired.  See OPM Report A-3 at p. 1109.

    2.  <u>General Clerical and Administrative, GS-0301</u>

    At the Department of the Air Force, there was adverse
impact against Hispanics under the 80% rule for this job
category.  A total of 69 appointments were made, of whom 2

---

    * Paragraph 10(h) of the Consent Decree shows that blacks
were 11.9% of the PACE test-takers, and that Hispanics were 4.9%
of the PACE test-takers.  These are the standards used to
determine adverse impact under ¶ 8(b)(1) of the Consent Decree.

ATTACHMENT D TO ATTACHMENT Q

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 24, 1983
Page 2

(2.9% of the total) were Hispanic. This is only 59.2% of the
standard.* No use was made of the special programs. Only one
of the appointments was reported under "Non-PACE CS Cert", so
all but one of these slots was a PACE slot. See OPM Report A-3,
p. 13.

### 3. Computer Specialist Trainee, GS-0334

According to the "test development report" attached to
Jim Green's June 22, 1983 letter, OPM's alternative examining
procedure was not in use during this period.

There is adverse impact against Hispanics under the 80%
rule. A total of 586 appointments were made, of whom only 19
(3.2% of the total) were Hispanic. The proportion of Hispanics
among the appointments is only 66.2% of the proportion of Hispanics
among the PACE-takers in ¶ 10(h) of the Decree (4.9%). (For
blacks, the standard is 11.9%).

OPM Report A-1 shows at p. 14 that no use of the special
programs for Hispanics was made by any agency.

Individual agencies against which separate adverse impact
against Hispanics has been shown for this job category are:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Agriculture | 58 | 32 | 0 | 0% | 0% |
| Army | 102 | 124 | 2 | 1.6% | 32.9% |
| Defense | 278 | 85 | 2 | 2.4% | 48.0% |
| HHS | 806 | 63 | 1 | 1.6% | 32.4% |
| Treasury | 1466 | 46 | 1 | 2.2% | 44.4% |

### 4. Administrative Officer, GS-0341

There is a statistically significant adverse impact against
Hispanics at the .05 level of confidence (2.4 standard devia-
tions), as well as adverse impact under the 80% rule. A total
of 112 appointments were made, of whom none were Hispanic.

OPM Report A-1 shows at p. 14 that no use of the special
programs was made by any agency.

Individual agencies against which separate adverse impact
against Hispanics has been shown for this job category are:

---

* The "% of Total" figures are rounded to the nearest tenth in this
letter, but the unrounded figures---going out to a hundred-thousandth of a
point---were used to calculate the "Percent of Standard" figures.

Barbara L. Ward, Esq.
August 24, 1983
Page 3

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Army | 102 | 30 | 0 | 0% | 0% |
| Navy | 1114 | 20 | 0 | 0% | 0% |

There is also adverse impact against blacks under the 80%
rule. A total of 112 appointments were made, of whom 10 (8.9%
of the total) were black. This is only 75.0% of the standard.

At the following agencies, there was adverse impact against
blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Army | 102 | 30 | 1 | 3.3% | 28.0% |
| Navy | 1114 | 20 | 0 | 0% | 0% |

### 5. Management Analysis, GS-0343

There is adverse impact against Hispanics under the 80%
rule. A total of 194 appointments were made, of whom only 7
(3.6% of the total) were Hispanic. This is only 73.6% of the
standard.

OPM  Report A-1 shows at p. 14 that no use of the special
programs was made by any agency.

Individual agencies against which separate adverse impact
against Hispanics has been shown for this job category are:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Defense | 278 | 20 | 0 | 0% | 0% |
| Navy | 1114 | 46 | 0 | 0% | 0% |

At the following agencies, there was adverse impact against
blacks under the 80% rule for this job category:

Barbara L. Ward, Esq.
August 24, 1983
Page 4

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|--------|-----------------------|-------------------------------|--------|--------|--------|
| | | | No. | % of Total | Percent of Standard |
| Air Force | 14 | 31 | 2 | 6.5% | 54.2% |
| Defense | 278 | 20 | 1 | 5.0% | 42.0% |

### 6. Program Analysis, GS-0345

There is adverse impact against Hispanics under the 80% rule. A total of 105 appointments were made, of whom only 4 (3.8% of the total) were Hispanics. This is only 77.7% of the standard.

OPM Report A-1 shows at p. 15 that no use of the special programs for Hispanics was made by any agency.

An independent showing of adverse impact has been made against the following agency:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|--------|-----------------------|-------------------------------|-----------|--------|--------|
| | | | No. | % of Total | Percent of Standard |
| Navy | 1115 | 25 | 0 | 0% | 0% |

At the following agency, there was also adverse impact against blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|--------|-----------------------|-------------------------------|--------|--------|--------|
| | | | No. | % of Total | Percent of Standard |
| Army | 103 | 34 | 2 | 5.9% | 49.4% |

### 7. General Accounting Clerical and Administrative, GS-501

At the following agencies, there was adverse impact against blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|--------|-----------------------|-------------------------------|--------|--------|--------|
| | | | No. | % of Total | Percent of Standard |
| Air Force | 16 | 57 | 3 | 5.3% | 44.2% |
| Agriculture | 60 | 17 | 0 | 0% | 0% |

At the following agencies, there was adverse impact against Hispanics under the 80% rule for this job category:

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 24, 1983
Page 5

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|--------|------------------------|-------------------------------|-----|-----------|----------------------|
| | | | No. | % of Total | Percent of Standard |
| Navy | 1116 | 40 | 0 | 0% | 0% |
| Treasury | 1468 | 65 | 1 | 1.5% | 31.4% |

### 8.  Budget Administration, GS-0560

There is adverse impact against Hispanics under the 80% rule. A total of 146 appointments were made, of whom only 4 (2.7% of the total) were Hispanic.  This is only 55.9% of the standard.

OPM Report A-1 shows at p. 17 that no use of the special programs for Hispanics was made by any agency.

Individual agencies against which separate adverse impact against Hispanics has been shown for this job category are:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|--------|------------------------|-------------------------------|-----|-----------|----------------------|
| | | | No. | % of Total | Percent of Standard |
| Army | 105 | 48 | 1 | 2.1% | 42.5% |
| Navy | 1117 | 54 | 1 | 1.9% | 37.8% |

At the following agency, there was adverse impact against blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|--------|------------------------|-------------------------------|-----|-----------|----------------------|
| | | | No. | % of Total | Percent of Standard |
| Navy | 1117 | 54 | 2 | 3.7% | 31.1% |

### 9.   Contact Representative, GS-0962

At the Veterans Administration, there was adverse impact against blacks under the 80% rule.  A total of 20 appointments were made, of whom none were black.  No use was made of the special programs.  See OPM Report A-3 at p. 1515.

### 10.   Social Insurance Claims Examining, GS-0993

There is statistically significant adverse impact against Hispanics at the .05 level of confidence (3.6 standard deviations), as well as adverse impact under the 80% rule.  The Department of Health and Human Services made a total of 425 appointments, of whom only 5 (1.2% of the total) were Hispanics.  See OPM Report A-3 at p. 814.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 24, 1983
Page 6

This Report shows that HHS made no use of any of the special programs for Hispanics.

### 11. Writing and Editing, GS-1082

There is adverse impact against Hispanics under the 80% rule. A total of 55 appointments were made, of whom none were Hispanics.

OPM Report A-1 shows at p. 24 that no use of the special programs for Hispanics was made by any agency.

### 12. Technical Writing and Editing, GS-1083

At the Army, there was adverse impact against Hispanics under the 80% rule. A total of 27 appointments were made, of whom none were Hispanic. No use was made of the special programs. See OPM Report A-3 at p. 113.

### 13. General Business and Industry, GS-1101

At the following agencies, there was adverse impact against blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|--------|------------------------|-------------------------------|--------|--------|-----------|
| | | | No. | % of Total | Percent of Standard |
| Agriculture | 69 | 138 | 3 | 2.2% | 18.3% |
| Army | 113 | 39 | 1 | 2.6% | 21.5% |

No use was made of the special programs.

At the following agency, there was adverse impact against Hispanics under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|--------|------------------------|-------------------------------|-----------|--------|-----------|
| | | | No. | % of Total | Percent of Standard |
| Agriculture | 69 | 138 | 5 | 3.6% | 73.9% |

No use was made of the special programs.

### 14. Contract and Procurement, GS-1102

There is adverse impact against Hispanics under the 80% rule. A total of 643 appointments were made, of whom only 22 (3.4% of the total) were Hispanic. This is only 69.8% of the standard.

OPM Report A-1 shows at p. 25 that no use of the special programs for Hispanics was made by any agency.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 24, 1983
Page 7

Individual agencies against which separate adverse impact against Hispanics has been shown for this job category are:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|--------|------------------------|-------------------------------|-----------|-----------|--------------------|
| | | | No | % of Total | Percent of Standard |
| Army | 113 | 169 | 3 | 1.8% | 36.2% |
| Defense | 289 | 170 | 4 | 2.4% | 48.0% |
| Navy | 1125 | 92 | 0 | 0% | 0% |

### 15. Production Control Specialist, GS-1152

At the Army, there was adverse impact against blacks under the 80% rule for this job category. A total of 37 appointments were made, of whom 2 (5.4% of the total) were black. This is only 45.4% of the standard. No use was made of the special programs. See OPM Report A-3 at p. 117.

At the Navy, there was adverse impact against Hispanics under the 80% rule for this job category. A total of 100 appointments were made, of whom 1 (1% of the total) was Hispanic. This is only 20.4% of the standard. No use was made of the special programs. See OPM Report A-3 at p. 1129.

### 16. Housing Management, GS-1173

There is adverse impact against Hispanics under the 80% rule. A total of 40 appointments were made, of whom none were Hispanic. No agency made any use of the special programs. See OPM Report A-1 at p. 31.

At the Army, there was adverse impact against blacks under the 80% rule for this job category. A total of 16 appointments were made, of whom 1 (6.3% of the total) was black. This is only 52.5% of the standard. See OPM Report A-3 at p. 119.

### 17. Immigration Inspection, GS-1816

There is adverse impact against blacks under the 80% rule. The Department of Justice made a total of 120 appointments, of whom only 10 (8.3% of the total) were black. This is only 70.0% of the standard. See OPM Report A-3 at p. 344.

This Report shows that no use was made of any of the special programs.

Barbara L. Ward, Esq.
August 24, 1983
Page 8

18.  GS-1890 (?)

The data show adverse impact against blacks, but GS-1890
is not on our list of PACE jobs.  Please check to see what the
story is.  The data were reported by the Treasury Department.
See OPM Report A-3 at p. 1490.

19.  Quality Assurance Specialist, GS-1910

There is adverse impact against Hispanics under the 80%
rule.  A total of 282 appointments were made, of whom only 10
(3.5% of the total) were Hispanic.  This is 72.4% of the standard.

OPM Report A-1 shows at p. 39 that no use of the special
programs for Hispanics was made by any agency.

Individual agencies against which separate adverse impact
against Hispanics has been shown for this job category are:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Army | 127 | 73 | 0 | 0% | 0% |
| Navy | 1139 | 61 | 0 | 0% | 0% |

At the following agency, there was adverse impact against
blacks under the 80% rule for this job category:

| Agency | Page No. of Report A-3 | Appointments From All Sources | Blacks | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Air Force | 39 | 47 | 4 | 8.5% | 71.5% |

20.  General Supply, GS-2001

At the Army, there was adverse impact against Hispanics
under the 80% rule for this job category.  A total of 76 appoint-
ments were made, of whom 1 (1.3% of the total) were Hispanic.  This
is only 26.9% of the standard.  No use of the special programs was
made.  See OPM Report A-3 at p. 127.

21.  Inventory Management, GS-2010

At the following agencies, there was adverse impact against
Hispanics under the 80% rule for this job category:

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 24, 1983
Page 9

| Agency | Page No. of Report A-3 | Appointments From All Sources | Hispanics | | |
|---|---|---|---|---|---|
| | | | No. | % of Total | Percent of Standard |
| Defense | 304 | 42 | 1 | 2.4% | 48.6% |
| Navy | 1140 | 44 | 0 | 0% | 0% |

No use was made of the special programs.

### 22.  Strange Happenings at the Veterans Administration

OPM Report A-3 at pp. 1536-40 reports a chain of events which strains credulity.  For each and every one of the job categories listed below, it reports the hire of 2 whites and no others at the GS-5 level, the hire of 14 whites and no others at the GS-7 level, and a total hire of 16 whites and no others.  The job categories covered are GS-2010, -2030, -2032, -2050, -2101, -2110, -2111, -2125, -2130, -2135, -2144, and -2150.

Please check and see what the problem is with these data.

*     *     *

If these patterns are not reversed by data for the second half of 1982, the government as a whole is in violation of the Consent Decree for each of the 21 jobs---including, for the moment, GS-1890---and the agencies specified above are in violation of the Decree for the jobs for which adverse impact has been shown against them.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  James S. Green, Esq.
     Barry L. Goldstein, Esq.
     John Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520  •  733 FIFTEENTH STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

September 16, 1983

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

                    Re:  <u>Luevano v. Devine</u>

Dear Barbara and Jim:

        This is the fifth letter following up on our August 9, 1983
Monitoring Committee meeting.  The four earlier letters, and the
topics they covered, were as follows:

            a) My August 22, 1983 letter enclosing Dr. Mann's
        letter specifying the steps OPM should take before giving
        us the next set of data processing tapes.  Taking these
        steps would cost the government little time and effort,
        but would save it a great deal in expert fees and computer
        costs.

            b) Barry's August 23, 1983 letter on the test
        development reports.  At your request after you received
        this letter, plaintiffs have agreed to extend the concilia-
        tion period under the Consent Decree on this issue to and
        including October 19, 1983.

            c) My August 24, 1983 letter setting forth adverse-
        impact calculations based on the data for the first six
        months of the Consent Decree's operation.

            d) My August 26, 1983 letter summarizing our agree-
        ments and possible areas of disagreement on the use of
        Schedule B appointment authority.

We have not yet received a response to any of these letters.

<u>ATTACHMENT E TO ATTACHMENT Q</u>

LAWYERS' COMMITTEE FOR CIVIL ⬤ _IS UNDER LAW

Barbara L. Ward, Esq.
James S. Green, Esq.
September 16, 1983
Page 2


This letter lists the remaining areas of agreement reached at
our August 9 meeting, in the order of the agenda items:

### A.   Problems in Nonstatistical Reporting

1.   Test Development Reports:  Basically covered in
Barry's August 23, 1983 letter.  However, you also agreed to
contact the FDIC for information on its Bank Examiner AEP, and to
report it to us. We have not heard anything further.

2.   Efforts to Use Special Programs:  As you agreed,
you have provided us with a copy of the June 23, 1983 FPM letter
asking agencies to report their use of the special programs, if
any.  The due date for responses was August 15, 1983.  At our
Monitoring Committee meeting, you and Jim told us that it would
take a week or so after that date for us to get the information.
We have not yet received it.

3.   Specific Means by Which Agencies Are Using
Their Schedule B Authority:  Covered in my August 26, 1983 letter.

4.   Guidance Provided by OPM to Agencies on Use of
Schedule B Authority:  Covered in my August 26, 1983 letter.  You
and Jim agreed that we could have access to the stack of authoriza-
tion requests and OPM actions, if we so desired.

5.   Delays in Reporting Nonstatistical Information:
In the future, we should receive by June 1 the nonstatistical data
for the entire previous year.

6.   Nonstatistical Information from GAO:  You assured
us that you had been after GAO for the information, and that you
should have it in about a month.  It has now been more than a month,
and we have still not received anything.

7.   Request for FPM Letter Asking Agencies to
Report Use of Special Programs:  You gave it to us.

### B.   Problems in Statistical Reporting:

1.   Our Need to Get Usable Tapes from OPM:  Covered
by my August 22, 1983 letter.  We have not gotten a response.

2.   The Inclusion of FDIC "GG" Jobs with "GS" Jobs:
Jim informed us that a rush letter requesting information from
FDIC was sent to that agency a couple of weeks before our August
9, 1983 meeting, and that it will be provided as a separate report
because it is too late to include it in the computerized reporting
system for 1982 data.  It is too late to include such information
in the computer system for the last half of 1982.  It will be in
the report for the first half of 1983, and in later reports.

Barbara L. Ward, Esq.
James H. Green, Esq.
September 16, 1983
Page 3


3.  The Inclusion of Data for Other Agencies With
Different Nomenclatures for Their PACE Jobs:  Jim informed us
that the only such agency in question is the State Department.
A letter similar to the FDIC's letter described above was sent
to the State Department on the same day the letter was sent to
the FDIC.  The results will be the same, and the State Department
data will be included in computer reports beginning with data
for the first half of 1983.


4.  The Numbers of Applicants of Each Race Taking
A Competitive Procedure Other than the PACE:  You and Jim told us
that OPM has the figures, but that they have to be analyzed and
broken down.  Jim said that this would take a couple of weeks,
and that plaintiffs will then receive the data.  We have not
yet gotten it.

Some individuals did not report their race on the forms.
You and Jim stated that you would get back to us quickly when you
have results showing the number of persons who did not respond
to the race-identification question.  We have not yet heard anything.

To avoid problems of incomplete racial identification in the
future, plaintiffs proposed that the Social Security Numbers of
all competitors be recorded in the future, so that the Social
Security Administration can tell us the proportions of minorities
and of non-minorities at different scoring levels.  We mentioned
that the Justice Department's Civil Rights Division and the EEOC
did this all the time.  You agreed.  We need to see the specifics
of what will be done.

5.  Appointments under non-PACE Competitive Procedures
Administered by OPM:  Jim informed us of the "asterisk" positions,
in which one can be hired either for a PACE slot or a non-PACE
slot.  Only the PACE slots have career ladders going from GS-5
to GS-7 and (usually) beyond.  Jim gave us a list of the "asterisk"
jobs.

Jim agreed with us that it was important to separate data
for PACE slots from data for non-PACE slots in the "asterisk"
positions.  There has been no mixture in the reports to date,
because the PACE was still in use.  Future mixture must be avoided.
Question:  Will there be mixture in the data for the second half
of 1982, and thus for the full-year 1982 reports?

Jim said that he would try to figure out a way around this
problem, and would get back to us.  We have not yet heard anything.

5A.  "Other Internal Placements":  This question arose at
the meeting.  Jim told us that there was no cause for concern,
because virtually all of the "other" placements could be taken
to be in PACE slots.  There would be no point to the placement

LAWYERS' COMMITTEE FOR CIVIL . TS UNDER LAW

Barbara L. Ward, Esq.
James H. Green, Esq.
September 16, 1983
Page 4

otherwise. Jim said we should try to break it down, and said
he would check on the burden involved, and would report back to
us. You asked that that be done as soon as possible. We have
not yet heard anything.

        6. Reporting of Conversions of Schedule B
Appointees: Covered by my August 26, 1983 letter.

        7. Delays in Reporting Statistical Information:
You and Jim told us that we would have the second-half 1982 data
in September 1983. We have not yet received it. You asked if we
also wanted a full 1982 report, and we said we did. In the
future, we should get first-half data for a given reporting year
by the end of that year, and second-half and full-year data by
the following June 1. There is no way to speed up the six-month
lag in obtaining data and reporting it out. We urged that some
effort be made to get at least preliminary data for major hirers,
like DOD and its agencies, because we could give input before the
end of the reporting year when it looked as if problems were
looming, and they might be able to take corrective action that
would avoid compliance problems. There was no agreement on this,
and we should discuss it again at our October 1983 meeting.

        8. Statistical Information from GAO: Same as Part
A, Item 6. We have still not received anything.

        C. Problems of Substantive Compliance, Other Than Reporting

        1. PACE Job Categories: Appointments from PACE
Registers: We agreed that my August 4, 1983 letter, second item,
set forth an incorrect standard for determining adverse impact.
The correct standard, and a new list, were set forth in my August 24,
1983 letter. We have not received a response.

        2. PACE Job Categories: Delegated Examining
Authority Appointments: You and Jim think that there is a problem
with the data. You were going to check Justice, and Jim was going
to check with the other agencies. We have not yet heard anything.

        3. Information on OPM's Compliance with the
Recruiting Requirements of the Consent Decree: OPM has done no
monitoring because there has been so little hiring. OPM did send
out the lists of institutions. The EEOC has FEORP data which
will show some recruitment information. At our October meeting,
we should discuss whether OPM should at least monitor the agencies
which are hiring.

        4. Information on OPM's Coordination and Monitoring
of Programs to Ensure that Class Members Will Benefit: Jim told
us that OPM has told its area offices, job information centers,
etc., of the special programs and that the Consent Decree has
been posted in such offices. Nothing else has been done. We have
the same suggestion as for item 3 above.

LAWYERS' COMMITTEE FOR CIVI___ ___TS UNDER LAW

Barbara L. Ward, Esq.
James H. Green, Esq.
September 16, 1983
Page 5

        5.  OPM's Actions to Provide Notice of the Special
Programs to Class Members:  The only thing done was sending out
the original notice for the fairness hearings.  You thought
that the agencies should be providing the notice.  We assume
that reports of such agency notices will be part of the agency
reports on the special programs.  Otherwise, we will have a problem.

        6.  OPM's Use of the Mailing List:  No use has been
made, but OPM will rectify this soon.  We have not heard of any
mailings since then.

    D.  Other

        1.  Reporting Year:  We agreed to make the calendar
year the reporting year under the Decree.  A draft Consent Order
will be sent to you next week.

        2.  PACE Basis for Adverse Impact:  Because the PACE
was used for all but two months of 1982, the entire year will be
considered a PACE year for purposes of adverse-impact analysis,
except where there are AEP's.

        3.  CRESS:  Jim informed us that this AEP has been
junked, because 90,000 people applied, 20,000 were examined
(including interview), 14 were hired, and 6 quit in the first year.
One or two said the job was too complicated.

                    *        *        *

    If any of the above is not correct, please let me know
by letter, so that we can avoid any future disputes concerning
what was or was not said.

                        Very truly yours,

                        Richard T. Seymour

RTS/lb

cc:  Barry Goldstein, Esq.
     John H. Erickson, Esq.

Enclosure



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

January 3, 1984

BY MESSENGER

Barbara Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

            Re:  Luevano v. Devine

Dear Barbara:

        We have not yet received a response to the matters discussed
in the following letters I've sent you:

        a) My August 24, 1983 letter setting forth adverse-
impact calculations based on the data for the first six
months of the Consent Decree's operation.  In the absence
of any disagreement, I assume that you and Jim Green agree
with our calculations.  If not, I would like to have some-
thing from you fairly soon, because we are now doing calcula-
tions for the full year, based on the additional informa-
tion for the second half I received from Jim on December 9.
If there are any errors in the last letter, I would not want
to repeat them in the new one.

        b) My August 26, 1983 letter summarizing our agree-
ments and possible areas of disagreement on the use of
Schedule B appointment authority.  I understand from our
conversation early last month that you intend to make a
response.

        c) My September 16, 1983 letter listing the remain-
ing areas of agreement reached at the August 9, 1983 meeting
of the Monitoring Committee, and recording the additional
information to be provided.  Again, I assume that the lack
of a response means that you are in agreement with each of
the statements in the letter.  If not, we need to hear from
you as soon as possible so that we all know where we stand.

        We have not received any of the information listed in the
September 16 letter, with the exception of the test development
study for the Computer Specialist (Trainee) position and the

ATTACHMENT F TO ATTACHMENT Q

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara Ward, Esq.
January 3, 1984
Page 2

additional information for the second half of 1982 which I
received from Jim Green on December 9.  We particularly need the
statistical information for 1982 from FDIC, GAO, and the State
Department, which is missing from the second-half reports as
well as from the first-half reports.

We also have a pressing need for the information on agencies'
use, if any, of the special programs under the Consent Decree.
We would like to provide a list of all job categories and all
agencies in apparent violation of the Consent Decree for 1982,
so that we can meet and decide what is to be done.

The other information requested in the above letters is
still necessary, but I have tried to single out above the specific
information for which we have the most pressing need.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barry L. Goldstein, Esq.
     John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

March 29, 1984

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

        Re: Luevano v. Devine:  Statistical Reporting

Dear Jim:

        This is to confirm our telephone conversation today, which
occurred after Barbara suggested I call you, about the following
problems in statistical reporting:

        First, fifteen occupational categories which were included
in the OPM printouts of selections for the first half of 1982
were omitted from the printouts for the second half of 1982.
They involve the following occupational codes:

| | | |
|---|---|---|
| 0027 | 0960 | 1410 |
| 0330 | 0986 | 1640 |
| 0391 | 1081 | 1860 |
| 0504 | 1135 | 1893 |
| 0954 | 1152 | 2135 |

The explanation cannot be that they were omitted because of a lack
of activity, inasmuch as other occupational categories with no
activity were included in the July-December 1982 printout.  See,
e.g., occupational codes 0011, 0106, 0130, 0131, etc.  You promised
to look into it and get back in touch with me.

        Second, I raised the question whether there were better
figures than total selections to use for determining the presence
or absence of adverse impact in the "asterisk" PACE occupations,
i.e., those in which the reports combine both PACE career ladder
slots and non-PACE slots.  You stated that it would be enormously
expensive and time-consuming to go back and separate the two types
of positions, and that you knew of no other source of information---
either on the printouts or outside of them---which would provide
more reliable information.  We agreed that we would use the "total
selections" standard required by the Consent Decree during the

ATTACHMENT G TO ATTACHMENT Q

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

James S. Green, Esq.
March 29, 1984
Page 2

interim use of PACE unless you found a better source of informa-
tion.  If you do, we can talk about it and discuss with Barbara
the idea of stipulating to a more accurate standard for these few
job categories.  If I don't hear from you soon, I'll consider the
matter closed.

Third, the State Department totals are incorrect.  We
have added up the selections at the GS-5 and GS-7 levels shown
on the State Department's own report, and our figures disagree
with its stated totals:

|  | State Dept. Count | Our Count |
|---|---|---|
| **Selections at Grade 5** | | |
| ---White (Non-Hispanic) | 98 | 98 |
| ---Black (Non-Hispanic) | 4 | 4 |
| ---Hispanic | 0 | 0 |
| **Selections at Grade 7** | | |
| ---White (Non-Hispanic) | 20 | 19 |
| ---Black (Non-Hispanic) | 3 | 4 |
| ---Hispanic | 0 | 0 |
| **Total Selections** | | |
| ---White (Non-Hispanic) | 118 | 117 |
| ---Black (Non-Hispanic) | 7 | 8 |
| ---Hispanic | 0 | 0 |

Please check the matter with State, and confirm that it simply
made an arithmetic error in its totals.

Fourth, the State Department selected two "other" persons
for one of the job categories.  I assume that we should ignore
these persons for purposes of determining the presence or absence
of adverse impact.  Please let me know if you disagree.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.
     Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

RECEIVED APR 9 1984

United States of America
# Office of
# Personnel Management

Office of the General Counsel
Washington, D.C. 20415

In Reply Refer To:

Your Reference:

APR 5 198

*4/5/84*

Richard Seymour, Esquire
Lawyers' Committee for Civil Rights
  Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.  20005

Re:  <u>Luevano</u> v. <u>Devine</u>, U.S.D.C. D.C., Civil No. 79-0271

Dear Rick:

This is in response to your letter dated March 29, 1984, and in furtherance of our telephone conversations of March 30 and April 3, 1984, all involving statistical reporting under the Decree in the above-captioned case.

Your letter requested information on some fifteen occupational categories which were included in the printouts of selections for the first half of 1982, but which were omitted in the second half of the 1982 report.  As I advised you, nine of these occupations have been abolished by OPM.  Their appearance in the first half of the 1982 report was either due to programming error (corrected in the second half of the 1982 report) or the date of abolishment was in the latter part of 1981 or the first part of 1982, resulting in some small number of early 1982 fills due to existing registers being depleted.  These occupations, with the month and year of abolishment, are:

                    0027 (November, 1981)
                    0033 (December, 1980)
                    0504 (April, 1982)
                    0954 (August, 1975)
                    0960 (March, 1973)
                    1081 (July, 1981)
                    1135 (December, 1979)
                    1860 (November, 1981)
                    1893 (May, 1981)

The reason (or reasons) why the remaining six occupations (0391, 0986, 1152, 1410, 1640, and 2135) were dropped in the second half of the 1982 report is under review.  At the same time, the process by which four occupations, not listed in Appendix A to the Decree, were added to the second half of the 1982 report is also being examined.  I will advise you, and the Department of Justice, as to the results of our inquiries.

ATTACHMENT H TO ATTACHMENT Q

CON 132-03-9  (2/82)

-2-

Your letter also raises the issue of determining adverse impact and separating PACE-type and non PACE-type fills in the so-called "asterisk positions", in which vacancies may be career ladder, PACE-type positions as well as non-PACE type jobs but in the same series (i.e., 0301). It is my understanding that for 1982, a PACE interim year, use of the "all sources" standard set forth in Section 8(b)(1) of the Decree, would be appropriate for these occupations. However, any decision as to any agreement concerning future interpretation of or a stipulation regarding the Decree in this area should be directed to the Department of Justice. I have no objection to further discussions on this issue, but your suggestion that the matter would be considered closed if you do not hear from me, may be inappropriate. Rather, any question of such issues to be discussed by the parties should be referred to Barbara Ward so that all concerned will be working from the same agenda.

As to your next inquiry, I have asked our staffing personnel to check with the State Department to confirm the potential mathematical error at the GS-7 level and the totals, in which the State Department's count differs from your count by one.

Finally, you have asked whether selectees shown in the State Department report for 1982, listed as "other", should be ignored for purposes of determining adverse impact. While that is my understanding of the adverse impact process required by the Decree, I have asked Barbara Ward, by copy of this letter, to confirm your assumption.

Very truly yours,

James S. Green
Assistant General Counsel

cc: Barbara Ward

```
REPORT A3        APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
                 PERIOD : JANUARY THROUGH JUNE 1982
                 AGENCY : DEPARTMENT OF EDUCATION
                 GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   465
```

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1083 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1101 | GS-05 | WHITE(N-HISP) | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 38 | 0 | 13 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 13 |
|  |  | BLACK(N-HISP) | 72 | 0 | 33 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 12 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 42 | 0 | 17 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 13 |
|  |  | BLACK(N-HISP) | 79 | 0 | 40 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 12 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1102 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

ATTACHMENT I TO ATTACHMENT Q

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF EDUCATION
GEOGRAPHIC AREA : NATIONWIDE    STATUS : ALL WORK SCHEDULES AND TENURES    PAGE : 451

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1082 | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 | | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| 1083 | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 | | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| 1101 | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | 5 | O | 4 | O | O | O | O | O | O | O | 1 |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | 3 | O | 2 | O | O | O | O | O | O | O | 1 |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 | | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | 8 | O | 6 | O | O | O | O | O | O | O | 2 |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE 1982
AGENCY : DEPARTMENT OF HEALTH AND HUMAN SERVICES
GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES          PAGE :    814

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O993 | GS-05 | WHITE(N-HISP) | 290 | 212 | 1 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 50 |
| | | BLACK(N-HISP) | 59 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 35 |
| | | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 57 | 42 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | BLACK(N-HISP) | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 347 | 254 | 2 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 64 |
| | | BLACK(N-HISP) | 73 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 49 |
| | | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| O994 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| O996 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ATTACHMENT J TO ATTACHMENT Q

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF HEALTH AND HUMAN SERVICES
GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES          PAGE :    682

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0990 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0991 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0993 | GS-05 | WHITE(N-HISP) | 250 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 |
|  |  | BLACK(N-HISP) | 92 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 73 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | GS-07 | WHITE(N-HISP) | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
|  |  | BLACK(N-HISP) | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 274 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 117 |
|  |  | BLACK(N-HISP) | 108 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 89 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

July 6, 1984

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division—Federal Programs Branch
10th and Pennsylvania Avenue N.W.
Room 3509
Washington, D.C. 20530

Re: Luevano v. Devine: Information on Applicants for
Alternative Examining Procedures in 1982

Dear Barbara:

This is a confirmation of my telephone requests to you and to Jim to provide us with racial and ethnic breakdowns of the applicants for the alternative examining procedures in use in 1982. Without this information, we do not have a yardstick with which to measure hiring.

My understanding of our agreement at our August 1983 meeting was that OPM would check on the information available, and that we would only in the last resort use the PACE applicant information set forth in the Consent Decree. We need to have a report back in writing, either giving the information or explaining why it is not available.

I had hoped to file a Plaintiffs' Report to the Court before leaving on a short vacation, but there hasn't been time. If we can get the applicant information squared away by July 23, we can file it that week.

Sincerely,

Richard T. Seymour

cc: James S. Green, Esq.
    Barry L. Goldstein, Esq.
    John H. Erickson, Esq.

ATTACHMENT K TO ATTACHMENT Q



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

May 7, 1984

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re:  Luevano v. Devine:  Statistical Reporting for 1982

Dear Jim:

On March 29, I wrote to you about a number of matters, including a total of 15 occupations which were included in the OPM printouts for the first half of 1982,  but which were not included in the OPM printouts for the second half.  In our telephone conversation of that date, you thought that one possible explanation, among others, was that they might have been consolidated with other occupations, so that we would have to find out which were consolidated with which, and then consolidate the first-half data for each such set so that we would be consistent with the second-half reports.  You were going to check into the matter, and you have since told me that you were still in the process of checking into it. We need to find out the answer, so we can prepare a complete report of those job categories which had adverse impact against blacks or against Hispanics in 1982.

I also have two questions concerning the State Department report for 1982.  First, your April 13, 1984 letter states that we should disregard the data for the State Department in the first-half OPM printouts in Report A3.  Does this mean that such data should be subtracted from the governmentwide totals in Report A1 for the first half of 1982?

Second, your April 12 letter states that the State Department data Barbara sent to us were correct for the full year.  My March 29

ATTACHMENT L TO ATTACHMENT Q

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

James S. Green, Esq.
May 7, 1984
Page 2


letter pointed out an inconsistency which either reflects an
arithmetic error in calculating the totals for the State Depart-
ment, or indicates some other reporting problem.  We need to have
an answer on this.

                              Very truly yours,

                              Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.
     Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

United States of America

# Office of
# Personnel Management

Office of the General Counsel
Washington, D.C. 20415

In Reply Refer To:                                                                      Your Reference:

MAY 2 4 1984
5/24/84

Richard Seymour, Esq.
Lawyers Committee for Civil
  Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.  20005

Re:  Luevano v. Devine, U.S.D.C. D.C. Civil No. 79-0271

Dear Rick:

     This is in regard to your letter of March 29, 1984, and my
letter of April 5, 1984 concerning statistical reporting in the
above-captioned case.  You inquired as to why six former PACE
occupations (0391, 0986, 1152, 1410, 1640 and 2135) were not
reported in the July-December, 1982 Report.  I responded that we
were reviewing the matter and that I would advise you of the
results of that review.

     Five of the six occupations in question (GS-1410, excluded),
all of which are historically low-fill occupations, were removed
from PACE coverage at some point in time prior to the initiation of
the Luevano lawsuit in 1979.  The coverage decision was made
because it was determined that the occupations no longer fit the
criteria for PACE coverage.  For the most part, this determination
was made as a result of occupational changes which occurred after
the job series had been placed under PACE.  The GS-986 and GS-1152
series, for example, are one-grade interval occupations and
positions at GS-5 and 7 are not trainee-type jobs leading to
journeyman status levels of GS-9 and higher.

     Competitive examining for GS-5/7 positions in the five series
at issue has been done at the local level on an as-needed,
unassembled basis since they were removed from PACE coverage.
Depending on anticipated vacancies, OPM area offices can establish
local registers, announce positions on a case-by-case basis and
match applicants' qualifications to individual job vacancies, or
delegate the examining process to an agency, as appropriate.  There
is no nationwide examining procedure for these positions.

     Librarian Trainee, GS-1410 (grade 5 only) was included in the
PACE coverage list under a special provision in the qualification
standard which could have been used if no candidates who met the
regular Librarian requirements for GS-7 were available.  This
provision was never used during the time of PACE because of the
widespread availability of applicants with Library Science

ATTACHMENT M TO ATTACHMENT Q

ON 132-03-9 (2/8)

-2-

backgrounds who qualified for GS-7 Librarian under the separate
Librarian register. There were no competitive hires made into the
GS-1410 series at the GS-5 level during the time PACE was in use
and there have been no competitive hires at the GS-5 level since
then.

It should be noted that in the six series you have asked
about, there were only 103 competitive hires from PACE registers
into all six series in the entire civil service during the time
these occupations were under PACE. In the GS-1410, 2135, 1640 and
391 series, combined, there were a total of four competitive hires
in the four years that these series were under PACE. The GS-986
series had a total of fourteen competitive hires in a four year
period under PACE. The GS-1152 series had the most use under PACE
of the questioned series with eighty-five competitive hires into
all Federal agencies. Of that number, the last two years of the
GS-1152 being under PACE, there were seven competitive hires.

When OPM abolished PACE and instituted Schedule B hiring in
late 1982, a list of occupations under competitive examinations on
delegated examining authority as well as the list of occupations to
be covered by Schedule B was created (FPM Letter 213-32). As the
six occupations at issue were already removed from PACE coverage
but were not under a specific OPM or delegated examination, they
were not listed in the FPM letter. Inadvertently, the FPM letter
list of occupations was utilized to determine the coverage of the
second half 1982 report. As these occupations were not listed in
the FPM letter, they were erroneously dropped from the report.

These occupational series, which were covered by PACE at some
time after 1975, are covered by the Decree in this case. These
occupational series have been added back into the coverage process
and will be reported for 1983 and subsequent years. Enclosed is an
update of Reports A1 and A3 for July-December 1982 for these
occupations.

In answer to your questions about the State Department report,
you should subtract from the nationwide A1 report the State
Department totals shown in the OPM printouts for Report A3 (first
half) and then add back into the nationwide totals in the A1 report
the figures in the State Department report for the entire year
1982. Furthermore, as far as OPM can determine the inconsistency
in the State Department report concerning one 1982 selection
indicates a mistake somewhere in the State Department preparation

-3-

process. It would require the State Department to redo the entire process to find the error. Barbara Ward and I agree that as the inconsistency is so small, you may assume that the figures are proper as you have computed them.

Sincerely yours,

James S. Green
Assistant General Counsel
Staffing & Civil Rights Division

Enclosure

cc: Barbara Ward, Esquire

REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION    PAGE :    1
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)    STATUS : ALL WORK SCHEDULES AND TENURES
             GEOGRAPHIC AREA : NATIONWIDE                                      PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O391 | GS-05 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| O986 | GS-05 | WHITE(N-HISP) | 248 | 0 | 23 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 220 |
|  |  | BLACK(N-HISP) | 64 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 |
|  |  | HISPANIC | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
|  |  | TOTAL | 321 | 0 | 25 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 291 |
|  | GS-07 | WHITE(N-HISP) | 45 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 |
|  |  | BLACK(N-HISP) | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  |  | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | TOTAL | 57 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 56 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 293 | 0 | 24 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 264 |
|  |  | BLACK(N-HISP) | 74 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72 |
|  |  | HISPANIC | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
|  |  | TOTAL | 378 | 0 | 26 | 0 | 3 | 0 | 0 | 0 | 2 | 0 | 347 |
| 1152 | GS-05 | WHITE(N-HISP) | 50 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 45 |
|  |  | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 57 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 52 |
|  | GS-07 | WHITE(N-HISP) | 75 | 0 | 9 | 0 | 0 | 6 | 0 | 0 | 7 | 0 | 53 |
|  |  | BLACK(N-HISP) | 9 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 6 |
|  |  | HISPANIC | 22 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 20 |
|  |  | TOTAL | 106 | 0 | 10 | 0 | 0 | 8 | 0 | 0 | 9 | 0 | 79 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 125 | 0 | 11 | 0 | 0 | 7 | 0 | 0 | 9 | 0 | 98 |
|  |  | BLACK(N-HISP) | 15 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 12 |
|  |  | HISPANIC | 23 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 21 |
|  |  | TOTAL | 163 | 0 | 12 | 0 | 0 | 9 | 0 | 0 | 11 | 0 | 131 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
* ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A1   APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION   PAGE :   2
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : GOVERNMENT-WIDE (ALL AGENCIES COVERED BY THE DECREE)   STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE   PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1410 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1640 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 2135 | GS-05 | WHITE(N-HISP) | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 10 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 10 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

```
REPORT A1     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                              PAGE :    3
              PERIOD : JULY THROUGH DECEMBER OF 1982
              AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)        STATUS : ALL WORK SCHEDULES AND TENURES
              GEOGRAPHIC AREA : NATIONWIDE                                          PAYPLANS : GS AND EQUIVALENT
```

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 312 | 0 | 25 | 0 | 3 | 1 | 0 | 0 | 5 | 0 | 278 |
| | | BLACK(N-HISP) | 71 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 69 |
| | | HISPANIC | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| | | TOTAL | 394 | 0 | 27 | 0 | 3 | 1 | 0 | 0 | 5 | 0 | 358 |
| | GS-07 | WHITE(N-HISP) | 124 | 0 | 10 | 0 | 0 | 6 | 0 | 0 | 7 | 0 | 101 |
| | | BLACK(N-HISP) | 19 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 16 |
| | | HISPANIC | 24 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 22 |
| | | TOTAL | 167 | 0 | 11 | 0 | 0 | 8 | 0 | 0 | 9 | 0 | 139 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 436 | 0 | 35 | 0 | 3 | 7 | 0 | 0 | 12 | 0 | 379 |
| | | BLACK(N-HISP) | 90 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 85 |
| | | HISPANIC | 35 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 33 |
| | | TOTAL | 561 | 0 | 38 | 0 | 3 | 9 | 0 | 0 | 14 | 0 | 497 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                      PAGE :     1
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE AIR FORCE                          STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                                  PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O391 | GS-O5 | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
| | GS-O7 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-O5+O7 | | WHITE(N-HISP) | 3 | O | O | O | O | O | O | O | O | O | 3 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 3 | O | O | O | O | O | O | O | O | O | 3 |
| O986 | GS-O5 | WHITE(N-HISP) | 5 | O | O | O | O | O | O | O | O | O | 5 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 5 | O | O | O | O | O | O | O | O | O | 5 |
| | GS-O7 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-O5+O7 | | WHITE(N-HISP) | 6 | O | O | O | O | O | O | O | O | O | 6 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 6 | O | O | O | O | O | O | O | O | O | 6 |
| 1152 | GS-O5 | WHITE(N-HISP) | 20 | O | 2 | O | O | 1 | O | O | 1 | O | 16 |
| | | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | HISPANIC | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | TOTAL | 22 | O | 2 | O | O | 1 | O | O | 1 | O | 18 |
| | GS-O7 | WHITE(N-HISP) | 52 | O | 5 | O | O | 6 | O | O | 3 | O | 38 |
| | | BLACK(N-HISP) | 5 | O | 1 | O | O | O | O | O | 1 | O | 3 |
| | | HISPANIC | 20 | O | O | O | O | 1 | O | O | O | O | 19 |
| | | TOTAL | 77 | O | 6 | O | O | 7 | O | O | 4 | O | 60 |
| TOTAL GS-O5+O7 | | WHITE(N-HISP) | 72 | O | 7 | O | O | 7 | O | O | 4 | O | 54 |
| | | BLACK(N-HISP) | 6 | O | 1 | O | O | O | O | O | 1 | O | 4 |
| | | HISPANIC | 21 | O | O | O | O | 1 | O | O | O | O | 20 |
| | | TOTAL | 99 | O | 8 | O | O | 8 | O | O | 5 | O | 78 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3   APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION   PAGE : 2
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE AIR FORCE                   STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                            PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1640 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2135 | GS-05 | WHITE(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GS-05 | WHITE(N-HISP) | 33 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 29 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 36 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 32 |
| | GS-07 | WHITE(N-HISP) | 56 | 0 | 5 | 0 | 0 | 6 | 0 | 0 | 3 | 0 | 42 |
| | | BLACK(N-HISP) | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| | | HISPANIC | 20 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 19 |
| | | TOTAL | 81 | 0 | 6 | 0 | 0 | 7 | 0 | 0 | 4 | 0 | 64 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 89 | 0 | 7 | 0 | 0 | 7 | 0 | 0 | 4 | 0 | 71 |
| | | BLACK(N-HISP) | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
| | | HISPANIC | 21 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 20 |
| | | TOTAL | 117 | 0 | 8 | 0 | 0 | 8 | 0 | 0 | 5 | 0 | 96 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
* ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3      APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                           PAGE :     3
               PERIOD : JULY THROUGH DECEMBER OF 1982
               AGENCY : DEPARTMENT OF THE ARMY                          STATUS : ALL WORK SCHEDULES AND TENURES
               GEOGRAPHIC AREA : NATIONWIDE                             PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 11 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 9 |
| | | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 15 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 13 |
| | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| | | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 17 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 15 |
| 1152 | GS-05 | WHITE(N-HISP) | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 14 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 14 |
| | GS-07 | WHITE(N-HISP) | 7 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 9 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 2 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 16 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 24 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 5 | 0 | 16 |
| 2135 | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                    PAGE :     4
              PERIOD : JULY THROUGH DECEMBER OF 1982
              AGENCY : DEPARTMENT OF THE ARMY                          STATUS : ALL WORK SCHEDULES AND TENURES
              GEOGRAPHIC AREA : NATIONWIDE                             PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 28 | O | 1 | O | O | O | O | O | 2 | O | 25 |
| | | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 32 | O | 1 | O | O | O | O | O | 2 | O | 29 |
| | GS-07 | WHITE(N-HISP) | 9 | O | 2 | O | O | O | O | O | 3 | O | 4 |
| | | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | 1 | O | O |
| | | HISPANIC | 1 | O | O | O | O | 1 | O | O | O | O | O |
| | | TOTAL | 11 | O | 2 | O | O | 1 | O | O | 4 | O | 4 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 37 | O | 3 | O | O | O | O | O | 5 | O | 29 |
| | | BLACK(N-HISP) | 5 | O | O | O | O | O | O | O | 1 | O | 4 |
| | | HISPANIC | 1 | O | O | O | O | 1 | O | O | O | O | O |
| | | TOTAL | 43 | O | 3 | O | O | 1 | O | O | 6 | O | 33 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                              PAGE :    5
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : MERIT SYSTEMS PROTECTION BOARD                        STATUS : ALL WORK SCHEDULES AND TENURES
             GEOGRAPHIC AREA : NATIONWIDE                                   PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-O5 | WHITE(N-HISP) | 8 | O | O | O | O | O | O | O | O | O | 8 |
|  |  | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 12 | O | O | O | O | O | O | O | O | O | 12 |
|  | GS-O7 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 8 | O | O | O | O | O | O | O | O | O | 8 |
|  |  | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 12 | O | O | O | O | O | O | O | O | O | 12 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-O5 | WHITE(N-HISP) | 8 | O | O | O | O | O | O | O | O | O | 8 |
|  |  | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 12 | O | O | O | O | O | O | O | O | O | 12 |
|  | GS-O7 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 8 | O | O | O | O | O | O | O | O | O | 8 |
|  |  | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 12 | O | O | O | O | O | O | O | O | O | 12 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3        APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                        PAGE :    6
                 PERIOD : JULY THROUGH DECEMBER OF 1982
                 AGENCY : DEPARTMENT OF COMMERCE                               STATUS : ALL WORK SCHEDULES AND TENURES
                 GEOGRAPHIC AREA : NATIONWIDE                                  PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                          PAGE :     7
              PERIOD : JULY THROUGH DECEMBER OF 1982
              AGENCY : DEPT OF DEFENSE                                STATUS : ALL WORK SCHEDULES AND TENURES
              GEOGRAPHIC AREA : NATIONWIDE                            PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1152 | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 2135 | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALL PACE OCCUPATIONS |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION    PAGE :    8
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF JUSTICE                                STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                                  PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 79 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 |
| | | BLACK(N-HISP) | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 91 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 |
| | GS-07 | WHITE(N-HISP) | 28 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 |
| | | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 32 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 107 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 89 |
| | | BLACK(N-HISP) | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| | | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | TOTAL | 123 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 105 |
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 79 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 |
| | | BLACK(N-HISP) | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 91 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 |
| | GS-07 | WHITE(N-HISP) | 28 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 |
| | | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 32 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 107 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 89 |
| | | BLACK(N-HISP) | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| | | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | TOTAL | 123 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 105 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                              PAGE :    9
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : DEPARTMENT OF LABOR                          STATUS : ALL WORK SCHEDULES AND TENURES
             GEOGRAPHIC AREA : NATIONWIDE                          PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| ALL PACE OCCUPATIONS |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                    PAGE :    10
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : DEPARTMENT OF ENERGY                           STATUS : ALL WORK SCHEDULES AND TENURES
             GEOGRAPHIC AREA : NATIONWIDE                            PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3          APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION.                                    PAGE :      11
                   PERIOD : JULY THROUGH DECEMBER OF 1982
                   AGENCY : FEDERAL COMMUNICATIONS COMMISSION                              STATUS : ALL WORK SCHEDULES AND TENURES
                   GEOGRAPHIC AREA : NATIONWIDE                                            PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL GS-05+07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3      APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION          PAGE :   12
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : GENERAL SERVICES ADMINISTRATION             STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                    PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O391 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3        APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                    PAGE :   13
                 PERIOD : JULY THROUGH DECEMBER OF 1982
                 AGENCY : DEPARTMENT OF HEALTH AND HUMAN SERVICES                  STATUS : ALL WORK SCHEDULES AND TENURES
                 GEOGRAPHIC AREA : NATIONWIDE                                      PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 103 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 98 |
| | | BLACK(N-HISP) | 30 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| | | HISPANIC | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | TOTAL | 137 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 131 |
| | GS-07 | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 110 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 105 |
| | | BLACK(N-HISP) | 32 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| | | HISPANIC | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | TOTAL | 146 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 140 |
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 103 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 98 |
| | | BLACK(N-HISP) | 30 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| | | HISPANIC | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | TOTAL | 137 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 131 |
| | GS-07 | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 110 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 105 |
| | | BLACK(N-HISP) | 32 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| | | HISPANIC | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | TOTAL | 146 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 140 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3        APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                    PAGE :    14
                 PERIOD : JULY THROUGH DECEMBER OF 1982
                 AGENCY : DEPARTMENT OF HOUSING & URBAN DEVELOPMENT                STATUS : ALL WORK SCHEDULES AND TENURES
                 GEOGRAPHIC AREA : NATIONWIDE                                      PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3      APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                    PAGE :    15
               PERIOD : JULY THROUGH DECEMBER OF 1982
               AGENCY : DEPARTMENT OF THE INTERIOR                    STATUS : ALL WORK SCHEDULES AND TENURES
               GEOGRAPHIC AREA : NATIONWIDE                           PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-O5 | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  | GS-O7 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-O5 | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  | GS-O7 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | .O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3          APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                    PAGE :    16
                   PERIOD : JULY THROUGH DECEMBER OF 1982
                   AGENCY : NATL LABOR RELATIONS BOARD
                   GEOGRAPHIC AREA : NATIONWIDE                                    STATUS : ALL WORK SCHEDULES AND TENURES
                                                                                   PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION    PAGE :    17
            PERIOD : JULY THROUGH DECEMBER OF 1982
            AGENCY : NATL AERONAUTICS & SPACE ADMINISTRATION    STATUS : ALL WORK SCHEDULES AND TENURES
            GEOGRAPHIC AREA : NATIONWIDE    PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0391 | GS-05 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| 1152 | GS-05 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| 1640 | GS-05 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
|  | GS-07 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                    PAGE :    18
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : NATL AERONAUTICS & SPACE ADMINISTRATION                 STATUS : ALL WORK SCHEDULES AND TENURES
             GEOGRAPHIC AREA : NATIONWIDE                                     PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
| | GS-07 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 3 | O | O | O | O | O | O | O | O | O | 3 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 3 | O | O | O | O | O | O | O | O | O | 3 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
  ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION    PAGE : 19
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE NAVY                    STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                       PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0986 | GS-05 | WHITE(N-HISP) | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 |
| | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 9 |
| 1152 | GS-05 | WHITE(N-HISP) | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| | | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| | GS-07 | WHITE(N-HISP) | 14 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| | | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 18 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 15 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 27 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 24 |
| | | BLACK(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | TOTAL | 35 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 32 |
| 2135 | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
* ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE NAVY
GEOGRAPHIC AREA : NATIONWIDE

PAGE :   20

STATUS : ALL WORK SCHEDULES AND TENURES
PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 23 | O | O | O | O | O | O | O | 2 | O | 21 |
| | | BLACK(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
| | | HISPANIC | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | TOTAL | 28 | O | O | O | O | O | O | O | 2 | O | 26 |
| | GS-07 | WHITE(N-HISP) | 15 | O | 2 | O | O | O | O | O | 1 | O | 12 |
| | | BLACK(N-HISP) | 3 | O | O | O | O | O | O | O | O | O | 3 |
| | | HISPANIC | 1 | O | O | O | O | O | O | O | O | O | 1 |
| | | TOTAL | 19 | O | 2 | O | O | O | O | O | 1 | O | 16 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 38 | O | 2 | O | O | O | O | O | 3 | O | 33 |
| | | BLACK(N-HISP) | 7 | O | O | O | O | O | O | O | O | O | 7 |
| | | HISPANIC | 2 | O | O | O | O | O | O | O | O | O | 2 |
| | | TOTAL | 47 | O | 2 | O | O | O | O | O | 3 | O | 42 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

REPORT A3          APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                 PAGE :    21
                   PERIOD : JULY THROUGH DECEMBER OF 1982
                   AGENCY : SMALL BUSINESS ADMINISTRATION
                   GEOGRAPHIC AREA : NATIONWIDE                                STATUS : ALL WORK SCHEDULES AND TENURES
                                                                               PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : SECURITIES & EXCHANGE COMMISSION          STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                       PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-O5 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  | GS-O7 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 3 | O | O | O | O | O | O | O | O | O | 3 |
| ALL PACE OCCUPATIONS |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | GS-O5 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  | GS-O7 | WHITE(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 1 | O | O | O | O | O | O | O | O | O | 1 |
| TOTAL GS-O5+O7 |  | WHITE(N-HISP) | 2 | O | O | O | O | O | O | O | O | O | 2 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 3 | O | O | O | O | O | O | O | O | O | 3 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                                PAGE :    23
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF TRANSPORTATION                    STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                             PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| ALL PACE OCCUPATIONS | | | | | | | | | | | | | |
| | GS-05 | WHITE(N-HISP) | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 2 | O | O | O | 1 | O | O | O | O | O | 1 |
| | | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
| | | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
| | | TOTAL | 2 | O | O | O | 1 | O | O | O | O | O | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                          PAGE :    24
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE TREASURY                         STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                                PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| | | BLACK(N-HISP) | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 31 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | GS-05+07 | WHITE(N-HISP) | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| | | BLACK(N-HISP) | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 31 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |

ALL PACE OCCUPATIONS

| | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GS-05 | WHITE(N-HISP) | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| | | BLACK(N-HISP) | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 31 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | GS-05+07 | WHITE(N-HISP) | 22 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| | | BLACK(N-HISP) | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | TOTAL | 31 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : VETERANS ADMINISTRATION                              STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                                  PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O986 | GS-05 | WHITE(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 5 | O | O | O | O | O | O | O | O | O | 5 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+O7 |  | WHITE(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 5 | O | O | O | O | O | O | O | O | O | 5 |
| ALL PACE OCCUPATIONS |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | GS-05 | WHITE(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 5 | O | O | O | O | O | O | O | O | O | 5 |
|  | GS-07 | WHITE(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | BLACK(N-HISP) | O | O | O | O | O | O | O | O | O | O | O |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | O | O | O | O | O | O | O | O | O | O | O |
| TOTAL GS-05+O7 |  | WHITE(N-HISP) | 4 | O | O | O | O | O | O | O | O | O | 4 |
|  |  | BLACK(N-HISP) | 1 | O | O | O | O | O | O | O | O | O | 1 |
|  |  | HISPANIC | O | O | O | O | O | O | O | O | O | O | O |
|  |  | TOTAL | 5 | O | O | O | O | O | O | O | O | O | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ATTACHMENT  N

RECEIVED APR 1 8 1984

United States of America
## Office of
## Personnel Management

Office of the General Counsel
Washington, D.C. 20415

In Reply Refer To:

Your Reference:

APR 1 3 1984

4/13/84

Richard Seymour, Esq.
Lawyers' Committee for Civil Rights
   Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.   20005

Re:  <u>Luevano v. Devine</u>, U.S.D.C., Civil Action No. 79-0271

Dear Rick:

This is in response to your letter of April 4, 1984, requesting information on this agency's 1982 report in the above-captioned case.

There are five agencies listed in your letter for which selection data was included in the January-June, 1982 report, but for which no data is shown in the July-December, 1982 report. These agencies are not reflected in the July-December, 1982 report because they reported no activity, internally or externally, in the covered occupations for the covered time period.

You have also requested information as to why twelve occupations in the January-June, 1982 A3 report for the Veterans Administration (VA) all indicate identical numbers.  We have determined that that "phenomenon" was the result of a programming error, corrected in the July-December, 1982 report.  The January-June, 1982 report for VA correctly shows the activity in the 2010 series (page 1536, Report A3).  For the remaining eleven occupations (2030, 2032, 2050, 2101, 2110, 2111, 2125, 2130, 2135, 2144, and 2150), the reports should show all zeros indicating no activity.  We have corrected the totals in our records by subtracting the figures in those eleven series from the VA totals and suggest you make the same correction.  Report A1 for the January-June, 1982 time frame did not pick up this error, is correct as shown and does not require further processing or correction.

ATTACHMENT N TO ATTACHMENT Q

CON 132-03-9  (2/82)

-2-

Finally, the State Department report transmitted to you by Barbara Ward is complete and correct for the entire year 1982. The data in OPM's January–June 1982 report should be disregarded. Incorrect and inconsistent data between the State report and the OPM report are attributable to reporting error on the part of State which was identified and corrected.  Future yearly reports will correctly identify all State Department fills.

Very truly yours,

James S. Green
Assistant General Counsel
Staffing and Civil Rights

cc:  Barbara Ward

ATTACHMENT  O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,    )
                                )
   individually and on behalf of  )
   all others similarly situated, )
                                )
               Plaintiffs,  )
                                )
         v.               )   C. A. No. 79-0271
                                )
DONALD J. DEVINE, et al.,    )
                                )
            Defendants.  )

### PLAINTIFFS' FIRST REPORT TO THE COURT ON THE DEFENDANTS' IMPLEMENTATION OF THE CONSENT DECREE

A.  Introduction

The Consent Decree in this action went into effect on January 18, 1982.  The Decree contemplated that regular reports would be made to the Court,[1] and this Court's Order granting final approval to the Consent Decree stated that these reports, coupled with the Court's inherent power to direct that any of the raw data generated under the Consent Decree be provided to it, "will ensure adequate judicial supervision of the defendants' compliance with the Consent Decree."[2]

Plaintiffs have prepared this report, and the defendants are not responsible for its contents.  However, plaintiffs provided the defendants with a courtesy copy of the text of this Report on October 10, 1984---two days before it was filed---so that

_____

[1]See ¶ 7 at p. 6.

[2]Order of November 19, 1981, conclusion of law 23, reported at 93 F.R.D. 68, 92.

ATTACHMENT O TO ATTACHMENT Q

any comments or corrections the government desired to make could be considered and appropriate changes made.  The defendants did not offer any comments or suggestions.

The government has provided plaintiffs with a total of five statistical reports on hiring by all agencies across the nation in calendar year 1982[3] in jobs formerly covered by the PACE.  Plaintiffs have combined the data from the reports, with the subsequent corrections furnished by the government, into the printout attached hereto as Attachment A.[4]

This printout shows that, when the outmoded application statistics from 1978 are used as the standard,[5] the government met its hiring obligations under the Consent Decree with respect to most job categories formerly subject to the PACE.  Those job categories in which the government fell short of the standards set by the Decree, and those situations in which specific agencies fell short of the standards for specific job categories, are detailed below.

B.   The Timing of This Report

The government's system for collecting information

———————————

[3]The Order of July 2, 1984, entered with the consent of the parties, provided that the statistics compiled for calendar year 1982 would conclusively be deemed to be statistics for the first reporting year under the Consent Decree.

[4]The sources of this information, and the subsequent corrections are described in detail below.

[5]The Office of Personnel Management has informed plaintiffs that these are the latest applicant statistics available for the PACE.  See the discussion at p. 5, infra.

on hires for the first reporting year was not swift.  On June
20, 1983, plaintiffs received the Office of Personnel Management's
[hereinafter, "OPM's"] reports on hiring in jobs covered by
the Consent Decree in the first half of 1982 for most, but not
all, government agencies.  Because of a problem which has been
corrected for reports for 1983 and the future, the 1982 reports
did not include information on hiring by the State Department
or by the Federal Deposit Insurance Corporation.  Information
from the General Accounting Office is reported separately because
its personnel system is not under the control of OPM.[6]  OPM's
report on hires in the second half of 1982 was received on December
9, 1983.  Again, information was not included for the State
Department or for FDIC, and information on GAO was to be provided
separately.

Plaintiffs raised a number of questions as to the
OPM reports, and obtained clarifications in stages on April
3, April 13, May 24, and June 11, 1984.  The reports for the
State Department and the FDIC were sent to plaintiffs on March
7, 1984, and the report for the General Accounting Office was
sent to plaintiffs on March 29, 1984.  The State Department
figures did not add up correctly, and plaintiffs requested a
clarification.  In June 1984, the defendants agreed that the
State Department had made an arithmetic error in adding up its
information.

---

[6]See the companion Order entered November 19, 1981.

- 3 -

Not all information required for a complete statistical report for 1982 has been received. Some alternative examining procedures for job categories covered by the Consent Decree were in place in 1982, but no information has been received on the numbers of blacks, Hispanics, and whites who applied under these alternative examining procedures. On August 28, 1984, OPM orally advised plaintiffs that there were no adequate and reliable data on such applicants for 1982, and that there was no choice but to use the same percentage figures for these alternative examining procedures as were being used for jobs still subject to the PACE.[7] While a letter confirming this information was to have been sent, plaintiffs have not yet received it.

Now that the reporting system is in place, reports of selections for each calendar year can be provided more quickly. OPM estimates that its hiring reports can be provided by the Summer following the end of the calendar year in question. Plaintiffs received OPM's 1983 hiring reports on August 30, 1984.[8] However, we have not yet received any information indicating that an effective system for recording application statistics is in place, and no racial or ethnic breakdown of applicants for any job or examining procedure has been received for either 1982 or 1983.

---

[7]See pp. 5 and 13-14 below.

[8]The 1983 hiring report from GAO has not yet been received.

C. <u>1982 Hiring Information</u>

1. <u>General Information</u>

The PACE was in use for most of calendar year 1982, and the parties have agreed through the Monitoring Committee that adverse impact in 1982 for all jobs not subject to the alternative examining procedures should be determined by using the standard set out in ¶ 8(b)(1) of the Consent Decree.[9]

The government does not have racial breakdowns on applicants who took the PACE in 1981---the "prior reporting year" for 1982 hiring data---or for any year after 1978. Accordingly, the parties have agreed through the Monitoring Committee that the stipulated 1978 information in paragraph 10(h) of the Consent Decree be used instead. These data show that blacks were 11.9% of the applicants taking the PACE, and that Hispanics

---

[9]This paragraph provides:

(b) The phrase "adverse impact" shall have the following meanings in the following situations:

(1) In the case of interim use of the PACE, "adverse impact" shall mean that the difference between the proportion of blacks or of Hispanics among the appointments from all sources made by an agency for the job category in question, and the proportion of blacks or Hispanics, respectively, among the persons who took the PACE in the prior reporting year (or, in the event that statistics for the prior reporting year are not available, for the most recent prior period for which statistics are maintained), is statisticaly significant at the .05 level of confidence or, if not so statistically significant, that the proportion of blacks or of Hispanics among such appointments is less than 80% of the proportion of blacks or of Hispanics, respectively, among the persons so taking the PACE.

were 4.9% of the applicants taking the PACE.

## 2.  The Results of the Analysis:  Government-wide Hiring

Attachment A is a 22-page printout combining overall nationwide hiring information, for all jobs formerly subject to the PACE, from the following reports received from the defendants: (a) OPM's report for the first six months of 1982; (b) OPM's report for the last six months of 1982; (c) the Department of State's report for calendar year 1982, with its arithmetic errors corrected; (d) the Federal Deposit Insurance Corporation's report for calendar year 1982; and (e) the General Accounting Office's report for calendar year 1982.  The job titles were taken from the titles shown in Appendix A to the Consent Decree, as modified and supplemented by further information provided orally by OPM.

The data for the referenced reports of the defendants were entered on the Lawyers' Committee's computer by hand, by employees of the Lawyers' Committee.  Each entry was then double-checked against the originals, and all necessary corrections were made.  Using a widely accepted spreadsheet program from Lotus Development Corp. called 1-2-3, the computer then totalled the hiring information in the five sets of source documents and calculated the percentages shown.  The accuracy of the formulas used was confirmed by manual spot-checks.  Where the entry "ERR" appears, it indicates that one cannot divide zero by zero in order to obtain a percentage.  The references to "Grade 5" and "Grade 7" are to pay grades 5 and 7, and include all pay systems equivalent to these grades---"GG", "GS", etc.

- 6 -

Four job categories had nationwide adverse impact against Hispanics substantial enough in the opinion of counsel for plaintiffs to warrant challenging at this time. They are listed below.

a) <u>Computer Specialist (Trainee), Occupational Series 0334</u>

A total of 1,113 persons were hired into this job category in calendar year 1982. Only 35 of these hires were Hispanic, constituting 3.1% of total hires. This rate of hiring constituted adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 64.2% of their availability rate (4.9%, as explained above). This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of Hispanics was 2.71 standard deviations below what was expected.[10] If Hispanics had been hired at the level of their availability, 20 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations

_____

[10]A finding of 1.96 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .05 level. A finding of 3 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .01 level. These are means of quantifying the possibility that the observed disparity (or a greater one) could have occurred by chance. Significance at the .05 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in twenty. Significance at the .01 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in a hundred.

for this job category is attached as Attachment B.  The printout
was prepared and verified in the same manner as the printout
in Attachment A.

The government did not make any use of the special
programs required by the Consent Decree to eliminate or reduce
the possibility of adverse impact.  Plaintiffs have attached
as Attachment C the pages from the OPM reports showing that
no hires were made in this job category in calendar year 1982
through use of the Outstanding Scholar, Co-op, or Bilingual/bi-
cultural programs.

> b) <u>Social Insurance Claims Examining, Occupational
> Series 0993</u>

A total of 816 persons were hired into this job category
in calendar year 1982.  Only 14 of these hires were Hispanic,
constituting 1.7% of total hires.  This rate of hiring constituted
adverse impact under the 80% rule, because Hispanics were hired
at a rate which was only 35% of their availability rate.  This
hiring rate also constituted adverse impact under the test of
statistical significance because the hiring of Hispanics was
4.21 standard deviations below the expected level.  If Hispanics
had been hired at the level of their availability, 26 additional
Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations
for this job category is attached as Attachment D.  This printout
was prepared and verified in the same manner as the printout
in Attachment A.

The government did not make any use of the special

programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact.  Plaintiffs have attached as Attachment E the pages from the OPM reports showing that no hires were made in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bicultural programs.

           c) <u>General Business and Industry, Occupational Series 1101</u>

A total of 645 persons were hired into this job category in calendar year 1982.  Only 22 of these persons were Hispanic, constituting 3.4% of total hires.  This rate of hiring constituted adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 69.6% of their availability rate.[11]  If Hispanics had been hired at the level of their availability, 10 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment F.  The printout was prepared and verified in the same manner as the printout in Attachment A.

The government did not hire any Hispanics through the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact.  Plaintiffs have attached as Attachment G the pages from the OPM reports showing

---

      [11]Under ¶ 8(b)(1) of the Consent Decree, a finding of adverse impact results from showing that <u>either</u> the 80% standard was not met, <u>or</u> that there was statistical significance.  It is not necessary to make both showings.

that no Hispanics were hired in this job category in calendar
year 1982 through use of the Outstanding Scholar, Co-op, or
Bilingual/bicultural programs.

> d) Contract and Procurement, Occupational Series
>    1102

A total of 1,083 persons were hired into this job
category in calendar year 1982.  Only 33 of these hires were
Hispanic, constituting 3.0% of total hires.  This rate of hiring
constituted adverse impact under the 80% rule, because Hispanics
were hired at a rate which was only 62.2% of their availability
rate.  This hiring rate also constituted adverse impact under
the test of statistical significance, because the hiring of
Hispanics was 2.82 standard deviations below the expected level.
If Hispanics had been hired at the level of their availability,
20 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations
for this job category is attached as Attachment H.  This printout
was prepared and verified in the same manner as the printout
in Attachment A.

The government did not hire any Hispanics through
the special programs required by the Consent Decree to eliminate
or reduce the possibility of adverse impact.  Plaintiffs have
attached as Attachment I the pages from the OPM reports showing
that no Hispanics were hired in this job category in calendar
year 1982 through use of the Outstanding Scholar, Co-op, or
Bilingual/bicultural programs.

### 3.   The Results of the Analysis:  Hiring by Specific Agencies

In addition to the governmentwide showings of adverse impact set forth above, plaintiffs have also analyzed agency-by-agency hiring statistics to determine whether there is adverse impact as to that particular agency's hiring.  For three job categories, there was adverse impact as to a specific agency's hiring, at a level sufficient to warrant challenge at this time. These instances are set forth below.

#### a)  Department of Agriculture Hiring for the General Business and Industry Job, Occupational Series 1101

The Agriculture Department hired a total of 262 persons into this job category in calendar year 1982.  Only 5 of these hires were black, constituting 1.9% of total hires.  This rate of hiring blacks constituted adverse impact under the 80% rule, because blacks were hired at a rate which was only 16% of their availability rate.  This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of blacks was 4.99 standard deviations below the expected level.  If blacks had been hired at the level of their availability, 26 additional blacks would have been hired into this job category.

A printout showing the adverse-impact calculations for this job at the Agriculture Department is attached as Attachment J.  This printout was prepared and verified in the same manner as the printout in Attachment A.

The Agriculture Department did not make any use of

the special programs required by the Consent Decree to eliminate
or reduce the possibility of adverse impact.  Plaintiffs have
attached as Attachment K the pages from the OPM reports showing
that no hires were made in this job category in calendar year
1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bi-
cultural programs.

 

        b) <u>Department of the Army Hiring for the Contract
         and Procurement Job, Occupational Series 1102</u>

      The Department of the Army hired a total of 304 persons
into this job category in calendar year 1982.  Only 3 of these
hires were Hispanic, constituting 1.0% of total hires.  This
rate of hiring Hispanics constituted adverse impact under the
80% rule, because Hispanics were hired at a rate which was only
20.1% of their availability rate.  This hiring rate also constituted
adverse impact under the test of statistical significance, because
the hiring of Hispanics was 3.16 standard deviations below the
expected level.  If Hispanics had been hired at the level of
their availability, 12 additional Hispanics would have been
hired into this job category.

      A printout showing the adverse-impact calculations
for this job category is attached as Attachment L.  This printout
was prepared and verified in the same manner as the printout
in Attachment A.

      The Army did not hire any Hispanics through the special
programs required by the Consent Decree to eliminate or reduce

the possibility of adverse impact. Plaintiffs have attached
as Attachment M the pages from OPM reports showing that the
Army did not hire any Hispanics in this job category in calendar
year 1982 through use of the Outstanding Scholar, Co-op, or
Bilingual/bicultural programs.

> c) Department of Health and Human Services Hiring
>    for the Social Insurance Claims Examining
>    Job, Occupational Series 0993

All hiring in calendar year 1982 for the Social Insurance
Claims Examining job category was done by the Department of
Health and Human Services ["HHS"]. Thus, all of the statistics
set forth at p. 8 above for this job category refer to information
for the Department of Health and Human Services. See Attachment
N to this Report, showing the same information as to HHS hiring
which Attachment D showed for governmentwide hiring for this
job category. See also the OPM reports for HHS attached as
Attachment O, showing the same lack of use of the special programs
established by the Consent Decree which was shown in Attachment
E.

> 4. The Use of Alternative Examining Procedures

> a) Alternative Examining Procedures Sponsored
>    by OPM

During calendar year 1982, OPM sponsored a total of
six alternative examining procedures for specific job categories:

- 13 -



| Occupational Series | Grade(s) | Title | Type of Procedure |
|---|---|---|---|
| 0110 | 5,7 | Economist | Unassembled |
| 0334 | 5 | Computer Specialist (Trainee) | Assembled |
| 1654 | 5,7 | Printing Management Specialist | Unassembled |
| 1810 | 5,7 | General Investigator | Unassembled |
| 1811 | 5,7 | Criminal Investigator | Unassembled |
| 1812 | 5 | Game Law Enforcement Agent (Fish & Wildlife) | Unassembled |

There were not enough hires in any of these job categories in calendar year 1982 to warrant adverse-impact challenges.

> b) <u>Delegations of Examining Authority to Specific Agencies</u>

During calendar year 1982, a number of agencies enjoyed delegations by OPM of examining authority for specific job categories. There were not enough hires in any of these job categories in calendar year 1982 to warrant adverse-impact challenges.

> 5. <u>Enforcement Proceedings</u>

Plaintiffs have raised each of the above showings with counsel for the defendant, through the Monitoring Committee, as an enforcement proceeding. We expect the Monitoring Committee to attempt to resolve these matters.

> D. <u>Abolition of the PACE</u>

The Consent Decree allowed, but did not require, phased-out use of the PACE for competitive external hiring for the

first three years after the Consent Decree went into effect.[12]
OPM decided instead to abolish the PACE for external competitive
hiring as of August 31, 1982.  All registers of eligibles compiled
under the PACE were abolished or withdrawn as of November 8,
1982.[13]  OPM's official description of this change is contained
in Federal Personnel Manual ["FPM"] Letter 213-21, dated September
9, 1982, reproduced at Attachment P.

          E.   Use of Schedule B Authority

          As indicated by FPM Letter 213-32, OPM has not yet
developed specific alternative examining procedures for most
of the job categories formerly covered by the PACE.  To replace
the PACE for such job categories, OPM established a new "Schedule
B authority" under which agencies needing to hire external applicants
could apply for and obtain OPM's permission to do their own
hiring under overall OPM guidelines.  The persons hired under
this authority are to be treated, in all but three respects,
in the same manner as applicants who had earlier been hired
through the PACE.  The FPM Letter expressly grants them such
rights with respect to discipline, training, opportunities to
compete for promotion and other appointments, removal, suspension
for more than 14 days, reduction in grade or pay, placement
on furlough for thirty days or more, and retention rights in

--------

[12]See ¶¶ 13-16 at pp. 25-30.

[13]OPM has informed us that some mistakes may have been
made in isolated cases, but official use of the PACE ended on
the date stated.

the event of a reduction in force.

There are three ways in which applicants hired under
Schedule B authority are treated less favorably than applicants
formerly hired under the PACE.  First, applicants formerly hired
under the PACE enjoyed career Civil Service status immediately
after the conclusion of their probationary periods.  Applicants
hired under Schedule B will not obtain career Civil Service
status unless they compete with outside applicants and present
employees for positions at the GS-9 level, and survive the competi-
tion. If they do not survive, they will lose their jobs.

Second, applicants formerly hired under the PACE were
able to use their Civil Service status to be transferred or
reassigned to other job categories for which they had the necessary
qualifications and thus had substantial career flexibility,
which can be important in light of changing job opportunities.
Applicants hired under Schedule B may be promoted or reassigned
only to other job categories covered by Schedule B authority.
Again, the less favorable treatment does not end unless and
until the Schedule B appointee survives the "sudden death" competi-
tion for a promotion to the GS-9 level and is thereby converted
to Civil Service status.

Third, applicants formerly hired under the PACE could
take full advantage of the "career ladders" in the jobs into
which they were hired.  A "career ladder" runs from the entry-
level job up to what is called the "journeyman level".  The
"journeyman level" may vary from agency to agency depending

- 16 -

on its needs, but can be as high as GS-13 for some jobs at some
agencies.  Where there is a career ladder, employees on the
ladder do not have to compete for promotions up to the journeyman
level.  They receive their promotions to grades 7, 9, 11, 12
and 13---depending on the top of the career ladder in question
---on the completion of a set amount of time in grade if their
performance has been satisfactory and they have demonstrated
by such performance their ability to handle more complex duties.
The availability of such "career ladder" promotions without
having to compete for them has always been one of the most important
attractions in the job categories formerly subject to the PACE,
and has been an important part of this lawsuit from the beginning.[14]

Paragraph 10 of the Complaint herein alleged in pertinent
part:

> Employees selected by the PACE are frequently
> placed in "career ladder" positions and subsequently
> promoted to higher, non-supervisory levels without
> competition.

Plaintiffs' September 29, 1980 Motion for Class Determination

---

[14]The General Accounting Office's 1979 study of the
PACE also highlighted the importance of career ladder promotions
to those hired under the PACE:

> PACE provides agencies with job candidates
> who demonstrate potential for advancement into professional
> and administrative positions. ... PACE covers GS-5
> and -7 entry level positions in 118 occupational series.
> ... Normal career progression in these jobs is to
> a GS-9 or higher grade level.

GAO, Report to the Congress of the United States:  Federal Employment
Examinations:  Do They Achieve Equal Opportunity and Merit Principle
Goals?  (No. FPCD-79-46, May 15, 1979) at 9.

stated in paragraph 5 at p. 3:

> In each case entry into career-oriented administrative or professional positions is via PACE, and subsequent promotions to the top of the career ladder are non-competitive and not based on testing.

OPM's decision that persons hired under Schedule B authority will be given treatment less favorable than that given to persons formerly hired under the PACE raises a serious legal question. The Uniform Guidelines on Employee Selection Procedures state in pertinent part:

- 18 -

... Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination. Thus, the persons who were in the class of persons discriminated against during the period the user followed the discriminatory practices should be allowed the opportunity to qualify under less stringent selection procedures previously followed, unless the user demonstrates that the increased standards are required by business necessity. ...

29 C.F.R. § 1607.11 (1984).[15]   The courts have accepted this regulation and its predecessor.   Albemarle Paper Co. v. Moody, 422 U.S. 405, 434, 45 L.Ed.2d 280, 306 (1975).   Blake v. City of Los Angeles, 595 F.2d 1367, 1382 (9th Cir., 1979), cert. den., 446 U.S. 928, 64 L.Ed.2d 281 (1980) ("The fact that the LAPD hired thousands of male police officers between 1968 and 1973 without using any pre-employment physical suggests that the practice is not essential to safe and efficient job performance"); Laffey v. Northwest Airlines, 185 U.S.App.D.C. 322, 567 F.2d 429, 456-57 (D.C.Cir., 1976), cert. den., 434 U.S. 1086, 55 L.Ed.2d 792 (1978) ("We recognize that Title VII discourages the use of even nondiscriminatory but newly-promulgated employee-selection criteria where there is a history of discriminatory treatment of some employees who would continue to be hurt by the new criteria.").

There have been meetings, substantial exchanges of

---

[15]The full text of this regulation is set forth at Attachment Q.

correspondence, and innumerable telephone calls between plaintiffs
and defendants on questions arising out of the implementation
of the Consent Decree, and much of this activity stems from
the above differences of treatment between Schedule B appointees
and former PACE appointees.  These efforts to resolve the matter
short of litigation are continuing.

A separate question is whether the use of Schedule
B authority can be considered an "alternative examining procedure"
under the Consent Decree.  The Consent Decree defines this term
as follows:[16]

> (j) The phrase "alternative examining procedure"
> shall mean the group of factors, including test
> scores and any other criteria which are considered,
> and the relative use made of each such factor,
> in making an appointment decision with respect
> to an applicant (as that term is defined in
> ¶ 8(b)(4)), for employment at the GS-5 or GS-
> 7 level in a job category listed in Appendix
> A.

OPM's decision to split into two parts the procedure for hiring
applicants into the career Civil Service in PACE occupations
---deferring until a second round of competition at the GS-9
level what had formerly occurred after just one round of competition
at the GS-5 or GS-7 level---means that both halves of the procedure
would have to be included within the definition.

The issue is not yet presented by this case, however,
because OPM has not to date followed any of the steps required
by the Decree for alternative examining procedures:

---

[16]Consent Decree, ¶ 8(j) at p. 15.

a) Although the agencies have some options available to them in choosing the means by which the second round of competition will be held and although ¶ 26 of the Consent Decree would apply to each such option, OPM has not yet provided plaintiffs with the information required by ¶ 26 of the Consent Decree as to the second round of competition.[17]

b) OPM has also failed to provide statistical information on the applicants for selection under Schedule B for each job, agency and region.  Such information is required by ¶ 25 of the Consent Decree for each alternative examining procedure.  In the event that OPM ever seeks in the future a determination that the use of Schedule B authority constitutes an alternative examining procedure, such information

---

[17]Paragraph 26 of the Consent Decree provides:

26.  As early as possible in the course of the development of an alternative examining procedure, OPM and/or the agency involved shall provide to plaintiffs an accurate summary of the development plan, including a description of the type of procedure contemplated and of the design of the validation study, or of a substantial change in previously submitted plans. OPM shall transmit semi-annually to plaintiffs the summaries it has received from other agencies, and those which it has itself developed.  Plaintiffs and their experts may review and comment upon the summaries, and make such suggestions for the improvement as seem appropriate.  OPM and/or the agency involved shall consider such comments, and shall notify plaintiffs of the ultimate decision on the matters commented upon.  Any failure by plaintiffs to provide comments shall be given no weight in any enforcement proceedings under the provisions of paragraph 17.

is indispensable.

Until each of these problems is rectified, OPM has not "implemented" an alternative examining procedure within the meaning of ¶ 7 of the Consent Decree.

It is also important to recognize that, whether the use of Schedule B authority be considered a set of alternative examining procedures or a temporary expedient, statistical information on applicants and selections for both rounds of competition is essential. Without such information, there can be no assurance of fairness to class members. Plaintiffs have raised this matter with the defendants in the Monitoring Committee.

F.  Mailings to Class Members

Paragraph 22 at pp. 39-40 of the Consent Decree required OPM to establish a mailing list of all class members responding to the 1981 notice of settlement. At least 2,000 class members have requested to be placed on the mailing list.[17]  Paragraph 22 goes on to require that OPM:

> ... shall use this list to inform such class members ... of the alternative examining procedures which are expected to go into effect before the date of the next mailing, of the job categories to which they are applicable, of the steps class members should take in order to be considered under such alternative examining procedures, and of the government offices class members should contact in order to find out more information about these training programs, procedures, and job categories. These mailings shall be made on a semi-annual basis during the period from the entry of this Decree until the last alternative

_____

[17]Information provided orally by counsel for defendants to counsel for plaintiffs.

examining procedure is put into effect, and shall
be without charge to class members.

No use of the mailing list was made in 1982, so class
members on the list were not informed of the use of Schedule
B authority, of the development of the alternative examining
procedures which OPM has put together, or of the means of applying
for the jobs in question.

Plaintiffs have raised this matter with the defendants
in the Monitoring Committee.

G. <u>Test Development Reports</u>

Paragraph 26 of the Consent Decree requires the defendants
to provide plaintiffs regularly with reports on the defendants'
development of alternative examining procedures.  This Court
recognized the importance of such reports in its November 19,
1981 Order granting final approval to the Consent Decree.  The
Order stated in finding 33:

> 33.  It must be noted that, during the course
> of this development process, defendants have
> agreed to provide plaintiffs with summaries of
> their plans for developing and validating the
> new procedures, to respond to any other reasonable
> requests by plaintiffs for information, and to
> consider any comments which plaintiffs may offer
> concerning the examination procedures.  (Decree,
> ¶ 26).  Thus, the phased-in examination development
> process will also offer an opportunity for comments
> by the plaintiffs which may be useful in the
> development of examining procedures which will
> be valid, as that term has been defined in the
> Decree.  (Outtz deposition, Tr. 12-13).

93 F.R.D. 68, 79-80 (1981).

The defendants have provided plaintiffs with test
development reports for the following occupations:

- 23 -

a) <u>Computer specialist (Trainee)</u>, GS-0334, Grades

5 and 7 (development completed August 1981, and test

used operationally in October and November, 1982);

b) <u>Claims Examining and Claims Representative</u>

<u>Social Security Positions</u>, GS-0993 and GS-0105, Grades

5 and 7 (development still underway as of June 1983);

c) <u>Tax Technician</u>, GS-0526, Grades 5 and 7 (develop-

ment still underway as of June 1983);

d) <u>Internal Revenue Officer</u>, GS-1169, Grades

5 and 7 (development still underway as of June 1983);

and

e) <u>Customs Inspector</u>, GS-1890, Grades 5 and 7

(development still underway as of June 1983).

They were so short and uninformative that plaintiffs determined

they would not help accomplish the purposes of ¶ 26.   There

have been numerous meetings, telephone calls, and exchanges

of correspondence over the issue, and OPM has provided two redrafts

of the Computer Specialist (Trainee) report in an effort to

prepare a model which would be useful for this purpose.   The

parties are still working on this issue.

- 24 -

CONCLUSION

Plaintiffs hope that the above information will be useful to the Court.  If the Court has any questions about this Report or desires further information, the parties will be happy to comply.

                          Respectfully submitted,

                          WILLIAM L. ROBINSON
                          RICHARD T. SEYMOUR
                          Lawyers' Committee for Civil
                             Rights Under Law
                          1400 'Eye' St., N.W., Suite 400
                          Washington, D.C. 20005

                          JULIUS LeVONNE CHAMBERS
                          CHARLES STEPHEN RALSTON
                          GAIL J. WRIGHT
                          99 Hudson Street, 16th Floor
                          New York, New York 10013

                          BARRY L. GOLDSTEIN
                          ELAINE R. JONES
                          806 - 15th Street, N.W., #940
                          Washington, D.C. 20005

                          JACK G. KNEBEL
                          McCutcheon, Doyle, Brown & Enerson
                          Three Embarcadero Center
                          San Francisco, Calif.  94111

                          VELMA S. MARTINEZ
                          MORRIS J. BALLER
                          Mexican-American Legal Defense
                             & Educational Fund
                          28 Geary Street
                          Sixth Floor
                          San Francisco, Calif.  94108

                          JOHN H. ERICKSON
                          Erickson, Beasley & Hewitt
                          12 Geary Street
                          Eighth Floor
                          San Francisco, Calif.  94108

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
95 Madison Avenue, Suite 1304
New York, New York 10016

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
  for Urban Affairs
625 Market Street, Suite 1208
San Francisco, Calif.  94105

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612


By:_____

        Attorneys for Plaintiffs

Dated:  October 12, 1984

- 26 -

Personnel
Research and
Development
Center

Data Survey Report 80-5

# Impact of the Professional and Administrative Career Examination (PACE) as Shown Through Applicant Flow Procedures



**United States Office of Personnel Management**

Staffing
Services
Group

ATTACHMENT R

DSR 80-5

IMPACT OF THE PROFESSIONAL AND ADMINISTRATIVE CAREER
EXAMINATION (PACE) AS SHOWN THROUGH APPLICANT FLOW PROCEDURES

Anthony J. Mento
and
Lois C. Northrop

U.S. Office of Personnel Management
Personnel Research and Development Center
Data Evaluation Task Force
Washington, D.C.
August 1980

IMPACT OF THE PROFESSIONAL AND ADMINISTRATIVE CAREER
EXAMINATION (PACE) AS SHOWN THROUGH APPLICANT FLOW PROCEDURES

ABSTRACT

This report describes group differences on ratings and selections on the Professional and Administrative Career Examination (PACE), a component of the competitive process used to fill approximately 35% of the yearly vacancies in entry-level Federal white collar occupations.  The sample consisted of applicants administered the PACE nationwide in January and April, 1978.  Race, sex, and ethnic group tabulations were produced for various score intervals of unaugmented and augmented (by Veteran Preference and Outstanding Scholar points) ratings both for regions and nationwide.  For the PACE competitive examination process, the White group had the highest selection rate.  There was adverse impact against all racial groups, women, and Hispanics.  For unaugmented ratings, there was a practically significant difference in ratings as a function of race.  With unaugmented ratings as the criterion, all races significantly outperformed Blacks, while Whites outperformed all other racial groups.  No other practically significant differences were obtained for sex or ethnicity on either of the criteria.

IMPACT OF THE PROFESSIONAL AND ADMINISTRATIVE CAREER
EXAMINATION (PACE) AS SHOWN THROUGH APPLICANT FLOW PROCEDURES

### EXECUTIVE SUMMARY

The purpose of this report is to describe the group differences, for minori-
ties and women, on the Professional and Administrative Career Examination
(PACE), one component of the selection process used to fill vacancies in six
major occupational specialties in the Federal government.

The majority of employees (about 65%) in the 118 occupations included in
these six occupational specialties are selected through means other than the
PACE competitive examination.  The predominant entry route is selection from
among current employees through normal career progression, upward mobility
programs, promotions, and reassignments.  In addition, there are a number of
special hiring authorities which provide entry into PACE-type occupations.

The remaining 35% of employees who enter the 118 occupations (at the GS-5
and GS-7 levels) do so through the PACE competitive examination.  Records
maintained on PACE applicants include information on interests, availability,
education, experience and test scores.  A sample of applicants in January,
1978, and all applicants in April, 1978, were also asked to fill out two
forms for the purpose of assessing adverse impact.  These forms requested
information on the race, sex, and ethnic origin of applicants as well as on
socioeconomic and other background variables.

The nationwide and regional distributions of 54,929 January and April, 1978
PACE applicants for whom race, sex, and ethnic identifications as well as
unaugmented and augmented (by Veteran preference and Outstanding Scholar
points) ratings were available are presented in tabular form.  Regional dif-
ferences in the distribution of minority PACE applicants reflect the general
population distributions.

Approximately 20,200 applicants (37.0%), nationwide, received unaugmented
ratings of 70 or better; approximately 4,000 applicants (7.0%) received
unaugmented ratings of 90 or better.

When these scores had been augmented by Outstanding Scholar and Veteran pref-
erence points, the numbers and percentages in the 70 and above and 90 and
above rating categories increased to approximately 23,000 (42.0%) and 6,000
(11.0%), respectively.

The status (selected, certified, active, or inactive) of January and April,
1978 PACE applicants is summarized by race, sex, and ethnic origin.
Summarized by race, 1,295 selections (2.4% of the 54,929 applicants) had
been made as of December 15, 1978.  More detailed tables of status by race,
sex, and ethnic origin by rating intervals (70-79, 80-89, 90-99, 100-109,
greater than 109) are included.  Distributions of selections by race, sex,
and ethnic origin and by Veteran and Outstanding Scholar status are pre-
sented in an attempt to illuminate the effect of these factors on the selec-
tion process.  Lastly, means and standard deviations were calculated for the
several race, sex, and ethnic groups for unaugmented as well as final (aug-
mented) ratings.

The calculation of selection rates by race, sex, and ethnic origin demon-

strated adverse impact for American Indians, Asians, Blacks, and Others, for females, and for Hispanics.  However, in all of these groups except Blacks, there were a sufficient number of applicants with final ratings of 90 'or better and who had been either certified or were in active status, to indicate that factors in addition to test scores were operating to cause adverse impact in selections.

CONTENTS

|                                                                                      | Page |
|--------------------------------------------------------------------------------------|------|
| Background of the PACE                                                                | 1    |
| Modes of Entry into PACE Occupations                                                 | 1    |
| PACE records                                                                         | 3    |
| PACE Ratings                                                                         | 3    |
| METHOD                                                                                | 3    |
| RESULTS                                                                               | 5    |
| Distribution of January and April PACE Applicants by Race, Sex, and Ethnicity        | 5    |
| Distribution of Unaugmented and Augmented Ratings                                    | 5    |
| Means and Standard Deviations of Unaugmented and Augmented Ratings                   | 6    |
| Distribution of Applicants Who Did Not Receive Occupational Specialty 001 Ratings    | 6    |
| Status of Eligible PACE Applicants                                                   | 7    |
| Adverse Impact Determination                                                         | 8    |
| DISCUSSION                                                                            | 8    |
| REFERENCE NOTES                                                                       | 9    |
| REFERENCES                                                                            | 10   |
| DATA TABLES 1 THROUGH 20                                                              | 11   |
| APPENDIXES                                                                            | 34   |
| A.  PACE Occupational Coverage List                                                  | 34   |
| B.  Form Used for Adverse Impact Determination on PACE in January and April, 1978    | 36   |
| C.  Supplementary Data Tables                                                        | 37   |

IMPACT OF THE PROFESSIONAL AND ADMINISTRATIVE CAREER
EXAMINATION (PACE) AS SHOWN THROUGH APPLICANT FLOW PROCEDURES

The purpose of this report is to describe the group differences in test performance and selections, for minorities and women, on the Professional and Administrative Career Examination (PACE), one component of the competitive selection process used to fill six major categories of jobs in the Federal government.

The report is divided into four major sections. The first section presents an introduction which discusses the nature of the PACE examination, modes of entry into PACE occupations, and the nature of records maintained on applicants. The second section presents the methodology used in assessing applicant flow data of the PACE. The third section presents the results of this applicant flow analysis. Finally, the fourth section presents a discussion to explicate these data.

Background of the PACE

In 1976, the U.S. Civil Service Commission, now the Office of Personnel Management (OPM), introduced the PACE, an examination for competitively selecting applicants for entry-level positions (GS 5-7) in 118 Federal professional and administrative occupations.[1] These occupations were grouped together because of their common requirements for on-the-job learning of complex white collar jobs for which there is no specific preparation. The research basis for the development and use of the written test portion of the examination can be found in McKillip, Trattner, Corts, and Wing (1977).

The PACE for competitive entry includes a written test tapping several of the abilities required in these occupations. These abilities are given weights according to the requirements of each occupation. Empirical evidence (Corts, Muldrow, and Outerbridge, 1977) supports the measurement of five abilities which are differentially weighted for six major occupational specialties. The PACE contains five operational parts, one for each of the abilities measured. The five part scores are weighted to yield total scores or ratings for each of the six occupational specialities. (For a complete explication of the scoring system for the PACE, see Wing, Note 1.) In addition, the examination includes procedures for rewarding outstanding academic scholarship (Outstanding Scholar option), and for crediting Veterans with preference points. The procedures also take into account specialized training required for certain positions (Selective Placement), geographic preference, and the first year (probationary period) of employment. In addition, the examination includes, for some positions, pre-employment interviews, physical requirements, and determinations of suitability.

Modes of Entry into PACE Occupations

The majority of employees in the 118 occupations included in the six occupational specialties are selected through means other than the PACE competitive examination. It is estimated that about 65 percent of the positions in these occupations are filled through non-PACE procedures, in comparison to about 35 percent through PACE.

The predominant entry route is selection from among current employees through normal career

---

[1]A list of these occupations appears in Appendix A.

progression, [2] upward mobility pro-
grams, promotions, and reassignments.
Unless an approved planned training
program is used, current employees
must meet an appropriate qualifica-
tion standard, but do not have to
pass the PACE written test.  These
internal candidates are ranked
against criteria developed by their
agencies, which take into account the
particular job requirements and pre-
vious work performance

   There are many other rather in-
formal ways individuals may enter a
PACE occupation without going through
OPM or decentralized agency registers.
In each of these cases, the person
does not need to compete with other
applicants for a job.  Examples of
these type of applicants are return-
ing Peace Corps personnel, staff of
Congressional committees, and per-
sonnel in excepted agencies with
which the particular hiring agency
has made arrangements for non-compet-
itive transfers.  Further, employees
in transferring from one agency to
another often change occupations.
Finally, former Federal employees,
once having earned career status in
any occupation, do not have to com-
pete again in a competitive examina-
tion to enter another occupation.
(An individual, for example, who
takes a clerk-typist job in OPM after
high school and works for three
years, could leave the government,
start a family, go back to school,
earn a B.A. degree, and enter any
PACE job at the GS-5 level without
ever competing on the PACE examina-
tion).

   In addition to these internal
non-competitive programs, there are
a number of special hiring authori-
ties which provide entry into PACE-
type occupations.  These include the
following:

-- Cooperative Education Program
   for Baccalaureate Students
   Students enrolled in this program
   gain education-related experience
   with Federal agencies and are
   eligible for conversion to career-
   conditional appointment upon
   graduation.

-- Cooperative Education Program
   for Graduate Students  This
   program was approved in 1977 to
   provide work-study experience
   in occupations directly related
   to the field of study for stu-
   dents who meet qualification
   standards for entry-level em-
   ployment in the field of inter-
   est.  For PACE occupations,
   this requires only a passing
   score on the written test or
   eligibility through the Out-
   standing Scholar option of the
   examination.

-- The Presidential Management In-
   tern Program  This program,
   authorized by Executive Order
   1208 in 1977, provides for the
   annual selection of 250 out-
   standing individuals who have
   completed master's degree re-
   quirements in fields of public
   management or public policy.

-- Veterans Readjustment Act Ap-
   pointments  While there is not
   a set of detailed data on the
   number of these Veterans appoint-
   ed to PACE positions, it is
   estimated that about 19,000
   were on agency rolls in all
   types of occupations as of
   December, 1978.  Again, these
   individuals must achieve a pass-
   ing score on the written test
   or meet the Outstanding Scholar
   option to qualify for appoint-
   ment in PACE occupations.

---

   [2]An example of normal career progression would be the selection of a
Border Patrol Agent for a Criminal Investigator position in the Department
of Justice.  An example of an upward mobility program would be the purpose-
ful selection and training of a group of clerical employees for Criminal
Investigator positions.  Both processes do indeed occur for Criminal Investi-
gator positions.

-- <u>Noncompetitive Appointing Authority to Appoint Veterans With 30 Percent or More Disability</u>
This authority, conferred by the Civil Service Reform Act, gives agencies the authority to appoint such Veterans, without competition, to any position in the career service for which they are qualified.  To qualify for PACE occupations, such a Veteran would have to pass the written test or meet the Outstanding Scholar option.

The multiple modes of entry into PACE occupations which have been cited above indicate that a low score on, or even failure to pass the written test for PACE, need in no way preclude an applicant's selection for a position.

<u>PACE Records</u>

The records maintained on applicants for PACE include background forms which solicit information on interests, availability, and education and experience.  Further, applicants complete an answer sheet for the written test portion of the examination.  In addition, for purposes of assessing adverse impact, a temporary form soliciting self-identification of race, sex, and ethnicity was administered to a sample of applicants in January, 1978, and to all applicants in April, 1978.

For those individuals who qualify on the PACE (i.e., meet the minimum education and experience requirements <u>and</u> qualify on the written test either through the written test score alone or by the Outstanding Scholar option), test scores are maintained on the PACE Master Certification Tapes (MCT).[3]

The MCT contains information as to whether applicants were put on a certificate or selected from a certificate, Veteran status,

Outstanding Scholar status, partial or complete GS-5 or GS-7 occupational specialty ratings, and other applicant information.

Since the MCT does not contain records of those who did not qualify on the PACE, it is not known whether the persons who lack records did not qualify on the written test requirement or on the education and experience requirements.

<u>PACE Ratings</u>

Each applicant has a preliminary rating calculated from his or her test score for levels GS-5 and GS-7, as appropriate to his or her education and experience.  These initial ratings range from 40 to 100 and for convenience are called "unaugmented" ratings in this report.  Applicants who are Outstanding Scholars or eligible Veterans will have their unaugmented rating augmented.  Unaugmented ratings for Outstanding Scholars (those who rank in the upper 10% of their graduating class, or have a Grade Point Average of at least 3.5 out of 4.00) are augmented by averaging their unaugmented rating (or 40, whichever is higher) with 100 to obtain the augmented or final rating.  Any applicant who obtains an augmented rating below 70 in any occupational specialty is ineligible for that occupation.  An applicant with augmented ratings below 70 on all six occupational specialties is considered to have failed the written portion of PACE.  The unaugmented ratings of eligible veterans are increased by five or ten points, as appropriate.

METHOD

During January, 1978, as part of a pilot study to determine the reliability and validity of self-identification of race, sex, and ethnicity, applicants who took the

---

[3]As a result of amendments to the Privacy Act of 1964, this agency decided not to keep records which would not be used for individuals.  Therefore, records of those who fail examinations are returned to the applicants.  Computer records are usually not made on these individuals.  Also, computer and hard copy records are purged on a regular cycle.

PACE in ten OPM regional office cities were requested to provide race, sex, and ethnic information by completing CSC Form 1289A (Survey for the Collection of Racial and Ethnic Data of Persons Applying for Federal Employment).[4] In April, 1978 all applicants administered the PACE were requested to fill out this form. A detailed description of the data processing requirements and problems encountered for this analysis is presented by Mento, (Note 4). Briefly, race, sex, and ethnic data from 54,929 January and April, 1978 PACE applicants were merged with data from the Master Certification Tape (MCT) for the 25,711 applicants who were eligible (i.e., passed the written test or were Outstanding Scholars).

The analyses of augmented and unaugmented ratings involved the application of the least squares solution to data from unequal cell frequencies. Overall and Spiegel (1969) describe three different approaches to data analysis, and discuss the conditions under which each of these may be appropriately used. The approach chosen here, the experimental design procedure, is appropriate when one wishes to make statements about main effects and interactions in the conventional manner. Multiple regression analysis was the technique used with age statistically controlled in both sets of analyses, first with unaugmented ratings as the criterion, then with augmented ratings as the performance measure. For the main effect variables of race, sex, and ethnicity, four, one, and two dummy-coded vectors were developed, respectively, as shown by Cohen and Cohen (1975). The race-by-sex interaction involved the generation of four coded vectors, while the ethnicity-by-sex interaction yielded two vectors. Data vectors representing the interactions were computer-generated by vector multiplication.

Since there are unequal cell frequencies, the main effect variables are correlated. In the experimental design approach to data analysis explicated by Kerlinger and Pedhazur (1973), it is necessary to adjust the proportion of variance attributed to a main effect factor with the other main effect factors in the regression equation. In practice, this involves noting the increment in the proportion of variance accounted for by the factor of interest when it is entered after the other main effect variables are in the equation. The interaction of the main effect variable is noted after it is adjusted for its correlation with the main effects. This involves examining the proportion of variance accounted for by this interaction after all other factors are in the equation.

When practically significant main effects were obtained, post-hoc comparisons were conducted with the Newman-Keuls test (Winer, 1971) to delineate significant race and ethnic group mean differences.

Programs from the Statistical Package for the Social Sciences were used with these data to generate crosstabulations relating group identification with examination and other demographic data.

For this report, all ratings analyzed were for occupational specialty 001 which represents 90% of PACE occupations. It should be noted that of the 25,711 eligible applicants, over 2,000 did not have ratings for occupational specialty 001. This is due to the fact that if an applicant's augmented rating is less than 70 in any occupational specialty, his or her rating will not be found in the PACE Master Certification Tapes in that occupational specialty. The race,

---

[4]As a result of this study (Northrop, Note 2) and other research (Northrop, Note 3), it was determined that self-identification of race, sex, and ethnicity by applicants was more reliable and valid then visual observation by examiners in the testing room.

sex, and ethnicity of these 2,000 applicants is reported in the Results Section.

A final note: depending on the data analysis, sample sizes fluctuate. This is due primarily to missing data -- some applicants chose not to respond to each of the race, sex, and ethnicity questions.

RESULTS

Distribution of January and April PACE Applicants by Race, Sex and Ethnicity

Table 1 presents the nationwide distribution of the 54,929 PACE applicants for whom race, sex, and ethnic data were available after the sorting and matching process described by Mento (Note 4) had been carried out. More males than females took the written examination (52.3% and 47.7%, respectively). The racial distribution of the nationwide sample was as follows: American Indian or Alaskan Native, 0.6%; Asian or Pacific Islander, 2.7%; Black, 11.8%; White, 82.9% and Other, 2.0%. Hispanics numbered 2,694, or 4.0% of the applicants represented in Table 1. They were present in all of the racial categories and comprised 14.0% of the American Indians, 7.0% of the Asians, 2.1% of the Blacks, 3.7% of the Whites, and 65.7% of the Others. A small percentage (2.4%) of applicants who filled out the race, sex, and ethnic questionnaire failed to respond to the ethnicity question.

Tables C-1 through C-11 in Appendix C present the race, sex, and ethnic distribution of PACE applicants for each of the ten regions as well as for the Washington, D.C. area.

Tables 2 and 3 present summaries of the regional distributions by race and sex (Table 2) and by ethnic origin (Table 3) of the January and April, 1978 applicants. The Washington Area Office is also included. A study of these tables reveals important differences in the racial and ethnic distributions in the various parts of the nation, reflecting the general population distribution of the racial and ethnic groups. For example, the Atlanta Region contains the highest percentage of Black applicants (21.5%), the San Francisco Region the highest percentage of Asian applicants (13.8%), and the Dallas Region the highest percentage of Hispanic applicants (17.0%).

Distribution of Unaugmented and Augmented Ratings

Table 4 presents a nationwide data summary by race, sex, and ethnic origin, of the unaugmented ratings (those scores to which Veteran preference and Outstanding Scholar points have not been added) and augmented ratings (to which Veteran preference and Outstanding Scholar points have been added) of those PACE applicants who scored 70 and above and 90 and above. For example, Table 4 reveals that of the 54,929 applicants for whom both race and ethnic data and unaugmented and augmented ratings were available, 20,192 (36.8%) received an unaugmented rating of 70 or better, and 3,978 (7.2%) received an unaugmented rating of 90 or better. When these ratings were augmented by Outstanding Scholar and Veteran preference points, the numbers and percentages in the 70 and above and 90 and above augmented rating categories increased to 23,178 (42.2%) and 6,232 (11.4%), respectively. Similarly, for those applicants for whom data on sex as well as ratings were available, 20,316 (37.0%) received unaugmented ratings of 70 and above, and 4,008 (7.3%) received unaugmented ratings of 90 and above. Augmented ratings for these categories yielded 23,332 (42.5%) for 70 or better and 6,273 (11.4%) for 90 or better. The discrepancies in numbers (at most 0.3%) in the categories by race, and by sex are indicative of missing data; that is, some applicants may have specified their sex on the race, sex, and ethnic form but did not respond to the question on race, or vice versa. In the third part of Table 4, which deals with rating distributions by ethnic origin, those applicants who did not respond to the question on ethnicity have been eliminated from

5

the number of applicants on whom the percentages of Hispanics and non-Hispanics are based.  As in the previous two parts of the table, numbers and percentages increase when final ratings are presented rather than unaugmented ratings.

Table C-12 through C-21 in Appendix C present the distribution of ratings by region.  Data from the Washington Area Office appear in Table C-22.  These may be consulted for an in-depth analysis of regional differences

Table 5 has been prepared to provide an overview of percentage differences within each region and the Washington D.C. area by race, by sex, for those applicants of Hispanic origin, and for regional totals (which are based on part 1 of Tables C-12 through C-22).  It is apparent that with few regional exceptions, 1.0% or less of Black applicants received final ratings of 90 or better. Without exception, 10% or more of White applicants received final ratings of 90 or better.  The percentage of applicants with ratings of 90 or better for the other races, and for Hispanics, varied widely from region to region as did overall regional percentages.  The reader should keep in mind that for some groups (for example, American Indians) sample sizes were very small, resulting sometimes in dramatic increases in percentages with the addition of only one or two persons to a rating category.

## Means and Standard Deviations of Unaugmented and Augmented Ratings

Carver (1978) has noted that when large sample sizes are involved, researchers have been known to make interpretations based on trivial results because they are statistically significant.  In light of the large sample sizes involved in the present research, a decision was made here based on a discussion with a statistical research expert in multiple regression analyses (Carroll, Note 5) and as a result of a close examination of literature dealing with the practical significance of subgroup differences.  It was decided

that any statistically significant effects that accounted for less than 2% of unique performance variance in the regression analyses should not be considered practically significant and would not be interpreted.  Carrol has advocated the 2% rule of thumb as has Backman (1972) in her analyses of practically significant subgroup differences when large sample sizes are involved. For a thorough and related explication of pitfalls in statistical significance testing see Carver (1978).

Table 6 presents nationwide means and standard deviations of the unaugmented and augmented ratings available for January and April, 1978 PACE applicants, for occupational specialty 001.  These statistics have been calculated by race, by sex, and by ethnic origin. As seen in Table 7, race accounts for a practically significant unique increment in unaugmented score variance of 11.73%.  For the unaugmented ratings the means for American Indians, Asians, Whites, and Others were all significantly higher than the mean for Blacks, and the mean for Whites was significantly higher than the means for all other races. There were no practically significant differences attributed to ethnicity for either of the two ratings criteria, or for any of the interactions.

Table 8 presents means and standard deviations of unaugmented and augmented ratings tabulated by sex within race.  Among the racial categories there were no practically significant mean differences between the sexes for the augmented or unaugmented ratings.

## Distribution of Applicants Who Did Not Receive Occupational Specialty 001 Ratings

Nationwide, the 2,090 applicants who did not qualify for occupational specialty 001 but who did qualify for one or more of the remaining five occupational specialties were distributed as follows: 9 American Indians (0.4% of the 2,090), 67 Asians (3.2%), 103

6

Blacks (4.9%), 1,888 Whites (90.3%), and 23 Others (1.1%). There were 1,218 males (53.3%) and 872 females (41.7%). Hispanics numbered 77 (3.7%) and non-Hispanics 1,970 (94.3%). Forty-three of these applicants did not respond to the question on ethnicity,

There were 29,681 January and April, 1978 PACE applicants who did not receive final ratings because either they did not qualify on the written test or because they did not qualify on the education and experience requirement. Table 9 presents the nationwide distribution of these applicants by race, sex, and ethnic origin.

Status of Eligible PACE Applicants

Table 10 presents the numbers and percentages of eligible PACE applicants who, as of December 15, 1978, had been selected or certified, or who were in active or inactive status. For the purpose of producing this national summary, career and temporary certifications were combined into one category. Also those applicants who were designated "Field" in their certification history were combined with those designated "Active". Forty-two applicants were in "Hold" status and are not included in the table. The table presents the data by three separate categorizations of race, sex, and ethnicity. Percentages are based upon the total number of persons in the various race, sex, and ethnic groups who took the written test. The table indicates that of the 54,929 applicants, 2.4% have been selected for employment, 4.6% have been placed on certificates, about 33.5% are in active status, and 1.9% are now inactive for a variety of reasons. As mentioned previously, small discrepancies in total numbers (when comparing the three parts of the table) are due to missing data in one of the factors used in crosstabulation.

Table 11 is in the same format as Table 10 but the data have been presented from another perspective; that is, percentages are based upon the total numbers of selections,

certifications, actives, and inactives rather than the number of applicants. For example, when status was crosstabulated by race, a total of 1,295 people had been selected. Three of these (0.2% of the 1,295) were American Indians; 22 (1.7%) were Asians; 32 (2.5%) were Black; 1,230 (95.0%) were White; and 8 (0.6%) were Other. The first two columns in the table give the racial distribution of the total applicant sample for comparison purposes.

Tables 12 through 18 present more detailed descriptions of those selected, certified, active and inactive, crosstabulated with race, sex, and ethnicity.

The first three of these tables show status by rating, by race, (Table 12), by sex (Table 13), and by ethnic origin (Table 14). From Table 12, for example, it is apparent that of the 1,230 Whites selected, 181 or 14.7% had ratings between 70 and 79, 446 (36.3%) between 80 and 89, 468 (38.0%) between 90 and 99, 135 (11.0%) between 100 and 109, and none had ratings greater than 109. Of the 32 Blacks selected, 16 (50.0%) had ratings between 70 and 79, 10 (31.3%) between 80 and 89, five (15.6%) between 90 and 99, none between 100 and 109, and one (3.1%) had a rating greater than 109.

The last four of these tables summarize Veteran status and Outstanding Scholarship by race, sex, and ethnicity for those selected (Table 15), those certified (Table 16), those in active status (Table 17), and those in inactive status (Table 18). Table 15 (Part 1-Race) shows, for example, that of 1,295 selected individuals, 386 were Outstanding Scholars. Of these 386, one (0.3%) was an American Indian; 4 (1.0%) were Asian; 13 (3.4%) were Black; 367 (95.1%) were White; and one (0.3%) was Other. Similary, Part 3 (Ethnicity) of this table shows that of 381 Outstanding Scholars, four (1.0%) were of Hispanic origin, whereas 377 (99.0%) were not. For comparison purposes, the last two columns in each of the four tables present the distribution of

7

totals selected, certified, active and inactive by race, sex, and ethnicity.

Table 19 presents a distribution of applicants and selectees by rating and Veteran status. The largest percentages of applicants with ratings of 70 and above and 90 and above, as well as selectees, were non-Veterans (over 80% in each case). In this category, females outnumbered males in both rating groups, but in selections, males were hired in greater numbers than females (586 v. 485). There were 2,614 male five-point veterans with ratings of 70 and above and 153 females in this same category. With ratings of 90 and above (and with five-point veteran preference), there were 888 males and 59 females. Selections in the five-point Veteran category included 180 males (13.8% of the 1,305 selections) and nine females (0.7%). In the 10-point compensable Veteran category, 37 males (2.8%) and one female (0.1%) were among those selected. Although 54.8% of the males and 45.2% of the females had ratings of 90 and above, 61.8% of the selections made were males and only 38.2% were females.

### Adverse Impact Determination

Table 20 presents the adverse impact determination for the selection process by which applicants are selected from PACE registers. The data indicate that there is adverse impact for women and for minorities.

### DISCUSSION

This report has presented data which demonstrates that the PACE, viewed as one of the inputs into a number of entry level professional and administrative jobs, has adverse impact against minorities and women. The fact that unaugmented ratings differ significantly as a function of race was clearly shown.

Added points for Veteran preference may be a contributing cause of this adverse impact against women. The results presented in Table 19 would indicate that this is so.

Of selections among Veterans, 221 (16.9% of the total of 1,305) were males, only 13 (1.0%) were females. However, although females outnumbered males in the non-Veteran rating category of 90 and above (43.6% v. 38.2%), selections in the non-Veteran category were only 37.2% female and 44.9% male. Obviously other factors are operating to produce the selection rate imbalance. It will be recalled that there were no practically significant differences in performance for men or women on either criteria. The adverse impact for females would not have occurred had 577 been selected rather than only 498. Among those January and April, 1978 PACE applicants who received ratings of 90 or better and who had been certified but not selected were 605 females.

Similarly, adverse impact for racial minorities and Hispanics would have been eliminated had the following occurred:

> 7 American Indians had been selected rather than 3
> 33 Asians had been selected rather than 22
> 143 Blacks had been selected rather than 32
> 54 Hispanics had been selected rather than 25

Among those January and April, 1978 PACE applicants who were not selected but who achieved final ratings of 90 or better, and who had been certified or were in active status were the following:

| | Certified | Active | Total |
|---|---|---|---|
| American Indians | 10 | 7 | 17 |
| Asians | 17 | 74 | 91 |
| Blacks | 15 | 11 | 26 |
| Hispanic | 16 | 38 | 54 |

Since the 1,295 selections included 466 (36%) applicants with ratings between 80 and 90, those applicants whose ratings were in this interval and who had been certified or were in active status, but who were not selected, should be enumerated.

They were as follows:

     50 American Indians

     187 Asians

     154 Blacks

     150 Hispanics

It is evident from the numbers above that more than enough applicants qualified for employment with ratings between 80 and 90. Adverse impact would have been eliminated had they been selected. In fact, except for Blacks, there were sufficient numbers of applicants with ratings of 90 or above to eliminate adverse impact if they had been selected. We do not know the reasons for the adverse impact found in this study. It is not known if the applicants were within reach on the certificates or the extent to which selections were affected by other factors, such as geographic preference, availability for temporary or part-time employment, special education and experience requirements for certain jobs, or failure on the part of an applicant to respond to an availability questionnaire or appear for a job interview. The extent to which these and other factors have a differential effect on minorities and women could be the subject of future research. The possible impact of Veteran preference on the selection of women has already been mentioned. That other factors, however, may also be operative is indicated by the fact that 88.4% of PACE applicants who received final ratings of 70 or better were non-Veterans. Furthermore 43.8% of female PACE applicants from January and April, 1978 and a slightly smaller percentage of male applicants (41.2%) were in this rating category.

Only 14.5% of the Black PACE applicants from January and April, 1978 received final ratings of 70 or better. The same figures for Hispanics and American Indians were 19.2% and 25.2%, respectively; for Asians, 39.9%; and for Whites, 46.9%. It may well be that these test score differences can be accounted for, at least in part, in terms of educational and economic opportunity. Regional differences may also be accounted for in these terms.

Bronfenbrenner, (1980) has recently suggested, based on a comprehensive literature review, some environmental conditions related to a child's development within and outside the family which may be later linked to differential test performance. Explaining the causes of differential test performance as a function of race is an extremely complex task which requires the collaboration of experts from several specialized areas of science, in addition to test developers and users.

REFERENCE NOTES

1. Wing, H. The scoring system of the Professional and Administrative Career Examination (PACE). (PRT 74-2). Washington, D.C.: U.S. Civil Service Commission, Personnel Research and Development Center, 1974.

2. Northrop, L. C. Regional distribution of January, 1978, PACE applicants by race, sex, and ethnic origin. Unpublished manuscript, 1980. (Available from Lois Northrop, U.S. Office of Personnel Management, Personnel Research and Development Center, 1900 E. St, N.W., Washington, D.C., 20415).

3. Northrop, L. C. Pilot study No. 1 for the collection of race, sex, and ethnic origin data in Federal testing. (TM 79-15). Washington, D.C.: U.S. Office of Personnel Management, Personnel Research and Development Center, 1979.

4. Mento, A. J. A detailed methodological explication of the processing of three sets of Professional and Administrative Career Examination (PACE) computer tape files. (OP 80-1). Washington, D.C.: U.S. Office of Personnel Management, Personnel Research and Development Center, 1980.

5.  Carroll, R.  Army Research
    Institute, Personal Communica-
    tion, March 18, 1980.

## REFERENCES

Backman, M. E. Patterns of mental
    abilities:  Ethnic, socioecono-
    mic and sex differences.
    Educational Research Journal
    1972, 9, 1-12.

Bronfenbrenner, U.  Intelligence in
    black and white.  (Review of Bias
    in Mental Testing by Arthur R.
    Jensen).  The Washington Post,
    Book World, April 20, 1980,
    pp. 1,2; 8-9.

Carver, R. P.  The case against stat-
    istical significance testing.
    Harvard Educational Review, 1978,
    48, 378-399.

Cohen, J. & Cohen, P.  Applied mul-
    tiple regression/correlation ana-
    lysis for the behavioral scien-
    ces.  Hillsdale, N.J.:  Lawrence
    Erlbaum, 1975.

Corts, D. B., Muldrow, T. W., &
    Outerbridge, A.  Research base
    for the written portion of the
    Professional and Administrative
    Career Examination (PACE):  Pre
    diction of job success for cus-
    toms inspector.  (TS 77-41).
    Washington, D.C.:  U.S. Civil
    Service Commission, Personnel
    Research and Development Center,
    1977.  (NTIS # PB280 620).

Kerlinger, F. N., & Pedhazur, E. J.
    Multiple regression in beha-
    vioral research.  New York:
    Holt, Rinehart, & Winston, 1973.

McKillip, R. H., Trattner, M. H.,
    Corts, D. B., & Wing, H.
    The professional and administra-
    tive career examination (PACE):
    Research and development.
    (PRR 77-1).  Washington, D.C.:
    U.S. Civil Service Commission,
    Personnel Research and Develop-
    ment Center, 1977.  (NTIS # PB
    273 118/AS.)

Overall, J. E., & Speigel, D. K.
    Concerning lease square analy-
    sis of experimental data.
    Psychological Bulletin, 1969,
    72,, 311-322.

Table 1

DISTRIBUTION OF PACE APPLICANTS BY SELF-IDENTIFICATION
OF RACE, SEX, AND ETHNIC ORIGIN

January – April, 1978

Nationwide

|  |  | Male | | Female | | Totals | |
|---|---|---|---|---|---|---|---|
|  |  | Number | Percent | Number | Percent | Number | Percent |
| American Indian | H | 31 | 0.1 | 14 | 0.1 | 45 | 0.1 |
| or | NH | 143 | 0.5 | 119 | 0.5 | 252 | 0.5 |
| Alaskan Native | NoR | 11 | 0.0 | 4 | 0.0 | 15 | 0.0 |
| Subtotal |  | 185 | 0.6 | 137 | 0.5 | 322 | 0.6 |
| Asian or | H | 64 | 0.2 | 41 | 0.2 | 105 | 0.2 |
| Pacific Islander | NH | 667 | 2.3 | 671 | 2.6 | 1338 | 2.4 |
|  | NoR | 34 | 0.1 | 22 | 0.1 | 56 | 0.1 |
| Subtotal |  | 765 | 2.7 | 734 | 2.8 | 1499 | 2.7 |
| Black | H | 72 | 0.3 | 66 | 0.3 | 138 | 0.2 |
|  | NH | 2148 | 7.5 | 3646 | 13.9 | 5794 | 10.6 |
|  | NoR | 267 | 0.9 | 289 | 1.1 | 556 | 1.0 |
| Subtotal |  | 2487 | 8.7 | 4001 | 15.3 | 6488 | 11.8 |
| White | H | 1039 | 3.6 | 657 | 2.5 | 1696 | 3.1 |
|  | NH | 23135 | 80.6 | 20026 | 76.4 | 43161 | 78.6 |
|  | NoR | 438 | 1.5 | 244 | 0.9 | 682 | 1.2 |
| Subtotal |  | 24612 | 85.7 | 20927 | 79.8 | 45539 | 82.9 |
| Other | H | 450 | 1.6 | 260 | 1.0 | 710 | 1.3 |
|  | NH | 196 | 0.7 | 146 | 0.6 | 342 | 0.6 |
|  | NoR | 19 | 0.1 | 10 | 0.0 | 29 | 0.1 |
| Subtotal |  | 665 | 2.3 | 416 | 1.6 | 1081 | 2.0 |
| Column Sub- | H | 1656 | 5.8 | 1038 | 4.0 | 2694 | 4.9 |
| total | NH | 26289 | 91.6 | 24608 | 93.9 | 50897 | 92.7 |
|  | NoR | 769 | 2.7 | 569 | 2.2 | 1338 | 2.4 |
| Column totals and Column percents |  | 28714 | 100.0 | 26215 | 100.0 | 54929 | 100.0 |

Percent Male   52.3        Percent Female 47.7

H = Hispanic origin        NH = Not of Hispanic origin        NoR = No response

11

Table 2

Regional Summary--Distribution of January and April, 1978
PACE Applicants by Self-Identification of Race and Sex

| | | American Indian | | Asian | | Black | | White | | Other | | Regional Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AT | M | 22 | 0.3 | 17 | 0.2 | 516 | 7.6 | 2740 | 40.4 | 25 | 0.4 | 3320 | 49.0 |
| | F | 13 | 0.2 | 19 | 0.3 | 940 | 13.9 | 2476 | 36.5 | 13 | 0.2 | 3461 | 51.0 |
| | Total | 35 | 0.5 | 36 | 0.5 | 1456 | 21.5 | 5216 | 76.9 | 38 | 0.6 | 6781 | 100.0 |
| BN | M | 7 | 0.2 | 17 | 0.4 | 51 | 1.2 | 2231 | 55.0 | 27 | 0.7 | 2333 | 57.5 |
| | F | 7 | 0.2 | 25 | 0.6 | 93 | 2.3 | 1589 | 39.2 | 11 | 0.3 | 1725 | 42.5 |
| | Total | 14 | 0.4 | 42 | 1.0 | 144 | 3.5 | 3820 | 94.1 | 38 | 1.0 | 4058 | 100.0 |
| CH | M | 8 | 0.1 | 33 | 0.5 | 282 | 4.1 | 3040 | 44.5 | 41 | 0.6 | 3404 | 49.8 |
| | F | 12 | 0.2 | 26 | 0.4 | 533 | 7.8 | 2826 | 41.4 | 32 | 0.5 | 3429 | 50.2 |
| | Total | 20 | 0.3 | 59 | 0.9 | 815 | 11.9 | 5866 | 85.8 | 73 | 1.1 | 6833 | 100.0 |
| DA | M | 37 | 0.6 | 20 | 0.4 | 274 | 4.8 | 2432 | 42.8 | 195 | 3.4 | 2958 | 52.1 |
| | F | 30 | 0.5 | 14 | 0.2 | 441 | 7.8 | 2132 | 37.6 | 102 | 1.8 | 2719 | 47.9 |
| | Total | 67 | 1.2 | 34 | 0.6 | 715 | 12.6 | 4564 | 80.4 | 297 | 5.2 | 5677 | 100.0 |
| DE | M | 16 | 0.9 | 12 | 0.6 | 32 | 1.7 | 932 | 50.3 | 17 | 0.9 | 1009 | 54.5 |
| | F | 3 | 0.2 | 13 | 0.7 | 34 | 1.8 | 777 | 42.0 | 16 | 0.9 | 843 | 45.5 |
| | Total | 19 | 1.0 | 25 | 1.3 | 66 | 3.6 | 1709 | 92.3 | 33 | 1.8 | 1852 | 100.0 |
| NY | M | 20 | 0.2 | 89 | 1.0 | 419 | 4.9 | 4261 | 50.1 | 118 | 1.4 | 4907 | 57.7 |
| | F | 10 | 0.1 | 76 | 0.9 | 502 | 5.9 | 2922 | 34.4 | 89 | 1.0 | 3599 | 42.3 |
| | Total | 30 | 0.3 | 165 | 1.9 | 921 | 10.8 | 7183 | 84.4 | 207 | 2.4 | 8506 | 100.0 |
| PH | M | 13 | 0.2 | 19 | 0.3 | 257 | 4.2 | 2818 | 46.2 | 15 | 0.2 | 3122 | 51.1 |
| | F | 9 | 0.1 | 17 | 0.3 | 495 | 8.1 | 2441 | 40.0 | 20 | 0.3 | 2982 | 48.9 |
| | Total | 22 | 0.4 | 36 | 0.6 | 752 | 12.3 | 5259 | 86.2 | 35 | 0.6 | 6104 | 100.0 |
| SL | M | 6 | 0.2 | 9 | 0.3 | 97 | 3.2 | 1406 | 45.7 | 21 | 0.7 | 1539 | 50.0 |
| | F | 10 | 0.3 | 9 | 0.3 | 222 | 7.2 | 1288 | 41.8 | 10 | 0.3 | 1539 | 50.0 |
| | Total | 16 | 0.5 | 18 | 0.6 | 319 | 10.4 | 2694 | 87.5 | 31 | 1.0 | 3078 | 100.0 |
| SF | M | 33 | 0.5 | 481 | 7.1 | 286 | 4.2 | 2608 | 38.5 | 157 | 2.3 | 3565 | 52.7 |
| | F | 26 | 0.4 | 451 | 6.7 | 338 | 5.0 | 2292 | 33.9 | 98 | 1.4 | 3205 | 47.3 |
| | Total | 59 | 0.9 | 932 | 13.8 | 624 | 9.2 | 4900 | 72.4 | 255 | 3.8 | 6770 | 100.0 |
| SE | M | 15 | 0.8 | 33 | 1.7 | 28 | 1.5 | 933 | 48.9 | 26 | 1.4 | 1035 | 54.3 |
| | F | 13 | 0.7 | 41 | 2.1 | 32 | 1.7 | 770 | 40.4 | 16 | 0.8 | 872 | 45.7 |
| | Total | 28 | 1.5 | 74 | 3.9 | 60 | 3.1 | 1703 | 89.3 | 42 | 2.2 | 1907 | 100.0 |
| WAO | M | 7 | 0.2 | 29 | 0.9 | 226 | 7.2 | 1096 | 34.9 | 20 | 0.6 | 1378 | 43.8 |
| | F | 4 | 0.1 | 41 | 1.3 | 350 | 11.1 | 1363 | 43.4 | 8 | 0.3 | 1766 | 56.2 |
| | Total | 11 | 0.3 | 70 | 2.2 | 576 | 18.3 | 2459 | 78.2 | 28 | 0.9 | 3144 | 100.0 |

Note: AT – Atlanta        NY – New York        WAO – Washington Area Office
BN – Boston        PH – Philadelphia
CH – Chicago       SL – St. Louis
DA – Dallas        SF – San Francisco
DE – Denver        SE – Seattle

These regional designations were in effect when the data were collected

12

Table 3

Regional Summary--PACE Applicants
Hispanics by Race
January - April, 1978

| | | American Indian | Asian | Black | White | Other | Regional Total |
|---|---|---|---|---|---|---|---|
| AT | Total N | 35 | 36 | 1456 | 5216 | 38 | 6781 |
| | Hispanic | 0 | 4 | 25 | 144 | 14 | 187 |
| | % Hispanic | 0.0 | 11.1 | 1.7 | 2.8 | 36.8 | 2.8 |
| BN | Total N | 14 | 42 | 144 | 3820 | 38 | 4058 |
| | Hispanic | 2 | 1 | 6 | 35 | 11 | 55 |
| | % Hispanic | 14.3 | 2.4 | 4.2 | 0.9 | 28.9 | 1.4 |
| CH | Total N | 20 | 59 | 815 | 5866 | 73 | 6833 |
| | Hispanic | 3 | 3 | 10 | 93 | 41 | 150 |
| | % Hispanic | 15.0 | 5.1 | 1.2 | 1.6 | 56.2 | 2.2 |
| DA | Total N | 67 | 34 | 715 | 4564 | 297 | 5677 |
| | Hispanic | 17 | 4 | 17 | 669 | 257 | 964 |
| | % Hispanic | 25.4 | 11.8 | 2.4 | 14.7 | 86.5 | 17.0 |
| DE | Total N | 19 | 25 | 66 | 1709 | 33 | 1852 |
| | Hispanic | 2 | 1 | 1 | 47 | 30 | 81 |
| | % Hispanic | 10.5 | 4.0 | 1.5 | 2.8 | 90.9 | 4.4 |
| NY | Total N | 30 | 165 | 921 | 7183 | 207 | 8506 |
| | Hispanic | 6 | 8 | 35 | 231 | 131 | 411 |
| | % Hispanic | 20.0 | 4.8 | 3.8 | 3.2 | 63.3 | 4.8 |
| PH | Total N | 22 | 36 | 752 | 5259 | 35 | 6104 |
| | Hispanic | 1 | 4 | 8 | 53 | 10 | 76 |
| | % Hispanic | 4.5 | 11.1 | 1.1 | 1.0 | 28.6 | 1.2 |
| SL | Total N | 16 | 18 | 319 | 2694 | 31 | 3078 |
| | Hispanic | 0 | 1 | 6 | 33 | 16 | 56 |
| | % Hispanic | 0.0 | 5.6 | 1.9 | 1.2 | 51.6 | 1.8 |
| SF | Total N | 59 | 932 | 624 | 4900 | 255 | 6770 |
| | Hispanic | 11 | 62 | 23 | 289 | 167 | 552 |
| | % Hispanic | 18.6 | 6.6 | 3.7 | 5.9 | 65.5 | 8.2 |
| SE | Total N | 28 | 74 | 60 | 1703 | 42 | 1907 |
| | Hispanic | 2 | 10 | 1 | 39 | 21 | 73 |
| | % Hispanic | 7.1 | 13.5 | 1.7 | 2.3 | 50.0 | 3.8 |
| WAO | Total N | 11 | 70 | 576 | 2459 | 28 | 3144 |
| | Hispanic | 1 | 7 | 6 | 50 | 12 | 76 |
| | % Hispanic | 9.1 | 10.0 | 1.0 | 2.0 | 42.9 | 2.4 |

APPENDIX A

PACE Occupational Coverage List

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| 011 | Bond Sales Promotion | 501 | General Accounting Clerical and Administrative |
| 018 | Safety Management | | |
| 020 | Community Planning | 526 | Tax Technician |
| 023 | Outdoor Recreation Planner | 560 | Budget Administration |
| 025 | Park Management | 570 | Financial Institution Examining |
| 027 | Crop Insurance Administration (except for fieldman and field specialist positions) | 673 | Hospital Housekeeping Management |
| | | 685 | Public Health Program Specialist |
| 028 | Environmental Protection | 950 | Paralegal Specialist |
| 080 | Security Administration | 962 | Contact Representative |
| | | 965 | Land Law Examining |
| 101 | Social Science | 967 | Passport and Visa Examining |
| 105 | Social Insurance Administration | 987 | Tax Law Specialist |
| 106 | Unemployment Insurance | 990 | General Claims Examining |
| 110 | Economist | 991 | Worker's Compensation Claims Examining |
| 120 | Food Assitance Program Specialist | | |
| 130 | Foreign Affairs | 993 | Social Insurance Claims Examining |
| 131 | International Relations | 994 | Unemployment Compensation Claims Examining |
| 132 | Intelligence | | |
| 140 | Manpower Research and Analysis | 996 | Veterans Claims Examining |
| 142 | Manpower Development | 997 | Civil Service Retirement Claims Examining |
| 150 | Geography | | |
| 170 | History | | |
| 180 | Psychology | 1001 | General Arts and Information (Fine & Applied Arts positions are excluded) |
| 184 | Sociology | | |
| 187 | Social Services | 1015 | Museum Curator |
| 190 | General Anthropology | 1081 | Public Information |
| 193 | Archeology | 1082 | Writing and Editing |
| | | 1083 | Technical Writing and Editing |
| 201 | Personnel Management | | |
| 205 | Military Personnel Management | 1101 | General Business and Industry |
| 212 | Personnel Staffing | 1102 | Contract and Procurement |
| 221 | Position Classification | 1103 | Industrial Property Management |
| 222 | Occupational Analysis | 1104 | Property Disposal |
| 223 | Salary and Wage Administration | 1130 | Public Utility Specialist |
| 230 | Employee Relations | 1135 | Transportation Industry Analysis |
| 233 | Labor Relations | 1140 | Trade Specialist |
| 235 | Employee Development | 1145 | Agricultural Program Specialist |
| 244 | Labor Management Relations Examining | 1146 | Agricultural Marketing |
| 246 | Contractor Industrial Relations | 1147 | Agricultural and Fisheries Marketing Reporter |
| 249 | Wage and Hour Compliance Specialist | | |
| | | 1149 | Wage and Hour Law Administration |
| 301 | General Clerical and Administrative | 1150 | Industrial Specialist |
| 334 | Computer Specialist (Trainee) | 1160 | Financial Analysis |
| 341 | Administrative Officer | 1163 | Insurance Examining |
| 343 | Management Analysis | 1165 | Loan Specialist |
| 345 | Program Analysis | 1169 | Internal Revenue Officer |
| 346 | Logistics Management | 1170 | Realty |
| 393 | Communications Specialist | 1171 | Appraising and Assessing |

34

APPENDIX A (continued)

| Series | Title |
|--------|-------|
| 1173 | Housing Management |
| 1176 | Building Management |
| 1410 | Librarian (for certain trainner positions at GS-5) |
| 1412 | Technical Information Services |
| 1420 | Archivist |
| 1421 | Archives Specialist |
| 1701 | General Education and Training |
| 1715 | Vocational Rehabilitation |
| 1720 | Education Research & Program Specialist |
| 1810 | General Investigation |
| 1811 | Criminal Investigation (except for Treasury Enforcement Agents) |
| 1812 | Game Law Enforcement |
|  | —Covers Marine Enforcement Agent at GS-5 only |
|  | —Does not cover Special Agent (Wildlife) |
| 1816 | Immigration Inspection |
| 1831 | Securities Compliance Examining |
| 1854 | Alcohol, Tobacco, and Firearms Inspection |

| Series | Title |
|--------|-------|
| 1860 | Public Health Inspection |
| 1864 | Public Health Quarantine Inspection |
| 1889 | Import Specialist |
| 1890 | Customs Inspection |
| 1893 | Customs Marine Officer |
| 1910 | Quality Assurance Specialist |
| 2001 | General Supply |
| 2003 | Supply Program Management |
| 2010 | Inventory Management |
| 2030 | Distribution Facilities and Storage Management |
| 2032 | Packaging Specialist |
| 2050 | Supply Cataloging |
| 2101 | General Transportation |
| 2111 | Transportation Rate and Tariff Examiner |
| 2125 | Highway Safety Management |
| 2130 | Traffic Management |
| 2144 | Cargo Scheduling |
| 2150 | Transport Operations |

U.S. GOVERNMENT PRINTING OFFICE  1977-260 850/08

## U.S. Civil Service Commission



**DO NOT FOLD, STAPLE, PUNCTURE OR PAPER CLIP THIS FORM.**

## SURVEY FOR THE COLLECTION OF RACIAL AND ETHNIC DATA OF PERSONS APPLYING FOR FEDERAL EMPLOYMENT

**FORM APPROVED**
**OMB NO. 50-R0604**

**GENERAL INSTRUCTIONS:**

(1.) *Use only a Number 2 (or softer) lead pencil.* (2.) Completely blacken the oval corresponding to your response choice. (3.) Completely erase any mistakes. (4.) Make no marks outside of the response areas.

**1.** NAME: _____
Please Print

DATE: _____
Please Print

**2** SOCIAL SECURITY NUMBER (SSN)

**3** EXAMINING OFFICE CODE (EOC)

**NOTE: BE SURE TO WRITE IN YOUR NUMBERS AS WELL AS BLACKENING THE OVALS.**

**4** Please categorize yourself in terms of the race, sex and ethnicity categories below. Be sure to blacken ONE oval for your response to each of the three categories. (First read definitions of subcategories.)

### DEFINITIONS

The racial and ethnic categories for Federal statistics and administrative reporting are defined as follows:

**ETHNICITY:**
HISPANIC. A person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.

**RACE:**
AMERICAN INDIAN or ALASKAN NATIVE. A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

ASIAN or PACIFIC ISLANDER. A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, India, Japan, Korea, the Philippine Islands, and Samoa.

BLACK. A person having origins in any of the black racial groups of Africa.

WHITE. A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

### PRIVACY ACT NOTICE

**GENERAL**

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals completing Federal records and forms that solicit personal information.

**AUTHORITY**

Section 717 of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972.

**PURPOSE AND ROUTINE USES**

To further the principles of equal employment opportunity, Federal agencies are required to assure that any selection procedures used as a basis for employment decisions (including tests and other examining methods) are not affected by discrimination on the basis of race, color, religion, sex, or national origin. As part of the effort required to assure nondiscrimination in selection processes, Federal agencies are required to collect sex, racial, and ethnic data on applicants for Federal employment for group statistical analyses purposes. Your individual record will not be disclosed for any purpose.

**EFFECTS OF NONDISCLOSURE**

Providing this information is voluntary and there will be no adverse effect on you for not providing the information requested.

**INFORMATION REGARDING DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER UNDER PUBLIC LAW 93-579, SECTION 7 (b)**

Solicitation of the Social Security Number (SSN) by the United States Civil Service Commission is authorized under provisions of Executive Order 9397, dated November 22, 1943. It is used to relate this form with other records that you file with the Civil Service Commission.

**RACE:** (Blacken one oval) (RCE)

○ American Indian or Alaskan Native (1)

○ Asian or Pacific Islander (2)

○ Black (3)

○ White (4)

○ Other (5)

**SEX:** (Blacken one oval) (SEX)

○ Male (1)

○ Female (2)

**ETHNICITY:** (Blacken one oval) (ETH)

○ Hispanic Origin (1)

○ Not of Hispanic origin (2)

**CSC Form 1289—A (Temp)**
**Expires 9/78 Revised 11/77**

36

Form Used for Adverse Impact Determination on PACE in January and April, 1978

APPENDIX B

For Attachment S, see the accompanying bound volume
on plaintiffs' showings of adverse impact for 1983
hiring.

ATTACHMENT S

For Attachment T, see the accompanying bound volume
on plaintiffs' showings of adverse impact for 1984
hiring.

ATTACHMENT T

United States of America
# Office of
# Personnel Management

Office of the General Counsel
Washington, D.C. 20415

In Reply Refer To:                                                                                    Your Reference:

APR 2 5 1986

Richard T. Seymour, Esq.
Lawyers' Committee
   For Civil Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.  20005

Re:  <u>Luevano v. Devine</u>

Dear Rick:

    This letter is in regard to your letter of April 4, 1986, concerning "missing" applicant information for 1984, addressed to Barbara Ward.  Barbara has asked that I respond directly to you.

    Your concern appears to be that 1984 hiring data indicates fills in certain occupations for which there was either no 1984 applicant data or inconsistent applicant data for those occupations.  The first occupation you question is Tax Technician GS-0526, for which there were no applicants and no hires from the 1984 administration of the OPM sponsored examination.  As the examination was not administered until late in the year, processing of applications and setting up registers was not completed until after the end of the year.  The 1985 reports  will show applicants and fills under "Non PACE CS Cert" for the 0526 series.

    The 1984 hires into occupations 0962, 0986, 1101 and 1152, listed as OPM-sponsored are all non-covered, non-PACE fills into "asterisk" positions.  OPM had no competitive alternative examinations for these occupations in 1984 which would have been used for PACE-type positions.  Thus, any fill would be into a non-decree covered position for which no applicant data would be required.

    You next have raised a question regarding the delegated examination to the Treasury Department for series 1811.  As I have previously advised you, in conjunction with 1983 reporting, the delegation to Treasury was for Treasury Enforcement Agents, not Criminal Investigating and the positions are not PACE positions.  The 1984 hires were under the same delegation that was discussed for 1983 (See footnote 2 in your August 2, 1985 letter to Barbara Ward).

ATTACHMENT U

-2-

The delegation to OPM (from OPM) for General Investigating is a PACE covered situation. That delegation to examine was terminated in late 1983, but hiring continued into early 1984. You should use 1983 applicant data for these 33 fills.

You have noted two situations where there was Schedule B hiring into both the GS 5 and 7 levels, but applicant data referred only to GS-5 (Air Force, GS-2001 and Army GS-0343). In both cases the agency neglected to note on the reporting forms that applicants would be considered at GS-7 for the job in question, where the added basic qualifications were met. You should treat these two jobs as though the applicant form, Box 9, had read "5/7".

You next note no applicants for the Defense Department in series 2010. As in the 1983 situation, all applicants for the Defense Logistics Agency for the position of Supply Management GS-2000 were considered for positions in the 2010 series. (See 1984 applicant form 619 for the Defense Logistics Agency, PAC's 83-75, 84-11 and 84-96 and Barbara Ward's letter to you of March 5, 1986). The same situation is true of fills by the Navy into series 2001. You should refer to the Navy's 1984 applicant Form 619 for the 2000 series for which applicants were considered for positions in the 2001 series.

Finally, you note a mathametical error in the GS-0560 series. You are quite correct. The proper figure for white applicants is 5,671. The four thousand figure correction should make the remaining tallies proper.

Sincerely yours,

James S. Green
Assistant General Counsel


cc: Barbara Ward, Esq.

LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

April 29, 1986

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re: Luevano v. Horner:  Missing Applicant Data
for 1985

Dear Barbara and Jim:

This is in response to Jim's April 25 reply to my April 4, 1986 letter on missing applicant data.

1.  If the 1984 applicants for the OPM-sponsored examination for Tax Technician (Trainee), GS-0526, are to be counted as 1985 applicants and can be compared with the 1985 hires, this is acceptable in this one instance.

I do not understand, however, why 1984 applicants would be counted as 1985 applicants.  I understand that the counting may take place after the end of the year, but I do not understand why the counted 1984 applicants are not reported for 1984, as the Consent Decree requires.  It seems to me that the parties can get bogged down in unnecessary complications if some people who apply during a year are counted as applicants in that year, and others who apply during that year are counted as applicants in a later year, because of fortuities in OPM's processing of data.

Plaintiffs have understood the applicant data reported to them to be what it says it is:  all applicants during the calendar year.  If it is something different, plaintiffs need to know what the difference is, what the real numbers are, and what the correct figures should have been.  We need to hear from you

ATTACHMENT V



Barbara L. Ward, Esq.
James S. Green, Esq.
April 29, 1986
Page 2

about this, so that we can consider it before the next meeting of the Monitoring Committee.

2. Jim's April 25 letter represents that <u>all</u> hires into the following occupations were hires into non-PACE positions, and that <u>no</u> hires in these occupations were into positions formerly covered by the PACE, although the government has represented that these "asterisk" job categories involve <u>both</u> PACE-type and non-PACE-type positions, and although the government has previously represented to us that it was <u>impossible to separate the information on hires</u> so that only hires in PACE-type positions were reported.

| Type of Procedure | Job Series | Job Name | 1984 Hires |
|---|---|---|---|
| OPM-Sponsored | 0962 | Contract Representative | 131 |
| OPM-Sponsored | 0986 | Legal Clerical and Administrative | 56 |
| OPM-Sponsored | 1101 | General Business and Industry | 32 |
| OPM-Sponsored | 1152 | Production Control | 46 |

No 1983 applications were reported for these jobs, either.

Plaintiffs have a right to know how the government made the determination. After the government's oral representation that such hires could be broken down for 1983, and that the breakdowns explained away plaintiffs' showings of adverse impact in 1983 hiring for some jobs, plaintiffs requested a breakdown. See my letter of August 5, 1985. The letter has not been answered.

When Barbara's March 5, 1986 letter to me sought to explain the lack of 1983 applicant data for job series 0301, 0962, and 0986 by asserting that all hires were in non-PACE positions in these "asterisk" job categories, my April 4, 1986 response[1] again raised the inconsistency between the government's current representations and its former representations, and again asked for supporting information. This letter has also not been answered.

---

[1] This was a different letter, on the same date as the letter discussing missing applicant information for 1984.

Barbara L. Ward, Esq.
James S. Green, Esq.
April 29, 1986
Page 3


        Pursuant to ¶ 27 of the Consent Decree, as a formal
enforcement matter, plaintiffs request copies of the following
information for each and every 1983 and 1984 placement in the
"Non-PACE CS Cert" column in the 1983 and 1984 hiring reports:

        a) the SF-171 for the person selected;

        b) the position description for the vacancy in
question;

        c) the SF-50 and SF-52 showing the position number
which was filled by this person; and

        d) the vacancy announcement for this position.

With this information, it should be possible to get quickly to
the bottom of the matter.

        3.  Jim's April 25, 1986 letter stated that applicants
for the Supply Management position (GS-2000) at the Defense
Department were also all considered applicants for the GS-2010
Inventory Management series.  It would save everyone's time if,
in the future, the Defense Department made this plain in its
applicant report form.  Because there were two grade 7 hires, I
assume that the applicants should be considered grade 5/7
applicants, as for the Air Force (GS-2001) and the Army (GS-0343)
in 1984.  If this is not correct, please inform me.

        I have performed a calculation of adverse impact for
Seris 2010 at the Defense Department, based on the application
figures reported for the GS-2000 series.  There is adverse impact
against blacks at the grade 5 level, and at both levels com-
bined.  The showing is being sent to you by separate letter.

        4.  Jim's April 25, 1986 letter stated that applicants
for the Supply Management position (GS-2000) at the Navy Depart-
ment were also all considered applicants for the GS-2001 General
Supply series.  Again, it would save everyone's time if the Navy
Department filled out its forms more carefully in the future.
Using this new source of applicant data, plaintiffs' April 11,

Barbara L. Ward, Esq.
James S. Green, Esq.
April 29, 1986
Page 4


1986 showing of adverse impact (based on 1983 applicant data)
must be withdrawn.  It is hereby withdrawn.

        With best wishes,

                Very truly yours,

                Richard T. Seymour

RTS/lb


cc:  Barry L. Goldstein, Esq.
     John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

April 29, 1986

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

            Re:  Luevano v. Horner:  Supplemental Showing
                 of Adverse Impact

Dear Barbara and Jim:

        Following up on the additional information, in Jim's
April 25, 1986 letter to me, on the Schedule B applicants for the
Inventory Management position, GS-2010, at the Defense Depart-
ment, I have enclosed a new showing of adverse impact pursuant to
the enforcement provisions of the Consent Decree.

        I suggest that the shopwing for this position be
handled in conjunction with the other showings of adverse impact
in 1984 hiring made on April 11, 1986.

                          Very truly yours,

                          Richard T. Seymour

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.

ATTACHMENT W

ENFORCEMENT PROCEEDING
BEFORE THE MONITORING COMMITTEE
(1984 HIRING)

ANGEL G. LUEVANO, et al.,                )
                                         )
    individually and on behalf of        )
    all others similarly situated,       )
                                         )
                    Plaintiffs,          )
                                         )
              v.                         )
                                         )
CONSTANCE HORNER, et al.,                )
                                         )
                    Defendants.          )


                SHOWING OF ADVERSE IMPACT

Name of Job:        Inventory Management

Job Series:         2010

Job Level:          Grade 5

Agency:             U.S. Department of Defense

Procedure:          Use of Schedule B Authority[1]

Affected Class:     Blacks

        Plaintiffs hereby begin an enforcement proceeding

before the Monitoring Committee as to the above job category,

_____

        [1] Plaintiffs do not concede that the use of Schedule B
authority can be considered to be an alternative examining
procedure for purposes of determining when the five-year period
of retention of jurisdiction commences to run under the pro-
visions of ¶ 7 of the Consent Decree, at p. 6.  The defendants
have chosen to use such authority as an interim measure to save
the expense of developing alternative examining procedures, until
such time as the numbers of hires to be made in particular job
categories will justify the expense of developing alternative
examining procedures.  In the meantime, the parties have no
choice but to apply the adverse-impact provisions of the Consent
Decree on an agency-by-agency basis.


- Supplemental Exhibit: Series 2010, Defense Department, page 1 -

pursuant to the provisions of ¶ 8(b)(2) of the Consent Decree, at
p. 7.[2]   The page of OPM Report A-3 showing hiring information
for this job category at the Department of Defense, page 85, is
attached as Attachment A.   The relevant figures are:

1984 DEFENSE DEPARTMENT HIRES UNDER SCHEDULE B AUTHORITY FOR
INVENTORY MANAGEMENT, SERIES 2010

| | |
|---|---:|
| GRADE 5 TOTAL | 67 |
|     WHITE (NON-HISPANIC) | 47 |
|     BLACK (NON-HISPANIC) | 18 |
|     HISPANIC | 2 |
| GRADE 7 TOTAL | 2 |
|     WHITE (NON-HISPANIC) | 2 |
|     BLACK (NON-HISPANIC) | 0 |
|     HISPANIC | 0 |
| TOTAL, GRADES 5 AND 7 | 69 |
|     WHITE (NON-HISPANIC) | 49 |
|     BLACK (NON-HISPANIC) | 18 |
|     HISPANIC | 2 |

The page showing the application statistics provided to plain-
tiffs by OPM  for Schedule B applicants at the Defense Department
for this job category is attached as Attachment B.   Plaintiffs
note that OPM has <u>not</u> reported any Grade 7 Schedule B application
figures for this Defense Department position, even though there
were 2 Schedule B hires at the Grade 7 level.   Plaintiffs assume
that the 1984 Grade 5 applicants should be considered grades 5/7
applicants, in accordance with the suggestion made as to an Air
Force job and an Army job in Mr. Green's April 25, 1986 letter to
Mr. Seymour.[3]   With these qualifications, the relevant figures

_____

[2] See note 1, <u>supra</u>.

[3] If the defendants can produce more accurate information,
plaintiffs request them to do so immediately.

- Supplemental Exhibit: Series 2010, Defense Department, page 2 -

are as follows:

```
        1984 APPLICATIONS UNDER SCHEDULE B AT DEFENSE FOR
        INVENTORY MANAGEMENT, SERIES 2010

        SCHEDULE B APPLICATIONS: YEAR USED: 1984 REPORTS

            GRADE 5 APPLICANTS
            (ONLY GRADE FOR WHICH
            APPLICANTS WERE REPORTED)
                WHITE (NON-HISPANIC)                812
                BLACK (NON-HISPANIC)                530
                    % OF TOTAL BLACK:               37.7%
                HISPANIC                            29
                    % OF TOTAL HISPANIC:            2.1%
                OTHER                               34

            GRADE 7 APPLICANTS
            (NONE REPORTED: DATA
            FOR GRADE 5 APPLICANTS
            USED)
                WHITE (NON-HISPANIC)                812
                BLACK (NON-HISPANIC)                530
                    % OF TOTAL BLACK:               37.7%
                HISPANIC                            29
                    % OF TOTAL HISPANIC:            2.1%
                OTHER                               34

            TOTAL APPLICANTS FOR
            GRADES 5 AND 7 (INCLUDES
            ONLY SEPARATE GRADE 5 APPLI-
            CANTS, BECAUSE THESE ARE THE
            ONLY APPLICANTS REPORTED)
                WHITE (NON-HISPANIC)                812
                BLACK (NON-HISPANIC)                530
                    % OF TOTAL BLACK:               37.7%
                HISPANIC                            29
                    % OF TOTAL HISPANIC:            2.1%
                OTHER                               34

        TOTAL RACIALLY IDENTIFIED                   1405

        NOT IDENTIFIED                              214
        ---% NOT IDENTIFIED                         13.2%
```

Plaintiffs' analysis of the adverse impact as to this job

category is set out below:

```
        APPOINTMENT RATES (LEVEL 5)
                WHITE (NON-HISPANIC)                5.8%
                BLACK (NON-HISPANIC)                3.4%
```

- Supplemental Exhibit: Series 2010, Defense Department, page 3 -

```
APPOINTMENT RATES (BOTH LEVELS)
     WHITE (NON-HISPANIC)              6.0%
     BLACK (NON-HISPANIC)             3.4%

ADVERSE IMPACT CALCULATIONS:

  80% RULE: BLACK HIRE RATE AS
     PERCENT OF WHITE HIRE RATE
          ---LEVEL 5                  58.7%
          ---BOTH LEVELS 5 AND 7      56.3%
```

The appointment rates for blacks failed the "80% test" at the grade 5 level, at the grade 7 level, and for both levels combined.

These racial disparities were extremely close to statistically significant for blacks for both levels combined:

```
STANDARD DEVIATION ANALYSIS
     FOR BLACKS (BOTH LEVELS)
     --AVAILABILITY                   37.7%
     --OBSERVED NO. OF HIRES           18
     --EXPECTED NO. OF HIRES          26.03
      --DIFFERENCE                    -8.03
     --STANDARD DEVIATION              4.03
     --NO. OF STANDARD DEVIATIONS
       BETWEEN EXPECTED AND
       OBSERVED VALUES:               -1.99
```

The shortfalls in hiring for blacks are set forth below:

```
NUMBER OF ADDITIONAL BLACK
     HIRES, IF BLACKS HAD BEEN
     HIRED AT THE RATE AT WHICH
     WHITES WERE HIRED
          ---LEVEL 5                   13
          ---BOTH LEVELS 5 AND 7       14
```

OPM Report A-3 shows that the Defense Department did not use any of the special programs established by the Consent Decree to minimize the adverse impact of the Schedule B procedure for this job category. Plaintiffs seek the immediate hiring of the same number of blacks as are shown in the above "shortfall" calculations for each grade level, and the further "make-whole"

- Supplemental Exhibit: Series 2010, Defense Department, page 4 -

remedies described in Mr. Seymour's letter of July 29, 1985 to
Ms. Ward.

      For convenience, plaintiffs are setting forth below a
summary of the adverse impact calculations for which they rely as
to this job category:

    ADVERSE IMPACT SUMMARY:

| | |
|---|---|
| BLACKS (LEVEL 5) | |
|    SHORTFALL | 13 |
|    % OF WHITE RATE | 58.7% |
| | |
| BLACKS (BOTH LEVELS) | |
|    SHORTFALL | 14 |
|    % OF WHITE RATE | 56.3% |
|    NO. OF STANDARD DEVIATIONS | -1.99 |

    If the defendants have any problems with the adequacy
of plaintiffs' showing of adverse impact, please bring them to
the attention of counsel for plaintiffs immediately, so that both
the question of adverse impact and the provision of an adequate
remedy can be resolved during the 60-day conciliation period
provided by ¶ 28 of the Decree, at p. 43.

                                     _[signature]_

                             RICHARD T. SEYMOUR
                               Attorney for Plaintiffs

Dated: April 29, 1986

- Supplemental Exhibit: Series 2010, Defense Department, page 5 -

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION                PAGE :    85
PERIOD : JANUARY THRU DECEMBER OF 1984
AGENCY : DEPT OF DEFENSE                                    STATUS : ALL WORK SCHEDULES AND TENURES
GEOGRAPHIC AREA : NATIONWIDE                                PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | GS-05 | WHITE(N-HISP) | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 | 34 |
|  |  | BLACK(N-HISP) | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 14 |
|  |  | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
|  |  | TOTAL | 115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 | 48 |
|  | GS-07 | WHITE(N-HISP) | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 16 |
|  |  | BLACK(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 20 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 49 | 50 |
|  |  | BLACK(N-HISP) | 37 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 18 | 18 |
|  |  | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
|  |  | TOTAL | 139 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 69 | 68 |
| 2030 | GS-05 | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 2032 | GS-05 | WHITE(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | TOTAL | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-75  PAC 84-11; 84-96 | 2. Reporting Period  From 1/1/84   To 12/31/84 | 3. Missing Data 214 | 4. Name of Agency Contact and Phone Number(s)  FTS:  Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation  Defense Logistics Agency | 6. Name of Submitting Office  DLA, Headquarters |
|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series  Supply Management   GS- 2 0 0 0 | 9. Grade Level(s)  5 |
|---|---|---|

### NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | 40 | | 262 | 122 | 10 | 1 | | | 1 | 51 | 13 | | 23 | 7 | 530 |
| Hispanic origin | 12 | | 2 | 6 | 1 | | | | | 2 | 4 | | 2 | | 29 |
| White, not of Hispanic origin | 141 | | 282 | 216 | 13 | 21 | | 4 | 8 | 73 | 21 | | 31 | 2 | 812 |
| Other qualified applicants | 9 | | 7 | 10 | | 1 | | | | 1 | 2 | | 4 | | 34 |
| 10. Zone Totals | 202 | | 553 | 354 | 24 | 23 | | 4 | 9 | 127 | 40 | | 60 | 9 | 1405 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E  Form 619 (1-83)



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

July 29, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

       Re:  <u>Luevano v. Devine</u>

Dear Barbara:

       We have not yet responded to your May 15, 1985 letter because
many of the items in the letter contained primarily the information
that the subjects in question would be discussed at a May 29, 1985
Inter-Agency Group Meeting and we have anticipated your getting back
to us with the results of the meeting.

       The purpose of this letter is to ask for an update based on
the results of that meeting, or on any further information which has
come to OPM's attention or your attention in the interim, and to
raise a few specific points.

       <u>First</u>, we have not heard anything further about plaintiffs'
proposed inclusion in the next mailing to be made to class members.
By agreement, the proposed inclusion was sent to OPM on June 4, 1985.
We assume that we would have heard if there is any problem, but
want to make sure that it has not fallen through the cracks.

       <u>Second</u>, point 11 in your letter concerns the collection of
racial data on applicants.  Plaintiffs have <u>not</u> agreed to the govern-
ment's demand that there be no mandatory racial identification of
applicants, and have only agreed to defer action on this question
pending the results of the government's internal review of the problem.
We retain our right to move for an Order requiring mandatory racial
identification, particularly in light of the government's position,
as we understand it, that it intends to reserve the right to assert
that its own policy of not requiring mandatory racial identification
has blocked the collection of usable statistical information on
applicant-flow.  This position would, if accepted by either the Court
or plaintiffs, effectively make it impossible to judge the govern-
ment's performance under the Decree.

<u>ATTACHMENT X</u>

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
July 29, 1985
Page 2


One of the suggestions plaintiffs made at our March 15, 1985 meeting is that the racial identifications reported under the present system be checked against the Social Security Administration's records to see if the percentage of race-identified applicants reported as black, by agencies with a great deal of missing information, varies from SSA's report of the percentage of all applicants who are black. Thus, if the Army reported that it had 1,500 applicants, that it race-identified only 750 of them, and that 250 of the race-identified applicants were black, all the parties presently know is that a third of the race-identified applicants were black. What makes both sides uneasy is the possibility that the racial breakdown of the race-identified half of the applicants may not be the same as the actual racial breakdown among those who have not been race-identified. The Social Security Administration will not report on the race of individuals, but will report on the racial composition of a large list of individuals. If SSA scans the names and Social Security numbers of all 1,500 applicants and reports that a third of the entire group is black, both sides could look at the partial racial identifications with a great deal more confidence than at present.

As we mentioned before, the Civil Rights Division routinely asks the Social Security Administration to provide such information. Dave Rose should have at his fingertips the name and telephone number of Justice's contact person at SSA, and a list of the requirements to be followed in compiling the list.

Third, your May 15 letter requested a sixty-day extension of the dispute resolution period, for the government to gather any statistics it may need to contest the instances in which adverse impact was found on the basis of 1982 statistics. We did not have any problem with the request, but the additional sixty days expired July 14. Plaintiffs take it that there is no dispute from the government as to those instances of adverse impact. We must now discuss the relief to be awarded.

In broad terms, plaintiffs seek for each instance of adverse impact the immediate hire of the number of blacks and/or Hispanics corresponding to the difference between the (1) number of blacks and/or Hispanics who would have been hired if the selection rate for blacks and/or Hispanics had been the same as the selection rate for white Anglos and (2) the number of blacks and/or Hispanics actually hired. The hires in question would have to be hires of rejected or passed-over 1982 applicants in each of those instances. We suggest that the government propose the means of identifying the persons to be hired; the agency in question is probably in the best position to do so. Back pay and back seniority would have to be given the persons thus hired. For ease of figuring, we suggest that July 1, 1982 be used as the hypothetical starting point for both seniority and back pay.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
July 29, 1985
Page 3


The back pay would run until the persons in question are
hired. The back pay would be based on (a) the Level 5 pay rates
in effect from July 1, 1982 to the date the person hired would
have been promoted to Level 7; (b) Level 7 pay rates in effect
from the date of promotion to Level 7 until the date he or she
would have been promoted to Level 9; (c) Level 9 pay rates to the
date of promotion to Level 11; and (d) Level 11 pay rates there-
after. If the agency had a system of noncompetitive promotions
from Level 5 to Level 7 after a year at Level 5, plaintiffs suggest
we use July 1, 1983 as the date of hypothetical promotion to Level
7. Promotions to Level 9 could be handled in the same manner, with
July 1, 1984 as the hypothetical date of promotion. Promotions to
Level 11 would have July 1, 1985 as the hypothetical date of
promotion.

The persons to be hired would accordingly come in at Level
11 pay rates, and would continue to progress up the ladder of non-
competitive promotions in accordance with the usual schedule, up
to the top of the noncompetitive "career ladder". The actual duties
assigned the remedial hires would presumably be at lower levels,
until the person in question is able to handle the duties of the
higher-rated positions. The agency should provide a program of
compensatory training to make up for the remedial hires' loss of the
opportunity to gain skill by actual on-the-job experience over the
last three years.

If any of the agencies in question did not use career ladders,
or used career ladders with journeyman levels below Level 11,
plaintiffs propose that we take account of the problem of lost
promotions by using a percentage based on the percentage of persons
at one level who are in fact promoted to the higher level at a
given point in their career. We will most likely have to deal
with ranges of time. For example, if agency A competitively
promotes 50% of its Level 5 hires to Level 7 a year after hire,
and if 100% of Level 5 hires have been promoted to Level 7 by two
years after hire, back pay for the remedial hire would be based
on Level 5 pay, plus 50% of the differential between Level 5 and
Level 7 until his or her second anniversary, at which point he or
she would receive full Level 7 pay. The midpoint of 18 months seems
reasonable to use as the hypothetical date of promotion (half the
differential for a year amounts to the same as the full differen-
tial for half a year), and this hypothetical date would be the
starting point for a similar calculation as to the hypothetical
promotion to Level 9.

Now that questions of liability are behind us on the 1982
instances of adverse impact, plaintiffs would like to wrap up
the remedy questions as quickly as possible. We should probably

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
July 29, 1985
Page 4


not defer this question until the next meeting of the Monitoring
Committee, but should try to make progress in the interim.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: James S. Green, Esq.
    Barry L. Goldstein, Esq.
    John H. Erickson, Esq.

<u>Certificate of Service</u>

I certify that I have this 6th day of June, 1987, served a copy of plaintiffs' foregoing Motion, its attachments, the Memorandum in support, and the proposed form of Order on counsel of record for the defendants by causing copies to be mailed to them at the following addresses:

> Barbara L. Ward, Esq.
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
>     Room 3509
> Washington, D.C. 20530
>
> James S. Green, Esq.
> U.S. Office of Personnel Management
> 1900 E Street N.W.
>     Room 7450
> Washington, D.C. 20415

RICHARD T. SEYMOUR
Bar No. 28100
        Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
    individually and on behalf of  )
    all others similarly situated, )
                                   )
                      Plaintiffs,  )
                                   )
              v.                   )      C. A. No. 79-0271
                                   )
CONSTANCE HORNER, Director,        )
    U.S. Office of Personnel       )
    Management, et al.,            )
                                   )
                      Defendants.  )

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR RELIEF ON THEIR SHOWINGS OF ADVERSE IMPACT IN
HIRING FOR 1982, 1983, AND 1984

### Table of Authorities

|                                                                                    | Pages |
|------------------------------------------------------------------------------------|-------|
| *Albemarle Paper Co. v. Moody, 422 U.S. 405, 45 L.Ed.2d 280 (1975)                 | 3, 5  |
| Boyd v. SCM Allied Paper Co., 42 FEP Cases 1643 (N.D.Ind., 1986)**                 | 10    |
| Bundy v. Jackson, 641 F.2d 934, 205 U.S.App.D.C. 444 (D.C.Cir., 1981)              | 11    |
| *Connecticut v. Teal, 457 U.S. 440, 73 L.Ed.2d 130 (1982)                          | 2     |
| Day v. Mathews, 530 F.2d 1083, 174 U.S.App.D.C. 231 (D.C.Cir., 1976)               | 11    |
| EEOC v. CW Transport, 43 FEP Cases 782 (W.D.Wis., 1987)**                          | 5     |
| EEOC v. Korn Industries, 662 F.2d 256 (4th Cir., 1981)                             | 9     |
| Franks v. Bowman Transportation Co., 424 U.S. 747, 47 L.Ed.2d 444 (1976)           | 6     |
| *Hameed v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, 637 F.2d 506 (8th Cir., 1980) | 11    |

                                                        <u>Pages</u>

Jepsen v. Florida Board of Regents, 754 F.2d 924
     (11th Cir., 1985)                                     9

*Laffey v. Northwest Airlines, 567 F.2d 429,
     185 U.S.App.D.C. 322 (D.C.Cir., 1976),
     cert. den., 434 U.S. 1086, 55 L.Ed.2d 792 (1978)      4

Luevano v. Campbell, 93 F.R.D. 68, 87-88 (1981)           4

McKenzie v. Sawyer, 684 F.2d 62, 221 U.S.App.D.C.
     288 (D.C.Cir., 1982)                                6, 11

*Pecker v. Heckler, 801 F.2d 709 (4th Cir., 1986)         7

Pettway v. American Cast Iron Pipe Co., 494 F.2d 211
     (5th Cir., 1974)                                      9

*Segar v. Smith, 738 F.2d 1249, 238 U.S.App.D.C. 103
     (D.C.Cir., 1984), cert. den., 471 U.S. 1115,
     86 L.Ed.2d 258 (1985)                               10, 11

*Thompson v. Sawyer, 678 F.2d 257, 219 U.S.App.D.C.
     393 (D.C.Cir., 1982)                                  7

*White v. Carolina Paperboard Corp., 564 F.2d 1073
     (4th Cir., 1977)                                     7, 9

*Denotes cases chiefly relied upon.
**Copy provided to the Court and to opposing counsel.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
    individually and on behalf of  )
    all others similarly situated, )
                                   )
                    Plaintiffs,    )
                                   )
           v.                      )   C. A. No. 79-0271
                                   )
CONSTANCE HORNER, Director,        )
    U.S. Office of Personnel       )
    Management, et al.,            )
                                   )
                    Defendants.    )

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR RELIEF ON THEIR SHOWINGS OF ADVERSE IMPACT IN
HIRING FOR 1982, 1983, AND 1984

        Plaintiffs' showings of adverse impact encompass three

years of hiring activity.  While it is certainly true that many

agencies have performed well under the Consent Decree, with

respect to job category after job category, it is with equal

certainty true that some agencies have performed poorly as to

some job categories.  The showings of adverse impact make clear

that the latter agencies have effectively ignored their obli-

gation under the Decree to use all practicable efforts to

eliminate adverse impact.

        A. The Fact that Other Agencies Have Made Progress
           Provides No Defense to Agencies Which Have Violated
           The Decree

        Plaintiffs expect the government to urge that the good

performance of some agencies should somehow excuse the poor

performance of other agencies, and that the good performance of

the officials responsible for hiring in one job category should

somehow excuse the poor performance of the officials responsible
for the complained-of hiring performance in another job category.
Such an argument has no basis in the Decree, and has no basis in
law.  Both the Consent Decree and logic require that each agency
and job category be considered on their own.  The blacks and/or
Hispanics victimized by discriminatory hiring in one job category
are not helped in the slightest by the fact that other blacks or
Hispanics did not face discrimination as to another agency or job
category.

        The Supreme Court faced an analogous situation in
<u>Connecticut v. Teal</u>, 457 U.S. 440, 73 L.Ed.2d 130 (1982).  There,
the four black plaintiffs were denied consideration for promo-
tions because of a test which had adverse impact against blacks.
The agency tried to defend against their claims by pointing out
that it had exercised "affirmative action" and promoted those
blacks who had passed the test at a disproportionately high rate,
so that the "bottom line" was better for blacks than it was for
whites.[1]  The Supreme Court rejected the agency's argument:

> The suggestion that disparate impact should be
> measured only at the bottom line ignores the fact
> that Title VII guarantees these individual
> respondents the <u>opportunity</u> to compete equally
> with white workers on the basis of job-related
> criteria. ...

457 U.S. at 451, 73 L.Ed.2d at 139 (emphasis in original).  The
Court continued:

---

[1] 22.9% of the blacks who took the test were promoted, while
only 13.5% of the whites who took the test were promoted.  457
U.S. at 444, 73 L.Ed.2d at 135.

- 2 -

In suggesting that the "bottom line" may be a defense to a claim of discrimination against an individual employee, petitioners and amici appear to confuse unlawful discrimination with discriminatory intent.  ...  But resolution of the factual question of intent is not what is at issue in this case.  Rather, petitioners seek simply to justify discrimination against respondents on the basis of their favorable treatment of other members of respondents' racial group.  Under Title VII, "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."  Furnco Construction Corp. v. Waters, 438 US, at 579, 57 L Ed 2d 957, 98 S Ct 2943.

                    *          *          *

It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.  We recognized in Los Angeles Dept. of Water & Power v. Manhart, 435 US 702, 55 L Ed 2d 657, 98 S Ct 1370 (1978), that fairness to the class of women employees as a whole could not justify unfairness to the individual female employee because the "statute's focus on the individual is unambiguous."  ...

457 U.S. at 454-55, 73 L.Ed.2d at 141-42.

    B. Plaintiffs and Their Class Are Presumptively
       Entitled to Back Pay for Violations of the
       Consent Decree Which are Timely Challenged

    In Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 45 L.Ed.2d 280, 298-99 (1975), the Court held that, "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination through- out the economy and making persons whole for injuries suffered through past discrimination." (Footnote omitted).  The D.C. Circuit has held that "any denial must be well supported", and

                         - 3 -

that a district court's "authority to limit [back pay] must be as narrowly constrained as authority to totally deny" back pay. Laffey v. Northwest Airlines, 567 F.2d 429, 470, 471, 185 U.S.App.D.C. 322 (D.C.Cir., 1976), cert. den., 434 U.S. 1086, 55 L.Ed.2d 792 (1978).

The purpose of eradicating discrimination requires that the back pay remedy be applied herein.  Plaintiffs waived classwide back pay as to the PACE, in return for the government's commitment to use "all practicable efforts" to eliminate adverse impact in the future, and to develop new and fair alternative examining procedures.[2]  Neither promise has been kept.  Plaintiffs' May 8, 1987 Motion on Schedule B hiring demonstrates the government's failure to develop alternative examining procedures for most job categories formerly subject to the PACE.  Turning to the defendants' promise to use "all practicable efforts" to

---

[2] This Court's Conclusion of Law No. 12, in its Order granting final approval to the Consent Decree herein, described the basis of the waiver in the following terms:

> Plaintiffs' counsel have advised the Court of their unanimous agreement that a waiver of classwide back pay is appropriate here, in light of the expense the government will face in developing proper alternatives to the PACE, the degree of protection provided to the class by the Consent Decree with respect to the proper development of such alternatives, the importance to the class of bringing use of the PACE to a speedy end, the large number of additional jobs they expect the settlement to provide for the class, the difficulty of proving individual class members' entitlement to back pay in this case, and the risks of litigation.

Luevano v. Campbell, 93 F.R.D. 68, 87-88 (1981).

eliminate adverse impact, at a number of agencies and job cate-
gories, that promise has rung hollow.  For three years running,
some agencies have utterly ignored this obligation.  What is now
needed is the financial "spur or catalyst", Albemarle Paper, 422
U.S. at 417-18, 45 L.Ed.2d at 296-97, to make these agencies
treat the Decree with the seriousness it deserves.

 The defendants will likely urge that they did not act
in bad faith.  Albemarle Paper pointed out, however, that "the
mere absence of bad faith ... does not depress the scales in the
employer's favor."  The Court continued:

> If backpay were awardable only upon a showing of
> bad faith, the remedy would become a punishment
> for moral turpitude, rather than a compensation
> for workers' injuries.  This would read the "make
> whole" purpose right out of Title VII, for a
> worker's injury is no less real simply because his
> employer did not inflict it in "bad faith." ...

422 U.S. at 422, 45 L.Ed.2d at 299 (footnote omitted).

 C.  Individualized Relief Should Be Provided in
   This Action

 Plaintiffs further expect the defendants to argue that
this Court should not grant back pay or other individualized
relief, but should instead remit the class member victims of
discrimination to individual enforcement actions.  The Consent
Decree expressly provides that plaintiffs may bring an enforce-
ment proceeding "seeking individualized injunctive and monetary
relief".  Decree, ¶ 17(b) at p. 31.  Where a consent decree so
provides, no new lawsuit is required in order to obtain such
relief, and the court which entered the Consent Decree has full
authority to grant the individualized relief requested.  EEOC v.

- 5 -

<u>CW Transport</u>, 43 FEP Cases 782, 801 (W.D.Wis., 1987).[3]

It is now beyond dispute that back pay and other individualized relief can be awarded in the context of a Rule 23(b)(2) class action. In <u>McKenzie v. Sawyer</u>, 684 F.2d 62, 77, 221 U.S.App.D.C. 288 (D.C.Cir., 1982), the court of appeals held that, where there has been a classwide violation of the law, class members who actually applied for competitive vacancies "are therefore presumptively entitled to share in the remedy." The court further held that the defendant in such a case has the burden of persuasion in rebutting class members' individual cases, and that it must carry its burden by clear and convincing evidence. 684 F.2d at 77-78.

> D. <u>The Legal Standards in Providing Individualized Relief</u>

It is settled that an award of individualized relief under Title VII is intended to put the discriminatee in the same position he or she would have occupied but for the discrimination. This requires an award of the same seniority, for competitive and other purposes, which the discriminatee would have received if he or she had been hired without discrimination. <u>Franks v. Bowman Transportation Co.</u>, 424 U.S. 747, 764-65, 47 L.Ed.2d 444, 461-62 (1976).

> E. <u>The Need to Include in the Award Expectable Promotions and Salary Increases Above the Entry Level</u>

An award of individualized relief should also take into

---

[3] A copy of the decision has been provided to the Court and to opposing counsel.

- 6 -

account the subsequent promotions and salary increases the
discriminatee would likely have obtained if he or she had been
hired without discrimination.  The D.C. Circuit has observed:

> An employee denied a raise in one year will fall
> further behind if raises in subsequent years are a
> function of prior salaries.  Likewise, an employee
> denied a promotion in a given year may be frozen
> out of additional promotional opportunities,
> unless the missed rung on the promotion ladder is
> somehow replaced. ...

Thompson v. Sawyer, 678 F.2d 257, 290, 219 U.S.App.D.C. 393
(D.C.Cir., 1982).  The court of appeals applied this observation
by expanding the accrual period for back pay, to reflect earlier
discrimination.  In White v. Carolina Paperboard Corp., 564 F.2d
1073, 1084 (4th Cir., 1977), the court held that the district
court should "construct a hypothetical employee as he advances to
each job in the line of progression", and award back pay based on
the difference between a black employee's actual employment
history and the hypothetical employment history for a person with
the same level of seniority.  In Pecker v. Heckler, 801 F.2d 709,
712-13 (4th Cir., 1986), the court of appeals applied White in a
case against the U.S. Department of Health and Human Services.
In April 1979, the plaintiff was denied promotion to a GS-10
position to which she had earlier been temporarily detailed.  The
job was ultimately upgraded to GS-11, and the Fourth Circuit held
that the plaintiff (1) should receive the next GS-11 vacancy in
the job, (2) should receive back pay based on the GS-10 rate for
the requisite period of one year following the discriminatory
denial, and (3) should receive back pay based on the GS-11 rate

- 7 -

from April 1980 to the date of her placement, based on a hypo-
thetical promotion to GS-11 in April 1980.  The court decision
collects the relevant authorities on this subject, and for the
sake of simplicity plaintiffs have simply set out the relevant
passage in extenso:

> Our conclusion accords with our earlier
> decisions, in which we have fashioned relief more
> expansive than mere reinstatement to the position
> at the very same level as that initially denied
> due to discrimination.  See, e.g., White v.
> Carolina Paperboard Corp., 564 F.2d 1073, 1084 (4
> Cir. 1977) (relief for discriminatory hiring and
> promotion determined by reference to court-
> reconstructed hypothetical line of progression
> along which plaintiff would have advanced absent
> discrimination) (citing United Transp. Union Local
> No. 974 v. Norfolk & W. Ry. Co., 532 F.2d 336, 341
> (4 Cir. 1975); Curl v. Reavis, 740 F.2d 1323 (4
> Cir. 1984) (female plaintiff discriminatorily
> denied job as patrol deputy awarded preferential
> consideration for higher level job of detective,
> provided she acquire some "road experience" in the
> meantime).
>
> Our conclusion also finds support in
> decisions from other circuits.  In order to
> accomplish the broad remedial purposes of make
> whole relief under Title VII, courts have looked
> beyond the particular position or benefit that a
> plaintiff has been denied, in order to determine
> the relief to which the plaintiff is entitled.
> See Saunders v. Claytor, 629 F.2d 596, 597 (9 Cir.
> 1980) cert. denied, 450 U.S. 980, 101 S.Ct. 1515,
> 67 L.Ed.2d 815 (1981) (district court's order
> required that plaintiff who had been discrimina-
> torily denied the position of EEO Specialist, GS-
> 9, "be promoted to the position of EEO Specialist
> at the level of GS-11, the same level that she
> would most likely have attained had she been hired
> for that position [in the first instance]"); Locke
> v. Kansas City Power & Light Co., 660 F.2d 359,
> 369 (8 Cir. 1981) (recognizing possible remedy of
> "job skipping," permitting placement of plaintiff
> in a higher level position than the one that he
> was initially denied, provided he "has demonstra-
> ted the skills or other qualifications legitimate-
> ly required or [sic] the higher level job and the

> promotion is in a line of progression where a
> promotion is normally forthcoming after some
> interval of time") (citing <u>Young v. Edgcomb Steel
> Co.</u>, 499 F.2d 97 (4 Cir. 1974)); <u>Cross v. U.S.
> Postal Service</u>, 34 Fair Empl.Prac.Cas. (BNA) 1442
> (E.D.Mo. 1983), <u>aff'd</u> 733 F.2d 1327 (8 Cir. 1984)
> (plaintiff, initially denied a GS-6 position,
> granted reinstatement at a GS-10 level position,
> having shown that she had adequate experience and
> qualifications); <u>Evans v. Baldridge</u>, 27 Fair
> Empl.Prac.Cas. (BNA) 1479, 1481 (D.D.C. 1982);
> <u>EEOC v. Kallir, Philips, Ross, Inc.</u>, 420 F.Supp.
> 919, 923-24 (S.D.N.Y. 1976).

801 F.2d at 712-13.

In <u>EEOC v. Korn Industries</u>, 662 F.2d 256, 263 (4th

Cir., 1981), the court referred to <u>White</u>'s command that back pay

be based on "the average progression in the company", and held

that a proper goal should "insure that the discriminatee's

economic progress mirrored that of an average employee's". The

court further held it was improper to allow the awards

> to terminate when the black employee had reached
> the starting point of the white employee with
> similar qualifications hired at the same time;
> this failed to make adjustment for the relative
> disadvantage of the black employee with respect to
> the white employee.

It is common to calculate back pay relief based on the

average progress of a group not discriminated against. The Fifth

Circuit commended such an approach to the district court in

<u>Pettway v. American Cast Iron Pipe Co.</u>, 494 F.2d 211, 263 (5th

Cir., 1974), noting that other alternatives were available but

stating that this approach "has more basis in reality (i.e.

actual advancement of a comparable group not discriminated

against) than an individual-by-individual approach." In <u>Jepsen

v. Florida Board of Regents</u>, 754 F.2d 924, 926 (11th Cir., 1985),

- 9 -

the court affirmed back pay calculations based on the difference between Ms. Jepsen's salary and the salaries of male faculty members.[4]  The D.C. Circuit has expressly held that this approach is proper in some cases.  <u>Segar v. Smith</u>, 738 F.2d 1249, 1290, 238 U.S.App.D.C. 103 (D.C.Cir., 1984), <u>cert. den.</u>, 471 U.S. 1115, 86 L.Ed.2d 258 (1985).

The Eighth Circuit has approved an approach virtually on all fours with that suggested by plaintiffs herein, as to promotions above the entry level:

> It is possible to determine with a fair degree of exactitude what the loss to the class was as a result of the discriminatory selection process.  Each year from 1965 through 1973 there were a number of apprentice vacancies that blacks were denied because of the discriminatory poli- cies.  The task for the district court on remand is to estimate for each year from 1965 through 1973 the number of apprentice vacancies that were denied blacks.  For this estimation, it should be assumed that under a nondiscriminatory selection process blacks would have been admitted roughly in the same proportion as whites.  For example, if in 1969 there were ten black applicants and 40 white applicants and a total of 15 apprentices admitted, all of which were white, the district court should conclude that three blacks were denied admission by virtue of the discriminatory policies.  ...  To compute the back pay due for the three black applicants who were hypothetically discriminated against in 1969, the district court shall select three white apprentices admitted in 1969 and compute their aggregate earnings (including benefits) as an apprentice and ironworker from their date of admission in 1969 until the present.

---

[4] <u>Accord</u>, <u>Boyd v. SCM Allied Paper Co.</u>, 42 FEP Cases 1643, 1655-56 (N.D.Ind., 1986).  There, the district court included in the back pay award of an unlawfully discharged black supervisor the average percentage salary increase for the supervisors who remained employed.  Thus, the fact that such increases were based on performance reviews, were not automatic, and varied in amount, did not defeat the plaintiff's claim for this aspect of relief.

> The district court shall subtract from the
> aggregate income of the three whites the aggregate
> income (including benefits and amounts earnable
> with reasonable diligence) of three randomly
> selected blacks who applied for an apprentice
> position in 1969 but were rejected.  The dif-
> ference in the respective earnings of the three
> white ironworkers and the three rejected black
> applicants shall be the total value of the back
> pay damages to the plaintiff class caused by the
> defendants' discriminatory policies during 1969.
> This back pay sum shall be distributed pro rata
> among the black applicants rejected in 1969 or in
> a more equitable manner as determined by the
> district court.

Hameed v. Int'l Ass'n of Bridge, Structural and Ornamental Iron

Workers, 637 F.2d 506, 520-21 (8th Cir., 1980) (footnote omit-

ted).  This passage was cited with approval in Segar, 738 F.2d at

1290.

### F. Unreasonable Exactitude is Not Required as a Condition of Providing Individualized Relief

Plaintiffs expect the defendants to urge that any

individualized relief would of necessity be inexact, and that for

this reason all back pay and other individualized relief should

be denied.  The law of this Circuit is to the contrary.  Where

the employer's unlawful action has given rise to uncertainty, "it

is only equitable that any resulting uncertainty be resolved

against the party whose actions give rise to the problem."  Day

v. Mathews, 530 F.2d 1083, 1086, 174 U.S.App.D.C. 231 (D.C.Cir.,

1976) (footnote omitted).  Accord, McKenzie v. Sawyer, 684 F.2d

at 77; Bundy v. Jackson, 641 F.2d 934, 952, 205 U.S.App.D.C. 444

(D.C.Cir., 1981).

Plaintiffs respectfully submit that their showings of

adverse impact are well founded, and that they are entitled to

- 11 -

individualized injunctive and monetary relief as well as to more
general relief.

                              Respectfully submitted,

                              WILLIAM L. ROBINSON
                              RICHARD T. SEYMOUR
                              Lawyers' Committee for Civil
                                Rights Under Law
                              1400 'Eye' St., N.W., Suite 400
                              Washington, D.C. 20005
                              (202) 371-1212

                              JULIUS LeVONNE CHAMBERS
                              CHARLES STEPHEN RALSTON
                              GAIL J. WRIGHT
                              99 Hudson Street, 16th Floor
                              New York, New York 10013
                              (212) 219-1900

                              BARRY L. GOLDSTEIN
                              ELAINE R. JONES
                              806 - 15th Street, N.W., #940
                              Washington, D.C. 20005
                              (202) 638-3278

                              E. RICHARD LARSON
                              THERESA BUSTILLOS
                              Mexican-American Legal Defense
                                & Educational Fund
                              634 South Spring Street
                              11th Floor
                              Los Angeles, California 90014
                              (213) 629-2512

                              JOHN H. ERICKSON
                              Erickson, Beasley & Hewitt
                              12 Geary Street
                              Eighth Floor
                              San Francisco, Calif.  94108
                              (415) 781-3040

                              KENNETH KIMERLING
                              Puerto Rican Legal Defense and
                                Educational Fund
                              99 Hudson Street, 14th Floor
                              New York, New York 10013
                              (212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
     RICHARD T. SEYMOUR
     Bar No. 28100

                    Attorneys for Plaintiffs

Dated: June 6, 1987

- 13 -



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 6, 1987

Mr. James F. Davey, Clerk
United States District Court
United States Court House
Third and Constitution N.W.
Washington, D.C. 20001

        Re: Luevano v. Horner
            C.A. No. 79-0271 (Judge Joyce Hens Green)

Dear Mr. Davey:        *Certificate of Service*

        Enclosed for filing are the original and a copy of
plaintiffs' Motion for Relief on their Showings of Adverse Impact
in Hiring for 1982, 1983, and 1984, Memorandum in support, and
proposed form of Order.

        The Motion and its direct attachments are too thick to
be fastened with a single staple, or with a binder clip.  I've
stapled it together in two units.  The "outside" attachments, the
bound copies of plaintiffs' adverse impact showings for 1983 and
1984, cannot be hole-punched.  The originally signed bound
volumes are so marked.

        Ms. Ward and Mr. Green have already received copies of
plaintiffs' bound showings of adverse impact for 1983 and 1984.
Because of the expense of duplicating these documents, no
additional copies are being served upon them today.  If they
request additional copies, of course, plaintiffs will have extras
made for them.

        For ease of the Court's use, the copy of the Motion and
its attachments have been bound so that they will lie flat when
opened.  An extra courtesy copy has been sent directly to the
Court.

        Thank you for your assistance.

                        Very truly yours,

                        Richard T. Seymour

                        Richard T. Seymour

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**

```
Mr. James F. Davey, Clerk
June 6, 1987
Page 2---
```

Enclosures

cc: Hon. Joyce Hens Green          Gail J. Wright, Esq.
    Barbara L. Ward, Esq.           E. Richard Larson, Esq.
    James S. Green, Esq.            Theresa Bustillos, Esq.
    Barry L. Goldstein, Esq.        Kenneth Kimerling, Esq.
    John H. Erickson, Esq.          Eva Jefferson Paterson, Esq.
    Charles Stephen Ralston, Esq.   Russell Galloway, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., | ) |
| individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C. A. No. 79-0271 |
| CONSTANCE HORNER, Director, U.S. Office of Personnel Management, et al., | ) ) ) ) |
| Defendants. | ) ) |

PLAINTIFFS' MOTION FOR RELIEF ON THEIR SHOWINGS OF
ADVERSE IMPACT IN HIRING FOR 1982, 1983, AND 1984

Pursuant to ¶ 17(d) of the Consent Decree, at p. 33, plaintiffs hereby commence a formal enforcement proceeding, for individualized injunctive and monetary relief and for such other relief as may be appropriate, on plaintiffs' showings of adverse impact for the years 1982, 1983, and 1984.

This enforcement proceeding involves a substantial number of jobs denied to blacks and to Hispanics in violation of the terms of the Consent Decree:[1]

| Hiring Year | Jobs Denied in Violation of the Consent Decree | | |
|---|---|---|---|
| | Denied to Blacks | Denied to Hispanics | Total Denied |
| 1982 | 26 | 88 | 114 |
| 1983 | 230 | 136 | 366 |
| 1984 | 580 | 328 | 908 |
| Total: | 836 | 552 | 1,388 |

---

[1] These totals exclude any double-counting which could otherwise arise when a nationwide alternative examining procedure has been challenged, and when individual agencies using that procedure have also been challenged.

In most cases, the agency or agencies charged made no effort
whatsoever to use the special programs established by the Consent
Decree to reduce or eliminate adverse impact.

Because this enforcement proceeding involves a number
of provisions of the Consent Decree and a number of communica-
tions between plaintiffs and defendants, plaintiffs have drawn
together in this Motion the relevant passages from all of these
documents, and have quoted from many of them, so that this
document could set forth the entire context of the matters to be
decided.  While this approach makes for a lengthy Motion, the
alternative would result confusion, in which each side would
quote from a few documents at a time, out of context and out of
chronological order.

Part A of this Motion, at pp. 3-14, sets forth the text
of the relevant provisions of Orders, including the Consent
Decree, which bear upon the matters raised in the Motion.  Part
B(1) of this Motion, at pp. 14-25, discusses plaintiffs' showings
of adverse impact for 1982 hiring.  Part B(2) of this Motion, at
pp. 25-35, discusses the government's responses, in informal
enforcement proceedings, to plaintiffs' showings of adverse
impact in 1982 hiring.  Part C of this Motion, at pp. 35-37,
discusses plaintiffs' showings of adverse impact for 1983 hiring,
the government's preliminary responses, and plaintiffs' rebuttal.
Part D of this Motion, at pp. 37-38, discusses plaintiffs'
showings of adverse impact for 1984 hiring and the defendant's
preliminary responses.  Part E of this Motion, at pp. 38-40,

- 2 -

discusses the relief plaintiffs seek on their showings of adverse impact. The parties have not been able to come to any agreement as to any of these showings.

In support of this Motion, plaintiffs show the following:

A. <u>Relevant Provisions of Orders</u>

1. Paragraphs 12(a) and 12(b) of the Consent Decree, at p. 19, and paragraph 14 of the Consent Decree, at pp. 26-27, provide in pertinent part:

> 12. (a) Defendants which conduct an alternative examining procedure for a job category set forth in Appendix A are enjoined from violating Title VII of the Civil Rights Act of 1964, as amended, with respect to any examining procedures used to select for those job categories listed in Appendix A. ...

> (b) Except as described in subparagraphs (c) through (g) below, during the period of retention of the Court's jurisdiction, as defined in paragraph 7, if there is adverse impact, then defendants shall use all practicable efforts to eliminate adverse impact in appointments to the job categories listed in Appendix A. ...

> *        *        *

> 14. Except as provided in paragraphs 12(c) through (g), during the period of retention of the court's jurisdiction, the agency responsible for making selections for the job categories listed in Appendix A shall use all practicable efforts to eliminate adverse impact in selections for those job categories by use of the Outstanding Scholar, College Co-op, bilingual/bicultural, and similar programs described in ¶ 16. It is the intent of the parties that these special programs are supplemental to the interim use of the PACE and alternative examining procedures to assure equal employment opportunity in the Federal service. It is not the intent of the parties that use of these special programs shall replace the interim use of the PACE or the use of alternative

- 3 -

> examining procedures, other than as may be
> necessary to effectuate the purposes of the
> Decree.  ...

No agency has exercised the option described in ¶¶ 12(c) through 12(g), and each agency has therefore had the obligation to "use all practicable efforts to eliminate adverse impact in appointments".

　　　2. Paragraph 8(b) of the Consent Decree, at pp. 6-12, sets forth the definition of "adverse impact" which applies to these proceedings.  Paragraph 8(b) provides that "the phrase 'adverse impact' shall have the following meanings", and continues in pertinent part:

> (1) In the case of interim use of the
> PACE, "adverse impact" shall mean that the
> difference between the proportion of blacks or of
> Hispanics among the appointments from all sources
> made by an agency for the job category in ques-
> tion, and the proportion of blacks or Hispanics,
> respectively, among the persons who took the PACE
> in the prior reporting year (or, in the event that
> statistics for the prior reporting year are not
> available, for the most recent prior period for
> which statistics are maintained), is statistically
> significant at the .05 level of confidence or, if
> not so statistically significant, that the
> proportion of blacks or of Hispanics among such
> appointments is less than 80% of the proportion of
> blacks or of Hispanics, respectively, among the
> persons so taking the PACE.

> (2) In the case of alternative examining
> procedures which are administered by an agency or
> OPM with respect to an occupation which exists in
> a single agency, "adverse impact" shall mean that
> the difference between the appointment rate for
> blacks or for Hispanics and the appointment rate
> for non-Hispanic whites is statistically sig-
> nificant at the .05 level or [sic] confidence or,
> if not so statistically significant, that the
> appointment rate for blacks or for Hispanics is
> less than 80% of the appointment rate for non-
> Hispanic whites.

- 4 -

(3) In the case of alternative examining procedures which are administered by OPM for use by more than one agency:

(i) "adverse impact" shall mean that the difference between the appointment rate for blacks or for Hispanics and the appointment rate for non-Hispanic whites is statistically significant at the .05 level of confidence or, if not so statistically significant, that the appointment rate for blacks or for Hispanics is less than 80% of the appointment rate for non-Hispanic whites.

(ii) Where adverse impact, as defined in ¶ 8(b)(3)(i) above has been shown, "adverse impact" as to a particular agency covered by that showing shall mean that the difference between the proportion of blacks or of Hispanics among the appointments from all sources made by an agency and the proportion of blacks or of Hispanics, respectively, among the applicants who have been evaluated by OPM by means of the alternative examining procedure applicable to the job category or job categories in question is statistically significant at the .05 level of confidence or, if not so statistically significant, that the proportion of blacks or of Hispanics among such appointments is 80% or less of the proportion of blacks or of Hispanics, respectively, among such applicants.

*          *          *

(4) With respect to alternative examining procedures, adverse impact shall be calculated on the basis of applicants who applied, and appointments which were made, during the same reporting year. If, in a particular instance, the relevant information is not available and could not reasonably have been obtained, the parties shall attempt to reach agreement on the next most appropriate basis for determining adverse impact. In the absence of agreement, the matter shall be presented to the Court for resolution. ...

*          *          *

(6) Determinations of adverse impact may

- 5 -


be made on any or all of the following bases, as
appropriate, any of which shall be sufficient for
the purposes of the enforcement procedures under
this Decree:

      (i) on a nationwide basis for any
job category listed in Appendix A;

      (ii) on a regional basis for any
job category listed in Appendix A in any of
the geographic areas for PACE consideration,
as set forth in the PACE announcement
attached hereto as Appendix C (whether or not
the job category in question is still subject
to the PACE or is instead subject to an
alternative examining procedure) in which
there are 40 or more appointments into that
job category in that region in that year, and
in which the hiring decision is made on a
regional or localized basis;

      (iii) on the basis of the alterna-
tive examining procedure as a whole for cross
agency jobs, aggregating statistics for each
of the agencies using the procedure;

      (iv) to the extent that OPM or an
agency combines various jobs formerly subject
to the PACE and develops a single selection
procedure in which the standards of assess-
ment of qualifications of applicants are the
same for each job, adverse impact shall also
be computed for the combined jobs as a whole;
and

      \*        \*        \*

Where the number of appointments for any year is
too small to determine adverse impact, adverse
impact may be determined by aggregating statistics
for that year and the following year.  Except as
otherwise specified, adverse impact shall be
calculated on the basis of the reporting year
described in ¶ 8(j).  None of the provisions of
this subparagraph shall be construed in a manner
which would conflict with any of the provisions of
¶ 9.

      (7) An agency may choose whether a
determination of adverse impact shall be made on
the basis of external applicants and of the
appointments from all external sources as descri-

bed in ¶¶ 8(b)(1) through 8(b)(3) above, or on the
basis of both external and internal applicants and
on the basis of appointments from all sources.
The latter election may be made only if the agency
maintains and reports information showing the
actual numbers of internal applicants and of the
selections of such internal applicants. An agency
which is not involved in any pending enforcement
proceeding under the provisions of ¶ 17 may change
its election, as to future reporting years, at any
time two or more years after having made its
previous election. This subparagraph shall not
apply to ¶ 8(b)(3)(i) or ¶ 8(b)(3)(iii) above
unless all agencies using the same alternative
examining procedure have elected to include both
internal applicants and internal selections in the
determinations of adverse impact as to them.

3. Paragraph 8(c) of the Consent Decree, at p. 12,
defines the term "appointment rate":

(c) In determining whether use of the
alternative examining procedure established by an
agency and/or OPM pursuant to ¶ 12, in conjunction
with the special programs described in ¶ 16, has
resulted in adverse impact against blacks or
against Hispanics, the phrase "appointment rate"
shall mean the number obtained by dividing the
total number of persons in a racial or ethnic
group selected by a Federal agency for a par-
ticular entry level job category listed in
Appendix A by the number of applicants in that
group for that job category under the examining
procedure in question.

4. Paragraph 8(d) of the Consent Decree, at p. 12,
makes clear that the defendants' obligations apply to selections
at the grade 5 level, apply separately to selections at the grade
7 level, and apply separately to selections for both levels
combined. This provision thus makes clear that plaintiffs'
showings of adverse impact may be made as to either or both grade
levels:

(d) The phrase "job subject to the PACE
requirement," "PACE job," "PACE occupation," "job

- 7 -

classification," or "job category" shall mean any
entry level job at the GS-5 or GS-7 level for
which the PACE was used as an examining procedure
as of January 1, 1979 or earlier.  A list of these
jobs is attached hereto as Appendix A.

5. Paragraph 8(f) of the Consent Decree, at pp. 13-14,

defines the phrase "all practicable efforts" and sets forth

standards for making determinations whether agencies have

fulfilled the obligation under ¶ 12(b) of the Consent Decree to

use "all practicable efforts" to eliminate adverse impact:

(f) "All practicable efforts", as used
herein, include use, to the greatest extent
feasible, consistent with the agency's performance
of its mission as authorized by law, of the
special programs described in ¶ 16 and of similar
programs which may be implemented to achieve the
purposes of this Decree, and of the recruiting
efforts as described in ¶¶ 14 and 16 and of other
similar recruiting programs for which PACE jobs
have been specifically targeted.

(1) The question whether an agency
has used "all practicable efforts" is a
question of fact which may vary from job to
job, from agency to agency, and from year to
year.  In determining whether an agency which
has not hired a sufficient number of blacks
and of Hispanics to eliminate adverse impact
has, nonetheless, used all practicable
efforts, as required by the Decree, to
eliminate such adverse impact, the finder of
fact may consider various factors including,
but not limited to: (a) the number of
vacancies filled in the job category or job
categories in question; (b) the comparative
difference between the number of blacks and
of Hispanics who are hired through the PACE
or the alternative examining procedure in
question and the number of blacks and of
Hispanics whose hire would have eliminated
adverse impact, as defined in the Decree; and
(c) the efforts made by the agency.  This
question shall be decided in a manner
consistent with the terms and with the
purposes of this Decree.

- 8 -

(2) To the extent that OPM and/or an agency have maintained records differentiated by race and ethnic group of instances in which individuals have declined appointment to a job for which they have been selected, and OPM and/or the agency carries the burden of establishing that there were racial or ethnic differences in the rate at which good-faith offers of appointment have been declined and that such differences account for part or all of the resulting adverse impact, such proof shall constitute presumptive compliance with the all practicable efforts obligation as to that part of the adverse impact it explains.

6. Paragraph 8(k) of the Consent Decree, at p. 15, defines the term "reporting year". This definition was changed by the July 2, 1984 Consent Order Modifying the Definition of "Reporting Year" in Paragraph 8(k) of the Consent Decree. The ordering paragraphs of the Consent Order state:

1. Paragraph 8(k) of the Consent Decree is modified to state:

(k) The term "reporting year" shall mean the period of time commencing on January 1 of each year and ending with December 31 of that year, except that the first reporting year shall be considered to have begun on January 18, 1982, the date on which the Consent Decree went into effect.

2. The statistics compiled by the defendants for calendar year 1982 shall be deemed conclusively to be statistics for the first reporting year, without regard to whether they include any actions taken in the first 17 days of calendar year 1982.

7. Paragraph 9 of the Consent Decree, at pp. 15-16, defines the affirmative defenses available to defendant agencies, and sets forth the conditions under which they may be invoked. This paragraph states in pertinent part:

- 9 -

9. Any adverse impact which results from the requirements of the Veteran's Preference Act, 5 U.S.C. § 3318, will be taken into account and may constitute a defense to the determination of adverse impact with respect to any competitive procedures.  It shall also be a defense if adverse impact is attributable to the fact that persons taking the PACE or alternative examining procedures did not possess the basic minimum qualifications, a four-year college degree or equivalent work experience (or any different level of education of [sic] experience subsequently required) for appointment to a job category covered by PACE.  ...  To the extent that OPM and/or an agency have maintained records of instances where individuals have declined appointment to a job for which they have been selected, racial or ethnic differences in the rates at which appointments have been declined may also constitute a defense to the determination of adverse impact.  OPM and/or the agencies involved shall have the burden of establishing these defenses, and shall have the burden of establishing the amount of adverse impact which is explained by a defense.

8. Paragraph 17(b) of the Consent Decree, at pp. 31-32, sets forth the time limits for plaintiffs' commencement of an informal enforcement proceeding.  This provision states in pertinent part:

(b) An enforcement proceeding seeking individualized injunctive and monetary relief instituted under the provisions of this paragraph to challenge noncompliance by an agency with its obligation to use all practicable efforts to eliminate adverse impact, as provided in ¶ 12, must be initiated under ¶ 17(c) no later than twelve months, extendable by consent of the parties or for good cause shown, after plaintiffs obtain information sufficient to place plaintiffs on notice of such non-compliance whether obtained from defendants under ¶¶ 24 and 25 or otherwise. Where this requirement has been met, plaintiffs may obtain individualized monetary and injunctive relief for violations by the agency of its obligation to use all practicable efforts to eliminate adverse impact as required by ¶ 12, only for the period of time commencing with the start

- 10 -



of the last full reporting year immediately
preceding plaintiffs' receipt of the information
described above.  ...  An enforcement proceeding
seeking generalized injunctive relief shall be
brought within 2 years, extendable by consent of
the parties or for good cause shown, after
plaintiffs obtain information sufficient to place
plaintiffs on notice of such non-compliance,
whether obtained from defendants under ¶¶ 24 and
25 or otherwise.  ...

9. Paragraph 17(c) of the Consent Decree, at pp. 32-33,
requires that the initial enforcement proceeding be informal, and
mandates the exchange of information on the charges made:

(c) If plaintiffs charge the agency or
agencies involved, including OPM, with a violation
of the Decree, they shall state the manner in
which plaintiffs contend that each agency has so
violated the Decree.  The requirements of such
charges shall be as set forth in paragraphs 12(e)
and 18 of this Decree.  Plaintiffs and the agency
or agencies charged shall not immediately commence
the formal enforcement proceeding after the filing
of the charge, but shall first attempt in good
faith to resolve the matter by agreement, unless a
delay would result in irreparable injury to the
interests of any party.  This period of informal
conciliation shall last for a period of 60 days,
unless extended by consent of both the plaintiffs
and the agency or agencies charged.  During the
period of informal conciliation, plaintiffs, the
agency or agencies charged, OPM (if not already
included as an agency charged) and the Department
of Justice shall participate in the effort
voluntarily to resolve the dispute.  During this
period, the parties shall within fifteen days
exchange additional information relevant to the
issue of the existence of adverse impact against
blacks or against Hispanics, defenses to the
existence of adverse impact, and data relevant to
the question whether all practicable efforts have
been used to eliminate this impact in selection
for the job category or job categories in ques-
tion.  The parties shall negotiate in good faith
to attempt to establish additional special
programs which shall eliminate the adverse impact
against blacks or against Hispanics.

10. Paragraph 17(d) of the Consent Decree, at p. 33,

provides for the commencement of formal (*i.e.*, judicial) enforce-
ment proceedings where informal conciliation has failed:

>            (d) If it is not possible to reach a
> satisfactory settlement of plaintiffs' charges
> within 60 days (or such extended period as has
> been agreed), the plaintiffs may within 45 days
> thereafter commence the formal enforcement
> proceeding.  The parties shall as soon as prac-
> ticable thereafter jointly submit a statement of
> stipulated facts and disputed issues and, if joint
> submission is not possible, separately submit a
> statement of disputed issues to be resolved during
> the formal proceeding.

11. Paragraph 17(e) of the Consent Decree, at pp. 33-
34, provides that the provisions of the Federal Rules of Civil
Procedure and of the Federal Rules of Evidence shall apply to
prehearing proceedings and to the hearing.  The paragraph
continues in pertinent part:

> The purpose of a hearing under this paragraph will
> be to resolve any disputed issues of fact concern-
> ing the extent to which the agency or agencies
> charged have used all practicable efforts to
> eliminate adverse impact against blacks or against
> Hispanics.  Where adverse impact has been shown
> the burden of proving the use of all practicable
> efforts shall in all cases be on the agency or
> agencies charged.  The determination whether the
> agency or agencies charged have used "all prac-
> ticable efforts" shall be made in accordance with
> the standards set forth in ¶ 8(f).  The parties
> shall have the right to call any witnesses or
> introduce any documentary evidence which is
> relevant to these issues.  Where there exists no
> disputed issue of material fact, the Court may
> resolve the charges upon submission of an ap-
> propriate motion and memorandum, with oral
> argument if necessary.

12. Paragraphs 18(b) and -(d) of the Consent Decree, at
pp. 36-38, provide the following burdens of proof and order of
resolution of issues in enforcement proceedings.  For ease of

reading, plaintiffs have separated with line skips each element of ¶ 18(b), although all elements are in the same indented subparagraph in the Consent Decree:

> (b) In enforcement proceedings under paragraph 17 of this Decree against agencies charged with a violation of this Decree, the following burdens of proof and order of resolution of issues shall be followed.  First, plaintiffs shall have the burden of proving adverse impact as defined in paragraph 8(b), with respect to a job category listed in Appendix A.
>
> Second, the agency charged shall have the opportunity to rebut this showing of adverse impact with respect to such job category, in whole or in part, by proving one or more of the affirmative defenses defined in paragraph 9.
>
> Third, if the agency charged with a violation of the Decree as to such a job category is unable to prove such an affirmative defense, or if the affirmative defenses proven do not eliminate all of the adverse impact shown with respect to such a job category, the agency shall have the burden of proving that it has used all practicable efforts to eliminate adverse impact as to that job category in accordance with the standards set forth in ¶ 8(f).  If an agency is unable to meet this burden, then plaintiffs shall be entitled to relief.
>
> In rebuttal, plaintiffs may have the opportunity to prove that the agency has engaged in subjective discrimination against blacks or Hispanics who are determined as a result of the selection procedure to be qualified.
>
> Fourth, if the agency has proved that it has used all practicable efforts to eliminate adverse impact, as defined in ¶ 8(b), with respect to such job category in accordance with the standards defined in ¶ 8(f), then the agency which developed or administered the alternative examining procedure shall have the burden of proving that such procedure is valid and appropriate for final use under the standards of the Uniform Guidelines.  However, as provided in ¶ 17(h), an agency's satisfaction of the interim use provisions of the Uniform Guidelines, combined with continued use of

all practicable efforts to eliminate adverse
impact, shall entitle the agency to continue use
of the procedure operationally, and its liability
shall be conditioned on its subsequent further
showing that the procedure in question meets the
final use standards of the Uniform Guidelines.

\*          \*          \*

(d) The order of resolution of issues
set forth in subparagraph (b) may be altered by
the Court or by consent of the parties to an
enforcement proceeding under ¶ 17.

B. <u>Plaintiffs' Showings of Adverse Impact in 1982
Hiring</u>

1. <u>The Showings</u>

13. Plaintiffs' showings of adverse impact for 1982
hiring were provided to the Government at a meeting of the
Monitoring Committee on October 10, 1984, as part of a draft
Plaintiffs' First Report to the Court on the Defendants' Im-
plementation of the Consent Decree.  The draft was intended to
have been filed in Court on October 12, 1984, but plaintiffs
wanted to obtain the benefit of the defendants' comments on it
first.  The defendants made a number of comments at the October
10, 1984 meeting, and plaintiffs prepared a new draft of the
Report, taking them into consideration.  The new draft was
provided to the government on December 12, 1984.  The defendants
requested back-up information, and this was provided to the
government on December 31, 1984.

14. Some parts of the October and December 1984
versions of the draft Report---including the discussion of the
problems plaintiffs saw with the Schedule B procedures---caused
considerable disagreement with the defendants, and the Report was

- 14 -

never filed.  Nonetheless, its statements as to adverse impact
contained the showings required by the Consent Decree.  A copy of
the October 10, 1984 draft Report is attached as Attachment O to
plaintiffs' November 25, 1986 letter to Ms. Ward and Mr. Green,
Attachment Q to this Motion.  Plaintiffs have not filed the
December 12, 1984 draft, but have quoted extensively from it
below.  If the government's response requires that the December
12, 1984 draft be submitted as well, or if the Court wishes to
see it, plaintiffs will provide copies to the Court.

        15. The October 10, 1984 and December 12, 1984 draft
Reports contained the following showings of adverse impact.  The
statistical showings were identical in these reports, but there a
few changes of language in some parts of the December 12, 1984
draft, to meet some of the government's concerns.  The exact
language quoted below is from the December 12, 1984 draft.  The
referenced Attachments are attached to this Motion, using the
same letter designations as in the draft Report.  Footnote
numbers, of course, have changed.  Plaintiffs have included the
part of the draft Report discussing the dates when plaintiffs
received the various parts of the statistical information
reported by the defendants, because the defendants have taken the
position in informal enforcement proceedings that plaintiffs'
showings of adverse impact for 1982 were not timely made.
Plaintiffs do not know whether the defendants will adhere to this
position, now that the matter is before the Court.  The relevant
parts of the draft Report are as follows:

- 15 -



B.   The Timing of This Report

    ... On June 20, 1983, plaintiffs received the Office of Personnel Management's [hereinafter, "OPM's"] reports on hiring in jobs covered by the Consent Decree in the first half of 1982 for most, but not all, government agencies. Because of a problem which has been corrected for reports for 1983 and the future, the 1982 reports did not include information on hiring by the State Department or by the Federal Deposit Insurance Corporation.  Information from the General Accounting Office is reported separately because its personnel system is not under the control of OPM.[2]  OPM's report on hires in the second half of 1982 was received on December 9, 1983.  Again, information was not included for the State Department or for FDIC, and information on GAO was to be provided separately.

    Plaintiffs raised a number of questions as to the OPM reports, and obtained clarifications in stages on April 3, April 13, May 24, and June 11, 1984.  The reports for the State Department and the FDIC were sent to plaintiffs on March 7, 1984, and the report for the General Accounting Office was sent to plaintiffs on March 29, 1984. The State Department figures did not add up correctly, and plaintiffs requested a clarification.  In June 1984, the defendants agreed that the State Department had made an arithmetic error in adding up its information.

    Not all information required for a complete statistical report for 1982 has been received.  Some alternative examining procedures for job categories covered by the Consent Decree were in place in 1982, but no information has been received on the numbers of blacks, Hispanics, and whites who applied under these alternative examining procedures.  On August 28, 1984, OPM orally advised plaintiffs that there were no adequate and reliable data on such applicants for 1982, and that there was no choice but to use the same percentage figures for these alternative examining procedures as were being used for jobs

---

[2] See the Order entered November 19, 1981.

still subject to the PACE.[3]  While a letter
confirming this information was to have been sent,
plaintiffs have not yet received it.

                    *          *          *

          C.   1982 Hiring Information

               1.   General Information

          The PACE was in use for most of calendar
year 1982, and the parties have agreed through the
Monitoring Committee that adverse impact in 1982
for all jobs not subject to the alternative
examining procedures should be determined by using
the standard set out in ¶ 8(b)(1) of the Consent
Decree.[4]

          The government does not have racial
breakdowns on applicants who took the PACE in
1981---the "prior reporting year" for 1982 hiring
data---or for any year after 1978.  Accordingly,

_____

          [3] See [p. 16 and pp. 22-23] below.


          [4] This paragraph provides:

          (b) The phrase "adverse impact" shall have
the following meanings in the following situa-
tions:

               (1) In the case of interim use of the
          PACE, adverse impact" shall mean that the
          difference between the proportion of blacks
          or of Hispanics among the appointments from
          all sources made by an agency for the job
          category in question, and the proportion of
          blacks or Hispanics, respectively, among the
          persons who took the PACE in the prior repor-
          ting year (or, in the event that statistics
          for the prior reporting year are not avail-
          able, for the most recent prior period for
          which statistics are maintained), is statis-
          tically significant at the .05 level of
          confidence or, if not so statistically
          significant, that the proportion of blacks or
          of Hispanics among such appointments is less
          than 80% of the proportion of blacks or of
          Hispanics, respectively, among the persons so
          taking the PACE.

                         - 17 -



the parties have agreed through the Monitoring
Committee that the stipulated 1978 information in
paragraph 10(h) of the Consent Decree be used
instead.  These data show that blacks were 11.9%
of the applicants taking the PACE, and that
Hispanics were 4.9% of the applicants taking the
PACE.

          2. <u>The Results of the Analysis:
            Government-wide Hiring</u>

      Attachment A is a 22-page printout
combining overall nationwide hiring information,
for all jobs formerly subject to the PACE, from
the following reports received from the defen-
dants: (a) OPM's report for the first six months
of 1982; (b) OPM's report for the last six months
of 1982; (c) the Department of State's report for
calendar year 1982, with its arithmetic errors
corrected; (d) the Federal Deposit Insurance
Corporation's report for calendar year 1982; and
(e) the General Accounting Office's report for
calendar year 1982.  The job titles were taken
from the titles shown in Appendix A to the Consent
Decree, as modified and supplemented by further
information provided orally by OPM.

      The data for the referenced reports of
the defendants were entered on the Lawyers'
Committee's computer by hand, by employees of the
Lawyers' Committee.  Each entry was then double-
checked against the originals, and all necessary
corrections were made.  Using a widely accepted
spreadsheet program from Lotus Development
Corp. called 1-2-3, the computer then totalled the
hiring information in the five sets of source
documents and calculated the percentages shown.
The accuracy of the formulas used was confirmed by
manual spot-checks.  Where the entry "ERR"
appears, it indicates that one cannot divide zero
by zero in order to obtain a percentage.  The
references to "Grade 5" and "Grade 7" are to pay
grades 5 and 7, and include all pay systems
equivalent to these grades---"GG", "GS", etc.

      Four job categories had nationwide
adverse impact against Hispanics substantial
enough in the opinion of counsel for plaintiffs to
warrant challenging at this time.  They are listed
below:

a) <u>Computer Specialist (Trainee),
Occupational Series 0334</u>

A total of 1,113 persons were hired into this job category in calendar year 1982. Only 35 of these hires were Hispanic, constituting 3.1% of total hires. This rate of hiring constituted adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 64.2% of their availability rate (4.9%, as explained above). This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of Hispanics was 2.71 standard deviations below what was expected.[5] If Hispanics had been hired at the level of their availability, 20 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment B. The printout was prepared and verified in the same manner as the printout in Attachment A.

The government did not make any use of the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact. Plaintiffs have attached as Attachment C the pages from the OPM reports showing that no hires were made in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bi-

---

[5] A finding of 1.96 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .05 level. A finding of 3 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .01 level. These are means of quantifying the possibility that the observed disparity (or a greater one) could have occurred by chance. Significance at the .05 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in twenty. Significance at the .01 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in a hundred.

- 19 -

cultural programs.

b) <u>Social Insurance Claims Examining,</u>
<u>Occupational Series 0993</u>

A total of 816 persons were hired into
this job category in calendar year 1982.  Only 14
of these hires were Hispanic, constituting 1.7% of
total hires.  This rate of hiring constituted
adverse impact under the 80% rule, because
Hispanics were hired at a rate which was only 35%
of their availability rate.  This hiring rate also
constituted adverse impact under the test of
statistical significance because the hiring of
Hispanics was 4.21 standard deviations below the
expected level.  If Hispanics had been hired at
the level of their availability, 26 additional
Hispanics would have been hired for this job
category.

A printout showing the adverse-impact
calculations for this job category is attached as
Attachment D.  This printout was prepared and
verified in the same manner as the printout in
Attachment A.

The government did not make any use of
the special programs required by the Consent
Decree to eliminate or reduce the possibility of
adverse impact.  Plaintiffs have attached as
Attachment E the pages from the OPM reports
showing that no hires were made in this job
category in calendar year 1982 through use of the
Outstanding Scholar, Co-op, or Bilingual/bicul-
tural programs.

c) <u>General Business and Industry,</u>
<u>Occupational Series 1101</u>

A total of 645 persons were hired into
this job category in calendar year 1982.  Only 22
of these persons were Hispanic, constituting 3.4%
of total hires.  This rate of hiring constituted
adverse impact under the 80% rule, because
Hispanics were hired at a rate which was only
69.6% of their availability rate.[6] If Hispanics

---

[6] Under ¶ 8(b)(1) of the Consent Decree, a
finding of adverse impact results from showing
that <u>either</u> the 80% standard was not met, <u>or</u> that
there was statistical significance.  It is not

had been hired at the level of their availability,
10 additional Hispanics would have been hired for
this job category.

A printout showing the adverse-impact
calculations for this job category is attached as
Attachment F.  The printout was prepared and
verified in the same manner as the printout in
Attachment A.

The government did not hire any Hispan-
ics through the special programs required by the
Consent Decree to eliminate or reduce the pos-
sibility of adverse impact.  Plaintiffs have
attached as Attachment G the pages from the OPM
reports showing that no Hispanics were hired in
this job category in calendar year 1982 through
use of the Outstanding Scholar, Co-op, or Bi-
lingual/bicultural programs.

d) <u>Contract and Procurement,</u>
<u>Occupational Series 1102</u>

A total of 1,083 persons were hired into
this job category in calendar year 1982.  Only 33
of these hires were Hispanic, constituting 3.0% of
total hires.  This rate of hiring constituted
adverse impact under the 80% rule, because
Hispanics were hired at a rate which was only
62.2% of their availability rate.  This hiring
rate also constituted adverse impact under the
test of statistical significance, because the
hiring of Hispanics was 2.82 standard deviations
below the expected level. If Hispanics had been
hired at the level of their availability, 20
additional Hispanics would have been hired for
this job category.

A printout showing the adverse-impact
calculations for this job category is attached as
Attachment H.  This printout was prepared and
verified in the same manner as the printout in
Attachment A.

The government did not hire any Hispan-
ics through the special programs required by the
Consent Decree to eliminate or reduce the pos-
sibility of adverse impact.  Plaintiffs have
attached as Attachment I the pages from the OPM

necessary to make both showings.

- 21 -



reports showing that no Hispanics were hired in
this job category in calendar year 1982 through
use of the Outstanding Scholar, Co-op, or Bilin-
gual/bicultural programs.

> 3. <u>The Results of the Analysis:  Hiring
> by Specific Agencies</u>

In addition to the governmentwide
showings of adverse impact set forth above,
plaintiffs have also analyzed agency-by-agency
hiring statistics to determine whether there is
adverse impact as to that particular agency's
hiring.  For three job categories, there was
adverse impact as to a specific agency's hiring,
at a level sufficient to warrant challenge at this
time.  These instances are set forth below.

> a) <u>Department of Agriculture Hiring
> for the General Business and
> Industry Job, Occupational
> Series 1101</u>

The Agriculture Department hired a total
of 262 persons into this job category in calendar
year 1982.  Only 5 of these hires were black,
constituting 1.9% of total hires.  This rate of
hiring blacks constituted adverse impact under the
80% rule, because blacks were hired at a rate
which was only 16% of their availability rate.
This hiring rate also constituted adverse impact
under the test of statistical significance,
because the hiring of blacks was 4.99 standard
deviations below the expected level.  If blacks
had been hired at the level of their availability,
26 additional blacks would have been hired into
this job category.

A printout showing the adverse-impact
calculations for this job at the Agriculture
Department is attached as Attachment J.  This
printout was prepared and verified in the same
manner as the printout in Attachment A.

The Agriculture Department did not make
any use of the special programs required by the
Consent Decree to eliminate or reduce the pos-
sibility of adverse impact.  Plaintiffs have
attached as Attachment K the pages from the OPM
reports showing that no hires were made in this
job category in calendar year 1982 through use of
the Outstanding Scholar, Co-op, or Bilingual/bi-

- 22 -

cultural programs.

b) <u>Department of the Army Hiring for the Contract and Procurement Job, Occupational Series 1102</u>

The Department of the Army hired a total of 304 persons into this job category in calendar year 1982.  Only 3 of these hires were Hispanic, constituting 1.0% of total hires.  This rate of hiring Hispanics constituted adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 20.1% of their availability rate.  This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of Hispanics was 3.16 standard deviations below the expected level.  If Hispanics had been hired at the level of their availability, 12 additional Hispanics would have been hired into this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment L.  This printout was prepared and verified in the same manner as the printout in Attachment A.

The Army did not hire any Hispanics through the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact.  Plaintiffs have attached as Attachment M the pages from OPM reports showing that the Army did not hire any Hispanics in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bicultural programs.

c) <u>Department of Health and Human Services Hiring for the Social Insurance Claims Examining Job, Occupational Series 0993</u>

All hiring in calendar year 1982 for the Social Insurance Claims Examining job category was done by the Department of Health and Human Services ["HHS"].  Thus, all of the statistics set forth at [pp. 19-20] above for this job category refer to information for the Department of Health and Human Services.  See Attachment N to this Report, showing the same information as to HHS hiring which Attachment D showed for government-wide hiring for this job category.  See also the



OPM reports for HHS attached as Attachment O,
showing the same lack of use of the special
programs established by the Consent Decree which
was shown in Attachment E.

4. <u>The Use of Alternative Examining
Procedures</u>

a) <u>Alternative Examining Procedures
Sponsored by OPM</u>

During calendar year 1982, OPM sponsored
a total of six alternative examining procedures
for specific job categories:

| Occupational Series | Grade(s) | Title | Type of Procedure |
|---|---|---|---|
| 0110 | 5,7 | Economist | Unassembled |
| 0334 | 5 | Computer Specialist (Trainee) | Assembled |
| 1654 | 5,7 | Printing Management Specialist | Unassembled |
| 1810 | 5,7 | General Investigator | Unassembled |
| 1811 | 5,7 | Criminal Investigator | Unassembled |
| 1812 | 5 | Game Law Enforcement Agent (Fish & Wildlife) | Unassembled |

There were not enough hires in any of these job
categories in calendar year 1982 to warrant
adverse-impact challenges.

b) <u>Delegations of Examining Authority to
Specific Agencies</u>

During calendar year 1982, a number of
agencies enjoyed delegations by OPM of examining
authority for specific job categories. There were
not enough hires in any of these job categories in
calendar year 1982 to warrant adverse-impact
challenges.

December 1984 Draft Report at 5-14.  Virtually identical language

was used in the October 1984 Draft Report at 5-14.  Each version

of the Draft Report contained the following language, appearing

- 24 -

immediately after the above discussion of adverse impact:

### 5.   Enforcement Proceedings

Plaintiffs have today raised each of the
above showings with counsel for the defendant,
through the Monitoring Committee, as an enforce-
ment proceeding.  We expect the Monitoring
Committee to attempt to resolve these matters.

Draft Report (both versions).

### 2.   The Defendants' Responses During the Informal Enforcement Proceedings

16. The defendants responded to plaintiffs' October 10,
1984 and December 12, 1984 showings of adverse impact for 1982
hiring on May 30, 1986.  A copy of the letter is attached hereto
as Attachment P.  Plaintiffs replied on November 25, 1986.  This
response and its attachments are attached hereto as Attachment Q.
The defendants have not made any response to plaintiffs' reply.
Accordingly, the parties have not yet been able to reach agree-
ment on the showings of adverse impact, or on the relief to be
provided.

17. Because the defendants have not yet replied to
plaintiffs' November 25, 1986 letter, plaintiffs do not know
whether the defendants will assert in Court the same positions
they have taken in the informal enforcement proceedings.  This
Motion can therefore discuss only the positions taken by the
defendants in May 1986.

### (a)   The Defendants' Contention That the 1982 Showings Were Untimely

18. The defendants contended in the informal proceed-
ings that plaintiffs "had in their possession all statistical

- 25 -

data concerning 1982 hiring by December 1983", and assert that
"no request for relief was made until plaintiffs' letter of March
14, 1985." The defendants then assert that plaintiffs failed to
meet the requirement of ¶ 17(b) of the Decree[7] that a complaint
seeking individualized relief must be brought no later than 12
months after plaintiffs obtain sufficient information to put them
on notice of non-compliance. May 30, 1986 Letter of Ms. Ward to
counsel for plaintiffs (Attachment P) at 5.

  19. The defendants are clearly in error on both of
their factual assertions, and on their conclusion. <u>First</u>, the
chronology shown above at pp. 15-16 demonstrates that plaintiffs
received statistical information on hiring in pieces, and that
plaintiffs did not have all of the hiring data until June 1984.
This fact alone disposes of defendants' contention.

  20. <u>Second</u>, the chronology shown above also demon-
strates that plaintiffs did not learn until August 28, 1984 of
the defendants' failure to comply with ¶¶ 24(a) and 25(a) of the
Consent Decree,[8] which require statistical reporting on "the
number of non-Hispanic white applicants, the number of black
applicants, and the number of Hispanic applicants" for the PACE
or for an entry-level job category listed in Appendix A.
Plaintiffs had repeatedly requested the applicant information,
precisely in order to perform calculations of adverse impact.

---

  [7] This provision is set out in full in ¶ 8 of this Motion,
at pp. 9-10 above.

  [8] These provisions appear at pp. 40-41 of the Consent Decree.

Mr. Seymour's July 6, 1984 letter to Ms. Ward stated in pertinent part:

> This is a confirmation of my telephone requests to you and to Jim to provide us with racial and ethnic breakdowns of the applicants for the alternative examining procedures in use in 1982. Without this information, we do not have a yardstick with which to measure hiring.
>
> My understanding of our agreement at our August 1983 meeting was that OPM would check on the information available, and that we would only in the last resort use the PACE applicant information set forth in the Consent Decree. We need to have a report back in writing, either giving the information or explaining why it is not available.

A copy of this letter is attached as Attachment K to Attachment Q. The response was the August 28, 1984 telephone call to Mr. Seymour from Mr. Green, reporting that no applicant data were available, either for the PACE or for the alternative examining procedures. Thus, the earliest date on which plaintiffs could be considered to be in possession of sufficient data---including the datum that the defendants had chosen to ignore ¶¶ 24(a) and 25(a) of the Consent Decree and that plaintiffs would therefore have to calculate adverse impact based on the four-year-old (by 1982) PACE application data in ¶ 10 of the Consent Decree---to make showings of adverse impact was August 28, 1984. There is no dispute as to the underlying facts, and they independently require rejection of the defendants' contention.

21. _Third_, plaintiffs submit that it is simply not possible to look at the statements quoted above from the October 10, 1984 and December 12, 1984 draft Reports and conclude that they were anything other than showings of adverse impact.

- 27 -

(b) <u>The Defendants' Contention That
Good Performance by Some
Agencies as to Some Job
Categories Should Immunize
Agencies Which Violated the
Consent Decree</u>

22. The defendants took the position in informal enforcement proceedings that the 1982 showings of adverse impact were "diminimus" [sic], and that the record of the defendants' hiring for 1982, in the aggregate, "evidences substantial compliance with the spirit and letter of the Decree and that no further relief should be accorded to plaintiffs." May 30, 1986 Letter of Ms. Ward to counsel for plaintiffs (Attachment P) at 5.

23. The defendants' position is clearly in error. The Consent Decree speaks again and again of showings of adverse impact as to a job category or job categories,[9] allows the grouping of job categories only where OPM has combined various

_____

[9] ¶ 8(b)(1) of the Consent Decree speaks of "the appointments from all sources made by an agency for the job category in question"; ¶ 8(b)(2) speaks of "an occupation which exists in a single agency"; ¶ 8(b)(3)(ii) refers to "the appointments from all sources made by an agency ... by means of the alternative examining procedure applicable to the job category or job categories in question"; ¶ 8(b)(3)(iii) refers to "the GS-5 and GS-7 entry-level positions in the job category as a whole" and refers to "the job category in question"; ¶ 8(b)(6)(i) allows determinations of adverse impact to be made "on a nationwide basis for any job category"; ¶ 8(b)(6)(ii) allows determinations of adverse impact to be made "on a regional basis for any job category"; ¶ 8(b)(6)(iii) allows determinations of adverse impact to be made "on the basis of the alternative examining procedure as a whole for cross agency jobs"; ¶ 8(c) speaks of "the total number of persons in a racial or ethnic group selected by a Federal agency for a particular entry level job category"; ¶ 8(f)(1) recognizes that the question whether an agency has used "all practicable efforts" is "a question of fact which may vary from job to job, from agency to agency, and from year to year", and speaks of "the job category or job categories in question".

- 28 -

jobs formerly subject to the PACE and developed a single selec-
tion procedure for that combined set of jobs,[10] and nowhere
allows any kind of "set-off" in which one agency's good perfor-
mance cancels out another agency's bad performance, or in which
good performance as to one job category cancels out bad perfor-
mance as to another.

      (c) <u>The Defendants' Contention That</u>
<u>Only External Hires Should Be</u>
<u>Considered in Making Adverse-</u>
<u>Impact Determinations as to</u>
<u>Specific Agencies</u>

     24. The defendants took the position in informal
enforcement proceedings that the 1982 showings of adverse impact
for particular agencies were improper because they were based on
¶ 8(b)(1) of the Consent Decree, set out at p. 3 above, a
standard involving "appointments from all sources", not just
external hires.  May 30, 1986 Letter of Ms. Ward to counsel for
plaintiffs (Attachment P) at 1, 3-4, and 4-5.

     25. The defendants are estopped from making this
assertion.  On August 4, 1983, plaintiffs had provided the
government with showings of adverse impact based on the first six
months of reported data.  These showings were limited to external
appointments, and at the August 9, 1983 meeting of the Monitoring
Committee the government rejected them, insisting that the only
appropriate standard was "appointments from all sources" as
provided in ¶ 8(b)(1) of the Decree.  Plaintiffs then re-calcu-
lated the showings based on the standard set forth in

_____

    [10] ¶ 8(b)(6)(iv) of the Decree, set out above at p. 6.

¶ 8(b)(1), and provided the new information to the government on August 29, 1983. The new understanding as to the appropriate standard was also set forth in Mr. Seymour's letters of September 16, 1983 to Ms. Ward and Mr. Green; of January 3, 1984 to Ms. Ward; and of March 29, 1984 to Mr. Green. Mr. Green confirmed this understanding in his April 5, 1984 letter to Mr. Seymour. This history is set out in Mr. Seymour's November 25, 1986 letter to Ms. Ward and Mr. Green at pp. 1-4 (Attachment Q) and in Attachments A through G to that letter.

    (d) <u>The Defendants' Contention That Factors Outside the Scope of the Matters Reported to Plaintiffs Can Defeat a Showing of Adverse Impact</u>

26. The defendants asserted in the informal enforcement proceedings that facts as to matters which are not affirmative defenses under the Consent Decree may defeat showings of adverse impact. For example, a showing of adverse impact as to the Agriculture Department's hires in the General Business and Industry job category, GS-1101, is assertedly defeated by the Agriculture Department's determination that all reported hires were into non-PACE slots.[11] May 30, 1986 Letter of Ms. Ward to counsel for plaintiffs (Attachment P) at p. 2. The nationwide showing as to this job category is assertedly defeated by this asserted fact, and by the asserted fact that the Department of

---

[11] The job category is an "asterisk" occupation in which hires could be either into slots of a type formerly covered by the PACE, or into slots of a type not formerly covered by the PACE.

Education's hires into this job category were "term" employees hired for a four-year period and thus not subject to the Decree.[12]  May 30, 1986 Letter of Ms. Ward to counsel for plaintiffs (Attachment P) at pp. 2-3.

27. The defendant has taken the position in informal enforcement proceedings that plaintiffs will not be allowed to see the back-up records showing whether the assertions as to the Agriculture and Education Departments are true, and that plaintiffs will have to be satisfied with affidavits from agency officials unknown to them.

28. The defendants' position as to the underlying records is clearly in error.  Plaintiffs have the same right as all litigants possess, to test the accuracy of the information represented to them as accurate.

29. The defendants' position on the merits is also clearly in error.  Nothing in the Consent Decree allows an overall showing of adverse impact to be defeated by a partial explanation proffered on behalf of two agencies, one of which was not even charged.  If the government is to be allowed to go outside the reporting system and the defenses expressly allowed by the Consent Decree to defend a showing of adverse impact, then it must make universal showings of the same factors, so that plaintiffs will have additional opportunities to make showings of adverse impact.  For each job category, at each agency, the

---

[12] Plaintiffs had not made any showing of adverse impact as to the Education Department's hires into this job category.

government would have to show that there are no "special situa-
tions" explaining away the hires of blacks or Hispanics, so that
plaintiffs can make the appropriate showings.  See plaintiffs'
November 25, 1986 letter to counsel for defendants, Attachment Q,
at pp. 4-5.

> (e) The Defendants' Contention
> That They Can Defend Against
> a Nationwide Showing of Adverse
> Impact by Using Regional
> Statistics, and That They Can
> Profit from Their Violation of
> Their Decretal Obligation to
> Keep Application Statistics by
> Using Old PACE Regional Appli-
> cation Statistics in Defense of
> The Showings Made

30. The defendants have taken the position in informal
enforcement proceedings that plaintiffs' nationwide showing of
adverse impact in 1982 hiring by the U.S. Department of Health
and Human Services for the Social Insurance Claims Examiner job
category, GS-0993, can be defeated by showing that the agency's
hiring was in the New York, Philadelphia-Baltimore, Birmingham,
Chicago, Kansas City, and San Francisco Civil Service regions and
that there were few Hispanic applicants in those regions.
Because the agency violated the Consent Decree in refusing to
keep application statistics by race in 1982, the defendants
assert that it can use old data on PACE applications by region
for the purpose of defending against the nationwide showing made
by plaintiffs.  May 30, 1986 Letter of Ms. Ward to counsel for
plaintiffs (Attachment P) at p. 4.

31. Moreover, the application statistics from OPM Data

- 32 -

Survey Report 80-5, the source of Ms. Ward's regional data,
reflect only the places from which PACE applicants applied to
take the PACE.[13]   There is not even a space on the form to
reflect the areas in which the applicants wanted to work.[14]   Only
the latter is arguably relevant to regional hiring statistics.
If a job is available in Boston, the pool of persons who can be
hired is limited to those who have stated they wish to work in
Boston, whether they were in Atlanta, Seattle, or Houston when
they made the statement.   The fact that many persons apply for
entry-level professional jobs while they are at the end of their
college careers,[15] and that many persons go to college far from
their homes and far from the places in which they wish to work,
indicate how far off such figures can be.

32. The defendants are clearly in error as to the
merits of their contention.   The Consent Decree does not allow a
nationwide showing of adverse impact to be defeated on a regional

_____

[13] It is fairly clear from the text of OPM Data Survey
Report 80-5, Impact of the Professional and Career Examination
(PACE) as Shown Through Applicant Flow Procedures, written by
Anthony J. Mento and Lois C. Northrop in August 1980, that the
regional breakdowns of applicants reflect only those who applied
in particular regions, not those who wanted to work in those
regions.  See pp. 3-9.  The racial identification form itself
asks only for the Examining Office code, not for the code of the
areas in which the applicant wished to work.  See Appendix B, at
p. 36.  The cited pages have been duplicated, and are attached as
Attachment R.

[14] "[A]pplicants taking the PACE are required to specify the
geographic areas in which they prefer to work ... ."  Finding 7,
November 19, 1981 Order granting final approval to the Consent
Decree, Luevano v. Campbell, 93 F.R.D. 68, 74 (D.D.C., 1981).

[15] This is why OPM has a college recruitment program.  Cf. ¶
16(e) of the Consent Decree, at p. 30.

- 33 -

basis.  The regional officials of an agency have an obligation to
ensure that there is no adverse impact within the region, and the
national officials of an agency have the obligation to ensure
that there is no adverse impact on a nationwide basis.  Paragraph
8(b)(6) of the Consent Decree, set out at pp. 4-5 above, clearly
states that determinations of adverse impact "may be made on <u>any</u>
<u>or all</u> of the following bases, as appropriate, <u>any of which shall</u>
<u>be sufficient</u> for the purposes of the enforcement procedures
under this Decree".

     33. Further, the defendants were in clear violation of
the Consent Decree by their failure or refusal to obtain and
report nationwide and regional statistics on non-Hispanic white
applicants, on non-Hispanic black applicants, and on Hispanic
applicants, in 1982.  Having failed to do so, the parties agreed
that the only recourse was to use the nationwide application
data---then already several years old---from the 1978 administra-
tions of the PACE, as reflected in the stipulation in ¶ 10(h) of
the Consent Decree.  It would be extraordinary to allow the
government to rely on regional applicant data, never before
revealed, for the purpose of defeating the showings made.
Plaintiffs, after all, were not given access to such data for the
purpose of <u>making</u> showings of adverse impact.

        (f)  <u>The Defendants' Contention That</u>
             <u>They Should Be Allowed to</u>
             <u>Double-Count Co-op Students in</u>
             <u>Defending Against a Showing of</u>
             <u>Adverse Impact</u>

     34. The defendants took the position in the informal

- 34 -

enforcement proceedings that they should be entitled to count
each Co-op placement once when he or she is placed in the Co-op
program (the data reported to plaintiffs) and a second time in a
later year, when he or she is converted into a GS-5 position.
May 30, 1986 Letter of Ms. Ward to counsel for plaintiffs
(Attachment P) at p. 4.

      35. The defendants' position is clearly in error.
There is no possible justification for counting the same person
twice.  Plaintiffs have relied upon the government's reports
showing placements in the Co-op program, and the reported data
should clearly be the data used.  If the defendants wish to
change the standard and use conversions instead of placements as
the standard, they must first start reporting the conversion data
and obtain plaintiffs' and the Court's agreement to the change.

      C. <u>Plaintiffs' Showings of Adverse Impact in 1983
        Hiring</u>

      36. On August 2, 1985, plaintiffs made their showings
of adverse impact in 1983 hiring.  A copy of the showings is
attached hereto as Attachment S.  Plaintiffs have repeatedly
requested the government to respond to these showings.  Until
three days ago, plaintiffs had not received a response.

      37. Eleven days ago, on May 26, 1987, the government
requested plaintiffs not to file this motion until after counsel
for the parties could meet, on June 3.  Plaintiffs agreed, and a
Monitoring Committee meeting was held on that date.  At the
meeting, plaintiffs were given a one-page note from the defen-
dants and a five-page chart containing what the government

- 35 -

described as its "preliminary responses" to plaintiffs' showings of adverse impact for 1983 and 1984. Plaintiffs have not attached these documents because a quick check has shown that they contain mistakes which the government should be given a chance to correct.

38. The government's "preliminary responses" make the same assumption as to the use of "external hires" instead of "hires from all sources" which the government made for plaintiffs' showings of adverse impact in 1982 hiring. Plaintiffs have shown in ¶¶ 24-25 above that the government is estopped from making this argument.

39. The government's "preliminary responses" make the assumption that a nationwide showing of adverse impact can be defeated by comparing regional statistics on applicants with regional statistics on hires. For the reasons stated in ¶ 32, the government's assumption is without merit. Further, the government's failure to answer plaintiffs' question as to the meaning of the regional application statistics means that it is quite possible that the regional application data reported are irrelevant to hires in that region.[16] See ¶ 31, supra. Even if

---

[16] There is a further problem as to the regional applicant statistics, even if they reflected all of the areas in which applicants wished to work, instead of the locations in which they lived or studied when they applied. Because PACE applicants could apply to work in more than one region, it is not clear how the additional regions of interest are reported. If only one region is reported per applicant, the resulting regional figures would be misleading. If more than one region can be reported per applicant, the total figures for nationwide applications would include double-counts, triple-counts, and other multiple counts. Plaintiffs have requested this information from the defendants,

the Decree could possibly be read to allow such an affirmative defense---and plaintiffs submit that it cannot be so read---the defendant has the burden of proving an affirmative defense, has not shown what its regional applicant statistics mean, and thus has not shown that such statistics are relevant or meaningful.

40. The defendants' "preliminary responses" purport to "correct" plaintiffs' showings by lumping together data for the GS-5 level with data for the GS-7 level.  Paragraph 6(d) of the Consent Decree, set out at p. 7 above, expressly allows plaintiffs to limit their showing of adverse impact to hiring at the GS-5 level, to hiring at the GS-7 level, or to combined hiring at both levels.  An agency is not allowed to discriminate in hiring at either entry level, without regard to whether it is discriminating at the other entry level.  Necessarily, the government cannot defeat a showing of adverse impact made as to one entry level by lumping together with it data for the other entry level.

D. Plaintiffs' Showings of Adverse Impact in 1984 Hiring

41. On April 11, 1986, plaintiffs made their showings

---

but have not received it.

In the interim, a Lawyers' Committee paralegal called up OPM's Washington Job Center to find out is she should submit a racial identification questionnaire for each area in which she wished to work.  OPM's Job Center told her that the answer varied from agency to agency and from job to job.  What she had to do was to find a vacancy announcement for a position she wanted, and contact the agency hiring people into the job category to see if they wanted information statements for each area in which she wanted to work in that job.  This does not sound as if regional application statistics were stable and sound.

of adverse impact in 1984 hiring.  A copy of the showings is

attached hereto as Attachment T.  On April 25, 1986, Mr. Green

informed counsel for plaintiffs that the 1984 applicants for the

Supply Management position, GS-2000 at the Navy Department were

also considered applicants for the Navy's General Supply series,

GS-2001.  A copy of Mr. Green's letter is attached hereto as

Attachment U.  On April 29, 1986, plaintiffs withdrew their 1984

showing of adverse impact involving the Navy's hiring for the

General Supply job category.  A copy of Mr. Seymour's April 29,

1986 letter withdrawing the showing is attached hereto as

Attachment V.  On June 3, 1987, plaintiffs received the govern-

ment's "preliminary responses", described above in ¶¶ 37-40.

        42. On April 29, 1986, plaintiffs made a supplemental

showing of adverse impact in 1984 hiring.  A copy of the sup-

plemental showing is attached hereto as Attachment W.  Plaintiffs

have not received a response to this showing; it was excluded

from the government's "Preliminary Responses".

        E. <u>The Relief Requested on the Showings of Adverse
           Impact</u>

        43. Plaintiffs seek both general and individualized

relief on each of their showings of adverse impact.  The showings

of adverse impact state the number of additional black and/or

Hispanic hires which would have been expected at each grade

level, if blacks and/or Hispanics had been hired at the same rate

as non-Hispanic whites were hired.  Plaintiffs seek the hiring of

that number of blacks and/or Hispanics at that grade level.  It

would be acceptable to plaintiffs for the agency to select the

- 38 -

best-qualified blacks and/or Hispanics from among the black and/or Hispanic applicants harmed by the adverse impact.

44. Plaintiffs' July 29, 1985 letter to counsel for the defendants set forth, at pp. 2-3, the "make whole" remedies requested by plaintiffs for the showings of adverse impact in 1982 hiring. The identical remedies are sought for the showings of adverse impact in 1983 and 1984 hiring. A copy of the letter is attached hereto as Attachment X. The defendants have never responded to these proposals.

45. Plaintiffs are willing to accept any means of calculating back pay which is a fair estimate of what the individual class members would have earned if they had been hired when the agency was hiring, and if they had progressed at the same rate as the persons the agency actually hired. The agencies involved in the showings of adverse impact are in the best position to describe their experience with promotions, to furnish documentation thereof, and to make the initial calculations. The resulting figure would be the same for each remedial hire at that agency, for the year in question.

46. Information on the interim earnings of the remedial class member hires can be obtained from the class members, and if necessary can be backed up with records of the Internal Revenue Service and/or of the Social Security Administration. When individual interim earnings are subtracted from the hypothetical agency earnings figure, the result would be the individual back pay amount.

- 39 -



47. Plaintiffs would also be willing to negotiate with defendants a liquidated amount to be paid to each such remedial hire, which would make the above calculations unnecessary.

48. Plaintiffs seek such other and further relief as may be appropriate, including an injunction requiring the immediate cessation or modification of any procedure which results in adverse impact year after year, where there has been no meaningful effort to eliminate the adverse impact through use of the special programs described in the Consent Decree.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA JEFFERSON PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
RICHARD T. SEYMOUR
Bar No. 28100
                Attorneys for Plaintiffs

Dated: June 6, 1987

- 41 -

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE     10-Sep-84

| JOB NAME | BOND SALES PROMOTION | SAFETY MANAGEMENT | COMMUNITY PLANNING | OUTDOOR RECREATION SPECIALIST | PARK MANAGEMENT |
|---|---|---|---|---|---|
| JOB SERIES | 0011: | 0018: | 0020: | 0023: | 0025: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | |
| GRADE 5 TOTAL | 0 | 57 | 2 | 1 | 15 |
| WHITE (NON-HISPANIC) | 0 | 48 | 2 | 1 | 14 |
| BLACK (NON-HISPANIC) | 0 | 5 | 0 | 0 | 1 |
| % OF TOTAL BLACK: | ERR | 8.8% | 0.0% | 0.0% | 6.7% |
| HISPANIC | 0 | 4 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | ERR | 7.0% | 0.0% | 0.0% | 0.0% |
| GRADE 7 TOTAL | 0 | 38 | 1 | 3 | 12 |
| WHITE (NON-HISPANIC) | 0 | 34 | 1 | 3 | 12 |
| BLACK (NON-HISPANIC) | 0 | 2 | 0 | 0 | 0 |
| % OF TOTAL BLACK: | ERR | 5.3% | 0.0% | 0.0% | 0.0% |
| HISPANIC | 0 | 2 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | ERR | 5.3% | 0.0% | 0.0% | 0.0% |
| TOTAL, GRADES 5 AND 7 | 0 | 95 | 3 | 4 | 27 |
| WHITE (NON-HISPANIC) | 0 | 82 | 3 | 4 | 26 |
| BLACK (NON-HISPANIC) | 0 | 7 | 0 | 0 | 1 |
| % OF TOTAL BLACK: | ERR | 7.4% | 0.0% | 0.0% | 3.7% |
| HISPANIC | 0 | 6 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | ERR | 6.3% | 0.0% | 0.0% | 0.0% |

ATTACHMENT A

FILED JUN 5 1987 U.S. DISTRICT COURT DISTRICT OF COLUMBIA

-1-

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE     10-Sep-84

| JOB NAME | CROP INSUR-ANCE ADMIN-ISTRATION (NOT ALL FIELD) | ENVIRON-MENTAL PROTECTION | SECURITY ADMIN-ISTRATION | SOCIAL SCIENCE | SOCIAL INSURANCE ADMIN-ISTRATION | UNEMPLOYMENT INSURANCE |
|---|---|---|---|---|---|---|
| JOB SERIES | 0027: | 0028: | 0080: | 0101: | 0105: | 0106: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 5 | 1 | 51 | 3 | 71 | 0 |
| WHITE (NON-HISPANIC) | 5 | 1 | 37 | 2 | 36 | 0 |
| BLACK (NON-HISPANIC) | 0 | 0 | 10 | 1 | 22 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 19.6% | 33.3% | 31.0% | ERR |
| HISPANIC | 0 | 0 | 4 | 0 | 13 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 7.8% | 0.0% | 18.3% | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 10 | 5 | 83 | 17 | 131 | 0 |
| WHITE (NON-HISPANIC) | 10 | 5 | 70 | 16 | 105 | 0 |
| BLACK (NON-HISPANIC) | 0 | 0 | 9 | 1 | 20 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 10.8% | 5.9% | 15.3% | ERR |
| HISPANIC | 0 | 0 | 4 | 0 | 6 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 4.8% | 0.0% | 4.6% | ERR |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 15 | 6 | 134 | 20 | 202 | 0 |
| WHITE (NON-HISPANIC) | 15 | 6 | 107 | 18 | 141 | 0 |
| BLACK (NON-HISPANIC) | 0 | 0 | 19 | 2 | 42 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 14.2% | 10.0% | 20.8% | ERR |
| HISPANIC | 0 | 0 | 8 | 0 | 19 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 6.0% | 0.0% | 9.4% | ERR |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | ECONOMIST | FOOD ASSISTANCE PROGRAM SPECIALIST | FOREIGN AFFAIRS | INTER-NATIONAL RELATIONS | INTELLIGENCE | MANPOWER RESEARCH AND ANALYSIS | MANPOWER DEVELOPMENT |
|---|---|---|---|---|---|---|---|
| JOB SERIES | 0110: | 0120: | 0130: | 0131: | 0132: | 0140: | 0142: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | | |
| GRADE 5 TOTAL | 16 | 7 | 1 | 0 | 12 | 0 | 0 |
| WHITE (NON-HISPANIC) | 14 | 7 | 1 | 0 | 8 | 0 | 0 |
| BLACK (NON-HISPANIC) | 2 | 0 | 0 | 0 | 4 | 0 | 0 |
| % OF TOTAL BLACK: | 12.5% | 0.0% | 0.0% | ERR | 33.3% | ERR | ERR |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | ERR | 0.0% | ERR | ERR |
| | | | | | | | |
| GRADE 7 TOTAL | 23 | 5 | 1 | 1 | 4 | 0 | 1 |
| WHITE (NON-HISPANIC) | 23 | 5 | 1 | 1 | 3 | 0 | 0 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 0.0% | 0.0% | 25.0% | ERR | 100.0% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | ERR | 0.0% |
| | | | | | | | |
| TOTAL, GRADES 5 AND 7 | 39 | 12 | 2 | 1 | 16 | 0 | 1 |
| WHITE (NON-HISPANIC) | 37 | 12 | 2 | 1 | 11 | 0 | 0 |
| BLACK (NON-HISPANIC) | 2 | 0 | 0 | 0 | 5 | 0 | 1 |
| % OF TOTAL BLACK: | 5.1% | 0.0% | 0.0% | 0.0% | 31.3% | ERR | 100.0% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | ERR | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GEOGRAPHY | HISTORY | PSYCHOLOGY | SOCIOLOGY | SOCIAL SERVICES | GENERAL ANTHRO-POLOGY | ARCHAEOLOGY |
|---|---|---|---|---|---|---|---|
| JOB SERIES | 0150: | 0170: | 0180: | 0184: | 0187: | 0190: | 0193: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | | |
| GRADE 5 TOTAL | 1 | 3 | 0 | 0 | 5 | 0 | 1 |
| WHITE (NON-HISPANIC) | 1 | 3 | 0 | 0 | 4 | 0 | 1 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | ERR | ERR | 20.0% | ERR | 0.0% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | ERR | ERR | 0.0% | ERR | 0.0% |
| GRADE 7 TOTAL | 2 | 2 | 4 | 0 | 14 | 0 | 5 |
| WHITE (NON-HISPANIC) | 2 | 2 | 4 | 0 | 10 | 0 | 5 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 0.0% | ERR | 28.6% | ERR | 0.0% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | ERR | 0.0% | ERR | 0.0% |
| TOTAL, GRADES 5 AND 7 | 3 | 5 | 4 | 0 | 19 | 0 | 6 |
| WHITE (NON-HISPANIC) | 3 | 5 | 4 | 0 | 14 | 0 | 6 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% | 0.0% | ERR | 26.3% | ERR | 0.0% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | ERR | 0.0% | ERR | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | PERSONNEL MANAGEMENT | MILITARY PERSONNEL MANAGEMENT | PERSONNEL STAFFING | POSITION CLASSIFI- CATION | OCCUPATIONAL ANALYSIS | SALARY AND WAGE ADMIN- ISTRATION |
|---|---|---|---|---|---|---|
| JOB SERIES | 0201: | 0205: | 0212: | 0221: | 0222: | 0223: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 134 | 7 | 45 | 25 | 0 | 0 |
| WHITE (NON-HISPANIC) | 102 | 4 | 36 | 22 | 0 | 0 |
| BLACK (NON-HISPANIC) | 25 | 2 | 6 | 3 | 0 | 0 |
| % OF TOTAL BLACK: | 18.7% | 28.6% | 13.3% | 12.0% | ERR | ERR |
| HISPANIC | 7 | 1 | 3 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 5.2% | 14.3% | 6.7% | 0.0% | ERR | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 112 | 21 | 84 | 39 | 0 | 1 |
| WHITE (NON-HISPANIC) | 90 | 17 | 66 | 34 | 0 | 1 |
| BLACK (NON-HISPANIC) | 16 | 3 | 16 | 5 | 0 | 0 |
| % OF TOTAL BLACK: | 14.3% | 14.3% | 19.0% | 12.8% | ERR | 0.0% |
| HISPANIC | 6 | 1 | 2 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 5.4% | 4.8% | 2.4% | 0.0% | ERR | 0.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 246 | 28 | 129 | 64 | 0 | 1 |
| WHITE (NON-HISPANIC) | 192 | 21 | 102 | 56 | 0 | 1 |
| BLACK (NON-HISPANIC) | 41 | 5 | 22 | 8 | 0 | 0 |
| % OF TOTAL BLACK: | 16.7% | 17.9% | 17.1% | 12.5% | ERR | 0.0% |
| HISPANIC | 13 | 2 | 5 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 5.3% | 7.1% | 3.9% | 0.0% | ERR | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | LABOR MAN-AGEMENT AND EMPLOYEE RELATIONS | LABOR RELATIONS | EMPLOYEE DEVELOPMENT | LABOR MANAGEMENT RELATIONS EXAMINING | CONTRACTOR INDUSTRIAL RELATIONS | WAGE AND HOUR COMPLIANCE SPECIALIST |
|---|---|---|---|---|---|---|
| JOB SERIES | 0230: | 0233: | 0235: | 0244: | 0246: | 0249: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 9 | 2 | 14 | 2 | 0 | 0 |
| WHITE (NON-HISPANIC) | 7 | 1 | 12 | 2 | 0 | 0 |
| BLACK (NON-HISPANIC) | 2 | 0 | 2 | 0 | 0 | 0 |
| % OF TOTAL BLACK: | 22.2% | 0.0% | 14.3% | 0.0% | ERR | ERR |
| HISPANIC | 0 | 1 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 50.0% | 0.0% | 0.0% | ERR | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 25 | 3 | 22 | 10 | 0 | 6 |
| WHITE (NON-HISPANIC) | 22 | 3 | 16 | 7 | 0 | 3 |
| BLACK (NON-HISPANIC) | 2 | 0 | 5 | 2 | 0 | 2 |
| % OF TOTAL BLACK: | 8.0% | 0.0% | 22.7% | 20.0% | ERR | 33.3% |
| HISPANIC | 1 | 0 | 1 | 1 | 0 | 1 |
| % OF TOTAL HISPANIC: | 4.0% | 0.0% | 4.5% | 10.0% | ERR | 16.7% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 34 | 5 | 36 | 12 | 0 | 6 |
| WHITE (NON-HISPANIC) | 29 | 4 | 28 | 9 | 0 | 3 |
| BLACK (NON-HISPANIC) | 4 | 0 | 7 | 2 | 0 | 2 |
| % OF TOTAL BLACK: | 11.8% | 0.0% | 19.4% | 16.7% | ERR | 33.3% |
| HISPANIC | 1 | 1 | 1 | 1 | 0 | 1 |
| % OF TOTAL HISPANIC: | 2.9% | 20.0% | 2.8% | 8.3% | ERR | 16.7% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GENERAL CLERICAL AND ADMIN- ISTRATIVE | DIGITAL COMPUTER SYSTEMS AD- MINISTRATION | COMPUTER SPECIALIST (TRAINEE) | ADMINISTRA- TIVE OFFICER | MANAGEMENT ANALYSIS | PROGRAM ANALYSIS |
|---|---|---|---|---|---|---|
| JOB SERIES | 0301: | 0330: | 0334: | 0341: | 0343: | 0345: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
|   GRADE 5 TOTAL | 388 | 1 | 578 | 40 | 184 | 101 |
|     WHITE (NON-HISPANIC) | 295 | 1 | 488 | 36 | 159 | 82 |
|     BLACK (NON-HISPANIC) | 67 | 0 | 71 | 3 | 18 | 16 |
|       % OF TOTAL BLACK: | 17.3% | 0.0% | 12.3% | 7.5% | 9.8% | 15.8% |
|     HISPANIC | 26 | 0 | 19 | 1 | 7 | 3 |
|       % OF TOTAL HISPANIC: | 6.7% | 0.0% | 3.3% | 2.5% | 3.8% | 3.0% |
| | | | | | | |
|   GRADE 7 TOTAL | 342 | 1 | 535 | 182 | 221 | 112 |
|     WHITE (NON-HISPANIC) | 271 | 1 | 425 | 164 | 183 | 92 |
|     BLACK (NON-HISPANIC) | 60 | 0 | 94 | 14 | 31 | 16 |
|       % OF TOTAL BLACK: | 17.5% | 0.0% | 17.6% | 7.7% | 14.0% | 14.3% |
|     HISPANIC | 11 | 0 | 16 | 4 | 7 | 4 |
|       % OF TOTAL HISPANIC: | 3.2% | 0.0% | 3.0% | 2.2% | 3.2% | 3.6% |
| | | | | | | |
|   TOTAL, GRADES 5 AND 7 | 730 | 2 | 1113 | 222 | 405 | 213 |
|     WHITE (NON-HISPANIC) | 566 | 2 | 913 | 200 | 342 | 174 |
|     BLACK (NON-HISPANIC) | 127 | 0 | 165 | 17 | 49 | 32 |
|       % OF TOTAL BLACK: | 17.4% | 0.0% | 14.8% | 7.7% | 12.1% | 15.0% |
|     HISPANIC | 37 | 0 | 35 | 5 | 14 | 7 |
|       % OF TOTAL HISPANIC: | 5.1% | 0.0% | 3.1% | 2.3% | 3.5% | 3.3% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE     10-Sep-84

| JOB NAME | LOGISTIC MANAGEMENT | COMMUNICA-TIONS MANAGEMENT | COMMUNICA-TIONS SPECIALIST | GENERAL ACCOUNTING CLERICAL AND ADMINISTRATIVE | BUDGET AND ACCOUNTING | TAX TECHNICIAN |
|---|---|---|---|---|---|---|
| JOB SERIES | 0346: | 0391: | 0393: | 0501: | 0504: | 0526: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 28 | 6 | 25 | 364 | 2 | 290 |
| WHITE (NON-HISPANIC) | 23 | 4 | 20 | 286 | 2 | 213 |
| BLACK (NON-HISPANIC) | 5 | 0 | 5 | 62 | 0 | 55 |
| % OF TOTAL BLACK: | 17.9% | 0.0% | 20.0% | 17.0% | 0.0% | 19.0% |
| HISPANIC | 0 | 2 | 0 | 16 | 0 | 22 |
| % OF TOTAL HISPANIC: | 0.0% | 33.3% | 0.0% | 4.4% | 0.0% | 7.6% |
| | | | | | | |
| GRADE 7 TOTAL | 21 | 4 | 28 | 181 | 3 | 184 |
| WHITE (NON-HISPANIC) | 19 | 4 | 19 | 147 | 3 | 138 |
| BLACK (NON-HISPANIC) | 2 | 0 | 9 | 20 | 0 | 35 |
| % OF TOTAL BLACK: | 9.5% | 0.0% | 32.1% | 11.0% | 0.0% | 19.0% |
| HISPANIC | 0 | 0 | 0 | 14 | 0 | 11 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 7.7% | 0.0% | 6.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 49 | 10 | 53 | 545 | 5 | 474 |
| WHITE (NON-HISPANIC) | 42 | 8 | 39 | 433 | 5 | 351 |
| BLACK (NON-HISPANIC) | 7 | 0 | 14 | 82 | 0 | 90 |
| % OF TOTAL BLACK: | 14.3% | 0.0% | 26.4% | 15.0% | 0.0% | 19.0% |
| HISPANIC | 0 | 2 | 0 | 30 | 0 | 33 |
| % OF TOTAL HISPANIC: | 0.0% | 20.0% | 0.0% | 5.5% | 0.0% | 7.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | BUDGET ADMINISTRA-TION | FINANCIAL INSTITUTION EXAMINING | HOSPITAL HOUSEKEEPING MANAGEMENT | PUBLIC HEALTH PROGRAM SPECIALIST | PARALEGAL SPECIALIST | LEGAL ASSISTANCE |
|---|---|---|---|---|---|---|
| JOB SERIES | 0560: | 0570: | 0673: | 0685: | 0950: | 0954: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 142 | 46 | 1 | 0 | 33 | 0 |
| WHITE (NON-HISPANIC) | 119 | 35 | 0 | 0 | 22 | 0 |
| BLACK (NON-HISPANIC) | 18 | 8 | 1 | 0 | 7 | 0 |
| % OF TOTAL BLACK: | 12.7% | 17.4% | 100.0% | ERR | 21.2% | ERR |
| HISPANIC | 5 | 3 | 0 | 0 | 4 | 0 |
| % OF TOTAL HISPANIC: | 3.5% | 6.5% | 0.0% | ERR | 12.1% | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 154 | 13 | 8 | 26 | 54 | 0 |
| WHITE (NON-HISPANIC) | 136 | 9 | 7 | 21 | 40 | 0 |
| BLACK (NON-HISPANIC) | 13 | 2 | 1 | 4 | 12 | 0 |
| % OF TOTAL BLACK: | 8.4% | 15.4% | 12.5% | 15.4% | 22.2% | ERR |
| HISPANIC | 5 | 2 | 0 | 1 | 2 | 0 |
| % OF TOTAL HISPANIC: | 3.2% | 15.4% | 0.0% | 3.8% | 3.7% | ERR |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 296 | 59 | 9 | 26 | 87 | 0 |
| WHITE (NON-HISPANIC) | 255 | 44 | 7 | 21 | 62 | 0 |
| BLACK (NON-HISPANIC) | 31 | 10 | 2 | 4 | 19 | 0 |
| % OF TOTAL BLACK: | 10.5% | 16.9% | 22.2% | 15.4% | 21.8% | ERR |
| HISPANIC | 10 | 5 | 0 | 1 | 6 | 0 |
| % OF TOTAL HISPANIC: | 3.4% | 8.5% | 0.0% | 3.8% | 6.9% | ERR |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE      10-Sep-84

| JOB NAME | ADJUDICATING | CONTACT REPRESEN-TATIVE | LAND LAW EXAMINING | PASSPORT AND VISA EXAMINING | LEGAL CLERICAL AND ADMINISTRA-TIVE | TAX LAW SPECIALIST |
|---|---|---|---|---|---|---|
| JOB SERIES | 0960: | 0962: | 0965: | 0967: | 0986: | 0987: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 0 | 742 | 21 | 89 | 550 | 3 |
| WHITE (NON-HISPANIC) | 0 | 476 | 17 | 86 | 422 | 3 |
| BLACK (NON-HISPANIC) | 0 | 182 | 1 | 3 | 105 | 0 |
| % OF TOTAL BLACK: | ERR | 24.5% | 4.8% | 3.4% | 19.1% | 0.0% |
| HISPANIC | 0 | 84 | 3 | 0 | 23 | 0 |
| % OF TOTAL HISPANIC: | ERR | 11.3% | 14.3% | 0.0% | 4.2% | 0.0% |
| | | | | | | |
| GRADE 7 TOTAL | 0 | 112 | 11 | 4 | 124 | 1 |
| WHITE (NON-HISPANIC) | 0 | 79 | 10 | 4 | 101 | 1 |
| BLACK (NON-HISPANIC) | 0 | 20 | 0 | 0 | 19 | 0 |
| % OF TOTAL BLACK: | ERR | 17.9% | 0.0% | 0.0% | 15.3% | 0.0% |
| HISPANIC | 0 | 13 | 1 | 0 | 4 | 0 |
| % OF TOTAL HISPANIC: | ERR | 11.6% | 9.1% | 0.0% | 3.2% | 0.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 0 | 854 | 32 | 93 | 674 | 4 |
| WHITE (NON-HISPANIC) | 0 | 555 | 27 | 90 | 523 | 4 |
| BLACK (NON-HISPANIC) | 0 | 202 | 1 | 3 | 124 | 0 |
| % OF TOTAL BLACK: | ERR | 23.7% | 3.1% | 3.2% | 18.4% | 0.0% |
| HISPANIC | 0 | 97 | 4 | 0 | 27 | 0 |
| % OF TOTAL HISPANIC: | ERR | 11.4% | 12.5% | 0.0% | 4.0% | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GENERAL CLAIMS EXAMINING | WORKMEN'S COMPENSATION CLAIMS EXAMINING | SOCIAL INSURANCE CLAIMS EXAMINING | UNEMPLOYMENT COMPENSATION CLAIMS EXAMINING | VETERANS CLAIMS EXAMINING | CIVIL SERV- ICE RETIRE- MENT CLAIMS EXAMINING |
|---|---|---|---|---|---|---|
| JOB SERIES | 0990: | 0991: | 0993: | 0994: | 0996: | 0997: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 20 | 6 | 705 | 0 | 37 | 0 |
| WHITE (NON-HISPANIC) | 12 | 4 | 540 | 0 | 23 | 0 |
| BLACK (NON-HISPANIC) | 8 | 2 | 151 | 0 | 13 | 0 |
| % OF TOTAL BLACK: | 40.0% | 33.3% | 21.4% | ERR | 35.1% | ERR |
| HISPANIC | 0 | 0 | 14 | 0 | 1 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 2.0% | ERR | 2.7% | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 50 | 4 | 111 | 0 | 6 | 0 |
| WHITE (NON-HISPANIC) | 36 | 3 | 81 | 0 | 5 | 0 |
| BLACK (NON-HISPANIC) | 13 | 1 | 30 | 0 | 1 | 0 |
| % OF TOTAL BLACK: | 26.0% | 25.0% | 27.0% | ERR | 16.7% | ERR |
| HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 2.0% | 0.0% | 0.0% | ERR | 0.0% | ERR |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 70 | 10 | 816 | 0 | 43 | 0 |
| WHITE (NON-HISPANIC) | 48 | 7 | 621 | 0 | 28 | 0 |
| BLACK (NON-HISPANIC) | 21 | 3 | 181 | 0 | 14 | 0 |
| % OF TOTAL BLACK: | 30.0% | 30.0% | 22.2% | ERR | 32.6% | ERR |
| HISPANIC | 1 | 0 | 14 | 0 | 1 | 0 |
| % OF TOTAL HISPANIC: | 1.4% | 0.0% | 1.7% | ERR | 2.3% | ERR |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GENERAL ARTS AND INFORMATION (NOT FINE OR APPLIED ARTS) | MUSEUM CURATOR | PUBLIC AFFAIRS | PUBLIC INFORMATION | WRITING AND EDITING | TECHNICAL WRITING AND EDITING |
|---|---|---|---|---|---|---|
| JOB SERIES | 1001: | 1015: | 1035: | 1081: | 1082: | 1083: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 23 | 0 | 25 | 6 | 59 | 49 |
| WHITE (NON-HISPANIC) | 21 | 0 | 24 | 5 | 53 | 46 |
| BLACK (NON-HISPANIC) | 1 | 0 | 1 | 1 | 6 | 1 |
| % OF TOTAL BLACK: | 4.3% | ERR | 4.0% | 16.7% | 10.2% | 2.0% |
| HISPANIC | 1 | 0 | 0 | 0 | 0 | 2 |
| % OF TOTAL HISPANIC: | 4.3% | ERR | 0.0% | 0.0% | 0.0% | 4.1% |
| | | | | | | |
| GRADE 7 TOTAL | 22 | 2 | 47 | 3 | 58 | 14 |
| WHITE (NON-HISPANIC) | 21 | 2 | 42 | 3 | 50 | 11 |
| BLACK (NON-HISPANIC) | 1 | 0 | 2 | 0 | 8 | 3 |
| % OF TOTAL BLACK: | 4.5% | 0.0% | 4.3% | 0.0% | 13.8% | 21.4% |
| HISPANIC | 0 | 0 | 3 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 6.4% | 0.0% | 0.0% | 0.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 45 | 2 | 72 | 9 | 117 | 63 |
| WHITE (NON-HISPANIC) | 42 | 2 | 66 | 8 | 103 | 57 |
| BLACK (NON-HISPANIC) | 2 | 0 | 3 | 1 | 14 | 4 |
| % OF TOTAL BLACK: | 4.4% | 0.0% | 4.2% | 11.1% | 12.0% | 6.3% |
| HISPANIC | 1 | 0 | 3 | 0 | 0 | 2 |
| % OF TOTAL HISPANIC: | 2.2% | 0.0% | 4.2% | 0.0% | 0.0% | 3.2% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE     10-Sep-84

| JOB NAME | GENERAL BUSINESS AND INDUSTRY | CONTRACT AND PROCUREMENT | INDUSTRIAL PROPERTY MANAGEMENT | PROPERTY DISPOSAL | PUBLIC UTILITY SPECIALIST | TRANSPOR-TATION INDUSTRY ANALYSIS |
|---|---|---|---|---|---|---|
| JOB SERIES | 1101: | 1102: | 1103: | 1104: | 1130: | 1135: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 415 | 722 | 17 | 15 | 5 | 0 |
| WHITE (NON-HISPANIC) | 373 | 595 | 10 | 12 | 3 | 0 |
| BLACK (NON-HISPANIC) | 25 | 110 | 6 | 3 | 2 | 0 |
| % OF TOTAL BLACK: | 6.0% | 15.2% | 35.3% | 20.0% | 40.0% | ERR |
| HISPANIC | 17 | 17 | 1 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 4.1% | 2.4% | 5.9% | 0.0% | 0.0% | ERR |
| | | | | | | |
| GRADE 7 TOTAL | 230 | 361 | 10 | 36 | 1 | 0 |
| WHITE (NON-HISPANIC) | 139 | 288 | 8 | 30 | 1 | 0 |
| BLACK (NON-HISPANIC) | 86 | 57 | 2 | 5 | 0 | 0 |
| % OF TOTAL BLACK: | 37.4% | 15.8% | 20.0% | 13.9% | 0.0% | ERR |
| HISPANIC | 5 | 16 | 0 | 1 | 0 | 0 |
| % OF TOTAL HISPANIC: | 2.2% | 4.4% | 0.0% | 2.8% | 0.0% | ERR |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 645 | 1083 | 27 | 51 | 6 | 0 |
| WHITE (NON-HISPANIC) | 512 | 883 | 18 | 42 | 4 | 0 |
| BLACK (NON-HISPANIC) | 111 | 167 | 8 | 8 | 2 | 0 |
| % OF TOTAL BLACK: | 17.2% | 15.4% | 29.6% | 15.7% | 33.3% | ERR |
| HISPANIC | 22 | 33 | 1 | 1 | 0 | 0 |
| % OF TOTAL HISPANIC: | 3.4% | 3.0% | 3.7% | 2.0% | 0.0% | ERR |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | TRADE SPECIALIST | AGRICULTURAL PROGRAM SPECIALIST | AGRICULTURAL & FISHERIES MARKETING REPORTER | AGRICULTURAL COMMODITY MARKETING REPORTER | WAGE AND HOUR LAW ADMINIS-TRATION | INDUSTRIAL SPECIALIST |
|---|---|---|---|---|---|---|
| JOB SERIES | 1140: | 1145: | 1146: | 1147: | 1149: | 1150: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 0 | 1 | 3 | 0 | 0 | 40 |
| WHITE (NON-HISPANIC) | 0 | 1 | 3 | 0 | 0 | 36 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 0 | 0 | 3 |
| % OF TOTAL BLACK: | ERR | 0.0% | 0.0% | ERR | ERR | 7.5% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 1 |
| % OF TOTAL HISPANIC: | ERR | 0.0% | 0.0% | ERR | ERR | 2.5% |
| | | | | | | |
| GRADE 7 TOTAL | 1 | 2 | 4 | 1 | 0 | 13 |
| WHITE (NON-HISPANIC) | 1 | 1 | 4 | 1 | 0 | 12 |
| BLACK (NON-HISPANIC) | 0 | 1 | 0 | 0 | 0 | 1 |
| % OF TOTAL BLACK: | 0.0% | 50.0% | 0.0% | 0.0% | ERR | 7.7% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 0.0% | ERR | 0.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 1 | 3 | 7 | 1 | 0 | 53 |
| WHITE (NON-HISPANIC) | 1 | 2 | 7 | 1 | 0 | 48 |
| BLACK (NON-HISPANIC) | 0 | 1 | 0 | 0 | 0 | 4 |
| % OF TOTAL BLACK: | 0.0% | 33.3% | 0.0% | 0.0% | ERR | 7.5% |
| HISPANIC | 0 | 0 | 0 | 0 | 0 | 1 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 0.0% | ERR | 1.9% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | PRODUCTION CONTROL SPECIALIST | FINANCIAL ANALYSIS | INSURANCE EXAMINING | LOAN SPECIALIST | INTERNAL REVENUE OFFICER | REALTY | APPRAISING AND ASSESSING |
|---|---|---|---|---|---|---|---|
| JOB SERIES | 1152: | 1160: | 1163: | 1165: | 1169: | 1170: | 1171: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | | |
| GRADE 5 TOTAL | 152 | 3 | 0 | 22 | 624 | 33 | 2 |
| WHITE (NON-HISPANIC) | 138 | 2 | 0 | 14 | 469 | 28 | 1 |
| BLACK (NON-HISPANIC) | 11 | 1 | 0 | 6 | 112 | 4 | 0 |
| % OF TOTAL BLACK: | 7.2% | 33.3% | ERR | 27.3% | 17.9% | 12.1% | 0.0% |
| HISPANIC | 3 | 0 | 0 | 2 | 43 | 1 | 1 |
| % OF TOTAL HISPANIC: | 2.0% | 0.0% | ERR | 9.1% | 6.9% | 3.0% | 50.0% |
| | | | | | | | |
| GRADE 7 TOTAL | 294 | 7 | 0 | 22 | 796 | 23 | 2 |
| WHITE (NON-HISPANIC) | 215 | 6 | 0 | 17 | 633 | 21 | 1 |
| BLACK (NON-HISPANIC) | 36 | 1 | 0 | 5 | 112 | 1 | 1 |
| % OF TOTAL BLACK: | 12.2% | 14.3% | ERR | 22.7% | 14.1% | 4.3% | 50.0% |
| HISPANIC | 43 | 0 | 0 | 0 | 51 | 1 | 0 |
| % OF TOTAL HISPANIC: | 14.6% | 0.0% | ERR | 0.0% | 6.4% | 4.3% | 0.0% |
| | | | | | | | |
| TOTAL, GRADES 5 AND 7 | 446 | 10 | 0 | 44 | 1420 | 56 | 4 |
| WHITE (NON-HISPANIC) | 353 | 8 | 0 | 31 | 1102 | 49 | 2 |
| BLACK (NON-HISPANIC) | 47 | 2 | 0 | 11 | 224 | 5 | 1 |
| % OF TOTAL BLACK: | 10.5% | 20.0% | ERR | 25.0% | 15.8% | 8.9% | 25.0% |
| HISPANIC | 46 | 0 | 0 | 2 | 94 | 2 | 1 |
| % OF TOTAL HISPANIC: | 10.3% | 0.0% | ERR | 4.5% | 6.6% | 3.6% | 25.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | HOUSING MANAGEMENT | BUILDING MANAGEMENT | LIBRARIAN (CERTAIN TRAINEES AT GS-5 LEVEL) | TECHNICAL INFORMATION SERVICES | ARCHIVIST | ARCHIVES SPECIALIST |
|---|---|---|---|---|---|---|
| JOB SERIES | 1173: | 1176: | 1410: | 1412: | 1420: | 1421: |
| TOTAL 1982 HIRES, ALL AGENCIES |  |  |  |  |  |  |
| GRADE 5 TOTAL | 49 | 6 | 1 | 26 | 0 | 7 |
| WHITE (NON-HISPANIC) | 44 | 4 | 1 | 18 | 0 | 5 |
| BLACK (NON-HISPANIC) | 5 | 2 | 0 | 7 | 0 | 2 |
| % OF TOTAL BLACK: | 10.2% | 33.3% | 0.0% | 26.9% | ERR | 28.6% |
| HISPANIC | 0 | 0 | 0 | 1 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 3.8% | ERR | 0.0% |
|  |  |  |  |  |  |  |
| GRADE 7 TOTAL | 33 | 7 | 18 | 13 | 2 | 4 |
| WHITE (NON-HISPANIC) | 31 | 7 | 14 | 13 | 2 | 2 |
| BLACK (NON-HISPANIC) | 2 | 0 | 3 | 0 | 0 | 2 |
| % OF TOTAL BLACK: | 6.1% | 0.0% | 16.7% | 0.0% | 0.0% | 50.0% |
| HISPANIC | 0 | 0 | 1 | 0 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 5.6% | 0.0% | 0.0% | 0.0% |
|  |  |  |  |  |  |  |
| TOTAL, GRADES 5 AND 7 | 82 | 13 | 19 | 39 | 2 | 11 |
| WHITE (NON-HISPANIC) | 75 | 11 | 15 | 31 | 2 | 7 |
| BLACK (NON-HISPANIC) | 7 | 2 | 3 | 7 | 0 | 4 |
| % OF TOTAL BLACK: | 8.5% | 15.4% | 15.8% | 17.9% | 0.0% | 36.4% |
| HISPANIC | 0 | 0 | 1 | 1 | 0 | 0 |
| % OF TOTAL HISPANIC: | 0.0% | 0.0% | 5.3% | 2.6% | 0.0% | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | FACILITIES MANAGEMENT | PRINTING MANAGEMENT | GENERAL EDUCATION AND TRAINING | VOCATIONAL REHABILITA- TION (GS-7 ONLY) | EDUCATION RESEARCH AND PROGRAM SPECIALIST | GENERAL INVESTI- GATING |
|---|---|---|---|---|---|---|
| JOB SERIES | 1640: | 1654: | 1701: | 1715: | 1720: | 1810: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 2 | 18 | 1 | 1 | 0 | 24 |
|   WHITE (NON-HISPANIC) | 1 | 13 | 1 | 1 | 0 | 19 |
|   BLACK (NON-HISPANIC) | 1 | 5 | 0 | 0 | 0 | 4 |
|     % OF TOTAL BLACK: | 50.0% | 27.8% | 0.0% | 0.0% | ERR | 16.7% |
|   HISPANIC | 0 | 0 | 0 | 0 | 0 | 1 |
|     % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 0.0% | ERR | 4.2% |
| GRADE 7 TOTAL | 4 | 16 | 2 | 6 | 0 | 44 |
|   WHITE (NON-HISPANIC) | 4 | 13 | 2 | 4 | 0 | 37 |
|   BLACK (NON-HISPANIC) | 0 | 3 | 0 | 1 | 0 | 5 |
|     % OF TOTAL BLACK: | 0.0% | 18.8% | 0.0% | 16.7% | ERR | 11.4% |
|   HISPANIC | 0 | 0 | 0 | 1 | 0 | 2 |
|     % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 16.7% | ERR | 4.5% |
| TOTAL, GRADES 5 AND 7 | 6 | 34 | 3 | 7 | 0 | 68 |
|   WHITE (NON-HISPANIC) | 5 | 26 | 3 | 5 | 0 | 56 |
|   BLACK (NON-HISPANIC) | 1 | 8 | 0 | 1 | 0 | 9 |
|     % OF TOTAL BLACK: | 16.7% | 23.5% | 0.0% | 14.3% | ERR | 13.2% |
|   HISPANIC | 0 | 0 | 0 | 1 | 0 | 3 |
|     % OF TOTAL HISPANIC: | 0.0% | 0.0% | 0.0% | 14.3% | ERR | 4.4% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | CRIMINAL INVES-TIGATING (NOT TREASURY ENFORCE-MENT AGENTS) | GAME LAW ENFORCEMENT (GS-5) | IMMIGRATION INSPECTION | SECURITIES EXAMINING COMPLIANCE | ALCOHOL, TOBACCO, AND FIREARMS INSPECTION |
|---|---|---|---|---|---|
| JOB SERIES | 1811: | 1812: | 1816: | 1831: | 1854: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | |
| GRADE 5 TOTAL | 37 | 4 | 183 | 0 | 3 |
| WHITE (NON-HISPANIC) | 30 | 4 | 100 | 0 | 2 |
| BLACK (NON-HISPANIC) | 4 | 0 | 18 | 0 | 1 |
| % OF TOTAL BLACK: | 10.8% | 0.0% | 9.8% | ERR | 33.3% |
| HISPANIC | 3 | 0 | 65 | 0 | 0 |
| % OF TOTAL HISPANIC: | 8.1% | 0.0% | 35.5% | ERR | 0.0% |
| | | | | | |
| GRADE 7 TOTAL | 54 | 3 | 9 | 0 | 1 |
| WHITE (NON-HISPANIC) | 42 | 3 | 7 | 0 | 1 |
| BLACK (NON-HISPANIC) | 6 | 0 | 1 | 0 | 0 |
| % OF TOTAL BLACK: | 11.1% | 0.0% | 11.1% | ERR | 0.0% |
| HISPANIC | 6 | 0 | 1 | 0 | 0 |
| % OF TOTAL HISPANIC: | 11.1% | 0.0% | 11.1% | ERR | 0.0% |
| | | | | | |
| TOTAL, GRADES 5 AND 7 | 91 | 7 | 192 | 0 | 4 |
| WHITE (NON-HISPANIC) | 72 | 7 | 107 | 0 | 3 |
| BLACK (NON-HISPANIC) | 10 | 0 | 19 | 0 | 1 |
| % OF TOTAL BLACK: | 11.0% | 0.0% | 9.9% | ERR | 25.0% |
| HISPANIC | 9 | 0 | 66 | 0 | 0 |
| % OF TOTAL HISPANIC: | 9.9% | 0.0% | 34.4% | ERR | 0.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | PUBLIC HEALTH INSPECTION | PUBLIC HEALTH QUARANTINE INSPECTION | IMPORT SPECIALIST | CUSTOMS INSPECTOR | CUSTOMS MARINE OFFICER | QUALITY ASSURANCE SPECIALIST |
|---|---|---|---|---|---|---|
| JOB SERIES | 1860: | 1864: | 1889: | 1890: | 1893: | 1910: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 0 | 0 | 6 | 97 | 0 | 246 |
| WHITE (NON-HISPANIC) | 0 | 0 | 6 | 69 | 0 | 209 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 5 | 0 | 26 |
| % OF TOTAL BLACK: | ERR | ERR | 0.0% | 5.2% | ERR | 10.6% |
| HISPANIC | 0 | 0 | 0 | 23 | 0 | 11 |
| % OF TOTAL HISPANIC: | ERR | ERR | 0.0% | 23.7% | ERR | 4.5% |
| GRADE 7 TOTAL | 0 | 5 | 7 | 95 | 0 | 196 |
| WHITE (NON-HISPANIC) | 0 | 4 | 7 | 64 | 0 | 161 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 16 | 0 | 26 |
| % OF TOTAL BLACK: | ERR | 0.0% | 0.0% | 16.8% | ERR | 13.3% |
| HISPANIC | 0 | 1 | 0 | 15 | 0 | 9 |
| % OF TOTAL HISPANIC: | ERR | 20.0% | 0.0% | 15.8% | ERR | 4.6% |
| TOTAL, GRADES 5 AND 7 | 0 | 5 | 13 | 192 | 0 | 442 |
| WHITE (NON-HISPANIC) | 0 | 4 | 13 | 133 | 0 | 370 |
| BLACK (NON-HISPANIC) | 0 | 0 | 0 | 21 | 0 | 52 |
| % OF TOTAL BLACK: | ERR | 0.0% | 0.0% | 10.9% | ERR | 11.8% |
| HISPANIC | 0 | 1 | 0 | 38 | 0 | 20 |
| % OF TOTAL HISPANIC: | ERR | 20.0% | 0.0% | 19.8% | ERR | 4.5% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GENERAL SUPPLY | SUPPLY PROGRAM MANAGEMENT | INVENTORY MANAGEMENT | DISTRIBUTION FACILITIES AND STORAGE MANAGEMENT | PACKAGING SPECIALIST | SUPPLY CATALOGING |
|---|---|---|---|---|---|---|
| JOB SERIES | 2001: | 2003: | 2010: | 2030: | 2032: | 2050: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 172 | 116 | 266 | 15 | 14 | 62 |
| WHITE (NON-HISPANIC) | 142 | 94 | 208 | 15 | 12 | 51 |
| BLACK (NON-HISPANIC) | 26 | 18 | 42 | 0 | 1 | 8 |
| % OF TOTAL BLACK: | 15.1% | 15.5% | 15.8% | 0.0% | 7.1% | 12.9% |
| HISPANIC | 4 | 4 | 16 | 0 | 1 | 3 |
| % OF TOTAL HISPANIC: | 2.3% | 3.4% | 6.0% | 0.0% | 7.1% | 4.8% |
| | | | | | | |
| GRADE 7 TOTAL | 175 | 64 | 262 | 12 | 11 | 38 |
| WHITE (NON-HISPANIC) | 137 | 52 | 180 | 12 | 8 | 28 |
| BLACK (NON-HISPANIC) | 28 | 7 | 39 | 0 | 1 | 8 |
| % OF TOTAL BLACK: | 16.0% | 10.9% | 14.9% | 0.0% | 9.1% | 21.1% |
| HISPANIC | 10 | 5 | 43 | 0 | 2 | 2 |
| % OF TOTAL HISPANIC: | 5.7% | 7.8% | 16.4% | 0.0% | 18.2% | 5.3% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 347 | 180 | 528 | 27 | 25 | 100 |
| WHITE (NON-HISPANIC) | 279 | 146 | 388 | 27 | 20 | 79 |
| BLACK (NON-HISPANIC) | 54 | 25 | 81 | 0 | 2 | 16 |
| % OF TOTAL BLACK: | 15.6% | 13.9% | 15.3% | 0.0% | 8.0% | 16.0% |
| HISPANIC | 14 | 9 | 59 | 0 | 3 | 5 |
| % OF TOTAL HISPANIC: | 4.0% | 5.0% | 11.2% | 0.0% | 12.0% | 5.0% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE    10-Sep-84

| JOB NAME | GENERAL TRANSPORTA- TION | | TRANSPORTA- TION RATE AND TARIFF EXAMINER | HIGHWAY SAFETY MANAGEMENT | TRAFFIC MANAGEMENT | TRANSPORTA- TION LOSS & DAMAGE CLAIMS EXAMINING |
|---|---|---|---|---|---|---|
| JOB SERIES | 2101: | 2110: | 2111: | 2125: | 2130: | 2135: |
| TOTAL 1982 HIRES, ALL AGENCIES | | | | | | |
| GRADE 5 TOTAL | 14 | 0 | 0 | 0 | 4 | 26 |
| WHITE (NON-HISPANIC) | 12 | 0 | 0 | 0 | 3 | 23 |
| BLACK (NON-HISPANIC) | 2 | 0 | 0 | 0 | 0 | 2 |
| % OF TOTAL BLACK: | 14.3% | ERR | ERR | ERR | 0.0% | 7.7% |
| HISPANIC | 0 | 0 | 0 | 0 | 1 | 1 |
| % OF TOTAL HISPANIC: | 0.0% | ERR | ERR | ERR | 25.0% | 3.8% |
| | | | | | | |
| GRADE 7 TOTAL | 39 | 1 | 0 | 0 | 14 | 2 |
| WHITE (NON-HISPANIC) | 31 | 1 | 0 | 0 | 12 | 1 |
| BLACK (NON-HISPANIC) | 6 | 0 | 0 | 0 | 1 | 1 |
| % OF TOTAL BLACK: | 15.4% | 0.0% | ERR | ERR | 7.1% | 50.0% |
| HISPANIC | 2 | 0 | 0 | 0 | 1 | 0 |
| % OF TOTAL HISPANIC: | 5.1% | 0.0% | ERR | ERR | 7.1% | 0.0% |
| | | | | | | |
| TOTAL, GRADES 5 AND 7 | 53 | 1 | 0 | 0 | 18 | 28 |
| WHITE (NON-HISPANIC) | 43 | 1 | 0 | 0 | 15 | 24 |
| BLACK (NON-HISPANIC) | 8 | 0 | 0 | 0 | 1 | 3 |
| % OF TOTAL BLACK: | 15.1% | 0.0% | ERR | ERR | 5.6% | 10.7% |
| HISPANIC | 2 | 0 | 0 | 0 | 2 | 1 |
| % OF TOTAL HISPANIC: | 3.8% | 0.0% | ERR | ERR | 11.1% | 3.6% |

LUEVANO v. DEVINE: 1982 HIRING BY ALL AGENCIES IN ALL JOBS FORMERLY COVERED BY THE PACE     10-Sep-84

| JOB NAME | CARGO SCHEDULING | TRANSPORTA- TION OPERATIONS |
|---|---|---|
| JOB SERIES | 2144: | 2150: |
| TOTAL 1982 HIRES, ALL AGENCIES | | |
| GRADE 5 TOTAL | 23 | 3 |
| WHITE (NON-HISPANIC) | 12 | 3 |
| BLACK (NON-HISPANIC) | 3 | 0 |
| % OF TOTAL BLACK: | 13.0% | 0.0% |
| HISPANIC | 8 | 0 |
| % OF TOTAL HISPANIC: | 34.8% | 0.0% |
| | | |
| GRADE 7 TOTAL | 8 | 8 |
| WHITE (NON-HISPANIC) | 7 | 8 |
| BLACK (NON-HISPANIC) | 0 | 0 |
| % OF TOTAL BLACK: | 0.0% | 0.0% |
| HISPANIC | 1 | 0 |
| % OF TOTAL HISPANIC: | 12.5% | 0.0% |
| | | |
| TOTAL, GRADES 5 AND 7 | 31 | 11 |
| WHITE (NON-HISPANIC) | 19 | 11 |
| BLACK (NON-HISPANIC) | 3 | 0 |
| % OF TOTAL BLACK: | 9.7% | 0.0% |
| HISPANIC | 9 | 0 |
| % OF TOTAL HISPANIC: | 29.0% | 0.0% |

ANALYSIS OF 1982 HIRING BY ALL AGENCIES IN CERTAIN JOBS     10-Sep-84

JOB NAME                          COMPUTER
                                  SPECIALIST
                                  (TRAINEE)                    79-271

JOB SERIES                    0334:
TOTAL 1982 HIRES, ALL AGENCIES                          FILED
    GRADE 5 TOTAL                         578
        WHITE (NON-HISPANIC)              488           JUN 5 1987
        BLACK (NON-HISPANIC)              71
            % OF TOTAL BLACK:             12.3%         CLERK, U.S. DISTRICT COURT,
        HISPANIC                          19            DISTRICT OF COLUMBIA
            % OF TOTAL HISPANIC:          3.3%

    GRADE 7 TOTAL                         535
        WHITE (NON-HISPANIC)              425
        BLACK (NON-HISPANIC)              94
            % OF TOTAL BLACK:             17.6%
        HISPANIC                          16
            % OF TOTAL HISPANIC:          3.0%

    TOTAL, GRADES 5 AND 7                 1113
        WHITE (NON-HISPANIC)              913
        BLACK (NON-HISPANIC)              165
            % OF TOTAL BLACK:             14.8%
        HISPANIC                          35
            % OF TOTAL HISPANIC:          3.1%

ADVERSE IMPACT CALCULATIONS:

    80% RULE: HISPANIC HIRING AS
        PERCENT OF 4.9% STANDARD          64.2%
    NUMBER OF ADDITIONAL
        HISPANIC HIRES, IF
        HISPANICS HAD BEEN HIRED
        AT THE STANDARD SET BY
        THE CONSENT DECREE                20

    STANDARD DEVIATION ANALYSIS
        FOR HISPANICS:
    --AVAILABILITY                        0.049
    --OBSERVED NO. OF HIRES               35
    --EXPECTED NO. OF HIRES               55
        --DIFFERENCE                      -20
    --STANDARD DEVIATION                  7.20
    --NO. OF STANDARD DEVIATIONS
        BETWEEN EXPECTED AND
        OBSERVED VALUES:                  -2.71

ATTACHMENT B

REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE OF 1982
AGENCY : GOVERNMENT-WIDE   (ALL AGENCIES COVERED BY THE DECREE)
GEOGRAPHIC AREA : NATIONWIDE              STATUS : ALL WORK SCHEDULES AND TENURES              PAGE :   14

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0334 | GS-05 | WHITE(N-HISP) | 253 | 34 | 11 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 206 |
|  |  | BLACK(N-HISP) | 28 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 26 |
|  |  | HISPANIC | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  | GS-07 | WHITE(N-HISP) | 231 | 27 | 31 | 0 | 13 | 5 | 0 | 0 | 5 | 0 | 150 |
|  |  | BLACK(N-HISP) | 55 | 1 | 8 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 42 |
|  |  | HISPANIC | 9 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 484 | 61 | 42 | 0 | 14 | 6 | 0 | 0 | 5 | 0 | 356 |
|  |  | BLACK(N-HISP) | 83 | 2 | 8 | 0 | 3 | 1 | 0 | 0 | 1 | 0 | 68 |
|  |  | HISPANIC | 19 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 18 |
| 0341 | GS-05 | WHITE(N-HISP) | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 81 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 77 |
|  |  | BLACK(N-HISP) | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 102 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 98 |
|  |  | BLACK(N-HISP) | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 9 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0343 | GS-05 | WHITE(N-HISP) | 77 | 6 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 69 |
|  |  | BLACK(N-HISP) | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
|  |  | HISPANIC | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | GS-07 | WHITE(N-HISP) | 82 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 6 | 0 | 74 |
|  |  | BLACK(N-HISP) | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
|  |  | HISPANIC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 159 | 6 | 2 | 0 | 0 | 2 | 0 | 0 | 6 | 0 | 143 |
|  |  | BLACK(N-HISP) | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
|  |  | HISPANIC | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |

ATTACHMENT C

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
FILED
JUN 5 1987


REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
             GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES          PAGE :   13

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0301 | GS-05 | WHITE(N-HISP) | 109 | 0 | 11 | 0 | 2 | 3 | 0 | 0 | 2 | 0 | 91 |
| | | BLACK(N-HISP) | 21 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 18 |
| | | HISPANIC | 6 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| | GS-07 | WHITE(N-HISP) | 130 | 0 | 5 | 0 | 0 | 2 | 0 | 0 | 8 | 0 | 115 |
| | | BLACK(N-HISP) | 20 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| | | HISPANIC | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| TOTAL | GS-05+07 | WHITE(N-HISP) | 239 | 0 | 16 | 0 | 2 | 5 | 0 | 0 | 10 | 0 | 206 |
| | | BLACK(N-HISP) | 41 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 37 |
| | | HISPANIC | 12 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 9 |
| 0334 | GS-05 | WHITE(N-HISP) | 233 | 40 | 12 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 180 |
| | | BLACK(N-HISP) | 43 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 |
| | | HISPANIC | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| | GS-07 | WHITE(N-HISP) | 192 | 1 | 40 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 148 |
| | | BLACK(N-HISP) | 38 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| | | HISPANIC | 7 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 6 |
| TOTAL | GS-05+07 | WHITE(N-HISP) | 425 | 41 | 52 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 328 |
| | | BLACK(N-HISP) | 81 | 3 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 68 |
| | | HISPANIC | 16 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 15 |
| 0341 | GS-05 | WHITE(N-HISP) | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 83 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 82 |
| | | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | | HISPANIC | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| TOTAL | GS-05+07 | WHITE(N-HISP) | 98 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 97 |
| | | BLACK(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | HISPANIC | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

```
ANALYSIS OF 1982 HIRING BY ALL AGENCIES IN CERTAIN JOBS     10-Sep-84
```

JOB NAME                          SOCIAL
                                  INSURANCE
                                  CLAIMS
                                  EXAMINING

*79-271*

JOB SERIES                        0993:
TOTAL 1982 HIRES, ALL AGENCIES
   GRADE 5 TOTAL                        705
      WHITE (NON-HISPANIC)              540
      BLACK (NON-HISPANIC)              151
         % OF TOTAL BLACK:             21.4%
      HISPANIC                          14
         % OF TOTAL HISPANIC:           2.0%

   GRADE 7 TOTAL                        111
      WHITE (NON-HISPANIC)              81
      BLACK (NON-HISPANIC)              30
         % OF TOTAL BLACK:             27.0%
      HISPANIC                          0
         % OF TOTAL HISPANIC:           0.0%

   TOTAL, GRADES 5 AND 7                816
      WHITE (NON-HISPANIC)              621
      BLACK (NON-HISPANIC)              181
         % OF TOTAL BLACK:             22.2%
      HISPANIC                          14
         % OF TOTAL HISPANIC:           1.7%

ADVERSE IMPACT CALCULATIONS:

   80% RULE: HISPANIC HIRING AS
      PERCENT OF 4.9% STANDARD         35.0%
   NUMBER OF ADDITIONAL
      HISPANIC HIRES, IF
      HISPANICS HAD BEEN HIRED
      AT THE STANDARD SET BY
      THE CONSENT DECREE                26

STANDARD DEVIATION ANALYSIS
      FOR HISPANICS:
   --AVAILABILITY                      0.049
   --OBSERVED NO. OF HIRES              14
   --EXPECTED NO. OF HIRES              40
      --DIFFERENCE                     -26
   --STANDARD DEVIATION                6.17
   --NO. OF STANDARD DEVIATIONS
      BETWEEN EXPECTED AND
      OBSERVED VALUES:                 -4.21

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT D

REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE OF 1982
AGENCY : GOVERNMENT-WIDE   (ALL AGENCIES COVERED BY THE DECREE)
GEOGRAPHIC AREA : NATIONWIDE              STATUS : ALL WORK SCHEDULES AND TENURES          PAGE :   22

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0993 | GS-05 | WHITE(N-HISP) | 290 | 212 | 1 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 50 |
|  |  | BLACK(N-HISP) | 59 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 35 |
|  |  | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 57 | 42 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
|  |  | BLACK(N-HISP) | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 347 | 254 | 2 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 64 |
|  |  | BLACK(N-HISP) | 73 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 49 |
|  |  | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 0994 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0996 | GS-05 | WHITE(N-HISP) | 11 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
|  |  | BLACK(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 15 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
|  |  | BLACK(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

ATTACHMENT E

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

FILED JUN 5 1987 CLERK, U.S. DISTRICT COURT, DISTRICT OF COLUMBIA

REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES          PAGE :    19

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0990 | GS-05 | WHITE(N-HISP) | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 19 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 17 |
|  |  | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 27 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 24 |
|  |  | BLACK(N-HISP) | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 0991 | GS-05 | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0993 | GS-05 | WHITE(N-HISP) | 250 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 |
|  |  | BLACK(N-HISP) | 92 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 73 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | GS-07 | WHITE(N-HISP) | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
|  |  | BLACK(N-HISP) | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 274 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 117 |
|  |  | BLACK(N-HISP) | 108 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 89 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ANALYSIS OF 1982 HIRING BY ALL AGENCIES IN CERTAIN JOBS    10-Sep-84

JOB NAME                          GENERAL
                                  BUSINESS AND
                                  INDUSTRY

JOB SERIES                    1101:
TOTAL 1982 HIRES, ALL AGENCIES
   GRADE 5 TOTAL                      415
        WHITE (NON-HISPANIC)         373
        BLACK (NON-HISPANIC)          25
            % OF TOTAL BLACK:         6.0%
        HISPANIC                      17
            % OF TOTAL HISPANIC:      4.1%

   GRADE 7 TOTAL                      230
        WHITE (NON-HISPANIC)         139
        BLACK (NON-HISPANIC)          86
            % OF TOTAL BLACK:        37.4%
        HISPANIC                       5
            % OF TOTAL HISPANIC:      2.2%

   TOTAL, GRADES 5 AND 7             645
        WHITE (NON-HISPANIC)         512
        BLACK (NON-HISPANIC)         111
            % OF TOTAL BLACK:        17.2%
        HISPANIC                      22
            % OF TOTAL HISPANIC:      3.4%

ADVERSE IMPACT CALCULATIONS:

   80% RULE: HISPANIC HIRING AS
        PERCENT OF 4.9% STANDARD     69.6%
   NUMBER OF ADDITIONAL
        HISPANIC HIRES, IF
        HISPANICS HAD BEEN HIRED
        AT THE STANDARD SET BY
        THE CONSENT DECREE            10

   STANDARD DEVIATION ANALYSIS
        FOR HISPANICS:
   --AVAILABILITY                    0.049
   --OBSERVED NO. OF HIRES            22
   --EXPECTED NO. OF HIRES            32
     --DIFFERENCE                    -10
   --STANDARD DEVIATION             5.48
   --NO. OF STANDARD DEVIATIONS
     BETWEEN EXPECTED AND
     OBSERVED VALUES:               -1.75

79·271

FILED

JUN  5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT F

REPORT A1     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
              PERIOD : JANUARY THROUGH JUNE OF 1982
              AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
              GEOGRAPHIC AREA : NATIONWIDE              STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   25

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1083 | GS-05 | WHITE(N-HISP) | 31 | 6 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 5 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 1 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 36 | 6 | 5 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 21 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 1 |  |  |  |  |  |  |  |  |  |  |
| 1101 | GS-05 | WHITE(N-HISP) | 168 | 0 | 5 | 0 | 1 | 1 | 0 | 0 | 3 | 0 | 158 |
|  |  | BLACK(N-HISP) | 13 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 12 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
|  | GS-07 | WHITE(N-HISP) | 94 | 0 | 23 | 0 | 1 | 12 | 0 | 0 | 10 | 0 | 48 |
|  |  | BLACK(N-HISP) | 78 | 0 | 34 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 17 |
|  |  | HISPANIC | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 262 | 0 | 28 | 0 | 2 | 13 | 0 | 0 | 13 | 0 | 206 |
|  |  | BLACK(N-HISP) | 91 | 0 | 41 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 23 |
|  |  | HISPANIC | 16 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| 1102 | GS-05 | WHITE(N-HISP) | 361 | 114 | 46 | 1 | 2 | 2 | 0 | 0 | 2 | 0 | 194 |
|  |  | BLACK(N-HISP) | 69 | 10 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 52 |
|  |  | HISPANIC | 11 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  | GS-07 | WHITE(N-HISP) | 160 | 15 | 3 | 1 | 2 | 0 | 0 | 0 | 2 | 0 | 137 |
|  |  | BLACK(N-HISP) | 31 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 28 |
|  |  | HISPANIC | 11 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 521 | 129 | 49 | 2 | 4 | 2 | 0 | 0 | 4 | 0 | 331 |
|  |  | BLACK(N-HISP) | 100 | 10 | 0 | 1 | 0 | 0 | 7 | 0 | 2 | 0 | 80 |
|  |  | HISPANIC | 22 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ATTACHMENT G

FILED JUN 5 1987 CLERK, U.S. DISTRICT COURT DISTRICT OF COLUMBIA

```
REPORT A1        APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
                 PERIOD : JULY THROUGH DECEMBER OF 1982
                 AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
                 GEOGRAPHIC AREA : NATIONWIDE        STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   22
```

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1082 | GS-05 | WHITE(N-HISP) | 30 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 20 | 1 | 4 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 13 |
|  |  | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 50 | 2 | 6 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 40 |
|  |  | BLACK(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1083 | GS-05 | WHITE(N-HISP) | 15 | 4 | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 7 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 21 | 4 | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 13 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1101 | GS-05 | WHITE(N-HISP) | 205 | 33 | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 168 |
|  |  | BLACK(N-HISP) | 12 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
|  |  | HISPANIC | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | GS-07 | WHITE(N-HISP) | 45 | 0 | 7 | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 33 |
|  |  | BLACK(N-HISP) | 8 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 250 | 33 | 8 | 0 | 0 | 3 | 0 | 0 | 5 | 0 | 201 |
|  |  | BLACK(N-HISP) | 20 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 13 |
|  |  | HISPANIC | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

```
ANALYSIS OF 1982 HIRING BY ALL AGENCIES IN CERTAIN JOBS    10-Sep-84


JOB NAME                    CONTRACT AND
                            PROCUREMENT

                                                      79-271

                                                      FILED

JOB SERIES                     1102:
TOTAL 1982 HIRES, ALL AGENCIES                        JUN  5 1987
   GRADE 5 TOTAL                722
      WHITE (NON-HISPANIC)      595                CLERK, U.S. DISTRICT COURT,
      BLACK (NON-HISPANIC)      110                  DISTRICT OF COLUMBIA
         % OF TOTAL BLACK:      15.2%
      HISPANIC                  17
         % OF TOTAL HISPANIC:   2.4%

   GRADE 7 TOTAL                361
      WHITE (NON-HISPANIC)      288
      BLACK (NON-HISPANIC)      57
         % OF TOTAL BLACK:      15.8%
      HISPANIC                  16
         % OF TOTAL HISPANIC:   4.4%

   TOTAL, GRADES 5 AND 7        1083
      WHITE (NON-HISPANIC)      883
      BLACK (NON-HISPANIC)      167
         % OF TOTAL BLACK:      15.4%
      HISPANIC                  33
         % OF TOTAL HISPANIC:   3.0%

ADVERSE IMPACT CALCULATIONS:

   80% RULE: HISPANIC HIRING AS
      PERCENT OF 4.9% STANDARD    62.2%
   NUMBER OF ADDITIONAL
      HISPANIC HIRES, IF
      HISPANICS HAD BEEN HIRED
      AT THE STANDARD SET BY
      THE CONSENT DECREE          20

STANDARD DEVIATION ANALYSIS
   FOR HISPANICS:
   --AVAILABILITY                0.049
   --OBSERVED NO. OF HIRES        33
   --EXPECTED NO. OF HIRES        53
     --DIFFERENCE                -20
   --STANDARD DEVIATION          7.10
   --NO. OF STANDARD DEVIATIONS
     BETWEEN EXPECTED AND
     OBSERVED VALUES:           -2.82
```

ATTACHMENT H

```
REPORT A1      APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
               PERIOD : JANUARY THROUGH JUNE OF 1982
               AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
               GEOGRAPHIC AREA : NATIONWIDE            STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   25
```

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1083 | GS-05 | WHITE(N-HISP) | 31 | 6 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | GS-07 | WHITE(N-HISP) | 5 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 1 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 36 | 6 | 5 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 21 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1101 | GS-05 | WHITE(N-HISP) | 168 | 0 | 5 | 0 | 1 | 1 | 0 | 0 | 3 | 0 | 158 |
|  |  | BLACK(N-HISP) | 13 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
|  |  | HISPANIC | 12 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
|  | GS-07 | WHITE(N-HISP) | 94 | 0 | 23 | 0 | 1 | 12 | 0 | 0 | 10 | 0 | 48 |
|  |  | BLACK(N-HISP) | 78 | 0 | 34 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 17 |
|  |  | HISPANIC | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 262 | 0 | 28 | 0 | 2 | 13 | 0 | 0 | 13 | 0 | 206 |
|  |  | BLACK(N-HISP) | 91 | 0 | 41 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 23 |
|  |  | HISPANIC | 16 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| 1102 | GS-05 | WHITE(N-HISP) | 361 | 114 | 46 | 1 | 2 | 2 | 0 | 0 | 2 | 0 | 194 |
|  |  | BLACK(N-HISP) | 69 | 10 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 52 |
|  |  | HISPANIC | 11 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  | GS-07 | WHITE(N-HISP) | 160 | 15 | 3 | 1 | 2 | 0 | 0 | 0 | 2 | 0 | 137 |
|  |  | BLACK(N-HISP) | 31 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 28 |
|  |  | HISPANIC | 11 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 521 | 129 | 49 | 2 | 4 | 2 | 0 | 0 | 4 | 0 | 331 |
|  |  | BLACK(N-HISP) | 100 | 10 | 0 | 1 | 0 | 0 | 7 | 0 | 2 | 0 | 80 |
|  |  | HISPANIC | 22 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |

ATTACHMENT I

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

FILED JUN 5 1987 CLERK U.S. DISTRICT COURT DISTRICT OF COLUMBIA

REPORT A1    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : GOVERNMENT-WIDE  (ALL AGENCIES COVERED BY THE DECREE)
GEOGRAPHIC AREA : NATIONWIDE                STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   23

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1102 | GS-05 | WHITE(N-HISP) | 232 | 50 | 16 | 1 | 0 | 3 | 0 | 0 | 1 | 0 | 161 |
| | | BLACK(N-HISP) | 41 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36 |
| | | HISPANIC | 6 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | GS-07 | WHITE(N-HISP) | 128 | 9 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 0 | 114 |
| | | BLACK(N-HISP) | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 |
| | | HISPANIC | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 360 | 59 | 17 | 2 | 0 | 3 | 0 | 0 | 4 | 0 | 275 |
| | | BLACK(N-HISP) | 66 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 61 |
| | | HISPANIC | 11 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 1103 | GS-05 | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| | | BLACK(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1104 | GS-05 | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| | | BLACK(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
  ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

```
1982 HIRING BY CERTAIN AGENCIES IN CERTAIN JOBS      10-Sep-84


DEPARTMENT OR AGENCY:          AGRICULTURE DEPT.

JOB NAME:                      GENERAL BUSINESS
                               AND INDUSTRY

JOB SERIES                     1101:
TOTAL 1982 HIRES (OPM REPORTS)
   GRADE 5 TOTAL                              246
        WHITE (NON-HISPANIC)                  233
        BLACK (NON-HISPANIC)                    5
           % OF TOTAL BLACK:                  2.0%
        HISPANIC                                8
           % OF TOTAL HISPANIC:               3.3%

   GRADE 7 TOTAL                               16
        WHITE (NON-HISPANIC)                   16
        BLACK (NON-HISPANIC)                    0
           % OF TOTAL BLACK:                  0.0%
        HISPANIC                                0
           % OF TOTAL HISPANIC:               0.0%

   TOTAL, GRADES 5 AND 7                      262
        WHITE (NON-HISPANIC)                  249
        BLACK (NON-HISPANIC)                    5
           % OF TOTAL BLACK:                  1.9%
        HISPANIC                                8
           % OF TOTAL HISPANIC:               3.1%


ADVERSE IMPACT CALCULATIONS:
   80% RULE: BLACK HIRING AS
        PERCENT OF 11.9% STANDARD            16.0%
   NUMBER OF ADDITIONAL BLACK
        HIRES, IF BLACKS HAD BEEN
        HIRED AT THE STANDARD
        SET BY THE CONSENT DECREE             26

STANDARD DEVIATION ANALYSIS
      FOR BLACKS:
   --AVAILABILITY                            0.119
   --OBSERVED NO. OF HIRES                       5
   --EXPECTED NO. OF HIRES                      31
      --DIFFERENCE                             -26
   --STANDARD DEVIATION                       5.24
   --NO. OF STANDARD DEVIATIONS
      BETWEEN EXPECTED AND
      OBSERVED VALUES:                       -4.99
```

79-271

FILED.

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT J

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE 1982
AGENCY : DEPARTMENT OF AGRICULTURE
GEOGRAPHIC AREA : NATIONWIDE              STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :    69

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1083 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1101 | GS-05 | WHITE(N-HISP) | 121 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 120 |
|  |  | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | HISPANIC | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  | GS-07 | WHITE(N-HISP) | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 130 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 129 |
|  |  | BLACK(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | HISPANIC | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 1102 | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL GS-05+07 | WHITE(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ATTACHMENT K

FILED JUN 5 1987 CLERK, U.S. DISTRICT COURT DISTRICT OF COLUMBIA

```
REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
             PERIOD : JULY THROUGH DECEMBER OF 1982
             AGENCY : DEPARTMENT OF AGRICULTURE
             GEOGRAPHIC AREA : NATIONWIDE          STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :   61
```

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1082 | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  |  | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1083 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1101 | GS-05 | WHITE(N-HISP) | 112 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 111 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | GS-07 | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 119 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 118 |
|  |  | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  |  | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

```
* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
  ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION
```

1982 HIRING BY CERTAIN AGENCIES IN CERTAIN JOBS    10-Sep-84


DEPARTMENT OR AGENCY:              ARMY

JOB NAME:                         CONTRACT AND
                                  PROCUREMENT

JOB SERIES                  1102:
TOTAL 1982 HIRES (OPM REPORTS)
   GRADE 5 TOTAL                            234
      WHITE (NON-HISPANIC)                  198
      BLACK (NON-HISPANIC)                   33
         % OF TOTAL BLACK:                 14.1%
      HISPANIC                                3
         % OF TOTAL HISPANIC:               1.3%

   GRADE 7 TOTAL                             70
      WHITE (NON-HISPANIC)                   56
      BLACK (NON-HISPANIC)                   14
         % OF TOTAL BLACK:                 20.0%
      HISPANIC                                0
         % OF TOTAL HISPANIC:               0.0%

   TOTAL, GRADES 5 AND 7                    304
      WHITE (NON-HISPANIC)                  254
      BLACK (NON-HISPANIC)                   47
         % OF TOTAL BLACK:                 15.5%
      HISPANIC                                3
         % OF TOTAL HISPANIC:               1.0%


ADVERSE IMPACT CALCULATIONS:

   80% RULE: HISPANIC HIRING AS
      PERCENT OF 4.9% STANDARD              20.1%
   NUMBER OF ADDITIONAL
      HISPANIC HIRES, IF
      HISPANICS HAD BEEN HIRED
      AT THE STANDARD SET BY
      THE CONSENT DECREE                     12


   STANDARD DEVIATION ANALYSIS
      FOR HISPANICS:
   --AVAILABILITY                          0.049
   --OBSERVED NO. OF HIRES                     3
   --EXPECTED NO. OF HIRES                    15
      --DIFFERENCE                           -12
   --STANDARD DEVIATION                     3.76
   --NO. OF STANDARD DEVIATIONS
      BETWEEN EXPECTED AND
      OBSERVED VALUES:                      -3.16

*79-271* (handwritten)

FILED

JUN  5 1987

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

ATTACHMENT L

REPORT A3     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE 1982
AGENCY : DEPARTMENT OF THE ARMY
GEOGRAPHIC AREA : NATIONWIDE     STATUS : ALL WORK SCHEDULES AND TENURES     PAGE :   113

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4083 | GS-05 | WHITE(N-HISP) | 22 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 25 | 5 | 5 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 12 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1101 | GS-05 | WHITE(N-HISP) | 14 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 3 | 0 | 9 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 21 | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 9 | 0 | 5 |
| | | BLACK(N-HISP) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 35 | 0 | 7 | 0 | 2 | 0 | 0 | 0 | 12 | 0 | 14 |
| | | BLACK(N-HISP) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 1102 | GS-05 | WHITE(N-HISP) | 109 | 32 | 18 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 55 |
| | | BLACK(N-HISP) | 16 | 1 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 8 |
| | | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | GS-07 | WHITE(N-HISP) | 31 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 29 |
| | | BLACK(N-HISP) | 10 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 140 | 32 | 18 | 2 | 3 | 0 | 0 | 0 | 1 | 0 | 84 |
| | | BLACK(N-HISP) | 26 | 1 | 0 | 1 | 0 | 0 | 7 | 0 | 0 | 0 | 17 |
| | | HISPANIC | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

ATTACHMENT M

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

FILED JUN 5 1987 CLERK, U.S. DISTRICT COURT, DISTRICT OF COLUMBIA

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF THE ARMY
GEOGRAPHIC AREA : NATIONWIDE                STATUS : ALL WORK SCHEDULES AND TENURES        PAGE :  101

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1102 | GS-05 | WHITE(N-HISP) | 89 | 20 | 12 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 54 |
|  |  | BLACK(N-HISP) | 17 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 25 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 23 |
|  |  | BLACK(N-HISP) | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 114 | 20 | 12 | 2 | 0 | 1 | 0 | 0 | 2 | 0 | 77 |
|  |  | BLACK(N-HISP) | 21 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1103 | GS-05 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1104 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

```
1982 HIRING BY CERTAIN AGENCIES IN CERTAIN JOBS     10-Sep-84


DEPARTMENT OR AGENCY:        HEALTH & HUMAN SERVICES

JOB NAME:                    SOCIAL INSURANCE
                             CLAIMS EXAMINING              79-271

JOB SERIES              0993:
TOTAL 1982 HIRES (OPM REPORTS)
   GRADE 5 TOTAL                                705
        WHITE (NON-HISPANIC)                    540
        BLACK (NON-HISPANIC)                    151
            % OF TOTAL BLACK:                   21.4%
        HISPANIC                                 14
            % OF TOTAL HISPANIC:                2.0%

   GRADE 7 TOTAL                                111
        WHITE (NON-HISPANIC)                     81
        BLACK (NON-HISPANIC)                     30
            % OF TOTAL BLACK:                   27.0%
        HISPANIC                                  0
            % OF TOTAL HISPANIC:                0.0%

   TOTAL, GRADES 5 AND 7                        816
        WHITE (NON-HISPANIC)                    621
        BLACK (NON-HISPANIC)                    181
            % OF TOTAL BLACK:                   22.2%
        HISPANIC                                 14
            % OF TOTAL HISPANIC:                1.7%


ADVERSE IMPACT CALCULATIONS:


   80% RULE: HISPANIC HIRING AS
        PERCENT OF 4.9% STANDARD              35.0%
   NUMBER OF ADDITIONAL
        HISPANIC HIRES, IF
        HISPANICS HAD BEEN HIRED
        AT THE STANDARD SET BY
        THE CONSENT DECREE                      26


   STANDARD DEVIATION ANALYSIS
        FOR HISPANICS:
   --AVAILABILITY                              0.049
   --OBSERVED NO. OF HIRES                       14
   --EXPECTED NO. OF HIRES                       40
      --DIFFERENCE                              -26
   --STANDARD DEVIATION                        6.17
   --NO. OF STANDARD DEVIATIONS
        BETWEEN EXPECTED AND
        OBSERVED VALUES:                       -4.21
```

FILED

JUN. 5 1987

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

ATTACHMENT N

REPORT A3     APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THROUGH JUNE 1982
AGENCY : DEPARTMENT OF HEALTH AND HUMAN SERVICES
GEOGRAPHIC AREA : NATIONWIDE                    STATUS : ALL WORK SCHEDULES AND TENURES                    PAGE :     814

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0993 | GS-05 | WHITE(N-HISP) | 290 | 212 | 1 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 50 |
| | | BLACK(N-HISP) | 59 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 35 |
| | | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | GS-07 | WHITE(N-HISP) | 57 | 42 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | BLACK(N-HISP) | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 347 | 254 | 2 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 64 |
| | | BLACK(N-HISP) | 73 | 23 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 49 |
| | | HISPANIC | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 0994 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0996 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

ATTACHMENT O

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION



FILED
JUN 5 1987
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

REPORT A3    APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JULY THROUGH DECEMBER OF 1982
AGENCY : DEPARTMENT OF HEALTH AND HUMAN SERVICES
GEOGRAPHIC AREA : NATIONWIDE    STATUS : ALL WORK SCHEDULES AND TENURES    PAGE : 682

| OCCUPATION SERIES | GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | * OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0990 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0991 | GS-05 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | GS-07 | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0993 | GS-05 | WHITE(N-HISP) | 250 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 |
|  |  | BLACK(N-HISP) | 92 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 73 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | GS-07 | WHITE(N-HISP) | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
|  |  | BLACK(N-HISP) | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
|  |  | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GS-05+07 |  | WHITE(N-HISP) | 274 | 155 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 117 |
|  |  | BLACK(N-HISP) | 108 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 89 |
|  |  | HISPANIC | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING
ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

U.S. Department of Justice

79-271

*FILED*

*Washington, D.C. 20530*

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Richard Seymour, Esq.
Lawyers' Committee for
  Civil Rights Under Law
1400 Eye Street, N.W.
Suite 400
Washington, D.C. 20005

MAY 30

(Date-Stamped May 30, 1986)

Re: Luevano v. Horner

Dear Rick:

In the interest of beginning the process of resolving the issues raised by the plaintiffs' challenge to certain of the 1982 hiring under the remedial provisions of the Consent Decree, I have set forth below some of the defendants' initial observations with respect to the statistics in general and with respect to specific agency situations. In addition, I have also set forth the government's proposal with respect to relief.

1. The statistics submitted by the plaintiffs to support their challenge to the various agencies' 1982 hiring are based upon an analysis of both the internal and external hiring of each agency. Plaintiffs have seemingly relied upon ¶ 8 (1) of the decree which provides that in the case of the interim use of the PACE adverse impact shall be determined by considering the appointments made from "all sources". Plaintiffs have mistakenly interpreted this provision as a mandatory requirement that the agencies must include internal hires when determining adverse impact. This analysis fails to consider the language of subparagraph 7 of ¶ 8 which provides:

> an agency may choose whether a determination
> of adverse impact shall be made on the basis
> of external applicants and of the appointments
> from all external sources... or on the basis
> of both external and internal applicants and
> on the basis pf appointments from all sources.

The subparagraph further requires that agencies maintain internal applicant data if they elect to include internal hires. There is no language in this subparagraph limiting the agencies' election rights concerning the inclusion of internal hires to only those instances when there has been no interim use of the PACE. Accordingly, it is the government's position that the agencies have the option of including internal hires or not. As of this time no agency has elected to include internal placements in the calculation of adverse impact and thus use of internal numbers is inappropriate in a determination of adverse impact.

ATTACHMENT P

- 2 -

2.  <u>General Business & Industry, Series 1101</u>

(a) <u>Department of Agriculture</u>:  Plaintiffs have alleged that there was adverse impact in the hiring for this position.  This charge is based upon the Department of Agriculture's report of 262 hires in this job series during 1982.  This job series is one of the "asterisk" positions, i.e., occupations into which an individual can be hired into either a "PACE" or "non-PACE" position.  For this job series, a PACE hire in an "asterisk" position would have to be an internal hire[1] and it would appear in the column labeled "Other". The "Other" column also reflects hires into the non-PACE positions.  In this instance, the 1982 Report indicates that there were no hires from the PACE Certificate during 1982 and thus no external hires into PACE jobs by Agriculture.  However, in order to insure the accuracy of the report, the Department of Agriculture has reviewed, on a component by component basis, all hires in that occupation during 1982.  The review indicates all hires were into non-PACE jobs.

Plaintiffs have been aware from the initial stages of the reporting process that the reporting system agreed to by the parties did not have the ability to distinguish between "PACE" and "non-PACE" hires in the few "asterisk" positions.  As you remember, because of the large number of agencies and occupational series involved and the nationwide character of the reporting to be done, it was our belief that by adapting an existing reporting system - the CPDF - reporting would be accomplished in a uniform manner, with a more accurate product.  This has generally been the case although there have been instances, and this is one of them, where the CPDF could not produce exactly the information sought.

It is defendants' position that the best way to handle the problem is to deal with specific issues as they arise rather than on a wholesale and unfocused basis.  In this case, plaintiffs found a problem with the Department of Agriculture's hiring in Series 1101 and it has been resolved by further research.

(b) <u>Department of Education</u>  Again, although not indicated by the CPDF statistics, all of Education's hires into this job series were "term employees".  "Term employees" are exactly as the name implies, hired for a specfic length of time, in this instance four years.

---

[1] The hire would have to be "internal" because the agency's external hiring authority was limited to the use of PACE certificates.  Thus, any external hires into PACE positions would have been reflected in the column labelled "PACE CERT."

- 3 -

Prior to 1981, Education's Office of Student Financial
Assistance employed a number of term employees for the purpose
of reducing the backlog of student loans in default. Their term
of employment expired in 1982. At that time, the decision was
made to contract out much of the work performed by these term
employees and to consolidate the remaining work in offices
located in San Francisco, Atlanta and Chicago. Employees hired
into positions in the now consolidated offices were again hired
as "term employees". Of the ninety-five term employees hired
during 1982, fifty-nine (59) were employees whose terms had just
expired and who were rehired.

Term employees were never required to take the PACE and
consequently, are not subject to the requirements of the Luevano
Decree.

(c) Remaining Hires  The remaining hires in this job
category constitute the basis for the plaintiffs' charge that
hiring in this job series adversely impacted Hispanics.
Specifically, plaintiffs have alleged that, had Hispanics been
hired at the level of their availability, ten (10) additional
Hispanics would have been hired for this job category.

Defendants dispute this analysis. For the reasons stated
above, the hires attributable to the Departments of Agriculture
and Education must be eliminated from plaintiffs'
calculations. Additionally, as set forth in paragraph 1 above,
it is the option of the agency to include internal hires in the
calculation of adverse impact. No agency has chosen to include
internal hires. Accordingly, the remaining agencies with PACE
hires in the 1101 Series had a total of 56 external hires.
These agencies are: Army - 34 hires; Navy - 6 hires; Air Force -
16 hires. Of these, 53 whites were hired, 2 blacks and 1
Hispanic. Application of the 80% rule would statistically
result in one additional Hispanic selection.

3. Social Insurance Claims Examiner - Series 993
Plaintiffs allege that in 1982, out of a total of 816 persons
hired into this occupational series, only 14 were Hispanic,
constituting 1.7% of the total hires. Relying on an Hispanic
applicant rate of 4.9%, plaintiffs allege that if Hispanics had
been hired at the level of their availability, twenty-six (26)
additional Hispanics would have been hired into this job
category.

Defendants dispute this assessment for several reasons:

a. The 816 hires cited by plaintiffs represent the combined
internal and external hires in this job category. As stated,
each agency has the option of including internal hires when
determining adverse impact. In this case, HHS has chosen not to
include internal hires. During 1982, HHS hired 500 people

- 4 -

externally.  Of these, 11 were Hispanic.  Nine (9) of these 11
hires were co-op conversions.[2]

    b.  The 4.9% nationwide applicant rate for Hispanics is not
applicable to HHS as HHS did not engage in nationwide hiring for
this job series.  Rather, hiring was conducted by each HHS
region and no hiring was done in a number of regions, including
Dallas, an area which had a 17% Hispanic applicant rate for PACE
jobs.  Hiring for the 993 Series was limited to six regions –
New York, Philadelphia-Baltimore, Birmingham, Chicago, Kansas
City and San Francisco.

    c.  As the attached chart indicates, when HHS' hiring for
job series is considered on a regional basis, HHS has met the
obligations imposed by the consent decree to eliminate adverse
impact in hiring.

    d.  Finally, this occupational series is gradually being
phased out.  In its place HHS has been emphasizing hiring in the
105 Series, Social Insurance Administration, which is also
subject to the Luevano Decree.


    4.  Contract & Procurement-Series 1102:  Plaintiffs allege
that out of a total of 1083 persons hired into this job category
during 1982, only 33 were Hispanics, constituting 3% of the
total hires.  Again, an Hispanic applicant rate of 4.9% is
applicable.  Plaintiffs allege that if Hispanics had been hired
at the level of their availability, 20 additional Hispanics
would have been hired in this job category.

    Defendants dispute these allegations for the several reasons
outlined below:

    a).  As stated above, the agencies have the option of
deciding whether to include internal hires when calculating
adverse impact.  In this instance, no agency has exercised that
option.  Accordingly, the total number of external hires is 285
persons, with a total of 5 Hispanics hired, equaling a hiring
rate of 1.7%.  Application of the 80% rule would statistically
result in the hiring of a total of 11.6 Hispanics.

───────────────────────

[2] These nine co-op conversions are not reflected in the report
received by plaintiffs.  The annual statistical report reflects
the individuals hired into co-op programs as GS 3's, rather than
those indviduals who, upon completion of their college degree,
are converted into GS 5 positions in the PACE occupations.

- 5 -

    5.  <u>Computer Specialist Trainee-Series 0334</u>:  In this job series plaintiffs allege that twenty (20) additional Hispanics should have been hired.  Again, this number is based upon a hiring analysis that includes both internal and external hires.  Utilizing only the external hires, the total number of hires was 251.[3]  Of these 10 were Hispanics.  Application of the 80% rule would statistically result in 9.7 Hispanic selections.

    <u>Timeliness</u>:  Insofar as the plaintiffs seek individualized injunctive and monetary relief, there is a substantial issue concerning the timeliness of plaintiffs' charges concerning 1982 hiring.  Plaintiffs had in their possession all statistical data concerning 1982 hiring by December 1983.  However, no request for relief was made until plaintiffs' letter of March 14, 1985.  ¶17 (b) of the decree provides that a complaint seeking individualized relief must be brought no later than 12 months after the plaintiffs obtain sufficient information to place plaintiffs on notice of non-compliance.

    <u>Remedy Proposal</u>:  As the above calculations indicate, the total number of positions which are actually at issue is diminimus.  Additionally, in some instances the actual number of external hires by any single agency is too small for there to be any meaningful statistical analysis of the agency's hiring.  The defendant believes that hiring for 1982 evidences substantial compliance with the spirit and letter of the Decree and that no further relief should be accorded to plaintiffs.

                                  Very truly yours,

                                  *Barbara*

                                  Barbara Ward

cc: James Green

---

[3] This is based on Agriculture - 5 hires; VA-15 hires; DOD - 62 hires; Army - 31 hires; Treasury - 12 hires; Navy - 95 hires; Air Force - 31 hires

External Hiring in the Department of Health and Human Services
GS-993 Series---Calendar Year 1982

| | New York | | | Philadelphia & Baltimore | | | Birmingham | | | Chicago | | | Kansas City | | | San Francisco | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total |
| 1. No. of HHS external hires | 79 | 1 | 80 | 121 | 2 | 123 | 81 | 5 | 86 | 73 | 0 | 73 | 92 | 0 | 92 | 45 | 1 | 46 | 491 | 9 | 500 |
| 2. No. of Hispanics hired | 4 | 0 | 4 | 1 | 0 | 1 | 0 | 2 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 3 | 8 | 3 | 11 |
| 3. OPM PACE applicant data*-- % Hispanic | 4.8% | | | 1.2% | | | 2.8% | | | 2.2% | | | 1.8% | | | 8.2% | | | | | |

\* From OPM Data Survey Report 80-5, pg 3.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

<u>By Hand</u>                         November 25, 1986

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th & Pennsylvania N.W.
   Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Deputy General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
Room 7540
Washington, D.C. 20415

79-271

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

           Re: <u>Luevano v. Horner: Showings of Adverse Impact</u>
               <u>for 1982, 1983, and 1984</u>

Dear Barbara and Jim:

          On May 30, 1986, Barbara sent me a letter responding to
plaintiffs' showings of adverse impact for 1982.  Plaintiffs have
not yet received from the government any responses to our
showings of adverse impact for 1983 and 1984.  We had hoped to be
able to deal with the government's responses for all three years,
since they raise the same issues.  Because of the lapse of time,
and so that you will have a written answer from plaintiffs before
the December 8, 1986 Monitoring Committee meeting, this letter
deals only with the showings for 1982.

          For the sake of clarity, the item numbers in this
letter are the same as the item numbers in your May 30 letter.

          1. <u>The Proper Statistical Standard for 1982 Hiring</u>:
Our October 1984 showings of adverse impact were based upon
¶ 8(b)(1) of the Consent Decree, which states:

                         (1) In the case of the interim use
               of the PACE, "adverse impact" shall mean that
               the difference between the proportion of
               blacks or of Hispanics among the appointments
               <u>from</u> <u>all</u> <u>sources</u> made by an agency for the

ATTACHMENT Q



Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 2---

job category in question, and the proportion
of blacks or Hispanics, respectively, among
the persons who took the PACE in the prior
reporting year (or, in the event that
statistics for the prior reporting year are
not available, for the most recent prior
period for which statistics are maintained),
is statistically significant at the .05 level
of confidence or, if not so statistically
significant, that the proportion of blacks or
of Hispanics among such appointments is less
than 80% of the proportion of blacks or of
Hispanics, respectively, among the persons so
taking the PACE.

(Emphasis supplied).  Your May 30, 1986 letter states that
plaintiffs have erred in relying on this paragraph, because
¶8(b)(7) of the Consent Decree allows agencies the election of
relying on either statistics for external applicants and appoint-
ments from external sources, or on statistics for internal and
external applicants and appointments from all sources.  You
further point out that the latter election could be made only if
the agency kept and reported data on internal applicants and
appointments from internal sources.

The government cannot have it both ways.  Plaintiffs
originally reported adverse impact information based solely on
hires from the PACE registers for the first half of 1982.  See my
August 4, 1983 letter to Barbara.  A copy is attached as Attach-
ment A for ease of reference.

At the August 9, 1983 meeting of the Monitoring
Committee, the government took the position that plaintiffs were
following an incorrect standard, and that appointments from all
sources under ¶ 8(b)(1) constituted the appropriate standard, and
Jim then read us re-calculations of adverse-impact data based on
¶ 8(b)(1).  A copy of John Erickson's notes of the meeting is
attached as Attachment B.  See p. 5 of those notes.  A copy of my
notes of the meeting is attached as Attachment C.  See p. 4 of my
notes.

Because of the government's insistence that ¶ 8(b)(1)
of the Consent Decree was the appropriate standard, I re-calcula-
ted the statistics for the first six months of 1982 and sent
Barbara my letter of August 24, 1983, with new adverse-impact
showings based on ¶ 8(b)(1).  I never received a response to this
letter.

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 3---

On September 16, 1983, I wrote to both of you, summarizing the developments at our August 9, 1983 Monitoring Committee meeting and the developments since then. A copy of my letter is attached as Attachment D. Part C(1) of this letter, at p. 4, stated the following:

> 1. <u>PACE Job Categories: Appointments from PACE Registers</u>: We agreed that my August 4, 1983 letter, second item, set forth an incorrect standard for determining adverse impact. The correct standard, and a new list, were set forth in my August 24, 1983 letter. We have not received a response.

My January 3, 1984 letter to Barbara (Attachment E) stated in subparagraph (c) that I had not had a response to my September 16, 1983 letter, and that I assumed that this meant you were in agreement with each of the statements in the letter. If not, I requested a response.

My March 29, 1984 letter to Jim, with a copy to Barbara, recounted a conversation I had had with Jim, at Barbara's suggestion, as to "whether there were better figures than total selections to use for determining the presence or absence of adverse impact in the 'asterisk' PACE occupations". The letter continued:

> We agreed that we would use the "total selections" standard required by the Consent Decree during the interim use of PACE unless you found a better source of information. If you do, we can talk about it and discuss with Barbara the idea of stipulating to a more accurate standard for these few job categories. If I don't hear from you soon, I'll consider the matter closed.

A copy has been attached as Attachment F.

Jim's April 5, 1984 response to me (with a copy to Barbara), stated at p. 2:

> It is my understanding that for 1982, a PACE interim year, use of the "all sources" standard set forth in Section 8(b)(1) of the Decree, would be appropriate for these

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 4---

occupations.  However, any decision as to any
agreement concerning future interpretation of
or a stipulation regarding the Decree in this
area should be directed to the Department of
Justice.  ...

A copy has been attached as Attachment G.

Until your May 30, 1986 letter, the government's
position had been that ¶ 8(b)(1) of the Consent Decree was
controlling.  It is too late for the government to change its
election.  I suspect that you and Jim have simply forgotten this
history, and will abandon your first point as soon as you have
thought further about it in light of this letter.

2. <u>General Business and Industry, Series 1101</u>

Your letter states that this is one of the "asterisk"
occupations, and that selections could have been either into PACE
or non-PACE positions.  Your response to our showings of adverse
impact for this job category is broken down by into three parts:

(a) <u>Department of Agriculture</u>: Your letter states that
the Agriculture Department "has reviewed, on a component by
component basis, all hires in that occupation during 1982.  The
review indicates that all hires were into non-PACE jobs."

Plaintiffs must personally inspect the records purpor-
ting to show that the Agriculture Department has not violated the
Consent Decree.  If its records bear out this conclusion,
plaintiffs will withdraw their challenge.

(b) <u>Department of Education</u>: Your letter states that
all of the hires into this job category were rehires of "term
employees", for a four-year period.  You further state that "term
employees' were never required to take the PACE, and that these
selections are therefore not covered by the Consent Decree.

Plaintiffs did not make a showing of adverse impact as
to this job category at this agency.

(c) <u>Remaining Hires</u>: Your letter takes the position
that plaintiffs' overall showing of adverse impact against
Hispanics must be altered, to reflect the Agriculture Department
and Education Department explanations described above.  This is
not correct.  An overall showing is an overall showing, and may
not be defeated on an agency-by-agency basis, particularly where



Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 5---

the agency-by-agency showings involve assertions of special
situations not covered by the reporting system under the Decree.

        Let's look at the consequences of adopting the position
you advocate.  Plaintiffs made an overall showing of adverse
impact against Hispanics, based on the hiring of 645 persons, of
whom 22 were Hispanic.  You have said in response that 262 of
those hires (5 of them Hispanic) were by the Agriculture Depart-
ment, and that you can explain them, leaving only 383 hires (17
of them Hispanic) to be explained.  Then you offer another
special situation, at the Education Department.  The six-month
Report A-3 for the period from January 1982 through June 1982
shows at p. 465 that 121 persons were hired from all sources,
none of them Hispanic.  The six-month Report A-3 for the period
from July through December 1982 shows that 8 persons were hired,
none of them Hispanic.  A copy of the reports for both six-month
periods is attached as Attachment H.  Based on information not
reported generally, you seek to explain a total of another 129
hires, none of them Hispanic.  This would then leave a total of
254 hires, 17 of them Hispanic, on which an overall showing of
adverse impact would be based.  Because 17/254 is 6.7%, and
because this exceeds the standard of 4.9% for Hispanics, you
conclude that there is no case to be answered.

        In logic, you cannot take this approach unless you also
examine the remaining 254 hires, and in particular the 17
Hispanic hires, to ensure that there are no "special situations"
explaining away these hires.  If the same kind of record search
done by the Agriculture and Education Departments showed that
these 17 Hispanic hires were also "special situations" and
should be excluded from the adverse-impact analysis, plaintiffs
would be left with 237 hires, none of them Hispanic, and a
shortfall of 11.6 Hispanic hires.

        Nor does the problem stop there.  If the government is
going to go outside the reporting system and the defenses
expressly allowed by the Consent Decree to defend a showing of
adverse impact, then it must make universal showings of the same
factors, so that plaintiffs will have additional opportunities to
make showings of adverse impact.  For each job category, at each
agency, the government would have to show that there are no
"special situations" explaining away the hires of blacks or
Hispanics, so that plaintiffs can make the appropriate showings.
I am sure that you do not want to rely on "one-way" facts which
pop up only when they help the government, and I am also sure
that the Court does not want such "one-way" facts.

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 6---

           3. <u>Social Insurance Claims Examiner - Series 0993</u>

         Plaintiffs showed that 816 persons were hired into this
job category, 14 of them Hispanic, making Hispanics 1.7% of total
hires.  The shortfall was 26 Hispanics.

         (a) <u>Internal versus External Hires</u>:  The May 30, 1986
letter's first response was that, [having seen the results of
plaintiffs' analysis,] "HHS has chosen not to include internal
hires."  Based on the information set forth above, I think you
will have to agree that it is too late for HHS to make an
election for four-year-old hiring.    The letter also asserts
that there were 500 external hires, 11 of them Hispanic, and that
9 of the 11 were co-op conversions not reflected in the reported
statistics because the reported statistics include only co-op
hires at the GS-3 level,[1] rather than conversions at the GS-5
level at the end of their college degrees.  I assume we all agree
that this is as it should be; appointments into the Co-op program
were exactly what the Decree had in mind.  However, we cannot
count <u>both</u> the appointments into the Co-op program <u>and</u> the
conversions at its end.  Nothing in the Decree contemplates
giving the government double credit for Co-op program placements.

         Moreover, I cannot get your figures from the reports
provided to us.  The six-month Report A-3 for the period from
January 1982 through June 1982 shows at p. 814 that 254 persons
were hired from the PACE Register, only 4 of them Hispanic.
There were 28 direct hires, none of them Hispanic.  There were 2
hires in the Non-PACE CS Cert column, none Hispanic.  No one was
hired through the Co-op program.  The six-month Report A-3 for
the period from July through December 1982 shows that 155 persons
were hired, 4 of them Hispanic.  There were, once more, 2 hires
in the Non-PACE CS Cert column, none Hispanic.  Again, none were
hired through the Co-op program.  For the year as a whole, there
were 404 hires from the PACE Register, 8 of them Hispanic.  A
copy of the relevant pages from OPM Report A-3, for both
six-month periods, is attached as Attachment I.

         (b) and (c) <u>Attack on the 4.9% Standard for Hispanics</u>:
The May 30 letter challenges the use of the 4.9% standard for
Hispanics, on the asserted ground that it is inappropriate
because this is a nationwide standard and HHS did not hire for

---

     [1] Are these appointments in fact reported?  The lowest grade
level of the reports provided to us is grade 5.  Please check
this.

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 7---


this job in regions where there were substantial numbers of
Hispanics.  The Consent Decree does not allow the government to
defend a nationwide showing of adverse impact by breaking data
down into regions.  It is exclusively plaintiffs' option to
decide whether to frame their challenges on a nationwide or a
regional basis.  Paragraph 8(b)(6) of the Decree states:

> (6) Determinations of adverse
> impact may be made on <u>any</u> <u>or</u> <u>all</u> of the
> following bases, as appropriate, <u>any</u> <u>of</u> <u>which</u>
> <u>shall</u> <u>be</u> <u>sufficient</u> <u>for</u> <u>the</u> <u>purposes</u> <u>of</u> <u>the</u>
> <u>enforcement</u> <u>procedures</u> <u>under</u> <u>this</u> <u>Decree</u>:
>
> > (i) on a nationwide basis for
> > any job category listed in Appendix A;
> >
> > (ii) on a regional basis ... .

(Emphasis supplied).

     Moreover, the government informed plaintiffs on August
28, 1984, that it had not kept any reliable data on applicants in
1982, and that the 1978 sample of applicant data in ¶ 10(h) of
the Consent Decree would have to be used to make determinations
of adverse impact.  Having neglected to keep any reliable data on
actual applications, the government cannot be heard to say that,
if it had bothered to keep the data, the data would help it.

     I am greatly bothered that the attachment to your
letter purports to show the percentage of 1982 applicants who
were Hispanic, on a regional basis, citing something called "OPM
Data Survey Report 80-5", at p. 3.  I cannot understand how
plaintiffs could have been informed in August 1984 that there
were no reliable 1982 applicant data for <u>any</u> selection procedure,
for <u>any</u> job category, for <u>any</u> agency, and then have this turn
up.  I think we are entitled to a full explanation.

     If the government has withheld information it should
have provided, plaintiffs will have to re-examine the 1982 hiring
data for all job categories at all agencies and make new determ-
inations of adverse impact.

     (d) <u>Relevance of the Phasing-Out of Series 0993</u>:  Your
May 30 letter states that HHS has been phasing out this job
category, and that it is "emphasizing hiring in the 105 series".
We are not sure exactly what this means.  Are hires still being
made in series 0993?  Are you suggesting that there will be a



Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 8---

problem in providing a remedy for the adverse impact shown?  Or
is this just a matter of information?  If series 0993 is no
longer in use for hiring, I assume that there would be no
difficulties in providing a remedy to those injured, by hiring
them into series 0105 instead.

        4. <u>Contract and Procurement-Series 1102</u>:  The govern-
ment's only response is that external hires should have been the
standard, and this is dealt with adequately above.

        5. <u>Computer Specialist (Trainee), Series 0334</u>:  Again,
the government urges that the standard should be external hires.
Again, this is dealt with adequately above.

        6. <u>The Timeliness of Plaintiffs' Complaints of Adverse
Impact</u>:  The May 30 letter asserts that there is a substantial
problem with the timeliness of plaintiffs' charges concerning
1982 hiring, and asserts that we had in our possession "all
statistical data concerning 1982 hiring by December 1983".  The
letter further asserts that no request for relief was made until
March 14, 1985, placing our showings of adverse impact outside of
the 12-month requirement of ¶ 17(b) of the Consent Decree.

        These assertions are erroneous.  Paragraph 17(b) of the
Consent Decree states in relevant part:

                        (b) An enforcement proceeding
                seeking individualized injunctive and
                monetary relief instituted under the provis-
                ions of this paragraph to challenge non-
                compliance by an agency with its obligation
                to use all practicable efforts to eliminate
                adverse impact, as provided in ¶ 12, must be
                initiated under ¶ 17(c) no later than twelve
                months, extendable by consent of the parties
                or for good cause shown, <u>after plaintiffs
                obtain information sufficient to place
                plaintiffs on notice of such non-compliance</u>
                whether obtained from defendants under ¶¶ 24
                and 25 or otherwise.

(Emphasis added).  <u>First</u>, plaintiffs did not receive any informa-
tion about application data until the government informed us, on
August 28, 1984, that it had no reliable data.  Until that day,
plaintiffs had no knowledge which standard was to be used in
determining the government's compliance with the Decree, and
could not make adverse-impact determinations.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 9---

    Indeed, my July 6, 1984 letter to Barbara stated in pertinent part:

        This is a confirmation of my telephone requests to you and to Jim to provide us with racial and ethnic breakdowns of the applicants for the alternative examining procedures in use in 1982.  Without this information, we do not have a yardstick with which to measure hiring.

        My understanding of our agreement at our August 1983 meeting was that OPM would check on the information available, and that we would only in the last resort use the PACE applicant information set forth in the Consent Decree.  We need to have a report back in writing, either giving the information or explaining why it is not available.

A copy of this letter is attached as Attachment J.  The response was the August 28, 1984 telephone call from Jim, reporting that no applicant data were available, either for the PACE or for the alternative examining porocedures.

    <u>Second</u>, you may have forgotten the errors in the original OPM reports, which took months to rectify.  For example, see my March 29, 1984 letter to Jim (Attachment F), involving 15 occupational categories in the OPM Reports for the first half of 1982 which were omitted from the second-half reports, see Jim's April 5, 1984 letter to me (Attachment G) providing partial answers and stating that further checking was underway, and my May 7, 1984 letter to Jim recounting our conversation, in which Jim stated that he thought some of these occupations:

        ... might have been consolidated with other occupations, so that we would have to find out which were consolidated with which, and then consolidate the first-half data for each such set so that we would be consistent with the second-half reports.  You were going to check into the matter, and you have since told me that you were still in the process of checking into it.  <u>We need to find out the answer, so we can prepare a complete report of those job categories which had adverse</u>

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 10---

> impact against blacks or against Hispanics in
> 1982.

(Emphasis added).  A copy of my May 7 letter is attached as
Attachment K.

Jim's May 24, 1984 response (Attachment L, including
the attachments to Jim's letter) provided further responses on
this subject and provided revised hiring reports for the second
half of 1982.  This marks the date when plaintiffs had reliable
hiring information for most job categories.

See also Jim's April 13, 1984 letter correcting the
reported information for 12 occupations at the Veterans Adminis-
tration, and representing that the problems in the VA report did
not affect the overall totals.  A copy of the letter is attached
as Attachment M.

Third, plaintiffs provided their adverse-impact
determinations to the government on October 10, 1984, at a
meeting of the Monitoring Committee.  We presented you with our
draft First Report to the Court, and informed you that it
contained our determinations of adverse impact.  We brought all
of the charts backing up those figures, and offered them for your
inspection.  We provided you with copies of the draft report, and
offered to make copies of the back-up charts for you, if you
wanted.  Not until the end of December 1984 did the govern-
ment request copies of the charts.  There was no question at the
October 1984 meeting that the statistics embodied in the draft
report were intended to serve as our showings of adverse impact.
Indeed, the original draft of the report, dated October 12, 1984
to reflect its intended filing date, stated on p. 14:

> 5. Enforcement Proceedings
>
> Plaintiffs have raised each of the
> above showings with counsel for the defend-
> ant, through the Monitoring Committee, as an
> enforcement proceeding.  We expect the
> Monitoring Committee to attempt to resolve
> these matters.

A copy of the original draft report provided to you on October
10, 1984, is attached as Attachment J.  Throughout the draft
Report, the language makes clear that the statistics in question
were then being raised as an enforcement proceeding:

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 11---

      Four job categories had nationwide adverse impact against Hispanics substantial enough in the opinion of counsel to warrant <u>challenging at this time</u>. ...  <u>Id.</u> at 7.

      This rate of hiring constituted adverse impact ... .  <u>Passim</u>.

      In addition to the governmentwide <u>showings</u> of adverse impact set forth above, plaintiffs have also analyzed agency-by-agency hiring statistics to determine whether there is adverse impact as to that particular agency's hiring.  For three job categories, there was adverse impact as to a specific agency's hiring, at a level <u>sufficient to warrant challenge at this time</u>.  <u>Id.</u> at 11 (emphasis added).

    If the government really wants to go before Judge Green and represent plaintiffs had complete information as of December 1983, and further represent that the government had no means of knowing that the showings in this draft Report were intended as the challenges to adverse impact contemplated by the Consent Decree, it had better be prepared for the Court's likely reaction.  Crash helmets would probably be in order.

    Plaintiffs want to come to closure on the 1982-1984 hiring problems as soon as possible.  We hope that this letter will persuade the government to accept our showings of adverse impact for 1982, and that we can then spend our time fashioning the remedy.

    We further hope that our explanations of the problems in defending plaintiffs' showings by resorting to matters outside the reporting system, and outside the permissible defenses enumerated in the Consent Decree, will lead the government to abandon any similar efforts as to 1983 hiring and 1984 hiring.

    In any event, we must come to closure on these problems soon.  They have been drawing on for far too long a time.

      Very truly yours,

      Richard T. Seymour

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 12---


Attachments

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.

ATTACHMENT A



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520  •  733 FIFTEENTH STREET. NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 4, 1983

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

          Re:  Luevano v. Devine:  August 9 Monitoring
               Committee Meeting

Dear Barbara:

        This information is being given to you so that you and OPM
can prepare more effectively for our August 9 meeting.

        First, we have not been able to get OPM's computer tapes
running, because they were prepared in a way that makes it
extremely expensive and time-consuming for someone outside to
make use of them.  There are utility programs which can be run
on future OPM tapes before they are turned over, which will make
them much easier and cheaper to use.  OPM's computer people have
asked us for a copy of such a utility program if we discovered
one.  We have, and we have permission from its developer to provide
it to OPM, but we want written assurance first that OPM will
actually use the utility program to put future tapes in a format
we can use.

        Second, I have enclosed a chart prepared from Report A-1
provided to us by OPM.  It shows that, if this report had covered
a twelve-month period instead of its actual six months, racially
disparate impact with respect to hires under the interim use of
the PACE for a number of job categories would have been shown, and
that in most instances no use had been made of the special programs
required by the Consent Decree.  If the full-year data we are to
receive in the early Fall do not reverse these patterns, the
defendants will be in contempt.  The job categories of most
interest are:

          a) Computer Specialist (Trainee), GS-0334

        63 persons were selected from PACE registers, of whom 2
were black and none were Hispanic.  Under ¶ 8(b)(1) at p. 7 of
the Consent Decree, the standard for determining adverse impact

ATTACHMENT A TO ATTACHMENT Q

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 4, 1983
Page 2

is the most recent period for which statistics on PACE test-takers have been maintained; that period is the period covered by the statistics set forth in ¶ 10(h) at p. 19 of the Consent Decree. There, blacks were 11.9% of the applicants, and Hispanics were 4.9% of the applicants. Using this standard, there was statistically significant disparate impact at the .05 level of confidence against blacks in selections for this six-month period. The proportion of blacks among the appointments is 3.2%, which is only 26.9% of the proportion of blacks among the applicants. This fails the 80% test. The proportion of Hispanics among the appointments is zero, which is infinitely less than the proportion of Hispanics among the applicants. This also fails the 80% test.

No use was made of the special programs.

The agencies most directly responsible for these hires are the Department of Defense, which hired 28 whites, 1 black, and no Hispanics into this job category (Report A-3, p. 278), and the Department of Health and Human Services, which hired 24 whites, 1 black, and no Hispanics into this job category (Report A-3, p. 806). The other agencies contributing to these hires were the Air Force (2 whites only; Report A-3, p. 14), the Army (5 whites only; Report A-3, p. 102), and the Veterans Administration (2 whites only; Report A-3, p. 1510).

b) Social Insurance Claims Examining, GS-0993

281 persons were selected from PACE registers, of whom 23 were black and none were Hispanic. All of these hires were made by the Department of Health and Human Services (Report A-3, p. 814). There was statistically significant adverse impact at the .05 level of confidence against both blacks and Hispanics. In terms of the 80% test, the proportion of blacks among the appointments was 8.2%, which is only 68.9% of the proportion of blacks among the applicants. The proportion of Hispanics among the appointments was zero, which is less than 80% of the proportion of Hispanics among the applicants.

Despite the fact that all of these hires were made by the same agency, no use was made of the special programs.

c) Contract and Procurement, GS-1102

141 persons were selected from PACE registers, of whom 10 were black and 2 were Hispanic. There was statistically significant adverse impact at the .05 level of confidence against Hispanics. In terms of the 80% test, the proportion of blacks among the appointments was 7.1%, which is only 59.7% of the proportion of blacks among the applicants. The proportion of Hispanics among the appointments was 1.4%, which is only 28.6% of the proportion of Hispanics among the applicants.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 4, 1983
Page 3

The special programs resulted in a combined hire of 2 whites, 8 blacks, and no Hispanics. Adding these to the hires from the PACE registers, we get 151 hires, of whom 18 were black and 2 were Hispanic. The 80% test is the only standard of adverse impact which has to be overcome as to blacks; the combined percentage of blacks among appointments then becomes 11.9%, the same as the percentage of blacks among applicants. Thus, use of the special programs eliminated the adverse impact for blacks.

The special programs were not used to hire Hispanics, and the adverse impact against them remains.

The agencies responsible for these hires are the Air Force (22 whites, no blacks, and 2 Hispanics; Report A-3, p. 25), the Army (32 whites, 1 black, no Hispanics; Report A-3, p. 113), Defense (59 whites, 8 blacks, and no Hispanics; Report A-3 at p. 289), and the Navy (16 whites, 1 black, and no Hispanics; Report A-3, p. 1125). Only the Army did any hiring under the special programs. There was adverse impact against blacks in hiring by the Air Force, the Army (where it was eliminated through use of the special programs), and the Navy. There was adverse impact against Hispanics in hiring by the Army, by Defense, and by the Navy. The Air Force, Defense, and the Navy made no use of the special programs; the Army used them only for blacks.

### d) Internal Revenue Officer, GS-1169

62 persons were selected from PACE registers, of whom 7 were black and 1 was Hispanic. All of these hires were made by the Department of the Treasury (Report A-3 at p. 1482). There is no adverse impact against blacks under either of the standards in the Consent Decree. Hispanics were 1.6% of the appointments, a rate which is only 32.7% of the proportion of Hispanics among the applicants. Thus, there is adverse impact against Hispanics.

The Treasury Department made no use of the special programs.

In addition, there are a good number of other job categories shown on the attached chart which have fewer appointments than the above-listed four job categories, but in which there was still adverse impact against blacks and/or Hispanics under the 80% test.

Third, the reports provided to us show four PACE job categories in which delegated examining authority has resulted in more than 20 hires. In most of these instances, there is

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 4, 1983
Page 4

probably adverse impact against blacks and Hispanics, without any
use having been made of the special programs required by the
Consent Decree.  I say "probably" because we have still not been
provided with statistics on the racial composition of appli-
cants.  For ease of reference, these will be denominated (e)
through (h) below:

### (e) General Clerical and Administrative, GS-301

32 persons were selected as a result of delegated examin-
ing authority, of whom 1 was black and 1 was Hispanic.  There is
probable adverse impact against both blacks and Hispanics.

### (f) Production Control Specialist, GS-1152

23 persons were selected as a result of delegated examin-
ing authority, of whom 4 were black and none were Hispanic.
There is probable adverse impact against Hispanics.

### (g) Immigration Inspection, GS-1816

42 persons were selected as a result of delegated examining
authority, of whom none were black and none were Hispanic.  There
is probable adverse impact against both blacks and Hispanics.

### (h) Quality Assurance Specialist, GS-1910

52 persons were selected as a result of delegated examining
authority, of whom 7 were black and 1 was Hispanic.  There is
probable adverse impact against Hispanics.

In addition, as with the hires from the PACE register,
there are other job categories on the attached chart, which have
probable adverse impact against blacks and/or Hispanics under
the 80% rule.

Fourth, we have to discuss all of the problems in statistical
reporting raised in my earlier letters to you.

Fifth, we agreed last year that Schedule B appointees
would be treated in exactly the same manner, for all purposes,
as PACE appointees have been treated in the past.  We have asked
several times for information on the implementation of Schedule
B authority, so that we can satisfy ourselves that our agreement
is being reflected in the actual practices of the agencies.  We are
concerned about several allegations in the NTEU suit, and need the
data. See C.A. No. 83-1503 (D.D.C.), Complaint, ¶ 16 at p. 6.

Sixth, we have to discuss the government's deliberate dis-
regard of the special programs established by the Consent Decree,
as well as its failure to make the required reports.

LAWYERS' COMMITTEE FOR CIV RIGHTS UNDER LAW

Barbara L. Ward, Esq.
August 4, 1983
Page 5

Seventh, we have to discuss the government's refusal to comply with the provisions of the Consent Decree requiring timely and meaningful reports to plaintiffs on the development of new examining procedures.  You informed me on Friday, July 21, 1983, that the government refuses to provide meaningful reports in place of the boilerplate we have been given.  Our time period before going to Court has been running since then, and we can have the conciliation meeting as part of our monitoring committee meeting.  If we can reach agreement, we will stop the clock.  If we cannot, we won't stop the clock.

Our agenda is attached.  We are still thinking of making additions, and may have a more complete one to you before the meeting.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  James S. Green, Esq.
     Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

August 4, 1983

AGENDA FOR FIRST MEETING OF THE MONITORING COMMITTEE
IN LUEVANO v. DEVINE, TO BE HELD AUGUST 9, 1983

| | Consent Decree | |
|---|---|---|
| | Paragraph(s) | Page(s) |

A.  **Problems in Nonstatistical Reporting**

    1.  Test development reports (see my 7/1/83 letter, third item, my 7/15/83 letter, p. 2, and my 8/4/83 letter, seventh item) — 26 — 42

    2.  Efforts to use special programs (see my 8/1/83 letter, second item, and my 8/4/83 letter, sixth item) — 24(c),25(c) — 41-42

    3.  Specific means by which various government agencies are using their Schedule B authority (see my 7/1/83 letter, fourth item, and my 8/4/83 letter, fifth item) — 27 — 42-43

    4.  Guidance provided by OPM to agencies on use of Schedule B authority (see my 7/1/83 letter, fifth item, and my 8/4/83 letter, fifth item) — 27 — 42-43

    5.  Delays in reporting nonstatistical information (see my 7/1/83 letter, sixth item) — 29 — 43

    6.  Statistical information from the General Accounting Office (see my 7/1/83 letter, seventh item) — 24-27 — 40-43

    7.  Request for FPM Letter asking agencies to make reports on use of special programs, issued a couple of weeks after our oral reminders that we needed these reports (see my 7/15/83 letter, third paragraph) — 27 — 42-43

B.  **Problems in Statistical Reporting**

    1.  Our need to get usable tapes from OPM (see my 8/4/83 letter, first item) — 27 — 42-43

    2.  The inclusion of FDIC "GG" jobs with "GS" jobs on statistical reports (see my 7/1/83 letter, first item, part (a)) — 24-25 — 40-42

    3.  The inclusion of other agencies with different nomenclatures for their PACE jobs on statistical reports (see my 7/1/83 letter, first item, part (a)) — 24-25 — 40-42

|  |  | Consent Decree | |
|---|---|---|---|
|  |  | Paragraph(s) | Page(s) |
| 4. | The numbers of applicants of each race taking a competitive procedure other than the PACE letter, first item, part (b), and my 8/4/83 letter, third item at p. 3) | 25 | 41-42 |
| 5. | Appointments made under non-PACE competitive procedures administered by OPM (see my 7/1/83 letter, first item, part (c), and my 7/15/83 letter, pp. 2-3) | 25 | 40-42 |
| 6. | Reporting of conversions of Schedule B appointees to career status, and reporting of their promotions to higher grade levels (see my 2/25/83 letter, item 6 and attached Table Form G, and see my 7/1/83 letter, first item, part (d)) | 25, 27 | 41-43 |
| 7. | Delays in reporting statistical information (see my 7/1/83 letter, sixth item) | 29 | 43 |
| 8. | Statistical information from the General Accounting Office (see my 7/1/83 letter, seventh item) | 24-27 | 40-43 |

C.  Problems of Substantive Compliance, Other Than Reporting

| | | | |
|---|---|---|---|
| 1. | PACE job categories where appointments from the PACE registers resulted in disparate impact against blacks and/or Hispanics, where there was no adequate use of the special programs (see my 8/4/83 letter, second item) | 8(b)(1) 12(b) | 7 19-20 |
| 2. | PACE job categories where appointments under delegated examining authorities resulted in probable disparate impact against blacks and/or Hispanics, where there was no adequate use of the special programs (see my 8/4/83 letter, third item) | 8(b)(2) 8(b)(3) 12(b) | 7 7-9 19-20 |
| 3. | Information on OPM's compliance with the recruiting requirements of the Consent Decree | 16(e) | 30 |
| 4. | Information on OPM's coordination and monitoring of programs "to ensure that the class herein shall receive the greatest possible benefit of the special programs described above." | 16(e) | 30 |

- 2 -

|  |  | Consent Decree | |
|---|---|---|---|
|  |  | Paragraph(s) | Page(s) |
| 5. | OPM's actions to provide notice of the special programs, etc., to class members | 16(e) | 30 |
| 6. | OPM's use, if any, of the mailing list required by the Consent Decree, and its compliance with the semi-annual mailing requirement | 22 | 39-40 |

SUMMARY OF OPM REPORT A-1, JANUARY 1982 - JUNE 1982
(All Agencies With "GS" Designations, Exclusive of
FDIC, GAO, and Possibly Others) (Nationwide)

| Job | PACE Certificates | | | Special Programs | | | Delegated Examining | | | Direct Hire | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics |
| 0018 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0025 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0080 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0105 | 1 | 0 | 0 | 0 | 0 | 0 | 8 | 6 | 0 | 0 | 0 | 0 |
| 0180 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0187 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 0201 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0212 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0221 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0301 | 1 | 0 | 0 | 0 | 0 | 0 | 30 | 1 | 1 | 5 | 0 | 0 |
| 0334 | 61 | 2 | 0 | 0 | 0 | 0 | 6 | 1 | 0 | 14 | 3 | 1 |
| 0343 | 6 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| 0345 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| 0346 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0501 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| 0526 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0560 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

- 2 -

| Job | PACE Certificates | | | Special Programs | | | Delegated Examining | | | Direct Hire | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics |
| 0685 | 15 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0950 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0962 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 0965 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0990 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 7 | 0 | 0 | 0 | 0 |
| 0993 | 254 | 23 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 1 | 0 |
| 0996 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1081 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1082 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 1083 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| 1102 | 129 | 10 | 2 | 2 | 8 | 0 | 2 | 0 | 0 | 4 | 0 | 0 |
| 1103 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1150 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1152 | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 4 | 0 | 0 | 0 | 0 |
| 1165 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 1169 | 54 | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 1 | 0 |
| 1170 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

- 3 -

| Job | PACE Certificates | | | Special Programs | | | Delegated Examining | | | Direct Hire | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics | Whites | Blacks | Hispanics |
| 1173 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1410 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 1412 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| 1816 | 3 | 0 | 0 | 0 | 0 | 0 | 42 | 0 | 0 | 16 | 9 | 32 |
| 1890 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1910 | 2 | 0 | 1 | 0 | 0 | 0 | 44 | 7 | 1 | 0 | 0 | 0 |
| 2001 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 14 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 26 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 2032 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2050 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2101 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 661 | 51 | 9 | 5 | 8 | 0 | 173 | 53 | 2 | 120 | 14 | 36 |

MEMORANDUM

To:        Luevano file

From:      JHE

Date:      August 9, 1983

Re:        first monitoring committee meeting

8/9/83 - Present at the meeting at OPM were:
Barbara Ward, Paul Blankenstein, Jim Green, Barry Goldstein,
Rick Seymour, Bob Dozier, John H. Erickson.

A. Statistical Reporting (§ B of RTS' agenda)

1.    RTS can get utility program to transform tapes
on OPM's Honeywell machine to make them usable on an IBM
machine.  BW:  government is willing to use this program if
there is no cost.  JG will talk to his computer people (Paul
Kaplan) to determine if this is possible.  There should be
a response within a few days.

2., 3.  There are only two agencies with different
nomenclature: FDIC (GG) and State Department (FG).  JG has
sent a priority request to FDIC for reports, but no date
set for response.  State had few hires.  The next computer
runs, for year 1982, will include these agencies.

Note:  agreed that reporting year should be
calendar year.  Parties agreed to execute agreement.

4.    Data for 6 months concerning applicant pools
for competitive procedure other than PACE has been collected
by OPM.  JG: It will be supplied within several weeks.

ATTACHMENT B TO ATTACHMENT Q

-1-

<u>JG</u>:  There is a problem with data in that some people refused
to self-identify -- could be as many as 20-25%.

     5.  <u>JG</u>:  The non-PACE CSC cert column on the
reports includes 11 "asterisk" positions.  These positions,
such as GS-301, include clerical GS-5's as well as PACE
GS-5's.  JG will supply list of asterisk positions.  Agreed
that we need to factor out non-PACE jobs from this category.
<u>JG</u>:  It may be necessary to have agencies to report both
PACE and non-PACE data, but separately.  <u>JHE</u>:  The same
should be done for "Other" column, which includes asterisk
positions as well.

     <u>Note</u>:  <u>JG</u>:  Effectively, 1982 is a PACE year.
Employees were being selected from registers until the end
of October, 1982.  Thus, only during two months were there
no PACE selections.

     6.  <u>JG</u>:  Schedule B is an examining procedure.
Conversion to GS-9 will occur in a minimum of 2 years,
i.e., August, 1984.  Once converted to the competitive
service, employee will be promoted non-competitively to
journeyman level.  <u>BLG</u>:  Agreement was that Schedule B
people would have all rights of PACE people.  <u>BW & PB</u>:
Affirmed that this was the agreement.  <u>BW</u>:  Schedule B
is AEP.  In order to become a GS-9, Schedule B employee
must take mid-level exam and be within reach on a register.
<u>RTS</u>:  Schedule B not AEP under ¶ 8(j).  <u>BLG</u>:  If AEP,
where are development plans from agencies granted authority;

¶ 26 requires them.  JG:  There are very few people on mid-level registers.  Schedule B employees are competing against non-status persons.  JG:  mid-level exam is not assembled, never has been and "There are no plans to make it assembled." Schedule B employee has advantage because he has experience in job.  If vet is on cert, however, he must be chosen over Schedule B employee.  Certs are in existence for short period of time only, unlike PACE certs.  Treasury has delegated authority to do mid-level exam.  BW:  In practice, mid-level exam will have no effect on class members. BLG:  Parties need agreement on information to be supplied, because there is no agreement on whether Schedule B is AEP and whether, if AEP, AEP extends through mid-level exam. BW:  Government's position is that Schedule B is AEP and decree covers entry level hiring only, not mid-level exam. JG:  Agency knows that promotion from GS-5 to 7 is automatic from FPM 213-32 and from Handbook X118.  The PACE positions remain career ladder positions.  RTS:  Wants reports on GS-5 to 7 promotions.  JG:  CPDF system only picks up accessions and, probably, conversions, not promotions.

Note:  Information to be supplied:  1.  Development plans under ¶ 26 from agencies for Schedule B examining; 2.  Procedures for conversion of Schedule B employees from 7 to 9; 3.  Statistical tracking of employees from 7 to 9 level; 4.  Information concerning Treasury mid-level exam; 5.  FPM 213-32 (supplied); 6.  List of asterisk positions; 7.  Updated list of delegated examining authority (supplied

-- list in FPM 213-32 less CRESS exam); 8. Guidance to agencies granted Schedule B authority (sample supplied); 9. FPM letter re special programs.

7. <u>JG</u>: OPM is shooting for a six month lag time in reports. <u>RTS</u>: It is most useful for year-end report to be total for whole year. Agreed that six months report would be due in December and final report, totalled for the year, in June.

8. GAO has been contacted, and data should be supplied in approximately one month.

B. <u>Nonstatistical Reporting (§ A of RTS' agenda)</u>

1. Disagreement over what ¶ 26 requires. BLG agreed to prepare letter stating specifics. <u>PB</u>: Government's position may be that OPM has supplied us everything required under ¶ 26. <u>JG</u>: Last exam put in place under delegated examining authority, or developed by OPM, was Computer Specialist in November, 1981. CRESS has been junked: 90,000 people applied, 20,000 were examined including an interview, 14 people hired, 6 quit in first year ("job too complicated").

2. <u>BW</u>: FPM letter has been sent concerning reporting of hires under special programs. Reports are due August 15. <u>JG</u>: Reports can be supplied within one week thereafter.

3. See § B6, <u>supra</u>.

-4-



4.    Guidance re Schedule B appointments supplied.

5.    See § B7, _supra_.

6.    See § B8, _supra_.

7.    FPM letter to be supplied.


C.    <u>Problems of Substantive Compliance (§ C of RTS' Agenda)</u>

1.    <u>JG</u>:  Results based on all hires, not just PACE hires, are as follows:

<u>GS-334</u>:

      GS-5 & 7     586 Total

                       83 B (15%)

                       19 H (3%)

      GS-5            291 Total

                       28 B (10%)

                       10 H (3.4%)

      GS-7            295 Total

                       55 B (19%)

                        9 H (3.1%)

<u>GS-993</u>:

      GS-5 & 7     425 Total

                       73 B (17%)

                        5 H (1.2%)

      GS-5            354 Total

                       59 B (17%)

                        5 H (1.4%)

```
        GS-7        71 Total

                    14 B (20%)

                     0 H (0%)

    GS-1102:

        GS-5 & 7   643 Total

                   100 B (16%)

                    22 H (3.4%)

        GS-5       444 Total

                    69 B (16%)

                    11 H (2.5%)

        GS-7       202 Total

                    31 B (15%)

                    11 H (5%)

    GS-1169:

        GS-5 & 7   288 Total

                    38 B (13%)

                    16 H (5.5%)

        GS-5       129 Total

                    15 B (12%)

                     8 H (6.2%)

        GS-7       163 Total

                    23 B (14%)

                     8 H (4.9%)
```

2.   BW:  Some agencies have misreported hires under delegated examining authority or under direct hire authority.  JG:  Agencies do not have both direct hire authority and delegated examining authority.  Thus, for

-6-

GS-1816 on the Al Report, all hires are probably under
delegated examining authority.  Justice does not have
direct hire authority.  See also, GS-301 & 1152.  There
is no delegated examining authority for these series.
Series 1910 has delegated examining authority at GS-5
level only.  JG will see if he can get correct information
from agencies.

3, 4 & 5  <u>JG</u>:  Because of reduced hiring, no
reports on recruiting efforts have been requested from
agencies.  May be available from EEOC under FEORP.  When
consent decree went into effect, consent decree was posted
in job information centers.  He doesn't know what informa-
tion was actually disseminated.

6.  Mailing list has not been used; it will be
in future.

ATTACHMENT  C

UNCLASS

8/9/83    Luevano - Monitoring Committee Ward, Green, Blankenstein,
10:00 A.M.        BLG, JHE and RTS

      Statistical Reporting - Agenda Part B

      Item 1.  Jim Green will check it out and get back to me
if there is any problem.  Paul Kaplan.

      Item 2.  OPM sent letter to FDIC a couple of weeks ago and
asked for it on a priority basis.  Will be in 1983 report.
Separate 1982 report.

      Item 3.  State Dept. sent letter on same day as FDIC.
Separate 1982 report; will be in 1983 report.

      OK to change reporting year under ¶ 8(k).

      Item 4.  BW & JG - numbers are in to OPM.  Have to be
analyzed and broken down.  JG:  couple of weeks.

      Will have to ensure that SSN's are recorded in the future.
Gov't to get back to us when it has results on nos. of
persons who did not respond to race - identification question.

      In future, around June 1, we will be able to get full-year
data for previous year.  Six-month reporting lag.

      Hoping for sometime in September 1983 for end-of-year 1982.

      We need both separate six-month data and full-year data.

      Item 5.  JG - "Asterisk" positions are those for which one
can be hired in either a PACE or non-PACE slot in a job category.
Eleven total - 301 General Clerical & Admin, etc.

Has to separate PACE from non-PACE hires.

      The non-PACE CS certs right now do not include any PACE
slots, because PACE is still being used.  In the future, there
may be mixtures.  Ps want to avoid them.

      JG will try to figure out a way to factor out the problem.
He will get back to us.

      PACE registers used until exhausted or late Fall 1982.
Varying phase-in time for Schedule B.  60 days from August 31.

      Most of the "other" internal placements would be into
PACE slots because there'd be little point to it.

      John - should break down also.  JG will check on burden
BLG - ASAP.

Item 6 - JG will get us a Schedule B package.  BW says, why relevant?

BLG - Our agreement is that Schedule B hires will be treated in same manner as PACE hires, including conversions. BW & PB agreed.

Jim will check with staffing on how best to report.  No promotion to GS-9 without conversion.

See official FPM Bulletin we are to get.  213-32, Sept. 9, 1982.

GS-5 to GS-7 is noncompetitive.  RTS Agreement covers both promotions and conversions.

Govt. disagree - promotions should be virtually automatic. Promotions to GS-7 not picked up in CPDF.

Coversions are a kind of accession, and should be picked up separately, not buried in "Other" column.

All agreed that terminations should be roughly proportionately so that conversion rates should be reliable.

Item 7.  Start-up problems in first-year reports.  Six-month lag time.

Item 8.  BW:  BW has been on GAO, and we should get data in about a month.

Nonstatistical Reporting (Part A)

Item 1.  Test development reports.

BW thinks only a summary is needed, and it is irrelevant that it is boilerplate.  At a later stage, when APE ceased, govt. has to give us much fuller data.

JG - we were given the computer specialist.

BLG - we can request under ¶ 27.

Ps to send a letter detailing what we need.

BW will contact FDIC to get test study.  CRESS dropped. 90,000 applied.  26,000 tested, 14 hired, 6 dropped out.

Item 2.  BW & JG will get us a copy of the FPM letter. The letter was a last-ditch effort to get the data from agencies. It'll take a week or so to get them.

Item 3.  BW says Schedule B is an AEP.  RTS - Does not meet the definition of AEP in ¶ 8(j) of Decree at p. 15.

JG - relative weight, etc., are up to agency.

- 2 -

BLG - then reports have to be made under ¶ 26.

BW & PB - agreed.

BLG - Without agreeing, at a minimum, procedure is con-
tinuing and does not end until people are in same position as
PACE hires.

BW - Conversion has nothing to do with Decree.

JG - people have to go through a competitive process to
become converted at GS-9.

BLG - not what we agreed.  Then selectees are not the same
as PACE hires.

PB - agreed that they have the same promotion rights.

BLG - but a competitive procedure is not the same.

BW - only semantics.  The competitive procedure is not a
paper-and-pencil test, but a supervisory evaluation.  Different
routes.

BLG - Some proportion?

BW:  Some proportion will get promoted to GS-9.

JG:  Conversion process - year as 5, year as 7, no
competition between them.  To get to 9, have to take a competitive
procedure to get to 9 and change from excepted service to
competitive service.  Like the mid-level JFA, it's an evaluation
of experience.  Who has better experience as a Customs Inspector,
GS-9, than a Customs Inspector, GS-7.  Local area office will
ask OPM for a mid-level register.  Others from outside can
compete.  Few do in practice at mid-level, he says.

BLG - not same job because promotion potential not the same.

BW & PB - semantic difference, but theoretical rather than
actual.  It just won't happen.

BLG - then full procedure is the AEP, at best.

Govt. disagreed.

BLG - how do you know what will be the competitive pro-
cedure?  What about a paper-and-pencil test?  How sure it could
not be used in the future?

Govt. says that evaluation is basically the same as non-
competitive procedure.

JO:  OPM can delegate to agencies the authority to develop
and use a competitive procedure for conversions.  Treasury already
delegated.  Nothing to say Treasury could not use a paper-and-
pencil test.

RTS we need to have data on those eligible for con-
version, as well as those being converted.  BW - That's fair.

BLG - we need to set these things down.

BW - Gov't has agreed to provide ¶ 26 reports on agency
Schedule B reports, provide numbers on conversions and eligibles
not converted.  Only considering request on conversion procedures.

Afternoon session

RTS - if gov't is going to take position that conversions
are not covered, it asks for trouble.  To give agencies such
advice invites results that we'd have to challenge.

BW - info to be provided.

(1) accurate summary of what the procedures are.  Type
of info described in ¶ 8(j).

(2) procedures to be used for conversions at GS-9 level.

(3) statistical tracking of GS-7 to GS-9, eligibles &
conversions.

Items 5 & 6 - same as part B

Item 7 - FPM Letter June 1983 on special programs - JG
will give to us.

<u>Substantive Compliance</u> (Part C)

Item 2 - BW:  Thinks there's a problem with information
reported.  At DOJ, Job 1816, has got direct hire & dlegated
examining.  Agencies do not have both authorities simultaneously
for the same job.  BW - will go back to DOJ to check for
reliable reports.

The 32 JG: Job 301 - no delegated examining authority for the job.
are a mistake.

Job 1910 - del. exam. is probably pretty accurate for GS-5,
but no authority at GS-7 level.  Could be an illegal appointment.

Job 1152 - no delegation for this job.

Item 1 - All sources are the standard

Job 0334 - total for all sources

586 all

83 B - 15%

19 H - 3%, under 80% level

- 4 -

```
69-5:  291            GS: 7    295 all
      28 B - 9.52%          55 B - 19%
      10 H - 3.4% H          9 H   3.1% H
```

| GS-0993 | | GS-5 | GS-7 |
|---|---|---|---|
| Total | 425 | 354 | 71 |
| B | 73 - 17% | 59 - 17% | 14 - 20% |
| H | 5 - 1.2% | 5 - 1.4% | 0 - 0% |

| GS-1102 | | GS-5 | GS-7 |
|---|---|---|---|
| Total | 643 | 441 | 202 |
| B | 100 - 16% | 69 - 16% | 31 - 15% |
| H | 22 - 3/4% | 11 - 2.5% | 11 - 5% |

| GS-1169 | | GS-5 | GS-7 |
|---|---|---|---|
| Total | 288 | 129 | 163 |
| | 38 - 13% | 15 - 12% | 23 - 14% |
| | 16 - 5.5% | 8 - 6.2% | 8 - 4.9% |

Item 3 - ¶ 16(e)

    EEOC has FEORP data.  OPM sent lists of institutions out.
No monitoring because so little outside hiring.

Item 4

    JG - OPM has told all area offices, JIC's, etc., of special
programs.

    JG - Consent Decree posted, and that's all he knows of.

Item 5 - only the original notice for the fiarness hearing.

    BLG - agencies should provide notice of special programs.

Item 6 - OPM has not done it.  OPM will send out FPM Bulletin.
Schedule B - 5700 appointments authorized.

*Treen, Joyce J*

CO-384 New 2/84

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON, D.C. 20001

# NOTICE

Guevara, et al.
_____
Plaintiff(s)

vs.

C.A. No. ___79-271___

Devine, et al.
_____
Defendant(s)

The following material has been filed and assigned these numbers on the docket sheet:

| Number(s) assigned: | Material | Filing Date |
|---|---|---|
| | Deposition(s) | |
| | Transcripts | |
| | Bulky Pleadings | |
| | attachments Exhibits | 6/5/87 |
| | Sealed Material | |

THIS NOTICE IS PLACED IN THE FILE
JACKET TO ACCOUNT FOR NUMBERS ASSIGNED
TO MATERIAL FILED IN THIS CASE BUT
NOT FILED IN THE CASE JACKET

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )        Civil Action
                                     )        No. 79-0271 (JHG)
CONSTANCE HORNER, Director.          )
    Office of Personnel              )
    Management, et al.,              )
                                     )
        Defendants.                  )
_____)

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A DETERMINATION THAT THE USE OF SCHEDULE B
AUTHORITY FOR HIRING DOES NOT CONSTITUTE AN
"ALTERNATIVE EXAMINING PROCEDURE" WITHIN THE MEANING OF
THE CONSENT DECREE, AND MOTION FOR INJUNCTIVE RELIEF

INTRODUCTION

In 1981, the parties to this action entered into a Consent
Decree designed to accomplish two basic purposes:  to increase
minority hiring into professional and administrative career
("PAC") positions through elimination of the PACE, and to replace
the PACE with alternative examining procedures designed to
examine for a particular job category.  The Decree did not
specify the nature or content of the alternative examining
procedures that OPM was to develop, and nowhere mandated that all
the alternative examining procedures must be competitive
examinations.  The parties agreed that the Decree would end five
years after the implementation of alternative examining
procedures for the covered occupations.

In August of 1982, OPM announced that it was eliminating the
PACE as of that date, and that, thereafter, hiring into those
former PACE occupations with relatively few external hires would

be accomplished through use of the Schedule B hiring authority, a procedure that is tailored to examining for particular occupations.

Despite full knowledge of the use of Schedule B hiring, plaintiffs did not seek a ruling from the Court in 1982 that such use violated the Consent Decree, nor did they do so at any time during the years that followed. While purportedly reserving their right to challenge the use of Schedule B, plaintiffs declined to file any objection with the Court for more than four-and-one-half years, secure in the knowledge that minority hiring more than quadrupled after the implementation of the Schedule B authority.

Now, however, on the virtual eve of the Decree's expiration, plaintiffs have asked the Court to rule that OPM should not be credited for its use of Schedule B hiring despite the enormous gains in minority representation in PAC jobs, and that the Decree should continue indefinitely. This request should be denied.

Defendants have achieved the two basic goals of the Decree. Minority hiring has increased fourfold and the PACE has been replaced with examining procedures tailored to particular occupations. Job-specific competitive examinations have been developed for occupations that account for 55-60 percent of all external PAC hiring. The remaining external PAC hiring is spread across such a large number of occupations, each with such a small number of hires per year, that development of job-specific competitive examinations for those occupations is not

practicable.  Schedule B hiring is the only practicable
alternative examining procedure for those occupations at the
present time.  The Consent Decree, which must be strictly
construed, nowhere forbids the use of Schedule B authority as an
alternative examining procedure, and certainly did not divest OPM
of its statutory authority under 5 U.S.C. § 3302 to make
necessary exceptions from the competitive service.  Defendants
have not violated the Decree, and therefore no basis exists for
extending the Decree.

Plaintiffs' request for injunctive relief should also be
denied.  Their request for an injunction against a layoff at the
Jacksonville Naval Supply Center is moot as the planned layoff
has been cancelled.  Their request for an immediate conversion of
Schedule B employees to competitive status seeks relief which the
Court already has stayed in NTEU v. Horner, No. 84-2573, slip op.
(D.D.C. Mar. 30, 1987), in order to avoid interfering with OPM's
appeal in that case.  Accordingly, plaintiffs' motion should be
denied in all respects.


   I.   THERE IS NO BASIS FOR PLAINTIFFS' REQUEST
        TO EXTEND THE CONSENT DECREE INDEFINITELY

Plaintiffs' motion essentially asks the Court to extend the
Consent Decree indefinitely.  According to plaintiffs, the five-
year retention of jurisdiction under the Decree does not even
begin to run until OPM implements competitive examinations for
each and every one of the 118 occupations formerly covered by the

PACE. This interpretation is not supported by either the letter or the spirit of the Decree.[1]

Plaintiffs' motion also appears to be based in part on the allegedly inferior rights of Schedule B employees as compared to competitive service employees. See Pls' Motion at 11-14. However, that issue already has been addressed fully in NTEU v. Horner, and any harm to these plaintiffs that is arguably attributable to their "inferior status" will be redressed should the Court of Appeals concur with the Court that such relief is warranted. For that reason, the status of Schedule B employees should have no bearing on whether Schedule B is a permissible hiring device under the Decree. As shown below, once the status question is put aside, there can be little doubt that OPM's use of Schedule B to meet its Decree obligations was reasonable, fully comported with the purposes of the Decree, and, in fact, ensured that the goals underlying the Decree would be achieved.

---

[1] At a minimum, plaintiffs' interpretation is plainly wrong with respect to the occupations for which a competitive alternative has been in place for more than five years. Termination of the Decree is not an "all or nothing" proposition. Rather, the Decree ends "with respect to any job category listed in Appendix A, five years after the cessation of the use of the PACE results for the job category and the implementation of an alternative examining procedure for that job category at the GS-5 or GS-7 level." Decree ¶ 7 (emphasis added). Thus, with respect to the nine occupations for which a competitive alternative was implemented prior to the effective date of the Decree, there can be no question that the Decree already has expired for those occupations, as plaintiffs have been advised.

- 4 -

A.  **Defendants Have Achieved The Two Basic Goals Of The Consent Decree**

At the outset, plaintiffs' motion to extend the Decree should be denied because defendants have achieved the two basic goals of the Decree.  As the Court is aware, the Consent Decree was designed to:  (1) increase minority hiring into PAC occupations where blacks and Hispanics historically had been underrepresented, and (2) replace the PACE with alternative examining procedures tailored to a particular occupation or group of related occupations.  Consent Decree ¶¶ 2(a), 13(a); <u>Luevano</u>, 93 F.R.D. 68, 78 (D.D.C. 1981).  In the less than five years since the abolition of the PACE, the defendants have succeeded in accomplishing both of these goals.

There is no dispute that minority hiring into PAC jobs has increased dramatically since the abolition of the PACE in August of 1982.  In the years immediately prior to the abolition of PACE, on average, approximately 4% of external PAC hires were black, and 2% were Hispanic.  For the first three years after the abolition of PACE,[2] 20% of all external PAC hires were black and 7% were Hispanic.  If only Schedule B hires are considered, the results are even more impressive.  Over 23% of Schedule B external PAC hires during the period 1982-1985 were black, and over 8% were Hispanic.[3]  Thus, the government has clearly met the

_____

[2] Hiring data for 1986 are not yet available.

[3] These figures are derived from a series of documents entitled "Appointments to Occupations Covered By The PACE, Report A-1."  Copies of these reports have been provided to plaintiffs' counsel pursuant to the Decree's reporting requirements.

Decree's goal of increasing minority hiring, and the Schedule B
authority has been an important tool in attaining that goal.[4]

Likewise, the government has met the Decree's goal of
replacing PACE with hiring procedures that are tailored to the
particular occupation.  It has done so in two ways.  First, OPM
has developed a total of 16 job-specific competitive examinations
for the traditionally "big-fill" PAC occupations.[5]  These 16
competitive examinations account for an annual average of 55-60
percent of all external PAC hiring.  Declaration of Curtis J.
Smith ¶ 4.[6]  Second, for the remaining 100 or so "small-fill"
occupations, the Schedule B authority requires each agency to
develop job-specific hiring procedures for each occupation.
Examples of these job-specific Schedule B hiring plans are
attached as Exhibits 2 and 3.  Thus, the hiring system now in

---

[4] In addition to increasing minority hiring overall, the
Decree is also designed to eliminate adverse impact against
minorities in each job category.  Plaintiffs' counsel has advised
us that plaintiffs' experts have identified adverse impact in 15
of the 118 former PACE occupations.  Defendants do not concede
that there has been any adverse impact, or that there has been
adverse impact to the degree plaintiffs contend.  The issue of
adverse impact has no bearing on this motion, however, as the
Decree provides that "the absence of examining procedures for
some or all of the PACE occupations which satisfy the
government's long term objective [of eliminating adverse impact]
shall not constitute cause for the extension of the period for
retention of jurisdiction."  Plaintiffs concede this point.
Pls' Motion at 5 n.5.

[5] Nine of these competitive examinations were developed
prior to the effective date of the Luevano Decree.  The remaining
seven examinations were developed and implemented at various
times after the abolition of the PACE.

[6] The Smith Declaration was submitted in NTEU v. Horner in
support of Defendants' Motion For A Stay Pending Appeal.  It is
reproduced here as Exhibit 1 for the Court's convenience.

- 6 -

place for PAC occupations does involve job-specific hiring procedures as contemplated by the Decree.[7]

Despite the government's attainment of the Decree's two basic goals, plaintiffs seek an indefinite extension of the Decree. Having waited until the virtual expiration of the Decree, and having reaped the benefits of the substantially increased minority hiring over the last five years, plaintiffs now contend the five-year period for retention of the Court's jurisdiction has not yet even begun to run, because the Schedule B hiring authority is not a permissible "alternative examining procedure." For the following reasons, this argument should be rejected.

_____

[7] Plaintiffs' assertion that OPM does not review the agencies' Schedule B hiring procedures is largely incorrect. Pls' Motion at ¶ 12. Although agencies are not required to detail their Schedule B hiring procedures when they initially apply to OPM for Schedule B authority, most agencies typically do summarize their procedures, thereby giving OPM the opportunity to review them at the outset. In addition, OPM engages in routine oversight, both formal and informal, of agency hiring procedures to ensure that minimum qualification standards (X-118 standards) are being met, that appropriate veterans preference is being afforded, and that hiring decisions are merit based. OPM's oversight efforts suggest that agencies have been very conscientious in exercising their Schedule B hiring authority. In the five years since the implementation of Schedule B hiring, OPM has not found any agency to be using improper procedures. See also GAO Report to the Chairwoman of the House Subcomm. on Civil Service, "Appointments to Professional and Career Positions," (Dec. 10, 1984) at 4 (hereinafter "GAO Report") (finding "no indication that [agencies' Schedule B hiring procedures] violate the requirements of merit selection.") (Exhibit 4).

B.   The Consent Decree Does Not Require That <u>All</u>
     Alternative Examining Procedures Be
     Competitive Examinations, And Does Not Supplant
     OPM's Statutory Authority To Make "Necessary
     Exceptions" From The Competitive Service

1.   <u>Consent Decrees Must Be Strictly Construed</u>

The standards for construing a consent decree are well
established.  Consent decrees must be strictly construed.  "[T]he
scope of a consent decree must be discerned within its four
corners, and not by reference to what might satisfy the purposes
of one of the parties to it."  <u>United States v. Armour & Co.</u>, 402
U.S. 673, 682 (1971); <u>United States v. Western Elec. Co</u>, 797 F.2d
1082, 1089 (D.C. Cir. 1986).  Because a defendant waives its
constitutionally protected right to litigate the issues raised in
the lawsuit by entering into a consent decree, "<u>the conditions
upon which he has given that waiver must be respected</u>, and the
instrument must be construed as it is written, and not as it
might have been written had the plaintiff established his factual
claims and legal theories in litigation."  <u>Armour</u>, 402 U.S. at
682 (emphasis added).

Given these principles, OPM can only be bound to what it
expressly promised in the Decree.  Similarly, it can only be held
to have given up those rights which it expressly waived in the
Decree.  If the Decree is silent or ambiguous on a point, or if
the parties did not consider a point, the Court may not simply
read an obligation into the Decree.  <u>Firefighters Local No. 1784
v. Stotts</u>, 467 U.S. 561, 574-75 (1984) (consent decree could not
be construed as altering city's seniority system for layoffs as

- 8 -

no such term was included within the four corners of the decree).
As the D.C. Circuit recently held in refusing to read a
geographical limitation on competition into a consent decree:

> [W]e think it likely that the drafters of the consent
> decree simply did not consider such a possibility [that
> a party to the decree would want to compete in a
> different geographical area].  Had they considered it,
> they might have proscribed it ....  The question before
> the court, however, is whether we may now read such a
> proscription into the decree.  Under <u>Armour</u> and <u>ITT</u>
> <u>Continental Baking</u>, it is clear that we may not.

<u>Western Electric Co.</u>, 797 F.2d at 1091.

> 2.  Nothing Within The Four Corners of the Decree
>     <u>Proscribes The Use Of Schedule B Hiring</u>

With the foregoing principles in mind, the Court must reject
plaintiffs' interpretation of the Consent Decree as requiring the
development of competitive examinations for all the former PACE
occupations.  Nothing in the Decree requires that all the
alternative examining procedures be competitive examinations.
The parties to the Decree simply did not foresee the
circumstances, described in part I.C. below, that necessitated
placing many of the former PACE occupations in the excepted
service, and so did not have any occasion to consider or
negotiate whether Schedule B would be a permissible alternative
examining procedure for purposes of the Decree.  Nor did the
parties ever agree to strip OPM of its statutory authority under
5 U.S.C. § 3302 to except former PACE occupations from the
excepted service where appropriate.  The Court may not now read
into the Decree a requirement upon which the parties themselves

- 9 -

did not agree.  <u>Stotts</u>, 467 U.S. at 574-75; <u>Western Electric Co.</u>, 797 F.2d 1091.

The starting point for analyzing the Decree is the definition of "alternative examining procedure" in paragraph 8(j) of the Decree:

> The phrase "alternative examining
> procedure" shall mean the group of factors,
> including test scores and any other criteria
> which are considered, and the relative use
> made of each such factor, in making an
> appointment decision with respect to an
> applicant (as that term is defined in ¶
> 8(b)(4)), for employment at the GS-5 or GS-7
> level in a job category listed in Appendix A.

Two things are noteworthy about this definition.  First, absent from this definition is any use of the term "competitive." If the parties had intended to ensure that all alternative examining procedures would be competitive, it would have been very easy to explicitly so provide.

Second, rather than rigidly prescribing a particular form of alternative examining procedure, the Decree wisely adopted a very general definition, thereby permitting OPM to use its expertise to develop new and possibly innovative alternative examining procedures, so long as those procedures were tailored to examining for a particular occupation or group of related occupations.  The Schedule B hiring procedures in use today clearly constitute "alternative examining procedures" under this broad definition because they constitute a "group of factors"

that are used to examine for a particular occupation.[8]   See
Exhibits 2 and 3.

The other provisions of the Decree upon which plaintiffs
rely similarly do not support plaintiffs' contention that all
"alternative examining procedures" must be competitive
examinations.  Paragraph 1 of the Decree, cited at page 7 of
plaintiffs' motion, states that the Decree "does not resolve the
claims of any class member involving the use of the PACE or of
PACE test scores for any purpose other than competitive external
hiring."  All this means is that, to the extent the PACE had been
used for promotion and other internal placement purposes, the
rights and remedies of the plaintiffs were not affected by the
Decree.  This interpretation is clear from the class definition.
Decree ¶ 3 (class includes "[a]ll blacks and Hispanics who have
taken the PACE for hire, but not promotion into entry-level PACE
jobs ...." (emphasis added)); see also Decree ¶ 6(c) ("Decree
does not resolve the claim of, or otherwise bind, any person who
has been adversely affected by any use of the PACE for internal

---

[8] There is no dispute that the terms "examination" or
"selection procedure" are terms of art that do not necessarily
denote a pencil and paper cognitive ability test such as the
PACE.  29 C.F.R. § 1607.16(Q).  In fact, several of the
competitive alternative examining procedures that OPM has
implemented for former PACE occupations, and which plaintiffs
have never challenged, do not use a pencil and paper test.  The
competitive examinations for Criminal Investigator, General
Investigator, and Game Law Enforcement Agent are of this type.
Each of these competitive examinations was developed prior to the
Consent Decree.  Smith Dec. ¶ 4 n.2.  The seven competitive
examinations developed since the Decree all have a written
component of some kind, but none includes a cognitive ability
test such as the PACE.



placements.")  Nothing in paragraph 1 states that all alternative examining procedures must be competitive.

Plaintiffs correctly note that the word "competitive" is used in three places in the Decree in apparent reference to alternative examining procedures.  Pls' Motion at 5-7.  Paragraph 7 states that, when a competitive procedure is used, any adverse impact resulting from the statutory requirement to grant eligible applicants veterans' preference will be discounted.  Paragraph 13(a) states that, when a competitive procedure is used, it must be job-specific.  Paragraph 25(a) states that when a particular position is filled on the basis of a competitive procedure, defendants must provide plaintiffs with certain demographic information regarding the applicants for that position.

The use of the word "competitive" in these instances was intended simply to differentiate between external hiring and internal placement, the latter not being covered by the Decree. Although they may reflect less than precise draftsmanship, these provisions cannot be held to impose a requirement that all alternative examining procedures be competitive.  Such a construction would be contrary to the much more specific definition of "alternative examining procedure" in paragraph 8(j), which does not impose such a requirement.  It would also have the effect of repealing <u>by implication</u> OPM's statutory authority under 5 U.S.C. § 3302 to make necesssary exceptions from the competitive service, which is contrary to the principles of construction of consent decrees.  See <u>Stotts</u>, 467 U.S. at 574-

- 12 -

75; <u>Western Electric Co.</u>, 797 F.2d 1091. Despite the use of the word "competitive" in these three paragraphs, both plaintiffs and defendants have construed the paragraphs as applying to any type of alternative examining procedure, whether it be a competitive or noncompetitive procedure.[9]

Plaintiffs also suggest that the Court's approval of the Decree was conditioned upon a requirement that all alternative examining procedures would be competitive. Pls' Motion at 7-9. Nothing in the Court's opinion giving final approval to the Decree imposes such a requirement. To be sure, the Post Affidavit submitted in support of the Decree's provision allowing for a three-year phase out of the PACE, Decree ¶ 13, assumed that most of the alternative examining procedures would be competitive, and that development of competitive alternatives would be very time-consuming. <u>See</u> Pls' Motion at 7-8. While the Court took note of those facts in authorizing a three-year phase-out of the PACE, <u>Luevano</u>, 93 F.R.D. at 79, it nowhere conditioned its approval of the Decree on a requirement that all alternative examining procedures be competitive.[10]

---

[9] Accordingly, defendants have provided demographic data to plaintiffs regarding Schedule B hires pursuant to paragraph 25(a), and have ensured that Schedule B procedures are job-specific pursuant to paragraph 13(a). The parties also agree that the effect of veterans preference is a defense to adverse impact under Schedule B hiring under paragraph 7, just as it is a defense with regard to competitive hiring.

[10] Significantly, as soon as it became clear to OPM that <u>de minimus</u> hiring needs and other factors made development of competitive alternatives for many of the former PACE occupations impractical, OPM abolished use of the PACE immediately, rather

- 13 -

Finally, and most significantly, neither the Decree itself nor the Court's opinion approving the Decree anywhere suggests that OPM was signing away its statutory right and obligation under 5 U.S.C. § 3302 to make "necessary exceptions from the competitive service" by entering into the Decree.  That the parties and the Court may have assumed, without so providing, that most of the alternative examining procedures would be competitive examinations did not preclude OPM from excepting many of the former PACE occupations from the competitive service in light of changed circumstances.  If the parties truly had intended to strip OPM of its statutory authority under section 3302, surely they would have expressly included such a material term within the four corners of the Decree.  Cf. Stotts, 467 U.S. at 574 (if consent decree had been intended to alter city's seniority system in the event of a layoff, "there would have been an express provision to that effect.")  To read such a limitation on OPM's powers into the Decree now would violate the principle that "the conditions upon which [a party] has given that waiver [of the right to litigate] must be respected" in construing a consent decree.  Armour, 402 U.S. at 682.

---

10(...continued)
than taking advantage of the three-year phase-out period allowed by the Decree.  This action shows that OPM was not trying to have it both ways, and that the Post affidavit was made in good faith.

- 14 -



3. Construction Of The Decree As Permitting
The Use Of Schedule B Hiring Would Not
Deprive Plaintiffs Of Any Rights Under The
Decree, Or Complicate The Computation Of
The Period For Retention of Jurisdiction

Plaintiffs contend that, if the term "alternative examining procedure" is construed as encompassing Schedule B hiring procedures, they will be deprived of their right under paragraph 26 of the Decree to comment on the government's replacement alternative examining procedures. Pls' Brief at 5. That is clearly not the case. Not only have plaintiffs been allowed to review and comment on the new competitive examinations developed since the start of the Decree, which account for a large percentage of all PAC hiring, they also have been provided with the agencies' Schedule B hiring plans for review and comment.[11] Thus, the use of Schedule B hiring has not deprived plaintiffs of their right to review and comment on OPM's alternative examining procedures.[12]

Plaintiffs also seem to suggest that the Decree should not terminate because the Schedule B procedures have not been validated. Pls' Motion at 10-11. However, plaintiffs can claim

---

[11] By letter dated March 27, 1984, defendants' counsel forwarded to plaintiffs' counsel copies of the Schedule B procedures for approximately 15 agencies. Plaintiffs made no comment on any of those procedures.

[12] Plaintiffs cannot argue that paragraph 26 gave them a right to review and comment on written pencil and paper tests. "Altenative exmaining procedure" is nowhere defined as necessarily including a pencil and paper test. Many competitive examinations do not use a pencil and paper test. See note 8 supra.

- 15 -

no right to validation under the Consent Decree.  The Decree explicitly provides that "[t]he absence of examining procedures which have been validated in accordance with Title VII and the Uniform Guidelines for some or all of the PACE occupations at the end of that five year period shall not by itself constitute cause for extension of the period for retention of jurisdiction." Decree ¶ 7 (emphasis added).

Plaintiffs next contend that construing the term "alternative examining procedure" to include Schedule B hiring would complicate the calculation of the five-year period of retained jurisdiction.  Pls' Brief at 2-4.  Of course, this argument has nothing to do with whether Schedule B is a permissible alternative examining procedure under the terms of the Decree.  If it is permissible, alleged complications in computing time limits are no bar to its use.  In any event, calculating the five-year period from the date of an agency's implementation of a Schedule B hiring procedure is no more difficult than calculating it from the date of the implementation of a competitive procedure.

First, plaintiffs' argument that, since agencies are typically granted Schedule B hiring authority for discrete periods of time, all those periods would have to be "tacked" together in computing the five-year period, wrongly assumes that only the time during which an agency is actually involved in the hiring of new employees counts toward the five-year period. This interpretation finds no support in the Decree.  See Decree ¶

- 16 -

7.    Agencies request Schedule B authority from OPM whenever they have the need to hire new employees.  Once the need is filled, no more hiring is done until the need again arises and the agency again requests hiring authority.  This system of "on again, off again" hiring is no different from the hiring practices of an agency using a competitive examination.  If a competitive examination had been put into place five years ago for an occupation, but the affected agency or agencies did all their hiring each year during the month of June, plaintiffs could not plausibly maintain that only five months of the five-year period of retained jurisdiction had elapsed.  <u>See</u> Decree ¶ 7.  The result should be no different simply because agencies using Schedule B need to get authorization from OPM before hiring new employees.

Second, plaintiffs' argument that "there would have to be different periods of retention of jurisdiction for each location of each agency at which Schedule B authority was put into effect" is also incorrect.  Pls' Brief at 3.  Expiration of the Decree is based on implementation of an alternative examining procedure for particular <u>job categories</u>, not on implementation at particular locations.  Decree ¶ 7.  It is absurd to think the Decree would not expire with respect to an occupation with a competitive examination until five years after an agency had hired at least one new employee at every one of its perhaps hundreds of locations.  It is equally absurd to suggest that such a result

- 17 -



must obtain just because an agency is using Schedule B hiring procedures rather than a competitive examination.[13]

The most logical date from which to measure the beginning of the five-year period of retained jurisdiction for Schedule B occupations is the date upon which agencies could no longer use the PACE for any purpose relating to external hiring and upon which the Schedule B hiring authority first became available for use. That date was November 9, 1982. Accordingly, the Decree terminates on November 9, 1987.

     C.  OPM's Implementation Of Schedule B Hiring
        Authority Is A Permissible Exercise Of Its
        Retained Statutory Right To Make Necessary
        Exceptions From The Competitive Service

As shown in part I.B. above, the Consent Decree did not strip OPM of its statutory right under 5 U.S.C. § 3302 to make necessary exceptions from the competitive service. In this section, we demonstrate why it was necessary for OPM to except many of the former PACE occupations from the competitive service. As the Court already is familiar with these reasons due to the NTEU litigation, we merely summarize them here, and respectfully

---

[13] Plaintiffs' argument that the five-year period should not begin running for Schedule B occupations until appointees are promoted to GS-9 makes no sense. If Schedule B is a permissible alternative examining procedure, the five-year period begins running from the time it is implemented as a hiring procedure, see Decree ¶ 7, not from the time appointees are subsequently promoted to GS-9.

refer the Court to our briefs in <u>NTEU</u> for a fuller discussion of these points.[14]

The Consent Decree allowed a three-year phase-out of the PACE, but required that, within one year after the effective date of the Decree, at least 50% of all external hires into PAC positions had to be made using an alternative selection procedure.  Decree ¶ 13(a).

OPM immediately began to work on competitive examinations for seven of the largest fill PAC occupations.  (Competitive alternatives had already been developed for nine other covered positions prior to the effective date of the Decree.)  Within several months after the effective date of the Decree, however, it became apparent that OPM could not meet the timetable for phasing out the PACE through development of competitive alternatives alone.  The main reason for this was a reduction-in-force that cut OPM's staff of test developers by approximately 50%.  <u>See</u> GAO Report at 8 (Exhibit 4).

It also soon became apparent that development of competitive alternatives for many of the former PACE occupations would be impractical due to reduced hiring needs in those occupations.  Upon assuming office in January of 1981, President Reagan imposed a government-wide hiring freeze with the goal of achieving "a significant reduction in the size of the federal workforce."

_____

[14] As the Court is aware, defendants' position is that OPM's action is a decision committed to agency discretion and not judicially reviewable.  Because the Court already has rejected that contention in <u>NTEU</u>, defendants will not belabor the point here.

<u>NTEU v. Reagan</u>, 509 F. Supp. 1337, 1348 (D.D.C. 1981), <u>aff'd in
part, remanded in part,</u> 663 F.2d 239 (D.C. Cir. 1981).  It was
expected that most future PAC fills would be accomplished through
internal placement rather than external hiring.

Faced with these unanticipated events, OPM decided to meet
the timetable for phasing out the PACE by placing the former PACE
occupations in the excepted service, while at the same time
continuing to develop competitive alternatives for the
historically big fill occupations.  In announcing this decision
in the Federal Register, OPM gave the following three reasons for
its action:  1) the absence of any alternative written tests to
substitute for the PACE; 2) the substantially reduced external
hiring needs for the affected PAC positions; and 3) the
prohibitive cost of developing competitive examinations for
occupations with relatively few hires.  47 Fed. Reg. 38258 (Aug.
31, 1982).

Subsequent events have borne out the reasonableness of OPM's
action.  Hiring into the PAC occupations for which no competitive
alternative has been developed has been very low.  In fact, 38 of
those positions had zero external fills during the three-year
period 1983-1985.  Smith Dec. ¶ 5.  An additional 37
occupations had 20 or fewer external fills during that same
period.  <u>Id</u>.  Development of competitive alternatives has proven
to be extremely expensive.  The seven competitive alternatives
developed since the effective date of the Decree have cost a
total of $4.5 million.  <u>Id</u>. ¶ 8.  Although OPM has developed

- 20 -



competitive alternatives for relatively few of the former PACE occupations, those examinations account for an annual average of approximately 55-60% of all hires into PACE occupations. Id. ¶ 4.

OPM has concluded that development of competitive alternatives for the remaining PAC jobs would not be cost-justified given the small number of external hires into those positions. Nevertheless, OPM continues to research new and innovative examining techniques that may, in the future, serve as competitive alternatives for the existing Schedule B procedures. Smith Dec. ¶ 10 n.5.

In short, OPM's placement of many of the former PACE occupations in the excepted service was reasonable under all the circumstances and did not violate OPM's obligations under the Decree. Therefore, no basis exists for extending the Decree.

II.  PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF
     SHOULD BE DENIED

In addition to their request for declaratory relief, plaintiffs also seek an injunction against any layoffs in the Naval Supply Center of the Jacksonville, Florida Naval Air Station. However, such an injunction is unnecessary because the planned layoff already has been cancelled. See Exhibit 5. Plaintiffs' requested relief is therefore moot.

Plaintiffs also seek the immediate conversion to competitive status of all affected Schedule B employees in PAC positions. But the Court already has stayed that relief pending appeal of

- 21 -

the NTEU case, finding that "the rights of excepted service
status employees are not so inferior that this court must deprive
the court of appeals of an opportunity to address the important
questions raised by this case." NTEU v. Horner, No. 84-2573,
slip op. at 6 (Mar. 30, 1987). Obviously, granting plaintiffs'
requested relief in this case would undermine the Court's
previous order in NTEU.

In addition, there is even less reason for immediate
conversion now than there was at the time of the Court's stay
ruling in NTEU. One of the plaintiffs' alleged harms from
Schedule B status is that it is more difficult for them to be
promoted to GS-9 after serving their minimum time in grade than
it is for their competitive service counterparts. Pls' Motion at
11. To the extent this was ever a problem,[15] it has now been
cured by issuance of an Executive Order which permits Schedule B
PAC employees to be noncompetitively converted to GS-9.
Executive Order 12596 (May 7, 1987), reprinted in 52 Fed. Reg.
17537 (May 11, 1987) (Exhibit 6).

CONCLUSION

Given defendants' attainment of the basic goals of the
Decree, the absence of any requirement in the Decree that
alternative examining procedures be competitive examinations, and
OPM's reasonableness in excepting many of the former PACE
occupations from the competitive service, the Court should deny

---

[15] See Smith Dec. at ¶ 6 ("OPM is not aware of any systemic
problem that has prevented the conversion of Schedule B
employees.")

- 22 -

plaintiffs' motion for an extension of the Decree.  The Court
should also deny plaintiffs' requested injunctive relief.

                                   Respectfully submitted,


                                   RICHARD K. WILLARD
                                   Assistant Attorney General

                                   JOSEPH E. DIGENOVA
                                   United States Attorney


OF COUNSEL:
JAMES GREEN                        RICHARD GREENBERG
Assistant General Counsel         BARBARA WARD
Office of Personnel               JEFFREY S. PAULSEN
  Management                      Department of Justice
                                  Room 3527 - Civil Division
                                  10th & Pennsylvania Ave., N.W.
                                  Washington, D.C.  20530
                                  Telephone:  (202) 633-3527

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al</u>.,                    )
                                                        )
        Plaintiffs,                              )
                                                        )
        v.                                       )    Civil Action
                                                        )    No. 79-0271 (JHG)
CONSTANCE HORNER, Director.                             )
     Office of Personnel                              )
     Management, <u>et</u> <u>al</u>.,                    )
                                                        )
        Defendants.                              )
_____)

DEFENDANTS' EXHIBITS 1-6

79-271

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 5 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES        )
UNION, et al.,                     )
                                   )
          Plaintiffs,              )
                                   )
                                   )
                                   )    Civil Action No. 84-2573
CONSTANCE HORNER                   )
DIRECTOR, OFFICE OF PERSONNEL      )
MANAGEMENT, et al.,                )
                                   )
          Defendants.              )
_____)

DECLARATION OF CURTIS J. SMITH
IN SUPPORT OF MOTION TO STAY

I, CURTIS J. SMITH, declare and say;

1.  I am the Associate Director for Career Entry of the
United States Office of Personnel Management (OPM).  My
responsibilities include operational and policy development of
the programs used to examine applicants for admission into the
civil service of the United States.  I am familiar with the
issues in the instant action and I have read the Opinion and
Order issued by the United States District Court in this case on
February 27, 1987.  I make this declaration based upon personal
knowledge and upon information made available to me in the course
of my official duties.

2.  I submit this declaration in support of the OPM's Motion
for a Stay of the District Court's February 27, 1987 Order. The
Court's Order mandates that, within six months, OPM must develop
competitive examinations for all occupations previously covered
by the Professional and Administrative Career Examination (PACE)

Exhibit 1

and now subject to Schedule B hiring authority.  As will be
explained in greater detail below, compliance with the Court's
Order not only has substantial cost and manpower implications,
but it will also require that OPM develop examinations for
occupations that have had few or no hires during the past three
years.

### SCHEDULE B USE

3.  In 1982, OPM anticipated that there would be
substantially reduced hiring in most federal occupations,
including those which were being filled by use of the PACE.  In
view of the government's agreement in the Consent Decree entered
in Luevano v. Horner, (D.D.C. 79-0271), to replace the PACE with
alternative examining procedures designed to examine for a
particular job category or, for a group of job categories with
relatively few hires, as well as the lengthy and expensive
process of developing examinations, the decision was made to use
Schedule B as an alternative examining procedure, while OPM
pursued the development of competitive alternatives for what were
historically the "big fill" occupations.  Schedule B examining
requires that "each agency establish[ ] its own application
procedures, and applicants must file separately with each agency
where they wish consideration." FPM Bulletin 213-54 at 2
(Attachment 2 to Plaintiff's Original Complaint).

4.  The selection of occupations for which to begin
development of a competitive alternative, and the timing of that
process, was and is made by OPM with awareness of historic hiring

- 2 -

trends, the anticipated number of fills, the expected
availability of qualified applicants, and the appropriateness of
various means of examining, so that examination development is
accomplished on an overall cost-productive basis.[1]  Since 1982,
OPM has implemented seven competitive examinations for
occupations previously covered by the PACE.  These occupations
are Computer Specialist, Tax Technician, Internal Revenue
Officer, Customs Inspector, Contract and Procurement Specialist,
Social Insurance Representative and Social Insurance Claims
Examiner.  Additionally, nine other occupations were removed from
PACE coverage and made subject to a competitive alternative
examination prior to the effective date of the Decree in Luevano
v. Horner.[2]  While these sixteen job-specific examinations cover
a relatively small number of the occupations previously covered
by PACE, since 1981, they have represented an annual average of
approximately 55% - 60% of all hires into PACE occupations.  The
remaining almost one hundred occupations historically have had

_____

1.  Thus, a decision to spend several hundred thousand dollars on
the new competitive examination for the Contract and Procurement
Occupation, where yearly outside hiring can reach over 1300 as it
did in 1984 and over 1200 as it did in 1985, must be viewed
against a decision to develop a new competitive examination for
the occupation of Archives Specialist, where there has been no
external hiring during the past three years.

2.  Prior to the effective date of the Luevano decree, the
following occupations were competitively filled by agencies .
having delegated examining authority: Bank Examiner (FDIC and
Federal Home Loan Bank Board); Agricultural Program Specialist;
General Investigator (DOD); Immigration Inspector.  In addition,
OPM had developed competitive examinations for the following
occupations: Economist, General Investigator, Criminal
Investigator, Game Law Enforcement Agent, and Print Management
Specialist.

- 3 -

relatively far fewer hires and constitute approximately 40% - 45% of overall staffing into covered occupations.

5.   During the time period beginning January 1, 1983 and ending December 31, 1985, for the approximately 100 occupations not covered by the alternative competitive examinations described above, Schedule B was only one of several means of filling vacancies.  The primary means was by internal placement, (promotion, reassignment and transfer); when external hiring was required, Schedule B was the most frequently used hiring procedure.[3]  Of the approximately 100 occupations for which no competitive alternative has been developed 75 of these occupations had 20 or fewer total Schedule B fills in all agencies during that entire time period (38 of these occupations had no fills at all); 9 occupations had between 21 and 50 total Schedule B fills; 5 occupations had between 51 and 100 total Schedule B fills; 5 occupations had between 101 and 200 total Schedule B fills; and, finally, during this same time period, only 7 occupations had over 200 total Schedule B fills into all agencies combined.

6.   The Schedule B PAC process currently includes a requirement for a competitive appointment to move to the GS-9 level.  That process, often referred to as the "conversion" of a Schedule B PAC incumbent into the competitive service, involves a

---

[3]. Smaller numbers of hires were accomplished by such programs as college co-op conversion, Veterans' Readjustment Act, and Outstanding Scholar.

non-written examination of the candidate's job-related skills.
Between January 1, 1983 and June 30, 1986, approximately 11,200
Schedule B appointments were made.  As of September 30, 1986,
approximately 4490 employees hold Schedule B PAC positions.
While I cannot definitively state that each of the remaining
approximately 6710 persons was converted into the competitive
service, for it is likely that some individuals resigned prior to
being eligible for conversion, or for some other reason were not
converted, OPM is not aware of any systemic problem that has
prevented the conversion of Schedule B employees.  Similarly, in
its May 1986, Report on Significant OPM Actions for 1984 & 1985,
the Merit Systems Protection Board, based on a sample of several
major Schedule B agency users, found that through March 31, 1985,
better than 99% of all Schedule B employees whom the employing
agency sought to "convert" to the GS-9 level in the competitive
service were, in fact, "converted".

DEVELOPMENT OF COMPETITIVE EXAMINATIONS

7.  Examination development in accordance with existing
professional standards, guidelines and legal requirements
requires that competitive examinations be practical and relate to
matters that fairly test the relative capacity and fitness of the
applicant.  5 U.S.C. § 3304.  For each competitive examination,
the test development process requires the utilization of careful
and intense development procedures.  The test development process
requires a detailed analysis of the requirements of each
occupation covered by a particular examination on a nationwide

- 5 -

basis.  On the basis of the job analysis, OPM designs the examination, develops test and interview questions, assembles the questions into a testing instrument, and develops and equates alternate forms of the test.  Validation studies are then designed and conducted.  The scoring and rating computer processing systems are developed immediately following the test development phase.[4]  Depending upon the occupation and the type of examination that is developed, this process can, in some instances, take as much as two to four years.

8.  As stated in ¶ 4, since 1982, OPM has implemented, seven competitive examinations for occupations previously covered by the PACE.  These competitive examinations were developed over a period of several years at a cost of almost $4.5 million dollars.  The least expensive of these, the examination developed for the occupation of Internal Revenue Officer, cost almost $554,000.  However, the cost of developing competitive examinations for the remaining occupations cannot be determined simply by multiplying the cost of the examinations developed thus far by the remaining occupations.  The cost for each examination will vary, based upon the unique circumstances of each, but the costs for a "small fill" occupation can be as substantial as the costs for one of the "big fill" occupations.  Test development

---

[4].  While it is possible to develop competitive examinations without following this rigorous development process, the resulting product would not meet the standards to which OPM has adhered in the past.  If OPM is required to meet the Court's six-month deadline, the resulting product would not meet the professional standards to which OPM seeks to subscribe.

consists of many unknowns; for example, the expenses of a job
analysis can, in some instances, range from $20,000 to $50,000.
Such costs will vary from occupation to occupation, and depend
upon such variables as the number and location of the sites to be
visited, the availability of subject matter expert incumbents,
the amount of information available about an occupation and its
complexity and heterogeneity.  Additionally, the cost of
validation, a critical factor in proper test development under
current legal and professional standards, is also substantial and
will vary with the occupation, the type of competitive
examination that is developed and the type and extent of the
validity study undertaken.

9. It is also difficult to determine without incurring
substantial cost which of the "small fill" occupations at issue
could be made the subject of the same examining procedure, as
allowed by the Luevano Decree.  In order to determine if an
occupation shares sufficient common traits with another
occupation(s) to warrant the use of a common examination, a job
analysis for each job must be done.  Thus, the process of
deciding which of several occupations may be properly joined
together entails a substantial cost, even before the actual test
instruments are developed.

10.  The Court's Order will require that, during the next
six months, OPM's limited resources and entire testing staff must
be devoted entirely to the development of competitive

- 7 -

examinations, including those occupations that may well have limited or even nonexistent hiring in the years to come.[5] Moreover, this devotion of resources and the short time-frame allowed by the Court's Order will necessarily include and impact upon almost every government agency. The process of test development requires that large numbers of current job incumbents, often senior and supervisory employees, must be taken away from their everyday responsibilities to work with OPM test developers.

I hereby declare under penalty of perjury, that the foregoing is true and correct.

Curtis J. Smith

---

[5]. Examining for PACE occupations accounts for only about 5% of OPM's overall examining responsibilities. OPM's test development staff is responsible for the examination development and administration for a wide variety of federal occupations, including blue collar jobs, scientists, engineers, clerical and secretarial occupations and higher and lower graded white collar occupations other than PACE positions. Moreover, the number of individuals hired into the PACE occupations represents only approximately 5% of the total number of hires resulting from the use of OPM examining procedures.

OPM's testing staff has the additional responsibility to conduct research with the goal that new and innovative examining techniques will be applicable, in the future, to federal occupations, including those PACE occupations now covered by Schedule B.

DEPARTMENT OF THE ARMY
OFFICE OF THE DEPUTY CHIEF OF STAFF FOR PERSONNEL
WASHINGTON, D.C. 20310

79-271

2 8 OCT 1983

REPLY TO
ATTENTION OF

DAPE-CP

FILED

JUN  5 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

Mr. William Bohling
Noncompetitive Staffing Branch
Room 6A12
1900 E Street, N. W.
Washington, D. C. 20415

Dear Mr. Bohling:

In reply to your letter of September 21, 1983, a description of
the procedures used by the Department of the Army to evaluate and
select candidates for Schedule B appointment is enclosed (Encl 1).
Statistical information on Professional and Administrative Career
appointments as of September 30, 1983, is also enclosed (Encl 2).

If you have questions concerning this letter or require addi-
tional information, please call Mrs. Karen Horn at (202) 325-9293.

Sincerely,

Raymond J. Sumser
Director of Civilian Personnel

Enclosures

Exhibit 2

DEPARTMENT OF THE ARMY

SCHEDULE B APPOINTING AUTHORITY

INTRODUCTION.  On March 15, 1983, the Director of the Office of Personnel Management (OPM) authorized the Department of the Army to make 600 external appointments in 13 Professional and Administrative Career (PAC) occupations (Personnel Management, Management Analysis, Budget Analysis, Public Information, Writing and Editing, Technical Writing and Editing, Maintenance Management Specialist, Contract and Procurement, Industrial Property Management, Industrial Specialist, Quality Assurance Specialist, General Supply and Supply Program Management).  The authorization, which is not to exceed a total of 600 appointments during a 12 month period, was delegated to major command civilian personnel directors to use in filling approximately 50 percent of their PAC intern vacancies.  To assure that best qualified candidates are being recruited, renewed emphasis was placed on targeted recruitment.  Army activities are required to consider Displaced Employee Program and Interagency Placement Assistance Program eligibles when external recruitment begins for any of the PAC positions.

Although evaluation and selection of candidates for Schedule B appointments are decentralized to the Army major command or activity having the vacancy, the following guidance was provided by Headquarters Department of the Army:

I.  IMPLEMENTING PROCEDURES FOR APPOINTMENTS UNDER THE BLANKET SCHEDULE B AUTHORIZATION

A.  APPLICANT:  An applicant is defined as an individual who meets the minimum qualification standards published by the Office of Personnel Management (OPM) for the Professional and Administrative Career (PAC) intern occupation and grade level for which application is made and who submits an SF-171, Personal Qualifications Statement.

B.  CANDIDATE EVALUATION:  Paragraphs 2 through 5 are considered optional and are provided as one method for your use in evaluating external candidates. Paragraph 1 is mandatory regardless of evaluation method.

    1.  Selectees will be interviewed before a commitment is made.

    2.  Criteria to be used in rating.  The criteria (Worker Traits (WT)) which will be used in rating applicants are Analytical Ability, Judgment, Planning and Organizing, Reading Comprehension, Oral and Written Communications, Stress Tolerance, Human Relations and, when appropriate, Mechanical Ability, as defined in encl 1 to encl 1.

    3.  Rating Instrument.  A rating worksheet will be completed on each applicant prior to referral for selection.  The applicant's response to questions pertaining to his/her abilities for each WT will be analyzed against the

Enclosure 1

levels of achievements identified in the worksheet, that is, against the rating scale of one to seven, using rating guide benchmarks. A set of interview questions has been developed for the WT (encl 2 to encl 1). Interviewers may need to pursue some questions further for clarification or to get enough information on which to base a rating. It is recommended that applicants be asked to provide a list of courses taken and grades achieved or to indicate specific work assignments that support achievements cited for the various WT. Guidance on conducting interviews is contained in Appendix C, DA Pamphlet 690-10. Raters will write an explanation for their rating on each WT, citing the applicant's specific achievements and activities that support their conclusion.

4. <u>Benchmarks</u>. Benchmarks are considered very important to achieve objective ratings. Therefore, benchmark samples of achievements for each level of the rating scale should be developed locally for each occupational series for which recruitment is initiated. This will assist raters in achieving consistency in rating applicants. Benchmarks are normally developed from a representative sample of achievements from the applicant pool. Consequently, it may be necessary to rate applicants based on judgment until sufficient information can be acquired from an adequate number of applicants.

5. <u>Determining Highly Qualified</u>. The relevance of each WT to certain positions to be filled under the blanket Schedule B Authority, i.e., Personnel Management Specialist, Management Analyst, Budget Analyst, Public Affairs Specialist, Contract Specialist and Supply Specialist, has been determined through a job analysis. In each job, four or five WT received a higher weight than others. These were identified as the key WT (encl 3 to encl 1). Applicants who receive a rating of five points on each key WT for the job(s) for which they are being considered and no less than four points on the remaining WT will receive a rating of highly qualified. Key WT for Public Affairs Specialist may be used when rating applicants for Writing and Editing and Technical Writing and Editing positions. Key WT for Contract Specialist may be used when rating applicants for Industrial Property Management Specialist and Industrial Specialist positions. Key WT for Supply Specialist may be used when rating candidates for Supply Program Management Specialist positions. Key WT for Equipment Specialist may be used when rating candidates for Maintenance Management Specialist positions.

6. <u>Outstanding Scholar</u>. Applicants who meet the Outstanding Scholar definition need not be rated against the worker traits. However, an interview must be conducted prior to making a selection decision. See paragraph B(1) above.

7. <u>Ranking Candidates</u>. There is no requirement to rank highly qualified candidates. However, you may choose to numerically rank highly qualified candidates by totaling the scores achieved on the rating worksheet if there are excessively large numbers of candidates. If highly qualified candidates are numerically ranked, those who rank at the top may be referred for selection either in rank or in alphabetical order.

C. <u>VETERANS PREFERENCE</u>:
   1. <u>No rating and ranking</u>. When there is no rating process, veterans will be afforded preference as follows: Persons entitled to ten-point preference who have a compensable service connected disability rating of ten percent or

more will be placed in alphabetical order and given first consideration. All other persons entitled to veterans preference will be placed in alphabetical order and given the next consideration. All other eligibles would then receive consideration for selection.

2. <u>Rating and ranking by group</u>. When applicants are rated, but not referred for selection in rank order, veterans will be afforded preference within the category(ies), e.g., Highly Qualified (HQ), Qualified, in which they fall, as follows: Persons entitled to ten-point preference who have a compensable service connected disability rating of ten percent or more who are HQ will be placed in alphabetical order and given first consideration. All other HQ persons entitled to veterans preference will be referred alphabetically in a second group and given the next consideration. The third group to be considered would comprise all other HQ candidates. All groups of HQ candidates may be referred concurrently; however, consideration will be in the order of preference, as stated above. If HQ candidates are ranked and a separate category (Best Qualified (BQ)) is identified, veterans within the BQ category will be afforded preference in the same order as that indicated for veterans in the HQ category.

3. <u>Rating, ranking, and referral in numerical order</u>. When applicants are rated, numerically ranked and referred for selection in rank order, veterans will be afforded preference as follows:

(a) <u>In ranking HQ candidates</u>: Ten points will be added to the earned numerical score of person(s) rated HQ who are entitled to ten-point preference. Five points will be added to the earned numerical score of person(s) rated HQ who are entitled to five-point preference. After the preference points have been added, HQ candidates will be numerically ranked.

(b) <u>In Selection</u>: The order of selection will follow a rule of three, i.e., selection will be from the highest three persons who are available for selection and who have not been eliminated. If more than one selection will be made, the next selection will be from among the three highest available and uneliminated persons. Each succeeding selection will be made in like manner until all selections are made or until there are fewer than three persons remaining.

4. <u>Approval of objections to or passover of preference eligibles</u>. Under paragraphs 1 and 2, appointing officers may not pass over a preference eligible and select a nonpreference eligible unless a higher level approves reasons for objecting to or passing over the preference eligible. Under paragraph 3, a preference eligible whose numerical ranking places him or her among the highest three persons available for selection who has not been eliminated may not be passed over and a nonpreference eligible selected unless a higher level approves reasons for objecting to or passing over the preference eligible. Installation appointing officers will forward reasons for nonselection of a preference eligible at the installation level to the Major Command (MACOM) for review and prior approval. If nonselection of a preference eligible is proposed at the MACOM or HQDA level, reasons for non-selection will be forwarded to HQDA (PECC-CMS), 200 Stovall Street, Alexandria, VA 22332 for review and prior approval. Selection of a five-point veteran over a ten-point veteran is permissible in all cases.

3

D.  TARGETED RECRUITMENT: External recruitment efforts must include sources that will maximize opportunities for high quality blacks and Hispanics to compete for PAC intern vacancies (see FPM Bulletin 213-57). Local chapters of black and Hispanic organizations may also serve as valuable recruitment sources.

E.  METHODS OF RECRUITING AND SELECTION:
1. The preferred method of recruitment and selection is onsite. Personnel Specialists, in conjunction with management official(s), should contact the placement offices of colleges and universities to arrange on-campus interviews. The recruitment period during which applications are accepted and interviews conducted will be established in advance and prospective applicants will be advised through placement offices or other appropriate means prior to the on-campus visit. Selection and onsite commitments may be made by a personnel specialist or a management official. Commitments will be tentative when a security clearance is required as a condition of employment or advancement within a specific PAC intern occupation.

2. When it is not feasible for the manager to recruit and select onsite, or if the manager chooses not to authorize the personnel specialist to select/commit, the PAC intern vacancy may be advertised by sending an announcement to educational institutions and other appropriate sources, and a referral list developed. This procedure is not recommended as a general practice because competition for external applicants from other Federal agencies and private industry is expected to be extremely keen. Delays in making commitments should be avoided.

F.  RETENTION OF APPLICATIONS: Applications of highly qualified candidates received in response to external recruitment may be retained. These applicants should be notified of non-selection when appropriate and that their applications are being retained for future consideration. Applications of minimally qualified applicants should be returned.

G.  PROMOTION OF PAC INCUMBENTS APPOINTED UNDER SCHEDULE B.
1.  Promotion to the GS-7. Noncompetitive promotion of the PAC incumbents appointed under Schedule B at the GS-5 level to the GS-7 level requires meeting time-in-grade requirements, successful completion of training assignments under the Individual Development Plan (IDP) and a recommendation by the supervisor with indorsement from the Activity Career Program Manager (ACPM) that the PAC incumbent has the potential to perform at the GS-7 level as evidenced by demonstrated performance.

2.  Promotion to the GS-9. The PAC incumbent will be converted to a career-conditional appointment and promoted to the GS-9 level when the following conditions are met:

(a)  The PAC incumbent's performance is fully successful.

(b)  The PAC incumbent has successfully completed all training requirements as certified by the ACPM.

(c)  The supervisor, with indorsement from the ACPM, recommends the PAC incumbent for conversion and promotion.

(d)   The PAC incumbent has met time-in-grade requirements.

(e)   The PAC incumbent is certified for appointment at the GS-9 level from an appropriate OPM Register (normally Mid-Level).  See paragraph H below.)

H.   CONVERSION OF PAC INCUMBENTS APPOINTED UNDER SHCEDULE B.

1.   If conditions stipulated in paragraph G2(a) through (d) have been met, the appointing officer will name request the PAC incumbent from OPM or from their Special Examining Unit under delegated examining authority concurrently with his/her eligibility for conversion/advancement to the GS-9 level.  The SF-39, Request for Certification, and information required by OPM such as job description, job analysis, knowledges, skills, and abilities pertinent to the job, and selective criteria will accompany the Request for Certification.  Appointing officers will assure that PAC incumbent(s) complete all required forms prior to submission of the name request(s), and will follow-up with OPM as necessary to assure timely Mid-Level Certification.

2.   PAC incumbents who fail to meet any of the conditions stipulated in paragraph G2(a) through (c) will normally be separated unless extenuating circumstances warrant extending the training period.  In those instances the training program may be lengthened up to six months and promotion delayed.

II. PROCEDURES FOR REQUESTING SCHEDULE B APPOINTING AUTHORITY ON A CASE-BY-CASE BASIS

Procedures outlined in FPM Letter 213-32, dated 9 September 1982, must be followed in requesting authority to fill positions not covered by the blanket authorization.

A. Before a Schedule B appointment may be made, appointing officers must assure that the Displaced Employee Program and Interagency Placement Assistance Program lists have been cleared with the OPM Area Office having examining jurisdiction over the position(s) to be filled and that there are no qualified candidates available on the activity's repromotion and reemployment lists. In addition, high quality candidates available for promotion, reassignment, transfer or reinstatement to professional and administrative career (PAC) positions must be considered. If established recruiting sources fail to yield highly qualified internal candidates or when it is not possible to eliminate adverse impact against blacks and Hispanics, requests for authority to recruit external candidates under Schedule B are appropriate. Your request should include all information required by FPM Letter 213-32 and specify if the position(s) to be filled is a career intern position. FPM Letter 213-34 requires that a statement of the manner in which veterans preference will be applied accompany all requests for Schedule B appointing authority. HQDA (PECC-CMS) will add the information stated in paragraph I.C to all case-by-case requests which are submitted to OPM for approval.

B. Requests for use of the Schedule B Authority are to be submitted through appropriate channels to HQDA (PECC-CMS), 200 Stovall Street, Alexandria, VA 22332. After review and HQDA approval, requests will be submitted to OPM.

## CRITERIA (WORKER TRAITS) TO BE USED FOR RATING

a.  The following criteria (worker traits) will be used to distinguish high quality candidates from qualified candidates.

(1)  Analytical ability.  This is the ability to identify and absorb relevant data or factors in job-related (paid or volunteer) situations.

(2)  Judgment.  This is the ability to look at all possible courses of action and make appropriate decisions.

(3)  Planning and organizing.  This is the ability to organize tasks and achieve goals according to priority and set deadlines.

(4)  Reading comprehension.  This is the ability to read and understand written material such as instructions or regulations.  Further, it is the ability to relate the principles and concepts in the written material to specific situations or problems.

(5)  Oral communications.  This is the ability to orally express ideas clearly, logically, and in the correct grammatical form.

(6)  Written communications.  This is the ability to express ideas in writing clearly, logically, and in the correct grammatical form.

(7)  Stress tolerance.  This is the ability to perform effectively and maintain composure in tension-filled situations.

(8)  Human relations.  This is the ability to get along with supervisors, co-workers and the public and work effectively with them.

(9)  Mechanical ability.  This is the ability to visualize, understand, and identify elements of systems.  (This trait applies only to Equipment Specialists.)

b.  These criteria may have been gained through all types of experience, paid or volunteer work, or through formal training.

Encl 1 to Encl 1

INTERVIEW QUESTIONS

1. Analytical Ability.

   Describe one or two experiences that demonstrate your analytical ability; include subject of the analysis, circumstances under which performed, complexity, and the results.

2. Judgment.

   Describe one or two instances requiring you to exercise judgment in making decision(s). Describe the situation(s), alternative courses of action, problems encountered, the decision made including the reason for your choice, and the outcome.

3. Planning and Organizing.

   Describe one or two experiences that required you to plan and organize work or school activities. Describe specific circumstances, your role and the role of others and the effect your role had on the final outcome.

4. Reading Comprehension.

   Describe any experience which demonstrates your ability to read, understand and evaluate written material. Describe subject of document in terms of complexity and type, e.g., scientific, technical, literature, etc., and give examples of how you have had to apply comprehension of what you have read.

5. Oral Communication.

   Describe any experience you have had in making formal presentations or other experiences requiring verbal communication skills such as providing instructions, serving as a tour guide, etc. What was the subject matter, your audience, how did you prepare, what visual aids did you use, what was the purpose, and the final outcome?

6. Written Communication.

   Tell us about specific writing assignments you have had in an educational or work situation. What was the subject(s), for what purpose was it written, what was your approach to the assignment and what was the outcome? Have you taken courses which required you to demonstrate writing ability? If so, identify courses and grades attained.

7. Stress Tolerance.

   Describe one or two experiences that demonstrate your ability to function well under pressure. Describe the difficulty or complexity of the task(s) you were assigned, what made the situation stressful, and how you handled it.

Encl 2 to Encl 1

8.  Human Relations.

a.  Describe any experience you have had that demonstrates your ability to work effectively with others.  Tell us your role, the group objective, the effect of your role on others in the group, if you had any problems, and the outcome.

b.  Do you prefer working on a project alone or with others?  Why?

9.  Mechanical Ability.

(To be asked of applicants for Maintenance Management Specialist position.)

Describe one or two experiences that demonstrate your ability to understand mechanical systems and how they function and malfunction.

## KEY WORKER TRAITS

| CAREER FIELD | KEY TRAITS | KEY TRAIT # |
|---|---|---|
| Management Analyst (Manpower) | Analytical Ability | WT 1 |
| | Judgment | WT 2 |
| | Reading Comprehension | WT 4 |
| | Written Communication | WT 6 |
| | Human Relations | WT 8 |
| Public Affairs Specialist | Analytical Ability | WT 1 |
| | Judgment | WT 2 |
| | Planning and Organizing | WT 3 |
| | Reading Comprehension | WT 4 |
| | Written Communication | WT 6 |
| Contract Specialist | Judgment | WT 2 |
| | Reading Comprehension | WT 4 |
| | Oral Communication | WT 5 |
| | Written Communication | WT 6 |
| Equipment Specialist | Judgment | WT 2 |
| | Planning and Organizing | WT 3 |
| | Reading Comprehension | WT 4 |
| | Written Communication | WT 6 |
| | Mechanical Ability | WT 9 |
| Supply Specialist | Judgment | WT 2 |
| | Planning and Organizing | WT 3 |
| | Reading Comprehension | WT 4 |
| | Stress Tolerance | WT 7 |
| | Human Relations | WT 8 |
| Personnel Management Specialist | Analytical Ability | WT 1 |
| | Judgment | WT 2 |
| | Reading Comprehension | WT 4 |
| | Oral Communication | WT 5 |
| | Human Relations | WT 8 |
| Management Analyst (Comptroller) | Analytical Ability | WT 1 |
| | Judgment | WT 2 |
| | Planning and Organizing | WT 3 |
| | Oral Communication | WT 5 |
| | Written Communication | WT 6 |
| | Human Relations | WT 8 |
| Budget Analyst | Analytical Ability | WT 1 |
| | Judgment | WT 2 |
| | Planning and Organizing | WT 3 |
| | Reading Comprehension | WT 4 |
| | Written Communication | WT 6 |

Encl 3 to Encl 1



**DEFENSE MAPPING AGENCY**
BUILDING 56, U.S. NAVAL OBSERVATORY
WASHINGTON D.C. 20305

79-271

17 OCT 1983

~~~~VED~~~~

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Mr. William Bohling
Chief
Noncompetitive Staffing Branch
U.S. Office of Personnel Management
Room 6A12
1900 E Street, N.W.
Washington, D.C.  20415

Dear Mr. Bohling:

The purpose of this letter is to provide report information required in the use
of appointment of applicants under Schedule B, Section 213.3202(1) authority and
the Luevano v. Devine decree.  The Schedule B authority was used to fill one
position of Geographer (Chinese Language), GS-150-7, Identification No. PAC 83-18.

Data Collection on the Race and National Origin (RNO) Data, Schedule B/PAC
Authority Reporting Form for Luevano v. Devine Decree  (E Form 619), is at
Enclosure 1.  Enclosure 2 is the summary description of the evaluation procedure
required by page 42, paragraph 26, of the decree.

A negative report is submitted for the position of Geographer (Arabic Language),
GS-150-5/7, Identification No. PAC 83-27, as the authority expired and was not
used.  Also, report data on our most recent authority to fill one position of
Geographer (Arabic Language) and one position of Geographer (Scandinavian
Language), both GS-150-5/7, Identification No. PAC 83-63, will be forwarded prior
to 31 January 1984.

Should you or members of your staff desire additional information, please contact
Mr. Paul Hayduk on 653-1581.

Sincerely,

G. G. Meeli

for C. W. MANIFOLD
    Director of Personnel

2 Enclosures a/s

*Decade of Progress — Decade of Challenge*

Exhibit 3

Case 1:79-cv-00271-RBW Document 1-1 Filed 01/20/79 Page 370 of 419

# SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR RELEVANT DENDRY

| 1. Authorization Number (see negoti-ated agreement) | 2. Reporting Period | | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) | | |
|---|---|---|---|---|---|---|
| | From | To | | | FTS: | |
| PAC 83-18 | 01-01-83 | 12-31-83 | 3 | MIGNON TURRENTINE | Commercial: (202) 227-2130 | |

| 5. Title of Department, Independent Establishment or Government Corporation | 6. Name of Submitting Office | | |
|---|---|---|---|
| DEFENSE MAPPING AGENCY | Civilian Personnel Office, Defense Mapping Agency Hydrographic/ Topographic Center-Recruitment and Staffing Division, POR-4 | | |

| 7. Address of Submitting Office | 8. Occupational Title/Series | 9. Grade Level(s) |
|---|---|---|
| Personnel Office, Recruitment & Placement Division DMA, Hydrographic/Topographic Center Brookmont, Maryland 20315 | GEOGRAPHER(Chinese Language) GS- 0 1 5 0 | GS-5 or 7 |

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | O | O | O | O | O | O | O | O | O | O | O | O | O | O | O |
| Hispanic origin | O | O | O | O | O | O | O | O | O | O | O | O | O | O | O |
| White, not of Hispanic origin | O | O | O | O | O | O | O | O | O | O | O | O | 1 | | 1 |
| Other qualified applicants | O | O | 1 | O | O | O | O | O | O | O | O | 1 | O | O | 2 |
| 10. Zone Totals | O | O | 1 | O | O | O | O | O | O | O | O | 1 | O | 1 | 3 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management                                    E    Form  619  (1-83)

NARRATIVE DESCRITPTION OF EVALUATION PROCEDURES

Applicants were screened against the Office of Personnel Management's
Qualifications Standards, X-118, GS-150, series to determine basic eligibility.
Qualified and eligible candidates were then rated and ranked against job related
knowledges, skills, and abilities to determine the best qualified group.
Candidates eligible for veterans preference were assigned additional points as
is done in open competitive examining.

A copy of the crediting plan used to evaluate candidates and support documentation
are attached.

Enclosure 2

Crediting Plan
Geographer (Chinese Language), GS-150-5/7
Scientific Data Department
Support Division, Toponymic Branch
Eastern Regional Section


KSAP No.1
Knowledge of the principles, concepts, and techniques of physical geography.

15 pts Superior Level:
Experience and formal education in the principles, concepts, and techniques of
physical geography.

Specific examples of this kind of work and academic coursework are as follows:
    Work which involved the interpretaiton, extraction, processing, and
    documentation of toponymic data for review and ultimate standardization of
    geographic nomenclature and publication, in gazeteers; plus, a Bachelor's
    degree in  Geography or higher in a related physical or social science which included
    at least 15 of the 24 semester hours of college course creditable toward a
    major in geography.

10 pts Above Average Level:
Experience or formal education listed above.

 5 pts Average Level:
Has a combination of work experience          related to the above and college
course work creditable toward a major in geography, which when combined with
experience will total 4-years of education and experience.


KSAP No.2
Knowledge of the Chinese Language and the ability to translate and transliterate
the language.

15 pts Superior Level:
Experience in the Chinese language that enable him/her to utilize Chinese language
sources in the extraction and analysis of toponymic data, translate and transliterate
geographic nomenclature, and translate reports, documents, etc.; plus, three years
of experience in translating, interpreting, or other work requiring the use of English
and the Chinese language, or 3-years of a combination of work experience and training
or a 4-year degree with a major study in translating or interpreting where English
and the Chinese language are prerequisites.

10 pts Above Average Level:
Experience or formal education listed above.

 5 pts Average Level:
Has a combination of work experience            related to the above and some college
coursework as listed above.

Candidates eligible for a Schedule B appointment and are eligible for veteran preference, will receive 5 or 10 additional points added to their total score for Announcement #DMAHTC 83-55 as follows:

5 Points

o  Five-point veterans preference will be granted to verterans who received an honorable or general discharge from the armed forces:

(a)  After active duty, during the period from April 6, 1917 to July 2, 1921, and December 7, 1941 to July 1, 1955;

(b)  After more than 180 consecutive days of active duty, any part of which occurred after January 31, 1955, and before October 15, 1976.
Note:  Service under an initial period of active duty for training under "6-month" reserve or National Guard program is not creditable for verteran perference; and

(c)  After service in a campaign for which a campaign badge has been authorized.

o  Non-disabled verterans who retired at or above the rank of major or its equivalent are not eligible for Veteran Preference after October 1, 1980.

10 Points

o  Ten-point veteran preference is granted to:

(a)  Disabled veterans; and
(b)  Veterans awarded the Purple Heart.

Ten-Point veteran preference is granted in certain cases to:

(a)  unmarried widows and widowers of veterans;
(b)  spouses of disabled veterans; and
(c)  mothers of deceased or disabled veterans.

SPECIAL NOTE:  A clemency discharge does not meet the Veterans Preference Act requirement for discharge under honorable conditions.  Accordingly, no preference may be granted with such discharge.

# BY THE U.S. GENERAL ACCOUNTING OFFICE

## Report To The Chairwoman, Subcommittee On Civil Service Committee On Post Office And Civil Service House Of Representatives

## Appointments To Professional And Administrative Career Positions

FILED

JUN  5 1987

CLERK, U. S. DISTRICT COURT,
DISTRICT OF COLUMBIA

This report provides information about appointments made to entry level professional and administrative career (PAC) positions before and after the abolishment of the Professional and Administrative Career Examination (PACE). The PACE, a written examination, was used to examine applicants for 120 different occupations. The PACE was abolished in August 1982 as a result of a consent decree negotiated in the case of <u>Luevano v. Devine</u>. The objective of the consent decree was to eliminate adverse impact in the hiring of blacks and hispanics to positions filled through PACE. The Office of Personnel Management has not developed examination alternatives for those PAC positions previously covered by PACE.



GAO/GGD-85-18
DECEMBER 10, 1984

Exhibit 4



**UNITED STATES GENERAL ACCOUNTING OFFICE**
WASHINGTON, D.C. 20548

GENERAL GOVERNMENT
DIVISION

B-217032

The Honorable Patricia Schroeder
Chairwoman, Subcommittee on Civil
   Service
Committee on Post Office and Civil
   Service
House of Representatives

Dear Madam Chairwoman:

In an August 8, 1983, letter, you asked us to obtain infor-
mation on appointments made to entry level professional and
administrative career (PAC) positions[1] before and after the
abolishment of the Professional and Administrative Career
Examination (PACE).  The Office of Personnel Management (OPM)
abolished PACE in August 1982 as a result of a consent decree
negotiated in the case of <u>Luevano</u> v. <u>Devine</u>.  The objective of
this consent decree was to eliminate adverse impact[2] in the
hiring of blacks and hispanics for positions filled through
PACE.

As an interim replacement for PACE, OPM established a new
Schedule B[3] appointing authority (Schedule B PAC) to be used in
external hiring of employees for entry level PAC positions.
These positions were covered by PACE at the time it was abol-
ished.  Thus far, no alternative competitive examining proce-
dures have been developed.

---

[1]PAC positions are nonclerical in nature and involve regulatory
and compliance work, administrative and management functions,
claims and benefit examining, investigative and law enforce-
ment duties, and social service work.

[2]Adverse impact is defined under the consent decree as a cir-
cumstance in which the percentage of minority applicants who
are hired in a job category is less than 80 percent of the per-
centage of white applicants who are hired.

[3]Schedule B authority covers positions for which OPM has deter-
mined that it is not practical to hold a competitive examina-
tion.  Authorization to use Schedule B must be requested and
approved by OPM.

B-217032

You asked us to provide information on a number of ques-
tions related to PACE and the new Schedule B authority for fill-
ing entry level PAC positions.  Our responses to these questions
are summarized below and presented in more detail in the appen-
dices to this letter.

We conducted our survey at OPM headquarters and four fed-
eral agencies--the Departments of the Navy and Health and Human
Services, the Defense Logistics Agency, and the Internal Revenue
Service.  These agencies were selected because, as of October
1983 when we began our survey, they had authority to fill about
77 percent of the total number of PAC positions covered by the
Schedule B authority.  A detailed description of the scope of
our review is presented in appendix I.

WHAT POSITIONS WERE FORMERLY FILLED
THROUGH PACE AND HOW HAVE THEY BEEN
FILLED SINCE PACE WAS ABOLISHED?

Data on positions filled through PACE were not available
for each agency.  Governmentwide, PACE covered GS-5 and GS-7
entry level positions in 120 different PAC occupations, but it
was only one of many methods used to fill PAC positions.  Other
methods included internal promotions and reassignments and
transfers from other agencies.  Although the principal method
for external hiring, PACE generally accounted for less than 10
percent of total PAC appointments.  For example, total hires
from the PACE were 4,606 in fiscal year 1979 and 1,472 in the
last three quarters of fiscal year 1982.  They comprised about 8
and 6 percent of total PAC hires for those periods (58,483 and
26,451, respectively).

From October 1982 through June 1983,[4] appointments were
made in all but 11 of the 120 PAC occupations that were formerly
covered by PACE.  Approximately 26,000 GS-5/7 PAC positions were
filled during this time.  Nearly three-fourths (19,194) of these
positions were filled by promoting or reassigning current
employees.  Other methods included transfers from other federal
agencies, reinstatements of former employees, and placement pro-
grams for federal employees who had either been or were sched-
uled to be displaced from their positions through no fault of
their own.  These methods have traditionally been used to fill
the majority of PAC vacancies.  About 1 percent (354) of total
GS-5/7 PAC appointments were made under the new Schedule B PAC.
Appendix III shows how PAC positions were filled from October 1,

---

[4]At the time of our survey, October 1982 to June 1983 data were
the most recent detailed data available from OPM's Central
Personnel Data File on PAC positions filled after PACE was
abolished.

B-217032

1982, to June 30, 1983.  Agency officials attributed the small
number of Schedule B PAC appointments in the 9-month period to
budget and personnel ceiling constraints and start-up delays
associated with the newness of the authority.

On July 24, 1984, OPM provided us with summary data showing
the number of Schedule B PAC appointments from July through
December 1983.  During that period, 1,732 additional Schedule B
PAC appointments were made, bringing the total number of these
appointments from October 1982 through December 1983 to 2,086.
Limited demographic data on these appointments are contained in
the tables below and in appendix III (p. 17).  More detailed
demographic data on total PAC appointments and the methods of
appointment were not available.

WHAT ARE THE DEMOGRAPHICS OF PAC
APPOINTEES SINCE PACE WAS ABOLISHED?

The tables below contain a summary of demographic data
obtained from OPM on all employees appointed to PAC positions
from October 1982 to June 1983.

### Total PAC Appointments
### 26,349

| Race and national origin | Number | Percent |
|---|---|---|
| White | 19,575 | 74.3 |
| Black | 4,478 | 17.0 |
| Hispanic | 1,433 | 5.4 |
| Other | 863 | 3.3 |

| Sex | Number | Percent |
|---|---|---|
| Female | 16,419 | 62.3 |
| Male | 9,926 | 37.7 |
| Unspecified | 4 | .0 |

| Age | Number | Percent |
|---|---|---|
| Under 25 yrs. | 3,839 | 14.6 |
| 25-40 yrs. | 16,424 | 62.3 |
| 41-64 yrs. | 5,990 | 22.7 |
| 65 yrs. or older | 96 | .4 |

| Veterans Preference | Number | Percent |
|---|---|---|
| Vet. Pref. | 5,225 | 19.8 |
| Non-Vet. Pref. | 21,112 | 80.1 |
| Unspecified | 12 | .1 |

3

B-217032

Appendix III (pp. 16 to 20) provides a detailed breakdown of the appointment methods used and demographic data on the PAC employees appointed during the period October 1982 to June 1983.

DO SCHEDULE B PAC PROCEDURES MEET
REQUIREMENTS OF MERIT SELECTION?

Section 2301 of Title 5 of the United States Code specifies that federal personnel management should be implemented consistent with merit system principles.  These principles, which are broad guidelines for agencies to follow in carrying out their personnel management activities, cover all aspects of personnel management, including the selection of employees.   The merit principle for selection of candidates for vacant positions requires that selection be based

". . . solely on the . . . relative ability, knowledge, and skills [of the candidates] after fair and open competition which assures that all receive equal opportunity."

As indicated on page 2, most of the PAC positions filled since the PACE was abolished were filled by methods other than Schedule B PAC.  These methods, such as promotions and reassignments, were also used to fill PAC positions prior to the abolishment of PACE.  Agencies must follow standard, OPM prescribed procedures in making appointments under any of these methods. We therefore did not review the selection procedures used under these methods to determine if they complied with the merit principle for employee selection.  However, since Schedule B PAC is new, we reviewed the descriptions of the procedures used by our four survey agencies to select candidates for Schedule B PAC appointments.  We found no indication that these selection procedures violate the requirements of merit selection under 5 U.S.C. 2301.  They all provide for what appears to be open competition and a means of determining qualified candidates.  It should be noted, however, that simply because a selection procedure conforms to merit requirements, there is no guarantee that during the actual selection process merit abuses will not occur.  Still, personnel officials from the agencies we contacted and OPM told us that, to their knowledge, no complaints or grievances relating to Schedule B PAC selection practices had been made.

The Merit Systems Protection Board, which is responsible for safeguarding the merit system against abuses, reported on Schedule B PAC in its annual report on the significant actions

4

B-217032

of OPM during calendar year 1982.[5]  The Board concluded that there may be an increased opportunity for merit abuse because of the "multitude" of agency-developed procedures that will be used to examine and select applicants.  OPM waived the standard Schedule B requirements[6] to allow agencies more flexibility in complying with the consent decree.  Similarly, in a report on PACE and the consent decree,[7] a panel of the National Academy of Public Administration concluded, among other things, that the use of Schedule B PAC invites abuse, such as vulnerability to personal and political influence in appointments.  Personnel officials of the agencies we visited believe that their selection practices conform to merit principles, but they also believe that the variety of selection procedures increases the opportunity for abuse.

## IS SCHEDULE B PAC AN ADEQUATE REPLACEMENT FOR PACE?

Since use of the Schedule B PAC has been relatively limited to date, we believe that its overall impact will not be known for some time.  However, in the opinion of personnel officials from the agencies we visited, the Schedule B PAC provided by OPM, while having advantages, such as more flexibility in recruiting, will not be an adequate replacement for PACE unless a procedure is provided for converting Schedule B PAC hires to the competitive service.[8]  Schedule B PAC appointments are in the excepted service[9], and appointees do not have competitive

---

[5]Report on the Significant Actions of the Office of Personnel Management During 1982, U.S. Merit Systems Protection Board, December 1983.

[6]OPM's regulations (5 C.F.R. Part 302, Subparts C and D) provide uniform procedures that agencies must follow in accepting and rating applications for employment and in selecting and appointing employees.

[7]The Selection of College Graduates for the Federal Civil Service:  The Problem of the "PACE" Examination and the Consent Decree, Panel of the National Academy of Public Administration, March 1984.

[8]The competitive service consists of all civilian positions in the federal government which are not specifically excepted from the civil service laws by statute, by the President, or by OPM.

[9]The excepted service consists of those civil service positions which are not in the competitive service.

5

B-217032

status[10] and cannot be noncompetitively promoted beyond the
GS-7 level or reassigned to positions not covered by the author-
ity.  Schedule B PAC employees may be converted to a competitive
service appointment only after successfully competing through a
competitive examining process.  The agency personnel officials
believe that the competitive registers will be blocked by pref-
erence eligibles[11] who are not in Schedule B PAC positions.
The officials believed they may, as a result, be unable to con-
vert and promote large numbers of their Schedule B PAC employees
to competitive service GS-9 positions.  OPM, on the other hand,
believes that because of the experience gained in their PAC
positions, most Schedule B PAC employees will be able to compete
successfully through the competitive examining process.  OPM
therefore sees no need for a special conversion procedure.
Whether problems will occur in promoting the Schedule B PAC em-
ployees is not known at this time since, according to an OPM
official, the majority of the initial Schedule B PAC appointees
are not expected to be eligible for promotion until late in
calendar year 1984.

WHAT ARE OPM'S PROCEDURES FOR OVERSIGHT
OF AGENCY USE OF SCHEDULE B PAC AUTHORITY?

     Before approving agency requests for Schedule B PAC, OPM
reviews the adequacy of the information submitted, requests
clarification or additional information when necessary, and
checks with its area offices to verify whether the agencies con-
sidered hiring federal employees who had been or are scheduled
to be displaced from their jobs.  According to OPM procedures,
agencies' use of Schedule B PAC will be monitored and evaluated
by reviewing agency reports required by the consent decree, data
from OPM's Central Personnel Data File, and its evaluations of
agency personnel management operations.  OPM officials informed
us that OPM does not plan to separately study Schedule B PAC.
Schedule B, as well as other hiring authorities, was reviewed as
part of a broad personnel management evaluation study relating
to federal government staffing practices which was conducted by
OPM's Office of Agency Compliance and Evaluation in the second

---

[10]Competitive status is a person's basic eligibility for noncom-
    petitive assignment to a position in the competitive service
    without open, competitive examination for the position.

[11]Preference eligibles are individuals who have been honorably
    discharged from a period of active military service; also
    included are wives, husbands, inlaws, widowers, and mothers of
    certain veterans.  These individuals receive additional points
    on competitive examinations depending on their veteran's
    category.

B-217032

quarter of fiscal year 1984.  This office is responsible for
conducting evaluations of agency personnel management prac-
tices.  A report on the results of the study is due at the end
of calendar year 1984.

- - - -

As requested by your office, we did not obtain agency com-
ments on this report.  Also, as arranged with your office, un-
less you publicly announce its contents earlier, we plan no
further distribution of this report until 30 days from the date
of the report.  At that time, we will send copies to interested
parties and make copies available to others upon request.

Sincerely yours,

William J. Anderson
Director

7

APPENDIX I                                                           APPENDIX I


## FILLING PROFESSIONAL AND ADMINISTRATIVE
## CAREER POSITIONS BEFORE AND AFTER PACE


### OBJECTIVES, SCOPE, AND METHODOLOGY

The Chairwoman, Subcommittee on Civil Service, House Committee on Post Office and Civil Service, asked us to obtain information on appointments made to PAC positions before and after the abolishment of PACE. As requested, we directed our efforts at answering five sets of questions.

--How many and what types of positions in each agency used to be filled through PACE? Have those same types of jobs been filled since the PACE was ended? How many have been filled, by agency? What selection devices have been used?

--What is the demographic makeup of employees hired under successor authorities to PACE?

--For each procedure currently in use for filling positions which used to be filled by PACE, does the selection device meet the requirements of merit selection under 5 U.S.C. 2301?

--Is the Schedule B hiring authority provided by OPM regulation adequate to replace PACE?

--How does OPM insure that agencies (a) comply with the requirements to receive Schedule B hiring authority, and (b) once that authority is received, carry out their appointment responsibilities consistent with applicable laws and regulations?

In conducting our work, we reviewed laws, regulations, OPM's and selected agencies' guidance relating to appointment methods, as well as agencies' selection procedures currently used to fill PAC positions formerly filled through PACE.

We reviewed past GAO reports on related subjects such as the PACE and the Uniform Guidelines on Employee Selection Procedures.[1] We also reviewed reports by the Merit Systems

---

[1] Federal Employment Examinations: Do They Achieve Equal Opportunity and Merit Principle Goals? (FPCD-79-46, May 15, 1979); and Uniform Guidelines on Employee Selection Procedures Should Be Reviewed and Revised (GAO/FPCD-82-26, July 30, 1982).

Protection Board and the National Academy of Public Administration[2] that discussed the advantages and disadvantages of the Schedule B PAC hiring authority.

Further, we interviewed officials at OPM and four selected federal agencies--the Departments of Navy and Health and Human Services, the Defense Logistics Agency, and the Internal Revenue Service--about the questions raised by the Chairwoman.  These four agencies were selected because, as of October 1983 when we began our survey, they had authority to fill about 77 percent of the total number of approved Schedule B PAC positions.  We also discussed Schedule B PAC with officials at the Department of Defense and the Merit Systems Protection Board's Merit Systems Review and Studies Office.

At OPM, we reviewed the files containing agency requests for Schedule B PAC and other related documents to determine and verify OPM procedures for granting approvals to make appointments to PAC positions under Schedule B.  We also obtained statistics from OPM, without independently verifying their accuracy, on (1) the number and type of PAC positions filled, by agency, (2) how these positions were filled before and after the PACE was abolished, and (3) demographic data on employees hired after PACE was abolished.  Most of these data were taken from OPM's Central Personnel Data File and, according to an OPM official, were the most current and accurate information available as of March 1984.

As requested by your office, we did not obtain agency comments on this report.  Our survey, conducted from October 1983 through March 1984, was performed in accordance with generally accepted government auditing standards.

## BACKGROUND

The federal government uses a variety of methods to fill vacancies in GS-5 and -7 entry level PAC positions.  These include internal promotions and reassignments, transfers from

---

[2] Report on the Significant Actions of the Office of Personnel Management During 1982, U.S. Merit Systems Protection Board, December 1983; and The Selection of College Graduates for the Federal Civil Service:  The Problem of the "PACE" Examination and the Consent Decree, Panel of the National Academy of Public Administration, March 1984.

other federal agencies, priority placement programs,[3] and hiring new employees. PAC appointments in these entry level positions have ranged from 58,483 in fiscal year 1979, to 26,451 in the last three quarters of fiscal year 1982.

From 1974 until its abolishment in August 1982, the principal device for examining and selecting new government employees for GS-5 and GS-7 entry level PAC positions was the PACE. It was a written, competitive examination. The number of PAC hires under PACE was 4,606 in fiscal year 1979 and 1,472 in the last three quarters of fiscal year 1982. One hundred twenty different career occupations were covered by the exam. These occupations are nonclerical in nature and involve regulatory and compliance work, administrative and management functions, claims and benefit examining, investigative and law enforcement duties, and social services work. See appendix II for a list of PAC occupations formerly filled through PACE.

The PACE was abolished as a result of a consent decree negotiated in the case of Luevano v. Devine. The objective of this consent decree was to eliminate adverse impact in the hiring of blacks and hispanics for positions filled through PACE. The decree required, in part, the phasing out of PACE and the development of alternative examining procedures which would validly and fairly test the relative capacity of applicants to perform in PAC occupations.

OPM abolished PACE in August 1982 and established a new Schedule B[4] appointing authority (Schedule B PAC) to use in external hiring of employees for entry level PAC positions. These positions were covered by PACE at the time it was abolished. Thus far, no alternative competitive examining procedures have been developed. OPM decided that the Schedule B PAC positions should be excepted from the competitive service because (1) there were no alternative written tests; (2) restrictions in federal employment would result in substantially reduced external hires in many former PAC occupations; and (3) the cost of developing validated competitive examinations consistent with the consent decree would be prohibitive, especially for occupations where relatively few hires are expected. OPM

---

[3] Priority placement programs are designed to help find new jobs for federal employees who have either been or are scheduled to be displaced from their positions through no fault of their own.

[4] Schedule B authority covers positions for which OPM has determined that it is not practical to hold a competitive examination. Authorization to use Schedule B must be requested from and approved by OPM.

believed that agencies could fill most vacancies that arise
either through internal placement, reinstatement of individuals
with civil service status, or through priority placement pro-
grams. When external hiring is considered necessary, agencies
may be granted Schedule B authority if they demonstrate to OPM
·that the positions cannot be filled through the other sources.

Employees hired under Schedule B PAC do not have competi-
tive status and cannot be noncompetitively promoted beyond the
GS-7 level or reassigned to positions not covered by the author-
ity. Schedule B PAC appointees may be advanced to the GS-9
level and converted to a competitive position only after they
undergo some form of competitive examining procedure and suc-
cessfully compete with other applicants for a position vacancy.
Pay, retirement, health benefits, life insurance, and leave
accrual provisions for Schedule B PAC employees are the same as
for competitive service employees. Also, agencies must observe
veterans preference in making Schedule B PAC appointments.

RESPONSES TO QUESTIONS
CONCERNING FILLING PAC POSITIONS

This section identifies the Chairwoman's questions relating
to appointments to PAC positions and provides details on the in-
formation we developed.

How many and what types of positions in each agency used to be
filled through PACE? Have those same types of jobs been filled
since the PACE was ended? How many have been filled, by
agency? What selection devices have been used?

What is the demographic makeup of employees hired under
successor authorities to PACE?

According to OPM officials, data showing the number and
types of PAC positions in each agency formerly filled through
the PACE were not available. However, governmentwide data on
PAC positions formerly filled through PACE were available along
with selected demographic data on PAC employees. Summaries of
this information are contained in appendix III.

For each procedure currently in use for filling positions which
used to be filled by PACE, does the selection device meet the
requirements of merit selection under 5 U.S.C. 2301?

Title 5 U.S.C. section 2301 enumerates the merit system
principles which are intended to serve as guides to federal
agencies in conducting their personnel management activities.
The principles apply to the full range of personnel processes
and decisions including recruitment, selection, advancement,
pay, and training.

4

With respect to the requirements of merit selection, section 2301(b)(1) provides that:

> ". . . selection . . . should be determined solely on the basis of relative ability, knowledge, and skills after fair and open competition which assures that all receive equal opportunity."

Most of the PAC positions filled since the PACE was abolished were filled by methods other than Schedule B PAC. These methods, such as promotions and reassignments, were also used to fill PAC positions prior to the abolishment of PACE. Agencies must follow standard, OPM prescribed procedures in making appointments under any of these methods. We therefore did not review the selection procedures used under these methods to determine if they complied with the merit principle for employee selection. However, we did review descriptions of the procedures used by the four agencies surveyed to select candidates for Schedule B PAC positions and discussed the Schedule B PAC selection practices with officials at these agencies. We found no indication that these selection procedures would violate the requirements of merit selection under Title 5 U.S.C. 2301. They all provided for what appeared to be open competition and a means of determining qualified candidates. Further, officials from the agencies we contacted and OPM's Office of Agency Compliance and Evaluation told us that, to their knowledge, no complaints or grievances relating to Schedule B PAC selection practices had been made.

It should be noted, however, that simply because a selection procedure appears to conform to merit requirements, there is no guarantee that during the actual selection process merit abuses will not occur. Some concern has been expressed that under Schedule B PAC, an increased opportunity exists for merit abuses because differing selection procedures are being used. OPM waived the Schedule B regulatory requirements[5] on selection for Schedule B PAC appointments to give agencies greater flexibility in complying with the requirements of the consent decree. As a result, agencies are permitted to use whatever selection procedure(s) they believe would best meet their particular needs.

The Merit Systems Protection Board and a panel of the National Academy of Public Administration expressed concern about the potential for merit abuse under Schedule B PAC. In

---

[5] 5 C.F.R., Part 302, Subpart C--Accepting, Rating, and Arranging Applications and Subpart D--Selection and Appointment. These provisions set out uniform procedures that agencies must follow in selecting and appointing employees.

its annual report on the significant actions of OPM for calendar
year 1982, the Board reported on the establishment of Schedule B
PAC and concluded that:

> ". . . the weakest link in this newly formed segment
> of the merit system chain is likely to be contained in
> the multitude of agency-developed recruitment and
> selection strategies or procedures that will be used
> under the new Schedule B authority."

In the Board's view, the weakness is caused by the dispersion of
responsibilities and the wide variety of formal and informal
agency selection procedures.  The Board concluded that this sit-
uation increases the opportunity for and the potential incidence
of merit abuses and the commission of prohibited personnel
practices.  Similarly, in a report on the PACE and the consent
decree, the Academy panel concluded, among other things, that
the use of Schedule B PAC invites abuse, such as vulnerability
to personal and political influence in appointments.  The Board
plans to continue monitoring the effects of the abolishment of
PACE and will report again on the use of the new Schedule B PAC
in its next annual report, which will focus on the significant
actions of OPM in calendar year 1983.

## Is the Schedule B hiring authority provided by the OPM regula-tion adequate to replace PACE?

Since the use of Schedule B PAC has been relatively limited
to date, we believe that its overall impact will not be known
for some time.  We did, however, obtain the views of selected
agency officials on the use of Schedule B PAC as a replacement
for the PACE.  In the opinion of the personnel officials from
our survey agencies, Schedule B PAC, while having advantages,
will not be an adequate replacement for PACE unless a viable
procedure is provided for converting the Schedule B PAC hires to
the competitive service.  The agency officials cited the
inability to noncompetitively convert Schedule B PAC employees
to the competitive service or promote them beyond the GS-7 level
as the major disadvantage of Schedule B PAC.  On the other hand,
these officials indicated that a major advantage of Schedule B
PAC is the increased flexibility it allows in recruiting and
selecting PAC employees.

According to OPM regulations, Schedule B PAC employees may
be converted to a competitive service appointment after success-
fully competing through a competitive examining process.  Agency
personnel officials with whom we spoke believe that the competi-
tive registers will be blocked by preference eligibles who are
not in Schedule B PAC positions.  These officials believed they
may, as a result, be unable to convert and promote large numbers
of their Schedule B PAC employees to competitive service GS-9

*6*

positions.  That is, the Schedule B PAC employees may not be
within reach on competitive registers because the preference
eligibles will likely be at the top of most register certifi-
cates.  OPM, on the other hand, believes that most Schedule B
PAC employees will be able to compete successfully through the
competitive examining process because of the specialized experi-
ence and training gained in their PAC positions.

Because of the concern about potential conversion problems,
the Department of Defense (DOD) developed a proposed executive
order which would allow the non-competitive conversion of its
Schedule B PAC employees to the competitive service.  Conversion
would be predicated, in part, on satisfactory performance;
demonstrated possession of the skills, knowledge, and abilities
required to perform successfully at the GS-9 level; and the
agency's recommendation for conversion.  However, we were told
by a DOD official that after several unsuccessful attempts to
obtain OPM's support, the Department decided not to pursue the
matter further.  OPM's position is that a special conversion
procedure should not be considered unless there are actual
problems.  Since, according to an OPM official, the majority of
the initial Schedule B PAC appointees will not be eligible for
promotion to the GS-9 level until late 1984, it is not known at
this time whether problems in promoting them will occur.

Several other problems associated with Schedule B PAC were
also cited by agency officials we interviewed.  These included
the following.

--The lengthy process of requesting and obtaining approval
  to make appointments under Schedule B PAC.  Under this
  authority, an activity must submit the request through
  its agency headquarters to OPM's central office.

--The lack of a governmentwide application point for
  applicants wishing to either obtain information about or
  be considered for a PAC position vacancy.

--The increased potential for abuse because agencies have
  developed and are using varied recruiting and selection
  procedures.  For example, there could be increased
  opportunity to make appointments on the basis of personal
  or political patronage.

According to personnel officials at the surveyed agencies,
Schedule B PAC allows increased flexibility to recruit and
select individuals to fill PAC positions.  These officials view
this increased flexibility as the major advantage of Schedule B
PAC.  Agencies are allowed, within the guidelines set by OPM and
in accordance with applicable regulations, to establish recruit-
ment and selection procedures to suit their particular needs.

APPENDIX I                                                    APPENDIX I

Agency officials stated that they can establish recruitment pro-
cedures which will give them more flexibility in meeting their
hiring goals.  For example, agencies can direct their recruiting
efforts to schools which are likely to yield qualified minor-
ities and women.  The result, according to these officials, is a
more diverse work force.

Agency officials cited two other advantages of Schedule B
PAC.

--There should be fewer declinations after job offers are
  made since applicants are applying for a specific job in
  a particular agency.

--Line managers will be more directly involved in the
  actual recruitment and selection process.

OPM has also expressed some concern about the use of Sched-
ule B PAC as a replacement for PACE.  In announcing the abolish-
ment of PACE and the planned establishment of the new Schedule B
PAC, the Director, OPM stated that:

"This is not an ideal solution for filling profession-
al administrative positions in the Federal Government
. . . . Nevertheless, this is the best available so-
lution, given the very tight constraints imposed by
the decree."

It was OPM's opinion at the time PACE was abolished that the
development of alternative examinations to PACE would be both
extremely costly and time-consuming.

OPM officials informed us that job specific examinations
are being developed for five PAC occupations which have large
numbers of hires:  tax technician, social insurance claims rep-
resentative, social insurance claims examiner, customs inspec-
tor, and internal revenue officer.  These examinations are at
various stages of development, but OPM officials could not pro-
vide any firm estimates as to when they might be implemented.
In addition, OPM officials stated that OPM has no definite plans
on the type of examining procedure(s) that may be developed for
the remaining PAC occupations.  According to an OPM official,
the development of the alternative examinations has been and may
continue to be hindered by a lack of sufficient staffing.  (The
size of the staff working on the development of the examinations
was reduced by about 50 percent in a 1982 reduction in force.)

8

How does OPM insure that agencies comply with the requirements to receive Schedule B hiring authority?

In its Federal Personnel Manual instructions on Schedule B PAC, OPM specified certain conditions that agencies must meet before it will grant Schedule B PAC. Prior to requesting the authority, agencies are required to make maximum use of internal priority placement programs as well as the two priority placement programs admini*tered by OPM--the Displaced Employee Program (DEP) and the Interagency Placement Assistance Program (IPAP)--and give appropriate consideration to available and qualified candidates with civil service status (candidates available for promotion, reassignment, transfer, or reinstatement to PAC positions).

As a means of ensuring adherence to these requirements, OPM requires that all requests for Schedule B PAC be submitted through the agency's headquarters to OPM's central office. According to OPM officials, after the requests for Schedule B PAC are received, OPM reviews them and other related documents submitted by the agencies to make sure that the agencies have provided the required information. Agencies must indicate the position(s) for which authority is needed; the use made of DEP and IPAP lists, merit promotion programs, reemployment, and repromotion priority lists; and other sources of candidates with civil service status. They must also state how veterans preference will be applied.

OPM does not, however, verify that agencies have met all the requirements to receive Schedule B PAC. OPM's policy is to accept the agency's statements with regard to consideration given priority placement eligibles and other status candidates unless those statements contain obvious conflicts or information that appears implausible or inconsistent. Although they are not required to, some agencies will submit various other documents, such as merit promotion vacancy announcements, to demonstrate that they have pursued internal sources before requesting Schedule B PAC. OPM verifies that agencies have contacted the appropriate OPM area office for DEP/IPAP candidates. If consideration of DEP/IPAP and status candidates or the provision for veterans preference appears inadequate, OPM requires the agency to take further action or provide clarification or additional information before the Schedule B PAC request will be approved. For example, an agency could be required to check with one of OPM's area offices for DEP/IPAP candidates or to provide information regarding how it plans to apply veterans preference in making Schedule B PAC appointments. On the basis of its review of the request and the agency's demonstration that external hiring is appropriate, OPM then authorizes the use of Schedule B PAC.

9

Our review of the 79 agency requests for Schedule B PAC, received by OPM as of the end of October 1983, confirmed that agencies provided the required information and OPM verified the agencies' use of the DEP and IPAP lists before approving appointments under Schedule B PAC.

<u>How does OPM insure that agencies, once Schedule B authority is received, carry out their appointment responsibilities consistent with applicable laws and regulations?</u>

According to OPM procedures, Schedule B PAC monitoring and evaluation activities include reviewing agency reports required by the consent decree, data from OPM's Central Personnel Data File, and its evaluation of agency personnel management operations. OPM officials informed us that there are no plans to conduct any separate studies or evaluations regarding the use of Schedule B PAC. Rather, Schedule B PAC was reviewed in the second quarter of fiscal year 1984 as part of a broad personnel management evaluation study relating to federal staffing practices conducted by OPM's Office of Agency Compliance and Evaluation (ACE).

OPM's current personnel management evaluation program is designed to provide information on the current status of governmentwide personnel programs and related personnel policy issues. Under its revised evaluation approach and methodology, ACE developed a 5-year plan which it believes will permit OPM to generalize governmentwide about the results of ACE's evaluation work. Previously, ACE's work was basically limited to evaluating the personnel management programs of individual agency installations. Over a 5-year period, fiscal years 1984 to 1988, ACE plans to gather baseline information on five personnel management issues: position classification; position management; staffing (which includes appointing authorities such as Schedule B PAC); performance management; and personnel administration. This will be accomplished through 1 day, on-site visits at approximately 4,000 government installations over the 5-year period.

As part of this new evaluation approach, ACE will conduct quarterly studies of aspects of the five personnel management programs. In this respect, one study, which was conducted in the second quarter of fiscal year 1984, addressed how the federal government appoints and promotes its employees. Specifically, the study examined the various ways hiring authorities (including Schedule B PAC) are administered, the results they achieve, the costs they incur, and whether they are in compliance with applicable laws and regulations. A report on the results of the study is due at the end of calendar year 1984. According to ACE's evaluation program plan, a more detailed, compliance type review would be conducted in any area, for example, the use of Schedule B PAC, if systemic problems are identified during the general evaluation phase of a study.



## PAC OCCUPATIONS FORMERLY FILLED THROUGH PACE

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| 011 | Bond Sales Promotion | 222 | Occupational Analyst |
| 018 | Safety Management | 223 | Salary and Wage Administration |
| 020 | Community Planning | | |
| 023 | Outdoor Recreation Specialist | 230 | Labor Management and Employee Relations |
| 025 | Park Management | 233 | Labor Relations |
| *027 | Crop Insurance Administration (except for field man and field specialist positions) | 235 | Employee Development |
| | | 244 | Labor Management Relations Examining |
| | | 246 | Contractor Industrial Relations |
| 028 | Environmental Protection | 249 | Wage and Hour Compliance Specialist |
| 080 | Security Administration | 301 | General Clerical and Administrative |
| 101 | Social Science | | |
| 105 | Social Insurance Administration | *334 | Computer Specialist (Trainee) |
| 106 | Unemployment Insurance | 341 | Administrative Officer |
| *110 | Economist | 343 | Management Analysis |
| 120 | Food Assistance Program Specialist | 345 | Program Analysis |
| | | 346 | Logistic Management |
| 130 | Foreign Affairs | 393 | Communications Specialist |
| 131 | International Relations | | |
| 132 | Intelligence | 501 | General Accounting Clerical and Administrative |
| 140 | Manpower Research and Analysis | | |
| 142 | Manpower Development | 526 | Tax Technician |
| 150 | Geography | 560 | Budget Administration |
| 170 | History | **570 | Financial Institution Examining[a] |
| 180 | Psychology | | |
| 184 | Sociology | 673 | Hospital Housekeeping Management |
| 187 | Social Sciences | | |
| 190 | General Anthropology | 685 | Public Health Program Specialist |
| 193 | Archeology | | |
| 201 | Personnel Management | 950 | Paralegal Specialist |
| 205 | Military Personnel Management | 962 | Contact Representative |
| | | 965 | Land Law Examining |
| 212 | Personnel Staffing | 967 | Passport and Visa Examining |
| 221 | Position Classification | | |

## PAC OCCUPATIONS FORMERLY FILLED THROUGH PACE

| Series | Title | Series | Title |
|---|---|---|---|
| 987 | Tax Law Specialist | | Fisheries Marketing Reporter |
| 990 | General Claims Examining | 1149 | Wage and Hour Law Administration |
| 991 | Workmen's Compensation Claims Examining | 1150 | Industrial Specialist |
| 993 | Social Insurance Claims Examining | 1160 | Financial Analysis |
| 994 | Unemployment Compensation Claims Examining | 1163 | Insurance Examining |
| | | 1165 | Loan Specialist |
| | | 1169 | Internal Revenue Officer |
| 996 | Veterans Claims Examining | 1170 | Realty |
| 997 | Civil Service Retirement Claims Examining | 1171 | Appraising and Assessing |
| | | 1173 | Housing Management |
| 1001 | General Arts and Information (Fine and Applied Arts positions are excluded) | 1176 | Building Management |
| | | *1410 | Librarian (for certain trainee positions at GS-5) |
| 1015 | Museum Curator | 1412 | Technical Information Services |
| 1035 | Public Affairs | 1420 | Archivist |
| 1081 | Public Information | 1421 | Archives Specialist |
| 1082 | Writing and Editing | *1654 | Printing Management |
| 1083 | Technical Writing and Editing | 1701 | General Education and Training |
| 1101 | General Business and Industry | 1715 | Vocational Rehabilitation (GS-7 only) |
| 1102 | Contract and Procurement | 1720 | Education Research and Program Specialist |
| 1103 | Industrial Property Management | */**1810 | General Investigation |
| 1104 | Property Disposal | 1811 | Criminal Investigation (except for Treasury Enforcement Agents) |
| 1130 | Public Utility Specialist | | |
| 1140 | Trade Specialist | | |
| 1145 | Agriculture Program Specialist | | |
| 1146 | Agriculture Marketing | | |
| 1147 | Agricultural and | | |

APPENDIX II                                                          APPENDIX II

### PAC OCCUPATIONS FORMERLY FILLED THROUGH PACE

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| *1812 | Game Law Enforcement (GS-5 only) | 2010 | Inventory Management |
| **1816 | Immigration Inspection[b] | 2030 | Distribution Facilities and Storage Management |
| 1831 | Securities Examining Compliance | 2032 | Packaging Specialist |
| 1854 | Alcohol, Tobacco, and Firearms Inspection | 2050 | Supply Cataloging |
| *1860 | Public Health Inspection | 2101 | General Transportation |
|  |  | *1135/2110 | Transportation Industry Analysis |
| 1864 | Public Health Quarantine Inspection | 2111 | Transportation Rate and Tariff Examiner |
| 1889 | Import Specialist | 2125 | Highway Safety Management |
| 1890 | Customs Inspection | 2130 | Traffic Management |
| *1893 | Customs Marine Officer | 2144 | Cargo Scheduling |
| **1910 | Quality Assurance Specialist | 2150 | Transport Operations |
| 2001 | General Supply |  |  |
| 2003 | Supply Program Management |  |  |

*These PAC occupations which were abolished or removed from coverage of PACE prior to the effective date of the consent decree were not subject to Schedule B PAC at the time of our survey.

**These PAC occupations which are competitively filled by agencies having delegated examining authority were not subject to Schedule B PAC at the time of our survey.

---

[a]The Federal Deposit Insurance Corporation and Federal Home Loan Bank Board have delegated examining authority for GS-5 positions and GS-5/7 positions, respectively.

[b]The delegated examining authority for this PAC occupation covers GS-5 positions only.

PAC APPOINTMENTS UNDER PACE
FISCAL YEARS 1979 THROUGH 1982

| Occupational Series and Group | Fiscal Year 1979 Number of Appointments | Percent | Fiscal Year 1980 Number of Appointments | Percent | Fiscal Year 1981 Number of Appointments | Percent | Fiscal Year 1982 Number of Appointments | Percent |
|---|---|---|---|---|---|---|---|---|
| 000 Miscellaneous Occupations Group | 75 | 1.6 | 89 | 2.1 | 76 | 2.5 | 15 | 1.0 |
| 100 Social Science, Psychology, and Welfare Group | 796 | 17.3 | 652 | 15.7 | 136 | 4.5 | 15 | 1.0 |
| 200 Personnel Management and Industrial Relations Group | 125 | 2.7 | 137 | 3.3 | 73 | 2.4 | 13 | .9 |
| 300 General Administrative, Clerical, and Office Service Group | 628 | 13.6 | 766 | 18.4 | 361 | 11.9 | 106 | 7.2 |
| 500 Accounting and Budget Group | 553 | 12.0 | 530 | 12.8 | 198 | 6.5 | 37 | 2.5 |
| 600 Medical, Hospital, Dental, and Public Health Group | 26 | .6 | 49 | 1.2 | 10 | .3 | 24 | 1.6 |
| 900 Legal and Kindred Group | 823 | 17.9 | 592 | 14.3 | 1,100 | 36.2 | 433 | 29.4 |
| 1000 Information and Art Group | 68 | 1.5 | 66 | 1.6 | 55 | 1.8 | 13 | .9 |
| 1100 Business and Industry Group | 776 | 16.8 | 615 | 14.8 | 582 | 19.1 | 698 | 47.4 |
| 1400 Library and Archives Group | 36 | .8 | 19 | .5 | 8 | .3 | 6 | .4 |
| 1600 Equipment, Facilities, and Service Group | 3 | .1 | 0 | .0 | 0 | .0 | 0 | .0 |
| 1700 Education Group | 10 | .2 | 1 | .0 | 9 | .3 | 0 | .0 |
| 1800 Investigation Group | 306 | 6.6 | 281 | 6.8 | 108 | 3.5 | 22 | 1.5 |

APPENDIX III

PAC APPOINTMENTS UNDER PACE
FISCAL YEARS 1979 THROUGH 1982

| Occupation Series and Group | Fiscal Year 1979 | | Fiscal Year 1980 | | Fiscal Year 1981 | | Fiscal Year 1982[a] | |
|---|---|---|---|---|---|---|---|---|
| | Number of Appointments | Percent | Number of Appointments | Percent | Number of Appointments | Percent | Number of Appointments | Percent |
| 1900  Quality Assurance, Inspection and Grading Group | 129 | 2.8 | 142 | 3.4 | 127 | 4.2 | 4 | .3 |
| 2000  Supply Group | 229 | 5.0 | 179 | 4.3 | 173 | 5.7 | 84 | 5.7 |
| 2100  Transportation Group | 23 | .5 | 32 | .8 | 25 | .8 | 2 | .2 |
| Total | 4,606 | 100.0 | 4,150 | 100.0 | 3,041 | 100.0 | 1,472 | 100.0 |

[a]Includes only those appointments made in the last three quarters of fiscal year 1982.

APPENDIX III

APPENDIX III

APPOINTMENTS[a] BY RACE AND NATIONAL ORIGIN
AFTER THE ABOLISHMENT OF PACE
OCTOBER 1, 1982 TO JUNE 30, 1983

| Appointment Method | White | | Black | | Hispanic | | Other | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | |
| Promotion | 8,630 | 73.3 | 2,145 | 18.2 | 653 | 5.5 | 353 | 3.0 | 11,781 |
| Reassignment | 5,509 | 74.3 | 1,322 | 17.8 | 359 | 4.9 | 223 | 3.0 | 7,413 |
| Reinstatement | 519 | 73.6 | 111 | 15.8 | 56 | 7.9 | 19 | 2.7 | 705 |
| Transfer | 271 | 75.7 | 55 | 15.3 | 21 | 5.9 | 11 | 3.1 | 358 |
| OPM Alternative Competitive Exams | 401 | 84.4 | 40 | 8.4 | 16 | 3.4 | 18 | 3.8 | 475 |
| PACE [b] | 384 | 85.5 | 43 | 9.6 | 16 | 3.6 | 6 | 1.3 | 449 |
| Schedule B PAC Authority | 185 | 52.3 | 95 | 26.8 | 53 | 15.0 | 21 | 5.9 | 354 |
| Veterans Readjustment Authority | 177 | 71.1 | 47 | 18.9 | 13 | 5.2 | 12 | 4.8 | 249 |
| Delegated Examining Authority | 166 | 75.5 | 28 | 12.7 | 22 | 10.0 | 4 | 1.8 | 220 |
| Direct Hire Authority | 75 | 81.5 | 9 | 9.8 | 5 | 5.4 | 3 | 3.3 | 92 |
| Cooperative Education Program | 49 | 69.0 | 16 | 22.6 | 2 | 2.8 | 4 | 5.6 | 71 |
| Bicultural/Bilingual Program | 0 | .0 | 0 | .0 | 1 | 25.0 | 3 | 75.0 | 4 |
| Outstanding Scholar Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Federal Junior Fellowship Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Other | 3,209 | 76.8 | 567 | 13.6 | 216 | 5.2 | 186 | 4.4 | 4,178 |
| Total | 19,575 | 74.3 | 4,478 | 17.0 | 1,433 | 5.4 | 863 | 3.3 | 26,349 |

[a]Covers appointments to GS-5 and GS-7 entry level positions only.  Includes promotions, reassignments, reinstatements, or transfers occurring when an individual moves from either a non-PAC occupation or another PAC occupation.

[b]PACE certificates could be used for a 60-day period after OPM announced the abolishment of PACE on September 9, 1982.

APPENDIX III

SCHEDULE B PAC APPOINTMENTS
BY RACE AND NATIONAL ORIGIN AFTER
THE ABOLISHMENT OF PACE
OCTOBER 1, 1982 TO DECEMBER 31, 1983

|  | Oct. 1, 1982 to June 30, 1983 | | July 1, 1983 to Dec. 30, 1983 | | Total | |
|---|---|---|---|---|---|---|
|  | Number | Percent | Number | Percent | Number | Percent |
| White | 185 | 52.3 | 1,171 | 67.6 | 1,356 | 65. |
| Black | 95 | 26.8 | 414 | 23.9 | 509 | 24.4 |
| Hispanic | 53 | 15.0 | 147 | 8.5 | 200 | 9.6 |
| Other | 21 | 5.9 | - | - | 21 | 1.0 |
| Total | 354 | 100.0 | 1,732 | 100.0 | 2,086 | 100.0 |

## GOVERNMENTWIDE PAC APPOINTMENTS[a] BY SEX AFTER THE ABOLISHMENT OF PACE OCTOBER 1, 1982 TO JUNE 30, 1983

| Appointment Method | Female Number | Female Percent | Male Number | Male Percent | Unspecified Number | Unspecified Percent | Total |
|---|---|---|---|---|---|---|---|
| Promotion | 8,142 | 69.1 | 3,637 | 30.9 | 2 | .0 | 11,781 |
| Reassignment | 5,257 | 70.9 | 2,155 | 29.1 | 1 | .0 | 7,413 |
| Reinstatement | 379 | 53.8 | 326 | 46.2 | 0 | .0 | 705 |
| Transfer | 186 | 52.0 | 172 | 48.0 | 0 | . | 358 |
| OPM Alternative Competitive Exams | 194 | 40.8 | 281 | 59.2 | 0 | .0 | 475 |
| PACE[b] | 242 | 53.9 | 207 | 46.1 | 0 | .0 | 449 |
| Schedule B PAC Authority | 120 | 33.9 | 234 | 66.1 | 0 | .0 | 354 |
| Veterans Readjustment Authority | 8 | 3.2 | 241 | 96.8 | 0 | .0 | 249 |
| Delegated Examining Authority | 44 | 20.0 | 176 | 80.0 | 0 | .0 | 220 |
| Direct Hire Authority | 36 | 39.1 | 56 | 60.9 | 0 | .0 | 92 |
| Cooperative Education Program | 41 | 57.7 | 30 | 42.3 | 0 | .0 | 71 |
| Bicultural/Bilingual Program | 1 | 25.0 | 3 | 75.0 | 0 | .0 | 4 |
| Outstanding Scholar Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Federal Junior Fellowship Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Other | 1,769 | 42.4 | 2,408 | 57.6 | 1 | .0 | 4,178 |
| Total | 16,419 | 62.3 | 9,926 | 37.7 | 4 | .0 | 26,349 |

[a]Covers appointments to GS-5 and GS-7 entry level positions only. Includes promotions, reassignments, reinstatements, or transfers occurring when an individual moves from either a non-PAC occupation or another PAC occupation.

[b]PACE certificates could be used for a 60-day period after OPM announced the abolishment of PACE on September 9, 1982.

GOVERNMENTWIDE PAC APPOINTMENTS[a] BY VETERANS PREFERENCE STATUS
AFTER THE ABOLISHMENT OF PACE
OCTOBER 1, 1982 TO JUNE 30, 1983

| Appointment Method | Veterans Preference | | Non-Veterans Preference | | Unspecified | | Total |
|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | |
| Promotion | 2,087 | 17.7 | 9,691 | 82.3 | 3 | .0 | 11,781 |
| Reassignment | 1,337 | 18.0 | 6,076 | 82.0 | 0 | .0 | 7,413 |
| Reinstatement | 175 | 24.8 | 530 | 75.2 | 0 | .0 | 705 |
| Transfer | 101 | 28.2 | 257 | 71.8 | 0 | .0 | 358 |
| OPM Alterative Competitive Exams | 144 | 30.3 | 331 | 69.7 | 0 | .0 | 475 |
| PACE[b] | 81 | 18.0 | 368 | 82.0 | 0 | .0 | 449 |
| Schedule B PAC Authority | 115 | 32.5 | 239 | 67.5 | 0 | .0 | 354 |
| Veterans Readjustment Authority | 247 | 99.2 | 2 | .8 | 0 | .0 | 249 |
| Delegated Examining Authority | 100 | 45.5 | 120 | 54.5 | 0 | .0 | 220 |
| Direct Hire Authority | 26 | 28.3 | 66 | 71.7 | 0 | .0 | 92 |
| Cooperative Education Program | 2 | 2.8 | 69 | 97.2 | 0 | .0 | 71 |
| Bicultural/Bilingual Program | 2 | 50.0 | 2 | 50.0 | 0 | .0 | 4 |
| Outstanding Scholar Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Federal Junior Fellowship Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Other | 808 | 19.3 | 3,361 | 80.5 | 9 | .2 | 4,178 |
| Total | 5,225 | 19.8 | 21,112 | 80.1 | 12 | .1 | 26,349 |

[a]Covers appointments to GS-5 and GS-7 entry level positions only. Includes promotions, reassignments, reinstatements, or transfers occurring when an individual moves from either a non-PAC occupation or another PAC occupation.

[b]PACE certificates could be used for a 60-day period after OPM announced the abolishment of PACE on September 9, 1982.

(966175)

APPENDIX III

APPENDIX III

20

GOVERNMENTWIDE PAC APPOINTMENTS[a] BY AGE
AFTER THE ABOLISHMENT OF PACE
OCTOBER 1, 1982 TO JUNE 30, 1983

| Appointment Method | Under 25 Years Old | | 25-40 Years Old | | 41-64 Years Old | | 65 Years Or Older | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | |
| Promotion | 1,522 | 12.9 | 7,557 | 64.1 | 2,671 | 22.7 | 31 | .3 | 11,781 |
| Reassignment | 633 | 8.5 | 4,641 | 62.6 | 2,105 | 28.4 | 34 | .5 | 7,413 |
| Reinstatement | 46 | 6.5 | 539 | 76.5 | 119 | 16.9 | 1 | .1 | 705 |
| Transfer | 11 | 3.1 | 253 | 70.6 | 93 | 26.0 | 1 | .3 | 358 |
| OPM Alternative Competitive Exams | 114 | 24.0 | 297 | 62.5 | 62 | 13.1 | 2 | .4 | 475 |
| PACE[b] | 147 | 32.7 | 244 | 54.4 | 58 | 12.9 | 0 | .0 | 449 |
| Schedule B PAC Authority | 59 | 16.7 | 229 | 64.7 | 66 | 18.6 | 0 | .0 | 354 |
| Veterans Readjustment Authority | 0 | .0 | 149 | 59.8 | 100 | 40.2 | 0 | .0 | 249 |
| Delegated Examining Authority | 28 | 12.7 | 140 | 63.6 | 51 | 23.2 | 1 | .5 | 220 |
| Direct Hire Authority | 20 | 21.8 | 59 | 64.1 | 13 | 14.1 | 0 | .0 | 92 |
| Cooperative Education Program | 32 | 45.1 | 38 | 53.5 | 1 | 1.4 | 0 | .0 | 71 |
| Bicultural/Bilingual Program | 1 | 25.0 | 1 | 25.0 | 2 | 50.0 | 0 | .0 | 4 |
| Outstanding Scholar Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Federal Junior Fellowship Program | 0 | .0 | 0 | .0 | 0 | .0 | 0 | .0 | 0 |
| Other | 1,226 | 29.4 | 2,277 | 54.5 | 649 | 15.5 | 26 | .6 | 4,178 |
| Total | 3,819 | 14.6 | 16,424 | 62.3 | 5,990 | 22.7 | 96 | .4 | 26,349 |

[a]Covers appointments to GS-5 and GS-7 entry level positions only. Includes promotions, reassignments, reinstatements, or transfers occurring when an individual moves from either a non-PAC occupation or another PAC occupation.

[b]PACE certificates could be used for a 60-day period after OPM announced the abolishment of PACE on September 9, 1982.

U.S. Department of Justice

*79-271*

*Washington, D.C. 20530*

Richard Seymour, Esq.
Lawyers Committee for Civil
  Rights Under Law
1400 "Eye" St. N.W.
Wahington, D.C.

FILED

June 5, 1987    JUN  5 1987

CLERK

Re: Luevano v. Horner

Dear Mr. Seymour:

This letter will confirm our past conversations concerning the RIF that had been announced at the Naval Supply Center, Jacksonville, Florida.

Attached is a statement from the Naval Supply Center, Jacksonville, Florida, stating that the RIF is cancelled. Until such time as the status of Schedule B employees is resolved by the Court in NTEU v. Horner, (D.D.C. 84-2573), the Navy will not take any action to terminate those Schedule B employees who had previously received RIF notices. Once the NTEU case has been resolved, the Navy will reevaluate its employment needs at that time and will act in accord with those needs and the dictates of the Court's final decision.

Additionally, it is my understanding that Mr. Randy Britt has never filed an administrative claim for the back pay which he believes he is owed. He should file such a claim with the Personnel Office at Jacksonville Naval Supply Center. If this claim is not resolved to Mr. Britt's satisfaction, please bring the matter to my attention. If we are unable to resolve the matter, you would of course be free to pursue resolution of the matter by the Court.

Should you have any questions concerning this matter, please feel free to contact me.

Very truly yours,

Barbara

Barbara Ward
Attorney
Civil Division
Department of Justice

*Exhibit 5*



# DEPARTMENT OF THE NAVY
### NAVAL SUPPLY CENTER
### JACKSONVILLE, FLORIDA 32212-0097

IN REPLY REFER TO:
03
5 June 1987

From:  Commanding Officer, Naval Supply Center Jacksonville
To:    Commander, Naval Supply Systems Command (SUP 93)

Subj:  NOTICE, REDUCTION-IN-FORCE

1.  For record purposes, the reduction-in-force noticed by my 30 January 1987 memoranda to affected Naval Supply Center Jacksonville employees is of no further legal force and effect and is cancelled by operation of law.

B. J. HUFFMAN

79-271

17537

Federal Register

Vol. 52, No. 90

Monday, May 11, 1987

# Presidential Documents

Title 3—

**The President**

Executive Order 12596 of May 7, 1987

### Noncompetitive Conversion to Career Status of Certain Employees in Professional and Administrative Career Positions

By the authority vested in me as President by the Constitution and laws of the United States of America, including sections 3301 and 3302 of title 5 of the United States Code, it is hereby ordered as follows:

**Section 1.** An individual who is employed in a Professional or Administrative Career position under Schedule B under the authority of 5 C.F.R. 213.3202(l) may be converted noncompetitively to a career or career-conditional appointment at GS–9, provided the individual meets the qualifications and other requirements established by the Director of the Office of Personnel Management, and further provided the individual's performance is determined by the employing agency, in a careful and formal evaluation, to warrant such conversion at GS–9.

**Sec. 2.** The Director of the Office of Personnel Management shall prescribe such regulations as may be necessary to implement this Order.

*Ronald Reagan*

THE WHITE HOUSE,
*May 7, 1987.*

[FR Doc. 87–10883
Filed 5–8–87; 11:23 am]
Billing code 3195-01-M

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Exhibit 6

## Certificate of Service

I certify that, on June 5, 1987, I served a copy of the foregoing Defendants' Memorandum In Opposition To Plaintiffs' Motion For A Determination That The Use Of Schedule B Hiring Does Not Constitute An "Alternative Examining Procedure" Within The Meaning Of The Consent Decree, And Motion For Injunctive Relief, by first-class mail, postage prepaid, on:

> Richard T. Seymour
> Lawyer's Committee For Civil
>   Rights Under Law
> Suite 400
> 1400 "Eye" Street, N.W.
> Washington, D.C.  20005

Jeffrey S. Paulsen

JUN   5  1987

JUN 5  6 04 PM '87    UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 5 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 79-0271 (JHG) |
| CONSTANCE HORNER, Director. ) | |
| Office of Personnel ) | |
| Management, et al., ) | |
| ) | |
| Defendants. ) | |

DEFENDANT'S MOTION AND SUPPORTING
MEMORANDUM FOR AN ENLARGEMENT OF TIME

Defendant, by its undersigned counsel, hereby moves for an
enlargment of time to and including Friday, June 19, 1987, to
serve its response to the National Treasury Employee Union's
(NTEU) Motion to Intervene in the above-captioned action.

This enlargement of time is necessary because the
undersigned counsel, who has primary litigation responsiblity,
was an annual leave for one week of the response period.
Additionally, counsel has been unable to devote adequate time to
a response because of the press of other previously pending
litigation matters, including those of this action.

Counsel for NTEU has been informed of this motion and has no
objection.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

*Barbara Ward*

RICHARD E. GREENBERG
BARBARA WARD
JEFFREY S. PAULSEN
Room 3336 - Civil Division
Departmetn of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3781

- 2 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion For An

Enlargement of Time was mailed, postage prepaid, this 5th day of

June 1987 to:

      Clinton D. Wolcott, Esq.
      National Treasury Employee Union
      1730 K Street, N.W.
        Suite 1101
      Washington, D.C.  20006

      Richard Seymour, Esq.
      Lawyers Committee for Civil
        Rights Under Law
      1400 "Eye" Street, N.W.
        Suite 400
      Washington, D.C.  20005

BARBARA WARD

JUN  5 1987

JUN 5  3 40 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al</u>.,                )
                                                     )
            Plaintiffs,                              )
                                                     )
        v.                                           )        Civil Action
                                                     )        No. 79-0271 (JHG)
CONSTANCE HORNER, Director.                          )
        Office of Personnel                          )
        Management, <u>et</u> <u>al</u>.,            )
                                                     )
            Defendants.                              )
_____)

**FILED**

JUN - 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>ORDER</u>

Upon consideration of the defendant's Motion For An

Enlargement of Time to respond to NTEU's Motion To Intervene, it

is hereby

ORDERED, that the defendant shall have to and including

Friday, June 19, 1987 to serve its response to the NTEU's Motion

To Intervene.

_____
UNITED STATES DISTRICT JUDGE

( N )

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
        individually and on behalf )
        of all others similarly    )
        situated,                  )
                                         )
                Plaintiffs,        )
                                         )
        v.                         )        C.A. No. 79-0271-JHG
                                         )
CONSTANCE HORNER, Director,        )
        U.S. Office of Personnel   )        **FILED**
        Management, et al.,        )
                                         )        JUN 15 1987
                Defendants.        )
                                         )        CLERK, U.S. DISTRICT COURT
                                                  DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION'S
MOTION FOR EXTENSION OF TIME TO
FILE REPLY

        Pursuant to Local Rule 108, intervenor National

Treasury Employees Union (NTEU) moves that it be permitted to

reply to the plaintiff's opposition to its motion to

intervene at the same time it replies to the defendants'

delayed response to its motion.

        The plaintiffs have filed an opposition to NTEU's

intervention and the defendants have moved to file their

response on Friday, June 19, 1987.  NTEU wishes to reply to

all responses to intervention in one filing and therefore

moves that it reply to the plaintiffs' opposition within the

time period specified for replying to the defendants'

response.

-2-


          Counsel for the plaintiffs and the defendants have no

objection to this request.


                              Respectfully submitted,



                              _____
                              Lois G. Williams
                              Director of Litigation
                              D.C. Bar No. 365894



                              _____
                              Clinton D. Wolcott
                              Assistant Counsel
                              D.C. Bar No. 343202


                              National Treasury Employees
                              Union
                              1730 K Street, N.W.
                              Suite 1100
                              Washington, D.C. 20006
                              (202) 785-4411

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 15 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        individually and on behalf )
        of all others similarly    )
        situated,                  )
                                   )
                  Plaintiffs,      )
                                   )
        v.                         )    C.A. No. 79-0271-JHG
                                   )
CONSTANCE HORNER, Director,        )
        U.S. Office of Personnel   )
        Management, et al.,        )
                                   )
                  Defendants.      )
                                   )

POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR EXTENSION OF TIME TO
FILE REPLY
_____

        Both the plaintiffs and the defendants have indicated

that they intend to respond to the National Treasury

Employees Union's (NTEU's) motion to intervene in this

action.  The plaintiffs' opposition was served "June 5-6" and

the defendants have requested until June 19 to respond.

        To avoid confusion and repetition, NTEU wishes to

reply to both responses in one filing.  Assuming that the

defendants serve their response by mail on June 19, as

indicated, NTEU's reply would be due June 29.  NTEU requests

that it be permitted to file its reply to the plaintiffs'

opposition at that time.

-2-

Counsel for the plaintiffs and the defendant's have no objection to this request.

Respectfully submitted,

Lois G. Williams
Director of Litigation
D.C. Bar No. 365894

Clinton D. Wolcott
Assistant Counsel
D.C. Bar No. 343202

National Treasury Employees
Union
1730 K Street, N.W.
Suite 1100
Washington, D.C. 20006

(202) 785-4411

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached Motion For Extenstion of Time To File Reply, with accompanying memorandum, was mailed, first class, on June 11, 1987 to:

Richard T. Seymour
Lawyers Committee for Civil
   Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C. 20005

Barbara L. Ward
U.S. Department of Justice
Civil Division
Tenth & Pennsylvania Avenue, N.W.
Room 3509
Washington, D.C. 20530

James S. Green
Office of Personnel Management
1900 F Street, N.W.
Washington, D.C. 20415

Clinton D. Wolcott

RECEIVED

JUN 15   3 53 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JUN 1 5 1987

RECEIVED

JUN 11   3 00 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

THIS CASE CONSISTS OF MORE THAN ONE VOLUME. DO NOT
PLACE ANY PLEADINGS IN THIS VOLUME OTHER THAN FOR
THE PERIOD OF TIME SPECIFIED IN THE UPPER RIGHT HAND
CORNER OF THIS JACKET FRONT.

CO-594
NEW 7/73

THIS CASE CONSISTS OF MORE THAN ONE VOLUME. DO NOT PLACE ANY PLEADINGS IN THIS VOLUME OTHER THAN FOR THE PERIOD OF TIME SPECIFIED IN THE UPPER RIGHT HAND CORNER OF THIS JACKET FRONT.