# CIVIL CASE NO. _79-271_

VOL. _3_ OF _____

FROM _7·15·87_ TO _7/31/87_

_Angel G. Luevano,_
_et al._

VERSUS

_Constance Horner, et al._
_( director, O. P. M.)_

| DEPOSITIONS | |
|---|---|
| TRANSCRIPTS | |
| EXHIBITS | |
| OTHER | |

| DATE | COURT CLERK'S MEMORANDUM | JUDGE |
|---|---|---|
| | | |
| | | |
| | _Temporary_ | |
| | _Jacket_ | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

1:79CV0271-004

THIS CASE CONSISTS OF MORE THAN ONE VOLUME. DO NOT
PLACE ANY PLEADINGS IN THIS VOLUME OTHER THAN FOR
THE PERIOD OF TIME SPECIFIED IN THE UPPER RIGHT HAND
CORNER OF THIS JACKET FRONT.

CO-594
NEW 7/73

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　individually and on behalf of　)
　　all others similarly situated,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiffs,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　)　　C. A. No. 79-0271
　　　　　　　　　　　　　　　　　　　)
CONSTANCE HORNER, Director,　　　　)
　　U.S. Office of Personnel　　　　)
　　Management, <u>et al.</u>,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendants.　)

FILED

JUL 15 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' MOTION TO ENFORCE THE APPLICANT-REPORTING
PROVISIONS OF THE DECREE BY REQUIRING THE COMPLETE OR
<u>VIRTUALLY COMPLETE RACIAL IDENTIFICATION OF APPLICANTS</u>

　　　　Plaintiffs hereby move to enforce the requirement of
¶ 25 of the Consent Decree that the defendants report the number
of all non-Hispanic white applicants, the number of non-Hispanic
black applicants, and the number of Hispanic applicants for each
alternative examining procedure.　In violation of the Consent
Decree, the defendants have failed to do so, and have refused to
take the steps necessary to come into compliance with the Consent
Decree.　The grounds for this Motion are as follows:

　　　　A.　<u>The Defendants' Obligations</u>

　　　　1. The Consent Decree mandates the defendant Office of
Personnel Management to require each Federal agency to collect,
maintain, and compile accurate and complete information on the
racial and Hispanic status of all applicants for alternative
examining procedures.　Paragraph 25 of the Decree states in
pertinent part:

25. In order to enable plaintiffs effectively to monitor compliance by the various agencies and by OPM with their obligations as to alternative examining procedures, and to use, to the greatest extent feasible, the special programs described in ¶ 16, OPM shall require each Federal agency to collect, maintain and compile the following statistics for each job category or alternative examining procedure on a nationwide basis, on the basis of the geographic, or other areas formerly used for PACE announcement attached hereto as Appendix B, or other area on an agency-by-agency basis (nationally and by such geographic area or other hiring entity), and by job category (nationally and by such geographic area or other hiring entity), and to submit such information to OPM and to plaintiffs annually:

(a) The number of non-Hispanic white applicants, the number of black applicants, and the number of Hispanic applicants for a GS-5 or GS-7 entry-level job category listed in Appendix A which is filled on the basis of a competitive procedure;

\*          \*          \*

Similarly, ¶¶ 24 and 24(a) of the Consent Decree expressly required OPM to "collect, maintain and compile" statistics on "the number of non-Hispanic white applicants, the number of black applicants, and the number of Hispanic applicants who take the PACE ... ."

2. The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4, 43 Fed.Reg. 38290, 38297 (1978), independently require the defendants to collect, maintain, and compile accurate and complete information on the number of applicants of each race and ethnic group. Sec. 1607.4(A), 43 Fed.Reg. 38297, states in pertinent part:

A. Records concerning impact. Each user should maintain and have available for inspection records or other information which will disclose

> the impact which its tests and other selection
> procedures have upon employment opportunities of
> persons by identifiable race, sex, or ethnic group
> as set forth in subparagraph B below in order to
> determine compliance with these guidelines. ...

The former U.S. Civil Service Commission, the predecessor of the

defendant OPM, signed these Guidelines and is bound by them. 29

C.F.R. § 1607.18. Indeed, OPM's own regulations, and the Civil

Service Commission's prior regulations, have for many years

required that the Guidelines be followed. 5 C.F.R. § 300.103(c)

(1987) states:

> (c) Equal employment opportunity. An
> employment practice shall not discriminate on the
> basis of race, color, religion, sex, age, national
> origin, partisan political affiliation, or other
> non-merit factor. Employee selection standards
> shall meet the standards established by the
> "Uniform Guidelines on Employee Selection Proce-
> dures", 43 FR 38290 (August 25, 1978).

3. Independently, the defendants have been under a

legal obligation since at least January 9, 1981 to obtain and to

keep complete racial identifications of applicants. EEOC

Management Directive 707, which went into effect on January 9,

1981, as revised in other part in January 1983, states at p. 1:

> Agencies must begin immediately to
> collect and maintain applicant flow data (see FPM
> Letters 720-4 and 720-6, and Section V of these
> instructions). Although these FPM Letters
> recommend collection of such data, EEOC and OPM
> have agreed that their collection should be
> mandatory. Such data are extremely important in
> gauging the success of FEORP activities, as well
> as in determining adverse impact of selection or
> promotion techniques used by the agency. (Collec-
> tion of such data is required for both private and
> public sector employers, including Federal
> agencies. See the Uniform Guidelines on Employee
> Selection Procedures, 43 FR 38,290 (1978).)

(Emphasis in original). A copy of excerpts from the revised MD-707 is attached as an attachment to Attachment Y. The Directive has been extended until September 30, 1987. Id., last page.

## B. The Defendants' Violations of Their Obligations

### 1. The Statistics

4. The PACE was given in January and in February, 1982. OPM violated ¶¶ 24 and 24(a) of the Consent Decree, § 1607.4 of the Uniform Guidelines, and MD-707 by administering the PACE in 1982 without collecting, maintaining, or compiling statistics on the racial[1] breakdown of the applicants taking the PACE. OPM wilfully ignored its reporting obligations in that year. OPM is now seeking to profit from its willful violation by relying on partial 1978 regional PACE application statistics to defend some of plaintiffs' showings of adverse impact.[2]

5. The defendants violated ¶¶ 25 and 25(a) of the Consent Decree in 1982 by failing to collect, maintain, or compile any statistics whatsoever on the racial and ethnic breakdown of the applicants applying under the alternative

---

[1] As used herein, the term "racial" refers to breakdowns of information as to non-Hispanic whites, non-Hispanic blacks, and Hispanics.

[2] See plaintiffs' June 6, 1987 Motion for Relief on Their Showings of Adverse Impact in Hiring for 1982, 1983, and 1984, ¶ 30 at p. 32 and ¶ 33 at p. 34. Defense counsel's letter setting forth this position is attached to that Motion as Attachment P.

examining procedures in effect during that year.[3]  The defendants wilfully ignored their reporting obligation in that year.

6. The defendants have violated ¶¶ 25 and 25(a) of the Consent Decree in 1983, 1984, and 1985 by failing to collect, compile, or maintain complete and accurate racial identifications of the applicants applying under the alternative examining procedures in effect during those years.  The details are set out in the following paragraphs.[4]

7. In each of the years 1983 through 1985, the defendant OPM sponsored an alternative examining procedure for the position of Economist, Series 0110.  OPM identified fewer than half of the applicants for this job series:

---

[3] On August 28, 1984, counsel for OPM orally informed counsel for plaintiffs that there were no adequate and reliable data on applications filed during 1982, and promised to confirm this information in writing.  OPM has never given plaintiffs this written confirmation.  See plaintiffs' June 6, 1987 Motion for Relief on Their Showings of Adverse impact in Hiring for 1982, 1983, and 1984 at 16-17.  See also ¶ 20 of the Motion, at pp. 26-27.

[4] Attachment A hereto is the Affidavit of the undersigned attorney, attesting that the calculations set forth in this Motion and in Attachment B are accurate.  Attachment B shows the complete breakdown of missing racial identifications for every agency and job category, for both competitive alternative examining procedures and for Schedule B.  Attachment C is a complete set of all of the applicant reports provided to plaintiffs by the government for 1983.  Attachment D is a complete set of the applicant reports provided by the government for 1984, and Attachment E is a complete set of the applicant reports provided by the government for 1985.

Because of their size, Attachments C, D, and E are contained in separate bound volumes accompanying this Motion.

Table 1. <u>Economist (Series 0110)</u>

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|------|
| | | Number | Percent of Total |
| 1983 | 254 | 168 | 66.1% |
| 1984 | 306 | 174 | 56.9% |
| 1985 | 567 | 370 | 65.3% |
| Total: | 1,127 | 712 | 63.2% |

8.   In each of the years from 1983 through 1985, the defendant OPM sponsored an alternative examining procedure for the position of Computer Specialist (Trainee), Series 0334.   In the defendant OPM's best years, it left fewer than 15% of the applicants unidentified.   In its worst year, it failed to identify the race of almost 60% of the applicants:

Table 2. <u>Computer Specialist (Trainee), Series 0334</u>

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|------|
| | | Number | Percent of Total |
| 1983 | 10,403 | 1,549 | 14.9% |
| 1984 | 5,079 | 3,037 | 59.8% |
| 1985 | 4,187 | 1,139 | 27.2% |
| Total: | 19,669 | 5,725 | 29.1% |

9. In each of the years from 1983 through 1985, the defendant OPM sponsored an alternative examining procedure for the position of Printing Management Specialist, Series 1654. Despite the small numbers of applicants, which should have made compliance quite easy for a defendant mindful of its obligations, the defendant failed to identify or report the race of the vast majority of applicants:

- 6 -

Table 3. <u>Printing Management Specialist,</u>
<u>Series 1654</u>

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 51 | 43 | 84.3% |
| 1984 | 47 | 47 | 100.0% |
| 1985 | 73 | 68 | 93.2% |
| Total: | 171 | 158 | 92.4% |

10. In each of the years from 1983 through 1985, the defendant OPM sponsored an alternative examining procedure for the position of General Investigator, Series 1810. (This procedure does not apply to the Department of Defense, which has a delegated examining procedure for the same job category). Over the three-year period of time in question, the defendant OPM has failed to identify and report the race of close to 30% of the applicants:

Table 4. <u>General Investigator, Series 1810</u>
<u>(Exclusive of Department of Defense)</u>

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 343 | 153 | 44.6% |
| 1984 | 2,067 | 458 | 22.2% |
| 1985 | 682 | 303 | 44.4% |
| Total: | 3,092 | 914 | 29.6% |

11. In each of the years from 1983 through 1985, the defendant OPM sponsored an alternative examining procedure for

the position of Criminal Investigating, Series 1811.[5]  Over this
period of time, the defendant OPM has failed to identify the race
of almost 40% of the applicants:

Table 5. Criminal Investigating, Series 1811
(Exclusive of Treasury Enforcement
Agents)

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|--------|------------------|
|      |                  | Number | Percent of Total |
| 1983 | 682 | 278 | 40.8% |
| 1984 | 451 | 157 | 34.8% |
| 1985 | 68 | 27 | 39.7% |
| Total: | 1,201 | 462 | 38.5% |

12. In 1984 and 1985, OPM sponsored an alternative
examining procedure for the position of Game Law Enforcement
(Fish and Wildlife), Series 1812.  It failed to identify and
report the race of more than 40% of the applicants for this job:

Table 6. Game Law Enforcement (Fish and Wildlife)
Series 1812

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|--------|------------------|
|      |                  | Number | Percent of Total |
| 1984 | 29 | 15 | 51.7% |
| 1985 | 42 | 15 | 35.7% |
| Total: | 71 | 30 | 42.3% |

13. In 1985, for the first time OPM sponsored an
alternative examining procedures for the Tax Technician job
category, Series 0526, and for the Customs Inspector job cate-
gory, Series 1890.  While there is room for improvement in its

---

[5] This does not include Treasury Department Enforcement Agents.

performance as to these job categories, its performance is nonetheless substantially better for these job categories than for those set forth above:

Table 7. Tax Technician, Series 0526, and Customs Inspector, Series 1890

| Job Category | Total Applicants | Applicants With Race Not Reported | |
| --- | --- | --- | --- |
| | | Number | Percent of Total |
| Tax Technician | 3,975 | 607 | 15.3% |
| Customs Inspector | 4,080 | 321 | 7.9% |

14. In 1983, 1984, and 1985, the defendant class member U.S. Department of Agriculture administered a delegated alternative examining procedure for the position of Agricultural Program Specialist, Series 1145. In each of these years, it failed to identify and report the race of from a quarter to a half of the applicants who applied under this procedure:

Table 8. Agriculture Department: Agricultural Program Specialist, Series 1145

| Year | Total Applicants | Applicants With Race Not Reported | |
| --- | --- | --- | --- |
| | | Number | Percent of Total |
| 1983 | 213 | 108 | 50.7% |
| 1984 | 93 | 23 | 24.7% |
| 1985 | 27 | 9 | 33.3% |
| Total: | 333 | 140 | 42.0% |

15. In 1983 and 1984, the defendant class member U.S. Department of Defense administered a delegated alternative examining procedure for the position of General Investigator, Series 1810. In 1983, it failed to identify and report the race or more than a third of the applicants. In 1984, showing what

- 9 -

can be done, it identified the race of all applicants:

Table 9. Defense Department: General Investigator, Series 1810

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 1,598 | 558 | 34.9% |
| 1984 | 260 | 0 | 0.0% |
| Total: | 1,858 | 558 | 30.0% |

    16. In 1983, 1984, and 1985, the defendant class member U.S. Department of Justice administered a delegated alternative examining procedure for the position of Immigration Inspection, Series 1816. While its 1985 performance showed a distinct improvement, over the entire period it failed to identify and report almost a third of the applicants:

Table 10: Justice Department: Immigration Inspection, Series 1816

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|-----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 6,722 | 1,600 | 23.8% |
| 1984 | 5,570 | 2,550 | 45.8% |
| 1985 | 669 | 66 | 9.9% |
| Total: | 12,961 | 4,216 | 32.5% |

    17. In 1983, 1984, and 1985, the defendant class member Federal Deposit Insurance Corporation administered a delegated alternative examining procedure for the position of Financial Institution Examining, Series 0570. Over this period of time, it failed to identify the race of more than a quarter of all applicants. In one year, 1984, it failed to identify the race of

almost two out of every three applicants, even though the total number of applicants was considerably smaller that year than in the other two years:

Table 11. Federal Deposit Insurance Corporation: Financial Institution Examining, Series 0570

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 1,160 | 176 | 15.2% |
| 1984 | 429 | 268 | 62.5% |
| 1985 | 2,155 | 573 | 26.6% |
| Total: | 3,744 | 1,017 | 27.2% |

18. By contrast, the defendant class member Federal Home Loan Bank Board reported much better performance for its delegated alternative examining procedure for the same job category, which it administered in 1983 and in 1984:

Table 12. Federal Home Loan Bank Board: Financial Institution Examining, Series 0570

| Year | Total Applicants | Applicants With Race Not Reported | |
|------|------------------|----------------------------------|---|
| | | Number | Percent of Total |
| 1983 | 3,241 | 465 | 14.3% |
| 1984 | 4,334 | 0 | 0.0% |
| Total: | 7,575 | 465 | 6.1% |

19. The parties are divided on the question whether the use of Schedule B hiring authority can be considered an "alternative examining procedure" within the meaning of the Consent Decree provisions providing for the retention of jurisdiction. The defendants have reported applicant and hiring information for the agencies using Schedule B authority, although they have not

- 11 -

followed other reporting provisions of the Decree for their use of Schedule B authority.[6] While some agencies with substantial numbers of Schedule B hires have had extremely poor performance in identifying and reporting the race of Schedule B applicants,[7] overall the defendant class members have identified the race of all but 11.7% of the 270,195 Schedule B applicants in the years 1983 through 1985.[8] With reasonable effort, there is no reason why the defendants could not have done at least as well for all of the competitive alternative examining procedures.

20. As is shown in detail in Attachment B, the defendants' performance can be extremely varied even within the same year and job category. The following are examples:

(a) In 1985, the Army reported the results of two authorizations from OPM to make use of Schedule B hiring authority for the same job category, Management Analyst, Series 0343. There were 3,716 applicants under Authorization No. PAC-84-22, and it failed to identify and report the race of 22.3% of these ap-

---

[6] Paragraph 26 of the Consent Decree requires the defendants to make semi-annual reports summarizing the "development plan, including a description of the type of procedure contemplated and of the design of the validation study, or of a substantial change in previously submitted plans." The defendants provided plaintiffs with a one-time statement of

[7] For example, in 1983 the defendant class member U.S. Department of the Army failed to identify and report the race of 51.2% of its Schedule B applicants for all job categories combined. Its performance increased dramatically in the following years, and over the three-year period it identified the race of all but 15.7% of its 101,381 applicants.

[8] The details are set forth in Attachment B hereto.

plicants.  There were 1,146 applicants under Authorization No. PAC-85-59, and the Army reports that it identified the race of every last applicant.[9]

(b) The same authorizations from OPM also allowed the Army to make use of Schedule B hiring authority for the Supply Management Specialist job category, Series 2003.  There were 3,806 applicants under Authorization No. PAC-84-22, and it failed to identify and report the race of 12.1% of these applicants.  There were 974 applicants under Authorization No. PAC-85-59, and the Army reports that it identified the race of all but 14 of them, or 1.4% of the total.[10]

(c) In 1985, the Navy received two authorizations from OPM to make use of Schedule B hiring authority for the Personnel Management Specialist job category, Series 0201.  Plaintiffs urge that, if the applicants for any job category can be expected to cooperate fully in providing requested personnel information, the applicants for personnel specialist jobs can be expected to do so.  Nonetheless, the Navy failed to report or identify the race of 34.6% of the 127 applicants under Authorization No. PAC-85-67, even though it identified the race of every one of the 61

[9] See Attachment B, p. 30.

[10] See Attachment B, p. 31.

applicants under Authorization No. PAC 85-15.[11]

21. The scattershot nature of the defendants' racial identifications and reporting makes clear that some officials at some agencies and in some locations are attempting to comply with the Decree's racial identification and reporting provisions, and that others are not. The defendant OPM has not fulfilled its obligation to take systematic steps sufficient to <u>require</u> compliance, as the Decree specifically obligates it to do.

## 2. The Defendants' Violations Have Prejudiced Plaintiffs

22. The defendants' failure to comply with the applicant reporting requirements of the Consent Decree hampers plaintiffs in their ability to make showings of adverse impact in hiring. For example, plaintiffs' 1982 showings of adverse impact were all of necessity based upon the old 1978 PACE application statistics set forth in ¶ 10(h) of the Consent Decree, at p. 18, showing that 6,488 blacks, 2,694 Hispanics, and 45,539 whites took the PACE. There were a total of 54,721 applicants falling within these groups. Blacks were 11.9% of these applicants, and Hispanics were 4.9% of these applicants. These were the standards plaintiffs were forced to use, for example, in determining whether there was adverse impact against blacks or against Hispanics in hiring for the Computer Specialist (Trainee) job category. Because blacks were 14.8% of the hires in this job category, and because this figure clearly exceeded the 11.9%

---

[11] See Attachment B at p. 38.

availability figure from the old 1978 PACE applicant sample, plaintiffs could not make a showing of adverse impact against blacks. The actual application figures for the period 1983-1985 show the extent of plaintiffs' prejudice:[12]

Table 13. <u>Blacks as a Proportion of Applicants Who Were Identified as White, Black, or Hispanic, and Who Applied for the Computer Specialist (Trainee) Job, Series 0334 (Excludes Others)</u>

| Attachment | Year | Race-Identified Applicants | Black Applicants | Percent Black |
|------------|-------|---------------------------|------------------|---------------|
| C | 1983 | 8,238 | 1,402 | 17.0% |
| D | 1984 | 1,931 | 539 | 27.9% |
| E | 1985 | 2,856 | 865 | 30.3% |
| | Total | 13,025 | 2,835 | 21.8% |

If plaintiffs had had actual applicant information for 1982---<u>as the Decree required</u>---it is highly likely that plaintiffs would have been able to show adverse impact against blacks both under the "80% rule" and under the test of statistical significance. Other examples could equally well be drawn.

23. Defense counsel have stated to counsel for plaintiffs that they may challenge plaintiffs' showings of adverse impact on the ground that the information the defendants themselves provided on the race of applicants was too incomplete to be used in determining adverse impact. See Attachments R and S. It would be prejudicial, and highly inequitable, to allow the defendants to profit from their own violation of the Decree and

---

[12] These figures exclude persons who are not white, black, or Hispanic, in accordance with an agreement among the parties.

of the Uniform Guidelines.

### C. The Defendants Know How to Obtain Complete and Accurate Racial Identifications, But Have Chosen Not to Use These Methods

24. The form which OPM uses to collect racial information from applicants is attached hereto as Attachment F. The most prominent information on the form is the statement, apparently underlined with a felt-tip pen: "**Submission of this information is voluntary.**" The form goes on to state: "Your failure to do so will have no effect on the processing of your application for Federal employment." In light of the demonstrated results of the use of this form, it is clear that its wording and emphasis have in effect encouraged applicants not to provide the information nominally requested by the form.

25. OPM well knows how to obtain virtually complete racial identification of applicants. In August 1979, OPM published the results of a pilot project on the racial identification of applicants taking the PACE at the Washington, D.C., Area Office of OPM.[13] Using forms which did not have the effect of inviting non-compliance, OPM identified the race of 97.6% of

---

[13] The project was begun in 1977, and was intended to identify the best means of complying with the then Federal Executive Agency Guidelines on Employee Selection Procedures, 41 Fed.Reg. 51744 (November 23, 1976), one of the predecessors to the Uniform Guidelines.

The EEOC did not enter into the Federal Executive Agency Guidelines, but continued using its own prior Guidelines. There were thus two sets of Guidelines in simultaneous use by different agencies with EEO enforcement authority. All agencies with enforcement authority subsequently entered into the successor Uniform Guidelines.

all applicants. OPM found that there was a somewhat higher response rate if the form simply requested the information without expressly stating that compliance was voluntary (Form A), and the lowest response rate if the form contained the words "completely voluntary" near the beginning of the instructions (Form C).[14] The following table shows the response rates to these two forms:[15]

Table 14. <u>OPM's 1977-79 Study of the Best Means</u>
<u>of Obtaining Racial Identifications</u>

| Type of Form | Applicants | No Response | Failure Rate |
|---|---|---|---|
| Form A (no statement on face of form that compliance is voluntary) | 474 | 7 | 1.5% |
| Form C (the phrase "completely voluntary" appears near start of instructions) | 290 | 9 | 3.1% |

The differences are, however, not statistically significant. A copy of the report is attached hereto as Attachment G.

26. OPM performed a further study of the means of collecting accurate racial information from test-takers, as part of a sample of applicants taking the PACE in ten cities in which OPM had Regional Offices, and in the Washington, D.C. Area Office. Again, the form used for collection of this information

---

[14] Lois C. Northrop, Project Director, OPM Staffing Services Group, Personnel Research and Development Center, Technical Memorandum 79-15, <u>Pilot Study No. 1 for the Collection of Race, Sex and Ethnic Origin Data in Federal Testing</u> (August 1979) at i (Abstract and Summary of Findings), and 10-11.

[15] <u>Id.</u> at 10-11.

(attached hereto as Attachment H)[16] did not invite non-com-
pliance. The form used stated on its face, but toward the bottom
of the form, that compliance was voluntary.

27. In the new study, OPM identified the race of 96.3%
of the 9,398 persons it requested to provide this information.[17]
The purpose of this study was to determine whether use of the
form attached hereto as Attachment H was a good means of comply-
ing with the requirement of the Uniform Guidelines that the race,
sex, and ethnic origin of job applicants be identified.[18] OPM's
conclusion was that the use of this form was feasible and
advisable for the collection of racial and ethnic identifica-
tions, in compliance with the Uniform Guidelines, in assembled
examinations.[19]

28. Thus, OPM has had available for its use an express-
ly voluntary reporting form and set of instructions which it had
previously used, studied, and found to be reliable in obtaining

---

[16] The form is reproduced as Appendix B to OPM Data Survey
Report 80-1, described in the following paragraph.

[17] Lois C. Northrop, OPM Staffing Services Group, Personnel
Research and Development Center, Data Survey Report 80-1,
Regional Distribution of January 1978 PACE Applicants by Race,
Sex, and Ethnic Origin (July 1980) at i (Abstract and Summary).
A copy of the report is attached hereto as Attachment I.

[18] Id. at 1.

[19] OPM stated that response rates were too low (from 60% to
85% of applicants) for use of this form to be effective when OPM
uses unassembled examinations ("that is, when individual
applicants are asked to mail the questionnaire directly to a
designated office"). Id. at 14. By contrast, in the case at bar
the highest response rates have been for the unassembled Schedule
B procedures.

- 18 -

the race of all but 3.3% of applicants for these types of jobs nationwide. Instead of using this tried and true approach, for unexplained reasons it decided to use instead a different form, to make the most prominent feature on that form a statement that compliance is completely up to the individual, and by placement and emphasis invite non-compliance. Its failure rate is from seven to twenty times higher than the failure rate of its previously tested form. OPM has deliberately chosen to continue using its flawed form, with full knowledge of this unacceptable failure rate, even after plaintiffs complained to the Monitoring Committee that this failure rate was unacceptable.

> D. The Justice Department's Civil Rights Division Routinely Uses Social Security Numbers to Obtain Accurate Percentages of the Persons on a List of Applicants Who Are Black, But the Defendants Have Refused to Use the Same Techniques to Determine Whether the Defendants' Failure to Obtain Complete Racial Identifications from Applicants Has Unfairly Distorted the Application Statistics Reported to Plaintiffs

29. The Justice Department's Civil Rights Division has statutory authority to bring Title VII enforcement actions against State and local government agency employers. It formerly had statutory authority to bring Title VII pattern-and-practice lawsuits against private employers. On behalf of the U.S. Department of Labor, it also brings actions against public and private employers to enforce the nondiscrimination requirements of government contractors under Executive Order 11246. Through its Civil Rights Division, the Justice Department has substantial experience in enforcing the obligations of Title VII and of the

Uniform Guidelines.

30. The Social Security Administration of the U.S. Department of Health and Human Services collects and maintains data on the race of persons obtaining Social Security cards. Its records show which Social Security cardholders are black, and which are white. It has only recently begun to collect data on Hispanics, so its information on black race is the information at issue here.

31. For many years, the Civil Rights Division of the Justice Department has routinely provided lists of applicants and their Social Security numbers to the Social Security Administration, asked that agency to state the percentage of the applicants who are black, obtained the information, and used the information in Court to make its showings of racial discrimination.

32. Plaintiffs do not have the names and Social Security numbers of the applicants for any of the jobs in question. Plaintiffs are unable to check the accuracy of the fragmentary racial information reported by the defendants by using this service of the Social Security Administration. Only the defendants have the information making it possible to use this service.

33. The defendants herein have at all times been able to supplement the racial identifications they have received from applicants with the above-described service provided by the Social Security Administration. For almost four years, plaintiffs have expressly requested the government to do so, and have

been put off time and again. The defendants have arbitrarily and wilfully refused to supplement their meager racial identifications with information from this unimpeachable source.

34. Information on racial identifications of blacks through the Social Security Administration would enable both the Court and the parties to find out whether OPM's failure to abide by the Decree has caused substantial distortions in the reported applicant-flow figures. For example, where a third of the applicants for a job category in a given year have not been identified, it is difficult to know exactly what to make of the fact that blacks are 25% of the race-identified applicants. If complete or virtually-complete racial identifications had been obtained, it might be that blacks were 35% of all applicants, or 20%, or some other number.

35. If it is minorities who systematically fail to report their race, as the government has suggested to plaintiffs on a number of occasions, then the reported data are distorted in a manner which hurts plaintiffs and their class. Limited to the under-reported information for blacks and for Hispanics, plaintiffs have therefore not been able to make showings of adverse impact which they would be able to make if the full facts had been obtained and reported. Where a showing of adverse impact has been made, plaintiffs' calculations of the degree of the shortfall in hiring blacks or Hispanics, and thus the degree of the remedy appropriate to the violation, would have been artificially lowered.

36. The defendants have no legitimate interest in forcing plaintiffs to use incomplete data, and in avoiding the information about possible distortions in reported data which resort to the Social Security Administration would provide.

E. Plaintiffs' Unsuccessful Efforts to Resolve the Problem of the Defendants' Non-Compliance Through Informal Enforcement Proceedings

37. To eliminate any possible dispute with the defendants about the course of the informal enforcement proceedings on the issues raised by this Motion, plaintiffs set forth below the complete history of these efforts, exclusive of telephone conversations:

(a) Mr. Seymour's July 1, 1983 letter to Ms. Ward (Attachment J) pointed out that plaintiffs had not been given information on applicants for 1982.

(b) Plaintiffs' proposed agenda for the August 9, 1983 meeting of the Monitoring Committee (Attachment K) raised as an issue in item B(4), on p. 2, the defendants' failure to report applicants by race for competitive procedures other than the PACE.

(c) Mr. Seymour's September 16, 1983 letter to Ms. Ward and Mr. Green (Attachment L) recounted in item B(4), on p. 3, that at the August 9 Monitoring Committee meeting the government had informed plaintiffs that it had the counts of the number of applicants of each race, that some persons had not reported their race on the forms provided, that the

government did not yet know the extent of the problem and would get back to plaintiffs quickly with the data, and that the government had agreed that Social Security numbers be recorded in the future, so that the Social Security Administration could provide more complete information on racial identifications.

(d) Plaintiffs' proposed agenda for the October 10, 1984 meeting of the Monitoring Committee (Attachment M) listed the nonreceipt of up-to-date applicant information as a problem to be discussed.

(e) Plaintiffs' October 10, 1984 and December 12, 1984 draft Reports to the Court (the December 12, 1984 draft Report is set out as Attachment Mc) discussed at pp. 4 and 5-6 the lack of information on the number of applicants of each race for 1982.

(f) Mr. Seymour's January 31, 1985 letter to Ms. Ward and Mr. Green on problems in the 1983 statistical reports (Attachment N) discussed at pp. 5-7 the problems of missing racial identifications.

(g) Ms. Ward's March 14, 1985 letter to Mr. Seymour (Attachment O) described the racial information reporting procedures used by the government, stated that the missing data was solely the result of applicant co-operation, and added:

> From the outset of negotiations concerning the defendants reporting requirements, plaintiffs have been aware that applicants are not required to supply race and national origin data

and that the government will not make supplying such information a requirement for federal government employment. We stand by that position.

Attachment O, item Fifth at p. 2.

(h) Mr. Seymour's March 14, 1985 letter to Ms. Ward and Mr. Green (Attachment P) stated at p. 3, item 7, that either the collection of racial information would have to be made mandatory, or the agencies administering selection procedures would have to record race so that complete information would be available, and that the government's explanations for missing racial identifications could not explain why some agencies had virtually complete racial information and other agencies had large percentages of unidentified applicants. The letter suggested that the parties stipulate that the partial information obtained to date be conclusively presumed to be an accurate representation of the whole---_i.e._, a random sample---so that the parties would know where they stood for purposes of adverse impact showings.

(i) On March 15, 1985, these problems were discussed at a meeting of the Monitoring Committee. No agreement was reached, but the parties agreed to develop and exchange further information in an effort to come to an agreed resolution. Mr. Erickson's notes show that the government promised to think again about its position that applicants should not be required to

provide racial identifications.

(j) Mr. Green's March 21, 1985 letter to Mr. Erickson (Attachment Q) transmitted a copy of the instructions on the collection of race and national origin data which OPM had sent to all Federal agencies receiving authorizations to hire under Schedule B. This letter included a copy of the form also attached hereto as Attachment F.

(k) Ms. Ward's May 15, 1985 letter to Mr. Erickson, Mr. Seymour and Mr. Goldstein (Attachment R) stated in item 11 on p. 3 that the government would not agree to a mandatory requirement that applicants provide racial identification, but stated that the problems of missing identifications would be discussed at a May 29, 1985 Inter-Agency Group meeting, and that the government would contact plaintiffs about the results of the meeting. Ms. Ward continued:[20]

---

[20] Plaintiffs disagree with Ms. Ward's description of the negotiations. The undersigned attorney, who participated in all negotiations with the defendants, has no recollection of any such discussion and would remember any such discussion if there had been one. No attorney for plaintiffs ever agreed---and none would ever for a moment have considered agreeing---that the government could satisfy its obligations by reporting data so incomplete as to be unusable.

If it is necessary for counsel to testify, to produce their notes of the negotiations, and to cross-examine each other, then that is what plaintiffs will do. However, we do not think that such an effort would be either advisable or proper. The four corners of the Decree, and the representations made by both sides to the Court in the course of obtaining final approval, embody the agreement of the parties. To those sources only can resort be had.

During negotiations, the problem of unreliable statistical data associated with the federal government's policy of not requiring applicants to provide racial data was explained to plaintiffs and was the subject of discussion between the parties. At that time, the government made clear that it would not require mandatory race-identification and plaintiffs, despite their knowledge that it might produce unusable statistical data, agreed to the government's demand on this point.

Moreover, I have seen no reliable evidence to support plaintiffs' suggestion that a mandatory race-identification requirement will produce reliable applicant-race statistics.

If plaintiffs have any suggestions concerning a solution to this problem, both OPM and I are more than willing to consider it.

(1) Mr. Seymour's July 29, 1985 letter to Ms. Ward (Attachment S) stated that plaintiffs were still awaiting the government's report of what had happened at the May 29 Inter-Agency Group Meeting which was supposed to have discussed the problem of missing racial identifications, asked for that information, and continued on pp. 1-2:

Second, point 11 in your letter concerns the collection of racial data on applicants. Plaintiffs have not agreed to the government's demand that there be no mandatory racial identification of applicants, and have only agreed to defer action on this question pending the govern-

---

The government made what appeared to be a good-faith commitment in the Consent Decree that it would provide complete racial identifications. While no one would be concerned with a 2% or 3% failure rate, a failure rate running from 20% to 65% to 100% is something else again. If the government seriously contends that this pitiful performance is what it had in mind when it signed the Decree, it never notified the plaintiffs or the Court it was "crossing its fingers behind its back".

ment's internal review of the problem. We retain
our right to move for an Order requiring mandatory
racial identification, particularly in light of
the government's position, as we understand it,
that it intends to reserve the right to assert
that its own policy of not requiring mandatory
racial identification has blocked the collection
of usable statistical information on applicant-
flow. This position would, if accepted by either
the Court or plaintiffs, effectively make it
impossible to judge the government's performance
under the Decree.

One of the suggestions plaintiffs made
at our March 15, 1985 meeting is that the racial
identifications reported under the present system
be checked against the Social Security Administra-
tion's records to see if the percentage of race-
identified applicants reported as black, by
agencies with a great deal of missing information,
varies from SSA's report of the percentage of all
applicants who are black. Thus, if the Army
reported that it had 1,500 applicants, that it
race-identified only 750 of them, and that 250 of
the race-identified applicants were black, all the
parties presently know is that a third of the
race-identified applicants were black. What makes
both sides uneasy is the possibility that the
racial breakdown of the race-identified half of
the applicants may not be the same as the actual
racial breakdown among those who have not been
race-identified. The Social Security Administra-
tion will not report on the race of individuals,
but will report on the racial composition of a
large list of individuals. If SSA scans the names
and Social Security numbers of all 1,500
applicants and reports that a third of the entire
group is black, both sides could look at the
partial racial identifications with a great deal
more confidence than at present.

As we mentioned before, the Civil Rights
Division routinely asks the Social Security
Administration to provide such information. Dave
Rose should have at his fingertips the name and
telephone number of Justice's contact person at
SSA, and a list of the requirements to be followed
in compiling the list.

(m) Mr. Seymour's August 2, 1985 letter to

Ms. Ward and Mr. Green (Attachment T) enclosed plain-

tiffs' showings of adverse impact for 1983, and on pp.
2-3 discussed further the problem of missing racial
identifications. After pointing out that plaintiffs
had still not received information about the results of
the May 29, 1985 Inter-Agency Group Meeting on this
topic and after repeating the suggestion of using
Social Security Administration data to cross-check the
partial racial identifications received to date, the
letter continued:

> This subject is of obvious importance: while
> plaintiffs have used the incomplete information
> already in hand for the showings of adverse impact
> contained in the attached document, the availabil-
> ity of more complete information could produce
> additional showings of adverse impact, or elimin-
> ate some of the showings already made in the
> document. Such information could also have a
> major effect on the relief necessary to redress
> adverse impact, since the relief must be propor-
> tional to the harm done.
>
> While I am on this subject, I should
> point out that some of the missing racial iden-
> tifications may have occurred because of the
> failure of officials in particular regions to send
> out the Applicant Race and National Origin
> Questionnaire. For example, when one looks at the
> statistics for missing data as to OPM-sponsored
> alternative examinations, it is clear that some
> regions of OPM performed much more poorly than
> others with respect to particular examinations.
> For the General Investigator examination, Series
> 1810, the New York region identified the race of
> 68 applicants, and failed to obtain racial
> identification for only 8 (11% of the total). For
> the same test, the Philadelphia office identified
> the race of 63 applicants, and failed to obtain
> data for only 30 applicants (32% of the total).
> The New England office also failed to race-
> identify a third of its applicants. Meanwhile,
> the Washington office identified the race of only
> 30 applicants, and failed to identify the race of
> 95 (76% of the total). This suggests that some

offices were more careful than others in issuing the questionnaire.

Most of the application reporting forms do not have regional breakdowns for missing racial information. Plaintiffs request this information. Because different civil service regions have different racial population and labor force compositions, regional breakdowns may help us find out possible distortions in the figures.

Parenthetically, plaintiffs have never received the regional breakdowns.

(n) Mr. Seymour's October 4, 1985 letter to Ms. Ward (Attachment U) reminded her that he had not had any response to his July 29, 1985 letter (Attachment S), and that plaintiffs had still not heard anything about the May 29, 1985 Inter-Agency Group Meeting.

(o) Mr. Seymour's October 24, 1985 letter to Ms. Ward and Mr. Green (Attachment V) discussed the missing racial identifications in the 1984 applicant figures reported to plaintiffs, and continued on p. 3:

As with the 1983 statistics, plaintiffs cannot understand why some agencies, such as the Defense Investigative Service and the Federal Home Loan Bank Board, can manage to race-identify every applicant while other agencies such as OPM and the Justice Department are missing such a high percentage of racial identifications. Nor do we understand how OPM failed to obtain racial identifications from 60% of the applicants for the Computer Specialist (Trainee) and Economist job categories, while doing so much better on the General Investigator job category. Again, the failure to obtain a single racial identification as to the Printing Management Specialist job category, where the information only had to be obtained from 47 persons, contrasts sharply with the better performance of the Agriculture Depart-

ment when dealing with small samples.

Plaintiffs again complained that the government had not yet provided any information about the May 29, 1985 Inter-Agency Group Meeting.

(p) Mr. Seymour's February 4, 1986 letter to Ms. Ward and Mr. Green (Attachment W) listed a number of matters on which plaintiffs were still waiting for a response from the government. Item (d), on pp. 1-2, mentioned missing applicant information and stated that plaintiffs had still not been fully informed[21] of the results of the May 29, 1985 Inter-Agency Group Meeting on missing racial identifications, and had still not had a response to their proposal of asking the Social Security Administration to check the percentages of applicants who were black. Item (g)(4) on p. 2 discussed the government's oral representation to plaintiffs that a detailed written report would be made on the variances between agencies in collecting racial information, mentioned the government's promise that plaintiffs would receive a copy of the report once it was approved by the Justice Department, and pointed out

_____

[21] The sole information provided to plaintiffs was provided in telephone conversations, in which defense counsel stated that the agencies with poorer results were generally those which took applications by mail, and the agencies with better results were those which had face-to-face meetings with applicants. No agencies or job categories were specified. Even a cursory glance at the figures, however, shows that there are extreme variations which cannot be explained away so readily.

that plaintiffs had still not received the information.

(q) Ms. Ward's March 5, 1986 letter to Mr. Seymour (Attachment X) in item (c) on p. 2 repeated the general representations set forth in note 21 above, stated that "[T]he agencies themselves are at a loss to offer any other explanation", stated that defense counsel "have urged the agencies to make greater efforts to ensure that the race-data collection form is always included with applications and that the results are correctly reported", and expressed the hope that "our efforts during the past few months to heighten the agencies' awareness of their reporting responsibilities in this area" would improve the government's perform-ance "in this coming year's statistics."[22]  The letter stated that Ms. Ward was not aware of the report described in ¶ (g)(4) of Mr. Seymour's February 4, 1986 letter (Attachment W), and continued:

> With respect to using race information supplied by the Social Security Administration, such information would not be helpful because the SSA has only recently begun to identify Hispanics and does not possess information concerning those persons who would be of an age to be applying for these jobs.

(r) Further discussions were held on plain-tiffs' proposal to use the Social Security Administra-tion racial identifications.  Mr. Seymour's May 14,

_____

[22] The 1986 application and hiring reports have not yet been received.

1986 letter to Ms. Ward and Mr. Green (Attachment Y) enclosed a draft Stipulation providing for the "test run". Following the government's receipt of the letter, the parties agreed to extend the conciliation period on the issue.

(s) Mr. Seymour's November 25, 1986 letter to Ms. Ward and Mr. Green (Attachment Z) stated in item 7 on p. 2 that plaintiffs had not yet received a response to their May 14, 1986 proposed Stipulation (Attachment Y). This letter also discussed OPM's agreement with the EEOC that collection of racial identifications would be made mandatory on the agencies.[23]

(t) On February 6, 1987, there was a meeting of the Monitoring Committee at which plaintiffs once again raised the problem of missing racial identifications, stated that the government's performance to date was not acceptable, and again urged that the parties use the Social Security Administration's data to find out whether the missing racial identifications were actually resulting in distortions. No progress was made, and plaintiffs were informed that the government would continue to think about these matters.

(u) The parties met again on March 30, 1987, but made no concrete progress on these issues.

---

[23] This is not the same as requiring mandatory racial identifications by applicants.

(v) Mr. Seymour's May 27, 1987 letter to Ms. Ward and Mr. Green (Attachment AA, after Z) agreed to the government's request for an extension of the conciliation period on all issues until June 3, 1987.

(w) The parties met again on June 3, 1987, but made no progress on any issue. Plaintiffs made proposals at the meeting on a number of issues, and have to this day not received the government's response on any of them.

WHEREFORE, plaintiffs pray that their Motion be granted, and that the Court:

(a) find the defendants to have been in violation of ¶ 24(a) of the Consent Decree in 1982;

(b) find the defendants to have been in violation of ¶ 25(a) of the Consent Decree from 1982 to the present;

(c) find the defendants to have been in violation of Title VII, the Uniform Guidelines on Employee Selection Procedures, and EEOC Management Directive 707 from 1982 to the present, with respect to the compilation, and reporting of the race of applicants;

(d) order the defendants to cease, as soon as possible, the use of their current applicant racial information form as shown in Attachment F to this Motion;

(e) order the defendants to begin using, as soon as possible, their prior applicant racial information form as set out in Attachment H herein, with the parties to have ten days to

consult on any modifications which may be necessary and the Court to resolve any disagreements;

(f) order the defendants to report as soon as possible, to plaintiffs and to the Court, on the numbers of missing racial identifications compared to the total numbers of applicants, from use of this new form;

(g) order the defendants to use the racial identification services of the Social Security Administration to obtain the percentages of all applicants who are black, for each job category in each year in which (a) 20% or more of the applicants were unidentified and (b) there were 100 or more applicants, and to report the information promptly to the Court and to plaintiffs;

(h) in light of past delays, order the defendants to report monthly on the steps they have taken to comply with each separate obligation imposed upon them by this Court as a result of this Motion;

(i) order such other and further relief as may be appropriate when the information described in subparagraph (f) becomes available, including but not limited to allowing plaintiffs to move that the Court make applicants' provision of their racial identification a mandatory condition of their consideration for employment; and

(j) order such other and further relief as may be appropriate when the information described in subparagraph (g) becomes available, including but not limited to allowing plain-

- 34 -

tiffs ninety days within which to make new showings of adverse impact for 1982, 1983, and 1984 where the Social Security Administration data show a substantial under-reporting of applications by blacks and Hispanics, compared to the standards plaintiffs had earlier been forced to use.  Such new showings should be considered timely for purposes of plaintiffs' right to seek individualized relief on the showings.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                Attorneys for Plaintiffs

Dated: July 15, 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



FILED

JUL 15 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,                    )
                                                     )
   individually and on behalf of                )
   all others similarly situated,               )
                                                     )
                 Plaintiffs,         )
                                                     )
               v.                      )   C. A. No. 79-0271 JHG
                                                     )
CONSTANCE HORNER, Director,                          )
   U.S. Office of Personnel                         )
   Management, <u>et al.</u>,                        )
                                                     )
               Defendants.        )

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO ENFORCE THE APPLICANT-REPORTING
PROVISIONS OF THE DECREE BY REQUIRING
COMPLETE OR VIRTUALLY COMPLETE RACIAL
<u>IDENTIFICATION OF APPLICANTS</u>

       One of the standard elements of relief in fair employ-
ment cases is the requirement that the defendant keep an accurate
and complete count of the race of applicants and/or employees,
and that reports of this information be made, so that the Court
and the parties may monitor the defendant's actions and determine
whether discrimination is re-asserting itself. <u>See</u>, <u>e.g.</u>, <u>Segar
v. Smith</u>, 738 F.2d 1249, 1295 (D.C.Cir., 1984), <u>cert. den.</u>, 471
U.S. 1115, 86 L.Ed.2d 258 (1985) (suggesting the monitoring of
black agents' progress to upper levels, a suggestion necessarily
requiring reports on promotions by race); <u>Sledge v. J.P. Stevens
& Co.</u>, 585 F.2d 625, 649 and note 37 (4th Cir., 1978), <u>cert.
den.</u>, 440 U.S. 981, 60 L.Ed.2d 241 (1979); <u>Bentley v. City of
Thomaston</u>, 32 FEP Cases 1476, 1482 (M.D.Ga., 1983); <u>EEOC v. Riss
Int'l Corp.</u>, 35 FEP Cases 430, 434-35 (W.D.Mo., 1982).

The provisions of the Consent Decree are clear. Nothing in the Consent Decree allows any exception to the requirement that the government report the number of applicants who are white but not Hispanic, who are black but not Hispanic, and who are Hispanic. Complete or virtually complete reporting is obviously essential if the monitoring and enforcement provisions are to work.

While a "rule of reason" would bar any challenge to the defendants for minor deviations from the obligation of complete reporting,[1] it is ludicrous for the defendants to contend, as they did in informal enforcement proceedings, that they are entitled to report data so incomplete as to be unusable and have such pitiful reports considered to be good-faith compliance.

If the defendants had ever revealed to plaintiffs prior to the Decree's submission to this Court that they relied on so loose a construction of the reporting provisions as to render them meaningless, negotiations would have ended right there. If the defendants had ever revealed such a material fact to the Court when the Decree was awaiting final approval, the Court would have denied final approval and sent the parties back to the drawing board. Indeed, the Court's grant of final approval to the Decree was expressly conditioned on the Court's view that meaningful reports, adequate to measure the government's compliance, were to be made, and that no thin perceived ambiguity

---

[1] This is why plaintiffs have styled their Motion as one seeking complete or "virtually complete" reporting.

could excuse the government from the plain meaning of its obligations. <u>Luevano v. Campbell</u>, 93 F.R.D. 68, 92 ¶ 23 and 93 ¶ 25 (D.D.C., 1981).

If the government's clear obligation to provide complete or virtually complete racial identifications of applicants can be met while leaving applicants free to refuse to identify their race---<u>i.e.</u>, if only a small number of applicants take advantage of the right of refusal---plaintiffs would have no objection to allowing the government to continue its policy of leaving these self-identifications voluntary. The "test run" with the new reporting form and OPM's quarterly reports on the results should indicate whether this is in fact possible. If not, plaintiffs will then have no choice but to ask the Court to override the government's present policy for the sake of ensuring that the Decree is able to work as the parties and the Court intended that it work.

In the event that resort to the Social Security Administration's data for applicants for 1982 and later years shows that the government's fragmentary reporting of race has substantially under-reported the number and percentage of applicants who are black or Hispanic, it would necessarily follow that plaintiffs may have been deprived by the defendants' violation of the Decree's reporting provisions from making timely showings of adverse impact. In such an event, fundamental fairness requires that plaintiffs be put in the position they would have occupied in the absence of the violation, <u>i.e.</u>, with a

- 3 -

reasonable time to make new showings of adverse impact which will be considered *nunc pro tunc*.

The other provisions in plaintiffs' proposed form of Order are detailed, because the history of this issue shows that it will take substantial measures to get the defendants to awaken to their obligations. Increasing the frequency of reports is a tried-and-true means of alerting all levels of management, at all agencies, to the fact that it can no longer be "business as usual". In an action to enforce the reporting requirements of Title VII, the Fifth Circuit has stated:

> While this record contains abundant evidence that the defendants have consistently declined in the past to submit the required reports, we are unwilling to make the initial forecast of what their course may be in the future. Nevertheless, we may hold on these facts that injunctive relief is mandatory unless the District Court finds on the basis of clear and convincing proof that there exists no reasonable probability of further non-compliance with the reporting provisions of the Act. ... The burden of negating that probability lies with the defendants, and in these circumstances it will be a monumental one.

EEOC v. Rogers Brothers, 470 F.2d 965, 966-67 (5th Cir.), cert. den., 409 U.S. 1059, 34 L.Ed.2d 511 (1972).

To be candid, we believe that the record of the government's dealings on this issue would support a contempt citation. We are not now asking for such a citation. The more moderate measures suggested by plaintiffs should, we urge, be tried first, to see if they can get the job done.

If the substantive obligations of the Decree are ever to be enforceable, the reporting provisions must be enforced now.

- 4 -

Plaintiffs' Motion should be granted.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
   & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
   Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.   94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.   94612

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                              Attorneys for Plaintiffs

Dated: July 15, 1987

- 6 -

RECEIVED

JUL 15 1987

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
   individually and on behalf of )
   all others similarly situated, )
)
                 Plaintiffs, )
)
         v. )  C. A. No. 79-0271
)
CONSTANCE HORNER, Director, )
   U.S. Office of Personnel )
   Management, et al., )
)
             Defendants. )

CITY OF WASHINGTON   )
                ) ss:
DISTRICT OF COLUMBIA  )

FILED

JUL 15 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

     I make the following declaration subject to the penalties for perjury:

     1. My name is Richard T. Seymour. I am one of the attorneys for plaintiffs in this action.

     2. I have prepared the foregoing Motion to enforce the government's reporting obligations under the Consent Decree. Each of the statements in the Motion is true and correct, to the best of my knowledge, information, and belief.

                               RICHARD T. SEYMOUR

Dated: July 15, 1987

ATTACHMENT A

A. <u>1983 Applicants for OPM-Sponsored Alternative Examinations</u>

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Economist, Series 0110 | 254 | 86 | 168 | 66.1% |
| 2. Computer Specialist (Trainee), Series 0334 | 10,403 | 8,854 | 1,549 | 14.9% |
| 3. Printing Management Specialist, Series 1654 | 51 | 8 | 43 | 84.3% |
| 4. General Investigator, Series 1810 | 343 | 190 | 153 | 44.6% |
| 5. Criminal Investigating (Not Treasury Enforcement Agents), Series 1811 | 682 | 404 | 278 | 40.8% |
| Total for OPM-Sponsored Alternative Examining Procedures in 1983: | 11,733 | 9,542 | 2,191 | 18.7% |

B. <u>1983 Applicants for Delegated Examining Procedures</u>

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: Agricultural Program Specialist, Series 1145 | 213 | 105 | 108 | 50.7% |
| 2. Department of Defense: General Investigator, Series 1810 | 1,598 | 1,040 | 558 | 34.9% |
| 3. Department of Justice: Immigration Inspection, Series 1816 | 6,722 | 5,122 | 1,600 | 23.8% |
| 4. Federal Deposit Insurance Corp.: Financial Institution Examining, Series 0570 | 1,160 | 984 | 176 | 15.2% |
| 5. Federal Home Loan Bank Board: Financial Institution Examining, Series 0570 | 3,241 | 2,776 | 465 | 14.3% |
| 6. Office of Personnel Management: General Investigating, Series 1810: | 398 | 274 | 124 | 31.2% |
| Total for Delegated Alternative Examining Procedures in 1983: | 13,332 | 10,301 | 3,031 | 22.7% |

C. <u>1983 Applicants for Hiring Under Schedule B Authority</u>

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: | | | | |
| a) Archaeologist, Series 0193 | 1 | 1 | 0 | 0.0% |
| Agriculture Subtotal: | 1 | 1 | 0 | 0.0% |
| 2. Air Force: | | | | |
| a) Safety Specialist, Series 0018 | 5 | 1 | 4 | 80.0% |
| b) Psychologist, Series 0180 | 11 | 11 | 0 | 0.0% |
| c) Personnel Management Specialist, Series 0201 | 52 | 43 | 9 | 17.3% |
| d) Personnel Staffing Specialist, Series 0212 | 55 | 53 | 2 | 3.6% |
| e) Maintenance Specialist, Series 0301 | 82 | 76 | 6 | 7.3% |
| f) Management Analyst, Series 0343 | 34 | 30 | 4 | 11.8% |
| g) Program Analyst, Series 0345 | 5 | 1 | 4 | 80.0% |
| h) Logistics Management Specialist, Series 0346 | 7 | 7 | 0 | 0.0% |
| i) Budget Analyst, Series 0560 | 31 | 26 | 5 | 16.1% |
| j) Public Affairs Specialist, Series 1035 | 36 | 36 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| k) Product Management Specialist, Series 1101 | 24 | 12 | 12 | 50.0% |
| l) Contract Administrator, Series 1102 | 1,476 | 1,376 | 100 | 6.8% |
| m) Quality Assurance Specialist, Series 1910 | 17 | 11 | 6 | 35.3% |
| n) General Supply Specialist, Series 2001 | 96 | 78 | 18 | 18.8% |
| o) Inventory Management Specialist, Series 2010 | 125 | 116 | 9 | 7.2% |
| p) Distribution Facilities and Storage Management, Series 2030 | 6 | 2 | 4 | 66.7% |
| Air Force Subtotal: | 2,063 | 1,880 | 183 | 8.9% |

3. Army:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Personnel Management Specialist, Series 0201 | 1,124 | 606 | 518 | 46.1% |
| b) Management Analyst, Series 0343 | 1,423 | 716 | 707 | 49.7% |
| c) Budget Analyst, Series 0560 | 1,440 | 781 | 659 | 45.8% |
| d) Public Affairs Specialist, Series 1035-5 | 25 | 22 | 3 | 12.0% |
| e) Public Affairs Specialist, Series 1035-7 | 12 | 7 | 5 | 41.7% |
| f) Writer-Editor, Series 1082 | 25 | 25 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| g) Technical Writer-Editor, Series 1083 | 3 | 3 | 0 | 0.0% |
| h) Maintenance Management Specialist, series 1101 | 476 | 135 | 341 | 71.6% |
| i) Contract Specialist, Series 1102 | 1,018 | 538 | 480 | 47.2% |
| j) Industrial Specialist, Series 1150 | 696 | 339 | 357 | 51.3% |
| k) Quality Assurance Specialist, Series 1910 | 476 | 135 | 341 | 71.6% |
| l) Supply Specialist, Series 2001 | 832 | 458 | 374 | 45.0% |
| m) Supply Management Specialist, Series 2003 | 510 | 169 | 341 | 66.9% |
| Army Subtotal: | 8,060 | 3,934 | 4,126 | 51.2% |

4. Defense Department:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Personnel Security Specialist, Series 0080 | 72 | 44 | 28 | 38.9% |
| b) Civilian Personnel Management, Series 0201 | 935 | 904 | 31 | 3.3% |
| c) Management Analyst, Series 0343 | 930 | 899 | 31 | 3.3% |
| d) Financial Specialist, Series 0501 | 1,010 | 979 | 31 | 3.1% |
| e) Budget Analyst, Series 0560 | 988 | 957 | 31 | 3.1% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| f) Contract and Procurement Administration, Series 1102 | 992 | 961 | 31 | 3.1% |
| g) Industrial Property Management, Series 1103 | 1,026 | 995 | 31 | 3.0% |
| h) Property Disposal Specialist, Series 1104 | 1,028 | 996 | 32 | 3.1% |
| i) Industrial Specialist, Series 1150 | 995 | 964 | 31 | 3.1% |
| k) Quality Assurance Specialist, Series 1910 | 1,078 | 1,046 | 32 | 3.0% |
| l) Supply Management, Series 2000 | 1,028 | 996 | 32 | 3.1% |
| m) Geographer, Series 0150 | 1 | 1 | 0 | 0.0% |
| Defense Dept. Subtotal: | 10,083 | 9,742 | 341 | 3.4% |

5. Department of Energy:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Administrative Assistant, Series 0341 | 67 | 34 | 33 | 49.3% |
| b) Budget Analyst, Series 0560 | 2 | 2 | 0 | 0.0% |
| c) Contract Specialist, Series 1102 | 6 | 4 | 2 | 33.3% |
| d) Industrial Property Management Specialist, Series 1103-5/7 | 13 | 13 | 0 | 0.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| e) Industrial Property Management Specialist, Series 1103-7 | 3 | 1 | 2 | 66.7% |
| Energy Dept. Subtotal: | 91 | 54 | 37 | 40.7% |

6. Federal Energy Regulatory Commission:

| | | | | |
|---|---|---|---|---|
| a) Public Utilities Specialist, Series 1130 | 8 | 8 | 0 | 0.0% |
| Subtotal: | 8 | 8 | 0 | 0.0% |

7. Federal Emergency Management Agency:

| | | | | |
|---|---|---|---|---|
| a) Planning Specialist, Series 0301 | 11 | 8 | 3 | 27.3% |
| Subtotal: | 11 | 8 | 3 | 27.3% |

8. General Services Administration:

| | | | | |
|---|---|---|---|---|
| a) Building Management Specialist, Series 1176 | 73 | 55 | 18 | 24.7% |
| Subtotal: | 73 | 55 | 18 | 24.7% |

9. Department of Health and Human Services:

| | | | | |
|---|---|---|---|---|
| a) Social Insurance Representative, Series 0105 | 2,922 | 2,539 | 383 | 13.1% |
| b) Social Insurance Claims Examiner, Series 0993 | 38 | 21 | 17 | 44.7% |
| HHS Subtotal: | 2,960 | 2,560 | 400 | 13.5% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 10. Dept. of the Interior: | | | | |
| a) Archaeologist, Series 0193 | 23 | 15 | 8 | 34.8% |
| Subtotal: | 23 | 15 | 8 | 34.8% |
| 11. Department of Justice: | | | | |
| a) Paralegal Specialist, Series 0950 | 2 | 1 | 1 | 50.0% |
| b) Procurement Agent, Series 1102 | 6 | 3 | 3 | 50.0% |
| Justice Dept. Subtotal: | 8 | 4 | 4 | 50.0% |
| 12. Department of Labor: | | | | |
| a) Personnel Management Specialist, Series 0201 (two sheets) | 27 | 27 | 0 | 0.0% |
| b) Position Classification Specialist, Series 0221 | 12 | 12 | 0 | 0.0% |
| Labor Dept. Subtotal: | 39 | 39 | 0 | 0.0% |
| 13. National Credit Union Administration: | | | | |
| a) Financial Institution Examiner, Series 0570 | 23 | 23 | 0 | 0.0% |
| Subtotal: | 23 | 23 | 0 | 0.0% |
| 14. Department of the Navy: | | | | |
| a) Aggregate of Twelve Overlapping Reports for Various Jobs | 2,457 | 2,356 | 101 | 4.1% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| b) Safety and Occupational Health Specialist, Series 0018 | 45 | 45 | 0 | 0.0% |
| c) Writer-Editor, Series 1082 | 1 | 1 | 0 | 0.0% |
| d) Quality Assurance Specialist, Series 1910 | 17 | 17 | 0 | 0.0% |
| e) Traffic Management Specialist, Series 2130 | 56 | 56 | 0 | 0.0% |
| Navy Subtotal: | 2,576 | 2,475 | 101 | 3.9% |

15. Small Business Administration:

| a) Loan Specialist Series 1165 | 11 | 5 | 6 | 54.5% |
|---|---|---|---|---|
| Subtotal: | 11 | 5 | 6 | 54.5% |

16. Smithsonian Institution:

| a) Museum Curator, Series 1015 | 1 | 1 | 0 | 0.0% |
|---|---|---|---|---|
| Subtotal: | 1 | 1 | 0 | 0.0% |

17. Department of State:

| a) Passport Examiner, Series 0967 | 34 | 34 | 0 | 0.0% |
|---|---|---|---|---|
| Subtotal: | 34 | 34 | 0 | 0.0% |

18. Dept. of Transportation:

| a) Community Planner, Series 0020 | 3 | 2 | 1 | 33.3% |
|---|---|---|---|---|

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| b) Writer-Editor, Series 1082 | 1 | 1 | 0 | 0.0% |
| Transportation Dept. Subtotal: | 4 | 3 | 1 | 25.0% |
| **19. Treasury Department:** | | | | |
| a) Tax Technician, Series 0526 | 2,130 | 2,130 | 0 | 0.0% |
| b) Internal Revenue Officer, Series 1169 | 8,622 | 8,622 | 0 | 0.0% |
| c) Customs Inspector, Series 1890 | 398 | 394 | 4 | 1.0% |
| Treasury Dept. Subtotal: | 11,150 | 11,146 | 4 | 0.0% |
| Total Schedule B Applicants in 1983: | 31,644 | 26,414 | 5,230 | 16.5% |

A. <u>1984 Applicants for OPM-Sponsored Alternative Examinations</u>

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Economist, Series 0110 | 306 | 132 | 174 | 56.9% |
| 2. Computer Specialist (Trainee), Series 0334 | 5,079 | 2,042 | 3,037 | 59.8% |
| 3. Printing Management Specialist, Series 1654 | 47 | 0 | 47 | 100.0% |
| 4. General Investigator, Series 1810 | 2,067 | 1,609 | 458 | 22.2% |
| 5. Criminal Investigating (Not Treasury Enforcement Agents), Series 1811 | 451 | 294 | 157 | 34.8% |
| 6. Game Law Enforcement (Fish and Wildlife), Series 1812 | 29 | 14 | 15 | 51.7% |
| Total for OPM-Sponsored Alternative Examining Procedures in 1984: | 7,979 | 4,091 | 3,888 | 48.7% |

B. 1984 Applicants for Delegated Examining Procedures

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: Agricultural Program Specialist, Series 1145 | 93 | 70 | 23 | 24.7% |
| 2. Department of Defense: General Investigator, Series 1810 | 260 | 260 | 0 | 0.0% |
| 3. Department of Justice: Immigration Inspection, Series 1816 | 5,570 | 3,020 | 2,550 | 45.8% |
| 4. Federal Deposit Insurance Corp.: Financial Institution Examining, Series 0570 | 429 | 161 | 268 | 62.5% |
| 5. Federal Home Loan Bank Board: Financial Institution Examining, Series 0570 | 4,334 | 4,334 | 0 | 0.0% |
| Total for Delegated Alternative Examining Procedures in 1984: | 10,686 | 7,845 | 2,841 | 26.6% |

C. <u>1984 Applicants for Hiring Under Schedule B Authority</u>

| | Total<br>Applicants | Race<br>Identified | Race<br>Unknown | Percent<br>Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: | | | | |
| a) Archaeologist,<br>Series 0193 | 11 | 11 | 0 | 0.0% |
| Subtotal: | 11 | 11 | 0 | 0.0% |
| 2. Air Force: | | | | |
| a) Community Planner,<br>Series 0020 | 1 | 1 | 0 | 0.0% |
| b) Personnel Research<br>Psychologist,<br>Series 0180 | 4 | 4 | 0 | 0.0% |
| c) Personnel Management<br>Specialist,<br>Series 0201 | 224 | 224 | 0 | 0.0% |
| d) Administrative<br>Specialist,<br>Series 0301 | 109 | 109 | 0 | 0.0% |
| e) Management Analyst,<br>Series 0343 | 112 | 112 | 0 | 0.0% |
| f) Program Analyst,<br>Series 0345 | 138 | 138 | 0 | 0.0% |
| g) Logistic Management<br>Specialist,<br>Series 0346 | 70 | 70 | 0 | 0.0% |
| h) General Accounting,<br>and Financial<br>Specialist,<br>Series 0501 | 188 | 188 | 0 | 0.0% |
| i) Procurement and Pro-<br>duction Specialist,<br>and Production<br>Management Specialist,<br>Series 1101 | 139 | 139 | 0 | 0.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| j) Contract Administrator (various titles) Series 1102 | 2,876 | 2,876 | 0 | 0.0% |
| k) Industrial Property Management Specialist, Series 1103 | 39 | 39 | 0 | 0.0% |
| l) Industrial Specialist, Series 1150 | 16 | 16 | 0 | 0.0% |
| m) Archivist, Series 1420 | 5 | 5 | 0 | 0.0% |
| n) Quality Assurance Specialist, Series 1910 | 80 | 80 | 0 | 0.0% |
| o) General Supply Specialist, Series 2001 | 160 | 160 | 0 | 0.0% |
| p) Supply Systems Analyst, Series 2003 | 50 | 50 | 0 | 0.0% |
| q) Inventory Management Specialist, Series 2010 | 334 | 334 | 0 | 0.0% |
| r) Distribution Specialist, Series 2030 | 49 | 49 | 0 | 0.0% |
| Air Force Subtotal: | 4,594 | 4,594 | 0 | 0.0% |

2. Army:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Safety Specialist, Series 0018 | 1,034 | 900 | 134 | 13.0% |
| b) Park Ranger, Series 0025 | 50 | 44 | 6 | 12.0% |
| c) Personnel Management Specialist, Series 0201 | 4,554 | 3,870 | 684 | 15.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| d) Management Analyst, Series 0343 | 9,724 | 8,810 | 914 | 9.4% |
| e) Program Analyst, Series 0345 | 3,597 | 3,237 | 360 | 10.0% |
| f) Communications Specialist, Series 0393 | 7 | 7 | 0 | 0.0% |
| g) Budget Analyst, Series 0345 | 8,344 | 7,508 | 836 | 10.0% |
| h) Public Affairs Specialist, Series 1035 | 328 | 240 | 88 | 26.8% |
| i) Writer-Editor, Series 1082 | 141 | 114 | 27 | 19.1% |
| j) Technical Writer, Series 1083 | 7,376 | 6,618 | 758 | 10.3% |
| k) Management Mgt. (?) Specialist, Series 1101 | 2,361 | 2,115 | 246 | 10.4% |
| l) Contract and Procurement, Series 1102 | 8,696 | 7,889 | 807 | 9.3% |
| m) Industrial Specialist, Series 1150 | 32 | 25 | 7 | 21.9% |
| n) Housing Management Specialist, Series 1173 | 70 | 65 | 5 | 7.1% |
| o) Quality Assurance Specialist, Series 1910 | 2,097 | 1,561 | 536 | 25.6% |
| p) General Supply, Series 2001 | 1,779 | 1,577 | 202 | 11.4% |
| q) Supply Program Management, Series 2003 | 1,853 | 1,454 | 399 | 21.5% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| r) Transportation Specialist, Series 2101 | 147 | 147 | 0 | 0.0% |
| s) TFC Management Specialist, Series 2130 | 18 | 18 | 0 | 0.0% |
| Army Subtotal: | 52,208 | 46,199 | 6,009 | 11.5% |

3. Defense Department:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Environmental Protection Specialist, Series 0028 | 2,435 | 2,232 | 203 | 8.3% |
| b) Personnel Security Specialist, Series 0080 | 95 | 58 | 37 | 38.9% |
| c) Civilian Personnel Management, Series 0200 | 2,432 | 2,230 | 202 | 8.3% |
| d) Administrative, Program and Management, Series 0300 | 2,446 | 2,243 | 203 | 8.3% |
| e) Management Analyst, Series 0343 | 2,358 | 2,161 | 197 | 8.4% |
| f) Financial Specialist, Series 0501 | 2,451 | 2,247 | 204 | 8.3% |
| g) Budget Analyst, Series 0560 | 2,327 | 2,130 | 197 | 8.5% |
| h) Writer-Editor, Series 1082 | 2,392 | 2,191 | 201 | 8.4% |
| i) General Business and Industry, Series 1101 | 2,325 | 2,127 | 198 | 8.5% |
| j) Contract and Procurement, Series 1102 | 2,332 | 2,134 | 198 | 8.5% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| k) Industrial Property Management, Series 1103 | 1,551 | 1,430 | 121 | 7.8% |
| l) Property Disposal Specialist, Series 1104 | 1,485 | 1,366 | 119 | 8.0% |
| m) Industrial Specialist, Series 1150 | 1,115 | 1,024 | 91 | 8.2% |
| n) Quality Assurance Specialist, Series 1910 | 2,539 | 2,328 | 211 | 8.3% |
| o) Traffic Management Specialist, Series 2100 | 987 | 903 | 84 | 8.5% |
| Defense Dept. Subtotal: | 29,270 | 26,804 | 2,466 | 8.4% |

4. Department of Education:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Personnel Management Specialist, Series 0201 | 30 | 29 | 1 | 3.3% |
| b) Management Analyst, Series 0343 | 44 | 42 | 2 | 4.5% |
| c) Program Analyst, Series 0345 | 29 | 28 | 1 | 3.4% |
| d) Communications Specialist, Series 0393 | 7 | 7 | 0 | 0.0% |
| e) Financial Management Specialist, Series 0501 | 11 | 9 | 2 | 18.2% |
| f) Budget Analyst, Series 0560 | 9 | 9 | 0 | 0.0% |
| g) Writer-Editor, Series 1082 | 21 | 20 | 1 | 4.8% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| h) Contract Specialist, Series 1102 | 20 | 20 | 0 | 0.0% |
| i) Education program Specialist, Series 1720 | 36 | 33 | 3 | 8.3% |
| j) Supply Management Specialist, Series 2003 | 9 | 8 | 1 | 11.1% |
| Education Dept. Subtotal: | 216 | 205 | 11 | 5.1% |
| 5. Department of Energy: | | | | |
| a) Budget Analyst, Series 0560 | 9 | 9 | 0 | 0.0% |
| Subtotal: | 9 | 9 | 0 | 0.0% |
| 6. Environmental Protection Agency: | | | | |
| a) Environmental Protection Specialist, Series 0028 | 768 | 562 | 206 | 26.8% |
| Subtotal: | 768 | 562 | 206 | 26.8% |
| 7. Federal Communications Commission: | | | | |
| a) Field Public Service Specialist, Series 1001 | 26 | 26 | 0 | 0.0% |
| Subtotal: | 26 | 26 | 0 | 0.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| **8. Federal Deposit Insurance Corporation:** | | | | |
| a) Bank Liquidation Trainee, Series 1160 | 352 | 352 | 0 | 0.0% |
| Subtotal: | 352 | 352 | 0 | 0.0% |
| **9. General Services Administration:** | | | | |
| a) Community Planner, Series 0020 (incorrectly stated as Series 0200 on the form) | 15 | 15 | 0 | 0.0% |
| b) Communications Specialist, Series 0393 | 27 | 27 | 0 | 0.0% |
| c) Legal Publications Specialist, Series 0950 | 58 | 7 | 51 | 87.9% |
| d) Space Management and Space Utilization Specialist, Series 1101 | 19 | 1 | 18 | 94.7% |
| e) Contract Specialist (various titles), Series 1102 | 163 | 62 | 101 | 62.0% |
| f) Realty Specialist, Series 1170 | 64 | 30 | 34 | 53.1% |
| g) Buildings Management Specialist, Series 1176 | 29 | 4 | 25 | 86.2% |
| h) Quality Assurance Specialist, Series 1910 | 15 | 14 | 1 | 6.7% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| i) General Supply Specialist, Series 2001 | 15 | 1 | 14 | 93.3% |
| GSA Subtotal: | 405 | 161 | 244 | 60.2% |

10. Department of Health and Human Services:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Social Insurance Administration, Series 0105 | 732 | 732 | 0 | 0.0% |
| b) Social Insurance Claims Examiner, Series 0993 | 56 | 56 | 0 | 0.0% |
| HHS Subtotal: | 788 | 788 | 0 | 0.0% |

11. Dept. of the Interior:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Archaeologist, Series 0193 | 3 | 3 | 0 | 0.0% |
| Subtotal: | 3 | 3 | 0 | 0.0% |

12. Department of Labor

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Wage and Hour Compliance Specialist, Series 0249 | 213 | 213 | 0 | 0.0% |
| b) Workers' Compensation Claims Examiner, Series 0991 | 179 | 179 | 0 | 0.0% |
| Labor Dept. Subtotal: | 392 | 392 | 0 | 0.0% |

13. Department of the Navy:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Safety Specialist, Series 0018 | 1 | 11 | 0 | 0.0% |
| b) Security Specialist, Series 0080 | 26 | 26 | 0 | 0.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| c) Personnel Management Specialist, Series 0201 | 619 | 606 | 13 | 2.1% |
| d) Personnel Staffing Specialist, Series 0212 | 273 | 273 | 0 | 0.0% |
| e) General Administration, Series 0301 | 273 | 273 | 0 | 0.0% |
| f) Management Analyst, Series 0343 | 461 | 435 | 26 | 5.6% |
| g) Program Analyst, Series 0345 | 273 | 273 | 0 | 0.0% |
| h) Logistics Management Specialist, Series 0346 | 34 | 34 | 0 | 0.0% |
| i) Financial Systems Analyst or Specialist, Series 0501 | 409 | 383 | 26 | 6.4% |
| j) Budget Analyst, Series 0560 | 527 | 505 | 22 | 4.2% |
| k) Contract and Procurement, Series 1102 | 560 | 560 | 0 | 0.0% |
| l) Housing Management Specialist, Series 1173 | 10 | 10 | 0 | 0.0% |
| m) Quality Assurance Specialist, Series 1910 | 273 | 273 | 0 | 0.0% |
| n) Supply Group, Series 2000 | 111 | 111 | 0 | 0.0% |
| o) Supply Systems Analysis, Series 2003 | 101 | 101 | 0 | 0.0% |
| p) Inventory Management Specialist, Series 2010 | 18 | 18 | 0 | 0.0% |

q) Distribution Facili-
ties and Storage
Management,
Series 2030                    12        12        0       0.0%

r) Traffic Management,
Series 2130                    126       126       0       0.0%

Navy Dept. Subtotal:           4,107     4,030     87      2.1%


14. Office of Management
and Budget:

a) Budget Examiner,
Series 0560                     1         1        0       0.0%

Subtotal:                       1         1        0       0.0%


15. Office of Personnel
Management:

a) Personnel Staffing
Specialist,
Series 0212                    118       106       12      10.2%

b) CRS Claims Examiner,
etc., Series 0301,
0990, 0997                     167       154       13      7.8%

OPM Subtotal:                  285       260       25      8.8%


16. Securities and Exchange
Commission:

a) Research Assistant,
Series 0301                     8         8        0       0.0%

b) Securities Compliance
Examiner, Series 1831          19        17        2       10.5%

SEC Subtotal:                  27        25        2       7.4%

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 17. Small Business Administration: | | | | |
| a) Loan Assistant, Series 1165 | 11 | 11 | 0 | 0.0% |
| Subtotal: | 11 | 11 | 0 | 0.0% |
| 18. Department of State: | | | | |
| a) Passport Examiner, Series 0967 | 67 | 67 | 0 | 0.0% |
| Subtotal: | 67 | 67 | 0 | 0.0% |
| 19. Dept. of Transportation: | | | | |
| a) Personnel Staffing Specialist, Series 0212 | 1 | 1 | 0 | 0.0% |
| Subtotal: | 1 | 1 | 0 | 0.0% |
| 20. Dept. of the Treasury: | | | | |
| a) Administrative Intern, Series 0301 | 23 | 23 | 0 | 0.0% |
| b) Tax Technician, Series 0526 | 5,258 | 5,203 | 55 | 1.0% |
| c) Paralegal Specialist, Series 0950 | 21 | 11 | 10 | 47.6% |
| d) Revenue Officer, Series 1169 | 5,452 | 5,452 | 0 | 0.0% |
| e) Alcohol, Tobacco and Firearms Inspector, Series 1854 | 23 | 23 | 0 | 0.0% |
| f) Customs Inspector, Series 1890 | 721 | 668 | 53 | 7.4% |
| Treasury Dept. Subtotal: | 11,498 | 11,380 | 118 | 1.0% |

Total Schedule B Applicants
   in 1984:                        105,039     95,881    9,168    8.7%

A. 1985 Applicants for OPM-Sponsored Alternative Examinations

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Economist, Series 0110 | 567 | 197 | 370 | 65.3% |
| 2. Computer Specialist (Trainee), Series 0334 | 4,187 | 3,048 | 1,139 | 27.2% |
| 3. Tax Technician, Series 0526 | 3,975 | 3,368 | 607 | 15.3% |
| 3. Printing Management Specialist, Series 1654 | 73 | 5 | 68 | 93.2% |
| 4. General Investigator, Series 1810 | 682 | 379 | 303 | 44.4% |
| 5. Criminal Investigating (Not Treasury Enforcement Agents), Series 1811 | 68 | 41 | 27 | 39.7% |
| 6. Game Law Enforcement (Fish and Wildlife), Series 1812 | 42 | 27 | 15 | 35.7% |
| 7. Customs Inspector, Series 1890 | 4,080 | 3,759 | 321 | 7.9% |
| Total for OPM-Sponsored Alternative Examining Procedures in 1985: | 13,674 | 10,824 | 2,850 | 20.8% |

B. 1985 Applicants for Delegated Examining Procedures

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: Agricultural Program Specialist, Series 1145 | 27 | 18 | 9 | 33.3% |
| 2. Department of Justice: Immigration Inspection, Series 1816 | 669 | 603 | 66 | 9.9% |
| 3. Federal Deposit Insurance Corp.: Financial Institution Examining, Series 0570 | 2,155 | 1,582 | 573 | 26.6% |
| Total for Delegated Alternative Examining Procedures in 1985: | 2,851 | 2,203 | 648 | 22.7% |

C. <u>1985 Applicants for Hiring Under Schedule B Authority</u>

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 1. Dept. of Agriculture: | | | | |
| a) Food Program Specialist, Series 0120 | 12 | 11 | 1 | 8.3% |
| b) Management Analyst, Series 0343 | 14 | 14 | 0 | 0.0% |
| c) Program Analyst, Series 0345 | 45 | 4 | 41 | 91.1% |
| d) Financial Management Specialist, Series 0501 | 4 | 4 | 0 | 0.0% |
| e) Contract Specialist, Series 1102 | 54 | 13 | 41 | 75.9% |
| Agriculture Dept. Subtotal: | 129 | 46 | 83 | 64.3% |
| 2. Air Force: | | | | |
| a) Safety and Occupational Health, Series 0018 | 49 | 32 | 17 | 34.7% |
| b) Personnel Research Psychologist, Series 0180 | 14 | 4 | 10 | 71.4% |
| c) Personnel Management Specialist, Series 0201 | 151 | 107 | 44 | 29.1% |
| d) Classification Specialist, Series 0221 | 7 | 7 | 0 | 0.0% |
| e) Employee Relations Specialist, Series 0230 | 21 | 19 | 2 | 9.5% |
| f) Various types of Specialist, Series 0301 | 350 | 310 | 40 | 11.4% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| g) Administrative Assistant, Series 0341 | 12 | 12 | 0 | 0.0% |
| h) Management Analyst, Series 0343 | 227 | 226 | 1 | 0.4% |
| i) Program Analyst, Series 0345 | 175 | 134 | 41 | 23.4% |
| j) Logistics Management Specialist, Series 0346 | 144 | 95 | 49 | 34.0% |
| k) Cost Analyst, and Financial Management Specialist, Series 0501 | 519 | 361 | 158 | 30.4% |
| l) Budget Analyst, Series 0560 | 214 | 195 | 19 | 8.9% |
| m) Public Affairs Specialist, Series 1035 | 357 | 357 | 0 | 0.0% |
| n) Writer-Editor, Series 1082 | 2 | 2 | 0 | 0.0% |
| o) Production Management Specialist, and General Business, Series 1101 | 130 | 119 | 11 | 8.5% |
| p) Contracting Series 1102 | 3,054 | 2,330 | 724 | 23.7% |
| q) Industrial Property Specialist, Series 1103 | 218 | 117 | 101 | 46.3% |
| r) Industrial Specialist, Series 1150 | 42 | 21 | 21 | 50.0% |
| s) Quality Assurance Specialist, Series 1910 | 161 | 146 | 15 | 9.3% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| t) General Supply Specialist, Series 2001 | 660 | 599 | 61 | 9.2% |
| u) Supply Systems Analyst, Series 2003 | 166 | 126 | 40 | 24.1% |
| v) Inventory Management Specialist, Series 2010 | 263 | 263 | 0 | 0.0% |
| w) Distribution Specialist, Series 2030 | 167 | 127 | 40 | 24.0% |
| x) Packaging Specialist, Series 2032 | 91 | 72 | 19 | 20.9% |
| y) Traffic Management Specialist, Series 2130 | 104 | 101 | 3 | 2.9% |
| z) Three overlapping reports for various job categories also covered above (other applicants) | 1,391 | 1,290 | 101 | 7.3% |
| Air Force Subtotal: | 8,689 | 7,172 | 1,517 | 17.5% |

3. Army:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Safety Management Specialist, Series 0018 | 2,944 | 2,400 | 544 | 18.5% |
| b) Park Ranger, Series 0025 | 27 | 27 | 0 | 0.0% |
| c) Security Specialist, Series 0080 | 23 | 23 | 0 | 0.0% |
| d) Engineer Psychologist, Series 0180 | 11 | 8 | 3 | 27.3% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| e) Personnel Management Specialist, Series 0201 | 3,403 | 2,870 | 533 | 15.7% |
| f) Management Analyst, Series 0343 (Auth. No. PAC-84-22) | 3,716 | 2,886 | 830 | 22.3% |
| g) Management Analyst, Series 0343 (Auth. No. PAC-85-59) | 1,146 | 1,146 | 0 | 0.0% |
| h) Program Analyst, Series 0345 | 1,536 | 1,172 | 364 | 23.7% |
| i) Communications Specialist, Series 0393 | 8 | 8 | 0 | 0.0% |
| j) Budget Analyst, Series 0560 | 3,556 | 3,383 | 173 | 4.9% |
| k) Public Affairs Specialist, Series 1035 | 99 | 66 | 33 | 33.3% |
| l) Writer-Editor, Series 1082 | 28 | 28 | 0 | 0.0% |
| m) Technical Writer-Editor, Series 1083 | 3,370 | 3,010 | 360 | 10.7% |
| n) Maintenance Management Specialist, Series 1101 | 2,925 | 2,415 | 510 | 17.4% |
| o) Contract Specialist, Series 1102 | 6,160 | 5,298 | 862 | 14.0% |
| p) Industrial Specialist, Series 1150 | 35 | 35 | 0 | 0.0% |
| q) Realty Specialist, Series 1170 | 5 | 5 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| r) Housing Management Specialist, Series 1173 | 9 | 9 | 0 | 0.0% |
| s) Family Care Director, Series 1701 | 8 | 8 | 0 | 0.0% |
| t) Quality Assurance Specialist, Series 1910 | 4,438 | 3,706 | 732 | 16.5% |
| u) Supply Specialist, Series 2001 | 156 | 145 | 11 | 7.1% |
| v) Supply Management Specialist, Series 2003 (Auth. No. PAC-84-22) | 3,806 | 3,346 | 460 | 12.1% |
| w) Supply Management Specialist, Series 2003 (Auth. No. PAC-85-59) | 974 | 960 | 14 | 1.4% |
| x) Supply Cataloger, Series 2050 | 20 | 20 | 0 | 0.0% |
| y) Transportation Specialist, Series 2101 | 41 | 41 | 0 | 0.0% |
| z) Traffic Management Specialist, Series 2130 | 2,669 | 2,321 | 348 | 13.0% |
| Army Subtotal: | 41,113 | 35,336 | 5,777 | 14.1% |

4. Defense Department:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Environmental Protection Specialist, Series 0028 | 6,404 | 5,674 | 730 | 11.4% |
| b) Personnel Security Assistant, Series 0080 | 106 | 73 | 33 | 31.1% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| c) Personnel Management, Series 0200 | 6,513 | 5,774 | 739 | 11.3% |
| d) Administrative, Program and Management, Series 0300 | 6,557 | 5,810 | 747 | 11.4% |
| e) Management Analyst, Series 0343 | 6,256 | 5,557 | 699 | 11.2% |
| f) Financial Specialist,Pr Series 0501 | 6,503 | 5,758 | 745 | 11.5% |
| g) Budget Analyst, Series 0560 | 6,160 | 5,474 | 686 | 11.1% |
| h) General Business and Industry, Series 1101 | 6,183 | 5,495 | 688 | 11.1% |
| i) Contract and Procurement, Series 1102 | 6,197 | 5,508 | 689 | 11.1% |
| j) Industrial Property Management, Series 1103 | 3,142 | 2,779 | 363 | 11.6% |
| k) Property Disposal Specialist, Series 1104 | 3,088 | 2,728 | 360 | 11.7% |
| l) Industrial Specialist, Series 1150 | 2,627 | 2,331 | 296 | 11.3% |
| m) Quality Assurance Specialist, Series 1910 | 6,612 | 5,858 | 754 | 11.4% |
| n) Supply Management, Series 2000 | 3,105 | 2,741 | 364 | 11.7% |
| o) Traffic Management Specialist, Series 2100 | 1,901 | 1,649 | 252 | 13.3% |
| Defense Dept. Subtotal: | 71,354 | 63,209 | 8,145 | 11.4% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| **5. Department of Education:** | | | | |
| a) Personnel Management Specialist, Series 0201 | 19 | 18 | 1 | 5.3% |
| b) Management Analyst, Series 0343 | 46 | 44 | 2 | 4.3% |
| c) Program Analyst, Series 0345 | 17 | 17 | 0 | 0.0% |
| d) Financial Management Specialist, Series 0501 | 18 | 17 | 1 | 5.6% |
| e) Budget Analyst, Series 0560 | 16 | 16 | 0 | 0.0% |
| f) Contract Specialist, Series 1102 | 18 | 18 | 0 | 0.0% |
| g) Education program Specialist, Series 1720 | 54 | 46 | 8 | 14.8% |
| Education Dept. Subtotal: | 188 | 176 | 12 | 6.4% |
| **6. Department of Energy:** | | | | |
| a) Budget Analyst, Series 0560 | 77 | 55 | 22 | 28.6% |
| b) Contract Specialist, Series 1102 | 40 | 39 | 1 | 2.5% |
| c) Public Utilities Specialist, Series 1130 | 9 | 9 | 0 | 0.0% |
| Energy Dept. Subtotal: | 126 | 103 | 23 | 18.3% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 7. Environmental Protection Agency: | | | | |
| a) Environmental Protection Specialist, Series 0028 | 419 | 234 | 185 | 44.2% |
| b) Management Analyst, Series 0343 | 77 | 52 | 25 | 32.5% |
| c) Program Analyst, Series 0345 | 54 | 32 | 22 | 40.7% |
| d) Budget Analyst, Series 0560 | 76 | 56 | 20 | 26.3% |
| e) Public Affairs Specialist, Series 1035 | 56 | 43 | 13 | 23.2% |
| EPA Subtotal: | 682 | 417 | 265 | 38.9% |
| 8. Federal Deposit Insurance Corporation: | | | | |
| a) Bank Liquidation Trainee, Series 1160 | 229 | 206 | 23 | 10.0% |
| Subtotal: | 229 | 206 | 23 | 10.0% |
| 9. Federal Energy Regulatory Commission: | | | | |
| a) Environmental Protection Specialist, Series 0028 | 24 | 23 | 1 | 4.2% |
| b) Historian, Series 0170 | 17 | 16 | 1 | 5.9% |
| c) Public Utilities Specialist, Series 1130 | 1 | 1 | 0 | 0.0% |
| F.E.R.C. Subtotal: | 42 | 40 | 2 | 4.8% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| **10. Federal Home Loan Bank Board:** | | | | |
| a) Financial Assistant, Series 1160 | 36 | 15 | 21 | 58.3% |
| Subtotal: | 36 | 15 | 21 | 58.3% |
| **11. General Services Administration (including the National Archives, mistakenly reported by OPM as if it were a separate agency)** | | | | |
| a) Community Planner, Series 0020 | 3 | 2 | 1 | 33.3% |
| b) Communications Specialist, Series 0393 | 13 | 13 | 0 | 0.0% |
| c) Legal Publication Specialist, Series 0950 | 21 | 8 | 13 | 61.9% |
| d) Public Information Specialist, Series 1035 | 66 | 21 | 45 | 68.2% |
| e) Space Planner, Series 1101 (mistakenly put down by OPM as Series 1001) | 6 | 6 | 0 | 0.0% |
| f) Contract Specialist, Series 1102 | 51 | 37 | 14 | 27.5% |
| g) Realty Specialist, Series 1170 | 45 | 33 | 12 | 26.7% |
| h) Appraiser, Series 1171 (Series No. left off OPM's transcription) | 3 | 3 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| i) Building Management Specialist, Series 1176 | 22 | 16 | 6 | 27.3% |
| j) Archivist, Series 1420 | 27 | 22 | 5 | 18.5% |
| k) Transportation Operations, Series 2150 | 17 | 17 | 0 | 0.0% |
| i) Aggregate figures for three job categories, Series 0393, 1170, and 1176 | 30 | 30 | 0 | 0.0% |
| G.S.A. Subtotal: | 304 | 208 | 96 | 31.6% |

12. Government Printing Office:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Industrial Specialist, Series 1150 | 4 | 0 | 4 | 100.0% |
| Subtotal: | 4 | 0 | 4 | 100.0% |

13. Department of Health and Human Services:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Social Insurance (Claims) Representative, Series 0105 | 1,944 | 1,515 | 429 | 22.1% |
| b) Management Analyst, Series 0343 | 131 | 74 | 57 | 43.5% |
| H.H.S. Subtotal: | 2,075 | 1,589 | 486 | 23.4% |

14. Dept. of the Interior:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Case Reviewer, Series 0301 | 5 | 5 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| b) Land Law Examiner, Series 0965 | 4 | 3 | 1 | 25.0% |
| Interior Dept. Subtotal: | 9 | 8 | 1 | 11.1% |

15. Department of Justice:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Personnel Management Specialist, Series 0201 | 5 | 5 | 0 | 0.0% |
| b) Financial Management, Series 0501 | 9 | 8 | 1 | 11.1% |
| c) Procurement Trainee, Series 1102 | 4 | 2 | 2 | 50.0% |
| Justice Dept. Subtotal: | 18 | 15 | 3 | 16.7% |

16. Department of Labor

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Unemployment Insurance Program Specialist, Series 0106 | 54 | 53 | 1 | 1.9% |
| b) Manpower Development Specialist, Series 0142 | 159 | 140 | 19 | 11.9% |
| c) Aggregate statistics for Series 0201 and Series 0235 | 17 | 17 | 0 | 0.0% |
| d) Wage and Hour Compliance Specialist, Series 0249 | 291 | 184 | 107 | 36.8% |
| e) Budget Analyst, Series 0560 | 7 | 7 | 0 | 0.0% |
| f) Workers' Compensation Claims Examiner, Series 0991 | 88 | 67 | 21 | 23.9% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| g) Contract Specialist, Series 1102 | 41 | 41 | 0 | 0.0% |
| Labor Dept. Subtotal: | 657 | 509 | 148 | 22.5% |

17. National Aeronautics and Space Administration:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Personnel Management, Series 0201 | 17 | 11 | 6 | 35.3% |
| b) Financial Management, Series 0501 | 52 | 40 | 12 | 23.1% |
| c) Contract Specialist, Series 1102 | 154 | 118 | 36 | 23.4% |
| N.A.S.A. Subtotal: | 223 | 169 | 54 | 24.2% |

18. Department of the Navy:

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Safety Specialist, Series 0018 | 81 | 80 | 1 | 1.2% |
| b) Security Specialist, Series 0080 | 5 | 5 | 0 | 0.0% |
| c) Personnel Management Specialist, Series 0201 (Auth. No. PAC-85-67) | 127 | 83 | 44 | 34.6% |
| d) Personnel Management Specialist, Series 0201 (Auth. No. PAC-85-15) | 61 | 61 | 0 | 0.0% |
| e) Labor Relations Specialist, Series 0233 | 13 | 7 | 6 | 46.2% |
| f) General Administration (various titles) Series 0301 | 107 | 68 | 39 | 36.4% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| g) Administrative Officer, Series 0341 | 50 | 15 | 35 | 70.0% |
| h) Management Analyst, Series 0343 (one sheet mistakenly labelled Series 0345) | 240 | 183 | 57 | 23.8% |
| i) Logistics Management Specialist, Series 0346 (three sheets) | 103 | 64 | 39 | 37.9% |
| j) Logistics Management Specialist, Series 0346 (Authorization Nos. 84-102 and 85-29 (one sheet) | 258 | 258 | 0 | 0.0% |
| k) Financial Systems Analyst or Specialist, Series 0501 | 138 | 137 | 1 | 0.7% |
| l) Budget Analyst, Series 0560 | 118 | 81 | 37 | 31.4% |
| m) Public Affairs, Series 1035 | 1 | 1 | 0 | 0.0% |
| n) Business Specialist, Series 1101 | 3 | 3 | 0 | 0.0% |
| o) Contract and Procurement, Series 1102 (Auth. No. 85-67) | 90 | 84 | 6 | 6.7% |
| p) Contract and Procurement, Series 1102 (Auth. Nos. 84-102 and 85-29)(one sheet) | 1,081 | 1,081 | 0 | 0.0% |
| q) Industrial Specialist, Series 1152 | 37 | 15 | 22 | 59.5% |
| r) General Supply, Series 2001 | 34 | 34 | 0 | 0.0% |

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| s) Supply Systems Analysis, Series 2003 | 146 | 146 | 0 | 0.0% |
| t) Inventory Management Specialist, Series 2010 | 26 | 26 | 0 | 0.0% |
| u) Distribution Facilities and Storage Management, Series 2030 | 36 | 36 | 0 | 0.0% |
| v) Traffic Management, Series 2130 | 60 | 60 | 0 | 0.0% |
| Navy Subtotal: | 2,815 | 2,528 | 287 | 10.2% |

19. Office of Personnel Management:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) CRS Claims Examiner, etc., Series 0301, 0990, 0997 | 50 | 49 | 1 | 2.0% |
| Subtotal: | 50 | 49 | 1 | 2.0% |

20. Securities and Exchange Commission:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Research Assistant, Series 0301 | 9 | 9 | 0 | 0.0% |
| Subtotal: | 9 | 9 | 0 | 0.0% |

21. Small Business Administration:

| | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| a) Public Affairs Specialist, Series 1035 | 9 | 9 | 0 | 0.0% |
| Subtotal: | 9 | 9 | 0 | 0.0% |

|  | Total Applicants | Race Identified | Race Unknown | Percent Unknown |
|---|---|---|---|---|
| 22. Department of State: | | | | |
| a) Passport Examiner, Series 0967 | 54 | 54 | 0 | 0.0% |
| Subtotal: | 54 | 54 | 0 | 0.0% |
| 23. Dept. of Transportation: | | | | |
| a) Environmental Protection Specialist, Series 0028 | 4 | 3 | 1 | 25.0% |
| b) Transportation Operations Specialist, Series 2150 | 1 | 1 | 0 | 0.0% |
| Transportation Dept. Subtotal: | 5 | 4 | 1 | 20.0% |
| 24. Dept. of the Treasury: | | | | |
| a) Securities Transaction, Series 0501 | 144 | 102 | 42 | 29.2% |
| b) Tax Auditor, Series 0526 | 30 | 30 | 0 | 0.0% |
| c) Revenue Officer, Series 1169 | 3,981 | 3,981 | 0 | 0.0% |
| d) Alcohol, Tobacco and Firearms Inspector, Series 1854 | 36 | 36 | 0 | 0.0% |
| e) Import Specialist, Series 1889 | 2,997 | 2,796 | 201 | 6.7% |
| f) Customs Inspector, Series 1890 | 2,195 | 1,876 | 319 | 14.5% |
| Treasury Dept. Subtotal: | 9,383 | 8,821 | 562 | 6.0% |
| Total Schedule B Applicants in 1985: | 133,512 | 116,282 | 17,230 | 12.9% |

Attachment C: The Government's 1983 Racial
Breakdowns of Applicants

(See Accompanying Bound Volume)

ATTACHMENT C

Attachment D: The Government's 1984 Racial
Breakdowns of Applicants

(See Accompanying Bound Volume)

ATTACHMENT D

Attachment E: The Government's 1985 Racial
Breakdowns of Applicants

(See Accompanying Bound Volume)

# APPLICANT RACE AND NATIONAL ORIGIN QUESTIONNAIRE

The United States District Court for the District of Columbia, in a Decree approved in a lawsuit entitled Luevano v. Devine, Civil Action No. 79-0271, has ordered that Federal Government agencies provide data on the race and national origin of applicants for certain Federal occupations. The position for which you are applying is in one of those occupations.

You are requested to complete this form. The data you supply will be used for statistical analysis pursuant to the requirements of the lawsuit. Submission of this information is voluntary. Your failure to do so will have no effect on the processing of your application for Federal employment.

Your Social Security Number (SSN) is requested under the authority of Executive Order 9397 (November 22, 1943) for the orderly administration of personnel records. Submission of your SSN is voluntary and failure to furnish your SSN on this form will have no effect on your application.

---

**PLEASE READ THE INSTRUCTIONS PROVIDED BELOW BEFORE COMPLETING THIS FORM**

---

SPECIFIC INSTRUCTIONS: The categories below provide descriptions of racial and national origins. Read the Definition of Category descriptions and then place an "X" in the box next to the category with which you identify yourself. If you are of mixed racial and/or national origin, select the category with which you most closely identify yourself. NOTE: PLEASE MARK ONLY ONE BOX!

| Name (Last, First, Middle Initial) | Social Security Number (cc 1-8) |
|---|---|
| Title of Position and Grade Level for Which Application is Made | Location of Position / Date |

| NAME OF CATEGORY (Mark only ONE) | DEFINITION OF CATEGORY |
|---|---|
| **A** ☐ Black, not of Hispanic Origin............................. | A person having origins in any of the black racial groups of Africa. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| **B** ☐ Hispanic................................................. | A person of Mexican, Puerto Rican, Cuban, Central, or South American, or other Spanish cultures or origins. Does not include persons of Portuguese culture or origin. |
| **C** ☐ White, not of Hispanic Origin............................. | A person having origins with any of the original peoples of Europe, North Africa, or Middle East. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish cultures or origins (see Hispanic). |
| **D** ☐ Other.................................................... | Persons not included in other categories. |

---

## FOR AGENCY USE ONLY

| Occupational Code (cc 10-13) | Date Received (YY-MM-DD) (cc 14-19) | RNO CODE (cc 20) ▷ |
|---|---|---|
| Title of Announcement, (if appropriate) | | Number of Announcement, (if appropriate) |
| Authorization Number, (if appropriate) | | Comments |

---

Authorized for use by the Office of Personnel Management and Other Defendant Agencies only for the purposes of complying with the requirements of the Luevano v. Devine decree.

REPRODUCE LOCALLY

E Form 618 (1-83)

ATTACHMENT F

Personnel
Research and
Development
Center

# Pilot Study No. 1
# for the Collection of Race, Sex, and
# Ethnic Origin Data in Federal Testing

**U.S. Office of**
**Personnel Management**
Staffing Services Group

ATTACHMENT G

Technical Memorandum 79-15

PILOT STUDY NO. 1 FOR THE COLLECTION OF RACE, SEX AND
ETHNIC ORIGIN DATA IN FEDERAL TESTING

Lois C. Northrop
Project Director

Personnel Research and Development Center
United States Office of Personnel Management
Washington, D. C.    20415
August 1979

# ABSTRACT AND SUMMARY OF FINDINGS

1. Six questionnaires, differing only in the wording of an introductory information paragraph, were developed for the collection of race, sex and ethnic origin data on applicants taking Federal employment tests. In addition, visual identifications of the sex and race (Black, White, Other) of applicants were made and recorded by two test development staff members in each exam room.

2. Sex, race and ethnic data were collected on 2250 applicants taking the PACE in May 1977 at the Washington Area Office. The percentages of the five different racial groups among the 2196 people (97.6%) who responded to the questionnaire, by each individual's self-identification, were: Blacks, 23.6; Whites, 73.4; American Indian and Alaskan natives, 0.5; Asians and Pacific Islanders, 1.5; Other, 1.0. The percentages by sex were: males, 46.5 and females, 53.5. Only 1971 applicants (87.6%) responded to the question on ethnicity. Of these 49, or 2.5%, were of Hispanic origin; 97.5% of non-Hispanic origin.

   Of further interest is the breakdown by sex of the Black and White groups of applicants. White males and females were present in approximately equal numbers (802 and 809 respectively). There were, however, considerably more Black females (328) than Black males (190).

3. 47 people (or 2.09%) refused to respond to the questionnaire. An additional 7 persons (or 0.3%) indentified themselves only as to sex.

4. There was no overall statistically significant difference among the forms; i.e., the manner in which the request for the information was worded and explained did not affect individuals' willingness to supply the information.

5. Tabulation of data collected after one week of testing revealed that about 12% of the applicants were omitting the ethnicity question. This question had been placed on the right-hand side of the page, apart from the questions on race and sex. To determine whether or not this high omit rate was due to the question being overlooked, a second version of each of the six questionnaires was produced, placing the ethnic question closer to the other two questions on the page. In addition, a third version of Form A was produced by inserting the word "Spanish" after Hispanic to clarify the meaning of the question. The omit rate for the revised forms was 8.2%, as compared to 12% for the original versions. The high omit rate for this question should be investigated further to determine whether it was due to failure to see the question or to a lack of understanding of the question.

6. The overall reliability and validity of self identification v. visual observation to determine the race and sex of applicants was good, although neither our survey of state and local governments nor published literature provide any statistics for comparison. In only 1.7% of the cases did the two observers disagree with each other in their observations. In another 1.4% of the cases the two observers agreed in their visual identifications but these did not agree with the self-identifications. Another 0.7% of the applicants made useless responses of one sort or another which could not be compared with the visual observations.

7. It is recommended that a nationwide study of the questionnaires be undertaken this summer using the Designation examination, a clerical examination and an unassembled examination.

TABLE OF CONTENTS

|  | Page |
|---|---|
| Introduction | 1 |
| Method | 1 |
| Results and Discussion | 4 |
|     Description of sample | 4 |
|     Those who refused the questionnaire | 6 |
|     The problem of no-response to the ethnic question | 11 |
|     Validity and reliability of self-identification v. visual observation | 13 |
| Appendix | 17 |
| Reference | 33 |

iii

## Introduction

The new FEA guidelines require that Federal selection procedures be examined for possible adverse impact on minority groups. In order to determine whether or not adverse impact exists it will be necessary to know the sex, race and ethnic origin of all job applicants. The present investigation represents a pilot study to determine if self-identification by applicants is a feasible and valid way to collect this information. Specifically the study attempted to answer four major questions:

1. What is the response rate to a questionnaire which requests that applicants identify themselves by sex, race and ethnic origin?

2. How should the request to respond to these questions be worded in order to elicit maximum cooperation from applicants?

3. How valid are self-identifications v. visual identifications by observers in the test room? (This question can apply only to identification by sex and race.)

4. How reliable are visual observations of sex and race, i.e., how closely do the observations of two different observers agree?

## Method

This survey was carried out during the May, 1977 administration of the U. S. Civil Service Commission's Professional and Administrative Career Examination (PACE) in the Washington Area Office. The written examination for the PACE was administered once a day for ten days -- May 9-13 and May 16-20. On Thursday May 19th the examination was administered twice, at 8 a.m. and at 12 noon. Table 1 is a summary of the examination schedule. The table also lists the number of applicants tested in each room as well as the questionnaire form used and the race and sex of the observers in each room, (these latter two entries in Table 1 will now be explained more fully.

A questionnaire was developed which asked each applicant to provide his/her name and ID number (from PACE answer sheet) and to identify him/her self in three ways: by race (OMB categories), sex (male, female) and ethnicity (Hispanic, non-Hispanic). Definitions of the race categories American Indian or Alaskan native, Asian or Pacific Islander, Black and White were printed below the three questions, as well as the definition of "Hispanic." The same three questions and five definitions were used on six different forms of the

1

## TABLE 1

### PACE Examination Schedule

#### May 1977

| Date | Time | ROOM 1 | | | ROOM 2 | | | ROOM 3 | | | ROOM 4 | | |
|------|------|--------|----|-----------|--------|----|-----------|--------|----|-----------|--------|----|-----------|
| | | Form | N[a] | Observers | Form | N | Observers | Form | N | Observers | Form | N | Observers |
| 5/9 | 8 a.m. | B | 83 | BF[b], WF | A | 45 | BF, WM | | | | | | |
| 5/10 | 11:30 | C | 83 | BF, WM | D | 70 | BF, WF | E | 115 | BF, WF | | | |
| 5/11 | 11:30 | F | 83 | BF, WF | A | 70 | BF, WF | B | 81 | BF, WM | | | |
| 5/12 | 11:30 | E | 83 | BF, WF | D | 70 | BF, WF | C | 84 | BM, WF | | | |
| 5/13 | 8 a.m. | F | 83 | BF, WM | A | 40 | BF, WM | | | | | | |
| 5/16 | 8 a.m. | D | 83 | BF, WF | A | 73 | BF, WF | | | | | | |
| 5/17 | 11:30 | B[1] | 83 | BF, WF | E[1] | 70 | BF, WF | C[1] | 123 | BF, WM | F | 12 | BF, WF |
| 5/18 | 11:30 | D[1] | 83 | BF, WM | A[1] | 70 | BF, WF | F[1] | 125 | BF, WF | B[1] | 46 | BF, WF |
| 5/19 | 8 a.m. | E[1] | 83 | BF, WM | A[1] | 42 | BF, WF | | | | | | |
| 5/19 | 12 noon | B[1] | 52 | BF, WM | | | | D[1] | 125 | BF, WF | F[1] | 56 | BF, WF |
| 5/20 | 8 a.m. | A[11] | 83 | BF, WM | A[1] | 51 | BF, WF | | | | | | |

[a] N = number of applicants in each room

[b] BF = Black female
WF = White female
BM = Black male
WM = White male

questionnaire (A-F), the forms differing only in the wording of the instructions and reason for the need to obtain the information. Copies of the six forms, A-F, are presented in the Appendix. Note that Form A merely requests the information while forms B-F present the reason for collecting the data in paragraphs differing in wording and length. On the back of every questionnaire, regardless of form, was a Privacy Act Notice which stated that providing the information was voluntary and non-disclosure would have no adverse effect on the applicant. The forms were administered, one to an exam room, on a more or less rotating basis in an attempt to obtain an approximately equivalent number of applicants (N) for each form. After the first five days of the testing period a check on results indicated that although the overall response rate for the questionnaire was about 98%, that for the question on ethnicity was averaging about 88%. It was felt that the position of this question, on the right hand side of the page and by itself, was causing applicants to miss it. Therefore, forms $A^1 - F^1$ were produced by simply repositioning the ethnicity question so that it would be closer to the questions on race and sex. The reader may see what the exact change was by consulting forms $A^1 - F^1$ in the Appendix. One further alteration was made to produce form $A^{11}$ from $A^1$: since there was some suspicion that the terms "ethnicity" and/or "Hispanic" might not be understood by some applicants, the word "Spanish" was inserted after "Hispanic" on form $A^1$ for use on the last day of testing.

Arrangements were made with the examining office to allow members of the test development staff to pass out the questionnaires in each exam room, collect them and visually observe and record the sex and race (Black, White and Other categories only) of every applicant. Seating charts were provided for each examination room (an example is presented in the Appendix) and two test development staff members (one Black and one White) observed and recorded, independently, the sex and race of each applicant as unobtrusively as possible. Answer sheets for the PACE are printed with a 6-digit ID number and one was placed on each desk, in sequential order, by the test examiner before the applicants were admitted to the room. By recording the ID number on the first and last desks in each room it became a simple matter to match each visual observation with the proper questionnaire.

A one-time-use set of directions (DFC) for the administration of the survey questionnaires was read by the test examiner after competitors had finished filling out the top of page two of their answer sheets. This DFC is presented in its entirety in the Appendix. Briefly, it stated that applicants would be asked to complete a supplemental questionnaire which would be passed out by members of the test development staff. The questionnaire was passed out, the examiner gave instructions for filling in the requested information and reminded applicants to read the Privacy Act Notice on the back of the questionnaire. After 2-3 minutes, when all applicants had finished, the forms were collected by

the two observers who then completed their visual identifications, if they had not done so already, and left. Any questions from applicants were directed to two test development staff members – Drs. Mary Anne Nester and Hilda Wing – by giving such applicants a card with the room and phone numbers of these two people. It was agreed that the observers themselves would not attempt to answer any questions in the interest of avoiding any confusion or conflicting information.

The questionnaires from each test room were put in numerical order according to the answer sheet ID numbers and were given, with the two seating charts containing the visual identifications, to two recorders (not the same two people who had made the observations). The recorders transferred the race and sex identifications of each observer to the questionnaires, noting which identification was made by the Black observer and which by the White.

The responses to each form (A-F, $A^1 - F^1$ and $A^{11}$) were tabulated separately. Frequency counts by race, sex and ethnicity were obtained as well as the percentage of applicants in each category. Disagreements between one or both observers and self-identifications were also tabulated as well as disagreements between observers.

Both chi square (Guilford, 1965, p. 227-236) and $\bar{z}$ for significant differences in proportions (Guilford, 1965, p. 185-189) were employed to answer such questions as: Is refusal to answer the questionnaire a function of race, sex or questionnaire form? Is failure to respond to the ethnicity question a function of questionnaire form?

Results and Discussion

The administration of the survey questionnaire and sex and race observations went smoothly for the most part. On two occasions the procedure was inserted at a point in the regular PACE DFC other than the specified one. On two occasions an examiner, who was not a regular one, had an observer read the questionnaire DFC. On one occasion an applicant asked, out loud, what the consequences of refusal to answer the questionnaire would be. The examiner replied that it was voluntary but hoped that everyone would cooperate. None of these occurrences had any effect on the results.

Description of sample

In all, data were obtained for 2250 PACE applicants. Only 47 of these (2.09%) refused to answer the questionnaire; many of these did, however, put their ID number and name on the form. Visual identification was available for all 47 and there was agreement at least between the two observers on the race and sex of all 47. Table 2

TABLE 2

Description of Applicant Population in Terms
of Response to Questionnaire

| Form | I[a] | II[b] | III[c] | IV[d] | V[e] | Row Total |
|------|------|-------|--------|-------|------|-----------|
| A | 194 | 30 | 2 | | 2 | 228 |
| B | 137 | 19 | 2 | 5 | 1 | 164 |
| C | 130 | 24 | 7 | 3 | 3 | 167 |
| D | 176 | 31 | 3 | 11 | 2 | 223 |
| E | 166 | 20 | 5 | 6 | 1 | 198 |
| F | 159 | 9 | 1 | 9 | | 178 |
| Sub total Form A–F | 962 | 133 | 20 | 34 | 9 | 1158 |
| $A^1$ | 136 | 21 | 3 | 2 | 1 | 163 |
| $B^1$ | 156 | 10 | 7 | 8 | | 181 |
| $C^1$ | 106 | 6 | 2 | 7 | 2 | 123 |
| $D^1$ | 182 | 18 | 2 | 6 | | 208 |
| $E^1$ | 137 | 7 | 2 | 7 | | 153 |
| $F^1$ | 152 | 17 | 9 | 3 | | 181 |
| Sub total Form $A^1$–$F^1$ | 869 | 79 | 25 | 33 | 3 | 1009 |
| $A^{11}$ | 71 | 6 | 2 | 4 | | 83 |
| Grand Total | 1902 | 218 | 47 | 71 | 12 | 2250 |

[a] All three questions were answered and responses to sex and race were in agreement with both observers.
[b] The question on ethnicity was omitted but responses to sex and race questions were in agreement with both observers.
[c] These individuals refused to complete the questionnaire.
[d] The race question was not responded to or the self-identification of race disagreed with the observations of one or both observers.
[e] The same as d, but in addition, the question on ethnicity was omitted.

NOTE: Complete data on the individuals in columns IV and V are presented in Table 7.

presents a description of the sample by form. The first column represents the number of applicants who answered all three questions and whose self identification agreed with those of both observers on race. This includes those in the Indian, Asian and "Other" categories correctly identified as "Other" by the observers. Column 2 represents the number of applicants who failed to answer the ethnicity question but whose self identification of race agreed with the identifications made by the two observers. Columns I and II represent agreement on the sex categorization in all but 35 cases (1.56%). In these 35 cases one observer agreed with the self identification and one did not (i.e., the observers disagreed with each other). It should be noted that the test rooms were large and quite crowded and many of the observations had to be made from some distance in the interest of being as unobtrusive as possible. Had the observations been made under less difficult conditions probably most, if not all, of these discrepancies would not have occurred. With this in mind the results in columns I and II indicate that 2120 (or 94.22%) of the 2250 applicants were cooperative and willing to supply accurate race and sex data about themselves. Column III represents a distribution of the 47 (2.09%) "no response at all" applicants. The administrative deviations mentioned at the beginning of this section were not aasociated with those forms having the higher no response rates.

In columns IV and V are distributed the 83 (3.69%) applicants whose racial self-identifications disagreed with one or both observers - complete data on these applicants is presented in a later table and will be discussed then).

Table 3 represents a sex, race and ethnicity description of 2196 applicants who identified themselves sufficiently to be categorized. As the table indicates, it does not include the 47 persons who refused to respond to the questionnaire nor does it include 7 additional people who responded only to the question on sex. It does, however, include 76 of the observer-self identification disagreements or 3.46% of the 2196 people categorized. The description presented in Table 3 cannot, of course, be completely accurate because we do not know the accuracy of the self-identifications in the disagreement group. As indicated, the "Other" category in the table is probably the most discrepant but it accounts for only 1% of the total. As would be expected in the Washington area, the largest racial percentages are White (73.36%) and Black (23.59%). 53.51% of the applicants were females while 46.49% were males. White males and females were represented in approximately equal numbers (36.52% and 36.84% respectively); Black females outnumbered Black males 328 to 190 (14.94% and 8.65% respectively). Each of the other categories accounted for no more than 1.50% of the respondents.

## Those who refused the questionnaire

As already reported, 47 of the 2250 applicants (or 2.09%) refused to fill out the questionnaire. It seemed desirable to investigate these refusals as a function of the form of the questionnaire and as a function of the race and sex of the individuals. Table 4 presents

6

TABLE 3

Race, Sex and Ethnic Origin of Applicant Population
in Terms of Self-Identification

| Race | Ethnicity | Males | | Females | | Total Self-Identifications | |
|------|-----------|--------|---------|--------|---------|--------|---------|
| | | Number | Percent | Number | Percent | Number | Percent |
| Indian | H (Hispanic) | – | 0 | – | 0 | 0 | 0 |
| | NH (non-H) | 5 | 0.23 | 3 | 0.14 | 8 | 0.36 |
| | N.R. (no response) | 1 | 0.05 | 2 | 0.09 | 3 | 0.14 |
| Sub total | | 6 | 0.28 | 5 | 0.23 | 11 | 0.50 |
| Asian | H | 1 | 0.05 | 3 | 0.14 | 4 | 0.18 |
| | NH | 9 | 0.41 | 15 | 0.68 | 24 | 1.09 |
| | N.R. | 2 | 0.09 | 3 | 0.14 | 5 | 0.23 |
| Sub total | | 12 | 0.55 | 21 | 0.96 | 33 | 1.50 |
| Black | H | 9 | 0.41 | 1 | 0.05 | 10 | 0.46 |
| | NH | 137 | 6.24 | 256 | 11.66 | 393 | 17.90 |
| | N.R. | 44 | 2.00 | 71 | 3.23 | 115 | 5.24 |
| Sub total | | 190 | 8.65 | 328 | 14.94 | 518 | 23.60 |
| White | H | 16 | 0.73 | 13 | 0.59 | 29 | 1.32 |
| | NH | 731 | 33.29 | 752 | 34.24 | 1483 | 67.53 |
| | N.R. | 55 | 2.50 | 44 | 2.00 | 99 | 4.51 |
| Sub total | | 802 | 36.52 | 809 | 36.83 | 1611 | 73.36 |
| Other[a] | H | 2 | 0.09 | 4 | 0.18 | 6 | 0.27 |
| | NH | 7 | 0.32 | 7 | 0.32 | 14 | 0.64 |
| | N.R. | 2 | 0.09 | 1 | 0.05 | 3 | 0.14 |
| Sub total | | 11 | 0.50 | 12 | .55 | 23 | 1.05 |
| | | 1021 | 46.50 | 1175 | 53.51 | 2196 | 100.000 |

[a]Includes "mixtures", "humans", and other useless responses.

Note: An additional 4 males and 3 females responded only to sex.        7
An additional 47 people refused to complete the questionnaire.      47
                                                                  2250   Total applicant
                                                                         population

a distribution of the 47 by sex, race and questionnaire form. Sex and race categorizations were based upon the observers' identification of these applicants; in all cases the two independent observations agreed. Both observers could have, of course, been wrong in some cases. The comparisons in Table 4 relative to race and sex should be interpreted with this in mind.

Table 4 shows that of the 47 non-respondents, 5 were Black males, 4 were Black females, 24 were White males and 14 were White females. From Table 3, the number of individuals in each of these categories who did identify themselves relative to race and sex were as follows: Black males, 190; Black females, 328, White males, 802; White females, 809. A contingency table of this data can be constructed:

|  | BM | BF | WM | WF | |
|---|---|---|---|---|---|
| Responded | 190 | 328 | 802 | 809 | 2129 |
| No response | 5 | 4 | 24 | 14 | 47 |
|  | 195 | 332 | 826 | 823 | 2176 |

A chi square calculated from this table, with 3 degrees of freedom, is 4.579 and is not significant. Therefore whether or not a person responded to the questionnaire is not dependent upon his/her race and sex.

Combining the data into categories of White and Black regardless of sex produces the following comparison:

|  | Black | White |
|---|---|---|
| Total | 527 | 1649 |
| No response | 9 | 38 |

The proportion of Blacks who did not respond was .0171; the proportion of Whites, .0230. The test for a significant difference in proportions (Guilford, 1965, p.185) showed that the difference between the two proportions is not significant (z = .808). Therefore it may tentatively be concluded that members of a minority group are no more apt to refuse to answer questions on race than are members of the majority group.

Examining the data in still a third way -- male v. female regardless of race -- produces the following:

|  | Male | Female |
|---|---|---|
| Total | 1021 | 1155 |
| No response | 29 | 18 |

TABLE 4

Distribution of "No Response" Individuals

| Form | Total Applicant Population | Black Male | Black Female | White Male | White Female | Row Total | Percent of Total Applicant Population |
|---|---|---|---|---|---|---|---|
| A | 228 | 1 | | | 1 | 2 | 0.88 |
| B | 164 | | | 1 | 1 | 2 | 1.22 |
| C | 167 | | 1 | 3 | 3 | 7 | 4.19 |
| D | 223 | | | 2 | 1 | 3 | 1.35 |
| E | 198 | | 1 | 3 | 1 | 5 | 2.53 |
| F | 178 | | | 1 | | 1 | 0.56 |
| A[1] | 163 | | | 1 | 2 | 3 | 1.84 |
| B[1] | 181 | 4 | | 3 | | 7 | 3.87 |
| C[1] | 123 | | | 2 | | 2 | 1.63 |
| D[1] | 208 | | | 2 | | 2 | 0.96 |
| E[1] | 153 | | | 1 | 1 | 2 | 1.31 |
| F[1] | 181 | | 2 | 4 | 3 | 9 | 4.97 |
| A[11] | 83 | | | 1 | 1 | 2 | 2.41 |
| Grand Total | 2250 | 5 | 4 | 24 | 14 | 47 | 2.09 |
| Percent of those who did not respond | | 10.64 | 8.51 | 51.06 | 29.79 | 100.00 | |

9

The proportion of males who did not repond was .0284; the proportion of females, .0156. A test for the significance of the difference between these two proportions showed that a significantly larger number of males than females chose not to fill out the questionnaire. ($z = 2.055$, $p<.05$). The foregoing results are interesting but should be accepted with caution because of the small total number of non-respondents and because of the possible errors in categorization already discussed.

Of more significant relevance to this study is the investigation of the no-response rate relative to the six different questionnaire forms. For this comparison the data from both, or all, versions of each form (i.e., A, $A^1$ and $A^{11}$; B and $B^1$; etc.) were combined, since the position of the ethnicity question was not relevant to the results. A contingency table was set up as follows:

| | A,$A^1$,$A^{11}$ | B,$B^1$ | C,$C^1$ | D,$D^1$ | E,$E^1$ | F,$F^1$ | Total |
|---|---|---|---|---|---|---|---|
| Responded | 467 | 336 | 281 | 426 | 344 | 349 | 2203 |
| No response | 7 | 9 | 9 | 5 | 7 | 10 | 47 |
| Total | 474 | 345 | 290 | 431 | 351 | 359 | 2250 |

| Percent of no response | 1.48 | 2.61 | 3.10 | 1.16 | 1.99 | 2.78 | |

The chi square statistic calculated from this data was 5.444. With 5 degrees of freedom, this value is not statistically significant. It can therefore be concluded that the manner in which the request for race, sex and ethnic origin is worded has no significant effect on the number of people who will or will not supply the information.

From Table 4, Table 5 can be constructed. It simply combines no-response males and females into two race categories, Black and White, and combines forms and forms-prime into 6 overall categories (A, B, C etc.)

TABLE 5

No Response by Form and Race

| Form | Black | White | Total |
|---|---|---|---|
| A | 1 | 6 | 7 |
| B | 4 | 5 | 9 |
| C | 1 | 8 | 9 |
| D | 0 | 5 | 5 |
| E | 1 | 6 | 7 |
| F | 2 | 8 | 10 |
| Total | 9 | 38 | 47 |

A chi square statistic calculated with this data was 5.516; with 5 degrees of freedom this is not significant. We can further conclude that the way the request for information is worded need not be different for minority group members.[1]

It might be of interest to note that Form A, which made nothing more than a straightforward request for the information, had the next to lowest no-response rate while Form C, which contained the words "completely voluntary" near the beginning of the instructions, had the highest rate. Although the Privacy Act Notice on the back of all forms stated that providing the information was voluntary, it is doubtful that many applicants read it; most, if not all, of the questionnaires were completed in less than a minute. (Note that the examiner in each room waited until all applicants had completed the questionnaire before they were collected.)

## The problem of no-response to the ethnic question

The change in the position on the survey forms of the question on ethnicity has already been discussed. Recall that forms A-F were the original ones with question 3 on the right side of the page; forms $A^1 - F^1$ placed question 3 in a position which would prevent its being overlooked by applicants. Form $A^{11}$ also added the word "Spanish" in parentheses after "Hispanic" in an attempt to clarify the meaning of the question.

Table 6 is a summary of the effects of using different versions of the 6 forms. In form A-E, moving question 3 reduced the proportion of "no-response" to the question on ethnicity, whereas in Form F the change had the opposite effect, although it was not statistically significant.

The bottom of Table 6 presents the overall effect of the different form versions: A-F, $A^1 - F^1$, and $A^{11}$. Over all forms, moving the question on ethnicity significantly improved the response rate. However a comparison of the proportions of "no-response" in forms $A^1 - F^1$ (.0823) and in form $A^{11}$ (.0741) shows that inserting "Spanish", although lowering the no-response rate still further, did not do so significantly.

The problem of no response to the ethnic question (8.23% for forms $A^1 - F^1$) is still unresolved. Applicants may still have just overlooked

---

[1]According to Guilford - applying the Yates correction when expected frequencies are less than 10, as they are in the above calculation, is not of great importance when degrees of freedom are greater than 1. The correction would serve to lower the $X^2$ value - which is already non-significant.

it because it remained next to the other two questions rather than under them, on the left side of the page. A more probable explanation is that applicants who do not respond do not know what "ethnicity" and/or "Hispanic" really mean. They may never have been asked the question previously and/or they are not aware of having any particular ethnic background.

## Validity and reliability of self-identification v. visual observation

Of the 2203 applicants who responded to all three questions or who identified themselves as to race and sex but not ethnicity, 2120 (or 96.23%) were correctly identified racially by both observers. These include 30 applicants of the Indian or Asian races who were correctly identified as "Other" by the observers. Of these 2120 applicants, the sex of all but 35 was correctly identified by both observers. The 35 observer disagreements have already been attributed to crowding in test rooms and the need for unobtrusiveness while making and recording observations. There remain 83 applicants whose self-identifications disagree with one or both observers; these represent 3.77% of the 2203 respondents. All of the data for these 83 people have been presented in Table 7 since their responses to the question on racial identification comprise quite a variety. The cases are numbered from 1 to 83 for easy referral during the following discussion.

In 38 (or 45.78%) of the 83 cases the White and Black observers disagreed. In the columns in Table 7 labeled ID-Black observer and ID-White observer, the identification which agreed with the person's self-identification is marked with an asterisk. In some cases, as in numbers 39, 47, and 61, the correct observation was "0". These three individuals had identified themselves as Mexican-American, Asian and one half Black-one half White respectively and the correct observer had recognized the fact that they were neither Black nor White. Many other comparisons can be made from the data but suffice it to say at this time that the 16 and 22 correct observations made by the Black and White observers respectively account for only 1.72% of the 2203 respondents, indicating a high inter-observer reliability.

In 30 (or 36.14%) of the 83 cases both observers agreed on the race of an individual but their observations did not agree with the self-identification. These have been checked ($\sqrt$) on Table 7. The disagreements are varied but seem mostly associated with mistaken identification of Asians, Indians and those who identify themselves as mixed. Note that of the 9 individuals (3, 10, 13, 21, 36, 51, 52, 54, 70) who identified themselves as American Indian or Alaskan natives, both observers identified 8 of them as White and one (number 3) as Black. Again a number of additional observations could be made but it will only be noted here that the 30 observer-self-ID disagreements account for only 1.36% of the 2203 respondents. This would or could undoubtedly be much higher in other areas of the country which have a much larger percentage of such races as Asian, American Indian or mixed (e.g., Mexican-American) in their populations.

13

TABLE 7

Complete Data on Applicants Whose Self-identifications
Disagreed with One or Both Observers

| Form | | Race Identification Self | Bl. Obs | Wh. Obs | Sex Identification Self | Bl. Obs | Wh. Obs | Eth Self-ID | Sex of Bl. O | Wh. O |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | W | *W | O | F | F | F | | F | M |
| | 2 | n.r. | W | W | M | M | M | | F | F |
| B | 3 | I | ✓B | B | M | M | M | NH | F | F |
| | 4 | B | ✓W | W | F | F | F | NH | F | F |
| | 5 | Cherokee Ind. & Black | ✓B | B | F | F | F | H | F | M |
| | 6 | W | ✓O | O | F | F | F | H | F | M |
| | 7 | W | *W | O | M | M | M | H | F | M |
| | 8 | B (but erased) | B | B | M | M | M | | F | M |
| C | 9 | Italian | W | W | F | F | F | NH | F | M |
| | 10 | I | ✓W | W | F | F | F | NH | F | M |
| | 11 | Guamanian | ✓B | B | M | M | M | NH | M | F |
| | 12 | Human | W | W | M | M | M | | M | F |
| | 13 | I | ✓W | W | F | F | F | | M | F |
| | 14 | B | W | *B | F | F | F | | M | F |
| D | 15 | W | O | *W | M | M | M | NH | F | F |
| | 16 | W | O | *W | M | M | M | NH | F | F |
| | 17 | W | O | *W | F | F | F | NH | F | F |
| | 18 | A (India) | ✓W | W | F | F | F | | F | F |
| | 19 | W | O | *W | F | F | F | H | F | F |
| | 20 | W | O | *W | F | F | F | NH | F | F |
| | 21 | I | ✓W | W | F | F | F | | F | F |
| | 22 | W | ✓O | O | M | M | M | H | F | F |
| | 23 | Human | W | W | M | M | M | NH | F | F |
| | 24 | W | ✓B | B | F | F | F | NH | F | F |
| | 25 | W | *W | O | F | F | F | NH | F | F |
| | 26 | W | O | *W | M | M | M | H | F | F |
| | 27 | A | *O | W | F | F | F | NH | F | F |
| E | 28 | n.r. | W | W | M | M | M | | F | F |
| | 29 | W | O | *W | F | F | F | NH | F | F |
| | 30 | B | *B | O | F | F | F | NH | F | F |
| | 31 | W | O | *W | M | M | M | NH | F | F |
| | 32 | W | O | *W | M | M | M | NH | F | F |
| | 33 | B | *B | O | F | F | F | NH | F | F |
| | 34 | B | ✓O | O | M | M | M | H | F | F |
| F | 35 | Human | W | W | F | F | F | NH | F | F |
| | 36 | I | ✓W | W | F | F | F | NH | F | F |
| | 37 | B | W | *B | F | F | F | NH | F | F |
| | 38 | Brasilian American | W | W | M | M | M | H | F | M |
| | 39 | Mexican American | *O | B | F | F | F | NH | F | M |
| | 40 | W | O | *W | M | M | M | NH | F | M |
| | 41 | W | O | *W | M | M | M | NH | F | M |
| | 42 | W | O | *W | M | M | M | NH | F | M |
| | 43 | W | O | *W | F | F | F | H | F | M |

* = Correct ID.

14

TABLE 7   (Cont.)

| Form | | Race Identification | | | Sex Identification | | | Eth | Sex of | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Self | Bl. Obs | Wh. Obs | Self | Bl. Obs | Wh. Obs | Self-ID | Bl. O | Wh. O |
| A¹ | 44 | Mixture A & W | ✓W | W | F | F | F | NH | F | F |
| | 45 | B (but erased) | B | W | F | F | F | | F | F |
| | 46 | W | O | *W | M | M | M | NH | F | F |
| A¹¹ | 47 | A | *O | W | F | F | F | NH | F | M |
| | 48 | W | O | *W | F | F | F | NH | M | M |
| | 49 | O (not specified) | ✓W | W | M | M | M | NH | F | M |
| | 50 | n.r. | B | B | F | F | F | NH | F | M |
| B¹ | 51 | I | ✓W | W | M | M | M | NH | F | F |
| | 52 | I | ✓W | W | M | M | M | NH | F | F |
| | 53 | W | *W | O | M | M | M | NH | F | F |
| | 54 | I | ✓W | W | F | F | F | NH | F | F |
| | 55 | n.r. | B | B | F | F | F | NH | F | F |
| | 56 | W | O | *W | M | M | M | NH | F | F |
| | 57 | B   (Joseph) | *B | O | M | F | *M | NH | F | M |
| | 58 | W | O | *W | M | M | M | NH | F | M |
| C¹ | 59 | n.r. | W | W | M | M | M | | F | M |
| | 60 | Bilolian | B | B | F | F | F | | F | M |
| | 61 | 1/2 B - 1/2 W | *O | B | F | F | F | NH | F | M |
| | 62 | B | W | *B | F | F | F | NH | F | M |
| | 63 | O (not specified) | ✓W | W | M | M | M | NH | F | M |
| | 64 | A & W (Ronald) | ✓W | W | M | *M | F | NH | F | M |
| | 65 | A & W | ✓W | W | M | M | M | NH | F | M |
| | 66 | Mixed | ✓W | W | M | M | M | NH | F | M |
| | 67 | B | *B | O | F | F | F | NH | F | M |
| D¹ | 68 | A | *O | W | F | F | F | H | F | M |
| | 69 | A | ✓W | W | F | F | F | NH | F | M |
| | 70 | I | W | W | M | M | M | NH | F | F |
| | 71 | W | *W | O | M | M | M | NH | F | F |
| | 72 | W | ✓O | O | F | F | F | H | F | F |
| | 73 | B & W | W | W | M | M | M | NH | F | F |
| E¹ | 74 | A & B | ✓B | B | F | F | F | H | F | F |
| | 75 | American | W | W | M & F | F | F | NH | F | M |
| | 76 | B | *B | O | F | F | F | NH | F | M |
| | 77 | A & W | ✓W | W | M | M | M | NH | F | M |
| | 78 | B | ✓O | O | F | F | F | NH | F | M |
| | 79 | B | O | *B | F | F | F | NH | F | M |
| | 80 | Hispanic American | ✓W | W | F | F | F | H | F | M |
| F¹ | 81 | Puerto Rican | W | *O | n.r. | M | M | H. | F | F |
| | 82 | Jewish | W | W | F | F | F | NH | F | F |
| | 83 | W | *W | O | M | M | M | NH | F | F |

* = Correct ID

15

Lastly we have the handful of people who refused to specify their race (5 of them) or did so and then erased it (2), those who are members of the "Human" race (3) and those who seem to mistake ethnicity for race (5) (e.g., "American", "Jewish"). These 15 "mavericks" account for only 0.68% of the total number of respondents, a figure one could expect to find in any type of survey.

APPENDIX

Form Approved
OMB No. 50-R

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Identification No. _____

Name _____
　　　Last　　　　　　　　　　First　　　　　　　M.I.

## QUESTIONNAIRE.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. Ethnicity
　　_____ Hispanic origin
　　_____ Not of Hispanic origin

3. Sex
　　_____ Male
　　_____ Female

2. Race
　　_____ American Indian or Alaskan Native
　　_____ Asian or Pacific Islander
　　_____ Black
　　_____ White
　　_____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

　　Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
　　South American or other Spanish culture or origin, regardless of race.

Race:

　　American Indian or Alaskan Native. A person having origins in
　　any of the original peoples of North America, and who maintains
　　cultural identification through tribal affiliation or community
　　recognition.

　　Asian or Pacific Islander. A person having origins in any of the
　　original peoples of the Far East, Southeast Asia, the Indian sub-
　　continent, or the Pacific Islands. This area includes, for example,
　　China, India, Japan, Korea, the Philippine Islands, and Samoa.

　　Black. A person having origins in any of the black racial groups
　　of Africa.

　　White. A person having origins in any of the original peoples of
　　Europe, North Africa, or the Middle East.

CSC 1289-A Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Form Approved
OMB No. 50-R

Identification No. _____

Name _____

    Last                     First            M.I.

Questionnaire: The following information is required to enable compliance
with the provisions of the Civil Rights Act. This information will be used
for statistical purposes only.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. Ethnicity                             3. Sex
      _____ Hispanic origin                  _____ Male
      _____ Not of Hispanic origin        _____ Female

2. Race
      _____ American Indian or Alaskan Native
      _____ Asian or Pacific Islander
      _____ Black
      _____ White
      _____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

     Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
     South American or other Spanish culture or origin, regardless of race.

Race:

     American Indian or Alaskan Native. A person having origins in
     any of the original peoples of North America, and who maintains
     cultural identification through tribal affiliation or community
     recognition.

     Asian or Pacific Islander. A person having origins in any of the
     original peoples of the Far East, Southeast Asia, the Indian sub-
     continent, or the Pacific Islands. This area includes, for example,
     China, India, Japan, Korea, the Philippine Islands, and Samoa.

     Black. A person having origins in any of the black racial groups
     of Africa.

     White. A person having origins in any of the original peoples of
     Europe, North Africa, or the Middle East.

CSC 1289-B Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Identification No. _____

Name _____
    Last                     First            M.I.

Questionnaire:  These questions are completely voluntary and will be used
to evaluate, for fair employment purposes, examination and testing methods.
Your replies will in no way affect your participation in this or future
Civil Service examinations or your chances for employment.

Please categorize yourself in terms of each of the following three
categories.  Be sure to mark your answer to each question by placing
an "X" next to each proper category.  (Please read definitions of
subcategories below.)

1.  Ethnicity
     _____ Hispanic origin
     _____ Not of Hispanic origin

3.  Sex
     _____ Male
     _____ Female

2.  Race
     _____ American Indian or Alaskan Native
     _____ Asian or Pacific Islander
     _____ Black
     _____ White
     _____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic.  A person of Mexican, Puerto Rican, Cuban, Central or
South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native.  A person having origins in
any of the original peoples of North America, and who maintains
cultural identification through tribal affiliation or community
recognition.

    Asian or Pacific Islander.  A person having origins in any of the
original peoples of the Far East, Southeast Asia, the Indian sub-
continent, or the Pacific Islands.  This area includes, for example,
China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black.  A person having origins in any of the black racial groups
of Africa.

    White.  A person having origins in any of the original peoples of
Europe, North Africa, or the Middle East.

CSC 1289-C Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Form Approved
OMB No. 50-R

Identification No. _____

Name _____
    Last                            First                      M.I.

Questionnaire: The U. S. Civil Service Commission pursuant to Federal
guidelines, requests that all applicants complete the following questions.
We request your cooperation in completing this questionnaire accurately.
Answers to these questions will be used to conduct studies to identify
and resolve possible problems in examining for the purpose of insuring
equal opportunity for employment in the Federal Civil Service.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. Ethnicity
    _____ Hispanic origin
    _____ Not of Hispanic origin

3. Sex
    _____ Male
    _____ Female

2. Race
    _____ American Indian or Alaskan Native
    _____ Asian or Pacific Islander
    _____ Black
    _____ White
    _____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native. A person having origins in
any of the original peoples of North America, and who maintains
cultural identification through tribal affiliation or community
recognition.

    Asian or Pacific Islander. A person having origins in any of the
original peoples of the Far East, Southeast Asia, the Indian sub-
continent, or the Pacific Islands. This area includes, for example,
China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black. A person having origins in any of the black racial groups
of Africa.

    White. A person having origins in any of the original peoples of
Europe, North Africa, or the Middle East.

CSC 1289-D Temp 4/77
Expires 12/31/77

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Form Approved
OMB No. 50-R

Identification No. _____

Name _____
    Last                     First             M.I.

Questionnaire: Federal Executive Guidelines for Employee Selection
which were written to enforce the 1972 amendments to the Civil Rights
Act of 1964 require the Federal government to collect race and national
origin data on applicants for Federal employment. Your responses to
the following questions will be used for research on the examination
and not for any personnel action.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. Ethnicity
    _____ Hispanic origin
    _____ Not of Hispanic origin

3. Sex
    _____ Male
    _____ Female

2. Race
    _____ American Indian or Alaskan Native
    _____ Asian or Pacific Islander
    _____ Black
    _____ White
    _____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
    South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native. A person having origins in
    any of the original peoples of North America, and who maintains
    cultural identification through tribal affiliation or community
    recognition.

    Asian or Pacific Islander. A person having origins in any of the
    original peoples of the Far East, Southeast Asia, the Indian sub-
    continent, or the Pacific Islands. This area includes, for example,
    China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black. A person having origins in any of the black racial groups
    of Africa.

    White. A person having origins in any of the original peoples of
    Europe, North Africa, or the Middle East.

CSC 1289-E Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment

Identification No. _____

Name _____
    Last                     First           M.I.

Questionnaire: The U. S. Civil Service Commission is required to
determine the race, national origin, and sex of applicants for Federal
Employment. These questions are asked pursuant to guidelines issued
under Title VII of the Civil Rights Act of 1964, as amended by the
Equal Employment Opportunity Act of 1972. Your responses to these ques-
tions will have no effect on your opportunity to get a job.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. Ethnicity
    _____ Hispanic origin
    _____ Not of Hispanic origin

3. Sex
    _____ Male
    _____ Female

2. Race
    _____ American Indian or Alaskan Native
    _____ Asian or Pacific Islander
    _____ Black
    _____ White
    _____ Other, please specify _____

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
    South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native. A person having origins in
    any of the original peoples of North America, and who maintains
    cultural identification through tribal affiliation or community
    recognition.

    Asian or Pacific Islander. A person having origins in any of the
    original peoples of the Far East, Southeast Asia, the Indian sub-
    continent, or the Pacific Islands. This area includes, for example,
    China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black. A person having origins in any of the black racial groups
    of Africa.

    White. A person having origins in any of the original peoples of
    Europe, North Africa, or the Middle East.

CSC 1289-F Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data
of Persons Applying for Federal Employment
Form Approved
OMB No. 50-S-77003

Identification No. _____

Name _____
    Last                        First               M.I.

## QUESTIONNAIRE

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. RACE
   _____ American Indian or Alaskan Native
   _____ Asian or Pacific Islander
   _____ Black
   _____ White
   _____ Other, please specify _____

2. SEX
   _____ Male
   _____ Female

3. ETHNICITY
   _____ Hispanic (Spanish) origin
   _____ Not of Hispanic (Spanish) origin

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native. A person having origins in
any of the original peoples of North America, and who maintains
cultural identification through tribal affiliation or community
recognition.

    Asian or Pacific Islander. A person having origins in any of the
original peoples of the Far East, Southeast Asia, the Indian sub-
continent, or the Pacific Islands. This area includes, for example,
China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black. A person having origins in any of the black racial groups
of Africa.

    White. A person having origins in any of the original peoples of
Europe, North Africa, or the Middle East.

CSC 1289-A[1]Temp 4/77
Expires 12/31/77

**Privacy Act Notice on Back**

## Survey for the Collection of Racial and Ethnic Data of Persons Applying for Federal Employment

Identification No. _____

Name _____
    Last            First            M.I.

Questionnaire: The following information is required to enable compliance with the provisions of the Civil Rights Act. This information will be used for statistical purposes only.

Please categorize yourself in terms of each of the following three categories. Be sure to mark your answer to each question by placing an "X" next to each proper category. (Please read definitions of subcategories below.)

1. RACE
   ____ American Indian or Alaskan Native
   ____ Asian or Pacific Islander
   ____ Black
   ____ White
   ____ Other, please specify _____

2. SEX                    3. ETHNICITY
   ____ Male                 ____ Hispanic origin
   ____ Female               ____ Not of Hispanic origin

Definitions: The racial and ethnic categories for Federal statistics and administrative reporting are defined as follows:

Ethnicity:

   Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of race.

Race:

   American Indian or Alaskan Native. A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

   Asian or Pacific Islander. A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, India, Japan, Korea, the Philippine Islands, and Samoa.

   Black. A person having origins in any of the black racial groups of Africa.

   White. A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

CSC 1289-BlTemp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Identification No. _____

Name _____
    Last                    First          M.I.

Questionnaire: These questions are completely voluntary and will be used
to evaluate, for fair employment purposes, examination and testing methods.
Your replies will in no way affect your participation in this or future
Civil Service examinations or your chances for employment.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. RACE
  _____  American Indian or Alaskan Native
  _____  Asian or Pacific Islander
  _____  Black
  _____  White
  _____  Other, please specify _____

2. SEX
  _____  Male
  _____  Female

3. ETHNICITY
  _____  Hispanic
  _____  Not of Hispanic origin

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native. A person having origins in
any of the original peoples of North America, and who maintains
cultural identification through tribal affiliation or community
recognition.

    Asian or Pacific Islander. A person having origins in any of the
original peoples of the Far East, Southeast Asia, the Indian sub-
continent, or the Pacific Islands. This area includes, for example,
China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black. A person having origins in any of the black racial groups
of Africa.

    White. A person having origins in any of the original peoples of
Europe, North Africa, or the Middle East.

CSC 1289-C[1] Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

Survey for the Collection of Racial and Ethnic Data       Form Approved
of Persons Applying for Federal Employment       OMB No. 50-S-77003

Identification No. _____

Name _____

    Last                    First              M.I.

<u>Questionnaire:</u> The U. S. Civil Service Commission pursuant to Federal
guidelines, requests that all applicants complete the following questions.
We request your cooperation in completing this questionnaire accurately.
Answers to these questions will be used to conduct studies to identify
and resolve possible problems in examining for the purpose of insuring
equal opportunity for employment in the Federal Civil Service.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. <u>RACE</u>
    \_\_\_\_\_ American Indian or Alaskan Native
    \_\_\_\_\_ Asian or Pacific Islander
    \_\_\_\_\_ Black
    \_\_\_\_\_ White
    \_\_\_\_\_ Other, please specify _____

2. <u>SEX</u>                     3. <u>ETHNICITY</u>
    \_\_\_\_\_ Male                  \_\_\_\_\_ Hispanic origin
    \_\_\_\_\_ Female               \_\_\_\_\_ Not of Hispanic origin

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    <u>Hispanic.</u> A person of Mexican, Puerto Rican, Cuban, Central or
    South American or other Spanish culture or origin, regardless of race.

Race:

    <u>American Indian or Alaskan Native.</u> A person having origins in
    any of the original peoples of North America, and who maintains
    cultural identification through tribal affiliation or community
    recognition.

    <u>Asian or Pacific Islander.</u> A person having origins in any of the
    original peoples of the Far East, Southeast Asia, the Indian sub-
    continent, or the Pacific Islands. This area includes, for example,
    China, India, Japan, Korea, the Philippine Islands, and Samoa.

    <u>Black.</u> A person having origins in any of the black racial groups
    of Africa.

    <u>White.</u> A person having origins in any of the original peoples of
    Europe, North Africa, or the Middle East.

CSC 1289-D¹Temp 4/77
Expires 12/31/77

Identification No. _____

Name _____
     Last                    First               M.I.

Questionnaire:  Federal Executive Guidelines for Employee Selection
which were written to enforce the 1972 amendments to the Civil Rights
Act of 1964 require the Federal government to collect race and national
origin data on applicants for Federal employment.  Your responses to
the following questions will be used for research on the examination
and not for any personnel action.

Please categorize yourself in terms of each of the following three
categories.  Be sure to mark your answer to each question by placing
an "X" next to each proper category.  (Please read definitions of
subcategories below.)

1.  RACE
    _____  American Indian or Alaskan Native
    _____  Asian or Pacific Islander
    _____  Black
    _____  White
    _____  Other, please specify _____

2.  SEX                    3.  ETHNICITY
    _____  Male               _____  Hispanic origin
    _____  Female             _____  Not of Hispanic origin

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

    Hispanic.  A person of Mexican, Puerto Rican, Cuban, Central or
    South American or other Spanish culture or origin, regardless of race.

Race:

    American Indian or Alaskan Native.  A person having origins in
    any of the original peoples of North America, and who maintains
    cultural identification through tribal affiliation or community
    recognition.

    Asian or Pacific Islander.  A person having origins in any of the
    original peoples of the Far East, Southeast Asia, the Indian sub-
    continent, or the Pacific Islands.  This area includes, for example,
    China, India, Japan, Korea, the Philippine Islands, and Samoa.

    Black.  A person having origins in any of the black racial groups
    of Africa.

    White.  A person having origins in any of the original peoples of
    Europe, North Africa, or the Middle East.

CSC 1289-E[1]Temp 4/77

Privacy Act Notice on Back           Expires 12/31/77

Identification No. _____

Name _____
　　　Last　　　　　　　　　　First　　　　　　M.I.

Questionnaire: The U. S. Civil Service Commission is required to
determine the race, national origin, and sex of applicants for Federal
Employment. These questions are asked pursuant to guidelines issued
under Title VII of the Civil Rights Act of 1964, as amended by the
Equal Employment Opportunity Act of 1972. Your responses to these ques-
tions will have no effect on your opportunity to get a job.

Please categorize yourself in terms of each of the following three
categories. Be sure to mark your answer to each question by placing
an "X" next to each proper category. (Please read definitions of
subcategories below.)

1. RACE
_____ American Indian or Alaskan Native
_____ Asian or Pacific Islander
_____ Black
_____ White
_____ Other, please specify _____

2. SEX
_____ Male
_____ Female

3. ETHNICITY
_____ Hispanic origin
_____ Not of Hispanic origin

Definitions: The racial and ethnic categories for Federal statistics
and administrative reporting are defined as follows:

Ethnicity:

Hispanic. A person of Mexican, Puerto Rican, Cuban, Central or
South American or other Spanish culture or origin, regardless of race.

Race:

American Indian or Alaskan Native. A person having origins in
any of the original peoples of North America, and who maintains
cultural identification through tribal affiliation or community
recognition.

Asian or Pacific Islander. A person having origins in any of the
original peoples of the Far East, Southeast Asia, the Indian sub-
continent, or the Pacific Islands. This area includes, for example,
China, India, Japan, Korea, the Philippine Islands, and Samoa.

Black. A person having origins in any of the black racial groups
of Africa.

White. A person having origins in any of the original peoples of
Europe, North Africa, or the Middle East.

CSC 1289-F [1] Temp 4/77
Expires 12/31/77

Privacy Act Notice on Back

PRIVACY ACT NOTICE FOR:

NAME OF FORM:  Coding Form For
Collecting Racial, Ethnic, and
Sex Data of Persons Applying
for Federal Employment

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act
of 1974), December 31, 1974, for individuals completing Federal records
forms that solicit personal information.

## AUTHORITY

Section 717 of the Civil Rights Act of 1964, as amended by the Equal
Employment Opportunity Act of 1972.

## PURPOSE AND ROUTINE USES

To further the principles of equal employment opportunity, the Federal
Executive Agency Guidelines on Employee Selection Procedures require
agencies to assure that any selection procedures used as a basis for
employment decisions, (including examining and testing methods and
standards, and employment practices), are not affected by discrimination
on the basis of race, color, religion, sex, or national origin.  As part
of the effort required to assure nondiscrimination in selection processes,
the Guidelines require Federal agencies to collect sex, racial and ethnic
data on applicants for Federal employment for group statistical analyses
purposes.  These records will become part of the Personnel Research Test
Validation Records System.  Your individual record will not be disclosed
for any purpose.

## EFFECTS OF NONDISCLOSURE

Providing this information is voluntary and there will be no adverse effect
on you for not providing the information requested.

1 time use only

UNITED STATES CIVIL SERVICE COMMISSION

Professional and Administrative Career Examination
Supplement to DFC 868

On Page 4, after the competitors have filled in the top of page 2 of the answer sheet, insert the following:

> As part of this examination you will complete a
> supplemental questionnaire. This will be passed out
> and collected by members of our test development staff.

The PRDC staff pass out the questionnaire designated for that room for that day. The examiner then SAYS:

> Please copy your identification number from your answer
> sheet on to this questionnaire. Also, print your name,
> last name first. (Pause)
>
> Now please read the Privacy Act Notice on the back of
> the form and the instructions on the front of the form.
> When you have done this, answer each of the three
> questions.

After about 5 minutes, SAY:

> I will now collect the questionnaire. Thank you very
> much for your cooperation. Please keep your answer
> sheet on your desk.

Note to PRDC and BMIS representatives:

If any questions or problems are encountered, tell the competitor that after the examination is over they can discuss it with Drs. Mary Anne Nester or Hilda Wing. Pass out the attached cards to the interested person. Do not answer any questions about the questionnaire yourself.

While the competitors are completing the questionnaire, or if possible, before you pass out the questionnaire, you are to indicate by visual survey each person's race and sex using the following categories. (Write B, W or O and M or F for each desk on the seating chart. These are to be done independently. Be sure that you identify every competitor.)

B = Black. Any person who would generally be considered black in our society, according to your own judgment. The questionnaire defines "Black" as, "A person having origins in any of the black racial groups of Africa." If in doubt, do not mark the person as Black, rather mark O for "Other."

W = White. Any person who would generally be considered white in our society, according to your judgment. The questionnaire defines "White" as, "A person having origins in any of the original peoples of Europe, North Africa, or the Middle East." If in doubt, do not mark the person as White, rather mark O for "Other."

O = Other. This includes all persons not falling into the above two categories such as American Indian, Asians, and those you cannot decide upon. This includes Indians from India.

M = Male     Use your best judgment.
  or
F = Female

This visual identification should be done independently by 2 persons in each examination room. Remember, we are not experts in judging persons' race membership; however, try to do the best job you can. Also, try not to make it obvious what you are doing. Be sure to sign your name to the Seating Chart so that we know who completed what charts. Leave the test room quietly when you have collected the questionnaires and completed the visual survey.

After you are finished, return the questionnaires and seating charts to Hilda Wing, who will lock them up for our later analyses.

# Reference

Guilford, J. P. <u>Fundamental statistics in psychology and Education</u>.
Fourth edition. New York: McGraw-Hill, 1965.

U S  GOVERNMENT PRINTING OFFICE 1979 -620-003/33E5

# U.S. Civil Service Commission

# SURVEY FOR THE COLLECTION OF RACIAL AND ETHNIC DATA OF PERSONS APPLYING FOR FEDERAL EMPLOYMENT

**DO NOT FOLD, STAPLE, PUNCTURE OR PAPER CLIP THIS FORM.**

FORM APPROVED
OMB NO. 50-R060

ATTACHMENT H

**GENERAL INSTRUCTIONS:**

(1.) *Use only a Number 2 (or softer) lead pencil.* (2.) Completely blacken the oval corresponding to your response choice. (3.) Completely erase any mistakes. (4.) Make no marks outside of the response areas.

**1** NAME: _____ Please Print

DATE: _____ Please Print

**2 SOCIAL SECURITY NUMBER** (SSN)

**3 EXAMINING OFFICE CODE (EOC)**

NOTE: BE SURE TO WRITE IN YOUR NUMBERS AS WELL AS BLACKENING THE OVALS.

**4** Please categorize yourself in terms of the race, sex and ethnicity categories below. Be sure to blacken **ONE** oval for your response to each of the three categories. (First read definitions of subcategories.)

## DEFINITIONS

The racial and ethnic categories for Federal statistics and administrative reporting are defined as follows:

**ETHNICITY:**

HISPANIC. A person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.

**RACE:**

AMERICAN INDIAN or ALASKAN NATIVE. A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

ASIAN or PACIFIC ISLANDER. A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, India, Japan, Korea, the Philippine Islands, and Samoa.

BLACK. A person having origins in any of the black racial groups of Africa.

WHITE. A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

## PRIVACY ACT NOTICE
### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals completing Federal records and forms that solicit personal information.

### AUTHORITY

Section 717 of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972.

### PURPOSE AND ROUTINE USES

To further the principles of equal employment opportunity, Federal agencies are required to assure that any selection procedures used as a basis for employment decisions (including tests and other examining methods) are not affected by discrimination on the basis of race, color, religion, sex, or national origin. As part of the effort required to assure nondiscrimination in selection processes, Federal employment agencies are required to collect sex, racial, and ethnic data on applicants for Federal employment for group statistical analyses purposes. Your individual record will not be disclosed for any purpose.

### EFFECTS OF NONDISCLOSURE

Providing this information is voluntary and there will be no adverse effect on you for not providing the information requested.

### INFORMATION REGARDING DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER UNDER PUBLIC LAW 93-579, SECTION 7 (b)

Solicitation of the Social Security Number (SSN) by the United States Civil Service Commission is authorized under provisions of Executive Order 9397, dated November 22, 1943. It is used to relate this form with other records that you file with the Civil Service Commission.

| RACE: (Blacken one oval) | SEX: (Blacken one oval) | ETHNICITY: (Blacken one oval) |
|---|---|---|
| ○ American Indian or Alaskan Native (1) | ○ Male (1) | ○ Hispanic Origin (1) |
| ○ Asian or Pacific Islander (2) | ○ Female (2) | ○ Not of Hispanic origin (2) |
| ○ Black (3) | | |
| ○ White (4) | | |
| ○ Other (5) | | |

CSC Form 1289—A (Temp
Expires 9/78 Revised 11/7

# Regional Distribution of January 1978 PACE Applicants by Race, Sex, and Ethnic Origin



**United States
Office of
Personnel
Management**

Staffing
Services
Group

ATTACHMENT I

REGIONAL DISTRIBUTION OF JANUARY 1978 PACE

APPLICANTS BY RACE, SEX, AND ETHNIC ORIGIN

Lois C. Northrop

U.S. Office of Personnel Management
Personnel Research and Development Center
Data Evaluation Group
Washington, D.C.
July 1980

REGIONAL DISTRIBUTION OF JANUARY 1978 PACE
APPLICANTS BY RACE, SEX, AND ETHNIC ORIGIN

## ABSTRACT AND SUMMARY

Race, sex, and ethnic origin data were collected from January, 1978, PACE applicants in ten
Regional Office cities and the Washington Area Office. An optic scan form (CSC Form 1289A,
Survey for the Collection of Racial and Ethnic Data of Persons Applying for Federal Employ-
ment) was administered to applicants in examination rooms prior to the written test.

Visual identifications of the sex and race (Black, White, or Other) were made and recorded by
two observers, working independently, in each test room. Completed questionnaires and test
room seating charts containing the visual observations were returned directly to the Personnel
Research and Development Center for comparison and statistical analysis.

The race, sex, and ethnic survey form was administered to 9,398 PACE applicants, nationwide.
Response to the questionnaire was voluntary; 345 applicants (3.67%) refused to fill out the
form.

Of the 9053 applicants who responded to the survey, 50 (0.55%) were American Indians or
Alaskan Natives, 319 (3.52%) were Asians or Pacific Islanders, 1216 (13.43%) were Black,
7,296 (80.59%) were White, and 172 (1.90%) were "Other." Males outnumbered females, overall,
52.97% to 47.03%. Males also outnumbered females in all races except Black. Black females
outnumbered Black males 710 to 506. The national percentage of Hispanics was 3.82. Of the
172 persons who identified themselves, racially, as "Others," 108 (62.79%) were also of
Hispanic origin. There were persons of Hispanic origin among all of the racial categories.

Visual observations were used to identify the race and sex of the 345 applicants who refused
the questionnaire. Significantly higher proportions of males than females and of Whites than
minorities did not fill out the form. Regional no-response rates varied from 0.52% to 9.51%.

Nationally, 3.00% of the applicants who identified their race and sex failed to respond to
the question on ethnicity. This was statistically a function of race—minorities omitting
the item at rates of 4% to 8%, Whites at 2%. It was hypothesized that some members of
minority groups consider only one classification important: that of race.

Nationwide there was some form of disagreement between self-identification and visual obser-
vation in 320 (6.78%) of a total of 4721 paired visual observations. Disagreement between
observers accounted for 214 of these 320 cases. These represented 4.53% of the 4721 paired
visual observations. It was concluded that self-identification is a feasible and valid way
to obtain race and sex data on applicants for Federal employment.

An attempt by three of the regions to visually identify Hispanics was considered unsuccessful.
Twenty-five to seventy-five percent of the self-identified Hispanics were "missed" by the ob-
servers. In addition, a number of non-Hispanics by self-identification were visually observed
as being of Hispanic origin. It was concluded that while the validity of information on
ethnicity produced through self-identification is uncertain, the method produces significantly
more data on this category than visual observation. Consequently, self-identification is
probably the only feasible way to obtain information on ethnicity.

i

CONTENTS

Page

INTRODUCTION                                                                    1

METHOD                                                                          1

RESULTS AND DISCUSSION                                                          3
    Description of the sample                                                   3
    No response to all or part of the questionnaire                            7
    Reliability/validity of self-identification v. visual observation          7
    Dallas, Denver, and San Francisco disagreements                           11
    Concluding notes                                                          14

REFERENCES                                                                     14

APPENDIXES

    A.  Abstract and Summary of Findings:  Pilot Study                        15
    B.  Race, Sex, and Ethnic Data Collection Form                            17
    C.  U.S. Population Characteristics                                        19

ii

REGIONAL DISTRIBTUION OF JANUARY 1978 PACE
APPLICANTS BY RACE, SEX, AND ETHNIC ORIGIN

## INTRODUCTION

The new Uniform Guildelines (August, 1978) specify that all employment selection procedures be examined for possible adverse impact on women and minority groups. In order to determine whether such adverse impact exists, it is necessary to identify the race, sex, and ethnic origin of job applicants.

In May 1977, a pilot study was conducted using applicants taking the U.S. Civil Service Commission's Professsional and Administrative Career Examination (PACE) in the Washington area office. The purposes of this study were:

1. To determine the response rate to a questionniare which asks applicants to identify their race, sex, and ethnic origin.

2. To determine how best to word the request in order to elicit the maximum cooperation from applicants.

3. To determine the validity of self-identification of race, sex, and ethnic origin, as opposed to visual identification by observers in the test rooms (race and sex only).

4. To determine the reliability (agreement) of observations made independently by two observers.

The results of this investigation have been reported by Northrop, 1979. An abstract and summary of the findings from this study can be found in Appendix A.

The present study is essentially an extension of the procedures used in the pilot study to all Regional Office cities in order to determine whether Regional differences in the collection of race, sex, and ethnic origin data exist. As in the pilot study, PACE applicants were surveyed. Specifically, the

answers to the following questions were sought:

1. What is the distribution by race, sex, and ethnic origin of PACE applicants in each Regional Office city?

2. Are there regional differences in the response rate to self-identification of race, sex, and ethnic origin?

3. What is the validity and reliability of self-identification v. visual observation?

4. Are there any regional administrative problems with the survey which need to be overcome?

## METHOD

This survey was carried out during the January, 1978 administration of PACE in the 10 Regional Office cities across the nation as well as in the Washington area office. Time constraints prohibited the distribution of forms and the establishment of data collection procedures in other area offices in each region. In preparation for this effort, an Operations Letter was sent to all Regional Directors in November 1977, requesting their cooperation and the assistance of a member of each Regional staff to coordinate the procedures. Telephone contacts were established with these coordinators (in some Regions it was a regional psychologist, in others it was a member of the staffing division; in all Regions the coordinator was a person throughly familiar with the testing procedures in that Region). Telephone communications proceeded so well that travel to every region by members of the Personnel Research and Development Center (PRDC) staff, as originally anticipated, was considered unnecessary. On December 21, 1977, a telephone conference was held with all ten regions to finalize preparations for the data collection and to discuss and clarify the procedures.

1

An optic scan form of the race, sex, and ethnic questionnaire, using the instructions found to elicit the highest response rate in the pilot study, was designed, printed, and distributed to each Regional Office city. This form was called "Survey For the Collection of Racial and Ethnic Data of Persons Applying for Federal Employment."

Using this form, applicants were asked to identify themselves in three ways; by race (American Indian or Alaskan native, Asian or Pacific Islander, Black, White, Other), by sex (male, female), and by ethnic origin (Hispanic, non-Hispanic). A copy of the form appears in Appendix B.

A second optic scan form, Personnel Research Questionnaire 77-11, was also designed, printed, and distributed and administered. This form contained questions about the applicants' language and mathematics background, economic and educational advantage, and parents' occupation and education (to be used as indicators of socioeconomic level). These questions reflected hypotheses as to causal factors of possible adverse impact. Results from this questionnaire will be reported in a separate paper, now in preparation.

Completion of both questionnaires was voluntary; refusal to answer the questions would not adversely affect an applicant's chance for employment. This information was contained in the Privacy Act Notice printed on each form. The Privacy Act Notices also explained that the data collected would be used for research purposes only and would not be used in any selection decision.

Instructions to applicants for completing the forms were prepared in PRDC, and were read by the examiner at the beginning of the examination procedure. In addition to guidance for the correct use of the optic scan forms, the examiner issued a reminder to read the Privacy Act Notice before answering the questions. The completed questionnaires were collected before the regular examination procedure began. They were kept separate from all other examination materials and application forms, and were sent directly to PRDC, where they were securely maintained in locked file cabinets.

In addition to the applicant instructions, some "general comments and instructions" were prepared to aid the regional coordinators in working out details of the

data collection suitable to the examining conditions in their respective regions. Since a check on the validity/reliability of the self-identification of race and sex was necessary, instructions were given for making numbered seating charts of test rooms, numbering the race, sex, and ethnic questionnaires and distributing them to applicants, visually observing applicants and recording race and sex on the seating charts, answering applicants inquiries about the forms, and returning the forms and seating charts to PRDC for data analysis. A second set of detailed instructions was prepared for the observers themselves so that the observations would be done in a uniform manner throughout the different regions. Although only the observation and identification of race (Black, White, or Other only) and sex was required, several of the regions (Dallas, Denver, San Francisco) decided to attempt the visual identification of American Indians, Asians, and Hispanics as well.

The instructions (applicant, general, and observer) were distributed to the Regional coordinators in early December 1977. Comments and suggestions for clarification and avoidance of potential problems were received from the coordinators and these were discussed and acted upon during the telephone conference with the regions late in December.

The completed questionnaires were returned from each region to PRDC, test room by test room, with accompanying seating charts and visual observations. For each region and the Washington area office, forms from each test room were put in numerical order and the visual observations of race and sex from the two seating charts for each room were transferred to the appropriate form filled out by the applicant. Disagreements between the two observers were noted as well as disagreements between one or both observers and the self-identification.

Responses were tabulated separately for each region and the Washington area office. Frequency counts of the race, sex, and ethnicity of all applicants by self-identification were obtained as well as the percentage of applicants in each category. Counts of disagreements between self-identifications and visual observations and, specifically, what each disagreement was, were made. Tests for significant differences in proportions (z) and in frequency distributions (chi square) were used to uncover important differences among groups and regions.

-2-

## RESULTS AND DISCUSSION

The administration of the question-naires and the sex and race observations went smoothly in all regions. There were a few isolated complaints from applicants regarding the fact that they were not told verbally by the examiner that providing the requested information was voluntary. The voluntary nature of the questionnaires was made clear in the Privacy Act Notice on the forms, which applicants were instructed to read before answering the questions. Perhaps a more legitimate complaint, again from only a scattered few, was that applicants should be instructed to read the Privacy Act Notice before being directed to write their names and Social Security numbers on the forms. Those who chose not to respond would then be totally anonymous.

Because of the size and location of some test rooms it was not feasible in several of the regions to carry out the visual observation part of the project on all of the applicants who filled out the forms. However, every region was able to provide visual observations on at least 300 applicants.

In two regions, Denver and San Francisco, the two observers did not make independent observations on separate seating charts but collaborated to produce a single identification which they both agreed upon.

The remaining parts of this section will present and discuss the nationwide results of the study.

### Description of the sample

The race, sex, and ethnic survey form was administered to 9,398 PACE applicants in January, 1978, in the ten regional office cities and the Washington area office. Of these, 345 (3.67%) refused to fill out the form. Tables 1 and 2 present regional distributions of the remaining 9,053 applicants, in terms of their self-identification, by race and sex. Table 1 shows the numbers and percentages of each race and sex group within each region. Regional totals for each racial group are presented as well as the percentage of the total regional sample which each racial groups represents. For example, in New York seven male and two female applicants identified themselves as American Indians or Alaskan natives. These nine persons represent 0.53% of the 1,704 applicants

in the last column who took the PACE in New York. The bottom row of the table shows nationwide racial totals (e.g., 50 American Indians or Alaskan natives) and the percent (0.55) of the 9,053 PACE applicants who responded to the questionnaire.

Table 2 presents a different view of the race-by-region distribution of the applicants. In this table the numerical distribution of the five racial groups is the same as in Table 1 but the regional percentages are based upon racial group totals rather than regional totals. For example, of the 319 Asians or Pacific Islanders in the sample, 203 or 63.64% were in San Francisco. This indicates a very large Asian minority among PACE applicants in that area relative to the total sample from San Francisco (bottom row) which accounted for 12.07% of the total PACE sample. Table 2 serves to emphasize that Regional differences in the distribution of minority groups makes it necessary to study the regions individually. These regional differences in minority percentages reflect, naturally, regional differences within the general and college populations. The interested reader may wish to consult such statistical sources as the Bureau of the Census Characteristics of the Population (volume 1 of the 1970 census) or Current Population Reports (frequent updates of population characteristics) for further information relative to the racial and ethnic distribution of these populations throughout various parts of the nation. Appendix C presents some relevant statistics from these sources so that the reader may make some quick, although very rough, comparisons.

Table 3 presents the distribution by race and region of PACE applicants who were of Hispanic origin. The overall percentage of Hispanics in the January, 1978 PACE applicant population in the regional office cities was 3.82%. The rows in the table represent regions and the columns show the number and percentage of Hispanics in each racial group. For example, in New York three American Indian/Alaskan Natives (two males and one female) identified themselves as being of Hispanic origin; there were no Asians/ Pacific Islanders of Hispanic origin; and 14 Blacks, 64 Whites, and 44 "Others" also were ethnically Hispanic. The percentages accompanying the N for each race indicate the percentage of the total Hispanics in that region who were Black, White, etc. In New York, 125 applicants were of Hispanic origin. The table shows that 2.40% of them were

TABLE 1

Distribution of Race and Sex, by Region
Self-identifications

| | | I[a] | | A | | B | | W | | O | | Regional Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| AT[b] | M | 1 | .13 | 1 | .13 | 52 | 6.96 | 271 | 36.28 | | | 325 | 43.51 |
| | F | | | 1 | .13 | 115 | 15.40 | 305 | 40.83 | 1 | .13 | 422 | 56.49 |
| | Reg. Total | 1 | .13 | 2 | .27 | 167 | 22.36 | 576 | 77.11 | 1 | .13 | 747 | 100 |
| BO | M | 2 | .22 | 4 | .44 | 19 | 2.06 | 499 | 54.00 | 8 | .87 | 532 | 57.58 |
| | F | 2 | .22 | 6 | .65 | 29 | 3.14 | 351 | 37.99 | 4 | .44 | 392 | 42.42 |
| | Reg. Total | 4 | .44 | 10 | 1.09 | 48 | 5.20 | 850 | 91.99 | 12 | 1.30 | 924 | 100 |
| CH | M | | | 2 | .67 | 25 | 8.39 | 122 | 40.94 | 7 | 2.35 | 156 | 52.35 |
| | F | 1 | .34 | | | 41 | 13.76 | 94 | 31.54 | 6 | 2.01 | 142 | 47.65 |
| | Reg. Total | 1 | .34 | 2 | .67 | 66 | 22.15 | 216 | 72.48 | 13 | 4.36 | 298 | 100 |
| DA | M | 3 | .39 | 1 | .13 | 38 | 4.95 | 318 | 41.41 | 17 | 2.21 | 377 | 49.09 |
| | F | 3 | .39 | | | 53 | 6.90 | 330 | 42.97 | 5 | .65 | 391 | 50.91 |
| | Reg. Total | 6 | .78 | 1 | .13 | 91 | 11.85 | 648 | 84.38 | 22 | 2.86 | 768 | 100 |
| DE | M | 3 | .79 | 1 | .26 | 13 | 3.44 | 152 | 40.21 | 3 | .79 | 172 | 45.50 |
| | F | 1 | .26 | 4 | 1.06 | 17 | 4.50 | 179 | 47.35 | 5 | 1.32 | 206 | 54.50 |
| | Reg. Total | 4 | 1.06 | 5 | 1.32 | 30 | 7.94 | 331 | 87.56 | 8 | 2.12 | 378 | 100 |
| NY | M | 7 | .41 | 24 | 1.41 | 135 | 7.92 | 876 | 51.41 | 37 | 2.17 | 1079 | 63.32 |
| | F | 2 | .12 | 20 | 1.17 | 132 | 7.75 | 447 | 26.23 | 24 | 1.41 | 625 | 36.68 |
| | Reg. Total | 9 | .53 | 44 | 2.58 | 267 | 15.67 | 1323 | 77.64 | 61 | 3.58 | 1704 | 100 |
| PH | M | 1 | .22 | 1 | .22 | 25 | 5.38 | 246 | 52.90 | 1 | .22 | 274 | 58.92 |
| | F | | | 2 | .44 | 38 | 8.17 | 150 | 32.26 | 1 | .22 | 191 | 41.08 |
| | Subtotal | 1 | .22 | 3 | .64 | 63 | 13.55 | 396 | 85.16 | 2 | .43 | 465 | 100 |
| SF | M | 4 | .37 | 110 | 10.06 | 46 | 4.21 | 395 | 36.14 | 14 | 1.28 | 569 | 52.06 |
| | F | 1 | .09 | 93 | 8.51 | 48 | 4.39 | 369 | 33.76 | 13 | 1.19 | 524 | 47.94 |
| | Subtotal | 5 | .46 | 203 | 18.57 | 94 | 8.60 | 764 | 69.90 | 27 | 2.47 | 1093 | 100 |
| SE | M | 3 | .63 | 7 | 1.46 | 10 | 2.08 | 217 | 45.21 | 7 | 1.46 | 244 | 50.83 |
| | F | 6 | 1.25 | 13 | 2.71 | 8 | 1.67 | 208 | 43.33 | 1 | .21 | 236 | 49.17 |
| | Subtotal | 9 | 1.88 | 20 | 4.17 | 18 | 3.75 | 425 | 88.54 | 8 | 1.67 | 480 | 100 |
| SL | M | | | 2 | .30 | 26 | 3.94 | 293 | 44.39 | 4 | .61 | 325 | 49.24 |
| | F | 3 | .46 | | | 69 | 10.46 | 262 | 39.70 | 1 | .15 | 335 | 50.76 |
| | Subtotal | 3 | .46 | 2 | .30 | 95 | 14.39 | 555 | 84.09 | 5 | .76 | 660 | 100 |
| WAO | M | 4 | .26 | 15 | .98 | 117 | 7.62 | 596 | 38.80 | 10 | .65 | 742 | 48.31 |
| | F | 3 | .20 | 12 | .78 | 160 | 10.42 | 616 | 40.10 | 3 | .20 | 794 | 51.69 |
| | Subtotal | 7 | .46 | 27 | 1.76 | 277 | 18.04 | 1212 | 78.91 | 13 | .85 | 1536 | 100 |
| * * * * | * * * * | * | * | * | * | * | * | * | * | * | * | * | * |
| Racial total by sex | M | 28 | .31 | 168 | 1.86 | 506 | 5.59 | 3985 | 44.02 | 108 | 1.19 | 4795 | 52.97 |
| | F | 22 | .24 | 151 | 1.67 | 710 | 7.84 | 3311 | 36.57 | 64 | .71 | 4258 | 47.03 |
| Racial Totals | | 50 | .55 | 319 | 3.52 | 1216 | 13.43 | 7296 | 80.59 | 172 | 1.90 | 9053 | 100 |

[a] I = American Indian/Alaskan Native
A = Asian/Pacific Islander
B = Black
W = White
O = Other

[b] AT = Atlanta  PH = Philadelphia
BN = Boston  SF = San Francisco
CH = Chicago  SE = Seattle
DA = Dallas  SL = St. Louis
DE = Denver  WAO = Washington Area Office
NY = New York

TABLE 2

Percent of Race Categories in Each Region
Self-identifications

| | | AT N | AT % of race Total | BN N | BN % of race Total | CH N | CH % of race Total | DA N | DA % of race Total | DE N | DE % of race Total | NY N | NY % of race Total | PH N | PH % of race Total | SF N | SF % of race Total | SE N | SE % of race Total | SL N | SL % of race Total | WAO N | WAO % of race Total | Total in each Race cat. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | M | 1 | | 2 | | | | 3 | | 3 | | 7 | | 1 | | 4 | | 3 | | | | 4 | | 28 |
| | F | | | 2 | | 1 | | 3 | | 1 | | 2 | | | | 1 | | 6 | | 3 | | 3 | | 22 |
| | Total I | 1 | 2.00 | 4 | 8.00 | 1 | 2.00 | 6 | 12.00 | 4 | 8.00 | 9 | 18.00 | 1 | 2.00 | 5 | 10.00 | 9 | 18.00 | 3 | 6.00 | 7 | 14.00 | 50  100% |
| A | M | 1 | | 4 | | 2 | | | | 1 | | 24 | | 1 | | 110 | | 7 | | 2 | | 15 | | 168 |
| | F | | | 6 | | | | | | | | 20 | | 2 | | 93 | | 13 | | | | 12 | | 151 |
| | Total A | 2 | .63 | 10 | 3.14 | 2 | .63 | 1 | .31 | 5 | 1.57 | 44 | 13.79 | 3 | .94 | 203 | 63.64 | 20 | 6.27 | 2 | .63 | 27 | 8.46 | 319  100% |
| B | M | 52 | | 19 | | 25 | | 38 | | 13 | | 135 | | 25 | | 46 | | 10 | | 26 | | 117 | | 506 |
| | F | 115 | | 29 | | 41 | | 53 | | 17 | | 132 | | 38 | | 48 | | 8 | | 69 | | 160 | | 710 |
| | Total B | 167 | 13.73 | 48 | 3.95 | 66 | 5.43 | 91 | 7.48 | 30 | 2.47 | 267 | 21.96 | 63 | 5.18 | 94 | 7.73 | 18 | 1.48 | 95 | 7.81 | 277 | 22.78 | 1216  100% |
| W | M | 271 | | 499 | | 122 | | 318 | | 152 | | 876 | | 276 | | 395 | | 217 | | 293 | | 596 | | 3985 |
| | F | 305 | | 351 | | 94 | | 330 | | 179 | | 447 | | 150 | | 369 | | 208 | | 262 | | 616 | | 3311 |
| | Total W | 576 | 7.90 | 850 | 11.65 | 216 | 2.96 | 648 | 8.88 | 331 | 4.54 | 1323 | 18.13 | 396 | 5.43 | 764 | 10.47 | 425 | 5.82 | 555 | 7.61 | 1212 | 16.61 | 7296  100% |
| O | M | | | 8 | | 7 | | 17 | | 3 | | 37 | | 1 | | 14 | | 7 | | 4 | | 10 | | 108 |
| | F | 1 | | 4 | | 6 | | 5 | | 5 | | 24 | | 1 | | 13 | | 1 | | 1 | | 3 | | 64 |
| | Total O | 1 | .58 | 12 | 6.98 | 13 | 7.56 | 22 | 12.79 | 8 | 4.65 | 61 | 35.46 | 2 | 1.16 | 27 | 15.70 | 8 | 4.65 | 5 | 2.91 | 13 | 7.56 | 172  100% |
| TOTAL N in each Region | | 747 | | 924 | | 298 | | 768 | | 378 | | 1704 | | 465 | | 1093 | | 480 | | 660 | | 1536 | | 9053 |
| % of total Sample | | | 8.25 | | 10.21 | | 3.29 | | 8.48 | | 4.18 | | 18.82 | | 5.14 | | 12.07 | | 5.30 | | 7.29 | | 16.97 | 100% Total N in Sample |

-5-

## TABLE 3

Hispanics by Race and Region

| | | AI N | AI % of Hisp. | A N | A % of Hisp. | B N | B % of Hisp. | W N | W % of Hisp. | O N | O % of Hisp. | Total Hispanics in Region N | % of Hisp. | Regional Total | Total % H in each Region |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AT | M | | | | | 2 | 22.22 | 5 | 55.56 | | | 7 | 77.78 | | .94 |
| | F | | | | | | | 2 | 22.22 | | | 2 | 22.22 | | .27 |
| | Total | | | | | 2 | 22.22 | 7 | 77.78 | | | 9 | 100.00 | 747 | 1.21 |
| BN | M | | | 1 | 8.33 | | | 4 | 33.33 | 1 | 8.33 | 6 | 50.00 | | .65 |
| | F | | | | | 1 | 8.33 | 4 | 33.33 | 1 | 8.33 | 6 | 50.00 | | .65 |
| | Total | | | 1 | 8.33 | 1 | 8.33 | 8 | 66.67 | 2 | 16.67 | 12 | 100.00 | 924 | 1.30 |
| CH | M | | | | | | | 1 | 6.67 | 4 | 26.67 | 5 | 33.33 | | 1.68 |
| | F | | | | | 1 | 6.67 | 4 | 26.67 | 5 | 33.33 | 10 | 66.67 | | 3.36 |
| | Total | | | | | 1 | 6.67 | 5 | 33.33 | 9 | 60.00 | 15 | 100.00 | 298 | 5.03 |
| DA | M | 1 | 2.04 | | | | | 16 | 32.65 | 15 | 30.61 | 32 | 65.31 | | 4.17 |
| | F | | | | | 1 | 2.04 | 13 | 26.53 | 3 | 6.12 | 17 | 34.69 | | 2.21 |
| | Total | 1 | 2.04 | | | 1 | 2.04 | 29 | 59.18 | 18 | 36.74 | 49 | 100.00 | 768 | 6.38 |
| DE | M | 1 | 6.25 | | | | | 2 | 12.50 | 2 | 12.50 | 5 | 31.25 | | 1.32 |
| | F | | | | | | | 7 | 43.75 | 4 | 25.00 | 11 | 68.75 | | 2.91 |
| | Total | 1 | 6.25 | | | | | 9 | 56.25 | 6 | 37.50 | 16 | 100.00 | 378 | 4.23 |
| NY | M | 2 | 1.60 | | | 8 | 6.40 | 42 | 33.60 | 26 | 20.80 | 78 | 62.40 | | 4.58 |
| | F | 1 | .80 | | | 6 | 4.80 | 22 | 17.60 | 18 | 14.40 | 47 | 37.60 | | 2.76 |
| | Total | 3 | 2.40 | | | 14 | 11.20 | 64 | 51.20 | 44 | 35.20 | 125 | 100.00 | 1704 | 7.34 |
| PH | M | | | | | | | 1 | 33.33 | 1 | 33.33 | 2 | 66.67 | | .43 |
| | F | | | | | | | 1 | 33.33 | | | 1 | 33.33 | | .22 |
| | Total | | | | | | | 2 | 66.67 | 1 | 33.33 | 3 | 100.00 | 465 | .65 |
| SF | M | | | 11 | 17.19 | 3 | 4.69 | 16 | 25.00 | 8 | 12.50 | 38 | 59.38 | | 3.48 |
| | F | | | 3 | 4.69 | 1 | 1.56 | 12 | 18.75 | 10 | 15.62 | 26 | 40.62 | | 2.38 |
| | Total | | | 14 | 21.88 | 4 | 6.25 | 28 | 43.75 | 18 | 28.12 | 64 | 100.00 | 1093 | 5.86 |
| SE | M | 1 | 7.69 | | | | | 3 | 23.08 | 4 | 30.77 | 8 | 61.54 | | 1.67 |
| | F | | | | | | | 5 | 38.46 | | | 5 | 38.46 | | 1.04 |
| | Total | 1 | 7.69 | | | | | 8 | 61.54 | 4 | 30.77 | 13 | 100.00 | 480 | 2.71 |
| SL | M | | | | | | | 3 | 42.86 | 2 | 28.57 | 5 | 71.43 | | .76 |
| | F | | | | | 1 | 14.29 | 1 | 14.29 | | | 2 | 28.57 | | .30 |
| | Total | | | | | 1 | 14.29 | 4 | 57.14 | 2 | 28.57 | 7 | 100.00 | 660 | 1.06 |
| WAO | M | 1 | 3.03 | 1 | 3.03 | 3 | 9.09 | 10 | 30.30 | 2 | 6.06 | 17 | 51.52 | | 1.11 |
| | F | | | | | 2 | 6.06 | 12 | 36.36 | 2 | 6.06 | 16 | 48.48 | | 1.04 |
| | Total | 1 | 3.03 | 1 | 3.03 | 5 | 15.15 | 22 | 66.67 | 4 | 12.12 | 33 | 100.00 | 1536 | 2.15 |
| Race Totals of Hispanics | M | 6 | 1.73 | 13 | 3.76 | 16 | 4.62 | 103 | 29.77 | 65 | 18.79 | 203 | 58.67 | | |
| | F | 1 | .29 | 3 | .87 | 13 | 3.76 | 83 | 23.99 | 43 | 12.43 | 143 | 41.33 | | |
| | Total | 7 | 2.02 | 16 | 4.62 | 29 | 8.38 | 186 | 53.76 | 108 | 31.21 | 346 | 100.00 | 9053 | 3.82 |
| Race-Total N | | 50 | | 319 | | 1216 | | 7296 | | 172 | | 9053 | | | |
| Hisp-totals | | 7 | | 16 | | 29 | | 186 | | 108 | | 346 | | | |
| % of race Total | | | 14.00 | | 5.02 | | 2.38 | | 2.55 | | 62.79 | | 3.82 | | |

-6-

American Indian, 11.20% were Black, 51.20% were White and 35.20% Were "Others." The last column in the table indicates that of the 1,704 PACE applicants in New York, 7.34% were ethnically Hispanic. As stated in the discussion of Table 2, the regional percentages of Hispanics reflect the distribution of Hispanics in the general population in each region.

The bottom row in Table 3 shows the total number of Hispanics in each racial group. It is particularly interesting to note that of the 172 applicants, nationwide, who identified themselves as "Other" racially, 108, or 62.79%, were also of Hispanic origin. Presumably many Mexican Americans and Puerto Ricans are using the "Other" category when identifying themselves racially.

## No response to all or part of the questionnaire

Table 4 presents the distribution by race (Black, White and "Other"), sex, and region of those applicants who refused to fill out the questionnaire. The identification of these individuals was through the recorded visual observations. Note that in Boston, New York, and the Washington area office, visual observations were not obtained for all applicants who were asked to fill out the race, sex, and ethnic form. The sex of these applicants was deduced from their names, which most of the non-responders did write in, even though they refused to answer the questions. Eleven applicants returned a completely blank form to the examiner, did not hand it back at all, or were the object of sex and race disagreement between the two visual observers. These are listed in the column headed "No sex ID or no form."

Out of the 9,398 applicants asked to fill out the questionniare, 345 (3.67%) refused to do so. About twice as many males as females declined to identify their race, sex, and ethnicity. The difference in the proportions of males and females who refused to respond was statistically significant ( $^2$ = 13.68, p .001). The proportion of Whites who did not respond was significantly higher ( $^2$ = 6.69, p .001) than that proportion for minorities. The regional office cities also differed widely in their no-response rates, as indicated in Table 4. No-response rates varied from 0.52% (Dallas) to 9.51% (New York).

Table 5 represents a regional breakdown by race and sex of those who identified their sex and race but failed to respond to the question on ethnicity. Nationally the omit rate for this question was 3.00% with the regional omit rates ranging from 0.83% (Seattle) to 5.05% (New York). The omission of the ethnicity question was very much a function of race ( $^2$ = 174.84, p .001). American Indians/Alaskan Natives, Asians/Pacific Islanders, and Blacks omitted the item at rates of 8.00%, 3.76%, and 8.96%, in that order. Only 1.97% of the White and 1.74% of the "Other" applicants failed to respond. It seems reasonable to hypothesize that for racial minorities only one classification is important—that of race. It has already been pointed out that the "Other" racial category was being used by many individuals of Hispanic origin. Therefore, it is not surprising that the omission of the ethnicity question by "Others" was not frequent. It also seems reasonable to assume that most of the omissions for all races were by individuals not of Hispanic origin.

## Reliability/validity of self-identification v. visual observation

Tables 6, 7, and 8 present regional summaries of the disagreement which occurred between visual observation and self-identification of race and sex. The reader will recall that two observers with numbered seating charts of test rooms were to record, independently, the race (Black, White, or Other, only) and sex (male or female) of all applicants. Table 6 summarizes the discrepancies between visual observation and self-identification for the Washington Area Office and all regions except Dallas, Denver, and San Francisco. In these latter three regions the staff wanted to attempt to identify ethnicity (Hispanic or non-Hispanic) as well as race and sex. Table 7 presents the results from Dallas. The results from Denver and San Francisco were tabulated separately in Table 8 because only one visual observation instead of two was recorded for each applicant. This single observation was the identification agreed upon by the two observers working together.

Discussion of the three tables, individually, follows. Table 6 indicates that in eight of the regions and the Washington Area Office there were 320 disagreements, or on 6.78% of a total of 4,721 paired visual observations. Ninety-seven (30.31%) of the disagreements involved the sex of an applicant

TABLE 4

No Response to the Race, Sex and Ethnic Questionnaire

| | MALE | | | | FEMALE | | | | No sex ID or No Form | TOTAL | Total Regional N Resp + NoR | % No resp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Race by Visual Observation | | | No Visual Observation | Race by Visual Observation | | | No Visual Observation | | | | |
| | B | W | O | | B | W | O | | | | | |
| AT | | 4 | | | 2 | 2 | | | | 8 | 755 | 1.06 |
| BN | | 14 | | 14 | | 3 | | 4 | 4 | 39 | 963 | 4.05 |
| CH | 1 | 4 | | | | 5 | | | | 10 | 308 | 3.25 |
| DA | | 1 | | | 1 | | | 2 | | 4 | 772 | .52 |
| DE | 1 | 10 | | | | 7 | | | | 18 | 396 | 4.54 |
| NY | 1 | 28 | | 92 | 2 | 16 | | 38 | 2 | 179 | 1883 | 9.51 |
| PH | 1 | 4 | | | 3 | 2 | | | | 10 | 475 | 2.10 |
| SF | 1 | 13 | 2 | | | 4 | 3 | | | 23 | 1116 | 2.06 |
| SE | | 12 | 2 | | | 1 | 1 | | | 16 | 496 | 3.22 |
| SL | | 2 | | | 1 | 1 | | | 2 | 6 | 666 | .90 |
| WAO | | 14 | | 5 | | 7 | | 3 | 3 | 32 | 1568 | 2.04 |
| Totals | 5 | 106 | 4 | 111 | 9 | 48 | 4 | 47 | 11 | 345 | 9398 | 3.67 |
| % of non-responders | 1.45 | 30.72 | 1.16 | 32.17 | 2.61 | 13.91 | 1.16 | 13.62 | 3.19 | 100 | | |
| | | 65.50% Males | | | | 31.30% Females | | | | | | |

TABLE 5

No Response to Ethnicity – Regional Breakdown

| | | AI N | AI % | A N | A % | B N | B % | W N | W % | O N | O % | Total NR in Region N | % | No Resp. Reg. to Eth N | Total as % of Total N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AT | M | | | | | 2 | 22.22 | 2 | 22.22 | | | 4 | 44.44 | | |
| | F | | | | | 5 | 55.56 | | | | | 5 | 55.56 | | |
| | Total | | | | | 7 | 77.78 | 2 | 22.22 | | | 9 | 100.00 | 747 | 1.20 |
| BN | M | | | 1 | 6.25 | 1 | 6.25 | 9 | 56.25 | | | 11 | 68.75 | | |
| | F | | | | | 1 | 6.25 | 4 | 25.00 | | | 5 | 31.25 | | |
| | Total | | | 1 | 6.25 | 2 | 12.50 | 13 | 81.25 | | | 16 | 100.00 | 924 | 1.73 |
| CH | M | | | | | 1 | 20.00 | 3 | 60.00 | | | 4 | 80.00 | | |
| | F | | | | | | | 1 | 20.00 | | | 1 | 20.00 | | |
| | Total | | | | | 1 | 20.00 | 4 | 80.00 | | | 5 | 100.00 | 298 | 1.68 |
| DA | M | | | | | 3 | 20.00 | 5 | 33.33 | | | 8 | 53.33 | | |
| | F | | | | | 4 | 26.67 | 3 | 20.00 | | | 7 | 46.67 | | |
| | Total | | | | | 7 | 46.67 | 8 | 53.33 | | | 15 | 100.00 | 768 | 1.95 |
| DE | M | | | | | 2 | 33.33 | 2 | 33.33 | | | 4 | 66.67 | | |
| | F | | | | | 1 | 16.67 | 1 | 16.67 | | | 2 | 33.33 | | |
| | Total | | | | | 3 | 50.00 | 3 | 50.00 | | | 6 | 100.00 | 378 | 1.59 |
| NY | M | 1 | 1.16 | | | 20 | 23.26 | 42 | 48.84 | | | 63 | 73.26 | | |
| | F | | | 2 | 2.32 | 8 | 9.30 | 11 | 12.79 | 2 | 2.32 | 23 | 26.74 | | |
| | Total | 1 | 1.16 | 2 | 2.32 | 28 | 32.56 | 53 | 61.63 | 2 | 2.32 | 86 | 100.00 | 1704 | 5.05 |
| PH | M | | | | | 5 | 25.00 | 8 | 40.00 | | | 13 | 65.00 | | |
| | F | | | 1 | 5.00 | 4 | 20.00 | 2 | 10.00 | | | 7 | 35.00 | | |
| | Total | | | 1 | 5.00 | 9 | 45.00 | 10 | 50.00 | | | 20 | 100.00 | 465 | 4.30 |
| SF | M | | | 4 | 14.81 | 4 | 14.81 | 6 | 22.22 | | | 14 | 51.85 | | |
| | F | | | 3 | 11.11 | 4 | 14.81 | 6 | 22.22 | | | 13 | 48.15 | | |
| | Total | | | 7 | 25.92 | 8 | 29.63 | 12 | 44.44 | | | 27 | 100.00 | 1093 | 2.47 |
| SE | M | | | | | | | 2 | 50.00 | | | 2 | 50.00 | | |
| | F | | | 1 | 25.00 | | | 1 | 25.00 | | | 2 | 50.00 | | |
| | Total | | | 1 | 25.00 | | | 3 | 75.00 | | | 4 | 100.00 | 480 | .83 |
| SL | M | | | | | 1 | 10.00 | 2 | 20.00 | | | 3 | 30.00 | | |
| | F | | | | | 4 | 40.00 | 3 | 30.00 | | | 7 | 70.00 | | |
| | Total | | | | | 5 | 50.00 | 5 | 50.00 | | | 10 | 100.00 | 660 | 1.52 |
| WAO | M | 1 | 1.35 | | | 19 | 25.68 | 15 | 20.27 | 1 | 1.35 | 36 | 48.65 | | |
| | F | 2 | 2.70 | | | 20 | 27.03 | 16 | 21.62 | | | 38 | 51.35 | | |
| | Total | 3 | 4.05 | | | 39 | 52.70 | 31 | 41.89 | 1 | 1.35 | 74 | 100.00 | 1536 | 4.82 |
| No. Resp. to Eth by racial groups | M | 2 | .74 | 5 | 1.84 | 58 | 21.32 | 96 | 35.29 | 1 | .37 | 162 | 59.56 | | |
| | F | 2 | .74 | 7 | 2.57 | 51 | 18.75 | 48 | 17.65 | 2 | .74 | 110 | 40.44 | | |
| | Total | 4 | 1.47 | 12 | 4.41 | 109 | 40.07 | 144 | 52.94 | 3 | 1.10 | 272 | 100.00 | 9053 | 3.00 |
| Race total N | | 50 | | 319 | | 1216 | | 7296 | | 172 | | 9053 | | | |
| No Response Totals | | 4 | | 12 | | 109 | | 144 | | 3 | | 272 | | | |
| % of race category not responding | | | 8.00 | | 3.76 | | 8.96 | | 1.97 | | 1.74 | | 3.00 | | |

## TABLE 6

### Reliability and Validity of Self ID v. Visual Observation

| | Total N Self ID plus Vis. Obs. | Total N Disagreement | Sex Disagree | Race Disagree | Sex and Race Disagree | Obs. disagree but one agreed with Self ID | Obs. agreed but Self ID differed |
|---|---|---|---|---|---|---|---|
| AT | 747 | 17  2.28% | 5  .67 | 10  1.34 | 2  .27 | 13  1.74 (6-sex) | 4  .54 (1-sex) |
| BN | 503 | 46  9.14 | 25  4.97 | 19  3.78 | 2  .40 | 30  5.96 (23-sex) | 16  3.18 (4-sex) |
| CH | 298 | 29  9.73 | 10  3.36 | 19  6.38 | | 23  7.72 (10-sex) | 6  2.01 |
| DA* | | | | | | | |
| DE* | | | | | | | |
| NY | 840 | 105  12.50 | 18  2.14 | 84  10.00 | 3  .36 | 74  8.81 (16-sex) | 31  3.69 (5-sex) |
| PH | 465 | 22  4.73 | 11  2.37 | 10  2.15 | 1  .21 | 18  3.87 (11-sex) | 4  .86 (1-sex) |
| SF* | | | | | | | |
| SE | 480 | 27  5.62 | 8  1.67 | 18  3.75 | 1  .21 | 11  2.29 (8-sex) | 16  3.33 (1-sex) |
| SL | 309 | 11  3.56 | 7  2.26 | 4  1.29 | | 6  1.94 (5-sex) | 5  1.62 (2-sex) |
| WAO | 1079 | 63  5.84 | 13  1.20 | 47  4.36 | 3  .28 | 39  3.61 (13-sex) | 24  2.22 (3-sex) |
| TOTAL | 4721 | 320      6.78 | 97     2.06 | 211     4.47 | 12    .25 | 214      4.53 | 106      2.24 |
| % of total obs. | | 6.78 | | | | | |
| % of total disagreem. | | | 30.31 | 65.94 | 3.75 | 66.88 | 33.12 |

*These regions wanted to visually identify Hispanics as well as B.W.O; results presented in Tables 7 and 8.

and 211 (65.94%) involved race. The remaining 12 disagreements (0.25%) involved both race and sex. The second column of the table indicates the total number of disagreements in each regional office city as well as the percent of the total number of observations made in that city which that number represents (e.g., in Atlanta paired visual observations were obtained on 747 applicants and on 17, or 2.28%, of these there was disagreement between one or both observers and the self-identification). The next three columns in the table break out the total disagreements into those relative to sex, those relative to race, and those few which included both the race and sex of an individual. It should be noted that disagreements relating to sex accounted for a large proportion of the total number of disagreements in most of the regions; in Boston, Philadelphia, and St. Louis, these accounted for more than half of the disagreements. Undoubtedly heavy winter clothing, unisex hair styles and the fact that observations were to be made quickly and as unobtusively as possible contributed significantly to this phenomenon. In any case, if sex disagreements are ignored, the nationwide disagreement rate is reduced to 4.72% (this includes the 12 cases on which disagreement occurred on race as well as sex). Therefore, it can be stated that in slightly more than 95% of this particular sample, self-identification and visual observation are in agreement. This constitutes a rough (and conservative) indication of the validity of the data obtained from the questionnaire and suggests that self-identification is a feasible way to obtain the race, sex, and ethnic origin of applicants for Federal employment.

Examination of the 320 disagreements in terms of disagreement between observers (i.e., one observer agreed with the self-identification, the other did not) reveals that this occurred in 214 of the 320 cases. Ninety-seven of these inter-observer disagreements were relative to the sex of an individual. Possible causes for these disagreements have already been offered. The 214 disagreements between observers account for 4.53% of the 4,721 paired visual observations obtained throughout the nation. Thus, it can be loosely stated that visual observation of race and sex was consistent or "reliable" about 95% of the time for this group of observers. Assuming that most of the sex disagreements would not have occurred if the observers had been permitted to study each person more closely, only the

117 race disagreements remain. These account for 2.48% of the 4,721 paired visual observations and inter-observer consistency, or reliability rises to 97.52%.

Another estimate of the validity of visual observation can be obtained using only the 106 cases in which the two observers agreed but their observations did not agree with self-identification. This estimate is much less conservative than the validity based upon the total number of disagreements since it assumes that errors made by only one of the two observers don't really count, that self-identification in agreement with only one visual observation constitutes a valid classification of an individual's race and sex. Under these conditions, discrepancies between visual observations and self-identification occurred in only the above mentioned 106 (2.24%) of the 4,721 cases, which produces a "validity" of 97.76%. It would be imprudent to state positively which of the two variables—self-identification or visual observation—is the true criterion measure. Were the errors due to the inability of the observers to identify race, especially "mixtures," accurately or were they due to the unwillingness of some individuals to identify themselves truthfully? The only meaningful statement which can be made is a repetition of what has already been stated— it would appear that self-identification is a feasible way to collect race, sex, and ethnic origin data on applicants for Federal employment.

## Dallas, Denver, and San Francisco disagreements

As previously noted, the conditions under which data were collected in Dallas, Denver, and San Francisco were somewhat different than in the remaining seven regions and the Washington area office. Specifically, these cities wished to identify ethnicity as well as race. The results of these efforts are presented in Tables 7 and 8.

Table 7 presents a summary of the disagreements between visual-observation and self-identification in Dallas. Observations in Dallas were recorded by sex (M or F), race (I, A, B, W, O) and ethnicity (H or NH). Of the 395 paired visual observations obtained, 35 (8.86%) were in some disagreement with the self-identification. In six of these cases the disagreement involved only the sex of an individual. There were 15 instances of disagreement relative to race and 20 cases of disagreement relative to race and 20 cases

TABLE 7

DALLAS Disagreements

| | Total-N Self ID plus vis. obs. | Total N disagreement | Sex disagreement | Race disagreement (A, I, B, W, O) | Ethnic disagreement 1[a/] | Ethnic disagreement 2[b/] | more than 1 area of disagreement | Observers disagreed | Observers agreed - Visual observation didn't |
|---|---|---|---|---|---|---|---|---|---|
| DA | 395 (% of 395) | 35 8.86 | 6[c/] (% of 35) 1.52 17.14 | 15 3.80 42.86 | 13 3.29 37.14 | 7 1.77 20.00 | (6)[d/] 1.52 17.14 | 22 5.57 62.86 | 13 3.29 37.14 |

Total Hispanics visually identified = 28
Number missed = 13
% missed = 46.43

a/ Self ID was "H" - visual observation was "NH"

b/2 Self ID was "NH" - visual observation was "H"
(A, I, B, W, O)

c/ In these 6 cases the disagreement was only on sex

d/ Dallas identified race and ethnicity - these 6 cases represent disagreement on both race and ethnicity - and have been included in both counts.

-12-

TABLE 8

DENVER and SAN FRANCISCO Disagreements

| | Total N Self ID plus vis. obs. | Total disagreement | Sex disagreed | Race disagree A, I, B, W, | Ethnicity disagree 1[a] | Ethnicity disagree 2[b] | disagree on R & S | Observers agreed - Self ID did not[c] |
|---|---|---|---|---|---|---|---|---|
| DE | 378 | 41  10.85 | 22  5.82 | 10  2.65 | 4  1.06 | 3  .79 | 2[d]  .53 | 41  10.85 |
| SF | 1093 | 84  7.68 | 2  .18 | 16  1.46 | 48  4.39 | 18  1.65 | | 84  7.68 |
| TOTAL | 1471 | 125 | 24 | 26 | 52 | 21 | 2 | 125 |
| % of total obs. | | 8.50 | 1.63 | 1.77 | 3.54 | 1.43 | .14 | |
| % of total disagreem. | | | 19.20 | 20.80 | 41.60 | 16.80 | 1.60 | |

Total Hispanics
DE  16  % missed[a] = 25.00 (n=4)
SF  64  % missed = 75.00 (n=48)

Denver and San Francisco used visual observation categories   M-F and I, A, B, W, H

[a]/ 1 Self ID was "H"-Visual observation was "NH"   9 were OM-H or OF-H who were observed as WM or WF

[b]/ 2 Self ID was "NH"-Visual observation was "H"   1 was AM-H called WM

c/ Only 1 visual observation recorded - 2 observers collaborated and agreed on the ID

d/ 
| Self ID | Vis obs. |
|---|---|
| IM | WF |
| WM | HF |

where ethnicity was in question. Included in both of these counts are the six individuals on whom disagreement occurred relative to race and ethnicity. Thirteen persons identified themselves as being of Hispanic origin but were "missed" by one or both observers; these represent 46.43% of the 28 Hispanic applicants in Dallas. An additional seven persons were visually observed as Hispanic but identified themselves as non-Hispanic.

Table 8 presents comparable results for Denver and San Francisco. In these two cities only one observation was recorded, the result of a joint agreement between the two observers. The observation categories for race/ethnicity were I, A, B, W, or H (for Hispanic). The total number of disagreements in Denver was 41 (10.85% of the 378 visual observations made). Twenty-two of these related to the sex of an individual. Of the 84 disagreements in San Francisco (7.68% of the 1,093 observations made) only two were relative to sex. The remaining disagreements in both cities related to race or ethnicity. The percentages of these relative to the total number of visual observations were not high but the identification of those of Hispanic origin merits some discussion, as for Dallas. Note that in Denver 16 applicants had identified themselves as being of Hispanic origin; four of these (25%) were "missed" by the observers. In San Francisco there were 64 self-identified Hispanics; 48 ((75%) of these were "missed." An additional three applicants in Denver and 18 in San Francisco were visually observed as Hispanics but were not of Hispanic origin by self-identification.

These results would seem to indicate that visual observation is not an accurate means of identifying ethnic origin, assuming of course, that most, if not all, of those individuals who indicated that they were of Hispanic origin were being truthful. Undoubtedly one of the reasons why the visual observations were so inaccurate is that race frequently overrides ethnicity. Whereas it is often not too difficult to identify a

person of, for example, Mexican-American heritage, the identification of someone who is, White, Black, or Asian as also being of Hispanic origin is next to impossible in most cases. It may be concluded, therefore, that self-identification is probably the only feasible way to collect ethnicity data on applicants for Federal employment.

## Concluding notes

The foregoing study has demonstrated the feasibility as well as the advisability of collecting race, sex, and ethnic origin data from applicants for Federal employment by self-identification only in assembled examination situations. In such situations, the appropriate questionnaire can be quickly and efficiently administered to groups sitting for a written test and can be collected immediately upon its completion. In unassembled examining situations, that is, when individual applicants are asked to mail the questionniare directly to a designated office such as the Personnel Research and Development Center, response rates have been too low (60-85%) for any solidly meaningful use in determinations of adverse impact for compliance with the Uniform Guidelines. Strategies to improve the response rates for unassembled examinations are currently being developed.

### REFERENCES

Guilford, J. P. Fundamental statistics in psychology and education. New York: McGraw-Hill Book Company, 1965.

Northrop, L. C. Pilot study No. 1 for the collection of race, sex, and ethnic origin data in Federal testing. Washington, D.C: U.S. Civil Service Commission, 1979.

U.S. Civil Service Commission, U.S. Department of Labor, U.S. Department of Justice, & U.S. Equal Employment Opportunity Commission. Uniform guidelines on employee selection procedures (1978). Washington, D.C.: Federal Register, August 25, 1978, Part IV.

APPENDIX A

ABSTRACT AND SUMMARY OF FINDINGS:  PILOT STUDY

ABSTRACT AND SUMMARY OF FINDINGS

1. Six questionnaires, differing only in the wording of an introductory information paragraph, were developed for the collection of race, sex, and ethnic origin data on applicants taking Federal employment tests. In addition, visual identifications of the sex and race (Black, White, Other) of applicants were made and recorded by two test development staff members in each examination room.

2. Sex, race, and ethnic data were collected on 2,250 applicants taking the PACE in May 1977, at the Washington area office. The percentages of the five different racial groups among the 2,196 people (97.6%) who responded to the questionnaire, by each individual's self-identification, were: Blacks, 23.6: Whites, 73.4; American Indian and Alaskan natives, 0.5; Asians and Pacific Islanders, 1.5; Other, 1.0. The percentages by sex were males, 46.5 and females, 53.5. Only 1,971 applicants (87.6%) responded to the question on ethnicity. Of these 49, or 2.5%, were of Hispanic origin; 97.5% were of non-Hispanic origin.

   Of further interest is the breakdown by sex of the Black and White groups of applicants. White males and females were present in approximately equal numbers (802 and 809 respectively). There were, however, considerably more Black females (328) than Black males (190).

3. Forty-seven people (or 2.09%) refused to respond to the questionnaire. An additional seven persons (or 0.3%) identified themselves only as to sex.

4. There was no overall statistically significant difference among the forms; i.e., the manner in which the request for the information was worded and explained did not affect individuals' willingness to supply the information.

5. Tabulation of data collected after one week of testing revealed that about 12% of the applicants were omitting the ethnicity question. This question had been placed on the right-hand side of the page, apart from the questions on race and sex. To determine whether or not this high omit rate was due to the question being overlooked, a second version of each of the sex questionnaires was produced, placing the ethnic question closer to the other two questions on the page. In addition, a third version of Form A was produced by inserting the word "Spanish" after Hispanic to clarify the meaning of the question. The omit rate for the revised forms was 8.2%, as compared to 12% for the original versions. The high omit rate for this question should be investigated further to determine whether it was due to failure to see the question or to a lack of understanding of the question.

6. The overall reliability and validity of self-identification v. visual observation to determine the race and sex of applicants was good, although neither a survey of state and local governments conducted by the Personnel Research and Development Center (Wing and Nester, 1977) nor published literature provided any statistics for comparison. In only 1.7% of the cases did the two observers disagree with each other in their observations. In another 1.4% of the cases the two observers agreed in their visual identifications but these did not agree with the self-identifications. Another 0.7% of the applicants made useless responses of one sort or another which could not be compared with the visual observations.

APPENDIX B

RACE, SEX, AND ETHNIC DATA COLLECTION FORM

# U.S. Civil Service Commission



DO NOT FOLD, STAPLE, PUNCTURE OR PAPER CLIP THIS FORM.

# SURVEY FOR THE COLLECTION OF RACIAL AND ETHNIC DATA OF PERSONS APPLYING FOR FEDERAL EMPLOYMENT

FORM APPROVED
OMB NO. 50-R060·

**GENERAL INSTRUCTIONS:**
(1.) *Use only a Number 2 (or softer) lead pencil.* (2.) Completely blacken the oval corresponding to your response choice. (3.) Completely erase any mistakes. (4.) Make no marks outside of the response areas.

**1**
NAME: _____ Please Print

DATE: _____ Please Print

**2** SOCIAL SECURITY NUMBER (SSN)

**3** EXAMINING OFFICE CODE (EOC)

**NOTE: BE SURE TO WRITE IN YOUR NUMBERS AS WELL AS BLACKENING THE OVALS.**

**4** Please categorize yourself in terms of the race, sex and ethnicity categories below. sure to blacken ONE oval for your response to each of the three categories. (First read definitions of subcategories.)

## DEFINITIONS

The racial and ethnic categories for Federal statistics and administrative reporting are defined as follows:

**ETHNICITY:**
HISPANIC. A person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.

**RACE:**
AMERICAN INDIAN or ALASKAN NATIVE. A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

ASIAN or PACIFIC ISLANDER. A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, India, Japan, Korea, the Philippine Islands, and Samoa.

BLACK. A person having origins in any of the black racial groups of Africa.

WHITE. A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

**PRIVACY ACT NOTICE**
**GENERAL**

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974). December 31, 1974, for individuals completing Federal records and forms that solicit personal information.

**AUTHORITY**

Section 717 of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972.

**PURPOSE AND ROUTINE USES**

To further the principles of equal employment opportunity, Federal agencies are required to assure that any selection procedures used as a basis for employment decisions (including tests and other examining methods) are not affected by discrimination on the basis of race, color, religion, sex, or national origin. As part of the effort required to assure nondiscrimination in selection processes, Federal agencies are required to collect sex, racial, and ethnic data on applicants for Federal employment for group statistical analyses purposes. Your individual record will not be disclosed for any purpose.

**EFFECTS OF NONDISCLOSURE**

Providing this information is voluntary and there will be no adverse effect on you for not providing the information requested.

**INFORMATION REGARDING DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER UNDER PUBLIC LAW 93-579, SECTION 7 (b)**

Solicitation of the Social Security Number (SSN) by the United States Civil Service Commission is authorized under provisions of Executive Order 9397, dated November 22, 1943. It is used to relate this form with other records that you file with the Civil Service Commission.

| RACE: (Blacken one oval) (RCE) | SEX: (Blacken one oval) (SEX) | ETHNICITY: (Blacken one oval) (ETH) |
|---|---|---|
| ◯ American Indian or Alaskan Native (1) | ◯ Male (1) | ◯ Hispanic Origin (1) |
| ◯ Asian or Pacific Islander (2) | ◯ Female (2) | ◯ Not of Hispanic origin (2) |
| ◯ Black (3) | | |
| ◯ White (4) | | |
| ◯ Other (5) | | |

CSC Form 1289—A (Temp
Expires 9/78 Revised 11/7

APPENDIX  C

U.S. POPULATION CHARACTERISTICS

Minority Percentages From 1970 Census
Standard Metropolitan Statistical Areas
Based on Total U.S. Population

|  | % Black | % American Indian | % Asian/P.I. | % Other Minority |
|---|---|---|---|---|
| Total U.S. | 12.03 | 0.22 | 0.86 | 0.40 |
| Atlanta | 22.34 | 0.06 | 0.11 | 0.07 |
| Boston | 4.61 | 0.08 | 0.58 | 0.21 |
| Chicago | 17.64 | 0.13 | 0.57 | 0.38 |
| Dallas | 15.89 | 0.32 | 0.14 | 0.33 |
| Denver | 4.09 | 0.35 | 0.58 | 0.43 |
| New York | 16.29 | 0.11 | 0.92 | 0.68 |
| Philadelphia | 17.52 | 0.08 | 0.25 | 0.27 |
| San Francisco | 10.62 | 0.39 | 5.29 | 0.90 |
| Seattle | 2.93 | 0.67 | 2.02 | 0.36 |
| St. Louis | 16.03 | 0.08 | 0.19 | 0.12 |
| Washington, DC | 24.60 | 0.12 | 0.63 | 0.39 |

Comparable figures are not available for persons of Hispanic origin

Source:

U.S. Department of Commerce
Bureau of the Census, 1970
Characteristics of the Population, Vol. 1
  Part 1, United STates Summary, Section 1
  Table 67

### Percentage of Persons Age 18 Years and Older
### in Selected States who are either Black or of Hispanic Origin
#### (States containing Regional Office Cities)
#### 1976

| | Black | Hispanic Origin |
|---|---|---|
| Total U.S. | 10.12% | 4.30% |
| Georgia | 24.71% | 0.45% |
| Massachusetts | 2.72% | 1.04% |
| Illinois | 12.81% | 2.95% |
| Texas | 10.48% | 16.76% |
| Colorado | 2.71% | 8.54% |
| New York | 11.40% | 6.66% |
| Pennsylvania | 7.76% | 0.72% |
| California | 7.16% | 12.73% |
| Washington | 1.94% | 1.61% |
| Missouri | 10.62% | 0.54% |
| Washington, DC | 66.67% | 2.18% |

Source:

U.S. Department of Commerce
Bureau of the Census
Current Population Reports:
  Demographic, Social, and
  Economic Profile of States:
  Spring, 1976

P-20 No. 334, January, 1979

---

### Percentage of Persons of Hispanic Origin
### in the
### Total U.S. Population and selcted States

| Total population | 5.6% |
|---|---|
| California | 16.5% |
| New York | 8.7% |
| Texas | 20.9% |
| Remainder of U.S. | 2.1% |

Source: as above

Persons of Spanish Origin in the
U.S. March, 1978

P-20 No. 339, June, 1979

* U.S.G.P.O. 620-239/1302-5525



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

July 1, 1983

<u>HAND-DELIVERED</u>

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

Re:  <u>Luevano v. Devine</u>:  <u>Reporting Problems</u>

Dear Barbara:

This letter discusses problems with the information we have received from OPM, in the hope that we can get complete information shortly and have our long-overdue monitoring meeting the week of August 8.

<u>First</u>, the statistical reports A-1 and A-3 which we have received are not adequate to comply with ¶¶ 24 and 25 of the Consent Decree.  They do not bear any resemblance to the draft reporting forms over which I labored for so long; was all that work wasted?  Part of the problems we see will be redressed by our agreement that OPM will provide the print-tapes for data in formats A-2, A-3, and A-4, and that we will have Dr. Mann prepare the necessary computer runs from these tapes.  His printouts will suppress separate data for job categories in which there has been no hiring activity, or in which there has been too little activity to be of interest, so that we are not buried in 15,000 pages of paper, most of which are filled with zeros.  However, the following problems remain:

a) We need to have written confirmation of the complete situation at the Federal Deposit Insurance Corporation.  Jim Green's letter of June 22 indicated that he was still checking.  Is there a similar problem for the State Department, which also uses symbols other than "GS"?

b) We know that some competitive procedures were used for filling GS-5 and GS-7 entry-level positions in former PACE job categories during the reporting period, but we have not been given the information required by ¶ 25(a) at p. 41:

ATTACHMENT J

(a) The number of non-Hispanic white applicants, the number of black applicants, and the number of Hispanic applicants for a GS-5 or GS-7 entry-level job category listed in Appendix A which is filled on the basis of a competitive procedure;

c) The statistical reports do not have any space for appointments under an alternative examining procedure which is administered by OPM, and not delegated to an individual agency. I do not think that any such procedures are now in operation---and would appreciate written confirmation that my impression is accurate---but we have to make sure that such information is captured and reported in the future, to meet the requirements of ¶ 25(b) of the Consent Decree at pp. 41-42:

(b) The number of non-Hispanic white applicants, the number of black applicants, and the number of Hispanic applicants who were appointed into any job category listed in Appendix A for which there is such an alternative examining procedure. This information shall be provided on an overall basis, and shall also be broken down by selection procedure and by each special program. Each of the above breakdowns shall be further broken down by the grade level of the appointments.

d) The formats for the printouts prepared by OPM do not contain any space for reporting conversions of Schedule B appointees to career status, or for recording their promotions to higher grade levels. While I understand that this had not yet occurred by the end of the reporting period, we need to address this question now so that the information will be captured and reported without problems in the future.

Second, OPM has not provided plaintiffs with information required by ¶¶ 24(c) and 25(c) of the Consent Decree, at pp. 41-42. These subparagraphs are almost identical, and ¶ 24(c) is set forth here to show the substance of both:

(c) Each agency shall provide OPM with a detailed statement describing its efforts to maximize use of each of the special programs described in ¶¶ 14 and 16.

These reports are now six months overdue, and we have to review them for the monitoring meeting.

Third, OPM has not complied with ¶ 26 of the Consent Decree at p. 42. This paragraph provides:

26. As early as possible in the course of the development of an alternative examining procedure, OPM and/or the agency involved shall provide to plaintiffs an accurate summary of the development plan, including a description of the type of procedure contemplated and of the design of the validation study, or of a substantial change in previously submitted plans. OPM shall transmit semi-annually to plaintiffs the summaries it has received from other agencies, and those which it has itself developed. Plaintiffs and their experts may review and comment upon the summaries, and make such suggestions for the improvement as seem appropriate. OPM and/or the agency involved shall consider such comments, and shall notify plaintiffs of the ultimate decision on the matters commmented upon. Any failure by plaintiffs to provide comments shall be given no weight in any enforcement proceedings under the provisions of paragraph 17.

On June 24, 1983 we received the first reports made under this provision. Plaintiffs have the following problems:

a) They are incomplete. We know that CRESS was used by the Social Security Administration, and I understand that it was in use when the Consent Decree went into effect. We have not received any report, and OPM's commencement of work on a replacement does not eliminate our need for the report. We also know that FDIC used an alternative examining procedure for bank examiners, and that this was in effect when the Consent Decree went into effect. Whether or not FDIC was hiring at that time --- and Jim Green's June 22, 1983 letter states that it was not hiring for this position--- ¶ 26 required the information on the procedure to be provided. Since we know of these two examples, we think there may be others.

b) Plaintiffs have two serious problems with the Computer Specialist GS-334 alternative examining procedure information reported to us on June 24, 1983 as an attachment to Jim Green's letter. This procedure's development was completed in August 1981, and it was put into use in October and November 1982, in plain violation of the prompt-reporting provisions of the Consent Decree. In addition, the two-page boilerplate given to us would be insufficient even for a procedure at a very preliminary stage of development, and it is hard to believe that this is all OPM has available for a completed procedure in actual use. My understanding has always been that OPM did formal test development reports prior to operational use of any procedure; we need full information, including the adverse-

impact data required by the Uniform Guidelines. Such
data had to be compiled for the purpose of the test
development study itself, and there is no need to await
the full reports for the second half of 1982. The viola-
tion of the prompt-reporting provisions of ¶ 26 will be
taken up at the Monitoring Committee meeting, and I am
not asking you to respond to it now; all I am now asking
is that you get us the additional information we need.

c) Finally, the two-page descriptions of the
alternative examinations still under development---Claim
Examining and Claims Representative Social Security Posi-
tions, Tax Technician, Internal Revenue Officer, and Customs
Inspector---contain too little real information and too
much boilerplate. One illustration should suffice. The
Job Analysis, which is a critical part of test development
and validation under the Uniform Guidelines and will be a
crucial factor in any enforcement proceeding arising from
unredressed adverse impact under the Consent Decree, is
described in identical fill-in-the-blanks language for
each of the five alternative examinations, including the
one already in use:

1. Job Analysis. A job analysis was conducted
to determine the knowledges [sic], skills, abilities
and other characteristics (KSAO's) required of
workers in order to successfully perform [sic] the
duties and behaviors of the_____.
This consisted of a review of materials from a
variety of sources including previous studies of
the occupation(s) and the use of panels of subject-
matter experts (SME's) representative of the_____
_____to identify, rate importance, and
link job and worker requirements. This resulted in the
identification of_____major KSAO's required of
_____.

The only variations are that the second reference to KSAO's
is sometimes spelled out, and that the Social Security
boilerplate refers to two occupations while the others
refer to only one. The identical language could be used
equally well for any occupations of which one could think:
peanut sheller, gas station attendant, judge, Mayor,
accountant, bus driver, janitor, or whatever. It says
nothing, and conceals information rather than revealing it.
The purpose of this provision of the Consent Decree is to
enable plaintiffs to point out problems early enough in
the development of an alternative examining procedure to
make them avoidable, so that we can prevent problems from
occurring. There are only two places to take care of a
problem: before the adverse impact arises, where the

procedure in question appears likely to cause adverse
impact and there are less discriminatory ways of
accomplishing the desired end, or during an enforcement
proceeding when the procedure is enjoined. Paragraph 26
creates the first opportunity, in an effort to minimize
resort to the latter and to avoid the time and expense of
trials over validity. These goals are completely defeated
by OPM's resort to boilerplate. These descriptions need to
be tossed out and redone in detail, from scratch, so that
our experts can fulfill their function.

Fourth, we have not been given any information about the
specific manner in which various government agencies have developed
plans to use their Schedule B appointment authority. While such
authority is not an alternative examining procedure under the
Consent Decree and does not start running the time period for
termination of the Court's jurisdiction as to any job category for
which it is used, we have previously been informed by you and by
Paul Blankenstein that such information would be provided.

Fifth, both sides agreed that the use of Schedule B
appointment authority for particular job categories may be
permissible until hiring picks up enough to warrant the develop-
ment of an alternative examining procedure for the job category
in question, but only if the Schedule B hires are treated in
precisely the same manner as PACE hires were formerly treated,
in terms of conversions to career status, promotions, career
ladders, civil service retention rights, etc., and if there were
no discrimination in making the Schedule B appointments. We need
to know whether these conditions are in fact being met, and also
need to know the mechanisms by which agencies are now using the
Schedule B authority. The information in question is as follows:

a) any guidance provided by OPM to agencies with
respect to the manner in which Schedule B appointments
were to be made, and on the treatment to be accorded
the Schedule B appointees;

b) applications by agencies to OPM for approval
of the use of Schedule B authority, and OPM's actions
on such applications;

c) the means by which Schedule B appointments are
being made;

d) any controls used to prevent racially disparate
selections; and

e) all statistical information now in hand on
Schedule B appointments to date (we should not have to
wait for the extended periods required for CPDF data) and,
in the future, on conversions, terminations, promotions, etc

Sixth, one of the problems we will have to discuss at the monitoring committee meeting is the extremely long delay between the end of a reporting period and the provision of information to us.  If the full-year data reported on October 1---according to the timetable in your June 14 letter---shows problems, the next reporting year will be virtually over before any corrective actions could be taken.  The delay is long enough here to guarantee a doubling of compliance problems by letting bad situations continue for almost two years before we are able to do anything to correct them.

Seventh, one of the orders signed by the Court on November 19, 1981 provided that the General Accounting Office would report separately from OPM, through you.  To date, we have received nothing from GAO.

For reasons of scheduling, as well as for the reason that we are not yet anywhere near having the information we need for our long-overdue monitoring committee meeting, we suggest the week of August 8 for the meeting.  We should plan on a multi-day meeting.

I would appreciate hearing from you promptly about the additional information we need, and in particular the nonstatistical information where we seem to be having the biggest problems.  We have been asking for this information for so long, and have now gotten so little, that, if there is any problem in providing it soon, I think we may need to petition the Court for a timetable under ¶ 29 of the Consent Decree.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  James S. Green, Esq.

August 4, 1983

AGENDA FOR FIRST MEETING OF THE MONITORING COMMITTEE
IN LUEVANO v. DEVINE, TO BE HELD AUGUST 9, 1983

| | Consent Decree | |
|---|---|---|
| | Paragraph(s) | Page(s) |

## A. Problems in Nonstatistical Reporting

1. Test development reports (see my 7/1/83 letter, third item, my 7/15/83 letter, p. 2, and my 8/4/83 letter, seventh item) — 26 — 42

2. Efforts to use special programs (see my 8/1/83 letter, second item, and my 8/4/83 letter, sixth item) — 24(c),25(c) — 41-42

3. Specific means by which various government agencies are using their Schedule B authority (see my 7/1/83 letter, fourth item, and my 8/4/83 letter, fifth item) — 27 — 42-43

4. Guidance provided by OPM to agencies on use of Schedule B authority (see my 7/1/83 letter, fifth item, and my 8/4/83 letter, fifth item) — 27 — 42-43

5. Delays in reporting nonstatistical information (see my 7/1/83 letter, sixth item) — 29 — 43

6. Statistical information from the General Accounting Office (see my 7/1/83 letter, seventh item) — 24-27 — 40-43

7. Request for FPM Letter asking agencies to make reports on use of special programs, issued a couple of weeks after our oral reminders that we needed these reports (see my 7/15/83 letter, third paragraph) — 27 — 42-43

## B. Problems in Statistical Reporting

1. Our need to get usable tapes from OPM (see my 8/4/83 letter, first item) — 27 — 42-43

2. The inclusion of FDIC "GG" jobs with "GS" jobs on statistical reports (see my 7/1/83 letter, first item, part (a)) — 24-25 — 40-42

3. The inclusion of other agencies with different nomenclatures for their PACE jobs on statistical reports (see my 7/1/83 letter, first item, part (a)) — 24-25 — 40-42

ATTACHMENT K

|  | Consent Decree |  |
|  | Paragraph(s) | Page(s) |

4. The numbers of applicants of each race taking a competitive procedure other than the PACE (see my 7/1/83 letter, first item, part (b), and my 8/4/83 letter, third item at p. 3)     25     41-42

5. Appointments made under non-PACE competitive procedures administered by OPM (see my 7/1/83 letter, first item, part (c), and my 7/15/83 letter, pp. 2-3)     25     40-42

6. Reporting of conversions of Schedule B appointees to career status, and reporting of their promotions to higher grade levels (see my 2/25/83 letter, item 6 and attached Table Form G, and see my 7/1/83 letter, first item, part (d))     25, 27     41-43

7. Delays in reporting statistical information (see my 7/1/83 letter, sixth item)     29     43

8. Statistical information from the General Accounting Office (see my 7/1/83 letter, seventh item)     24-27     40-43

C. Problems of Substantive Compliance, Other Than Reporting

1. PACE job categories where appointments from the PACE registers resulted in disparate impact against blacks and/or Hispanics, where there was no adequate use of the special programs (see my 8/4/83 letter, second item)     8(b)(1)     7
     12(b)     19-20

2. PACE job categories where appointments under delegated examining authorities resulted in probable disparate impact against blacks and/or Hispanics, where there was no adequate use of the special programs (see my 8/4/83 letter, third item)     8(b)(2)     7
     8(b)(3)     7-9
     12(b)     19-20

3. Information on OPM's compliance with the recruiting requirements of the Consent Decree     16(e)     30

4. Information on OPM's coordination and monitoring of programs "to ensure that the class herein shall receive the greatest possible benefit of the special programs described above."     16(e)     30

|  |  | Consent Decree |  |
|  |  | Paragraph(s) | Page(s) |
| 5. | OPM's actions to provide notice of the special programs, etc., to class members | 16(e) | 30 |
| 6. | OPM's use, if any, of the mailing list required by the Consent Decree, and its compliance with the semi-annual mailing requirement | 22 | 39-40 |



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET. NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

September 16, 1983

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

      Re: <u>Luevano v. Devine</u>

Dear Barbara and Jim:

      This is the fifth letter following up on our August 9, 1983 Monitoring Committee meeting. The four earlier letters, and the topics they covered, were as follows:

      a) My August 22, 1983 letter enclosing Dr. Mann's letter specifying the steps OPM should take before giving us the next set of data processing tapes. Taking these steps would cost the government little time and effort, but would save it a great deal in expert fees and computer costs.

      b) Barry's August 23, 1983 letter on the test development reports. At your request after you received this letter, plaintiffs have agreed to extend the conciliation period under the Consent Decree on this issue to and including October 19, 1983.

      c) My August 24, 1983 letter setting forth adverse-impact calculations based on the data for the first six months of the Consent Decree's operation.

      d) My August 26, 1983 letter summarizing our agreements and possible areas of disagreement on the use of Schedule B appointment authority.

We have not yet received a response to any of these letters.

ATTACHMENT L

Barbara L. Ward, Esq.
James S. Green, Esq.
September 16, 1983
Page 2


This letter lists the remaining areas of agreement reached at
our August 9 meeting, in the order of the agenda items:

### A. Problems in Nonstatistical Reporting

1. **Test Development Reports:** Basically covered in
Barry's August 23, 1983 letter. However, you also agreed to
contact the FDIC for information on its Bank Examiner AEP, and to
report it to us. We have not heard anything further.

2. **Efforts to Use Special Programs:** As you agreed,
you have provided us with a copy of the June 23, 1983 FPM letter
asking agencies to report their use of the special programs, if
any. The due date for responses was August 15, 1983. At our
Monitoring Committee meeting, you and Jim told us that it would
take a week or so after that date for us to get the information.
We have not yet received it.

3. **Specific Means by Which Agencies Are Using
Their Schedule B Authority:** Covered in my August 26, 1983 letter.

4. **Guidance Provided by OPM to Agencies on Use of
Schedule B Authority:** Covered in my August 26, 1983 letter. You
and Jim agreed that we could have access to the stack of authoriza-
tion requests and OPM actions, if we so desired.

5. **Delays in Reporting Nonstatistical Information:**
In the future, we should receive by June 1 the nonstatistical data
for the entire previous year.

6. **Nonstatistical Information from GAO:** You assured
us that you had been after GAO for the information, and that you
should have it in about a month. It has now been more than a month,
and we have still not received anything.

7. **Request for FPM Letter Asking Agencies to
Report Use of Special Programs:** You gave it to us.

### B. Problems in Statistical Reporting:

1. **Our Need to Get Usable Tapes from OPM:** Covered
by my August 22, 1983 letter. We have not gotten a response.

2. **The Inclusion of FDIC "GG" Jobs with "GS" Jobs:**
Jim informed us that a rush letter requesting information from
FDIC was sent to that agency a couple of weeks before our August
9, 1983 meeting, and that it will be provided as a separate report
because it is too late to include it in the computerized reporting
system for 1982 data. It is too late to include such information
in the computer system for the last half of 1982. It will be in
the report for the first half of 1983, and in later reports.

3. <u>The Inclusion of Data for Other Agencies With
Different Nomenclatures for Their PACE Jobs</u>: Jim informed us
that the only such agency in question is the State Department.
A letter similar to the FDIC's letter described above was sent
to the State Department on the same day the letter was sent to
the FDIC. The results will be the same, and the State Department
data will be included in computer reports beginning with data
for the first half of 1983.

4. <u>The Numbers of Applicants of Each Race Taking
A Competitive Procedure Other than the PACE</u>: You and Jim told us
that OPM has the figures, but that they have to be analyzed and
broken down. Jim said that this would take a couple of weeks,
and that plaintiffs will then receive the data. We have not
yet gotten it.

Some individuals did not report their race on the forms.
You and Jim stated that you would get back to us quickly when you
have results showing the number of persons who did not respond
to the race-identification question. We have not yet heard anything.

To avoid problems of incomplete racial identification in the
future, plaintiffs proposed that the Social Security Numbers of
all competitors be recorded in the future, so that the Social
Security Administration can tell us the proportions of minorities
and of non-minorities at different scoring levels. We mentioned
that the Justice Department's Civil Rights Division and the EEOC
did this all the time. You agreed. We need to see the specifics
of what will be done.

5. <u>Appointments under non-PACE Competitive Procedures
Administered by OPM</u>: Jim informed us of the "asterisk" positions,
in which one can be hired either for a PACE slot or a non-PACE
slot. Only the PACE slots have career ladders going from GS-5
to GS-7 and (usually) beyond. Jim gave us a list of the "asterisk"
jobs.

Jim agreed with us that it was important to separate data
for PACE slots from data for non-PACE slots in the "asterisk"
positions. There has been no mixture in the reports to date,
because the PACE was still in use. Future mixture must be avoided.
<u>Question</u>: Will there be mixture in the data for the second half
of 1982, and thus for the full-year 1982 reports?

Jim said that he would try to figure out a way around this
problem, and would get back to us. We have not yet heard anything.

5A. "<u>Other Internal Placements</u>": This question arose at
the meeting. Jim told us that there was no cause for concern,
because virtually all of the "other" placements could be taken
to be in PACE slots. There would be no point to the placement

Barbara L. Ward, Esq.
James H. Green, Esq.
September 16, 1983
Page 4

otherwise. Jim said we should try to break it down, and said he would check on the burden involved, and would report back to us. You asked that that be done as soon as possible. We have not yet heard anything.

6. Reporting of Conversions of Schedule B Appointees: Covered by my August 26, 1983 letter.

7. Delays in Reporting Statistical Information: You and Jim told us that we would have the second-half 1982 data in September 1983. We have not yet received it. You asked if we also wanted a full 1982 report, and we said we did. In the future, we should get first-half data for a given reporting year by the end of that year, and second-half and full-year data by the following June 1. There is no way to speed up the six-month lag in obtaining data and reporting it out. We urged that some effort be made to get at least preliminary data for major hirers, like DOD and its agencies, because we could give input before the end of the reporting year when it looked as if problems were looming, and they might be able to take corrective action that would avoid compliance problems. There was no agreement on this, and we should discuss it again at our October 1983 meeting.

8. Statistical Information from GAO: Same as Part A, Item 6. We have still not received anything.

C. Problems of Substantive Compliance, Other Than Reporting

1. PACE Job Categories: Appointments from PACE Registers: We agreed that my August 4, 1983 letter, second item, set forth an incorrect standard for determining adverse impact. The correct standard, and a new list, were set forth in my August 24, 1983 letter. We have not received a response.

2. PACE Job Categories: Delegated Examining Authority Appointments: You and Jim think that there is a problem with the data. You were going to check Justice, and Jim was going to check with the other agencies. We have not yet heard anything.

3. Information on OPM's Compliance with the Recruiting Requirements of the Consent Decree: OPM has done no monitoring because there has been so little hiring. OPM did send out the lists of institutions. The EEOC has FEORP data which will show some recruitment information. At our October meeting, we should discuss whether OPM should at least monitor the agencies which are hiring.

4. Information on OPM's Coordination and Monitoring of Programs to Ensure that Class Members Will Benefit: Jim told us that OPM has told its area offices, job information centers, etc., of the special programs and that the Consent Decree has been posted in such offices. Nothing else has been done. We have the same suggestion as for item 3 above.

5. <u>OPM's Actions to Provide Notice of the Special Programs to Class Members</u>: The only thing done was sending out the original notice for the fairness hearings. You thought that the agencies should be providing the notice. We assume that reports of such agency notices will be part of the agency reports on the special programs. Otherwise, we will have a problem.

6. <u>OPM's Use of the Mailing List</u>: No use has been made, but OPM will rectify this soon. We have not heard of any mailings since then.

D. <u>Other</u>

1. <u>Reporting Year</u>: We agreed to make the calendar year the reporting year under the Decree. A draft Consent Order will be sent to you next week.

2. <u>PACE Basis for Adverse Impact</u>: Because the PACE was used for all but two months of 1982, the entire year will be considered a PACE year for purposes of adverse-impact analysis, except where there are AEP's.

3. <u>CRESS</u>: Jim informed us that this AEP has been junked, because 90,000 people applied, 20,000 were examined (including interview), 14 were hired, and 6 quit in the first year. One or two said the job was too complicated.

\*       \*       \*

If any of the above is not correct, please let me know by letter, so that we can avoid any future disputes concerning what was or was not said.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry Goldstein, Esq.
    John H. Erickson, Esq.

Enclosure

AGENDA FOR MEETING OF THE MONITORING COMMITTEE
IN LUEVANO v. DEVINE, OCTOBER 10, 1984

A. Presentation of text of draft report to Court

B. Problems with statistical reporting

    1. Delay in receiving GAO statistics

    2. Nonreceipt of up-to-date applicant information

        a) Schedule B data for each job, agency, and region

        b) AEP data for each procedure, job, agency, and region

    3. Schedule B data on those entering the second round of
competition for each job, agency, and region, and those
surviving the competition (each side broken down between
those hired under Schedule B and those competing from
some other source)

C. Schedule B problems

    1. Nonreceipt of statistical information (see above)

    2. Information on competitions, including the requested cor-
respondence between agencies and OPM local offices

    3. Reports under ¶ 26 as to means of competition

    4. New NTEU suit against OPM

    5. Decision to reach agreement or to litigate the conversion
and second-round-of-competition issues

    6. Decision to reach agreement or to litigate the issue whether
Schedule B can be considered an AEP

D. Use of Mailing List

E. Test Development Reports

    1. Absence of data on adverse impact from Computer Specialist
(Trainee) test, and failure to look for alternatives

    2. Present status of development of other tests identified to
plaintiffs in June 1983

    3. Other test development developments

ATTACHMENT M



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 12, 1984

<u>BY MESSENGER</u>

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: <u>Luevano v. Devine</u>: Redraft of Plaintiffs' First
> Report to the Court

Dear Barbara and Jim:

Although Barbara said that she had a number of additional comments, beyond those made at our October 10 meeting, I thought it would be useful to send you a redraft taking care of the problems we discussed at the meeting. Perhaps some of the other points will have dropped out in the reworking of various sections, and this may save some time.

I'd like to incorporate any remaining or additional points, and get the thing filed next week if we can. Some of it may, of course, depend on what happens with the draft Consent Order we sent you last week on the use of Schedule B authority as an alternative examining procedure. We should talk as soon as possible, but we cannot let the end of the year slip without filing a report.

I look forward to hearing from you.

Very truly yours,

*Rick Seymour*

Richard T. Seymour

RTS/lb
Enclosure

<u>ATTACHMENT Mc</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
   individually and on behalf of   )
   all others similarly situated,  )
                                   )
                    Plaintiffs,    )
                                   )
          v.                       )    C. A. No. 79-0271
                                   )
DONALD J. DEVINE, et al.,          )
                                   )
                    Defendants.    )

PLAINTIFFS' FIRST REPORT TO THE COURT ON THE
DEFENDANTS' IMPLEMENTATION OF THE CONSENT DECREE

A.  Introduction

The Consent Decree in this action went into effect
on January 18, 1982.  The Decree contemplated that regular reports
would be made to the Court,[1]  and this Court's Order granting
final approval to the Consent Decree stated that these reports,
coupled with the Court's inherent power to direct that any of
the raw data generated under the Consent Decree be provided
to it, "will ensure adequate judicial supervision of the defendants'
compliance with the Consent Decree."[2]

Plaintiffs have prepared this report, and the defendants
are not responsible for its contents.  However, plaintiffs provided
the defendants with a courtesy copy of the text of this Report
on October 10, 1984, so that any comments or corrections the

_____

[1]See ¶ 7 at p. 6.

[2]Order of November 19, 1981, conclusion of law 23,
reported at 93 F.R.D. 68, 92.

government desired to make could be considered and appropriate changes made.[3]  The defendants have made a number of comments, and a redraft was provided to the government on December 11, 1984 so that the government would have a further opportunity to make comments or suggestions.

The government has provided plaintiffs with a total of five statistical reports on hiring by all agencies across the nation in calendar year 1982[4] in jobs formerly covered by the PACE.  Plaintiffs have combined the data from the reports, with the subsequent corrections furnished by the government, into the printout attached hereto as Attachment A.[5]

This printout shows that, when the old application statistics from 1978 are used as the standard,[6] the government met its hiring obligations under the Consent Decree with respect to most job categories formerly subject to the PACE.  Those job categories in which the government fell short of the standards set by the Decree, and those situations in which specific agencies fell short of the standards for specific job categories, are

---

[3]The government was also offered the opportunity to inspect the attachments, but declined.

[4]The Order of July 2, 1984, entered with the consent of the parties, provided that the statistics compiled for calendar year 1982 would conclusively be deemed to be statistics for the first reporting year under the Consent Decree.

[5]The sources of this information, and the subsequent corrections, are described in detail below.

[6]The Office of Personnel Management has informed plaintiffs that these are the latest applicant statistics available for the PACE.  See the discussion at p. 5, infra.

detailed below.

B.  The Timing of This Report

The government's system for collecting information
on hires for the first reporting year was not swift.  On June
20, 1983, plaintiffs received the Office of Personnel Management's
[hereinafter, "OPM's"] reports on hiring in jobs covered by
the Consent Decree in the first half of 1982 for most, but not
all, government agencies.  Because of a problem which has been
corrected for reports for 1983 and the future, the 1982 reports
did not include information on hiring by the State Department
or by the Federal Deposit Insurance Corporation.  Information
from the General Accounting Office is reported separately because
its personnel system is not under the control of OPM.[7]  OPM's
report on hires in the second half of 1982 was received on December
9, 1983.  Again, information was not included for the State
Department or for FDIC, and information on GAO was to be provided
separately.

Plaintiffs raised a number of questions as to the
OPM reports, and obtained clarifications in stages on April
3, April 13, May 24, and June 11, 1984.  The reports for the
State Department and the FDIC were sent to plaintiffs on March
7, 1984, and the report for the General Accounting Office was
sent to plaintiffs on March 29, 1984.  The State Department
figures did not add up correctly, and plaintiffs requested a

_____

[7]See the companion Order entered November 19, 1981.

clarification.  In June 1984, the defendants agreed that the State Department had made an arithmetic error in adding up its information.

Not all information required for a complete statistical report for 1982 has been received.  Some alternative examining procedures for job categories covered by the Consent Decree were in place in 1982, but no information has been received on the numbers of blacks, Hispanics, and whites who applied under these alternative examining procedures.  On August 28, 1984, OPM orally advised plaintiffs that there were no adequate and reliable data on such applicants for 1982, and that there was no choice but to use the same percentage figures for these alternative examining procedures as were being used for jobs still subject to the PACE.[8]  While a letter confirming this information was to have been sent, plaintiffs have not yet received it.

Now that the reporting system is in place, reports of selections for each calendar year can be provided more quickly. OPM estimates that its hiring reports can be provided by the Summer following the end of the calendar year in question. Plaintiffs received OPM's 1983 application and hiring reports

_____

[8]See pp. 5-6 and 13-14 below.

on August 30, 1984.[9]

     C.   1982 Hiring Information

        1.   General Information

     The PACE was in use for most of calendar year 1982, and the parties have agreed through the Monitoring Committee that adverse impact in 1982 for all jobs not subject to the alternative examining procedures should be determined by using the standard set out in ¶ 8(b)(1) of the Consent Decree.[10]

     The government does not have racial breakdowns on applicants who took the PACE in 1981---the "prior reporting year" for 1982 hiring data---or for any year after 1978. Accor-

---

[9]The 1983 application and hiring reports from GAO have not yet been received. Plaintiffs need this information before they can analyze governmentwide hiring and application statistics.

[10]This paragraph provides:

    (b) The phrase "adverse impact" shall have the following meanings in the following situations:

        (1) In the case of interim use of the PACE, "adverse impact" shall mean that the difference between the proportion of blacks or of Hispanics among the appointments from all sources made by an agency for the job category in question, and the proportion of blacks or Hispanics, respectively, among the persons who took the PACE in the prior reporting year (or, in the event that statistics for the prior reporting year are not available, for the most recent prior period for which statistics are maintained), is statisticaly significant at the .05 level of confidence or, if not so statistically significant, that the proportion of blacks or of Hispanics among such appointments is less than 80% of the proportion of blacks or of Hispanics, respectively, among the persons so taking the PACE.

dingly, the parties have agreed through the Monitoring Committee
that the stipulated 1978 information in paragraph 10(h) of the
Consent Decree be used instead. These data show that blacks
were 11.9% of the applicants taking the PACE, and that Hispanics
were 4.9% of the applicants taking the PACE.

## 2. The Results of the Analysis: Government-wide Hiring

Attachment A is a 22-page printout combining overall
nationwide hiring information, for all jobs formerly subject
to the PACE, from the following reports received from the defendants:
(a) OPM's report for the first six months of 1982; (b) OPM's
report for the last six months of 1982; (c) the Department of
State's report for calendar year 1982, with its arithmetic errors
corrected; (d) the Federal Deposit Insurance Corporation's report
for calendar year 1982; and (e) the General Accounting Office's
report for calendar year 1982. The job titles were taken from
the titles shown in Appendix A to the Consent Decree, as modified
and supplemented by further information provided orally by OPM.

The data for the referenced reports of the defendants
were entered on the Lawyers' Committee's computer by hand, by
employees of the Lawyers' Committee. Each entry was then double-
checked against the originals, and all necessary corrections
were made. Using a widely accepted spreadsheet program from
Lotus Development Corp. called 1-2-3, the computer then totalled
the hiring information in the five sets of source documents
and calculated the percentages shown. The accuracy of the formulas
used was confirmed by manual spot-checks. Where the entry "ERR"

appears, it indicates that one cannot divide zero by zero in order to obtain a percentage. The references to "Grade 5" and "Grade 7" are to pay grades 5 and 7, and include all pay systems equivalent to these grades---"GG", "GS", etc.

Four job categories had nationwide adverse impact against Hispanics substantial enough in the opinion of counsel for plaintiffs to warrant challenging at this time. They are listed below.

### a) Computer Specialist (Trainee), Occupational Series 0334

A total of 1,113 persons were hired into this job category in calendar year 1982. Only 35 of these hires were Hispanic, constituting 3.1% of total hires. This rate of hiring constituted adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 64.2% of their availability rate (4.9%, as explained above). This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of Hispanics was 2.71 standard deviations below what

was expected.[11]  If Hispanics had been hired at the level of their availability, 20 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment B.  The printout was prepared and verified in the same manner as the printout in Attachment A.

The government did not make any use of the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact.  Plaintiffs have attached as Attachment C the pages from the OPM reports showing that no hires were made in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bicultural programs.

### b) Social Insurance Claims Examining, Occupational Series 0993

A total of 816 persons were hired into this job category in calendar year 1982.  Only 14 of these hires were Hispanic, constituting 1.7% of total hires.  This rate of hiring constituted

---

[11]A finding of 1.96 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .05 level.  A finding of 3 standard deviations below the expected level of hiring is the statistical equivalent of a finding of statistical significance at the .01 level.  These are means of quantifying the possibility that the observed disparity (or a greater one) could have occurred by chance.  Significance at the .05 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in twenty.  Significance at the .01 level shows that the likelihood of that disparity (or a greater one) occurring by chance is approximately one chance in a hundred.

adverse impact under the 80% rule, because Hispanics were hired at a rate which was only 35% of their availability rate. This hiring rate also constituted adverse impact under the test of statistical significance because the hiring of Hispanics was 4.21 standard deviations below the expected level. If Hispanics had been hired at the level of their availability, 26 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment D. This printout was prepared and verified in the same manner as the printout in Attachment A.

The government did not make any use of the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact. Plaintiffs have attached as Attachment E the pages from the OPM reports showing that no hires were made in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bicultural programs.

c) General Business and Industry, Occupational Series 1101

A total of 645 persons were hired into this job category in calendar year 1982. Only 22 of these persons were Hispanic, constituting 3.4% of total hires. This rate of hiring constituted adverse impact under the 80% rule, because Hispanics were hired

at a rate which was only 69.6% of their availability rate.[12]
If Hispanics had been hired at the level of their availability,
10 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations
for this job category is attached as Attachment F. The printout
was prepared and verified in the same manner as the printout
in Attachment A.

The government did not hire any Hispanics through
the special programs required by the Consent Decree to eliminate
or reduce the possibility of adverse impact. Plaintiffs have
attached as Attachment G the pages from the OPM reports showing
that no Hispanics were hired in this job category in calendar
year 1982 through use of the Outstanding Scholar, Co-op, or
Bilingual/bicultural programs.

d) Contract and Procurement, Occupational Series
1102

A total of 1,083 persons were hired into this job
category in calendar year 1982. Only 33 of these hires were
Hispanic, constituting 3.0% of total hires. This rate of hiring
constituted adverse impact under the 80% rule, because Hispanics
were hired at a rate which was only 62.2% of their availability
rate. This hiring rate also constituted adverse impact under
the test of statistical significance, because the hiring of

_____

[12]Under ¶ 8(b)(1) of the Consent Decree, a finding of
adverse impact results from showing that <u>either</u> the 80% standard
was not met, <u>or</u> that there was statistical significance. It
is not necessary to make both showings.

Hispanics was 2.82 standard deviations below the expected level.
If Hispanics had been hired at the level of their availability,
20 additional Hispanics would have been hired for this job category.

A printout showing the adverse-impact calculations
for this job category is attached as Attachment H.  This printout
was prepared and verified in the same manner as the printout
in Attachment A.

The government did not hire any Hispanics through
the special programs required by the Consent Decree to eliminate
or reduce the possibility of adverse impact.  Plaintiffs have
attached as Attachment I the pages from the OPM reports showing
that no Hispanics were hired in this job category in calendar
year 1982 through use of the Outstanding Scholar, Co-op, or
Bilingual/bicultural programs.

3.  <u>The Results of the Analysis:  Hiring by Specific</u>
<u>Agencies</u>

In addition to the governmentwide showings of adverse
impact set forth above, plaintiffs have also analyzed agency-
by-agency hiring statistics to determine whether there is adverse
impact as to that particular agency's hiring.  For three job
categories, there was adverse impact as to a specific agency's
hiring, at a level sufficient to warrant challenge at this time.
These instances are set forth below.

a)  <u>Department of Agriculture Hiring for the General</u>
<u>Business and Industry Job, Occupational Series</u>
<u>1101</u>

The Agriculture Department hired a total of 262 persons
into this job category in calendar year 1982.  Only 5 of these

hires were black, constituting 1.9% of total hires. This rate
of hiring blacks constituted adverse impact under the 80% rule,
because blacks were hired at a rate which was only 16% of their
availability rate. This hiring rate also constituted adverse
impact under the test of statistical significance, because the
hiring of blacks was 4.99 standard deviations below the expected
level. If blacks had been hired at the level of their availability,
26 additional blacks would have been hired into this job category.

A printout showing the adverse-impact calculations
for this job at the Agriculture Department is attached as Attachment
J. This printout was prepared and verified in the same manner
as the printout in Attachment A.

The Agriculture Department did not make any use of
the special programs required by the Consent Decree to eliminate
or reduce the possibility of adverse impact. Plaintiffs have
attached as Attachment K the pages from the OPM reports showing
that no hires were made in this job category in calendar year
1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bi-
cultural programs.

### b) Department of the Army Hiring for the Contract and Procurement Job, Occupational Series 1102

The Department of the Army hired a total of 304 persons
into this job category in calendar year 1982. Only 3 of these
hires were Hispanic, constituting 1.0% of total hires. This
rate of hiring Hispanics constituted adverse impact under the

- 12 -

80% rule, because Hispanics were hired at a rate which was only 20.1% of their availability rate.  This hiring rate also constituted adverse impact under the test of statistical significance, because the hiring of Hispanics was 3.16 standard deviations below the expected level.  If Hispanics had been hired at the level of their availability, 12 additional Hispanics would have been hired into this job category.

A printout showing the adverse-impact calculations for this job category is attached as Attachment L.  This printout was prepared and verified in the same manner as the printout in Attachment A.

The Army did not hire any Hispanics through the special programs required by the Consent Decree to eliminate or reduce the possibility of adverse impact.  Plaintiffs have attached as Attachment M the pages from OPM reports showing that the Army did not hire any Hispanics in this job category in calendar year 1982 through use of the Outstanding Scholar, Co-op, or Bilingual/bicultural programs.

### c) Department of Health and Human Services Hiring for the Social Insurance Claims Examining Job, Occupational Series 0993

All hiring in calendar year 1982 for the Social Insurance Claims Examining job category was done by the Department of Health and Human Services ["HHS"].  Thus, all of the statistics set forth at p. 8 above for this job category refer to information for the Department of Health and Human Services.  See Attachment N to this Report, showing the same information as to HHS hiring

which Attachment D showed for governmentwide hiring for this job category. See also the OPM reports for HHS attached as Attachment O, showing the same lack of use of the special programs established by the Consent Decree which was shown in Attachment E.

    4. <u>The Use of Alternative Examining Procedures</u>

        a) <u>Alternative Examining Procedures Sponsored by OPM</u>

During calendar year 1982, OPM sponsored a total of six alternative examining procedures for specific job categories:

| Occupational Series | Grade(s) | Title | Type of Procedure |
|---|---|---|---|
| 0110 | 5,7 | Economist | Unassembled |
| 0334 | 5 | Computer Specialist (Trainee) | Assembled |
| 1654 | 5,7 | Printing Management Specialist | Unassembled |
| 1810 | 5,7 | General Investigator | Unassembled |
| 1811 | 5,7 | Criminal Investigator | Unassembled |
| 1812 | 5 | Game Law Enforcement Agent (Fish & Wildlife) | Unassembled |

There were not enough hires in any of these job categories in calendar year 1982 to warrant adverse-impact challenges.

        b) <u>Delegations of Examining Authority to Specific Agencies</u>

During calendar year 1982, a number of agencies enjoyed delegations by OPM of examining authority for specific job categories. There were not enough hires in any of these job categories in calendar year 1982 to warrant adverse-impact challenges.

5. Enforcement Proceedings

Plaintiffs have today raised each of the above showings with counsel for the defendant, through the Monitoring Committee, as an enforcement proceeding. We expect the Monitoring Committee to attempt to resolve these matters.

D. Abolition of the PACE

The Consent Decree allowed, but did not require, phased-out use of the PACE for competitive external hiring for the first three years after the Consent Decree went into effect.[13] OPM decided instead to abolish the PACE for external competitive hiring as of August 31, 1982. All registers of eligibles compiled under the PACE were abolished or withdrawn as of November 8, 1982.[14] OPM's official description of this change is contained in Federal Personnel Manual ["FPM"] Letter 213-21, dated September 9, 1982, reproduced at Attachment P.

E. Use of Schedule B Authority

Instead of developing specific alternative examining procedures for each of the job categories formerly covered by the PACE, OPM decided to establish a new "Schedule B authority" for most of these job categories. Under it, agencies needing to hire external applicants could apply for and obtain OPM's permission to do their own hiring under overall OPM guidelines.

_____

[13] See ¶¶ 13-16 at pp. 25-30.

[14] OPM has informed us that some mistakes may have been made in isolated cases, but official use of the PACE ended on the date stated.

The persons hired under this authority are to be treated, in all but four respects, in the same manner as applicants who had earlier been hired through the PACE. FPM Letter 213-21 expressly grants them such rights with respect to discipline, training, opportunities to compete for promotion up to the Grade 7 level, opportunities to compete for appointments to other positions also covered by Schedule B authority, removal, suspension for more than 14 days, reduction in grade or pay, placement on furlough for thirty days or more, and retention rights in the event of a reduction in force.

There are four ways in which applicants hired under Schedule B authority are treated less favorably than applicants formerly hired under the PACE. First, applicants formerly hired under the PACE enjoyed career Civil Service status immediately after the conclusion of their probationary periods. Applicants hired under Schedule B will not obtain career Civil Service status unless they compete with outside applicants and present employees for positions at the GS-9 level, and succeed in the competition.

Second, applicants formerly hired under the PACE were able to use their career Civil Service status to be transferred or reassigned to other job categories for which they had the necessary qualifications and thus had substantial career flexibility, which can be important in light of changing job opportunities. Applicants hired under Schedule B may be promoted or reassigned only to other job categories covered by Schedule B authority.

Again, the less favorable treatment does not end unless and until the Schedule B appointee succeeds in the competition for a promotion to the GS-9 level and is thereby converted to Civil Service status.

Third, applicants formerly hired under the PACE could take full advantage of the "career ladders" in the jobs into which they were hired. A "career ladder" runs from the entry-level job up to what is called the "journeyman level". The "journeyman level" may vary from agency to agency depending on its needs, but can be as high as GS-13 for some jobs at some agencies. Where there is a career ladder, employees on the ladder do not have to compete for promotions up to the journeyman level. They receive their promotions to grades 7, 9, 11, 12 and 13---depending on the top of the career ladder in question ---on the completion of a set amount of time in grade if their performance has been satisfactory and if they have demonstrated by such performance their ability to handle more complex duties. Applicants hired under Schedule B cannot go past Grade 7 on the career ladders for their jobs. They have to compete to get to Grade 9, and only after succeeding in the competition can they resume their career ladders.

The availability of such "career ladder" promotions without having to compete for them has always been one of the most important attractions in the job categories formerly subject

to the PACE,[15] and has been an important part of this lawsuit
from the beginning.    Paragraph 10 of the Complaint herein alleged
in pertinent part:

>  Employees selected by the PACE are frequently
>  placed in "career ladder" positions and subsequently
>  promoted to higher, non-supervisory levels without
>  competition.

Plaintiffs' September 29, 1980 Motion for Class Determination
stated in paragraph 5 at p. 3:

>  In each case entry into career-oriented administrative
>  or professional positions is via PACE, and subsequent
>  promotions to the top of the career ladder are
>  non-competitive and not based on testing.

Fourth, applicants formerly hired under the PACE and
assigned to job categories with career ladders going to Grade
9 or beyond did not have to wait for vacancies to occur at the
Grade 9 level before they could be promoted to Grade 9.    Schedule
B appointees must wait for a vacancy to occur at the Grade 9
level before they have any opportunity for promotion and conversion.

The manner in which selections are made by agencies
pursuant to their Schedule B authority varies from agency to

_____

[15]The General Accounting Office's 1979 study of the
PACE also highlighted the importance of career ladder promotions
to those hired under the PACE:

>  PACE provides agencies with job candidates
>  who demonstrate potential for advancement into professional
>  and administrative positions. ... PACE covers GS-5
>  and -7 entry level positions in 118 occupational series.
>  ... Normal career progression in these jobs is to
>  a GS-9 or higher grade level.

GAO, Report to the Congress of the United States:  Federal Employment
Examinations:  Do They Achieve Equal Opportunity and Merit Principle
Goals?  (No. FPCD-79-46, May 15, 1979) at 9.

agency, from job category to job category within agencies, and from location and time to location and time within the same agency for the same job category. No effort has been made by any defendant agency to validate, pursuant to the Uniform Guidelines on Employee Selection Procedures, 43 Fed. Reg. 38290, the manner in which any agency has made selections under Schedule B authority for any job category.[16]

Under the Schedule B authority approved by OPM, a Schedule B appointee must compete with outsiders for vacancies at the Grade 9 level. If the Schedule B appointee is not selected in the competition, he or she will remain in the Grade 7 position he or she is then occupying, and will be able to continue competing for each further Grade 9 vacancy as it occurs. There is no limit to the number of times a Schedule B appointee may compete.[17]

Most of the competitions for promotions to the Grade 9 level and conversion to career Civil Service status will be conducted under OPM's Mid-Level Examination authority, and will consist of a review of the competitors' experience and other qualifications, as stated on forms filled out by the competitors. However, OPM has the power to authorize agencies to use other means of deciding these competitions, such as by the use of paper-and-pencil tests.[18]

---

[16]Information obtained orally from counsel for OPM.

[17]Information obtained orally from counsel for OPM.

[18]Information obtained orally from counsel for OPM.

The first appointments under Schedule B were made in late 1982, but not many were made at that time. The first competitions involving Schedule B appointees trying to be promoted to the Grade 9 level and to career Civil Service status occurred in mid-1984, but most Schedule B appointees have not yet been involved in such competitions.[19]

[Note to Barbara and to Jim: the following section is essentially unchanged from pp. 18-22 of the October 10, 1984 draft of this Report, except that the paragraph starting at the bottom of p. 20 and running to the top of p. 22 has been dropped. Barbara called some weeks ago to suggest that, if we are going to be able to reach agreement on the use of Schedule B authority as an AEP, it would be best to make substantial revisions in this section. I suggest we talk about this after we see what progress, if any, we can make on the proposed Consent Order we sent you on December 5.]

OPM's decision that persons hired under Schedule B authority will be given treatment less favorable than that given to persons formerly hired under the PACE raises a serious legal question. The Uniform Guidelines on Employee Selection Procedures state in pertinent part:

> ... Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the

---

[19]Information obtained orally from counsel for OPM.

> period of discrimination. Thus, the persons
> who were in the class of persons discriminated
> against during the period the user followed the
> discriminatory practices should be allowed the
> opportunity to qualify under less stringent selection
> procedures previously followed, unless the user
> demonstrates that the increased standards are
> required by business necessity. ...

29 C.F.R. § 1607.11 (1984).[20] The courts have accepted this

regulation and its predecessor. Albemarle Paper Co. v. Moody,

422 U.S. 405, 434, 45 L.Ed.2d 280, 306 (1975). Blake v. City

of Los Angeles, 595 F.2d 1367, 1382 (9th Cir., 1979), cert.

den., 446 U.S. 928, 64 L.Ed.2d 281 (1980) ("The fact that the

LAPD hired thousands of male police officers between 1968 and

1973 without using any pre-employment physical suggests that

the practice is not essential to safe and efficient job perform-

ance"); Laffey v. Northwest Airlines, 185 U.S.App.D.C. 322,

567 F.2d 429, 456-57 (D.C.Cir., 1976), cert. den., 434 U.S. 1086,

55 L.Ed.2d 792 (1978) ("We recognize that Title VII discourages

the use of even nondiscriminatory but newly-promulgated employee-

selection criteria where there is a history of discriminatory

treatment of some employees who would continue to be hurt by

the new criteria.").

There have been meetings, substantial exchanges of

correspondence, and innumerable telephone calls between plaintiffs

and defendants on questions arising out of the implementation

of the Consent Decree, and much of this activity stems from

---

[20]The full text of this regulation is set forth at
Attachment Q.

the above differences of treatment between Schedule B appointees and former PACE appointees. These efforts to resolve the matter short of litigation are continuing.

A separate question is whether the use of Schedule B authority can be considered an "alternative examining procedure" under the Consent Decree. The Consent Decree defines this term as follows:[21]

> (j) The phrase "alternative examining procedure" shall mean the group of factors, including test scores and any other criteria which are considered, and the relative use made of each such factor, in making an appointment decision with respect to an applicant (as that term is defined in ¶ 8(b)(4)), for employment at the GS-5 or GS-7 level in a job category listed in Appendix A.

OPM's decision to split into two parts the procedure for hiring applicants into the career Civil Service in PACE occupations ---deferring until a second round of competition at the GS-9 level what had formerly occurred after just one round of competition at the GS-5 or GS-7 level---means that both halves of the procedure would have to be included within the definition.

It is also important to recognize that, whether the use of Schedule B authority be considered a set of alternative examining procedures or a temporary expedient, statistical information on the results of the second round of competition is essential. Without such information, there can be no assurance of fairness to class members. Plaintiffs have raised this matter with the

---

[21] Consent Decree, ¶ 8(j) at p. 15.

defendants in the Monitoring Committee.

　　F.　Mailings to Class Members

　　　　Paragraph 22 at pp. 39-40 of the Consent Decree required OPM to establish a mailing list of all class members responding to the 1981 notice of settlement. At least 2,000 class members have requested to be placed on the mailing list.[22] Paragraph 22 goes on to require that OPM:

> ... shall use this list to inform such class members ... of the alternative examining procedures which are expected to go into effect before the date of the next mailing, of the job categories to which they are applicable, of the steps class members should take in order to be considered under such alternative examining procedures, and of the government offices class members should contact in order to find out more information about these training programs, procedures, and job categories. These mailings shall be made on a semi-annual basis during the period from the entry of this Decree until the last alternative examining procedure is put into effect, and shall be without charge to class members.

　　　　No use of the mailing list [has been made to date?] [was made until_____ ?] so class members on the list were not informed of the use of Schedule B authority, of the development of the alternative examining procedures which OPM has put together, or of the means of applying for the jobs in question.

　　　　Plaintiffs have raised this matter with the defendants in the Monitoring Committee.

　　G.　Test Development Reports

_____

[22]Information provided orally by counsel for defendants to counsel for plaintiffs.

Paragraph 26 of the Consent Decree requires the defendants
to provide plaintiffs regularly with reports on the defendants'
development of alternative examining procedures.  This Court
recognized the importance of such reports in its November 19,
1981 Order granting final approval to the Consent Decree.  The
Order stated in finding 33:

> 33.  It must be noted that, during the course
> of this development process, defendants have
> agreed to provide plaintiffs with summaries of
> their plans for developing and validating the
> new procedures, to respond to any other reasonable
> requests by plaintiffs for information, and to
> consider any comments which plaintiffs may offer
> concerning the examination procedures.  (Decree,
> ¶ 26).  Thus, the phased-in examination development
> process will also offer an opportunity for comments
> by the plaintiffs which may be useful in the
> development of examining procedures which will
> be valid, as that term has been defined in the
> Decree.  (Outtz deposition, Tr. 12-13).

93 F.R.D. 68, 79-80 (1981).

The defendants have provided plaintiffs with test
development reports for the following occupations:

a) <u>Computer specialist (Trainee)</u>, GS-0334, Grades
5 and 7 (development completed August 1981, and test
used operationally in October and November, 1982);

b) <u>Claims Examining and Claims Representative
Social Security Positions</u>, GS-0993 and GS-0105, Grades
5 and 7 (development still underway as of June 1983);

c) <u>Tax Technician</u>, GS-0526, Grades 5 and 7 (develop-
ment still underway as of June 1983);

d) <u>Internal Revenue Officer</u>, GS-1169, Grades
5 and 7 (development still underway as of June 1983);

and

e) <u>Customs Inspector</u>, GS-1890, Grades 5 and 7
(development still underway as of June 1983).

They were so short and uninformative that plaintiffs determined
they would not help accomplish the purposes of ¶ 26. There
have been numerous meetings, telephone calls, and exchanges
of correspondence over the issue, and OPM has provided two redrafts
of the Computer Specialist (Trainee) report in an effort to
prepare a model which would be useful for this purpose. The
parties are still working on this issue.

## CONCLUSION

Plaintiffs hope that the above information will be useful to the Court. If the Court has any questions about this Report or desires further information, the parties will be happy to comply.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 — 15th Street, N.W., #940
Washington, D.C. 20005

JACK G. KNEBEL
McCutcheon, Doyle, Brown & Enerson
Three Embarcadero Center
San Francisco, Calif. 94111

JOAQUIN AVILA
MORRIS J. BALLER
Mexican—American Legal Defense
    & Educational Fund
28 Geary Street
Sixth Floor
San Francisco, Calif. 94108

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif. 94108

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
  for Urban Affairs
625 Market Street, Suite 1208
San Francisco, Calif. 94105

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif. 94612

By:_____

         Attorneys for Plaintiffs

Dated:  December 19, 1984



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

January 31, 1985

<u>BY MESSENGER</u>

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: Luevano v. Devine: Problems in the 1983
> <u>Statistical Reports</u>

Dear Barbara and Jim:

In redoing plaintiffs' draft Report to the Court to include 1983 activity, we have run into a number of problems with the statistical information reported, and we need to resolve them before we can go further.

<u>First</u>, Jim's letter of July 1, 1983 identified the column "Non-PACE CS Cert" on Reports Al through A4 as including hires in job categories for which OPM sponsors an alternative examining procedure. Jim's letter of June 22, 1983 identifies

ATTACHMENT N

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 2

the column headed "Delegated Examining" as including hires in job

categories as to which OPM has delegated examining authority to

an agency. My understanding has been that both situations cannot

exist as to the same job category. Thus, there should not be

entries in both columns for the same job categories. However,

there are dual entries in Report A1 and the other reports for

1983 in the following job categories:

| Occupational Series | Total Hires | |
|---|---|---|
| | Non-PACE CS Cert | Delegated Examining |
| 0080 | 4 | 5 |
| 0301 | 17 | 10 |
| 0334 | 367 | 11 |
| 0345 | 1 | 4 |
| 0570 | 20 | 89 |
| 0962 | 196 | 13 |
| 1001 | 13 | 1 |
| 1082 | 1 | 1 |
| 1101 | 12 | 3 |
| 1152 | 7 | 1 |
| 1169 | 3 | 4 |
| 1811 | 77 | 70 |
| 1816 | 4 | 121 |
| 1910 | 1 | 40 |
| 2001 | 1 | 1 |
| 2003 | 1 | 1 |

While some of these job categories have too few hires

to be of enforcement interest for 1983 taken alone, many are of

such interest and it is essential that we know how to use the

data. Even for the job categories with few hires, years can be

combined under the Decree to make a showing of adverse impact,

and we need to know how to handle the data.

Second, my understanding has been that OPM delegates examining authority to a particular agency for a particular job category only if it is the only agency using that job category. However, two of the job categories with substantially enough hiring in the "Delegated Examining" column to be of interest had such hires reflected for more than one agency. These situations are:

a) Quality Assurance Specialist, GS-1910: The Army reports 31 hires on p. 48 of Report A3. The Department of Defense reports 9 hires on p. 75 of Report A3. Are these different tests, or are they the same? How do we treat it?

b) Financial Institution Examiner, GS-0570: The FDIC reports 64 hires on p. 127 of Report A3. The Federal Home Loan Bank Board reports 25 hires on p. 129 of Report A3. Again, are these different tests or the same? How do we treat it?

Third, the application statistics reflect some of the same confusion:

a) Both the Department of Defense (Defense Investigative Service) and the Office of Personnel Management report applicant statistics for a delegated examining procedure for the same job, General Investigator, GS-1810. OPM reports 398 applicants (124 not race-

identified) and DOD reports 1,598 applicants (558 not race-identified). Report A3 at p. 75 shows that DOD hired 11 whites, no blacks, and no Hispanics for this job; Report A3 on p. 212 does not show any hires in this job by OPM. Are there different tests, or are they the same? How do we treat it?

b) The applicant statistics for OPM-sponsored alternative examining procedures also report statistics for applicants for the General Investigator job, GS-1810. They show 285 applicants, of whom 190 were race-identified. I assume that these are different people than the applicants counted in the OPM and DOD delegated-examining reports, and that all three sources should be added together to get the government-wide totals for purposes of enforcement. I also assume that the test is the same in all three cases. Is this correct?

Fourth, there are no reports of application statistics for a number of job categories with enough 1983 hires to be of



Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 5


enforcement interest:

| Scope | Occupational Series | Column of Hiring Report | Total Hires |
|-------|--------|-------------------------|-------|
| All Agencies | 0301 | Non-PACE CS Cert | 17 |
| " " | 0570 | Non-PACE CS Cert | 20 [1] |
| " " | 0962 | Non-PACE CS Cert | 196 |
| " " | 0986 | Non-PACE CS Cert | 23 |
| " " | 1811 | Delegated Examining | 70 [2] |
| " " | 1910 | Delegated Examining | 40 |
| " " | 0230 | Schedule B | 4 |
| " " | 1170 | Schedule B | 4 |
| " " | 1412 | Schedule B | 1 |
| Defense Dept. | 2010 | Schedule B | 25 |

Fifth, there are a number of job categories with alternative examining procedures in which application statistics are virtually completely race-identified. For some job categories, and at some agencies, the officials fell down on the job to an unacceptable level:

| Occupational Series | Total Applicants | No Racial Identification | Percent Not Identified |
|---------------------|-------|-------|-------|
| 0110 (OPM Admin.) | 254 | 168 | 66.1% |
| 1654 (OPM Admin.) | 51 | 43 | 84.3% |
| 1811 (OPM Admin.)[3] | 764 | 278 | 36.4% |
| 1145 (Agriculture) | 213 | 108 | 50.7% |
| 1810 (OPM) | 398 | 124 | 31.2% |
| 1810 (DOD) | 1,598 | 558 | 34.9% |
| 1816 (Justice) | 6,722 | 1,600 | 23.8% |

When agencies like FDIC can manage to race-identify all but 15.2% of their 1,160 applicants (GS-0570), when the FHLBB can manage to

_____

[1] See the discussion at p. 3 above.

[2] See the table at p. 2 above.

[3] These figures are based on our arithmetic corrections of the data shown on the Application Report. See the discussion at p. 18 below.

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 6

race-identify all but 15.2% of its 3,068 applicants (same job),[4] and when OPM can manage to race-identify all but 14.9% of its 10,409 applicants for the GS-0334 Computer Specialist (Trainee) job, it seems clear that the far higher missing-data rates described above are simply attributable to a lack of interest on the part of some officials. The persons listed as not racially identified must be contacted by responsible officials to determine their correct race, so that we have at least 85% identified.

While the above list covers only application statistics for alternative examining procedures, there are also examples in the Schedule B applicant statistics. For instance, the Army was a disaster area in collecting racial information on Schedule B applicants:

| Occupational Series | Total Applicants | No Racial Identification | Percent Not Identified |
|---|---|---|---|
| 0201 | 1,124 | 518 | 46.1% |
| 0343 | 1,423 | 707 | 49.7% |
| 0560 | 1,440 | 659 | 45.8% |
| 1101 | 476 | 341 | 71.6% |
| 1102 | 1,018 | 480 | 47.2% |
| 1150 | 696 | 357 | 51.3% |
| 1910 | 476 | 341 | 71.6% |
| 2001 | 832 | 374 | 45.0% |
| 2003 | 510 | 341 | 66.9% |
| 1035 | 12 | 5 | 41.7% |
| Total for these examples | 8,007 | 4,123 | 51.5% |

---

[4] These figures are based on our arithmetic corrections of the data shown on the Application Report. See the discussion at pp. 16-17 below.

This performance is not acceptable. Apart from the problems described below, it is apparent that the Army simply chose to ignore its legal obligations in this case. Plaintiffs insist that each applicant listed as racially unidentified be contacted by a responsible official of the Army in order to determine his or her race, until we have at least 85% correctly identified.

To prevent the recurrence of this problem in the future, designation of race and/or ethnic group must be made a mandatory part of the application process, the same as designation of information as to level of education, for jobs subject to the Consent Decree.

Sixth, there are several problems in the application statistics reported by the Navy:

a) The Navy reported a total of 217 applicants for combined occupational series 0201, 0501, 0560, 0080, 2001, 2100, 1102, 0343, 0301, and 0346, all at the Grade 5 level ("Conglomerate A"), without breaking down the results on a job-by-job basis for all these jobs. This makes it impossible to calculate adverse impact on a job-by-job basis, as the Decree requires us to do.

b) The Navy reported a total of 328 applicants (9 of whom were not race-identified) for combined occupational codes 0301, 0343, 0345, 0501, 0560, and 1102, all at the grades 5/7 level ("Conglomerate B"), without

breaking down the results on a job-by-job basis.

c) The Navy reported a total of 145 applicants (9 of whom were not race-identified) for combined occupational codes 2001, 2003, 2010, and 2050, all at the Grades 5/7 level ("Conglomerate C"), without breaking down the results on a job-by-job basis for any of these jobs but series 2010, grades 5/7. We do not know why the separate figures for this job were included in the conglomerate grouping; perhaps it is merely the listing of this job on the bottom of the 2000-series conglomerate which is incorrect. The Navy did report separate figures for job series 2003 at the Grade 5 level, but made no separate report at the Grades 5/7 level included in the conglomerate.

d) An applicant at the grade 5/7 level must be counted as both a grade 5 applicant and a grade 7 applicant for purposes of determining adverse impact. The overlap in the conglomerate reports makes this even more impossible:

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 9

| Conglomerate A (Grade 5) | Conglomerate B (Grades 5/7) | Conglomerate C (Grades 5/7) |
|---|---|---|
| 0080 | | |
| 0201 | | |
| 0301 | 0301 | |
| 0343 | 0343 | |
| | 0345 | |
| 0346 | | |
| 0501 | 0501 | |
| 0560 | 0560 | |
| 1102 | 1102 | |
| 2001 | | 2001 |
| | | 2003 |
| | | 2010 |
| | | 2050 |
| 2100 | | |

e) While the Navy reported a total of only 217 applicants for Conglomerate A, which includes series 0343, 0346, and 0501 at the grade 5 level (Conglomerate A), it separately reported 95 applicants (20 of whom were not racially identified) for series 0343, grade 5; 260 applicants for series 0346, grade 5; 91 applicants (22 of whom were not racially identified) for series 0501, grade 5; and 15 applicants (6 of whom were not racially identified) for series 0560, grade 5. It is impossible to have only 217 applicants at the grade 5 level for a conglomerate including 10 job categories when separate reports for four of those job categories show a total of 461 applicants.

f) The Navy made two reports for applications for

series 1102 at the grades 5/7 level. One stated a
total of 358 applicants (14 of whom were not racially
identified), and the other stated a total of 489 appli-
cants (4 of whom were not racially identified).[5] Both
cannot be right. Perhaps neither is right. Or perhaps
one needs to be added to the other, given that one has
Philadelphia data only, and the other has only data for
the other regions. We need to _know_ what is right.

g) The Navy made two reports for applications for
series 2003 at the grade 5 level. One stated a total
of 19 applicants (1 of whom was not racially identified),
all from the San Francisco Civil Service region. The
other stated a total of 46 applicants, including 7 from
the San Francisco Civil Service region. Both cannot be
right, and there is no indication that they could
possibly be added together to produce correct results.
Perhaps neither is right.

A responsible official of the Navy must go back over all of the
source information and personally certify accurate figures. If the
source data are insufficient, the applicants must be contacted in
order to obtain accurate information.

Seventh, the Department of Labor reported two sets of

---

[5] These figures are based on our arithmetic corrections of
the data shown on the Application Report. See the discussion at
pp. 15-16 below.

applicant data for occupational series 0201, at the grade 7 level. One shows only 12 white applicants from the Chicago Civil Service Region, and the other shows only 15 white applicants from the same region. Both cannot be right. Is either correct? Again, a responsible official of the Labor Department must personally certify the correct figures.

Eighth, some of the data for two agencies look unusual, to use a polite term. The Army, for example, reports a series of extraordinary coincidences. Consider, for example, the following set of Schedule B application statistics:

| | |
|---|---|
| Blacks: | 18 applicants |
| Hispanics: | 2 applicants |
| White Non-Hispanics: | 111 applicants |
| Other: | 4 applicants |
| Total race-identified applicants: | 135 applicants |
| Total applicants not racially identified: | 341 applicants |

The identical breakdown shows up for the Army's Dallas Civil Service Region applicants for the Maintenance Management Specialist job, GS-1101-5; for the Army's Chicago Civil Service Region applicants for the Quality Assurance Specialist job, GS-1910-5; and for the Army's Dallas Civil Service Region applicants for the Supply Management Specialist job, GS-2003-5. This would strain the credulity of the most credulous viewer.

Nor did the Army's coincidences stop there. Consider the following pattern of race-identified applicants:

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 12

| | |
|---|---|
| Blacks: | 14 applicants |
| Hispanics: | 7 applicants |
| White Non-Hispanics: | 29 applicants |
| Other: | 1 applicant |
| Total: | 51 applicants |

This precise breakdown of applicants supposedly applied in the
Atlanta Civil Service Region for both the industrial Specialist
job, GS-1150-5 and for the Supply Specialist job, GS-2001-5.
I've checked OPM's Handbook X-118, and the nature of these jobs
differs widely.

There are three further sets of identical breakdowns in
the Army statistics:

| Total Numbers of Applicants Involved in Identical Breakdowns in Army Reports | Regions and Jobs Involved |
|---|---|
| 5 (1-0-4-0-5) | Seattle (for Alaska):  Personnel Management Specialist, GS-0201-5 |
| | Atlanta:  Public Affairs Specialist, GS-1035-7 |
| 11 (3-1-7-0-11) | Philadelphia:  Contract Specialist, GS-1102-5 |
| | Philadelphia:  Industrial Specialist, GS-1150-5 |
| | Philadelphia:  Supply Specialist, GS-2001-5 |
| 23 (1-12-10-0-23) | Dallas:  Personnel Management Specialist, GS-0201-5 |
| | Dallas:  Management Analyst, GS-0343-5/7 |
| | Dallas:  Budget Analyst, GS-0560-5/7 |
| | Dallas:  Supply Specialist, GS-2001-5 |

Nor is this situation limited to the Army.  The Defense

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 13


Logistics Agency shows a pattern of reporting basically the same
data for every job in a region, with minor variations of a couple
of persons in the counts.  For example, the New York Civil Service
Region figures for this agency show either 11 or 12 black applicants,
and either 5 or 6 Hispanic applicants, and from 60 to 66 white
applicants, and 3 or 4 Other applicants, for every single one
of the following job categories, no matter how dissimilar:

            Civilian Personnel Management, GS-0201-5
            Management Analyst, GS-0343-5
            Financial Specialist, GS-0501-5
            Budget Analyst, GS-0560-5
            Contract and Procurement Administration, GS-1102-5
            Industrial Property Management, GS-1103-5
            Property Disposal Specialist, GS-1104-5
            Industrial Specialist, GS-1150-5
            Quality Assurance Specialist, GS-1910-5
            Supply Management, GS-2000-5

Taking all regions as a whole, in 7 out of these 9 job categories
there were exactly 31 persons with missing racial identification;
in the other 2 job categories, there were 32 persons with such
identification.  This is what the reports say, even though the
total numbers of applicants range from 899 (Management Analyst)
to 1,046 (Quality Assurance Specialist).

        If you compare the reports of these two agencies with
the reports for the Air Force and for other agencies, which show
the kinds of variations one would expect in application statistics
for dissimilar jobs, I think you will agree that a real question
arises as to the Army's and the Defense Logistics Agency's figures.

        The integrity of the statistical reporting system is

essential to the ability of the parties and of the Court to monitor the defendants' compliance with the Consent Decree, and we cannot afford to leave such strange coincidences unexamined. Plaintiffs need to take the depositions of the knowledgeable officials at the Army and at the Defense Logistics Agency who were involved in the preparation of these reports. They should bring with them to their depositions copies of all of their original papers of any kind bearing on these questions, including notes of telephone conversations or any other kind of document, as well as all copies of such documents in their possession. Plaintiffs will file a Rule 30(b)(6) Notice of Depositions next week. We expect that we will have your full co-operation in this inquiry. If any officials of these agencies have falsified any information in the reports, their interests are not the same as those of the government.

Ninth, it seems strange that the Department of Labor reports no black or Hispanic applicants in the Chicago Civil Service Region for any of the jobs for which it was filling Schedule B vacancies. It also seems strange that the Department of Energy and the Federal Energy Regulatory Commission report no black or Hispanic applicants for any job, in any region but one. The exception was the Atlanta Civil Service Region, with 2 black applicants. We request to know what, if anything, these agencies did to advertise Schedule B vacancies to the minority community.

Tenth, we have had to check the accuracy of the figures
on the application reports.  The following discrepancies were found:

a) Internal Revenue Service, Treasury Department,

Schedule B Applicants for Revenue Officer, GS-1169 at

grades 5/7:  No less than nine errors of arithmetic

appear on this one-page report.  The errors are:

| Data | Is | Should Be |
|---|---|---|
| Zone Total:  New York Region | 935 | 904 |
| Zone Total:  Chicago Region | 138 | 144 |
| Zone Total:  Philadelphia Region | 1,192 | 1,186 |
| Zone Total:  Atlanta Region | 2,942 | 2,987 |
| White Non-Hispanic Total | 4,542 | 4,587 |
| White Non-Hispanic Percentage of Total | 52.7% | 53.1% |
| Other Applicants Total | 307 | 276 |
| Other Applicants Percentage of Total | 3.6% | 3.2% |
| Total Applicants | 8,622 | 8,636 |

The level of sloppiness in this report is so high that
it is not possible to have any confidence in any of the
figures reported.  Plaintiffs request that a responsible
official of the Treasury Department go back to the original
sources, re-compile the data, and personally certify
accurate results.

b) Navy Department, Schedule B Applicants for

Contract Specialist, GS-1102 at grades 5/7:  There are

only three arithmetic errors in this report (independently

of the problems identified above):

| Data | Is | Should Be |
|------|-----|-----------|
| Hispanic Total | 33 | 13 |
| White Non-Hispanic Total | 371 | 370 |
| Total Applicants | 486 | 485 |

We request written confirmation that these corrections

are right.

c) <u>Defense Logistics Agency, Schedule B Applicants</u>

<u>for Supply Management, GS-2000, Grade 5</u>:  There are 6

arithmetic errors in this report, independently of the

problems identified above:

| Data | Is | Should Be |
|------|-----|-----------|
| Zone Total:  San Francisco Region | 30 | 20 |
| White Non-Hispanic Total | 649 | 639 |
| Total Applicants | 996 | 986 |
| Black Percentage of Total | 30% | 30.2% |
| White Non-Hispanic Percentage of Total | 65% | 64.8% |
| Other Applicants Percentage of Total | 1.5% | 1.4% |

The arithmetic errors in the report for this job would

all disappear if the number of white (non-Hispanic)

applicants in the San Francisco region were 16 rather

than 6.  Please check first to see if there was simply

a typo in recording this information.  If not, please

confirm the accuracy of these corrections.

d) <u>Federal Home Loan Bank Board, Applicants for</u>

<u>Alternative Examining Procedure for Savings and Loan</u>

<u>Examiner (Financial Institution Examiner), Occupational</u>

Series 0570 at grades 5/7:  There are 10 arithmetic

errors on this one-page report:

| Data | Is | Should Be |
|---|---|---|
| Zone Total:  Philadelphia Region | 432 | 439 |
| Total Applicants | 27,776 | 2,603 |
| Black Applicants | 382 | 359 |
| Black Percentage of Total | 13.5% | 13.8% |
| Hispanic Applicants | 72 | 60 |
| Hispanic Percentage of Total | 2.6% | 2.3% |
| White Applicants | 2,204 | 2,073 |
| White Percentage of Total | 79.4% | 79.6% |
| Other Applicants | 118 | 111 |
| Other Percentage of Total | 4.2% | 4.3% |

Because of the degree of the errors, we cannot safely rely

on the accuracy of the individual cell entries on the

form.  A responsible official of the FHLBB should go

back to the original records, make a new compilation,

and personally certify the results.

e) Applicants for OPM-Sponsored Alternative Examining

Procedure for Computer Specialist (Trainee), GS-0334,

at grades 5/7:

There are 8 arithmetic errors on this one-page report:

| Data | Is | Should Be |
|---|---|---|
| Zone Total:  Seattle Region (for Idaho, Oregon and Washington) | 288 | 317 |
| Zone Total:  Atlanta Region | 1,225 | 1,202 |
| Total Applicants | 8,854 | 8,860 |
| Black Applicants | 1,402 | 1,431 |
| Black Percentage of Total | 15.8% | 16.2% |
| Hispanic Applicants | 418 | 395 |
| Hispanic Percentage of Total | 4.7% | 4.6% |
| White Percentage of Total | 72.5% | 72.4% |

Because of the degree of the errors, plaintiffs cannot

safely rely on the accuracy of the individual cell counts. A responsible official of OPM should go back to the original records, make a new compilation, and personally certify the results.

f) Applicants for OPM-Sponsored Alternative Examining Procedure for Criminal Investigator, Occupational Series 1811, at grades 5/7: There are 6 arithmetic errors on this one-page report, all apparently stemming from one original mistake:

| Data | Is | Should Be |
|------|-----|-----------|
| Black Applicants | 10 | 92 |
| Black Percentage of Total | 2.5% | 18.9% |
| Hispanic Percentage of Total | 5.4% | 4.5% |
| White Percentage of Total | 86.1% | 71.6% |
| Other Percentage of Total | 6.0% | 4.9% |
| Total Applicants | 404 | 486 |

Please confirm in writing the accuracy of these corrections.

g) Applicants for OPM-Sponsored Alternative Examining Procedure for General Investigator, Occupational Series 1810 at grades 5/7: The number of racially-unidentified applicants is stated to be 95, but this is merely the total for the Washington regional office. The correct total is 153, based on correct addition of the numbers in the report. Please confirm in writing the accuracy of this correction.

The above list does not include errors of a couple of tenths of a percentage point in calculating percentages, where these were the

Barbara L. Ward, Esq.
James S. Green, Esq.
January 31, 1985
Page 19

only problems in a report, and does not include obvious problems such as the use of a bracket symbol instead of a "1".

\*     \*     \*

When you consider the above problems, I think you will agree that they need to be resolved before accurate statistics can be calculated on hiring in 1983. These problems should be sorted out immediately, without going through the long delays we had in sorting out far less serious problems with the 1982 hiring data.

Any problems not yet resolved by the time of our next Monitoring Committee meeting should be taken up there. However, we do not want to delay resolution of _any_ of these questions until the time of that meeting. We want to come to closure on everything possible before that date, so that we can get accurate figures prepared for a new draft report to the Court.

Please get back to me as soon as possible.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.



**U.S. Department of Justice**

Washington, D.C. 20530

JFL:BWard:klp

Telephone:
633-3781

Richard Seymour, Esq.
Lawyers' Committee for Civil
  Rights Under Law
1400 Eye Street, N.W.
Washington, D.C.  20005

(Date-Stamped March 14, 1985)

Re:  Luevano v. Devine:  Problems
     in 1983 Statistical Reports

Dear Rick:

Below are the government's responses to your letter of January 31, 1985, concerning the Statistical Reports for 1983 hiring that were provided to you in September 1984.  In responding, I have utilized your numbering system, e.g. First, Second, etc. as well as the page numbers of your letter.

First, page 1:  There are at least three reasons hires would be shown in both the "Delegated Examining" and "Non-PACE CS Cert" columns.  First, a delegated examination either began or ended during a calendar year and OPM examining was in operation for the remainder of the year.  Second, and most applicable to the small fill occupations (i.e., series 1152, 345), there is simply a reporting error somewhere along the line in the agency input.  Third, the vast number of appointments made through "delegated examining" in the absence of a nationwide delegation (described below) would have been in the "mixed occupations," where both PACE and non-PACE jobs are in the same series.  (We have previously referred to these as the "asterisk" occupations.)  Any delegated examining of such non-PACE occupations would be local – between an OPM area or regional office and the local agency.  As has been explained, the CPDF simply canot differentiate between these occupations, so they show up in our reports when they really should not.

Nationwide delegation were in effect for 1983 for GS-570-5,(FDIC), GS-570-5/7 (FHLBB), GS-1816-5 (DOJ) and GS-1910-5 (DOD, terminated 4/15/83).  All other delegations were local PACE/PAC delegations or involved or "asterisk" occupations.

Second, Page 3:  (a) – The delegation for GS-1910-5 was for all positions within DOD, including Army.  The same examination was used for all positions.

ATTACHMENT O

(b) - The delegation for GS-570 was in effect throughout 1983. The FDIC delegation covers only GS-5, the FHLBB both 5 and 7. The agencies used different examinations and should be treated separately.

Third, Page 3: (a) - Both OPM (Washington Headquarters) and the Defense Investigative Service (DIS) received delegations of examining authority; however, they used different procedures and should be treated separately..

(b) - OPM, the institutional agency delegated authority to OPM the hiring agency to hire for General Investigator. OPM the institutional agency also had a competitive exam in effect for this occupation during 1983, however, inasmuch as this hiring was for the same occupation, it should be treated as one.

Fourth, Page 4: We are attempting to determine the necessary applicant statistics for the Schedule B applicants.

Fifth, Page 5: All Schedule B applicants are given the same applicant reporting form, the Applicant Race and National Origin (RNO) Questionnaire, E Form 618 (1/83). That formrequests that race and national origin data from the applicant to be returned with the application package. Extensive procedures have been put into effect to process the RNO data separately from the application process to avoid allegations of non-merit selection. The Schedule B authorization from OPM to an agency requires that these procedures be utilized. Thus, the number and percent of missing data is solely the product of applicant cooperation.

From the outset of negotiations concerning the defendants reporting requirements, plaintiffs have been aware that applicants are not required to supply race and national origin data and that the government will not make supplying such information a requirement for federal government employment. We stand by that position.

Sixth, Page 7: (a) (b) - All applicants were considered for all the series noted.

(c) - In this instance there are a number of Navy Offices within one region hiring under one PACE

authority #83-3 but hiring for different occupations. Thus, the numbers for the 2010 series in the Philadelphia office must be added to the numbers for the same job series from the Mechanicsburg, Pa. Office. Rather than spend pages trying to explain how these statistics came to be, Jim Green, upon your request, will explain these statistics or any others falling into this category.

(d) (e) (f) (g) and Seventh, Page 10: Different PAC authorities were issued to different segments of the Navy at different times during the year - thus the resulting statistics. The Department of Labor had two different jobs under the 201 series, but these may be considered as one.

Eighth, Page 11: "Extraordinary coincidences" - The three job classifications referenced on page 11,-GS-1101-5, GS-1910-5 and GS-2003-5-are all part of a Management Intern plan, whereby an application for one is considered an application for all three jobs series. Moreover, applicants must indicate their willingness to be posted in either of the two cities - Chicago or Dallas.

A similar explanation is applicable to the examples set out on page 12 of your January 31st letter. In Atlanta, the Industrial Specialist job, GS-1150-5 and the Supply Specialist job GS-2001-5 were announced together and applicants applied for both. The fact that the job are dissimilar does not necessarily mean that an applicant, seeking an entry-level trainee position, would not want to be considered for both. If you remember, one of the features of the PACE series was that applicants could be considered for all one-hundred-eighteen occupations.

The sitauation for those positions detailed in your chart on the bottom of page 12 is not unlike that described above. These positions were part of a Management Intern program, applicants were required to be willing to accept appointments to any one of these jobs and, where applicable, in either city.

Finally, the Defense Logistics Agency had one PAC authorization for all of the jobs listed on page 13. Thus, many of the applicants applied for more than one job.

As you can see there are legitimate explanations for each of the questions raised in this subsection. There is however, no legitimate explanation for the thinly veiled allegations of impropriety contained in your January 31st letter. In my dealings with you, I have found that you, not unlike myself or others, value highly your reputation for integrity and do not easily accept any questioning of your ethical standards. Others have similar expectations and, without some proof of impropriety your accusations concerning the integrity of those charged with reporting information is reprehensible. While I am always willling to answer any questions that may arise concerning these reports, I am unwilling to tolerate baseless attacks on the integrity of the government personnel and, in the future, will, at a minimum, simply disregard letters of this nature.

Ninth, Page 14: OPM has doubled checked this statistic with the Department of Labor in Chicago and it is, in fact, correct. OPM is still gathering information concerning DOE and FERC, but it appears that the location of the jobs may be an influencing factor.

Tenth, Page 15: (a) Your corrections to the arithmetic data are accepted.

(b) Your correction is accepted.

(c) It is a typo. White applicants should be listed as 16.

(d) (e) (f) (g) - Your corrections are accepted.

Very truly yours,

Barbara

Barbara Ward
Attorney
Federal Programs Branch
Civil Division

cc: James Green, Esq.
Gary Ewing, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

March 14, 1985

<u>BY MESSENGER</u>

Barbara Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: Luevano v. Devine: Subjects to be Discussed
> at the March 15, 1985 Monitoring Committee
> <u>Meeting</u>

Dear Barbara and Jim:

The following are some of the major subjects we need to discuss at the Monitoring Committee meeting scheduled for 10:00 A.M. tomorrow at OPM:

1. <u>Test Development Reports</u>: (a) our request that all future test development reports include the preliminary data on adverse impact which OPM is already obtaining in the course of test development, and that the preliminary information obtained to date be given to us; (b) the lack of details on OPM's efforts, if any, to find specific alternatives to proposed examining procedures which will have less adverse impact than the proposed procedures, and our request that such details be included in all test development reports; (c) our suggestion that we take the depositions of knowledgeable OPM officials to establish the specific actions taken to minimize adverse impact for the Computer Specialist (Trainee) examination, the Tax Technician examination, and any other examination which is in development and has reached the stage at which alternatives should be considered, so that we can resolve these months-old factual questions in a couple of hours; and (e) our need to obtain test development reports on a timely basis and our request that OPM provide us with such reports for all tests now in development.

ATTACHMENT P

2. <u>Other Testing Information</u>: (a) the present status of all test development efforts, including any tests about which we have not yet been informed; (b) the approximate dates on which any new tests will be administered; (c) our request that plaintiffs be provided with information on test scores, broken down by race, to help us make practically useful suggestions for minimizing adverse impact in future administrations or scoring of the tests; and (d) information on the tests listed in the government's discovery responses to the NTEU as approved examining procedures for job categories formerly subject to the PACE, about which plaintiffs have not yet received any information (see attachment A).

3. <u>Preservation of Applicant Information</u>: Our request that the government inform us whether it has retained records of the names, addresses, and scores of each applicant who has taken any examining procedure (Schedule B or otherwise) for a job category covered by the PACE and, if no such records have been kept, that the government be required to keep records of the names, addresses and scores of all applicants who took each such examining procedure (Schedule B or otherwise), so that any appropriate relief can be awarded with minimum difficulty in situations in which there has been a violation of the Consent Decree.

4. <u>Mailings to Class Members</u>: Our request that a proper notice, providing the information required by ¶ 22 of the Consent Decree, be mailed to all class members on the mailing list.

5. <u>Schedule B Authority</u>: (a) the draft Stipulation and Order we sent you in December 1984, which we need to go over paragraph by paragraph; (b) your suggestion that we agree to a monitoring procedure limited to a specific number of installations with a high number of Schedule B hires, with recordkeeping on competitions for promotion to the grade 9 level and conversion to competitive status to be limited to those installations, and with annual on-site visits to each of these installations (and the protections plaintiffs would need to have to make such a system workable, including a stipulation that the results found in the sample would be conclusively presumed to reflect the results for the country as a whole); and (c) the government's responses to the NTEU's discovery requests suggesting that there are different and lesser reduction-in-force rights for Schedule B hires than there were for PACE hires (see Attachment B).

6. <u>Use of Temporary Hires</u>: Our request for information on the projected numbers of temporary hires in the future, compared with those in the past, and for information on how these temporary hires will be selected.

7. <u>Statistical Reporting</u>: Your letter was received by messenger a couple of hours ago, and there has not yet been a chance to go through it in detail, but we will be discussing it. My initial reaction to the problem of missing race information is (a) that it will either have to be made mandatory, or the agencies administering the procedures will have to record the information, so that we have complete and reliable information in the future; (b) that the proffered explanation for missing race information does not explain the huge disparities from agency to agency, with some agencies having virtually complete race information and others having large percentages of applicants without race information; and (c) that we need to enter into a stipulation and order providing that the fragmentary information obtained before a more complete system goes into effect will be treated as a random sample, so that the percentages of race-identified applicants who are white, black, Hispanic, etc., will be conclusively presumed to reflect the percentages of all applicants who are white, black, Hispanic, etc.

8. <u>The language of your March 14, 1985 letter</u>: In objecting to my January 31, 1985 letter on problems in the statistical reports provided to us, you assert that it contained "thinly veiled allega- tions of impropriety", that my letter was "reprehensible", that it constituted "baseless attacks on the integrity of the government personnel", and that you will in the future "at a minimum, simply disregard letters of this nature." If you will re-examine my letter of January 31, 1985, you will find no language remotely approximating your language. You will find instead an unexceptionable presentation of a series of oddities in the reports provided by two agencies, a statement that we want to take the depositions of the reporting officials in those agencies, and the concluding statement: "<u>If</u> any officials of these agencies have falsified any information in the reports, their interests are not the same as those of the government." This is no more than a statement of the obvious: that the oddities are sufficient to raise reasonable doubts about the figures, and that there is a possibility of falsification. It is neither a representation nor an accusation of actual falsification. If plaintiffs cannot point out to you even the possibility of a serious problem, where the government's own figures raise a reasonable basis for considering the possibility that a serious problem exists, I do not know how it is possible to communicate. In any event, I advise you strongly not to disregard any letters plaintiffs send you con- cerning possible problems.

9. <u>Paragraph 21 Claimants</u>: Our proposed consent order changing the procedure for disposing of these claims.

Barbara Ward, Esq.
James S. Green, Esq.
March 14, 1985
Page 4


10. <u>Relief for the Adverse Impact in 1982 Hiring</u>: By separate letter attached hereto, John Erickson is making our proposals for relief.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION )
  et al., )
                                            )
          Plaintiff, )
                                            )
          v. )     Civil Action No. 84-2573
                                            )
DONALD J. DEVINE, DIRECTOR, OFFICE )
  OF PERSONNEL MANAGEMENT, et al., )
                                            )
         Defendants. )

## DEFENDANTS' ANSWERS AND OBJECTIONS TO INTERROGATORIES PROPOUNDED BY PLAINTIFFS TO DEFENDANTS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendants Donald J. Devine, James A. Baker and William Von Raab hereby answer plaintiffs' interrogatories as follows:

## [I.  INSTRUCTIONS]

\*\*\*

These interrogatories are continuing in character and require you to file supplementary answers in accordance with Rule 26(e) if you obtain further, or different, information after your initial answer and before trial.

\*\*\*

## OBJECTION TO INSTRUCTIONS

Defendants object to the characterization of these interrogatories as continuing and assume no obligation to supplement their responses except to the extent required by Rule 26 (e) of the Federal Rules of Civil Procedure.

\*\*\*

INTERROGATORIES

Interrogatory No. 1

Identify any competitive examination utilized by the Office of Personnel Management ("OPM") for testing applicants for GS 5/7 PAC positions.

Answer to Interrogatory No. 1

See paragraphs 2 and 3 of Defendants' answer to interrogatory 24.

Interrogatory No. 2

Identify any competitive examination utilized by any federal agency for testing applicants for GS 5/7 PAC positions.

Answer to Interrogatory No. 2

The examinations for the following jobs are competitive:

Bank Examiner, GS-570-5, examining authority delegated to Federal Deposit Insurance Corporation by delegation agreement numbered WA-FD-0017;

Savings and Loan Examiner, GS-570-5/7, examining authority delegated to Federal Home Loan Bank Board by delegation agreement numbered WA-FH-0019;

Agricultural Program Specialist, GS-1145-5/7, examining authority delegated to the Department of Agriculture by delegation agreement numbered MC-AG-004;

General Investigator, GS-1810-5/7, examining authority delegated to the Defense Investigative Service by delegation agreement numbered WA-DD-0044;

Immigration Inspector, GS-1816-5, examining authority delegated to the Department of Justice by delegation agreements numbered

SS-DJ-A021, E021, G021, and J021.

Information Arts Specialist, GS-1001-5/7, examining authority delegated to the Department of the Army, Ft. Knox, Tennessee by delegation agreement SE-AR-0021

Family Housing Inspector, GS-301-5, examining authority delegated to the Department of the Army, Ft. Knox, Tennessee by delegation agreement SE-AR-0021

Treasury Enforcement Agent, GS-1811, examining authority delegated to the Internal Revenue Service by delegation agreements EA-TR-0002 (IRS New York State), GL-TR-0022 (multi-region), GL-TR-0112 (IRS Central Region).

Paralegal Assistant, GS-986-5/9, examining authority delegated to the Department of Energy (Bonneville Power Administration, Portland, Oregon) by delegation agreement NW-DN-0015. (This is considered a PAC position only when the career ladder requires 2-grade intervals.)

Facilities Management, GS-1640-5/15, examining authority delegated to the Department of Energy (Bonneville Power Administration, agency wide) by delegation agreement NW-DN-0015.

Safety Management, GS-018-5/12, Intelligence, GS-132-5/12, Miscellaneous Administrative and Program, GS-301-5/12, General Claims Examiner, GS-990-5/8, Facilities Management, GS-1640-5/12, examining authority delegated to the Department of the Army (Ft. Bragg, North Carolina) by delegation agreement SE-AR-0030.

Special Agent (Intelligence), GS-1811-5/9, examining authority delegated to the Department of The Treasury (IRS Central Region) by

delegation agreement SE-TR-0044.

Special Agent (Intelligence), GS-1811-5/7, examining authority delegated to the Department of the Treasury (IRS, Kentucky) by delegation agreement SE-TR-0045.

All GS-5/7 positions formerly covered by PACE, examining authority delegated to the Department of the Army (Army Aviation Research Development Command, Ft. Rucker, Alabama) by delegation agreement SE-AR-0023.

Environmental Protection Specialist, GS-028-5/7, examining authority delegated to the Environmental Protection Agency (within OPM's New York Region) by delegation agreement SS-EP-B019.

Agricultural Economist, GS-110-5/15, examining authority delegated to the Department of Agriculture by delegation agreement WA-AG-0042.

Production Controller, examining authority delegated to the Department of the Air Force (McClellan Air Force Base) by delegation agreement WE-AF-0073.

## Interrogatory No. 3

Identify any competitive procedure which OPM believes satisfies the requirements of 5 U.S.C. § 3305.

## Objection to Interrogatory No. 3

Defendants object to this interrogatory on the grounds that it is unduly broad, burdensome, and irrelevant to the extent that it purports to require defendants to separately identify each and every competitive procedure OPM believes satisfies the requirements of 5 U.S.C. § 3305.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION   )
  et al.,                                                        )
                                                                 )
           Plaintiff,                                )
                                                                     )
         v.                                            )     Civil Action No. 84-2573
                                                               )
DONALD J. DEVINE, DIRECTOR, OFFICE      )
  OF PERSONNEL MANAGEMENT, et al.,          )
                                                               )
           Defendants.                              )
_____)

DEFENDANTS' RESPONSES TO
PLAINTIFFS' REQUESTS FOR ADMISSIONS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure,
defendants Donald J. Devine, James A. Baker and William Von Raab
respond to plaintiffs' requests for admissions as follows:

INSTRUCTIONS

***

b.  These requests for admissions shall be deemed to be
continuing until and during the course of trial.  Responses sought
by these requests must be amended by you, should new or additional
information come to your attention, in whatever form, which permits
you to provide a response.

***

OBJECTION TO INSTRUCTIONS:

Defendants object to the characterization of these requests for
admissions as continuing and assume no obligation to supplement
their responses except to the extent required by Rule 26(e) of the
Federal Rules of Civil Procedure.

service merely become eligible for promotions under these conditions, but they do not become entitled to be promoted.

Request 9. Schedule B employees and competitive service employees compete in separate reduction-in-force (RIF) procedures.

Response to Request 9. Admit in part, deny in part. The procedures prescribed in 5 C.F.R., part 351 apply to all employees, those in the excepted service and those in the competitive service, except that employees in the competitive service must receive assignment rights, which Schedule B employees may also receive at the agerncy's option. Schedule B employees are, however, in separate competitive levels for RIF.

Request 10. Schedule B employees and competitive service employees compete in different tenure groups in RIF procedures.

Response to Request 10. Admit.

Request 11. In agency RIF actions, Schedule B employees can not "bump" competitive service employees.

Response to Request 11. Admit.

Request 12. OPM has no plans to implement a competitive examination to replace the PACE exam.

Response to Request 12. Admit that OPM has no plans to implement a single, broad-based examination to replace PACE; however, OPM is developing several alternative competitive examinations for specific occupations. See defendants' answer to interrogatory 24.

Request 13. Schedule B employees are not entitled to non-competitive career ladder promotions to the GS 9 level.

Response to Request 13. Admit.

Request 14. Competitive Service employees are entitled to non-competitive career ladder promotions to the GS 9 level.

In Reply Refer To:

Your Reference:

MAR 2 1 1985

(Date-Stamped March 21, 1985)

John H. Erickson, Esquire
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, CA 94108

Re: Luevàno v. Devine

Dear Mr. Erickson:

    Pursuant to our agreement at the March 15th meeting of the monitoring committee, I have enclosed a copy of the uniform instructions on collecting race and national origin data that OPM sends to all Federal agencies who receive authorization to hire under Schedule B.

Sincerely yours,

James S. Green
Assistant General Counsel

Enclosure

cc: Richard T. Seymour, Esquire

ATTACHMENT Q

CON 132-03-9  (2/82)

SAMPLE

Dear

This refers to your letter of— requesting authority to fill
positions in various series in by Schedule
B appointments under 5 CFR 213.3202(1). We understand from discussion with
your staff that some of the positions have been filled and
that Schedule B authority is now needed for positions.

Based upon the information provided in your letter and in discussion with
and your staff, we find that your
request meets the criteria for use of the Schedule B appointing authority.
Accordingly, the is authorized to conduct external
recruiting and make appointments under the Schedule B authority for these
positions. A copy of the signed authorization is enclosed. Although
the authorization shows the projected number of vacancies to be filled in
each series, you may redistribute Schedule B slots among the listed occupa-
tions, as long as no new series are added and the total number of positions
filled by Schedule B appointments does not exceed . This authorization
will be in effect for 60 days.

Section III.I. of the Authority to Appoint provides that the agreeing
agency will comply with the data collection requirements of the Luevano v.
Devine decree. Under the decree, you are required to collect and report
data on the number of applicants who identified themselves with each of
the following groups: (1) Black; (2) Hispanic; (3) Non-Hispanic White;
and (4) Other. Attachments 1 through 5 of the Authority to Appoint are
the Schedule B PAC Authority Race and National Origin Data Collection and
Reporting Procedures and forms for collecting and reporting the required
data. We have enclosed one set of instructions and camera-ready forms.
Your Department should reproduce these forms from the originals provided.
OPM will not stock these forms for distribution.

A report of race and national origin data on this authority will be due on
January 31, 1985. In addition, because the Department of Justice has deter-
mined that the Schedule B appointing authority, 5 CFR 213.3202(1), is an
alternative examination as defined in the Luevano v. Devine decree, this
authorization is subject to the reporting requirements specified in the
decree for alternative examinations. As soon as possible, please prepare a

description of the procedures used to evaluate and select candidates for these Schedule B appointments. OPM will submit this information to the plaintiffs in accordance with the decree. The description of your selection procedures should be sent to OPM's Staffing Policy Analysis Division, Room 6526, 1900 E Street, N.W., Washington, D.C. 20415.

Please refer to the identification number PAC-        in any reports you submit in connection with this authorization.

Sincerely,

Donald J. Devine
Director

Enclosures

SCHEDULE B/PAC AUTHORITY RACE AND NATIONAL ORIGIN
DATA COLLECTION AND REPORTING PROCEDURES

## General Information

These instructions establish procedures for collecting, maintaining and
reporting Race and National Origin (RNO) data.  They are to be followed
by agencies when accepting applications for Schedule B 213.3202(1)
appointments to professional and administrative career (PAC) positions.
Those appointments are subject to the decree entered on November 19, 1981,
by the United States District Court for the District of Columbia in the
civil action known as Luevano et. al. v. Devine , No.  79-0271.  De-
fendant agencies that receive authority to make appointments under the
Schedule B/PAC authority are obliged by law to give full effect to this
decree.

## Applicant Race and National Origin Questionnaire

A new form has been developed for the purpose of collecting applicant RNO
data for Schedule B/PAC appointments; it has been designated the "Applicant
Race and National Origin Questionnaire, E 618" (see Attachment 2). The
form collects among other applicant data, information on race and national
origin.  It should take less than 5 minutes for applicants to complete.
The form advises applicants that completion of the form is voluntary,
and that the information collected on it will be used for statistical
analysis pursuant to the requirements of the lawsuit.

## Reproduction of the Applicant Race and National Origin Questionnaire, E 618

A camera copy of the Applicant Race and National Origin Questionnaire, E 618
is attached for agency use when making Schedule B/PAC appointments.  It
should be used to reproduce additional copies of the form as necessary.
OPM offices will not stock supplies of this form.

## Agency Responsibilities

Prior to accepting applications for a position covered by a Schedule
B/PAC authority, the agency should reproduce a supply of the Applicant
Race and National Origin Questionnaire, E 618 for its use.

If a recruitment notice is issued for the Schedule B/PAC position,
the agency should include a reference to the Applicant Race and
National Origin Questionnaire, E 618 in it and indicate that
completion of the form is voluntary.

When applications are accepted under the Schedule B/PAC authority,
the agency should provide a copy of the Applicant Race and National
Origin Questionnaire, E 618 to each applicant.  The Applicant Race
and National Origin Questionnaire, E 618 should be distributed along
with any other appropriate application forms.

Once the applications have been accepted under the Schedule B/PAC authority, the agency should complete those sections of the Applicant Race and National Origin Questionnaire, E 618 that are listed under the "For Agency Use Only" section of the form. Instructions for making such entries are discussed below.

## Agency Instructions for Completion of the Applicant Race and National Origin Questionnaire, E 618

Below are agency instructions on how to complete the for "Agency Use Only" sections of the Applicant Race and National Origin Questionnaire, E 618.

For Agency Use -- Agencies may use this block for any purpose
Only               deemed appropriate (i.e. to record eligibility
(Blank Block)      determinations, etc.).

Occupational -- Enter the occupational code for the position
Code            being filled in the space provided (four
                numeric codes).  If occupational code for the
                position is only three digits, enter a zero in
                the first position (e.g., the occupational
                code for Budget Analyst would be 0560).

Date        -- Enter the year, month and day the application
Received       for the PAC position was received.  The size and
               class of the data entered is 6 entries, numeric
               codes.  If the month of the year is a single
               digit, enter a zero (0) in the third position.
               For example, assume the date of receipt was
               March 31, 1983.  The date received would be entered
               as 830331.  If the day of the month is a single
               digit, enter a zero (0) in the fifth position.
               For example, assume the date of receipt was March 5,
               1983.  The date received would be entered as 830305.

RNO         -- Enter the "Name of Category Code" selected by the
Code           applicant (A, B, C, or D as appropriate).

Title       -- Enter the title of the announcement (recruitment
of             notice) under which application was made, if
Announce-      appropriate.  If no announcement was issued, leave
ment           this item blank.

Number       --   Enter the number of the announcement (recruitment
of                notice) under which application was made, if appropriate.
Announce-         If no announcement was issued, leave this item blank.
ment

Authoriza-   --   Enter the OPM authorization number assigned to the
tion              specific Schedule B/PAC authority, e.g., PAC-83-3.
Number

Comments     --   Agencies may use this block for any purpose deemed
                  appropriate.


PROCESSING RNO Data

Agencies are responsible for pre-screening the application forms
submitted by the applicants.  Such reviews are designed to reduce
recordkeeping problems and improve the chance for accuracy in the RNO
data that must be extracted and reported to OPM.

When applications are accepted for a Schedule B/PAC position and the
Applicant Race and National Origin Questionnaire, E 618 is returned
with other appropriate application forms, agencies should:

  1) make sure that all entries were properly recorded in those
     items that applicants were to complete;

        [If the applicant did not entirely complete the items on the
         Applicant Race and National Origin Questionnaire, E 618, the
         designated officials should check the companion forms for
         that individual (if identifiable) and record entries for the
         missing fields, except those fields pertaining to race and
         national origin.  If the applicant did not complete the
         sections pertaining to race and national origin consider the
         entire form to be "missing data" for purposes of the RNO
         report (see Attachment 3).  If the Applicant Race and National
         Origin Questionnaire, E 618 was returned but was not completed
         by the applicant it should also be counted as "missing data".
         If the Applicant Race and National Origin Questionnaire, E
         618 was not returned but companion forms were, the absence
         of the form should be accounted for as "missing data".]

  2) determine which applicants meet X-118 qualification require-
     ments and other job-related requirements for the position;

3) separate the Applicant Race and National Origin Questionnaire, E-618 from the companion application forms of those persons considered to be eligible for appointment and forward them to the office which has been authorized by the head of the agency or their designee to maintain and analyze the data. This will assure that the race and national origin identifications do not become a part of any personnel data files.

4) separate the Applicant Race and National Origin Questionnaire, E-618 from the companion forms of those persons considered to be ineligible for appointment and destroy them.

If any applicant wants more detailed information concerning the Applicant Race and National Origin Questionnaire or has any complaints, he or she should be directed to write to the Office of General Counsel, Office of Personnel Management, Room 5H30, 1900 E Street, N. W., Washington, D.C. 20415.

## Safeguarding, Storing, Retrieving, Retaining and Disposing of Records on the Applicant Race and National Origin Questionnaire, E-618

### Safeguarding the Records

Agencies should designate specific personnel who will be responsible for safeguarding the information reported on the Applicant Race and National Origin Questionnaire, E 618.

### Storing and Retrieving the Records

The records are to be safeguarded at all times. Records are to be retained in a secured file cabinet and room or in a computerized system accessible by confidential passwords issued only to specified personnel. Agencies must develop other safeguards as needed to protect the information from unwarranted invasions of individual applicant's privacy.

### Retention and Disposition of Records

These records are to be maintained until OPM provides a disposal schedule.

### Annual Reports

Each Department, Independent Establishment, or Government Corporation that makes Schedule B/PAC appointments will be responsible for providing, for each calendar year, the information collected on the Applicant Race and National Origin Questionnaire, E 618 to comply with the RNO data collection requirements of the decree. A new form has been developed for the purpose of reporting applicant RNO data for Schedule B/PAC appointments; it has been designated as the "Schedule B/PAC Authority Reporting Form for Luevano v. Devine Decree, E Form 619" (see Attachment 4). A camera copy of the Schedule B/PAC Reporting Form for Luevano v. Devine Decree is attached for agency use. It should be used to reproduce additional copies of the form as necessary. OPM offices will not stock supplies of this form. A separate form must be completed for each

occupational series that was covered under a Schedule B/PAC delegation agreement(s). The annual reports are due to OPM by January 30 of each year. Negative reports are required when the authorization to make Schedule B/PAC appointments was granted but not used.

Since the data collection and reporting requirements resulted from judicial action, these reports are exempted from any reporting clearances under OMB Circular No. A-40.

Reports are to be submitted by the agency headquarters to the:

> Office of Personnel Management
> Noncompetitive Staffing Branch,
> Staffing Group, Room 6A12
> Washington, DC  20415

Reports are to be submitted with a cover letter titled, RNO Data for Schedule B/PAC Appointments.

Data to be Reported

The decree requires a report on the total number of qualified applicants who identified themselves with each of the following groups: a) Black, but not of Hispanic Origin, b) Hispanic, c) White, not of Hispanic Origin d) Other (persons not included in the above categories). The responses that such applicants could have entered in the "Name of Category" section of the Applicant Race and National Origin Questionnaire, E 618 are listed below:

| Group Designation | Name of Category |
|---|---|
| Black, but not of Hispanic Origin | Code A |
| Hispanic | Code B |
| White, but not of Hispanic Origin | Code C |
| Other | Code D |

Designation totals for each of the above four categories must be reported separately.

Content of RNO Report

The information that is to be provided in the RNO reports is described in Attachment 3. The appropriate data must be reported separately for each occupational series covered by each Schedule B/PAC authority. Attachment 4

is the reporting form (and corresponding geographic jursidictions) that should be completed by agencies when reporting the RNO data. <u>Attachment 5</u> is a sample of a completed reporting form.

## Inquiries

Inquiries concerning the RNO report should be directed to the Noncompetitive Staffing Branch. Its telephone number is (202) 632-6000 (commercial), or FTS 632- 6000.

# APPLICANT RACE AND NATIONAL ORIGIN QUESTIONNAIRE

The United States District Court for the District of Columbia, in a Decree approved in a lawsuit entitled Luevano v. Devine, Civil Action No. 79-0271, has ordered that Federal Government agencies provide data on the race and national origin of applicants for certain Federal occupations. The position for which you are applying is in one of those occupations.

You are requested to complete this form. The data you supply will be used for statistical analysis pursuant to the requirements of the lawsuit. Submission of this information is voluntary. Your failure to do so will have no effect on the processing of your application for Federal employment.

Your Social Security Number (SSN) is requested under the authority of Executive Order 9397 (November 22, 1943) for the orderly administration of personnel records. Submission of your SSN is voluntary and failure to furnish your SSN on this form will have no effect on your application.

## PLEASE READ THE INSTRUCTIONS PROVIDED BELOW BEFORE COMPLETING THIS FORM

SPECIFIC INSTRUCTIONS: The categories below provide descriptions of racial and national origins. Read the Definition of Category descriptions and then place an "X" in the box next to the category with which you identify yourself. If you are of mixed racial and/or national origin, select the category with which you most closely identify yourself. NOTE: PLEASE MARK ONLY ONE BOX!

| Name (Last, First, Middle Initial) | Social Security Number (cc 1-9) | |
|---|---|---|
| Title of Position and Grade Level for Which Application is Made | Location of Position | Date |

| NAME OF CATEGORY (Mark only ONE) | DEFINITION OF CATEGORY |
|---|---|
| A ☐ Black, not of Hispanic Origin................ | A person having origins in any of the black racial groups of Africa. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| B ☐ Hispanic.................................. | A person of Mexican, Puerto Rican, Cuban, Central, or South American, or other Spanish cultures or origins. Does not include persons of Portuguese culture or origin. |
| C ☐ White, not of Hispanic Origin................ | A person having origins with any of the original peoples of Europe, North Africa, or Middle East. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| D ☐ Other................................... | Persons not included in other categories. |

## FOR AGENCY USE ONLY

| Occupational Code (cc 10-13) | Date Received (YY-MM-DD) (cc 14-19) | RNO CODE (cc 20) |
|---|---|---|
| Title of Announcement, (if appropriate) | | Number of Announcement, (if appropriate) |
| Authorization Number, (if appropriate) | | Comments |

Authorized for use by the Office of Personnel Management and Other Defendant Agencies only for the purposes of complying with the requirements of the Luevano v. Devine decree.

REPRODUCE LOCALLY

E Form 618 (1-83)

Instructions for Completing the SCHEDULE B/PAC REPORTING FORM
FOR <u>LUEVANO</u> v. <u>DEVINE</u> DECREE (E FORM 619)

| Form Item | Item Instructions/Entry |
|---|---|

1. Authorization Number     -- Enter the OPM assigned authorization number for
   the Schedule B/PAC authority (e.g., PAC-83-01).

2. Reporting Period:
   From_____To_____        -- Enter the calendar year period covered by
   the report (e.g., From <u>January 1, 1983</u>
   To <u>December 31, 1983)</u>.

3. Missing Data             -- Count the number of qualified applicants
   that did not 1) return the Applicant Race and
   National Origin Questionnaire, E 618 or
   2) complete the "Name of Category" section of
   the form.  Then enter the number.

4. Name of Agency Contact  -- Enter the name of the designated agency
   and Phone Number          contact and their phone number (FTS
   and commercial, if available).

5. Title of Department,     -- Enter title of Department, Independent
   Independent Establish-     Establishment, or Government Corporation
   ment, or Government        (i.e., Department of Defense, Veterans
   Corporation                Administration, Federal Deposit Insurance
   Corporation, etc.).

6. Name of Submitting       -- Enter the name of the office that prepared
   Office                     the report (e.g., Directorate of Civilian
   Personnel).

7. Address of Submitting    -- Enter the address of the office that prepared
   Office                     the report (e.g., Directorate of Civilian
   Personnel, Department of Army, Washington,
   D.C. 20310).

8. Occupational Title/      -- Enter the occupational title and series
   Series                     for the positions for which the Schedule B/PAC
   authority was granted (e.g., Budget Analyst,
   GS-0560).

9. Grade                    -- Enter grade level for which the Schedule B/PAC
   authority was granted. Enter either GS-5 or
   GS-7 or both.

Form Item                              Item Instructions/Entry

A. Black but not of        --    Determine which qualified applicants identified
   Hispanic origin               themselves as being Black, but not of Hispanic
                                 origin (those that entered code "A" under
                                 the "Name of Category" section on the
                                 Applicant Race and National Origin Question-
                                 naire, E 618). Count the number of those applicants
                                 that indicated an interest in being considered
                                 for positions in each specific geographic zone
                                 (see Attachment 4, page 2). Then enter the
                                 number(s) under the appropriate zone(s) of the
                                 reporting form.

B. Any Race, of                  Determine which qualified applicants identi-
   Hispanic origin               fied themselves as being of Hispanic origin
                                 (those that entered code "B" under the "Name
                                 of Category" section on the Applicant Race and
                                 National Origin Questionnaire, E 618). Count
                                 the number of those applicants that indicated in
                                 interest in being considered for positions in
                                 each specific geographic zone (see Attachment 4,
                                 page 2). Then enter the number(s) under the
                                 appropriate zone(s) of the reporting form.

C. White, Not of           --    Determine which qualified applicants identi-
   Hispanic origin               fied themselves as being White, but not of
                                 Hispanic origin (those that entered code
                                 "C" under the "Name of Category" section on
                                 the Applicant Race and National Origin
                                 Questionnaire, E 618). Count the number of those
                                 applicants that indicated an interest in
                                 being considered for positions in each specific
                                 geographic zone (see Attachment 4, page 2).
                                 Then enter the number(s) under the appropriate
                                 zone(s) of the reporting form.

D. Other Qualified         --    Determine which qualified applicants identified
   Applicants                    themselves as being "Other" (those that entered
                                 code "D" under the "Name of Category" section
                                 on the Applicant Race and National Origin Question-
                                 naire, E 618). Count the number of those applicants
                                 that indicated an interest in being considered
                                 for positions in each specific geographic zone
                                 (see Attachment 4, page 2). Then enter the
                                 number(s) under the appropriate zone(s) of the
                                 reporting form.

Form Item                          Item Instructions/Entry

10.  Zone Totals          --  Add totals derived from items A., B., and C., and
                              D. to derive "overall totals" for each geographic
                              zone.

11.  Nationwide Totals    --  Add the numbers entered for each zone for
                              items A., B., C., and D. to derive the
                              nationwide totals.

# SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) | 2. Reporting Period  From          To | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s)  FTS:  Commercial: | | |
|---|---|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation | | 6. Name of Submitting Office | | | |
| 7. Address of Submitting Office | | 8. Occupational Title/Series  GS- \| \| \| \| | | 9. Grade Level(s) |

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | | | | | | | | | | | | |
| Hispanic origin | | | | | | | | | | | | | | | |
| White, not of Hispanic origin | | | | | | | | | | | | | | | |
| Other qualified applicants | | | | | | | | | | | | | | | |
| 10. Zone Totals | | | | | | | | | | | | | | | |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

E  Form  619  (1-83)

Attachment 4  (1)

| OPM Regional Offices | Geographic Jurisdiction | Zone Code |
|---|---|---|
| **Eastern Regional Office**<br>26 Federal Plaza<br>New York, NY 10278 | New York; New Jersey (Except Camden County) | NY |
| | Puerto Rico; Virgin Islands | CR |
| **Great Lakes Regional Office**<br>230 South Dearborn Street<br>Chicago, Illinois 60604 | Illinois (except Madison and St. Clair Counties; Indiana (except Clark and Floyd Counties; Scott County, Iowa; Michigan; Minnesota (except Clay County); Ohio (except Belmont, Jefferson and Lawrence Counties); Wisconsin; Henderson, Boone, Campbell and Kenton Counties, Kentucky | CH |
| **Mid-Atlantic Regional Office**<br>William J. Green, Jr. Federal Building<br>600 Arch Street<br>Philadelphia, Pennsylvania 19106 | Delaware; Maryland (except Prince Georges, Charles, and Montgomery Counties); Pennsylvania; Virginia (except Arlington, Fairfax, Loudoun, Stafford, Prince William and King George Counties); West Virginia; Belmont, Jefferson and Lawrence Counties, Ohio; Camden County, New Jersey | PH |
| **Mid-Continent Regional Office**<br>300 Old Post Office Building<br>815 Olive Street<br>St. Louis, Missouri 63101 | Iowa (except Scott County); Kansas; Missouri; Nebraska; Madison and St. Clair Counties, Illinois | SL |
| **New England Regional Office**<br>John J. McCormack Post Office and<br>Courthouse<br>Boston, Massachusetts 02109 | Connecticut, Maine, Massachusetts, New Hampshire; Rhode Island; Vermont | BN |
| **Northwest Regional Office**<br>Federal Building<br>915 Second Avenue<br>Seattle, Washington 98174 | Alaska | AL |
| | Idaho, Oregon, Washington | SE |
| **Rocky Mountain Regional Office**<br>Denver Federal Center, Bldg. 20<br>Denver, Colorado 80225 | Colorado; Montana; North Dakota; South Dakota Utah; Wyoming; Clay County, Minnesota | DN |
| **Southeast Regional Office**<br>75 Spring Street, S.W.<br>Atlanta, Georgia 30303 | Alabama; Florida; Georgia; Kentucky (except Henderson, Boone, Campbell and Kenton Counties); Mississippi; North Carolina; South Carolina; Tennessee; Crittenden County, Arkansas, Floyd and Clark Counties, Indiana | AT |
| **Southwest Regional Office**<br>1100 Commerce Street<br>Dallas, Texas 75242 | Arkansas (except Crittenden County); Louisiana; New Mexico, Oklahoma; Texas | DA |
| **Western Regional Office**<br>525 Market Street 23rd Floor<br>23rd Floor<br>San Francisco, California 94105 | Hawaii; Guam; Pacific Ocean Area | PC |
| | Arizona; California; Nevada | SF |
| **Washington, D.C. Area Office**<br>1900 E Street, N.W.<br>Washington, DC 20415 | Washington Metropolitan Area (District of Columbia; Charles, Montgomery and Prince Georges Counties, Maryland; the cities of Alexandria, Fairfax and Falls Church, Virginia; and Arlington, Fairfax, Loudoun, Stafford, Prince William and King George Counties, overseas area (except Pacific Ocean area) | WAO |

| uthorization Number (see negoti-ted agreement)<br>PAC-83-02 | 2. Reporting Period<br>From 1/1/83  To 12/31/83 | 3. Missing Data<br>100 | 4. Name of Agency Contact and Phone Number(s)<br>Ms. Sally Jones | FTS:<br>Commercial: 202 296-5515 |
|---|---|---|---|---|

| itle of Department, Independent Establishment or Government Corporation<br>Department of Army | 6. Name of Submitting Office<br>Directorate of Civilian Personnel | | |
|---|---|---|---|

| ddress of Submitting Office<br>Directorate of Civilian Personnel,<br>Department of Army,<br>Washington, D.C.  20310 | 8. Occupational Title/Series<br>Quality Assurance Specialist  GS- 1 9 1 0 | 9. Grade Level(s)<br>GS-7 |
|---|---|---|

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| SIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 125 | | 45 | | | | | | | | | | 170 |
| Hispanic origin | | | 50 | | 15 | | | | | | | | | | 65 |
| White, not of Hispanic origin | | | 350 | | 125 | | | | | | | | | | 475 |
| Other qualified applicants | | | 75 | | 85 | | | | | | | | | | 160 |
| Zone Totals | | | 600 | | 270 | | | | | | | | | | 870 |

y those applicants who meet the appropriate qualification requirements for the position.

e definitions are on the reverse side of this form.

Attachment 5

# APPLICANT RACE AND NATIONAL ORIGIN QUESTIONNAIRE

The United States District Court for the District of Columbia, in a Decree approved in a lawsuit entitled Luevano v. Devine, Civil Action No. 79-0271, has ordered that Federal Government agencies provide data on the race and national origin of applicants for certain Federal occupations. The position for which you are applying is in one of those occupations.

You are requested to complete this form. The data you supply will be used for statistical analysis pursuant to the requirements of the lawsuit. Submission of this information is voluntary. Your failure to do so will have no effect on the processing of your application for federal employment.

Your Social Security Number (SSN) is requested under the authority of Executive Order 9397 (November 22, 1943) for the orderly administration of personnel records. Submission of your SSN is voluntary and failure to furnish your SSN on this form will have no effect on your application.

**PLEASE READ THE INSTRUCTIONS PROVIDED BELOW BEFORE COMPLETING THIS FORM**

SPECIFIC INSTRUCTIONS: The categories below provide descriptions of racial and national origins. Read the Definition of Category descriptions and then place an "X" in the box next to the category with which you identify yourself. If you are of mixed racial and/or national origin, select the category with which you most closely identify yourself. NOTE: PLEASE MARK ONLY ONE BOX!

| Name (Last, First, Middle Initial) | Social Security Number (cc 1-8) | |
| --- | --- | --- |
| Title of Position and Grade Level for Which Application is Made | Location of Position | Date |

| NAME OF CATEGORY (Mark only ONE) | DEFINITION OF CATEGORY |
| --- | --- |
| A ☐ Black, not of Hispanic Origin......................... | A person having origins in any of the black racial groups of Africa. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| B ☐ Hispanic................................................ | A person of Mexican, Puerto Rican, Cuban, Central, or South American, or other Spanish cultures or origins. Does not include persons of Portuguese culture or origin. |
| C ☐ White, not of Hispanic Origin......................... | A person having origins in any of the original peoples of Europe, North Africa, or Middle East. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| D ☐ Other................................................. | Persons not included in other categories. |

FOR AGENCY USE ONLY

| Occupational Code (cc 10-13) | Date Received (YY-MM-DD) (cc 14-19) | RNO CODE (cc 20) ▷ |
| --- | --- | --- |
| Title of Announcement, (if appropriate) | | Number of Announcement, (if appropriate) |
| Authorization Number, (if appropriate) | | Comments |

Authorized for use by the Office of Personnel Management and Other Defendant Agencies only for the purposes of complying with the requirements of the Luevano v. Devine decree.

REPRODUCE LOCALLY

E Form 618 (1-83)

# SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR <u>LUEVANO</u> v. <u>DEVINE</u> DECREE

| 1. Authorization Number (see negoti-ated agreement) | 2. Reporting Period From ‧ To | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: | | |
|---|---|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation | | 6. Name of Submitting Office | | | |
| 7. Address of Submitting Office | | 8. Occupational Title/Series GS- \| \| \| | | | 9. Grade Level(s) |

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | | | | | | | | | | | | |
| Hispanic origin | | | | | | | | | | | | | | | |
| White, not of Hispanic origin | | | | | | | | | | | | | | | |
| Other qualified applicants | | | | | | | | | | | | | | | |
| 10. Zone Totals | | | | | | | | | | | | | | | |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E    Form  619   (1-83)



BWard:jld
35-16-1319

*Washington, D.C. 20530*

Telephone:
(202) 633-3781

John Erickson, Esq.
Erickson, Beasley & Hewitt
Eighth Floor
12 Geary Street
San Francisco, California  94108

*DATED MAY 15, 1985*

Richard Seymour, Esq.
Lawyers Committee for Civil Rights
  Under Law
1400 Eye Street, N.W.
Suite 400
Washington, D. C.  20005

Barry Goldstein, Esq.
NAACP Legal Defense Fund
806 15th Street, N.W.
Washington, D. C.  20008

> Re:  <u>Luevano v. Devine</u>

Dear John, Rick & Barry:

This letter will provide you with an update concerning the issues raised at our March 15, 1985 meeting.

1. <u>Proposed Schedule for Producing Test Development Reports</u>:

| | |
|---|---|
| Customs Inspector | May 17, 1985 |
| Internal Revenue Officer | May 24, 1985 |
| Social Security Examiner & <br> Claims Representative | May 31, 1985 |
| Procurement & Contract <br> Specialist | June 7, 1985 |

2. <u>Implementation of New Examinations</u>

At present, it is OPM's intention to administer the below-listed examinations according to the following schedule:

| | |
|---|---|
| Customs Inspector | October 1985 |
| Internal Revenue Officer | November 1985 |
| Social Security Examiner & <br> Claims Representative | May 1986 |
| Procurement and Contract <br> Specialist | February 1986 |

<u>ATTACHMENT R</u>

3. Additional Schedule B Authorizations:

No agency has received hiring authority for any occupational series other than those about which plaintiffs have been previously informed. However, some agencies have been previously granted authorization to make additional hires into occupations for which Schedule B authority had been previously granted.

4. Preservation of Applicant Data:

On May 29th, OPM has scheduled an Inter-Agency Group meeting to discuss, among other matters, issues arising out of the implementation of the Luevano Consent Decree. At that time, we intend to instruct agencies to retain, until further notice, data concerning applicants, i.e., name, current address, job sought. If the agencies have a problem with this proposal, we will come back to you with further refinements.

5. Mailing to class members: As you know, the next mailing to class members is scheduled for sometime in June. At that time, class members will be informed of the scheduled implementation of the four examinations noted in paragraph two. After the last mailing approximately 16% of the letters were returned "addressee unknown". Obviously, these class members have moved and failed to notify OPM of address changes. Letters will not be mailed to these individuals in June.

If plaintiffs intend to propose an enclosure concerning Schedule B Hiring, OPM must receive it no later than May 31st.

6. Report Concerning the Conversion of Schedule B Employees to Competitive Status: This topic is also scheduled for the May 29th Inter-Agency Group meeting. At that time, we will query the agencies concerning the best methods of collecting accurate data concerning the conversion of Schedule B employees to competitive status.

7. Riffing of Schedule B Employees: If John Erickson will contact Jim Green, Jim will arrange for one of his staff persons, who is knowledgable in the field, to answer John's questions.

8. Use of Temporary Hires: OPM does not have any additional information concerning the agencies' use of Temporary Hires.

9. Provision of Computer Tapes Containing Test Answers and Racial Data: Defendants will defer making a decision concerning this issue until we receive plaintiffs' letter detailing

criticisms of the test development reports.

10. <u>Status of Delegated Examining</u> : OPM has the following delegation agreements:

a. Bank Examiner, Occupational Series 570, delegated to the Federal Deposit Insurance Corp.
b. Savings and Loan Examiner, Occupational Series, 570 Delegated to the Federal Home Loan Bank Board. (Beginning this summer, this occupation will be moved into the private sector and it is expected that many of these employees will be employed by the individual banks.)
c. Agricultural Program Specialist, Series 1145, delegated to the Department of Agriculture.
d. General Investigatory, Series 1810, delegated to the Defense Investigative Service.
e. Immigration Inspector, Series 1816, delegated to the Department of Justice, INS.

11. <u>Collection of Racial Data</u>: We are unable to agree to the requirement of mandatory racial identification by persons seeking employment with the federal government. However, at the May 29th Inter-Agency Group meeting it is our intention to raise the issue of the reporting variances in the self-identification racial data. If we receive any further information or ideas concerning this issue we will communicate them to plaintiffs.

During negotiations, the problem of unreliable statistical data associated with the federal government's policy of not requiring applicants to provide racial data was explained to plaintiffs and was the subject of discussion between the parties. At that time, the government made clear that it would not require mandatory race-identification and plaintiffs, despite their knowledge that it might produce unusable statistical data, agreed to the government's demand on this point.

Moreover, I have seen no reliable evidence to support plaintiffs' suggestion that a mandatory race-identification requirement will produce reliable applicant-race statistics.

If plaintiffs have any suggestions concerning a solution to this problem, both OPM and I am more than willing to consider it.

12. <u>Adverse Impact - 1982 Statistics</u>: We are still in the process of gathering statistical and other defense data. Since this has been a first-time request to the agencies it has taken considerably more time than expected to gather the statistical information and develop and consider other defenses which are available to the government. Consequently, defendants

seek a sixty-day extension of the dispute resolution period.

Very truly yours,

Barbara

BARBARA WARD
Trial Attorney
Federal Programs Branch
Civil Division

cc: James Green, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

July 29, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

Re:  Luevano v. Devine

Dear Barbara:

We have not yet responded to your May 15, 1985 letter because many of the items in the letter contained primarily the information that the subjects in question would be discussed at a May 29, 1985 Inter-Agency Group Meeting and we have anticipated your getting back to us with the results of the meeting.

The purpose of this letter is to ask for an update based on the results of that meeting, or on any further information which has come to OPM's attention or your attention in the interim, and to raise a few specific points.

First, we have not heard anything further about plaintiffs' proposed inclusion in the next mailing to be made to class members. By agreement, the proposed inclusion was sent to OPM on June 4, 1985. We assume that we would have heard if there is any problem, but want to make sure that it has not fallen through the cracks.

Second, point 11 in your letter concerns the collection of racial data on applicants. Plaintiffs have not agreed to the government's demand that there be no mandatory racial identification of applicants, and have only agreed to defer action on this question pending the results of the government's internal review of the problem. We retain our right to move for an Order requiring mandatory racial identification, particularly in light of the government's position, as we understand it, that it intends to reserve the right to assert that its own policy of not requiring mandatory racial identification has blocked the collection of usable statistical information on applicant-flow. This position would, if accepted by either the Court or plaintiffs, effectively make it impossible to judge the government's performance under the Decree.

ATTACHMENT S

One of the suggestions plaintiffs made at our March 15, 1985 meeting is that the racial identifications reported under the present system be checked against the Social Security Administration's records to see if the percentage of race-identified applicants reported as black, by agencies with a great deal of missing information, varies from SSA's report of the percentage of all applicants who are black. Thus, if the Army reported that it had 1,500 applicants, that it race-identified only 750 of them, and that 250 of the race-identified applicants were black, all the parties presently know is that a third of the race-identified applicants were black. What makes both sides uneasy is the possibility that the racial breakdown of the race-identified half of the applicants may not be the same as the actual racial breakdown among those who have not been race-identified. The Social Security Administration will not report on the race of individuals, but will report on the racial composition of a large list of individuals. If SSA scans the names and Social Security numbers of all 1,500 applicants and reports that a third of the entire group is black, both sides could look at the partial racial identifications with a great deal more confidence than at present.

As we mentioned before, the Civil Rights Division routinely asks the Social Security Administration to provide such information. Dave Rose should have at his fingertips the name and telephone number of Justice's contact person at SSA, and a list of the requirements to be followed in compiling the list.

Third, your May 15 letter requested a sixty-day extension of the dispute resolution period, for the government to gather any statistics it may need to contest the instances in which adverse impact was found on the basis of 1982 statistics. We did not have any problem with the request, but the additional sixty days expired July 14. Plaintiffs take it that there is no dispute from the government as to those instances of adverse impact. We must now discuss the relief to be awarded.

In broad terms, plaintiffs seek for each instance of adverse impact the immediate hire of the number of blacks and/or Hispanics corresponding to the difference between the (1) number of blacks and/or Hispanics who would have been hired if the selection rate for blacks and/or Hispanics had been the same as the selection rate for white Anglos and (2) the number of blacks and/or Hispanics actually hired. The hires in question would have to be hires of rejected or passed-over 1982 applicants in each of those instances. We suggest that the government propose the means of identifying the persons to be hired; the agency in question is probably in the best position to do so. Back pay and back seniority would have to be given the persons thus hired. For ease of figuring, we suggest that July 1, 1982 be used as the hypothetical starting point for both seniority and back pay.

The back pay would run until the persons in question are
hired. The back pay would be based on (a) the Level 5 pay rates
in effect from July 1, 1982 to the date the person hired would
have been promoted to Level 7; (b) Level 7 pay rates in effect
from the date of promotion to Level 7 until the date he or she
would have been promoted to Level 9; (c) Level 9 pay rates to the
date of promotion to Level 11; and (d) Level 11 pay rates there-
after. If the agency had a system of noncompetitive promotions
from Level 5 to Level 7 after a year at Level 5, plaintiffs suggest
we use July 1, 1983 as the date of hypothetical promotion to Level
7. Promotions to Level 9 could be handled in the same manner, with
July 1, 1984 as the hypothetical date of promotion. Promotions to
Level 11 would have July 1, 1985 as the hypothetical date of
promotion.

The persons to be hired would accordingly come in at Level
11 pay rates, and would continue to progress up the ladder of non-
competitive promotions in accordance with the usual schedule, up
to the top of the noncompetitive "career ladder". The actual duties
assigned the remedial hires would presumably be at lower levels,
until the person in question is able to handle the duties of the
higher-rated positions. The agency should provide a program of
compensatory training to make up for the remedial hires' loss of the
opportunity to gain skill by actual on-the-job experience over the
last three years.

If any of the agencies in question did not use career ladders,
or used career ladders with journeyman levels below Level 11,
plaintiffs propose that we take account of the problem of lost
promotions by using a percentage based on the percentage of persons
at one level who are in fact promoted to the higher level at a
given point in their career. We will most likely have to deal
with ranges of time. For example, if agency A competitively
promotes 50% of its Level 5 hires to Level 7 a year after hire,
and if 100% of Level 5 hires have been promoted to Level 7 by two
years after hire, back pay for the remedial hire would be based
on Level 5 pay, plus 50% of the differential between Level 5 and
Level 7 until his or her second anniversary, at which point he or
she would receive full Level 7 pay. The midpoint of 18 months seems
reasonable to use as the hypothetical date of promotion (half the
differential for a year amounts to the same as the full differen-
tial for half a year), and this hypothetical date would be the
starting point for a similar calculation as to the hypothetical
promotion to Level 9.

Now that questions of liability are behind us on the 1982
instances of adverse impact, plaintiffs would like to wrap up
the remedy questions as quickly as possible. We should probably

Barbara L. Ward, Esq.
July 29, 1985
Page 4

not defer this question until the next meeting of the Monitoring Committee, but should try to make progress in the interim.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: James S. Green, Esq.
Barry L. Goldstein, Esq.
John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 2, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

ATTACHMENT T

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re:  Luevano v. Devine:  1983 Partial Showings of
Adverse Impact

Dear Barbara and Jim:

I have enclosed for each of you two copies of plaintiffs'
partial showings of adverse impact based on the hiring and applica-
tion information reported for 1983.

The showings are not complete, because plaintiffs have not
received a number of pieces of information:

a) My January 31, 1985 letter to both of you pointed
out that plaintiffs had not been given information on appli-
cations for the following job categories:

| Scope | Occupational Series | Column of Hiring Report | Total Hires |
|-------|--------|-------------------------|-------|
| All Agencies | 0301 | Non-PACE CS Cert | 17 |
| "        " | 0570 | Non-PACE CS Cert | 20 |
| "        " | 0962 | Non-PACE CS Cert | 196 |
| "        " | 0986 | Non-PACE CS Cert | 23 |
| "        " | 1811 | Delegated Examining | 70 |
| "        " | 1910 | Delegated Examining | 40 |
| "        " | 0230 | Schedule B | 4 |
| "        " | 1170 | Schedule B | 4 |
| "        " | 1412 | Schedule B | 1 |
| Defense Dept. | 2010 | Schedule B | 25 |

Footnotes omitted.

Barbara's March 14, 1985 response said that the government was working on getting the application statistics for the "Schedule B applicants". I have assumed that the failure to mention the "Non-PACE CS Cert" applicants and the "Delegated Examining" Applicants was an oversight, and that Barbara's intent was to get us all of this information. However, we have not received any of these data. 1/

b) Although my January 31 letter requested the government to take further steps to pin down the racial identification for applicants, where substantial numbers of applicants did not have racial information recorded, we have not received any further information. I gather from Barbara's May 15, 1985 letter to John, Barry and myself that the May 29, 1985 Interagency Group meeting was supposed to produce new information or ideas, or perhaps ideas about getting information. In my July 29 letter to Barbara, I asked for the results of the meeting in this area, and repeated plaintiffs' suggestion of attempting to cross-check the partial information with the assistance of the Social Security Administration. This subject is of obvious importance: while plaintiffs have used the incomplete information already in hand for the showings of adverse impact contained in the attached document, the availability of more complete information could produce additional showings of adverse impact, or eliminate some of the showings already made in the document. Such information could also have a major effect on the relief necessary to redress adverse impact, since the relief must be proportional to the harm done.

While I am on this subject, I should point out that some of the missing racial identifications may have occurred because of the failure of officials in particular regions to send out the Applicant Race and National Origin Questionnaire. For example, when one looks at the statistics for missing data as to OPM-sponsored alternative examinations, it is clear that some regions of OPM performed much more poorly than others with respect to particular examinations. For the General Investigator examination, Series 1810, the New York region identified the race of 68 applicants, and failed to obtain racial identification for only 8 (11% of the total). For the same test, the Philadelphia office identified the race of 63 applicants, and failed to obtain data for only

---

1/ Jim told me on the phone today, in connection with a different inquiry, that the "Delegated Examining" column on the OPM hiring reports for Series 1811 positions were all delegations for positions not covered by the PACE or the consent decree. Accordingly, we can drop this one job category from the table.

30 applicants (32% of the total). The New England office also failed to race-identify a third of its applicants. Meanwhile, the Washington office identified the race of only 30 applicants, and failed to identify the race of 95 (76% of the total). This suggests that some offices were more careful than others in issuing the questionnaire.

Most of the application reporting forms do not have regional breakdowns for missing racial information. Plaintiffs request this information. Because different civil service regions have different racial population and labor force compositions, regional breakdowns may help us find out possible distortions in the figures.

c) We have previously discussed with you the fact that you expected to get hiring information from the General Accounting Office for 1983 and had not yet gotten it. We need it.

Please do everything you can to get the missing information to us, so that we can make any necessary changes to the accompanying showings of adverse impact, make any additional showings which are appropriate, and have the information we need to frame the proper remedy.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Co-counsel

Enclosures



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 4, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

      Re:  <u>Luevano v. Devine</u>

Dear Barbara:

     This is just to remind you that we have not had any
response to my July 29 letter, and that we have still not heard
anything about the results of the May 29, 1985 Inter-Agency
Group Meeting.

                    Very truly yours,

                    Richard T. Seymour

RTS/lb

cc:  Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

ATTACHMENT U



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 24, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W.
Room 5H30
Washington, D.C. 20415

Re: <u>Luevano v. Devine</u>: Applicants Whose Race Was Not
Identified

Dear Barbara and Jim:

We are starting to go through the 1984 reports on applications and hires which were delivered to us last week. The first thing we've noticed is that the problem of applicants whose race is not identified is still present. I've set forth below the complete 1984 figures for all OPM-sponsored alternative examining procedures and all delegated examining procedures. They show no improvement from 1983. The figures are:

### 1984 APPLICANTS WHOSE RACE WAS NOT IDENTIFIED

| Agency and Job Category | Total Applicants | Race Not Identified | % of Applicants Not Identified |
|---|---|---|---|
| A.  OPM-Sponsored Alternative Examining Procedures | | | |
| Computer Specialist (Trainee) GS-0334-5/7 | 5,079 | 3,037 | 59.8% |
| Game Law Enforcement (Fish and Wildlife), GS-1812-5 | 29 | 15 | 51.7% |
| Criminal Investigator, GS-1811-5/7 | 451 | 157 | 34.8% |

ATTACHMENT V

Barbara L. Ward, Esq.
James S. Green, Esq.
October 24, 1985
Page 2

| Agency and Job Category | Total Applicants | Race Not Identified | % of Applicants Not Identified |
|---|---|---|---|
| General Investigator, GS-1810-5/7 | 2,067 | 458 | 22.2% |
| Printing Management Specialist, GS-1654-5/7 | 47 | 47 | 100% |
| Economist, GS-0110-5/7 | 306 | 174 | 56.9% |

B. Delegated Examining Procedures

    1. Justice Department

| | | | |
|---|---|---|---|
| Immigration Inspector/Examiner, GS-1816-5 | 5,570 | 2,550 | 45.8% |

    2. Agriculture Department

| | | | |
|---|---|---|---|
| Agricultural Program Specialist, GS-1145-7 | 21 | 4 | 19.0% |
| Agricultural Program Specialist, GS-1145-5 | 72 | 19 | 26.4% |

    3. Defense Investigative Service

| | | | |
|---|---|---|---|
| General Investigator, GS-1810-5/7 | 260 | 0 | 0% |

    4. Federal Deposit Insurance Corp.

| | | | |
|---|---|---|---|
| Bank Examiner (Trainee), GS-0570-5 | 429 | 268 | 62.5% |

    5. Federal Home Loan Bank Board

| | | | |
|---|---|---|---|
| Savings and Loan Examiner GS-0570-5 | 2,232 | 0 | 0% |
| Savings and Loan Examiner, GS-0570-7 | 366 | 0 | 0% |
| Savings and Loan Examiner, GS-0570-5/7 | 1,736 | 0 | 0% |

Barbara L. Ward, Esq.
James S. Green, Esq.
October 24, 1985
Page 3

It will take a while to tabulate the results for Schedule B applications, but leafing through them shows similar results.

As with the 1983 statistics, plaintiffs cannot understand why some agencies, such as the Defense Investigative Service and the Federal Home Loan Bank Board, can manage to race-identify every applicant while other agencies such as OPM and the Justice Department are missing such a high percentage of racial identifications. Nor do we understand how OPM failed to obtain racial identifications from 60% of the applicants for the Computer Specialist (Trainee) and Economist job categories, while doing so much better on the General Investigator job category. Again, the failure to obtain a single racial identification as to the Printing Management Specialist job category, where the information only had to be obtained from 47 persons, contrasts sharply with the better performance of the Agriculture Department when dealing with small samples.

Plaintiffs understand the government's official position to be that every agency does the same thing in attempting to obtain racial identifications. As with the 1983 statistics, however, the figures suggest that some agencies are trying harder than others to obtain the data.

There was an inter-agency meeting on this and other questions on May 29 of this year. You had promised to get back to us after this meeting with suggestions for improvements in obtaining racial identification (see your May 15 letter), but we have not heard from you (see my July 29, August 4, and October 4 letters). Plaintiffs had also made their own proposal for obtaining racial breakdowns through the Social Security Administration. We have not gotten a response.

The conciliation period on all issues expired October 15, 1985, and plaintiffs have 45 days from that date within which to file motions in Court. If the government has anything to say to us on this subject before we file our motion, the government should say it quickly.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

February 4, 1986

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re: Luevano v. Devine

Dear Barbara and Jim:

The extended conciliation period on all issues expired
January 15, 1986, and I want to re-capitulate a number of matters
on which plaintiffs are still waiting for a response:

a) our proposed stipulations and Consent Order on
the use of Schedule B authority and whether Schedule B
authority is an "alternative examining procedure" within
the meaning of the Consent Decree;

b) our showings of adverse impact based on the 1982
hiring statistics;

c) our showings of adverse impact based upon the 1983
application and hiring statistics;

d) the requests for further statistical information
contained in my letter of August 2, 1985 to both of you,
in which I pointed out that plaintiffs had not been given
any applicant statistics for four job categories covered
by Non-PACE CS Certificates, two jobs covered by Delegated
Examining Procedures, and four agencies subject to Schedule
B authority. This letter repeated requests made in my
January 31, 1985 letter to you, and which Barbara's March
14, 1985 response said the government was working on.

ATTACHMENT W

This letter also requested information about the results of the May 29, 1985 Interagency Group Meeting on the subject of obtaining better racial identifications of applicants, and requesting a response to our proposal of asking the Social Security Administration to tell us the percentages of applicants who were black. A copy of this letter is attached for ease of reference.

e) the request for further statistical information, requesting a complete breakdown of hires for 1982, 1983, and 1984, distinguishing between hires in "asterisk" positions of a type formerly covered by the PACE, and hires in "asterisk" positions of a type formerly not covered by the PACE. See the attached copy of my August 5, 1985 letter to both of you.

f) On December 20, 1985, Barry Goldstein had a copy of plaintiffs' Comments on the test development summary for the Computer Specialist (Trainee) position hand-delivered to Barbara. The comments would be virtually the same for the other test development summaries we have been given, because the summaries track each other in the important respects covered by our Comments. Barbara's May 15, 1985 letter to us said that the government's response to our request for the provision of computer tapes containing test answers and racial identifications was being held in abeyance pending receipt of our comments. See item 9 of Barbara's letter to us, a copy of which is attached.

g) Barbara's May 15, 1985 letter to us stated that she would get back to us on a number of matters after the May 29, 1985 Interagency Group Meeting. These issues included:

1) preservation of applicant data (perhaps we have heard nothing further because the agencies have all agreed to preserve the data; if so, we would like confirmation; if not, we would like to know the problems);

2) mailings to class members: plaintiffs still do not know if their June 4, 1985 proposed explanation (copy attached) has been in fact mailed to class members;

3) report concerning the conversion of Schedule B Employees to competitive status;

4) the results of the May 29th Interagency Group Meeting on variances in the collection of racial data have been gone into on the telephone a few times, but we understood that a detailed written report would be made once the report was approved by Justice. We have not gotten it.

h) My July 29, 1985 letter to Barbara listed a number of matters as to which plaintiffs had not yet received the information they had requested, and proposed specific relief for the showings of adverse impact from the 1982 hiring reported to us. A copy is attached.

i) My October 4, 1985 letter to Barbara reminded her that we had still not had a response to my July 29, 1985 letter. A copy is attached.*

j) My October 24, 1985 letter to Barbara made the same point, and included a two-page table listing the 1984 percentages of applicants for OPM-sponsored alternative examining procedures and delegated examining procedures who were not race-identified. A copy is attached.

We need to get the information for which we have asked. Will you give us the information now, or at least give us a timetable for responding to these requests?

Plaintiffs also request copies of all mailings to class members we have not yet received, and request updated information on the development or use of alternative examining procedures.

Sincerely,

Richard T. Seymour

RTS/lb
Enclosures

cc: Barry L. Goldstein (with encl.)
John H. Erickson (with encl.)

---

* Barbara informed me orally that the assumption of my July 29 letter to her---to the effect that the government's failure to respond within the conciliation period to our showings of adverse impact meant that the government conceded liability---was wrong. My August 2, 1985 letter to Barbara confirmed this position. (Copy attached).



---

BWard:jld
35-16-1319

*Washington, D.C. 20530*

Telephone:
(202) 633-3781

John Erickson, Esq.
Erickson, Beasley & Hewitt
Eighth Floor
12 Geary Street
San Francisco, California  94108

*DATED MAY 15, 1985*

Richard Seymour, Esq.
Lawyers Committee for Civil Rights
  Under Law
1400 Eye Street, N.W.
Suite 400
Washington, D. C.  20005

Barry Goldstein, Esq.
NAACP Legal Defense Fund
806 15th Street, N.W.
Washington, D. C.  20008

Re:  <u>Luevano v. Devine</u>

Dear John, Rick & Barry:

This letter will provide you with an update concerning the issues raised at our March 15, 1985 meeting.

1. <u>Proposed Schedule for Producing Test Development Reports</u>:

| | |
|---|---|
| Customs Inspector | May 17, 1985 |
| Internal Revenue Officer | May 24, 1985 |
| Social Security Examiner &<br>  Claims Representative | May 31, 1985 |
| Procurement & Contract<br>  Specialist | June 7, 1985 |

2. <u>Implementation of New Examinations</u>

At present, it is OPM's intention to administer the below-listed examinations according to the following schedule:

| | |
|---|---|
| Customs Inspector | October 1985 |
| Internal Revenue Officer | November 1985 |
| Social Security Examiner &<br>  Claims Representative | May 1986 |
| Procurement and Contract<br>  Specialist | February 1986 |

3. <u>Additional Schedule B Authorizations</u>:

No agency has received hiring authority for any occupational series other than those about which plaintiffs have been previously informed. However, some agencies have been previously granted authorization to make additional hires into occupations for which Schedule B authority had been previously granted.

4. <u>Preservation of Applicant Data</u>:

On May 29th, OPM has scheduled an Inter-Agency Group meeting to discuss, among other matters, issues arising out of the implementation of the <u>Luevano</u> Consent Decree. At that time, we intend to instruct agencies to retain, until further notice, data concerning applicants, <u>i.e.</u>, name, current address, job sought. If the agencies have a problem with this proposal, we will come back to you with further refinements.

5. <u>Mailing to class members</u>: As you know, the next mailing to class members is scheduled for sometime in June. At that time, class members will be informed of the scheduled implementation of the four examinations noted in paragraph two. After the last mailing approximately 16% of the letters were returned "addressee unknown". Obviously, these class members have moved and failed to notify OPM of address changes. Letters will not be mailed to these individuals in June.

If plaintiffs intend to propose an enclosure concerning Schedule B Hiring, OPM must receive it no later than May 31st.

6. <u>Report Concerning the Conversion of Schedule B Employees to Competitive Status</u>: This topic is also scheduled for the May 29th Inter-Agency Group meeting. At that time, we will query the agencies concerning the best methods of collecting accurate data concerning the conversion of Schedule B employees to competitive status.

7. <u>Riffing of Schedule B Employees</u>: If John Erickson will contact Jim Green, Jim will arrange for one of his staff persons, who is knowledgable in the field, to answer John's questions.

8. <u>Use of Temporary Hires</u>: OPM does not have any additional information concerning the agencies' use of Temporary Hires.

9. <u>Provision of Computer Tapes Containing Test Answers and Racial Data</u>: Defendants will defer making a decision concerning this issue until we receive plaintiffs' letter detailing

criticisms of the test development reports.

10. <u>Status of Delegated Examining</u> :  OPM has the following delegation agreements:

a. Bank Examiner, Occupational Series 570, delegated to the Federal Deposit Insurance Corp.
b. Savings and Loan Examiner, Occupational Series, 570 Delegated to the Federal Home Loan Bank Board. (Beginning this summer, this occupation will be moved into the private sector and it is expected that many of these employees will be employed by the individual banks.)
c. Agricultural Program Specialist, Series 1145, delegated to the Department of Agriculture.
d. General Investigatory, Series 1810, delegated to the Defense Investigative Service.
e. Immigration Inspector, Series 1816, delegated to the Department of Justice, INS.

11. <u>Collection of Racial Data</u>:  We are unable to agree to the requirement of mandatory racial identification by persons seeking employment with the federal government.  However, at the May 29th Inter-Agency Group meeting it is our intention to raise the issue of the reporting variances in the self-identification racial data.  If we receive any further information or ideas concerning this issue we will communicate them to plaintiffs.

During negotiations, the problem of unreliable statistical data associated with the federal government's policy of not requiring applicants to provide racial data was explained to plaintiffs and was the subject of discussion between the parties.  At that time, the government made clear that it would not require mandatory race-identification and plaintiffs, despite their knowledge that it might produce unusable statistical data, agreed to the government's demand on this point.

Moreover, I have seen no reliable evidence to support plaintiffs' suggestion that a mandatory race-identification requirement will produce reliable applicant-race statistics.

If plaintiffs have any suggestions concerning a solution to this problem, both OPM and I am more than willing to consider it.

12. <u>Adverse Impact - 1982 Statistics</u>:  We are still in the process of gathering statistical and other defense data. Since this has been a first-time request to the agencies it has taken considerably more time than expected to gather the statistical information and develop and consider other defenses which are available to the government.  Consequently, defendants

seek a sixty-day extension of the dispute resolution period.

Very truly yours,

*Barbara*

BARBARA WARD
Trial Attorney
Federal Programs Branch
Civil Division

cc: James Green, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 4, 1985

BY MESSENGER

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: Luevano v. Devine:  Insert for Next Mailing to
> Class Members

Dear Jim:

I've enclosed our proposed insert for the next mailing to
class members under ¶ 21 of the Consent Decree.  OPM should either
have the information for the attachment ready to hand, or should
be able to pull it together without much difficulty.  As a
practical matter, such information is essential if class members
are to be able to make applications for the jobs in which they
are interested.  If there is any difficulty, please give me a call.

I assume that the next mailing will inform class members
of the upcoming alternative examinations to be administered in the
next several months, and of the manner in which they can apply for
these jobs.  If not, please give me a call.

With best wishes,

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.
     Barry L. Goldstein, Esq.
     John H. Erickson, Esq.

Enclosure



## Schedule B Hires

The Consent Decree in <u>Luevano v. Campbell</u> provided that the government would develop alternative examining procedures for the various job categories formerly covered by the PACE. Because of the expense of developing and validating new tests, and because of the low level of hiring at many agencies caused by budget cuts, OPM has decided to allow some agencies to perform their own hiring in certain job categories. These "Schedule B hires" have the same civil service rights as persons hired under the PACE, but are not considered competitive civil service employees. Schedule B hires will become competitive civil service employees if they succeed in a competition for positions at the grade 9 level. You can find out more about Schedule B by contacting the nearest OPM Area Office or Job Center.

The attachment lists the agencies which currently have Schedule B authority, and lists the job categories each agency can fill under Schedule B. The attachment also shows the address you can write at each agency, to find out how to apply for the Schedule B jobs that agency can fill.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

July 29, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

Re:  Luevano v. Devine

Dear Barbara:

We have not yet responded to your May 15, 1985 letter because many of the items in the letter contained primarily the information that the subjects in question would be discussed at a May 29, 1985 Inter-Agency Group Meeting and we have anticipated your getting back to us with the results of the meeting.

The purpose of this letter is to ask for an update based on the results of that meeting, or on any further information which has come to OPM's attention or your attention in the interim, and to raise a few specific points.

First, we have not heard anything further about plaintiffs' proposed inclusion in the next mailing to be made to class members. By agreement, the proposed inclusion was sent to OPM on June 4, 1985. We assume that we would have heard if there is any problem, but want to make sure that it has not fallen through the cracks.

Second, point 11 in your letter concerns the collection of racial data on applicants. Plaintiffs have not agreed to the government's demand that there be no mandatory racial identification of applicants, and have only agreed to defer action on this question pending the results of the government's internal review of the problem. We retain our right to move for an Order requiring mandatory racial identification, particularly in light of the government's position, as we understand it, that it intends to reserve the right to assert that its own policy of not requiring mandatory racial identification has blocked the collection of usable statistical information on applicant-flow. This position would, if accepted by either the Court or plaintiffs, effectively make it impossible to judge the government's performance under the Decree.

One of the suggestions plaintiffs made at our March 15, 1985 meeting is that the racial identifications reported under the present system be checked against the Social Security Administration's records to see if the percentage of race-identified applicants reported as black, by agencies with a great deal of missing information, varies from SSA's report of the percentage of all applicants who are black. Thus, if the Army reported that it had 1,500 applicants, that it race-identified only 750 of them, and that 250 of the race-identified applicants were black, all the parties presently know is that a third of the race-identified applicants were black. What makes both sides uneasy is the possibility that the racial breakdown of the race-identified half of the applicants may not be the same as the actual racial breakdown among those who have not been race-identified. The Social Security Administration will not report on the race of individuals, but will report on the racial composition of a large list of individuals. If SSA scans the names and Social Security numbers of all 1,500 applicants and reports that a third of the entire group is black, both sides could look at the partial racial identifications with a great deal more confidence than at present.

As we mentioned before, the Civil Rights Division routinely asks the Social Security Administration to provide such information. Dave Rose should have at his fingertips the name and telephone number of Justice's contact person at SSA, and a list of the requirements to be followed in compiling the list.

Third, your May 15 letter requested a sixty-day extension of the dispute resolution period, for the government any statistics it may need to contest the instances in which adverse impact was found on the basis of 1982 statistics. We did not have any problem with the request, but the additional sixty days expired July 14. Plaintiffs take it that there is no dispute from the government as to those instances of adverse impact. We must now discuss the relief to be awarded.

In broad terms, plaintiffs seek for each instance of adverse impact the immediate hire of the number of blacks and/or Hispanics corresponding to the difference between the (1) number of blacks and/or Hispanics who would have been hired if the selection rate for blacks and/or Hispanics had been the same as the selection rate for white Anglos and (2) the number of blacks and/or Hispanics actually hired. The hires in question would have to be hires of rejected or passed-over 1982 applicants in each of those instances. We suggest that the government propose the means of identifying the persons to be hired; the agency in question is probably in the best position to do so. Back pay and back seniority would have to be given the persons thus hired. For ease of figuring, we suggest that July 1, 1982 be used as the hypothetical starting point for both seniority and back pay.

The back pay would run until the persons in question are hired. The back pay would be based on (a) the Level 5 pay rates in effect from July 1, 1982 to the date the person hired would have been promoted to Level 7; (b) Level 7 pay rates in effect from the date of promotion to Level 7 until the date he or she would have been promoted to Level 9; (c) Level 9 pay rates to the date of promotion to Level 11; and (d) Level 11 pay rates thereafter. If the agency had a system of noncompetitive promotions from Level 5 to Level 7 after a year at Level 5, plaintiffs suggest we use July 1, 1983 as the date of hypothetical promotion to Level 7. Promotions to Level 9 could be handled in the same manner, with July 1, 1984 as the hypothetical date of promotion. Promotions to Level 11 would have July 1, 1985 as the hypothetical date of promotion.

The persons to be hired would accordingly come in at Level 11 pay rates, and would continue to progress up the ladder of noncompetitive promotions in accordance with the usual schedule, up to the top of the noncompetitive "career ladder". The actual duties assigned the remedial hires would presumably be at lower levels, until the person in question is able to handle the duties of the higher-rated positions. The agency should provide a program of compensatory training to make up for the remedial hires' loss of the opportunity to gain skill by actual on-the-job experience over the last three years.

If any of the agencies in question did not use career ladders, or used career ladders with journeyman levels below Level 11, plaintiffs propose that we take account of the problem of lost promotions by using a percentage based on the percentage of persons at one level who are in fact promoted to the higher level at a given point in their career. We will most likely have to deal with ranges of time. For example, if agency A competitively promotes 50% of its Level 5 hires to Level 7 a year after hire, and if 100% of Level 5 hires have been promoted to Level 7 by two years after hire, back pay for the remedial hire would be based on Level 5 pay, plus 50% of the differential between Level 5 and Level 7 until his or her second anniversary, at which point he or she would receive full Level 7 pay. The midpoint of 18 months seems reasonable to use as the hypothetical date of promotion (half the differential for a year amounts to the same as the full differential for half a year), and this hypothetical date would be the starting point for a similar calculation as to the hypothetical promotion to Level 9.

Now that questions of liability are behind us on the 1982 instances of adverse impact, plaintiffs would like to wrap up the remedy questions as quickly as possible. We should probably

Barbara L. Ward, Es
July 29, 1985
Page 4

not defer this question until the next meeting of the Monitoring
Committee, but should try to make progress in the interim.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:   James S. Green, Esq.
      Barry L. Goldstein, Esq.
      John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 2, 1985


Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: Luevano v. Devine: 1983 Partial Showings of
>     Adverse Impact

Dear Barbara and Jim:

I have enclosed for each of you two copies of plaintiffs' partial showings of adverse impact based on the hiring and application information reported for 1983.

The showings are not complete, because plaintiffs have not received a number of pieces of information:

a) My January 31, 1985 letter to both of you pointed out that plaintiffs had not been given information on applications for the following job categories:

| Scope | Occupational Series | Column of Hiring Report | Total Hires |
|---|---|---|---|
| All Agencies | 0301 | Non-PACE CS Cert | 17 |
| " " | 0570 | Non-PACE CS Cert | 20 |
| " " | 0962 | Non-PACE CS Cert | 196 |
| " " | 0986 | Non-PACE CS Cert | 23 |
| " " | 1811 | Delegated Examining | 70 |
| " " | 1910 | Delegated Examining | 40 |
| " " | 0230 | Schedule B | 4 |
| " " | 1170 | Schedule B | 4 |
| " " | 1412 | Schedule B | 1 |
| Defense Dept. | 2010 | Schedule B | 25 |

Footnotes omitted.

Barbara's March 14, 1985 response said that the government
was working on getting the application statistics for the
"Schedule B applicants". I have assumed that the failure
to mention the "Non-PACE CS Cert" applicants and the
"Delegated Examining" Applicants was an oversight, and that
Barbara's intent was to get us all of this information.
However, we have not received any of these data. 1/

b) Although my January 31 letter requested the govern-
ment to take further steps to pin down the racial identifica-
tion for applicants, where substantial numbers of applicants
did not have racial information recorded, we have not
received any further information. I gather from Barbara's
May 15, 1985 letter to John, Barry and myself that the May 29,
1985 Interagency Group meeting was supposed to produce new
information or ideas, or perhaps ideas about getting informa-
tion. In my   July 29 letter to Barbara, I asked for the
results of the meeting in this area, and repeated plaintiffs'
suggestion of attempting to cross-check the partial informa-
tion with the assistance of the Social Security Adminis-
tration. This subject is of obvious importance:  while
plaintiffs have used the incomplete information already in
hand for the showings of adverse impact contained in the
attached document, the availability of more complete informa-
tion could produce additional showings of adverse impact, or
eliminate some of the showings already made in the document.
Such information could also have a major effect on the relief
necessary to redress adverse impact, since the relief must
be proportional to the harm done.

While I am on this subject, I should point out that
some of the missing racial identifications may have occurred
because of the failure of officials in particular regions to
send out the Applicant Race and National Origin Questionnaire.
For example, when one looks at the statistics for missing
data as to OPM-sponsored alternative examinations, it is
clear that some regions of OPM performed much more poorly
than others with respect to particular examinations. For
the General Investigator examination, Series 1810, the New
York region identified the race of 68 applicants, and failed
to obtain racial identification for only 8 (11% of the total).
For the same test, the Philadelphia office identified the
race of 63 applicants, and failed to obtain data for only

_____

1/ Jim told me on the phone today, in connection with a
different inquiry, that the "Delegated Examining" column on the OPM
hiring reports for Series 1811 positions were all delegations for
positions not covered by the PACE or the consent decree. Accordingly,
we can drop this one job category from the table.

30 applicants (32% of the total). The New England office also failed to race-identify a third of its applicants. Meanwhile, the Washington office identified the race of only 30 applicants, and failed to identify the race of 95 (76% of the total). This suggests that some offices were more careful than others in issuing the questionnaire.

Most of the application reporting forms do not have regional breakdowns for missing racial information. Plaintiffs request this information. Because different civil service regions have different racial population and labor force compositions, regional breakdowns may help us find out possible distortions in the figures.

c) We have previously discussed with you the fact that you expected to get hiring information from the General Accounting Office for 1983 and had not yet gotten it. We need it.

Please do everything you can to get the missing information to us, so that we can make any necessary changes to the accompanying showings of adverse impact, make any additional showings which are appropriate, and have the information we need to frame the proper remedy.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Co-counsel

Enclosures



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 2, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re: <u>Luevano v. Devine: 1982 Adverse Impact Showings</u>

Dear Barbara and Jim:

Barbara mentioned on the telephone earlier this week that she was about to send me a letter, in response to my January 29 letter, stating that the government did not agree with plaintiffs' showings of adverse impact for 1982 and that more time was needed to pull together the facts she needs to have before responding to us. She suggested a 60-day extension of the conciliation period on this question.

Since there are a lot of matters outstanding, what I propose instead is a thirty-day extension of the conciliation period on all matters raised at our March 1985 meeting. This would carry us to September 3, and both sides can have that date to shoot for in winding up business not yet finished. The week after Labor Day would also be a good time for each side to assess where we are now, and if there is any reason to prolong the conciliation period for any issue.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry L. Goldstein, Esq.
John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

August 5, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W., Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

> Re: <u>Luevano v. Devine</u>: Problems in Statistical
> Reporting, and Showings of Adverse Impact Based
> on 1982 Reports

Dear Barbara and Jim:

On July 31, Barbara called me to say, among other things, that some of plaintiffs' showings of adverse impact based on the 1982 statistics reported to us were no good because they concerned "asterisk" occupations, in which there are both positions formerly covered by the PACE and positions which were never subject to the PACE. If I understand correctly what Barbara was saying, you have gone back to the departments involved in the showings of adverse impact, and have obtained breakdowns of the hires for positions formerly covered by the PACE, excluding that part of the reported hires which were for non-PACE positions.

Plaintiffs would have no problems with restricting the reported information, and adverse-impact determinations, to that part of the hires in "asterisk" occupations which represents hires into positions formerly covered by the PACE, if the reporting system had given us such statistics. Indeed, when we were informed of the problem with the "asterisk" occupations a couple of years ago, we asked for such reports. Both of you represented, however, that it was impossible to separate out and report the hires into the positions formerly covered by the PACE.

Our position is simple: if it is impossible to separate out the PACE-type hires from the reported statistics for purposes of making the reports, it is impossible to separate them out for purposes

of defending a showing of adverse impact based on the statistics reported to us. If it is possible to separate them out for purposes of defense, then it was possible to separate them out for purposes of reporting and plaintiffs have not yet been given accurate reports on hiring for "asterisk" occupations for 1982 or 1983. For all plaintiffs know, additional showings of adverse impact would have been possible for 1982 and 1983, if we had had the information Barbara is now indicating to be available.

The government cannot have it both ways, telling us information is unavailable for our showings of adverse impact and then defending the showings by relying on the information.

Plaintiffs request a complete breakdown of hires for 1982 and 1983 (and for 1984, when such figures become available) in all "asterisk" occupations: governmentwide for the nation as a whole, governmentwide for each region, agency-by-agency for the nation as a whole, and agency-by-agency for each region.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 4, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

      Re:  <u>Luevano v. Devine</u>

Dear Barbara:

      This is just to remind you that we have not had any response to my July 29 letter, and that we have still not heard anything about the results of the May 29, 1985 Inter-Agency Group Meeting.

                    Very truly yours,

                    Richard T. Seymour

RTS/lb

cc:  Barry L. Goldstein, Esq.
      John H. Erickson, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 24, 1985

Barbara L. Ward, Esq.
U.S. Dept. of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W.
Room 5H30
Washington, D.C. 20415

> Re: <u>Luevano v. Devine</u>: Applicants Whose Race Was Not
> <u>Identified</u>

Dear Barbara and Jim:

We are starting to go through the 1984 reports on applica-
tions and hires which were delivered to us last week. The first
thing we've noticed is that the problem of applicants whose race is
not identified is still present. I've set forth below the complete
1984 figures for all OPM-sponsored alternative examining procedures
and all delegated examining procedures. They show no improvement
from 1983. The figures are:

### 1984 APPLICANTS WHOSE RACE WAS NOT IDENTIFIED

| Agency and Job Category | Total Applicants | Race Not Identified | % of Applicant Not Identified |
|---|---|---|---|
| A. OPM-Sponsored Alternative Examining Procedures | | | |
| Computer Specialist (Trainee) GS-0334-5/7 | 5,079 | 3,037 | 59.8% |
| Game Law Enforcement (Fish and Wildlife), GS-1812-5 | 29 | 15 | 51.7% |
| Criminal Investigator, GS-1811-5/7 | 451 | 157 | 34.3% |

| Agency and Job Category | Total Applicants | Race Not Identified | % of Applicants Not Identified |
|---|---|---|---|
| General Investigator, GS-1810-5/7 | 2,067 | 458 | 22.2% |
| Printing Management Specialist, GS-1654-5/7 | 47 | 47 | 100% |
| Economist, GS-0110-5/7 | 306 | 174 | 56.9% |

B. Delegated Examining Procedures

1. Justice Department

| | | | |
|---|---|---|---|
| Immigration Inspector/Examiner, GS-1816-5 | 5,570 | 2,550 | 45.8% |

2. Agriculture Department

| | | | |
|---|---|---|---|
| Agricultural Program Specialist, GS-1145-7 | 21 | 4 | 19.0% |
| Agricultural Program Specialist, GS-1145-5 | 72 | 19 | 26.4% |

3. Defense Investigative Service

| | | | |
|---|---|---|---|
| General Investigator, GS-1810-5/7 | 260 | 0 | 0% |

4. Federal Deposit Insurance Corp.

| | | | |
|---|---|---|---|
| Bank Examiner (Trainee), GS-0570-5 | 429 | 268 | 62.5% |

5. Federal Home Loan Bank Board

| | | | |
|---|---|---|---|
| Savings and Loan Examiner GS-0570-5 | 2,232 | 0 | 0% |
| Savings and Loan Examiner, GS-0570-7 | 366 | 0 | 0% |
| Savings and Loan Examiner, GS-0570-5/7 | 1,736 | 0 | 0% |

Barbara L. Ward, Esq.
James S. Green, Esq.
October 24, 1985
Page 3

It will take a while to tabulate the results for Schedule B applications, but leafing through them shows similar results.

As with the 1983 statistics, plaintiffs cannot understand why some agencies, such as the Defense Investigative Service and the Federal Home Loan Bank Board, can manage to race-identify every applicant while other agencies such as OPM and the Justice Department are missing such a high percentage of racial identifications. Nor do we understand how OPM failed to obtain racial identifications from 60% of the applicants for the Computer Specialist (Trainee) and Economist job categories, while doing so much better on the General Investigator job category. Again, the failure to obtain a single racial identification as to the Printing Management Specialist job category, where the information only had to be obtained from 47 persons, contrasts sharply with the better performance of the Agriculture Department when dealing with small samples.

Plaintiffs understand the government's official position to be that every agency does the same thing in attempting to obtain racial identifications. As with the 1983 statistics, however, the figures suggest that some agencies are trying harder than others to obtain the data.

There was an inter-agency meeting on this and other questions on May 29 of this year. You had promised to get back to us after this meeting with suggestions for improvements in obtaining racial identification (see your May 15 letter), but we have not heard from you (see my July 29, August 4, and October 4 letters). Plaintiffs had also made their own proposal for obtaining racial breakdowns through the Social Security Administration. We have not gotten a response.

The conciliation period on all issues expired October 15, 1985, and plaintiffs have 45 days from that date within which to file motions in Court. If the government has anything to say to us on this subject before we file our motion, the government should say it quickly.

Very truly yours,

Richard T. Seymour

RTS/lb

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.



JFL:BWard:bw                                    Telephone:
                              *Washington, D.C. 20530* (202) 633-3781


Richard Seymour, Esq.                  ᴹᴿ  5
Lawyers' Committee for Civil
     Rights Under Law              (March 5, 1986)
1400 'Eye' St., N. W.
Suite 400
Washington D.C. 20005

        Re. <u>Luevano v. Devine</u>:  Plaintiffs' 1982 Hiring Challenge

Dear Rick:

     This letter will respond to each of the issues raised by
your letter of February 4, 1986, except those relating to the
plaintiffs' allegations concerning adverse impact in hiring for
certain occupations.  Those will be dealt with by a separate
letter.

     1. <u>Schedule B Consent Order:</u> At the Monitoring Committee
meeting of March 1985, I stated the government's position that
the plaintiffs' proposed Consent Order concerning Schedule B
hiring was unnecessary as it is the government's position that
Schedule B is an alternative examining procedure.  Accordingly,
there is no need for a Consent Order.  My position has not
changed during the ensuing year.

     Schedule B conversions were also discussed at the Inter-
Agency Meeting in May 1985.  At that time, no agency reported
any unsolved problem with respect to Schedule B conversions.
Since that time, the conversion of Schedule B employees has
taken place as expected.  In sum, there is nothing to report.
If plaintiffs are aware of any problems with conversions of
Schedule B employees to the competitive service, please let
either Jim Green or I know of the specific problem.

     2.  With respect to the May, 1985 Interagency Group Meeting,
the following issues were discussed at that meeting:

     a) <u>Preservation of applicant data:</u>  All agencies present at
the meeting agreed to begin to maintain applicant data.  It is

<u>ATTACHMENT X</u>

my expectation that basic identifying data concerning applicants will be retained for 1986 and after. OPM has already begun to maintain applicant information concerning those persons who take OPM sponsored examinations. A letter will be mailed to all agencies to remind them of their obligation to retain identifying applicant information.

b) Class-Member Mailing: In August 1985, a mailing to class members was made, including a statement concerning the availability of information concerning Schedule B. (A copy of the mailing is enclosed.) The decision was made not to list each agency with Schedule B authority because hiring is not necessarily nationwide and, with the passage of time, positions can become available that were not available at the time of the mailing. Consequently, the best way of ensuring that class members receive the most complete information concerning employment opportunities with the federal government is to encourage the use of local OPM offices as an employment resource.

c) Collection of Applicant Race Data: As we have previously discussed, my discussions with the various agencies as well as the discussion at the May 1985 Inter-Agency meeting indicates that those agencies that are involved in face-to-face recruiting do best in collecting identifying race data from applicants. Counselors are able to guide the applicant through the application and the race-data form is filled in as a matter of course. In contrast, in those situtations where application is made by mailing in the application form, the rate is lower. The agencies themselves are at a loss to offer any other explanation.

We have urged the agencies to make greater efforts to ensure that the race-data collection form is always included with applications and that the results are correctly reported. It is my hope that our efforts during the past few months to heighten the agencies' awareness of their reporting responsibilities in this area will be reflected in this coming year's statistics. Finally, I am not aware of the "report of race-collection data" to which you refer at page 2, para. g(4) of your letter.

With respect to using race information supplied by the Social Security Administration, such information would not be helpful because the SSA has only recently begun to identify Hispanics and does not possess information concerning those persons who would be of an age to be applying for these jobs.

3. <u>General Applicant Data</u>: With respect to your request for further statistical applicant data as outlined in your letter of August 2, 1985:

a) Occupational Series 301; 962; & 986: These are "asterik" occupations and the hiring which is reported under "Non-PACE CS Cert" is hiring into the non-PACE part of the occupational series. Consequently, hiring in this category is not covered by the Consent Decree.

b) Occupational Series 570 - This is an occupation previously filled by the Federal Home Loan Bank Board. Hiring for this occupational series has been discontinued as the job is now done by private industry. Nonetheless, Jim Green is attempting to get whatever responsive information the FSLIC may have.

c) Occupational Series 1910 - Quality Assurance Specialist. This delegated examining authority was granted to DOD for the time period January 1982 - April 1983. No additional applications were received during 1983. However, 40 1982 applicants were appointed in this occupational series during 1983.

d) Occupational Series 0230; 1170; 1412; & 2010. The only DOD component that hired in occupational series 2010 was the Defense Logistics Agency (DLA). All applicants listed on the DLA 's 1983 application form for series 2000 were considered for this position. (You have already received information concerning series 2000.) Given the small number of hires in the other three occupational series, there seems to be little reason to assume that these fills were not made by use of 1982 applicants.

4. Finally, with respect to to the plaintiff's Comments on the test development summary for the Computer Specialist (Trainee) position, these comments were forwarded to those persons at OPM who are responsible for test development and validation. Inasmuch as the plaintiffs' December 20, 1985 critique of OPM's test development methodology and validity strategy for the Computer Specialist examination essentially challenged the basic assumptions upon which OPM has developed the examination and planned a validity strategy, OPM does not believe that providing these computer tapes containing test

answers and racial information will aid in the resolution of the issues raised by the plaintiffs' report.

Very truly yours,

Barbara Ward
Attorney
Federal Programs Branch
Civil Division

cc:James Green, Esq.



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

May 14, 1986

BY MESSENGER

Barbara L. Ward, Esq.
U.S. Department of Justice
Civil Division-Federal Programs Branch
10th & Pennsylvania, N.W.
Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Office of General Counsel
U.S. Office of Personnel Management
1900 E Street, N.W., Room 5H30
Washington, D.C. 20415

Re: <u>Luevano v. Campbell</u>

Dear Barbara and Jim:

     I've enclosed a draft Stipulation providing for the "test run" with Social Security Administration data. We think it is important to set forth the context, and put the matter into a stipulation filed with the Court, so that no question can arise in the future as to what was done, why it was done, or what the effect will be.

     We do not want any question to arise in the future as to the propriety of plaintiffs' agreement that, if the test results show that there is no problem for blacks in the sample procedures tested, we will assume that there is no problem for blacks or for Hispanics in any of the procedures, whether or not they were included in the sample. (If the results are mixed, we will have to talk about what we should do). I suspect that both sides will be better off with the protection of judicial approval.

     If you think that we are on the right track but need more time to consider the matter and talk with the people with whom you need to talk, I suggest that you give me a call and that we retroactively extend the conciliation period on this question through the end of the week. If you think that we are not on the right track, we need to talk right away. As of now, May 15---tomorrow---is plaintiffs' deadline for filing their motion.

ATTACHMENT Y

With best wishes,

Very truly yours,

Richard T. Seymour

RTS/lb
Enclosure

cc: Barry L. Goldstein, Esq.
John H. Erickson, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                        Plaintiffs,           )
                                             )
            v.                                )        · C.A. No. 79-0271
                                             )
CONSTANCE HORNER, et al.,                     )
                                             )
                                             )
                    Defendants.               )

STIPULATION AND ORDER ON APPLICANTS
WHOSE RACE IS NOT IDENTIFIED

        Plaintiffs and the defendants hereby stipulate to the
following matters, and the Court accepts and approves their
stipulation as consistent with the purposes of the Consent
Decree:

        1.  Paragraph 25(a) of the Consent Decree requires the
defendants to report annually to plaintiffs the number of non-
Hispanic white applicants, the number of non-Hispanic black
applicants, and the number of Hispanic applicants, who have
applied under each alternative examining procedure.

        2.  The 1983 and 1984 reports provided to plaintiffs
included a number of applicants whose race was not identified.
In some instances, the race of most applicants was identified.
In other instances, the race of most applicants was not identi-
fied.

        3.  It has been the defendants' policy and practice
that applicants are not required to state their race or ethnic

group. At least some of the missing racial identifications---perhaps most of them---are attributable to the refusal of individual applicants to state their race or ethnic group. The parties have discussed the question whether this policy or practice should be changed, but to date the parties have not been able to reach an agreement. The parties are agreed that they should obtain further information, in the manner described in this Stipulation, before concluding their discussions of this matter.

4. The Social Security Administration has information on the race of persons who have registered for Social Security numbers. It has only partial information showing whether registrants are Hispanic, because it has only recently begun to gather such information. While the Social Security Administration is legally required to protect the confidentiality of information on individuals and will not release racial information on individuals, it will state the percentage of persons on a list who are black, as long as there are enough persons on the list to preclude the possibility that it would be revealing the race of any particular person. The Civil Rights Division of the Justice Department, and the Equal Employment Opportunity Commission, have used this service of the Social Security Administration in the course of prosecuting employment discrimination lawsuits. There is a charge for the service.

5. The parties stipulate that their primary concern with the missing racial identifications is whether the missing

data are random, so that the racial and ethnic composition of the racially-identified and ethnically-identified applicants are a reasonable representation of the racial and ethnic composition of all applicants for an examining procedure.  To answer this question, the parties have agreed to the following procedure:

a)  the defendants shall provide the Social Security Administration with the Social Security numbers, and any other necessary information in the defendants' possession, for the applicants who took the examining procedures described below, and shall request the Social Security Administration to state the percentage of such applicants who are black;

b)  the procedures for which this request shall be made are:

1) the OPM-sponsored alternative examining procedure for Computer Specialist (Trainee), GS-0334, in 1984;

2) the OPM-sponsored alternative examining procedure for the Criminal Investigating (Not Treasury Enforcement Agents) job, GS-1811, in 1983 and 1984;

3) the delegated examining procedure of the Justice Department for Immigration Inspector/Examiner, GS-1816, in 1983 and 1984;

4) the delegated examining proce-

dure of the Federal Deposit Insurance
Corp. for Bank Examiner (Trainee) for 1984;

   5) the Schedule B procedure of the
Army for Management Analyst, GS-0343, in
1983 and 1984; and

   6) the Schedule B procedure of the
Army for Contract Specialist, GS-1102, in
1983 and 1984.

c) the results of this procedure for blacks
shall be accepted by all parties as showing what the
results of this procedure would be for Hispanics (if
such a procedure had been available for Hispanics), in
terms of whether the percentage of ethnically-identi-
fied applicants for a procedure who were Hispanic is a
reasonable representation of the percentage of all
applicants for that procedure who were Hispanic;

d) if the Social Security Administration's
reported percentage figure for black applicants for
each particular procedure differs by no more than plus
or minus 10% from the percentage figure calculated from
the racially-identified applicants in the defendants'
reports, that result shall be accepted by both sides as
demonstrating that the racially-identified applicants
for that procedure are a reasonable representation of
the racial and ethnic composition of all applicants for
the procedure.  In other words, if in defendants'

reports the percentage of racially-identified appli-
cants who were black was 20%, any result from the
Social Security Administration showing that blacks were
from 18% to 22% of the applicants would be accepted as
showing that the defendants' figures for racially-
identified and ethnically-identified applicants were
reasonable representations of the percentages of all
applicants for that procedure who were black or who
were Hispanic. Any larger variations between the
Social Security Administration's results and the
results obtained from the defendants' reports for
racially-identified applicants would be accepted by
both sides as demonstrating that the defendants'
figures for racially-identified and ethnically-identi-
fied applicants were _not_ reasonable representations of
the percentages of all applicants for that procedure
who were black or who were Hispanic.

    e) After receipt of the results from the
Social Security Administration, the parties shall
confer in an effort to resolve any disagreement over
the meaning of the results. If a consistent pattern is
shown for the job categories specified above, the
parties stipulate that the same pattern shall be
presumed to apply to other job categories for which no
requests were made to the Social Security Administra-
tion. The Court shall resolve any matters on which the

parties are unable to come to agreement.

6. Nothing in this Stipulation shall be construed to have any bearing on the question whether Schedule B authority or its use constitute an alternative examining procedure within the meaning of the Consent Decree.

WE STIPULATE TO THE ABOVE:


_____          _____
RICHARD T. SEYMOUR                   BARBARA L. WARD

   Attorney for Plaintiffs              Attorney for Defendants


Dated: May 15, 1986


APPROVED BY THE COURT:


                                     _____
                                     JOYCE HENS GREEN
                                     United States District Judge

Dated: _____



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

<u>By Hand</u>                                   November 25, 1986

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th & Pennsylvania N.W.
    Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Deputy General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
Room 7540
Washington, D.C. 20415

          Re: <u>Luevano v. Horner: Outstanding Matters</u>

Dear Barbara and Jim:

          The following matters are still outstanding:

          1. <u>Schedule B Authority</u>:  See my separate letter today
on this subject.

          2. <u>1982 Showings of Adverse Impact</u>:  See my separate
letter today on this subject.

          3. <u>1983 Showings of Adverse Impact</u>:  Plaintiffs made
these showings on August 2, 1985, and have not received a
response.

          4. <u>1984 Showings of Adverse Impact</u>:  Plaintiffs made
these showings on April 11, 1986, made a supplemental showing on
April 29, 1986, and have not received a response to any showing.

          5. <u>Plaintiffs' Proposals on the Claims Under ¶ 21 of
the Consent Decree</u>:  Plaintiffs made these proposals on May 8,
1986, and enclosed draft copies of letters to each of the ¶ 21
claimants, telling them the results of their claims.

          6. <u>Plaintiffs' Proposals for the Procedure for Handling
Appeals to the Court on ¶ 21 Claims</u>:  Plaintiffs sent Barbara a

ATTACHMENT Z

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 2---

draft Consent Order on January 9, 1985.  At her request, another
copy was sent to her on May 5, 1986.  Plaintiffs have never
received a response.

7.  Plaintiffs' Proposal for Performing a "Test Run" on
Racial Identification of Blacks, Using Social Security Adminis-
tration Data:  We made this suggestion at the March 15, 1985
meeting of the Monitoring Committee.  It was repeated in my July
29, 1985 letter to you.  Plaintiffs sent you a detailed proposal,
with a draft Stipulation and Order on Applicants Whose Race is
Not Identified, on May 14, 1986.  We have never received a
response.

In connection with the problem of missing racial
identifications for applicants, plaintiffs want to point out that
the defendants have been under a legal obligation to obtain and
to keep complete racial identifications of applicants.  EEOC
Management Directive 707, which went into effect on January 9,
1981, as revised in other part in January 1983, states at p. 1:

> Agencies must begin immediately to
> collect and maintain applicant flow data (see
> FPM Letters 720-4 and 720-6, and Section V of
> these instructions).  Although these FPM
> Letters recommend collection of such data,
> EEOC and OPM have agreed that their collec-
> tion should be mandatory.  Such data are
> extremely important in gauging the success of
> FEORP activities, as well as in determining
> adverse impact of selection or promotion
> techniques used by the agency.  (Collection
> of such data is required for both private and
> public sector employers, including Federal
> agencies.  See the Uniform Guidelines on
> Employee Selection Procedures, 43 FR 38,290
> (1978).

(Emphasis in original).  A copy of the revised MD-707 is attached
as Attachment A.  This Management Directive has recently been
extended to September 30, 1987.  A copy of the June 23, 1987
extension is attached as Attachment B.

8.  Preliminary Information on Adverse Impact Collected
by OPM in the Course of Test Development, Race-Identified
Answers, and Race-Identified Information on Job Performance:
All prior correspondence and communications on this subject were
summarized in my January 31, 1985 letter to both of you, stating

a Chronology of Our Discussions on Race-related Issues in Test Development Reports. This letter also discussed at length the reasons for plaintiffs' desiring to have this information. Our requests were discussed at the March 15, 1985 meeting of the Monitoring Committee. Barbara's May 15, 1985 letter stated in item 9 that the government preferred not to respond to this request until plaintiffs provided a detailed critique of OPM's test development efforts. Plaintiffs provided a lengthy commentary on December 20, 1985. Barbara 's March 5, 1986 letter stated in item 4 that, because plaintiffs' comments challenged OPM's basic assumptions in planning the development and validation of tests, OPM would not provide the race-identified answers. See my April 1, 1986 letter agreeing to extensions of the conciliation period on all issues other than the issue of the race-identified answers and two other issues, where plaintiffs believed that we had received final rejections on these matters.[1] See also my April 15, 1986 letter to both of you, which raised in subparagraph (i) the question whether the government had meant to give us a final denial on the preliminary adverse-impact information, as well.

9. <u>Plaintiffs' Statement of Attorneys' Fees and Costs for the Period from October 11, 1984 through March 31, 1986</u>: This matter has been pending since Barry's April 17, 1986 letter submitting our statement to Barbara. You have told us that you have some questions with respect to John Erickson's statements of time. We suggest that you, Barry and John have a conference call to resolve whatever questions you have, so that we can move ahead on this.

10. <u>Hires in "Asterisk" Positions</u>: The government has previously represented to us that it was not possible to break down hires in "asterisk" positions to show which of them were hired into slots which formerly would have been PACE slots, and which of them were hired into slots which would not formerly have been PACE slots. More recently, you have informed us that it <u>was</u> possible to break down these figures. We have asked for such figures for all job categories, at all agencies, pursuant to the government's obligation to report accurate hiring data under the Consent Decree. We have not received this information. See my September 16, 1983 letter to Barbara and to Jim, recounting the government's statements at the August 9, 1983 Monitoring Committee meeting that all hires into the "asterisk" jobs reported to

---

[1] Subsequently, the parties agreed to continue the conciliation period on these three issues.

Barbara L. Ward, Esq.
James S. Green, Esq.
November 25, 1986
Page 4---

date for 1982 (the first six months) were into PACE slots; my March 29, 1984 letter to Jim Green recounting his statement in our telephone conversation that it would be enormously expensive and time-consuming to go back and separate the hires in the two types of positions; Jim's April 5, 1984 response which does not take issue with this statement and states his understanding that the appropriate standard to use for "asterisk" occupations would be total selections; my August 5, 1985 letter to both of you; and see my April 4, 1986 letter to Barbara.

11. <u>Preservation of Information Identifying Applicants, for Purposes of Relief</u>: It is extremely difficult for plaintiffs to understand that the government deliberately threw away information identifying applicants who took its various selection procedures, and that it now is defending its having thrown the information away. Surely, the defendants must realize that they must now provide a nationwide notice, at government expense, to afford a remedy for the showings of adverse impact which have been made. It would have been so simple, and inexpensive, to have adopted the common-sense expedient of retaining such information.

12. <u>Plaintiffs' Proposals for Relief for the Showings of Adverse Impact</u>: Plaintiffs made their proposals in my July 29, 1985 letter to Barbara. We have not had any response.

We need to come to closure, on each of these issues, at the next meeting of the Monitoring Committee. If we cannot come to agreement, we would like to be so informed in writing, so that there will not be any question about where we stand, and so that the present sets of issues will not remain in a conciliation process which is not producing much agreement.

Very truly yours,

Richard T. Seymour

Attachments

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.

## TO THE HEADS OF FEDERAL AGENCIES

1. SUBJECT. INSTRUCTIONS FOR AFFIRMATIVE ACTION (EQUAL EMPLOYMENT OPPORTUNITY) PROGRAM PLANS FOR MINORITIES AND WOMEN FOR FISCAL YEARS 1982 THROUGH 1986.

2. PURPOSE. This directive transmits instructions to Federal agencies for development, submission and implementation of equal employment opportunity and affirmative action plans required by Section 717 of Title VII of the Civil Rights Act of 1964, as amended. Agency plans and programs must extend from Fiscal Year 1982 through Fiscal Year 1986. These agency plans are programs designated "multi-year affirmative action program plans."

3. EFFECTIVE DATE. January 9, 1981

4. SUPERSESSION. EEOC M.D. 702. December 11, 1979.

5. AUTHORITY. These instructions are prepared pursuant to EEOC's authority under Section 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e-16; Reorganization Plan No. 1 of 1978, issued pursuant to 5 USC 901 et. seq.; Executive Order 12106 (44 FR 1053, January 5, 1979); and 29 CFR part 1613 (formerly 5 CFR part 713, 43 FR 60901). In addition, the instructions outline agency obligations for submission to EEOC of plans developed under 5 USC §7201, pursuant to agreement between EEOC and OPM.

6. APPLICABILITY AND SCOPE. These instructions apply to all executive agencies (except the General Accounting Office), to military departments insofar as covered employees are concerned (definition in 5 USC §102), the U. S. Postal Service, the Postal Rate Commission, and those units of the legislative and judicial branches of the Federal government having positions in the competitive service, as specified in Section 717 (a) of Title VII of the Civil Rights Act of 1964, as amended. All agencies covered by Title VII and not by 5 USC 7201 must also prepare comparable recruitment plans based on FPM Letter 720-2 for submission to EEOC. Although SES positions are not covered by FEORP, they are covered by Section 717 and are required to be included in all agency Multi-Year Plans (MYP's).

7. RESPONSIBILITIES.

   a. The head of each agency specified in Section 6 above shall be responsible for agency compliance with these instructions.

   b. EEOC will approve or disapprove agency plans and communicate in writing results of its evaluations to the agency, with instructions for submission of revised plans if required.

   c. EEOC will report to the President (pursuant to 29 CFR 1613.205) and to the Congress on accomplishments of each agency, based on agency reports of fiscal year accomplishments and on-site or other reviews conducted by EEOC.

8. POLICIES AND PROCEDURES. The attached instructions contain revised requirements for agency multi-year affirmative action program planning.

9. AGENCY REPORTING AND SUBMISSION REQUIREMENTS.

   a. Agency Plan of Action and Milestones: March 1, 1981

   b. Multi-Year Plans: August 1, 1981

   c. Plan (see Section III) Implementation: October 1, 1981

10. ATTACHMENTS. The attached "Instructions for Affirmative Action (Equal Employment Opportunity) Program Plans for Minorities and Women for Fiscal Years 1982 through 1986" are included as part of this directive. These instructions include the following forms:

| | |
|---|---|
| Work Force Profile by Grade/Pay Levels | EEOC Form 521 |
| Work Force Profile by Occupational Series/Occupational Levels | EEOC Form 522 |
| Work Force Profile by Organizational Unit | EEOC Form 523 |

2

| Work Force Profile – Personnel Transactions | EEOC Form 524 |
| Work Force Profile – Training | EEOC Form 525 |
| Assessment of Underrepresentation | EEOC Form 526 |
| Ultimate Goal Formula | EEOC Form 527 |
| Annual Goal | EEOC Form 528 |
| Prorating Annual Goals | EEOC Form 529 |
| Barrier Analysis | EEOC Form 530 |
| Affirmative Action Plan Summary | EEOC Form 531 |
| Action Plan for the Prevention of Sexual Harassment in the Workplace | EEOC Form 532 |

11. SUPPLY OF FORMS. EEOC Form 521 through 532 can be obtained by contacting:

Forms and Directive Stock Room
Administrative Management Services
Equal Employment Opportunity Commission
2401 E. Street, N. W.
Washington, D. C.   20507

12. INQUIRIES. Further information concerning this directive may be obtained by contacting:

Office of Program Operations
Public Sector Programs
Equal Employment Opportunity Commission
2401 E Street, N. W.
Washington, D. C.   20507

Telephone:  (202) 634-6755

13. AMENDMENTS. This management directive has been amended by the following two memoranda:

Dated:    March 19, 1981
From:     Executive Director, EEOC
To:       Directors, Offices of EEO and Personnel
Subj:     Appendix "B" and Other Clarifying Materials

Dated:    June 15, 1981
From:     Acting Chairman, EEOC
To:       Heads of Federal Agencies
Subj:     Federal Multi-Year Affirmative Action Planning, FY-82-86

They are herein attached.

This report has been cleared in accordance with FPMR 101.11.11 and assigned interagency report control number 0279-EEO-OT.

Douglas X Bielan, Director
Public Sector Programs

Attachments

# TABLE OF CONTENTS

|  |  | Page Number |
|---|---|---|
| I. | INTRODUCTION .......................................... | 1 |
| II. | AFFIRMATIVE ACTION PLAN DEVELOPMENT | |
| | A. Essentials of Affirmative Action ................. | 6 |
| | B. Elements of the MYP ............................. | 8 |
| III. | DEVELOPMENT AND SUBMISSION OF AFFIRMATIVE ACTION PLANS .......................................... | 12 |
| IV. | AFFIRMATIVE ACTION PLANNING PROCESS | |
| | A. Work force Utilization Analysis ................... | 19 |
| | B. Determining the Appropriate Civilian Labor Force ..................................... | 30 |
| | C. Establishing Multi-Year Goals .................... | 33 |
| V. | ANALYSIS OF BARRIERS ................................. | 42 |
| VI. | FEORP: RECRUITING AND STAFFING STRATEGIES DESIGNED TO ACCOMPLISH AFFIRMATIVE ACTION ............. | 46 |
| VII. | EEOC EVALUATIONS OF MYP SUBMISSIONS AND AGENCY SELF-MONITORING SYSTEMS ............................... | 48 |
| VIII. | DEVELOPMENT OF A SUMMARY MULTI-YEAR PLAN ............. | 49 |

APPENDICES

| APPENDIX A | OCCUPATIONAL SERIES AND PATCO CATEGORIES FOR WHITE COLLAR PAY SYSTEMS ............................. | A-1 |
| APPENDIX B | LABOR FORCE DATA ............................. | B-1 |
| APPENDIX C | RECRUITMENT SOURCES ............................. | C-1 |

FIGURE 1a    PLAN SUBMISSION:  500 EMPLOYEES OR MORE ............... 9
             (EEOC Form 521)

FIGURE 1b    PLAN SUBMISSION:  LESS THAN 500 EMPLOYEES ............. 10

FIGURE 2     MULTI-YEAR PLANNING PROCESS ......................... 11

FIGURE 3     WORK FORCE PROFILE BY GRADE/PAY LEVELS ................ 21
             (EEOC Form 521)

FIGURE 4     WORK FORCE PROFILE BY OCCUPATIONAL
             SERIES/LEVELS (EEOC Form 522) ** ..................... 22

FIGURE 5     WORK FORCE PROFILE BY ORGANIZATION UNIT*** ............ 23
             (EEOC Form 523)

FIGURE 6     WORK FORCE PROFILE - PERSONNEL TRANSACTIONS*** ........ 24
             (EEOC Form 524)

FIGURE 7     WORK FORCE PROFILE - TRAINING*** ..................... 25
             (EEOC Form 525)

FIGURE 8     ASSESSMENT OF UNDERREPRESENTATION** .................. 26
             (EEOC Form 526)

FIGURE 9     ULTIMATE GOAL FORMULA ............................... 31
             (EEOC Form 527)

FIGURE 10    ANNUAL GOAL FORMULA ................................. 32
             (EEOC Form 528)

FIGURE 11    PRORATING ANNUAL GOALS ............................. 41
             (EEOC Form 529)

FIGURE 12    BARRIER ANALYSIS ................................... 43
             (EEOC Form 530)

FIGURE 13    AFFIRMATIVE ACTION PLAN SUMMARY ..................... 51
             (EEOC Form 531)

FIGURE 14    ACTION PLAN FOR THE PREVENTION OF SEXUAL
             HARASSMENT IN THE WORKPLACE ........................ 52
             (EEOC Form 532)

* Although Agencies and Departments are not required to use specific EEOC
  formats when providing the information as listed, these forms should be
  used as a guide for development of the Multi-Year Affirmative Action Plan.

** These forms were modified by the March 19, 1981 memorandum, subject: Appendix
   "B" and Other Clarifying Materials (hereafter referred to as the 3/19/81
   memorandum).

*** This information was made optional by the June 15, 1981 memorandum, subject:
    Federal Multi-Year Affirmative Action Planning, FY 82-86 (hereafter referred
    to as the 6/15/81 memorandum).

## Section 1. INTRODUCTION

During Fiscal Year 1980, the Equal Employment Opportunity Commission (EEOC) introduced a systematic approach to agency affirmative action planning and program development. Emphasis was placed on a results-oriented process with quantifiable goals, timetables and indices of progress. This "Transition Year" also was designed to become a predicate for development of comprehensive multi-year affirmative action plans and programs.

Basic transition period concepts will continue to apply for multi-year planning. In addition, EEOC considered existing affirmative action models in the private and public sectors to arrive at an effective system. Moreover, agency comments and suggestions were an integral part of EEOC's review of the transition year experience and development of multi-year plan instructions.

After issuance of MD-707 on January 9, 1981, several corrections and clarifications were provided to Federal agencies in the March 19, 1981, Memorandum. Additionally, as a result of discussions between EEOC and the National Archives and Records Service (NARS), the EEOC amended MD-707 by stating that certain elements should considered optional. This document reflects both the March 9, 1981, and June 15, 1981, modifications.

For the purposes of this directive, a multi-year plan (MYP) is defined as a single plan which includes affirmative action goals, timetables and program strategies to be implemented over a period of several years. The MYP must include annual goals or increments over the period of the plan that are designed to achieve the long-term goal of eliminating underrepresentation. Where there is no underrepresentation, no goals should be set. Annual agency modifications of the plans as necessary, as well as annual accomplishment reports, will be submitted to EEOC. In addition, EEOC will provide appropriate technical assistance and guidance to agencies in both the development and implementation of multi-year planning and programs.

Agencies must begin immediately to collect and maintain applicant flow data (see FPM Letters 720-4 and 720-6, and Section V of these instructions). Although these FPM Letters recommend collection of such data, EEOC and OPM have agreed that their collection should be mandatory. Such data are extremely important in gauging the success of FEORP activities, as well as in determining adverse impact of selection or promotion techniques used by the agency. (Collection of such data is required for both private and public sector employers, including Federal agencies. See the Uniform Guidelines on Employee Selection Procedures, 43 FR 38,290 (1978).)

These instructions modify some elements of the transition year program in order to adapt them to multi-year plan requirements and to clarify ambiguities or issues that were identified in Federal agency comments. The MYP instructions:

o   Provide new guidance and flexibility for determining the organizational levels at which MYP's will be developed in order to accommodate structural differences among Federal agencies; to ensure greatest accountability in plan development; and to ensure meaningful affirmative action goals. Agencies may suggest and use, with the approval of EEOC, modified organizational levels for MYP development that more closely conform with the agencies' own internal structure, personnel hiring authority delegations or management accountability systems.

o  Generally require the use of local civilian labor force data for
   determining underrepresentation and setting affirmative action
   goals. Aggregation of smaller units for MYP development at the
   regional or Major Operating Component ("MOC") level may require
   use of regional or national CLF data. However, if objective
   evidence demonstrates consistent hiring primarily from a different
   labor force market area, the agency must, instead, use such
   other data (e.g., national civilian labor force), provided that
   the agency receives prior approval from EEOC. EEOC will approve
   use of such data only upon a showing that hiring from that labor
   market area is required to meet employment needs.

o  Clarify the relationship between FEORP determinations of
   underrepresentation and the Section 717 determinations of
   underrepresentation.

   oo  Agencies will prepare FEORP plans as required by OPM's
       FPM Letter 720-2, and will submit such plans as a separable
       part of the Section 717 MYP. EEOC and OPM have agreed
       that although FEORP plans should be reviewed annually and
       revised if necessary, they need only be developed once
       every five years and be submitted to EEOC along with the
       MYP. In accordance with OPM regulations, agencies will
       submit copies of their FEORP's and necessary revisions
       upon OPM request.

   oo  Agencies are not required to conduct FEORP determinations
       of underrepresentation unless the Section 717 under-
       representation analyses for professional occupations show
       no Section 717 underrepresentation (see Section IV). For
       all other occupations, the calculations are exactly the
       same so only one calculation is required for both programs.

   oo  Agencies will continue to submit FEORP plans to EEOC.

   oo  EEOC and OPM have agreed that the same data will be used
       for both FEORP and Section 717 determinations of under-
       representation. Accordingly, paragraph III(c) of EEOC's
       Guidelines for the Development of a Federal Recruitment
       Program to implement 5 USC 7201, as amended, is superceded
       by these instructions, insofar as it is inconsistent with
       these instructions.

o  Provide new guidance for defining employment categories by grouping
   occupational series and levels for purposes of determining
   underrepresentation and for the establishment, assignment and
   reporting of affirmative action goals.

o   Provide a new affirmative action goal formula that:

   oo   gives a methodology for estimating opportunities based on the
        past five years;

   oo   utilizes percentage "rates of hire" that should be maintained
        to meet agency affirmative action goals;

   oo   provides a method for prorating opportunities among underrepresented
        groups when more opportunities are required to eliminate under-
        representation of all groups than are actually available; and

   oo   provides for accelerated hiring rates where severe underrepresen-
        tation is found.*

o   Distinguish the limited barrier analysis required in Year One of the
    MYP and the more extensive analyses required by the Uniform Guidelines
    on Employee Selection Procedures (UGESP).   EEOC and OPM will develop
    further guidance for agencies, and require the UGESP analyses to be
    conducted in Year Two of the MYP.

o   Provide reductions in data submissions and revised formats for agency
    program plan submissions.

NOTE:  EEOC is aware that the attainment of equal employment opportunity
       and affirmative action goals is an important part of agency SES
       and merit pay performance evaluations.   Although the achievement
       of actual affirmative action goals is a major component of
       successful performance, it may not always be possible to attain
       all goals according to the agreed-upon timetables, despite
       vigorous and goodfaith efforts, particularly for highly technical
       professional occupations in which the pool of historically
       underrepresented groups may be limited.   Therefore, we advise
       agencies that credit for innovative program activities, designed
       to buttress agency affirmative action planning, is also important.
       Efforts that result in restructuring jobs, creating bridge positions,
       focusing on entry-level positions as a way to create larger pools
       of qualified persons or providing more and better training should be
       evaluated in conjuction with the attainment of overall affirmative
       action hiring goals.

---

* This action item was made optional by the 6/15/81 memorandum.

As in MD-702, the following legal authorities are cited for the MYP requirements imposed by EEOC.

## Legal Authorities

**Executive Order 11478 and Title VII** – Requirements for Federal agency affirmative action programs were first established by Executive Order 11478 in 1969. In the 1972 amendments of Title VII of the Civil Rights Act (Section 717, 42 USC §2000 e-16), the Congress required agencies to maintain affirmative action programs to ensure enforcement of Federal equal employment opportunity policy; to apply the same legal standards to prohibited discrimination established for private employers to the Federal government; and to eliminate discrimination that Congress found existed throughout the Federal employment system.

In enacting these requirements, Congress cited the need to eliminate discrimination in Federal employment. This discrimination was evidenced (1) by serious underrepresentation and exclusion of minorities and women in specific areas, agencies, regions, and grade levels; and (2) by systemic, institutional barriers operating through various civil service rules and procedures, particularly non-job related selection and promotion techniques.

**Uniform Guidelines** – The Uniform Guidelines on Employee Selection Procedures (UGESP) became effective on September 25, 1978. They require agencies to examine employee selection procedures for each job to determine if they have adverse impact on the employment opportunities of members of race, sex, or national origin groups. If adverse impact is found, the agency should determine which selection procedure(s) is the source of the adverse impact. Once the agency has made this determination, it must:

1. modify the overall selection process to eliminate adverse impact; or

2. substitute an alternative selection process(es); or

3. validate the selection process(es); or

4. otherwise justify the use of the procedure(s) under law.

OPM has informed agencies that it will assure that all procedures used or required by OPM satisfy UGESP requirements. OPM has also directed each agency to review all employee selection criteria and procedures it establishes or uses to assure compliance with the UGESP. (See FPM Letter 300-25, December 19, 1978.)

Reorganization Plan No. 1 of 1978 and Executive Order 12067 - These Presidential directives gave EEOC lead coordinating responsibility for all Federal equal employment opportunity programs and activities. Pursuant to this authority, EEOC and OPM will continue regular consultation on Federal equal employment opportunity policy.

The Civil Service Reform Act of 1978 - This legislation directed EEOC to develop guidelines for a special recruitment program, designated the Federal Equal Opportunity Recruitment Program (FEORP). The statutory authority for program oversight was given to OPM (5 U.S.C. 7201) and requires that agencies conduct affirmative recruitment for those occupations and grades within their work forces in which there is underrepresentation of minorities and women. Agency FEORPs should result in more representative applicant pools from which to select Federal employees.

Section 717 - Federal agencies are obligated to undertake affirmative action under Section 717 of Title VII of the Civil Rights Act of 1964, as amended. Other public employers and many employers in the private sector may choose to undertake affirmative action voluntarily. Federal agency affirmative action, however, was mandated by Congress after specific findings of pervasive discrimination in Federal employment, not only at the national level, but at regional and local levels as well.



JUN 23 1986

MEMORANDUM

TO      : EEO Directors

FROM    : Douglas J. Bielan
          Director
          Public Sector Programs

SUBJECT : Federal Affirmative Employment Program Instructions
          for Minorities and Women in FY 1987

Our current management directives (EEO-MD-707 and EEO-MD-707A)
for affirmative employment programs for minorities and women are
scheduled to expire this year. EEO-MD-707 has been extended and
will now expire September 30, 1987, and EEO-MD-707A expires
January 31, 1987. The GSA Interagency Report Control No. is
0279-EEO-OT.

In an effort to reduce paperwork and streamline affirmative
employment reporting requirements during the next year, EEOC will
not be requiring submission of all forms previously required in
your annual accomplishment reports and updates. Although EEOC
will not be requiring submission of all forms, Federal agencies
should use the information collected but not submitted in their
internal evaluation systems. The following forms will not be
required for your FY86 Annual Accomplishment Report and FY87
Annual Update:

   EEOC FORM 506, Change in Work Force EEO Profile by Pay
                  Level,

   EEOC FORM 509, Summary Sheet: Internal Movement Goal
                  Accomplishments by PATCO, and

   EEOC FORM 509A, Internal Movement Goal Accomplishments by
                   PATCO for Occupational Series with 100
                   or More Employees.

   EEOC FORM 512A, Hiring Goals by PATCO for Occupational
                   Series with 100 or more Employees,

   EEOC FORM 513, Summary Sheet: Internal Movement Goals by
                  PATCO, and

   EEOC FORM 513A, Internal Movement Goals by PATCO for
                   Occupational Series with 100 or More
                   Employees.

Your FY 1986 Annual Accomplishment Report is due on December 31, 1986, and shall include the following forms:

EEOC FORM 504, Cover Sheet, Accomplishment Report for Minorities and Women,

EEOC FORM 505, Summary Sheet, Change in Work Force EEO Profile by PATCO,

EEOC FORM 507, Summary Sheet, Distribution of EEO Groups and Underrepresentation Indices by PATCO and Pay Level,

EEOC FORM 507A, Summary Sheet, Distribution of EEO Groups and Underrepresentation Indices for Occupational Series with 100 or more Employees (P/R Units only),

EEOC FORM 508, Summary Sheet, Hiring Goal Accomplishments by PATCO,

EEOC FORM 508A, Hiring Goal Accomplishments by PATCO for Occupational Series with 100 or more Employees (P/R Units only), and

EEOC FORM 510, Barrier Elimination.

FORM 508 and FORM 508A should report combined Hiring Goal Accomplishments and Internal Movement Goal Accomplishments.

Since FY86 is the fifth year of the current multi-planning cycle, Federal agencies are expected to submit their reports and updates prior to or on the due date. We will not be providing any extensions on the December 31, 1986, due date. Agency systems should by now have the ability to generate these reports in a timely fashion.

Your FY 87 Annual Update is due on December 31, 1986, and shall include the following forms:

EEOC FORM 511, Cover Sheet, Annual Update of Program for Minorities and Women,

EEOC FORM 512, Summary Sheet, Hiring Goals by PATCO, and

EEOC FORM 514, Projected Barrier Elimination.

FORM 512 should report combined Hiring Goals and Internal
Movement Goals. Completion and submission of the above forms
will fulfill Federal agency requirements in EEO-MD-707A for the
FY86 annual accomplishment report and FY87 annual update.
Attached are copies of the required reporting forms.

The Commission is developing a multi-year management directive
covering affirmative employment programs for minorities and
women for the period FY88-FY92. We are confident that this
approach will provide both Federal agencies and EEOC with
long-term, definitive program expectations and will assist
Federal agencies in developing more effective programs based on
our new program requirements.

As you may know, our draft directive will need to: be coordinated
among affected Federal agencies; receive final Commission
approval; be printed; and issued to Federal agencies. We are
aware that many Federal agencies require a minimum of six to
eight months to implement a new directive. Agencies must
coordinate our reporting requirements with appropriate management
officials, computer staff, and their field offices or commands.

EEOC plans to circulate the new multi-year directive to Federal
departments and agencies in late 1986 for coordination. It is
expected that the final document will be issued to Federal
agencies thereafter so they may develop appropriate strategies
for implementation of the new five year cycle (FY88-FY92) which
begins October 1, 1987. This should provide sufficient planning
time for agencies to have their systems and program implemented
on the first day of the new multi-year cycle.

If you have any questions, please do not hesitate to contact
Louis W. Jones of my staff on (202)-634-7833.

Attachment



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

<u>By Hand</u>                                      May 27, 1987

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th & Pennsylvania N.W.
   Room 3509
Washington, D.C. 20530

James S. Green, Esq.
Deputy General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
Room 7540
Washington, D.C. 20415

          Re: <u>Luevano v. Horner: Extension of Conciliation Period</u>

Dear Barbara and Jim:

        At your request, plaintiffs agree to retroactively
extend the conciliation period on all matters listed in my
November 25, 1987 letter on outstanding matters (except for the
Schedule B questions already pending before the Court) until
Wednesday, June 3, 1987, so that we can have a meeting on that
day.  Pursuant to this agreement, plaintiffs will defer at least
until then the filing of their enforcement motion on plaintiffs'
showings of adverse impact for 1982, 1983, and 1984.

        At the meeting, I hope we can resolve at least part of
the Schedule B questions now pending before the Court.

        I want to put again in writing what I have told you
orally: plaintiffs cannot agree to any open-ended extensions of
the conciliation period on any issues, or to any open-ended
deferrals of the filing of motions seeking judicial resolutions
of the matters on which we have, up to the present, been unable
to come to agreement.

        If the government is simply going to tell us on June 3
that (a) it is unwilling to extend the period of retention of
jurisdiction under the Consent Decree; or (b) is willing to
extend the period for only a couple of years; or (c) is willing

ATTACHMENT AA

Barbara L. Ward, Esq.
James S. Green, Esq.
May 27, 1987
Page 2---

to extend the period for the full five years we will easily get from the Court, but only on condition that plaintiffs get reports and be unable to bring enforcement proceedings in this case; or (d) has not made up its mind yet on the question of an extension of the period of retention of jurisdiction; or (e) is unwilling to provide individualized monetary and injunctive relief on showings of adverse impact; or (f) is unwilling to give immediate competitive status to Schedule B appointees; or (g) is unwilling to make Schedule B a competitive procedure or to develop competitive alternatives to Schedule B; or (h) has not made up its mind yet about the "test run" on racial identifications of blacks from Social Security Administration data; or (i) has not made up its mind yet about plaintiffs' requests for information about the preliminary information on adverse impact collected by OPM in the course of test development, race-identified answers, and race-identified information on job performance requested by plaintiffs for the last several years; then we are simply wasting our time.

There is no secret about what plaintiffs want. Plaintiffs have been making their proposals, both orally and in writing, for several years. We made them again in my November 25, 1987 letters to you. We made them again at the February 6, 1987 meeting of the Monitoring Committee and were rebuffed on every one of them. I made them again at our March 30, 1987 meeting. I have made many of these points again in our many telephone conversations since that meeting. Plaintiffs made some of these points again in our May 8, 1987 Motion on Schedule B questions.

If the government is not prepared to address these questions on June 3, and give us at the meeting at least the framework of a reasonable proposal on these questions---which framework can be put into final shape within no more than a week or two---then we will have to go ahead and get a judicial resolution, without further delay. I speak for all plaintiffs' counsel when I say that this is the last chance to conciliate these issues without asking for the aid of the Court.

Indeed, if you know right now that the government will not be able to address these questions on June 3, or that what it has to say will not give plaintiffs what we have made clear we want, I would appreciate your letting me know right away so that we can file our enforcement motion on the showings of adverse impact for 1982, 1983, and 1984, and can begin to prepare the other motions necessary to resolve the remaining outstanding issues.

Barbara L. Ward, Esq.
James S. Green, Esq.
May 27, 1987
Page 3---

As we have said in our Schedule B motion, and as I have said with respect to any forthcoming motions we have to file, plaintiffs will be as ready to talk with the defendants after the filing of a motion as before. The filing of a motion may actually enhance the possibility of coming to an agreement; judicial deadlines can help concentrate the mind and result in decisions being made more quickly, and being made more in conformity with what the Court would likely order.

Very truly yours,

Richard T. Seymour

cc: Barry L. Goldstein, Esq.
    John H. Erickson, Esq.
    Eva Jefferson Paterson, Esq.
    Kenneth J. Kimerling, Esq.
    E. Richard Larson, Esq.
    Theresa Bustillos, Esq.
    Charles Stephen Ralston, Esq.
    Gail J. Wright, Esq.
    Russell Galloway, Esq.

## Certificate of Service

I certify that I have this 15th day of July, 1987, served a copy of plaintiffs' foregoing Motion, its attachments, the Memorandum in support, and the proposed form of Order on counsel of record for the defendants by causing copies to be hand-delivered to them at the following addresses:

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
    Room 3509
Washington, D.C. 20530

James S. Green, Esq.
U.S. Office of Personnel Management
1900 E Street N.W.
    Room 7450
Washington, D.C. 20415

RICHARD T. SEYMOUR
Bar No. 28100
    Attorney for Plaintiffs

RECEIVED

JUL 15 1987

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
            Plaintiffs,                  )
                                         )
        v.                               )        Civil Action
                                         )        No. 79-0271 (JHG)
CONSTANCE HORNER, Director.              )
    Office of Personnel                  )
    Management, et al.,                   )        FILED
                                         )
            Defendants.                  )        JUL 17 1987
_____)

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

DEFENDANTS' MOTION AND SUPPORTING
MEMORANDUM FOR AN ENLARGEMENT OF TIME

Defendants, by their undersigned counsel, hereby move for an enlargement of time to and including Friday, July 24, 1987, to serve their response to the plaintiffs' Motion To Extend The Period Of Retention Of Jurisdiction filed in the above-captioned action.

During this past week defense counsel has prepared a draft order for review by plaintiffs. Plaintiffs are now reviewing that order and intend to make a counter-proposal. It is unlikely that this matter can be resolved today. Thus, defendants seek an additional week, until July 24, 1987, to either submit a joint stipulation or a reply and proposed order. Counsel for plaintiffs has been informed of this motion and has no objection. Finally, this short enlargement of time will not prejudice the rights of any party.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

Barbara Ward

BARBARA WARD
RICHARD GREENBERG

Room 3509 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3781

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion For An
Enlargement of Time was mailed, postage prepaid, this 17th day of
July 1987 to:

        Richard Seymour, Esq.
        Lawyers Committee for Civil
          Rights Under Law
        1400 "Eye" Street, N.W.
          Suite 400
        Washington, D.C.  20005

                    *Barbara Ward*
                    BARBARA WARD

RECEIVED

JUL 17  2 34 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )
                                    )     Civil Action
CONSTANCE HORNER, Director.         )     No. 79-0271 (JHG)
     Office of Personnel            )
     Management, et al.,            )
                                    )     **FILED**
          Defendants.               )
                                    )     JUL 2 2 1987
_____)
                                          CLERK, U.S. DISTRICT COURT
                    ORDER                  DISTRICT OF COLUMBIA

     Upon consideration of the defendants' Motion For An

Enlargement of Time to respond to plaintiffs' Motion To Extend

The Period Of Retention Of Jurisdiction, it is hereby

     ORDERED, that the defendants shall have to and including

Friday, July 24, 1987, to serve their response to the plaintiffs'

Motion To Extend The Period Of Retention of Jurisdiction.

                              _____
                              UNITED STATES DISTRICT JUDGE

RECEIVED

JUL 23  8 17 AM '87

JAMES F. ___ CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

*Jayne Green*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )   Civil Action
CONSTANCE HORNER, Director.         )   No. 79-0271 (JHG)
      Office of Personnel           )
      Management, et al.,           )
                                    )
            Defendants.             )
_____)

FILED

JUL 24 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
TO EXTEND THE PERIOD OF RETENTION OF JURISDICTION

Preliminary Statement

Over the last three months, plaintiffs, in addition to the
instant motion, have filed three separate motions addressing
defendants' discharge of their obligations under the Luevano
Consent Decree and challenging aspects of the defendants' conduct
that were first implemented almost five years ago.  First, on May
8, 1987, plaintiffs moved for a judicial determination that
defendants' hiring under the Schedule B authority, first
instituted in November 1982, is improper notwithstanding the
relief ordered by this Court in National Treasury Employees Union
v. Horner, C. A. No. 84-2573, and the substantial minority hiring
that has resulted from use of Schedule B authority.  As just a
portion of the relief requested in the Schedule B motion,
plaintiffs propose that the Court impose a continuation of the
Decree for another five years.  Defendants have responded to this
motion, and plaintiffs have commenced substantial discovery

(twenty-one notices of deposition and corresponding document production requests) apparently to buttress their claims.[1]

Second, on June 6, 1987, plaintiffs initiated an enforcement proceeding seeking both individual injunctive and monetary relief as well as general injunctive relief for hiring that has been conducted from 1982-1984 that allegedly resulted in adverse impact findings under the Decree. Although the general injunctive relief sought by plaintiffs is not fully detailed, plaintiffs do request that the Luevano Decree be continued for an as yet undetermined period of time for those job categories for which the Court finds adverse impact. Defendants have not, as yet, responded to the motion although a response is due in the near future.[2]

Now, in the midst of this litigation, prior to any ruling by the Court that there has been a violation of the Decree, plaintiffs ask that, until such time as the Court rules on the pending motions, the defendants be required to continue to meet the Decree's obligations whether or not the original five-year period of retention of jurisdiction would otherwise have expired as to that job category. Indeed, the relief requested is so broad that even in those instances where the Court rules in the

---

[1]. The parties have agreed that a number of the depositions and document requests can be handled by stipulation.

[2]. Additionally, plaintiffs have filed a Motion To Enforce The Applicant-Reporting Provision of the Decree By Requiring Complete Or Virtually Complete Racial Identification of Applicants and, of course, the instant motion.

defendants' favor, the defendants will be required to meet the decree's obligations while plaintiffs pursue an appeal.

This request is largely based on plaintiff's purported concern that unless the affirmative obligations of the decree are continued the "government will declare the proceedings moot and in effect walk away from its obligations", thereby frustrating the ability of the Court to fashion relief, should relief be found to be appropriate. However, as explained below, defendants do not dispute that the Court has jurisdiction to entertain plaintiffs' claims and to fashion relief should the Court find that the defendants have not adequately satisfied the obligations of the Decree.[3] Accordingly, in the absence of a threat of irreparable harm, no interim extension is warranted. Given plaintiffs' failure to show how maintence of the status quo would frustrate the Court's ability to award relief should it be ultimately deemed appropriate, plaintiffs' motion to extend the period of retention should be denied.

<u>Argument</u>

The Consent Decree entered in this action sets a finite period during which the defendant agencies must take certain

---

[3]. To that end, the defendants have entered into a stipulation with plaintiffs (filed this day) that sets forth the government's agreement that the Court has jurisdiction to consider the plaintiffs' claims and to enter appropriate orders. Additionally, defendants have agreed that with respect to those those years for which plaintiffs still have time to make their charges or have not yet received the necessary hiring data, plaintiffs will be entitled to the time provided by the decree to review the information and to take action.

actions required by the Decree.  Paragraph 7 of the Decree provides, (in part):

> [T]he period of retention shall expire, with respect to any job category listed in Appendix A, five years after the cessation of the use of the PACE results for the job category and the implementation of an alternative examining procedure for that job category at the GS-5 or GS-7 level.  This period of time may be extended for any such job category by agreement of the parties, or upon motion for good cause shown.

There are a number of job categories which presently satisfy the requirments of ¶ 7 such that the Court's jurisdiction, in the absence of a timely challenge, has expired over hiring in those job categories.[4]  Additionally, for those job categories for which Schedule B was implemented as the alternative examining procedure, use of the PACE ceased and Schedule B was implemented in November 1982.  Finally, there are those job categories for which OPM ceased use of the PACE and implemented a competitive

---

[4].  This has occured where use of the PACE ceased either prior to the effective date of the Decree (January 1982) or shortly thereafter and, at the same time, OPM implemented a competitive alternative examining procedure for that job category.  These job categories fall into two categories.  First, those for which plaintiffs have not filed any challenge.  These jobs are Agricultural Program Specialist (Series 1145); Librarian (Series 1410); Printing Management (Series 1654).

Second, those job categories for which plaintiffs have filed a challenge.  These are Immigration Inspector (Series 1816); Criminal Investigator (Series 1811); General Investigator (Series 1810); Financial Institution Examiner (Series 570); and Economist (Series 110).

alternative in late 1982 - the Computer Specialist job category.[5]

Defendants do not dispute that, should this Court rule that a defendant agency has failed to meet its Decree imposed responsibilities, it is within the Court's jurisdiction to impose an order requiring further action by the defendant agency.

If this were all that plaintiffs sought there would be no need for the instant motion; however, the parties disagreement arises from the wholesale and premature extent of the additional relief that plaintiffs seek - an order continuing all Decree obligations as to any job category for which there is a pending challenge, but for which there been no prior determination by this Court that there has been a violation of the Decree. Indeed, plaintiffs' proposed order requires that even in those instances where the District Court has ruled that there has been no violation, the defendants are to adhere to the affirmative obligations of the decree while plaintiffs pursue an appeal.

In support of this extraordinary relief, plaintiffs argue that if it is not granted the "government could simply announce that the proceedings are moot and in effect walk away from its obligations". Plaintiffs' Motion to Extend the Retention of Jurisdiction, ¶ 4. The government has no such intention and has never indicated that it intended to take such a position.

---

[5]. For those job categories subject to Schedule B hiring authority and the Computer Specialist job category, the defendants would agree that, because of the practical realitites in carrying out the Decree's requirements, the Decree's obligations continue until the end of 1987.

Nor does the case law cited by plaintiffs support the extraordinary relief sought. In <u>EEOC v. Bartenders Int's Union</u>, 28 FEP Cases 1575, 1577 (N.D. Calif., 1979), the Court's order extending its jurisdiction resulted from its finding that the efendants had not met the obligations of the prior order. Similarly, in <u>EEOC v. Riss Int'l Corp.</u>, 35 FEP Cases 430, 431-32 (W.D. Mo., 1982) the Court only recognized its inherent ability to extend or modify its order as future circumstances dictate. In the instant case, the relief sought by plaintiffs is not appropriate until such time as there has been a determination by this Court that, in fact, some violation has occurred. At that time, the Court will be in a position to determine if the proper remedy for the violation warrants the defendants continued implementation of some or all of the Decree's obligations or some other remedial action.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

_Barbara Ward_

BARBARA WARD
RICHARD GREENBERG

Room 3509 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C. 20530
Telephone: (202) 633-3781

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Response To Plaintiffs' Motion To Extend The Period Of Retention Of Jurisdiction was mailed, postage prepaid, this 21st day of July 1987 to:

> Richard Seymour, Esq.
> Lawyers Committee for Civil
>   Rights Under Law
> 1400 "Eye" Street, N.W.
>   Suite 400
> Washington, D.C.  20005

*Barbara Ward*
BARBARA WARD

RECEIVED

JUL 24 1987

JAMES F. DAVEY, Clerk

*Jayce Green*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al</u>.,    )
                          )
       Plaintiffs,         )
                          )
       v.               )
                          )   Civil Action
CONSTANCE HORNER, Director.   )   No. 79-0271 (JHG)
    Office of Personnel     )
    Management, <u>et</u> <u>al</u>.,    )
                          )
       Defendants.        )
_____)

**F I L E D**

**JUL 24 1987**

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

### DEFENDANTS' UNOPPOSED MOTION AND SUPPORTING
### <u>MEMORANDUM FOR AN ENLARGEMENT OF TIME</u>

Defendants, by their undersigned counsel, hereby move for an enlargement of time to and including Friday, August 21, 1987, to serve their response to the plaintiffs' Motion For Relief On Their Showings of Adverse Impact In Hiring For 1982, 1983 And 1984, filed in the above-captioned action.

The plaintiffs' motion raises a significant number of factual issues concerning how applicants apply for positions with the federal government and are counted (often in a different manner at different agencies and, within the agency, hiring practices may vary depending on the job or its location). The development of declarations which accurately and completely depict this complex system is extemely time-consuming and is the object of a large number of employees' attention at the various agencies.

Additionally, the undersigned counsel has been required to spend substantial time addressing the issues raised by

plaintiffs' other motions, extensive discovery requests[1] and informally settling other matters. This informal resolution process is continuing and, hopefully, may also result in narrowing some of the factual issues arising out of the plaintiffs' instant motion.

Finally, summer and family vacation schedules have caused some delays. However, the undersigned counsel wishes to note that she has cancelled all but three days of leave which was to occur during this time.

Plaintiffs' counsel has been informed of this motion and has no objection.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

BARBARA WARD
RICHARD GREENBERG

Room 3509 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C. 20530
Telephone: (202) 633-3781

---

1. Plaintiffs have noticed 19 depositions with correspnding document requests of the Office of Personnel Management; a document request and deposition of the Naval Supply Facility, Jacksonville, Florida; and, a deposition and document request from the Merit System Protection Board. While the parties have agreed that many of these matters can be disposed of by stipulation, gathering the necessary information is nonetheless time-consuming.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion For An Enlargement of Time was mailed, postage prepaid, this 21st day of July 1987 to:

Richard Seymour, Esq.
Lawyers Committee for Civil
  Rights Under Law
1400 "Eye" Street, N.W.
  Suite 400
Washington, D.C.  20005

*Barbara Ward*
BARBARA WARD

RECEIVED
JUL 24 1987
JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al</u>.,     )
     )
    Plaintiffs,     )
     )
    v.     )
     )  Civil Action
CONSTANCE HORNER, Director.     )  No. 79-0271 (JHG)
    Office of Personnel     )
    Management, <u>et al</u>.,     )
     )
    Defendants.     )
_____)

FILED

JUL 27 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

## DEFENDANTS' UNOPPOSED MOTION AND SUPPORTING MEMORANDUM FOR AN ENLARGEMENT OF TIME

Defendants, by their undersigned counsel, hereby move for an enlargement of time to and including Friday, September 4, 1987, to serve their response to the plaintiffs' Motion To Enforce The Applicant Reporting Provisions Of The Decree By Requiring Complete Or Virtually Complete Racial Identification Of Applicants in the above-captioned action.

The undersigned counsel has been required to spend substantial time addressing the issues raised by plaintiffs' other motions, extensive discovery requests[1] and informally settling other matters. This informal resolution process is continuing and, hopefully, may also result in narrowing some of the issues arising out of the plaintiffs' instant motion.

---

[1]. Plaintiffs have noticed 19 depositions with correspnding document requests of the Office of Personnel Management; a document request and deposition of the Naval Supply Facility, Jacksonville, Florida; and, a deposition and document request from the Merit System Protection Board. While the parties have agreed that many of these matters can be disposed of by stipulation, gathering the necessary information is nonetheless time-consuming.

Additionally, summer and family vacation schedules will cause some delays.

Plaintiffs' counsel has been informed of this motion and has no objection.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

*Barbara Ward*

BARBARA WARD
RICHARD GREENBERG

Room 3509 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3781

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Motion For An Enlargement Of Time was mailed, postage prepaid, this 27th day of July 1987 to:

> Richard Seymour, Esq.
> Lawyers Committee for Civil
>   Rights Under Law
> 1400 "Eye" Street, N.W.
>   Suite 400
> Washington, D.C.  20005

_Barbara Ward_
BARBARA WARD

RECEIVED

Jᴜʟ 27  3 47 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
          Plaintiffs,               )
                                    )
          v.                        )
                                    )   Civil Action
CONSTANCE HORNER, Director.         )   No. 79-0271 (JHG)
     Office of Personnel            )
     Management, et al.,            )
                                    )        FILED
          Defendants.               )
_____)      JUL 27 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

                         ORDER

     Upon consideration of the defendants' Unopposed Motion For

An Enlargement of Time to respond to plaintiffs' Motion For

Relief On their Showings of Adverse Impact In Hiring for 1982,

1983 And 1984, it is hereby

     ORDERED, that the defendants shall have to and including

Friday, August 21, 1987, to serve their response to the

plaintiffs' Motion .

                         _____
                         UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )
                                   )   Civil Action
CONSTANCE HORNER, Director.        )   No. 79-0271 (JHG)
        Office of Personnel        )
        Management, et al.,         )   **FILED**
                                   )
        Defendants.                )   JUL 2 9 1987
_____)

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORDER

Upon consideration of the defendants' Unopposed Motion For
An Enlargement of Time to respond to plaintiffs' Motion To
Enforce The Applicant-Reporting Provisions Of The Decree By
Requiring Complete Or Virtually Complete Racial Identification Of
Applicants, it is hereby

ORDERED, that the defendants shall have to and including
Friday, September 4, 1987, to serve their response to the
plaintiffs' Motion .

_____
UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                    )
            Plaintiffs,             )          *Place in file*
                                    )
      v.                            )
                                    )   Civil Action
CONSTANCE HORNER, Director.         )   No. 79-0271 (JHG)
      Office of Personnel           )
      Management, et al.,           )
                                    )
            Defendants.             )
_____)

## AMENDED CERTIFICATE OF SERVICE

I hereby certify that the Defendants' Response To

Plaintiffs' Motion To Extend The Period of Retention of

Jurisdiction was mailed, postage prepaid, on the 24th day of July

1987 (not, as previously stated the 21st day of July) to:

            Richard Seymour, Esq.
            Lawyers Committee for Civil
              Rights Under Law
            1400 "Eye" Street, N.W.
              Suite 400
            Washington, D.C.  20005


Further, I herby certify that this Amended Certificate of

Service was mailed, postage prepaid, this 29th day of July, 1987

to Mr. Seymour at the above-listed address.

*Barbara Ward*

BARBARA WARD

RECEIVED

JUL 29 | 31 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**JUL 30 1987**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,  )
                                 )
   individually and on behalf of  )
   all others similarly situated,  )
                                 )
            Plaintiffs,  )
                                 )
     v.                      )  C. A. No. 79-0271
                                 )
CONSTANCE HORNER, Director,      )
   U.S. Office of Personnel      )
   Management, <u>et al.</u>,          )
                                 )
           Defendants.  )

ORDER DENYING THE NATIONAL TREASURY EMPLOYEES'
UNION'S MOTION TO INTERVENE, AND ITS MOTION FOR
INJUNCTIVE RELIEF

     This matter comes before the Court on the Motion of the
National Treasury Employees' Union to intervene as a party in
this action, and its motion for further injunctive relief. Based
on the NTEU's moving papers and the papers in opposition filed by
the plaintiffs and of the defendants herein, the Court concludes
that the NTEU's motions are not well taken and should be denied.

     The NTEU has an interest in the proper application of
the civil service laws, an interest not involved in this lawsuit.
The present parties to this lawsuit have an interest in the
interpretation and proper application of the Consent Decree and
of Title VII of the Civil Rights Act of 1964. The NTEU has no
standing as to these issues.

     No determination the Court may make in this action
could affect the NTEU's rights; indeed, the NTEU has already
obtained an Order in its own lawsuit, now stayed while the case



is on appeal, providing it with all the relief to which it is entitled.

It appears from the NTEU's proposed form of injunction that the primary goal it seeks to achieve by intervention is to obtain discovery from each agency, and from each present and former Schedule B appointee. This matter should it then be appropriate will have to await resolution of the issues on appeal in NTEU v. Horner, No. 84-2573 (D.D.C.).

The NTEU may, however, proceed as amicus in this case with respect to Schedule B issues, even though the NTEU's motions are denied.

July 30, 1987

Joyce Hens Green
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
   individually and on behalf of             )
   all others similarly situated,            )
                                             )
                         Plaintiffs,         )
                                             )
         v.                                  )   C. A. No. 79-0271
                                             )
CONSTANCE HORNER, Director,                  )
   U.S. Office of Personnel                  )
   Management, et al.,                        )
                                             )
                         Defendants.         )

F I L E D

JUL 3 1 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO
EXTEND THE PERIOD FOR RETENTION OF JURISDICTION

Since the filing of plaintiffs' July 2, 1987 Motion to
Extend the Period for Retention of Jurisdiction, the parties have
been able to come to a partial agreement on the issues raised by
plaintiffs' Motion.  The partial agreement is embodied in the
July 24 proposed Stipulation and Order.  Plaintiffs are willing
to narrow the issues further, by withdrawing their request that
the government's affirmative obligations under the Decree
automatically continue during the pendency of an appeal from any
determination made by this Court.[1]

    A.  The Remaining Issue to Be Decided: Whether to
        Allow a Hiatus in the Government's Obligations

    Both sides agree that the Court has authority to extend

_____

    [1] The parties would be free to seek a change in the status
quo ante as to a particular job category involved in an enforce-
ment proceeding by seeking an injunction pending appeal, or by
seeking a stay of a remedial extension of the period for reten-
tion of jurisdiction, on the basis of the facts of that par-
ticular situation.

the period for retention of jurisdiction as part of a remedial order for a violation of the Decree; the question remains as to the government's obligations during the hiatus between the expiration of the five-year period for a job category and the entry of a remedial order.

It is easy to envision the occurrence of such a hiatus. Contested issues of liability may protract the entry of a decision on the merits of plaintiffs' showing of noncompliance; the defendants are in the process of setting up a barrage of defenses, the acceptance of which would involve a major re-writing of the adverse-impact provisions of the Consent Decree, and which will therefore be vigorously contested by plaintiffs.[2] Once liability is determined, plaintiffs expect the defendants to oppose virtually all individualized relief, thus protracting the delay before entry of a full remedial order.[3]

---

[2] Examples are the defendants' contentions that the bad performance of a particular agency can be "cancelled out" by the good performance of another agency, that bad performance as to a particular job category can be "cancelled out" by good perfor-mance as to other job categories, that a nationwide showing of adverse impact can be cancelled out by using regional figures, that the defendants can assert affirmative defenses outside the scope of ¶ 9 of the Decree even though they have never reported statistics on the subjects of the affirmative defenses, etc.

[3] Plaintiffs hope that the Court would decide the question of the extension of the period for retention of jurisdiction as to a job category as part of its order determining liability as to that job category, to avoid further rounds of delay. The timing of the decision of this question is up to the Court, and plaintiffs simply seek protection until such time as the Court makes its decision on such an extension.

## B. The Practical Consequences of Allowing a Hiatus in the Government's Obligations Under the Decree

The practical consequences of allowing an interruption in the government's obligations can be seen by examining the obligations. First, the government is presently obligated to record and report the numbers of applicants and of hires who are white, black, or Hispanic. It takes time to set up a system for gathering this information by a number of different agencies as to the same job category, and it would take time to re-establish such a system once it has been abandoned for that job category. In the interim, important data would be missed and could never be recaptured.

Second, loss of the information could well be prejudicial. For example, large numbers of applicants take the Computer Specialist (Trainee) examination. In 1985, 4,187 applicants took the test. If such a test is given only once a year or a couple of times a year, and if there is no recordkeeping or reporting obligation for the part of the year when the applications are being taken, the parties and the Court would be left with fragmentary---perhaps useless---applicant information for the year. Worse yet, some of the hires occurring after the entry of a remedial order extending the period for retention of jurisdiction will stem from unreported applications filed during the period of hiatus, so that the parties and the Court would be left with comparisons of apples to oranges.

Third, the obligation to use all practicable efforts to eliminate adverse impact in hiring for the job category cannot be

turned on and off like a spigot. If such obligations ended
during a hiatus before the entry of a remedial order, they could
not be started again on the instant a remedial order was entered.
It can take a considerable period of time before the Justice
Department notifies the agencies using a particular job category,
before those agencies identify all of their local facilities
where the job category is used, and before all of the officials
making personnel decisions at those local facilities are made
aware of the change.

The defendants have identified no real harm they would
suffer if their ongoing obligations continued until the Court
enters a remedial order, and plaintiffs have shown the real
prejudice they would suffer if the defendants' obligations were
allowed to end prematurely.

> C. <u>Given the Defendants' Inordinately Long Delays
> in Responding to Plaintiffs' Showings of Adverse
> Impact Before the Monitoring Committee, It Would
> Be Inequitable to Allow the Government to Take
> Advantage of These Overlong Delays by Ending
> the Government's Obligations Before Entry of a
> Remedial Order</u>

As the Court knows, plaintiffs have recently been
forced to file a number of Motions to enforce the requirements of
the Consent Decree, because efforts to conciliate these matters
informally were taking far too long, and were not accomplishing
anything. One of the Motions we were thus forced to file with
the Court was plaintiffs' June 6, 1987 Motion for Relief on Their
Showings of Adverse Impact in Hiring for 1982, 1983, and 1984.

Plaintiffs made their 1982 showings on October 10,

- 4 -

1984; the defendants took _more_ _than_ _nineteen_ _months_ to make their partial May 30, 1986 response, and have not yet responded to the points plaintiffs made on November 25, 1986.

Plaintiffs made their 1983 showings on August 2, 1985. The defendants took _more_ _than_ _twenty-one_ _months_ to make their minimal May 26, 1987 response.

Plaintiffs made their 1984 showings on April 11, 1986. The defendants took _more_ _than_ _thirteen_ _months_ to make their minimal May 26, 1987 response.

Where the defendants have taken such incredibly long periods of time to respond to plaintiffs' showings that the government has violated the Decree's requirement to use "all practicable efforts" to eliminate adverse impact in hiring for a job category, it maximizes the chance that the five-year period for retention of jurisdiction will expire before the Court issues its own determination of the violation and issues a remedial order. In other words, the government's own delay puts the government in a position to profit from that delay.

D. In Light of the Protracted Nature of Some of Plaintiffs' Showings of Adverse Impact, It Would Be Inequitable to Allow a Hiatus in the Government's Obligations Prior to the Entry of a Remedial Order

On July 2, 1987, plaintiffs filed their Motion, in large part because the government was not able to agree even that the Court would have jurisdiction to determine plaintiffs' charges of hiring violations and to issue relief. The government

- 5 -

has now agreed to at least that much,[4] but still insists on profiting from its own incredibly long delays in responding to plaintiffs' showings of adverse impact.

The job of Computer Specialist (Trainee) is an excellent example. The five-year period for retention of jurisdiction would in the ordinary course expire in November 1987. Plaintiffs have made showings of adverse impact in hiring for this job category in 1982, 1983, and 1984. The shortfalls were 20 Hispanics in 1982, 46 blacks and 17 Hispanics in 1983, and 109 blacks and 23 Hispanics in 1984. The showings made to date involve the denial of 215 jobs to class members over three years. The 1985 showing shortly to be made involves the denial of 188 jobs to blacks and 26 jobs to Hispanics.[5]

Thus, the shortfall _tripled_ from 1982 (20 class members) to 1983 (63 class members), _doubled_ from 1983 (63 class members) to 1984 (132 class members), and _almost_ _doubled_ from 1984 (132 class members) to 1985 (214 class members).

Over all these years, the government virtually ignored the special programs set up under the Decree to provide three additional ways to avoid adverse impact. We use "ignored" in its

---

[4] The government's papers attempt to depict plaintiffs as unreasonable because plaintiffs' July 2 Motion discusses plaintiffs' need for relief without taking into account the provisions of the July 24 stipulation. If the defendants had been willing to stipulate to _anything_ by July 2, plaintiffs would have been delighted to take it into account. However, we can hardly be faulted for failing to predict a partial agreement which did not emerge until three weeks later.

[5] A copy of the draft 1985 showing is attached.

dictionary sense: acting as if it had no knowledge of the programs or its obligations, or acting as if these were of little concern.

In the face of this kind of record, the government wants the freedom to end the system of reporting and record-keeping for this job category by the end of the year, even if this Court has not yet made its determination, or has determined the violation and has not yet issued an injunctive order.

The defendants have not performed any criterion-related validation study on this test, or on any of the tests implemented by OPM after the effective date of the Decree. While the defendants have asserted that these tests are content valid, they have not begun to satisfy the requirements of the Uniform Guidelines on Employee Selection Procedures for content valida- tion.[6] The level of the test's adverse impact against blacks and against Hispanics is extreme.

The practical consequences of allowing the defendants a hiatus within which they will have freedom from their decretal obligations is that they will continue to harm blacks and Hispanics, and will continue to violate Title VII. The Decree was intended to avoid such harm, but the hiatus would ensure that there will be no remedy under the Decree for these violations.

_____

[6] Mr. Goldstein's December 20, 1985 comments on the govern- ment's test development report for Computer Specialist (Trainee), which applied in equal measure to the government's similar test development reports for all of the other post-Decree tests, explained in detail why the government had not shown the test to be content-valid. A copy of these comments is attached as Attachment B.

### E. The Defendants' Miscellaneous Contentions Do Not Speak to the Merits of the Issue Remaining for Decision, and are Without Merit

The defendants raise a number of matters having nothing to do with the question at bar, and which are completely without merit.

_First_, the defendants complain that plaintiffs have filed a number of motions, but choose not to mention that the motions were filed only after years of unsuccessful efforts by plaintiffs to conciliate the matters they involve. It may well be that, as long as these matters were being handled informally, it was difficult to obtain the attention of officials high enough to make the necessary decisions. Paradoxically, the decision to litigate these matters may therefore be an essential step to getting an agreed resolution.

The partial agreement on plaintiffs' Motion to Extend submitted to the Court on July 24 is a case in point. The government was unable to agree on July 2, before the Motion was filed, but was able to reach a partial agreement little more than three weeks after the Motion was filed. The filing of the recent Motions has led to agreement on a number of other matters which had been in "endless conciliation" for a number of years, thus avoiding the need to file further motions.

In these circumstances, the defendants can hardly be heard to complain that plaintiffs have been forced to file a number of motions.

_Second_, the defendants urge again that "[a]s just a

- 8 -

portion of the relief requested in the Schedule B motion, plaintiffs propose that the Court impose a continuation of the Decree for another five years." This is merely a variant of the argument defendants previously made, in their Memorandum in Opposition to plaintiffs' Schedule B Motion, to the effect that plaintiffs were allegedly seeking an "indefinite extension" of the Decree or to the effect that plaintiffs were allegedly arguing that the five-year period does not start running for any job category until the defendants had implemented alternative examining procedures for all job categories.

Plaintiffs responded to this gross misrepresentation in their June 24-25, 1987 Reply in support of their Schedule B Motion, at pp. 13-15, pointing out that the period for retention of jurisdiction operates on a job-category-by-job-category basis, and that the defendants themselves control the date for the running of the period by their control over the date of implementing the competitive alternative examining procedure required by the Decree.

The defendants have ignored this response, and have cited nothing in plaintiffs' papers which could possibly support either the previous or present forms of their misrepresentation. The defendants' assertion is even more remarkable in light of the fact that their assertion was made simultaneously with their submission of the July 24 proposed Stipulation and Order, in which both sides expressly agreed that the period for retention of jurisdiction had already ended as to some job categories.

- 9 -

<u>Third</u>, plaintiffs have filed three Notices of Depositions, not twenty-one. The defendants apparently arrived at the figure of twenty-one by counting the subjects to be discussed during the Rule 30(b)(6) deposition of OPM and treating each subject as a separate deposition.

<u>Fourth</u>, the defendants assert that plaintiffs' notices of depositions were filed "apparently to buttress their claims". We do not understand the defendants' plaint. Again and again, in proceedings before the Monitoring Committee, in letters stating the government's position, and in papers filed in Court, the government has made a variety of assertions of fact in support of its positions. What can be extraordinary about plaintiffs' effort to find out the bases of such assertions and the limits of the representations?

<u>Fifth</u>, the government piously asserts that the government never had any intention of asserting that the expiration of the period for retention of jurisdiction over a job category would render ongoing enforcement proceedings moot, and equally piously asserts that it "has never indicated that it intended to take such a position." Then <u>why</u> <u>did</u> <u>the</u> <u>government</u> <u>refuse</u> <u>on</u> <u>July</u> <u>2</u> <u>to</u> <u>agree</u> <u>that</u> <u>the</u> <u>Court</u> <u>would</u> <u>have</u> <u>jurisdiction</u> <u>to</u> <u>decide</u> <u>a</u> <u>pending</u> <u>enforcement</u> <u>proceeding</u> <u>after</u> <u>the</u> <u>expiration</u> <u>of</u> <u>the</u> <u>five-year</u> <u>period?</u> What can the government possibly think that a refusal to consent meant, if not that the government wanted to leave open its freedom to make precisely the same argument it now urges it never had any intention of making?

## Conclusion

The test for extension of the period for retention of jurisdiction is set forth in ¶ 7 of the Decree: good cause. The Decree does not require that the Court first find a violation, any more than a party seeking a preliminary injunction must first obtain final findings on the merits of the controversy; ¶ 7 requires only "good cause".

The need to avoid a hiatus in the government's obligations, where substantial and facially adequate challenges have timely been made, where the government's own tardiness has caused substantial delay, and where the five-year period has not yet expired, surely meets this requirement.

Plaintiffs' Motion should be granted. A revised form of proposed Order is submitted herewith.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
   & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
   Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
        RICHARD T. SEYMOUR
        Bar No. 28100

            Attorneys for Plaintiffs

Dated: July 31, 1987

*attachments*
*(A 79-271)*

ANGEL G. LUEVANO, et al.,                    )
                                             )
   individually and on behalf of     )
   all others similarly situated,    )
                                             )
              Plaintiffs,   )
                                             )
          v.              )
                                             )
CONSTANCE HORNER, et al.,                    )
                                             )
                                             )
         Defendants.     )

FILED

JUL 31 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## SHOWING OF ADVERSE IMPACT

Name of Job:        Computer Specialist (Trainee)

Job Series:         0334

Job Level:          Grade 5 and Grade 7

Agency:             All Agencies (Government-wide Showing)

Procedure:          OPM-Sponsored Alternative Examining Procedure

Affected Class:     Blacks and Hispanics

      Plaintiffs hereby begin an enforcement proceeding before the Monitoring Committee as to the above job category, pursuant to the provisions of ¶ 8(b)(3)(i) of the Consent Decree, at p. 7. The page of OPM Report A-1 showing government-wide hiring information for this job category, p. 13, is attached as Attachment A. The government as a whole has exercised its option pursuant to ¶ 8(b)(7) of the Consent Decree, at p. 11, to have adverse impact calculated for 1985 on the basis of appointments from external sources only. This choice shall bind the government for showings of adverse impact in 1986 hiring as well. The

relevant figures are:

1985 HIRES FROM OPM REPORTS
(ALL EXTERNAL HIRES)

| | |
|---|---|
| GRADE 5 TOTAL | 251 |
|     WHITE (NON-HISPANIC) | 221 |
|     BLACK (NON-HISPANIC) | 25 |
|     HISPANIC | 5 |
| GRADE 7 TOTAL | 370 |
|     WHITE (NON-HISPANIC) | 323 |
|     BLACK (NON-HISPANIC) | 40 |
|     HISPANIC | 7 |
| TOTAL, GRADES 5 AND 7 | 621 |
|     WHITE (NON-HISPANIC) | 544 |
|     BLACK (NON-HISPANIC) | 65 |
|     HISPANIC | 12 |

The pages showing the application statistics provided to plaintiffs by OPM for applicants for this job category are attached as Attachment B. The relevant figures are as follows:

1985 APPLICATIONS FOR OPM'S
ALTERNATIVE EXAMINATION FOR
COMPUTER SPECIALIST (TRAINEE),
SERIES 0334:

APPLICANTS FOR GRADES 5/7

| | |
|---|---|
| WHITE (NON-HISPANIC) | 1,860 |
| BLACK (NON-HISPANIC) | 865 |
|   % OF TOTAL BLACK: | 28.4% |
| HISPANIC | 131 |
|   % OF TOTAL HISPANIC: | 4.3% |
| OTHER | 192 |
| TOTAL RACIALLY IDENTIFIED | 3,048 |
| NOT IDENTIFIED | 1,139 |
| ---% NOT IDENTIFIED | 27.2% |

Plaintiffs' analysis of the adverse impact as to this job category is set out below:

- Exhibit 3: Series 0334, All Agencies, page 2-

```
APPOINTMENT RATES (LEVEL 5)
        WHITE (NON-HISPANIC)          11.9%
        BLACK (NON-HISPANIC)           2.9%
        HISPANIC                       3.8%

APPOINTMENT RATES (LEVEL 7)
        WHITE (NON-HISPANIC)          17.4%
        BLACK (NON-HISPANIC)           4.6%
        HISPANIC                       5.3%

APPOINTMENT RATES (BOTH LEVELS)
        WHITE (NON-HISPANIC)          29.2%
        BLACK (NON-HISPANIC)           7.5%
        HISPANIC                       9.2%

ADVERSE IMPACT CALCULATIONS:

  80% RULE: BLACK HIRE RATE AS
  PERCENT OF WHITE HIRE RATE
        ---LEVEL 5                    24.3%
        ---LEVEL 7                    26.6%
        ---BOTH LEVELS 5 AND 7        25.7%

  80% RULE: HISPANIC HIRE RATE AS
  PERCENT OF WHITE HIRE RATE
        ---LEVEL 5                    32.1%
        ---LEVEL 7                    30.8%
        ---BOTH LEVELS 5 AND 7        31.3%
```

The appointment rates for both blacks and Hispanics failed the "80% test" at the grade 5 level, the grade 7 level, and for both levels combined.

These racial disparities were statistically significant for blacks at the grade 5 level, the grade 7 level, and for both levels combined, and were statistically significant for Hispanics at the grade 5 level and for both levels combined:

```
STANDARD DEVIATION ANALYSIS
    FOR BLACKS (LEVEL 5)
  --AVAILABILITY                      28.4%
  --OBSERVED NO. OF HIRES               25
  --EXPECTED NO. OF HIRES            71.23
    --DIFFERENCE                    -46.23
  --STANDARD DEVIATION               7.14
  --NO. OF STANDARD DEVIATIONS
    BETWEEN EXPECTED AND
    OBSERVED VALUES:                 -6.47
```

STANDARD DEVIATION ANALYSIS
     FOR BLACKS (LEVEL 7)
  --AVAILABILITY                      28.4%
  --OBSERVED NO. OF HIRES               40
  --EXPECTED NO. OF HIRES           105.00
    --DIFFERENCE                     -65.00
  --STANDARD DEVIATION                8.67
  --NO. OF STANDARD DEVIATIONS
    BETWEEN EXPECTED AND
    OBSERVED VALUES:                  -7.50

STANDARD DEVIATION ANALYSIS
     FOR BLACKS (BOTH LEVELS)
  --AVAILABILITY                      28.4%
  --OBSERVED NO. OF HIRES               65
  --EXPECTED NO. OF HIRES           176.24
    --DIFFERENCE                    -111.24
  --STANDARD DEVIATION               11.23
  --NO. OF STANDARD DEVIATIONS
    BETWEEN EXPECTED AND
    OBSERVED VALUES:                  -9.90

STANDARD DEVIATION ANALYSIS
     FOR HISPANICS (LEVEL 7)
  --AVAILABILITY                       4.3%
  --OBSERVED NO. OF HIRES                7
  --EXPECTED NO. OF HIRES            15.90
    --DIFFERENCE                      -8.90
  --STANDARD DEVIATION                3.90
  --NO. OF STANDARD DEVIATIONS
    BETWEEN EXPECTED AND
    OBSERVED VALUES:                  -2.28

STANDARD DEVIATION ANALYSIS
     FOR HISPANICS (BOTH LEVELS)
  --AVAILABILITY                       4.3%
  --OBSERVED NO. OF HIRES               12
  --EXPECTED NO. OF HIRES            26.69
    --DIFFERENCE                     -14.69
  --STANDARD DEVIATION                5.05
  --NO. OF STANDARD DEVIATIONS
    BETWEEN EXPECTED AND
    OBSERVED VALUES:                  -2.91

The shortfalls in hiring for blacks are set forth below:

NUMBER OF ADDITIONAL BLACK
HIRES, IF BLACKS HAD BEEN
HIRED AT THE RATE AT WHICH
WHITES WERE HIRED
    ---LEVEL 5          78
    ---LEVEL 7        110
    ---BOTH LEVELS 5 AND 7  188

NUMBER OF ADDITIONAL HISPANIC
HIRES, IF HISPANICS HAD BEEN
HIRED AT THE RATE AT WHICH
WHITES WERE HIRED
    ---LEVEL 5          11
    ---LEVEL 7         16
    ---BOTH LEVELS 5 AND 7  26

OPM Report A-1 shows that the government did not use any of the special programs established by the Consent Decree to minimize the adverse impact of the OPM-sponsored alternative examining procedure for this job category. The government did not hire a single person under the Outstanding Scholar program, did not hire a single person under the Bicultural/Bilingual program, and hired 12 whites, only 3 blacks, and no Hispanics under the Co-op Student program.

Plaintiffs seek the immediate hiring of 78 blacks and 11 Hispanics at the grade 5 level, and of 110 blacks and 16 Hispanics at the grade 7 level, and the further "make-whole" remedies described in Mr. Seymour's letter of July 29, 1985 to Ms. Ward.

For convenience, plaintiffs are setting forth below a summary of the adverse impact calculations for which they rely as to this job category:

ADVERSE IMPACT SUMMARY:

BLACKS (LEVEL 5)
SHORTFALL 78
% OF WHITE RATE 24.3%
NO. OF STANDARD DEVIATIONS -6.47

BLACKS (LEVEL 7)
SHORTFALL 110
% OF WHITE RATE 26.6%
NO. OF STANDARD DEVIATIONS -7.50

BLACKS (BOTH LEVELS)
SHORTFALL 188
% OF WHITE RATE 25.7%
NO. OF STANDARD DEVIATIONS -9.90

HISPANICS (LEVEL 5)
SHORTFALL 11
% OF WHITE RATE 32.1%

HISPANICS (LEVEL 7)
SHORTFALL 16
% OF WHITE RATE 30.8%
NO. OF STANDARD DEVIATIONS -2.28

HISPANICS (BOTH LEVELS)
SHORTFALL 26
% OF WHITE RATE 31.3%
NO. OF STANDARD DEVIATIONS -2.91

If the defendants have any problems with the adequacy of plaintiffs' showing of adverse impact, please bring them to the attention of counsel for plaintiffs immediately, so that both the question of adverse impact and the provision of an adequate remedy can be resolved during the 60-day conciliation period provided by ¶ 28 of the Decree, at p. 43.

RICHARD T. SEYMOUR

Attorney for Plaintiffs

Dated:

- Exhibit 3: Series 0334, All Agencies, page 6-

<u>HAND DELIVERED</u>

Barbara Ward, Esquire
United States Department of Justice
Civil Division - Federal Programs
   Branch
10th & Pennsylvania Avenue, N.W.
Room 3509
Washington, D.C.  20530

                   Re:  <u>Luevano</u> v. <u>Devine</u>

Dear Barbara:

    I have enclosed two copies of Plaintiffs' Comments Regarding
"A Summary Of Procedures Followed In The Development Of The Com-
puter Specialist Trainee Examination" Submitted Pursuant To
Paragraph 26 Of The Consent Decree Entered In <u>Luevano</u> v. <u>Devine</u>,
one for you and one for James Green.

                        Very truly yours,

                        Barry L. Goldstein

BLG:oet

Enclosure

cc:  Richard T. Seymour, Esquire
     John Erickson, Esquire

PLAINTIFFS' COMMENTS REGARDING "A SUMMARY OF
PROCEDURES FOLLOWED IN THE DEVELOPMENT OF THE
COMPUTER SPECIALIST TRAINEE EXAMINATION" SUBMITTED
PURSUANT TO PARAGRAPH 26 OF THE CONSENT DECREE
ENTERED IN <u>LUEVANO v. DEVINE</u>

Page

I.   INTRODUCTION AND SUMMARY.                          1

II.  OPM'S CLAIMS OF VALIDITY FOR THE SELECTION
     PROCEDURES ARE IN ERROR AND OPM'S PLANS
     FOR ESTABLISHING VALIDITY ARE INADEQUATE.          5

III. SINCE THE PROCESS FOR THE DEVELOPMENT OF
     THE SELECTION PROCEDURES DID NOT ESTAB-
     LISH CONTENT VALIDITY, OPM SHOULD TAKE
     ADDITIONAL ACTION TO INSURE THE DEVELOP-
     MENT OF SELECTION PROCEDURES WHICH COMPLY
     WITH THE CONSENT DECREE.                           10

     A.  Introduction.                                  10

     B.  The Job Analysis and the Development
         of the Selection Procedures.                   11

         1.  Job Analysis.                              11

         2.  Determination and Development
             of the Selection Procedures.              13

     C.  OPM Has Not Demonstrated Content
         Validity.                                      16

         1.  Content Validity May Not Be
             Used to Justify Selection
             Procedures  Which Measure
             Aptitudes or Constructs, such
             as the "Ability to Learn" or
             "Judgment."                                16

         2.  Content Validity May Not Be
             Used to Justify Selection Pro-
             cedures which Measure Knowledge,
             such as the "Knowledge of Pro-
             gramming Language," which Is
             Not a Necessary Prerequisite
             for the Job.                               21

- i -

3.   The Job Analysis Was Not Adequate.                    24

4.   The Development of the Selection
     Procedures Did Not Properly Fol-
     low a Content Validity Strategy.                      27

D.   OPM Should Take Additional Action in
     Order To Develop Appropriate Selec-
     tion Procedures for the Computer
     Specialist Trainees Position.                         33

     1.   Miniature Training and Evalua-
          tion Test (MT&E).                                33

     2.   Job Characteristics Preference
          Survey (JCPS).                                   39

     3.   Occupational Supplement.                         41

IV.  OPM HAS NEITHER JUSTIFIED THE USE OF THE
     SELECTION PROCEDURES AS RANK-ORDERING
     MEASURES NOR ADEQUATELY INVESTIGATED AND
     ATTEMPTED TO REDUCE OR ELIMINATE ADVERSE
     IMPACT.                                               43

     A.   The Operational Use of the Selection
          Procedures.                                      43

     B.   Since OPM Has Not Justified the
          Rank-Ordering Use of the Selection
          Procedures, OPM Needs To Explore
          Further the Use of Appropriate
          Selection Procedures and To Con-
          sider Methods To Eliminate or
          Reduce Adverse Impact.                           43

CONCLUSION                                                 53

Attachments

     A    Barrett, "Content Validity and the
          Law" (1984) (Unpublished Paper).

     B    APA Standards, at "Categories of
          Standards."

     C    The Berger Series of Data Processing
          Personnel Tests (Psychometrics Inc.,
          Santa Monica, CA).

D    Contents and a Sample Outline of a
     Validity Study, B-APT Validity Studies
     A Technical Summary.

E    FPM Bulletin 331-3 re Alternative
     Selection Procedures.

PLAINTIFFS' COMMENTS REGARDING "A SUMMARY OF
PROCEDURES FOLLOWED IN THE DEVELOPMENT OF THE
COMPUTER SPECIALIST TRAINEE EXAMINATION" SUBMITTED
PURSUANT TO PARAGRAPH 26 OF THE CONSENT DECREE
ENTERED IN LUEVANO v. DEVINE

I.  INTRODUCTION AND SUMMARY.

We have reviewed "A Summary of Procedures followed in the
Development of the Computer Specialist."  As the members of the
Implementation Committee have discussed on several occasions,
plaintiffs have a number of criticisms regarding the development
of the selection procedures.

In general, OPM relies upon a set of "procedures" for
developing tests rather than upon empirical evidence.  The docu-
ment expresses a theory of test development but not a method for
empirically or otherwise evaluating the validity or practical
significance of a test or for determining potential adverse impact
and methods for limiting or eliminating the potential adverse
impact.  The statement of a theory for test development is not a
plan for establishing the validity of a test, its practical use
or significance, or to limit or eliminate adverse impact.  The
reliance upon theory, opinion, or inference, are general criticisms
of the test development procedure.

The conclusions which we reach are as follows:  (1) The
development plan for the test and the material provided does not
establish a reasonable methodology for the determination of a
job-related test; (2) if there is an adverse impact, then the use
of the selection procedure violates the Consent Decree and the

Uniform Guidelines; (3) the development of the selection procedure did not provide a basis for considering alternative examining procedures or for examining alternative use of those procedures in order to make "all practicable efforts" to eliminate adverse impact.[1]

The plaintiffs' specific comments and suggestions are summarized below:

1.  In order to develop empirical evidence of validity within a reasonable time period OPM should undertake a concurrent criterion-related validity study, and not just plan to perform a predictive criterion-related validity study, p.6.

2.  OPM improperly describes the requirements for the use of training scores as criteria; any plan to use training performance criteria in a future study should insure that the training performance is comparable to job performance or that there is a "demonstration" of the relationship between training scores and job performance, pp. 6-9.

3.  The proposed predictive criterion-related validity study would almost certainly fail to include a representative sample of applicants; the plan for any criterion-related study should include, insofar as feasible, steps to insure that the study includes a representative sample of applicants, pp. 9-10.

4.  Since the description of the plans for the criterion-related and construct studies are too sketchy to comment upon, OPM should provide plaintiffs' counsel pursuant to paragraph 26 of the Consent Decree summaries of the plans for any such studies "[a]s early a possible in the course of the development" of the study design, p. 10.

5.  OPM fails to provide basic information which is important for analyzing the development of the selection procedure: for example, (a) the relationship between and qualifications of the "test researchers," "Personnel Research Psychologists," "project

[1]  Plaintiffs' counsel on the Implementation Committee have previously stated these concerns.  In this written presentation, the plaintiffs' position is described in greater detail in the hope that these matters may be resolved.  You have provided other "summaries" of development plans.  The plaintiffs focus upon the Summary concerning the Computer Specialist because it is an archetype for subsequent summaries.  Our Comments apply with equal force to the other test development summaries.

reviewers" and "test developers" are not listed, pp. 13, n.9, 16; (b) there is no description of the "integration" of the techniques which result in 6 job-specific KSAOs, p.12; (c) there is no explanation as to whom or how the "linkage" was made between duties, KSAOs and the MT&E Test, p.15; (d) no explanation is given for the development of the education and experience rating procedure, p.16; (e) there is no description of the varying definitions of the three groups of job incumbents, groups of 44, 216 and 318 incumbents. or why these different groups were used, p.16.

6.  OPM has not demonstrated the validity of the selection procedures for the computer specialist trainee position, and if the procedures cause adverse impact they violate the Consent Decree and Title VII, pp. 16-32. Thus, OPM must cease use of the procedures, validate the procedures, or eliminate any racially or ethnically disparate results.

7.  OPM's goal of developing a job-related programming aptitude test, as B-APT is claimed to be, is appropriate; such a test is likely to be superior to a general aptitude test like the PACE, p.33. However, the information provided by OPM does not indicate that the MT&E is comparable to the B-APT, pp.33-34.

8.  If OPM is to establish the validity of the MT&E or a comparable test, it must rely upon empirical validity evidence similar to the evidence developed for the B-APT, p.34.

9.  A sufficient number of minorities should be included as subjects in the empirical validity studies in order to determine whether the selection practices have an adverse impact, and, if so, whether the adverse impact might be reduced or eliminated by, for example, eliminating or modifying items in an appropriate fashion, pp. 35, 49-50.

10.  OPM should also include minority group members in the validity study in order to investigate the "unfairness" of the test, pp. 35-36.

11.  In order to design proper empirical studies, OPM should undertake another job analysis which will focus upon the development of appropriate criteria, the elimination of bias from the criteria, and the construction of appropriate test items, pp. 36-38.

12.  We support the examination of alternative, non-cognitive selection procedures which may have no adverse impact; however, OPM's attempt to undertake such an examination of the JCPS is flawed because it was not properly developed or examined for possible adverse impact, pp. 39-41.

13.  If OPM decides to use a preference inventory like the JCPS it should develop empirical evidence to support its use,

p.40, and consider the possibilities that such inventories may be seriously affected by varying racial, ethnic and cultural backgrounds among the pool of applicants, pp. 40-41.

14. OPM has established no justification for the use of a rating of prior education and experience when OPM admits that no education or experience is required for the job; if OPM intends to use this scale, it must as in the case of the JCPS, establish evidence by means of a study which includes a representative number of minority employees, pp.41-42.

15. Since OPM has not justified the rank-ordering use of the selection procedures, it may not so use those procedures if rank-ordering increases disparate racial or ethnic results, pp.43-52.

16. In order to justify the use of rank-ordering OPM would need to develop significant empirical evidence supporting the validity of this use of the procedures and to investigate whether alternative use would remove or eliminate adverse impact, pp.49-50.

II. OPM's CLAIMS OF VALIDITY[2/] FOR THE SELECTION PROCEDURES ARE IN
ERROR AND OPM'S PLANS FOR ESTABLISHING VALIDITY ARE INADEQUATE.

In section 6 of the Summary there is a brief description of
the strategy for validating the alternative examining procedure.
Summary, at 19-20. OPM states that "all components [of the
examination] were developed following the content validity strategy,"
and that "there is sufficient documentation of the computer specialist
job analysis to establish content validity of the examination...."
Summary, at 19. We disagree with these conclusions as set forth
in section III, supra.

OPM further states that although content validity was estab-
lished it "will" conduct investigations of criterion-related validity
and construct validity. Summary, at 19-20. Since we conclude that
content validity has not been established, it is our position that
in order to establish validity OMB must resort to an empirical
approach, either criterion-related or construct validity.

The Summary only provides a brief statement describing the
proposed criterion-related study. OMB plans to undertake a "pre-
dictive" study -- there is no plan for a concurrent model. The pro-
posed approach includes an investigation of "[t]he relationship
between MT&E and JCPS[3/] score and training score [and] [t]he

---

2/    The terms "valid," "validated," "validity" or "validation" in this
analysis are used in a manner consistent with the definition of these
terms in paragraph 8(k) of the Consent Decree: "All references to
'valid,' 'validated'[,] 'validity' or to 'validation' in this Decree
shall, except where otherwise noted, refer to the demonstration, in an
appropriate study, that the agency's use of a particular examining
procedure for a particular job category or group of job categories
meets all of the applicable standards of the Uniform Guidelines."

3/    The selection instruments which comprise the alternative examining
procedure are the Miniature Training and Evaluation Test (MT&E), Job
(footnote continued)

relationship between MT&E and JCPS score and performance." We have several comments. First, it may take several years before a predictive study can be fully commenced since a certain number of applicants must proceed through the training program or work on the job before the sample will be sufficiently large to permit a study. Importantly, the Summary does not indicate any time schedule for the predictive study. Since the selection procedure has not been adequately validated by content validity, it is necessary for OPM to undertake immediately a criterion-related study if OPM is to establish that the procedure is valid. See section IIIC, infra. Accordingly, we suggest that OPM undertake as soon as possible an appropriate concurrent criterion-related validity study.[4]

Second, the description of the training criteria which will be developed requires revision. The Summary inaccurately describes the applicable law: "The relevance of this comparison [between MT&E and JCPS score and training score] has been established in Washington v. Davis (1976), where the U.S. Supreme Court affirmed the use of training school score as a bona fide performance criterion in a criterion-related validity study," id., at 19. With respect to the use of training scores as performance criteria the Uniform Guidelines provide as follows:

---

footnote continued
Characteristics Preference Survey (JCPS), and an Occupational Supplemen
Form. The MT&E is used to screen and rank applicants. If an applicant
passes the MT&E, points may be credited to an applicants' ranking based
upon the performance of the applicant on the JCPS and the Occupational
Supplement. Summary, at 1.

[4] We do not suggest that OPM abandon its plan to do a predictive stu

> Where a performance in training is used as
> a criterion, success in training should be
> properly measured and the relevance of the
> training should be shown either through a
> comparison of the content of the training
> program with the critical or important
> work behavior(s) of the job(s), or through
> a demonstration of the relationship between
> measures of performance in training and
> measures of job performance.... Criterion
> measures consisting of paper and pencil tests
> will be closely reviewed for job relevance.

§14B(3).

The Summary does not provide any plan to insure that training score criteria properly reflect job content or that a "demonstration" of the relationship of training scores and job performance must be shown. In fact, the relationship between training score and job performance is listed as separate from the evaluation of the relationship between training score and the selection criteria. See Summary, at 20.

The problems created by using training scores without reference to job performance are apparent. "If employers were permitted to validate selection devices without reference to job performance, then non-job-related selection devices could always be validated through the simple expedient of employing them at both the pretraining and training stage." Blake v. City of Los Angeles, 593 F.2d 1367, 1382 n.17 (9th Cir. 1979), cert. denied, 446 U.S. 928 (1980); see also, Craig v. county of Los Angeles, 626 F.2d 659, 663 (9th Cir. 1980). An applicant's performance on a "paper and pencil test," such as the MT&E, may correlate with performance on a "paper and pencil" test given during a training program or with some other academically focused criteria. However, the test performance may

- 7 -

not have any relationship to job performance.

The Uniform Guidelines, which are expressly incorporated into this Consent Decree, reject the interpretation of Washington v. Davis relied upon in the Summary. Training scores cannot be used as criteria simply because they are training scores; rather training scores may only be used as criteria if they measure or bear a relationship to job performance. In addition, the courts have rejected the expansive reading of Washington v. Davis set forth in the Summary, and approved application of the principles in the Guidelines or similar principles. See e.g., Guardians Ass'n of New York City v. Civil Service, 633 F.2d 232, 246-47 (2d Cir. 1980), aff'd on other grounds, 463 U.S. 582 (1983); Harless v. Duck, 619 F.2d 611, 616-17 (6th Cir.), cert. denied, 449 U.S. 872 (1980); Blake, supra; Craig, supra; Ensley Branch, NAACP V. Seibels, 616 F.2d 812, 822 n.25 (5th Cir.), cert. denied, 449 U.S. 1061 (1970); Dickerson v. United States Steel Corp., 472 F. Supp. 1304, 1347-49 (E.D. Pa. 1978).[5/] Thus, OPM's plans for the use of a training criteria should be revised to require adherence to the principles

_____

[5/]   The courts rely upon three basic points to reject the interpretatic of Washington v. Davis relied upon in the Summary:  (1) That, as Justice Stevens stated in his concurring opinion, Washington v. Davis, 426 U.S. 229, 255 (1976), "there [was] no Title VII question in [the] case;" (2) That Washington v. Davis held merely that where the test sought only to ascertain whether applicants have the minimum communication skills necessary to understand the material in the police training course performance in the training course may serve as a criterion; (3) If Washington v. Davis was interpreted otherwise, as the Ninth Circuit stated in Blake, the use of training scores as criteria would seriously undermine the "job relatedness" requirement set forth in Griggs v. Duke Power Co., 401 U.S. 424 (1971), Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), and the Uniform Guidelines.

in the Guidelines.[6/]

Third, the proposed use of a predictive criterion-related validity study may be infirm because the sample will not be representative of the population of applicants. The Uniform Guidelines provide as follows:

> Whether the study is predictive or concurrent, the sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question, and should insofar as feasible include the races, sexes, and ethnic groups normally available in the relevant labor market.

§14B(4). The Supreme Court has ratified the importance of these principles by criticizing a concurrent study which "dealt only with job-experienced, white workers [where] the tests themselves are given to new job applicants, who are younger, largely inexperienced, and in many instances nonwhite." Albemarle Paper Co. v. Moody, 422 U.S. 405, 435 (1975). Obviously, OPM should properly be concerned about obtaining an appropriate representative sample whether it uses a concurrent or a predictive study.

However, as briefly described in the Summary, the proposed predictive study would almost certainly be based upon an

_____

[6/] The recently published Standards for Educational and Psychological Testing (1985), published by the American Psychological Association ("APA Standards") are consistent with the principles in the Guidelines. Standard 10.3 provides that "[t]he rationale for criterion relevance should be made explicit. It should include a description of the job in question and of the judgments used to determine relevance." Id., at 60. The Comment to the Standard provides that "[i]n general, the judged relevance of a criterion.... should reflect important and substantial aspects of the job." (Emphasis added), id.

- 9 -

unrepresentative sample. Apparently, the study would only include those persons who passed the MT&E and ranked sufficiently high on the combined procedures for selection. Depending upon the consequences of the selectin procedure, the sample likely would not be "representative of the candidates normally available in the relevant labor market." For example, if the current selection procedures have a significant adverse impact on Hispanics or blacks, then the sample would not "include the races ... and ethnic groups normally available in the relevant labor market." The design for the criterion-related study must include procedures to insure "insofar as feasible" a representative sample.

Fourth, the description of the other "relationships" that "will be investigated" in the criterion-related study and the description of construct validity is too sketchy to give any additional specific comments. Pursuant to paragraph 26 of the Consent Decree, OPM should send us summaries of the plans for any criterion-related or construct validity studies "[a]s early as possible in the course of the development ... of the design of the validation study...." We shall comment upon the design of the empirical studies when we receive the design.

III. SINCE THE PROCESS FOR THE DEVELOPMENT OF THE SELECTION PROCEDURES DID NOT ESTABLISH CONTENT VALIDITY, OPM SHOULD TAKE ADDITIONAL ACTION TO INSURE THE DEVELOPMENT OF SELECTION PROCEDURES WHICH COMPLY WITH THE CONSENT DECREE.

A.    Introduction.

The description of the development and selection of the alternative examining procedure is divided into four sections in the Summary. Sections one and two, Summary, at 2-10, concern the

job analysis, and sections three and four, Summary, at 11-16,
concern the determination of and choosing appropriate procedures.
In Section B we describe the job analysis process and selection
procedure development, in section C we describe the basis for our
conclusion that the job analysis and the selection procedure
development did not establish content validity, and in section D
we make several general comments regarding possible additional
action.

    B.    <u>The Job Analysis and the Development of the Selection
         Procedures</u>.

        1.    <u>Job Analysis</u>.

        The "job analysis" process described in the Summary
is essentially the process which was used during the development
of the PACE. OPM starts the process with "Thirty-one Knowledges,
Skills, Abilities, and Other Characteristics Educed to Underlie
Successful Job Performance in PACE Occupations," and 11 "job duties."
Summary, at 2, 23. "During the validation of the PACE Examination"
these 31 KSAOs and 11 job duties

> were rated for importance to
> successful performance on the
> job by 73 senior-level and
> supervisory computer specialists
> using a 7-point rating scale.
> Six of the 11 duties and 11 of
> the 31 KSAOs received mean rat-
> ings greater than 5.0 ("Very
> Important").

Summary, at 2.

        The "current" study basically replicated the PACE
study. The 31 KSAOs and 11 job duties were used. However, OPM
used "216 incumbent computer specialists representing three Federal

agencies" as "subject-matter experts" (SMEs). Id., at 4. Like the "73 senior-level specialists" in the PACE study, these 216 individuals were requested to rate the 31 KSAOs and the 11 job duties on a "7-point" scale. In addition to the rating of these factors, the 216 job analysis participants were asked to rate "six job specific KSAO's (sic)." Summary, at 3. These six KSAOs were apparently derived by a series of techniques; the processes for using these techniques or "integrating" the results are not described.[7] Summary, at 3.

The ratings by the 216 job incumbents were used to identify "important job duties and KSAOs." Summary, at 4. Duties and KSAOs which received a rating of 5.0 or higher "were selected as important for subsequent test development." Id. A 5.0 score represents a rating of "very important." As shown in the review of the findings of the job analysis, the use of a 5.0 rule was modified in several situations.

Four of the eleven "PACE duty statements" received a rating of 5.0 or above. Summary, at 5. Nine of the 31 PACE KSAOs received a rating of 5.0 or above, id., at 6, but two KSAOs, "Listening" and "Deal with people," "were dropped because they were not measurable within the context of the planned examination," id., at 8.[8]

_____

7/  "These six job specific KSAO's (sic) were derived from an integration of the information gathered from interviews with job incumbents experts and reviews of past job analyses, position classification standards, qualification standards, task analysis, and validity studies of various predictors related to the job of computer specialist/programmer trainee." Summary, at 3.

8/  A job analysis is supposed to provide the basis for determining the scope and substance of the selection process. Apparently, OMB had

(Footnote continued)

Four of the six "job specific KSAOs" were rated above 5.0. However, all six "were selected as important because of their direct relevance to the actual content of the job," Summary, at 7.

The last step in the job analysis process "entailed linking the duty and KSAO data." An unidentified group of "Personnel Research Psychologists" were instructed "to link" the remaining "important" KSAOs to the "important" duties. All four duties were "retained for refinement into test tasks or exercises" since all the duties "accounted for 50 percent or more of the important KSAOs." Summary, at 9-10.[9]

## 2. Determination and Development of the Selection Procedures.

The "job analysis" process produced 13 KSAOs, 7 "PACE KSAOs" and 6 "Job-specific KSAOs," and 4 "PACE Duties." Supposedly, these 17 duties and KSAOs were used to determine appropriate selection procedures and to develop these procedures.

However, section 3, "Determination of Appropriate Selection Procedures," does not mention a single duty or KSAO. The MT&E is selected because "[b]oth previous and current job analysis data indicate that the ability to learn is crucial to success as a

footnote continued
a preconceived notion of "the planned examination." When the job analysis produced indications contrary to the plan, "the planned examination" was not modified but rather the indications from the job analysis were ignored. We disagree with this approach, see also, pp. 31-32, infra.

[9] The reported results are "the final linkage following review and editing by project reviewers." The intermediary linkage or linkages are not described nor is the "review and editing process." The qualifications or identity of the "project reviewers" are not set forth.

- 13 -

programmer trainee." Summary, at 11.[10]/

The education and experience rating was selected because "the assumption is made that if applicants have successfully completed courses or training in the computer specialist field and/or have worked in the field, their ability to learn is further substantiated." (Emphasis added). Summary, at 11. The "measure of related work experience and training were deemed appropriate." (Emphasis added). The identity and the qualifications of the "assumers" and "deemers" were not listed.

The Job Characteristics Preference Survey is a "non-cognitive" alternative selection procedure studied during the development process. "In the interest of investigating new and potentially effective types of alternatives, it was decided to incorporate this approach in the new examination." The "person-job matching" approach was used since "[r]elevant empirical literature indicated" that this was the "best methodology" and that "[i]t appeared to produce an instrument with little or no adverse impact...." Summary, at 12.

"The MT&E test was developed to measure the ability to learn the kind of data processing language, principles, and

_____

10/ The "ability to learn" was not listed among the original 31 "knowledges, skills, and abilities," and thus, of course, it is not included among the 13 KSAOs which are "important" for the job. Indeed three of the "job-specific" KSAOs are "knowledges." Accordingly, these KSAOs to the extent they are related to development of a selection procedure would presume that the applicant has already learned the pertinent knowledge.

- 14 -

structures required of a computer specialist...." Summary, at 13.
The "duty/KSAO linkage information" (this includes the "PACE"
duties and KSAOs) 'was used to prepare a preliminary outline" for
developing the test. A "detailed review by the test developers"
resulted in the selection of the six job-specific KSAOs (these are
not the KSAOs or duties included in the "preliminary outline") "as
the major areas on which actual sections of the test would be con-
structed." Id. "It was determined that exercises based on these
duties and KSAOs could be simulated through the use of a hypothetical
computer programming language." Id. The five sections of the test
are described in some detail. Summary, at 13-14. A table indicates
the "Linkage of Important Duties, KSAOs, and MT&E Test." There is no
description of how the "linkage" was made or who made the determination.
Summary, at 15.

A separate job analysis was conducted for the
development of the JCPS. The analysis was based upon incumbents
"deem[ing] aspects of the job which either stimulate or thwart" per-
formance. The aspects or "characteristics" were drawn from a number
of sources "that purportedly measured ... factors which might affect
employee performance." (Emphasis added), Summary, at 15. "After
extensive review by test researchers, a final pool of 156 job
characteristics was selected [which] was administered to a group of
44 incumbents who provided data on the desirability of each charac-
teristics [and] its salience in the job." Id. The characteristics
were "matched into 71 pairs based on their equivalent desirability
and disparate salience in the job." This "interim instrument" was

given "to another group of 318 incumbents who provided ratings" regarding which characteristic was "a better description of the ... job." Summary, at 15-16. Someone then "identified" 59 pairs to form the JCPS. There is no description regarding the identity or selection procedure for the groups of 44 incumbents and 318 incumbents or the relationship between these groups and the 216 incumbents involved in the job analysis, see pp.11-12, supra. Nor are the identities or qualifications of the "test researchers" revealed. Finally, the relationship between the "test researchers" the "Personnel Research Psychologists," the "project reviewers" and the "test developers" is unclear. See, Summary at 9, 13.

There is no description of the development of the education and experience rating procedure.

C. <u>OPM Has Not Demonstrated Content Validity</u>.

OPM has not established content validity for the selection procedure for the computer specialist series. We do not attempt to gave an exhaustive description of the reasons why there is no showing of content validity. Rather, we describe four principal reasons why content validity has not been shown and why OPM needs to perform an apropriate empirical validity strategy.

1. <u>Content Validity May Not Be Used to Justify Selection Procedures Which Measure Aptitudes or Constructs, such as the "Ability to Learn" or "Judgment."</u>

The content validity strategy was inappropriate for the abilities which OPM sought to test. The MT&E is selected because it measures "the ability to learn." The test also is said to measure "important" abilities, "attention to detail," "general reasoning,"

"judgment," "reading-comprehension," "planning," and "adaptablity."
These seven "PACE KSAOs" are defined in Appendix A, Summary, at 23-
27. The "ability to learn," which is the crucial focus of the
MT&E is not defined nor explained by the job analysis. See n.10,
supra.

> The Uniform Guidelines provide as follows:

>> A selection procedure based upon infer-
>> ences about mental processes cannot be
>> supported solely or primarily on the
>> basis of content validity. Thus, a
>> content strategy is not appropriate
>> for demonstrating the validity of
>> selection procedures which purport
>> to measure traits or constructs, such
>> as intelligence, aptitude, personality,
>> common sense, judgment, leadership,
>> and spatial ability.

§14C(1). OPM erroneously attempts to justify these types of ability,
such as "judgment," "perseverance," by a content validity strategy.

The Principles[11] also indicate the inappropriateness
of the OPM attempting to show the content validity of a procedure
measuring these broad aptitudes: "[t]he term 'ability' is difficult
to define and distinguish from 'skill,' and it is important to note
here that the use of the former term does not imply that content
validity is a sufficient justification for the use of abilities or
for such characteristics as empathy, dominance, leadership aptitude,
and other broad psychological traits." Id., at 13.[12]

---

11/ Principles for the Validation and Use of Personnel Selection Pro-
cedures: Second Edition, published by the Division of Industrial-
Organizational Psychology, American Psychological Association (1980)
("Principles).

12/ In a graphic manner, Dr. Richard Barrett described the problem to
a professional meeting called Content Validity III which was held in
Bowling Green, Ohio, on November 15, 1984:

> (Footnote continued)

The courts have applied §14C(1) of the Uniform Guide-
lines to preclude the use of content validity purporting to measure
broad "abilities," such as those which OPM purports to measure
by the M,T&E. Firefighters Institute for Racial Equality v. City
of St. Louis, 616 F.2d 350, 357, n.12 (8th Cir. 1980), cert. denied,
443 U.S. 904 (1979); Walls v. Mississippi Department of Public
Welfare, 542 F. Supp. 281, 312 (N.D. Miss. 1982), aff'd, 730 F.2d
306, 320 (5th Cir. 1984); Easley v. Anheuser-Busch, Inc., 572 F.
Supp. 402, 409 (E.D.Mo. 1983); United States v. San Diego County,
21 FEP Cases 402, 415 (S.D. Cal. 1979); Vanguard Justice Society,
Inc. v. Hughes, 471 F. Supp. 670, 741 (D. Md. 1979).

---

footnote continued
     The Multijurisdictional Police Officer Examination
containing a compass reading question in which a
scene is shown in perspective from the side, and the
compass tilted 90 degrees to the vertical. The
problem is thus transformed from a test of compass
reading to one of spatial relations.

     Perhaps you recall the escape and recapture of
James Earl Ray a few years ago. After he was recap-
tured, the local sheriff described how the mountain
men had to give false clues to the FBI with their
fancy compasses and doleful bloodhounds to get them
out of the way so they wouldn't mess up the territory
after a rain had washed away all of the pre-existing
scents. He pointed out that none of the mountain men
could read a compass, but they knew the mountains and
how to find escaped prisoners. Perhaps the test
measures an ability, but not the one which counts,
that is, the ability to catch the escaped James Earl
Ray.

Barrett, "Content Validity and the Law" (1984) (Unpublished paper).
The paper is enclosed as Attachment A. The paper provides further
explanation for several of the points made in these Comments.

The Second Circuit determined that the Uniform Guidelines "adopt too rigid an approach" in precluding the use of content validation to justify tests purporting to measure constructs. Guardians Ass'n of New York City v. Civil Service Comm'n., 630 F.2d 79, 92 (1980), cert. denied, 452 U.S. 940 (1981). However, even in Guardians Ass'n, the appellate court opinion which most broadly interprets the appropriate application of content validity, indicates that OPM erred in using content validity to justify the use of the MT&E. The court adopted a "functional approach:"

> If the job in question involves primarily abilities that are somewhat abstract, content validation should not be rejected simply because these abilities could be categorized as constructs. However, if the test attempts to measure general qualities such as intelligence or common-sense, which are no more relevant to the job in question than to any other job, then insistence on the rigorous standards of construct validation is needed. Since tests of this kind are often biased in favor of a person's familiarity with the dominant culture, permitting them to be used without a showing of predictive validity would perpetuate the effects of prior discrimination. But as long as the abilities that the test attempts to measure are no more abstract than necessary, that is, as long as they are the most observable abilities of significance to the particular job in question, content validation should be available. To lessen the risks of perpetuating cultural disadvantages, the degree to which content validation must be demonstrated should increase as the abilities tested for become more abstract.

(Emphasis added), Id., at 93.

It is difficult to think of abilities, such as "judgment," or "general reasoning," more abstract than those selected by OPM; these abilities are no more relevant to the computer specialist job than to many other jobs. Under the Guardians Ass'n test, construct or criterion-related validity not content validity must be used to justify the measure of these abstract abilities; to do otherwise, is to increase "the risks of perpetuating cultural disadvantages" and "the effects of prior discrimination."

The JCPS is a "survey designed to assess the job-related preferences of applicants for key aspects of the computer specialist trainee job." (Emphasis added), Summary, at 1. The process for developing this survey involved a series of judgments by (apparently) separate groups of job incumbents regarding "charac-teristics" which "either stimulate or thwart their tendency to perform well." Summary, at 15; see pp. 15-16, supra. "A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the job" or a measure of a "knowledge, skill or ability [which] is a necessary prerequisite to successful job performance." Uniform Guidelines, §14C(1). The applicant "preference" survey does not fall under the type of measures for which a content validity strategy is appropriate. Instead, it is "[a] selection based upon inferences about mental processes [which] cannot be supported solely or primarily on the basis of content validity." Id.

2. <u>Content Validity May Not Be Used to Justify Selection Procedures Which Measure Knowledge, such as the "Knowledge of Programming Language," which Is Not a Necessary Prerequisite for the Job.</u>

The content validity strategy is inappropriate to justify the measurement of the "knowledges" defined by the six "job-specific KSAOs."[13/] The job analysis and the determination of appropriate selection procedures are contradictory.

The job analysis indicates "six job specific KSAO's (sic) ... which were <u>deemed</u> important for success as a programmer trainee." (Emphasis added), Summary, at 3. However, applicants are not expected to have specialized skills in programming," Summary, at 11. Accordingly, these six KSAOs can only be relevant as goals for the training of computer specialists. The initial position for the computer specialist occupational series is computer specialist trainee--GS5 and 7 positions are "trainee levels." Summary, at 23.

"Content validity is ... not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities which an employee will be expected to learn on the job." Uniform Guidelines, §14C(1). The <u>Principles</u> stress this point.

> <u>Job Content Domains Should be Defined in Terms of Those Things an Employee is Expected to Do Without Training or Experience on the Job.</u> It is important to delineate what knowledges, skills, and abilities an employee is expected to have before placement

---

13/ For example, the job analysis defines "knowledge of programming logic: To have a good working knowledge of programming logic such as an understanding of repetitive 'looping' conditional 'branching,' counters, etc." Summary, at 7. The other five "job-specific KSAOs" define comparably specific knowledge or skills.

> on the job, and define the selec-
> tion domain in those terms.

Id., at 13.

If a "knowledge, skill or ability is a necessary
prerequisite to successful job performance" then tests designed to
measure such a knowledge, skill or ability may be justified by
content validity.  Uniform Guidelines, 14C(1). But the six "job-
specific KSAOs" do not fall into this category.  The courts have
applied the "sensibl[e]" rule in the Guidelines that content validity
is "not an appropriate strategy" when the KSAOs, like the six "job-
specific KSAOs, are not "necessary prerequisites to successful job
performance."  Berkman v. City of New York, 536 F. Supp. 177, 208
(S.D.N.Y. 1982), aff'd, 705 F.2d 854 (2d Cir. 1983); see also,
Wallas v. Mississippi Dept. of Public Welfare, 542 F. Supp., at 312,
aff'd, 730 F.2d at 320; Vanguard Justice society, Inc. v. Hughes,
592 F. Supp. 245, 262, n.61 (D. Md. 1984); Easley v. Anheuser-Busch,
Inc., 572 F. Supp., at 409.

In Guardians Association, the Second Circuit deter-
mined that content validation "remains inappropriate for tests that
measure knowledge of factual information if that knowledge will be
fully acquired in a training program."  Guardians Ass'n of New York
City v. Civil Service Comm'n., 630 F.2d, at 94.  The Court rightfully
noted that approving the use of such tests without requiring empirical
evidence of validity would "risk favoring applicants with prior
exposure to the information, a course likely to discriminate against
a disadvantaged minority."  Id.

OPM appears to attempt to avoid these well-established principles by justifying the MT&E by content validity because the test "would permit simulation of the training process ... and would measure applicants' ability to learn computer programming principles rather than their developed competence in the area...." Summary, at 11. Furthermore, "[i]t was determined that exercises based on these duties and KSAOs could be simulated through the use of a hypothetical computer programming language." Id., at 13. In essence, OPM attempts to measure the ability of applicants to learn complicated computer programming knowledge over a lengthy training period by the applicants score on the 75-item MT&E. The theory may be an appropriate one to explore but it is not a selection procedure which can be justified by content validity. Neither the "ability to learn," see pp. 16-20, supra, nor the knowledge learned during the training period is an appropriate item to measure by a selection procedure justified by content validity.

The use of an education and experience rating "was deemed appropriate" because "the assumption is made that if applicants have successfully completed courses or training in the computer specialist field and/or have worked in the field, their ability to learn is further substantiated." Summary, at 11. OPM admits that "no positive education or specialized experience requirements are specified in the qualification standards for the" position. Id. It is inappropriate to use content validity to justify a selection procedure measuring education and experience levels which are

admittedly not "necessary prerequisites" for the job. Furthermore, as Judge Newman stated in Guardians Association of New York City, 630 F.2d, at 94, the use of such measures "risk[s] ... discriminat[ion] against a disadvantaged minority." See also, §14C(6), Uniform Guidelines.[14/]

### 3. The Job Analysis Was Not Adequate.

The Uniform Guidelines require that in order to demonstrate content validity

> [t]here should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis should focus on the work behavior(s) and the tasks associated with them.... The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

§14C(2). The Guidelines define "work behavior" as "[a]n activity performed to achieve the objectives of the job.... Knowledges, skills, and abilities are not behaviors, although they may be applied in work behaviors." (Emphasis added), §16Y.

The "job analysis" performed by OMB does not describe work behaviors, tasks, or work products of the computer specialist trainee position. Rather the analysis focues on knowledge, skills, and abilities. Moreover, the KSAOs are broad and non-job specific:

---

14/ "Prior training or experience. A requirement for or evaluation of specific prior training or experience based on content validity, including a specification of level or amount of training or experience, should be justified on the basis of the relationship between the conten of the training or experience and the content of the job for which the training or experience is to be required or evaluated."

for example, there are KSAOs such as "adaptability," "reading comprehension," and "perseverance." Furthermore, the four PACE duties fail to describe the tasks performed or relevant work products.

The OPM job analysis ignores the Guidelines and adopts a method, reliance on a description of knowledges, skills, and abilities rather than on work behaviors, specifically rejected by the Guidelines. As a result, for example, we are told that "judgment" is "very important" but there is no basis for determining the level of reading comprehension or numerical ability, if any, required for the job.[15]

The Guidelines' requirements for specificity and explicit definition for job analyses for content validity studies are endorsed by the Principles and the APA Standards

> A content domain should ordinarily
> be defined in terms of tasks, activi-
> ties or responsibilities or specific
> abilities, knowledge, or job skills
> found to be prerequisite to effective
> behavior in the domain. This means
> conducting a job analysis.

(Emphasis in original), Principles, at 13.

* * * * *

---

[15] The MT&E has a "reading level" which "is at approximately the 9th grade level." Summary, at 14. Does this level reflect the requirements of the job? Is it too high or too low? The "job analysis" provides no basis for answering these questions.

Furthermore, Section II of the MT&E requires "the examiners to perform simple arithmetic calculations on the numbers contained in the computer's storage...." Summary, at 13. Is this a numerical test? Is numerical ability a necessary prerequisite for the job? If so, what level of numerical ability or knowledge is required? Once again, the "job analysis" does not provide a clue.

> Content validation should be based
> on a thorough and explicit defi-
> nition of the content domain of
> interest. For job selection,
> classification, and promotion,
> the characterization of the
> domain should be based on job
> analysis. (Conditional).

Standard 10.4, APA Standards, at 60.[16]

The leading texts on psychological testing agree that "the application of content validation to personnel selection tests ... depends on a thorough and systematic job analysis," and that, "[t]o be effective, a job analysis must be specific." A. Anastasi, Psychological Testing (4th ed. 1984), at 360-61. Generally, the courts have recognized that "[t]he adequacy of defendant's job analysis is often crucial in employment discrimina-ton litigation [and that a] well-done job analysis is essential to prove content validity...." (Footnotes omitted), B. Schlei & P. Grossman Employment Discrimination Law (2d ed. 1983), at 160-61.

The Second Circuit determined that the "absence [of] a critical component of a proper job analysis ... observation of actual performance [resulted in a] fail[ure] to raise any inference that the content of the job was accurately reflected in the content of the examination." Guardians Ass'n. of New York City v. Civil Service Commission, 633 F.2d at 243; see also, United States v. City of Chicago,

---

16/ The "Categories of Standards" section of the APA Standards is enclosed as Attachment B.

573 F.2d 416, 425-26 (7th Cir. 1978) ("Constructing a content valid examination requires a thorough task analysis of the job to be performed.") Similarly, the job analysis for the computer analyst position did not involve an observation and reporting of the actual performance or even a description of the specific work behaviors and tasks. The job analysis does not pass muster under the Guidelines, professional standards, or case law.

### 4. The Development of the Selection Procedures Did Not Properly Follow a Content Validity Strategy.

OPM attempts to demonstrate the content validity of selection procedures which do not resemble work behavior. The most obvious examples are the JCPS and the experience and education rating. Since there is no experience or education requirement for the job, there is no basis for evaluating the "content validity" of an experience or education rating. The preference survey does not reflect work behavior and it is not a procedure amenable to the form of content validation used by OPM, see p.20, supra.

The MT&E is an attempt by OPM to recreate in test form the learning process for a computer trainee. It is an inference or, as OPM phrases, it, a "determination" that certain "exercises" could "simulate" the learning process, and therefore predict training success for the six "job-specific KSAOs." This is not a test which is "a representative sample of the behavior(s) of the job" or a test for a knowledge or an ability which is a necessary prerequisite for a job. For example, if an employer sought to hire a trained computer programmer, then the employer could test for

whether the applicants could write a program (the work behavior) or understood programming principles (necessary specific knowledge).

Furthermore, OPM has simply estimated the "linkage" between "important duties, KSAOs, and MT&E test." There is no basis other than inferences concerning mental processes or the learning process to support this "linkage." As we show in some detail, OPM's approach to the development of the MT&E cannot be justified by a content validity strategy.

Since content validity does not rely upon empirical evidence it is inappropriate to claim content validity where the test constructors rely primarily upon inference regarding mental processes or estimates for the measure of general aptitudes or abilities, such as the ability to learn. The Guidelines, professional standards, and judicial decision require a close relationship between the test and the job.

> To demonstrate the content validity of a selection procedure, a user should show that the behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job.

§14C(4). If the selection procedure measures an ability -- apparently the MT&E is designed to measure the ability to learn the knowledge defined by the six "job-specific KSAOs -- the procedure must meet several specific requirements. (1) The "ability being measured should be operationally defined in terms of observable aspects of

- 28 -

work behavior of the job." (2) "The procedure [should measure[ ] and [be] a representative sample of that ... ability." (3) The "ability [must be] used and [be] a necessary prerequisite to performance of critical or important work behavior." (4) The "selection procedure measuring a[n] ability should either closely approximate an observable work behavior, or its product should closely approximate an observable work product." Id.

The Uniform Guidelines establish a useful sliding scale:

> The closer the content and the context of the selection procedure are to work samples or work behaviors, the stronger is the basis for showing content validity. As the content of the selection procedure less resembles a work behavior, or the setting and manner of the administration of the selection procedure less resemble the work situation, or the result less resemble a work product, the less likely the selection procedure is to be content valid, and the greater the need for other evidence of validity.

Id.

The MT&E does not meet these requirements. It is not a work behavior or work product of the computer specialist trainee job that a person learn in a short period of time a "hypothetical" computer language and perform certain "exercises" with that language. This test context does not resemble the work situation or context. OPM only infers that the ability to learn this hypothetical language in this 75-item test form measures the

ability to learn computer programming over the lengthy training period for a computer specialist trainee. The OPM only infers that the items "simulate" exercises based on the "job-specific KSAOs" and duties. The MT&E is not a representative sample of the job or an approximation of an actual work behavior but rather a "simulation" of a sample of the job or a work behavior. OPM estimates that the MT&E can predict the ability to learn the work behavior and job performance.

The APA Standards indicate that OPM has exceeded the bounds of the content validity strategy.

> When the content-related validation evidence is to stand as support for the use of a test in selection or promotion a close link between test content and job content should be demonstrated. (Primary).

> Comment: For example, if the test content samples job tasks with considerable fidelity (e.g., actual job samples such as machine operation) or, in the judgment of experts, correctly simulates job task content (e.g., certain assessment center exercises), or sample specific job knowledge required for successful job performance (e.g., information necessary to exhibit certain skills), then content-related validity can be offered as the principal form of evidence of validity. If the link between the test content and the job content is not singular and direct, additional evidence is required.

(Emphasis added) Standard 10.5, APA Standards, at 61.

Where "linkage" between the test content and the job is "not singular and direct," as is the case with the MT&E and the

computer specialist job, empirical evidence based on a criterion-related or construct validity strategy is required. In effect, OPM attempts to measure a construct, the ability to learn, by the MT&E and follows a "linkage-strategy" suitable for construct validity.[17]

Finally, the validity of the entire process is further undercut by the development of a test, the MT&E, which focuses upon six "important" KSAOs identified by the job analysis, the six "job-specific KSAOs," but not seven other "important" KSAOs, the "PACE KSAOs." See, Summary, at 13.[18] This apparent selectivity in the test development process contravenes the principle that "[t]he work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job." §14C(2), Uniform Guidelines. Either the job analysis was inappropriate or OPM ignored "important" KSAOs in the development of the selection procedure.

_____

17/ "If construct-related evidence is to be the major support of validity for personnel selection, two links need to be established. First, there should be evidence for the validity of the test as a measure of the construct, and second, there should be evidence for the validity of the construct as a determinant of major factors of job performance. There should be a clear conceptual rationale for this linkage. Both the construct and the job factors to which it is to be linked should be defined carefully. A consistent pattern of results should point toward the hypothesized relationship. Expert judgment alone should not be used to substantiate a claim of construct-related evidence. (Primary)." (Emphasis added), Standard 10.8, APA Standards, at 61.

18/ All seven of the "PACE KSAOs" were rated as more "important" than two of the "job-specific KSAOs." Summary, at Table 4, p.8. Furthermore two PACE KSAOs," "listening" and "deal with people", which were also rated as more "important" than two of the "job-specific-KSAOs" were completely dropped from the test development study. See p.12, supra.

In a substantial number of cases courts have found that employers violated Title VII even after conducting adequate job analyses where the employers constructed or used tests that could not be justified by a content validity strategy or constructed tests in a manner that ignored or distorted the information described in their own job analyses. *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 511-12 (8th Cir.), *cert. denied*, 434 U.S. 819 (1977); *Guardians Ass'n of New York City v. Civil Service Comm'n.*, 630 F.2d, at 100-06; *Vanguard Justice Society, Inc. v. Hughes*, 592 F. Supp., at 258-60; *United States v. San Diego County*, 21 FEP Cases 402, 414-16 (S.D. Cal. 1979). Similarly, the test construction of the MT&E is not consistent with a content validity strategy.

D.   OPM Should Take Additional Action in Order To Develop
     Appropriate Selection Procedures for the Computer
     Specialist Trainee Position.

   1.   Miniature Training and Evaluation Test (MT&E).

          As we understand it, OPM is attempting to develop
a test which would sample the process for performing computer
programming but which would not require any prior education or
experience.  If the test is properly developed, the assumption of
OPM is that success on the test will predict training and job per-
formance.  OPM states that "a commerical MT&E" is "the Berger
Aptitude For Programming Test (B-APT)."  Summary, at 11.

          The development of a test like the B-APT appears
to be an appropriate goal, and it is likely to be superior
a general aptitude test like PACE.  However, the information sup-
plied by OPM and the process followed by OPM do not demonstrate
or even strongly suggest that a test like the B-Apt has been
developed or that the developed test, the MT&E, will predict train-
ing or job performance.

          There is no basis for concluding that the MT&E
is a "governmental" B-APT Test.  While we have not reviewed both
tests in detail -- of course, we have not been provided with a copy
of the MT&E -- there appear to be significant differences.  Compare,
Summary, at 11, 13-14 with The Berger Series of Data Processing
Personnel Tests (Psychometrics, Inc., Santa Monica, CA), at 4-5
(Appended as Attachment C).  The MT&E is a five-section test with
75 items which takes 210 minutes to administer.  The B-APT has
"three separately timed parts of ten problems each."  The

"administration time is about 1 hour and 40 minutes [which] includes approximately 1 hour of tutorial instruction and practice items, and 40 minutes of actual test-taking time." Attachment C.

Most importantly, substantial empirical validity evidence has been obtained for the B-APT. The B-APT Validity Studies: A Technical Summary lists approximately 15 criterion-related validity studies which demonstrate the validity of the B-APT.[19/] (The Contents of the Summary and one example of an outline of a study is appended as Attachment D). Criteria similar to those used in the B-APT studies, performance on actual programming problems or supervisory evaluation of important work behaviors or job tasks, could have and should be developed for criterion-related studies for the MT&E. During the "development" of the MT&E several groups[20/] of job incumbents were asked to participate. Rather than asking the opinion, estimation or inferences of these job incumbents, the incumbents could have been asked to take the MT&E and their scores could have been correlated to well-developed criteria for their job performance.

---

19/ We have only reviewed the Technical Summary and thus we have no independent judgment regarding the validity of the B-APT. However, the use of criterion-related validity studies which are designed to demonstrate empirically the inferences regarding the predictive power of the B-APT is necessary for establishing the validity of a test like the B-APT or the MT&E.

20/ At various steps in the process, OPM used groups of 216, 44, and 318 job incumbents. See p. 16, supra.

- 34 -

The empirical data gathered would indicate not only the degree, if any, of the power of the MT&E to predict job performance but also the empirical process could be used to identify the test items with the most, or any, predictive power. Furthermore, OPM should include a sufficient number of minority computer specialists in order to determine whether the selection practices may have an adverse impact and, if so, whether the adverse impact might be reduced or eliminated. It is possible that by eliminating or modifying specific items or by modifying the method by which items are presented, the adverse impact might be eliminated or reduced. The use of the selection procedures is discussed further in section IV, infra.

Finally, the OPM should include minority group members in the validity study in order to investigate the "unfairness" of the test. See §14B(8), Uniform Guidelines.[21/] The Uniform Guidelines "generally call for studies of unfairness where technically feasible." Id. The APA Standards provide that the possibility of "differential prediction" should be investigated:

> Investigations of criterion-related validity for tests used in selection decisions should include, where feasible, a study of the magnitude of predictive bias due to differential prediction for these groups for which previous research has

21/ Section 14B(a) of the Uniform Guidelines defines "unfairness" as follows: "When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores."

established a substantial prior
probability of differential pre-
diction for the particular kind of
test in question. (Conditioned).

Standard 1.20, APA Standards, at 17.

The requirement that an employer, where feasible,
investigate the "unfairness" of a test has been upheld by the
courts. See e.g., Albemarle Paper Co. v. Moody, 422 U.S., at 435
(The Company's validity evidence was criticized because it included
"no clear showing that differential validation was not feasible for
lower-level jobs"); United States v. City of Chicago, 549 F.2d 415,
430 (7th Cir.), cert. denied, 434 U.S. 875 (1977); Rogers v. Inter-
national Paper Co., 510 F.2d 1340, 1350 (8th Cir.), vac. and rem.
on other grounds, 423 U.S. 809 (1975); United States v. Georgia
Power Co., 474 F.2d 906, 913-14 (5th Cir. 1973); Vanguard Justice
Society, Inc. v. Hughes, 592 F. Supp., at 270 n.81; Wallas v.
Mississippi Department of Public Welfare, 542 F. Supp., at 313,
aff'd, 730 F.2d, at 320; Berkman v. City of New York, 536 F. Supp.,
at 213; but see, Cormier v. PPG Industries, 519 F. Supp. 211, 262
(W. D. La. 1981), aff'd, 702 F.2d 567 (5th Cir. 1983).

The empirical studies which OPM needs to undertake
must be based upon a careful job analysis. We have explained the
deficiencies with the current job analysis, see section III, C, 3,
supra, and it is not necessary to restate the problems with the
current analysis. In particular, OPM should pay close attention to
the development of appropriate criteria through a job analysis.

There should be a review of job
information to determine measures

of work behavior(s) or perfor-
mance that are relevant to the
job or group of jobs in question.
These measures or criteria are
relevant to the extent that they
represent critical or important
job duties, work behavior(s) or
work outcomes as developed from
the review of job information.
The possibility of bias should
be considered both in selection
of the criterion measures and
their application.  In view of
the possibility of bias in
subjective evaluations, super-
visor rating techniques and
instructions to raters should
be carefully developed.  All
criterion measures and the
methods for gathering data need
to be examined for freedom from
factors which would unfairly
alter scores of members of any
group.  The relevance of the
criteria and their freedom from
bias are of particular concern
when there are significant
differences in measures of
job performance for different
groups.

§14B(2), Uniform Guidelines, see also, Principles, at 7-8 ("The

possibility of bias or other contamination should be considered

.... What is required is the anticipation and reduction of the pos-

sibility of bias, alertness to this possibility, protection against

it insofar as is feasible, and use of the best judgment possible

in evaluation of the data....").[22]

---

[22] Cronbach offers a practical suggestion for uncovering bias: "The
properly curious, properly cautious investigator will form an overall
regression equation and then examine the roster of persons for whom
the formula underpredicts.  Insofar as either list seems to be unrepre-
sentative of the pool, pointed questions can then be asked."
L. Cronbach, Essentials of Psychological Testing (4th ed. 1983), at 388

In Albemarle Paper Co., the Supreme Court recognized that supervisory ratings and other subjective evaluations may be used as criterion measures, but it also determined that such measures require "far more care [in development] than was demonstrated" in that case. 422 U.S., at 432. Similarly, lower courts have rejected validity studies in part because they failed to take adequate precaution against racial or other bias in supervisory rankings and other subjective criterion measures. See e.g., Blake v. City of Los Angeles, 595 F.2d, at 13; Watkins v. Scott Paper Co., 530 F.2d 1159, 1184 (5th Cir.), cert. denied, 429 U.S. 861 (1978); Walls v. Mississippi Dept. of Public Welfare, 542 F. Supp., at 313, aff'd, 730 F.2d, at 320; Dickerson v. United States Steel Corp., 472 F. Supp., at 1342-45; Ensley Branch, NAACP v. Seibels, 13 EPD para. 11504, at 6799, n.23 (N.D. Ala. 1977), aff'd, 616 F.2d 813, 818 (5th Cir.), cert. denied, 449 U.S. 1061 (1980).

It is not our intention to review all of the requirements for the development of appropriate empirical studies, for example, the need to insure "representative samples," the appropriate grouping of job or job segments, use of statistical measures and corrections, because OPM has provided no information regarding the planned empirical studies, see, section II, supra. Of course, we would review any summary of planned empirical studies and comment at that time.

2.  Job Characteristics Preference Survey (JCPS).

The JCPS was developed by a series of estimations by job incumbents intended "to assess the job-related preferences of applicants for key aspects of the computer specialist-trainee job." Summary, at 1; see pp. 15-16, supra. The selection procedure was selected in order to "investigat[e] new and potentially effective types of alternatives" and because a study of the "[r]elevant empirical literature.... appeared [to indicate that this approach] produce[d] an instrument with little or no adverse impact on minority groups." Summary, at 12.

We encourage the examination of alternative, non-cognitive selection procedures which may have no adverse impact. However, on the basis of the information which we have been provided, the JCPS has not been adequately developed or examined for adverse impact.

Even on the basis of the brief outline regarding this type of selection procedure which OPM included as Appendix B[23/] to its Summary, the JCPS was not properly developed. The first step listed for the development of this type of a selection procedure is described as follows:

> A job analysis is conducted which focuses on the characteristics, motives, and interests which distinguish outstanding employees from those with similar abilities but whose performances are mediocre.

23/ Appendix B is entitled, "A Review of Some Alternative Procedures for Personnel Selection." ("Review") See p.49, n.24, infra, for a general discussion of this Review.

Review, at 43. OPM did no evaluation designed to determine the "outstanding employees" and the "mediocre employees." Accordingly, there was no attempt to distinguish "the chracteristics, motives, and interests" of the outstanding employees from the mediocre employees.

Moreover, OPM did not attempt to validate the JCPS by determining whether the outstanding employees received a statistically and practically significant better score than the mediocre employees. The JCPS was neither properly developed nor validated.

In developing the JCPS, "OPM should consider the content and type [of items] in relation to cultural backgrounds and prior experiences of the variety of ethnic, cultural, age, and gender groups represented in the intended population of test takers." Standard 3.5, APA Standards, at 26. The evaluation of inventories of characteristics, motives, and interests, may be seriously affected by varying racial, ethnic, and cultural background. In the Comment to Standard 3.5, the APA stated as follows:

> At various points in test development, empirical procedures may be needed. Such procedures may be needed, for example, when constructing interest inventories, in which differential item response rates may exist for different gender, ethnic, and educational groups. Differential response rates do not necessarily invalidate such items or scales based on them. However, the developer's aim should be to maximize scale validity and within this constraint, the developer should strive to minimize the potential misrepresentation of interests for major groups in the population that is served.

APA Standards, at 26.

OPM did not, as it should, use any "empirical procedures" to "strive to minimize [on the JCPS] the potential misrepresentation of interests" of blacks or Hispanics.

   3.   Occupational Supplement.

           The use of an education and experience rating by OPM is extraordinary since OPM admits that no prior education or experience is necessary for the job and OPM provides no description of the development of the scale. See pp. 23-24, supra; Summary, at 13-16. By its own admission OPM has removed the rating scale from the type of measure which might be justified by content validity. A measure of knowledge, skill and ability developed by prior experience or training is not suitable for justification by content validity if the knowledge, skill or ability is not a "necessary prerequisite for successful job performance." §14C(1), Uniform Guidelines. Courts have held that the job relatedness of minimum education requirements must be demonstrated by evidence of validation. See e.g., Carpenter v. Stephen F. Austin State University, 706 F.2d 608, 622 (5th Cir. 1983); Johnson v. Uncle Ben's Inc., 628 F.2d 414, 427 (5th Cir. 1980), cert. denied, 459 U.S. 967 (1982). The Uniform Guidelines, which control the implementation of this Consent Decree, see p.5 n.2, require that all selection procedures which have an adverse impact must be validated. §3A, Uniform Guidelines.

           The use of the education and experience scale depends upon the validity of an "assumption" about future job performance -- the more substantial the prior education and experience of applicants the better they will perform in training and on the job even

- 41 -

though <u>no</u> prior education or experience are required. Other assumptions might appear equally plausible. In any event, the assumption must be tested by empirical evidence. As in the case of the JCPS, the validity of the assumption could possibly be tested by examining and comparing the prior experience and education of "superior" and "mediocre" incumbents. Of course, if OPM attempts to do this empirical analysis it should include a sufficient number of minorities in order to test for possible adverse impact and, if adverse impact is found, explore alternative use of the scale which may eliminate or reduce the adverse impact.

IV. OPM HAS NEITHER JUSTIFIED THE USE OF THE SELECTION PROCEDURES AS RANK-ORDERING MEASURES NOR ADEQUATELY INVESTIGATED AND ATTEMPTED TO REDUCE OR ELIMINATE ADVERSE IMPACT.

A. The Operational Use of the Selection Procedures.

OPM has implemented a two-step operational process. First, the MT&E is used as a "screen." If an applicant does not "pass" the MT&E then the applicant does not qualify for rank-ordering. An applicant who passes the MT&E receives a score of 70. Summary, at 17-18.

Second, the applicants who pass the MT&E are ranked on the basis of their scores on the MT&E, the JCPS and on their education and experience. The highest score which an applicant may achieve is 100. In addition to the 70 points which an applicant receives when she or he passes the MT&E, an applicant may receive an additional 20 points based on her or his performance on the MT&E, five points based on the JCPS, and five points based on education and experience. Id.

B. Since OPM Has Not Justified the Rank-Ordering Use of the Selection Procedures, OPM Needs To Explore Further the Use of Appropriate Selection Procedures and To Consider Methods To Eliminate or Reduce Adverse Impact.

Even if we assume, and we strongly reject this assumption, see section IIIC, that the selection procedures are content valid, OPM has not demonstrated that the rank-ordering of the selection procedures is justified, consistent with the Uniform Guidelines and the Consent Decree or lawful under Title VII. Even if a test is shown to be content or otherwise valid, its use may violate Title VII. A valid test which is used as a ranking instrument or with a high cutoff score may still violate Title VII where the employer has not

demonstrated that such use is related to job performance and where such use increases disparate racial or ethnic results. See e.g., Guardians Ass'n of New York City v. Civil Service Comm'n., 630 F.2d, at 100-06; Ensley Branch, NAACP v. Seibels, 616 F.2d, at 822; Rogers v. Inernational Paper Co., 510 F.2d, at 1351; Boston Chapter, NAACP v. Beecher, 504 F.2d 1017, 1023 (1st Cir. 1974), cert. denied, 421 U.S. 910 (1975).

The Uniform Guidelines contain several provisions requiring employers to justify particular methods of using otherwise valid selection procedures. These requirements apply primarily to methods of use that have greater adverse impact than other methods -- especially rank ordering and setting high cutoff scores. Section 5G, for example, generally provides that more evidence is required to support the use of a procedure on a ranking basis than is required to support the use of the same procedure on a pass/fail or screening basis: "[I]f a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis.... the user should have sufficient evidence of validity and utility to support the use on a ranking basis...." Section 5H states that cutoff scores "should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force," and that, where ranking results in effectively higher cutoff scores, "the degree of adverse impact should be considered." Section 14B(6), specifically addressing criterion-related

validation, states that "[u]sers should evaluate each selection pro-
cedure to assure that it is appropriate for operational use, including
establishment of cutoff scores or rank ordering," and that the degree
of adverse impact should be considered in determining appropriateness
for operational use. Section 14C(9), without explicit reference to
any consideration of adverse impact, provides that the results of a
content valid selection procedure may be used to rank persons who
score above minimum levels "[i]f a user can show, by a job analysis
or otherwise, that a higher score on [such a] procedure is likely
to result in better job performance...."

The courts have endorsed the requirements of the Uniform
Guidelines for the use of cutoff scores and ranking. "Courts have
regularly rejected rank ordering as inadequately validated...," and
"[c]utoff scores have similarly met with strict scrutiny by the
courts." B. Schlei & P. Grossman, Employment Discrimination Law
(2d ed. 1983), at 155-56 (footnotes omitted). Courts and enforcement
agencies have closely scrutinized the use of high-cutoff scores and
rank-ordering because, as a genereal matter, the higher the cutoff
score the greater the adverse impact. If an employer intended to
maximize the adverse racial or ethnic consequences of a test, the
employer would use rank-ordering.

The most complete discussion of the law in this area is
provided in Guardians Ass'n of New York City. The Second Circuit
endorsed the Uniform Guidelines' interpretation of Title VII with
respect to ranking and cutoff scores, and on that basis the court held
that the employer's use of the exam was unlawful. The Court found
that §14C(9) of the Uniform Guidelines, providing that rank ordering
should be used only if it can be shown that "a higher score ... is
likely to result in better job performance," is

reasonable and consistent with Title VII's
provision that the "results" of a test may
not be "used to discriminate." 42 U.S.C.
§2000e-2(h). If test scores do not vary
directly with job performance, ranking the
candidates on the basis of their scores
will not select better employees....

...[C]lose scrutiny is required because
rank-ordering makes such a refined use of
the test's basic power to distinguish
between those who are qualified to perform
the job and those who are not.... A test
may have enough validity for making gross
distinctions between those qualified and
unqualified for a job, yet may be totally
inadequate to yield passing grades that
show positive correlation with job per-
formance....

...The frequency with which ... one-
point differentials are used for important
decisions in our society, both in academic
assessment and civil service employment,
should not obscure their equally frequent
lack of demonstrated significance. Rank-
ordering satisfies a felt need for
objectivity, but it does not necessarily
select better job performers. In some
circumstances the virtues of objectivity
may justify the inherent artificiality
of the substantively deficient distinc-
tions being made. But when test scores
have a disparate racial impact, an employer
violates Title VII if he uses them in ways
that lack significant relationship to job
performance.

Guardians Association of New York v. Civil Service Comm'n., 630 F.2d,

at 100.

Although the Court had concluded that there was sufficient

evidence of validity to permit some use of the test, it held that

there was not sufficient evidence of either validity or reliability

to satisfy the employer's "substantial task in demonstrating that

rank-ordering is sufficiently justified to be used." Id., at 103.

- 46 -

See also, Firefighters Institute for Racial Equality v. City of St. Louis, 616 F.2d, at 357-60; Berkman v. City of New York, 536 F. Supp., at 211 (evidence held insufficient to support the "extraordinary pretense at precision" reflected in rank ordering).

Similarly, the Court in Guardians Ass'n found that §5H of the Uniform Guidelines, providing that cutoff scores "should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force,"

> also makes sense. No matter how valid the exam, it is the cutoff score that ultimately determines whether a person passes or fails. A cutoff score unrelated to job performance may well lead to the rejection of applicants who were fully capable of performing the job. When a cutoff score unrelated to job performance produces disparate racial results, Title VII is violated....

Guardians Association of New York City v. Civil Service Commission, 630 F.2d, at 105. Nor can a civil service employer justify the use of rank-ordering on the basis of the requirements of a civil service law. Id., at 104-05.

OPM asserts that "[b]ecause each section of the test builds upon knowledge gained in earlier ones and varies in level of difficulty, higher raw scores indicate greater ability to learn the concepts presented." Summary, at 17. However, this argument is based on inference not "evidence" as required by Section 5G of the Uniform Guidelines. Also OPM asserts that "[t]he fact that the test was based on those KSAOs which received high ratings [the job incumbents indicated that the KSAOs were "important"] further substantiates the expected linkage between higher test score and

greater ability to learn the job." Id.  Of course, any KSAO or work
behavior measured by a purportedly content-valid test must be "impor-
tant" if not critical to the job.  The fact that OPM intended to
measure an "important" KSAO is a bottom-line requirement for
creating a content valid test, not a "show[ing] ... that a higher
score ... is likely to result in better job performance...."  Sec-
tion 14C(9), Uniform Guidelines.

The evidence of content validity for the selection pro-
cedures is scant.  Section IIIC, supra.  The "demonstration [of
content validity] must be very substantial when a test procedure
that does not closely approximate the job is sought to reflect the
fine graduations required for rank-ordering." Guardians Ass'n of
New York City, 630 F.2d, at 101.  The evidence for content validity
was based upon inferences, estimations, and assumptions.  Even if this
patch-work of guessing was sufficient to support a finding of
content validity, it provides inadequate evidence to support rank-
ordering.

The inadequacy of the "showing" that a higher score on
the JCPS and the education and experience scale is related to job
performance is apparent from the discussion with respect to the MT&E.
OPM does not even purport to "show" this relationship or to pro-
vide evidence.  Rather OPM simply and honestly asserts that "[t]he
assumption is that the better fit between the characteristics of
the ... job and the applicant's preferences for those characteris-
tics" the better the performance, and that "[t]he assumption is,
if applicants have successfully completed courses ... and/or have

- 48 -

worked in the field, their ability to learn is further substan-
tiated [and] suggest[s] interest and possible commitment to the
field." (Emphasis added), Summary, at 17.

Moreover, OPM did not make any attempt to determine
whether rank-ordering increased adverse impact and whether alter-
native uses of the selection procedures would reduce adverse impact.
See §14B(6), Uniform Guidelines. OPM admits that "[n]o alternative
scoring or weighting procedures were investigated." Summary, at 17.
OPM does not provide any basis for concluding that the single use
"investigated" had the most practical significance or the least
adverse impact. It is clear that OPM needs substantially more
evidence of validity, for example, from empirically based studies,
which we have suggested in other parts of this analysis, before
OPM should even consider using the selection procedures on a rank-
order basis.

Furthermore, OPM should investigate alternative test
uses in order to reduce or remove adverse impact. Items should
be examined for possible elimination or modification in order
to lessen or remove adverse impact without reducing validity.
The APA Standards provide as follows:

> When research indicates the need for
> studies of item or test performance
> differences for a particular kind of
> test for members of age, ethnic, cul-
> tural, and gender groups in the
> population of test takers, such
> studies should be conducted as soon
> as is feasible. Such research should
> be designed to detect and eliminate
> aspects of test design, content, or
> format that might bias test scores
> for particular groups. (Conditional)

Standard 2.10, APA Standards, at 27. OPM should immediately

commence an empirical analysis designed to detect and eliminate

adverse impact and aspects of the selection process which might

bias the test scores.

OPM states that it made "[t]he determination of

specific selection procedures to be used in the new examination ...

following an extensive review of a variety of alternative selec-

tion methods." Summary, at 11. OPM attached as Appendix B to

its Summary, "A Review of Some Alternative Procedures for Per-

sonnel Selection."[24] This general review of alternatives does

not substitute for the careful, empirical analysis of the

selection procedures in order to eliminate bias and adverse

impact to the extent possible and to investigate the alternative

uses of the procedures which will eliminate adverse impact

to the extent feasible while maintaining the proper standard for

job validity.

---

24/. This "Review" is merely a copy of the attachment to FPM Bulletin 331-3 which was issued in 1979 under the signature of Jule M. Sugarman. who was the Deputy Director of OPM at that time. (Attachment E). The Review was intended to "summarize the nature and uses of the first nine alternatives being investigated." (Emphasis added). The FPM Bulletin provides that "[C]omprehensive reviews of these methods and of grade point average as a predictor of job performance have been prepared and will be available in CY 1980." (Emphasis added). It is peculiar that the "summary" and not the "comprehensive review" was attached to the material provided to counsel for plaintiffs and that the FPM Bulletin which explained the purpose and scope of the Review was omitted from the materials.

Where these procedures are not followed, as OPM has not, then it is necessary to incorporate a plan which will neutralize the discriminatory consequences of the use of a selection procedure which has not been properly validated or which has been used improperly.

Courts or employers have added points to the scores of blacks in order to remove adverse impact, see e.g., Kirkland v. New York State Dept. of Correctional Services, 628 F.2d at 798; Bushey v. N.Y. State Civil Service Comm'n, 733 F.2d 220, 223, 227-29 (2d Cir. 1984), cert. denied, 53 U.S.L.W. 3477 (1985). In other instances the use of the selection procedure has been modified in order to remove the rank-order process. See, e.g., Kirkland v. N.Y. State Dept. of Correctional Services, 711 F.2d 1117, 1133-34 (2d Cir. 1983) (use of "zones" of scores rather than rank-ordering); Vulcan Society of Westchester County, Inc. v. Fire Dept. of City of White Plains, 505 F. Supp. 955, 959, 964 (S.D.N.Y. 1981) (settlement altered the use of a rank-order exam and made it a general qualifying exam). Some courts or employers have used a random selection method or indicated the propriety of selecting in a random manner applicants who possessed basic qualifications. See e.g., Association Against Discrimination v. City of Bridgeport, 594 F.2d 306, 313 n.19 (2d Cir. 1979) (adverse impact "could be eliminated by random selection of appointees from the group of passing candidates, rather than use of rankings"); Sims v. Local 65, Sheet Metal Workers, 353 F. Supp. 22, 29 (N.D. Ohio 1972) (apprentices "shall be indentured from the eligible pool by

lottery"), _aff'd_ _in_ _pertinent_ _part_, 489 F.2d 1023 (6th Cir.).

As the Second Circuit has determined, these methods are similar:

> Since interim hiring provisions, where
> needed to satisfy immediate personnel
> requirements, are to be used prior to
> the development and approval of a
> valid selection procedure, such pro-
> visions cannot meet Title VII stan-
> dards by demonstrated job relatedness.
> Therefore, one appropriate way to
> assure Title VII compliance on an
> interim basis is to avoid a disparate
> racial impact. This means selecting
> from among adequately qualified either
> on a random basis or according to some
> appropriately noncompensatory ratio
> normally reflecting the minority ratio
> of the applicant pool or the relevant
> work force.

(Citations omitted), Guardians Ass'n of New York City v. Civil
Service Comm'n., 630 F.2d, at 108-09.

If, as we assert, OPM fails to follow proper means for
validating selection procedures and for justifying the use of
these procedures, then OPM has no alternative under the Consent
Decree or under Title VII but to insure that the selection pro-
cedures do not have any adverse impact.

## CONCLUSION

The development of and the proof of validity of the selection procedures for the computer specialist trainee position are inadequate. We hope that the informal procedures in the Consent Decree will provide a basis for the resolution of these issues. Accordingly, we have described our comments at length and we have attempted to provide a detailed justification for our positions. While there is more that we could add, we attempted to set forth the more important points. Of course, we are available to attempt to answer any questions or to discuss any particular points. Also, the experts who have provided guidance are available for consultation.

Respectfully submitted,

BARRY L. GOLDSTEIN
    Suite 940
    806 15th Street, N.W.
    Washington, D.C. 20005
    (202) 638-3278

RICHARD T. SEYMOUR
    Lawyers' Committee for
    Civil Rights Under Law
    Suite 400
    1400 'Eye' Street, N.W.
    Washington, D.C. 20005
    (202) 371-1212

JOHN ERICKSON
    Erickson, Beasley & Hewitt
    8th Floor
    12 Geary Street
    San Francisco, CA 94108
    (415) 781-3041

Members of the Implementation Committee

FILED

JUL 3 1 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT A

Barrett, "Content Validity and the Law"
(1984) (Unpublished Paper).

# Content Validity and the Law

## Richard S. Barrett, Ph.D.

While I was preparing this retrospective look at content validity, I finally identified my earliest thoughts in the field. When I was quite young, growing up in the heart of Queens, about a mile from where Geraldine Ferraro now lives, I asked my mother why, in such a location, there were no Jewish telephone operators. "Their arms are too short," she explained.

It was then that I had my first thought which I have later realized could be categorized under the heading of content validity. "Why," I asked of myself, certainly not of her, "don't they just measure the length of their arms?"

Next in my development was to watch, with no conscious, but perhaps some unconscious qualms, as my colleagues in the Personnel Research Institute at Western Reserve developed multiple choice tests of tool knowledge to determine whether Naval mechanics were competent.

Incidentally, I have not always opposed multiple choice tests, nor do I now for some purposes. I even published little remembered polemics against Banesch Hoffman's Tyranny of Testing and Martin Gross' The Brain Watchers.

Soon I became enamored of the concept of criterion related validity, and applauded when the 1970 EEOC Guidelines gave it preferred status over other forms of validity even if that status turned out to result from "infelicitous" wording. It seemed to me that the criterion related validity strategy answered the basic question of the employer, that is, how well does this test predict the applicant's eventual job performance. However, practical difficulties, now highlighted by the recent attention being paid to the effects of small samples, make criterion related validity less than universally applicable.

When it was proposed for what eventually became the Federal Executive Agency Guidelines that content validity be raised to equal status with criterion related validity I objected strongly and ineffectively. In retrospect, I believe that I was part right and part wrong in my position.

I believed then, and I believe now, that I was right to be concerned that test makers would try to slide in under the umbrella of content validity tests, particularly multiple choice tests, which do not remotely echo the content of the job, but only some distant abstraction from it. I will deal with this problem at length later on.

I believe that I was wrong in that I did not foresee the success with which psychologists would develop, administer, and score sophisticated simulations of work performance. I will comment on this process later on as well.

My plan for this paper is first to discuss the pernicious and lasting impact of educational testing on selection testing. Then, I will use the Uniform Guidelines

as an organizing theme for discussing content validity and the law.

Like any ungrateful offspring, I see the problems brought on by my ancestry more clearly than I see the benefits. The whole concept of content validity arose in the context of educational achievement testing, and we Industrial Psychologists owe a great deal to the early and continuing work in the field. However, there are such important differences between testing educational achievement and testing for personnel selection that it is time we clarified the differences and declare that we are not only fully weaned, but also fully fledged as a profession.

Here are some of the more important contrast between educational and selection testing:

Education looks backward to what was taught, selection looks forward to what the job requires. There is nothing pejorative in my comment that educational testing is retrospective; educators are quite properly concerned whether their students have learned and remember the facts and concepts which they have been taught. But, despite the Supreme Court's decision in U.S. v. South Carolina, merely demonstrating that the prospective teacher can or cannot select from four alternatives the one which most closely conforms to what was taught in class is not enough to establish that person's competence, or lack of competence to teach. My own experience, and I am sure that it is the experience of many others is that much of what one needs to be able to do as a teacher is not taught, and much of what is taught is not needed.

Educators are the arbiters of educational testing; job requirements should prevail in selection. Unless we invoke some societal standard which calls into question the entire educational apparatus, it is up to the educators to determine the goals of education, the knowledge, skills and abilities to be taught, and the performance standards to be met. In selection, the only standard is the work performance demanded by the job.

Confusion arises when we ask experts to describe the job, which they can do, and then ask them to delineate the knowledges, skills, abilities and other characteristics which are required, which they may be able to do for jobs which involve specific manual skills or discrete knowledge, but which they cannot do for more complex jobs involving inter-personal relations, persuasion, making decisions, responding to emergencies and the like.

Common sense requires that the test reflect the job duties, not the syllabus of the teacher training institution. There is now a suit regarding the National Teacher Examinations, the lineal descendants of the tests which were the subject of the South Carolina case. In preparation for trial, the defendants assembled groups of teachers who were told, "You should judge the relevance of the content measured by the question [in the NTE Core Examination] with respect to the domain of knowledge you believe a minimally qualified person, regardless of his/her teaching field should possess

2

in order to be a successful teacher." Using standards which I believe to be overly generous, they came up with the following percentages of defective items:

| NTE Common Examination | % Defective |
|---|---|
| Professional Education | 26 |
| Written English Expression | 7 |
| Social Studies, Literature and the Fine Arts | 46 |
| Science and Mathematics | 32 |
| Total Test | 28 |

On the basis of these brilliant results, the researchers conclude that the test is content valid and recommend a cut-score of 507, which would eliminate about half of the recently graduated teachers, nation-wide. So whether the test adequately reflects what is taught in teacher training institutions, 28% of it was judged to be irrelevant to teaching. Despite ETS's demurrers, the defendant continued to use the test to eliminate teachers whom they have had a chance to observe in the classroom for a year or more.

It makes me wonder how many irrelevant items they would have had to have found to decide that the test was unacceptable. If 46 % is not enough how about 50%? If not 50%, how about 60%? I think that, given the results of its own study, the defendant will have a hard time convincing anyone that the NTE Core Examination is an adequate measure of teaching performance.

The educational experts can set the passing score on their own authority; in selection the passing score must be related to job performance. For example, a manufacturer of coils could show that production below a certain level would make the company lose out in competition. Such examples are rare. More generally, it is necessary to consider the acceptable levels of production, spoilage, and safety, the available work force, and the balance between the benefits derived from the test and adverse impact.

To repeat the basic point of all of the above, I urge selection psychologists to keep their eyes on the job, and let the educators be concerned with the lingering traces of classroom learning.

Now I shall take a look at how the Uniform Guidelines stand up after six years. When they first came out, I anticipated little concerted effort to replace them because of the reaction of spokesmen for management. I observed that they did what the Daily Worker used to do when reviewing a publication by a left leaning but not card carrying author. They would praise with faint damns. More specifically, I predicted that Uniform Guidelines would be unchanged during the first Reagan term, and it looks as though I had the right scoop.

Here's how the Uniform Guidelines have fared from my point of view.

3

14C(1) deals with the appropriateness of using content validity. It allows, in addition to observations of work behavior and work product, tests of Knowledge, Skills and Abilities. This phraseology resulted from an unfortunate compromise with the Civil Service Commission, whose representatives claimed that if those words were not included, they would have to rewrite all of their manuals. To remind you once again, these terms, especially _Skill_ and _Ability_, are defined in their own idiosyncratic way:

Knowledge — A body of information applied directly to the performance of a function.

Skill — A present observable competence to perform a learned psychomotor task.

Ability — A present competence to perform an observable behavior or a behavior which results in an observable product.

Despite these definitions, there are still attempts to produce tests of constructs and label them tests of content. Let me give you just one egregious example. The _Multijurisdictional Police Officer Examination_ containing a compass reading question in which a scene is shown in perspective from the side, and the compass tilted 90 degrees to the vertical. The problem is thus transformed from a test of compass reading to one of spatial relations.

Perhaps you recall the escape and recapture of James Earl Ray a few years ago. After he was recaptured, the local sheriff described how the mountain men had to give false clues to the FBI with their fancy compasses and doleful bloodhounds to get them out of the way so they wouldn't mess up the territory after a rain had washed away all of the pre-existing scents. He pointed out that none of the mountain men could read a compass, but they knew the mountains and how to find escaped prisoners. Perhaps the test measures an ability, but not the one which counts, that is, the ability to catch the escaped James Earl Rays.

Section 14C (1) also makes the obvious but often ignored point that one should not rely on content validity if the applicants have not been exposed through training or experience to the content on which they are being tested. I am involved in one case in which the identical 100 items of test, claimed to be content valid, are used both for initial selection and for later promotion for a police type of job. An additional 25 items make the selection test into a promotion test. Some one, I maintain, has missed the point.

14C (2) requires a Job Description. In this respect, I am afraid that we have bred a monster. I have plowed through job descriptions which are measured in inches, not pages, with table after dreary table reporting someone's judgment on the importance, frequency and criticality of each muscle twitch. Then a test is developed, sometimes by people who have never seen the job description. But it tells all.

On the other hand, Burlington Northern Railroad defended for a little while a job description which listed some 77 tasks which told us, for example that locomotive engineers:

4

63. Operate locomotive in undulating territory
64. Move through railroad crossings
65. Move through highway crossings
66. Enter and leave sidings
    66a. Adjust speed (including stopping, if necessary)
    66b. Check that switch is properly lined
    66c. Maintain proper speed in siding
    66d. Move onto main line

Somehow this description, prepared by one of the better known test building organizations, does not capture the flavor of the locomotive engineer's job. The New York Times account of the settlement mentioned the inadequacy of the job description. The settlement cost Burlington Northern over $10,000,000.

Since there are no formal standards for a job description, I suggest a few informal ones.

The reader should learn something by reading a job description. For example, when Dr. Cranny and I started to work on the examination for Junior and Senior High School Principals, I smugly told myself that I really did not need the exercise since I had worked with the New York City school system in another context, and I had been a trustee of a suburban school board. But, I learned a few things.

I already knew that an important function of a Principal is to prepare a budget, but not in New York. The budget is prepared centrally.

I knew that principals observed classrooms, but I never dreamed that these observations were so central to their supervisory effort that one Borough Superintendent requires each Principal to perform 75 per year. That is almost one every two days. As a result of this new understanding, a simulated observation became central to our test.

We were told that there is so much difference between the Junior and Senior High Schools that we would would need two descriptions and two tests. After much discussion, we demonstrated that from the point of view of testing the differences in the jobs are trivial, and the tests are nearly identical.

There should be an indication of the level of skill, responsibility, decision making, etc. It does little good to say that a police officer enforces the law without indicating where the police officers involvement ends and the District Attorney, and the Courts begin. For example, police corporals in one city were tested on item decided by 5-4 decision of Supreme Court, which involved 7 separate opinions. Further, two lawyers told me that the issue was misstated in stem.

One way to delineate the level and type of responsibility is to specify the dividing lines between the duties of the job in question and those of the supervisor, subordinates and specialists.

Relative importance of duties should be queried in a way which makes it necessary for the Subject Matter Experts to differentiate. Free ratings leave the door open to calling virtually everything important. Forcing the Subject

Matter Experts to assign percentage weights makes them more critical, and makes the results more meaningful.

Parenthetically, I still haven't figured out the difference between "Very Important," and "Critical." If someone can explain it to me, I will be most grateful.

14 C (3) discusses test development. There is a basic confusion in the minds of many regarding what Subject Matter Experts can do which is exemplified by the use and misuse of the Job Element method. In its original conception, the Job Element method was used to describe craft jobs. With some coaxing and editing by the job analyst, most journeymen can describe what they do, and tell what skills are needed.

Then, as interest grew in the more complex jobs, people were asked the about the Knowledges, Skills, Abilities and Personal Characteristics needed to perform jobs which involved interpersonal relations, selling, teaching counseling, and other activities which are difficult to define, and which can often be performed successfully in many different ways. Since psychologists have not been able to define these abilities succinctly and persuasively they delegate the chore to those who are least able to do it, the incumbents.

We wind up with such gems as these from <u>Job Analysis of the Position of New York State Trooper</u> which were left after those judged inadequate by the psychometricians had been eliminated:

Know rules of evidence (admissibility)
Ability to con people
Possess aggressiveness
Have flexibility
Have honesty
Have no fear of dark
Have no fear of failure
Possess humility
No fear of opposite sex
Ability to resist temptation of free gas

The resulting test had nothing to do with any of these concepts. Instead, it presented 23 multiple-choice questions based on incidents recounted by the Subject Matter Experts.

There are several important sections which I will skip because of time restraints, and go to Section 14C (8) which discusses, among others, the setting of a passing score. To set a passing score for simulations developed for the Board of Examiners, Dr. Cranny and I used a five point scale with these general definitions:

5. Greatly exceeds requirements
4. Exceeds requirements
3. Meets requirements
2. Fails to meet requirements
1. Seriously fails to meet requirements

The Subject Matter Experts provided examples of the key levels, 3. Meets requirements, and 2. Fails to meet

requirements, as well as other points. The procedure seemed to
work, but we were especially concerned about the standards
for written English because we were afraid that the
professors who developed the scale might have unrealistic
expectations, either too tough or too lenient. So we used the
same scale with a sample of laypersons who had an interest in
schools. The results were nearly identical.

I am skeptical of using the same procedure for multiple-
choice tests because the subject matter experts do not have
the experiential basis on which to make comparable judgments.

Section 15C (6) calls for a consideration alternative
procedures with less adverse impact. Authors in the Harvard
Law Review coined the phrase "cosmic search," which has
stuck with this requirement ever since, even though all that
is required is a description of where the researchers looked
and what they found. The basic generalization seems to be
that the closer the test reflects the job, the less the
adverse impact. There should not really need be lot of
looking nor a long report on alternatives to a content valid
test since it is likely to have a lower adverse impact than
the tests with which it is compared.

Being faced with the problem of evaluating a
promotion test for Baltimore police officers in the Vanguard
case, I developed a form which I used to record the judgments
of Subject Matter Experts recruited by the plaintiff. They
were asked to examine each question, and answer several
questions about them. I indicated that they must document
their answers so that I could make use their expertise when I
testified. You may want to follow the discussion with the
Content Validity Form, which has been revised on the basis of
my experience.

Incorrect v. Correct answers. It is always instructive
to discuss, item-by-item, a multiple choice test with persons
who are as expert as those who wrote the items in the first
place. Unless the answer is obvious the experts don't always
agree, even after a long discussion. It is often difficult
to find plausible distractors which are also clearly inferior
to the keyed answer.

In Baltimore, the Subject Matter Experts are asked to
discuss the items, and select the correct answer. In 20 out
of 80 items, the Subject Matter Experts disagreed among
themselves, or disagreed with the keyed answer. Since the
Personnel Department had already discarded 13 items, they
were already in trouble.

The Judge entered the questioning at many points.
Typical of his contributions is a discussion of the
determination of the value of stolen property. After some
searching, the Police Department's witness came up with a
sentence in a four-inch thick manual which seemed to answer
the question. The Judge commented that he had been on the
Federal bench for 17 years and he still did not know how to
establish the value of stolen property.

Need to know. The relevance of a question cannot
generally be demonstrated even through the most thorough job
description. They simply don't, and shouldn't, go into that

7

much detail. The job description is often useful in the negative sense, to show that questions are asked which cover duties which are not part of the job. However, the job description generally does not cover the content of specific questions. It is at this point that Subject Matter Experts are needed.

Of the original 80 questions in the Baltimore test, 21 were judged as being related to the duties of other persons, or simply were not part of the job.

Importance  The issue of importance can be covered in the negative by asking what bad things can be expected to happen if the applicant does not know the information. If the answer is that the consequences are trivial, so then is the question.

In Baltimore, in only 29 of the original 80 items were the consequences of not knowing the information judged as being serious.

Realism of situations. Simulations of real life events in the multiple-choice or traditional essay format are limited by the oversimplification inherent in a concise statement of a complex situation. There is room for interpretation and ambiguity in such problems because the essay questions and the stems of most multiple choice questions are so short, that it is not possible to give all of the relevant details. Even Ann Landers works with more complete information than does the taker of the typical test. Adding more detail is counterproductive because it converts the item into a reading test.

Applicability to population  As I mentioned earlier, the applicants must have had exposure either through experience or training if a question is tied to the content of the job.

These are the issues covered by the revised Content Validation Form. There are other problems with the multiple choice format:

Recognition v. Production  Real life seldom hands us solutions to problems in a way which makes us possible to solve a problem simply by recognizing the correct action. Generally we have to construct the answer, which is much more difficult that producing it.

For example, as part of an In-Basket to be used for selecting Principals in New York, Dr. Cranny's Subject Matter Experts wrote an item about a riot outside of a school which moved inside. The police could not be located, and things looked tense for the next day. More than half of the applicants responded by setting a date for a meeting with the staff two weeks in the future. It would take an imaginative item writer to think of such an obviously poor distractor, and given a more realistic alternative, probably no one would have chosen it anyway.

Cognition v. Action  I once knew a financial writer who started his talks by acknowledging that he drove a Chevrolet, saying, "Writing about investing is different from making money in the stock market." There is an aphorism that goes back to 1853 which says, "No man can predict in cold blood what he will do in a passion." Knowing the answer from the

book is not the same as doing what a situation calls for.

Coverage. How much of a job has to be covered?  Except for some ill-defined notion of the more the better,  and no one has to be perfect there is no real standard.  It seems clear that the percent of the job covered dictates how test the test can be used. If it covers a large portion of the job convincingly,  it can be used for rank ordering.  If less of the job is covered,  and the coverage is less convincing, then there is less justification for ranking, although a pass-fail standard may be used,  with the score depending on the degree and quality of coverage,  the importance of variability to  job performance.

There is no standard, but I believe that one tester who analyzed job, and then built test for 10% of it which he used for a rigid ranking procedure went too far.

William Burns has suggested a rule of thumb for establishing content validity when he asks,  "Would you be willing to have the testing procedure used as a criterion for a validity study?"  If you would, and if you believed that you could defend it against your critics,  you have some convincing evidence that you have a content valid test.

I offer an additional such rule of thumb, which comes from my experience in the Board of Examiners, who are deathly afraid of subversion of the test by coaching courses.  They were even resistant to distributing a job analysis on the grounds that telling people what they did would somehow spoil the test. My question is this,  "Assuming that the content of specific items is kept secret, would you welcome coaching courses in test taking skills?" An answer of "Yes," implies that the test is so similar to the job that improvement in taking the test will be reflected directly in improvement in job performance,  and that it is therefore content valid.

Summary.  My major message is that we can sharpen our understanding of the content validity of a test item, or of the test as a whole if we can,  with the help of Subject Matter Experts, give satisfactory answers to these questions:

Regarding the Job Description:

"Does the Job Description report the information needed to understand the job?"

"Does the Job  Description clearly describe the importance of satisfactory job performance, or cost of unsatisfactory performance?"

"Does the Job Description accurately describe the levels of knowledges, skill, and ability, and of responsibility, decision making, and the like?"

Regarding each test item:

"Does the item measure knowledge, skill or ability required of the incumbent to perform on the job?"

"Is the keyed answer right, and are the distractors wrong?"

"Does the incumbent need to know the information covered by the item to perform adequately

"If a question deals with a situation, does the test taker perceive the situation accurately enough to be able respond properly?"

FILED

JUL 31 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT B

APA Standards, at "Categories of Standards."

# standards for educational and psychological testing

American Educational Research Association
American Psychological Association
National Council on Measurement in Education

the *Standards* for documentation and scientific analysis may sometimes, in itself. place a greater burden on one side of a policy issue than on another.

The purpose of publishing the *Standards* is to provide criteria for the evaluation of tests. testing practices. and the effects of test use. Although the evaluation of the appropriateness of a test or application should depend heavily on professional judgment. the *Standards* can provide a frame of reference to assure that relevant issues are addressed. The *Standards* does not attempt to assign precise responsibility for the satisfaction of individual standards. To do so would be difficult. especially since much work in testing is done by contractual arrangement. However. all professional test developers. sponsors. publishers. and users should make reasonable efforts to observe the *Standards* and to encourage others to do so.

The *Standards* is not meant to prescribe the use of specific statistical methods. Where specific statistical reporting requirements are mentioned. the phrase "or equivalent" should always be understood. For concreteness. the standards sometimes refer to a common method of achieving specific reporting objectives. In particular situations. however. more desirable alternatives may be available.

## Cautions To Be Exercised in Using These Standards

The *Standards* is a technical guide that can be used as the basis for evaluating testing practices. Evaluating the acceptability of a test or test application does not rest on the literal satisfaction of every primary standard in this document. and acceptability cannot be determined by using a checklist. Specific circumstances affect the importance of individual standards. Individual standards should not be considered in isolation. Therefore. evaluating acceptability involves the following: professional judgment that is based on a knowledge of behavioral science. psychometrics. and the professional field to which the tests apply: the degree to which the intent of this document has been satisfied by the test developer and user: the alternatives that are readily available: and research and experiential evidence regarding feasibility.

The use of the standards in litigation is inevitable: it should be emphasized. however. that in legal proceedings and elsewhere professional judgment based on the accepted corpus of knowledge always plays an essential role in determining the relevance of particular standards in particular situations. The *Standards* is intended to offer guidance for such judgments.

It would not be appropriate for test developers or test users to state that a test. manual. or procedure satisfies or follows these standards. That judgment is more appropriately made by others in the professional community.

These standards are concerned with a field that is evolving. Therefore. there is a continuing need for monitoring and revising this document: as knowledge develops. There are some areas in which new developments are particularly likely. such as gender-specific or combined-gender norms. cultural bias. computer based test interpretation. validity generalization. differential prediction. and flagging test scores for people with handicapping conditions.

## Categories of Standards

In previous versions of the *Standards*. the classifications "essential." "highly desirable." and "desirable" were used to indicate the relative importance of the individual standards. In the 1985 *Standards*. new categories and labels are used. in part to avoid the troublesome distinction between desirable and highly desirable and to avoid the label "essential." The standards are now categorized either as being of primary or of secondary importance. Importance is viewed largely as a function of the potential impact that the testing process has on individuals. institutions. and society.

*Primary standards* are those that should be met by all tests before their operational use and in all test uses. unless a sound professional reason is available to show why it is not necessary. or technically feasible. to do so in a particular case. Test developers and users and. where appropriate.

sponsors, are expected to be able to explain why any primary standards have not been met.

*Secondary standards* are desirable as goals but are likely to be beyond reasonable expectation in many situations. Although careful consideration of these standards will often be helpful in evaluating tests and programs and in comparing the usefulness of competing instruments, limitations on resources may make adherence to them infeasible in many situations. Some secondary standards describe procedures that are beneficial but not often used. Test developers and users are not expected to be able to explain why secondary standards have not been met.

The importance of some standards for test construction and evaluation will vary with application. These standards are designated as *conditional*. Such standards should be considered primary for some situations and secondary for others. In deciding whether to take an individual conditional standard as primary or secondary, one should consider carefully the feasibility of meeting that standard in relation to the potential consequences to all parties involved in the testing process. It may be infeasible technically or financially for some testing programs to observe some conditional standards, particularly those programs that conduct low-volume tests. However, if the use of a test is likely to have serious consequences for test takers, especially if a large number of people may be affected, conditional standards assume increased importance.

The categories in which standards are placed should be viewed as imperfect. Where testing has a limited role in a larger assessment procedure (e.g., tests conducted by a clinical, industrial, or school psychologist), some primary standards, especially those dealing with documentation, should be considered as having a secondary designation.

Ideally all relevant primary standards should be met at publication or first operational use of each test. Because the development of a test for widespread use is an extensive undertaking, a requirement that all relevant primary standards be satisfied at first operational use would be likely to stifle both the development of new instruments and progress in the field. Furthermore, a testing professional who is put in charge of a new or continuing program that does not meet relevant primary standards cannot be expected to remedy all that program's shortcomings immediately.

When judging the short-term acceptability of a test or program under development or redevelopment, the test user should determine that the test is on a par with readily available alternatives. In addition, the test developer or publisher should determine that

1. advertising for a test or program recommends only applications supported by the test's research base;

2. necessary cautions are given in the manual or elsewhere to encourage sufficiently limited reliance on the test results, particularly when the use of the new test will have significant impact on the test takers; and

3. there is clear indication of continuing and significant improvement in the research base directed toward observance of the standards.

## Tests and Test Uses to Which These Standards Apply

The major new sections in the 1985 *Standards* relate to test use. The *Standards* emphasizes that test users should have a sound technical and professional basis for their actions, much of which can be derived from research done by test developers and publishers. In selecting tests, a potential user should depend heavily upon the developer's research documentation that is clearly related to the intended application. Although the test developer should supply the needed information, the ultimate responsibility for appropriate test use lies with the user.

Tests include standardized ability (aptitude and achievement) instruments, diagnostic and evaluative devices, interest inventories, personality inventories, and projective instruments. The 1966 and 1974 *Standards* noted that the same general types of information are needed for all these varieties of published diagnostic, prognostic, and evaluative devices. Sim-

FILED

JUL 31 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT C

The Berger Series of Data Processing
Personnel Tests (Psychometrics Inc.,
Santa Monica, CA)



**PSYCHOMETRICS INC.**

# B-APT



**Q** *HOW CAN APPLICANTS TAKE A JOB-RELATED APTITUDE TEST WHEN THEY KNOW NOTHING ABOUT THE JOB?*

**A** *They can if you use the tutorial test approach. A tutorial aptitude test teaches elements of the job prior to presenting the test questions. The B-APT is a tutorial test.*

## DESCRIPTION

The Berger Aptitude for Programming Test (B-APT) is a highly valid, job-related programming aptitude test. It is designed so that even examinees with no programming background can understand the test's programming language required to solve the problems. The B-APT is a work sample test. Applicants take the test by writing short "programs" in the test booklet. They do practice exercises, then apply the principles they have learned to solve the test problems. By the time the examinees reach the last part of the B-APT they will have been taught to code, loop, increment and branch.

The B-APT has been translated into Italian, French, German, Spanish, Japanese, Chinese and Hebrew.

In addition, there are Braille and enlarged versions of the B-APT for the visually impaired.

## FORMAT

The test consists of three separately timed parts of ten problems each. Examinees are taught a simple programming language which they use to write a short routine when solving each problem.



## TIME

Total administration time is about 1 hour and 40 minutes. This includes approximately 1 hour of tutorial instruction and practice items, and 40 minutes of actual test-taking time.

## WORKSHOP

The work sample nature of the B-APT, which makes it a unique and highly valid test, requires special administration. Workshops are held for new B-APT users to demonstrate the easily-mastered administration procedure. Typically, representatives from both personnel and data processing departments attend these workshops. This enables DP management to be informed on the procedure for selecting their future programmers, and enables personnel management to observe the job-relatedness of B-APT assessment.

## SCORING

Organizations have the option of scoring their own tests. Scoring procedure is part of the B-APT administration workshop given to all new clients. If Psychometrics Inc. does the scoring, score reports are usually mailed to clients within 24 hours of receiving the completed booklets. Telephoned score reports are available if requested by the client.

## USES

**Selection** — The B-APT has been used with continued success to select programmer trainees. It is a powerful indicator of future technical proficiency on the job.

**Evaluation** — B-APT services can include interpretative diagnostic reports. The examinee's grasp of the programming concepts given in the test, his skill in writing routines using a simple language, and his understanding of program requirements provide indicators for a diagnostic interpretation of test results.

## PRICES

There is a minimum initial order of 50 B-APTs. Subsequent orders may be of any size.

$25.00 per test

$5.00 to score each test at Psychometrics Inc. (client has the option of scoring B-APT).

## Workshop

First training workshop:

Option 1: Administration training only. One day (approximately 8 hours)

— no charge, except travel costs.

Option 2: Administration training **and** test scoring training. Two days (approximately 8 hours each day)

— $400, plus travel costs.

Additional workshops:

— $400 per day, plus travel costs.

Q WE ANTICIPATE TEST-ING LARGE GROUPS ONCE OR TWICE A YEAR. CAN PSYCHOMETRICS INC. PROVIDE TEST ADMINIS-TRATORS TO MEET THIS NEED?

A *Yes, at your own facility.*

Clients usually conduct their own test administration, but some prefer to utilize the services of Psychometrics, Inc.

Arrangements include a Psychometrics professional staff member administering the tests at the client's facility for a nominal fee plus travel costs.

FILED

JUL 3 1 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT D

Contents and a Sample Outline of a
Validity Study, <u>B-APT</u> Validity
Studies A Technical Summary.

B-APT VALIDITY STUDIES

A Technical Summary

# CONTENTS

| Section I | TRAINING CRITERIA | PAGE |
|---|---|---|
| | U.S. Navy | 2 |
| | A T & T | 4 |
| | LA Trade & Technical College | 6 |
| | CNA Insurance | 7 |

| Section II | ON-THE-JOB CRITERIA | |
|---|---|---|
| | Security Pacific National Bank | 9 |
| | Penn Mutual | 10 |
| | Florida Power and Light | 11 |
| | Republic Steel | 13 |
| | Southern California Gas Company | 15 |
| | Northeast Utilities Services Company | 17 |
| | Blue Cross, Blue Shield of Iowa | 19 |
| | Blue Cross, Blue Shield of Maryland | 21 |
| | Rand McNally | 23 |

Section III    OTHER B-APT STATISTICS

| Section IV | PREDICTIVE VALIDITY STUDIES WITH THE B-APT | |
|---|---|---|
| | Study A | 27 |
| | Study B | 28 |

8. **Organization:** Blue Cross, Blue Shield of Maryland (BCBSM)

   **User's location:** Baltimore, Maryland

   **Date of Study:** June, 1981

   **Purpose of Study:** Prediction of on-the-job success in programming

   **Job Analysis:** Conducted by managers/supervisors of BCBSM

   **Sample:** Three teams of experienced staff programmers participated in the study. Total number: 51 people took B-APT; 47 were ranked by supervisors.

   **Job titles:** Trainees, Programmers, Senior Programmers

   **DOT codes:** 020.188, 020.168

   **Race:** 14% Black, 86% Non-Black

   **Sex:** 39% Female, 61% Male

   **Design:** Concurrent, criterion-related. Each team of programmers was ranked for proficiency in 5 areas of programming. Validity coefficients were computed for each team independently, and also for the combined total group.

   **Predictor:** The B-APT

   **Criterion Measures:** Managers/supervisors ranked the programmers in each of these 5 categories: Planning and Analysis, Program Development, Program Implementation, Program Testing, and Overall Technical Proficiency.

### Results:

#### a. Validity coefficients for B-APT vs. Overall Technical Proficiency [1]

| Group | Number | Validity coef. [2] | Significance Level |
|---|---|---|---|
| Males | 23 | .71 | .01 |
| Females | 19 | .59 | .01 |
| Total | 42 | .62 | .01 |

1. Very high validity coefficients (.79 to .83) were obtained for the separate teams in four specific categories of programming outside of the Overall category. They are not reported here because they are based on small subgroup sizes.

2. Correlations have been corrected for restriction of range.

#### b. Means, t-tests, Standard Deviations and Ranges

| Group | N | Mean | t-test [1] | Standard Deviation | Range |
|---|---|---|---|---|---|
| Team 681 | 17 | 20.7 | | 9.6 | 10-30 |
| Team 682 | 12 | 25.0 | | 4.1 | 14-30 |
| Team 683 | 11 | 17 | | 9.6 | 5-30 |
| Males | 31 | 22.7 | | 8.3 | 0-30 |
| Females | 20 | 20.2 | 1.10 | 7.4 | 3-30 |
| Blacks | 7 | 19.0 | | 7.3 | 10-30 |
| Non-Blacks | 44 | 22.5 | .97 | 7.7 | 0-30 |
| Total | 51 | 21.2 | | 8.3 | 0-30 |

---

[1] The t-test measures the statistical significance of the difference between group means. These results demonstrate that the differences between male/female means and between Black/Non-Black means were not statistically significant. (For an N of 51, t would have to be 2.7 for a difference between mean scores to be significant).

FILED

JUL 31 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT E

OPM Federal Personnel Manual
System FPM Bulletin

Office of Personnel Management

# Federal Personnel Manual System
## FPM Bulletin

FPM Bulletin 331-3

Washington, D. C. 20415

Bulletin No. 331-3

SUBJECT: Alternative Selection Procedures

Action Date:

Heads of Departments and Independent Establishments:

A task force has been established within the Personnel Research and Development Center (PRDC) to research alternative selection methods and combinations of methods which reduce adverse impact and retain validity. This group is preparing technical guidance and information materials. It can offer some assistance to agencies wishing to use selection methods other than written ability tests in meeting their new responsiblities under decentralized examining. (This is in addition to the ongoing assistance provided in personnel measurement by PRDC. Requests for that assistance should continue to be addressed to the Applied Psychology Branch, 632-5442.) Requests for assistance with alternative selection methods in decentralized examining should be addressed to the task force (number below).

The attachment to this Bulletin, <u>A Review of Some Alternative Procedures for Personnel Selection</u>, summarizes the nature and uses of the first nine alternatives being investigated. Comprehensive reviews of these methods and of grade point average as a predictor of job performance have been prepared and will be available early in CY 1980. Those described in the attachment are:

> Biodata/Application Blanks
> Reference Checks
> Self-Assessment
> Interviews
> Work Samples and Simulations
> Miniature Training and Evaluation
> Assessment Centers
> Work Motivation
> Probationary Period

In addition, the group is researching the feasibility of adapting the Behavioral Consistency Approach to unassembled examining for use with entry-level jobs. This approach, originally developed for use with mid-level jobs, relates actual achievements to job-required behaviors. Further information concerning these and other alternatives will be available as the research progresses.

| | |
|---|---|
| Inquiries: | Staffing Services, 632-7610 — Personnel Research and Development Center |
| Code: | 331- |
| Distribution: | FPM |
| Bulletin Expires: | January 20 ~~November~~, 1980 |

OPM FORM 464   1/78

A list of OPM publications that may be helpful to agencies interested in alternative selection methods appears on the last page of the attachment. The OPM library has two copies of each for loan, and they are available for purchase from NTIS and/or GPO.

Jule M. Sugarman,
Deputy Director

## A REVIEW OF SOME ALTERNATIVE PROCEDURES
## FOR PERSONNEL SELECTION

The field of personnel selection is turning its attention to the development of selection methods which may have less adverse impact against minority group members and women. Attention has been focused especially on alternatives to written ability tests, since such tests have frequently been found to have adverse impact against certain minority groups.

As part of this new emphasis, the Personnel Research and Development Center (PRDC) has prepared reviews of the research literature on the most commonly used selection devices. The purpose of this paper is to present summaries of these reviews on the use of alternative selection methods. The reviews have concentrated on the validity and adverse impact of the methods. Recommendations have focused on methods which might be expected to minimize adverse impact and retain adequate validity. While the recommendations have been tailored to the context of entry-level white collar occupations, the methods can, of course, be used in other contexts.

Additional information on these methods can be obtained from PRDC. Complete technical papers are in preparation and will be made available to agencies upon request. In addition, PRDC can offer some technical assistance and will conduct research on the use of alternative selection methods.

The development of a selection system using the alternatives described in this booklet must meet the requirements of FPM Supplement 271-2, Tests and Other Applicant Appraisal Procedures. Among the necessary steps are:

1. An analysis of the job to identify the knowledges, skills, abilities, and other characteristics (KSAOs) which are necessary for successful job performance. This job analysis should

identify the important duties or work behaviors of the job.

2. Selection of methods for measuring the most important KSAOs. At this point the appropriateness of each method for measuring each KSAO must be considered in terms of its measurement characteristics, likely validity and likely adverse impact, as well as cost and other practical considerations.

3. Tailoring the selected methods to the job for which they will be used. Unlike written tests, these methods are generally unstandardized. They provide a method and a result but not the content. This must be provided by the user based on the results of the job analysis. Each of the selection methods described in this document may be useful for measuring some KSAOs but not others. Therefore, it may be necessary to use a combination of two or more devices in order to assess an adequate number of the KSAOs.

4. Developing the crediting plan. When two or more devices are used, a plan for weighting and combining the scores into a single rating must be developed.

For several of the selection methods reviewed, some modifications to this general implementation strategy are required. Discussions of procedural issues are included at the end of each summary. In sum, all selection procedures must be objective, reliable, job-related and valid.

### BIODATA QUESTIONNAIRES
### AND APPLICATION BLANKS

Biographical information may be used for selection purposes by scoring specially

## Certificate of Service

I certify that I have this 31st day of July, 1987, served a copy of plaintiffs' foregoing Reply in support of their Motion to Extend the Period for Retention of Jurisdiction, its attachments, and the new proposed form of Order on counsel of record for the defendants by causing copies to be hand-delivered to them at the following addresses:

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
    Room 3509
Washington, D.C. 20530

James S. Green, Esq.
U.S. Office of Personnel Management
1900 E Street N.W.
    Room 7450
Washington, D.C. 20415


RICHARD T. SEYMOUR
Bar No. 28100
    Attorney for Plaintiffs

RECEIVED

Jul 31   3 51 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JUL 31 1987

FILED

JUL 31 1987

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
    individually and on behalf of )
    all others similarly situated, )
)
                Plaintiffs, )
)
          v. )    C. A. No. 79-0271
)         JHG
CONSTANCE HORNER, Director, )
    U.S. Office of Personnel )
    Management, et al., )
)
                Defendants. )

JOINT MOTION TO AMEND THE ORDER OF JUNE 9,
1981 AND TO AMEND THE PROCEDURE FOR
RESOLVING CLAIMS MADE UNDER PARAGRAPH 21
OF THE CONSENT DECREE

      Plaintiffs and defendants in this action hereby jointly
move for entry of the attached Order amending the Order of June
8, 1981, to amend the procedure for resolving claims under
paragraph 21 of the Consent Decree. Their Motion is based on the
following grounds:

      1. The parties have completed the telephone depositions
of claimants, as prescribed by the Order of July 2, 1984. As to
a substantial number of claimants, the parties have agreed that
there was no need to take telephone depositions and that the
claims could be determined on the basis of information already in
the possession of counsel.

      2. It appears that the parties will be able to reach
agreement as to most claimants' entitlement to relief under the
provisions of paragraph 21 of the Consent Decree, although some
may have to be resolved by the Court. In many instances, the
agreement of the parties will be that the claimant is not

entitled to the relief provided by paragraph 21.

3. The Order of June 8, 1981 requires the parties to report to the Court "on their respective positions with respect to the entitlement of ... class members ... to relief under paragraph 21 ... ." See paragraph 4 of the Order. The Order continues:

> At that time, the original statements of the class members, their responses to the forms sent to them, any attachments to those forms, the transcripts of any trial depositions and any other evidentiary materials shall be filed with the Court.

Id. The filings under this provision would be voluminous.

4. The undersigned counsel for plaintiffs was involved in determinations of back pay as to the Houston Police and Fire Departments, and successfully used a different and less cumbersome procedure in that case. There, counsel for plaintiffs sent individualized letters to each of the 688 class members with agreed partial or total objections to their back pay claims as to the Police Department, and to each of the 335 class members with agreed partial or total objections to their back pay claims as to the Fire Department, explaining in detail the reasons for the objections.[1] Claimants were provided an opportunity to appeal to the district court from the agreement of counsel on the objections to their claims. The appeal forms required them to state whether they disagreed with the statements of facts in the objection letters sent them by class counsel. Only 178 appeals

---

[1] Because some class members had claims against both Departments, some received more than one objection letter. A total of 919 class members received objection letters.

were filed, and further explanations responding to the appeal statements produced withdrawals of most of those appeals. The statements in the appeal forms led to the re-examination of a number of the objections, and some were withdrawn. Compared to the 1,026 objection letters, the Court ultimately had to decide only 59 appeals involving only 53 persons. The ultimate result is that use of the procedure has both guaranteed fairness to the class members and greatly reduced the burden on the Court and on the Clerk's office.

5. The accompanying proposed form of Order and its attachments would enable the same approach to be used herein, and should reduce the burden on the Court and on the Clerk's office.

WHEREFORE, plaintiffs and defendants jointly pray that their Motion be granted.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DiGENOVA
United States Attorney

RICHARD GREENBERG
BARBARA L. WARD
Attorneys
U.S. Department of
  Justice
Civil Division
10th & Pennsylvania N.W.
Room 3509
Washington, D.C. 20530

By: _Barbara Ward_
    Attorneys for
    Defendants

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
  Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                Attorneys for Plaintiffs

Dated: July 28, 1987

- 4 -

JUL 31 1987