Judge *Joyce Green, J.*

# CIVIL CASE NO. 79-271

*Angel G. Luevano, et al.,*

**VOL.** 4 **OF** _____

**FROM** 9/1/87 **TO** 7/6/89

**VERSUS**

*Constance Horner, Director Office of Personnel Management. et al;*

| | |
|---|---|
| DEPOSITIONS | |
| TRANSCRIPTS | |
| EXHIBITS | |
| OTHER | |

| DATE | COURT CLERK'S MEMORANDUM | JUDGE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | *Temp. Jacket* | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

THIS CASE CONSISTS OF MORE THAN ONE VOLUME. DO NOT
PLACE ANY PLEADINGS IN THIS VOLUME OTHER THAN FOR
THE PERIOD OF TIME SPECIFIED IN THE UPPER RIGHT HAND
CORNER OF THIS JACKET FRONT.

CO-594
NEW 7/73

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
    v.                             )
                                   )   Civil Action
CONSTANCE HORNER, Director.        )   No. 79-0271 (JHG)
    Office of Personnel            )
    Management, et al.,            )   **FILED**
                                   )
            Defendants.            )   SEP - 1 1987
_____)

                ORDER                  CLERK, U.S. DISTRICT COURT
                                       DISTRICT OF COLUMBIA

    Upon consideration of the defendants' Unopposed Motion For

An Enlargement of Time to respond to plaintiffs' Motion For

Relief On Their Showing Of Adverse Impact For 1982, 1983 and

1984, it is hereby

    ORDERED, that the defendants shall have to and including

Friday, September 25, 1987, to serve their response to the

plaintiffs' Motion .

                                    _____
                                    UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,

individually and on behalf of all others similarly situated,

Plaintiffs,

v.

C. A. No. 79-0271

CONSTANCE HORNER, Director, U.S. Office of Personnel Management, et al.,

Defendants.

FILED

SEP - 1 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORDER AMENDING PROCEDURE FOR RESOLVING CLAIMS UNDER PARAGRAPH 21 OF THE CONSENT DECREE

This matter comes before the Court on the joint motion of the parties. It appears that the motion is well taken, and it is therefore hereby

ORDERED, that:

1. The attached Notice form, and the attached Appeal Form, are approved for use where the parties have agreed on objections. The parties shall co-operate in setting the dates to be filled in on these forms.

2. Counsel for plaintiffs shall prepare individualized letters of notification as to each claimant whose claim is subject to an agreed objection, informing the claimant in detail of the objection and of the grounds for the objection. The notice period shall be sixty days from the date of the mailing of the Notice, letters and appeal forms.

3. Counsel for plaintiffs shall file with the Clerk a statement showing the date on which the individualized letters,

(N)

Notices and Appeal Forms are mailed to the affected claimants, and shall file copies of the letters with the Clerk.

4. Counsel for plaintiffs shall provide counsel for defendants with a copy of any appeal form received from a claimant, along with a copy of any attachments.

5. If a claimant's statement on the appeal form indicates that the objection should be re-examined, the parties are free to do so and to modify or withdraw their agreement. In the event that the statement creates an issue of material fact, the parties may take a deposition of the claimant, by telephone or otherwise.

6. There shall be no extension of the deadline for filing appeals, as stated on the accompanying Notice. No excuses for failure to meet the deadline shall be approved, whether or not the claimant has moved from the last address provided to class counsel herein.

7. The parties shall notify the Court of all appeals filed, of the results of any further depositions taken on any claim, and of any change of position by any party as to any claim, no later than sixty days after the expiration of the deadline for filing appeals. The parties shall co-operate with the Clerk in setting the date of the hearing on the appeals.

This the _____1ˢᵗ_____ day of _____September_____, 1987.


_____
JOYCE HENS GREEN
United State District Judge


- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,        )
                                        )
     individually and on behalf of      )
     all others similarly situated,     )
                                        )
                      Plaintiffs,       )
                                        )
          v.                            )    C. A. No. 79-0271
                                        )
CONSTANCE HORNER, Director,             )
     U.S. Office of Personnel           )
     Management, <u>et al.</u>,         )
                                        )
                      Defendants.       )

<u>NOTICE</u>

    You are receiving this Notice because there is an objection to your back pay claim.  The grounds for the objection are stated in the accompanying letter.  Both the plaintiffs and the defendants have agreed that, based on the information in their possession, the objection is proper.

    If you wish to appeal from the decision of the parties, you must fill out the accompanying Appeal Form, and Mr. Seymour must receive it, at the office of the Lawyers' Committee for Civil Rights Under Law, 1400 'Eye' Street, N.W., Suite 400, Washington, D.C. 20005, by the close of business on _____, 1987.  Mr. Seymour must receive it by that day, or your appeal will not be considered.  Mailing it by that day is <u>not</u> suffi-cient.

    To wind up this procedure, it is necessary to have a firm deadline for the receipt of appeals.  There will be no exceptions to the deadline, and no excuses for failure to meet it

will be accepted.

The appeal form must be completely filled in, and it must be signed, or it will not be considered.

JAMES F. DAVEY, CLERK
United States District Court
U.S. Courthouse
3rd & Constitution Ave., N.W.
Washington, D.C. 20001

Dated: _____

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,                )
                                                )
    individually and on behalf of               )
    all others similarly situated,              )
                                                )
                        Plaintiffs,             )
                                                )
            v.                                  )   C. A. No. 79-0271
                                                )
CONSTANCE HORNER, Director,                     )
    U.S. Office of Personnel                     )
    Management, <u>et al.</u>,                   )
                                                )
                        Defendants.             )

APPEAL BY CLASS MEMBER FROM
<u>OBJECTION TO BACK PAY CLAIM</u>

PRINT NAME: _____

        If you want to have the Court consider your back pay
claim and overrule the objection to your claim, fill out this
form to the best of your knowledge and mail or deliver it to Mr.
Seymour at the address shown in the attached Notice.  Please
<u>print</u> all information.  If the space provided is not enough, you
may attach additional sheets.  Mr. Seymour must receive this form
by _____, 1987, or your appeal will not be con-
sidered.

        1. Is the statement of facts in Mr. Seymour's objection
letter accompanying this form:

                (a) right? _____

                (b) wrong in some respect? _____ If so,

        explain what is wrong in the statement of facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

2. State why you think the objection should be dismissed by the Court, and why you think you should share in the back pay award:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Print your name:_____

Print your mailing address: _____

_____

     City _____ State _____ Zip _____

Social Security Number: _____

Telephone number (home): Area Code _____ Number _____

                 (work): Area Code _____ Number _____

These statements are made under the penalties for perjury.


                 Signature: _____


Date: _____


NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

     1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-
SIDERED.

     2. THIS FORM MUST BE MAILED TO:

         Richard T. Seymour
         Lawyers' Committee for Civil Rights Under Law
         1400 'Eye' Street N.W.
         Suite 400
         Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY _____, 1987, IT
WILL NOT BE CONSIDERED.


- 3 -

RECEIVED

JUL 31  3 58 PM '87

JAMES F. DAVEY CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al</u>.,        )
                                          )
          Plaintiffs,                     )
                                          )
          v.                              )
                                          )    Civil Action
CONSTANCE HORNER, Director.               )    No. 79-0271 (JHG)
     Office of Personnel                  )
     Management, <u>et</u> <u>al</u>.,    )
                                          )
          Defendants.                     )
_____ )

**FILED**

SEP 4 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' UNOPPOSED MOTION AND SUPPORTING
<u>MEMORANDUM FOR AN ENLARGEMENT OF TIME</u>

Defendants, by their undersigned counsel, hereby move for an
enlargement of time to and including Friday, September 11, 1987,
to serve their response to the plaintiffs' Motion To Enforce the
Applicant-Reporting Provisions Of The Decree in the above-
captioned action.

The undersigned counsel, who has had primary litigation
responsibility for this matter, will shortly be resigning her
position.  Additionally, during the past month, the undersigned
counsel has spent substantial time attempting to resolve other
issues raised by plaintiffs, including discovery issues and other
matters that have been subject to the informal reconcilation
process provided by the Decree.

Plaintiffs' counsel has been informed of this motion and has no objection.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

*Barbara Ward*

BARBARA WARD
RICHARD GREENBERG

Room 3509 - Civil Division
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3781

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Defendants' Unopposed Motion For An Enlargement Of Time was mailed, postage prepaid, this 4th day of September 1987 to:

> Richard Seymour, Esq.
> Lawyers Committee for Civil
>   Rights Under Law
> 1400 "Eye" Street, N.W.
>   Suite 400
> Washington, D.C.  20005

*Barbara Ward*

BARBARA WARD

RECEIVED

SEP 4  4 00 PM '87

JAMES . . . . . . Y. CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA


SEP 4 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                    Plaintiffs,              )
                                             )
        v.                                   )    C. A. No. 79-0271
                                             )         JHG
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                 )
    Management, et al.,                       )
                                             )
                    Defendants.              )

FILED

SEP - 4 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## CONSENTED CONFIDENTIALITY ORDER

    This matter comes before the Court on the joint request
of the parties.  The parties represent that they have reached an
agreement under which the defendants will provide plaintiffs with
race-identified raw answer data from OPM's post-Decree develop-
ment of assembled competitive alternative examining procedures
and preliminary administrations of those examinations, and that
such data includes the Social Security numbers of the persons
taking the preliminary administrations of the tests.  This
information has been requested by plaintiffs pursuant to ¶ 27 of
the Consent Decree.  This Order is entered to satisfy the
provisions of the Privacy Act.

    The defendants may provide the requested information to
counsel for plaintiffs.  Counsel for plaintiffs may share this
information with their staff, with plaintiffs' experts and their
staff, with data processing personnel, with the defendants and
their counsel, and with the Court, for purposes of analysis and

to further the purposes of the Consent Decree.  Any individually
identifiable information provided to the Court shall be provided
under seal.  Counsel for plaintiffs, plaintiffs' experts, and
plaintiffs' data processing personnel, and their respective
staff, shall not disclose any individually identifiable infor-
mation to anyone else.

        SO ORDERED.

        This the _3rd_ day of _September_ , 1987.

                            JOYCE HENS GREEN
                            United States District Judge

We so represent, and we ask for this:

RICHARD T. SEYMOUR            BARBARA L. WARD
   Attorney for Plaintiffs       Attorney for Defendants

- 2 -

RECEIVED

SEP 3  10 43 AM '87

JAMES F.       LERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al</u>.,          )
                                          )
          Plaintiffs,                     )
                                          )
          v.                              )
                                          )   Civil Action
CONSTANCE HORNER, Director.               )   No. 79-0271 (JHG)
     Office of Personnel                  )
     Management, <u>et al</u>.,            )
                                          )   **FILED**
          Defendants.                     )
_____ )   **SEP - 9 1987**

                                              **JAMES F. DAVEY, Clerk**

<u>ORDER</u>

Upon consideration of the defendants' Unopposed Motion For
An Enlargement of Time to respond to plaintiffs' Motion To
Enforce The Applicant-Reporting Provisions of The Decree it is
hereby

ORDERED, that the defendants shall have to and including
Friday, September 11, 1987, to serve their response to the
plaintiffs' Motion .

_____
UNITED STATES DISTRICT JUDGE



RECEIVED
SEP 10  8 00 AM '87
JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )    Civil Action
                                    )    No. 79-0271 (JHG)
CONSTANCE HORNER, Director.         )
    Office of Personnel             )
    Management, et al.,             )
                                    )
        Defendants.                 )
_____)

FILED

SEP 10 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' UNOPPOSED MOTION FOR AN
EXTENSION OF TIME TO RESPOND TO
PLAINTIFFS' MOTION TO ENFORCE THE
APPLICANT-REPORTING PROVISIONS OF THE DECREE

Defendants, by their undersigned counsel, move for a 12-day extension of time to respond to Plaintiffs' Motion To Enforce The Applicant-Reporting Provisions Of The Decree. Plaintiffs' counsel has consented to this motion, which is based on the following facts.

Defendants' lead attorney during this eight-year-old litigation, Barbara Ward, recently left the Civil Division. Defendants' response to plaintiffs' motion is being prepared by the undersigned counsel, Jeffrey Paulsen, who is far less familiar with the history of this litigation than Ms. Ward. In addition, commitments to other cases as well as previously arranged vacation plans on the part of Mr. Paulsen make it impossible to complete defendants' response by the current due date of September 11, 1987.

For the foregoing reasons, defendants respectfully submit that a two-week extension is warranted. A proposed order is attached.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

OF COUNSEL:
JAMES GREEN
Assistant General Counsel
Office of Personnel
  Management

RICHARD GREENBERG
ALLEN FERBER
JEFFREY S. PAULSEN
Department of Justice
Room 3529 - Civil Division
10th & Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3527

- 2 -

## Certificate of Service

I certify that, on September 10, 1987, I served a copy of the foregoing Defendants' Unopposed Motion For An Extension Of Time To Respond To Plaintiffs' Motion To Enforce The Applicant-Reporting Provisions Of The Decree, by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under Law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005

Clinton Wolcott
National Treasury Employees Union
Suite 1101
1730 K Street
Washington, D.C.  20006

Jeffrey S. Paulsen

RECEIVED

SEP 10  12 29 FM '87

JAMES F            CLERK
U.S. DISTR.        COURT
DISTRICT OF COLUMBIA

SEP 1 0 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )      Civil Action
                                     )      No. 79-0271 (JHG)
CONSTANCE HORNER, Director.          )
    Office of Personnel              )
    Management, et al.,              )           FILED
                                     )
        Defendants.                  )         SEP 15 1987
_____)
                                           JAMES F. DAVEY, Clerk

                            ORDER

        Based on Defendants' Unopposed Motion For An Extension Of

Time To Respond To Plaintiffs' Motion To Enforce The Applicant-

Reporting Provisions Of The Decree,

        IT IS ORDERED that defendants may have until September 25,

1987 to respond to plaintiffs' motion.


Dated: September 14, 1985           _____
                                    United States District Judge

(N)



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )    C.A. No. 79-0271 (JHG)
                                   )
CONSTANCE HORNER, Director,        )
      Office of Personnel          )
      Management, et al.,          )
                                   )
            Defendants.            )
_____)

FILED

SEP 23 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' UNOPPPOSED MOTION FOR AN
ENLARGEMENT OF TIME TO RESPOND TO PLAINTIFFS'
MOTION FOR RELIEF ON THEIR SHOWINGS OF
ADVERSE IMPACT IN HIRING FOR 1982, 1983 AND
1984 AND POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendants, by their undersigned attorneys, hereby move,
pursuant to Rule 6(b) of the Federal Rules of Civil Procedure,
for an enlargement of time of three weeks extending the time for
service and filing of defendants' response to Plaintiffs' Motion
For Relief On Their Showings Of Adverse Impact In Hiring For
1982, 1983, And 1984.  Defendants' response is currently due on
September 25, 1987, and the additional time will extend the
filing date to October 16, 1987.  In support of this motion,
defendants state as follows:

1.  Counsel for the United States with primary
responsibility for the preparation of defendants' response has
been unexpectedly preoccupied by the press of other business
which has included the preparation of the defense to one motion
for a temporary restraining order and two motions for preliminary
injunctions within the past two weeks.  As a result, the
necessary consultation and coordination required for the

preparation of the response could not be conducted over the past two weeks.  This difficulty has been exacerbated by the resignation of Civil Division attorney Barbara Ward who previously was primarily responsible for the handling of this matter.

2.  On September 21, 1987, counsel for the United States spoke with counsel for the plaintiffs and is authorized to represent that plaintiffs consent to the requested enlargement of time.

<u>CONCLUSION</u>

Defendants respectfully request that the motion for a three week enlargement of time be granted.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

RICHARD GREENBERG

ALAN L. FERBER
Attorneys, Department of Justice
Civil Division, Room 3501
10th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-4770

Attorneys for Defendants.

- 2 -

## CERTIFICATE OF SERVICE

I certify that, on September 23, 1987, I served a copy of the foregoing Defendants' Unopposed Motion For An Enlargement Of Time To Respond To Plaintiffs' Motion For Relief On Their Showings Of Adverse Impact In Hiring For 1982, 1983 and 1984 And Points And Authorities In Support Thereof, by first-class mail, postage prepaid, on:

                Richard T. Seymour
                Lawyer's Committee For Civil
                  Rights Under Law
                Suite 400
                1400 "Eye" Street, N.W.
                Washington, D.C.  20005

                                    _____
                                    ALAN L. FERBER

RECEIVED

SEP 23   12 49 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SEP 23 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,        )
                                        )
              Plaintiffs,               )
                                        )
        v.                              )        C.A. No. 79-0271 (JHG)
                                        )
CONSTANCE HORNER, Director,             )
    Office of Personnel                 )
    Management, <u>et al.</u>,          )
                                        )
              Defendants.               )
_____)

**FILED**

SEP 25 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>ORDER</u>

Based on Defendants' Unopposed Motion For An Enlargement Of Time To Respond To Plaintiffs' Motion For Relief On Their Showings Of Adverse Impact In Hiring For 1982, 1983 and 1984 And Points And Authorities In Support Thereof,

IT IS ORDERED that defendants may have until October 16, 1987 to respond to plaintiffs' motion.

Dated: _September 25_, 1987

_____
United States District Judge

RECEIVED
SEP 28 1987
03 AM
JAMES F.
U.S. DIS
DISTRICT
CLERK
COURT
COLUMBIA



FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SEP 25 1987

| | | |
|---|---|---|
| ANGEL G. LUEVANO, et al., | ) | |
| | ) | CLERK, U.S. DISTRICT COURT |
| Plaintiffs, | ) | DISTRICT OF COLUMBIA |
| | ) | |
| v. | ) | |
| | ) | Civil Action |
| CONSTANCE HORNER, Director. | ) | No. 79-0271 (JHG) |
| Office of Personnel | ) | |
| Management, et al., | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO ENFORCE THE APPLICANT-
REPORTING PROVISIONS OF THE DECREE

INTRODUCTION

In their motion seeking enforcement of the Consent Decree's
applicant reporting provisions, plaintiffs have chosen the
emotional, yet disingenous, tactic of portraying the problem as
arising from the defendant agencies' refusal to comply with the
Decree's reporting requirements concerning applicant race and
national origin data.  (Decree ¶¶ 24, 25).  In fact, however,
plaintiffs have produced absolutely no evidence that any
defendant agency has ever willfully failed to comply with the
Decree's requirement that applicant race and national origin data
be collected.  No such evidence exists, and plaintiff's
suggestion that a contempt sanction is warranted, Pls' Memorandum
at 4, is, therefore, irresponsible.

In reality, as plaintiffs are well aware, the problem of
incomplete racial data stems from the fact that submission of
such information is voluntary, and that many applicants for
federal employment, given the choice, prefer not to reveal their

race.  OPM has consistently taken the position, and has made
clear to plaintiffs' counsel from the outset, that, as a matter
of policy, it would not require submission of race and national
origin information as a mandatory prerequisite to applying for a
federal job, even if it had the legal authority to do so, which
is unclear.[1]  See Declaration of James S. Green (attached as
Exhibit 1).  Until now, plaintiffs had never challenged this
position in court during the more than five years the Decree has
been in effect, nor had they ever challenged the form that is
used to collect racial data.

    Plaintiffs' new-found dissatisfaction with the form and the
applicant race data appears to stem solely from their mistaken
assumption that defendants intend to challenge plaintiffs'
adverse impact statistics on the ground of insufficient applicant
data.  Pls' Motion at 15.  Defendants have no such intention.
Defendants are willing to accept the data that exists as
accurate, because, through nobody's fault, it is the best data
available.

    At the same time, defendants are willing to revise the form
in an effort to assuage plaintiffs' concerns about the future
collection of race data.  However, because plaintiffs are not
prejudiced by the incompleteness of the data collected over the

_____

    [1] OPM has statutory authority to examine candidates' fitness
for federal employment only with respect to characteristics that
bear on an applicant's ability to perform the position sought.  5
U.S.C. § 3301.  Since race and national origin are not such
characteristics, it is questionable whether OPM has the legal
authority to require that such information be provided as a
condition of applying for a federal job.

past five years, defendants oppose plaintiffs' request for
intrusive and unnecessary retroactive relief, particularly in
light of plaintiff's unexplained delay in raising this alleged
problem with the Court.

### 1. The Race-National Origin Data Form Is Not Defective

Each applicant who applies for employment in a job series
covered by the Luevano Consent Decree receives OPM Form 618,
"Applicant Race and National Origin Questionnaire." (Attachment
F to Pls' Motion). While the form makes clear that the provision
of race and national origin data is voluntary, it also attempts
to overcome any reluctance or possible suspicion on the part of
applicants by explaining that the information is requested in
order to comply with the Court Order in this action, and for that
purpose only.

These forms have been distributed to every agency with
instructions that they are to be provided to each applicant.
There is no evidence that any agency has refused or willfully
neglected to provide applicants with this form.

In March 1985, in response to plaintiffs' first request, OPM
provided plaintiffs with a copy of OPM Form 618.[2] Plaintiffs
expressed no dissatisfaction with any aspect of the form until
the instant motion was filed in July 1987, more than two years
after plaintiffs' initial receipt of the form. As a matter of

_____

[2] Plaintiffs could have obtained this form at any time from
the government.

equity, this delay alone should foreclose any right of plaintiffs
to now complain about the form.

Despite this unexcused delay, plaintiffs now move for an
order requiring OPM, the form's originator, to cease use of the
form and to begin immediately using a form employed by OPM during
the Northrup study conducted in 1977 and 1978.[3]  Plaintiffs claim
that the Northrup form is a "tried and true approach," and that
"OPM has deliberately chosen to continue using its flawed form."
Pls' Motion at 19.

Plaintiffs have failed to show, however, either that the
present Form 618 is "flawed," or that use of the Northrup form
would improve the response rate.  First, plaintiffs' only
objections to Form 618 are that it contains the underlined
statement "Submission of this information is voluntary," and the
statement "Your failure to [fill out the form] will have no
effect on the processing of your application ..."  Pls' Motion at
16.  Plaintiffs conclude that "it is clear that [the form's]
wording and emphasis have in effect encouraged applicants not to
provide the information nominally requested by the form."  Id.

However, the form plaintiffs propose contains almost exactly
the same statement -- i.e., "providing this information is
voluntary and there will be no adverse effect on you for not
providing the information requested" -- in approximately the same
size type.  The only differences in the statement are that no

---

[3] This two-part study is appended to Plaintiffs' Motion as
Attachments G and I.  The form plaintiffs propose is Attachment H
to Plaintiffs' Motion.

- 4 -

portion of it is underlined, and that it appears near the bottom of the page rather than near the top.

Second, plaintiffs' assumption that the high response rate achieved in the Northrup study is due to these trivial differences in the wording of the form is totally unwarranted, and is refuted by the conclusions of the study itself. In the Northrop study, race and national origin data was gathered in the setting of an "assembled" examination with a proctor leading the test-takers through each step of the form and explaining that the information requested was for research purposes only and would not become part of a personnel file or be used for personnel decisions.[4] See Attachment I to Pls' Motion at 2. The proctor was available to answer any questions or concerns applicants might have about the form. Interestingly, it appears that the proctor did not advise the applicants that filling out the form was voluntary. Id. at 3 ("There were a few isolated complaints from applicants regarding the fact that they were not told verbally by the examiner that providing the requested information was voluntary.")

In contrast, since OPM ceased use of the PACE in 1982, hiring into most of the occupations formally covered by the PACE has been accomplished by means of unassembled examinations where

---

[4] An assembled examination is a test administered to a group of individuals who have come together (assembled) for that purpose. An unassembled examination does not require the test-takers to come together, but rather involves applicants sending in written responses to examination questions which usually deal with the applicant's background, education and prior work experience.

there is no proctor present.  Unlike the controlled atmosphere of
the Northrup Study, it is impossible to give these applicants any
oral guidance and direction about the form at the time they are
filling it out.

Thus, the absence of a proctor, not the trivial differences
in the wording of the form, appears to explain the differences in
response rates between the two forms.  It is plain common sense
that people are more likely to take the time to fill out an
optional form when they are politely asked to do so by a human
proctor (who then watches over their shoulders while they do it),
than when the form is simply presented to them along with many
other forms as part of a lengthy application package which they
must slog through at home when they might rather be playing with
the children or watching television.

Indeed, the Northrup study itself reached precisely this
conclusion:

> The foregoing study has demonstrated the
> feasibility as well as the advisability of
> collecting race, sex, and ethnic origin data
> from applicants for Federal employment by
> self-identification only in assembled
> examination situations.  In such situations,
> the appropriate questionnaire can be quickly
> and efficiently administered to groups
> sitting for a written test and can be
> collected immediately upon its completion.

Att. I to Pls' Motion at 14 (emphasis added, in part).

Thus, the very study plaintiffs rely on refutes their claim
that defendants deliberately have employed a form designed to
produce incomplete data.  The problem of incompleteness results
from the inherent limitations of the unassembled examination

- 6 -

procedure, not from any bad faith on defendants' part.  Even in the controlled environment of the Northrup study, the response rate for unassembled examinations averaged only 60-85%, <u>id</u>., which is not much better than the response rates using Form 618. <u>Compare</u> Pls' Motion at 6-11.[5]

Nevertheless, defendants are willing to delete the underlining from the form now in use, in order to eliminate any concern that defendants are "over-emphasizing" the voluntary nature of the form.  Inasmuch as the form plaintiffs propose contains essentially the same language as the form now used (with the deletion of the underlining) there is no conceivable advantage to be gained by the adoption of plaintiffs' proposed form.[6]

---

[5] The data plaintiffs themselves cite bears this out.  Table 7 to their motion (Pls' Motion at 9) shows a very high response rate for applicants who took the Tax Technician and Customs Inspector examinations in 1985.  Both of these examinations were assembled examinations, unlike virtually all of the other examinations referenced in plaintiffs' motion.

[6] The only other difference between the two forms on this score is the placement of the notice near the top of Form 618 as opposed to near the bottom of the Northrup form.  Defendants oppose moving the notice.  The only purpose in doing so would be to make the notice less conspicuous in an effort to "fool" some applicants into believing the form is mandatory.  Defendants believe that applicants have the right to know the form is voluntary, and that it would be hypocritical to profess to give them that information while in reality taking steps to conceal it from them.

- 7 -

2.  **Defendants Have Not Violated The Decree With
    Respect To Applicant Statistics For 1982**

In addition to their general complaints about incomplete
data over the last five years, plaintiffs also complain
specifically about the lack of applicant race and national origin
data for 1982, the first year under the Decree's reporting
requirements.  They argue that they have been prejudiced in their
ability to demonstrate adverse impact for 1982 by having to rely
on 1978 data obtained when the PACE was still in effect.  Pls'
Motion at 15.

What plaintiffs fail to acknowledge, however, is that they
previously stipulated that the applicant data for 1982 should <u>not</u>
be used, and that the parties would substitute the 1978 data as
specifically allowed by paragraph 8(b)(1) of the Decree.[7]
Exhibit 2 hereto is a stipulation, which was written and signed
by plaintiffs' counsel, in which Mr. Seymour acknowledged that
"the task of determining the presence or absence of adverse
impact against blacks and/or against Hispanics in hiring for job
categories formerly covered by the PACE will be simplified
<u>without sacrificing accuracy</u>" by relying on the 1978 data as
allowed by paragraph 8(b)(1).  (Emphasis added).

---

[7] Paragraph 8(b)(1) states that, in the case of the interim
use of the PACE, adverse impact shall be calculated using as
applicant data those who took the PACE in the prior reporting
year "or, in the event that statistics for the prior reporting
year are not available, for the most recent prior period for
which statistics are maintained."  In this case, the most recent
prior period is 1978.

Moreover, it must be noted that paragraph 8(b)(1) was included in the Decree because the parties realized it was likely that, during the first year of the Decree, statistical applicant information could not effectively be gathered.  This is exactly what happened, see Green Dec. ¶¶ 7-8 (Exhibit 1), and the decree provides a remedy -- use of the 1978 applicant statistics.[8]  No finding of a violation of the Decree or any other remedy is appropriate in these circumstances.

### 3. Obtaining Additional Data From the Social Security Administration Would Serve No Useful Purpose

Finally, plaintiffs argue that for those job categories where there are more than 100 applicants and more than 20% of the applicant data is missing, defendants should submit a master list of all applicants to the Social Security Administration ("SSA") for its analysis of the racial composition of the applicants.[9] Plaintiffs claim they are entitled to this remedy because the government intends to rely on the absence of complete data to defend plaintiffs' allegations of adverse impact.  Pls' Motion at 15.

---

[8] Another problem with relying on the 1982 applicant data for non-PACE jobs, or for jobs that were only partly filled using PACE, was that many of the people who were hired in 1982, after the Decree went into effect, first became applicants in 1981 or earlier, prior to the effective date of the Decree.  Green Dec. ¶ 8.

[9] As plaintiffs concede, because the Social Security Administration (SSA) only recently began to collect data concerning Hispanics, this analysis would be limited to a breakdown of blacks, whites, and others.  Pls' Motion at 20.

Plaintiffs' request should be denied for two reasons.
First, plaintiffs' assumptions about defendants' intentions are
erroneous.   Although plaintiffs cite a letter from defendants'
counsel purportedly stating such an intention, Pls' Motion at 15
(citing Pls' Attachment R), the letter in question says no such
thing.   In any event, defendants have no intention of defending
plaintiffs' adverse impact motion on the ground of incomplete
data, as our response to that motion conclusively will
demonstrate.[10]   Thus, plaintiffs will not be prejudiced by the
data, and their requested relief, therefore, would serve no
purpose.

Second, even if there were any reason for requiring
defendants to submit a master list of applicants to SSA for an
analysis of the racial composition of that list, such an analysis
would not provide any useful information.   As plaintiffs concede,
privacy laws prevent SSA from identifying the race of particular
individuals.   Attachment S to Pls' Motion at 2.   SSA will only
provide data regarding the overall composition of the list; for
example, that 20% of the people on the list are black.   Id.
Thus, the SSA data would not assist in identifying the race of
the people who failed to fill out Form 618.

Plaintiffs argue that the SSA data would at least allow the
parties to look upon the existing applicant race data with

---

[10] Defendants' response to plaintiffs' adverse impact motion
is due October 16, 1987.   Defendants have no objection to the
Court's postponing a ruling on the present motion until that
response is filed.

- 10 -

greater confidence.  Plaintiffs claim it is unclear whether
blacks, for example, were as likely to fill out the form as
whites, and argue that the SSA data would somehow help to gauge
this tendency.  Id.  But, in the Northrup study upon which
plaintiffs rely, this tendency was measured in a much more
scientific fashion, and the researchers found no statistically
significant difference between the tendency of blacks to fill out
the form as opposed to whites.  Att. G to Pls' Motion at 8.  The
report tentatively concluded that "members of a minority group
are no more apt to refuse to answer questions on race than are
members of the majority group."  Id.  The Northrup study thus
provides an additional reason why submitting applicant data in
bulk to SSA would be a useless endeavor.

<u>CONCLUSION</u>

Because defendants have not violated the Consent Decree by
the manner in which they have collected data on the race and
national origin of applicants, and because plaintiffs have
demonstrated no prejudice, plaintiffs' motion for enforcement of
the Decree's reporting provisions should be denied.

- 11 -

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

OF COUNSEL:                            RICHARD GREENBERG
JAMES GREEN                            ALAN FERBER
Associate General Counsel              JEFFREY S. PAULSEN
Office of Personnel                    Department of Justice
   Management                          Room 3529 - Civil Division
                                       10th & Pennsylvania Ave., N.W.
                                       Washington, D.C.  20530
                                       Telephone:  (202) 633-3527

- 12 -

79-271

FILED

SEP 25 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                  )
                                           )
            Plaintiffs,                    )
                                           )
      v.                                   )
                                           )
CONSTANCE HORNER, Director,                )
      Office of Personnel                  )
      Management, et al.,                   )
                                           )
            Defendants.                    )
                                           )
_____   )

DECLARATION OF JAMES S. GREEN

1.   I am the Associate General Counsel, U. S. Office of
Personnel Management (OPM). I have served previously as the
Deputy Assistant General Counsel and Assistant General
Counsel at OPM, and have been assigned as the OPM attorney in
the above captioned litigation since the complaint was filed
in 1979. I was involved in the negotiations that led to the
Consent Decree entered in this action, and I am familiar with
the issues in the Plaintiffs' Motion concerning the Decree's
applicant reporting requirements.

2.   During the negotiations with plaintiffs' counsel, the
issue of collection of racial and national origin data from
applicants was discussed in some detail by OPM officials,

-2-

attorneys from the Department of Justice and myself. It was
the view of these OPM officials, including the then Deputy
Director, the then Associate Director for Staffing and the
then General Counsel, that OPM could not agree to a Decree
which required mandatory race or national origin data as a
prerequisite to Federal employment.

3.  The decision not to agree to mandatory collection of
race and national origin data was based on policy
considerations by the highest officials at OPM. It was their
view that making an application subject to such mandatory
reporting would be unacceptable to the public seeking Federal
jobs, including members of the plaintiffs' class.

4.  The OPM position regarding the mandatory collection of
race and national origin data also was based on a concern by
OPM officials that OPM lacked the legal authority to collect
such data from applicants as a prerequisite to consideration
for a Federal job. OPM's authority to examine applicants
flows from Title 5 of the United States Code, Section 3301.
That statute allows the President,and through the President,
the Director of OPM, to ascertain the fitness of applicants
as to age, health, character, knowledge and ability for

the employment sought. It was OPM's belief that the race or national origin of an applicant was not included in that analysis.

5. Further, OPM was bound by the merit principle that applicants for employment should receive fair and equitable treatment without regard to race or national origin (5 U.S.C. 2301(b)(2)). It was the position of OPM officials that mandating the collection of race and national origin data from applicants as a requirement of consideration for a Federal job could violate these laws and, as such, would not be agreed to as part of the negotiations toward a settlement of the case.

6. To the best of my recollection, OPM's position concerning mandatory collection of race and national origin data was transmitted clearly and without reservation to plaintiffs' counsel during the negotiations that led to the Decree. In the several meetings of the Decree Monitoring Committee since the Decree became effective, the position of OPM concerning the voluntary nature of applicant race and national origin data has been stated on a number of occasions.

7. The Decree, at paragraph 8(b)(1), defines adverse impact for interim use of PACE as using applicant data from the prior reporting year or the most recent prior period for which statistics are maintained. As the Decree became effective in January, 1982, there was no "prior" reporting year and no pre-1982 PACE applicant data except the 1978 PACE applicant data. Plaintiffs' counsel were aware  of this and it was agreed that for the 1982 reports on PACE adverse impact, applicant data would be based on the 1978 data.

8. The only newly developed OPM competitive examination used in 1982 was for the Computer Specialist (Trainee) occupation. That competitive alternative examination was first administered in the Fall of 1982 and the register of eligibles was not established until November 15, 1982. Much of the hiring from the Computer Specialist (Trainee) register would not have occurred until 1983. Furthermore, a number of Computer Specialist (Trainee) positions would have been filled in earlier 1982, but from existing PACE registers, as the PACE was the examining procedure in effect for that occupation at that time. Because of the timing of the effective date of the Decree and the implementation of the new Computer Specialist (Trainee) examination, and the results of attempting to mix applicant data from different

-5-

examining sources at different times of the year, it was

decided that applicant data for Computer Specialist (Trainee)

in 1982 was not sufficiently reliable for use under the

Decree. For these reasons, the Government decided to use

Paragraph 8(b)(1) for Computer Specialist (Trainee) as it had

been a PACE job for virtually the entire year 1982. In using

that provision of the Decree, the 1978 PACE applicant data

was employed, as it reflected the most recent prior period

for which statistics were maintained. To the best of my

recollection, plaintiffs' counsel were advised of this and

agreed to this procedure for 1982 adverse impact analysis.


I hereby declare under penalty of perjury that the

foregoing is true and correct.


JAMES S. GREEN


September 25, 1987

DEFENDANT'S EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL LUEVANO, et al.,                    )
                                          )
    individually and on behalf of         )
    all others similarly situated,        )
                                          )
                        Plaintiffs,       )
                                          )
            v.                            )    Civil Action No. 79-0271
                                          )
DONALD J. DEVINE, et al.,                 )
                                          )
                        Defendants.       )

STIPULATION AND ORDER

Plaintiffs and defendants in this action hereby stipulate
that the first selections using Schedule B authority for job
categories formerly covered by the PACE took place in the last two
months of calendar year 1982, and that the task of determining the
presence or absence of adverse impact against blacks and/or against
Hispanics in hiring for job categories formerly covered by the PACE
will be simplified without sacrificing accuracy by treating all hires
in such job categories as if made during interim use of the PACE.
Accordingly, the parties stipulate that paragraph 8(b)(1) of the
Consent Decree shall govern determinations of the presence or absence
of adverse impact for all hiring in calendar 1982 in GS-5 and
GS-7 slots in job categories formerly covered by the PACE, with the
exceptions noted below.

The above stipulation shall not apply to the filling of non-
PACE GS-5 and GS-7 slots in job categories which were formerly subject
to the PACE and which had both PACE and non-PACE tracks for
employees.  A list of such job categories is attached as Attachment
A.  As to such job categories, the above stipulation shall apply

only to hiring in the PACE track, which is the only track which had career ladders leading to noncompetitive promotions above the GS-7 level. The exception noted in this paragraph shall not be applicable, and the above stipulation shall be applicable, if the defendants are unable to provide reliable adverse-impact information separating the PACE slots from the non-PACE slots.

The above stipulation shall also not apply to hiring in certain job categories formerly subject to the PACE, where the hiring was done pursuant to alternative examining procedures sponsored by the Office of Personnel Management. This exception shall not be applicable, and the above stipulation shall be applicable, to an alternative examining procedure if the defendants are unable to provide reliable adverse-impact information for the use of that procedure.

WE SO STIPULATE:

_____        _____
RICHARD T. SEYMOUR                      BARBARA L. WARD

    Attorney for Plaintiffs                 Attorney for Defendants

The Court finds that the above stipulation is consistent with the Consent Decree and tends to carry out its purposes. The stipulation is approved.

                                        _____
                                        JOYCE HENS GREEN
                                        United States District Judge

## ASTERIK PACE OCCUPATIONS

The following occupations may be filled by both PACE and non-PACE procedures at the 5/7 level depending on the job

| | |
|---|---|
| 301 | General Clerical and Administrative |
| 341 | Administrative Officer |
| 501 | General Accounting Clerical & Administrative |
| 962 | Contact Representative |
| 990 | General Claims Examining |
| 1001 | General Arts and Information |
| 1421 | Archives Specialist |
| 1860 | Public Health Inspection (abolished) |
| 2001 | General Supply |
| 2150 | Transportation Operations |
| 2101 | General Transportation |
| 1101 | General Business and Industry |

ATTACHMENT A

OPM Sponsored Competitive Alternative Examinations

A.  Unassembled

GS-110 5/7                              Economist
GS-1654 5/7                             Printing Management Specialist
GS-1810 5/7                             General Investigator
GS-1811 5/7                             Criminal Investigator
GS-1812 5                               Game Law Enforcement Agent
                                        (Fish & Wildlife)

B.  Assembled

GS-334 5                                Computer Specialist trainee

ATTACHMENT B

## Certificate of Service

I certify that, on September 25, 1987, I served a copy of the foregoing Defendants' Memorandum In Response To Plaintiffs' Motion To Enforce The Applicant Reporting Provisions Of The Decree, by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under Law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005

Clinton Wolcott
National Treasury Employees Union
Suite 1101
1730 K Street
Washington, D.C.  20006

Jeffrey S. Paulsen



RECEIVED

SEP 25 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SEP 2 5 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,        )
                                        )
        individually and on behalf      )
        of all others similarly         )
        situated,                       )
                                        )
                Plaintiffs,             )
                                        )
                v.                      )   C.A. No. 79-0271-JHG
                                        )
CONSTANCE HORNER, Director,             )
        U.S. Office of Personnel        )
        Management, <u>et al.</u>,      )
                                        )
                Defendants,             )
                                        )
                                        )
NATIONAL TREASURY EMPLOYEES             )
        UNION,                          )
                Intervenor.             )
_____)

*denied*

*Place in file*

**FILED**

JUN 30 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>COMPLAINT IN INTERVENTION</u>

     The National Treasury Employees Union (NTEU)
intervenes in this action to protect the interests of the
plaintiffs in a related case.  <u>National Treasury Employees
Union</u>, <u>et al.</u> <u>v.</u> <u>Horner</u>, <u>et al.</u>, 654 F. Supp. 1159 (D.D.C.
1987), appeals pending, Nos. 87-5102 and 87-5191.  NTEU also
supports the relief requested by the plaintiffs here, with
limited exceptions, and seeks injunctive relief in addition
to the relief requested by the plaintiffs.

-2-

1.  This Court has jurisdiction over this case
pursuant to 28 U.S.C. 1331, 1361, 2201, and 2202; 5 U.S.C.
701, et seq.; and 42 U.S.C. 2000e-16(c).

2.  Venue is proper pursuant to 28 U.S.C. 1391(e).

3.  Intervenor NTEU is an unincorporated association
having its principal place of business at 1730 K Street,
N.W., Suite 1101, Washington, D.C. 20006.  Pursuant to Title
VII of the Civil Service Reform Act (CSRA), 5 U.S.C. Section
7101 et seq., NTEU is the exclusive bargaining representative
of approximately 120,000 Federal employees.  NTEU intervenes
on behalf of its members who are Schedule B employees of
various federal agencies whose rights have been violated by
defendants' unlawful acts and on behalf of all similarly
situated Schedule B employees, the proposed class in NTEU v.
Horner, supra.

4.  Plaintiff Angel G. Luevano represents a class
certified by the Court as consisting of

> All blacks and all Hispanics who have taken the
> [Professional and Administrative Career Examination]
> for hire, but not for promotion, into entry level PACE
> jobs at any time on or after May 19, 1975, or who,
> during the term of this Decree [in this case], take or
> may take the PACE and/or any alternative examining
> procedures developed by an agency and/or OPM for hire,
> but not promotion, into entry level PACE jobs.

Consent Decree at 3-4, par. 3.

-3-

5.  Defendant Constance Horner is the Director of the
Office of Personnel Management (OPM), an agency in the
executive branch of the United States government responsible
for executing, administering, and enforcing the laws
governing the civil service 5 U.S.C. 1102.

6.  The other class of defendants to this action are
"all Federal departments, agencies, and corporations subject
to Section 717 of the Civil Rights Act of 1964, as amended,
which have used, are using, or may use the PACE." Consent
Decree at 4, par. 4.

7. NTEU's interests in this action arise from OPM's
improper implementation of the Consent Decree in this case.
In 1981, OPM agreed to replace its prior hiring examination,
the PACE exam, with new, non-discriminatory examinations.
Luevano v Campbell, 93 F.R.D. 68 (D.D.C. 1981). Instead, for
most positions at issue, OPM replaced the PACE examination on
August 31, 1982, with "Schedule B" hiring authority, which
does not require examination and grants hired employees
inferior job status. NTEU v. Horner, supra, Oct. 15 Decision
at 4, 11.

8.  The Court determined that OPM's action was
arbitrary and capricious and granted NTEU's request for

- 4 -

declaratory and injunctive relief.  NTEU v. Horner, supra.
That relief included the conversion of Schedule B employees
to the competitive service, a requirement that competitive
examinations be developed and the enjoining of further
Schedule B hiring.  Id. at 1168.  This relief was stayed by
the Court pending appeal on March 30, 1987.

   9.  On May 8, 1987, the plaintiffs to this action
(Luevano plaintiffs) moved for a determination and injunctive
relief under the Consent Decree.  They challenge OPM's
assertion that the Court's jurisdiction over the Consent
Decree ends on November 5, 1987, request that the Court take
judicial notice of its findings in NTEU v. Horner, supra, and
seek injunctive relief.  Their proposed injunctive relief
includes the immediate conversion of all Schedule B employees
to the competitive service, restraints on reductions in force
by the Department of the Navy, and information gathering by
OPM.

                    FIRST CAUSE OF ACTION

   10.  OPM and other defendants' actions implementing
and carrying out Schedule B hiring authority are contrary to
their obligations under the Consent Decree and civil service
statutes. 5 U.S.C. 3301, et seq.

   11.  NTEU's members and the proposed class members in
NTEU v. Horner, supra, are harmed by these violations, as
they have received inferior job status and have suffered
losses because of that inferior status.

-5-

## SECOND CAUSE OF ACTION

12.  NTEU repeats and realleges the statements contained in paragraphs 1 to 9.

13.  The grant or denial by the Court of the relief requested by the <u>Luevano</u> plaintiffs will affect, directly and indirectly, the relief previously granted and stayed in <u>NTEU v. Horner</u>, <u>supra</u>, because the cases concern similar relief to the same employees, because OPM's responsibilities under the Consent Decree are a central issue in that case, and because the Court's interpretation of OPM's obligations may have a <u>stare decisis</u> effect on that case.

14.  NTEU seeks to protect the relief granted and stayed by the Court in <u>NTEU v. Horner</u> and to ensure that any relief granted by the Court here comports with the civil service laws and that all adversely affected employees are identified and granted relief.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, NTEU requests that the Court:

A.  ORDER the relief requested by the <u>Luevano</u>

-6-

plaintiffs on May 8, 1987, in paragraphs 1-5 of their
proposed order,

B.  ORDER OPM to gather information from federal
agencies and employees to determine the extent of harm
suffered by employees hired into Schedule B PAC positions,

C.  ORDER that all future hiring for PAC positions be
conducted competitively and result in employment with full
competitive service rights,

D.  ORDER the Defendants to pay a reasonable amount of
NTEU's attorneys' fees as determined by the Court; and

E.  ORDER such other relief as the Court deems just
and proper.

                              Respectfully submitted,


                              Lois G. Williams
                              Director of Litigation
                              D.C. Bar 365294


                              Clinton D. Wolcott
                              Assistant Counsel
                              D.C. Bar 343202

                              National Treasury
                              Employees Union
                              1730 K Street, N.W.
                              Suite 1101
                              Washington, D.C. 20006

                              (202) 785-4411

CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached reply to the parties' opposition to intervention and complaint in intervention was mailed, first class, on June 30, 1987 to:


Richard T. Seymour
Lawyers Committee for Civil
  Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.  20005

Jeffrey S. Paulsen
Barbara L. Ward
U.S. Department of Justice
Civil Division
Tenth & Pennsylvania Avenue, N.W.
Washington, D.C.  20530

James S. Green
Office of Personnel Management
1900 F. Street, N.W.
Washington D.C.  20415


Clinton D. Wolcott
Assistant Counsel

National Treasury Employees Union
1730 K Street, N.W.
Suite 1101
Washington, D.C. 20006

(202) 785-4411

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

JUN 30   5 02 PM '87

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
   individually and on behalf of )
   all others similarly situated, )
)
                 Plaintiffs, )
)
         v. )   C. A. No. 79-0271
)
CONSTANCE HORNER, Director, )
   U.S. Office of Personnel )
   Management, et al., )
)
           Defendants. )

FILED

OCT 8 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

      PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
      THEIR MOTION TO ENFORCE THE APPLICANT-
      REPORTING PROVISIONS OF THE DECREE BY
      REQUIRING COMPLETE OR VIRTUALLY COMPLETE
      <u>RACIAL IDENTIFICATION OF APPLICANTS</u>

      The defendants' Memorandum in Opposition does not

respond to the substance of plaintiffs' showings, but chooses to

rely instead on imagined justifications for defendants' actions

and on name-calling.  In the first paragraph of defendants'

Memorandum in Opposition, plaintiffs are termed "emotional",

"disingenous" [sic], and "irresponsible".

      A. <u>The Defendants Do Not Dispute the Extent
         of Their Failure to Obtain Complete Racial
         Identifications of Applicants</u>

      Plaintiffs have shown that the defendants' reporting of

the race of applicants[1] is often extremely incomplete.  Motion,

¶¶ 7-20.  The defendants do not dispute any of plaintiffs'

figures.

_____

     [1] As in plaintiffs' Motion, references to racial identifica-
tions include ethnic identifications.

B. <u>The Defendants Have Not Rebutted Plaintiffs'
Showings of Likely Prejudice Arising from
Their Failure to Obey the Decree</u>

Plaintiffs showed how they were prejudiced by the
defendants' failure to obtain racial information on applicants
for the competitive alternative examining procedure for Computer
Specialist (Trainee) in 1982, because plaintiffs were forced to
use 1978 PACE applicant data with a low rate of black applicants
(11.9%) when the likely rate of black applications under this
procedure was 21.8% (1983-1985 data).  The defendants have simply
ignored this showing, and have argued that they consider them-
selves excused from the decretal requirement of reporting
applications filed in 1982.

Plaintiffs have also provided a clear explanation of
the harm incomplete applicant statistics do to plaintiffs'
ability to make accurate showings of adverse impact.  Motion, ¶¶
34-36.  The defendants assure the Court that it can safely ignore
the problems presented by 50%-missing and 60%-missing data sets
because a nine-year-old study showed that, when fewer than 4% of
the data were missing, the missing data made no real difference.
Defendants' Memorandum at 11; Attachment G to plaintiffs' Motion.
This seems a thin reed on which to rely, and a wholly inadequate
excuse for the defendants' wholesale failure to comply with the
applicant-reporting provisions of the Decree.

Plaintiffs have proposed a means of determining with
certainty whether there has been prejudice against black class
members, by providing the Social Security Administration with

- 2 -

lists of names and Social Security numbers in instances where
there are numerous applicants and a high rate of missing informa-
tion.  The Civil Rights Division of the Justice Department uses
this approach in proving violations of Title VII, and the
defendants have advanced no reason for failing to use it herein.
There is no occasion to indulge in speculation, as the defendants
urge, when clear evidence is readily available from another arm
of the government.

      C. <u>The Defendants Have Never Been Excused from
         Complying with the Decree's Applicant-Reporting
         Provisions for 1982 Applicants</u>

            1. <u>The Fact that a Register Was
               Established in November Does Not
               Waive the Reporting Provisions</u>

The defendants urge that the Fall 1982 administration
of the Computer Specialist (Trainee) test did not result in the
establishment of a register until November 15, 1982, and that
many hires in that occupation occurred earlier in 1982.[2]  This
will <u>always</u> be the situation when an alternative examining
procedure is put into place, because no civil service register
has ever been established on New Year's Day.  Every register is
necessarily put into effect during the course of a year, and some
hires will <u>always</u> occur prior to the implementation of a new
procedure.

If accepted, the defendants' argument would immunize
all defendants as to all hiring occurring during the year in
which a new examining procedure is implemented.  The Consent

_____

    [2] Defendant's exhibit 1, Green Declaration, ¶ 8.

- 3 -

Decree does not allow any such blanket defense.

> 2. The Submission of a Draft Stipulation
> Offering to Settle an Issue Did Not
> Waive the Applicant-Reporting Require-
> ments of the Decree for 1982

The defendants urge that plaintiffs' showing of prejudice does not matter, because plaintiffs had proposed a Stipulation which the government had never accepted.[3]  The defendant's view of the stipulation is that plaintiffs agreed therein to use 1978 PACE applicant data for all hiring in 1982.  The rejected proposal, however, refers only to ¶ 8(b)(1) of the Consent Decree, and makes no reference to 1978 data.  For its part, ¶ 8(b)(1) of the Decree requires that hiring during interim use of the PACE be measured by applications in the "prior reporting year", which in this case would be 1981.[4]  Mr. Seymour's February 25, 1983 letter to Ms. Ward stated:

> If 1981 data is not available, we would need the
> sworn certification of a responsible OPM official
> explaining why it is not available, and [the
> proposed form known as] Table A can be used to
> record the most recent available information.

_____

[3] Defendant's exhibit 2.  This is not a proposed stipulation of fact, but a proposed stipulation of settlement of an issue which could otherwise be disputed.  The defendants' unwillingness to accept the offered stipulation leaves it legally meaningless, and plaintiffs object to the defendants' attempt to give the offer a one-sided binding effect.

[4] Plaintiffs expected that there would be such data.  There was a February 5, 1980 meeting at OPM, attended by Mr. Seymour, Mr. Green, Dr. Northrop, Frank McKillip, Dr. Schneider, and other OPM officials.  At this meeting, Mr. Seymour was informed that OPM had in the pipeline "a picture of the applicant pool", and would have it for the February 1980 administration of the PACE. If racial identifications were to be obtained in 1980, there would be no reason to expect that they would be omitted in 1981 and later.

- 4 -

No such explanation was ever provided to plaintiffs, and none has been provided to the Court.

Moreover, the rejected offer expressly stated that it did not apply to former PACE job categories "where the hiring was done pursuant to alternative examining procedures sponsored by the Office of Personnel Management", unless the defendants were unable to provide reliable data for the use of that procedure.[5] The defendants have never provided any explanation showing that they were in good faith <u>unable</u> to follow the applicant-reporting provisions of the Decree in 1982, as opposed to simply ignoring these provisions, and their Opposition provides none.

> 3. <u>The Language of ¶ 8(b)(1) of the Decree Did Not Waive the Applicant-Reporting Requirements for 1982</u>

The defendants also urge that the purpose of ¶ 8(b)(1) of the Decree, requiring that hiring in one reporting year during interim use of the PACE be measured by applications in the prior reporting year, "because the parties realized it was likely that, during the first year of the Decree, statistical applicant information could not effectively be gathered." Defendant's Memorandum at 4.

This is not supported by Mr. Green's affidavit, and is untrue. Paragraph 8(b)(1) applies throughout the permitted use

---

[5] Adverse-impact data for the PACE was to be based on as comparison of hires in one reporting year and applications in the prior reporting year. Decree ¶ 8(b)(1). By contrast, adverse-impact data for alternative examining procedures was to be based on applications and hires during the same reporting year. Decree ¶ 8(b)(4).

of the PACE, which ¶ 13 of the Decree defined as three years.
PACE hiring in 1983 would have been governed by 1982 PACE
applications, and PACE hiring in 1984 would have been governed by
1983 PACE applications.  The defendants' argument fails because
it posits a purpose for ¶ 8(b)(1) which could apply only to 1982
hiring, and the provision has far broader application.

The purpose of the paragraph was to meet the govern-
ment's concern that all agencies know by the start of a reporting
year the standard which they would have to meet in hiring.  The
applicants were not applying to the various agencies, and were
not applying for a single job category, but were applying to OPM
for 118 different job categories.

This rationale did not apply to alternative examining
procedures for a single job category, whether administered by OPM
or an agency for a single-agency job category (Decree ¶ 8(b)(2))
or administered by OPM for a job category used by more than one
agency (Decree ¶ 8(b)(3)).  There, each agency's compliance was
to be measured by applications and hires during the same report-
ing year.  (Decree ¶ 8(b)(4)).  If the defendants' argument were
correct, the Decree would bar consideration of 1982 applications
for the alternative examining procedures, but this is in fact the
decretal standard for 1982 hiring.

Moreover, there is no conceivable reason why it would
have been difficult to gather applicant information in 1982.  The
Decree had been negotiated in 1980, and the applicant-reporting
provisions were unchanged when they were submitted to the Court

- 6 -

in January and February 1981.  They could not possibly have come as a shock to OPM officials when the Decree went into effect in January 1982.

Apart from all this, the 60-day postponement in the Decree's effective date was inserted precisely to enable the administrative machinery to start running smoothly.  The defendants, it must be remembered, never informed the Court that they did not plan to comply with any part of the Decree during its first year.

C. <u>The Defendant Has Ignored Plaintiffs' Evidence That Some Agencies and Officials Are Not Trying, Or Are Not Trying Hard Enough, to Comply With the Applicant-Reporting Provisions of the Decree</u>

Plaintiffs have shown that the defendants' reporting of racial information on applicants varies enormously from agency to agency, from job to job, and from examining procedure to examining procedure.  Motion, ¶¶ 5-21.

We showed that these variations cannot be explained by the defendants' simple assertion that applicants only identify their race in an assembled examination, when they are guided by a "proctor":[6]

(a) Motion, ¶ 8 (for assembled examination for Computer Specialist (Trainee), racial data was missing for 14.9% of examinees in 1983, but was missing for 59.8% of examinees in 1984---<u>four</u> <u>times</u> the number the year before);

--------------------

[6] Defendants' Memorandum at 5-6.

- 7 -

(b) Motion, ¶ 10 (twice as many missing iden-
tifications in 1985 as in 1984, for the same pro-
cedure);

(c) Motion, ¶ 15 (race data missing for 34.9%
of applicants in 1984, but all were race-identified in
1985 although the procedure was the same);

(d) Motion, ¶ 16 (the proportion of applica-
tions with missing racial data almost doubled from 1983
to 1984, and was then reduced three-quarters in 1985
although the procedure was the same);

(e) Motion, ¶¶ 17-18 (in 1984, two agencies
hiring for the same job category, Financial Institution
Examining, GS-0570; the FDIC reported no racial
information for 62.5% of its 429 applicants, and the
Federal Home Loan Bank Board identified the race of
every one of its 4,334 applicants);

(f) Motion, ¶ 19 (agencies' performance under
the unassembled Schedule B procedure superior to
performance under assembled procedures; and

(g) Motion, ¶ 20 (anomalies in reporting
racial data within Schedule B).

The defendants have not disputed one iota of this evidence, and
have not advanced any explanation for any of these anomalies.

It is thus clear beyond cavil that the defendants'
default cannot be blamed on the presence or absence of a "proc-
tor", or on whether a procedure was assembled or unassembled.

- 8 -

Indeed, most of the instances in which 100%-complete racial
identifications occurred were with unassembled procedures such as
Schedule B, in which applicants were "slogging through" their
application packages "at home when they might rather be playing
with the children or watching television." Cf. defendants'
Memorandum at 6.

From plaintiffs' undisputed evidence, only one con-
clusion can be drawn: some agency officials are trying to comply
with the applicant-reporting provisions of the Decree in some
years, and other agency officials sometimes fail to make the
effort required to comply.

Certainly, plaintiffs are without direct evidence of
such failures to comply.  In the nature of things, few personnel
officials can be expected to beat a path to our door, bearing
sworn admissions of their failures.  It is unrealistic to expect
such evidence, and such evidence is legally unnecessary where the
circumstantial proof makes the defendants' default so clear.  As
the Supreme Court stated in an antitrust case:

> As is usual in cases of alleged unlawful agree-
> ments to restrain commerce, the government is
> without the aid of direct testimony that the
> distributors entered into any agreement with each
> other to impose the restrictions upon subsequent-
> run distributors.  In order to establish agreement
> it is compelled to rely on inferences drawn from
> the course of conduct of the alleged conspirators.

Interstate Circuit v. United States, 306 U.S. 208, 221, 83 L.Ed.
610, 617 (1939).

Plaintiffs' showings are not new to the defendants; the
attachments to the Motion show that plaintiffs have been com-

- 9 -

plaining of the defendants' noncompliance and anomalous results
for years.  The defendants have had a full and fair opportunity
to provide affidavits containing explanations which would rebut
the inference that some officials have on occasion adopted a
carefree attitude to their obligations, but have failed to do so.
They have not produced an iota of evidence explaining any of the
above showings, not even after receiving repeated extensions of
time to respond to plaintiffs' Motion.  "Silence then becomes
evidence of the most convincing character."  Interstate Circuit,
306 U.S. at 226, 83 L.Ed. at 620.

The question whether agency officials have been trying
hard enough to comply with the applicant-reporting provisions of
the Consent Decree is a serious matter.  The adoption of an
unjustified requirement of direct proof of intentional failure to
comply would amount to the Court's blinding itself to the results
tangibly showing that the decretal requirements have not been
met.

We must remember that plaintiffs have not yet requested
a contempt citation, and are not seeking a penalty against any
agency or official.  All plaintiffs are saying is that there has
not been compliance with the applicant-reporting provisions of
the Decree, and that this noncompliance entitles plaintiffs to
relief.  Because it is plain that defense counsel will not advise
the defendants that they are not in compliance and that they must
take whatever steps are required to come into compliance, there
is no alternative to this Court's entry of an Order making their

- 10 -

obligations clear.

   D. The Defendants' Failure to Comply With the
      Applicant-Reporting Provisions of the Decree
      Cannot Be Justified by Any Supposed Lack of
      Legal Authority

   The defendants have raised the rather surprising

argument that "it is questionable whether OPM has the legal

authority to require that such [race and national origin]

information be provided as a condition of applying for a federal

job." Defendants' Memorandum at 2 note 1.

   This is sophistry. The Consent Decree stands as an

Order of this Court, and must be obeyed on pain of contempt. The

applicant-reporting provisions are an integral part of the

remedy, and there can be no question as to their lawfulness.

Again, the fact that such an argument is seriously advanced to

the Court indicates the need for judicial enforcement of these

provisions.

   Moreover, OPM and the EEOC have agreed that the

collection of racial identifications of applicants should be

mandatory. Motion, ¶ 3. The defendants have not disagreed with

plaintiffs on this point.

   The sole question before the Court is what it will take

to obtain compliance with the applicant-reporting provisions of

the Decree. Plaintiffs do not care if reporting is mandatory or

voluntary, as long as there is complete or virtually-complete

compliance. If a mere change in the form will bring about

adequate levels of compliance without making the form mandatory,

plaintiffs will not request that the form be made mandatory. If

- 11 -

it must be made mandatory in order to accomplish the requirements

of the Decree, however, then it must be made mandatory.[7]

      E.  <u>The Defendants' Failure to Comply With the
Decree Cannot be Excused on the Ground that
Plaintiffs Acceded to Their Requests to Attempt
to Conciliate the Matter</u>

     Plaintiffs have set forth the history of their efforts

to inform the defendants of the problems of inadequate racial

identifications of applicants, and their repeated efforts to

persuade the defendants that this violation of the Decree should

be taken seriously.  Motion, ¶ 37.  Plaintiffs communicated with

the defendants on these matters on the following documented

occasions, in addition to countless telephone calls:

        July 1, 1983 (letter from plaintiffs)

        August 9, 1983 (meeting)

        September 16, 1983 (letter from plaintiffs)

        October 10, 1984 (draft Report; meeting)

        December 12, 1984 (draft Report)

        January 31, 1985 (letter from plaintiffs)

        March 14, 1985 (letters from each side)

        March 15, 1985 (meeting)

---

[7] Plaintiffs have never agreed that the defendants' ideolog-
ical opposition to mandatory reporting should take precedence
over the requirements of the Decree.  See the accompanying
Affidavit of Counsel.

    Such an agreement would have been improper because it
would have changed the plain meaning of the Decree and materially
weakened the protections of the class.  Indeed, if the defendants
had had such an unusual reservation about the Decree in mind
during the fairness proceedings, they would have had to notify
the Court of this material change prior to the grant of final approval

- 12 -

March 21, 1985 (letter from defendants)

May 15, 1985 (letter from defendants)

July 29, 1985 (letter from plaintiffs)

August 2, 1985 (letter from plaintiffs)

October 4, 1985 (letter from plaintiffs)

October 24, 1985 (letter from plaintiffs)

February 4, 1986 (letter from plaintiffs)

March 5, 1986 (letter from defendants)

May 14, 1986 (letter from plaintiffs)

November 25, 1986 (letter from plaintiffs)

February 6, 1987 (meeting)

March 30, 1987 (meeting)

May 27, 1987 (letter from plaintiffs)

June 3, 1987 (meeting)

Motion, ¶ 37. The essence of these communications was that
plaintiffs were attempting to reach a fair resolution of the
problems at hand, to persuade the defendants to prevent any
recurrence, and to resort to an unimpeachable source---the Social
Security Administration---to determine whether prejudice had been
and was being suffered.

Throughout these contacts, plaintiffs repeatedly
threatened to go to court to seek a resolution, and the defend-
ants continually begged, pleaded, and cajoled plaintiffs to
remain in informal conciliation.

Nevertheless, the defendants argue that plaintiffs'
Motion should be barred by laches. Defendants' Memorandum at 2-

- 13 -

3 and 3-4.  The defendants measure laches in two respects.
First, the defendants claim laches by the time which elapsed
since the defendants assertedly informed plaintiffs that they
would not agree to make racial identifications a mandatory
prerequisite to application for a job formerly covered by the
PACE.  However, the defendants never informed plaintiffs that
they would place this ideological preference above their decretal
obligations,[8] and plaintiffs repeatedly informed the defendants
that there had to be usable applicant information.[9]  It was only
on the latter point that the parties reached an agreement,
drafted the Decree to set forth the agreement, presented it to
the Court, and obtained approval.

Second, the defendants claim laches because they
provided plaintiffs with a copy of the present applicant report-
ing form in March 1985.  The defendants ignore the fact that they
were at that very time leading plaintiffs on with the promise
that an Inter-Agency Group Meeting had been scheduled for May 29,
1985 to consider the causes of the application-reporting problems
and to devise solutions.  Simultaneously, the defendants were

---

[8] Even such a declaration would have had to have been
combined with proof of the inadequacy of voluntary reporting, in
order to start laches running.  Only such a combination would
have shown an inevitable conflict with the Decree.

[9] Plaintiffs still do not care whether applicant racial
identifications are mandatory, if leaving them voluntary never-
theless produces virtually complete racial identifications.
Plaintiffs are still willing to make a limited experiment with a
new form, to see whether the defendants' ideological preference
to avoid mandatory reporting can be indulged without endangering
the relief provided by the Decree.

assuring plaintiffs that they stood ready to consider any
suggestions plaintiffs could offer.  See Motion, ¶ 37(k) at p.
25, and Attachment R to the Motion.  Again and again thereafter,
plaintiffs wrote to the defendants to make the requested sugges-
tions and to find out what had transpired, and what had been
devised as solutions.  Motion, ¶¶ 37(l), 37(m), 37(n), 37(o), and
37(p).  A year after the defendants claim plaintiffs' laches
began running, the defendants simply stated that "the agencies
themselves are at a loss".  Attachment X to the Motion, at 2.
Discussions about plaintiffs' suggestions, plaintiffs' draft
Stipulation for a "test run" with Social Security Administration
data, and similar matters consumed the next 15 months.  Where are
the laches?

        Plaintiffs are at a loss to understand the defendants'
position.  There can be no question of plaintiffs' having slept
on their rights, and there can be no question of prejudice to the
defendants.

        Again, it must be emphasized that plaintiffs have not
yet exercised the option of seeking a contempt citation, and have
not yet exercised the option of seeking the imposition of a
penalty.  All plaintiffs are now seeking is (a) a change of
reporting forms in the future, which the defendants say they are
willing at least in part to make, (b) the right to seek further
relief if the change in forms is insufficient to obtain com-
pliance, (c) a check of the information provided to date, through
Social Security Administration facilities regularly used by the

- 15 -

Justice Department for precisely this kind of purpose, to see whether plaintiffs have in fact suffered prejudice because of the defendants' default of their obligations and a chance to cure any such prejudice by making such new showings of adverse impact as are warranted; and (d) sufficient reporting provisions to ensure that, this time, the defendants' officials will know that they have specific obligations to meet.

The defendants' claim of laches requires hard evidence of plaintiffs' unreasonableness in delaying their enforcement action, and equally hard evidence of the defendants' material prejudice, in the sense of essential witnesses and documentation having become unavailable through no fault of the defendant. Rozen v. District of Columbia, 702 F.2d 1202 (D.C.Cir., 1983); Bishopp v. District of Columbia, 602 F.Supp. 1401, 1404 (D.D.C., 1985), aff'd in relevant part, rev'd on other issues, 788 F.2d 781, 783 note 1 (D.C.Cir., 1986). Where the defendants have been engaging in conciliation efforts, and have asked plaintiffs not to file enforcement motions, plaintiffs' agreement to make further efforts to reach an informal resolution cannot be considered unreasonable, and cannot have prejudiced defendants.

Moreover, for purposes of raising a laches defense, the relevant time period is the time between the end of conciliation efforts and the filing of an enforcement action. Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 372-73, 53 L.Ed.2d 402, 415 (1977). Here, this was a matter of a mere six weeks.

## F. Changes in the Reporting Form

The defendants agree that a different type of form should be used, and propose only to delete the underscoring in their present form, Attachment F to the Motion. They object to the form OPM itself used successfully in 1978, on the ground that the sole difference between the forms lies in the placement of the information about the voluntary nature of the form, and that placing this statement at the bottom of the form is misleading.

In point of fact, OPM's former successful form also contained a statement not made on OPM's current form: that the form was being used to further the principles of equal employment opportunity and to avoid discrimination on the basis of race, color, and national origin.

Plaintiffs would agree to a modification of the present OPM form if the present underscoring were removed, if such a statement were added to the present form, and if the present form were also modified to make the following underlined statement: "The United States District Court with responsibility for this case requests that you fill out this form."

This set of changes would enable OPM to experiment one last time with a voluntary form, in an effort to see if it will work or if plaintiffs must move that the reporting requirement be made mandatory.

### Conclusion

Plaintiffs' Motion should be granted. The defendants have not disputed most of plaintiffs' factual assertions, and

- 17 -

their proffered justifications are clearly after-the-fact
pretexts for their failure of performance.  They have raised no
adequate objections to the relief requested, and the facts of the
matter amply justify such relief.

                            Respectfully submitted,

                            WILLIAM L. ROBINSON
                            RICHARD T. SEYMOUR
                            Lawyers' Committee for Civil
                                Rights Under Law
                            1400 'Eye' St., N.W., Suite 400
                            Washington, D.C. 20005
                            (202) 371-1212

                            JULIUS LeVONNE CHAMBERS
                            CHARLES STEPHEN RALSTON
                            GAIL J. WRIGHT
                            99 Hudson Street, 16th Floor
                            New York, New York 10013
                            (212) 219-1900

                            BARRY L. GOLDSTEIN
                            ELAINE R. JONES
                            806 - 15th Street, N.W., #940
                            Washington, D.C. 20005
                            (202) 638-3278

                            JOHN H. ERICKSON
                            Erickson, Beasley & Hewitt
                            12 Geary Street
                            Eighth Floor
                            San Francisco, Calif.  94108
                            (415) 781-3040

                            E. RICHARD LARSON
                            THERESA BUSTILLOS
                            Mexican-American Legal Defense
                              & Educational Fund
                            634 South Spring Street
                            11th Floor
                            Los Angeles, California 90014
                            (213) 629-2512

                            KENNETH KIMERLING
                            Puerto Rican Legal Defense and
                            Educational Fund
                            99 Hudson Street, 14th Floor
                            New York, New York 10013
                            (212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444


By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

         Attorneys for Plaintiffs

Dated: October 5-6, 1987


- 19 -

<u>Certificate of Service</u>

I certify that I have this night of October 5-6, 1987, served a copy of plaintiffs' foregoing Reply Memorandum on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

```
Alan Ferber, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
     Room 3501
Washington, D.C. 20530

James S. Green, Esq.
Associate General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
     Room 7450
Washington, D.C. 20415

Clint D. Wolcott, Esq.
National treasury Employees Union
1730 K Street N.W.
     Suite 1101
Washington, D.C. 20006
```

RICHARD T. SEYMOUR
Bar No. 28100
     Attorney for Plaintiffs

*Attachment*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

ANGEL G. LUEVANO, et al., )
)                                    OCT 8 1987
    individually and on behalf of )
    all others similarly situated, )          CLERK, U.S. DISTRICT COURT
)                                    DISTRICT OF COLUMBIA
                    Plaintiffs, )
)
            v. )    C. A. No. 79-0271
)
CONSTANCE HORNER, Director, )
    U.S. Office of Personnel )
    Management, et al., )
)
                    Defendants. )

<u>SUPPLEMENTAL AFFIDAVIT OF COUNSEL</u>

CITY OF WASHINGTON     )
                       ) ss:
DISTRICT OF COLUMBIA   )

        I make the following declaration subject to the

penalties for perjury:

        1. My name is Richard T. Seymour.  I am one of the

attorneys for plaintiffs in this action.

        2. I have prepared the accompanying Reply Memorandum in

support of plaintiffs' Motion to enforce the government's

reporting obligations under the Consent Decree.  Each of the

statements in the Reply Memorandum is true and correct, to the

best of my knowledge, information, and belief.

        3. I have attended all or virtually all negotiating

sessions with the defendants.  I remember these sessions and, in

addition, I have reviewed most of the notes I took of the

negotiating sessions.

        4. At no time during the negotiations leading up to

submission of the Consent Decree to this Court in January and

February 1981 did the plaintiffs ever agree that the defendants would be excused from compliance with the applicant-reporting provisions of the Consent Decree in the event that compliance with these provisions meant that applicants' submission of racial identifications would have to be made mandatory.  Plaintiffs have made no such agreement since that time.

5. Plaintiffs have repeatedly informed the defendants that plaintiffs have no objections to the use of voluntary reporting, as long as the results are virtually complete, and that plaintiffs would seek mandatory reporting in the event that voluntary reporting was inadequate.

6. At no time have plaintiffs ever agreed, or understood, that the defendants would fail to gather racial identifications from applicants in 1982.  The defendants never proposed such an omission to plaintiffs, and never informed plaintiffs during 1982 that they were not gathering racial identifications from applicants.

RICHARD T. SEYMOUR

Dated: October 6, 1987

- 2 -

<u>Certificate of Service</u>

I certify that I have this night of October 5-6, 1987, served a copy of the foregoing Supplemental Affidavit of counsel on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

> Alan Ferber, Esq.
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
>     Room 3501
> Washington, D.C. 20530
>
> James S. Green, Esq.
> Associate General Counsel
> U.S. Office of Personnel Management
> 1900 E Street N.W.
>     Room 7450
> Washington, D.C. 20415
>
> Clint D. Wolcott, Esq.
> National treasury Employees Union
> 1730 K Street N.W.
>     Suite 1101
> Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
    Attorney for Plaintiffs

OCT 8 - 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al</u>.,               )
                                              )
                    Plaintiffs,               )
                                              )
               v.                             )        C. A. No. 79-0271(JHG)
                                              )
CONSTANCE HORNER, Director,                   )
    U.S. Office of Personnel                  )
    Management, <u>et al</u>.,                )
                                              )
                    Defendants.               )

FILED

OCT 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFFS'
MOTION FOR RELIEF ON THEIR SHOWINGS OF
<u>ADVERSE IMPACT IN HIRING FOR 1982, 1983 AND 1984</u>

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. diGENOVA
United States Attorney

RICHARD E. GREENBERG
ALAN L. FERBER

OF COUNSEL:

JAMES S. GREEN
Associate General Counsel
Office of Personnel
    Management

Attorneys, Department of Justice
Civil Division, Room 3501
9th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-4770

# TABLE OF CONTENTS

FILED

OCT 9 1987

CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

Page

Preliminary Statement ............................. 1

Background Statement ............................. 4

    1.   The Luevano Decree ...................... 4

    2.   Overall Hiring Figures ................. 7

    3.   Plaintiff's Adverse Impact
       Challenges ............................. 9

Argument ........................................ 13

    I.   PLAINTIFFS' FIGURES GROSSLY
       EXAGGERATE ANY ADVERSE IMPACT
       AND MUST BE CORRECTED TO
       REFLECT DEFENDANTS' HIRING
       PRACTICES ............................. 13

       A.  1983 And 1984 Adjustments .......... 13

          1.  Internal v. External
             Hiring ........................ 14

          2.  Regionalized Analysis ......... 17

          3.  Combined Hiring At
             GS-5 And GS-7 Levels .......... 20

          4.  Binomial Analysis &
             "Expected" Number Of
             Minority Hires ................ 22

       B.  1982 Adjustments ................... 23

          1.  General Business And
             Industry (1101) .............. 23

          2.  Social Insurance Claims
             Examiner (993) ............... 26

          3.  Contract & Procurement (1102)
             Computer Specialist (0334) .... 27

II.   DEFENDANTS' OVERALL HIRING DEMON-
      STATES GENERAL COMPLIANCE WITH THE
      DECREE'S HIRING REQUIREMENTS
      RENDERING INDIVIDUALIZED RELIEF
      INAPPROPRIATE AND UNNECESSARY ...........    28

III.  ANY AWARD OF INDIVIDUALIZED RELIEF
      MUST BE LIMITED TO ACTUAL VICTIMS
      OF DISCRIMINATION ......................    33

Conclusion .......................................    36

- ii -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,         )
                                  )
                Plaintiffs,       )
                                  )
        v.                        )    C. A. No. 79-0271(JHG)
                                  )
CONSTANCE HORNER, Director,       )
    U.S. Office of Personnel      )
    Management, et al.,           )
                                  )
                Defendants.       )

FILED

OCT 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DEFENDANTS' MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFFS'
MOTION FOR RELIEF ON THEIR SHOWINGS OF
ADVERSE IMPACT IN HIRING FOR 1982, 1983 AND 1984

Preliminary Statement

Without any finding that the defendants engaged in discrimi-
natory hiring, plaintiffs ask this Court to award monetary
damages, individual injunctive relief and unspecified generalized
relief predicated upon plaintiffs' showing of limited adverse
impact in hiring for certain positions covered by the Luevano
Decree.  More specifically, plaintiffs ask that the lost wages
for a shortfall of approximately fourteen hundred blacks and
Hispanics who purportedly should have been hired in 1982, 1983
and 1984 be aggregated and then split among eligible class
members.[1]  For individualized injunctive relief, plaintiffs ask
that eligible class members (who are not defined) be hired solely
on the basis of race and provided "the same seniority, for com-
petitive and other purposes, which the discriminatee would have

_____

[1]    Plaintiffs' Memorandum In Support of Their Motion For
Relief On Their Showings Of Adverse Impact in Hiring For 1982,
1983, and 1984 ("Plaintiffs' Memorandum") at 6-11.

received if he or she had been hired without discrimination."[2]
Finally, plaintiffs also seek generalized relief which is not
identified beyond the request that the defendants be enjoined
from continued use of any hiring procedure that purportedly
produced adverse impact.

Plaintiffs' requests should be denied. Viewed in the
aggregate, defendants' hiring has largely met and satisfied the
broad mandate of the <u>Luevano</u> Decree "to eliminate adverse impact
against blacks and Hispanics as much as feasible". In 1980, the
year before the <u>Luevano</u> Decree was signed and hiring was still
subject to the PACE, 7% of new appointments into covered
occupations were awarded to blacks and 2.5% were awarded to
Hispanics.[3] By 1986, however, these numbers had more than
tripled to 21.8% of new appointments for blacks and more than
doubled to 5.9% for Hispanics. Given this dramatic increase in
overall hiring levels, any shortfall in specific occupations must

---

[2]    Plaintiffs' Memorandum at 6. At no point in their brief
do plaintiffs explicitly request that the Court order hiring by
racial quotas without consideration of relative qualifications.
Such a request, however, is implicit in the request for "indi-
vidualized injunctive relief" beyond monetary damages which is to
include an award of seniority, Plaintiffs' Memorandum at 6, and
is explicitly stated in Plaintiffs' Motion For Relief On Their
Showings of Adverse Impact In Hiring For 1982, 1983, and 1984
("Plaintiffs' Motion") at ¶ 43.

[3]    The basis for these statistics is set forth in the
Second Declaration of Donald L. Holum, attached as Exhibit A, and
discussed further at pp. 7-8, <u>infra</u>.

be regarded as de minimis and therefore not warranting any
relief.[4]

Moreover, plaintiffs' adverse impact figures are grossly
inflated because they fail to reflect actual hiring patterns and
adjustments permitted by the decree.  By ignoring the effects of
regionalized hiring and improperly including internal selections
in their data, plaintiffs artificially exaggerate their adverse
impact statistics.  Similarly, separate analysis of hiring into
GS-5 and GS-7 positions is unwarranted when, in fact, the
defendants largely did not consider applicants separately by
grade.  Properly adjusted for these factors, and as explained in
the First and Second Joint Affidavits of statisticians Stephan
Michelson and Jessica Pollner ("First Michelson Aff." and "Second
Michelson Aff.") attached, respectively, as Exhibits B and C, the
level of adverse impact claimed by the plaintiffs is reduced by
slightly more than two-thirds.

Finally, even if the Court, after reviewing the totality of
the circumstances, determines that some relief should be awarded,
such relief should be limited to generalized relief requiring
more intensive use of the special programs keyed to only those
few, if any, job categories that have shown persistent and
substantial adverse impact.  In light of the defendants'

_____

[4]    When it is considered that selections into Decree
covered jobs are made by over forty agencies in literally
hundreds of installations, offices, commands, regions and
bureaus, by thousands of different selecting officials, without a
scintilla of evidence that any selection was made on a discrimi-
natory basis, then the relief sought is simply inappropriate
under this Decree.

- 3 -

substantial showing in eliminating adverse impact, individualized
relief is inappropriate and unnecessary.  Even if such relief
should be required, consistent with traditional Title VII
principles, such relief is appropriate only if a class member
demonstrates that he was a victim of discrimination and the
defendants are provided the requisite opportunity to challenge
and defeat claims of discrimination predicated upon adverse
impact showings.  Nothing in the <u>Luevano</u> Decree mandates
windfalls for class members and, accordingly, plaintiffs' request
for millions of dollars of back pay and jobs to be awarded solely
on the basis of race should be rejected.

<div align="center"><u>Background Statement</u></div>

**1.    The Luevano Decree**

The instant action was commenced in 1979 to challenge the
Professional and Administrative Career Examination (PACE) on the
ground that it resulted in disparate impact on black and Hispanic
applicants being considered for entry-level federal positions.
The parties stipulated that then-available data indicated that
while 42.1% of the white applicants taking PACE received passing
scores, 12.9% of the Hispanic and 5% of the black applicants
received passing scores on the examination.  As the PACE was the
almost exclusive entry level exam for filling the jobs at issue
from outside the federal workforce, these passing rates resulted
in very low rates of black and Hispanic hires into covered
occupations.  In 1978, for example, only 3.4% of external hires
into PACE positions were black and only 2.3% were Hispanic

<div align="center">- 4 -</div>

(Second Holum Declaration at ¶ 4.)  To remedy these disparities, the parties entered into the Decree that is the subject of the instant motion.

As this Court has previously recognized, the Luevano Decree was designed to accomplish two basic purposes:  (1) to increase minority hiring into professional and administrative career positions through the elimination of the PACE, and (2) to replace the PACE with alternative examining procedures tailored to a particular occupation or group of related occupations.  Luevano Decree at ¶¶ 2(a), 13(a); Luevano v. Campbell, 93 F.R.D. 68, 78 (D.D.C. 1981).  Minority hiring was to be increased through the development of selection procedures specifically correlated to the skills and abilities required for particular positions.  As an adjunct to these efforts, the Decree also provided that "[i]f there is adverse impact, then defendants shall use all practicable efforts to eliminate adverse impact in appointments to the job categories." Luevano Decree at ¶12(b).  "All practicable efforts" was in turn defined to require use of special programs described in paragraphs 14 and 16 of the Decree.[5]

---

[5]    The use of the special programs was not intended to substitute for the general requirement of creating selection devices to replace the PACE.  The Decree specifically provides that it is "not the intent of the parties that the special programs shall replace the interim use of the PACE or the use of the alternative examining procedure other than as may be necessary to effectuate the purpose of the Decree."  Decree at ¶ 14.

Defendants' compliance with the Decree's obligations to develop alternative examining devices is the subject of a pending motion filed by the plaintiffs, and is irrelevant here.  The

(continued...)

- 5 -

Adverse impact was generally to be analyzed by determining whether the difference in the appointment rate for blacks or for Hispanics and the appointment rate for non-Hispanic whites is statistically significant at the .05 level of confidence or under the "80% rule." Decree at ¶ 8(b). For 1982, when the PACE was used on an interim basis, adverse impact is found when the proportion of blacks and Hispanics among hires is less than 80% of the proportion of blacks and Hispanics taking the PACE. For years since use of the PACE was discontinued in 1982, the 80% rule permits a finding of adverse impact whenever the appointment rate for blacks and Hispanics is less than 80% of the appointment rate for non-Hispanic whites. Id.[6]

Statistics for analyzing adverse impact were first compiled in June of 1983 for 1982 and plaintiffs' finalized their challenge to 1982 hiring in late December, 1984. Plaintiffs' Motion at ¶¶ 13-15. Hiring data for 1983 was supplied in early fall, 1984, and plaintiffs' adverse impact challenge was made in

---

[5](...continued)
Court is respectfully referred to Defendants' Memorandum In Opposition To Plaintiffs' Motion For A Determination That the Use of Schedule B Authority For Hiring Does Not Constitute An 'Alternative Examining Procedure' Within The Meaning if the Consent Decree, And Motion For Injunctive Relief" for a description of defendants' actions to satisfy this aspect of the Decree.

[6]   A finding of adverse impact could be defeated by a showing that an alternative examining procedure had been properly validated. This is permitted, however, only after the procedure has been in effect for two years and no earlier than three years after the effective date of the Decree, and the requisite notice has been given to plaintiffs. Decree at ¶ 12. As plaintiffs note, such notice has not been provided to date.

- 6 -

August, 1985.  Id. at ¶ 36.  Finally, hiring data for 1984 was
supplied to the plaintiffs in late summer 1985, and, on April 11,
1986, plaintiffs filed their adverse impact showings for that
year.  Id. at ¶ 41.  These are the challenges at issue here.

### 2.  Overall Hiring Figures

As plaintiffs concede, defendants' efforts under the Luevano
Decree have resulted in a dramatic increase in the selection rate
of blacks and Hispanics for covered positions.  Although avail-
able statistics on the appointment rate for blacks and Hispanics
prior to 1980 are limited, the best available statistics, taken
from career conditional appointments of which the vast majority
would have been drawn from PACE registers, indicate the following
appointment rates for blacks and Hispanics, which can then be
contrasted with minority hiring levels during the Luevano Decree:

| Year | Total<br>#  /  % | Black<br>#  /  % | Hispanic<br>#  /  % |
|------|--------|-------|----------|
| 1976 | 5563/100 | 121/2.2 | 95/1.7 |
| 1978 | 5641/100 | 194/3.4 | 127/2.3 |
| 1980 | 3339/100 | 234/7 | 82/2.5 |
| 1982 | 3636/100 | 430/11.8 | 140/3.9 |
| 1983 | 4020/100 | 799/19.9 | 316/7.9 |
| 1984 | 6490/100 | 1325/20.4 | 473/7.3 |
| 1985 | 7136/100 | 1455/20.4 | 461/6.5 |
| 1986 | 5248/100 | 1144/21.8 | 310/5.9 |

Second Holum Dec. at ¶ 4.  The combined percentage total for
appointing blacks and Hispanics into covered occupations has gone
from 5.7% in 1978 (a major PACE year) to 15.7% in 1982 (the year

- 7 -

use of the PACE was discontinued) to 27.7% for 1986, the most recent full year of available data. _Id_.

Viewed in terms of job occupations subject to the _Luevano_ Decree, plaintiffs' 1982-1984 adverse impact claims challenge hiring in only 14 of the 118 former PACE occupations. Although some of the challenges reach government-wide hiring, individual challenges to the 1982-1984 hiring practices of specific agencies are limited to only 14 federal agencies out of approximately 47 agencies subject to the decree. On a percentage basis, plaintiffs' alleged shortfall of 1400 blacks and Hispanics for 1982-1984, which is exaggerated, amounts to less than 10% of the hiring into PACE categories.

The 10% figure, as discussed _infra_, is grossly inflated, and, as defendants will demonstrate, is actually only 3%. Even so, the limited adverse impact figure fails to reflect any of the minority hiring in substantial categories that _exceeded_ the minority application rate and ultimately produced the impressive level of minority hiring overall for 1982-1984. In a substantial number of the occupations for which no challenges were made, blacks and Hispanics were hired at rates far greater than the rate that would statistically be expected given the level of minority applications. _See_ First Michelson Affidavit at ¶ 32. While "credit" for this "surplus" or "excess" hiring is not explicitly provided under the Decree, the impressive rate of minority hiring for 1982-1984 cannot be overlooked or minimized in the context of the instant enforcment proceeding.

- 8 -

### 3.  **Plaintiff's Adverse Impact Challenges**

Set forth below is a table summarizing plaintiffs' adverse impact challenges by year, job category and agency, drawn from the adverse impact reports relied upon by the plaintiffs as exhibits to Plaintiffs' Motion.  Also set forth are defendants' revision of those figures based upon adjustments explained and justified in the following section of this memorandum.[7]  Where utilization of defendants' methodology produces adverse impact figures for job categories for years not cited by the plaintiffs, those job categories are noted below and included in defendants' figures.

1982

| Series | Job | Agency | Plaintiff Shortfall Black | Plaintiff Shortfall Hispanic | Gov't Revision[8] Black | Gov't Revision[8] Hispanic |
|--------|-----|--------|-------|----------|-------|----------|
| 0334 | Computer Specialist | Gov't-wide | | 20 | | 11 |

---

[7]  In minor instances, defendants have revised the available OPM data where there was an error in either the agency's reporting of the statistics or OPM transcription of the data onto reporting forms. Revisions for reporting errors were made in the data of the Air Force and Navy.  See Declarations of Leif E. Peterson (Exhibit D) and Second Declaration of Mary S. Manes (Exhibit E).

[8]  The defendants' 1982 Hispanic shortfall calculations are explained in the Third Joint Affidavit of Dr. Stephan Michelson and Dr. Jessica Pollner ("Third Michelson Aff.") attached as Exhibit F.  Occupation series 1101 hiring at the Department of Agriculture and Department of Education in 1982 did not utilize the PACE and thus is not reflected in Dr. Michelson's calculations.  See Declarations of Evie White, attached as Exhibit G and Edward C. Cook, attached as Exhibit H.  Hiring for occupation series 0993 at the Department of Health and Human Services in 1982 did not result in an Hispanic shortfall.  See Declaration of James A. Delaney, attached as Exhibit I.

- 9 -

| 0993 | Social Ins. Claims Ex. | HHS | | 26 | | |
|---|---|---|---|---|---|---|
| 1101 | Gen'l Bus. & Industry | Gov't-wide Agriculture | 26 | 10 | | 2 |
| 1102 | Contract & Procurement | Gov't-wide Army | | 20 12 | | 9 0 |
| 1982 | Totals | | 26 | 88 | 0 | 22 |

1983

| Series | Job | Agency | Plaintiff Shortfall | | Gov't Revision | |
|---|---|---|---|---|---|---|
| | | | Black | Hispanic | Black | Hispanic |
| 0334 | Computer Specialist | Gov't-wide | 46 | 17 | 71 | 10 |
| | | Air Force | 13 | | 4 | |
| | | Agriculture | 10 | 5 | 6 | 3 |
| | | Army | 17 | | 11 | 2 |
| | | Interior | 7 | | 1 | |
| | | Navy | 23 | 12 | 18 | 2 |
| | | Treasury | 7 | 11 | 14 | 1 |
| | | HHS | | | 3 | 1 |
| | | DOD | | | 4 | 1 |
| | | | 77 | 28 | 71 (GW)[9] | 10 |

---

[9]   The designation (GW) indicates that the government-wide total shortfall is higher than the agency-by-agency total shortfall and is, therefore, being used by defendants.  As explained infra at pp. 23-24, plaintiffs may elect to measure adverse impact by either summing the shortfalls on an agency-by-agency basis or by computing the shortfall on a government-wide basis for a job category.  Plaintiff may then elect the higher of the two numbers, but cannot combine the agency-by-agency result with the government-wide result which would be tantamount to double-counting.  See Luevano Decree at ¶ 8(b).

Plaintiffs appear to agree with this reading, see Plaintiffs' Motion at 1 n.1, but have double-counted for the total Hispanic shortfall in 1982 by combining the adverse impact result government-wide for series 1102 with the Army result to produce the number 88.  For 1983 and 1984 shortfalls, we have taken the specific numbers from plaintiffs' adverse impact annual reports for each category, and taken the higher of the government-wide and agency shortfalls figures.

For example, for computer specialist (0334) in 1983, plaintiff would presumbablly elect the agency-by-agency black
(continued...)

- 10 -

| 1811 | Criminal Investigating | Gov't-wide | 17 | | $1^{10}$ | |
| | | Justice | 6 | | | 2 |
| | | | 17 (GW) | | 1 (GW) | 2 |
| 1816 | Immigration Inspector | Justice | 6 | 97 | | |
| 1102 | Contract & Procurement | Air Force | 72 | 12 | 41 | |
| | | Navy | 8 | | 3 | 1 |
| 2010 | Inventory Management | Navy | 10 | | 5 | |
| | | Air Force | | | 3 | 1 |
| 1169 | Internal Revenue Officer | | 59 | | 37 | |
| 2001 | Gen'l Supply | Air Force | | | 6 | |
| 2003 | Supply Rm Mgmt | Navy | | | 1 | |
| 570 | Financial Inst. Exam. | FDIC | | | | 1 |
| 110 | Economist | Gov't-wide | | | 2 | |

---

[9] (...continued)
adverse impact figure (77) rather than the government-wide black figure (46). When these numbers are adjusted, however, the government-wide figure (71) is higher than the agency-by-agency figure (61). Because plaintiffs would likely rely on the higher figure, defendants also have taken the higher of the two numbers for purposes of defendants' adverse impact analysis.

[10]  The available OPM data shows a 1983 government-wide shortfall in this category of 27 for black hires. However, defendants have subtracted from this number the 26 Treasury Department shortfall hire number for blacks reflected in the data. During 1982 and earlier years when the PACE was generally in use, the Treasury Department did not use the PACE for hiring into series 1811. See First Declaration of Stephen C. Benowitz, attached as Exhibit J. Thus, the Treasury Department underhires should not be reflected in the government-wide totals. One Hispanic shortfall in this category has also been deleted from the OPM data for this reason. See infra, at 23-26.

- 11 -

| Series | Job | Agency | Plaintiff Shortfall Black | Hispanic | Gov't Revision Black | Hispanic |
|---|---|---|---|---|---|---|
| 1810 | General Investigator | Gov't-wide | ___ | ___ | 1 | ___ |
| 1983 Totals | | | 249 | 137 | 171 | 15 |

## 1984

| Series | Job | Agency | Plaintiff Shortfall Black | Hispanic | Gov't Revision Black | Hispanic |
|---|---|---|---|---|---|---|
| 110 | Economist | Gov't-wide | 28 | 8 | 35 | 1 |
| | | Labor | 18 | 6 | 22 | |
| | | Commerce | 11 | | 7 | 1 |
| | | | 29 | 8 (GW) | 35 (GW) | 1 |
| 0334 | Computer Specialist | Gov't-wide | 109 | 23 | 76 | 3 |
| | | Agriculture | 23 | | 1 | 1 |
| | | Army | 64 | 19 | 12 | 1 |
| | | DOD | 24 | 8 | 7 | |
| | | HHS | 12 | | 9 | |
| | | Interior | 11 | | 1 | |
| | | Navy | 93 | 20 | 19 | 1 |
| | | Air Force | | | 2 | |
| | | VA | 7 | | 3 | 1 |
| | | Treasury | 56 | 18 | 16 | 1 |
| | | | 290 | 65 | 76 (GW) | 5 |
| 1810 | General Investigator | Gov't-wide | 19 | | 13 | |
| | | OPM | 25 | | 11 | |
| | | | 25 | | 13 (GW) | |
| 1811 | Criminal Investigating | Gov't-wide | 24 | 4 | 15 | 4 |
| | | Treasury | 43 | 5 | 16 | 3 |
| | | | 43 | 5 | 16 | 4 (GW) |
| 1816 | Immigration Inspector | Justice | | 229 | 13 | 12 |
| 501 | Gen'l Acct'g & Financial Specialist | Air Force | 9 | | 8 | |
| 1102 | Contract Administrator | Air Force | 97 | 18 | 58 | |
| | | DOD | 24 | 3 | | |
| 2001 | Gen'l Supply Specialist | Air Force | 10 | | 6 | |
| | | Navy | 17 | | 7 | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2010 | Inventory Mgmt. Spec. | Air Force Navy | 9 14 | | 8 | |
| 2003 | Supply Rm Mgmt | Navy | _17_ | ___ | ___ | ___ |
| Total | | | 584 | 328 | 240 | 23 |
| Overall Totals | | | 859 | 553 | 411 | 60 |

## Argument

I.

### PLAINTIFFS' FIGURES GROSSLY EXAGGERATE ANY ADVERSE IMPACT AND MUST BE CORRECTED TO REFLECT DEFENDANTS' HIRING PRACTICES

Reconciliation of the parties' adverse impact figures turns on proper interpretation of the Luevano Decree in light of actual hiring practices employed by the federal agencies. As explained below, plaintiffs' figures must be adjusted accurately to reflect the minimal amounts of adverse impact that occurred during 1982-1984.

### A. 1983 And 1984 Adjustments

Plaintiffs' adverse impact figures for 1983 and 1984 fail to reflect actual hiring patterns and adjustments permitted under the decree. Four specific errors addressed below distort plaintiffs' analysis producing grossly inflated adverse impact findings. When the data is corrected for these errors and recomputed, the adverse impact is reduced from a total of 1298 blacks and Hispanics claimed by the plaintiffs for 1983-84 to only 449, a de minimis level in the context of more than 10,510 hires for those years.

- 13 -

### 1.  Internal v. External Hiring

Relying on paragraphs 8(b)(1) to 8(b)(3) of the decree which provide that adverse impact may be computed generally on the basis of hiring from "all sources," plaintiffs maintain that adverse impact must be calculated by counting both "external" and "internal" hiring.  Plaintiffs' Motion at ¶¶ 24-25 (1982), ¶ 38 (1983 & 1984).  Plaintiffs therefore claim that adverse impact calculations must be based upon both internal appointments (fills from reassignments, transfers, reinstatements and promotions) as well as external apppointments.  Id.  Plaintiffs further assert that, independent of the terms of the decree, defendants are estopped from electing to exclude internal appointments based upon an isolated statement of government counsel made at an early monitoring committee meeting addressing only 1982 hiring.  Id.

Plaintiffs are plainly in error.  First, the language of the decree upon which plaintiffs rely is modified by paragraph 8(b)(7) which specifically allows the defendants to choose between including or excluding internal applicants:

> An agency may choose whether a deter-
> mination of adverse impact shall be made on
> the basis of external applicants and of the
> appointments from all external sources as
> described in ¶¶ 8(b)(1) through 8(b)(3)
> above, or on the basis of both external and
> internal applicants and on the basis of
> appointments from all sources.  The latter
> selection may be made only if the agency
> maintains and reports information showing the
> actual numbers of internal applicants and of
> the selections of such internal applicants.

Agencies therefore have the discretion to determine adverse impact by examining only outside or external hiring or combining

- 14 -

external hiring with internal hiring.  Here, as plaintiffs were
advised in defendants' formal responses to plaintiffs' adverse
impact findings for 1982 and in all of defendants' responses to
the challenges for 1983 and 1984, no agency has elected to
include internal applicants and hires in determining adverse
impact.  Indeed, such an election is now precluded as federal
agencies have not generally maintained the internal application
information for purposes of the Decree required under paragraph
8(b)(7) to include internal hiring in the adverse impact
determinations.

Notwithstanding these provisions, plaintiffs assert that the
discretion to exclude internal hiring data has been waived on the
basis of a tentative statement made by counsel in an August 1983
monitoring committee meeting and the failure of the defendants to
respond to self-serving letters issued by plaintiffs' counsel.[11]

---

[11]    In fact, the defendants did respond to plaintiffs'
tactic of issuing letters purportedly requiring a response in a
set time or _ipse dixit_ deeming a matter resolved favorably to the
plaintiffs.  On this specific issue, plaintiffs were advised as
follows:

> It is my understanding that for 1982, a PACE
> interim year,  use of the "all sources"
> standard set forth in paragraph 8(b)(1) of
> the Decree, would be appropriate for these
> occupations [referring only to limited
> "asterisk occupations"].  However, any
> decision as to any agreement concerning
> future interpretation of or a stipulation
> regarding the Decree in this area should be
> directed to the Department of Justice.  I
> have no objection to further discussions on
> this issue, but your suggestion that the
> matter would be considered closed·if you do
> not hear from me, may be inappropriate."
>                         (continued...)

- 15 -

Plaintiffs' Motion at ¶ 25. The statement was made solely in the context of a conciliation meeting and constituted, at most, a preliminary response that was subject to further review once all the facts were compiled, and, at most, could only have applied to 1982.[12] Nowhere in the decree does it provide that an isolated statement made in this context constitutes a binding admission precluding reconsideration when, as here, defendants' formal response to the 1982 adverse impact challenge indicated that

_____

[11](...continued)

Letter From James Green, Assistant General Counsel, OPM, to plaintiffs' counsel, attachment H to Exhibit Q to Plaintiffs' Motion. As noted above, this notice that the issue had not been resolved was consistent with the other written and oral communications responding to plaintiffs' notices of adverse impact challenges.

[12]    This is essentially a claim of estoppel against the defendants which, at a minimum, requires that, inter alia, (1) the party to be estopped "must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel must have been ignorant of the facts;" (2) "the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury;" and (3) "the government action upon which estoppel is to be based must amount to affirmative misconduct." TRW, Inc. v. FTC, 647 F.2d 942, 950-51 (9th Cir. 1981). None of these requirements is met here for estoppel to apply. See Schweiker v. Hansen, 450 U.S. 785 (1981); International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551-52 (D.C. Cir. 1983).

In addition, the purpose of monitoring committee meetings is to conciliate differences between the parties, and tentative statements made at such meetings are entitled to the protection afforded by Rule 408 of the Federal Rules of Evidence to foster settlements of outstanding disputes. "Rule 408 reflects the judgment that free and frank discussions in negotiations leading toward settlement should be fostered in order to protect the courts against excessive litigation to the death." J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 408[01] at 408-09. See also Branch v. Fidelity & Casualty Co., 783 F.2d 1289 (5th Cir. 1986).

- 16 -

defendants declined to include internal hires in the adverse
impact calculations.  Accordingly, pursuant to paragraph 8(b)(7),
no internal hiring data should be included in calculating adverse
impact.

    2.  Regionalized Analysis

    Plaintiffs' reliance on national as opposed to regional
statistics is improper.  First, national hiring statistics fail
to accurately reflect the actual hiring practices of the
defendants, especially in the post-Pace years 1983-84.  As the
agency declarations attached as Exhibits I, K-P demonstrate,
hiring by the defendants was conducted on a regional basis.  As a
general rule, an applicant was considered for hiring for the
region in which the application was submitted; where employees
also indicated availability for hiring in other regions, the
applicant was subject to additional consideration only where
either the agency or the applicant forwarded a separate
application to another region.  Thus, plaintiffs' analysis of
hiring on the basis of national statistics when hiring decisions
were made on a regional basis presents an inaccurate picture of
the defendants' hiring practices.  See Segar v. Smith, 738 F.2d
1249, 1268 (D.C. Cir. 1984), cert. den. sub nom Meese v. Segar,
471 U.S. 1115 (1985).

    The effect of this error is grossly to distort adverse
impact determinations.  As explained in the First Michelson
Affidavit, the use of national statistics incorrectly assumes (1)
that blacks and Hispanics constituted the same percentages of

- 17 -

applicants for Decree-covered positions at each region throughout the country and (2) that vacancies were evenly distributed among the different regions that were conducting hiring.  Neither of these assumptions is true.  As the examples discussed in the Michelson Declaration vividly demonstrate,[13] the percentages of blacks and Hispanics who applied for Decree-covered positions throughout the country varied dramatically depending upon the job and region, and the number of vacancies that were available similarly varied widely depending upon the regions and job categories.[14]  As Drs. Michelson and Pollner point out, and as demonstrated by their statistical analysis, plaintiffs' failure to utilize regional statistics "artificially and substantially inflate[s] the size of the minority hiring deficit...."  First Michelson Affidavit at ¶ 10.

Plaintiffs nonetheless assert that regionalized analysis is improper under paragraph 8(b)(6) which purportedly allows plaintiffs unbridled discretion in choosing to claim adverse impact on either a nationwide or regional basis.  Plaintiffs'

---

[13]    A graphic example of this distortion is also demonstrated through the Declaration of James A. Delaney (Ex. I) addressing 1982 hires by the Department of Health and Human Services into the GS-993 occupations series.  Although plaintiffs allege an Hispanic deficit of 26, the regionalized nature of the hiring reveals that, in fact, there was no deficit.  Even more dramatic is the difference between plaintiffs' alleged shortfall of over 200 Hispanics for 1984 hires into the Justice/Immigration Inspector position (series 1816) which, when properly adjusted to account for regionalized hiring, shows a shortfall of 12.  See supra, p. 12.

[14]    As a general matter, the composition of applicants by region for the different occupations was consistent for 1983 and 1984.

Motion at ¶¶ 32, 39.  However, the discretion afforded by
paragraph 8(b)(6) is qualified:

> Determinations of adverse impact may be
> made on any and all of the following bases,
> as appropriate, any of which shall be suf-
> ficient for the purposes of the enforcement
> procedures under the decree:

It is hardly "appropriate," or even reasonable, for adverse
impact to be determined on a national basis when hiring was
conducted on a regional basis, and an undifferentiated nationwide
analysis produces grossly inflated adverse impact determinations.
Nor is it appropriate to use national figures simply "because
national officials [and not just regional officials] of an agency
have an obligation to ensure that there is no adverse impact on a
nationwide basis."  Plaintiffs' Motion at ¶ 32.[15]  Where, as
here, there are no national officials making any hiring
decisions, but only regional officials hiring on a regional
basis, plaintiffs' concern over decisions that are not being made
is plainly misplaced.

As the Supreme Court has recognized, "statistics are not
irrefutable, they come in infinite variety and . . . their
usefullness depends on all the surrounding facts and circum-
stances."  International Brotherhood of Teamsters v. United
States, 431 U.S. 324, 340 (1977).  When statistics fail to

_____

[15]    Plaintiffs also cannot rely on the language of para-
graph 8(b)(6)(ii) to limit regionalized analysis to only occu-
pations in which there were 40 or more appointments into a
region.  Paragraph 8(b)(8) provides that "notwithstanding the
provisions of ¶ 8(b)(6)(ii), an agency may elect to have its own
regions, rather than the geographic areas for PACE consideration,
used for purposes set forth in that subparagraph."

accurately model or reflect actual hiring practices and
conditions, the analytical results are to be rejected.  E.g., New
York City Transit Authority v. Beazer, 440 U.S. 568, 584-87
(1979); Pouncy v. Prudential Insurance Co., 688 F.2d 795, 803 5th
Cir. 1982).  Here, the national analysis proferred by the
plaintiffs is distorted because it fails to reflect the pattern
of regional hiring actually conducted by the defendants.
Plaintiffs' adverse impact calculations should accordingly be
rejected.

        3.  Combined Hiring At GS-5 And GS-7 Levels

        Plaintiffs' analysis incorporates analogous errors in their
separate treatment of hiring at the GS-5 and GS-7 levels.[16]
First, the statistical methodology employed by plaintiffs
improperly used the number of applicants to the combined grades
as the basis for separate calculations for hiring deficits into
grades 5 and 7.  As more fully explained in the First Michelson
Affidavit, separate analysis at each grade using a combined grade
or overall applicant rate is statistically improper because it
constitutes an attempt to refine the analysis beyond the

---

        [16]  Plaintiffs analyze hiring deficits at either the GS-5
or the GS-7 levels separately.  Because the data does not dis-
tinguish by race and national origin for applicants at each
level, plaintiffs have taken the overall percentage of minority
applicants at both levels, and then applied the overall per-
centage separately to the number of hires at the GS-5 and GS-7
levels.  As explained in the Michelson Declaration at ¶ 14, "[i]f
they found under-hiring into grade 7 on the basis of race of 5/7
applicants, they listed that deficit even if, on the same basis,
there was over-hiring of minorities into grade 5 positions."

precision of the data.[17]  Given the probability (confirmed by the

evidence in the Second Michelson Affidavit) that minority

applicants not hired into grade 7 may have applied to and been

hired into grade 5 which plaintiffs fail to recognize through

their improper methodolgy, "the best analysis of grade 5 and

grade 7, from data that already come with these two grades

combined, is a combined grade 5/7 analysis."  Second Michelson

Affidavit at ¶ 16.[18]

Second, as the agency declarations filed at Exhibits K, L,

M, O and P make clear, hiring was generally not conducted

separately at the two grade levels.  Rather, almost all Schedule

B positions were advertised as vacancies at the "GS 5/7" level

allowing an applicant to apply at either or both grades.

Separate grade-specific registers for Schedule B positions were

---

[17]   As explained in the First Michaelson Declaration at
¶ 17, given that there are no separate application rates for GS-5
and GS-7 positions:

> [t]he question is how best to model actual
> applications  and hires when the information
> does not allow applying the strictly best
> procedure.  The answer is make the numerator
> (hires) accord with the denominator
> (applicants) at as small an application level
> as possible.  That level is the combined
> grade 5 and 7.

If separate applicant pool data were available for grades 5 and
7, then a fair comparison using separate hiring by grade would be
possible.  Without this data, the permissible way of anylzing the
data requires that the combined GS-5 and GS-7 applicant pool be
compared with the combined GS-5 and GS-7 hires.

[18]   As explained in the Second Michelson Declaration at
¶ 16, even this approach "is biased for the plaintiffs in the
sense of generating 'under-hire' counts at a higher average grade
than that to which minorities in fact apply."

not compiled. Depending upon the qualifications of the applicant
and the desires of the agency, the hiring official exercised
discretion to select either a grade 5 applicant or a grade 7
applicant from a single pool. In short, Schedule B hiring was
not separately conducted at the GS-5 and GS-7 levels.[19] As this
was also largely true for occupations for which OPM examined,
combined analysis of GS-5 and GS-7 hiring more accurately
reflects actual hiring patterns than the methodology employed by
the plaintiffs.

    4. <u>Binomial Analysis & "Expected" Number Of Minority Hires</u>

    Finally, plaintiffs' standard deviation analysis is flawed.
As explained in the First Michelson Affidavit at ¶ 19, a standard
deviation analysis assumes that there are only two possible
outcomes that may occur for a certain number of events, and
measures how likely it is that the actual distribution of
outcomes was a function of chance. <u>See Palmer</u> v. <u>Shultz</u>, 815

────────────────

[19]    Similarly, positions for which OPM examines (Internal
Revenue Officer, Computer Specialist, Economist, General
Investigator and Criminal Investigator) were also advertised as
"Grade 5/7." First Michelson Dec. at ¶ 15. Although separate
registers by grade levels were compiled for these vacancies, an
applicant who was eligible for a GS-7, and was willing to accept
a GS-5 appointment, would appear on registers for both grades.

    Thus, although there is no separate consideration by grade
for Schedule B hiring, there can be separate consideration by
grade for the occupations for which OPM conducted examinations.
For 1983-1984, most hiring was conducted under Schedule B and not
through OPM examinations. First Holum Dec.at ¶ 14. As further
explained in the Second Michelson Affidavit, actual examination
of a sample population indicates that even for OPM examining job
categories, separate consideration of hiring at the GS-5 and GS-7
levels is unwarranted given that 43.6% of the applications
indicated a willingness to accept either a grade 5 or a grade 7.
Second Michelson Aff. at ¶ 13.

F.2d 84 (D.C. Cir. 1987). Such an analysis must be adjusted when, as here, there are more than two possible outcomes: white hire, black hire or Hispanic hire. Id. The consequence of plaintiffs' analysis is to "over-count deficits of one minority by ignoring hires into the other." First Michelson Aff. at ¶ 19. Adjustment of the analysis is accordingly required in order to validly employ a standard deviation analysis to measure deficits. Id. at ¶ 24.

Similarly, a second adjustment is also required to correct an error in plaintiffs' methodology which assumes that there were an unlimited number of vacancies to be filled which was not the case. First Michelson Affidavit at ¶ 25. Plaintiffs' analysis produces hiring deficits that, when added to the number of actual hires, necessarily exceeds the number of vacancies that were available and therefore artificially inflates the deficits beyond what could be expected given the actual number of available vacancies to be filled. To avoid this distortion, defendants have recomputed the deficits by measuring minority hiring rates against the rate of overall hiring as opposed to the white hiring rate. Id. at ¶ 27.

B.  **1982 Adjustments**[20]

1.  General Business And Industry (1101)

Paragraph 8(b) of the Luevano Decree permits adverse impact to be determined, at the election of the plaintiffs, on an

---

[20]  All figures for 1982 reflect the adjustment excluding internal hires from the calculations addressed infra at 14-17.

agency-by-agency analysis, or on a government-wide basis where the same hiring practices were employed for a particular category of jobs. As plaintiffs recognize,[21] the election was designed to provide a choice of methodologies for measuring adverse impact, but was not designed to permit double-counting of hiring deficits. By first measuring deficits on an agency-by-agency basis and claiming adverse impact of 12 Hispanics for the Army, and also claiming adverse impact of 20 calculated on a government-wide basis for this series, plaintiffs are improperly double counting and cumulating shortfalls for this job category where only an election is provided under the decree. Accordingly, the shortfall of 12 claimed for the Army represents double-counting and should not be added to the figure of 20 claimed as the adverse impact for this series measured on a government-wide basis.

The government-wide figures must then be adjusted to account for what the parties have referred to as "asterisk positions," occupations for which an applicant may be hired into either a "PACE" or "Non-Pace" position. Certain job series such as 1101 contain within its boundaries a number of different jobs, only some of which were subject to the PACE and therefore subject to

---

[21]    At footnote 1 of thier motion, plaintiffs state that their adverse impact "totals exclude any double-counting which could arise when a nationwide alternative examining procedure has been challenged, and when individual agencies using that procedure have also been challenged." Nonetheless, for the job category "Contract and Procurement (series 1102), plaintiffs improperly double-count a shortfall of 20 Hispanics calculated on a government-wide basis, as well as a shortfall of 12 Hispanics for Army hiring.

the decree.[22]  As explained in the Declaration of Evie White, attached as Exhibit G, all of the hires into this job category at the Department of Agriculture included in plaintiffs' analysis[23] were hired into positions that were not subject to the PACE.  See Exhibit G.  Similarly, all of the 95 hires at the Department of Eduction should be excluded because the employees were hired into positions which were not formerly subject to the PACE.  See Declaration of Edward C. Cook, attached as Exhibit H.[24]

---

22  As plaintiffs were advised, for 1982, the computer program that was in use at OPM for determinimg appointments could not distinguish between hires into PACE positions and hires into positions not covered by the PACE for this job series.  Once an adverse impact challenge was made, defendants then verified by hand whether an adjustment was necessary for non-Pace jobs.  The adjustments for the Departments of Agriculture and Education are verified and documented in the declarations submitted on behalf of each agency.  See Exhibits G and H.  The "asterisk position" problem does not reoccur in 1983 or 1984 as there was no PACE hiring in those years.

23  Ms. White's analysis of Department of Agriculture records reflects that 296 hires were made into series 1101 positions in 1982, rather than the 262 hires reported in OPM data.

24  Plaintiffs assert that this adjustment is improper because paragraph 9 of the Decree does not explicitly provide as an affirmative defense that adjustments be made to account for hiring that was not subject to the PACE.  Plaintiffs' Motion at 30-32.  However, the issue is not whether this is an affirmative defense; the question is whether, in the first instance, adverse impact claims may be computed on the basis of hiring into positions that were not subject to the PACE, and therefore not subject to the decree.  The language of the Decree, in noting that (1) the action was brought to "challenge the implementation of the PACE (¶ 1), (2) the Decree's purpose is to "eliminate adverse impact against blacks and Hispanics . . . for those categories which are subject to the Pace requirement" (¶ 2), and (3) the class is limited to "[a]ll blacks and Hispanics who have taken the PACE for hire . . . take or may take the PACE and/or
(continued...)

- 25 -

Excluding the hiring at the Department of Agriculture and the Department of Education as well as the internal hiring results in a total of 56 external hires for the series (Army: 34, Navy: 6, Air Force: 16), of which 53 were white, 2 were black and 1 was Hispanic. Based on these numbers, defendants have calculated a shortfall of 2 Hispanics. See Third Michelson Aff. at ¶ 4.

2. Social Insurance Claims Examiner (993)

Plaintiffs' allegation of adverse impact totalling 26 Hispanics for this category must be rejected for two reasons. First, plaintiffs improperly combine both internal and external hiring for a total pool of 816 hires rather than rely on external hiring which totalled only 500 hires.[25] Second, as explained in the Declaration of James A. Delaney, attached as Exhibit I, hiring for this category was not conducted on a nationwide basis but was limited to six regions, and no hiring was conducted in a number of regions, including Dallas, which had a 17% Hispanic applicant rate for PACE jobs. When reviewed on the basis of

_____

[24](...continued)
any alternative examining procedure . . . into entry-level PACE jobs" (¶ 3), makes clear that only hiring into positions formerly subject to the PACE should be considered under the decree. To widen the scope of the Decree as plaintiffs seek would ultimately improperly provide relief to third parties who are not included within the Luevano class.

[25]    Nine of the 500 hires were co-op recruits who were hired at the GS-3 grade level before 1982 and converted to GS-5 upon completion of their college degree program during 1987. See Delaney Dec. at ¶ 4. Accordingly, plaintiffs' claim, Plaintiffs' Motion at ¶ 35, that defendants double-counted the co-op hires is incorrect.

- 26 -

regional applicant and hiring data, and as documented by the chart attached to the Delaney Declaration, there was no adverse impact in this category.[26]

3.  Contract And Procurement (1102)

    Computer Specialist (0334)

Excluding external hires from the calculations reduces the number of hires in Contract and Procurement from 1083 to 309. With a total of 6 Hispanics hired, the shortfall claimed by the plaintiffs is reduced to 9 Hispanics. Similarly, for the Computer Specialist category, external hires totalled only 261, of which 2 were Hispanics, reducing the shortfall figure to 11 Hispanics. See Third Michelson Affidavit.

*    *    *    *

In sum, plaintiffs' adverse impact figures for 1982-1984 are grossly exaggerated. Properly adjusted to reflect actual hiring patterns and adjustments permitted under the decree, the three years of hiring involving more than 14,146 (external) hires

---

[26]   Plaintiffs' general objection to the regionalized analysis of applicant and hiring data has been previoulsy addressed. Plaintiffs additionally object that regionalized analysis is improper because the analysis relies on 1978 regionalized hiring data. Plaintiffs' Motion at ¶ 32. This is disengenuous as plaintiffs' nationwide analysis of 1982 adverse impact relies on the same 1978 data, albeit compiled on a national basis. Nor does the defendants' failure to collect 1982 applicant data bar reliance on the 1978 data. As explained in Defendants' Memorandum In Opposition To Plaintiffs' Motion To Enforce The Applicant Reporting Provisions Of The Decree at 8-9, the Luevano decree specifically contemplated the possibility that 1982 applicant data would not be available and that "the task of determining the presence or absence of adverse impact . . . will be simplified without sacrificing accuracy" by relying on the 1978 data. Id. at Exhibit 2 (Plaintiffs' Proposed Stipulation).

- 27 -

produced adverse impact of only 471. As shown below, this is plainly a de minimis level of adverse impact for which individualized relief is unwarranted.

<div align="center">II.</div>

> DEFENDANTS' OVERALL HIRING DEMONSTRATES
> GENERAL COMPLIANCE WITH THE DECREE'S
> HIRING REQUIREMENTS RENDERING INDIVIDUALIZED
> RELIEF INAPPROPRIATE AND UNNECESSARY

The power of a court to enforce a consent decree, like the power to modify the decree, rests in the sound discretion of the court. White Equipment Co. v. Kupcho, 792 F.2d 526, 529-30 (5th Cir. 1986); Environmental Defense Fund v. Costle, 636 F.2d 1229, 1240 (D.C. Cir. 1980). This stems from the "fact that an injunction often requires continuing supervision by the issuing court" in light of the decree's purposes and terms. Railway Employees v. Wright, 364 U.S. 642, 647 (1961). As one district court has recognized, "in assessing efforts to comply with decrees, [a court] should not apply inflexible, absolute standards, particularly where elaborate and complex performance is called for." Ricci v. Okin, 537 F. Supp. 817, 824 (D. Mass. 1982).

Here, broad relief to enforce the Decree is unwarranted given the extraordinary increases in minority hiring that have occurred as a result of defendants' compliance with the Decree. Analysis of the limited adverse impact challenges should not obscure the overall accomplishments of the defendants in eliminating almost all adverse impact for 1982-1984. As previously demonstrated, minority hiring into PACE occupations

<div align="center">- 28 -</div>

has risen from 5.7% in 1978 to 27.8% in 1983 which is also the
level of minority hiring for 1986.  Taken separately, black
hiring has increased from 3.4% in 1978 to 11.8% in 1982 to 21.8%
in 1986.  Hispanic hiring has similarly increased from 2.3% in
1978 to 3.9% in 1982 to 5.9% in 1986 and has been as high as 7.3%
in 1984.  These dramatic hiring levels plainly show that
defendants have met the purpose of the Decree -the elimination of
barrriers to minority hiring.

Nor do the limited findings of adverse impact for specific
job categories undermine this accomplishment.  On average, the
adverse impact, whether calculated under either plaintiffs'
methodology or adjusted as proposed by the defendants, is limited
and occurs only in isolated categories.  On a percentage basis,
the adverse impact calculated by the defendants amounts to less
than 1% of 1982 hiring, 4.6% of 1983 hiring and only 4% of 1984
hiring.  As explained by Dr's. Michelson and Pollner, quoting
from the decision in McDowell v. Safeway Stores, Inc., 575 F.
Supp. 1007, (E.D. Ark. 1983), aff'd 753 F.2d 716 (8th Cir. 1985),
given the substantial hiring over 1982-1984, and the myriad ways
in which adverse impact may be calculated under the Decree, "[i]t
is statistically unsurprising to find one employment practice
which shows a differential in favor of whites given the large
number of employment practices at issue" in the case.  First
Michelson Declaration at ¶ 32.  Indeed, the limited adverse
impact figures fail to reflect any of the minority hiring in
substantial job  categories that exceeded the minority

produced the impressive level of minority hiring overall for 1982-1984.

To be sure, plaintiffs are correct in asserting that the defendants may not rely on their use of the "special programs" to defeat adverse impact claims. Simply put, the special programs were not sufficiently utilized to provide an independent defense because the defendants believed, reasonably, that the impressive minority hiring that was on-going alone would be sufficient to defeat any and all adverse impact claims. However, there was some limited adverse impact nonetheless.

But this should not mandate the broad individualized relief sought by the plaintiffs. It is well-settled that "the remedy to be crafted to address a violation must be tailored to fit that violation." Hammon v. Barry, 813 F.2d 412, 425 (D.C. Cir. 1987), reh'g denied, No. 85-5668 (D.C. Cir. Aug. 14, 1987). See also General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 399 (1982). This traditonal requirement for relief for constitutional, statutory and common law claims has been codified in Title VII in the well-established principle that the remedy be "narrowly tailored" to the violation in affording relief. Hammon, 813 F.2d at 425; Wygant v. Jackson Board of Education, 106 S.Ct. 1842, 1846 (1986). Here, the overall minority hiring that occurred for 1982-1984 must be considered in determining the propriety of individualized relief. Defendants have largely satisfied the primary purpose of the Decree as set forth in paragraph 2: the elimination of adverse impact against blacks

- 30 -

and against Hispanics.  To the extent that defendants' failure lies in improperly failing to utilize the special programs, relief requiring better utilization of this mechanism where there has been limited showings of adverse impact is all that should be appropriate.

Imposition of individualized relief should also be rejected where, as here, the hiring rates for 1982-1984 exceed the levels at which qualified minorities are represented in the general population.  Census data reveals that college educated blacks and Hispanics constitute the following percentages of the national population:[27]

**Percentage of College-educated population by race**

|      | Black | Hispanic |
|------|-------|----------|
| 1982 | 5.0%  | 2.2%     |
| 1983 | 5.1%  | 2.1%     |
| 1984 | 5.6%  | 2.2%     |

Declaration of Robert Kominski, attached as Exhibit Q.[28] Notwithstanding limited minority representation in the applicant

---

[27]   As the Decree indicates, 90% of the individuals who competed for PACE positions are or would be college graduates within nine months.  Decree at ¶ 10(b).

[28]   The Department of Education has also compiled statistics on minority representation among college graduates receiving degrees in 1982.  Of the 934,800 degrees conferred, 60,673 were awarded to blacks (6.5%) and 21,832 were awarded to Hispanics (2.3%).  See Digest of Education Statistics 1985-1986, Office of Educational, Research & Improvement, U.S. Department of Education (1986), excerpts attached as Exhibit R.  There is thus little difference whether the relevant applicant pool is defined in terms of college graduates in a particular year or college graduates generally.

- 31 -

pool, minority hiring rates into PACE positions have been more than two to three times the representation in the general population. Given that the rate of hiring does not reflect an imbalance when compared to the available applicant pool, but instead, represents substantial hiring beyond what ordinarily could reasonably be expected, there in no predicate for an award of individualized relief.[29]

Finally, plaintiffs' reliance on <u>Connecticut</u> v. <u>Teal</u>, 457 U.S. 440 (1982), and its rejection of the "bottom-line defense" is misplaced. Plaintiffs' Memorandum at 2-3.[30] <u>Teal</u> involved a two-tier promotion system for which the Supreme Court rejected the defense that a test that results in disparate impact can be justified if, in the end, the employer nonetheless promotes

_____

[29] This Circuit has recently held that "remediation of present discrimination (or extant results of its insidious prior operation) is the absolutely indispensable element of the legality of remedies which differentiate human beings on the basis of race," and further, for racial preferences to be afforded, "the remedy crafted to address a violation must be tailored to fit that violation." <u>Hammon</u> v. <u>Barry</u>, 813 F.2d at 425. Although that principle was enunciated in the context of prospective hiring not limited to individuals who had applied for employment, it places in question the validity of the <u>Luevano</u> Decree insofar as it is to be read to impose the requirement of proportional hiring as an enforceable goal where there is no evidence or admission of discrimination. <u>See</u> <u>Hammon</u> v. <u>Barry</u>, 826 F.2d 73, 81-88 (Silberman, J. concurring) (D.C. Cir. 1987). This question is avoided if minimal showings of adverse impact are to be remedied through use of the special programs and not through the rigid enforcement of proportional hiring requirements.

[30] Moreover, paragraph 17(a) of the Decree provides that enforcement proceedings are to be viewed in terms of enforcing the decree "rather than for the purpose of enforcing Title VII generally."

- 32 -

minorites in sufficient numbers to eliamiate the adverse impact.
Here, in contrast, there is no "two-tier structure" with
disparate impact.  Instead, there are small and isolated showings
of adverse impact that are eliminated when the statistics are
aggregated and hiring is viewed in terms of the government's
overall efforts.  Where that is the case, limited and isolated
showings of adverse impact should not provide a basis for broad
relief.  Sengupta v. Morrison-Knudsen Co., 804 F.2d 1072, 1077
(9th Cir. 1986); Robinson v. Polaroid Corp., 732 F.2d 1010, 1016
(1st Cir. 1984).

### III.

#### ANY AWARD OF INDIVIDUALIZED
#### RELIEF MUST BE LIMITED TO
#### ACTUAL VICTIMS OF DISCRIMINATION

Assuming individualized relief is to be awarded, plaintiffs
request that the defendants be ordered to hire blacks and
Hispanics to satisfy any deficits.  Although plaintiffs state
that individualized hiring relief should be afforded to those
qualified applicants for 1982-1984 who were not selected,
plaintiffs appear to also be asserting that preferential minority
hiring should include non-applicants if necessary to fully
satisfy a shortfall.  Because the failure to limit injunctive
relief to applicants would be unconstitutional and violate the
tenets of United States v. Teamsters, 431 U.S. 324 (1977), the
request should be rejected.  As shown below, any individualized
relief must be modeled on the well-accepted and traditional
formula described in Teamsters.

To the extent plaintiffs are requesting that shortfalls be satisfied through the hiring of blacks and Hispanics -- qualified or unqualified -- who were not applicants for PACE positions in 1982-1984, plaintiffs' requested individualized relief constitutes a request for minority quotas beyond the language of the Decree and is proscribed by the constitution. Nothing in the Luevano Decree indicates that the parties agreed or even contemplated imposition of hiring quotas. Further, as this Circuit recently made plain, for racial preferences to be afforded, "[t]here must, in essence, be a direct nexus between the race-preferential action and the remediation of discrimination." Hammon, 813 F.2d at 422. There must be evidence of discrimination; a "court should exercise its discretion with an eye toward Congress' concern that race-concious affirmative measures not be invoked simply to create a racially balanced workforce." Id. (emphasis in original), quoting, Local 28, Sheet Metal Workers v. EEOC, 106 S.Ct. 3019, 3050 (1986). As Judge Silberman underscored, "[p]ursuing racial balance or proportional representation simpliciter is not a permissible goal of racial classifications under the equal protection clause." Hammon v. Barry, 826 F.2d at 85 (Silberman, J., concurring).

Here, the predicate for racial quotas is completely lacking. In entering into the Luevano Decree, the defendants denied engaging in discriminatory hiring. Further, as the prior discussion demonstrates, there is hardly a "manifest imbalance"

- 34 -

in PACE hiring as required, at a minimum, under <u>Johnson</u> v.
<u>Transportation Agency,</u> 107 S.Ct. 1442 (1987), for racial
preferences to be afforded under Title VII.  Nor is this a
situation where the defendants have engaged in a history of
defiance or obdurate behavior with respect to their obligations
under the decree.  <u>See</u> <u>Sheet Metal Workers</u>, 106 S.Ct. at 3025-28.
Indeed, plaintiffs have failed to show that there are not less
drastic measures such as heightened use of the special programs
that could not remedy any outstanding obligations of the
defendants.  <u>United States</u> v. <u>Paradise</u>, 107 S.Ct. 1053, 1067
(1987).

Instead, if individualized relief is to awarded, the
<u>Teamsters</u> model must be employed.[31]  As both this Circuit and the
Supreme Court have recognized, "[i]n the majority of Title VII
cases, the court will not have to impose affirmative action as a
remedy for past discrimination, but need only order the employer
or union to cease engaging in discriminatory practices and award
make-whole relief to the individuals victimized by these
practices."  <u>Hammons</u>, 813 F.2d at 422, <u>Sheet Metal Workers</u>, 106
S.Ct. at 3036.  There is thus a presumption in favor of

---

[31]  For <u>Teamsters</u> hearings, a claimant must identify a
particular opening for which the claimant believes she was denied
due to discrimination, demonstrate that she applied or was dis-
couraged from applying, and show that she possessed the necessary
qualifications for consideration for the position.  <u>See</u>
<u>Teamsters</u>, 431 U.S. at 362; <u>Thompson</u> v. <u>Sawyer</u>, 678 F.2d 257, 286
(D.C. Cir. 1982); <u>Richardson</u> v. <u>Byrd</u>, 709 F.2d 1016, 1021 (5th
Cir. 1983).  It is then the defendants' burden to show by clear
and convincing evidence that the claimant would not have been
hired.  <u>Baxter</u> v. <u>Savannah Sugar Refining Co.</u>, 495 F.2d 437, 445
(5th Cir. 1974).

individual hearings in phase II relief proceedings for Title VII actions.  <u>Teamsters</u>, 431 U.S. at 371-72, 376; <u>Segar</u> v. <u>Smith</u>, 738 F.2d at 1289.  Courts have uniformly recognized that '[w]here possible, an individualized remedy should be utilized because it will best compensate the victims of discrimination without unduly penalizing the employer." <u>Stewart</u> v. <u>General Motors Corp.</u>, 542 F.2d 445, 452 (7th Cir. 1976), <u>cert</u>. <u>denied</u>, 433 U.S. 919 (1977).[32]

### Conclusion

For the forgoing reasons, plaintiffs' motion for relief based upon adverse impact challenges for 1982 through 1984 should be denied.  Should the Court decide that any relief is appropriate, it should be limited to generalized relief requiring greater use of the special programs as defined under the Decree. Finally, if individualized relief is to be awarded, such relief should be limited to only those job categories which arguably show persistent and substantial adverse impact.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. diGENOVA
United States Attorney

-------------------

[32]   The remaining issues plaintiffs raise regarding the monetary awards that could or should issue if <u>Teamsters</u> hearings are to be held are premature at this time.  If such hearings are ordered, and a claimant demonstrates entitlement to relief, there will then at that time be a factual record which will permit proper resolution of the monetary issues plaintiffs have atttempted to pose in Plaintiffs' Memorandum at 8-11.

- 36 -

_Richard E. Greenberg / ay_
RICHARD E. GREENBERG

_Alan C. Ferber_
ALAN L. FERBER

OF COUNSEL:

JAMES S. GREEN
Associate General Counsel
Office of Personnel
   Management

Attorneys, Department of Justice
Civil Division, Room 3501
9th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-4770

- 37 -

## CERTIFICATE OF SERVICE

I certify that, on October 9, 1987, I served a copy of the foregoing Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Relief on Their Showings of Adverse Impact In Hiring For 1982, 1983 and 1984 and proposed order, by first-class mail, postage prepaid, on:

                    Richard T. Seymour
                    Lawyer's Committee For Civil
                      Rights Under Law
                    Suite 400
                    1400 "Eye" Street, N.W.
                    Washington, jD.C.  20005


                            _____
                            ALAN L. FERBER

A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )
                                   )
CONSTANCE HORNER, Director         )   Civil Action
    Office of Personnel            )   No. 79-0271 (JHG)
    Management, et al.,            )
                                   )
        Defendants.                )
                                   )
_____)

FILED

OCT 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SECOND DECLARATION OF DONALD L. HOLUM

        1. I am the Acting Assistant Director for Staffing
Policy and Operations, United States Office of Personnel
Management (OPM), and I am familiar with the issues in the
instant case.

        2. My official duties include a number of policy and
operational functions involving the examining procedures that are
used to consider and qualify persons seeking positions in the
civil service of the United States. As part of my official
duties, I am familiar with the procedures for collecting and
reporting data on the racial and ethnic makeup of those persons
selected and appointed to positions in occupations covered by the
Consent Decree entered into in this case.

        3. I have reviewed the available data on the number and
percentage of black and Hispanic persons appointed into
occupations subject to the Consent Decree in this matter. Using
that data, I have prepared the chart set forth at paragraph 4 of

DEFENDANTS' EXHIBIT A

-2-

this Declaration. The data for the years 1982 through 1986 is derived from the Report A1, "Appointments To Occupations Covered By The PACE Examination, Government-Wide, Nationwide", one of the Reports that have been prepared and submitted to the plaintiffs in this case, each year since the effective date of the Consent Decree. That data is derived from the Central Personnel Data File compiled by OPM. The totals set forth in the chart at paragraph 4 are the totals of "All sources" from Reports A1 minus the "Other" category, which includes internal appointments such as promotions, reassignments and transfers. The totals include appointments from use of PACE, other competitive examinations, Schedule B PAC, delegated competitive examinations, Co-op and direct hires, as applicable and include appointments at the GS-5 and 7 levels, combined.

The figures for 1976, 1978, and 1980 are based on data that was collected prior to the Consent Decree and was collected and compiled under a variation of the process used in 1982 and subsequent years. The totals for those years, when PACE was the predominant selection procedure for the covered occupations, includes only career conditional appointments, and would not include such appointing authorities as the Co-op program. The data does include all appointments from PACE registers and is generally comparable to the 1982 through 1986 data in terms of routine selections into Consent Decree covered occupations at the GS-5 and 7 levels. It is my belief that while the reporting process is not precisely the same for pre-1982 and post-1982, the

data in paragraph 4 represents the best comparison of the number
and percentages of black and Hispanic appointments into Consent
Decree covered positions between 1976 and 1986.

| 4. YEAR | TOTAL*<br>#  (  %  ) | BLACK<br>#  (  %  ) | HISPANIC<br>#  (  %  ) |
|---------|--------------|-------------|------------|
| 1976 | 5563(100) | 121(2.2) | 95(1.7) |
| 1978 | 5641(100) | 194(3.4) | 127(2.3) |
| 1980 | 3339(100) | 234(7) | 82(2.5) |
| 1982 | 3636(100) | 430(11.8) | 140(3.9) |
| 1983 | 4020(100) | 799(19.9) | 316(7.9) |
| 1984 | 6490(100) | 1325(20.4) | 473(7.3) |
| 1985 | 7136(100) | 1455(20.4) | 461(6.5) |
| 1986 | 5248(100) | 1144(21.8) | 310(5.9) |

*Totals are of black, Hispanic and white and do not
include "other" such as Oriental or American Indian.

I hereby declare under penalty of perjury that the
foregoing is true and correct.

_Donald L. Holum_  10/7/87
DONALD L. HOLUM

B

B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                  )
ANGEL G. LUEVANO, et al.,         )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )         Civil Action
                                  )         No. 79-0271 (JHG)
CONSTANCE HORNER, Director        )
                                  )
        Office of Personnel       )
        Management, et al.,       )
                                  )
        Defendants                )
                                  )
```

FIRST JOINT AFFIDAVIT OF
DR. STEPHAN MICHELSON AND DR. JESSICA POLLNER

1.    Stephan Michelson is the President, and Jessica Pollner
is a Senior Statistician, at Longbranch Research Associates, Inc.
(LRA) in Takoma Park, MD.  We both hold PhD degrees (Michelson in
economics, Pollner in statistics), have published professional
papers, and have been employed in academic institutions and in
research institutions.  We both have experience analyzing equal
employment opportunity and other issues in the setting of
litigation, actual or anticipated.  Our resumes are appended as
Attachments 1 and 2.

2.    LRA was retained by the United States Department of
Justice to review plaintiffs' calculations and claims that certain
federal agencies have under-hired Hispanics and blacks in certain
job series, under the terms of the Luevano Consent Decree of
February 1981.

DEFENDANTS' EXHIBIT B

3.   For the institutional basis of our review, our understanding of the relevant application and hiring procedures, we relied on our prior knowledge from work in this field, declarations from Donald Holum (OPM), Stephen Benowitz (Treasury), James H. Walker (INS), Lief Peterson (Air Force), Dorothy Meletzke (Navy), and Roberta Peters (DLA), and discussions with additional OPM staff. For the factual basis of our review, we obtained the data as provided to plaintiffs (OPM Form 619), from which we constructed a computerized data base.

4.   The Consent Decree sets out certain procedures for determining whether minority hiring deficits exist.  However, there is flexibility, both analytically and procedurally, in how these deficits may be calculated.  Within the framework of the Consent Decree, we have determined those calculations that are most appropriate institutionally (best represent actual application and hiring procedures) and technically (best utilize current statistical knowledge).  In this affidavit we explain and correct five errors in plaintiffs' calculation procedures.[1]  These errors concern:

     o   The geographic area to which an applicant applies.

     o   The difference between "applicant" and "application" in the data.

------

[1]   Additionally, LRA's calculations use as a data base only those hires defined as "external," that is, persons not already employed by the appointing agency.

- 2 -

o   The grade to which a person applies.

o   Making statistical comparisons in pairs (black vs. white or minority vs. white) when there are more than two classes in the population.

o   The calculation of the number of minority hires one would expect under "fair" or "race-neutral" hiring.

Briefly, the first two errors come from not aligning the statistical procedure with the institution.  Once it is understood that applications and hires are regional, the statistics used by plaintiffs, even if correctly calculated, would be incorrect in this context.  The third error is similar, except it is a matter of aligning calculations with the institution <u>as limited by the data available</u>.  The last two errors are technical.  Plaintiffs' calculations are simply incorrect.

<u>Regional Analysis</u>

5.   Plaintiffs misunderstand the geographical basis of the data.  We start by explaining the institutional assumptions necessary to justify plaintiffs' calculations.  We then show that these assumptions, and therefore their calculations, are incorrect.  We explain the requisite assumptions for our calculations, and show that they do hold.

6.   Data on applicants to positions covered by the <u>Luevano</u> Consent Decree have been provided to plaintiffs on special forms prepared by the Office of Personnel Management (OPM) for this

- 3 -

purpose. On a single page, OPM Form 619, each agency records the number of applicants by geographic region of application and, to whatever extent possible, by race, for an agency/job series combination. A sample of this data form is appended as Attachment 3. A sample of hire information, as provided to plaintiffs, is appended as Attachment 4.

7. In many of the instances (agency/job series combinations) in which plaintiffs claim hiring deficits, applicants submit an application for an opening in a region, in response to a posted announcement. Within a region, the applicant may specify interest only in certain specific locales.[2] Form 619, however, captures no finer geographic unit than the geographic region of application (one of thirteen). An applicant must apply to each region in which he wants to be considered; his application is region specific. To be considered in two regions, an applicant must file two applications.[3]

---

[2] See the declarations of personnel named in Paragraph 3. Each of these declarations explains the regional application and hiring procedures into the challenged agency/job series categories. In every instance but one at the Air Force (Peterson declaration), applicants are not considered for positions nationally; rather, they are considered only for vacancies existing in those regions where they have applied.

[3] In late 1985, the Internal Revenue Service adopted a different procedure for application to the 1169 job series (Internal Revenue Officer), which went into effect in early 1986. Although an applicant asks to be considered in more than one region, he need only submit one application, but must indicate all regions in which he would like to be considered. Other agencies, not covered under Luevano, have since adopted similar procedures.

- 4 -

8.    Although the data reflect applications within regions, plaintiffs have aggregated them as if application were made on a nationwide basis, that is, to positions anywhere in the country. Plaintiffs calculate "expected" and "actual" hires on a nationwide basis, and calculate a deficit of minority hires that incorrectly assumes the following:

      o    The aggregate count of applications reflects the race (proportion black, proportion Hispanic) of applicants available for every opening (availability is everywhere the same).

      o    All positions were available to all applicants; that is, there was a national "market" for every position, and every applicant was in that national market.

To see the risk in these assumptions, consider the following hypothetical scenario:

      o    There are two regions, A and B.

      o    In a given year, there are 60 hires in region A, 40 in region B.

      o    In region A there are 20 minority applicants, 180 white applicants (200 total); in region B there are 280 minority applicants, 520 white applicants (800 total).

Plaintiffs would add these regional figures together, finding 300 minority applications out of 1000 total applications, and 100 hires. Plaintiffs calculate that minorities are 30 percent of applications, and therefore should be 30 percent of hires. If fewer than 30 minorities were hired (30 percent of the 100 hires),

- 5 -

plaintiffs would conclude that there has been under-hiring of minorities.[4]

9.    Plaintiffs' aggregation produces incorrect figures.  In region A, ten percent of the applicants are minority (20 out of a total of 200).  We would expect, on the average, that ten percent of the hires would be minorities: 10 percent of 60 is 6. Similarly, minorities are 280 of the total 800 applicants in region B, or 35 percent of all applicants.  If they were also 35 percent of 40 hires, then 14 minorities would have been hired. The total number of minorities we would actually expect to be hired, under race-neutral hiring, is 6 + 14 = 20, not thirty.  The reason for this difference between the correct expectation (20) and plaintiffs' expectation (30) is simple: minorities have applied in larger proportions than whites to regions where fewer jobs are available.  We will see that, in some job series, minorities do indeed apply in larger proportions to regions with relatively few openings, and in smaller proportions to regions with relatively many openings.  Minorities are less likely to be hired into such series, under a strict mathematically "fair" system, than plaintiffs will calculate.

---

[4]    Plaintiffs do not actually calculate their deficits this way, but this would be the correct effectuation of their approach, which is aggregating over regions.  Their technical errors are discussed subsequently.

10.  The effect of the plaintiffs' incorrect calculations is illustrated in the examination of one of the challenged job categories, Justice/Immigration Inspector (series 1816).  As calculated by the plaintiffs, the aggregate (national) Hispanic hiring deficit exceeded 200 in 1984.  Regional applications and hires look like the following:

| Region | Hispanic Applicants (percent) | Hispanic Hires (percent) |
|--------|-------------------------------|--------------------------|
| North  | 3.5  | 3.6  |
| South  | 83.3 | 84.6 |
| West   | 37.9 | 38.7 |
| East   | 22.3 | 7.8  |

(Percents are calculated on the basis of total applicants and total hires within each region.[5])

From almost 1800 Hispanic applicants in the Southern region in 1984, 33 Hispanic hires out of 39 total hires was an appropriate number.  This region had the largest number of both Hispanic applicants and hires in 1984, but not many hires of any kind.  The Western region had 74 Hispanic applicants and 12 Hispanic hires, of 31 total hires, again proportional.  The Northern region had 12 Hispanic applicants and a proportional 2 Hispanic hires, of 55 total hires.  Only in the Eastern region, with 64 Hispanic applicants and 6 Hispanic hires, of 77 total hires, was there a Hispanic hiring deficit.  Plaintiffs artificially and

---

[5]    Although data are reported for eleven regions, applications were received and hires were made in only four.  The declaration of James Walker (INS) describes the appropriate regional structure for positions in the 1816 job series.

- 7 -

substantially inflate the size of the minority hiring deficit by considering the Southern applicants available for all positions. Analyzed correctly, the Hispanic hiring deficit in 1984 is 12.

11. That regions differ widely in the percent black or Hispanic among applicants is clear from the data provided to plaintiffs. As an example, we have prepared a summary of applications to the Computer Specialist position (series 334) for the years 1983 through 1985. These figures are derived from the application counts to each of eleven regions for Blacks, Hispanics and Whites for grades 5 and 7 combined. There are eleven regions because OPM in general collapsed the Caribbean region into New York, and the Pacific region into San Francisco. We ask first whether the racial distribution (nationally) of applications differs from year to year.

### Applications by Year
(counts by race)

|      | White | Black | Hispanic | Total | Percent Minority |
|------|-------|-------|----------|-------|------------------|
| 1983 | 7318  | 2018  | 537      | 9873  | 25.9             |
| 1984 | 1697  | 844   | 116      | 2657  | 36.1             |
| Total | 9015 | 2862  | 653      | 12530 | 28.1             |

The race distribution of applicants is not the same in each year. Nonetheless, we first examine the racial distribution of the total applications distinguishing only geographic region:

- 8 -

## Application by Region
(percent by race)

|            | White | Black | Hispanic |
|------------|-------|-------|----------|
| New England    | 93.5 | 5.4  | 1.1  |
| Eastern        | 66.1 | 13.2 | 20.7 |
| Mid-Atlantic   | 70.1 | 28.9 | 1.0  |
| Southeast      | 73.4 | 24.8 | 1.8  |
| Great Lakes    | 70.4 | 28.8 | 0.8  |
| Southwest      | 59.9 | 19.0 | 21.1 |
| Mid-Continent  | 82.1 | 16.3 | 1.6  |
| Rocky Mountain | 88.8 | 6.9  | 4.3  |
| Western        | 75.2 | 18.0 | 6.8  |
| Northwest      | 90.7 | 6.6  | 2.7  |
| Washington DC  | 59.0 | 39.4 | 1.6  |

The racial distribution of applications differs from region to region, $p < .001$.[6]  There are relatively more whites among applications to New England, relatively more blacks among applications to Washington D.C., and relatively more Hispanics among applications to the Southwest (Dallas) and Eastern (New York) regions.  Finally, we asked if these patterns are consistent over time.  Despite the overall trend toward more minority applicants, the racial distribution among applicants differs from region to region ($p < .001$) in the same pattern that we have just described, in each of these years separately.

_____

[6]   This probability is calculated from a chi-square statistic.  A distribution as diverse as this would be highly unlikely if these regions reflected random variation, or non-purposeful categorization from a national labor market.  We conclude that applicants to the different regions are different racially.

- 9 -

## Multiple Applications

12.   In our hypothetical example we counted 300 minority and 700 white applications.   However, we do not know if these are different people (that is, applicants).   In each region we expect all applicants to be treated independently.   Unless we know that an  applicant  has  been  hired  elsewhere  or  withdrawn  his application,  a  race-neutral  hiring  standard  implies  that  each application must count equally.   Thus, when we calculate expected hires region by region, the application is the proper unit of account.   If we were to analyze hiring from a national pool of applicants, we would want to add up applicants, not applications, because an applicant can be hired only once.   Adding up the regional applications could lead us astray.   If minorities and whites apply to multiple regions in different proportions, we will not have a correct view of the race composition of applicants from aggregating applications.

13.   We do not know how many applicants are double counted because of  multi-region  application  in  the  data  analyzed  by plaintiffs.   There is no reason a priori to assume that double counting of applicants is unequal by race.   In addition, we have reason to believe that multi-region application is a very rare event, done by less than one percent of the applicants.[7]   Thus it

---

7.     See our Second Joint Affidavit in this matter.

- 10 -

is likely that plaintiffs' additional error of adding up applications as if they were applicants is harmless. But it is an error. If one were to aggregate nationally, one would want to aggregate applicants, not applications. Our procedures correctly calculate regional deficits (and then add them), and so do not run into the problem of determining how one would first add applicants and then calculate a hiring deficit.[8]

### Grade of Application and Hire

14. Our third subject is grade at application. The data do not distinguish among applicants to grade 5 positions and applicants to grade 7 positions. Plaintiffs have used the number of applicants to these combined grades as the basis for separate calculations for hiring deficits into grades 5 and 7. If they found under-hiring into grade 7 on the basis of the race of 5/7 applicants, they listed that deficit even if, on the same basis, there was over-hiring of minorities into grade 5 positions. It should be obvious that if we do not know the grade of the applicants, we must combine grade 5 and grade 7 hires in our analysis. There are also institutional reasons why plaintiffs are wrong: application to both grade 5 and grade 7 is allowed on a single application form. Thus persons hired as grade 5 may have been "applicants" to grade 7 and, similarly, persons hired into

---

[8] Multiple applications within region, which also occur rarely, should be reduced to one applicant, as within a region that applicant can only be selected once. However, neither we nor plaintiffs can correct this flaw in the data, which appears to be minimal anyway. See our Second Joint Affidavit in this matter.

- 11 -

grade 7 may have been "applicants" to grade 5. To some extent, the applications are joint, and therefore so must be the analysis.

15. Positions are posted as "Grade 5/7" for job categories for which OPM does the examining.[9] An applicant for a position posted as a grade 5/7 may ask to be considered for either a grade 5 assignment or a grade 7 assignment. Registers are grade-specific.[10] An applicant eligible for Grade 7, who is willing to accept a Grade 5 appointment, will appear on registers of both grades. He/she is truly a two grade applicant, despite the fact that a register carries a single grade. Although separate registers exist for grade 5 and 7 applicants, OPM Form 619 captures only the number of applicants (by race and region) to the position, designated generally as a grade 5/7 vacancy. Thus, for analysis purposes, only one register, a composite 5/7 register, is perceived to exist.

16. Almost all Schedule B positions are advertised as vacancies at the "GS 5/7" level. An applicant may apply at either grade or both grades. Management, in making its hiring decisions, has the discretion to appoint applicants to vacancies according to its own needs and the qualifications of the applicants. They can select a grade 5 applicant or a grade 7 applicant and do so from one pool of applicants. That is, there are no grade-specific

---

[9]    These job categories are: Internal Revenue Officer, Computer Specialist Trainee, Economist, General Investigator, and Criminal Investigator.

[10]    See Affidavit of Donald L. Holum.

- 12 -

registers for these positions, although each application is grade-specific.

17.   Just as multi-region analysis solves the problem of multi-region application, so separate analyses by grade would solve the problem of the same people appearing on different grade lists, if we knew the percentage minority applying at each grade (as we did at each region).  The problem here is that the data are not available to perform the correct, multi-grade analysis.  But the multi-regional analysis was not strictly correct either, for applicants may specify locational preference within regions and thus appear in some competitions but not others.  The question is how best to model actual applications and hires when the information does not allow applying the strictly best procedure. The answer is, make the numerator (hires) accord with the denominator (applicants) at as small an application level as possible.  That level is the combined grade 5 and 7.

18.   Plaintiffs apply the same applicant data, which is combined applicants for grade 5 and grade 7, to grade 5 and grade 7 hires separately, as if the combined percentage minority were an "availability" estimate for both grades.  If they were willing to balance over-hires of minorities at one grade with under-hires of minorities at the other, this procedure would be acceptable.  As it stands, plaintiffs search for negative numbers and ignore positive numbers.  They double the number of calculations (by looking separately at grades 5 and 7, even though plaintiffs do

- 13 -

not know who applied to each grade). By chance alone they will find negative numbers. These negative numbers do not necessarily reflect minority hiring deficits, because they are based on applications to two grades but are calculated on only one grade. Where there is a grade 7 hiring deficit, as calculated by plaintiffs, the minorities not hired into grade 7 may have applied to and been hired into grade 5. In such a circumstance, plaintiffs will report only the grade 7 deficit.

## Binomial Model

19. Plaintiffs' "standard deviation analysis" is incorrect for two reasons. We discuss one in this section, one in the next. In this section we show that plaintiffs over-count deficits of one minority by ignoring hires into the other. We start with an example in which we have the following figures:

| | White | Black | Hispanic | Total |
|---|---|---|---|---|
| Applicants | 700 | 200 | 100 | 1000 |
| Hires | 75 | 17 | 8 | 100 |
| Expected Hires | 70 | 20 | 10 | 100 |

"Expected" hires are calculated as if each racial group were hired strictly in proportion to application. A "surplus" or "deficit" can be calculated as the difference between expected and actual hires. Using appropriate arithmetic, plaintiffs should find hiring deficits, relative to proportions among applicants, of three blacks (20 expected less 17 actual) and two Hispanics (10 expected less 8 actual). The "deficits" of all minorities, added

- 14 -

together, equals 5, the same as the "surplus" of white hires. Plaintiffs, however, make the following calculation:

> White Hires:  75
>
> White Applicants: 700
>
> White Hiring rate:  10.7% (10.7 percent of white applicants are hired)
>
> White hiring rate times black applicants:
>     10.7 percent of 200 = 21.4
>
> White hiring rate times Hispanic applicants:
>     10.7 percent of 100 = 10.7
>
> Deficits: Black:    4.4
>           Hispanic: 3.7
>           Total:    8.1

20. The two errors in this calculation are:

o   All positions are made available in turn to both blacks and Hispanics, whereas if the "deficit" in minority hires is corrected by compensating blacks, it is double counting to again compensate Hispanics for the same deficit.

o   The hiring rate of whites is not the correct standard against which to compare hiring of minorities.  The correct standard is "fair" hiring, which is the hiring rate of all applicants (or the chance of hire of any applicant, ignoring race).

In this section we discuss the first error, utilizing the total minority deficit as the basis for calculating compensation due to one race, and then again using that minority deficit as the basis for compensating the other race.  In technical language, plaintiffs misapplied the binomial model.

- 15 -

21. The procedure utilized by the Supreme Court in Castaneda v. Partida, 430 U.S. 482 (1977) and Hazelwood School District v. United States, 433 U.S. 299 (1977) has come to be known as "standard deviation analysis." One gets to this standard deviation analysis in two steps. The first is a "binary" or "two-outcome" statistic, called the binomial distribution. This distribution describes the expected proportion of outcomes, and random variation around this proportion, when there are only two possibilities. Heads-tails, majority-minority, male-female, are examples of binary (two outcome) choices. We know that out of 100 flips of a coin we expect 50 heads and 50 tails, but would 49 heads, 51 tails be unusual? Would 65 heads, 35 tails? The binomial distribution describes how unusual each combination would be, depending on our original expectation (in this case, the probability of a head on any toss is p = .50) and the number of tosses.

22. The second step is an approximation to the binomial distribution, called the normal distribution, which is the familiar bell-shaped curve. Over a wide range of probability values, with a large enough sample, the binomial distribution begins to look like, and have properties similar to, the normal distribution. For the coin toss example, if we know how far away the actual number of heads is from the expected number, in units by which the normal distribution is measured (the standard deviation), we can determine the probability of such an event.

- 16 -

Thus, "standard deviation analysis" is the use of the normal approximation to the binomial distribution in a two-outcome situation such as heads-tails, or the selecting of Hispanics (as opposed to everyone else) for grand juries. Plaintiffs' calculations violate the assumptions of a two-outcome experiment: when looking for under-hiring in two disfavored classes (Blacks and Hispanics) relative to the favored class (Whites), adjustments must be made to counts so that any application of the model reflects only one disfavored class and the favored class. Plaintiffs, however, calculated appointment rates and deficits for three classes (Hispanics, Blacks, and Whites), based on the entire applicant and hire populations; they then compared the derived rates for each disfavored class to the those of the favored class (Whites).

23. The correct formulation of the expected number of minority hires can be found in many places. We recommend in this instance an article by Thomas J. Sugrue and William B. Fairley,[11] who list several assumptions underlying the binomial model and its approximation by the normal curve. In particular, Sugrue and Fairley discuss the proposition that "each binomial trial can have only two possible outcomes." They then discuss "how the selection experience of one disfavored group should be treated when the data

---

[11] "A Case of Unexamined Assumptions: The Use and Misuse of the Statistical Analysis of Castaneda/Hazelwood in Discrimination Litigation," 24 Boston College Law Review 4:925, July, 1983.

on another disfavored group are being analyzed." That is exactly
the situation in <u>Luevano</u>, where plaintiffs analyze the hiring of
both Hispanics and Blacks.

24. We have used the principles suggested by Sugrue and
Fairley to determine minority under-hiring for both Blacks and
Hispanics. Sugrue and Fairley suggest two possible adjustments by
which the assumptions of the binomial model are met. In the first
case, one would adjust both applicant and hire counts to reflect
only two classes (either Black and White, or Hispanic and White)
and then compute deficits. In the second case, one would combine
either disfavored class with the favored class and then compute
deficits for the other disfavored class. Although either
adjustment may be utilized in a statistical test, the latter
adjustment is better in the sense that the correct minority
deficits are calculated. Only in the second adjustment does the
sum of the under-hires for each disfavored class equal the surplus
hires for the favored class. In the first adjustment there
remains double-counting of deficits so that the number of minority
under-hires is too large. Therefore, we prefer and will utilize
the second adjustment. As plaintiffs have not made any adjustment
for the requirements of the binomial model, their reporting of
statistics, or which series meet the "two standard deviation"
level, cannot be accepted.

<u>Calculating the Expected Number of Minority Hires</u>

25.  Plaintiffs choose as a basis of their calculation of minority under-hiring a standard that is not race-neutral hiring. From the total number of applications in a year, over all regions, plaintiffs calculate the "expected" number of black and Hispanic hires.  They first calculate the white hiring rate (WHR) as:

$$WHR = \frac{Number\ of\ whites\ Hired}{Number\ of\ white\ applicants}$$

and then they calculate plaintiffs' expected minority hires (PEMH) as:

$$PEMH = (WHR)(Number\ of\ minority\ applicants).$$

Plaintiffs ask that minority applicants should be hired at the same rate as white applicants were hired.  Plaintiffs' error is easily demonstrated.  In the standard example we have been using, 1000 people, 700 whites and 300 minorities, applied to a position. Unlike the standard example, in which there were 100 selections, 75 of them whites, let us assume that there were 700 selections, all whites.  We want to determine the minority hiring deficit. Surely it is 210:  thirty percent of the applicants were minority, so thirty percent of the hires (.30 x 700 = 210) should be minority.  But all the white aplicants were hired.  Plaintiffs would calculate the white hiring rate as 100 percent, and determine the minority hiring deficit as 300 (100 percent of the minorities).  Their deficit calculation procedure is clearly biased toward producing large numbers.

- 19 -

26. "Expected" minority hires should mean the number of minorities that would be hired, on the average, assuming minorities and whites are equally qualified, under race-neutral hiring procedures.  Plaintiffs have chosen the result of non-neutral hiring, surplus hiring of non-minorities, as their standard.  The application of the white hire rate assumes (i) the rate at which whites are hired is appropriate and (ii) minorities should be hired at that rate as well.  In formulating hiring as such, the institutional ceiling on the number of hires will be exceeded; that is, the plaintiffs' calculations result in the requirement that an agency hire more persons than were actually hired in total: a surplus of both non-minorities and minorities.

27. In the correct calculation we define expected minority hires (EMH), under a race-neutral system, from the total applicants and hires.  We start by defining the total hiring rate (THR) as:

$$THR = \frac{Number\ of\ Hires}{Number\ of\ applicants}$$

This hiring rate, applied to each set of applicants, will sum to the actual number of hires.  In particular, we define expected minority hires, EMH, as:

$$EMH = (THR)(Number\ of\ minority\ applicants).$$

"Fair" hiring is hiring minorities at the rate at which applicants in general are hired.  In general, THR, the total hiring rate, is smaller than WHR, the white hiring rate, in those agencies/job

- 20 -

series selected by plaintiffs.  Therefore, EMH is lower than PEMH so that plaintiffs over-count minority deficits.

28.  If there is neither a deficit nor surplus of minority hires, applying plaintiffs' formula does no harm.  But as soon as there appears to be a minority deficit, plaintiffs' formula exaggerates it.  We demonstrate this exaggeration of deficits using numbers instead of percents.  Returning to our standard example (see paragraph 19), let us suppose there are 1000 applicants of whom 700 are white, 300 are minority; and 100 hires of whom 75 are white, 25 are minority.  In table form:

|            | White | Minority | Total |
|------------|-------|----------|-------|
| Applicants | 700   | 300      | 1000  |
| Hires      | 75    | 25       | 100   |

Plaintiffs will calculate the white hiring rate as 75 hires in 700 applicants, and PEMR = (75/700)(300) = 32.  The minority hire deficit is then the expected (32) less actual (25), or seven minority hires.  In fact, with fair hiring one would have expected (100/1000)(300) = 30 minority hires; thus, the deficit is 30 less 25, or five.  Plaintiffs have exaggerated the deficit in minority hires by two.  Implicitly, they have determined that 102 people, not 100, should be hired, which violates actual institutional practice.  Notice that the correct deficit in minority hires is exactly the same as the "surplus" in white hires: 75 whites were hired, 70 should have been.  Plaintiffs' arithmetic does not allow

- 21 -

calculation of a surplus of white hires, because it accepts the white hire rate as its basis. Plaintiffs' arithmetic is wrong; it is biased to exaggerate the under-hiring of minorities.

29. Let us suppose, as in paragraphs 8 and 9, that the aggregate figures misused by plaintiffs were derived from two regions. We can now apply our more formal arithmetic to the regional figures.

From the formulas provided above, we should expect the following numbers of minority hires (EMH):

Region A: EMH(A) = (60/200)(20) = 6

Region B: EMH(B) = (40/800)(280) = 14

Thus although minority applicants are thirty percent of all applicants (300/1000), and therefore plaintiffs should ask that they be 30 percent of the hires, we would expect, under race-neutral hiring, that they would be only 20 percent of hires (20/100). In this example, plaintiffs would over-count the minority hiring deficit by two by miscalculating "expected" minority hires in their aggregate (as demonstrated in paragraph 28), and over-count the minority hiring deficit by an additional ten asking that minorities be hired in regions into which they did not apply. Although we only expect 20 minority hires (6 in region A and 14 in region B), 25 have been hired (see table in paragraph 28), so that there is a surplus of five minority hires. Plaintiffs would turn this surplus into a deficit of seven (32 less 25) through arithmetic and procedural errors.

- 22 -

30. The examples provided here are not artificial. They explain why plaintiffs' minority hiring deficits are larger than would be calculated by a correct standard deviation analysis. Attachment 5 contains our calculations of deficits based on the OPM data forms provided to plaintiffs, and on the procedures we have discussed. Specifically:

o    We use recognized multiple pools procedures to aggregate hiring deficits from regional competition groups.[12]

o    We define a competition pool at the finest level at which we can identify both hires and applicants, which geographically is the region, and by grade combines Grades 5 and 7.

o    We correctly calculate the "expected" minority hires in each year, region and grade.

o    In our statistical tests we compare each minority group against all remaining applicants, to satisfy the binomial criterion that the applicants must comprise two groups.

In Attachment 5 we provide calculations of surplus and deficit black and Hispanic hires for those series/agency combinations in which plaintiffs determined "adverse impact" (defined as number of standard deviations less than -2.0).    As described above, plaintiffs incorrectly calculated the extent (and often the

---

[12]    See, for example, Joseph L. Gastwirth, "Statistical Methods for Analyzing Claims of Employment Discrimination," 38 Industrial & Labor Relations Review 1:75 (1984).  See also Arnold v. Postmaster General, ___ F. Supp. ___, D. D. C. (August 20, 1987) [also 44 FEP Cases 887].

- 23 -

direction) of the difference between actual and "expected" number of hires.  We also provide calculations of the number of standard deviations between actual and "expected" hires.  One can see that there is often no adverse impact where plaintiffs say there is, another consequence of their erroneous shortfall calculations.

31.  Although we have followed the Consent Decree as it stands, we feel professionally obligated to comment on it.  The consent decree accepts procedures we would criticize if we were at a stage in the proceedings where we could do so.  Most importantly, plaintiffs may calculate a statistical test of each job series (within those covered) at both the agency and national level, and may select different levels of analysis for different job series.  They may also count minority under-hiring for particular agency/job series combinations without considering substantial over-hiring of minorities for other agency/job series combinations.

32.  Plaintiffs apply statistical tests to each of their selected examples in a manner fundamentally at odds with the meaning of these tests.  As explained in McDowell v. Safeway, E. D. Ark., 575 F. Supp. 1007 (1983), Af'd. 753 F. 2d 716 (1985), paraphrasing defendant's expert:

- 24 -

> [I]t is statistically unsurprising
> to find one employment practice
> which shows a differential in
> favor of whites given the large
> number of employment practices
> analyzed in this case. [33 FEP
> Cases 1734 at 1747.]

The "two standard deviation" rule is based on the improbability of finding a large hiring deficit in a single statistical test. If 100 coins are tossed on the floor once we expect to see between 40 and 60 heads. If the same 100 coins are tossed on the floor twenty times, we expect by chance alone to find fewer than 40 or more than 60 heads at least once.[13] The rationale for the two standard deviation rule fades if many tests are made, and loses meaning entirely if of many tests made, few are revealed.

---

[13] "The essential point is that a significant nonzero result at a .05 level of probability will occur at random five times in a hundred. Ordinarily, twenty combinations would suffice to get one 'false positive' but significant nonzero correlation as a matter of pure chance. A hundred combinations would ordinarily be sufficient to get one 'false positive' but highly significant (.01 level of probability) nonzero correlation as a matter of pure chance." "Challenging A Test: What Plaintiffs' Counsel Look For In Deciding Whether To Prosecute A Case," unpublished paper by Richard T. Seymour, October 1, 1987.

- 25 -

33.  We hereby affirm under the penalties of perjury that the content of the foregoing affidavit, in the matter of <u>Luevano v. Horner</u>, represents our true opinions and the facts as we understand them.

_____
Stephan Michelson

_____
Jessica Pollner

State of Maryland
County of Montgomery

Subscribed and sworn before me this 8th day of October, 1987.

_____
Notary Public

My commission expires:                My Commission Expires July 1, 1990

– 26 –

**STEPHAN MICHELSON**
Longbranch Research Associates, Inc.
7001 Carroll Ave.
Takoma Park, MD 20912

## EDUCATION

Ph.D.                    Economics, Stanford University, 1968

M.A.                     Economics, Stanford University, 1962

B.A.                     Economics, Oberlin College, 1960 (with honors)

New York University 1958-1959
(Junior year)

Tanglewood, Summer 1956 (Orchestral Conducting)

Colby College (French, Summer 1955)

## EMPLOYMENT

October 1984             Longbranch Research Associates, Inc.
   to                    Takoma Park, MD
Present
                         **President**:  As Chief Executive Officer, responsible for staff and facilities,
                         administration and product.  Director of litigation analyses and research
                         projects.

March 1979               Econometric Research, Inc.
   to                    Washington, DC
Present
                         **President**:  As Chief Executive Officer, responsible for staff and facilities,
                         administration and product.  Director of litigation analyses and research
                         projects.

April 1978               The Urban Institute
   to                    Washington, DC
March 1979
                         **Senior Fellow**:  Resource person for Urban Institute President and staff.
                         Conducted research for a book on social science and the law.

                         During this period, also served as a litigation analyst as "Michelson
                         Associates."

STEPHAN MICHELSON
Page 2

| | |
|---|---|
| July 1974<br>to<br>March 1978 | Center for Community Economic Development<br>Cambridge, MA<br><br>**Senior Economist/Research Director**:  Directed a staff of fifteen, performing research on community based economic development. Responsible for conceptualization and supervision of research.<br><br>During this period, also served as a litigation analyst as "Michelson Associates." |
| September 1972<br>to<br>April 1974 | Center for Law and Education<br>Harvard University<br>Cambridge, MA<br><br>**Research Associate**:  The Center for Law and Education is part of the Legal Services back-up system.  Served as sole professional non-attorney with responsibility for all non-legal litigation support, such statistical and economic analyses for class action cases. |
| January 1974<br>to<br>March 1974 | University of California<br>Irvine, CA<br><br>**Lecturer in Economics**:  Taught two economics courses as a visiting lecturer.  Completed book on Public School Finance. |
| September 1968<br>to<br>June 1972 | Graduate School of Education<br>Harvard University<br>Cambridge, MA<br><br>**Lecturer**:  Joint research and teaching appointment. Taught research methods, radical economics, labor economics and human capital. Served on several Ph.D. orals committees.<br><br>Center for Educational Policy Research Cambridge, MA<br><br>**Research Associate**:  Part of the "Jencks team" that produced the book, Inequality. |
| September 1968<br>to<br>June 1970 | Department of Economics<br>Harvard University<br>Cambridge, MA<br><br>**Research Fellow** |

STEPHAN MICHELSON
Page 3

| September 1966<br>to<br>August 1968 | The Brookings Institution<br>Washington, DC |
|---|---|
| | **Research Associate**:  Member of the Human Resources group.  Wrote unpublished book, consulted with U.S. Department of HEW on the estimated effects of proposed policies. |
| Summer 1966 | Stanford University<br>Stanford, CA |
| | **Visiting Instructor (Economics)** |
| September 1964<br>to<br>June 1966 | Reed College<br>Portland, OR |
| | **Instructor of Economics** |

## BOOKS AND MONOGRAPHS

A Review of the Abt Associates' Evaluation of the Special Impact Program (Project Director and Senior Author), Center for Community Economic Development, July 1977.

Children Out of School in America, A Report by the Children's Defense Fund of the Washington Research Project (multiple authors), October 1974.

States and Schools:  The Political Economy of Public School Finance, W. Norton Grubb and Stephan Michelson, D.C. Heath (Lexington Books), 1974.

Inequality:  A Reassessment of the Effect of Family and Schooling in America, Christopher Jencks et al., Basic Books, 1972, and Harper Torchbook, 1973.

An Impact Study of Day Care (multiple authors), Center for the Study of Public Policy, February 1971.

Educational Vouchers, A Preliminary Report (multiple authors), Center for the Study of Public Policy, March 1970.

## ACADEMIC ARTICLES

"Reverse Regression Analysis of Wage Discrimination," with Gail Blattenberger, 14 Western Sociological Review 1 (1983), pp. 95-110.

"Regulation of Industry Through the Courts," in Problems in the Organization of American Social Policy Research, edited by Clark C. Abt, Abt Books, 1980.

STEPHAN MICHELSON
Page 4

"Statistical Determination in Employment Discrimination Issues," in The Use/Nonuse/Misuse of Applied Social Research in the Courts, edited by Michael J. Saks and Charles H. Baron, Abt Books, 1980.

"History and State of the Art of Applied Social Research Used in the Courts," in The Use/Nonuse/Misuse of Applied Social Research in the Courts, edited by Michael J. Saks and Charles H. Baron, Abt Books, 1980.

"The Working Bureaucrat and the Nonworking Bureaucracy," American Behavioral Scientist, Vol. 22, No. 5, May/June 1979. Reprinted in Carol H. Weiss and Allen H. Barton, editors, Making Bureaucracies Work, Sage Publications, Inc., 1980.

"Community Based Development In Urban Areas," in Central City Economic Development, edited by Benjamin Chinitz, Abt Books, 1979. Reprinted in Robert Friedman and William Schweke, editors, Expanding the Opportunity to Produce: Revitalizing the American Economy Through New Enterprise Development, 1981.

"What is a 'Just' System for Financing Schools: An Evaluation of Alternative Reforms," Law and Contemporary Problems, Vol. 38, No. 3, Winter-Spring 1974; pp. 436-438.

"Public School Finance in a Post-Serrano World," with Norton Grubb, Harvard Civil Rights-Civil Liberties Law Review, Vol. 8, No. 3, May 1973; pp. 550-570.

"Economics in the Courts:  Equal School Resource Allocation," Journal of Human Resources, Vol. 3, No. 3, Summer 1972; pp. 283-306.

"The Political Economy of Public School Finance," in Martin Carnoy, editor, Schooling in a Corporate Society, David McKay, 1972.

"Rational Income Decisions of Negroes and Everybody Else," Industrial and Labor Relations Review, Vol. 23, No. 1, October 1969; pp. 15-28. Revised and reprinted in Martin Carnoy, editor, Schooling in a Corporate Society, David McKay, 1972.

Critique of "Social and Economic Conditions of Negroes in the United States" (U.S. Government), co-author:  Rashi Fein (called "The Brookings Critique"), The Washington Post, January 1968. Reprinted in Joseph, Bach and Seeber, editors, Economic Analysis and Social Policy, Prentice-Hall, 1971.

"The Association of Teacher Resourceness with Children's Characteristics," in Do Teachers Make A Difference?, U.S. Office of Education, Washington, DC, 1970.

"The Economics of Real Income Distribution," Review of Radical Political Economics, Vol. 2, No. 1, Spring 1970.

"On Income Differentials by Race:  An Analysis And A Suggestion," Conference Papers of the Union for Radical Political Economics, December 1968; pp. 85-121.

STEPHAN MICHELSON
Page 5

## NEWSLETTER/NEWSPAPER ARTICLES

"Using Statistical Evidence," The Baltimore Sun May 3, 1987, page B1 (Sunday "Perspective" section).

"When Experts Disagree," The Expert and the Law (The National Forensic Center) Vol. 3, No. 2, April 29, 1983.

"On Profit Maximization by SIP Ventures," CCED Newsletter (Center for Community Economic Development) June-July 1977.

"On Assessing Economic Impact:  The Multiplier," CCED Newsletter (Center for Community Economic Development) October-November 1976.

"Projecting Capital Requirements," CCED Newsletter (Center for Community Economic Development) June-July 1976.

"Who Gets To Do What?" with Roger Rice, Inequality in Education (Newsletter of the Center for Law and Education) No. 16, March 1974.

"Principal Power," Inequality in Education (Newsletter of the Center for Law and Education) No. 16, March 1974.No. 5, June 1970.

"Equal Protection and School Resources," Inequality in Education (Newsletter of the Center for Law and Education) No. 16, March 1974.No. 2, December 1969.

## REVIEWS AND DISCUSSIONS

Comments on "Regression Analyses in Employment Discrimination Cases" by Delores A. Conway and Harry V. Roberts, in Statistics and the Law, edited by Stephen Fienberg, Morris DeGroot, and Jay Kadane, John Wiley & Sons, 1986.

"Reverse Regression and Employment Discrimination," Journal of Business and Economic Statistics, Vol. 2, No. 2, April 1984, pp. 121-122.

Review of John D. Owen, School Inequality and the Welfare State, Johns Hopkins University Press, 1974, in Monthly Labor Review, July 1975.

"The Further Responsibility of Intellectuals," essay review of Christopher Jencks et al., Inequality, in Harvard Educational Review, Vol. 43, No. 1, February 1973; pp. 92-105.

Review of Guthrie, Kleindorfer, Levin and Stout, Schools and Inequality, in Educational Studies, Vol. 3, No. 2, Spring 1972; pp. 41-42.

Comment on Lester Thurow, "On Analyzing the American Income Distribution," American Economic Review, Vol. LX, No. 2, May 1970; pp. 283-285.

STEPHAN MICHELSON
Page 6


## EXPERT TESTIMONY

Hartman v. Wick, CA No. 77-2019 (Richey), D.D.C., January, 1987. (Discrimination in failure to hire females in six job series. Testimony in remedy phase only, studying selection from applicants in 1984-85, for defendants.)

Klein & Wilson v. Wright State University, CA No. C-3-85-626 (Rice), Western Division, S.D. Ohio, October, 1986. (Complaint of age discrimination because older faculty allegedly received lower percentage salary increases than younger. Not a class action. Testimony for defendants.) Jury decision for plaintiffs.

Holden, et al. v. Burlington Northern, Inc., et al., Civil No. 4-81-622 (Rosenbaum), D. Minnesota (4th Division), February-April 1986. (Discrimination against females in hiring, assignment, transfer, promotion, compensation and discipline. Testimony for plaintiffs.) Settlement including cash payments, rightful place transfers and hiring goals, July, 1986.

Palmer v. Shultz, 616 F. Supp. 1540 (Smith), D.D.C., May-June, 1985. (Sex discrimination in assignment, promotion and other employee actions. Testimony for defendants.) Decision for defendant September 1985. Af'd in part, reversed in part, remanded in part, ___ F. 2d. ___, _____, 1987.

Cooper v. Ideal Basic Industries, No. LR-C-83-700, (Eisele), E.D. Arkansas (Western Division) February, 1985. (Sex and age discrimination in termination. Testimony for defendant showing ranking of sales employees by productivity.) Judge (sex) for defendants, jury (age) for plaintiff. JNOV denied.

Holden et al. v. Burlington Northern Railroad, Civil No. 3-81-994 (Magnuson), D. Minnesota (Third Division), November-13-15 and 19, 1984. (Hearing to determine scope of the class. Discrimination against females in hiring, transfer, promotion, compensation, and discharge. Testimony for plaintiffs showing common issues throughout the Burlington Northern system.)

Wagner v. Wisconsin Department of Public Instruction, 79-C-428 (Will), W.D. Wisconsin, December 30, 1983. (Discrimination against females in hiring, advancement and pay increases. Testimony for defendants showing sex-neutral selections from certification lists and reclassification requests, and sex-neutral pay raises.) Bench decision for defendants December 30, 1983.

AFSCME v. State of Washington, 32 FEP Cases 1577, 578 F. Supp. 846 (Tanner), W.D. Washington (Tacoma), August 2 and 8, 1983. (Female dominated jobs have lower pay ranges than male dominated jobs with "comparable worth." For plaintiffs.) Bench decision for plaintiffs September 16, 1983. Additional testimony on damages, November 14, 1983. Written opinion December 14, 1983. Reversed in 9th Circuit. Settled for changes in pay structure.

Shirley Bechtel v. Allstate Insurance Company, C81-105 (Walinsky), N.D. Ohio, June 28-29, 1983. (Discrimination against females in hiring and assignment. Testimony for defendant showing sex-neutral offers for sales agent positions with respect to applicants.) Decision for defendant September 20, 1984.

STEPHAN MICHELSON
Page 7

EEOC v. International Business Machines Corporation, 583 F.Supp. 875, 34 FEP Cases 766 (Ramsey), D.MD., June 16-17, 1983. (Discrimination against black professional and managerial personnel, Maryland facility, in promotion and salary. For plaintiffs only in rebuttal of defendant's statistical presentations.) Decision for defendant March 29, 1984.

Pence v. Shulton and Hart v. Shulton, C.A. 81-2311 and 81-2454 (Sarokin), D.N.J., June 2, 1983. (Discrimination by age in terminations. For defendants.) Jury verdict for defendants.

EEO Complaint of Cicily P. Osteen, Library of Congress Administrative Proceeding, (Oldham, ALJ), December 14, 1982. (Discrimination in promotion against older females. Testimony for defendants using stipulated data, showing no nonrandom selection by age and sex.) Opinion recommending dismissal of action, July 29, 1983.

Robinson et al. v. Polaroid Corp., 567 F.Supp. 192 (Skinner), Af'd 732 F.2d 1010, First Circuit (1984), D.MA, November 12, 15, and 16; December 22, 1982. (Discrimination against blacks in layoffs in 1974 through 1975. Testimony for defendants showing that seniority fully explained apparent race disparity.) Decision for defendant, June 24, 1983; affirmed April, 1984.

Smith v. Lubbers, C.A. 81-1747, (Gasch), D.D.C., May 25, 1982. (Age discrimination in employment. For defendant, National Labor Relations Board, showing that individual plaintiff's rejected applications for transfer to field position were not part of a discernible pattern of rejection of applicants over age 40.) All allegations dismissed.

EEOC v. D. Justin McCarthy et al., (Framingham State College), 578 F.Supp. 45 (Zobel), D.MA, March 16, 1982. (For plaintiffs who alleged equal pay act violations. Findings that females were paid equally on hire, but fell behind thereafter.) Decision for plaintiffs, July 15, 1983, Af'd July, 1985.

Harrison et al. v. Lewis, C.A. 79-1816 (Oberdorfer), D.D.C., February 25 and 26, 1982. Af'd. March 1, 1984. (Discrimination in promotion alleged by plaintiffs. Testimony for defendants that selection of competition winners from eligible applicants showed no male-female differential, nor black-white differentials at high grade levels, when selections from applicants to posted announcements were examined.) Unpublished opinion June 1982, dismissing claims of sex discrimination, but finding for plaintiffs in some claims of race discrimi-nation, based on defendant's presentations. Subsequent order 559 F.Supp. 943.

Cain et al. v. Trans World Airlines, 78 Civ. 2119 (Sand), S.D.N.Y., January 1982. (Fifty-seven individual plaintiffs claiming breach of employment contract. Estimates of damages presented for plaintiffs in damages phase of bifurcated case.) Jury awarded $1.75 million in damages, reduced to $1.2 million. JNOV and other motions: 549 F.Supp. 963 (1982).

Marson v. Jones & Laughlin Steel Corp., 523 F.Supp. 503, (Evans) E.D. Wisconsin, September 1981. (For plaintiffs, age discrimination in terminations. Rebuttal to correct calculation errors made by defense expert witness.) Opinion for defendant does not mention statistics.

Mateza v. Polaroid Corporation, Superior Court of Massachusetts (Middlesex), No. 76-3379 (Murphy), November 1980. (Sex and age discrimination in pay and promotion. For defense, both in rebuttal of plaintiff's expert and presenting classwide promotion study.) All claims dismissed July 30, 1981.

U.S. Department of Labor v. Firestone Tire & Rubber Co., Inc., U.S. Department of Labor Administrative Proceeding, Case No. 80-OFCCP-15 (Sternburg, ALJ), May 1980. (For

STEPHAN MICHELSON
Page 8

defendants, who were charged with failing to declare underutilization in accordance with regulations.) Decision for defense May 29, 1980, overruled by Secretary of Labor. District Court upheld original decision in Firestone v. Marshall, E.D. Texas, 507 F.Supp. 1330, February 11, 1981.

U.S. Department of Labor v. Kerr Glass Manufacturing Corporation, U.S. Department of Labor Administrative Proceeding, Case No. 77-OFCCP-4, October 29, 1979. (Rebuttal witness for plaintiffs, who charged that the glass container industry's job evaluation manual incorporates sex-biased wage differentials.)

U.S. Department of the Treasury v. Harris Trust and Savings Bank, U.S. Department of Labor Administrative Proceeding, Case No. 78-OFCCP-2 (Burrow, ALJ), August and September 1979. (For plaintiffs who charged Harris Trust with salary discrimination on the basis of sex and race. Administrative proceeding.) Administrative Law Judge finding for plaintiff, January 30, 1981. Remand by Secretary of Labor May 17, 1983, 31 FEP Cases 1223. Original finding sustained December 24, 1986.

Caulfield v. Board of Education of the City of New York, E.D. New York (Weinstein), 486 F.Supp. 862 (24 FEP Cases 1418) May 1979. (Local District No. 26, the teachers' union and others sued the Board and the Office of Civil Rights of HEW, to overthrow an affirmative action agreement. For U.S. Attorney in defense.) Decision for defense, allowing agreement to stand, July 1979. Affirmed 632 F.2d 999, September 22, 1980.

Equal Employment Opportunity Commission v. Tufts Institution of Learning, D. Massachusetts, C.A. No. 74-5279 (Murray), January 1977. (For plaintiffs, who alleged that Tufts discriminated against women in faculty salaries.) Judge retired, no decision. Case being settled (1986-87) with some cash payments but no admission of wrong.

Rhode Island Society for Autistic Children, Inc. et al. v. Board of Regents for Education of the State of Rhode Island, D.R.I., No. 5081 (Pettine), August 1975. (For plaintiffs who charged that children were misclassified as retarded based on race.) Settled for corrective action after trial on merits had begun.

Morgan v. Hennigan, 379 F.Supp. 410 (1974) (Garrity), Af'd 509 F.2d 580 1st Circuit (1974), Cert. denied 421 US 963 (1975). (For plaintiffs, who charged that the Boston School Committee segregated schools and discriminated against minorities in the hiring of teachers.) Desegregation and non-discriminatory hiring ordered.

Robinson v. Cahill, 62 NJ 473, 303 A. 2d 273 (1973). (School resources in New Jersey allocated by income of community. For plaintiffs.) Current law found to violate state constitution.

Josephs v. Board of Appeals of Brookline, Superior Court of Norfolk, Norfolk Equity No. 103078 (1971). (Challenge to planned new construction for inadequate transportation facilities. For plaintiffs.) Original decision for defendants, for plaintiffs on appeal.

Cynthia v. O'Kelly, C.A. No. 13714, S.D. Georgia, April 1970. (For plaintiffs, suing local school board for not applying for funds under Title I of the Elementary and Secondary Education Act because, it was claimed, funds would have aided only black children.) Decision for defendant in district court, reversed.

STEPHAN MICHELSON
Page 9

## ANALYSES FILED IN LAWSUITS

"A Study of Hiring At Spring Branch Independent School District" in <u>United States v. Spring Branch Indepen-dent School District, et al.</u>, C. A. H-84-2949, S. D. Texas, April 10, 1987, with Bliss Cartwright and Joy Waltzer. (For plaintiffs, finding disproportionate under-selection of black applicants to teaching and clerical/aide positions, by subject area, at different selection stages.)

Joint affidavit with Timothy Wyant in <u>United States of America v. Victor Gerena et al.</u>, H 85-50, D. Conn., April 8, 1987. (Defendants contend that Puerto Ricans are under-represented on jury panels. For plaintiffs, in rebuttal of defendants' expert, showing errors in his use of Census data and implications of correct data under different legal standards.)

Affidavit in <u>Foster et al. v. Barry</u>, C. A. No. 87-0635, DC D.C., March 10, 1987. (For plaintiffs, fire fighters' union, claiming that the District of Columbia promoted disproportionately many black fire fighters on the basis of race.)

Second affidavit in <u>Morris v. Dresser Industries</u>, CA No. 85-P-1965-S, N. D. Alabama, Southern Division, September 26, 1986. (Plaintiffs' expert submitted new calculations, which were still irrelevant and incorrect.)

Joint affidavit with Rebecca Klemm in <u>Margaret J. Holden, et al., v. Burlington Northern, Inc., et al.</u>, Civil No. 4-81-622, D. MN, Fourth Division, September 15, 1986. (For fairness hearing on settlement, recalculating damages for shorter time period than was analyzed at trial.)

Affidavit in <u>EEOC v. Chicago Miniature Lamp</u>, C. A. No. C2362 (Shadur), N. D. Illinois, subsequent to District Court decision 622 F. Supp. 1281 (N. D. IL, 1985). (Critique of EEOC's principles for remedy, for defendant.) See subsequent decision August 13, 1986, 41 FEP Cases _____.

Joint Affidavit with Bliss Cartwright in <u>EEOC v. Firestone</u>, C. A. No. 85-2675-MA, W. D. TN, May 27, 1986. (For defendant, analyzing the effect of union contract plant closing provisions, as applied in closing Memphis operation, on workers, by age.) Summary judgment granted _____, 1987.

Affidavit in <u>Weir et al. v. Litton Bionetics, Inc.</u>, C.A. No. H-84-2545, D. MD, April 1, 1986. (For defendant supporting motion <u>in limine</u>, explaining errors in plaintiff's statistics, and finding no strong relationship between age and termination.) Motion to preclude plaintiffs from introducing statistical evidence granted, March 16, 1987.

Affidavit in <u>Morris & Birdsong v. Dresser Industries, Inc.</u>, CA No. 85-P-1965-S, ND Al, March 20, 1986. (For defendant, explaining that issues and numbers did not call for statistical analysis, but that, if they did, plaintiff's expert's analysis was unintelligible.)

"Filling Job Vacancies: A Statistical Analysis" in <u>Clark v. Boorstein</u>, CA No. 80-554, D.D.C., February 3, 1986. (Statistical analysis of selection from pools defined by repeated application by one person, for defendant Library of Congress.) Settled.

"A Study of Hiring by the City of Gallup," in <u>U.S. v. City of Gallup</u>, CA No. 83 1395-M, D. NM, June 5, 1985. (Statistical analysis of hires of American Indians, for plaintiffs.) Case settled with back pay distribution, March, 1986.

STEPHAN MICHELSON
Page 10

"Promotion of United States Foreign Service Officers, 1975 through 1983: An Analysis of Sex Differences" (two volumes), with Rebecca Klemm and Diane Steele, in Palmer v. Shultz, April 17, 1985.

Joint Affidavit with Herbert L. Tyson in EEOC v. Southern Pacific Transportation Company et al., MDL 262, Consolidated CA No. 75-H-1227, S. D. TX, January 16, 1985. (For plaintiffs in Fairness Hearing, analyzing hires into bargaining unit positions by race and national origin.)

Joint Affidavit with Bliss C. Cartwright in EEOC v. Southern Pacific Transportation Company et al., MDL 262, Consolidated CA No. 75-H-1227, S. D. TX, January 16, 1985. (For plaintiffs in Fairness Hearing, evaluating damages by race, sex, and national origin, from initial assignment and subsequent transfer.)

Affidavit in the Matter of Plaintiff Attorney Fees for In Re Burlington Northern, Inc. Employment Practices, MDL 374, November 26, 1984. (Critique of defendant's survey of attorney fees, and estimates of monetary value of settlement.)

Joint Affidavit with Rebecca Klemm in Holden et al. v. Burlington Northern, Inc., C.A. No. 3-81-994, D. MN, March 26 and June 19, 1984. (For plaintiffs prior to hearing on class.)

Affidavit in Coffin et al. v. The South Carolina Department of Social Services, C.A. No. 82-803-15, D.SC., February 24, 1984. (Age discrimination in termination, for defendants.) Settled prior to trial.

Affidavit in William Bourgeois et al. v. Data General Corporation, complaints before the Maine Human Rights Commission, February 7, 1984. (Age discrimination in termination, for plaintiffs.)

"Comments on Analysis of Mobility Patterns for Men and Women in the Avionics Division of the Naval Air Rework Facility-Alameda" by John H. Freeman, Moore et al. v. Naval Air Rework Facility, CA No. C-81-0905, N. D. California, January 13, 1984.

"Review of Plaintiff's Supplemental Motion For Certification of Class Action, and Supporting Memorandum of Law," Affidavit for defendant in Robinson v. Lehman, C.A. No. 83-0745, E. D. Pennsylvania, September 30, 1983. (Class certification denied January 6, 1984.)

Affidavit Subsequent to Trial in EEOC v. International Business Machines Corporation, C.A. No. 80-1408, D.MD., July 25, 1983.

"Salary Increases at the Department of Public Instruc-tion, State of Wisconsin," with Ani DiFazio, in Wagner et al. v. Wisconsin DPI, C.A. No. 79-C-428, W. D. Wisconsin, March 4, 1983. (A statistical analysis, of allegations of sex discrimination in promotions.)

"Review of Affidavit of John H. Freeman," Moore et al. v. Naval Air Rework Facility, C.A. No. C-81-0905, N.D. California, November 12, 1982.

"Polaroid Corporation Layoffs 1974 through 1975 By Race," (two volumes), Robinson et al. v. Polaroid Corporation, C.A. Nos. 77-2520-5, 77-3514-5, and 77-1244-5, November 11, 1982.

"An Analysis of the Age of Selections of Transfers from the Headquarters of the National Labor Relations Board to Field Positions," Smith v. Lubbers, D.D.C., C.A. 81-1747, March 17, 1982.

STEPHAN MICHELSON
Page 11

"Employment Practices at the Navy Resale and Services Support Office, 1974 through 1978," with Timothy Wyant, in Verdell v. Kocher, E.D.N.Y., C.A. 76-C-908, March 10, 1982. (Rebuttal and affirmative case in defense.) Plaintiffs withdrew class claims after receiving this report.

"A Statistical Analysis of Competitive Appointments at the Maritime Administration Headquarters," in Harrison et al. v. Lewis, D.D.C., C.A. 79-1816, February 22, 1982. (Extensive analysis of selection from applicants for positions at the U.S. Maritime Administration Headquarters, including parameterized random assignment of race to applicants of unknown race.)

"'Promotions' at the Navy Regional Data Automation Center: A Study of Competitive Promotions and Career-Ladder Advancement March 24, 1972 through May 15, 1981," assisted by Jay Gruber, in Trout v. Hidalgo, D.D.C., C.A. 73-55, October 28, 1981. (This material was a basis for the Supreme Court's vacating lower court decisions.)

"A Study of Promotion Among Salaried, Non-Technical Employees at Polaroid, By Sex, 1977-1979," with Timothy Wyant, in Mateza v. Polaroid Corporation, Superior Court of Massachusetts (Middlesex), Number 76-3379, November 1980.

"Critique of Plaintiffs' Statistical Studies," Mateza v. Polaroid Corporation, Superior Court of Massachusetts (Middlesex), Number 76-3379, November 1980.

Affidavit in Miller v. Staats, D.C.C., C.A. No. 73-996, April 1980. (Summary of regression analysis estimating GS grade levels in two federal agencies. For plaintiffs, who claimed race and sex discrimination.) Settled for $4 million in relief, 1980.

"Teacher Transfers to Achieve Compliance with the September 1977 Memorandum of Agreement Between the School Board of the City of New York and the Office for Civil Rights, U.S.D. H.E.W.: A Simulation," with Gail Blattenberger, in Board of Education v. Harris, E. D. New York, January 28, 1980.

Affidavit in Sun Ship, Inc. v. Edward Hidalgo et al., D.D.C., January 1980. (Analysis of the probability of a low bidder not being the lowest cost producer. For low bid plaintiff, challenging contract awarded to another ship builder.) Decision for defense.

"The Harris Bank: An Analysis of Employee Compen-sation" in U.S. Department of Treasury v. Harris Bank, OFCCP Administrative Proceeding, August 6, 1979.

"The Hiring and Assignment of Teachers in the New York City Public School System," with Gail Blattenberger, in Caulfield v. Board of Education, E.D. New York, May 10, 1979.

Written submission (preliminary data analysis sup-porting motion for class certification) in Bette A. Boughton et al. v. Addison Wesley Publishing Co., D. Massachusetts, C.A. No. 76-3687-T, May 1978. (For plaintiffs, who claimed that defendants discriminated against women in promotion and pay. Certification granted.) Case settled in 1980.

"A Statistical Analysis of Faculty Salaries in the College of Liberal Arts at Tufts Institution of Learning," in EEOC v. Tufts, D. Massachusetts, January 1977.

"An Analysis of the Racial Consequences of Utilizing the National Teacher Examination in the Selection of Teachers for the Boston School System," in Morgan v. Hennigan, D. MA, February 2, 1983.

STEPHAN MICHELSON
Page 12

Director of Research for plaintiff, author of report referred to in opinion as "the Michelson analysis," <u>Hobson v. Hansen</u>, 327 F.Supp. 824 (1971). (Complaint that school resources in the District of Columbia were allocated to favor white and high income children. Analysis showing that "economies of scale" defense was deficient.) Decision for plaintiff, with order to equalize per pupil expenditures.

## ACADEMIC INSTRUCTION (Guest Appearances)

Boston University School of Education
Boston University School of Law
Bucknell University
Georgetown University School of Law
Howard University
Institute for Social and Policy Studies, Yale University
Massachusetts Institute of Technology
Northeastern University
Trinity College (Hartford, CT)
University of California, Irvine
University of Maryland (Adjunct Professor 1984-85)
University of Michigan
University of New Hampshire
University of Pittsburgh
University of Tennessee, Knoxville
Williams College
Woodrow Wilson School, Princeton University

STEPHAN MICHELSON
Page 13

## OTHER PROFESSIONAL ACTIVITIES

Invited participant, conference on Labor Economics, University of Utah, October, 1985

Paper presented at Eastern Economic Association, Annual Meetings, March 23, 1985

Paper presented at Society of Government Economists meeting, December 29, 1983

Invited Speaker, Political Economy Research Association, University of Utah, May 1983

Guest Speaker, Chicago Chapter American Statistical Association, March 1983 Panelist, Massachusetts Bar Association, January 1983.

Discussant, Association for Public Policy Analysis and Management, Panel on Law and Policy Analysis, October 1980

Panelist, Law and Society Association, June 1980

Panelist, "The Statistician as an Expert Witness," Boston Chapter of the American Statistical Association, February 1980

Co-leader, Workshop (On Statistics) for Judges of the Fifth Circuit, Federal Judicial Center, January 1979

Member, Select Panel on Standard for Proof of Discrimination, U.S. Department of Labor (OFCCP), 1978-79

Discussant, American Educational Studies Association Annual Convention, November 1978

Organizer and Chairman of two conferences on Input-Output Analysis, April 1975 and April 1976

Organizer and Chairman of a Conference for Community Development Corporation Planners, St. Louis, October 1976

Instructor, "Radical Economics," evening course at the Cambridge Center for Adult Education: Fall 1973; Summer and Fall 1974; Summer 1975

National Steering Committee, Union for Radical Political Economics, 1968-69

Panelist, Symposium on Educational Productivity, American Education Research Association, April 1974

Chairman of Symposium on Social Mobility, American Education Research Association, April 1971

Discussant, Econometrics Society Annual Meeting, December 1972

Discussant, American Economics Association, Annual Meetings, December 1969 and December 1971

STEPHAN MICHELSON
Page 14

## REFEREE AND REVIEW

American Education Research Journal
Growth and Change
Journal of the American Statistical Association
Journal of Business and Economic Statistics
Journal of Human Resources
Law & Human Behavior
National Science Foundation
Sociology of Education

## PROFESSIONAL ORGANIZATIONS

American Economic Association
American Statistical Association
Institute of Mathematical Statistics
Union for Radical Political Economics

September 1987

# JESSICA POLLNER

## EDUCATION

| | |
|---|---|
| Ph.D. | State University of New York at Buffalo, 1980<br>Statistical Science |
| M.A. | Mathematics<br>Boston University, 1974 |
| B.A. | Mathematics<br>State University of New York at Buffalo, 1973 |

## EMPLOYMENT

April 1987
to
Present

Longbranch Research Associates, Inc.
Takoma Park, MD

### Senior Analyst:

Responsible for overall project management including organization and coordination of activities, management and delegation of tasks, formulation and writing of analysis plans, data analysis and interpretation, and writing of final reports. Responsible also for extensive client interface and the provision of expert testimony in matters involving employment practices and product liability

June 1985
to
March 1987

Insurance Institute for Highway Safety
Washington, DC

### Statistician:

Responsible for the management of research projects, and the statistical analyses of such data, on relevant policy issues related to highway safety, risk analysis and human factors. Extensive interaction and consulting with behavioral psychologists, biomedical and automotive engineers and computer specialists on aspects of statistical methodology related to highway safety.

**JESSICA POLLNER**
**PAGE 2**

| | |
|---|---|
| May 1982<br>to<br>May 1985 | Arete Associates<br>Washington, DC<br><br>**Statistician:**<br><br>Responsible for analysis and modeling of geophysical, oceanographic and accoustical data using techniques of signal processing, probability modeling, likelihood theory and time series analysis. Extensive interaction with physicists, engineers and mathematicians on aspects of design of experiments, sampling theory and statistical methodology. |
| August 1979<br>to<br>April 1982 | Office of Water Regulations and Standards,<br>Environmental Protection Agency<br>Washington, DC<br><br>**Statistician:**<br><br>Responsible for statistical analyses to evaluate effluent guideline regulations for pollutant discharge. Included the formation of statistical methodology required to asess data quality, survey and sample design and probability modeling. Extensive interaction with engineering and economic project officers for short and long-term studies of water pollution control problems. |
| September 1978<br>to<br>July 1979 | U.S. Bureau of the Census<br>Washington, DC<br><br>**Statistician/ASA Trainee:**<br><br>Traineeship with the jointly-sponsored ASA/Census project on "Seasonal Adjustment of Economic Time Series." Worked as a member of a research team and collaborated with Census personnel to develop and evaluate new methodology for time series decompositions and modeling. |
| January 1977<br>to<br>May 1977 | Millard Fillmore College<br>State Univeristy of New York at Buffalo<br>Buffalo, NY<br><br>**Instructor:**<br><br>Instructor for a four-credit course in statistics and computation for undergraduate management majors. |

JESSICA POLLNER
PAGE 3

| | |
|---|---|
| January 1977<br>to<br>May 1977 | Statistical Laboratory<br>State University of New York at Buffalo<br>Buffalo, NY |

**Data Manager:**

Data manager and statistician for clinical trials study, sponsored by G.I.Tumor Group and ECOG, under the direction of Dr. M. Zelen and Dr. P. Lavin.

| | |
|---|---|
| September 1974<br>to<br>May 1978 | Statistical Science Division<br>State University of New York at Buffalo<br>Buffalo, NY |

**Research Assistant:**

Ongoing research in time series analysis and robust autoregressions (supported,in part,by a contract from the Office of Naval Research); teaching assistant for graduate and undergraduate courses in time series, linear models, statistical inference, computation and probability.

## PUBLICATIONS AND TECHNICAL REPORTS

"Modeling and Investigation of Periodic Phenomena Using Techniques of Time Series Analysis," (Dissertation, December 1979)

"Trading Day Variation in Seasonal Adjustment of Economic Time Series," (with W.P. Cleveland, 1979) in The Proceedings of the Census/NBER Conference on Time Series Analysis (June 1980)

"Color Limitations for the Textile Industry," EPA Technical Report (February 1980)

"Analysis Results for the Timber Industry," EPA Technical Report (December 1980)

"Effluent Guidelines Regulations for the Textile Industry," EPA Technical Report and Federal Register (December 1981)

"Comparison of Normal and Poisson Probabilities," Arete Associates Technical Report (December 1983)

"Confidence Interval for a Predicted Y-Value in Regression Analysis," Arete Associates Technical Report (January 1984)

"S-Fold Analysis," Arete Associates Technical Report (Classified) February 1984

"B-Sensor Analysis," Arete Associates Technical Report (Classified) March 1984

"Detector Performance," Arete Associates Technical Report (Classified) May 1984

"Markov Theory Applied to Tactical Strategies," (with C. Forsythe) Arete Associates Technical Report (Classified) January 1985

JESSICA POLLNER
PAGE 4

"Preliminary Estimates of the Effects of Mandatory Seat Belt Use Laws," by Lund, A., Pollner, J., and Williams, A.  In press, Accident Analysis and Prevention, May 1986

"Motor Vehicle Occupant Fatalities in Four States with Seat Belt Use Laws," by Lund. A., Zador, P., and Pollner, J.  In press, Society for Automotive Engineering, December 1986

"Radar Detectors and Speeds in Maryland and Virginia," by Ciccone, M., Goodson, M., and Pollner, J.  Journal of Police Science and Administration (submitted 6/22/87).

## PROFESSIONAL AFFILIATIONS

Member, American Statistical Association

Member, Biometrics Society

September 1987

ATTACHMENT 3

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2<br>PAC 84-1 & 84-55 | 2. Reporting Period<br>From 1/1/84   To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s)<br>FTS:<br>Commercial: |
|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation<br><br>Department of the Air Force | | 6. Name of Submitting Office<br><br>Directorate of Civilian Personnel | |

| 7. Address of Submitting Office | 8. Occupational Title/Series<br><br>Contract Price Analyst     GS- 1 1 0 2 | 9. Grade Level(s)<br><br>5/7 |
|---|---|---|

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SF | DN | AL | DA | PC | SL | WAO | |
| Black, not of Hispanic origin | | | 1 | 3 | | | | 1 | | | | | | | 5 |
| Hispanic origin | | | | | | | | 1 | 1 | 2 | | | 1 | | 5 |
| White, not of Hispanic origin | 10 | | 37 | 12 | 19 | 2 | 8 | 20 | 13 | 10 | | | 21 | | 152 |
| Other qualified applicants | | | | | | | 2 | 3 | 1 | | | | 2 | | 8 |
| 10. Zone Totals | 10 | | 38 | 15 | 19 | 2 | 10 | 25 | 15 | 12 | | | 24 | | 170 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E form 619 (1-84)

ATTACHMENT 4

REPORT A3 APPOINTMENTS TO OCCUPATIONS COVERED BY THE PACE EXAMINATION
PERIOD : JANUARY THRU DECEMBER OF 1983
AGENCY : DEPARTMENT OF THE AIR FORCE
GEOGRAPHIC AREA : NATIONWIDE



STATUS : ALL WORK SCHEDULES AND TENURES
PAYPLANS : GS AND EQUIVALENT

| OCCUPATION SERIES | GS EQUIV GRADE | RACE/ NATL ORIGIN | TOTAL ALL SOURCES | CS CERT PACE | NON-PACE CS CERT | OUTSTANDING SCHOLAR | DIRECT HIRE | DELEGATED EXAMINING | CO-OP | BI-CULT. BI-LING. | VRA | SCHEDULE B | OTHER * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1102 | GS-05 | WHITE(N-HISP) | 279 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 198 | 79 |
| | | BLACK(N-HISP) | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 | 13 |
| | | HISPANIC | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 7 |
| | | TOTAL | 359 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 257 | 99 |
| | GS-07 | WHITE(N-HISP) | 164 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 56 | 104 |
| | | BLACK(N-HISP) | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 7 |
| | | HISPANIC | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| | | TOTAL | 188 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 69 | 115 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 443 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 254 | 183 |
| | | BLACK(N-HISP) | 87 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 | 20 |
| | | HISPANIC | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 11 |
| | | TOTAL | 547 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 326 | 214 |
| 1103 | GS-05 | WHITE(N-HISP) | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | TOTAL | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 9 |
| | GS-07 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | | TOTAL | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 |
| 1150 | GS-05 | WHITE(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | GS-07 | WHITE(N-HISP) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | | BLACK(N-HISP) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| TOTAL GS-05+07 | | WHITE(N-HISP) | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | BLACK(N-HISP) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | HISPANIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | TOTAL | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |

* THIS CATEGORY INCLUDES REASSIGNMENTS, TRANSFERS, REINSTATEMENTS, OR PROMOTIONS OCCURRING ONLY WHEN AN INDIVIDUAL CAME FROM A NON PACE OCCUPATION

ATTACHMENT 5

Shortfalls in Hiring

We have calculated the surplus (+) and deficit (-) hires of Blacks and Hispanics using the region of application and hire, and the correct expected numbers of hires for those series/agency combinations for which plaintiffs determined hiring deficits. The numbers of standard deviations from expected hires associated with each surplus or deficit is provided in parentheses.

Schedule B Series:

| Series | Department | Year | Black | | Hispanic | |
|--------|------------|------|-------|--|----------|--|
| 501 | Air Force | 1983 | – | | – | |
|  |  | 1984 | -7.7 | (-2.7) | -0.4 | (-.6) |
| 1102 | Navy | 1983 | -2.6 | (-2.4) | -0.9 | (-.9) |
|  |  | 1984* | – | | – | |
|  | Air Force | 1983 | -40.6 | (-9.9) | 1.4 | (4.2) |
|  |  | 1984 | -57.8 | (-9.9) | 1.6 | (7.4) |
| 1169 | Treasury | 1983 | -37.1 | (-11.7) | 20.5 | (7.4) |
|  |  | 1984 | 11.6 | (8.6) | 0.7 | (6.3) |
| 2001 | Navy | 1983 | -0.4 | (-1.7) | – | |
|  |  | 1984 | -7.0 | (-3.2) | -1.0 | (1.0) |
|  | Air Force | 1983 | -6.2 | (-2.0) | 0.6 | (0.6) |
|  |  | 1984 | -5.6 | (-3.1) | 0.8 | (0.5) |
| 2003 | Navy | 1983 | 0.5 | (1.9) | 0.1 | (1.3) |
|  |  | 1984 | -6.2 | (-3.1) | 0.4 | (1.2) |
| 2010 | Navy | 1983 | -5.4 | (-3.8) | 0.3 | (1.6) |
|  |  | 1984 | -2.8 | (-4.1) | 0.8 | (1.5) |
|  | Air Force | 1983 | -3.4 | (-1.7) | -1.0 | (-1.3) |
|  |  | 1984 | -8.3 | (-4.1) | 1.6 | (4.6) |
| Schedule B Deficit: |  | 1983 | -92.6 | | 21.5 | |
|  |  | 1984 | -76.4 | | 16.0 | |

---

* There were 25 Black hires and 6 Hispanic hires in 1984 although there were neither Black nor Hispanic applicants. These are neither considered a deficit nor a surplus.

- V-1 -

Delegated Series :

| Series | Department | Year | Black | Hispanic |
|--------|-----------|------|-------|----------|
| 570 | FDIC | 1983 | 4.0 (1.4) | -0.7 (-1.3) |
|  |  | 1984* | − | − |
| 1810 | OPM | 1983 | − | − |
|  |  | 1984 | -10.5 (-4.2) | 1.4 (2.1) |
| 1816 | Justice | 1983 | 5.0 (2.7) | 5.1 (3.0) |
|  |  | 1984 | -13.2 (-5.4) | -11.9 (-5.4) |
| | Delegated Deficit: | 1983 | 9.0 | 4.4 |
|  |  | 1984 | -23.7 | -10.5 |

OPM Examination Series :

| Series | Department | Year | Black | Hispanic |
|--------|-----------|------|-------|----------|
| 110 | All | 1983 | -2.1 (-2.7) | -0.2 (-.4) |
|  |  | 1984 | -34.8 (-5.1) | -0.6 (-1.9) |
| 110 | Labor | 1983 | -0.3 (-2.2) | -0.2 (-.4) |
|  |  | 1984 | -21.8 (-4.0) | -0.4 (-1.5) |
| 110 | Commerce | 1983 | -0.4 (-.6) | − |
|  |  | 1984 | -7.0 (-2.3) | -0.6 (-.8) |
| 334 | All | 1983 | -70.9 (-8.8) | -10.3 (-3.5) |
|  |  | 1984 | -75.7 (-8.8) | -3.1 (-2.7) |
| 334 | Agriculture | 1983 | -5.7 (-2.1) | -3.2 (-1.6) |
|  |  | 1984 | -0.8 (-.8) | -0.5 (-.6) |
| 334 | Treasury | 1983 | -13.6 (-3.7) | -1.4 (-1.1) |
|  |  | 1984 | -15.7 (-4.1) | -0.6 (-.7) |
| 334 | Navy | 1983 | -18.3 (-4.6) | -2.4 (-1.5) |
|  |  | 1984 | -19.0 (-4.3) | -0.5 (-1.2) |
| 334 | Interior | 1983 | -0.9 (-.8) | -0.2 (-.4) |
|  |  | 1984 | -1.4 (-1.0) | -0.4 (-.6) |

* There were 3 Black and 2 Hispanic hires in 1984 although there were neither Black nor Hispanic applicants. These are neither considered a surplus nor a deficit.

- V-2 -

| | | | | | |
|---|---|---|---|---|---|
| 334 | HHS | 1983 | -3.0 (-2.7) | -0.6 (-.7) |
| | | 1984 | -8.9 (-2.7) | -0.3 (-.6) |
| 334 | Army | 1983 | -11.4 (-3.3) | -1.8 (-1.2) |
| | | 1984 | -12.3 (-3.4) | -0.5 (-1.4) |
| 334 | Air Force | 1983 | -4.4 (-2.2) | -0.2 (-1.3) |
| | | 1984 | -2.2 (-1.3) | -0.3 (-1.0) |
| 334 | Defense | 1983 | -4.4 (-2.3) | -1.1 (-1.0) |
| | | 1984 | -7.0 (-3.1) | -0.3 (-.6) |
| 334 | VA | 1983 | -1.4 (-1.8) | -0.2 (-.5) |
| | | 1984 | -2.7 (-2.2) | -0.5 (-.7) |
| 1810 | All | 1983 | -1.2 (-1.0) | -0.4 (-.7) |
| | | 1984 | -12.8 (-4.5) | -0.2 (-2.3) |
| 1811 | All | 1983 | -27.3 (-4.8) | 0.4 (2.6) |
| | | 1984 | -15.1 (-4.1) | -3.7 (-1.9) |
| 1811 | Justice | 1983 | -0.4 (-1.0) | 1.8 (0.5) |
| | | 1984 | - | - |
| 1811 | Treasury | 1983 | -25.6 (-4.7) | -1.3 (-2.6) |
| | | 1984 | -15.7 (-3.9) | -3.3 (-1.8) |
| [1]Deficit (based on "ALL") | | 1983 | -101.5 | -10.5 |
| | | 1984 | -138.4 | -7.6 |
| [2]Deficit (from agencies) | | 1983 | -89.8 | -10.8 |
| | | 1984 | -114.5 | -8.2 |

---

[1]     Deficit based on "ALL" refers to total deficit for OPM Examination series, when agency-specific deficits are not computed.  Deficit is based on rows labelled : 334-All, 110-All, 1810-All, and 1811-All.

[2]     Deficit from agencies refers to total deficit for OPM Examination series, when agency-specific deficits are computed. Deficit is based on all rows for job series #334, 110, 1810 and 1811 in which a particular agency (e.g., Army, Treasury, etc.) is mentioned.

- V-3 -

C

C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    Civil Action
    )    No. 79-0271 (JHG)
CONSTANCE HORNER, Director    )
    )
    Office of Personnel    )
    Management, et al.,    )
    )
    Defendants    )
    )

SECOND JOINT AFFIDAVIT OF
DR. STEPHAN MICHELSON AND DR. JESSICA POLLNER

1.    Stephan Michelson is the President, and Jessica Pollner is a Senior Statistician, at Longbranch Research Associates, Inc. (LRA) in Takoma Park, MD.  We both hold PhD degrees (Michelson in economics, Pollner in statistics), have published professional papers, and have been employed in academic institutions and in research institutions.   We both have experience analyzing equal employment opportunity and other issues in the setting of litigation, actual or anticipated.   Our resumes were appended as Attachments 1 and 2 to our First Joint Affidavit in this matter.

2.    LRA was retained by the United States Department of Justice to review plaintiffs' calculations and claims that certain federal agencies have under-hired Hispanics and blacks in certain job series, where "under-hired" is defined by the terms of the

DEFENDANTS' EXHIBIT C

<u>Luevano</u> Consent Decree of February 1981. Our criticism of plaintiffs' methods, and our calculations of minority hiring "deficits" from data available to plaintiffs, appear in our First Joint Affidavit.

3. Plaintiffs have made calculations on the extent of under-hiring from annual applicant summary data provided by the Office of Personnel Management (OPM) on OPM Form 619. In our First Joint Affidavit, in addition to correcting clear errors in plaintiffs' calculations, we suggested that additional information about applicants to positions covered by the Consent Decree, not available in OPM's summary tables, would show that plaintiffs' calculation methods were untenable. To pursue those questions, we obtained a copy of the <u>current</u> OPM computerized applicant register for Series 334 (Computer Specialist). This file is maintained by OPM in Macon, Georgia, and is continually updated to reflect new applications, withdrawals, etc.[1] The tapes we obtained contain a

--------------------------------------------------

[1] The data originally provided to plaintiffs and LRA were in the form of regional counts of applicants (by race, if available) to particular agency/job series combinations. The supplemental OPM data contain information on individuals, all applicants to the 334 series. Applicants who did not have the minimum requirements for the job still appear on this file although they are not counted as applicants in the <u>Luevano</u> data summaries. In the opinion of the OPM staff, transmitted orally to us, roughly 90 to 95 percent of the applicants on the current OPM series 334 register satisfy the minimum requirements for the job series and will appear on the <u>Luevano</u> applicant forms. For the OPM Series 334 data, all applications (either multiple region or multiple grade) are recorded for each person and include ancillary information as fields on a computer record. Typical fields of interest are: specific location (within a region) of application, test scores, grade of application, etc.

-2-

"snapshot" of applications as of the close of business on July 17, 1987.   The data discussed below may be thought of as representative, though we have not formally sampled or tested these data against any standard.[2]   These data refer only to applications.   We asked for these data and obtained them for the following reasons:

o     The data presented to plaintiffs compared applications received over a year with hires made in that year.    From the OPM data we will  obtain a picture of an actual list of applicants at a point in time.

o     These new tapes contain individual identifiers (but not names), from which we can identify persons who have applied at approximately the same time to more than one region.

o     Similarly, from these tapes we can identify persons who have applied at approximately the same time to both grade 5 and grade 7 positions, whether in a single region or in different regions.

We  obtained  also  from  OPM  a  data  set  of  applicants  who  had returned a race self-identification form provided to them in their application materials.   As these data are collected separately from applicant data, they contain some of the same, but also some different individuals.[3]   Where it was available from the self-identification file, race information was merged with applicant

---

2     A  formal  sampling  procedure  might  have  entailed selecting  a  date  from  a  random  number  series.    The  date  we selected was "as soon as possible."

3     As we will show, many applicants do not return race information, or had not yet returned it.  In addition, some people may return the race information first, and have not yet applied, or may not apply.

lists by LRA, using Social Security number to match individuals from tape to tape.

4. Several records may be associated with the same individual as he/she may have submitted more than one application. Multiple applications arise because an applicant has applied to different regions or submits different scores to the same region. A person must submit an application to each region in which he/she wants to be considered.

### Regions

5. We asked first about the regional distribution of applicants. We found the following:

Table 1

All Applicants
(Counts and Percentages by Race)

| Race | Counts | Percentage |
|------|--------|------------|
| White | 2825 | 30.5 |
| Black | 1300 | 14.0 |
| Hispanic | 270 | 2.9 |
| Other | 381 | 4.1 |
| Unknown | 4503 | 48.5 |
| -------- | ----- | ------- |
| Total | 9279 | 100.0 |

Table 2

Application To Multiple Regions, By Race
(percent)

|  | White | Black | Hispanic | Other | Unknown |
|--|-------|-------|----------|-------|---------|
| One region | 99.4 | 99.6 | 100.0 | 99.0 | 99.4 |
| Two or more regions | 0.6 | 0.4 | 0.0 | 1.0 | 0.6 |

-4-

Of 9279 people in this file, only 52 applied to two or more regions: 48 to two regions and 4 to three. Application to multiple regions is not related to race. A chi-square statistic comparing the number of regions to which whites apply to the number of regions to which non-whites (Blacks, Hispanics and Other) apply shows that differences in multiple application rate by race would be highly likely as chance variation in samples drawn from a population in which no differences exist.

6. Although we believe that application to multiple regions is not related to race, these data do represent a "snapshot", so that counts (and percentages) on any given day may not be wholly representative of the application process in general. In particular, regions add to and delete applications from the composite series 334 register at different times, and applicants file additional applications after their initial application has been active for some period of time.[4] Hence, it is possible that additional multiple applications will be filed for these positions, either at different regions and/or different grades. Furthermore, the regional distribution of applications

---

[4]    The average age of first applications for these data exceeds a year, whereas the time between first and second applications is roughly six months. Presumably we see most multiple applications that will occur, but not necessarily all. As Donald Holum indicates in his declaration in this matter, for purposes of Luevano reporting (OPM Form 619) an applicant to this series (0334) is counted in only one region. We have captured the data prior to that modification.

changes constantly.[5]  However, we believe the racial distribution of applications within a region is reliable, except for any unknown bias due to missing data.[6]

7.  The 52 applicants to multiple regions have submitted 108 applications.  The counts and percentages associated with each region follow:

Table 3

Applications to Multiple Regions
(based on 52 applicants)

| Region | Frequency | Percent |
|--------|-----------|---------|
| Southeast | 16 | 14.8 |
| New England | 1 | 0.9 |
| Great Lakes | 21 | 19.4 |
| Alaska | 1 | 0.9 |
| Southwest | 5 | 4.7 |
| Rocky Mountain | 4 | 3.7 |
| Eastern | 8 | 7.4 |
| Mid-Atlantic | 17 | 15.8 |
| Mid-Continent | 4 | 3.7 |
| Western | 6 | 5.6 |
| Northwest | 5 | 4.6 |
| Washington D.C. | 20 | 18.5 |

There is no consistency in the selection of a second region of application given the first.  For example, one person applied to both the Eastern and Northwest Regions while another applied to the Eastern and Great Lakes Regions.  More detailed information

---

    [5]   There appears to be too few applicants for both the New England and Rocky Mountain regions on this sample, possibly because these data had recently been cleared from the register.

    [6]   Our First Joint Affidavit examines the racial distribution of regional applications, and looks at the series 334 data in particular.

-6-

about multiple applications is provided as Attachment 1 to this affidavit.

8.    We asked about applications to Grades 5 and 7 across all regions.    We define three grade categories for an application: grade 5 only, both grades 5 and 7, and grade 7 only. We count one application as "separate" from another if it was submitted by a different person or if it was submitted by an already counted applicant to a different region or to a different grade category.    Counting this way, there are 9455 applications.

9.    If there are 9279 applicants and 9455 unique applications, at most 176 applicants are multiply counted.    We already know that 56 additional applications are counted because 52 people have applied to multiple regions:

> Forty-eight people applying to two regions leads to 48 additional applications;
>
> Four people applying to three regions leads to eight additional applications.

In addition, 131 people applied to more than one of our three categories, of whom two applied to all three grade categories. Hence, these 131 applicants account for 133 additional applications.    We have apparently over-explained multiple applications, as 56 + 133 = 189, thirteen more than the 176 difference between applications and applicants.    Eleven applicants, two of whom applied to three regions, applied to both

-7-

different regions and different grade categories. Their additional applications appear in both the 56 and the 133. Thus we have exactly explained the difference between applications and applicants in our data as due to 52 + 131 - 11 = 172 multiple applicants. In this sample of this one job series, fewer than two percent of the applicants file more than one application.

10. From the data provided to them, plaintiffs should have realized that the race composition of applicants varies markedly by region. In this "snapshot" of an applicant list, we find the same phenomenon.

Table 4
Variation in Race of Applications
Among Regions[7]
(Percent Among Race-Identified Applications)

| Region | White | Black | Hispanic | Other |
|--------|-------|-------|----------|-------|
| Eastern | 46.9 | 33.3 | 4.5 | 15.3 |
| Mid-Atlantic | 62.5 | 32.5 | 1.1 | 3.9 |
| Southeast | 61.4 | 32.2 | 2.9 | 3.5 |
| Great Lakes | 63.2 | 31.1 | 1.6 | 4.2 |
| Southwest | 55.5 | 19.0 | 20.7 | 4.8 |
| Mid-Continent | 75.5 | 18.8 | 2.5 | 3.2 |
| Western | 44.4 | 14.0 | 5.4 | 36.2 |
| Northwest | 81.1 | 5.5 | 1.7 | 11.7 |
| Washington DC | 42.7 | 48.9 | 2.0 | 6.4 |

---

[7] Only nine regions are presented here, as Alaska and the Rocky Mountains are combined with the Northwest, the Caribbean is combined with the Eastern region, and the Pacific is combined with the Western region. Regions are collapsed because of small sample sizes; the choice of which regions to collapse into is dictated by similar collapsing indicated on the Luevano data forms. The New England region is not used because there were zero race-identified applications on the current OPM series 334 register.

-8-

As demonstrated in this table, there is large variation across regions in the racial distribution of applications (chi-square statistic leads to a p-value < .0001). We see relatively more Hispanics in the Southwest region, relatively more Blacks in the Washington D.C. region, and relatively more whites in the Northwest region. Except for the column labelled "Other", these results are similar to those presented in our First Affidavit for the 1983 and 1984 series 334 data.

11. The question is not so much are regions different, but does that difference matter. Application and hire is by region, so regional differences matter unless applicants in general apply to many, if not most regions. We now know the opposite is true: Almost all applicants apply to only one region. Plaintiffs' calculations from aggregated national application figures ignore the regional structure of the application and selection process. Plaintiffs count as under-hired minorities some persons who had no chance of being hired not because they were minorities, but because they had not applied where the jobs were.[8]

---

[8]    To a very small extent, plaintiffs also double-count applicants because the data do not reveal when the same person applies in more than one region. However, as anticipated in our First Joint Affidavit, there is no racial consequence to that double-counting.

### Grades

12.  It appears that regional application is the important phenomenon, multiple application is not.  The typical applicant files in one region for one grade category.  But, recalling our categories, a person can apply to more than one grade in a single application.  We turn to that issue here.  The race distribution of application for distinct grade categories is:

Table 5
Application By Grade Category
(Percent by Race)

|               | White | Black | Hispanic | Other | Unknown |
|---------------|-------|-------|----------|-------|---------|
| Grade 5 Only  | 34.5  | 45.5  | 50.7     | 41.8  | 36.8    |
| Grades 5 & 7  | 47.0  | 40.8  | 32.8     | 30.7  | 44.0    |
| Grade 7 only  | 18.5  | 13.7  | 16.5     | 27.5  | 19.2    |
| Total         | 100.0 | 100.0 | 100.0    | 100.0 | 100.0   |

Although this table is based on all 9455 applications, there are only 4881 race-identified applications.  When comparing applications to single grades for race-identified applications, we find relatively fewer minorities submitting applications at grade 7.  From a chi-square statistic comparing the racial distribution of grade 5 applications to that of grade 7 applications, $p < .001$, which indicates a highly improbable distribution by chance.

13.  Only 129 applicants applied to two grade categories as we have defined them:

72 applied to Grades 5 and 5/7;

24 applied to  Grades 5 and 7;

33 applied to Grades 5/7 and 7.

-10-

In addition, two people applied to all three grade categories. However, of the 9455 applications, 4122 applications (or 43.6 percent), were to the "grade" 5/7. These applicants have expressed a willingness to accept either a grade 5 or a grade 7 position. The high frequency of application to more than one grade should deter single-grade calculations of the sort plaintiffs have made.

14. From the data supplied to plaintiffs one could not tell if the race composition of Grade 5 applicants was different from the race composition of Grade 7 applicants. There are two problems here. First, they are not distinct individuals. As demonstrated in paragraph 13, one person may apply to several grades by filing multiple applications. Few do, however. More importantly, as seen in Paragraph 12, many people apply to the "one" grade "5 or 7." For that reason, it would have been better for plaintiffs to combine Grade 5 and 7 hires to accord with the combined Grade 5 and Grade 7 applicant data, rather than separately assuming that Grade 5 are distinct from Grade 7 applicants.

15. Second, as demonstrated in Paragraph 12, use of the average race composition of grade 5/7 applicants to analyze hires to both grades exaggerates the percentage of minorities among applicants to the higher grade. The data provided to Luevano plaintiffs force one to combine Grade 5 and Grade 7 applicants

-11-

into one group, with one percentage black and one percentage Hispanic. We do not criticize plaintiffs for utilizing such a summary statistic; we did so ourselves. (We criticize the manner in which they used it.) We only point out that the result of doing so, for both plaintiffs and defendants, is to distribute more minority under-hires to Grade 7, fewer to Grade 5, than would be the case if the data were separated by grade.

## Summary

16. We can now revisit our criticisms of plaintiffs' calculations with the additional information about applicants derived from this OPM "snapshot" of applicant lists. The summary statistics presented in this Affidavit demonstrate that our analysis of the Luevano data relied on appropriate statistical methods while adhering to OPM's application processing practices. In summary form:

o   Application and hire is done by region. Plaintiffs' calculations, based on "national" applications and hires, fails to analyze the actual hiring opportunities if the race composition of applicants varies among regions.

o   Race of applicants does vary among regions, as seen in these "snapshot" data as well as in OPM data provided to plaintiffs.

-12-

o    The only condition that could justify a
     national hiring analysis, given regional
     applications and selections, is massive
     multi-region application behavior. If most
     people applied to many regions, we could not
     observe the regional variation we have
     observed. So we already knew that multiple
     applications could not be the norm; however,
     we have now seen that it is extremely rare
     behavior. More than 99 percent of the
     applicants file in only one region.

o    Even in one application a person may apply
     to two grades, 5 and 7. In fact, many
     applicants do apply to both grades.

o    Relative to whites, fewer minorities apply
     to grade 7 than grade 5. By failing to
     balance surpluses at grade 5 with deficits
     at grade 7, plaintiffs expect minority
     hiring into grade 7 at an unrealistically
     high rate.

o    In addition to the bias created by separate
     grade calculations, the willingness of large
     numbers of applicants to accept either grade
     5 or grade 7 appointments, and their
     subsequent appearance on both grade 5 and
     grade 7 registers, argues that the best
     analysis of grade 5 and grade 7, from data
     that already come with these two grades
     combined, is a combined grade 5/7 analysis.

o    Though both plaintiffs and defendants use an
     average percent minority for these two
     grades, such use is biased for plaintiffs in
     the sense of generating "under-hire" counts
     at a higher average grade than that to which
     minorities in fact apply.

It is our opinion that plaintiffs' calculations are seriously
flawed and should be rejected. Our calculations, as presented in
our First Joint Affidavit, though still biased for plaintiffs, are
as close to the correct calculations, in our understanding of the
Luevano consent decree, as the data permit.

-13-

17. We hereby affirm under the penalties of perjury that the content of the foregoing affidavit, in the matter of <u>Luevano v. Horner</u>, represents our true opinions and the facts as we understand them.


_____
Stephan Michelson


_____
Jessica Pollner


State of Maryland
County of Montgomery

Subscribed and sworn before me this 8th day of October, 1987.


_____
                Notary Public

My Commission Expires July 1, 1990


-14-

ATTACHMENT 1

ONE RECORD PER UNIQUE APPLICATION
APPLICANTS TO MULTIPLE ZONES
ONLY ONE OF EACH ZONE CLASSIFICATION PER APPLICANT

| OBS | SSN | GRDREQ | ZONE | RACE | NUMZONE |
|---|---|---|---|---|---|
| 1 | 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 | 0707 | SOUTHWEST | UNKNOWN | 2 |
| 2 | 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 | 0505 | ROCKY MOUNTAIN | UNKNOWN | 2 |
| 3 | 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 | 0505 | SOUTHEAST | UNKNOWN | 2 |
| 4 | 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 | 0505 | EASTERN | UNKNOWN | 2 |
| 5 | 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 | 0707 | EASTERN | UNKNOWN | 2 |
| 6 | 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 | 0707 | MID-ATLANTIC | UNKNOWN | 2 |
| 7 | 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 | 0507 | GREAT LAKES | OTHER | 2 |
| 8 | 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 | 0507 | ROCKY MOUNTAIN | OTHER | 2 |
| 9 | 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 | 0505 | SOUTHEAST | WHITE | 2 |
| 10 | 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 | 0507 | EASTERN | WHITE | 2 |
| 11 | 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 | 0505 | SOUTHEAST | UNKNOWN | 3 |
| 12 | 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 | 0707 | EASTERN | UNKNOWN | 3 |
| 13 | 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 | 0505 | WASHINGTON, D.C. AREA | UNKNOWN | 3 |
| 14 | 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 | 0505 | MID-ATLANTIC | WHITE | 2 |
| 15 | 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 | 0507 | WASHINGTON, D.C. AREA | WHITE | 2 |
| 16 | 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 | 0707 | SOUTHEAST | UNKNOWN | 2 |
| 17 | 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 | 0707 | EASTERN | UNKNOWN | 2 |
| 18 | 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 | 0505 | EASTERN | WHITE | 2 |
| 19 | 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 | 0505 | MID-ATLANTIC | WHITE | 2 |
| 20 | 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 | 0507 | MID-ATLANTIC | UNKNOWN | 2 |
| 21 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 22 | 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 | 0505 | MID-ATLANTIC | UNKNOWN | 2 |
| 23 | 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 | 0507 | MID-CONTINENT | UNKNOWN | 2 |
| 24 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 25 | 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 | 0507 | MID-ATLANTIC | WHITE | 2 |
| 26 | 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 | 0505 | MID-ATLANTIC | BLACK | 2 |
| 27 | 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 | 0505 | WASHINGTON, D.C. AREA | BLACK | 2 |
| 28 | 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 | 0505 | MID-ATLANTIC | UNKNOWN | 2 |
| 29 | 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 | 0505 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 30 | 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 | 0505 | MID-ATLANTIC | WHITE | 2 |
| 31 | 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 | 0505 | WASHINGTON, D.C. AREA | WHITE | 2 |
| 32 | 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 | 0507 | MID-ATLANTIC | UNKNOWN | 2 |
| 33 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 34 | 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 | 0507 | SOUTHEAST | OTHER | 2 |
| 35 | 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 | 0507 | MID-ATLANTIC | OTHER | 2 |
| 36 | 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 | 0507 | MID-ATLANTIC | UNKNOWN | 2 |
| 37 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 38 | 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 | 0707 | MID-ATLANTIC | UNKNOWN | 2 |
| 39 | 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 | 0707 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |

1-1

ONE RECORD PER UNIQUE APPLICATION
APPLICANTS TO MULTIPLE ZONES
ONLY ONE OF EACH ZONE CLASSIFICATION PER APPLICANT

| OBS | SSN | GRDREQ | ZONE | RACE | NUMZONE |
|-----|-----|--------|------|------|---------|
| 40 | 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 | 0505 | GREAT LAKES | UNKNOWN | 2 |
| 41 | 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 | 0505 | MID-ATLANTIC | UNKNOWN | 2 |
| 42 | 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 | 0505 | SOUTHEAST | BLACK | 2 |
| 43 | 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 | 0505 | WASHINGTON, D.C. AREA | BLACK | 2 |
| 44 | 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 | 0507 | ROCKY MOUNTAIN | OTHER | 2 |
| 45 | 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 | 0505 | WESTERN | OTHER | 2 |
| 46 | 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 | 0505 | GREAT LAKES | WHITE | 2 |
| 47 | 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 | 0507 | SOUTHWEST | WHITE | 2 |
| 48 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 49 | 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 | 0507 | MID-ATLANTIC | WHITE | 2 |
| 50 | 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 | 0505 | GREAT LAKES | UNKNOWN | 2 |
| 51 | 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 | 0505 | WESTERN | UNKNOWN | 2 |
| 52 | 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 | 0505 | MID-ATLANTIC | UNKNOWN | 2 |
| 53 | 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 | 0707 | NORTHWEST | UNKNOWN | 2 |
| 54 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 55 | 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 | 0507 | SOUTHWEST | WHITE | 2 |
| 56 | 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 | 0507 | GREAT LAKES | UNKNOWN | 2 |
| 57 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 58 | 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 | 0507 | SOUTHEAST | WHITE | 2 |
| 59 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 60 | 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 | 0707 | GREAT LAKES | UNKNOWN | 2 |
| 61 | 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 | 0707 | SOUTHWEST | UNKNOWN | 2 |
| 62 | 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 | 0505 | GREAT LAKES | WHITE | 2 |
| 63 | 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 | 0505 | MID-CONTINENT | WHITE | 2 |
| 64 | 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 | 0505 | GREAT LAKES | UNKNOWN | 2 |
| 65 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 66 | 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 | 0507 | SOUTHEAST | BLACK | 2 |
| 67 | 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 | 0707 | GREAT LAKES | BLACK | 2 |
| 68 | 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 | 0505 | SOUTHEAST | WHITE | 2 |
| 69 | 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 | 0505 | GREAT LAKES | WHITE | 2 |
| 70 | 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 | 0507 | SOUTHEAST | WHITE | 2 |
| 71 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 72 | 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 | 0505 | SOUTHEAST | BLACK | 2 |
| 73 | 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 | 0505 | WASHINGTON, D.C. AREA | BLACK | 2 |
| 74 | 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 | 0505 | SOUTHEAST | UNKNOWN | 2 |
| 75 | 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 | 0507 | SOUTHWEST | UNKNOWN | 2 |
| 76 | 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 | 0505 | GREAT LAKES | UNKNOWN | 2 |
| 77 | 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 | 0505 | WESTERN | UNKNOWN | 2 |
| 78 | 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 | 0707 | ALASKA | UNKNOWN | 2 |

ONE RECORD PER UNIQUE APPLICATION
APPLICANTS TO MULTIPLE ZONES
ONLY ONE OF EACH ZONE CLASSIFICATION PER APPLICANT

| OBS | SSN | GRDREQ | ZONE | RACE | NUMZONE |
|-----|-----|--------|------|------|---------|
| 79 | 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 | 0707 | NORTHWEST | UNKNOWN | 2 |
| 80 | 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 | 0707 | SOUTHEAST | WHITE | 2 |
| 81 | 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 | 0507 | WASHINGTON, D.C. AREA | WHITE | 2 |
| 82 | 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 | 0505 | ROCKY MOUNTAIN | UNKNOWN | 2 |
| 83 | 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 | 0505 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 84 | 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 | 0507 | EASTERN | UNKNOWN | 3 |
| 85 | 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 | 0507 | NORTHWEST | UNKNOWN | 3 |
| 86 | 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 | 0707 | WASHINGTON, D.C. AREA | UNKNOWN | 3 |
| 87 | 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 | 0505 | WESTERN | WHITE | 2 |
| 88 | 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 | 0505 | NORTHWEST | WHITE | 2 |
| 89 | 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 | 0507 | GREAT LAKES | WHITE | 2 |
| 90 | 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 | 0507 | NORTHWEST | WHITE | 2 |
| 91 | 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 | 0507 | MID-ATLANTIC | UNKNOWN | 2 |
| 92 | 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 | 0507 | WESTERN | UNKNOWN | 2 |
| 93 | 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 | 0507 | SOUTHEAST | WHITE | 3 |
| 94 | 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 | 0507 | GREAT LAKES | WHITE | 3 |
| 95 | 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 | 0507 | MID-CONTINENT | WHITE | 3 |
| 96 | 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 | 0707 | NEW ENGLAND | UNKNOWN | 3 |
| 97 | 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 | 0707 | WESTERN | UNKNOWN | 3 |
| 98 | 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 | 0707 | WASHINGTON, D.C. AREA | UNKNOWN | 3 |
| 99 | 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 | 0505 | SOUTHEAST | BLACK | 2 |
| 100 | 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 | 0507 | WASHINGTON, D.C. AREA | BLACK | 2 |
| 101 | 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 | 0505 | SOUTHEAST | OTHER | 2 |
| 102 | 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 | 0505 | MID-CONTINENT | OTHER | 2 |
| 103 | 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 | 0507 | GREAT LAKES | UNKNOWN | 2 |
| 104 | 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 | 0507 | EASTERN | UNKNOWN | 2 |
| 105 | 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 | 0507 | GREAT LAKES | UNKNOWN | 2 |
| 106 | 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 | 0507 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |
| 107 | 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 | 0505 | GREAT LAKES | UNKNOWN | 2 |
| 108 | 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 | 0505 | WASHINGTON, D.C. AREA | UNKNOWN | 2 |

1-3

D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )      Civil Action
                                   )      No. 79-0271 (JHG)
CONSTANCE HORNER, Director.        )
     Office of Personnel           )
     Management, et al.,           )
                                   )
          Defendants.              )
_____   )

### DECLARATION OF LEIF E. PETERSON

I, LEIF E. PETERSON, hereby declare as folows:

1. I am the Chief of the Staffing, Development and Equal
Employment Opportunity Division, Directorate of Civilian
Personnel, Headquarters United States Air Force.  I have occupied
this position since September 1986.  My responsibilities include
developing policies and procedures, to be used by over 120 Air
Force bases worldwide in the areas of staffing, training and
equal employment opportunity.  My responsibilities include
obtaining data from each Air Force Installation, compiling that
data, and preparing OPM Forms 619 to report Air Force data
concerning the Luevano Decree.

2. In the course of reviewing the applicant information for
this job series, it became known that the applicant data reported
on OPM Form 619[1] for the position of Contract Administrator, GS-
1102-5/7 for the period January 1, 1984 through December 31, 1984

_____

1.  This form records applicants by race, national origin
and geographic zone.

DEFENDANTS' EXHIBIT D

is incorrect.  Review of the applications for the St. Louis
region has led to this conclusion.

3.  The information originally reported was that there were
19 Hispanic origin applicants in the Philadelphia Region.  The
correct information is that there were 19 white applicants, not
19 applicants of Hispanic origin, and these applicants were in
the St. Louis Region.  The applicants to which the report
pertains were considered for positions at a Systems Program
Office at Wichita, Kansas.

4.  The corrected applicant page is attached hereto.


I hereby declare under penalty of perjury that the foregoing
is true and correct.

Leif E. Peterson

— 2 —

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUVIANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2 PAC 84-1 & 84-55 | 2. Reporting Period From 1/1/84 To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

5. Title of Department, Independent Establishment or Government Corporation

Department of the Air Force

6. Name of Submitting Office

Directorate of Civilian Personnel

7. Address of Submitting Office

8. Occupational Title/Series

Contract Administrator

GS- | 1 | 1 | 0 | 2

9. Grade Level(s)

5/7

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AI | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 4 | | | | | | | | | | | | |
| Hispanic origin | | | | | | | | | | | | | | | 4 |
| White, not of Hispanic origin | | | | | 19 | | | | | | | | | | |
| Other qualified applicants | | | | | | | | | | | | | | | 19 |
| 10. Zone Totals | | | 4 | | 19 | | | | | | | | | | 23 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E

E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Angel G. Luevano, et al.,        :
                                 :
            Plaintiffs,          :
                                 :      Civil Action No.
v.                               :        79-0271 (JHG)
                                 :
Constance Horner, Director,      :
U.S. Office of Personnel         :
Management, et al.,              :
                                 :
            Defendants.          :
_____

Second Declaration of Mary S. Manes

I, Mary S. Manes, hereby declare under the provisions of
28 U.S.C. S 1746 as follows:

1.  I am Mary S. Manes and an employed as Head, Staffing
Branch II, Staffing Systems Division, Office of Civilian
Personnel Management, Department of the Navy and have
served in that capacity since November 1985.

2.  In the position of Head, Staffing Branch II, I am
responsible for the management of staffing reports and
records concerning Schedule B activities in the Department
of the Navy.

3.  On reviewing the Office of Personnel Management (OPM)
applicant reporting forms covering 1983 and 1984 for the
Department of the Navy included in Exhibits 24-26 of
plaintiff's Partial Showings of Adverse Impact Based On
The 1984 Information Reported to Date it was determined
that certain of the forms contained incorrect or
incomplete information. Attached hereto are corrected
Reporting Forms reflecting the most accurate information
obtainable:

    A.  Forms included in Plaintiff's Exhibit 24[1]/

        1.  Supply Group (GS-2000) Reporting Period
1/1/83 - 12/31/83.  This form reflected only the
applicants for one of the four job series (GS-2001) listed
at the bottom of the form.  Separate applicant reporting
forms for all four job series listed  are attached hereto
as Exhibit A. The "Supply Group" occupation title reported
under authorization PAC 83-3 in Exhibits 24 and 26 is not

_____

[1]/ All references to "Plaintiff's Exhibits" refer to
Exhibits attached to Plaintiff's Partial Showings of
Adverse Impact Based on the 1984 Information Reported to
Date dated April 11, 1986.

DEFENDANTS' EXHIBIT E

a series per se but a generic identification for supply related positions. Exhibit 24 reported " Supply Group" activity for naval activities in the OPM's Philadelphia Region. Applicants submitting applications for" Supply Group" positions were considered for jobs in General Supply (GS-2001), Supply Program Management or Supply Systems Analysis (GS-2003), Inventory Management (GS-2010) and Supply Cataloging (GS-2050).

    2.  General Register (so designated on Reporting Form by four asterisks) Reporting Period 1/1/83 - 12/31/83. Each applicant reported was considered for each job listed at the bottom of the form. Applicants for series General Supply (GS-2001) have been reported separately. See Exhibit A.

    B.  Forms Included in Plaintiff's Exhibit 25.

    Supply System Analysis or Supply Program Management (GS-2003) Reporting Period 1/1/84 - 12/31/84.

    This form incorrectly listed Chicago regional applicants as Philadelphia applicants and omitted the Philadelphia applicants. A corrected version is attached hereto as Exhibit B.

    C.  Forms Included in Plaintiff's Exhibit 26.

    1. Inventory Management (GS-2010) Reporting Period 1/1/84 - 12/31/84. This form omitted applicants in the Philadelphia region. A corrected form is attached hereto as Exhibit C.

    2. Inventory Management (GS-2010) Reporting Period 1/1/83 - 12/31/83.

    This form under-reported Philadelphia region applicants. A corrected version is attached hereto as part of Exhibit A.

    3. Supply Group (GS-2000) Reporting Period 1/1/83 - 12/31/83 (see paragraph A1) above.

    For purposes of completeness, also attached hereto, as Exhibit D, is the correct reporting form for General Supply (GS-2001) 1/1/84 - 12/31/84.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on ___7 October 1987___

_Mary S Manis_

corrected copy

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-3 | 2. Reporting Period From 1/1/83 to 12/31/83 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation Department of the Navy | 6. Name of Submitting Office Office of Civilian Personnel Management | |
|---|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series General Supply    GS-2|c|c|1 | 9. Grade Level(s) 5/7 |
|---|---|---|

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | NY | CR | CH | PH | SL | DN | AL | SL | DM | AT | DA | PC | SI | WAO | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black, not of Hispanic origin | | | | 18 | | | | | | | | | | | 18 |
| Hispanic origin | | | | 0 | | | | | | | | | | | 0 |
| White, not of Hispanic origin | | | | 114 | | | | | | | | | | | 114 |
| Other qualified applicants | | | | 4 | | | | | | | | | | | 4 |
| 10. Zone Totals | | | | 136 | | | | | | | | | | | 136 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E Form 619 (1-83)

Attachment 4 (1)

corrected copy

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-3 | 2. Reporting Period From 1/1/83  to 12/31/83 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s)  FTS:  Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation Department of the Navy | 6. Name of Submitting Office Office of Civilian Personnel Management |
|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series Supply Programs Management or Supply Systems Analysis  GS-2003 | 9. Grade Level(s) 5/7 |
|---|---|---|

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | NU | SL | BW | AL | SL | TW | AI | DA | PC | SI | WAO | |
| Black, not of Hispanic origin | | | 1 | 18 | | 1 | | 1 | | 4 | | | 2 | 3 | 30 |
| Hispanic origin | | | 1 | | | | | | | | | | 8 | 9 | 9 |
| White, not of Hispanic origin | | | 3 | 123 | | 3 | | 2 | | 7 | | | 12 | 1 | 151 |
| Other qualified applicants | | | 1 | 5 | | 1 | | . | | | | | 3 | | 10 |
| 10. Zone Totals | | | 6 | 146 | | 5 | | | | | | | 25 | 4 | 200 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E  Form 619 (1-83)

Attachment 4 (1)

corrected copy

# SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-3 | 2. Reporting Period from 1/1/83 to 12/31/83 | | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation Department of the Navy | | 6. Name of Submitting Office Office of Civilian Personnel Management | | |
| 7. Address of Submitting Office | | 8. Occupational Title/Series Inventory Management  GS-|2|0|8|0| | | 9. Grade Level(s) 5/7 |

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | DN | AL | SE | LM | AT | DA | PC | SJ | WAO | |
| Black, not of Hispanic origin | | | | 149 | | | | | | | | | | | 149 |
| Hispanic origin | | | | 20 | | | | | | | | | | | 20 |
| White, not of Hispanic origin | | | | 335 | | | | | | | | | | | 335 |
| Other qualified applicants | | | | 9 | | | | | | | | | | | 9 |
| 10. Zone Totals | | | | 513 | | | | | | | | | | | 513 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

OPM Form 619 (1-83)

Ex. A

Attachment 4 (1)

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-3 | 2. Reporting Period From 1/1/83 — To 12/31/83 | 3. Missing Data 9 | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation DEPARTMENT OF THE NAVY | 6. Name of Submitting Office |
|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series SUPPLY CATALOGING GS-2 0 5 0 | 9. Grade Level(s) 5/7 |
|---|---|---|

### NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | 18 | | | | | | | | | | | 18 |
| Hispanic origin | | | | 0 | | | | | | | | | | | 0 |
| White, not of Hispanic origin | | | | 114 | | | | | | | | | | | 114 |
| Other qualified applicants | | | | 4 | | | | | | | | | | | 4 |
| 10. Zone Totals | | | | 136 | | | | | | | | | | | 136 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

Ex. A

E   Form  619  (1-83)

# SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negoti-ated agreement) PAC-84-102 | 2. Reporting Period From 01-01-84 To 12-31-84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation | 6. Name of Submitting Office |
|---|---|
| Department Of The Navy | OFFICE OF CIVILIAN PERSONNEL MANAGEMENT |

| 7. Address of Submitting Office | 8. Occupational Title/Series SUPPLY PROGRAMS MANAGEMENT OR SUPPLY SYSTEMS ANALYSIS GS- 2 0 0 3 | 9. Grade Level(s) 5/7 |
|---|---|---|

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | DN | AI | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | 144 | | | | | | 29 | | | 4 | | 177 |
| Hispanic origin | | | | 11 | | | | | | | | | 6 | | 17 |
| White, not of Hispanic origin | | | 1 | 423 | | | | 1 | | 29 | | | 28 | | 482 |
| Other qualified applicants | | | | 207 | | | | | | | | | 3 | | 210 |
| 10. Zone totals | | | 1 | 785 | | | | 1 | | 58 | | | 41 | | 886 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E Form 619 (1-84)

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement)<br>PAC-84-102 | 2. Reporting Period<br>From 01-01-84  To 12-31-84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s)<br><br>FTS:<br>Commercial: |
|---|---|---|---|
| 5. Title of Department, Independent Establishment, or Government Corporation<br><br>Department Of The Navy | | 6. Name of Submitting Office<br><br>OFFICE OF CIVILIAN PERSONNEL MANAGEMENT | |

| 7. Address of Submitting Office | 8. Occupational Title/Series<br><br>INVENTORY MANAGEMENT   GS-|2|0|1|0| | 9. Grade Level(s)<br>5/7 |
|---|---|---|

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AT | SE | DA | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | 144 | | | | | | | | | 2 | | 146 |
| Hispanic origin | | | | 11 | | | | | | | | | 3 | | 14 |
| White, not of Hispanic origin | | | | 423 | | | | | | | | | 12 | | 435 |
| Other qualified applicants | | | | 207 | | | | | | | | | 1 | | 208 |
| 10. Zone Totals | | | | 785 | | | | | | | | | 18 | | 803 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E   Form 619 (4-84)

Ex. C

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC-84-102 | 2. Reporting Period from 01-01-84 to 12-31-84 | | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation  Department Of The Navy | | | 6. Name of Submitting Office  OFFICE OF CIVILIAN PERSONNEL MANAGEMENT | |
| 7. Address of Submitting Office | | | 8. Occupational Title/Series  GENERAL SUPPLY    GS-|2|0|0|1| | 9. Grade Level(s)  5/7 |

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | DN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | | 144 | | | | | | | | | | | |
| Hispanic origin | | | | 11 | | | | | | | | | | | |
| White, not of Hispanic origin | | | | 423 | | | | | | | | | | | |
| Other qualified applicants | | | | 207 | | | | | | | | | | | |
| 10. Zone Totals | | | | 785 | | | | | | | | | | | |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

F

F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, <u>et</u> <u>al.</u>, )<br><br>     Plaintiffs, )<br><br>        v. )<br><br>CONSTANCE HORNER, Director )<br><br>     Office of Personnel )<br>     Management, <u>et</u> <u>al.</u>, )<br><br>     Defendants ) | Civil Action<br>No. 79-0271 (JHG) |

THIRD JOINT AFFIDAVIT OF
DR. STEPHAN MICHELSON AND DR. JESSICA POLLNER

1.   Stephan Michelson is the President, and Jessica Pollner is a Senior Statistician, at Longbranch Research Associates, Inc. (LRA) in Takoma Park, MD.  We both hold PhD degrees (Michelson in economics, Pollner in statistics), have published professional papers, and have been employed in academic institutions and in research institutions.  We both have experience analyzing equal employment opportunity and other issues in the setting of litigation, actual or anticipated.  Our resumes were appended as Attachments 1 and 2 to our First Joint Affidavit in this matter.

2.   LRA was retained by the United States Department of Justice to review plaintiffs' calculations and claims that certain federal agencies have under-hired Hispanics and blacks in certain job series, where "under-hired" is defined by the terms of the

DEFENDANTS' EXHIBIT F

<u>Luevano</u> Consent Decree of February 1981. Our criticism of plaintiffs' methods, and our calculations of minority hiring "deficits" from data available to plaintiffs, appear in our First Joint Affidavit.

3.    This Affidavit addresses Hispanic shortfalls for job series 334, 1101, and 1102 in 1982. Using the April, 1978 sample data collected by the Office of Personnel Management (OPM) and reported in the Consent Decree at paragraph C.10.(h), we calculate the Hispanic hiring shortfall by applying the procedures outlined in our First Joint Affidavit.

4.    The OPM A1 and A3 reports of 1982 provide counts of hires. Counts (by race) for series 0334 and 1102 are derived by subtracting the column labelled "Other" (internal hires) from the total hires, in the A1 report. Counts for series 1101 are PACE hires in the A3 report. These figures follow.

|  | Series: | 0334 | 1101 | 1102 |
|---|---|---|---|---|
| Hires: | White | 229 | 53 | 278 |
|  | Black | 30 | 2 | 25 |
|  | Hispanic | 2 | 1 | 6 |
|  | Total | 261 | 56 | 309 |

Hispanics were 4.92 percent of the applicants taking the PACE Examination (in 1978), and therefore are assumed to be 4.92

-2-

Hispanic shortfalls for these series are:

| Series: | 0334 | 1101 | 1102 |
|---|---|---|---|
| Hispanic Shortfall: | 10.8 | 1.8 | 9.2 |

These are arrived at by applying the 4.92 percent to total hires less the actual number of Hispanic hires for that series (e.g., (4.92 percent x 261) - 2 = 10.8 for series 0334.)


5.    These figures represent the correct calculation of deficits using the A1 and A3 reports, the Consent Decree, and procedures accepted as the standard for neutral hiring.


6.    We hereby affirm under the penalties of perjury that the content of the foregoing affidavit, in the matter of <u>Luevano v. Horner</u>, represents our true opinions and the facts as we understand them.


_____
Stephan Michelson

_____
Jessica Pollner

State of Maryland
County of Montgomery

Subscribed and sworn before me this 8th day of October, 1987.

_____
Notary Public

My commission expires: My Commission Expires July 1, 1990

-3-

G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
            Plaintiffs,                  )
                                         )
        v.                               )
                                         )    Civil Action
CONSTANCE HORNER, Director.              )    No. 79-0271 (JHG)
    Office of Personnel                  )
    Management, et al.,                  )
                                         )
            Defendants.                  )
_____)

## DECLARATION OF EVIE WHITE

I, Evie White, hereby declare and say as follows:

1. I am Branch Chief for Employment Programs, Office of Personnel, United States Department of Agriculture.

2. The Employment Programs Branch is responsible for policy development, program guidance, and direction to other Department of Agriculture agencies on all employment matters. These responsibilities include, but are not limited to, monitoring and oversight of cases such as the above captioned matter which require Departmental involvement in coordinating compliance with judicial decrees.

3. This declaration concerns the 296 hires into the GS-1101 job series by the Department of Agriculture in 1982. Of this total, 21 hires by the United States Forest Service were in the GS-3 and GS-4 grades.

DEFENDANTS' EXHIBIT G

4.  Based upon reports submitted by subordinate personnel offices in agencies of the Department of Agriculture, in 1982, only three agencies had hires in the GS-1101 job series: United States Forest Service, Farmers Home Administration, and Animal and Plant Health Inspection Service.

5.  In these agencies, jobs in this job category (i.e. clerical and technical) are defined as single grade interval series work and are not professional positions for which the PACE was used as a hiring mechanism.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 6 , 1987.

EVIE WHITE

H

H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____ _____ _____ _____ _____ ___)
                                   )
ANGEL G. LUEVANO, et al.,          )
     Plaintiffs                    )
                                   )
                                   )     Civil Action No.
v.                                 )     79-0271 (JHG)
                                   )
CONSTANCE HORNER, Director,        )
  Office of Personnel Management,  )
  et al.,                          )
     Defendants                    )
___ _____ _____ _____ ___ ___ ___ )
```

DECLARATION OF EDWARD C. COOK

I, Edward C. Cook, declare as follows:

1.  I am the Director of the Division of Personnel
Operations, Office of Personnel Resource Management, in the U.S.
Department of Education.  In this position, I am responsible for
personnel services for the Department's headquarters office in
Washington, D.C. and for its ten regional offices.

In 1982, I was the Director of Regional Personnel Operations
in the Department.  In that position, I was responsible for
personnel services in the regional offices, including overseeing
the hiring of employees in the regions for the Department.

2.  This declaration concerns Department of Education (ED)
hires into General Business and Industry, Series 1101 positions
for calendar year 1982.

3.  ED records reflect that in 1982 ED hired 95 individuals
into grades 5 and 7 of the job series 1101 --- General Business
and Industry.  Of these 95 individuals, all were hired as
Accounts Resolutions Clerks (GS 1101-5) or Accounts Resolutions

DEFENDANTS' EXHIBIT H

-2-

Technicians (GS 1101-5 or GS 1101-7). Government-wide, some jobs
in the 1101 series in 1982 were professional or administrative
positions which were classified at two-grade intervals, and
therefore were the types of positions that would have been
covered under the PACE. The Accounts Resolution Clerk and
Accounts Resolution Technician positions at ED were not in this
category. Neither job required a college degree and neither job
would have been filled through the PACE.

4. The only vacancies for the Accounts Resolution Clerk and
Accounts Resolution Technician positions in 1982 were in Atlanta,
Georgia and Chicago, Illinois. Consequently, only applicants who
indicated that they were available to work in one of those
locations were hired.

I declare under penalty of perjury that the foregoing
statement, executed on *October 3, 1982,* is true and correct.

_Edward C. Cook_
EDWARD C. COOK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.          )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )          Civil Action No. 79-0271(JHG)
                                  )
CONSTANCE HORNER, Director,       )
     Office of Personnel          )
     Management, et al.,          )
                                  )
          Defendants.             )
_____)

### JAMES A. DELANEY DECLARATION

I, James A. Delaney, declare as follows:

1.  I am employed as the Assistant Director for Employment Programs in the Office of the Assistant Secretary for Personnel Administration, Department of Health and Human Services.

2.  In this position, I am responsible for personnel staffing and affirmative action for the entire Department.

3.  This declaration concerns hires into the GS-993 Series (Social Insurance Claim Examiner) for calendar year 1982.

4.  Attached as Exhibit A is a chart entitled "External Hiring in the Department of Health and Human Services GS-993 Series --- Calendar Year 1982". This chart accurately reflects, on a regional basis, the overall and Hispanic hiring rate into the GS-993 Series for both entry level GS-5/7 positions and co-op

DEFENDANTS' EXHIBIT I

- 2 -

conversions to GS-5.[1]  For this year, there were a total of 816
hires of which 500 were external hires from outside the agency.

5.  In order to graphically demonstrate the absence of
adverse impact in 1982 hiring for the GS-993 position, the Chart
also sets forth the percentage of Hispanic applicants by region,
80% of that percentage (the hiring rate below which adverse
impact is established) (Consent Decree ¶8(b)(1)), the expected
number of Hispanic hires using this formula to avoid adverse
impact, and the deficit or surplus of Hispanic hires.  The
overall results show that there was a shortfall of one Hispanic
hire in the New York region and surplus of one in the Kansas City
region resulting in no shortfall overall.

6.  The Chart also reflects the regional nature of HHS
hiring for GS-993 in 1982.  Hiring for GS-993 in 1982 did not
occur in any region other than the six listed, because only these
six regions had Social Security Program Service Centers which, in
addition to the Headquarters of the Social Security Administra-
tion, are the only HHS facilities employing individuals in the
GS-993 series occupation.  The data for Headquarters are included

_____

[1] Co-op hires are initially employed at a GS-3 grade and are
converted into GS-5 positions upon completion of their college
degree program.  All of the co-op hires reflected in Exhibit A
were converted to GS-5 in calendar year 1982 and none were
initially hired as GS-3's in 1982.  Co-op conversions to GS-5
occurring during 1982 are not reflected in the OPM report
statistics received by plaintiffs.

- 3 -

in Region III.  Thus, for example, no 1982 hiring for GS-993 was
conducted in the Dallas region, which has a 17% Hispanic
applicant rate based upon the 1978 hiring data.

7.  Concomitantly, only those applicants who indicated
availability in one of the 6 regions listed were considered for
placement in the GS-993 position.  Thus hiring into the GS-993
position for 1982 was on a regional, not nationwide, basis.

8.  The Co-op program is a special program cited in ¶16(c)
of the <u>Luevano</u> consent decree, and its use accounted for 3 of the
11 hispanic placements into GS-5/7, GS-993 positions in 1982.

I declare under penalty of perjury that the foregoing
statement, executed on October 7, 1987, is true and correct, to
the best of my knowledge, information, and belief.

JAMES A. DELANEY

External Hiring in the Department of Health and Human Services
GS-993 Series---Calendar Year 1982

| | New York | | | Philadelphia & Baltimore | | | Birmingham | | | Chicago | | | Kansas City | | | San Francisco | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total | OPM data | Co-op | Total |
| 1. No. of HHS external hires | 79 | 1 | 80 | 121 | 2 | 123 | 81 | 5 | 86 | 73 | 0 | 73 | 92 | 0 | 92 | 45 | 1 | 46 | 491 | 9 | 500 |
| 2. No. of Hispanics hired | 4 | 0 | 4 | 1 | 0 | 1 | 0 | 2 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 3 | 8 | 3 | 11 |
| 3. OPM PACE applicant data*-- % Hispanic | 4.8% | | | 1.2% | | | 2.8% | | | 2.2% | | | 1.8% | | | 8.2% | | | | | |
| 4. 80% of above figure | 3.8% | | | 1.0% | | | 2.2% | | | 1.8% | | | 1.4% | | | 6.6% | | | | | |
| 5. How many total Hispanics HHS should have hired (line 1 x line 4) | 3 | | | 1 | | | 2 | | | 1 | | | 1 | | | 3 | | | 11 | | |
| 6. How many more Hispanics HHS should have hired (line 5 - line 2) | -1 | | | 0 | | | 0 | | | 0 | | | 1 | | | 0 | | | 0 | | |

*From OPM Data Survey Report 80-5, "Impact of the Professional and Administrative Career Examination (PACE) as Shown through Applicant Flow Procedures," page 13.

J

J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
       v.                          )
                                   )      Civil Action
CONSTANCE HORNER, Director.        )      No. 79-0271 (JHG)
     Office of Personnel           )
     Management, et al.,           )
                                   )
            Defendants.            )
                                   )

FIRST DECLARATION OF STEPHEN C. BENOWITZ

I, STEPHEN C. BENOWITZ, Director of Personnel, Department of the

Treasury, hereby declare as follows:

    1.  The Department of the Treasury is subject to the

remedial obligations of the consent decree entered by the

district court in Luevano v. Devine, C.A. No. 79-0271 (D.D.C.).

    2.  Among the occupations affected by the Luevano consent

decree is the job category of Criminal Investigator, Occupational

Series 1811.

    3.  The Department of the Treasury hires personnel in the

job category of Criminal Investigator, Occupational Series 1811.

However, during the years that the Professional and

Administrative Career Examination (PACE) was in use, the Treasury

Department never hired in this job category using the PACE.  The

Department of the Treasury hires Occupational Series 1811

personnel using the Treasury Enforcement Agent Examination.

    I hereby declare under penalty of perjury that the foregoing

is true and correct.

Subscribed and sworn to before me
this 16th day of August 19 87

                                   Stephen C. Benowitz   8/20/87
                                   STEPHEN C. BENOWITZ

My Commission Expires Feb. 29, 1988      Notary Public

                                        DEFENDANTS' EXHIBIT J

K

K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
                    Plaintiffs,     )
                                    )
            v.                      )   Civil Action No. 79-0271 (JHG)
                                    )
CONSTANCE HORNER, Director.         )
    Office of Personnel             )
    Management, et al.,             )
                                    )
                    Defendants.     )
_____)

<u>DECLARATION OF FREDERICK E. HAUGH</u>

I, FREDERICK E. HAUGH, declare as follows:

1.  I am employed in the Staffing, Development and Equal
Employment Opportunity Division, Directorate of Civilian
Personnel, Headquarters, United States Air Force.  I have occupied
my position since May 1986.  My responsibilities include obtaining
data from each Air Force Installation, compiling that data, and
preparing OPM Form 619 to report Air Force data concerning the
Luevano Decree.

2.  Personnel management and administration within the Air
Force is delegated in accordance with Air Force Regulation 40-102.
This regulation delegates the appointing authority to the
Commander of each Air Force organization to which a civilian
personnel office is assigned.  As a result of this
decentralization, the Air Force has over 120 bases to which
appointing authority has been delegated.  The only major exception
to this rule, which is pertinent to this case, is the Air Force
Logistics Command (AFLC).  In that case, appointing authority is
delegated to the commander of each Air Logistics Center.

DEFENDANTS' EXHIBIT K

3.  Employment actions, including Schedule B appointments, are taken by each of these bases independent of the action taken by another base.  Consequently, an applicant must separately apply to each base (even if there are several within one OPM region) for a position and is considered separately by each employing entity.

### 1983 Hiring

4.  <u>Contract and Procurement</u> (Series 1102):  During 1983, the majority of the applicants (approximately 83%) for this job series applied for positions with the Air Force Logistics Command (AFLC). Although the AFLC recruited on a nationwide basis, applicants were considered for employment based upon their stated area of geographical availability.

5.  The remaining applicants were considered for positions not within AFLC and were recruited and hired locally.  Applicants for these positions were considered only at the Air Force installation(s) to which they applied.

6.  Attachments 1 & 2 provide a breakdown of the applicants for this job category.  Attachment 1 indicates the applicants for AFLC positions.  Attachment 2 indicates the applicants for positions at the non-AFLC installations.  Although applicants are only considered for employment at the specific Air Force installation to which they apply, applicant data is reported to OPM according to the OPM region in which the Air Force installation is located.  Thus, although the original Applicant Report for this position indicates that there were 395 black applicants for this position in the Chicago region, in fact, 319 were AFLC applicants and 76 applied for non-AFLC jobs.  These 76

2

applicants were not considered for the AFLC jobs and the 319

applicants were not considered for the jobs at the non-AFLC

installations.

7.  Attachment 7 provides a breakdown of hiring for positions

in this job series within AFLC by OPM region.[1]  Attachment 8

provides a breakdown of hiring for positions in this job series at

non-AFLC installations by OPM region.

<p align="center">1984 Hiring</p>

8.  <u>General Accounting</u> (Series 501):  The Air Force hires for

a number of different job categories within this occupational

series.  Included among the job categories within this series are

Financial Specialist and General Accounting.  During 1984, the Air

Force Logistics Command and the Air Force Systems Command hired

into these job categories.  However, as set forth in ¶ 2 above,

both Commands conducted their own recruiting and each separately

considered its own candidates.  Thus, applicants for the Financial

Specialist position at Wright-Patterson Air Force Base (located in

Dayton, Ohio)[2] were not considered for the General Accounting

position at Warner-Robins Air Logistics Center.[3]

9.  The General Accounting positions at Warner-Robins Air

Logistics Center, Georgia were advertised only at the GS-5 level.

---

[1] Hiring information provided in the attachments to this
declaration is derived from Air Force data.
[2] Data pertaining to this job category was reported on OPM Form
619 showing the positions at GS-5/7 in the Chicago Region.

[3] Data for this position was reported as applicants in the
Atlanta region.

10.   Attachment 9 provides a breakdown of hiring for positions in this job series within AFLC by OPM region. Attachment 10 provides a breakdown of hiring for positions in this job series at non-AFLC installations by OPM region.

11.   Contract and Procurement Specialist (Series 1102):  The Air Force hires for a number of different job categories within this occupational series.  Included within this series are the job categories of Contract Specialist, Contract Administrator, and Contract Price Analyst.  Additionally, as in 1983, hiring for AFLC positions was separate from any other hiring which may have occurred in the same region.

A.   Contract Specialist Positions:  91% of the applicants for the contract Specialist Positions were for AFLC positions. Applicants for AFLC positions are only considered in the region for which they have indicated a geographic availability.  As in 1983, applicants were not considered for non-AFLC positions, even if in the same region or at the same base.  Applicant numbers for these AFLC positions are found at Attachment 3.

B.   The remaining nine per cent of the applicants were for positions in the Military Airlift Command and the Air Force Systems Command, but again, as with the 1983 hiring, applicants for these positions are considered on a regional basis, only at the installations to which they applied.  Applicants for these positions are found at Attachment 4.

C.   Contract Administrator:  The Military Airlift Command recruited and hired for all positions within this job category. Hiring was done on a regional basis, applicants who applied in the

4

Chicago region were not considered for positions in the St. Louis region.[4]  The applicant data for this job category is Attachment 5 to this Declaration.

D.  Contract Price Analyst:  The Military Airlift Command recruited and hired for all position within this job category.  As with the other job categories, hiring for this job category is done on a regionalized basis.  The applicant data for this job category is Attachment 6 to this Declaration.

12.  Attachment 11 provides a breakdown of hiring for positions in this job series within AFLC by OPM region. Attachment 12 provides a breakdown of hiring for positions in this job series at non-AFLC installations by OPM region.

13.  General Supply Specialist (Series 2001):  During 1984, the GS-2001 General Supply Specialist positions were filled only at the GS-5 level.  Hiring for this position was conducted by the AFLC at Wright-Patterson Air Force Base (located in Dayton, Ohio). (Applicants for this position, as with the Contract Specialist Position, are reported as applicants in the Chicago OPM region.)

14.  Attachment 13 provides a breakdown of hiring for positions in this job series within AFLC by OPM region.

15.  Inventory Management Specialist (Series 2010):  during 1984, all hires into this position were made by the Air Force Logistics Command.  The positions were located at the Oklahoma

---

[4] While preparing the government's response to the plaintiffs' motion, the Air Force became aware that the applicants for the Contract Administrator position had been misreported.  The report should reflect 19 white applicants in the St. Louis region, rather than 19 Hispanics in Philadelphia.  The Second Declaration of Leif E. Peterson provides information concerning this issue.

City Air Logistics Center, the Sacramento Air Logistics Center, and the San Antonio Air Logistics Center. The Logistics Command did not do centralized hiring for this position; rather, hiring was decentralized to the local level. Thus, applicants for these positions were considered only at the Air Logistics Center(s) to which they applied.

16. Attachment 14 provides a breakdown of hiring for positions in this job series within AFLC by OPM region.

### GS-5/7 Hiring

17. Schedule B positions are generally advertised as "GS-5/7".[5] This means that applicants apply for one or both grade levels and that the agency has the option of filing the vacancy at one or both of these grades. The decision is a managerial one and can be influenced by such factors as an exceptional educational background, prior work experience, or the needs of a particular hiring authority.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_Frederick E. Haugh_
Frederick E. Haugh
7 Oct 87

---

[5] With respect to the job categories at issue, only one job category was advertised differently, General Accounting,, which advertised only at the GS-5 level.

6

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) | 2. Reporting Period From 1/1/83 To 12/31/83 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation | 6. Name of Submitting Office |
|---|---|
| Department of the Air Force | Directorate of Civilian Personnel |

| 7. Address of Submitting Office | 8. Occupational Title/Series | 9. Grade Level(s) |
|---|---|---|
| | CONTRACT AND PROCUREMENT SPEC. GS- 1 1 0 2 | 5/7 |

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES** | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 319 | | | | | | 2 | 5 | 13 | | | | 339 |
| Hispanic origin | | | 22 | | | | | | 1 | 0 | 8 | | | | 31 |
| White, not of Hispanic origin | | | 537 | | | | | | 112 | 36 | 43 | | | | 728 |
| Other qualified applicants | | | 31 | | | | | | 3 | 0 | 9 | | | | 43 |
| 10. Zone Totals | | | 1047 | | | | | | 118 | 41 | 73 | | | | 114-1 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

AFLC POSITIONS

U. S. Office of Personnel Management

F. Form 619 (1-

Attachment 1

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) | 2. Reporting Period From H-83 To 12/31/83 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|
| 5. Title of Department, Independent Establishment or Government Corporation Department of the Air Force | | 6. Name of Submitting Office Directorate of Civilian Personnel | |

| 7. Address of Submitting Office | 8. Occupational Title/Series CONTRACT AND PROCUREMENT SPEC. GS- 1 1 1 0 2 | 9. Grade Level(s) 5/7 |
|---|---|---|

### NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | 12 | 76 | | | | | | | | | | 23 | | 111 |
| Hispanic origin | | 0 | 17 | | | | | | | | | | 5 | | 22 |
| White, not of Hispanic origin | | 20 | 41 | | | | | | | | | | 37 | | 98 |
| Other qualified applicants | | 0 | 4 | | | | | | | | | | 0 | | 4 |
| 10. Zone Totals | | 32 | 138 | | | | | | | | | | 65 | | 235 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

NON AFLC POSITIONS

U. S. Office of Personnel Management

E Form 619 (18..)

Attachment 2

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2 PAC 84-] & 84-55 | 2. Reporting Period From 1/1/84  To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s)  FTS:  Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation | 6. Name of Submitting Office |
|---|---|
| Department of the Air Force | Directorate of Civilian Personnel |

| 7. Address of Submitting Office | 8. Occupational Title/Series  CONTRACT SPECIALIST  GS- 1 1 0 2 | 9. Grade Level(s)  5/7 |
|---|---|---|

### NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 152 | | | | | | 9 | 342 | 167 | | 38 | | 708 |
| Hispanic origin | | | 5 | | | | | | 5 | 10 | 165 | | 12 | | 199 |
| White, not of Hispanic origin | | | 186 | - | | | | | 192 | 521 | 410 | | 97 | | 1406 |
| Other qualified applicants | | | 22 | | | | | | 6 | 25 | 63 | | 14 | | 130 |
| 10. Zone Totals | | | 365 | | | | | | 212 | 898 | 805 | | 161 | | 2441 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

AFLC -

U. S. Office of Personnel Management

E  Form 619 (1-83)

Attachment 3

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2 PAC 84-1 & 84-55 | 2. Reporting Period From 1/1/84 To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation | 6. Name of Submitting Office |
|---|---|
| Department of the Air Force | Directorate of Civilian Personnel |

| 7. Address of Submitting Office | 8. Occupational Title/Series CONTRACT SPECIALIST GS-1102 | 9. Grade Level(s) |
|---|---|---|

NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AT | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 38 | | | | | | | 1 | | | 33 | | |
| Hispanic origin | | | | | | | | | | | | | 17 | | |
| White, not of Hispanic origin | | | 38 | - | | | | | 1 | 2 | | | 68 | | |
| Other qualified applicants | | | 1 | | | | | | | | | | 12 | | |
| 10. Zone Totals | | | 77 | | | | | | 1 | 3 | | | 130 | | |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

NON AFLC - LOCAL HIRE

U. S. Office of Personnel Management

E  Form 619 (1-81)

Attachment 4

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LOSAVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2 PAC 84-1 & 84-55 | 2. Reporting Period From 1/1/84  To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation  Department of the Air Force | 6. Name of Submitting Office  Directorate of Civilian Personnel |
|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series  Contract Administrator   GS- 1 1 0 2 | 9. Grade Level(s)  5/7 |
|---|---|---|

### NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AI | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 4 | | | | | | | | | | | | 4 |
| Hispanic origin | | | | | | | | | | | | | | | |
| White, not of Hispanic origin | | | | | 19 | | | | | | | | | | 19 |
| Other qualified applicants | | | | | | | | | | | | | | | |
| 10. Zone Totals | | | 4 | | 19 | | | | | | | | | | 23 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E Form 619 (1 80)

Attachment 5

SCHEDULE B/PAC AUTHORITY REPORTING FORM FOR LUEVANO v. DEVINE DECREE

| 1. Authorization Number (see negotiated agreement) PAC 83-2 PAC 84-1 & 84-55 | 2. Reporting Period From 1/1/84 To 12/31/84 | 3. Missing Data | 4. Name of Agency Contact and Phone Number(s) FTS: Commercial: |
|---|---|---|---|

| 5. Title of Department, Independent Establishment or Government Corporation  Department of the Air Force | 6. Name of Submitting Office  Directorate of Civilian Personnel |
|---|---|

| 7. Address of Submitting Office | 8. Occupational Title/Series  Contract Price Analyst  GS- 1 1 0 2 | 9. Grade Level(s)  5/7 |
|---|---|---|

## NUMBER OF QUALIFIED* APPLICANTS BY ZONE

| DESIGNATION CATEGORY | GEOGRAPHIC ZONES ** | | | | | | | | | | | | | | 11. NATIONWIDE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NY | CR | CH | PH | SL | BN | AL | SE | DN | AI | DA | PC | SF | WAO | |
| Black, not of Hispanic origin | | | 1 | 3 | | | | 1 | | | | | | | 5 |
| Hispanic origin | | | | | | | | 1 | 1 | 2 | | | 1 | | 5 |
| White, not of Hispanic origin | 10 | | 37 | 12 | 19 | 2 | 8 | 20 | 13 | 10 | | | 21 | | 152 |
| Other qualified applicants | | | | | | | 2 | 3 | 1 | | | | 2 | | 8 |
| 10. Zone Totals | 10 | | 38 | 15 | 19 | 2 | 10 | 25 | 15 | 12 | | | 24 | | 170 |

*Only those applicants who meet the appropriate qualification requirements for the position.

**Zone definitions are on the reverse side of this form.

U. S. Office of Personnel Management

E Form 619 (1 83)

Attachment 6

1983 Series 1102 Hiring Data for Air Force
Logistics Command Installations by OPM Region

| Region | Denver | Atlanta | Dallas | Chicago |
|---|---|---|---|---|
| Designation Category | | | | |
| Black, Not of Hispanic Origin | 1 | 5 | 5 | 93 |
| Hispanic Origin | 0 | 0 | 18 | 3 |
| White, Not of Hispanic Origin | 16 | 35 | 49 | 238 |
| Other Qualified Applicants | 0 | 0 | 6 | 2 |
| Zone Totals | 17 | 40 | 78 | 336 |

*attachment 7*

1983 Series 1102 Hiring Data for Non – Air Force
Logistics Command Installations by OPM Region

| Region | Chicago | San. Fran | Dallas | Atlanta | Seattle |
|---|---|---|---|---|---|
| Designation Category | | | | | |
| Black, Not of Hispanic Orig. | 1 | 2 | 0 | 1 | 0 |
| Hispanic origin | 0 | 0 | 0 | 0 | 0 |
| White, not of Hispanic Origin. | 7 | 12 | 1 | 0 | 3 |
| Other qualified Applicannts | 0 | 0 | 0 | 0 | 0 |
| Zone Totals | 8 | 14 | 1 | 1 | 3 |

*attachment 8*

1984 Series 501 Hiring Data for Air Force
Logistics Command Installations by OPM Region

| Region | Atlanta |
|--------|---------|
| Designation Category | |
| Black, Not of Hispanic Origin | 0 |
| Hispanic Origin | 0 |
| White, Not of Hispanic Origin | 2 |
| Other Qualified Applicants | 0 |
| Zone Total | 2 |

*attachment 9*

1984 Series 501 Hiring Data for Non - Air Force
Logistics Command Installations by OPM Region

| Region | Chicago |
|---|---|
| Designation Category | |
| Black, Not of Hispanic Orig. | 3 |
| Hispanic origin | 0 |
| White, not of His-panic Origin. | 29 |
| Other qualified Applicannts | 0 |
| Zone Total | 32 |

attachment 10



1984 Series 1102 Hiring Data for Air Force
Logistics Command Installations by OPM Region

| Region | San Fran | Denver | Atlanta | Chicago | Dallas |
|---|---|---|---|---|---|
| Designation Category | | | | | |
| Black, Not of Hispanic Origin | 3 | 3 | 34 | 0 | 37 |
| Hispanic Origin | 0 | 2 | 1 | 0 | 63 |
| White, Not of Hispanic Origin | 18 | 52 | 118 | 1 | 169 |
| Other Qualified Applicants | 0 | 2 | 1 | 0 | 6 |
| Zone Totals | 21 | 59 | 154 | 1 | 275 |

*attachment 11*

1984 Series 1102 Hiring Data for Non – Air Force
Logistics Command Installations by OPM Region

| Region | CH | St. L. | SF | DA | DE | AT | SE |
|---|---|---|---|---|---|---|---|
| Designation Category | | | | | | | |
| Black, Not of Hispanic Orig. | 3 | 0 | 2 | 0 | 0 | 0 | 0 |
| Hispanic origin | 0 | 0 | 3 | 0 | 0 | 1 | 0 |
| White, not of Hispanic Origin. | 7 | 1 | 21 | 23 | 1 | 0 | 2 |
| Other qualified Applicannts | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| Zone Totals | 10 | 1 | 29 | 23 | 1 | 1 | 2 |

*attachment 12*

1984 Series 2001 Hiring Data for Air Force
Logistics Command Installations by OPM Region

| Region | Chicago |
|---|---|
| Designation Category | |
| Black, Not of Hispanic Origin | 12 |
| Hispanic Origin | 0 |
| White, Not of Hispanic Origin | 28 |
| Other Qualified Applicants | 0 |
| Zone Totals | 40 |

attachment 13

1984 Series 2010 Hiring Data for Air Force
Logistics Command Installations by OPM Region

| Region<br>Designation<br>Category | Dallas | San Francisco |
|---|---|---|
| Black, Not of<br>Hispanic Origin | 14 | 1 |
| Hispanic Origin | 26 | 0 |
| White, Not of<br>Hispanic Origin | 43 | 10 |
| Other Qualified<br>Applicants | 2 | 2 |
| Zone Totals | 85 | 13 |

attachment 14

L

L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )
              Plaintiffs,            )
                                     )
        v.                           )
                                     )    Civil Action
CONSTANCE HORNER, Director.          )    No. 79-0271 (JHG)
    Office of Personnel             )
    Management, et al.,              )
                                     )
              Defendants.            )
_____)

SECOND DECLARATION OF STEPHEN C. BENOWITZ

I, STEPHEN C. BENOWITZ, Director of Personnel, Department of the
Treasury, hereby declare as follows:

1.  The Department of the Treasury is subject to the
remedial obligations of the consent decree entered by the
district court in Luevano v. Devine, C.A. No. 79-0271 (D.D.C.).

2.  Among the occupations affected by the Luevano consent
decree is the job category of Internal Revenue Officer,
Occupational Series 1169.

3.  During 1983, the Department of the Treasury hired
personnel in the job category of Internal Revenue Officer
pursuant to its Schedule B authority for grades 5 and 7.

4.  The Internal Revenue Service is divided into seven
regions and each of those regions is further divided into
district offices.  Each district office separately conducted its
hiring based on the particular needs of that district office.  A
Schedule B applicant was required to apply separately to each
district office where he/she sought employment.  If an applicant
sought employment in more than one district office within an OPM

DEFENDANTS' EXHIBIT L

region, the applicant numbers reported to OPM reflect each
application.

5.  As a general rule, the positions were advertised as
Grade 5/7.  However, on occasion the positions could have been
advertised separately as a grade 5 or grade 7, depending upon the
needs of a particular region.  Advertising a position at the GS-
5/7 levels means that an applicant applies for one or both grade
levels and that the IRS management, depending on the
qualifications of the individual applicant and the needs of the
district office, had the option of filling the vacancy at one or
both of these grades.

I hereby declare under penalty of perjury that the foregoing
is true and correct.

_Stephen C. Benowitz_    8/20/87
Stephen C. Benowitz

Subscribed and sworn to before me
this 20th day of August 19 87

Notary Public

My Commission Expires Feb. 29, 1988

- 2 -

M

M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,              )
                                       )
         Plaintiffs,                   )
                                       )
             v.                        )        Civil Action
                                       )        No. 79-0271 (JHG)
CONSTANCE HORNER, Director             )
     Office of Personnel               )
     Management, et al.,               )
                                       )
         Defendants.                   )
_____)

DECLARATION OF ROBERTA PETERS

I, Roberta K. Peters, hereby declare as follows:

1.  I am the deputy Staff Director For Civilian Personnel,
Defense Logistics Agency (DLA).  I have occupied this position since
6 January 1985.  My responsibilities include , but are not limited to,
managing the development and implementation of policies and procedures
to be used by the DLA in areas of recruitment, staffing, position
classification, employee development, and equal employment opportunity.

2.  I am aware that the plaintiffs, in the above-captioned
action, have challenged the Department of Defense's 1982 and 1984
hiring for a number of job categories.[1]  This declaration will address
the procedures utilized by DLA for hiring into these jobs categories
during 1984 using Schedule B authority.  These positions are Contract
and Procurement (Series 1102) and Inventory Management (Series 2010).

_____

[1]  The Luevano reporting system reports DLA's hiring as part of the
DoD's hiring.

DEFENDANTS' EXHIBIT M

3.   The recruitment and hiring procedures used by DLA for hiring into these two job categories were the same (These procedures were discontinued for 1102 positions in 1986 when a competitive examination process was put into effect by OPM).  DLA's hiring for Schedule B job categories is conducted by a DLA office in Columbus, Ohio.  That office is responsible for issuing recruitment bulletins, as necessary (usually once or twice a year), to fill vacancies in the job categories for which DLA has Schedule B hiring authority including, but not limited to, vacancies in the 1102 and 2010 job series.  The vacancy announcements for these Schedule B job categories are issued on a nationwide basis; however, as described below, hiring is done on a regional basis.  An applicant may either send in an application form or request that an application package been forwarded, so long as the request comes at a time when the job opportunity announcement in which he/she is interested is open to receipt of applications.

4.   An application package contains a geographic availability form which requires the applicant to designate area(s) of availability.  If an applicant fails to indicate an area of geographic availability, he/she is contacted to determine an area of geographic availability.  Applicants for these positions are not considered on a nationwide basis; rather, they are only considered for employment in those areas which have been designated.  An applicant may indicate several geographic areas of availability.

5.  When DLA provides its annual hiring report to OPM, that reports reflects those individuals who have indicated availability or a particular series or location.  If an applicant has indicated geographic availability for more than one location, that individual is counted as an applicant for each location.

6.  DLA vacancy announcements contemplate the filling of vacancies at the "GS-5/7" level.  This means that applicants apply for one or both of those grade levels and that the agency has the option of filling the vacancy at one or both of these grades.   GS-5 is the customary grade at which Schedule B appointments are made; however, in some situations, managers will recommend that applicants be hired at the GS-7 level because of an exceptional educational background or prior work experience.

7.  Additionally, during 1982-1984, DLA maintained a structured intern program.  One of the features of that program was that interns were hired at the GS-5 level and given formal and on-the-job training to enable them to progress to higher grade positions.  The PAC register was one source of external candidates for the PAC program.

I hereby declare under penalty of perjury that the foregoing is true and correct.

*Roberta K Peters*

ROBERTA K. PETERS

Given under my hand this 27th day of August 1987 in Alexandria, VA.  My commission expires 31 March 1989.   *Harriet Glickman*
Notary Public

N

N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,           )
                                          )
              Plaintiffs,                 )
                                          )
        v.                                )
                                          )    Civil Action
CONSTANCE HORNER, Director.               )    No. 79-0271 (JHG)
    Office of Personnel                   )
    Management, <u>et al.</u>,            )
                                          )
              Defendants.                 )
_____ )

I, JAMES H. WALKER, DECLARE AS FOLLOWS:

    1.  I am the Assistant Commissioner for Personnel and
Training, United States Immigration and Naturalization Service
(INS) and have served in that capacity since July 29, 1984.

    2.  In the position of Assistant Commissioner, I am
responsible for the development, implementation, administration,
and evaluation of the full range of personnel and training
programs and policies for the INS.

    3.  This declaration addresses the methods utilized by the
INS to make competitive appointments, primarily "outside hires"
to the GS-5 position of Immigration Inspector or Immigration
Examiner (Series 1816).  Examining responsibility for this series
at this grade level has been delegated to INS by the Office of
Personnel Management.  This delegation means that the INS has
full responsibility for the entry level staffing process, <u>i.e.</u>,
INS administers the competitive unassembled examination, compiles
registers and makes the final hiring decision.

DEFENDANTS' EXHIBIT N

4.    Competitive examining for this job category is not conducted centrally, but by each regional office.    INS has delegated examining responsibility for this job series to each of its four regions.[1]    This means that each region separately conducts its own advertising, administers the unassembled examination, develops a register for each of the locations within the region, issues certificates of eligibles, makes selections, and effects appointments.

5.    Within each of the four regions applicants are only considered for employment for the specific location for which they actually file an application.    An applicant, who wishes to be considered for more than one location within a region (ex. both New York and Philadelphia are within the Eastern Region), must file separate applications for each location within the Eastern region.

Similarly, if the applicant wishes to be considered for a position in another region, the applicant must make separate applications to that region for each location within the region

---

[1].    The four INS regions encompass the "OPM reporting cities/regions" as follows: the INS' Eastern region includes New York, Philadelphia & Boston; the INS' Western region includes the Pacific and San Francisco; the INS' Northern region includes Alaska, Chicago, St. Louis, Seattle & Denver; and, the INS' Southern region includes Atlanta and Dallas.

Additionally, INS' reporting for each of these "OPM cities/regions" encompasses a number of different locations within the INS region.    For example, the reporting for "Dallas OPM Region" (located in INS' Southern Region) encompasses those applicants for positions in a number of separate locales in the Southern Region, among them Houston, San Antonio, El Paso.    The reporting for "Atlanta OPM Region" reflects INS' hiring that not only in Atlanta but also in a number of other locations within INS' Southern Region.

for which the applicant wishes to be considered.  For example, an applicant for a position in the Southern region, will not be considered for a position in New York, but must file an application with headquarters for that area which is located in Burlington, Vermont.

6. The applicant numbers which are reported reflect the fact that an individual may have applied more than once within the same region.  For example, the applicant numbers for the "Dallas Region" reflect the applicants to cities throughout Texas.  Thus, an applicant who applied to Dallas, San Antonio and Houston is counted three times.

I hereby declare under penalty of perjury that the foregoing is true and correct.

James H Walker
JAMES H. WALKER



# IMMIGRATION & NATURALIZATION SERVICE
## REGIONAL AND DISTRICT AREAS

NORTHERN REGION

EASTERN REGION

WESTERN REGION

SOUTHERN REGION

ALASKA

32

N R

PUERTO RICO AND VIRGIN ISLANDS

27

SAN JUAN

E R

HAWAII

HONOLULU

17

GUAM, M.I.

W R

33  BANGKOK, THAILAND

35  MEXICO CITY, MEXICO

37  ROME, ITALY

LEGEND

CENTRAL OFFICE
WASHINGTON, D.C.

2  DISTRICT NUMBER

HEADQUARTERS

☐ REGIONAL

⊙ DISTRICT

BOUNDARY LINES
▬▬▬▬ REGIONAL
▬▬▬ DISTRICT

N-6  Nov. 7, 1986 Y

# REGIONAL AND DISTRICT OFFICE LOCATIONS

**Regional Offices**

| | | |
|---|---|---|
| Eastern Region (BUR) | Burlington, VT 05401 Federal Building Elmwood Avenue | |
| Southern Region (DLS) | Dallas, TX 75270 Skyline Center Building C 311 North Stemmons Freeway | |
| Western Region (SPD) | San Pedro, CA 90731 Terminal Island | |
| Northern Region (TWC) | Twin Cities, MN 55111 Bishop Henry Whipple Federal Building Fort Snelling | |

**District Offices**

| 32 (ANC) | Anchorage, AK 99513 New Federal Building 701 C Street, Room D-251 Lock Box 16 |
|---|---|
| 26 (ATL) | Atlanta, GA 30303 75 Spring Street, S.W. Room 1408 |
| 5 (BAL) | Baltimore, MD 21201 E. A. Garmatz Federal Building 101 West Lombard Street |
| 2 (BOS) | Boston, MA 02203 John Fitzgerald Kennedy Federal Building Government Center |
| 7 (BUF) | Buffalo, NY 14202 68 Court Street |
| 9 (CHI) | Chicago, IL 60604 Dirksen Federal Office Building 219 South Dearborn Street |

**District Offices**

| 24 (CLE) | Cleveland, OH 44199 Room 1917, Anthony J. Celebrezze Federal Office Building 1240 East 9th Street |
|---|---|
| 20 (DAL) | Dallas, TX 75242 Room 6A21, Federal Building 1100 Commerce Street |
| 19 (DEN) | Denver, CO 80202 1787 Federal Building 1961 Stout Street |
| 8 (DET) | Detroit, MI 48207 333 Mt. Elliott Street |
| 15 (ELP) | El Paso, TX 79984 343 U. S. Courthouse P.O. Box 9398 |
| 40 (HLG) | Harlingen, TX 78550 2102 Teege Road |
| 30 (HEL) | Helena, MT 59626 Federal Building, Room 512 310 South Park, Drawer 10036 |
| 17 (HHW) | Honolulu, HI 96809 P.O. Box 461 595 Ala Moana Boulevard |
| 38 (HOU) | Houston, TX 77004 2627 Caroline Street |
| 11 (KAN) | Kansas City, MO 64106 Suite 1100 3324 East Eleventh Street |
| 16 (LOS) | Los Angeles, CA 90012 300 North Los Angeles Street |

**District Offices**

| 6 (MIA) | Miami, FL 33138 7880 Biscayne Boulevard |
|---|---|
| 21 (NEW) | Newark, NJ 07102 Federal Building 970 Broad Street |
| 28 (NOL) | New Orleans, LA 70113 Postal Service Building Room T-8005 701 Loyola Avenue |
| 3 (NYC) | New York, NY 10278 26 Federal Plaza |
| 29 (OMA) | Omaha, NE 68102 Federal Office Building Room 1008 106 South 15th Street |
| 4 (PHI) | Philadelphia, PA 19106 U.S. Courthouse, Room 1321 Independence Mall West 601 Market Street |
| 18 (PHO) | Phoenix, AZ 85025 Federal Building 230 North First Avenue |
| 22 (POM) | Portland, ME 04112 76 Pearl Street |
| 31 (POO) | Portland, OR 97209 Federal Office Building 511 North Broadway |
| 10 (SPM) | St. Paul, MN 55101 927 Main Post Office Building 180 East Kellogg Boulevard |
| 14 (SNA) | San Antonio, TX 78206 U. S. Federal Building 727 East Durango, Suite A301 |

**District Offices**

| 39 (SND) | San Diego, CA 92188 880 Front Street |
|---|---|
| 13 (SFR) | San Francisco, CA 94111 Appraisers Building 630 Sansome Street |
| 27 (SAJ) | San Juan, PR 00936 GPO Box 5068 |
| 12 (SEA) | Seattle, WA 98134 815 Airport Way, South |
| 25 (WAS) | Washington, DC 20013 25 E Street, N.W. P.O. Box 37034 |

**District Offices In Foreign Countries**

| 33 (BKK) | Bangkok, Thailand District Director U. S. Immigration and Naturalization Service C/O American Embassy APO San Francisco, CA 96346 |
|---|---|
| 35 (MEX) | Mexico City, Mexico District Director U.S. Immigration and Naturalization Service c/o American Embassy Apartado Postal 88 BIS Mexico 5, D.F., Mexico |
| 37 (RIT) | Rome, Italy U.S. Immigration and Naturalization Service c/o American Embassy APO New York, NY 09794 (NOT FOR MAIL) Street Address Via V. Veneto 119 |

# OTHER OFFICES FROM WHICH INFORMATION CONCERNING IMMIGRATION AND NATURALIZATION SERVICE MATTERS MAY BE OBTAINED

| 17 (AGA) | Agana, GU 96910 U.S. Immigration and Naturalization Service 801 Pacific News Building 238 O'Hara Street |
|---|---|
| 7 (ALB) | Albany, NY 12207 Room 220 U.S. Post Office & Courthouse 445 Broadway |
| 28 (CLT) | Charlotte, NC 28205 1111 Hawthorne Lane |
| 24 (CIN) | Cincinnati, OH 45201 U.S. Post Office and Courthouse ... 5th Street ... 537 |

| 23 (HAR) | Hartford, CT 06103-3060 Ribicoff Federal Building 450 Main Street |
|---|---|
| 18 (LVG) | Las Vegas, NV 89101 Federal Building U.S. Courthouse 300 Las Vegas Boulevard South |
| 28 (MEM) | Memphis, TN 38103 814 Federal Office Building 167 North Main Street |
| 9 (MRL) | Merrillville, IN 46410 51 West 80th Place Georgetown Plaza |

| 9 (MIL) | Milwaukee, WI 53202 Room 186 Federal Building 517 East Wisconsin Avenue |
|---|---|
| 25 (NOR) | Norfolk, VA 23510 Norfolk Federal Building 200 Granby Mall, Room 439 |
| 4 (PIT) | Pittsburgh, PA 15222 2130 Federal Building 1000 Liberty Avenue |
| 2 (PRO) | Providence, RI 02903 Federal Building U. S. Post Office Exchange Terrace |

| 18 (REN) | Reno, NV 89502 Suite 150 350 South Center Street |
|---|---|
| 22 (STA) | St. Albans, VT 05478 Federal Building P.O. Box 328 |
| 11 (STL) | St. Louis, MO 63101 210 North Tucker Boulevard Room 100 |
| 19 (SLC) | Salt Lake City, UT 84101 230 West 400 South Street |
| 12 (SPO) | Spokane, ... 99201 691 U.S. ... house Building |

O

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Angel G. Luevano, et al.,       :
                                :
                    Plaintiffs, :
                                :          Civil Action No.
v.                              :          79-0271 (JHG)
                                :
Constance Horner, Director,     :
U.S. Office of Personnel        :
Management, et al.,             :
                                :
                    Defendants. :
_____

First Declaration of Mary S. Manes

I, Mary S. Manes, hereby declare under the provisions of 28 U.S.C.
S 1746 as follows:

1.  I am Mary S. Manes and am employed as Head, Staffing Branch
II, Staffing Systems Division, Office of Civilian Personnel
Management, Department of the Navy and have served in that
capacity since November 1985.

2.  In the position of Head, Staffing Branch II, I am
responsible for the management of staffing reports and records
concerning Schedule B activities in the Department of the Navy.

3.  The Department of the Navy's (DON's) recruitment under
Schedule B appointment authority for positions is decentralized
to the employing activity.  Each activity authorized to use
Schedule B authority conducts individual recruitment,
establishing separate applicant pools.  DON activities authorized
to use the BPAC authority conduct recruitment primarily through
campus visits.  These visits are supplemented by mailings of job
announcements directed to college placement offices, state and
federal employment offices and national and local organizations
with a minority orientation.  Activities within DON made more
than 200 visits to colleges and universities which were selected
on the basis of academic curriculums and student ethnic
population.  Special emphasis has been directed toward scheduling
visits to institutions having a high percentage of black or
Hispanic students.

4.  Applicants for appointment under the Schedule B authority are
generally considered for appointment at the highest grade level
for which they are eligible.  While all applicants meeting basic
eligibility are qualified for the GS-5 level, only those with
additional qualifying experience or education are eligible for
consideration at the GS-7 level.  In addition, candidates who are
eligible for the GS-7 level frequently decline consideration at

DEFENDANTS' EXHIBIT O

the GS-5 level.  Therefore, applicant pools will vary based on both the experience and the individual wishes of applicants. Applicants for each pool are evaluated on the basis of job related evaluation criteria to determine those who are "best qualified" for selection.

5.  Decisions on the grade level to appoint Schedule B employees is at the discretion of the activity or directed by career program policy.  A large proportion of the positions are filled exclusively at the GS-5 level.

I hereby declare under penalty of perjury:


_____
                MARY S. MANES

_____
                Date

P

P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )
                                   )   Civil Action
CONSTANCE HORNER, Director.        )   No. 79-0271 (JHG)
     Office of Personnel           )
     Management, et al.,           )
                                   )
          Defendants.              )
                                   )
_____    )

### FIRST DECLARATION OF DONALD L. HOLUM

1.   I am the Acting Assistant Director for Staffing Policy
and Operations, United States Office of Personnel Management
(OPM), and I am familiar with the issues in the instant case.

2.   My official duties include a number of policy and opera-
tional functions involving the examining procedures that are
used to consider and qualify persons seeking positions in the
civil service of the United States. I am familiar with the ap-
plication process for positions covered by the Decree in this
case as well as the process by which Federal agencies staff po-
sitions from among applicants who have been examined for those
positions by OPM.

3.   I am aware that plaintiffs have alleged that in certain
occupations covered by the Decree, for which examining is done
by OPM, hiring has had an adverse impact on members of the
plaintiffs' class. For each of these occupations, the descrip-
tions provided below describe the application process, the re-
gionalized nature of the hiring, and the GS-5/7 consideration
process.

DEFENDANTS' EXHIBIT P

4. <u>Computer Specialist (Trainee)</u> (Series 334):  An appli-
cant for this job series must apply to take the written compet-
itive test at the local OPM area office in the OPM region in
which the applicant wishes to establish eligibility.[1]  The ap-
plicant must make <u>separate</u> application to each of the regions
in which he/she wishes to be considered for employment.[2]  Ap-
plicants are not considered for employment on a nationwide ba-
sis but only in those regions to which they have applied.

5. The test answer sheet, information concerning the appli-
cant's region of geographic preference and the race and nation-
al origin information are processed by OPM's Staffing Service
Center (SSC), Macon, Georgia.  The SSC does not respond to in-
dividual requests from agencies wishing to hire into this job
series.  Rather, SSC enters the names of qualified applicants
on separate, regional GS-5 and/or GS-7 registers which are

---

1. Within each region, applicants are given the further
choice of geographic locations within the region for which they
desire consideration.  They will only be certified to those lo-
cations.  An exception to a single regional register is the San
Francisco region which has three register-holding offices.

2. Applicants may establish additional GS-5 and/or GS-7 eli-
gibilities in other OPM regions either by reapplying and retak-
ing the test in that region(s) or by submitting an application
package to the new region with a copy of the original notice of
rating (test score plus appropriate Veterans Preference
points).

provided to OPM area offices having examining responsibility
for the region.  When an agency, in a particular region, seeks
to hire Computer Specialists for that region, it contacts the
local OPM examining office for a Certificate of Eligibles, who,
as stated above, have previously applied for work in that re-
gion.  When an applicant applies to more than one region, he/
she is reported in the Luevano applicant reports only in the
first region for which an application has been received.    In
the case of applications being filed at the same time in sever-
al regions, the applicant is recorded in the first region that
the computer picks up that applicant, when the applicant re-
ports are being prepared.

6.  Economist, (Series 110); General Investigator, (Series
1810); and Criminal Investigator (Series 1811):   Competitive
examining for these positions is conducted by OPM.   There is no
written test; the competitive examining procedure is accom-
plished by means of an unassembled examination which requires
the applicant to provide education and experience information
for rating by OPM.

7.   For these three occupations, OPM usually examines by
first announcing the vacancy, an open period is established and
applications are accepted, rated and a certificate is issued as
appropriate and a selection is made. [3]  A register is not

---

3. The application is the competitive "unassembled examina-
tion".  The examination requires that the applicant provide in-
formation concerning his background, education and prior exper-
ience.

-3-

maintained. This process, referred to as "case examining", may be conducted in one area office for the entire region or by each or some area offices for local vacancies. Where there are a number of frequently occurring vacancies, a continuing register can be established, but in the normal case of infrequent vacancies, case examining is used. Under this process applicants can apply for a specifically advertised position.

8.   Applicants must apply separately to each region in which they have an interest in working. [4] Applicants are not considered automatically on a nationwide basis for these occupations, or for any other occupation covered by OPM-sponsored competitive examination.

9.   For each of the job categories discussed above, as well as those other job categories formerly subject to the PACE for which OPM now examines, the OPM examination announcements contemplate the filling of vacancies at the "GS-5/7" level.   This means that applicants apply for one or both of those grade levels and that the agency has the option of filling the vacancy at one or both of these grades.

10.   When applying, applicants indicate the lowest grade (salary) they are willing to accept.   If the applicant indicates that the lowest grade he/she will accept is a GS-5, the

_____

4. An OPM region may establish a GS-5 or GS-7 register in one area office within the region for vacancies within the entire region or, alternatively, several area offices within an OPM region may maintain registers for local vacancies.   For example, the Dallas Area Office maintains a register for Economist that serves the entire region.   In contrast, the Atlanta Area Office maintains a register and the other 5 area offices within the Atlanta region use case examining procedures and announce for each vacancy.   The decision on which system to use is based on the anticipated number of vacancies to be filled.

-4-

applicant is rated for grades GS-5 and GS-7 and placed on both registers, if eligible at both levels. If the applicant indicates that he/she will accept employment only at the GS-7 level, he/she is rated only for that grade and placed only on that register. The qualification requirements are greater for GS-7 than for GS-5. Therefore, some applicants may be rated eligible for GS-5 and ineligible for GS-7, even though they included an interest at both levels.

11. Additionally, some GS-7 eligibles who initially indicated unavailability for GS-5 may later request that their name be added to the GS-5 register. Likewise, a GS-5 and 7 eligible may request that their name be removed from consideration for GS-5 vacancies. [5]

12. An agency determines at which grade level it wants to fill its vacancy and requests a certificate of eligibles for that grade level from OPM. OPM issues a Certificate of Eligibles to the agency for the appropriate grade and the agency may only select a candidate from that certificate for that grade.[6]

13. After the agency has acted on the certificate (certificates may be returned unused) the selected eligibles' names are removed from the registers and those non-selected are returned to the registers for consideration for future vacancies. Applicants' eligibilities on registers maintained by one examining office are not affected by their selection from registers

---

5. If they are on registers in other regions, it is possible that they may be on GS-5 and GS-7 registers in one region and only on a GS-7 register in another region, if that is what they selected.

6. Normally, when an eligible's name is out on a certificate, that eligible is not certified out to other vacancies.

maintained by another examining office. Thus, while an appli-
cant may be selected for employment in San Francisco, if that
applicant does not remove his/her name from consideration in a
second region to which the applicant has applied, the applicant
will continue on the register of eligibles in the second re-
gion.

14. During the years 1983 and 1984, more than half of all
external hires in covered occupations were made pursuant to
Schedule B PAC alternative examining procedures.

I hereby declare under penalty of perjury that the foregoing
is true and correct.

Donald L. Holum        10/7/87

Q

Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et</u> <u>al.</u>,          )
                                      )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )        C. A. No. 79-0271
                                      )
CONSTANCE HORNER, Director,           )
      U.S. Office of Personnel        )
      Management, <u>et</u> <u>al.</u>,            )
                                      )
            Defendants.               )
_____)

<u>DECLARATION OF ROBERT KOMINSKI</u>

I, ROBERT Kominski, hereby declare as follows:

1.  I am a demographer/statistician with a doctorate in Sociology from University of Wisconsin.  I am currently employed by the United States Census Bureau in the Education and Social Stratification Branch of the Population Division.  I have held this position for four years.

2.  In that capacity, I am responsible for analysis of population survey data, design of questionnaires and response to information requests.

3.  I have reviewed and analyzed population data for national census surveys dated March 1982, March 1983 and March 1984.

4.  Set forth below is a chart based on census data maintained by the Census Bureau that identifies the percentages of black and Hispanic persons in the total population of persons in the United States in the years 1982, 1983 and 1984 who were twenty-five years or older and who had attended a college or university for a period of four or more years:

DEFENDANTS' EXHIBIT Q

|      | Black | Hispanic |
|------|-------|----------|
| 1982 | 5.0   | 2.2      |
| 1983 | 5.1   | 2.1      |
| 1984 | 5.6   | 2.2      |

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C. on October 7, 1987.

ROBERT KOMINSKI

- 2 -

R

R

# Digest of Education Statistics 1985-86

**OERI**

*Office of Educational
Research and Improvement
U.S. Department of Education
Center for Statistics*

FILED

OCT 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

CA 79-271

DEFENDANTS' EXHIBIT R

*(spine)* Digest of Education Statistics • 1985-86

**Table 116.—Bachelor's degrees conferred by institutions of higher education, by racial/ethnic group, major field of study, and sex of student: United States, 1980–81**

| Major field of study and sex of student | Total | White non-Hispanic | Black non-Hispanic | Hispanic | Asian or Pacific Islander | American Indian/ Alaskan Native | Nonresi-dent alien |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **All fields:** | | | | | | | |
| Total | 934,800 | 807,319 | 60,673 | 21,832 | 18,794 | 3,593 | 22,589 |
| Men | 469,625 | 406,173 | 24,511 | 10,810 | 10,107 | 1,700 | 16,324 |
| Women | 465,175 | 401,146 | 36,162 | 11,022 | 8,687 | 1,893 | 6,265 |
| **Agriculture and natural resources:** | | | | | | | |
| Total | 21,886 | 20,234 | 380 | 248 | 312 | 96 | 616 |
| Men | 15,154 | 13,908 | 259 | 181 | 200 | 81 | 525 |
| Women | 6,732 | 6,326 | 121 | 67 | 112 | 15 | 91 |
| **Architecture and environmental design:** | | | | | | | |
| Total | 9,455 | 8,069 | 300 | 270 | 296 | 24 | 496 |
| Men | 6,800 | 5,778 | 210 | 203 | 217 | 20 | 372 |
| Women | 2,655 | 2,291 | 90 | 67 | 79 | 4 | 124 |
| **Area studies:** | | | | | | | |
| Total | 2,585 | 2,242 | 67 | 104 | 118 | 4 | 50 |
| Men | 1,031 | 900 | 20 | 41 | 39 | 3 | 28 |
| Women | 1,554 | 1,342 | 47 | 63 | 79 | 1 | 22 |
| **Biological sciences:** | | | | | | | |
| Total | 43,216 | 37,276 | 2,269 | 1,144 | 1,489 | 137 | 901 |
| Men | 24,149 | 21,085 | 954 | 648 | 830 | 67 | 565 |
| Women | 19,067 | 16,191 | 1,315 | 496 | 659 | 70 | 336 |
| **Business and management:** | | | | | | | |
| Total | 200,857 | 174,198 | 13,400 | 4,114 | 3,943 | 636 | 4,566 |
| Men | 127,058 | 112,267 | 6,503 | 2,560 | 2,121 | 388 | 3,219 |
| Women | 73,799 | 61,931 | 6,897 | 1,554 | 1,822 | 248 | 1,347 |
| **Communications:** | | | | | | | |
| Total | 31,282 | 27,473 | 2,405 | 557 | 368 | 110 | 369 |
| Men | 14,179 | 12,541 | 980 | 258 | 153 | 51 | 196 |
| Women | 17,103 | 14,932 | 1,425 | 299 | 215 | 59 | 173 |
| **Computer and information sciences:** | | | | | | | |
| Total | 15,120 | 12,565 | 786 | 302 | 669 | 21 | 777 |
| Men | 10,202 | 8,622 | 394 | 193 | 410 | 17 | 566 |
| Women | 4,918 | 3,943 | 392 | 109 | 259 | 4 | 211 |
| **Education:** | | | | | | | |
| Total | 108,265 | 93,724 | 9,494 | 2,847 | 723 | 569 | 908 |
| Men | 27,069 | 22,876 | 2,587 | 754 | 258 | 164 | 430 |
| Women | 81,196 | 70,848 | 6,907 | 2,093 | 465 | 405 | 478 |
| **Engineering:** | | | | | | | |
| Total | 74,954 | 60,848 | 2,449 | 1,433 | 3,066 | 195 | 6,963 |
| Men | 67,255 | 54,453 | 2,020 | 1,302 | 2,699 | 173 | 6,608 |
| Women | 7,699 | 6,395 | 429 | 131 | 367 | 22 | 355 |
| **Fine and applied arts:** | | | | | | | |
| Total | 40,241 | 35,933 | 1,835 | 779 | 788 | 187 | 719 |
| Men | 14,624 | 12,768 | 811 | 345 | 289 | 73 | 338 |
| Women | 25,617 | 23,165 | 1,024 | 434 | 499 | 114 | 381 |
| **Foreign languages:** | | | | | | | |
| Total | 10,319 | 8,614 | 293 | 909 | 210 | 25 | 268 |
| Men | 2,520 | 2,067 | 76 | 258 | 39 | 10 | 70 |
| Women | 7,799 | 6,547 | 217 | 651 | 171 | 15 | 198 |
| **Health professions:** | | | | | | | |
| Total | 63,649 | 56,790 | 3,603 | 1,153 | 1,312 | 209 | 582 |
| Men | 10,519 | 9,276 | 436 | 262 | 299 | 39 | 207 |
| Women | 53,130 | 47,514 | 3,167 | 891 | 1,013 | 170 | 375 |
| **Home economics:** | | | | | | | |
| Total | 18,370 | 16,260 | 1,125 | 230 | 395 | 73 | 287 |
| Men | 916 | 745 | 83 | 17 | 41 | 1 | 29 |
| Women | 17,454 | 15,515 | 1,042 | 213 | 354 | 72 | 258 |
| **Law:** | | | | | | | |
| Total | 776 | 731 | 22 | 10 | 5 | 2 | 6 |
| Men | 388 | 368 | 9 | 4 | 2 | 1 | 4 |
| Women | 388 | 363 | 13 | 6 | 3 | 1 | 2 |
| **Letters:** | | | | | | | |
| Total | 40,028 | 36,315 | 1,980 | 694 | 460 | 103 | 476 |
| Men | 16,107 | 14,748 | 666 | 278 | 167 | 44 | 204 |
| Women | 23,921 | 21,567 | 1,314 | 416 | 293 | 59 | 272 |

134

**Table 116.—Bachelor's degrees conferred by institutions of higher education, by racial/ethnic group, major field of study, and sex of student: United States, 1980–81—Continued**

| Major field of study and sex of student | Total | White non-Hispanic | Black non-Hispanic | Hispanic | Asian or Pacific Islander | American Indian/Alaskan Native | Nonresident alien |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Library science: | | | | | | | |
| Total | 375 | 339 | 30 | 1 | 2 | 2 | 1 |
| Men | 22 | 18 | 2 | 1 | --- | 1 | --- |
| Women | 353 | 321 | 28 | --- | 2 | 1 | 1 |
| Mathematics: | | | | | | | |
| Total | 11,078 | 9,445 | 584 | 185 | 391 | 18 | 455 |
| Men | 6,342 | 5,422 | 276 | 113 | 223 | 10 | 298 |
| Women | 4,736 | 4,023 | 308 | 72 | 168 | 8 | 157 |
| Military sciences: | | | | | | | |
| Total | 305 | 289 | 6 | 3 | 4 | 1 | 2 |
| Men | 293 | 278 | 5 | 3 | 4 | 1 | 2 |
| Women | 12 | 11 | 1 | --- | --- | --- | --- |
| Physical sciences: | | | | | | | |
| Total | 23,950 | 21,246 | 906 | 405 | 596 | 65 | 732 |
| Men | 18,062 | 16,124 | 613 | 297 | 412 | 44 | 572 |
| Women | 5,888 | 5,122 | 293 | 108 | 184 | 21 | 160 |
| Psychology: | | | | | | | |
| Total | 40,833 | 34,701 | 3,308 | 1,305 | 839 | 196 | 484 |
| Men | 14,295 | 12,215 | 1,040 | 490 | 293 | 68 | 189 |
| Women | 26,538 | 22,486 | 2,268 | 815 | 546 | 128 | 295 |
| Public affairs and services: | | | | | | | |
| Total | 36,311 | 29,310 | 4,869 | 1,176 | 416 | 224 | 316 |
| Men | 15,266 | 12,476 | 1,726 | 590 | 187 | 91 | 196 |
| Women | 21,045 | 16,834 | 3,143 | 586 | 229 | 133 | 120 |
| Social sciences: | | | | | | | |
| Total | 100,647 | 85,535 | 8,129 | 2,888 | 1,645 | 474 | 1,976 |
| Men | 56,156 | 48,509 | 3,696 | 1,549 | 860 | 241 | 1,301 |
| Women | 44,491 | 37,026 | 4,433 | 1,339 | 785 | 233 | 675 |
| Theology: | | | | | | | |
| Total | 5,807 | 5,352 | 166 | 88 | 58 | 5 | 138 |
| Men | 4,334 | 3,964 | 142 | 74 | 43 | 5 | 106 |
| Women | 1,473 | 1,388 | 24 | 14 | 15 | --- | 32 |
| Interdisciplinary studies: | | | | | | | |
| Total | 34,491 | 29,830 | 2,267 | 987 | 689 | 217 | 501 |
| Men | 16,884 | 14,765 | 1,003 | 389 | 321 | 107 | 299 |
| Women | 17,607 | 15,065 | 1,264 | 598 | 368 | 110 | 202 |

--- Indicates data either not reported, not available, or not applicable.
NOTE.—This tabulation excludes 258 men and 82 women whose racial/ethnic group was not reported.

SOURCE: U.S. Department of Education, National Center for Education Statistics, "Earned Degrees Conferred" survey, 1980–81.

RECEIVED

Oct 9  3 49 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                     )
                                              )
    individually and on behalf of         )
    all others similarly situated,        )
                                              )
                Plaintiffs,     )
                                              )
          v.                          )    C. A. No. 79-0271
                                              )
CONSTANCE HORNER, Director,                   )
    U.S. Office of Personnel              )
    Management, et al.,                   )
                                              )
                Defendants.     )

FILED
OCT 16 1987
CLERK, U.S. DISTRICT COURT,
DISTRICT OF COLUMBIA

PLAINTIFFS' CONSENTED MOTION FOR AN EXTENSION
OF TIME WITHIN WHICH TO FILE THEIR REPLY IN
SUPPORT OF THEIR MOTION FOR RELIEF ON THEIR
SHOWINGS OF ADVERSE IMPACT FOR 1982, 1983, AND 1984

      Plaintiffs request a 60-day extension of their time

within which to file their reply in support of their Motion for

Relief on their Showings of Adverse Impact for 1982, 1983, and

1984.  The grounds for this Motion are as follows:

      1. Plaintiffs made their informal showings of adverse

impact before the Monitoring Committee on the following dates:

(a) for 1982 hiring, on October 10, 1984; (b) for 1983 hiring, on

August 2, 1985; and (c) for 1984 hiring, on April 11, 1986.  The

defendants have thus had from 18 months to three years to

evaluate plaintiffs' information and gather their defenses.[1]

---

    [1] The defendants made an informal response to the 1982
showings of adverse impact on May 30, 1986.  See Attachment P to
plaintiffs' Motion.  They made "preliminary responses", consist-
ing of a one-page note and a five-page chart, to the 1983 and
1984 showings on June 3, 1987.  See plaintiffs' Motion, ¶¶ 36-42
at pp. 35-38.

2. Plaintiffs filed their Motion on June 6, 1987. The government received repeated extensions of time to file its response, and ultimately took four months to respond.

3. The government's October 9, 1987 Memorandum in Opposition is far more exhaustive than anything the government provided in its tardy responses while the matter was before the Monitoring Committee:

> (a) The Memorandum in Opposition consumes 37 pages, and contains among other things a wholesale attack on the standards by which the government had agreed to be bound in the Consent Decree.

> (b) It includes thirteen affidavits of government officials: Donald L. Holum (two affidavits), Leif E. Peterson, Mary S. Manes (two affidavits), Evie White, Edward C. Cook, James A. Delaney, Stephen C. Benowitz (two affidavits), Frederick E. Haugh, Roberta Peters, and James H. Walker. Some of these affidavits purport to change the statistics previously provided to plaintiffs under the reporting provisions of the Consent Decree.[2] Some attempt to create exceptions to the adverse-impact provisions of the Decree, based on the peculiarities of hiring in particular parts of

---

[2] E.g., Declaration of Leif E. Peterson, Exhibit D to the defendants' Memorandum; Second Declaration of Mary S. Manes, Exhibit E to the defendants' Memorandum; Declaration of Evie White, Exhibit G to the defendants' Memorandum.

particular agencies.[3]   One affidavit admits to the use
of the PACE register long after plaintiffs were assured
that such use had ended.[4]    These affidavits raise a
plethora of issues, and plaintiffs will have to
discover the background information on which they rely,
and will likely have to take the depositions of some or
all of these officials.

(c) The defendants' Memorandum contains four
affidavits of three experts: Dr. Stephen Michelson, Dr.
Jessica Pollner (three affidavits), and Dr. Robert
Kominsky.  These, too, raise numerous issues, and novel
attacks on both the decretal standards for calculating
adverse impact and the particular calculations per-
formed by plaintiffs.  Here, too, plaintiffs will
likely have to take the depositions of some or all of
these experts.

4. Plaintiffs received the government's October 9
Memorandum in Opposition today, October 15.  As usual, only Mr.
Seymour was served, and plaintiffs must now duplicate the filing
for the benefit of co-counsel.  While co-counsel will be able to
assist in the preparation of plaintiffs' Reply, Mr. Seymour
prepared the challenged showings of adverse impact and no one
else can assume primary responsibility for preparation of the

---

[3] E.g., Declaration of Frederick E. Haugh, Exhibit K to the
defendants' Memorandum.

[4] Declaration of Roberta K. Peters, Exhibit M to the
deposition.

- 3 -

Reply.

5. Mr. Seymour is scheduled to leave this afternoon to speak at the 34th Annual Institute on Labor Law sponsored by the Southwestern Legal Foundation in Dallas, will be occupied at this conference on October 16, and will be in New York to report to the Lawyers' Committee's Board on October 19. He will be in the office on October 20, and the next day will begin two weeks of jury service in the D.C. Superior Court. Because of these and other previously-scheduled commitments, a sixty-day extension of time will be necessary to conduct the necessary factual inquiry, to seek any possible narrowing of the issues with the defendants,[5] and to prepare their Reply. Plaintiffs' time to respond would expire on October 22 in the usual course (five working days plus three working days for service), and this extension would allow plaintiffs until December 21, 1987 to file their Reply.

6. Plaintiffs are authorized to state that the defendants consent to this Motion. This does not imply any agreement of the defendants as to any of the substantive statements made above, and does not imply any agreement of the defendants to make their experts available for deposition.

WHEREFORE, plaintiffs pray that their Motion be granted, and that they be allowed to and including December 21,

---

[5] Plaintiffs cannot give the Court any assurances that any agreement can be reached, but can only say that they will try in good faith to seek any possible narrowing of the issues.

- 4 -

1987 within which to file their Reply.  A proposed form of Order

is submitted herewith.

                              Respectfully submitted,

                              WILLIAM L. ROBINSON
                              RICHARD T. SEYMOUR
                              Lawyers' Committee for Civil
                                 Rights Under Law
                              1400 'Eye' St., N.W., Suite 400
                              Washington, D.C. 20005
                              (202) 371-1212

                              JULIUS LeVONNE CHAMBERS
                              CHARLES STEPHEN RALSTON
                              GAIL J. WRIGHT
                              99 Hudson Street, 16th Floor
                              New York, New York 10013
                              (212) 219-1900

                              BARRY L. GOLDSTEIN
                              ELAINE R. JONES
                              806 - 15th Street, N.W., #940
                              Washington, D.C. 20005
                              (202) 638-3278

                              JOHN H. ERICKSON
                              Erickson, Beasley & Hewitt
                              12 Geary Street
                              Eighth Floor
                              San Francisco, Calif.  94108
                              (415) 781-3040

                              E. RICHARD LARSON
                              THERESA BUSTILLOS
                              Mexican-American Legal Defense
                                 & Educational Fund
                              634 South Spring Street
                              11th Floor
                              Los Angeles, California 90014
                              (213) 629-2512

                              KENNETH KIMERLING
                              Puerto Rican Legal Defense and
                                 Educational Fund
                              99 Hudson Street, 14th Floor
                              New York, New York 10013
                              (212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.   94105
(415) 989-9444

By: _____
RICHARD T. SEYMOUR
Bar No. 28100

Attorneys for Plaintiffs

Dated: October 15, 1987

- 6 -

## Certificate of Service

I certify that I have this 15th day of October, 1987, served a copy of plaintiffs' foregoing Motion for an Extension of Time, and of plaintiffs' proposed form of Order, on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

> Alan Ferber, Esq.
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
>      Room 3501
> Washington, D.C. 20530
>
> James S. Green, Esq.
> Associate General Counsel
> U.S. Office of Personnel Management
> 1900 E Street N.W.
>      Room 7450
> Washington, D.C. 20415
>
> Clint D. Wolcott, Esq.
> National treasury Employees Union
> 1730 K Street N.W.
>      Suite 1101
> Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
     Attorney for Plaintiffs

OCT 16 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                    Plaintiffs,              )
                                             )
        v.                                   )    C. A. No. 79-0271
                                             )
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                 )
    Management, et al.,                       )
                                             )
                    Defendants.              )

**FILED**

OCT 22 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

CONSENTED ORDER EXTENDING THE TIME WITHIN WHICH
PLAINTIFFS MAY FILE THEIR REPLY IN SUPPORT OF
THEIR MOTION FOR RELIEF ON THEIR SHOWINGS OF
ADVERSE IMPACT FOR 1982, 1983, AND 1984

        This matter comes before the Court on plaintiffs'
Motion for a 60-day extension of their time within which to file
their reply in support of their Motion for Relief on their
Showings of Adverse Impact for 1982, 1983, and 1984.  The
defendant has consented to the grant of the Motion, and plain-
tiffs have shown good cause for the extension.  It is therefore
hereby

        ORDERED, that plaintiffs shall have to and including
December 21, 1987 within which to file their Reply.

                This the 21st day of _____October_____, 1987.


                        _____
                        JOYCE HENS GREEN
                        United States District Judge



RECEIVED

Oct 22   1 68 PM '87

JAMES F.      CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

FILED

OCT 22 1987

CLERK U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,                    )
                                                   )
   individually and on behalf of                  )
   all others similarly situated,                  )
                                                   )
                         Plaintiffs,               )
                                                   )
             v.                                    )    C. A. No. 79-0271
                                                   )
CONSTANCE HORNER, Director,                        )
   U.S. Office of Personnel                        )
   Management, <u>et al.</u>,                      )
                                                   )
                         Defendants.               )

FILED

NOV 30 1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>NOTICE</u>

   You are receiving this Notice because there is an objection to your back pay claim.  The grounds for the objection are stated in the accompanying letter.  Both the plaintiffs and the defendants have agreed that, based on the information in their possession, the objection is proper.

   If you wish to appeal from the decision of the parties, you must fill out the accompanying Appeal Form, and Mr. Seymour must receive it, at the office of the Lawyers' Committee for Civil Rights Under Law, 1400 'Eye' Street, N.W., Suite 400, Washington, D.C. 20005, by the close of business on <u>January 29, 1988</u>.  Mr. Seymour must receive it by that day, or your appeal will not be considered.  Mailing it by that day is <u>not</u> sufficient.

   To wind up this procedure, it is necessary to have a firm deadline for the receipt of appeals.  There will be no exceptions to the deadline, and no excuses for failure to meet it

will be accepted.

The appeal form must be completely filled in, and it must be signed, or it will not be considered.

*Nancy M. Mayer* /a/

JAMES F. DAVEY, CLERK
United States District Court
U.S. Courthouse
3rd & Constitution Ave., N.W.
Washington, D.C. 20001

Dated: November 30, 1987

United States District Court
for the District of Columbia
A TRUE COPY
JAMES E. DAVEY, CLERK,
By _____
Deputy Clerk

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
   individually and on behalf of         )
   all others similarly situated,        )
                                         )
                      Plaintiffs,        )
                                         )
         v.                              )   C. A. No. 79-0271
                                         )
CONSTANCE HORNER, Director,              )            ✓FILED
   U.S. Office of Personnel              )
   Management, et al.,                   )
                                         )         DEC 1 8 1987
                      Defendants.        )

                                             JAMES F. DAVEY, Clerk

                STIPULATION AND ORDER

         The parties have reached an agreement to narrow the
issues raised in plaintiffs' July 2, 1987 Motion to Extend the
Period of Retention of Jurisdiction for Each Job Category
Involved in an Enforcement Proceeding, During the Pendency of the
Proceeding or of a Remedial Proceeding.   To this end, the parties
agree and stipulate as follows:

         1. (a) With respect to those occupations for which a
competitive examination was implemented prior to the effective
date of the Consent Decree or in early 1982,[1] and for which
plaintiffs have not filed any charge of noncompliance, the period
for retention of the Court's jurisdiction has ended.   The parties
agree that the Decree does not require the defendants to submit
application and hiring information for 1987, although the
defendants are free to do so.

_____

        [1] These occupations are Agricultural Program Specialist
(Series 1145); Librarian (Series 1410); Printing Management
(Series 1654).




(b) As plaintiffs still have time to make their charges of discrimination for 1985 hiring, and as plaintiffs have not yet received defendants' hiring data for 1986, plaintiffs will be entitled to the time provided by the decree to review the information for these years and to take action on the 1985 and 1986 data.

(c) The parties do not dispute that the Court would have jurisdiction to consider the plaintiffs' timely claim concerning 1985 or 1986 hiring and enter an appropriate order.

2 (a) There are some job categories for which a competitive examination was implemented prior to the effective date of the Decree, or in early 1982, and for which plaintiffs have filed charges challenging hiring in the job category.[2] As to these job categories, and as to job categories with later-implemented competitive alternative examining procedures or which are subject to the use of Schedule B hiring authority,[3] the parties agree that the Court has jurisdiction to consider timely hiring challenges raised by plaintiffs and to enter an appropriate order.

(b) As plaintiffs still have time to make their charges of discrimination for 1985 hiring, and as plaintiffs have not yet

---

[2] These job categories are: Immigration Inspector (Series 1816); Criminal Investigator (Series 1811); General Investigator (Series 1810); Financial Institution Examiner (Series 570); Economist (Series 110).

[3] The parties disagree as to whether the use of Schedule B hiring authority is an "alternative examining procedure" for purposes of the period for retention of jurisdiction under the Consent Decree.

received defendants' hiring data for 1986, plaintiffs will be entitled to the time provided by the Consent Decree to review the information for these years and to take action on the 1985 and 1986 data. The parties do not dispute that the Court would have jurisdiction to consider the plaintiffs' timely claim concerning 1985 and 1986 hiring, and to enter appropriate orders thereon.

(c) The principles of subparagraph (b) shall apply to subsequent years, with respect to job categories for which alternative examining procedures were developed after 1982.

3. The Court shall resolve the remaining issues raised in plaintiffs' Motion.

SO ORDERED.

This the 17$^{b}$ day of December , 1987.

JOYCE HENS GREEN
United States District Judge

We so represent, and we ask for this:

RICHARD T. SEYMOUR
Attorney for Plaintiffs

BARBARA L. WARD
Attorney for Defendants

- 3 -

RECEIVED

JUL 24 1987

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )
    individually and on behalf of    )
    all others similarly situated,   )
                                     )
                   Plaintiffs,       )
                                     )
        v.                           )     C. A. No. 79-0271 JHG
                                     )
CONSTANCE HORNER, Director,          )
    U.S. Office of Personnel         )
    Management, et al.,              )
                                     )
                   Defendants.       )

FILED

DEC 23 1987

JAMES F. DAVEY, Clerk

STIPULATION AND CONSENT ORDER STAYING CONSIDERATION OF
PLAINTIFFS' MOTION FOR RELIEF ON THEIR SHOWINGS OF
ADVERSE IMPACT IN HIRING FOR 1982, 1983, AND 1984,
EXTENDING THE TIME FOR MAKING NEW SHOWINGS OF ADVERSE
IMPACT FOR THOSE YEARS AND FOR 1985, AND PROVIDING A
LIMITED EXTENSION OF THE PERIOD FOR RETENTION OF
JURISDICTION

A. Stipulation

Plaintiffs and defendants hereby stipulate to the
following, and jointly request the entry of this Stipulation and
Consent Order:

1. On June 6, 1987, plaintiffs filed their Motion for
Relief on Their Showings of Adverse Impact for 1982, 1983, and
1984. On October 9, 1987, the defendants filed their Memorandum
in Opposition. On October 22, 1987, this Court extended until
December 21, 1987, plaintiffs' time within which to file their
Reply.

2. The papers filed by the parties raise a large number
of issues, including the proper construction of the Consent
Decree, the proper means of performing statistical analyses to

determine the presence or absence of adverse impact, and other
matters.

3. Counsel for plaintiffs and for defendants have met
and conferred repeatedly over the last two months, in an effort
to narrow the issues to be resolved by this Court in connection
with the aforesaid Motion.

4. It may be possible for the parties to reach agree-
ment on most of the issues raised by plaintiffs' Motion and by
the defendants' response, but more time is needed to reach such
an agreement. One of the central aspects of such an agreement
would be the withdrawal by plaintiffs of all outstanding showings
of adverse impact, and the making of new showings to the Monitor-
ing Committee, based upon the standards being developed by the
parties within a time period to be agreed. The Consent Decree's
one-year period of limitations for making showings of adverse
impact in which individualized relief is sought, and its two-year
period of limitations for making showings of adverse impact in
which generalized injunctive relief is sought, would be waived as
to such new showings for each hiring year from 1982 through 1985.
The Court's approval would be sought for the agreement.

5. On December 18, 1987, the Court approved the
Stipulation and Order narrowing the issues raised in plaintiffs'
July 2, 1987 Motion to Extend the Period of Retention of Juris-
diction for Each Job Category Involved in an Enforcement Proceed-
ing. Under this Stipulation and Order, the period of retention
of jurisdiction for some job categories depends at least in part

- 2 -

on whether plaintiffs have made showings of adverse impact as to
those job categories.  The unresolved parts of plaintiffs'
Motion, as refined in plaintiffs' July 31, 1987 Reply, also
depend in part on whether plaintiffs have made showings of
adverse impact as to those job categories.

      6. The parties intend that any agreement they reach
involving the withdrawal of plaintiffs' existing showings of
adverse impact, or as to the making of new showings, have no
effect on the terms of their previous Stipulation and Order, or
on the unresolved parts of plaintiffs' Motion to Extend the
Period of Retention of Jurisdiction, although the job categories
affected may change.

      B. <u>Order</u>

      1. The Court hereby approves the Stipulation of the
parties.

      2. Consideration of plaintiffs' June 6, 1987 Motion for
Relief on Their Showings of Adverse Impact for 1982, 1983, and
1984 and of the defendants' Memorandum in Opposition shall be
stayed until further Order of the Court, to allow the parties to
reach the agreement they are trying to reach.

      3. Plaintiffs' time to make to the Monitoring Committee
their showings of adverse impact in hiring for 1985 is extended
until further Order of the Court, so that such showings may be
made in accordance with the standards on which the parties are
trying to reach agreement.

      4. Any new showings of adverse impact made pursuant to

- 3 -



an agreement of the parties will be considered <u>nunc pro tunc</u>, as if made at the same time the original showings were made, and will be fully subject to the terms of the previous Stipulation and Order, and to the relief sought in the unresolved parts of plaintiffs' Motion.  Any job category for which no new showings are made will be considered <u>nunc pro tunc</u>, as if no showings of adverse impact had been made prior to the previous Stipulation and Order.

5. Subject to these provisions, the period for retention of jurisdiction shall not expire as to any job category for which plaintiffs may make a showing of adverse impact based upon a new analysis to be agreed upon by the parties or decided upon by the Court, and shall continue as to all job categories, until the expiration of the period for making new showings of adverse impact for the hiring years 1982 through 1985.  Thereafter, the period of retention of jurisdiction shall be determined by the provisions of the Consent Decree, by the prior Stipulation and Order, by the future Orders of this Court.

This the 22nd day of December , 1987.

_Joyce Hens Green_

JOYCE HENS GREEN
United States District Judge

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
                    Plaintiffs,              )
                                             )
        v.                                   )       C.A. No. 79-0271
                                             )              JHG
CONSTANCE HORNER, Director,                  )
  U.S. Office of Personnel                   )
Management, et al.,                          )
                                             )
                    Defendants.              )
_____)

**FILED**

**JAN -6 1988**

**JAMES F. DAVEY, Clerk**

STIPULATION FOR PROVIDING RELIEF TO CLAIMANTS
UNDER PARAGRAPH 21 OF THE CONSENT DECREE

IT IS HEREBY STIPULATED AND AGREED by and between the
parties, through their undersigned counsel, and subject to the
Court's approval, as follows:

1.  The following four individuals have submitted valid
claims under paragraph 21 of the Consent Decree and are entitled
to full relief under that paragraph:

                    a.  Ruben Conde del Valle
                    b.  Rigoberto Morales Torres
                    c.  Denise A. Richardson
                    d.  Arlene Williams

2.  Accordingly, defendants will pay the above-named
individuals $3,000 and the Office of Personnel Management shall
assist them to obtain suitable jobs with the federal government
in accord with the process set forth in paragraph 20 of the
Consent Decree.

3.  Defendants will provide the relief set forth in
paragraph 2 herein without waiting for resolution of other
paragraph 21 claims.

4.   The relief provided in paragraph 2 herein constitutes full settlement of the above-named individuals' claims arising from the competitive use of the PACE.

Respectfully submitted,

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH DiGENOVA
United States Attorney

_Richard Greenberg /aw_
RICHARD GREENBERG

_Alan L. Ferber_
ALAN L. FERBER

Attorneys, Department of Justice
Civil Division, Room 3501
10th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-4770

Attorneys for Defendants

_Richard T. Seymour_
RICHARD T. SEYMOUR
Attorneys for Plaintiffs
Bar No. 28100

SO ORDERED:

_January 5, 1988_
DATE

_Joyce Hens Green_
JOYCE HENS GREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., ) | |
| ) | |
| individually and on behalf ) | |
| of all others similarly ) | |
| situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 79-0271 |
| ) | |
| CONSTANCE HORNER, Director, ) | |
| U.S. Office of Personnel ) | |
| Management, et al., ) | |
| ) | |
| Defendants. ) | |

✓FILED

JUN 27 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

OPINION AND ORDER

Presently pending is plaintiffs' motion asking this
Court to determine that defendants' use of Schedule B hiring
authority does not constitute a permissible alternative
examining procedure within the meaning of the Consent Decree
entered in this action.  For the reasons outlined below,
this motion will be granted in part and denied in part.

I.  Background

Suing on behalf of a class of Blacks and Hispanics,
plaintiffs brought this action under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., challenging
the federal government's use of the Professional and
Administrative Career Examination (PACE) as a means of
assessing applicants for positions in 118 entry-level job

categories.  On November 19, 1981, this Court granted final approval to a Consent Decree that sought to eliminate adverse impact in hiring against class members by phasing out the PACE over a three-year period and replacing it with "alternative examining procedures" for each of the 118 job categories.  See Luevano v. Campbell, 93 F.R.D. 68 (D.D.C. 1981).

Rather than gradually reduce its reliance on the PACE over the three-year time span provided in the Decree, defendant Office of Personnel Management (OPM) decided in May 1982 to exempt the 118 positions from the competitive service and place them under Schedule B hiring authority.[1]  In explaining its decision, OPM noted that

> Excepting these positions from the competitive service and placing them in Schedule B is appropriate because (1) there are no alternative written tests and other merit selection procedures, other than the PACE, currently available, (2) restrictions in federal employment will result in substantially reduced external hires in many former PACE occupations, and (3) the cost of developing validated competitive examinations consistent with the decree would be prohibitive, especially for the occupations where relatively few hires are expected.  Thus, it is not practicable to hold competitive examinations for those positions.  OPM will, of course, continue to explore the development of competitive selection procedures where appropriate.

———————————————

[1] Schedule B does not establish job-specific examinations for each of the 118 job categories formerly subject to the PACE.  Rather, it permits OPM to authorize an individual agency to conduct its own external hiring for a particular period of time.

2

47 Fed. Reg. 38,257, 38,257 (1982). Although OPM has developed competitive procedures in 16 job categories, it has chosen to rely on Schedule B for hiring in the remaining 102 positions.

In their motion, plaintiffs first contend that Schedule B does not qualify as a permissible alternative examining procedure because the Consent Decree requires that all such procedures be conducted on a competitive basis. Building on this argument, plaintiffs also assert that the five-year period for retention of jurisdiction, established under paragraph 7 of the Decree, did not begin running when Schedule B was introduced in 1982. As relief, plaintiffs seek an injunction converting all Schedule B hires to competitive status and ordering defendants to conduct a survey to determine whether any Schedule B appointees have been or will be laid off as a result of their inferior employment status. Each of these matters will be considered in turn.

II.  Discussion

    A.  Is Schedule B a Permissible Alternative Examining
        Procedure Under the Consent Decree?

As defendants correctly observe, it is well-settled that "the scope of a consent decree must be discerned within its four corners . . . and not as it might have been written." United States v. Armour & Co., 402 U.S. 673, 682 (1971). Resort to the plain language of the Consent Decree,

3

however, demonstrates that Schedule B may <u>not</u> be used as an
alternative examining procedure.

Paragraph 8(j) of the Decree is the starting point in
any inquiry into the propriety of Schedule B.  It states:

> The phrase "alternative examining procedure" shall
> mean the group of factors, including test scores
> and any other criteria which are considered, and
> the relative use made of each such factor, in
> making an appointment decision with respect to an
> applicant . . . for employment at the GS-5 or GS-7
> level in a job category listed in Appendix A.

This definition is, of course, silent on the question whether
alternative examining procedures must be within the
competitive service.  Seizing on this fact, defendants
invoke the "four corners" rule of <u>Amour</u> and contend that
this Court may not construe the Consent Decree to impose a
requirement (use of competitive procedures) to which they did
not expressly agree.

Although the Court agrees with defendants' premise,
their conclusion must be rejected.  While paragraph 8(j)
neither compels nor precludes the use of competitive
procedures, defendants have drawn the four sides of their
<u>Amour</u> box without regard to the other provisions of the
Consent Decree.  As plaintiffs point out, the rest of the
Decree is replete with references that make clear that
alternative examination procedures must be competitive in
nature.  Paragraph 1, for example, states that "[t]his Decree
does not resolve the claims of any class member involving

4

any use of the PACE or of PACE scores for any purpose other than <u>competitive external hiring</u>" (emphasis added), thus recognizing by implication that noncompetitive methods would not permitted.  In addition, paragraph 13(a) reinforces this view more directly: "No later than three years after the effective date of this Decree, every job category which is presently subject to the PACE requirement shall, <u>when filled by competitive examination</u>, be filled on the basis of an examining procedure which is designed to examine for that particular job category" (emphasis added).  Paragraph 25(a) likewise requires the reporting of information on applicants "for a GS-5 or GS-7 entry-level job category listed in Appendix A which is filled on the basis of a <u>competitive procedure</u>" (emphasis added).  In addition, the Decree also speaks of Veteran's Preference Act requirements providing "a defense to the determination of adverse impact with respect to any <u>competitive</u> procedures," <u>see</u> paragraph 9 (emphasis added), and calls for reporting of data on applicants appointed "by any <u>competitive</u> selection procedure." Paragraph 24(b).  Finally, paragraph 2(b) of the Decree calls for the development of procedures "which validly and fairly test the relative capacity of applicants to perform the jobs listed in Appendix A."  Thus, the plain language of the Consent Decree, taken as a whole, clearly indicates that alternative examination procedures must be instituted on a

competitive basis.[2]

Defendants offer a second reason why they believe Schedule B hiring is appropriate under the Decree. If alternative examining procedures must be competitive, they claim, OPM's authority under 5 U.S.C. § 3302(1) to make "necessary exceptions of positions from the competitive service" will be compromised, a condition that was not expressly stated in the Decree. This contention, however, also lacks merit.

_____

[2] Defendants' present insistence that Schedule B qualifies as an alternative examining procedure is directly contradicted by earlier statements that they have made to the contrary. For example, during the time when the proposed Consent Decree was pending before the Court, defendants offered an affidavit from Richard Post, an OPM official, which indicated that alternative examining procedures would be competitive in nature. See Attachment B to Plaintiffs' Motion. In granting final approval to the Decree, this Court expressly relied on, and cited, the Post affidavit to illustrate the extensive work that would attend the development of competitive testing procedures. See 93 F.R.D. at 79-80 (findings 32-34). More significantly, however, the guidelines drawn up to assist federal agencies in applying for Schedule B authority clearly indicate that OPM believed Schedule B was not an alternative examining procedure. Appendix E to the Federal Personnel Manual, which plaintiffs' have provided as Attachment D to the instant motion, observes at page 213-E-3 that six job categories "were removed from PACE examination coverage prior to the effective date of the consent decree and are presently filled through alternative competitive examinations." It then goes on to state, however, that "[i]f the alternative examinations for the positions listed above are discontinued, the positions would become subject to the Schedule B authority. Conversely, if alternative examinations are developed for any positions, those positions would be removed from coverage of Schedule B authority and would be filled by the alternative examinations." Id. One would be hard-pressed to find a clearer statement of plaintiffs' position that Schedule B and alternative examining procedures are mutually exclusive.

In paragraph 2(a) of the Consent Decree, the parties
agreed that the two main purposes of the Decree were "to
eliminate adverse impact against blacks and against
Hispanics" and "to establish alternative examining procedures
which are consistent with Title VII, for those job categories
which are subject to the PACE requirement."  Paragraph 2(a)
concluded with the statement that "[t]he parties intend that
this agreement be construed to effectuate the foregoing
policies and purposes."  To construe the Decree as defendants
suggest would undermine, not effectuate, the Decree's
important goals.  In adopting Schedule B, defendants have
eliminated all 118 job categories from the competitive
service, have developed competitive exams for only 16 of
these positions and have indicated that they will not devise
competitive procedures for the remainder.  If this Court
placed its imprimatur on their interpretation, defendants
would be free to ignore -- as they have done thus far --
their obligation to implement alternative examining
procedures that will reduce adverse impact in hiring.  This
the Court will not do.

Even assuming, however, that the Court agreed with
defendants' position and found that alternative examining
procedures need not be conducted within the competitive
service, there is another, independent reason defendants'
reliance on Schedule B is inappropriate.  Simply put,

7

Schedule B is not an "alternative examining procedure" as
that term is defined in the Consent Decree.  Paragraph 8(j)
defines alternative examining procedure as "the group of
factors, any other criteria which are considered, and the
relative use made of each such factor, in making an
appointment decision with respect to an applicant" (emphasis
added).  Moreover, paragraph 13(a) requires that each job
category "be filled on the basis of an examining procedure
which is designed to examine for that particular job
category" (emphasis added).  Under Schedule B, however, each
agency is free to establish its own set of hiring criteria
within a given job category, in contravention of paragraph
13(a).[3]  Moreover, the representative Schedule B procedures
now before the Court, see Exhibit 2 to Defendants'
Opposition, lack any discussion of the relative weight given
to each of the hiring factors, in violation of paragraph
8(j).  Thus, the ad hoc quality of Schedule B hiring -- with
individual managers making decisions according to their own
set of factors and without having to indicate the importance
of each criterion -- contravenes express language in the
Consent Decree, language which neither defendants nor this

_____

[3] Defendants' own affiant does not deny this fact.  See
Declaration of Curtis J. Smith, Exhibit 1 to Defendants'
Opposition, at 2 ("Schedule B examining requires that 'each
agency establish[ ] its own application procedures'")
(quoting FPM Bulletin 213-54 at 2).

Court can conveniently ignore.[4]

Defendants' justification for their decision not to develop competitive examinations for all 118 job categories warrants brief comment.  Defendants point out that, although they have constructed alternative examining procedures for only 16 positions, those positions are "big-fill" jobs that account for approximately 55-60% of all Schedule B hiring. It would be overly expensive and time-consuming to develop examinations for the rest of the 102 former PACE positions, defendants contend, because there are few (and often no) hires in many of these job categories.

Defendants' rationalization is wholly unpersuasive.  As an initial matter, it is far from obvious that the 16 "big-fill" jobs do in fact comprise 55-60% of defendants' Schedule B hiring.  See Plaintiffs' Reply Brief at 13 (suggesting 30% as the level of hiring under the 16 categories).  Moreover, plaintiffs have persuasively demonstrated, using OPM's reporting data, that many of the "small-fill" jobs for which examining procedures were not devised have more hires than

---

[4] In a December 1984 report, the General Accounting Office summarized studies by the Merit Systems Protection Board and the National Academy of Public Administration that recognized the potential for abuse inherent in Schedule B's agency-specific hiring system and concluded by noting that "[p]ersonnel officials of the agencies we visited believe that their selection practices conform to merit principles, but they also believe that the variety of selection procedures increases the opportunity for abuse."  See Exhibit 4 to Defendants' Opposition at 5.

some of the "big-fill" jobs that do have competitive exams.
Id. at 11-13.  Finally, although defendants assert that they
have already expended $4.5 million just to develop the 16
"big-fill" jobs that now are being tested, paragraph 13(a) of
the Decree recognized that "[s]ome PACE job categories have
relatively few vacancies and OPM may develop an alternative
examining procedure for a group of all such job categories."
Rather than avail themselves of that opportunity, defendants
chose to abrogate their duties under the Decree by failing to
produce examinations for any of the other approximately 100
PACE positions.[5]  Their partial adherence to the terms of the
Consent Decree is an unacceptable substitute for the full
and adequate compliance that they promised, and committed,
themselves to do.

B.    Retention of Jurisdiction

Paragraph 7 of the Consent Decree provides:

In order to ensure compliance with the terms of
this Decree, to provide a framework for
implementation of this Decree, and to receive
reports concerning the government's actions
hereunder, the Court shall retain jurisdiction over
this case.  The period of retention of jurisdiction
shall expire, with respect to any job category
listed in Appendix A, five years after the
cessation of the use of PACE results for the job
category and the implementation of an alternative
examining procedure for that job category at the

_____

[5] Although the requirement for developing alternative
examining procedures in each job category may be onerous from
a fiscal and administrative standpoint, it was the parties --
including defendants -- who included that provision in the
Decree.

10

GS-5 or GS-7 level.

In their Opposition (at 18), defendants argue that the five-year period for retention of jurisdiction began running on November 9, 1982, the date on which federal agencies were required to begin using Schedule B authority, rather than the PACE, for external hiring. In light of this Court's conclusion that Schedule B does not constitute an alternative examining procedure under the Decree, the period for retention of jurisdiction did not begin running when Schedule B was announced in 1982 or when new employees were first hired under Schedule B authority. In fact, because OPM has implemented alternative examining procedures in only 16 job categories, the five-year countdown has not started running for _any_ of the remaining PACE positions.

C.    Relief

Plaintiffs seek broad relief to remedy defendants' failure to comply with the Consent Decree. Pointing out that Schedule B hirees do not enjoy all of the employment rights to which competitively-selected federal employees are entitled, _see_ Motion at 11-13,[6] plaintiffs ask this Court to

---

[6] Plaintiff cites inferior rights with respect to entry into the career Civil Service, transfer and reassignment, career ladder promotion and retention and bump-back situations. To this list one could add the inability to obtain judicial review of adverse personnel actions for which the Civil Service Reform Act does not explicitly provide a right of review. _See_ United States v. Fausto, 108 S. Ct. 668 (1988). _See also_ Allen v. Heckler, 780 F.2d 64, 65-66 (D.C. Cir. 1985).

enter an injunction requiring the immediate conversion of all
Schedule B appointees to competitive status.   Defendants do
not dispute plaintiffs' entitlement to this relief. Rather,
the only argument they offer for denying the requested
injunction (Opposition at 21-22) is based on language in
National Treasury Employees Union v. Horner, No. 84-2573
(March 30, 1987) (NTEU), where this Court stated, in staying
similar relief that had been awarded in a suit challenging
OPM's decision to remove the former PACE positions into the
excepted service, that "the rights of excepted service status
employees are not so inferior that this court must deprive
the court of appeals of an opportunity to address the
important questions raised by this case."  Order at 6.
Granting an injunction in this case, defendants contend,
would undermine the stay entered in NTEU.

    The Court agrees that requiring defendants to convert
Schedule B hires to competitive status immediately would
interfere with the appellate litigation now pending in NTEU.
That does not mean, however, that plaintiffs are not entitled
to the injunction that they seek.  Rather, the Court will
enter the injunctive relief that has been requested by
plaintiffs but will, sua sponte, stay the effect of that
injunction pending the outcome of the appeal in NTEU.  In
this way, the interests of justice will best be served.

    Citing an attempt by the Navy to layoff 11 Schedule B

employees at its Jacksonville, Florida facility and the
difficulty in discovering whether similar actions have been
taken at other agencies, plaintiffs also seek an order
compelling defendants to conduct a survey of every agency
using Schedule B hiring to determine whether there have been
or will be layoffs of other Schedule B appointees.  Inasmuch
as defendants' opposition does not contest this point, see
Opposition at 21-22, and since such a survey would be a
sensible and appropriate method of assuring that past
violations of the Decree will be uncovered and future
violations will be deterred, defendants will be ordered to
conduct the requested survey.[7]

III.  **Conclusion**

The Court is well-aware that the obligations imposed on
the parties under the Consent Decree are substantial.  It was
defendants, however, who voluntarily made the decision to
enter into the Decree and abide by its terms rather than
proceed to a trial on the merits in this action.  Defendants

_____

[7] Plaintiffs also invite the Court to grant injunctive
relief with respect to the Jacksonville employees.  It
appears from a June 5, 1987 letter from defendants' counsel
to plaintiffs' counsel, however, that the planned adverse
action against these individuals has been cancelled.  See
Exhibit 5 to Defendants' Opposition.  Although plaintiffs
claim that this cancellation does not assure that a similar
adverse action will not occur in the future, the Court will
accept the representation at face value and deny plaintiffs
this relief.  It should be abundantly clear, however, that
plaintiffs are free to seek this relief in the future should
a similar problem recur.

must now live up to the bargain that they struck.

Accordingly, it is hereby

ORDERED that plaintiffs' motion be and it hereby granted in all respects except insofar as it seeks relief for the Jacksonville, Florida naval employees, as to which it be and hereby is denied; it is

FURTHER DECLARED that the use of Schedule B hiring authority is not an "alternative examining procedure" within the meaning of the Consent Decree; it is

FURTHER DECLARED that the five-year period for retention of jurisdiction provided for in paragraph 7 of the Decree did not start running with the promulgation of Schedule B authority in 1982 or with its implementation for any job category formerly subject to the PACE; it is

FURTHER ORDERED that defendants are enjoined to convert all Schedule B appointees to competitive service status; it is

FURTHER ORDERED that the injunction enjoining defendants to convert all Schedule B appointees to competitive service be and it hereby is stayed pending the outcome of the appeal in NTEU v. Horner; and it is

FURTHER ORDERED that defendants shall inquire of each agency and facility given Schedule B authority at any time from 1982 to the present whether there have been layoffs of Schedule B appointees in the past and whether any such

14

layoffs are now pending.  Defendants shall report the results of this survey to plaintiffs and to the Court within 120 days of the date of this Order.

June 27, 1988

JOYCE HENS GREEN
United States District Judge

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGEL G. LUEVANO, et al., | ) |
| | ) |
| individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| Plaintiffs. | ) |
| | ) |
| v. | ) |
| | ) |
| CONSTANCE HORNER, Director, U.S. Office of Personnel Management, et al., | ) ) ) |
| | ) |
| Defendants. | ) |

Civil Action No. 79-0271

**FILED**

**JUN 27 1988**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORDER

It has come to the attention of the Court that defendants have decided to pursue a policy that may impact on matters contained within the Consent Decree entered in this action. Accordingly, the parties are directed to attend a status call on July 14, 1988, at 9:15 a.m., at which time the Court will briefly explore the implications of defendants' proposed policy on the future course of this litigation.

June 27, 1988

JOYCE HENS GREEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
ANGEL G. LUEVANO, et al.,           )
                                    )
    individually and on behalf      )
    of all others similarly         )
    situated,                       )
                                    )
                  Plaintiffs,       )
                                    )
        v.                          )        Civil Action No. 79-0271
                                    )
CONSTANCE HORNER, Director,         )
    U.S. Office of Personnel        )
    Management, et al.,             )
                                    )
                  Defendants.       )
                                    )
```

**FILED**

**JUN 27 1988**

**JAMES F. DAVEY, Clerk**

ORDER

Plaintiffs, suing on behalf of a nationwide class of

Blacks and Hispanics, brought this action alleging that the

Professional and Administrative Career Examination (PACE)

discriminated against class members in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

On November 19, 1981, this Court gave final approval to a

Consent Decree that called for gradual phaseout of the PACE

and, in its place, establishment of alternative examining

procedures for particular job categories.  See Luevano v.

Campbell, 93 F.R.D. 68 (D.D.C. 1981).

This Court retained jurisdiction over this action under

Paragraph 7 of the Decree, which also stated:

> The period of retention of jurisdiction shall
> expire, with respect to any job category listed in
> Appendix A, five years after the cessation of the



use of PACE results for the job category and the
implementation of an alternative examining
procedure for that job category at the GS-5 or GS-7
level.    This period of time may be extended for any
such job category by agreement of the parties, or
upon motion for good cause shown.

On July 2, 1987, plaintiffs filed a motion seeking to
extend the period of retention of jurisdiction, and
defendants' obligations under the Decree, during the
pendency of any enforcement or remedial proceeding relating
to a particular job category.  The parties are now in
agreement, however, that this Court may extend the period for
retention of jurisdiction to consider plaintiffs' challenges
to defendants' hiring decisions and to enter appropriate
remedial orders if necessary.  See Stipulations and Orders of
December 18, 1987 and December 23, 1987.  Only one issue
therefore remains to be resolved: whether, after plaintiffs
have raised a question of noncompliance in a particular job
category and after the five-year period of retention of
jurisdiction has expired, defendants must continue to abide
by their other obligations under the Decree until entry of a
remedial order.  For the reasons set forth below, that
question will be answered in the affirmative.

As noted above, defendants agreed under the Consent
Decree to phase out their use of the PACE and replace it with
alternative examining procedures in particular job
categories.  "[T]o ensure that the obligations assumed by
defendants under the Consent Decree are properly

2

implemented," 93 F.R.D. at 81, defendants also agreed to record and report the numbers of applicants and hires who are White, Black and Hispanic and to use all practicable efforts to eliminate adverse impact in hiring within each job category. Plaintiffs now ask that defendants be required to adhere to these duties until this Court can determine whether adverse impact is occurring as a result of defendants' newly-formulated procedures.

Plaintiffs' request is a reasonable method of assuring the implementation of alternative examination procedures that do not adversely impact on class members First, it recognizes that long periods of time may elapse between an allegation of noncompliance and a finding that the Decree has been violated and guarantees that the crucial safeguards embodied in the Decree will continue unabated until a judicial resolution of plaintiffs' claims. In addition, it removes any incentive on the part of defendants to act in a dilatory fashion by maintaining adherence to the Decree during the interim period. See Reply Brief at 4-5. Finally, it avoids the difficulties that would arise if defendants ceased complying with the Decree and were subsequently compelled, through a remedial order, to resume their obligations in a particular job category. Id. at 3-4. Weighing these substantial benefits against defendants' only contention to the contrary -- that action at this time would

3

be premature (see Defendants' Response at 6) -- it is clear
that plaintiffs are entitled to the relief that they seek.

Accordingly, it is hereby

ORDERED that plaintiffs' motion be and it hereby is
granted.  Where plaintiffs have made a timely prima facie
showing of a violation of defendants' obligation to use all
practicable efforts to eliminate adverse impact in hiring for
a job category, and where this showing has been made before
the Monitoring Committee or in Court prior to the expiration
of the five-year period for retention of jurisdiction but
such period would otherwise expire before the Court
determines whether defendants have violated the Decree or
before the Court decides whether to extend the period of
retention of jurisdiction over that job category as part of
the remedy for any violation found, the period for retention
of jurisdiction over that job category, the defendants'
recordkeeping and reporting obligations for that job
category, and defendants' obligation to use all practicable
efforts to eliminate all adverse impact in hiring for that
job category, shall continue until such time as the Court
determines whether defendants have violated the Decree or
until the Court decides whether to extend the period for
retention of jurisdiction over that job category as part of
the remedy for any violation found; it is

FURTHER ORDERED that this Order shall not apply to a

particular job category if plaintiffs inform the Court that they are not seeking an extension of the period for retention of jurisdiction as to that job category as part of the remedy for the violation charged; and it is

FURTHER ORDERED that defendants shall have the right to move to exclude any particular job category from the terms of this Order for good cause shown, where the showing of good cause is particularized as to that job category.

June 27, 1988

JOYCE HENS GREEN
United States District Judge

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                 )
ANGEL G. LUEVANO, et al.,        )
   individually and on behalf    )
   of all others similarly       )
   situated,                     )
                                 )
                    Plaintiffs.  )
                                 )
            v.                   )       Civil Action No. 79-0271
                                 )
CONSTANCE HORNER, Director,      )
   U.S. Office of Personnel      )
   Management, et al.,           )
                                 )
                    Defendants.  )
_____)
```

FILED

JUN 27 1988

JAMES F. DAVEY, Clerk

### OPINION AND ORDER

Presently before the Court is plaintiffs' motion to enforce the applicant-reporting provisions of the Consent Decree entered in this case.  For the reasons outlined below, this motion will be granted in part and denied in part.

Suing on behalf of a nationwide class of Blacks and Hispanics, plaintiffs instituted this action contending that use of the Professional and Administrative Career Examination (PACE) to assess applicants for 118 professional and administrative entry-level positions in the federal government violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  Two years of litigation and settlement negotiations culminated in the January 15, 1981 preliminary approval and notice to class members.  This Court gave final approval on November 19, 1981 to a Consent Decree that sought to eliminate adverse impact in hiring against

class members by phasing out the PACE over three years and replacing it with alternative examining procedures in each of the job categories.  See Luevano v. Campbell, 93 F.R.D. 68 (D.D.C. 1981).

Paragraph 25(a) of the Decree is particularly relevant for present purposes.  It states in pertinent part:

> In order to enable plaintiffs effectively to monitor compliance by the various agencies and by OPM with their obligations as to alternative examining procedures, and to use, to the greatest extent feasible, the special programs described in ¶ 16, OPM shall require each federal agency to collect, maintain and compile the following statistics . . . and to submit such information to OPM and to plaintiffs annually:
>
> (a) The number of non-Hispanic white applicants, the number of black applicants, and the number of Hispanic applicants for a GS-5 or GS-7 entry-level job category listed in Appendix A which is filled on the basis of a competitive procedure.

In their motion, plaintiffs contend that defendants have violated paragraph 25(a)'s requirement to "collect, maintain and compile" statistics on the racial background of applicants for the 118 positions at issue in the Decree because the data supplied by defendants to date is far from complete.[1]  They further point out that the form given to prospective applicants by defendant Office of Personnel Management (OPM) contains a section where applicants may

---

[1] Plaintiffs also submit that defendants have violated a similar provision in paragraph 24(a) of the Decree that requires them to provide similar data for applicants taking the PACE exam during the three-year phase-out period.

2

indicate their racial background but also states, in words
that are underlined, that "[s]ubmission of this information
is voluntary." Plaintiff's Motion, Attachment F. Plaintiffs
observe that a different form used in an OPM study of PACE
applicants (the Northrup study) was able to identify the race
of the applicant 96% of the time. See Attachment H.
Finally, observing that the Department of Health and Human
Service's Social Security Administration (SSA) will state,
for a given pool of applicants, which applicants are white
and which are black, plaintiffs contend that defendants could
have -- but did not -- request this information in order to
supplement the data they have collected.

Plaintiff seek broad relief. They ask this Court, inter
alia, to find that defendants have violated the terms of the
Decree, to order defendants to replace their current form for
collecting race data with the one used in the Northrup study,
and to compel defendants to make use of the SSA data for
black applicants in job categories in which defendants have
not achieved an 80% reporting rate.

Defendants do not dispute that the racial data compiled
to date is incomplete, as only fragmentary racial data has
been provided for many job categories.[2]  Two graphic examples

---

[2] Plaintiffs have included the data for years 1983, 1984
and 1985 as Attachments C, D and E to their motion but have
summarized this material for convenience in Attachment B.
All references to reporting data shall be to the summary
contained in Attachment B unless otherwise noted.

will suffice.  For 1983, the Army's Maintenance Management Specialist position does not have race information for 341 of the 476 applicants, a 72% failure rate; for OPM-sponsored applicants in the Computer Specialist position in 1984, racial information is lacking in 60% of the cases (3,037 of 5,079 applicants).  The only question, then, is whether the lack of racial data amounts to a violation of the Consent Decree.

Defendants dispute that they have violated paragraph 25(a)'s requirement that they "collect, maintain and compile" information on the racial composition of job applicants. They maintain that the current form to designate race has been distributed to all of the defendant agencies, accompanied by instructions that the form be provided to each job applicant.  They further assert that plaintiffs have no evidence that any agency has willfully failed to collect race-related information.  Rather, defendants attribute the low rates of reporting to the fact that submission of race data is voluntary and that "many applicants for federal employment, given the choice, prefer not to reveal their race."  Opposition at 1-2.

Although one may safely assume that a certain percentage of job applicants will not provide racial data when told that there is no compulsion to do so, that argument cannot provide the whole story.  Defendants' explanation fails to account

4

for the wide discrepancies in data that exist from year to
year within similar job categories.  In 1984, for example,
OPM had no data on 22% of the applicants for the General
Investigator position; in 1985, however, that figure <u>doubled</u>
to 44%.[3]  Nor does defendants' position describe why the
reporting rates vary so much within the same job category
for the same year and within the same agency.  <u>See</u>
Plaintiffs' Motion at 12-13.  Finally -- and most
significantly -- applicant reluctance to provide racial
information cannot be the sole explanation for the lack of
data because defendants have been able, in some categories,
to identify the race of <u>every</u> applicant for a particular job
category.  <u>See</u>, <u>e.g.</u>, 1984 Internal Revenue Officer (Treasury
Department) (data compiled on 8,622 of 8,622 applicants);
1985 Contract and Procurement position (Department of the
Navy) (data compiled on 1,081 of 1,081 applicants).

    Although plaintiffs have no direct evidence of
noncompliance by defendants, these numbers (gleaned from data
submitted by defendants) speak for themselves.[4]  The nature
and breadth of the discrepancies revealed by the reported

_____

    [3] These examples are illustrative.  Other discrepancies
are legion and could just as well have been chosen.  <u>Compare</u>,
<u>e.g.</u>, Department of Agriculture, Contracting Administrator,
1984 data (0% unknown) <u>with</u> <u>id</u>. 1985 data (23.7% unknown).

    [4] It is unclear how plaintiffs would obtain direct
evidence of noncompliance with the Decree even if it existed.
<u>See</u>, <u>e.g.</u>, <u>Interstate Circuit v. United States</u>, 306 U.S. 208,
221 (1936).

data clearly demonstrates that it is far more likely that
administrative attitude has played the major role in the
incomplete race data assembled thus far, rather than the
suggested human reluctance.  Simply put, it is clear that
some agencies and managers are collecting and reporting race
data and others are not.  Accordingly, without making a
determination as to whether this failure constitutes
intentional willfulness or not, the Court concludes that
defendants have not fulfilled the terms of the Consent Decree
requiring them to "collect, maintain and compile" information
on the race of job applicants.

What remedy would most appropriately address this
failure?  Plaintiffs initially suggest that the Court order
defendants to replace their current form with the form
employed in the Northrup study, which achieved a 96% success
rate in identifying the race of applicants that used it.
This suggestion shall be rejected for several reasons.  At
the outset, it is clear that comparing the Northrup form to
the one currently in use is an "apples and oranges" affair:
the Northrup study involved "assembled" testing, with
applicants gathered together and guided through the
examination procedures by a proctor, while most of the jobs
formerly subject to the PACE use "unassembled" testing, in
which applicants fill out their forms without the aid of a
proctor.  See Attachment I at 2.  It is logical to assume

6

that an individual is more likely to provide race data in the former situation than the latter.

A more significant reason exists for refusing to supplant one race data form with another: plaintiffs have failed to show that the Northrup form would better achieve the important reporting goals set forth in the Decree. Plaintiffs object to the underlining of the statement in the current form that tells applicants that submission of race data is voluntary, but defendants have stated that they are willing to remove that underlining from the current form.[5] Another objection raised by plaintiffs to the current form is that it places its warning about voluntariness at the top of the page, while the Northrup form's statement is located at the bottom. Suffice it to say that this objection provides little basis to determine the impact of compelling OPM, the federal agency charged with developing testing exams and personnel procedures, to use one form rather than another. For the present, and in the expectation that there will be substantial improvement in the applicant reporting data, the form currently in use can continue to be employed with the underlining removed. Should there be a continued failure of improvement over the next several months, plaintiffs may then

---

[5] The Court accepts defendants' willingness to modify their race data form and expects that this change will be immediately implemented. The parties shall submit a joint report informing the Court as soon as this change has been accomplished.

7

move to substitute the Northrup form or another form to
achieve the mandate of the Consent Order provisions.

Plaintiffs next seek to require that defendants obtain
the SSA aggregate of race data for job categories with more
than 100 applicants and in which at least 20% of the
applicants were unidentified.  Given the inadequacy of the
data that defendants have adduced thus far, there is no
reason why the SSA information should not be collected, as
this additional material may demonstrate whether adverse
impact occurred in a particular job category without
plaintiffs' knowledge.  See Plaintiffs' Motion at 21.  More
information, not less, will enable this Court to determine
whether class members have suffered adverse impact in a given
case.

The Court urges defendants to continue to devote full
efforts at gathering this critical racial data.  It bears
mentioning that plaintiffs, while suggesting that there would
be merit in the proposal, have not yet sought contempt
sanctions for defendants' violation of the Consent Decree.
Because of the substantial anomalies that exist in the racial
reporting data, it appears appropriate that defendants file
quarterly status reports with the Court describing the
progress they have made toward improvement of the current

8

reporting problems.[6]

For the reasons set forth above, it is

ORDERED that plaintiff's motion to enforce the applicant-reporting provisions of the Decree be and it hereby is granted in part. In accordance with this Opinion and Order, defendants shall remove the underlining from the race data form currently in use, shall obtain and make available to plaintiffs within sixty (60) days the SSA breakdown of racial data for job categories with more than 100 applicants and in which the race of 20% or more of applicants is unknown, and shall, commencing October 1, 1988, file quarterly status reports with the Court describing their progress in achieving more complete reporting of race data. In all other respects, plaintiffs' motion be and it hereby is denied.

June 27, 1988

JOYCE HENS GREEN
United States District Judge

---

[6] Over the three-year period from 1983 to 1985, the rates for unknown applicants has gone from 18.7% to 48.7% to 20.8% for OPM-sponsored alternative examining procedures; from 22.7% to 26.6% to 22.7% for delegated alternative exams; and from 16.5% to 8.7% to 12.9% for Schedule B hiring.

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
*************************************
                                    *
ANGEL G. LUEVANO, et al.,           *
                                    *
                    Plaintiffs,     *
                                    *
            v.                      *  Civil Action
                                    *  No. 79-0271 (JHG)
CONSTANCE HORNER, Director          *
Office of Personnel Management,     *
et al.,                             *
                                    *
                    Defendants.     *
*************************************
```

**FILED**

**JUL 8 1988**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>REQUEST OF AMICUS TO ATTEND STATUS CONFERENCE</u>

Amicus National Treasury Employees Union (NTEU) requests that it be permitted to attend the July 14, 1988, status conference in the above case which was ordered by the Court on June 27, 1988.   NTEU has filed a complaint challenging the Defendant's recently announced program to allow widespread noncompetitive hiring into the civil service.   <u>NTEU v. Horner</u>, No. 88-1732 (JHP) (Attachment 1). This case is currently pending before Judge John H. Pratt and NTEU has moved that it be transferred to Judge Joyce H. Green as a case related to this case (Attachment 2).   Because of this, NTEU believes that its presence at the conference will assist the Court in evaluating the status of the case.

Respectfully submitted,

_____
LOIS G. WILLIAMS
Director of Litigation
D.C. Bar #365894

_____
ELAINE KAPLAN
Assistant Director of
  Litigation
D.C. Bar #292441

_____
CLINTON WOLCOTT
Assistant Counsel
D.C. Bar #343202

NATIONAL TREASURY
  EMPLOYEES UNION
1730 K Street, N.W.
Suite 1100
Washington, DC   20006
(202) 785-4411

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
**************************************
                                     *
ANGEL G. LUEVANO, et al.,            *
                                     *
                    Plaintiffs,      *
                                     *
              v.                     *  Civil Action
                                     *  No. 79-0271 (JHG)
CONSTANCE HORNER, Director           *
Office of Personnel Management,      *
et al.,                              *
                                     *
                    Defendants.      *
**************************************
```

ORDER

On consideration of amicus NTEU's request to attend the
July 14, 1988, status conference in the above case,

IT IS ORDERED that the request is granted.

_____                    _____
Date                               Joyce Hens Green
                                   United States District Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below, a copy of a request to attend status conference was mailed by first class mail, postage prepaid to

    Michael Sitcov, Esq.
    Civil Division, Department of Justice
    Room 3519
    10th & Pennsylvania Ave. N.W.
    Washington, DC  20006

    Richard T. Seymour
    Lawyer's Committee For Civil
     Rights Under Law
    1400 Eye Street, NW
    Washington D.C. 20006

7/8/88
Date

Clinton Wolcott

E COPY    IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*********************************
                                *
NATIONAL TREASURY EMPLOYEES UNION *
1730 K Street, N.W., Suite 1100  *
Washington, DC  20006            *
(202) 785-4411                   *        PRATT, J. JHP
                                 *
            Plaintiff,           *
                                 *
        v.                       *  Civil Action
                                 *  No.  88-1732
CONSTANCE HORNER, Director       *
Office of Personnel Management   *
1900 E Street, N.W.              *        JUN 24 1988
Washington, DC  20415            *
(202) 652-6106                   *
                                 *
*********************************

FILED

JUL 8 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.  This action challenges the new, comprehensive program which the Office of Personnel Management has developed to govern hiring for over 100 career positions with the federal government (Attachment 1).  Under that program federal agencies are given the authority to directly hire individuals for federal jobs, without subjecting them to competitive examining procedures, whenever they achieved a specified grade point average in college.

2.  Plaintiff National Treasury Employees Union (NTEU) seeks declaratory and injunctive relief invalidating this program because it provides for extensive noncompetitive hiring for the federal service, in violation of the civil service laws, and because it is arbitrary and capricious.

<u>JURISDICTION AND VENUE</u>

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202 and 5 U.S.C. § 701 <u>et seq</u>.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

<u>PARTIES</u>

5. Plaintiff National Treasury Employees Union (NTEU) is an unincorporated association that has its principal place of business at 1730 K Street, N.W., Suite 1100, Washington, DC 20006. Pursuant to Title VII of the Civil Service Reform Act of 1978, Public Law 95-454, 92 Stat. 1111, NTEU is the exclusive bargaining representative of approximately 120,000 federal employees, including employees of the Internal Revenue Service, the United States Customs Service, and a number of other agencies. NTEU represents the interests of federal employees by, <u>inter alia</u>, negotiating collective bargaining agreements, arbitrating grievances under such agreements, filing unfair labor practice charges, lobbying Congress for favorable working conditions, pay, and benefits, and litigating employees' collective and individual rights in the federal courts.

6. Defendant Constance Horner is the Director of the Office of Personnel Management. The Director is responsible for executing, administering and enforcing the civil service laws and regulations, including the requirement that individuals be employed by the federal government through

2

open, competitive examinations.  5 U.S.C. §§ 1103(a)(5),
3304.  OPM is also responsible for developing and
administering the examinations and is limited to making only
"necessary" exceptions to the requirement of competitive
examination.

<center>STATEMENT OF CLAIMS</center>

7.  Prior to 1982, the federal government hired outside
employees for 127 entry level, career positions through the
Professional and Administrative Career Examination (PACE), a
nationwide, open, written, competitive examination.

8.  In November, of 1981, OPM agreed to abandon the PACE
examination and replace it with job specific examining
procedures, in order to settle a lawsuit claiming that the
examination discriminated against black and Hispanic job
applicants.  Luevano v. Campbell, 93 F.R.D. 68 (D.D.C.
1981).

9.  In May, 1982, OPM announced that it would not
replace the PACE examination with new examinations, but would
instead permit agencies to fill these positions with a new,
non-competitive hiring authority pursuant to "Schedule B".
Then Director of OPM Donald Devine has recently acknowledged
that Schedule B hiring authority was used as a stalling
tactic until the Luevano consent decree expired, and a return
to a "PACE-like test" could be effected (Attachment 2).

10.  In February, 1987, this Court invalidated OPM's
use of Schedule B hiring authority to replace the PACE

<center>3</center>

examination and ordered OPM to create competitive
examinations, as required by law, and as it had agreed to do
under the Luevano decree.  National Treasury Employees Union
v. Horner, 659 F.Supp. 8 (D.D.C.  1987), appeal pending Nos.
87-5102 & 87-5191 (oral argument March 1, 1988).  The Court
stayed its order pending the government's appeal to the D.C.
Circuit.

11.  On June 23, 1988, OPM announced a "comprehensive
new program" which replaces the PACE examination and Schedule
B hiring authority (Attachment 1).  A key component of this
new program is a provision allowing agencies to directly hire
applicants without competition, provided the applicant has a
college grade point average above a certain cutoff.

12.  Employees hired through this new, non-competitive
procedure will become members of the "competitive service,"
with full civil service rights. 5 U.S.C. § 3301, et seq.

13.  The new program also provides for an alternative
two-step examination procedure for applicants who do not have
the required grade point average.

14.  OPM's public statements indicate that the two-step
examining procedure has an adverse impact against minority
applicants.  In addition, NTEU believes that the direct hire
procedure is irrational and will also select applicants in a
manner which disproportionately harms minorities.

15.  In addition to requiring competitive examining
procedures, the civil service laws require that OPM may not

4

prescribe a minimum educational requirement for an
examination for the competitive service, 5 U.S.C. § 3308,
must grant a preference to service veterans, 5 U.S.C. § 3309-
11, and must allow agencies to hire only one of the top three
eligible candidates certified for employment in a particular
position. 5 U.S.C. § 3313-18.

16.  Current employees who desire promotion into
positions covered by this new program must compete through
internal merit promotion systems, in which they are rated and
ranked against other internal candidates.

### FIRST CAUSE OF ACTION

17.  OPM is required to prescribe rules which provide
for the appointment of employees to the federal service
through competitive examination. 5 U.S.C. § 3304.

18.  OPM's new program, which provides for the direct
hiring of employees into the federal service without
competition violates § 3304, 3308, 3309, and 3318.

19.  The employees represented by NTEU are harmed by
this direct hiring procedure, because they are disadvantaged
in their ability to obtain appointment to the covered
positions.

20.  NTEU, as the exclusive bargaining representative,
and the employees it represents as the exclusive bargaining
representative, are harmed because the composition of its
bargaining units will be determined under procedures that do

not guarantee fair and open competition amongst candidates,
or the use of rational examination procedures.

## SECOND CAUSE OF ACTION

21.  Plaintiff reasserts and realleges each allegation
in paragraphs 1 to 17.

22. OPM is required to publish all proposed regulations
in the Federal Register for notice and comment. 5 U.S.C.
§ 1103(b)(1).

23.  OPM's failure to publish its new program in the
federal register deprived NTEU and its members of their
opportunity to comment on the program.

## THIRD CAUSE OF ACTION

24.  Plaintiff reasserts and realleges each allegation
in paragraphs 1 to 17.

25.  OPM's new program is arbitrary and capricious in
that its procedure for qualifying individuals for federal
jobs solely on the basis of college grade point average is
irrational.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, plaintiff requests
judgment against the defendant:

A. Declaring that the defendant's comprehensive new
program for federal hiring is arbitrary, capricious, contrary
to law, null, and void;

6

B.  Ordering the defendant to develop and implement competitive examining procedures for the hiring of employees into jobs previously covered by the PACE examination;

C. Ordering the defendant to pay a reasonable amount of plaintiff's attorney fees as determined by the Court; and

D.  Granting such other relief as the Court deems just and proper.

Respectfully submitted,

LOIS G. WILLIAMS
Director of Litigation
D.C. Bar # 365894

ELAINE KAPLAN
Assistant Director of
       Litigation
D.C. Bar # 292441

CLINTON WOLCOTT
Assistant Counsel
D.C. Bar # 343202

NATIONAL TREASURY
EMPLOYEES UNION
1730 K Street, N.W.
Suite 1100
Washington, DC    20006
(202) 785-4411

7



**UNITED STATES**
**OFFICE OF PERSONNEL MANAGEMENT**
WASHINGTON. D C. 20415

Office of the Director

## NEW PROGRAM to FILL GS-5 AND 7 ENTRY-LEVEL JOBS

We are announcing a comprehensive new program to fill career positions in the Federal Government and I wanted to give you advance information on our plans.

The new program will replace the Professional and Administrative Career Examination (PACE), which served as the Government's primary vehicle for hiring college graduates until 1982, and the interim Schedule B appointing process used over the last six years. It will be used to fill entry-level positions at the GS-5 and 7 levels in over 100 different occupations.

A major factor in our decision to proceed with the new program is the belief that it will enable us to obtain a quality Federal workforce which is also reflective of the population it serves. We will use merit selection techniques which measure both competence and character--a blend of the traditional civil service focus on technical skills with a new emphasis on such critical job-related values as achievement, perseverance, and initiative. This will add a new dimension of quality to our selection process.

Our experience with similar approaches on a limited basis since the termination of PACE has convinced us that they also enhance the Government's ability to attract highly qualified minority candidates. The use of such procedures has contributed to an increase in the rate of minority selections, from less than 10% of the candidates hired through PACE, to over 27% of the employees appointed to such positions in recent years.

A key feature of the new program is that it will provide a variety of ways in which candidates can enter Federal service. Written tests will be used in the selection process, but they will be job related, and will include for the first time a measure of personal characteristics indicative of successful performance. Federal agencies will also be able to recruit and hire top candidates who have demonstrated achievement through a high college grade-point average, without using written tests. We also plan to continue existing programs to provide upward mobility opportunities for current Federal employees, and special entry programs for cooperative education students, Vietnam-era veterans and Presidential Management Interns.

(June 23, 1988)

CON: '61-64-4
May 1986

We feel that providing this variety of selection techniques,
instead of a single centralized examination like PACE,
or the Schedule B process with the difficulties it gave
applicants in finding openings, is essential if the Government
is to maintain a high quality workforce in the tough recruiting
years ahead. I am sure you are familiar with the demographic
trends which show a declining number of young people entering
the workforce over the next decade, and the major implications
that this has for employers. We need fast, flexible staffing
programs to enable Federal recruiters to compete effectively
in this labor market.

The enclosed material provides more detailed information
on the program.


Enclosure

**OPM's NEW PROGRAM TO FILL GS-5 AND 7 ENTRY LEVEL POSITIONS**

## -FACT SHEET-

o   The U.S. Office of Personnel Management is announcing a new
    plan to select candidates for GS-5 and 7 administrative
    positions.  These jobs are typically filled by recent college
    graduates beginning a career in the Federal Government.

o   The program will use sophisticated merit selection techniques
    which measure a candidate's competence and character.  These
    are designed to enable Federal agencies to recruit and
    hire high quality talent over the next decade- a period
    during which the pool of young people entering the labor
    market is expected to shrink significantly.

o   The new program will replace the Professional and Administrative
    Career Examination (PACE) which served as the Government's
    chief vehicle for hiring college graduates until 1982,
    and the interim Schedule B hiring process used over the last
    6 years.

o   Over 100 different occupations will be filled through the
    program at the GS-5 and 7 levels ($15,118 to $18,726 per
    year).  Examples of these jobs are:

    o   Program Analyst            o   Budget Analyst
    o   Investigator               o   Public Information Specialist
    o   Personnel Specialist       o   Management Analyst

o   Applicants will be able to qualify for these positions in
    several ways:

    o   They can take a written test in one of a number of major
        occupational fields, for example, financial and program
        management occupations.  The tests will be job-related
        in content and will also include an evaluation of the
        candidates based on the Individual Achievement Record-
        a new technique which essentially measures what individuals
        have been able to accomplish with the opportunities
        they have had.  The entire examining process will be
        automated so that candidates can be referred to agencies
        for selection within a few days after they are tested.

    o   Applicants who have demonstrated academic achievement
        through a high college grade point average will be
        eligible for employment without taking the test.  Agencies
        will be able to recruit and select such candidates directly.

    o   Individuals in Cooperative Education work/study programs
        and Vietnam-era veterans will also be able to enter these
        occupations without taking the written test.  Current
        Federal employees can qualify in the same way through
        their agency's upward mobility program.

o   The new program will be implemented in consultation with
    plaintiffs who participated in litigation involving the
    former PACE examination.  Current plans are to put it in
    operation in the spring of 1989.

                                        (June 23, 1988)

# Questions and Answers

## about

## OPM's New Program

## to Fill Entry-Level Jobs

1.  How does the new program differ from the hiring procedures
Federal agencies have used since the PACE was eliminated in
1982?

Professional entry-level positions have been filled in 3
major ways since the PACE examination was dropped in 1982.

When the decision was made to drop the PACE, OPM began
developing individual tests for occupations formerly covered
by the exam.  These examinations are currently used to fill
16 occupations formerly covered by PACE.  Under the new program
we will have a small number of basic job-related tests which
will cover over 100 occupations.

Another major source of hires since 1982 has been through the
Schedule B appointment authority.  This was established as an
interim selection device for those former PACE occupations
for which OPM had not yet developed competitive job-specific
examinations.  Agencies hired Schedule B employees directly
under excepted appointments which provided only limited
promotional and mobility opportunities.  Under our new program,
all employees will be given regular career-conditional appointments
and the use of Schedule B appointments will be ended.

Finally, agencies have filled many thousands of their GS-5
and 7 positions from among their own employees selected
through internal upward mobility programs. These programs
will continue to be a major hiring source in the future.

Although these techniques have enabled agencies to keep their
jobs filled, they suffered a number of serious deficiencies:
they did not necessarily provide enough highly-educated candidates
to meet the need for future managers; they did not have high
visibility, and public awareness of career opportunities in
the Federal Government has thus diminished.  This will be one
of the chief benefits of the new program.  It will give more
visibility to our recruiting programs, and provide a simpler
and more accessible system through which individuals can
apply for Federal employment.

(June 23, 1988)

2.  How does the new program differ from the old PACE exam?


Our new program differs from the PACE in both its approach and its philosophy.

PACE was designed to meet the requirement for a merit-based hiring system through a single, overall test of a candidate's abilities.  In a labor market full of good candidates, it was an effective and relatively cheap and easy way to identify candidates intellectually talented enough for entry level jobs leading to future management positions.  It served as a highly centralized "hiring hall" and anyone who wanted to enter one of 118 professional and administrative occupations in government was required to take it.

However, in the early 80's, litigation surrounding the issue of racial and ethnic representativeness caused the abandonment of the PACE under a court-approved consent decree.

Although generally accepted as a very strong measure of cognitive ability, PACE did not provide agencies with any real incentive to recruit candidates.  Under the PACE everyone was tested.  Even if an agency did recruit candidates, the agency could not offer them jobs until they had taken the test and their names had come up for selection on a civil service register.  Managers could not depend on specific candidates being referred to their agency and the process was so time-consuming that the best candidates often accepted other jobs in the meantime.

The new program has two main ways that candidates can be hired, both of which allow a measure to be taken of character in addition to cognitive ability.  Candidates can take an individual test which directly relates to the major occupational field they are applying for.  These tests also include a new candidate evaluation technique -- called the Individual Achievement Record -- which will give us a fuller picture of a candidate's accomplishments and abilities than we were able to get from PACE.

Agencies will also be able to recruit and directly hire candidates with high college grade-point averages.  Federal recruiters will have a clear incentive to seek out the best talent they can find and the means to bring that talent on board quickly in a period of labor shortage.

Under the new program, the prospects improve for the Federal Government to be able to hire intellectually talented and highly motivated future managers of all races and ethnic groups.


(June 23, 1988)

3. Does the new system you propose guarantee that the Federal Government is hiring the most intellectually capable people you can attract?

Yes, but in a new way that allows the Federal Government to compete for the best in an increasingly tight labor market. Our combined approach of college recruiting and an examination allows us to identify and quickly hire the best graduates and ensures that we don't overlook anyone who is attracted to the Federal Government.

The PACE exam which we used previously did a good job of identifying the relative standing of those who bothered to take it, but it wouldn't serve us well in a very competitive recruiting market where other employers are hiring highly qualified applicants on the spot. These days, college students don't have to take a long exam and wait months to see whether and where they'll get a job offer in order to find attractive employment. Recognizing this, we want to give Federal managers the same tools their competitors have, but with a quality control factor built in: managers will have access only to the top quartile of college graduates, which is no small guarantee of quality.

Applicants will also be able to take a more traditional job-related exam, though one that broadly measures quality by including character as well as competence. Strong performance on the exam will make sure we don't lose highly qualified applicants whose grades were below our cutoff, and the exam will provide, for the first time since PACE was abolished, a simple, visible means for all who are interested in these occupations to compete for them, whether or not they have gone to college.

Finally, because quality is a crucial concern to us, we will carefully measure the quality of those we hire over the next few years. We will be able to determine which approach to hiring produces the best employees and we will use this information to ensure that the Federal Government gets the best people for its jobs.

(June 23, 1988)

4.  Why are there expected to be shortages of job candidates over the next decade?

The pool of workers from which new Federal employees will be drawn will change significantly over the next decade.  The U.S. labor force, which expanded by almost 3% per year in the 1970's, will be expanding by only about 1% annually in the 1990's.  More importantly, the number of workers in the entry level age group (16-24) will actually drop by almost 2 million.  We're starting to see the effects of this change already in the Northeast and West Coast, where employers cannot find enough entry-level workers in many occupations.

This trend will make the competition for new workers much keener than it has been, and the Federal Government will have to adopt a much more aggressive recruiting posture than in the past to deal with it.  The traditional Federal approach to hiring— which used a complex and lengthy screening process— will simply not work in this kind of environment.  Good candidates will not sit back and wait until their names come up on a civil service hiring list, when they can receive quick offers elsewhere.

Our new program gives Federal agencies the ability to go after and hire the best talent they can find.

(June 23, 1988)

5.  How are minorities going to fare under this new program?


Over the last 6 years, the percentage of minorities coming into
these occupations at the GS-5 and 7 level has increased signi-
ficantly and we believe that this record will continue.

When OPM dropped the PACE in 1982, it was because of litigation
ensuing from the exam's poor minority hiring record.

Since that time we have used several different selection
techniques including job-related tests, and excepted Schedule
B appointments to fill these positions, pending the development
of a new comprehensive hiring program.

Although these interim programs have not been perfect--in
some cases employees could not be given career appointments
when they were initially hired--they have provided valuable
lessons which have been incorporated into the new exam.  We
learned for example, that when we used tests which were more
job-related, minority hiring results improved.  While minority
candidates accounted for only about 10% of the selections
from PACE, over 22% of the candidates hired from the job-
related replacement tests used since 1983 have been black and
Hispanic.

We also have excellent minority results through the interim
programs which have permitted agencies to recruit and hire
high quality candidates directly.  Overall, about 27% of the
candidates appointed to these positions have been black and
Hispanic.

Both of these staffing approaches will be incorporated in the
new program.


(June 23, 1988)

6.  How does the new program relate to the consent decree
which OPM negotiated with a group of minority candidates in
1981 when it agreed to replace the PACE?


We see it as the next logical step in this process.  We will
work with plaintiffs to perfect our new approach.  We will
also continue to monitor selection data, as we have since
1982, and the court will presumably review this information
and the new program as well.

There is, of course, another lawsuit affecting our college-
level hiring programs, the suit brought by the National
Treasury Employees' Union against the interim Schedule B
hiring authority used for some of the positions formerly
covered by PACE.  This case is currently at the Appeals Court
level, and its outcome cannot be predicted.  The primary
issue here would be resolved, however, once we start using
the new program, since Schedule B appointments would then no
longer be made.


(June 23, 1988)

7. How will the provision authorizing direct hire on the basis of grade-point average work?

Under our new program, agencies will be allowed to hire candidates who have a high college grade point average (GPA) without using the written test, based on a shortage of high scoring candidates in the general labor market.

This authorization will apply to positions at GS-5 and 7 in all occupations covered by the new program. The GPA cutoff will be in the 3.00 to 3.25 range (on a 4.0 scale). We will announce final details before the new program goes into operation.

There are several reasons why we are incorporating this selection technique in the new program. The GPA is widely used by industry in the employment process and is generally recognized as a measure of educational achievement, intellectual capability, and perseverance. Although there are differences in the grading policies and educational levels of individual schools, we feel that the GPA is a benchmark which provides a good indicator of applicant quality.

Use of the GPA is also a key element in our effort to speed up the hiring process and strengthen agency recruiting programs. We feel that this is essential if we are to deal effectively with the coming shortages of entry-level candidates.

(June 23, 1988)

8.  What is this new examining technique-the Individual
Achievement Record (IAR)-that you referred to?


This is a new personnel measurement tool developed by our
psychologists which improves our ability to evaluate a can-
didate's overall potential for successful job performance.
The technique has been successfully used in the private
sector for sometime.  We plan to include it as a component in
our new program for GS-5 and 7 entry-level positions.

The IAR consists of a series of questions about certain aspects
of an individual's background including education and
employment.  These questions are designed to discover how
well applicants have used the opportunities available to
them, not what opportunities they've had.  The questions have
been carefully developed and field tested on over 6,000 employees
in over 100 Federal administrative occupations.  In this
process we found that there was a clear correlation between
the answers given to these questions and whether or not the
individual was a successful job performer.  Scoring of the
IAR is based directly on how successful job performers responded
to the questions compared to not-so-successful job performers.

In developing this approach we were careful to avoid using
questions which would  be inappropriate in a merit system
context or which would have discriminatory implications.
We appear to have been successful in this effort.  We found
only small differences between the IAR scores of blacks and
whites- averaging less than a third of a standard deviation.
This is significantly less than the differences usually found
when using written ability tests.


(June 23, 1988)

9. Even if improvements are made in the hiring process, isn't the Government still going to have problems attracting good candidates because of low pay?

Pay comparability with the private sector is certainly a problem in some areas and occupations. OPM has authorized special pay rates in many of these situations, and has developed legislation which we believe represents the best overall solution to the problem.

However, most people who are interested in a public service career realize that they are not going to make as much money as a Wall Street investment banker. Pay is not their only motivation. They know that Government service offers other rewards, such as experience, relative job security, and the reward of public service itself.

We have to insure that employees receive fair compensation, but just as important, we have to make sure that the Government's recruiting message gets through to them when they are making career decisions. In this sense the strength of our recruiting programs, and the ability to hire such people quickly and efficiently, are just as important as how much money we pay them.

(June 23, 1988)

Case 1:79-cv-00271-RBW    Document 1-4    Filed 01/29/__    Page 379 of 459

# Civil Service To Revise Hiring

## Traditional Exams Will Be Abandoned For Entry-Level Jobs

**By Judith Havemann**
Washington Post Staff Writer

Six years after the federal government's entrance test for workers was thrown out as racially discriminatory, the Reagan administration will announce this morning that it intends to abandon the traditional written examination requirement for all civil servants and allow college graduates with top grades to be hired on the spot.

Applicants for entry-level professional and administrative jobs will become eligible for hiring by either:

■ Earning a college grade point average still to be determined of 3.0 to 3.25 or above on a scale of 4.0, and impressing an agency recruiter with personal, technical or other qualifications.

■ Passing a job-related skills test and a wholly new type of test called an Individual Achievement Record, which attempts to measure "the full range of relevant personal qualities required for successful job performance," according to the Office of Personnel Management.

"We want the strongest possible civil service and we're going to get it under this plan," said OPM Director Constance Horner.

The government has had no entrance test for more than 100 jobs since the Professional and Administrative Career Examination (PACE) was thrown out in 1982. Hiring has been based on interviews, recommendations and college grades.

The proposal must pass legal muster because the government has been successfully sued twice over discriminatory examination practices. But Horner said OPM hopes to negotiate acceptable details of the plan with the two sets of lawyers and begin using it next

The current system, she said, is "intellectually confusing, procedurally nightmarish," inaccessible to students and very difficult to explain.

The decision to abandon efforts to develop new blanket PACE exams was made because testing is slow and many of the best candidates in a highly competitive job market go elsewhere, she said.

In addition, Horner said, "Based on my experience over time in government, I have become convinced that it is very important that the people who implement laws be in touch with American life and be reflective of the diversity of this country."

The use of grade point averages to rate students without requiring a written ability test is necessary because testing procedures are "so slow and cumbersome that they cannot be tied to recruiting," Horner said. She said that under her plan, recruiters will be able to target historically black colleges, for example, and seek qualified blacks rather than wait passively for them to apply.

She said she is "not concerned on balance" about the differences between the same grade point average earned at a highly selective college and one that is less selective. "Not everybody with a 3.25 GPA will be hired," Horner said.

Applicants without a high grade point average in college, or who have not attended college, would be hired after receiving a high score on a combination of two tests: a job-related skills test and the new Individual Achievement Record.

Minorities do far better on the Individual Achievement Record than on written ability tests, in comparison with whites, according to a study of 6,000 federal workers. Although some discrepancy remains between average black and white scores on the Individual Achievement Record, it is less than one-quarter as much as on traditional tests such as PACE.

OPM said that the Individual Achievement Record predicts successful on-the-job performance to a high degree.

Ninety-five percent of black applicants were screened out by PACE, which led to a suit that was settled on the eve of President Reagan's inauguration with the government promising to develop nondiscriminatory tests.

Since then, new civil servants have been hired through a special temporary process that was thrown out last year by U.S. District Court Judge Joyce Hens Green as "arbitrary and capricious."

While her decision is being appealed, the government has continued to use the special temporary process, called Schedule B, under which recruiters rely heavily on grade point averages.

Horner said she is eager to resolve differences with the two sets of lawyers who have sued OPM over the issue. She said the 3.25 minimum GPA for hiring is negotiable, as well as how many different written tests of job-related skills can be given.

"For seven years litigation strategy has been driving policy," and no progress has been made, she said.

The attorney for the Lawyers Committee for Civil Rights who handled the original attack on PACE was out of town yesterday and could not be reached for comment.

Robert M. Tobias, president of the National Treasury Employees Union, which successfully sued to restrict Schedule B last year, said he had "a lot of concern about Horner's proposal. Hiring on the basis of GPAs is contrary to congressional intent that hiring be done through a competitive exam that is nationwide in scope."

Donald J. Devine, Horner's predecessor at OPM, called her proposal a "sad day for the civil service when it can't have an objective civil service exam, but I can't criticize OPM because I know the kind of pressure they're under" from the lawsuits.

Devine's strategy was to use the temporary Schedule B hiring authority as a stalling tactic until the consent degree expired and the government could go back to a PACE-like test, he acknowledged.

Rep. Patricia Schroeder (D-Colo.), head of the House civil service subcommittee and a critic of PACE, said the Horner proposal "beats what we've been having."

She said the combination of skills and achievement tests "sounds almost like what the Ivy League does to select well-rounded students, instead of only students with good grades."

(over) AH-2

# U.S. Plans Hiring System Without Traditional Tests

Tests like the Individual Achievement Record are widely used in the private sector with great success in predicting job performance as well as improving minority representation, said Frank Erwin, president of a personnel research firm.

Erwin said the tests, sometimes called "biodata" or autobiographical questionnaires, "should have been implemented 20 years ago.

"There is more to work performance than just knowledge about the task," he said.

"Strong job performance has both an intellectual and moral component," Horner said. "Smarter people perform better on jobs, but smartness is not just cognitive, it is also a function of personal qualities like drive, ambition, and ability to be generous and work cooperatively with people."

## BIOGRAPHICAL QUESTIONS

Some Individual Achievement Record questions on "quantifying biographical experience":

■ My *high school* teachers would most likely describe my *self-discipline* as:

A. superior
B. above average
C. average
D. below average
E. don't know

■ The number of *high school* clubs and organized activities (such as band, sports, newspaper, etc.) in which I participated was:

A. 4 or more
B. 3
C. 2
D. 1
E. didn't participate

■ In the past three years, the number of different paying jobs I have held for more than two weeks is:

A. 7 or more
B. 5-6
C. 3-4
D. 1-2
E. none

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
************************************
                                  *
NATIONAL TREASURY EMPLOYEES UNION  *
                                  *
                Plaintiff,         *
                                  *
        v.                         *  Civil Action
                                   *  No. 88-1732 (JHP)
CONSTANCE HORNER, Director         *
Office of Personnel Management     *
                                  *
************************************
```

## MOTION FOR REASSIGNMENT OF RELATED CASE

Plaintiff National Treasury Employees Union moves that the Court reassign the above case to the Honorable Joyce Hens Green, because it is related to two other cases. This case arises from the same factual situation and involves certain of the same legal issues as <u>Luevano v. Horner</u>, No. 84-2573-(JHG), which is before Judge Green on the enforcement of the consent decree, and <u>National Treasury Employees Union v. Horner</u>, No. 84-2573 (JHG), which is currently on appeal to the D.C. Circuit as Nos. 87-5102 & 87-5191 (oral argument held March 1, 1988). The reasons for reassignment are explained in the accompanying memorandum in support of the motion.

Respectfully submitted,


LOIS G. WILLIAMS
Director of Litigation
D.C. Bar #365894


ELAINE KAPLAN
Assistant Director of
  Litigation
D.C. Bar #292441


CLINTON WOLCOTT
Assistant Counsel
D.C. Bar #343202

NATIONAL TREASURY
  EMPLOYEES UNION
1730 K Street, N.W.
Suite 1100
Washington, DC   20006
(202) 785-4411

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
***********************************
                                  *
NATIONAL TREASURY EMPLOYEES UNION  *
                                  *
              Plaintiff,          *
                                  *
         v.                       *  Civil Action
                                  *  No. 88-1732 (JHP)
CONSTANCE HORNER, Director        *
Office of Personnel Management    *
                                  *
***********************************
```

MEMORANDUM IN SUPPORT OF MOTION TO REASSIGN RELATED CASE

This action challenges the recently announced program of
the Office of Personnel Management (OPM) to allow widespread
non-competitive hiring for career federal government
positions.  This new program is the latest development in the
nine year old dispute over the abolishment and replacement of
the Professional and Administrative Career Examination
(PACE).  Judge Joyce Hens Green has presided over this
dispute since its inception with the filing of Luevano v.
Campbell, 93 F.R.D. 68 (D.D.C. 1981), in 1979, and is
currently presiding over a variety of claims relating to the
interpretation of, and OPM's compliance with, the consent
decree in that case.

In addition, Judge Green presided over National Treasury
Employees Union v. Horner, 654 F.Supp. 1159 (D.D.C. 1987),
and ordered OPM to develop examining procedures very
different from those announced by OPM for these same jobs.
Judge Green stayed this order pending appeal, and the appeal

of her decision was argued March 1, 1988. <u>Id</u>. Appeal Nos. 87-5102 and 87-5191.

NTEU attempted to file the complaint in this action as a related case, pursuant to Local Rule 405.  The clerk would not accept our designation that the case is related, however, because Rule 405 specifies that the earlier related case must be "still pending on the merits in the District Court..." and neither <u>Luevano</u> nor <u>NTEU</u> is currently pending on the merits.

Nevertheless, it is appropriate to transfer this case to Judge Green, because the issues here are intertwined with the pending compliance issues in <u>Luevano</u>, and because it is possible that compliance issues or consideration on remand of <u>NTEU</u> will involve OPM's newly announced program.  Certainly, no point would be served by a different Judge taking the extensive amount of time necessary to become familiar with the complex and lengthy background to this dispute.

NTEU has discussed this motion with counsel for the defendant and they have no objection to the transfer of the case to Judge Green.

Therefore, NTEU moves that this case be reassigned to Judge Green.

2

Respectfully submitted,

LOIS G. WILLIAMS
Director of Litigation
D.C. Bar #365894

ELAINE KAPLAN
Assistant Director of
   Litigation
D.C. Bar #292441

CLINTON WOLCOTT
Assistant Counsel
D.C. Bar #343202

NATIONAL TREASURY
   EMPLOYEES UNION
1730 K Street, N.W.
Suite 1100
Washington, DC    20006
(202) 785-4411

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
************************************
                                  *
NATIONAL TREASURY EMPLOYEES UNION  *
                                  *
                  Plaintiff,      *
                                  *
          v.                      * Civil Action
                                  * No. 88-1732 (JHP)
CONSTANCE HORNER, Director        *
Office of Personnel Management    *
                                  *
************************************
```

<u>ORDER</u>

On consideration of the plaintiff's motion to transfer this case to Judge Joyce Hens Green as a related case,

IT IS ORDERED that the case is transfered to Judge Green.


_____                _____
Date                           John H. Pratt
                               United States District Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below, a copy of a

Motion for Reassignment of Related Case and the accompanying

Memorandum were mailed by first class mail, postage prepaid

to

      Michael Sitcov, Esq.
      Civil Division, Department of Justice
      Room 3519
      10th & Pennsylvania Ave. N.W.
      Washington, DC  20006

5/30/88
Date

Clinton Wolcott

RECEIVED

JUL 8  3 45 PM '88

JAMES F.       CLERK
   U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

CO-525
(12/86)

**PRAECIPE**

# United States District Court
## for the District of Columbia

the ____14th____ day of ____July____ 19 88.

Angel G. Luevano

vs.

Constance Horner

} *Civil/Criminal* 79-0271
*Action No.* ____

The Clerk of said Court will __please enter Barry Goldstein as counsel__

for plaintiff Angel G. Luevano.

FILED

JUL  ...

CLERK, U.S. DISTRICT COURT

Barry Goldstein    941927
(Name)    (Bar ID)

1275 K Street, N.W., #301
(Address)

(202) 682-1300
(Phone Number)

Plaintiff Angel G. Luevano
(Attorney For)

(Name)    (Bar ID)

(Address)

(Phone Number)

(Attorney For)



RECEIVED

JUL 21  4 25 PM '80

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

# United States District Court

DISTRICT OF __COLUMBIA__

## APPEARANCE

ANGEL G. LEUVANO, el al.
      Plaintiffs

    v.

CONSTANCE HORNER
      Defendant

CASE NUMBER: 79-0271 (JHG)

To the Clerk of this court and all parties of record:

   Enter my appearance as counsel in this case for Defendant

FILED

JUL 28 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

July 26, 1988
_____
Date

_____
BAR IDENTIFICATION NO.

_____
Signature

Jeffrey S. Gutman
_____
Print Name
U.S. Department of Justice
9th & Pennsylvania Ave., N.W.  Room 3336
_____
Address

Washington, D.C.                20530
_____
City              State     Zip Code

(202) 633-3416
_____
Phone Number

### CERTIFICATE OF SERVICE

   A copy of this Appearance was mailed by first class mail this 26th Day of July,
1988 to:

   Mr. Richard Seymour
Lawyers Committee for Civil Rights Under Law
1400 I Street, N.W.
Washington, D.C. 20005

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

JUL 26   1   09 PM '88

RECEIVED

JUL 28   12 59 PM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., ) <br><br> individually and on behalf ) <br> of all others similarly ) <br> situated, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> CONSTANCE HORNER, Director, ) <br> U.S. Office of Personnel ) <br> Management, et al., ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 79-0271 <br><br> Judge Joyce Hens Green |

FILED

AUG 10 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## DEFENDANTS' MOTION FOR EXTENSION OF TIME

This Court's June 27, 1988 Opinion and Order requires defendants to obtain and make available to plaintiffs within sixty days the Social Security Administration breakdown of racial data for job categories with more than 100 applicants and in which the race of 20% or more of applicants is unknown. Defendants respectfully move the Court that they have until September 30, 1988 to comply with this Order.

Counsel for defendants has contacted Mr. Richard Seymour, counsel for plaintiffs. He has no opposition to this motion and was informed by counsel for defendants that defendants will make every effort to comply with the Order in advance of the September 30 date.

Respectfully submitted,

JOHN R. BOLTON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

_Anne M. Gulyassy /sgc_
ANNE M. GULYASSY

_[signature]_
ALAN L. FERBER
JEFFREY S. GUTMAN

OF COUNSEL:

JAMES GREEN
Associate General Counsel
Office of Personnel
  Management

Attorneys, Department of Justice
Civil Division, Room 3336
9th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3416

Dated: August 10, 1988

Attorneys for Defendants

## CERTIFICATE OF SEVICE

I certify that, on August 10, 1988, I served a copy of a Motion for Extension of Time and Order by first-class mail, postage prepaid, on:

                    Richard T. Seymour
                    Lawyer's Committee For Civil
                      Rights Under law
                    Suite 400
                    1400 "Eye" Street, N.W.
                    Washington, D.C.  20005


                    _____
                    JEFFREY S. GUTMAN

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

AUG 10   1 26 PH '88

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ANGEL G. LUEVANO, et al.,          )
                                   )
    individually and on behalf )
    of all others similarly    )
    situated,                   )
                                   )
               Plaintiffs,   )
                                   )      Civil Action No. 79-0271
      v.                         )
                                   )      Judge Joyce Hens Green
CONSTANCE HORNER, Director,        )
    U.S. Office of Personnel    )
    Management, et al.,         )
                                   )
             Defendants.     )
                                   )

---

**FILED**

AUG 12 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORDER

     Defendants have moved for an extension of time to comply with this Court's June 27, 1988 Opinion and Order which requires defendants to obtain and make available to plaintiffs within sixty days the Social Security Administration breakdown of racial data for job categories with more than 100 applicants and in which the race of 20% or more of applicants is unknown.  Good cause appearing,

     it is this day ORDERED that defendants shall have until until September 30, 1988 to comply with the above Order.

                                 _Joyce Hens Green_
                            UNITED STATES DISTRICT JUDGE

DATED: August 12, 1988



Richard T. Seymour
Lawyer's Committee For Civil
Rights Under Law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005

Counsel for Plaintiffs

Jeffrey S. Gutman
Department of Justice
Civil Division, Room 3336
9th & Pennsylvania Ave. NW
Washington, D.C. 20530

Counsel for Defendants

RECEIVED

Aug 15  9 01 AM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGEL G. LUEVANO, et al., ) | |
| ) | |
| individually and on behalf ) | |
| of all others similarly ) | |
| situated, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 79-0271 |
| v. ) | |
| ) | Judge Joyce Hens Green |
| CONSTANCE HORNER, Director, ) | |
| U.S. Office of Personnel ) | |
| Management, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

FILED

AUG 26 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## NOTICE OF APPEAL

Notice is hereby given that Defendants in the above titled action appeal to the United States Court of Appeals for the District of Columbia Circuit the fifteen and five-page Orders, entered in this action on June 27, 1988. Defendants also hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the nine-page Opinion and Order entered on June 27, 1988.

Respectfully submitted,

JOHN R. BOLTON
Assistant Attorney General

_____
JAY B. STEPHENS
United States Attorney

_Anne M. Gulyassy, USA_
ANNE M. GULYASSY

OF COUNSEL:

JAMES GREEN
Associate General Counsel
Office of Personnel
   Management

Dated: August 26, 1988

_____
ALAN I. FERBER
JEFFREY S. GUTMAN

Attorneys, Department of Justice
Civil Division, Room 3336
9th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3416

Attorneys for Defendant

- 2 -

CERTIFICATE OF SEVICE

I certify that, on August 26, 1988, I served a copy of the
Notice of Appeal, by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005

Clinton Wolcott
National Treasury Employees Union
Suite 1101
1730 K Street
Washington, D.C.  20006

JEFFREY S. GUTMAN

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA
AUG 26  11 10 AM '88

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 3 1 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
    individually and on behalf      )
    of all others similarly         )
    situated,                        )
                                    )
                Plaintiffs,    )
      v.                            )    Civil Action No. 79-0271
                                    )
CONSTANCE HORNER, Director,         )    Judge Joyce Hens Green
    U.S. Office of Personnel         )
    Management, et al.,              )
                                    )
              Defendants.       )
                                    )
                                    )

## JOINT REPORT

The parties submit this joint report pursuant to footnote 5 of this Court's nine-page Opinion and Order entered on June 27, 1988.

On July 28, 1988, the Office of Personnel Management distributed a revised Applicant Race and National Origin Questionaire, E Form 618, to the local headquarters of all federal departments and agencies. A copy of the revised Questionaire is attached as Exhibit 1. The Office of Personnel Management has revised E Form 618 to remove the underlining of the sentence "Submission of this form is voluntary." present in the previous version of this questionaire.

All heads of departments and independent establishments have been notified of the requirement that they henceforth use this revised Questionaire in all personnel application packages. A

copy of Federal Personnel Manual System Bulletin No. 213 so

advising these departments and independent establishments is

attached as Exhibit 2.

Respectfully submitted,

RICHARD T. SEYMOUR
Bar No. 28100
Lawyer's Committee for Civil
Rights Under Law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C. 20005
202/371-1212
Counsel for Plaintiffs

Dated: August 31, 1988

JOHN R. BOLTON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

ANNE M. GULYASSY

ALAN L. FERBER
JEFFREY S. GUTMAN

Dated: August 18, 1988

JAMES GREEN
Associate General Counsel
Office of Personnel
  Management

Attorneys, Department of Justice
Civil Division, Room 3336
9th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 633-3416

Counsel for Defendants

FILED

AUG 3 1 1988

CLERK, U.S. DISTRICT COURT

# APPLICANT RACE AND NATIONAL ORIGIN QUESTIONNAIRE

The United States District Court for the District of Columbia, in a Decree approved in a lawsuit entitled Luevano v. Devine, Civil Action No. 79-0271, has ordered that Federal Government agencies provide data on the race and national origin of applicants for certain Federal occupations. The position for which you are applying is in one of those occupations. You are requested to complete this form. The data you supply will be used for statistical analysis pursuant to the require- ments of the lawsuit. Submission of this form is voluntary. Your failure to do so will have no effect on the processing of your application for Federal Employment. Your Social Security Number (SSN) is requested under the authority of Executive Order 9397 (November 22, 1943) for the orderly administration of personnel records. Submission of your SSN is voluntary and failure to furnish your SSN on this form will have no effect on your application.

---

## PLEASE READ THE INSTRUCTIONS PROVIDED BELOW BEFORE COMPLETING THIS FORM

SPECIFIC INSTRUCTIONS: The categories below provide de- scriptions of racial and national origins. Read the Definition of Category descriptions and then place an "X" in the box next to the category with which you identify yourself. If you are of mixed racial and/or national origin, select the category with which you most closely identify yourself. NOTE: PLEASE MARK ONLY ONE BOX!

| Name (Last, First, Middle Initial) | Social Security Number (cc 1–8) |
| --- | --- |
| Title of Position and Grade Level for Which Application is Made | Location of Position      Date |

| NAME OF CATEGORY (Mark only ONE) | DEFINITION OF CATEGORY |
| --- | --- |
| A   Black, not of Hispanic Origin................................. | A person having origins in any of the black racial groups of Africa. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| B   Hispanic....................................................... | A person of Mexican, Puerto Rican, Cuban, Central, or South Ameri- can, or other Spanish cultures or origins,  Does not include per- sons of Portuguese culture or origin. |
| C   White, not of Hispanic Origin................................. | A person having origins with any of the original peoples of Europe, North Africa, or Middle East. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| D   Other......................................................... | Persons not included in other categories. |

## FOR AGENCY USE ONLY

| Occupational Code (cc 10–13) | Date Received (YY–MM–DD) (cc 14–19) | RNO CODE (cc 20) |
| --- | --- | --- |
| Title of Announcement, (if appropriate) | | Number of Announcement, (if appropriate) |
| Authorization Number, (if appropriate) | | Comments |

---

Authorized for use by the Office of Personnel Management and Other Defendant Agencies only for the purposes of complying with the requirements of the Luevano v. Devine decree.

REPRODUCE LOCALLY

**PREVIOUS EDITIONS UNUSABLE**

E Form 618 Rev. 7/88

79-271

EXHIBIT 1

# Federal Personnel Manual System

## FPM Bulletin

Bulletin No. 213-

Washington, D. C. 2041

**SUBJECT:** Actions Needed to Improve Data Collection
Under the Luevano Consent Decree

FILED

AUG 3 1 1988

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

Heads of Departments and Independent Establishments:

1. In response to a motion filed by the Luevano plaintiffs, the U. S. District Court for the District of Columbia has ordered OPM to take several steps to improve collection of race and national origin data from applicants for professional and administrative career (PAC) positions. The Court expressed concern about the wide variations in applicant response rate among agencies, even when the agencies are filling similar jobs. Some agencies obtain race information from almost all applicants, while others have a high percentage of nonresponse.

2. Specifically, the Court has directed OPM to deemphasize the statement that provision of RNO information is voluntary on Form E 618, which is used to collect the information from applicants. The form has been reprinted to remove the underlining from that statement. Camera copies of the revised form have been provided to directors of personnel in all agencies for reproduction and distribution. A facsimile of the form is attached for your information. Any activity that is accepting applications for PAC positions (whether under Schedule B, direct hire, or delegated examining authority) should contact its headquarters personnel office for a supply of the revised forms. Use of the previous edition is to be discontinued.

3. Agencies recruiting for PAC positions should be sure that all applicants receive a copy of the data collection form, E 618, and are encouraged to complete it.

4. The Court has also directed OPM to survey every agency using the Schedule B PAC authority to determine whether there have been or will be layoffs of Schedule B employees and to report the findings to the Court by October 25, 1988. Personnel directors have been asked to report within 30 days whether any Schedule B PAC appointees have been separated or have received specific notices that they will be separated by RIF and, if so, how many. We are also interested in any upcoming RIF's that may affect Schedule B PAC employees. All activities that have made Schedule B appointments since the authority was established in 1982 should prepare this information for submission to their headquarters personnel offices. Negative reports are required.

Constance Horner
Constance Horner
Director

---

**Inquiries:** Staffing Policy Division, Career Entry Group, (202) 632-6817

79-271

**Code:** 213, Excepted Service

**Distribution:** Basic FPM

EXHIBIT 2

**Bulletin Expires:** October 20, 1989

Attachment to FPM Bulletin 213-

# APPLICANT RACE AND NATIONAL ORIGIN QUESTIONNAIRE

The United States District Court for the District of Columbia, in a Decree approved in a lawsuit entitled Luevano v. Devine, Civil Action No. 79-0271, has ordered that Federal Government agencies provide data on the race and national origin of applicants for certain Federal occupations. The position for which you are applying is in one of those occupations. You are requested to complete this form. The data you supply will be used for statistical analysis pursuant to the require-ments of the lawsuit. Submission of this form is voluntary. Your failure to do so will have no effect on the processing of your application for Federal Employment. Your Social Security Number (SSN) is requested under the authority of Executive Order 9397 (November 22, 1943) for the orderly administration of personnel records. Submission of your SSN is voluntary and failure to furnish your SSN on this form will have no effect on your application.

## PLEASE READ THE INSTRUCTIONS PROVIDED BELOW BEFORE COMPLETING THIS FORM

SPECIFIC INSTRUCTIONS: The categories below provide descriptions of racial and national origins. Read the Definition of Category descriptions and then place an "X" in the box next to the category with which you identify yourself. If you are of mixed racial and/or national origin, select the category with which you most closely identify yourself. NOTE: PLEASE MARK ONLY ONE BOX!

| Name (Last, First, Middle Initial) | Social Security Number (cc 1-8) |
|---|---|
| Title of Position and Grade Level for Which Application is Made | Location of Position / Date |

| NAME OF CATEGORY (Mark only ONE) | DEFINITION OF CATEGORY |
|---|---|
| A ☐ Black, not of Hispanic Origin........................... | A person having origins in any of the black racial groups of Africa. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| B ☐ Hispanic............................................... | A person of Mexican, Puerto Rican, Cuban, Central, or South American, or other Spanish cultures or origins. Does not include persons of Portuguese culture or origin. |
| C ☐ White, not of Hispanic Origin........................... | A person having origins with any of the original peoples of Europe, North Africa, or Middle East. Does not include persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish cultures or origins (see Hispanic). |
| D ☐ Other................................................. | Persons not included in other categories. |

### FOR AGENCY USE ONLY

| Occupational Code (cc 10-13) | Date Received (YY-MM-DD) (cc 14-19) | RNO CODE (cc 20) |
|---|---|---|
| Title of Announcement, (if appropriate) | Number of Announcement, (if appropriate) | |
| Authorization Number, (if appropriate) | Comments | |

Authorized for use by the Office of Personnel Management and Other Defendant Agencies only for the purposes of complying with the requirements of the Luevano v. Devine decree.

REPRODUCE LOCALLY

PREVIOUS EDITIONS UNUSABLE

E Form 618 Rev. 7/8

RECEIVED

Aug 31   2 51 PM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

AUG 3 1 1988

# United States District Court

DISTRICT OF **COLUMBIA**

## APPEARANCE

ANGEL G. LEUVANO, et al.

      Plaintiffs

CONSTANCE HORNER

      Defendant

CASE NUMBER: 79-o271 (JHG)

To the Clerk of this court and all parties of record:

    Enter my appearance as counsel in this case for

FILED

SEP 2 3 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

September 20, 1988
**Date**

_Alan L. Ferber_
**Signature**

Alan L. Ferber
**Print Name**

**BAR IDENTIFICATION NO.**

U.S. Department of Justice
9th & Pennsylvania Ave., N.W., Room 3547
**Address**

Washington, D.C.  20530
**City**        **State**    **Zip Code**

(202) 633-3428
**Phone Number**

## CERTIFICATE OF SERVICE

A copy of this Appearance was mailed by first class mail this 20th day of September to:

Mr. Richard Seymour
Lawyers Committee for Civil Rights Under Law
1400 I Street, N.W.
Washington, D.C.  20005

_Alan L. Ferber_

RECEIVED

SEP 21   11 22 AM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SEP 23   11 10 AM '88
DISTRICT OF COLUMBIA
DISTRICT COURT
UNITED STATES

TO: Clerk, US Court of Appeals
RE: Criminal/Civil/Miscellaneous No. _79-0271_     TITLE: ANGEL G. LUEVANO, et al

vg. - CONSTANCE HORNER
                                                    USCA No. _88-5301_
-------------------------------------------------------------------------------

1. ( XX ) Attached are copies of the notice of appeal and docket entries in the
         above captioned case pursuant to Rule 3(d), Fed.R.App.P.

   ( ) This case is filed pursuant to the Equal Access to Justice Act. YES/NO

2. ( ) The Court of Appeals docketing fee was paid on _____.

3. ( XX ) The Court of Appeals docketing fee was not paid because (check one):
      _XX_ Appeal by the Government.
      ____ In Forma Pauperis.
      ____ The fee remains to be paid and another notice will be transmitted
           when the fee has been paid in the District Court.
      ____ This case was proceeding on a paid basis in the District Court but
           a motion to proceed In Forma Pauperis was filed and is now pending;
           another notice will be transmitted when the judge issues a ruling.
      ____ No fee required pursuant to Rule 4(a)(4), Fed.R.App.P. The fee
           was previously paid in USCA No. _____.

4. ( ) In Forma Pauperis motion or request was GRANTED. (See Attached)

5. ( ) In Forma Pauperis motion was DENIED or In Forma Pauperis status was
       REVOKED. (See Attached)

6. ( ) Record on appeal cannot be transmitted because (check one):
      ____ It is not available at this time.
      ____ It cannot be located at this time.
      ____ The Court of Appeals docketing fee has not been paid.
      ____ Post-judgment motion has been filed and is pending. (See Attached)
      ____ Other _____.

7. ( ) Referred motion for appointment of counsel has been filed. (See Attached)

8. ( ) Transcript was ordered. (See Attached)

9. ( ) Expedition of this case is requested by District Court Judge. (See
       Attached)

10. ( ) Other _____.


                                    Clerk, US District Court

                                    By_Cindy J. Proctor_____
                                          Deputy Clerk
-------------------------------------------------------------------------------

TO: Clerk, U.S. District Court
USCA Docket No. _88-5301_

( ) Motion to dismiss by appellant or stipulation of dismissal has bee filed.
    Do not transmit record on appeal.


                                    Clerk, US Court of Appeals

                                    By_____
                                          Deputy Clerk

        United States Court of Appeals
         For the District of Columbia Circuit


USCA Form D
USDC CO-940        FILED SEP 27 1988
Rev. 10/81 ⊕
        CONSTANCE L. DUPRÉ
                CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )      C.A. No. 79-0271 (JHG)
                                    )
CONSTANCE HORNER, Director,         )
    Office of Personnel             )
    Management, et al.,             )                FILED
                                    )
            Defendants.             )           SEP 30 1988
_____)

                                         CLERK, U.S. DISTRICT COURT
                    REPORT TO THE COURT      DISTRICT OF COLUMBIA

      In response to the Court's Order of June 27, 1988,

defendants submit the following quarterly status report

describing progress in achieving more complete applicant race

data reporting for the job categories covered by the Consent

Decree.

      As we previously informed the Court by Joint Report filed

August 18, 1988, the Office of Personnel Management (OPM),

pursuant to the Court's June 27, 1988 Order, has revised the

Race and National Origin Questionnaire given to job applicants to

eliminate the underlining of the sentence "Submission of this

form is voluntary." Additionally, by Federal Personnel Manual

System Bulletin No. 213, entitled "Actions Needed to Improve Data

Collection Under The Luevano Consent Decree" (attached as Exhibit

2 to the August 18, 1988 Joint Report), OPM informed the heads of

federal departments and independent establishments of the concern

expressed by the Court regarding wide variations in applicant

race data reporting among agencies. OPM further instructed heads

of federal departments and independent establishments that

applicants for covered positions should be encouraged to complete the applicant race questionnaire.

In addition to these actions, OPM will, in the near future, send an additional follow-up memorandum to the heads of federal departments and independent establishments specifically stressing their responsibility to insure the most accurate and complete reporting of applicant race data possible.

Respectfully submitted,

JOHN R. BOLTON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

ANNE M. GULYASSY

ALAN L. FERBER
JEFFREY S. GUTMAN

Attorneys, Department of Justice
Civil Division, Room 3547
10th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 633-3428

Attorneys for Defendants.

- 2 -

## CERTIFICATE OF SERVICE

I certify that, on September 30, 1988, I served a copy of
the foregoing Defendants' Report To The Court, by first-class
mail, postage prepaid, on:

> Richard T. Seymour
> Lawyer's Committee For Civil
>   Rights Under Law
> Suite 400
> 1400 "Eye" Street, N.W.
> Washington, D.C.  20005

ALAN L. FERBER

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

SEP 30   4 05 PM '88

SEP 3 0 1988

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
   individually and on behalf of    )
   all others similarly situated,   )
                                    )
                    Plaintiffs,     )
                                    )
          v.                        )    C. A. No. 79-0271
                                    )
CONSTANCE HORNER, Director,         )
   U.S. Office of Personnel         )
   Management, et al.,              )                    FILED
                                    )
                    Defendants.     )                 OCT 3 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' MOTION THAT WILLIAM L. ROBINSON
BE GIVEN LEAVE TO WITHDRAW AS ONE OF THE
ATTORNEYS FOR PLAINTIFFS HEREIN

        Plaintiffs move that William L. Robinson be given leave
to withdraw as one of the attorneys for plaintiffs herein.  Mr.
Robinson is the former Director of the Lawyers' Committee for
Civil Rights Under Law, and in that capacity has for several
years been listed on plaintiffs' papers as one of the attorneys
for plaintiffs.  Mr. Robinson has resigned to become the Dean of
the Law School of the University of the District of Columbia.

        The primary responsibility for the representation of
plaintiffs and their class will not change, and the same attor-
neys who have previously been handling this action will continue
to handle it.

        Copies of this Motion are being mailed to the named
plaintiffs in this action.

        WHEREFORE, plaintiffs pray that their Motion be
granted.  A proposed form of Order is submitted herewith.

Respectfully submitted,

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005
(202) 638-3278

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
   & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
   Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.   94105
(415) 989-9444

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                    Attorneys for Plaintiffs

Dated: September 30, 1988

- 3 -

## Certificate of Service

I certify that I have this 30th day of October, 1988, served a copy of plaintiffs' foregoing Motion on counsel of record for the defendants, on counsel of record for _amicus_ herein, and on the named plaintiffs, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

Alan Ferber, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
     Room 3501
Washington, D.C. 20530

James S. Green, Esq.
Associate General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
     Room 7450
Washington, D.C. 20415

Clint D. Wolcott, Esq.
National treasury Employees Union
1730 K Street N.W.
     Suite 1101
Washington, D.C. 20006

Mr. Angel Luevano
OFCCP
U.S. Department of Labor
2320 LaBranch Street, Room 1007
Houston, Texas 77004

Ms. Melody A. Van
2643 Ocala Street
Hayward, California 94545

Ms. Vicky Chapman
3080 Monaco Parkway
Denver, Colorado 80207

RICHARD T. SEYMOUR
Bar No. 28100
     Attorney for Plaintiffs

OCT 3 - 1966

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
    individually and on behalf of  )
    all others similarly situated, )
                                   )
                     Plaintiffs,   )
                                   )
          v.                       )    C. A. No. 79-0271
                                   )
CONSTANCE HORNER, Director,        )
    U.S. Office of Personnel       )       FILED
    Management, et al.,            )
                                   )       OCT 11 1988
                     Defendants.   )

                                        JAMES F. DAVEY, Clerk

O R D E R

        Upon motion by plaintiffs and for good cause shown, it
is hereby

        ORDERED, that William L. Robinson be given leave to
withdraw as one of the attorneys for plaintiffs and that his
withdrawal is hereby duly noted.

        This the  7⁴  day of ___October___, 1988.

                        _____
                        JOYCE HENS GREEN
                        United States District Judge



RECEIVED

OCT 3  9 05 AM '86

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JAMES F. DAVEY, CLERK

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,              )
                                       )
    individually and on behalf of      )
    all others similarly situated,     )
                                       )
                        Plaintiffs,    )
                                       )
            v.                         )    C. A. No. 79-0271  JH2/
                                       )
CONSTANCE HORNER, Director,            )
    U.S. Office of Personnel           )                  FILED
    Management, et al.,                )
                                       )
                        Defendants.    )          OCT 4  1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PRAECIPE

        At the request of the Court, plaintiffs file the

following praecipe, noting the current names, addresses, and

telephone numbers of the attorneys representing plaintiffs and

their class:

            RICHARD T. SEYMOUR              Bar No. 28100
            Lawyers' Committee for Civil
                Rights Under Law
            1400 'Eye' St., N.W.
                Suite 400
            Washington, D.C. 20005
            (202) 371-1212

            JULIUS LeVONNE CHAMBERS
            CHARLES STEPHEN RALSTON
            99 Hudson Street
                16th Floor
            New York, New York 10013
            (212) 219-1900

            BARRY L. GOLDSTEIN              Bar No. 949271
            1275 K Street, N.W.
                Suite 301
            Washington, D.C. 20005
            (202) 682-1300

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
  Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
  & Educational Fund
634 South Spring Street
  11th Floor
Los Angeles, California 90014
    (213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
99 Hudson Street
  14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission
  Suite 400
San Francisco, Calif.  94105
(415) 989-9444


By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

        Attorneys for Plaintiffs

Dated: October 3, 1988

- 2 -

## Certificate of Service

I certify that I have this 3rd day of October, 1988, served a copy of plaintiffs' foregoing Praecipe on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

> Alan Ferber, Esq.
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
>     Room 3501
> Washington, D.C. 20530
>
> James S. Green, Esq.
> Associate General Counsel
> U.S. Office of Personnel Management
> 1900 E Street N.W.
>     Room 7450
> Washington, D.C. 20415
>
> Clint D. Wolcott, Esq.
> National treasury Employees Union
> 1730 K Street N.W.
>     Suite 1101
> Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
     Attorney for Plaintiffs

RECEIVED

OCT 4 3 00 PM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
ANGEL G. LUEVANO, et al.,       )
                                )
      individually and on behalf )
      of all others similarly    )
      situated,                  )
                                )
                   Plaintiffs,  )
            v.                   )      Civil Action No. 79-0271
                                )
CONSTANCE HORNER, Director,     )      Judge Joyce Hens Green
      U.S. Office of Personnel   )
      Management, et al.,         )
                                )
                   Defendants.  )
                                )
_____)
```

FILED

OCT 25 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## REPORT TO THE COURT

In response to the Court's Order of June 27, 1988, defendants have inquired of each federal agency whether there have been layoffs of Schedule B appointees since 1982 and whether there may be such layoffs in the future. All but six of the agencies responded to the Office of Personnel Management ("OPM"). The six agencies that have not responded had never received Schedule B authority. This report summarizes the result of this survey.

By the memorandum attached as Exhibit 1 hereto, the Office of Personnel Management ("OPM") asked all directors of personnel to report whether any Schedule B PAC appointees had been or would be separated by a reduction in force ("RIF"). Federal Personnel Manual System Bulletin No. 213, attached as Exhibit 2 hereto, advised all heads of departments and independent

establishments that personnel directors were asked to file such a report with OPM.

A summary of the reponses to OPM's request for a report on reductions in force affecting Schedule B PAC employees is attached hereto as Exhibit 3. As the summary indicates, thirty-five agencies that have used Schedule B authority have reported no past or anticipated reductions in force affecting Schedule B employees.[1] Sixteen agencies have never used the Schedule B PAC authority.[2] One agency, the Agricultural Marketing Service, Department of Agriculture, may separate one Schedule B employee in a forthcoming RIF. The agency has not yet separated the employee and may be able to avoid doing so. Defendants will advise plaintiffs and the court when the Agricultural Marketing Service has determined how to proceed.

Respectfully submitted,

JOHN R. BOLTON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

ANNE M. GULYASSY

---

[1] Four of these thirty-five agencies were not defendants bound by the consent decree.

[2] Of these sixteen agencies, six did not file a report with OPM, but had never received Schedule B PAC authority. Five of the sixteen are not defendants bound by the consent decree and one maintains a separate personnel system established prior to the creation of Schedule B PAC authority.

Dated: October 25, 1988

ALAN L. FERBER
JEFFREY S. GUTMAN


JAMES GREEN                         Attorneys, Department of Justice
Associate General Counsel           Civil Division, Room 3728
Office of Personnel                 9th & Pennsylvania Avenue, N.W.
  Management                        Washington, D.C.  20530
                                    Telephone:  (202) 633-4775

                                    Counsel for Defendants

<u>CERTIFICATE OF SEVICE</u>

I certify that, on October 25, 1988, I served a copy of a Report to the Court by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005


JEFFREY S. GUTMAN

# INTERAGENCY ADVISORY GROUP

UNITED STATES
**OFFICE OF PERSONNEL MANAGEMENT**
WASHINGTON, DC 20415

Secretariat
1900 E St., NW
(202) 632-6266

MEMORANDUM FOR DIRECTORS OF PERSONNEL

FROM:    CURTIS J. SMITH
         ASSOCIATE DIRECTOR
           FOR CAREER ENTRY

FILED
OCT 25 1988
CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

SUBJECT: **ACTIONS NEEDED TO IMPROVE DATA COLLECTION
         UNDER LUEVANO DECREE**

In response to a motion filed by the Luevano plaintiffs, the
U. S. District Court for the District of Columbia has ordered
OPM to take several steps to improve collection of race and
national origin data from applicants for professional and
administrative career (PAC) positions.

- ° Deemphasize statement that provision of RNO information
  by applicants is voluntary. Form E 618 has been
  reprinted to remove the underlining from that statement.
  A camera copy of the new form is attached. **This form
  should be duplicated and distributed immediately to all
  activities that are accepting applications for PAC
  positions. Use of the previous edition is to be
  discontinued.** As before, agencies should prepare their
  own stocks of the form from the original provided. OPM
  will not stock this form for distribution.

- ° Encourage more complete reporting of RNO data. The Court
  expressed concern about the wide variations in applicant
  response rate among agencies, even when the agencies are
  filling similar jobs. Some agencies obtain race
  information from almost all applicants, while others have
  a high percentage of nonresponse. Please be sure that
  all applicants for PAC positions receive a copy of the
  data collection form, E 618, and are encouraged to
  complete it. If applicants are reluctant to provide the
  requested information, it may be helpful to explain the
  purpose of the form and to assure the applicants that the
  information will not be used in any hiring decisions.

The Court has also directed OPM to survey every agency using
the Schedule B PAC authority to determine whether there have
been or will be layoffs of Schedule B employees and to report
the findings to the Court by October 25, 1988. **All agencies
that have made Schedule B appointments since the authority was**

EXHIBIT 1  79-271

2

established in 1982 are asked to report within 30 days whether
any Schedule B PAC appointees have been or have received
specific notices that they will be separated by RIF and, if
so, how many.  We also need to know of any forthcoming RIF's
that are likely to affect Schedule B PAC employees.  If final
retention lists have not been prepared, please estimate the
number of Schedule B employees, if any, who would be
separated.  Negative reports are required.  Please send the
reports to:

       Staffing Policy Division
       Room 6504
       U. S. Office of Personnel Management
       1900 E Street, N.W.
       Washington, D.C.  20415

Thank you for your assistance.


Attachment

# Federal Personnel Manual System
## FPM Bulletin

---

Bulletin No. 213-

Washington, D. C. 20415

**SUBJECT:** Actions Needed to Improve Data Collection
Under the <u>Luevano</u> Consent Decree

Heads of Departments and Independent Establishments:

1.  In response to a motion filed by the <u>Luevano</u> plaintiffs, the U. S. District Court for the District of Columbia has ordered OPM to take several steps to improve collection of race and national origin data from applicants for professional and administrative career (PAC) positions. The Court expressed concern about the wide variations in applicant response rate among agencies, even when the agencies are filling similar jobs. Some agencies obtain race information from almost all applicants, while others have a high percentage of nonresponse.

2.  Specifically, the Court has directed OPM to deemphasize the statement that provision of RNO information is voluntary on Form E 618, which is used to collect the information from applicants. The form has been reprinted to remove the underlining from that statement. Camera copies of the revised form have been provided to directors of personnel in all agencies for reproduction and distribution. A facsimile of the form is attached for your information. Any activity that is accepting applications for PAC positions (whether under Schedule B, direct hire, or delegated examining authority) should contact its headquarters personnel office for a supply of the revised forms. Use of the previous edition is to be discontinued.

3.  Agencies recruiting for PAC positions should be sure that all applicants receive a copy of the data collection form, E 618, and are encouraged to complete it. If applicants are reluctant to provide the requested information, it may be helpful to explain the purpose of the form and to assure the applicants that the information will not be used in any hiring decisions.

4.  The Court has also directed OPM to survey every agency using the Schedule B PAC authority to determine whether there have been or will be layoffs of Schedule B employees and to report the findings to the Court by October 25, 1988. Personnel directors have been asked to report within 30 days whether any Schedule B PAC appointees have been separated or have received specific notices that they will be separated by RIF and, if so, how many. We are also interested in any upcoming RIF's that may affect Schedule B PAC employees. All activities that have made Schedule B appointments since the authority was established in 1982 should prepare this information for submission to their headquarters personnel offices. Negative reports are required.

Constance Horner
Director

FILED

OCT 25 1988

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

---

**Inquiries:** Staffing Policy Division, Career Entry Group, (202) 632-6817

**Code:** 213, Excepted Service

**Distribution:** Basic FPM

**Bulletin Expires:**

79-271
EXHIBIT 2

RESPONSES TO REQUEST FOR REPORT ON REDUCTIONS IN FORCE
AFFECTING SCHEDULE B PAC EMPLOYEES

We have received written or telephone responses from all but six agencies
(which have never received Schedule B PAC authority) in the defendant
class and from nine agencies not named in the Luevano decree.

No agencies have separated any Schedule B PAC employees by RIF.  Only one
agency anticipates a RIF that may affect Schedule B employees:

> The Agricultural Marketing Service, Department of Agriculture, may
> separate one Schedule B employee in a forthcoming RIF.  This is not
> yet certain; AMS may be able to avoid separating the employee.

Thirty-five agencies that have used the Schedule B authority report no
past or anticipated reductions in force affecting Schedule B employees:

Department of the Air Force
Department of the Army
Department of the Navy
Department of Defense (other):
    Defense Communications Agency
    Defense Contract Audit Agency
    Defense Investigative Service
    Defense Logistics Agency
    Defense Mapping Agency
    Defense Nuclear Agency
    Uniformed Services University of the Health Sciences
Department of Commerce
Department of Education
Department of Energy
    Federal Energy Regulatory Commission
Environmental Protection Agency
Equal Employment Opportunity Commission
Farm Credit Administration*
Federal Communications Commission
Federal Deposit Insurance Corporation
Federal Emergency Management Agency
Federal Home Loan Bank Board
General Services Administration
Government Printing Office
Department of Health and Human Services
Department of Housing and Urban Development
Department of the Interior
Department of Justice
Department of Labor
National Aeronautics and Space Administration
National Archives and Records Administration*

F I L E D

OCT 25 1988

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

79-271
EXHIBIT 3

- 2 -

    National Endowment for the Arts*
    National Endowment for the Humanities*
    National Labor Relations Board
    Office of Management and Budget
    Office of Personnel Management
    Securities and Exchange Commission
    Small Business Administration
    Smithsonian Institution
    Department of State
    Department of Transportation
    Department of the Treasury
    Veterans Administration

The remaining agencies have never used the Schedule B PAC authority:

    ACTION**
    Agency for International Development*
    Commission on Civil Rights**
    Consumer Products Safety Commission**
    Federal Labor Relations Authority
    Federal Maritime Commission
    Federal Mediation and Conciliation Service
    Federal Trade Commission**
    General Accounting Office***
    Interstate Commerce Commission
    Merit Systems Protection Board**
    Nuclear Regulatory Commission*
    Occupational Safety and Health Review Commission*
    Panama Canal Commission*
    Selective Service System
    Tennessee Valley Authority*


*    Not a defendant under the Luevano decree.

**   Did not report, but has never received Schedule B PAC authority.

***  Has separate personnel system (outside of title 5) established by
     statute before creation of the Schedule B PAC authority.

RECEIVED

Oct 25   12 55 PM '88

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

OCT 2 5 1988

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 88-5301                                    September Term, 19 89

                                                   CV 79-00271

Angel G. Luevano, et al.,
 Individually and on behalf
 of all others similarly situated

                                        United States Court of Appeals
                                        For the District of Columbia Circuit

              v.                        FILED NOV 1 0 1988

                                        CONSTANCE L. DUPRÉ
Constance Horner, Director,                     CLERK
U.S. Office of personnel
Management, et al.,                                  FILED

                    Appellants                 NOV 1 0 1988

                                        CLERK, U. S. DISTRICT COURT
                                           DISTRICT OF COLUMBIA

                    O R D E R

     Upon consideration of appellants motion for voluntary
dismissal, it is

     ORDERED that the aforesaid motion is granted and that
the appeal is hereby dismissesd.

     The Clerk is directed to transmit a certified copy of
this order to the district court in lieu of formal mandate.

                              FOR THE COURT:
                              Constance L. Dupré, Clerk

                              By: Teresa L. Johnson

                                  Teresa L. Johnson
                                  Deputy Clerk

A true copy:
    Test: Constance L. Dupre
    United States Court of Appeals
    for the District of
    Columbia Circuit

By: _____
                  Deputy Clerk

CD/N
Becki/N

RECEIVED

NOV 1 0 1988

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 79-0271 (JHG) |
| | ) |
| CONSTANCE HORNER, Director, | ) |
| Office of Personnel | ) |
| Management, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

FILED

DEC 29 1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

REPORT TO THE COURT

In response to the Court's Order of June 27, 1988,
defendants submit the following quarterly status report
describing progress in achieving more complete applicant race
data reporting for the job categories covered by the Consent
Decree.

By Report to the Court filed September 30, 1988, defendants
informed the Court that by Federal Personnel Manual System
Bulletin No. 213, entitled "Actions Needed to Improve Data
Collection Under The Luevano Consent Decree" (attached as Exhibit
2 to the August 18, 1988 Joint Report), the Office of Personnel
Managment (OPM) informed the heads of federal departments and
independent establishments of the concern expressed by the Court
regarding wide variations in applicant race data reporting among
agencies, and that OPM further instructed heads of federal
departments and independent establishments that applicants for
covered positions should be encouraged to complete the applicant
race questionnaire.

As of this date, OPM has not taken further steps to improve agencies' applicant race data reporting. Any such actions taken in the future will be promptly reported to both the Court and plaintiffs.

Respectfully submitted,

JOHN R. BOLTON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

ANNE M. GULYASSY

ALAN L. FERBER
JEFFREY S. GUTMAN

Attorneys, Department of Justice
Civil Division, Room 3547
10th & Pennsylvania Avenue, N.W.
Washington, D.C.   20530
Telephone:  (202) 633-3428

Attorneys for Defendants.

- 2 -

CERTIFICATE OF SERVICE

I certify that, on December 30, 1988, I served a copy of the foregoing Defendants' Report To The Court, by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under Law
Suite 400
1400 "Eye" Street, N.W.
Washington, D.C.  20005

ALAN L. FERBER

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

DEC 29    4 13 PM '88

DEC 2 9 1988

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
ANGEL G. LUEVANO, et al.,     )
     Individually and on behalf )
     of all others similarly   )
     situated,                 )
                              )
                 Plaintiffs,  )
                              )
     v.                       )      Civil Action No. 79-0271
                              )
CONSTANCE HORNER, Director,   )      ✓ FILED
     U.S. Office of Personnel  )
     Management, et al.,        )
                              )      JUN - 9 1989
                 Defendants.  )
_____)       CLERK, U.S. DISTRICT COURT
                                      DISTRICT OF COLUMBIA
```

ORDER

On June 27, 1988 this Court issued three Orders in this
case.  Defendants took an appeal on August 27, 1988 but, on
November 10, 1988, the court of appeals granted defendants'
motion for voluntary dismissal of the appeal.  Since that time,
however, no substantive pleadings have been filed.  Accordingly,
the parties are directed to submit a joint status report no later
than June 26, 1989 indicating whether any issues remain to be
resolved in this matter.[1]

June 8, 1989

                          _____
                               JOYCE HENS GREEN
                          United States District Judge

_____

[1] On December 23, 1987 the Court approved a Stipulation
staying consideration of plaintiffs' motion for relief on their
showings of adverse impact, but the parties have not pursued that
issue thus far.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
   individually and on behalf of     )
   all others similarly situated,    )
                                     )
                     Plaintiffs,     )
                                     )
             v.                      )    C. A. No. 79-0271 (TPJ)
                                     )
CONSTANCE HORNER, Director,          )
   U.S. Office of Personnel          )
   Management, et al.,               )
                                     )
                     Defendants.     )
_____)

**FILED**

**JUN 26 1989**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JOINT STATUS REPORT

In accordance with the Court's Order filed June 9, 1989, the
parties file the following joint status report indicating whether
any issues remain to be resolved in this matter.

As noted in footnote 1 of the Court's Order, the Court, by
Order on December 23, 1987, approved a joint stipulation staying
consideration of plaintiffs' Motion for Relief on Their Showings
of Adverse Impact.  The matters raised in the Motion remain open,
and will have to be decided in the event that the parties cannot
reach agreement.

As the Court will recall, the parties have agreed that many
claimants apply for positions only within particular geographic
regions, and are not available for positions in other parts of
the country.  This is not a fact on which the parties have
focussed in the drafting of the Amended Consent Decree, but
became apparent in the course of the defendants' examination of
plaintiffs' adverse-impact showings.  The parties have further

agreed that, recognizing this fact, it would be appropriate to amend the adverse-impact definitions of the Amended Consent Decree, to reflect the reality of less-than-universal availability.

The defendants' examination of plaintiffs' adverse-impact showings also revealed other, unexpected problems in the reporting of application information under the Decree. Not all agencies followed the same procedures with respect to applicants who applied for positions in more than one region, or even with respect to applicants who applied for positions at more than one location within the same region. Before framing the necessary revision to the Amended Decree, the parties agreed that it would be appropriate to identify all other problems which might exist in the reporting of application data. To this end, a letter --- the text of which was agreed by the parties --- was sent by the Department of Justice to all Federal agencies employing persons in job categories covered by the Amended Consent Decree, enquiring into the means by which those agencies were reporting their application information. Mr. Ferber transmitted the results of this review to Mr. Seymour on March 17, 1989. Mr. Seymour is the attorney for plaintiffs who is most familiar with these issues, and who prepared all of the original showings of adverse impact.

Mr. Seymour is also lead counsel for plaintiffs in <u>Anderson v. Douglas & Lomason Co.</u>, C.A. No. DC 85-160-LS-O (N.D. Miss.), an employment discrimination class action in which trial has been

underway since June 5, 1989, and which is not expected to
conclude until June 16 or June 27, and in <u>Sledge v. J.P. Stevens
& Co.</u>, Civil No. 1201 (E.D.N.C.), an employment discrimination
class action in which the merits of close to 3,000 back pay
claims are being litigated and in which a February 23, 1989 Order
imposed substantial deadlines on counsel for the parties with
respect to the amendments of claim forms, assertions of defenses
to claim forms, and responses to those defenses.  Because of the
pressures of trial preparation and trial in <u>Anderson</u> and the
pressures of the deadlines imposed on the parties in <u>Sledge</u>, it
has not been possible for plaintiffs herein to respond yet to the
defendants' March 17, 1989 transmission of materials.  Plaintiffs
expect to be able to respond during the month of July, 1989.

One of the issues related to the determination of adverse
impact, and possibly related to any re-definition of adverse
impact in any amendment to the Amended Consent Decree, concerns
the accuracy of the partial reporting of racial information as to
applicants.  The Court has directed that the Social Security
Administration be requested to identify the percentage of
applicants for particular job categories in particular years who
are black, so that the accuracy of the reported data can be
gauged.  These data have not yet been provided to counsel for
plaintiffs but the defendants expect to be able to do so in the
near future.

Because of the problems described above, the parties have
further agreed, plaintiffs' showing of adverse impact --- based

- 3 -

upon nationwide applications and hires --- should be revised and put on a regional basis.  Some specifications of job categories and agencies as to which there was adverse impact may have to be withdrawn entirely, and it may be necessary to make others, in accordance with the revised definition of adverse impact. Plaintiffs have agreed that the initial re-calculations of adverse impact may be done by defendants' expert, subject to the right of plaintiffs to check the accuracy of the results and submit their own calculations in the event of any disagreement.

Pending the resolution of the questions described above, the defendants have temporarily suspended the reporting of information on applications and hires, to ensure that the reports will meet whichever new standards are agreed by the parties and approved by the Court.

The most important other matter in this case concerns the Office of Personnel Management's proposals for a new hiring system.  Plaintiffs have raised a number of questions, and the defendants have provided additional information.  Some requests for information have not yet been answered, but may be answered in an expected meeting of counsel and the experts on both sides, which the parties are attempting to schedule for July.  On April 14, 1989, plaintiffs provided the defendants with their preliminary conclusions on the expanded use of grade-point-average hiring and on the potential problems with recordkeeping and reporting under the proposal.  The defendants have stated

- 4 -

their willingness to discuss these points at the meeting we are expecting to schedule in July 1989.

Finally, a hearing date needs to be set for the appeals of a small number of class members from the determination that they did not qualify for relief under the terms of ¶ 21 of the Amended Consent Decree.  Mr. Seymour has not requested a date until this point, because of the press of so much other business subject to time deadlines, but these appeals do need to be resolved.  The parties will contact the Court's secretary on Mr. Seymour's return to Washington, to discuss possible dates.

Mr. Seymour has authorized counsel for the defendants to represent that he concurs fully in this Joint Status Report, and has not signed it only because he is presently in Aberdeen, Mississippi rather than in Washington, D.C.

                                    Respectfully submitted,

                                    STUART E. SCHIFFER
                                    Acting Assistant Attorney General

                                    JAY B. STEVENS
                                    United States Attorney

                                    ANNE M. GULYASSY

*ALAN L. Ferber*

ALAN L. FERBER

Attorneys, Department of Justice
Civil Division, Room 3547
10th & Pennsylvania Avenue, N.W.
Washington, D.C.   20530
Telephone:   (202) 633-4770

Attorneys for Defendants.

- 6 -

CERTIFICATE OF SERVICE

I certify that, on June 26, 1989, I served a copy of the foregoing Defendants' Joint Status Report, by first-class mail, postage prepaid, on:

>       Richard T. Seymour
>       Lawyer's Committee For Civil
>         Rights Under Law
>       Suite 400
>       1400 "Eye" Street, N.W.
>       Washington, D.C.  20005

_____
ALAN L. FERBER

RECEIVED

JUN 26  3 56 PM '89

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JUN 2 6 1989

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,        )
   individually and on behalf of  )
   all others similarly situated, )
                           )
             Plaintiffs,       )
                           )
            v.             )    C. A. No. 79-0271
                           )
CONSTANCE HORNER, Director,      )
   U.S. Office of Personnel      )
   Management, et al.,           )
                           )
           Defendants.       )

FILED

JUL - 6 1989

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' MOTION FOR LEAVE FOR BARRY GOLDSTEIN
TO WITHDRAW AS COUNSEL FOR PLAINTIFFS

    Pursuant to Local Rule 201(c) Barry Goldstein respectfully requests permission to withdraw as counsel for the plaintiffs. As grounds for the Motion, Barry Goldstein shows the Court as follows:

    1.  Barry Goldstein has served as counsel for the plaintiffs for more than 10 years since this case was filed in 1979.

    2.  During that time he has served as an attorney on the staff of the NAACP Legal Defense & Educational Fund, Inc. (LDF). LDF has supported the litigation and provided staff attorneys to represent the plaintiffs.

    3.  As of July 1, 1989, Barry Goldstein has become Special Counsel to the law firm of Farnsworth, Saperstein & Seligman in Oakland, California.

    4.  The plaintiffs are adequately represented by other

attorneys including Richard Seymour, John Erickson, and Steve Ralston, who have represented the plaintiffs since the Complaint was filed. Copies of this Motion are being mailed to the named plaintiffs in this action.

Thus, Barry Goldstein respectfully requests the Court's leave to withdraw as counsel.

Respectfully submitted,

_Barry Goldstein_

BARRY GOLDSTEIN
Bar Number 949271
Farnsworth, Saperstein & Seligman
505 Fourteenth Street
Suite 1150
Oakland, California  94612
(415) 763-9800

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
  Rights Under Law
1400 'Eye' Street, N.W.
Suite 400
Washington, D.C.  20005
(202) 371-1212

ELAINE R. JONES
1275 K Street, N.W.
Suite 301
Washington, D.C.  20005
(202) 682-1300

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, California  94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
  & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California  90014

2

(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
99 Hudson Street, 14th Floor
New York, New York  10013

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
  for Urban Affairs
301 Mission, Suite 400
San Francisco, California  94105
(415) 989-9444

                    Attorneys for Plaintiffs


Dated:  July 3, 1989

<u>Certificate of Service</u>

I certify that I have this 3rd of July, 1989, served a copy of plaintiffs' foregoing Motion on counsel of record for the defendants, on counsel of record for <u>amicus</u> herein, and on the named plaintiffs, by depositing copies in the United States Mail, first-class postage prepaid, addressed to them as follows:

> Alan Ferber, Esquire
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
> Room 3501
> Washington, D.C.  20530
>
> James S. Green, Esquire
> Associate General Counsel
> U.S. Office of Personnel Management
> 1900 E Street, N.W.
> Room 7450
> Washington, D.C.  20415
>
> Clint D. Wolcott, Esquire
> National Treasury Employees Union
> 1730 K Street, N.W.
> Suite 1101
> Washington, D.C.  20006
>
> Mr. Angel Luevano
> OFCCP
> U.S. Department of Labor
> 2320 LaBranch Street, Room 1007
> Houston, Texas  77004
>
> Ms. Melody A. Van
> 2643 Ocala Street
> Hayward, California  94545
>
> Ms. Vicky Chapman
> 3080 Monaco Parkway
> Denver, Colorado  80207

BARRY GOLDSTEIN
Bar No. 949271
Attorney for Plaintiffs

JUL - 6 1989

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,         )
    individually and on behalf of      )
    all others similarly situated,     )
                                        )
                    Plaintiffs,         )
                                        )
            v.                          )    C. A. No. 79-0271
                                        )
CONSTANCE HORNER, Director,             )
    U.S. Office of Personnel            )
    Management, <u>et al.</u>,          )
                                        )
                    Defendants.         )

**FILED**

**JUL 1 0 1989**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

O R D E R

Upon motion by plaintiffs and for good cause shown, it
is hereby

ORDERED, that Barry Goldstein be given leave to
withdraw as one of the attorneys for plaintiffs and that his
withdrawal is hereby duly noted.

This the  10th  day of _____July_____, 1989.

JOYCE HENS GREEN
United States District Judge

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA
JUL 11  8 31 AM '89