# CIVIL CASE NO. 79-271

Angel G. Luevano, et al

VERSUS

Constance Horner, Director
Office of Personnel Management
et. al,

**VOL.** 5 **OF** 5

**FROM** 5/1/90 **TO** 10/28/94

| DEPOSITIONS | |
|---|---|
| TRANSCRIPTS | |
| EXHIBITS | |
| OTHER | |

| DATE | COURT CLERK'S MEMORANDUM | JUDGE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

1:79CV0271-005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY - 1 1990

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
    individually and on behalf of )
    all others similarly situated, )
)
                Plaintiffs, )
)
                  v. )    C.A. No. 79-0271 (JHG)
)
CONSTANCE NEWMAN, Director, )
)
    U.S. Office of Personnel )
    Management, et al., )
)
               Defendants. )
_____)

## JOINT STATUS REPORT ON NEW TESTING PROGRAM

    Plaintiffs and defendants jointly represent that the following information is correct:

    1.  On May 1, 1990, the United States will implement a new testing program for positions formerly filled under the Professional and Administrative Career Examination ["PACE"] and covered by the Amended Consent Decree herein.[1]  The overall name for these examinations will be "Administrative Careers with America" or "ACWA."  The new examinations will replace the current Schedule B hiring authority, will replace the alternative examinations previously developed by the Office of Personnel Management ("OPM") for particular job categories formerly subject

_____

    [1] Positions in the General Accounting Office are not affected by the new procedures.  See November 19, 1981 Order Modifying List of Defendant Class Members, ¶ 3 at pp. 3-4. Additionally, the Federal Deposit Insurance Corporation which has delegated examining authority for occupation series 570 (bank examiners) will continue to exercise that authority after the new testing program is implemented.

to the PACE, and will replace the alternative examinations currently used by agencies under OPM's delegations of examining authority for positions other than those discussed in note 1, supra.

2. The government will begin taking applications for these test on May 1, 1990, and will begin administering the tests on or about June 1, 1990. Use of Schedule B authority in the occupations covered by the Amended Consent Decree will terminate on June 30, 1990. New registers of eligible applicants will be established in July, 1990.

3. A discussion of the details of the new examinations is set forth in the attachments hereto. Attachment A is a copy of OPM Operations Letter 337-1527 dated April 16, 1990. Attachment B is a copy of Federal Personnel Manual Bulletin 337-72 dated April 20, 1990. These materials have been sent to users of the Federal Personnel Manual.

4. Plaintiffs and their experts have consulted with the defendants and their experts while the plans for these new tests were being made, in accordance with the provisions of ¶¶ 26 and 27 of the Amended Consent Decree.

5. The plaintiffs and the defendants will continue to keep the Court informed with respect to developments in this case.

6. Plaintiffs will file a separate Statement of Position. The defendants reserve the right to respond accordingly.

Respectfully submitted,

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
  Rights Under Law
1400 Eye St., N.W.,
Washington, D.C.  20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York  10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
  & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California  90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
99 Hudson Street, 14th Floor
New York, New York  10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
  for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

By: *Richard T. Seymour (RSS)*
    RICHARD T. SEYMOUR
    Bar No. 28100

STUART M. GERSON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

*Anne M. Gulyassy (RSS)*
ANNE M. GULYASSY

*Eric J. Segall*
ERIC J. SEGALL
Attorneys, Civil Division
U.S. Department of Justice
10 & Penna. Avenue, N.W.
Room 3744
Washington, D.C.  20530
(202) 633-3256

Attorneys for Defendants

Dated:  May 1, 1990

-3-

Attorneys for Plaintiffs

Dated:  May 1, 1990

Bulletin No. 337-72

**SUBJECT:** The Administrative Careers With America Examinations (ACWA) for Filling Entry Level Former PACE Positions

Washington, D. C. 20415
April 20, 1990

**FILED**

MAY - 1 1990

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Heads of Departments and Independent Establishments:

INTRODUCTION:

1. On May 1, 1990, we will open to receipt of applications the new examinations covering positions formerly filled under the Professional and Administrative Career Examination (PACE) and the subsequent Schedule B hiring process which resulted from the Luevano Decree. The overall name for these examinations will be "Administrative Careers With America." The new examinations include use of a written test and a biodata questionnaire. The new examinations replace the current PAC B hiring authority, alternative examinations, and any examining delegations currently authorized for these positions.

2. ACWA covers six groups of occupations for which there are written tests and a seventh group with positive education requirements. The positive education occupations will be examined for under unassembled rating procedures. The operating titles of the six examinations with written tests are:

| Group | Title |
|-------|-------|
| 1 | Health, Safety and Environmental Occupations |
| 2 | Writing and Public Information Occupations |
| 3 | Business, Finance and Management Occupations |
| 4 | Personnel, Administration and Computer Occupations |
| 5 | Benefits Review, Tax, and Legal Occupations |
| 6 | Law Enforcement and Investigation Occupations |

Attachment 1 lists the occupations covered under each group.

3. The new written examinations include job specific questions and a new feature called the Individual Achievement Record (IAR). The IAR evaluates how well individuals have used the opportunities they have had in school, work, and outside activities. The combination of the written test and IAR will provide enhanced prediction of applicant's potential to do well in these occupations.

4. The special direct-hire authorities -- Outstanding Scholar and Bilingual/Bicultural -- will remain in effect. These authorities are provided by the Luevano decree as tools for agencies' use in connection with their affirmative recruiting programs and are still appropriate for this purpose.

**Inquiries:** Office of Staffing Policy and Operations, Career Entry and Employee Development Group, (202) 632-0728

**Code:** 337 - Examining System

Distribution: Basic FPM

Bulletin Expires

5. The Outstanding Scholar Provisions will not be changed at this time. To qualify for consideration under these provisions applicants must be college graduates and have a grade-point average (GPA) of 3.5 or above, on a 4.0 scale, for all undergraduate course work, or have graduated in the upper ten percent of their class. (An applicant's GPA will be rounded in the following manner: a 3.44 is rounded down to 3.4; a 3.45 is rounded up to 3.5.) OPM will continue to review this provision and will monitor its use and effectiveness in compliance with the Luevano decree. OPM will consider modifications to the provision, as needed, and will work with the plaintiffs' counsel to amend that provision, as appropriate.

6. The following outlines the new examinations.

   a. There is a separate written test for each of the six job groups listed. Each group will have a separate automated application form (called a Form B). The Form B collects applicant data such as name, address, education and experience. Applicants will not be required to submit a Standard Form 171, Application for Federal Employment, at the time of application to OPM. Agencies may request a resume or similar listing of qualifications from applicants when they contact them for employment consideration. An SF 171 must be collected for any applicant who will be appointed.

   b. Individuals qualifying under the Outstanding Scholar Provisions may apply directly to agencies for employment consideration, and may request to be placed on OPM's ACWA referral file. Agencies will have the option of requesting a referral list of those candidates who claim to meet one of the Outstanding Scholar Provisions.

   c. The Bilingual/Bicultural hiring authority will continue as originally authorized under the Consent Decree. Applicants who pass the appropriate written test and possess appropriate knowledge may be hired directly for a position in one of the groups.

   d. The collection of race and national origin (RNO) data for applicants continues as required under the Luevano Decree. The process of collecting the data from written test applicants has been integrated into the collection of examining data. (The RNO data will continue to be stored separate from applicant data.) This will improve the reporting rate and accuracy of the data.

OPERATIONAL ISSUES

7. Registers: Applicants who meet the qualification requirements and pass one of the six written tests will be placed on a competitive register.

   Registers for groups 1 and 2, and group 7, will be maintained by our area offices.

   Registers for groups 3 through 6 for positions in the continental United States will be maintained in our Examining Office located in Macon, GA. The address is: Office of Personnel Management, Staffing Service Center, Examining Office, P.O. Box 9035, Macon, GA 31297-6899. Certification requests may be mailed or, sent by facsimile (FAX) to (912) 744-2183 or FTS 263-8183.

Registers for group 3 through 6 positions in Alaska, Hawaii and Pacific Overseas area, and Puerto Rico and the U.S. Virgin Islands will be maintained by our Anchorage, Honolulu, and San Juan Area Offices respectively.

8. Open Periods: Examinations for groups 1 through 6 will be open to the receipt of applications through May 1990. After the initial open period, examinations for groups 3 through 6 will open again in November 1990, and groups 1 and 2 will open on an as-needed basis.

Examinations for the group 7 positions will be opened locally as needs require.

9. Testing: OPM area offices will determine the dates and sites for testing based on applications received.

10. Announcement Materials: We have developed a recruiting brochure that highlights the new program. This brochure will be available to applicants through our area offices and will be distributed to college placement offices. Copies of announcement materials may be obtained by following the instructions in OPM's March 1990 Rider Bulletin.

We will issue a quarterly Competition Notice defining open periods for each occupational group. We have also prepared Qualification Information Statements (QIS) for groups 1 through 6 which contain procedures on how and where to apply and the qualification requirements for the positions. The QIS's contain two copies of OPM Form 5000AB, Test Scheduling Card, used for applying to take the appropriate written test. (A standard OPM Form 5000AB is also acceptable for applying to take a written test.)

11. RNO Data Collection: While completion of RNO data is voluntary, we expect agencies to make reasonable efforts to obtain the data from applicants. The following outlines the data collection and reporting process for the various segments of the examination.

    a. Applicants based on a Written Test - Applicant data will be collected by OPM as part of the application process. The RNO collection form, OPM Form 1386A, Applicant Race and National Origin Questionnaire, is incorporated into the application form. Selection data will be obtained from the Central Personnel Data File (CPDF).

    b. Applicants to a Positive Education Position (Group 7) - Applicant data will be collected by OPM on OPM Form 1386, Applicant Race and National Origin Questionnaire. The RNO form and application form are separate for these occupations. Selection data will be obtained from the Central Personnel Data File (CPDF).

    c. Applicants to Agencies under the Outstanding Scholar Provisions - Agencies will be required to collect RNO data from all applicants who are considered under the Outstanding Scholar Provisions. This includes applicants contacted from the ACWA referral file, as well as applicants who apply directly to an agency. Applicant data will be collected on OPM Form 1386B, Applicant Race and National Origin Questionnaire - For use when applying to agencies based on scholastic achievement. Agency RNO data must be reported annually, in the same manner as PAC B applicant data is currently reported. The form used to report the data will be OPM Form 1592. Both forms and accompanying instructions will be provided in a future FPM Bulletin.

REFERRAL AND CONSIDERATION OF OUTSTANDING SCHOLAR APPLICANTS

12. Quality Assessment Data Collection: As part of the Quality Assessment of the Federal workforce, agencies are requested to collect quality survey data from applicants. For OPM administered ACWA examinations which include a written test, quality questions are incorporated into the application form. For applicants under the Outstanding Scholar Provisions and Group 7 (positive education positions), quality data will be collected using OPM Form 1203-AK (or subsequent revisions). Forms should be obtained from OPM area offices. Completed forms should be returned to OPM area offices on a monthly basis. We will provide more information at a later date.

13. Direct Application: Any applicant who meets the qualification standards and the Outstanding Scholar Provisions is eligible to be hired directly, without getting on an OPM register. Applicants can apply directly to an agency for consideration and, they can apply to the ACWA referral file which we will maintain. Information on application procedures for the referral file can be found in the QIS for each occupational group. Applicants to the referral file would need to complete OPM Form 1203-AS, Administrative Careers With America Referral Form.

Hiring based on the Outstanding Scholar Provisions is authorized by the Luevano Decree and is separate from consideration on OPM registers. Any applicant on a list who meets the qualification requirements may be appointed. Appointments made under this provision are competitive appointments.

14. Direct Access Through the Automated Applicant Referral System: Agencies will access the referral file through OPM's Automated Applicant Referral System (AARS) by using a touch-tone telephone assisted by voice prompts. AARS is currently being used with our Engineer, Scientist and Mathematician registers. Names will be referred to the agency via a CCITT (Consultative Committee International Telephone and Telegraph) Group 3 FAX machine or a PC FAX board. Agencies without FAX or computer equipment may get a referral list through their servicing OPM area office.

We will forward all current users of AARS a supplemental guide for using the system with the new ACWA examinations. Your access code (ID) will allow use of the system for both ACWA and Engineer, Scientist, and Mathematician. Agencies who do not already have an access code for AARS must apply for a code to obtain referral lists. An Automated Applicant Referral System Agency ID Request Form is provided (Attachment 2) for this purpose. Send completed forms to Staffing Service Center, 4685 Log Cabin Drive, Macon, GA 31298, Attn. Agency ID Coordinator. This form may be reproduced locally. An Operations Manual will be sent to each agency along with its access code. Access codes must be treated as a password and kept secure.

15. Referral Actions: Applicants on the referral file will have an eligibility of six months and may be referred on more than one request at a time. Agencies are requested to notify OPM whenever an applicant is appointed so that the applicant is not referred to other agencies.

16. Race and National Origin (RNO) Data: Agencies are required to provide RNO data for applicants considered from the referral file as outlined in 11.c. above.

EFFECTS ON CURRENT OPERATIONS

17. Alternative Examinations: OPM alternative examinations will be terminated and eligibles will be advised of the new examining procedures.

18. Delegations: Examining delegations for positions covered under the new examinations will be terminated. Delegation units that examine for affected positions will be contacted by the responsible OPM office to arrange termination of the delegation.

Agencies with delegated examining units will need to forward copies of applications for individuals registered in either the Displaced Employee Program (DEP) or the Interagency Placement Assistance Program (IPAP) to the new register holding office. In most cases, it will mean sending the application to the Macon Examining Unit.

19. PAC B: The authority to use the current PAC B hiring authority will remain in effect until June 30, 1990. At that time, the authority will terminate. Agencies should plan now to make sure that all PAC B appointments are finalized by June 30, 1990.

Employees serving under PAC B excepted appointments at the time the registers are established may be converted to competitive service appointments as authorized under 5 C.F.R. 315.701.

20. Tests for Inservice Use: In order to provide a testing vehicle for inservice use, an interim procedure will be adopted until noncompetitive forms of the new examinations are developed. In occupations for which an alternative examination was previously developed under the Luevano Decree, that alternative may be used for inservice testing when the new examining program begins. For all other occupations in Groups 1, 3, 4, 5, and 6, a form of Test No. 750 will be available for inservice testing. Test No. 750 measures the same job-relevant reasoning abilities as the tests for these five groups. For occupations in Group 2, special arrangements may be made.

21. The following timetable outlines our target implementation schedule. The schedule also outlines actions that can be taken as the new examinations are announced and implemented.

| Date | Action |
|------|--------|
| May 1/31 | Examinations announced for Groups 1 - 6.<br>- Applications to take written test accepted.<br>- PAC B authority, delegations for PAC positions, and alternative examinations remain in effect.<br>- Regions may announce examinations for Group 7 positions. |
| May/June | Testing begins<br>- PAC B authority, examining delegations for PAC positions, and alternative examinations remain in effect. |

July          Registers established
              - Authority to make appointments based on PAC B
              terminates as of June 30, 1990.
              - Delegations for PAC positions and alternative
              examinations terminate.

Questions may be directed to Larry Towne on (202) 632-0728.

Constance Berry Newman
Director

Attachments

**Group 1 Health, Safety and Environmental Occupations**

| Series | Title |
|---|---|
| 0018 | Safety and Occupational Health Management |
| 0023 | Outdoor Recreation Planning |
| 0028 | Environmental Protection Specialist |
| 0673 | Hospital Housekeeping Management |
| 0685 | Public Health Program Specialist |

**Group 2 Writing and Public Information Occupations**

| Series | Title |
|---|---|
| 1001 | General Arts and Information |
| 1035 | Public Affairs |
| 1082 | Writing and Editing |
| 1083 | Technical Writing and Editing |
| 1147 | Agricultural Market Reporting |
| 1412 | Technical Information Services |
| 1421 | Archives Specialist |

**Group 3 Business, Finance and Management Occupations**

| Series | Title |
|---|---|
| 0011 | Bond Sales Promotion |
| 0106 | Unemployment Insurance |
| 0120 | Food Assistance Program Specialist |
| 0346 | Logistics Management |
| 0393 | Communications Specialist |
| 0501 | Financial Administration and Programs |
| 0560 | Budget Analysis |
| 0570 | Financial Institution Examining |
| 1101 | General Business and Industry |
| 1102 | Contract Specialist |
| 1103 | Industrial Property Management |
| 1104 | Property Disposal |
| 1130 | Public Utilities Specialist |
| 1140 | Trade Specialist |
| 1145 | Agricultural Program Specialist |
| 1146 | Agricultural Marketing |
| 1149 | Wage and Hour Law Administration |
| 1150 | Industrial Specialist |
| 1160 | Financial Analysis |
| 1163 | Insurance Examining |
| 1165 | Loan Specialist |
| 1170 | Realty |
| 1171 | Appraising and Assessing |
| 1173 | Housing Management |
| 1176 | Building Management |
| 1910 | Quality Assurance Specialist |
| 2001 | General Supply |
| 2003 | Supply Program Management |
| 2010 | Inventory Management |

**Group 3 Business, Finance and Management Occupations (continued)**

| Series | Title |
|---|---|
| 2030 | Distribution Facilities and Storage Management |
| 2032 | Packaging |
| 2050 | Supply Cataloging |
| 2101 | Transportation Specialist |
| 2110 | Transportation Industry Analysis |
| 2125 | Highway Safety Management |
| 2130 | Traffic Management |
| 2150 | Transportation Operations |

**Group 4 Personnel, Administration and Computer Occupations**

| Series | Title |
|---|---|
| 0142 | Manpower Development |
| 0201 | Personnel Management |
| 0205 | Military Personnel Management |
| 0212 | Personnel Staffing |
| 0221 | Position Classification |
| 0222 | Occupational Analysis |
| 0223 | Salary and Wage Administration |
| 0230 | Employee Relations |
| 0233 | Labor Relations |
| 0235 | Employee Development |
| 0244 | Labor Management Relations Examining |
| 0246 | Contractor Industrial Relations |
| 0301 | Miscellaneous Administration and Programs |
| 0334 | Computer Specialist (Trainee) |
| 0341 | Administrative Officer |
| 0343 | Management Analysis |
| 0345 | Program Analysis |
| 1715 | Vocational Rehabilitation |

**Group 5 Benefits Review, Tax and Legal Occupations**

| Series | Title |
|---|---|
| 0105 | Social Insurance Administration |
| 0187 | Social Services |
| 0526 | Tax Technician |
| 0950 | Paralegal Specialist |
| 0962 | Contact Representative |
| 0965 | Land Law Examining |
| 0967 | Passport and Visa Examining |
| 0987 | Tax Law Specialist |
| 0990 | General Claims Examining |
| 0991 | Worker's Compensation Claims Examining |

**Group 5 Benefits Review, Tax and Legal Occupations (continued)**

| Series | Title |
|---|---|
| 0993 | Social Insurance Claims Examining |
| 0994 | Unemployment Compensation Claims Examining |
| 0996 | Veterans Claims Examining |
| 0997 | Civil Service Retirement Claims Examining |

**Group 6 Law Enforcement and Investigation Occupations**

| Series | Title |
|---|---|
| 0025 | Park Ranger |
| 0080 | Security Administration |
| 0132 | Intelligence |
| 0249 | Wage and Hour Compliance |
| 1169 | Internal Revenue Officer |
| 1801 | Civil Aviation Security Specialist |
| 1810 | General Investigator |
| 1811 | Criminal Investigator |
| 1812 | Game Law Enforcement |
| 1816 | Immigration Inspection |
| 1831 | Securities Compliance Examining |
| 1854 | Alcohol, Tobacco, and Firearms Inspection |
| 1864 | Public Health Quarantine Inspection |
| 1889 | Import Specialist |
| 1890 | Customs Inspector |

**Group 7 Positions with Positive Education Requirements**

| Series | Title |
|---|---|
| 0020 | Community Planning |
| 0101 | Social Science |
| 0110 | Economist |
| 0130 | Foreign Affairs |
| 0131 | International Relations |
| 0140 | Manpower Research and Analysis |
| 0150 | Geography |
| 0170 | History |
| 0180 | Psychology |
| 0184 | Sociology |
| 0190 | General Anthropology |
| 0193 | Archeology |
| 1015 | Museum Curator |
| 1420 | Archivist |
| 1701 | General Education and Training |
| 1720 | Education Program |

# U. S. OFFICE OF PERSONNEL MANAGEMENT
## AUTOMATED APPLICANT REFERRAL SYSTEM
## AGENCY ID REQUEST FORM

**REQUESTING AGENCY:** This form must be signed by your personnel officer. Complete only SECTION 1. Retain a copy for your records and send the original to Staffing Service Center, 4685 Log Cabin Drive, Macon, GA 31298, ATTN: AGENCY ID Coordinator.

## SECTION 1

**a. AGENCY CONTACT**

**b. PHONE NUMBER**

**c. AGENCY NAME AND ADDRESS**
*(As it should appear on FAXed outputs.)*

**d. FAX PHONE NUMBER**
*(FTS if available. Otherwise, include area code.)*

**e. FAX ROUTING INFORMATION**
*(This will be printed on a cover sheet for all FAX transmittals. Please include your name, organization, room number or any other information that will ensure delivery from your office FAX machine to your desk.)*

**f. SIGNATURE**                              **DATE**

## SECTION 2                    *(FOR OPM USE ONLY)*

AGENCY ID #

ACWA                              Clerk _____ Date _____

# Operations Letter

Letter No.   337-1527

**SUBJECT:**   Administrative Careers With America (ACWA)

Washington, D.C. 20415
April 16, 1990

FILED

MAY – 1 1990

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## THE NEW EXAMINATIONS

1. This letter is to provide you with updated information on the new examinations for entry level professional and administrative (PAC) positions. We will announce the new examinations May 1, 1990.  An FPM bulletin (advanced copy attached) will be issued announcing our plans to the Federal community.

2. <u>Titles:</u>  The overall name for these examinations will be "Administrative Careers With America."  This includes the six groups of occupations for which there is a written test and a seventh group of 16 occupations with positive education requirements. These will be covered under local unassembled examining procedures.  The operating titles of the six examinations with written tests are:

| Group | Title |
|---|---|
| 1 | Health, Safety and Environmental Occupations |
| 2 | Writing and Public Information Occupations |
| 3 | Business, Finance and Management Occupations |
| 4 | Personnel, Administration and Computer Occupations |
| 5 | Benefits Review, Tax and Legal Occupations |
| 6 | Law Enforcement and Investigation Occupations |

Attachment 1 contains a list of the occupations covered under each group.

3. <u>Outstanding Scholar Provisions:</u>  The new examinations include the following provision authorized by the Consent Decree in the <u>Luevano</u> case:

a.  To qualify for consideration under the Outstanding Scholar Provisions, applicants must be college graduates and have a grade-point average (GPA) of 3.5 or above, on a 4.0 scale, for all undergraduate course work, or have graduated in the upper ten percent of their class. (An applicant's GPA is rounded in the following manner: a 3.44 is rounded down to 3.4; a 3.45 is rounded up to 3.5.)

**Inquiries:**   Career Entry and Employee Development Group, Staffing Policy and Operations, (202) 632-0728

**Code:**   337, Examining System

**Distribution:**   Associate and Regional Directors, Area Managers, FJIC's and Heads of Other Offices

Letter Expires:   April 20. 1991

OPM Form 658
April 1984
CON 101 87-7

b. Applicants who want additional consideration under the Outstanding Scholar Provisions, beyond applying directly to agencies, can submit a scannable form for the ACWA referral file.  The referral file will be maintained separately from the competitive registers and will be an option agencies can use in filling positions.  The file will be maintained by the Macon Examining Unit on a single CRES inventory.

c. The referral file will be accessed by agencies through the Automated Applicant Referral System (AARS).  Records on the file will contain names, addresses, the GPA of applicants, and whether they qualify for veteran preference.  Applicants will be referred in GPA order, although they may be selected in any order.  Agencies will be responsible for verifying that applicants meet the required GPA and the qualification requirements at the time of appointment.

4. Bicultural Hiring Authority:  The Bilingual/Bicultural hiring authority will continue as originally authorized under the Consent Decree in the Luevano case.  Applicants who pass the test and possess appropriate knowledge may be hired directly.

5. Register Coverage:  The location of registers for groups 1 and 2, and the positive education positions (group 7), will be determined by each region. One area office in each region should be designated to maintain registers for groups 1 and 2.  If so desired, a seperate area office may be designated for each group.  Examining responsibility for group 7 positions may be assigned to one or more area offices.  Please provide a list of register holding offices to Staffing Operations Division by March 30, 1990, so that necessary automated files can be established.  (See item 7 on open periods.)

Registers for groups 3 through 6 will be maintained in the Macon Examining Unit and in the Anchorage, Honolulu, and San Juan Area Offices.

6. Automated Support:  Registers for the six groups with a written test will be maintained on the Competitive Recruitment and Examining System (CRES).  We have developed automated Form B's to collect all necessary applicant information.  Additionally, RNO data questions will be collected as part of the Form B's.

Automated support for the positive education positions will be on the Key Entry Examining System (KEES).  RNO data will be collected using a separate automated form (OPM Form 1386, REV 1-90).  To ensure accurate data collection, Attachment 4 provides the list of KEES OCC and OCC Titles that must be used for these occupations.

7. Open Periods:  Groups 1 through 6 will initially be opened to the receipt of applications during May 1990.  Groups 1 and 2 may be opened in the future as regional needs require.  Groups 3 through 6 will be opened again during November.

Beginning May 1, 1990, examinations for positions with positive education requirements need only be opened to the receipt of applications when necessary to fill vacancies.  We anticipate that most of the activity will be through case examining.

8. Testing:  Test sites will be determined by each region.  We request that initial testing be expedited so that we can establish registers in July.

Test booklets will be stocked in the Denver Distribution Center (DDC). Offices should order materials from the DDC using the standard retail system.

9. <u>Establishing Registers</u>: Registers will be established in July 1990. It will be necessary to inform applicants, during the initial test sessions, of the delay in receiving a Notice of Results to avoid unnecessary inquiries.

10. <u>Announcement Materials</u>: Central office will issue a quarterly Competition Notice (CN) for groups 1 through 6 identifying future open periods. The CN will be provided to the Staffing Service Center to distribute through the College Hotline.

Staffing Operations Division is developing the Qualification Information Statements (QIS) for groups 1 through 6.

The Office of Affirmative Recruiting and Employment is preparing a brochure to be used for recruitment and information purposes.

For the initial printing, copies of the competition notice, recruiting brochure, QIS's, Form B's, and Sample Questions will be distributed to all area and regional offices. Stock will be maintained in the Denver Distribution Center. The Applicant Race and National Origin Questionnaire, OPM Form 1386, will not be distributed but will be stocked in Denver.

Additionally, the College Hotline will be used as a recruiting and information resource for the new examinations. Individuals will be able to call and obtain information about the positions covered, application procedures, and request an application package. Each region will have the option of preparing an insert showing when and where written tests will be administered. If the regional supplements remain stable, we will maintain a supply in Macon.

THE EXAMINATION PLAN

11. <u>Overview</u>: The following outlines major parts of the examination plan.

   a. There will be a separate Form B for each of the six examinations. The Form B will allow for an automated qualifications review. RNO data will be collected as part of the Form B. Completion of the RNO data remains optional.

   b. There will be a separate QIS for each of the six examinations. The QIS's will contain the standard information on how and where to apply and the qualification requirements. Additionally, each QIS will include two copies of OPM Form 5000AB, which will be titled "Test Scheduling Card," and a list of addresses showing where the form should be sent. (A standard OPM Form 5000AB is also acceptable for applying to take a written test.)

   c.  Applicants may apply for consideration as follows:

   1) Option 1:  OPM Register

      (a) <u>Written Test Positions - Groups 1 through 6</u>
          They may take a written test to receive consideration on an OPM register.

      (b) <u>Positive Education Positions - Group 7</u>
          They may apply to the OPM office announcing the vacancy. Applicants will be rated based on the Generic Rating Schedule which was forwarded in my memorandum of March 11, 1988.

2) Option 2: Outstanding Scholar Provisions

    (a) <u>Direct Application to Agencies</u>
        They may apply directly to agencies based on the Outstanding
        Scholar Provisions.

    (b) <u>Application to OPM Referral List</u>
        They may submit an Administrative Careers with America
        Referral Form, OPM 1203-AS, and will be placed on OPM's
        referral list. Applicants will be referred when agencies
        request a list of candidates who meet the Outstanding Scholar
        Provisions. Use of these lists by agencies is optional.

d. The following timetable should help clarify what actions can be taken
when the new examinations are announced and implemented.

| Date | Action |
|---|---|
| May 1/31 | Examinations announced for Groups 1 – 6. |
| |   - Applications to take written test accepted. |
| |   - PAC B authority, delegations for PAC positions, and |
| |     alternative examinations remain in effect. |
| |   - Regions may announce examinations for Group 7 positions. |
| May/June | Testing begins |
| |   - PAC B authority, examining delegations for PAC positions, |
| |     and alternative examinations remain in effect. |
| July | Registers established |
| |   - Authority to make appointments based on PAC B terminates |
| |     as of June 30, 1990. |
| |   - Delegations for PAC positions and alternative |
| |     examinations terminate. |

12. <u>Geographic Codes:</u> Based on a review of past geographic code selections
used for these positions and discussions with several examining offices, we
have decided to use the revised nationwide Geographic Code List that has been
developed for the Engineer, Scientist and Mathematician registers. This list
is comprehensive and should provide certification only of candidates
interested in a specific geographic area. For groups 1 and 2, and the
positions with a positive education requirement, you may want to develop a
form listing only the locations in your region using the codes and locations
in the nationwide listing. The nationwide list must be used for groups 3
through 6.

EFFECTS ON CURRENT OPERATIONS

13. <u>Alternative Examinations:</u> Each agency register for an alternative
examination will be terminated once the new registers are established (July
1990). Responsible examining offices will need to modify their publicity
materials to indicate that the alternative examination will be closed on a
date prior to May 1, 1990. Announcement materials should indicate that
consideration under the current register will continue until the new register
is established and that to receive consideration beyond that date applicants
will need to take the new examination. Alternative examination registers will
be used up to the time of the establishment of the new registers. All
eligibles should be circularized prior to the opening date of the new
examinations. (See Attachment 2 for a sample circularization letter.)

A list of alternative examinations and register holding offices is provided in Attachment 3.

**14. Delegations:** All examining delegations for positions covered under the new examinations will be terminated prior to the establishment of registers under the new examinations. The delegation unit should be instructed that candidates on the affected registers must be circularized and informed of the new examining procedures. Staffing Operations Division will advise agencies' headquarters regarding the termination of nationwide delegations.

**15. Structured Interviews:** The current requirement of passing a structured interview will continue for Customs Inspector (1890), Tax Technician (0526), and Social Insurance Representative (0105). This process will be coordinated through the Macon Examining Office since they will be the register holding office.

**16. Displaced Employees:** Offices which have individuals registered in either the Displaced Employee Program (DEP) or the Interagency Placement Assistance Program (IPAP) for PAC positions will need to forward copies of their application package(s) to the new register holding office. In some cases, it may mean copying and sending the application(s) to several offices. We will provide a list of register holding offices once this information is received.

**17. PAC B:** The authority to use the current PAC B hiring authority will remain in effect until June 30, 1990. At that time, the authority will terminate.

**18. FJOL:** Appropriate changes to the automated Federal Job Opportunities Listing (FJOL) will need to be made. This includes the following:

Area Offices:
- Show a closing date for alternative examinations which are local.
- Maintain a listing for group 1 and 2 positions; Anchorage, Honolulu, and San Juan Area Offices will maintain listings for all groups.

Macon Examining Unit:
- Show a closing date for alternative examinations which are nationwide.
- Maintain a listing for positions in groups 3 through 6, with an exception noted for positions in Alaska, Hawaii and Pacific Overseas area, and Puerto Rico.

**19. Touchscreen Systems:** Offices that provide job information through touchscreen computers will need to have changes made in the text related to the PAC hiring process. Changes should be forwarded to the Staffing Service Center in Macon, GA.

**20. Additional Information:** We will provide additional information as it becomes available. Contact Larry Towne (FTS 653-5913) if you have questions or comments.

Donald L. Holum
Assistant Director
for Staffing Policy and Operations

Attachments

**Group 1 Health, Safety and Environmental Occupations**

| Series | Title |
|--------|-------|
| 0018 | Safety and Occupational Health Management |
| 0023 | Outdoor Recreation Planning |
| 0028 | Environmental Protection Specialist |
| 0673 | Hospital Housekeeping Management |
| 0685 | Public Health Program Specialist |

**Group 2 Writing and Public Information Occupations**

| Series | Title |
|--------|-------|
| 1001 | General Arts and Information |
| 1035 | Public Affairs |
| 1082 | Writing and Editing |
| 1083 | Technical Writing and Editing |
| 1147 | Agricultural Market Reporting |
| 1412 | Technical Information Services |
| 1421 | Archives Specialist |

**Group 3 Business, Finance and Management Occupations**

| Series | Title |
|--------|-------|
| 0011 | Bond Sales Promotion |
| 0106 | Unemployment Insurance |
| 0120 | Food Assistance Program Specialist |
| 0346 | Logistics Management |
| 0393 | Communications Specialist |
| 0501 | Financial Administration and Programs |
| 0560 | Budget Analysis |
| 0570 | Financial Institution Examining |
| 1101 | General Business and Industry |
| 1102 | Contract Specialist |
| 1103 | Industrial Property Management |
| 1104 | Property Disposal |
| 1130 | Public Utilities Specialist |
| 1140 | Trade Specialist |
| 1145 | Agricultural Program Specialist |
| 1146 | Agricultural Marketing |
| 1149 | Wage and Hour Law Administration |
| 1150 | Industrial Specialist |
| 1160 | Financial Analysis |
| 1163 | Insurance Examining |
| 1165 | Loan Specialist |
| 1170 | Realty |
| 1171 | Appraising and Assessing |
| 1173 | Housing Management |
| 1176 | Building Management |
| 1910 | Quality Assurance Specialist |
| 2001 | General Supply |
| 2003 | Supply Program Management |
| 2010 | Inventory Management |

**Group 3 Business, Finance and Management Occupations (continued)**

| Series | Title |
|--------|-------|
| 2030 | Distribution Facilities and Storage Management |
| 2032 | Packaging |
| 2050 | Supply Cataloging |
| 2101 | Transportation Specialist |
| 2110 | Transportation Industry Analysis |
| 2125 | Highway Safety Management |
| 2130 | Traffic Management |
| 2150 | Transportation Operations |

**Group 4 Personnel, Administration and Computer Occupations**

| Series | Title |
|--------|-------|
| 0142 | Manpower Development |
| 0201 | Personnel Management |
| 0205 | Military Personnel Management |
| 0212 | Personnel Staffing |
| 0221 | Position Classification |
| 0222 | Occupational Analysis |
| 0223 | Salary and Wage Administration |
| 0230 | Employee Relations |
| 0233 | Labor Relations |
| 0235 | Employee Development |
| 0244 | Labor Management Relations Examining |
| 0246 | Contractor Industrial Relations |
| 0301 | Miscellaneous Administration and Programs |
| 0334 | Computer Specialist (Trainee) |
| 0341 | Administrative Officer |
| 0343 | Management Analysis |
| 0345 | Program Analysis |
| 1715 | Vocational Rehabilitation |

**Group 5 Benefits Review, Tax and Legal Occupations**

| Series | Title |
|--------|-------|
| 0105 | Social Insurance Administration |
| 0187 | Social Services |
| 0526 | Tax Technician |
| 0950 | Paralegal Specialist |
| 0962 | Contact Representative |
| 0965 | Land Law Examining |
| 0967 | Passport and Visa Examining |
| 0987 | Tax Law Specialist |
| 0990 | General Claims Examining |
| 0991 | Worker's Compensation Claims Examining |

**Group 5 Benefits Review, Tax and Legal Occupations (continued)**

| Series | Title |
|--------|-------|
| 0993 | Social Insurance Claims Examining |
| 0994 | Unemployment Compensation Claims Examining |
| 0996 | Veterans Claims Examining |
| 0997 | Civil Service Retirement Claims Examining |

**Group 6 Law Enforcement and Investigation Occupations**

| Series | Title |
|--------|-------|
| 0025 | Park Ranger |
| 0080 | Security Administration |
| 0132 | Intelligence |
| 0249 | Wage and Hour Compliance |
| 1169 | Internal Revenue Officer |
| 1801 | Civil Aviation Security Specialist |
| 1810 | General Investigator |
| 1811 | Criminal Investigator |
| 1812 | Game Law Enforcement |
| 1816 | Immigration Inspection |
| 1831 | Securities Compliance Examining |
| 1854 | Alcohol, Tobacco, and Firearms Inspection |
| 1864 | Public Health Quarantine Inspection |
| 1889 | Import Specialist |
| 1890 | Customs Inspector |

**Group 7 Positions with Positive Education Requirements**

| Series | Title |
|--------|-------|
| 0020 | Community Planning |
| 0101 | Social Science |
| 0110 | Economist |
| 0130 | Foreign Affairs |
| 0131 | International Relations |
| 0140 | Manpower Research and Analysis |
| 0150 | Geography |
| 0170 | History |
| 0180 | Psychology |
| 0184 | Sociology |
| 0190 | General Anthropology |
| 0193 | Archeology |
| 1015 | Museum Curator |
| 1420 | Archivist |
| 1701 | General Education and Training |
| 1720 | Education Program |

### SAMPLE CIRCULARIZATION LETTER

Dear Applicant:

The Office of Personnel Management (OPM) is in the process of establishing new examinations for GS-5 and 7 level professional and administrative positions. The examination, titled "Administrative Careers With America," is broken down into six job groupings. Each job grouping requires taking a specific written test. We will accept requests to be scheduled for the written tests from May 1 through May 31, 1990.

(Insert position title, series, grade) is covered under the job group (insert group title). Your current eligibility for this position will remain in effect through your eligibility end date or June 30, 1990, whichever is earlier. You will need to take the new written test for (insert group title) to be considered beyond this date. We have enclosed a written test application form. (OPM Form 5000AB)

Your interest in Federal employment is appreciated.

Sincerely,


Enclosure: 5000 AB
           List of Test Sites

## ALTERNATIVE EXAMINATIONS

| SERIES | POSITION | RESPONSIBLE OFFICE | ACTION* |
|--------|----------|--------------------|---------|
| 0105 | Social Insurance Representative | Macon Examining Unit | 1 |
| 0993 | Social Insurance Examiner | | |
| 0110 | Economist | Local Offices | 1 |
| 0334 | Computer Specialist (Assembled) | Local Offices | 1 |
| 0526 | Tax Technician | Local Offices | 1 |
| 0570 | Bank Examiner | WASC/FDIC Delegation | 2 |
| 1102 | Contract Specialist | Macon Examining Unit | 1 |
| 1145 | Agriculture Program Specialist | CKO/USDA Delegation | 3 |
| 1169 | Internal Revenue Officer | Macon Examining Unit | 4 |
| 1810 | Investigator | WASC/DIS Delegation | 2 |
| 1810 | Investigator | Local Offices | 1 |
| 1811 | Criminal Investigator | Local Offices | 1 |
| 1812 | Special Agent (Wildlife) | Local Offices | 1 |
| 1816 | Immigration Inspector | Regional/INS Delegation | 5 |
| 1890 | Customs Inspector | Macon Examining Unit | 4 |

*Action:
1. Modify public notice materials, close register, circularize.
2. WASC: Coordinate with delegation unit to modify public notice materials, close register, circularize, and terminate and audit delegation.
3. Kansas City Area Office: Coordinate with delegation unit to modify public notice materials, close register, circularize, and terminate and audit delegation.
4. Modify public notice materials, close register, circularize, direct hire terminates.
5. Regional Offices: Coordinate with delegation unit to modify public notice materials, close register, circularize, and terminate and audit delegation.

KEES OCC's and OCC Titles
for
Group 7 Positions

| Series | Title | OCC |
|--------|-------|-----|
| 0020 | Community Planning | 0001D |
| 0101 | Social Science | 0001J |
| 0110 | Economist | 0001E |
| 0130 | Foreign Affairs | 0001F |
| 0131 | International Relations | 0001I |
| 0140 | Manpower Research/Analysis | 0001M |
| 0150 | Geography | 0001G |
| 0170 | History | 0001K |
| 0180 | Psychology | 0001Y |
| 0184 | Sociology | 0001S |
| 0190 | General Anthropology | 0001N |
| 0193 | Archeology | 0001O |
| 1015 | Museum Curator | 0001Q |
| 1420 | Archivist | 0001U |
| 1701 | General Education and Training | 0001T |
| 1720 | Education Program | 0001V |

RECEIVED

MAY - 1 1990

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY 10 1990

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
individually and on behalf of )
all others similarly situated, )
)
Plaintiffs, )
)
v. )          C. A. No. 79-0271 (JHG)
)
CONSTANCE NEWMAN, Director, )
U.S. Office of Personnel )
Management, et al., )
)
Defendants. )

## PLAINTIFFS' STATEMENT OF POSITION ON THE OFFICE
## OF PERSONNEL MANAGEMENT'S NEW TESTING PROGRAM

Plaintiffs were happy to join in the May 1, 1990 Joint
Status Report on New Testing Program. Because we believe that
further information may be helpful to the Court and should be
stated of record, plaintiffs submit the following additional
information:

1. Plaintiffs have represented to the defendants, and
represent to this Court, that they contend the new tests are not
alternative examining procedures within the meaning of ¶¶ 7 and
13(a) of the Amended Consent Decree because they are not separate
procedures designed specifically to examine for each particular
job category. Plaintiffs accordingly contend that the implemen-
tation of the new examining procedures does not start running for
any job category the five-year period for retention of jurisdic-
tion.

2. Plaintiffs have further represented to the defen-

dants, and represent to this Court, (a) that the purpose of the job-specific requirements of ¶ 13(a) of the Amended Consent Decree was to obtain the greatest possible reduction in adverse impact against blacks and against Hispanics which is consistent with the government's interest in having a well-qualified work-force; (b) that the alternative OPM examinations developed to date under the Amended Consent Decree have in fact substantially reduced adverse impact against blacks and against Hispanics as shown below; (c) that after the parties see the results of the operational use of the new examinations and biodata instrument they are committed to further discussions; and (d) that, if the purposes of the Amended Consent Decree can be satisfied through the use of the new examinations and biodata instrument with any modifications which operational use may show to be appropriate, plaintiffs are willing to negotiate with the defendants a modification to the Amended Consent Decree which would allow the new examinations and biodata instrument with such modifications to be treated for all purposes as alternative examining procedures. The parties will keep the Court informed.

3. Plaintiffs base their statement that the alternative OPM examinations developed to date under the Amended Consent Decree have in fact substantially reduced adverse impact against blacks and against Hispanics upon the following information:

>(a) The parties have stipulated that a score of 70 or higher was required in order to be considered for competitive appointment from the PACE. Amended Consent

Decree, ¶ 10(b). These scores could be augmented by Veterans' Preference points and points for the Out-standing Scholar program. Id., ¶¶ 10(b), -(c) and -(d). A total of 21,343 whites, 940 blacks, and 518 Hispanics received augmented scores of 70 or above from a sample of test-takers from the January 1978 adminis-tration of the PACE and from all test-takers during the April 1978 administration of the PACE. Id., ¶ 10(h). Thus, blacks were 4.1%, and Hispanics were 2.3%, of the 22,801 applicants passing the PACE.[1]

(b) The parties have further stipulated that the PACE was used on a rank-ordered basis, and that "[i]n many areas and for many jobs, due to the large number of applicants with high PACE ratings, a rating of 90 or higher is necessary in order for the applicant to be referred to an employing agency for consideration for appointment." In other areas, "a rating in the lower range of eligibility above 70 is sufficient". Id., ¶¶ 10(b), -(e), and -(f). A total of 6,030 whites, 42 blacks, and 69 Hispanics received augmented scores of 90 or above from a sample of test-takers from the January 1978 administration of the PACE and from all test-takers during the April 1978 administration of the PACE. Id., ¶ 10(h). Thus, blacks were 0.7%, and

---

[1] Calculation of counsel.

- 3 -

Hispanics were 1.1%, of the 6,141 applicants scoring 90 or above.[2]

(c) The above figures do not include actual hires, and may overstate the relative performance of blacks and Hispanics on the PACE, compared with their performance on the alternative examinations, because they include adjustments for Outstanding Scholar status, which is not included in the test scores of the alternative examinations, along with adjustments for Veterans' Preference points which is included in both sets of scores.

(d) Nevertheless, the racial composition of the actual hires from OPM-sponsored alternative examining procedures from 1983 through the first six months of 1989 reflect a dramatic improvement over the racial composition of those test-takers on the PACE with augmented scores of 90 or above, and even over the racial composition of those test-takers on the PACE with augmented scores of 70 or above:

---

[2] Calculation of counsel.

Table A. Competitive Hires from OPM-Sponsored Examinations

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|---|---|---|---|---|---|---|
| 1983 | 894 | 140 | 15.7% | 40 | 4.5% | 20.1% |
| 1984 | 1,105 | 149 | 13.5% | 48 | 4.3% | 17.8% |
| 1985 | 1,665 | 365 | 21.9% | 78 | 4.7% | 26.6% |
| 1986 | 2,042 | 512 | 25.1% | 87 | 4.3% | 29.3% |
| 1987 | 3,751 | 878 | 23.4% | 234 | 6.2% | 29.6% |
| 1988 | 3,048 | 641 | 21.0% | 197 | 6.5% | 27.5% |
| 1989: 1st Half | 801 | 109 | 13.6% | 25 | 3.1% | 16.7% |
| Total | 13,306 | 2,794 | 21.0% | 709 | 5.3% | 26.3% |

(Calculations of counsel from the attached summary sheets from Report A1 under the reporting procedures established pursuant to the Amended Consent Decree).

4. There are still problems with these tests. Much of the improvement in the hiring of blacks and of Hispanics is occurring in hiring at the GS-5 level. Substantially fewer blacks and Hispanics are being hired at the more desirable GS-7 level:

Table B. Competitive GS-7 Hires from OPM-Sponsored Examinations

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|---|---|---|---|---|---|---|
| 1983 | 405 | 30 | 7.4% | 5 | 1.2% | 8.6% |
| 1984 | 498 | 41 | 8.2% | 9 | 1.8% | 10.0% |
| 1985 | 660 | 76 | 11.5% | 22 | 3.3% | 14.8% |
| 1986 | 791 | 95 | 12.0% | 28 | 3.5% | 15.5% |
| 1987 | 1,457 | 179 | 12.3% | 95 | 6.5% | 18.8% |
| 1988 | 1,106 | 117 | 10.6% | 51 | 4.6% | 15.2% |
| 1989: 1st Half | 362 | 26 | 7.2% | 10 | 2.8% | 9.9% |
| Total | 5,279 | 564 | 10.7% | 220 | 4.2% | 14.9% |

(Same).

5. The alternative paper-and-pencil tests developed by the

- 5 -

agencies which have delegated examining authority under the approval
of the Office of Personnel Management are also a substantial improve-
ment over the PACE, seem to be better for Hispanics than the OPM-
sponsored tests, but are not as much of an improvement for blacks as
the OPM-sponsored tests:

Table C. **Competitive Hires from Agency Examinations Under Delegated**
**Examining Authority**

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|------|------|------|------|------|------|------|
| 1983 | 390 | 41 | 10.5% | 22 | 5.6% | 16.2% |
| 1984 | 641 | 117 | 18.3% | 50 | 7.8% | 26.1% |
| 1985 | 646 | 99 | 15.3% | 35 | 5.4% | 20.7% |
| 1986 | 485 | 60 | 12.4% | 33 | 6.8% | 19.2% |
| 1987 | 916 | 103 | 11.2% | 53 | 5.8% | 17.0% |
| 1988 | 1,151 | 173 | 15.0% | 111 | 9.6% | 24.7% |
| 1989: 1st Half | 345 | 35 | 10.1% | 43 | 12.5% | 22.6% |
| Total | 4,574 | 628 | 13.7% | 347 | 7.6% | 21.3% |

(Same).

6. Here, too, much of the improvement in the hiring of
blacks and of Hispanics under the delegated examining authority is
occurring in hiring at the GS-5 level. Substantially fewer blacks
and Hispanics are being hired from agency-sponsored tests at the more
desirable GS-7 level:

Table D. Competitive GS-7 Hires from Agency Examinations Under Delegated Examining Authority

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|------|------------|-------------|---------------|----------------|--------------------------|-------------------|
| 1983 | 85 | 6 | 7.1% | 4 | 4.7% | 11.8% |
| 1984 | 109 | 7 | 6.4% | 2 | 1.8% | 8.3% |
| 1985 | 114 | 12 | 10.5% | 3 | 2.6% | 13.2% |
| 1986 | 86 | 14 | 16.3% | 5 | 5.8% | 22.1% |
| 1987 | 166 | 10 | 6.0% | 7 | 4.2% | 10.2% |
| 1988 | 204 | 17 | 8.3% | 10 | 4.9% | 13.2% |
| 1989: 1st Half | 111 | 9 | 8.1% | 7 | 6.3% | 14.4% |
| Total | 875 | 75 | 8.6% | 38 | 4.3% | 12.9% |

(Same).

7. Table E combines data to show overall hiring from

replacement paper-and-pencil tests:

Table E. Competitive Hires from OPM-Sponsored Examinations and from Agency Examinations Under Delegated Examining Authority (Combined Data)

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|------|------------|-------------|---------------|----------------|--------------------------|-------------------|
| 1983 | 1,284 | 181 | 14.1% | 62 | 4.8% | 18.9% |
| 1984 | 1,746 | 266 | 15.2% | 98 | 5.6% | 20.8% |
| 1985 | 2,311 | 464 | 20.1% | 113 | 4.9% | 25.0% |
| 1986 | 2,527 | 572 | 22.6% | 120 | 4.7% | 27.4% |
| 1987 | 4,667 | 981 | 21.0% | 287 | 6.1% | 27.2% |
| 1988 | 4,199 | 814 | 19.4% | 308 | 7.3% | 26.7% |
| 1989: 1st Half | 1,146 | 144 | 12.6% | 68 | 5.9% | 18.5% |
| Total | 17,880 | 3,422 | 19.1% | 1,056 | 5.9% | 25.0% |

(Same).

8. Table F combines data to show overall hiring at the GS-7
level from replacement paper-and-pencil tests:

Table F. Competitive GS-7 Hires from OPM-Sponsored Examinations and from Agency Examinations Under Delegated Examining Authority (Combined Data)

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Percent Hispanic | Black or Hispanic |
|------|-------------|-------------|---------------|----------------|--------------------------|-------------------|
| 1983 | 490 | 36 | 7.3% | 9 | 1.8% | 9.2% |
| 1984 | 607 | 48 | 7.9% | 11 | 1.8% | 9.7% |
| 1985 | 774 | 88 | 11.4% | 25 | 3.2% | 14.6% |
| 1986 | 877 | 109 | 12.4% | 33 | 3.8% | 16.2% |
| 1987 | 1,623 | 189 | 11.6% | 102 | 6.3% | 17.9% |
| 1988 | 1,310 | 134 | 10.2% | 61 | 4.7% | 14.9% |
| 1989: 1st Half | 473 | 35 | 7.4% | 17 | 3.6% | 11.0% |
| Total | 6,154 | 639 | 10.4% | 258 | 4.2% | 14.6% |

(Same).

9. Under ¶¶ 12(b) and 16 of the Amended Consent Decree, the defendants are required to make all practicable efforts to use special programs to reduce or eliminate the adverse impact caused by alternative examining procedures. These provisions can work effectively only if there are numerous hires under the special programs, and if blacks and Hispanics comprise a higher percentage of the hires under the special programs than they do under the competitive paper-and-pencil tests. Unfortunately, the defendants' use of the special programs does not meet these practical requirements for fulfilling the purposes of the Amended Consent Decree. The following tables, based on the calculations of counsel from Report A-1, show the problems:

**Table G. Outstanding Scholar Hires**

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Hispanic | Black or Hispanic |
|------|------|------|------|------|------|------|
| 1983 | 0 | 0 | N.A. | 0 | N.A. | N.A. |
| 1984 | 0 | 0 | N.A. | 0 | N.A. | N.A. |
| 1985 | 6 | 0 | 0.0% | 1 | 16.7% | 16.7% |
| 1986 | 237 | 27 | 11.4% | 14 | 5.9% | 17.3% |
| 1987 | 855 | 97 | 11.3% | 32 | 3.7% | 15.1% |
| 1988 | 972 | 81 | 8.3% | 35 | 3.6% | 11.9% |
| 1989: 1st Half | 408 | 46 | 11.3% | 22 | 5.4% | 16.7% |
| Total | 2,478 | 251 | 10.1% | 104 | 4.2% | 14.3% |

**Table H. Outstanding Scholar Hires at GS-7**

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Hispanic | Black or Hispanic |
|------|------|------|------|------|------|------|
| 1983 | 0 | 0 | N.A. | 0 | N.A. | N.A. |
| 1984 | 0 | 0 | N.A. | 0 | N.A. | N.A. |
| 1985 | 6 | 0 | 0.0% | 1 | 16.7% | 16.7% |
| 1986 | 160 | 7 | 4.4% | 11 | 6.9% | 11.3% |
| 1987 | 709 | 82 | 11.6% | 30 | 4.2% | 15.8% |
| 1988 | 781 | 59 | 7.6% | 29 | 3.7% | 11.3% |
| 1989: 1st Half | 359 | 38 | 10.6% | 20 | 5.6% | 16.2% |
| Total | 2,015 | 186 | 9.2% | 91 | 4.5% | 13.7% |

**Table I. Bicultural/Bilingual Hires**

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Hispanic | Black or Hispanic |
|------|------|------|------|------|------|------|
| 1983 | 19 | 0 | 0.0% | 17 | 89.5% | 89.5% |
| 1984 | 4 | 1 | 25.0% | 2 | 50.0% | 75.0% |
| 1985 | 20 | 0 | 0.0% | 15 | 75.0% | 75.0% |
| 1986 | 17 | 1 | 5.9% | 14 | 82.4% | 88.2% |
| 1987 | 27 | 1 | 3.7% | 21 | 77.8% | 81.5% |
| 1988 | 178 | 3 | 1.7% | 101 | 56.7% | 58.4% |
| 1989:1st Half | 45 | 2 | 4.4% | 25 | 55.6% | 60.0% |
| Total | 310 | 8 | 2.6% | 195 | 62.9% | 65.5% |

Table J. Co-op Student Hires

| Year | Total Hires | Black Hires | Percent Black | Hispanic Hires | Percent Hispanic | Black or Hispanic |
|------|-------|-------|---------|----------|----------|----------|
| 1983 | 52 | 14 | 26.9% | 7 | 13.5% | 40.4% |
| 1984 | 178 | 22 | 12.4% | 16 | 9.0% | 21.3% |
| 1985 | 174 | 18 | 10.3% | 7 | 4.0% | 14.4% |
| 1986 | 102 | 14 | 13.7% | 6 | 5.9% | 19.6% |
| 1987 | 105 | 21 | 20.0% | 6 | 5.7% | 25.7% |
| 1988 | 96 | 10 | 10.4% | 4 | 4.2% | 14.6% |
| 1989: 1st Half | 34 | 4 | 11.8% | 2 | 5.9% | 17.6% |
| Total | 741 | 103 | 13.9% | 48 | 6.5% | 20.4% |

10. Plaintiffs have raised these questions concerning use of the special programs with the defendants, and the parties have agreed to meet in good faith and attempt to resolve these matters.

11. Plaintiffs and the defendants are continuing to work in good faith on a resolution of the other problems concerning adverse impact and plaintiffs' motion for relief. We hope that we will be able to report to the Court soon on an agreed procedure for resolving many of these problems.

Respectfully submitted,

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

ELAINE R. JONES
1275 K Street, N.W.
Suite 301
Washington, D.C. 20005
(202) 682-1300

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
JOSE ROBERTO JUAREZ
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
  for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

By: _____
RICHARD T. SEYMOUR
Bar No. 28100

Attorneys for Plaintiffs

Dated: May 10, 1990

## Certificate of Service

I certify that I have, this 10th day of May, 1990, served a copy of Plaintiffs' Statement of Position On the Office of Personnel Management's New Testing Program on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by depositing copies in the U.S. Mail, first-class postage prepaid, addressed to them as follows:

Eric J. Segall, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
    Room 3744
Washington, D.C. 20530

James S. Green, Esq.
Karen Kimball
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
    Room 7450
Washington, D.C. 20415

Clint D. Wolcott, Esq.
National treasury Employees Union
1730 K Street N.W.
    Suite 1101
Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
Attorney for Plaintiffs

RECEIVED

MAY 1 0 1990

JAMES F. DAVEY, Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )   CIVIL ACTION NO. *Place in file*
                                   )   79-0271 (JHG)
                                   )
CONSTANCE NEWMAN, Director,        )
Office of Personnel Management,    )
et al.,                            )
            Defendants.            )
_____  )

## NOTICE OF CHANGE OF TELEPHONE NUMBERS

Pursuant to Local Rule 106(d), the attorneys for the
defendants hereby report the following change in telephone
numbers:

Ann Gulyassy: (202) 514-3527

Eric Segall: (202) 514-3256

Respectfully submitted,

STUART M. GERSON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

ANNE M. GULYASSY

ERIC J. SEGALL

Attorneys, Department of
Justice Civil Division,
Room 3744, 10th & Pennsylvania
Avenue, N.W.
Washington, D.C.  20530
(202) 514-3256

Counsel for Defendants

Date: May 29, 1990

## CERTIFICATE OF SERVICE

I certify that, on May 29, 1990, I served a copy of the foregoing Defendants' Notice of Change of Telephone Numbers, by first-class mail, postage prepaid, on:

Richard T. Seymour
Lawyer's Committee For Civil
  Rights Under Law
Suite 400
1400 Eye Street, N.W.
Washington, D.C.  20005

Clinton Wolcott
National Treasury Employees Union
1730 K Street, N.W.
Washington, D.C. 20006

ERIC SEGALL

RECEIVED

MAY 29 1990

JAMES F. DAVEY, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 28 1990

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
    individually and on behalf of )
    all others similarly situated, )
)
                Plaintiffs, )
)
          v. )   C. A. No. 79-0271
)
CONSTANCE NEWMAN, Director, )
    U.S. Office of Personnel )
    Management, et al., )
)
             Defendants. )

**CONSENT ORDER REVISING THE DEFINITION OF
ADVERSE IMPACT IN THE AMENDED CONSENT DECREE,
FOR THE PURPOSE OF MAKING RETROSPECTIVE
DETERMINATIONS OF ADVERSE IMPACT**

Pursuant to the December 23, 1987 Stipulation and
Consent Order Staying Consideration of Plaintiffs' Motion for
Relief on their Showings of Adverse Impact in Hiring for 1982,
1983, and 1984, etc., the parties have reached the following
agreements and said agreements are approved and adopted by the
Court:

1. An examination of the reports by agencies of the
means by which they count applicants under the Amended Consent
Decree has disclosed problems which the parties had not antici-
pated in the negotiation and framing of the Decree. These
problems include the following:

        (a) With a few exceptions involving central-
    ized registers or the concentration of hiring within
    one region, applicants apply for consideration at
    particular locations or within particular regions.

(N)

Apart from those exceptions, applicants are free to
apply in more than one region of an agency, and are
free to apply at more than one location within a re-
gion.

(b) There are differences among agencies, and
there are sometimes differences among regions or activ-
ities within the same agency, as to the manner of
reporting applications. Sometimes, nationwide totals
of applicants for an agency include the same applicant
once for each region in which he or she applies; some-
times, regional totals include the same applicant once
for each location within a region in which he or she
applies; sometimes, nationwide and regional totals
reflect only separate persons; and sometimes an appli-
cant who applies in more than one region is counted
only in the first region for which his or her applica-
tion is entered on the computer, and is not counted in
any other region in which he or she applies.

(c) Some agencies have retained race and
national origin forms or data for some or all years and
may be able to go back and report information according
to any newly agreed format; other agencies have not re-
tained such forms or data and may not be able to gener-
ate any additional information.

2. The parties are continuing to meet and negotiate the
concepts and details of a more effective reporting system for

- 2 -

future use.

3. Showings of adverse impact shall be based upon external hiring, i.e., on appointments from all sources in the defendant's hiring reports less appointments appearing in the "Oth"[1] or "Other" column. The defendants retain the right to make the election for the future allowed under the provisions of ¶ 8(b)(7) of the Consent Decree.

4. The parties are agreed that some revisions to the decretal definitions of adverse impact are appropriate with respect to the determination of adverse impact for the past and until such time as a revised reporting system is in place.

> (a) The Office of Personnel Management shall re-run its report A-4 showing regional hiring information for each job category by agency for the years 1982 through 1988, but shall exclude from the report any job category for any agency and region in which there were fewer than 10 external selections (i.e., total selections less the column entitled "Other"). Copies of these reports shall be provided to plaintiffs. The Office of Personnel Management expects to be able to run or re-run these reports and provide copies to plaintiffs within sixty days from the entry of this Order. If data are available for 1989, these data shall be run as well.

---

[1] This is the abbreviation used in the defendants' hiring reports.

(b) To save expense, calculations of adverse impact from the new reports by the Office of Personnel Management shall be performed in the first instance by the expert retained by the Department of Justice in this litigation, subject to checking and verification by plaintiffs. These calculations shall be made _de novo_ for all job categories and agencies other than those which hired on a nationwide basis or from a nationwide register, and shall not be limited to those job categories and agencies in which showings of adverse impact have already been alleged. The defendants expect that their expert will be able to complete these calculations within sixty days after receipt of the new reports from OPM. If plaintiffs are not satisfied with the accuracy or completeness of the calculations made by the defendants' expert, they retain the right to make their own corrected or supplemental showings of adverse impact within the time allowed by the Amended Consent Decree.

(c) In the event that further unanticipated difficulties arise with respect to the calculations required by this paragraph and the parties reach agreement on the means of resolving them; or in the event that the parties reach agreement upon, and the Court approves, a permanent modification to the definition of adverse impact which the parties agree should be ap-

plied to the calculations required by this paragraph; or in the event that either plaintiffs or defendants develop in light of the performance of the calculations required by this paragraph an alternative means of determining adverse impact and the parties reach agreement thereon, nothing in this Consent Order shall be construed as limiting the ability of the parties to make a joint application to the Court for permission to make the determinations of adverse impact required by this paragraph in accordance with the means upon which they have reached agreement. Each party shall attempt in good faith to negotiate with the other parties reasonable solutions to each such problem or suggestion which arises. In the event that the parties are unable to reach agreement on any of the matters covered by this subparagraph, either plaintiffs or defendants may petition the Court, in a reasonably prompt manner and upon a showing of good cause contained within the petition, for an amendment to the provisions of this paragraph governing the manner in which the determinations of adverse impact are to be made.

(d) For agencies which did hire on a nationwide basis or from a nationwide register, showings of adverse impact as to the hiring of those agencies shall continue to be made as provided in the Amended Consent Decree.

(e) For agencies which hired on a regional basis and for any year maintained data showing all of the regions to which particular applicants applied, showings of adverse impact as to the hiring of those agencies in those years shall be made on a regional basis whereby the persons applying for the job category in question in a region shall be compared with the hires made for that job category within that region. No showing of adverse impact shall be made unless there were at least ten hires in that job category by that agency in that region. This amends ¶ 8(b)(6)(ii) of the Amended Consent Decree. To the extent possible, applicants shall be counted only once within a region for a particular job category. To the extent possible, an applicant who has applied in more than one region, and who was hired within the year of the application for that job or for a different job category also formerly subject to the PACE, shall be counted as an applicant only for the region, agency, or job for which he or she was hired, and shall not be counted elsewhere. The inability to make the refinements described in the two preceding sentences shall not prevent a reasonable showing of adverse impact or be a defense to a reasonable claim of adverse impact.

(f) For agencies which hired on a regional basis and for any year did not maintain data showing

all of the regions to which applicants applied, show-
ings of adverse impact as to the hiring of those agen-
cies in those years shall be made on a regional basis
whereby the persons applying for the job category in
question in a region shall be compared with the hires
made for that job category within that region. No
showing of adverse impact shall be made unless there
were at least ten hires in that job category by that
agency in that region. This amends ¶ 8(b)(6)(ii) of
the Amended Consent Decree.

(g) The parties agree that determinations of
adverse impact should be made from the best data avail-
able, but that imperfections in the data should not
prevent the making of reasonable showings of adverse
impact or constitute defenses to such reasonable show-
ings.

(h) In the event that there are no reported
applicants for a job category for an agency nationally
or in a region, in a year in which there are hires in
that job category for that agency nationally or in that
region, the agency shall be consulted to determine
whether there is an explanation, such as that appli-
cants in one region were considered for another as
well, or that applicants for one job category were
considered for another as well. Where there is such an
explanation, the determination of adverse impact shall

be made in a manner consistent with the agency's actual practice of considering applications. If the agency does not have such an explanation, determinations of adverse impact shall be made, based upon the applicants for that job category for that agency nationally or in that region in the most recent year for which such applications are reported.

(i) An agency which has kept reasonably complete records, which plaintiffs have had a reasonable opportunity to verify, showing the particular applicants who were no longer interested in the possibility of employment at the time the agency was making hiring decisions, or who rejected offers of employment in the job in question, shall be entitled to a determination of the presence or absence of adverse impact after the exclusion of applicants who rejected offers or who otherwise removed themselves from consideration. An agency relying on the provisions of this subparagraph for any job category must use the same approach for all other job categories covered by the Amended Consent Decree.

(j) Plaintiffs shall have a reasonable opportunity to verify the evidence supporting any defense to a showing of adverse impact.

5. Pursuant to ¶ 17(b) of the Consent Decree, all the new and/or initial showings of adverse impact to be made under

¶ 4 above shall be deemed timely for the purposes of seeking both individualized injunctive and monetary relief and generalized injunctive relief.

6. Subsequent showings of adverse impact shall be made in accordance with the provisions of ¶ 4 until such time as a new reporting and recordkeeping system is implemented and further revisions are made to the adverse-impact provisions of the Amended Decree.

7. The parties have been unable to date to reach agreement on the meaning of, or on any actions to be taken as a result of, the Social Security Administration's analysis of the percentage of blacks among the nationwide applicants for three OPM-sponsored job categories, compared with the percentage of race-identified applicants who were black, as shown on OPM's reports under the Amended Consent Decree, for the years 1983 through 1986. The parties are continuing to discuss the matter, and will advise the Court promptly when these negotiations are concluded. The parties will submit any agreement to the Court for approval. If the paries are unable to reach agreement, they will so advise the Court and request the Court to resolve the matter.

This the 28 day of ___August___, 1990.

_JOYCE HENS GREEN_
**JOYCE HENS GREEN**
United States District Judge

We so stipulate, and we ask for this:

- 9 -

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.   94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.   94105
(415) 989-9444

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

Attorneys for Plaintiffs

Dated: August 23, 1990

STUART M. GERSON
Assistant Attorney General

JAY B. STEPHENS
United States Attorney

_____
ANNE M. GULYASSY

_____
ERIC J. SEGALL
Attorneys, Department of
    Justice
Civil Division, Room 3744
9th and Pennsylvania Ave. N.W.
Washington, D.C. 20530
(202) 514-3256

- 10 -

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO et al,                    ) CIVIL ACTION:

      V                                  ) No. 79-0271

MS. CONSTANCE NEWMAN, DIRECTOR  OFFICE OF ) JUDGE, JOYCE GREEN
PERSONNEL MANGEMENT                        )
1900 E St. N.W.                            )
Washington, D.C. 20415                     )
                                           ) June 2], 1991
      AND                                )
                                           )
DR. LOUIS SULLIVAN, SECRETARY OF HEALTH    )
AND HUMAN SERVICES                         )
200 Indepedence Ave. S.W.                  )
Washington, D.C. 20201                     )
                                           )
      V                                  )
                                           )
SAMUEL B WALLACE IV                        )
INTERVENOR AND CLASS MEMBER                )

**FILED**

**JUN 2 1 1991**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

I. MOTION OF SAMUEL B. WALLACE A CLASS MEMBER AND AN HONORABLY
DISCHARGED VETERAN OF THE KOREAN CONFLICT FOR LEAVE TO INTERVENE
UNDER FRCP RULE 24(a)(2)"INTERVENTION AS OF RIGHT"-WHERE PETITIONER
AND CLASS MEMBERS ARE "VICTIMS OF DISCRIMINATION"
NO REMEDY UNDER THE LUEVANO CONSENT DECREE OF JOBS OR BACK PAY ETC.

> This is a Motion to the court
> for leave to file Motion to
> vacate interlocutory orders under
> the court's Inherent Power. Under
> Supreme Court Decision in
> <u>Martin V Wilkes</u>, 104 LED 2d 835(1989)

The Petitioner is a Class Member under the Luevano Decree. He has
during the period of 1975 and 1991 applied for numerous competitive
positions with the government, received high scores and then has been
Discriminatorily "Passed Over" despite his being a Preference Eligible.

Recently, he took and passed the Nationwide ACWA Exam, received a
score of 98% and was again Discriminatorily "passed"over".

Petitioner believes that many black and hispanic Class Members who
are also Preference Eligible Veterans have experienced the same treatment.

And that he as a representative sample has been "passed over" hundreds
of times. Therefore,Petitioner, Samuel B. Wallace Moves this court for
Leave to Petition as of right R. 24(a)(2) in order to secure a Job for
which he is qualified.      Signed: Samuel B. Wallace IV

*Samuel B Wallace*

1

Bender's Forms, Federal Rules of Civil Procedure R.60, p.586-7, 1990 Ed. Form 3340, Rule 60 (b):

> "2] Relief from final Judgment, order or proceedings--The addition of 1946 of Amendments of the qualifying word "final" emphasizes the character of the Judgments, Orders or Proceedings from which Rule 60(b) affords Relief; (and) hence <u>Interlocutory Judgments are not within the Restrictions of Rule 60(b),but rather are left subject to the complete Power of the Court in rendering Interlocutory Orders so as to afford such relief from those Orders as Justice Requires.</u>"

(Advisory Committee Notes 1946 Amendments)

> "That is in accord with the principle of <u>John Simmons V Grier</u>, 258 U.S. 82 (1922); Moore's Federal Practice and "Relief from Civil Judgments, 55 Yale Law Journal 641-643 (1946):

>> "The Principle of the Simmon's Case is sound. So long as the Court shall have complete Jurisdiction over the Action, it should have complete power over its Interlocutory Orders made therein and should be able to revise them when consonant with Justice and Equity...."

....Bon Air Hotel V Time Incorporated, 426 F2d 858 (5th Circ 1970):

> "An Order Denying a Motion for Summary Judgment is not subject to vacation for "mistake" under Rule 60(b), but being Interlocutory may be considered at any time at any time prior to Judgment (Rule 60(b) until entry of Judgment disposing of litigation, such Court has Inherent power to correct any error on its own which it may have previously made. Citing Cohn V US , 259 F2d 321 (6th Cir. 1958)"

See also Laffey V North West Airlines, 642 F2d 578,DC Circuit 1980, where it was held that a Court may relieve a party from final judgment where it is no longer Equitable that the Judgment should have prospective application.

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO et al,                    ) CIVIL ACTION:

    V                                      ) No. 79-0271

                                           ) JUDGE, JOYCE GREEN
MS. CONSTANCE NEWMAN, DIRECTOR  OFFICE OF  )
PERSONNEL MANGEMENT                        )
1900 E St. N.W.                            )
Washington, D.C. 20415                     )

    AND                                    )
                                           )
DR. LOUIS SULLIVAN, SECRETARY OF HEALTH    )
AND HUMAN SERVICES                         )
200 Indepedence Ave. S.W.                  )
Washington, D.C. 20201                     )

    V                                      )

SAMUEL B WALLACE IV                        )
INTERVENOR AND CLASS MEMBER                )
                                           )

II MOTION FOR THE LUEVANO CONSENT DECREE COURT TO VACATE ITS
INTERLOCUTORY ORDERS DENYING PETITIONER, SAMUEL B. WALLACE'S
MOTIONS TO INTERVENE OF 2/25/81(("MOTION'SAMUEL WALKER'-Court's
Docket p.4)) AND MOTION TO INTERVENE "Lodged Not Filed"-
SEE LETTER ATTORNEY SEYMOUR OF MAY 11,1987:"YOUR MOTION FOR
DECLARATORY AND INJUNCTIVE  RELIEF WITH P &A's-LODGED, NOT FILED"

GROUNDS FOR VACATION OF INTERLOCUTORY ORDERS RIGHT OF CLASS
MEMBERS TO INTERVENE IN CLASS ACTION CONSENT DECREES FIRMLY

ESTABLISHED BY THE SUPREME COURT IN MARTIN V WILKES 104 LED 2d
835 AND BY DEFENDANTS' ATTORNEY JAMES GREEN ASSOCIATE COUNSEL
OF THE OFFICE OF PERSONNEL MANAGEMENT'S ADMISSION THAT THE OPM
AND OTHER DEFENDANT FEDERAL AGENCIES WERE "INTERESTED IN HAVING
THE GOVERNEMENT AWARD COMPENSATION FOR THE "ACTUAL VICTIMS OF
DISCRIMINATION".(But see Effects of Decree (Back Pay and Jobs for
"Named Plaintiffs (Luevano etc.); Zero Class Members with Claims.****

AND WHERE CLASS MEMBERS CLAIMING THEY COULD PROVE LIABILITY AND
INJURY HAVE RECEIVED NO REMEDY WHATSOEVER UNDER THE LUEVANO
CONSENT DECREE WHICH HAS "RESOLVED THEIR CLAIMS"- Decree page 4
WITHOUT PERMITTING THEIR PARTICIPATION AS PARTIES TO THE CIVIL
ACTION INVOLVING THEIR RIGHTS AND THEIR CLAIMS. ***

***See"'Causation in Title VII Actions',COLUMBA LAW REVIEW, March
1982, Volume page 317 discussing Victims, named parties and
compensation, all parties and Public Policy.P. 323 to 319 to 321
Discussing Liability and Injury and Public Policy.

See also: University of Virginia Professors Rutherglen and Ortiz
Article: "Affirmative Action under the Constitution & Title VII"
P.467-515,V.35,1988.P.469,491, p. 470. Federal Consent Decrees also
are under 5th Amendment's "Equal Protection." ****

Petitioner's Motion to Vacate the Court's Interlocutory
Order Denying Petitioner's Motion to Intervene as of
Right under Rule 24(a)(2)

The Petitioner, Samuel B. Wallace, Moves the Court under its
inherent powers to change its Interlocutory Orders to vacate its
Order of April 1981 on the grounds that the basis for that Denial
has bewen abrogated by the Supreme Court decision in Martin V
Wilks where the Supreme Court ruled that Non-Parties to a
Consent Decree cyan not be bound by "judgment in personam"
in Litigation in which they have not been made Parties.

And on the basis that Attorneys for the Plaintiffs who
in their Consent Decree " resolved the claims of the Class
Members" (See Consent Decree on P.   clearly did not represent
the Interests of Class Members and Objectors who indicated or
believed that they could prove liability and damages.  /

And on the basis that the Consent Decree in its present
form clearly violated the Equal Protection  stanmdards of the
Fifth Amendment to the United States Constitution. /
In that the Decree established two categories of Plaintiffs:
the named Plaintiffs Luevano et al who received Title VII Back
Pay and Jobs; and the unnamed Class Members whose "Claims were
resolved"  by the Consent Decree, where they were in effect barred
from trying their claims on merits and where there was no relief
for victims of Discrimination who could prove liability and injury.

The Petitioner also asserts that he has a viable cause of
action under this Consent Decree, such as it is, because he
believes that he can prove Continuing Acts of discrimination

by the Defendants which include Discriminatory Rejection of his application for a vacancy as a Technical Publications Writer after he passed the new nationwide alternative to the PACE Exam with a Score of 98% and submitted proof of that to the NCI Personnel Office which again rejected Petitioner's application for a vacant position as Writer-Editor even though an EEOC Claim against the same NCI Defendants was still pending and had not been resolved within the 180 days.

The Petitioner argues that he would be severely disadvantaged if he were not granted interim relief in the form of a Job which is fiting because he has been illegally and discriminatorily " passed over" without prior Notice and Opportunity for Hearing as required by law. And because the Petitioner also represents a subclass within the Class of Black and Hispanic Preference Eligible Veterans who have been similarly Discriminated against. And that those Preference eligibles should be Certified as Parties to the Luevano Consent Decree as well as all other Class Members who believe that they can prove liability or injury with respect to the PACE Exam and alternative Examinations and other Discriminatory Procedures used to bar the Plaintiff Class from Lawful Employment Opportunities.

Therefore the Petitioner, Samuel B. Wallace, Respectfully Moves this Court to Vacate its Interlocutory Order Denying Petitioner's Motion to Intervene and to allow Petitioner to Amend his Motion to Certify a Class of Class Members who believe that they can prove liability and injury including Preference Eligibles Veterans who are members of the Class and who are past or

3

continuing victims of Discrimination by the Defendants.

Respectfully Submitted
Samuel B. Wallace

Affirmation of Service

The Petitioner, .Samuel B. Wallace, affirms that he
has sent or is delivering this day to Attornys for Defendants at
the Department of Justice  and Plaintiffs Luevano et al, Mr.
Seymour a copy of this Petitioner's Motion for Leave to Intervene,
and his  Motion  to Vacate Judge Green's Interlocutory Order of
April 9, 1981 Denying Petitioner's Motion to Intervene as of Right
and Motion for Certification of a Class of Class Members who
believe that they can  prove Injury or Liability under the PACE or
its alternative as  as well as Discriminatory Evaluation, Selection
and Referral Procedures flowing from its use or directed to Class
Members who     are qualified to  hold  Entry  Level  or  higher
Professional Level Positions.

Affirmed: The Petitioner, Samuel B.  Wallace

4

The Non-statutory Right to Intervene R. 24(a)(2)

Rule 24 (b) has an explicit provision for "avoidance of delay by the predjudicing (disadvantaging) exisitng parties. But this provision is not found in R. 24(a)(2) as the Court of Appeals clearly indicat'ed in Stallworth V Monsanto.

Rule 24 (a)(2) is the non-statutory right to intervene rule which

exemplified in Martin V Wilkes.

Moore Fed Pract. Comm. Rule 124, P. 24-53, 1991 Suppl.:

Martin V Wilkes,109 S.Ct. 2180 (1989):

Firefighters alleged that Defendants under a Consent Decree were making Discriminatory decisions with respect to promotions on the basis of race.

None of the firefighters had been parties to the original suit. The Defendants moved to dissmiss the firefighters from the action on the grounds

"on the grounds that it was an Impermissible collateral attack on a Consent Decree."

The District Court ruled in favor of Defendants and the firefighters appealed.

The Circuit Court of Appeals for the 11th Circuit held that it explcitily rejected the doctrine of "Impermissible collateral attack on a Consent Decree" and also held that the firefighters Discrimination Claims were not precluded.

Defendants appealed and the Supreme Court in five-four majority decision ruled with Chief Justice Rehnquist writing for the majority first citing the fundamental principle that no one is bound by a judgment in personam in litigation to which he has not been made a party.
The majority concluded that the preclusion of firefighter's claims would amount to a deprivation of their legal rights in a proceeding in which they were not parties.
The decision also rejected by the Supreme Court also rejected explicitly the doctrine of Impermissible Collateral Attack on a Consent Decree on the grounds that that Doctrine ignored both Rule 19 and Rule 24 as well as the Due Process requirements of the 14th Amendment."& .

The Significance of Martin V Wilkes in the Luevano Case.

The facts of Luevano except for race have many things in common with the Wilkes decision. In Luevano the named Plaintiffs secured a Consent Decree but that Consent Decree by its terms "resolved the Claims of the Class Members with respect to illegal Discriminatory use of the PACE Exam by Defendants, OPM et al.

The effect of that Decree as S. Wallace and other Objectors to the Decree pointed out at the Hearing of the Objectors was to actually Discriminate against Class Members who had claims and who could prove liability. Thus, the Decree, itself as written actually was used to Discriminate against Class Members with viable claims.

Petitioner, Samuel B. Wallace, sought to intervene in February 25, 1981, but his Motion to Intervene was rejected under the Implicit Doctrine of Impermissible Collateral Attack of a Consent Decree and under the misapplied ruling that Intervention of Right should be Denied to the would-be Intervenor because "it would "predjudice" the Parties to the Action by raising other points not at isue and not germaine to the suit itself." That Ruling was of course incorrect because as Stallworth V Monsanto indicated in a famous appellate ruling that Disadvantage to Parties should only be considered with respect to the issue of Timeliness. But the Petitioner had actually intervened almost 9 months or so before the Consent Decree was finalized by the Court. Therefore, Petitioner's Motion was timely and his arguments concerning whether the supposed "Victims of Discrimination" should have their claims considered by the courts was valid as subsequent Supreme Court cases would clearly indicate. /

6

ANGEL G. LUEVANO, et al.,                    :

    Plaintiffs,                          :

vs.                                          :          Civil Action No. 79-0271

ALAN CAMPBELL, et al.                        :
                                                          APR 2 1991
    Defendants.                          :

## ORDER

    This matter is before the Court on the motion of Samuel
B. Wallace to intervene in this action. This motion is opposed by
both the plaintiffs and the defendants to the instant case. The
movant allegedly took the PACE Examination, the subject of this
lawsuit, in 1975 and 1976 and did not receive a passing grade.
He filed a complaint with the appropriate administrative agencies
and with this Court claiming that his examination was graded
fraudulently. His motion to intervene expresses, inter alia,
his concern that members of the plaintiff class will not receive
adequate notice of the consent decree in this case, to which pre-
liminary approval was given February 26, 1981.

    Movant is entitled neither to intervention by right nor
by permission. To the extent that movant questions the ability of
the parties to effectuate notice pursuant to the terms of the
consent decree, his interest is adequately represented by the
plaintiffs whose interest it is to achieve the widest possible
dissemination of the terms of the decree. If movant is attempting
to expand the scope of this litigation to include claims of individuals
who believe that their examination was unfairly graded, he is
presenting a claim wholly unrelated to the issues encompassed by
even a liberal reading of plaintiffs' complaint and the terms of
the consent decree. It would prejudice both parties to permit
movant to so enlarge the content of this cause of action.

    Accordingly, it is this _9_ day of April, 1981

    ORDERED that the motion of Samuel B. Wallace to intervene
in this action be and it hereby is denied.

JOYCE HENS GREEN
United States District Judge

Scholar, College Co-op Student, Bilingual/Bicultural and other programs. In return, we have agreed to waive classwide back *(8 PPD)* pay and quota relief. The case is an extremely complex one, and we believe that it is reasonable to settle it on this basis, in light of the importance of an improvement in the government's means of selection for its job categories, and in light of the burdens such an improvement will place upon the government.

In the meantime, we do not believe that any purpose would be served by adding any additional persons as plaintiffs in the case. I hope that this letter, and the more detailed information you will be receiving from the Office of Personnel Management if the settlement is approved, will answer your questions.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS:rc

8

R24: <u>Moore's Federal Practice:</u> Vol. 3B

Rule 24 P 24-50: "In Summary, an Application for Non-Statutory Intervention under R66 Version R24 (a)(2) must meet the following: (1) The application must be timely. (2) Show an interest in the Subject Matter of the action. (3) Show that the protection of the Interest may be impaired by the disposition of the action (In the Consent Decree Court without the Intervenor). (4) Show that the interest is not adequately represented by an Existing Party.7 -- See Cook v. Boorstin 763 F2d 463 (D.C. Cir. 19851: D.C. Employees of the Library of Congress sought to intervene as of Right under R.24(a)(2) pending TVII Court Action the Judge Denied Intervention under Rule 24(a)(2) Criteria. Court of Appeal D.C. Circuit Reversed :Proposed Intervention met R24(a)'s Requirements of Timeliness, Interest in Subject Matter, Likelihood of Impairment of Interests by Disposition of Suit without Intervenors. Further,the Court held that because named Plaintiff's planned or proved the same pattern and practice of Discrimination, the Intervenor's Exhaustion of Remedies had been met Vicariously through the Plaintiff's Exhaustion of Remedies Requirement (and) although Employees held Different positions and alleged Distinguishable harm, each had protectable Interest in Employment Free of Discrimination and each had standing to bring suit separately.To require separate actions would unduly restrict the Rights of Intervenors: Cook v. Boorstein; 763 Fed. 1462 (D.C. Circ.)

THAT PETITIONER'S MOTION TO INTERVENE UNDER RULE 24(a)(2) MET THE
REQUIREMENTS FOR INTERVENING AS OF RIGHT AS SETFORTH IN COOK V
BORSTIN, 763 F2d 463 (D.C. Circ. 1985)

In Cook V Boorstin:

"(1) The application must be timely. (2) Show an interest in
the Subject Matter of the action. (3) Show that the protection
of the interest may be impaired by the dispostion of the
action. (in the proceedings without the Intervenor).(Par.Added)
(4)"Show that the Interest is not adequately represented by
the existing party."

I. THAT THE PREVIOUS APPLICATION WAS TIMELY AS IS THIS ONE

The Petitioner, Samuel B. Wallace, first filed Motion to Intervene
February 25th 1981 and Denied by Interlocutory Order on April 9th 1981
by this Court while the Consent Decree did not become Final until November
1981. Furthermore, Petitioner Filed Motions indicating that according to
Statistical Evidence obtained by the OPM the OPM was not hiring at a rate
sufficient to indicate that the OPM was no longer violating disparate
impact requirements of the Consent Decree. as well as a Motion for
Injunctive Relief and Mandamus to correct Test Procedures etc. which was
noted in Attorney Semour's Letter to me in 1987 noting on page two
that My Motion of August 5, 1983 was "Lodged and Not Filed". And again
I filed Motion to Intervene,this year. Which Motion was rejected by the
Court Clerk because it lacked a "Zero" in the Civil Action Number.
Therefore, Petitioner's Motions to Intervene on the basis that their has
been no relief or remedy for the "Victims of Discrimination" among Class
Members who believe that they can prove both Injury and Liability on the
Part of the Defendants. And Petitioner's current Motion to Intervene is
Timely filed in this action where the Court maintains jurisdiction because
it is filed on the grounds of Past and Continuing Acts of Discrimination
by the OPM, HHS and other Defendants. Petitioner now files this Motion
under the Supreme Court Ruling in Martin V Wilkes, which allows non-
Parties to Intervene in Class Action Consent Decrees affecting their
Interests.

II. THAT PETITIONER'S MOTIONS OF FEB. 25th 1981 SHOWED AN INTEREST IN THE
SUBJECT MATTER OF THE ACTION AS DOES THIS MOTION

The Petitioner in his Motion to Intervene of Feb. 25,1981 indicated
that he was a Member of the Class who believed that he had been
intentionally discriminated against by being assigned a PACE Score far
below the score that he earned on the PACE Exam which Petitioner indicated
that he thought he had passed in his Motion to Interve n and t the
Objector's Hearing held by this Court. (Petitioner had previously filed
suit in this District Court House Charging the same thing. And that suit
had been D ismissed without Predjudice for "Misjoinder of Parties"
Therefore, the Petitioner had an Interest of the suit in that he alleged
that that Exam had been used to Discriminate against Blacks, but that
in addition that scores of intelligent well qualified blacks had been
altered to prevent them from attaining Federal Employment. This Court
noted those facts in its Court Order. But it failed to understand that
the Petitioner's allegations involved those Class Members who could prove
or who thought that they could prove liability and injury.-The "victims
of actual discrimination." These points become clear by the reading of
parts of the Court Order:

> Judge Joyce Green's Court Order Denying Intervention of
> April 9th 1981: (in Part):
> ...."He (the Petitioner Samuel B. Wallace), filed a
> complaint with the appropriate Administrative Agencies
> and with this Court Claiming that his (PACE) Examination
> was fraudulently graded...
>
> "If the Movant is attempting to expand the scope of
> this litigation to include the claims of individuals who
> believe that their Examinations were unfairly graded,
> he is presenting a Claim wholly unrelated to the Issues
> encompassed by even a liberal reading of Plaintiff"s
> Complaint and the terms of the Consent Decree. It would
> "Predjudice" (disadvantage is a better word) both Parties
> to permit the Movant (Samuel B. Wallace) to so enlarge the
> content of this Cause of Action......
>
> "Movant is entitled neither to Intervention by Right
> (Rule 24(a)(2) or by Permission(Rule 24(b))***

---

*** Court of Appeals in Stallworth V Monsanto,558 F2d 257 at p.265
    indicated that "delay,or disadvantage to existing parties not in R24(a)

The difference between Plaintiffs's Attorney Semour's position and that of the Petitioner is obvious. Plaintiffs' Attorney based on Statistical Studies indicated that the Disparate Impact of the PACE indicated that its effects on Blacks was Discriminatory in that far fewer blacks and hispanics than Whites Passed the PACE.

Petitioner's position was that Disparate Impact in this case was so disproportionate to anything that he had encountered as an educator, member of initially an all black unit that won three Congressional Citations or as a Sociologist that it indicated a deliberate manipulation of the test scores to conform with the taker's race. And that there was no way that University Graduates who had been required to take a more difficult SAT Exam to enter college would flunk the PACE in such dis- proportionate numbers. Statistically a Standard Deviation of almost ten. Which was as indicated by the GAO Report and offhandedly by Plaintiffs' Attorney the most disproportionate rate of failing among minorities of any test given. And if such an outrageously disproportionate rate of failure among blacks and hispanics was true then every single Employment Discrimination Case based on disproportionate disparate impact such as Chance V the New York City Board of Education would have to be thrown out. Petitioner even made a graph called Triggering Validitation" showing the PACE the most Disproportionate of any test in Civil Rights litigation. And that such disproportion could not statistically or otherwise be due to "chance."

In other words Plaintiffs' Attorneys said their statistic showed the tests Discriminated against Class Members. While Petitioner agreed they Discriminated and then proceeded to demonstrate How they Discriminated by a deliberate selection of white candidates who were invariably assigned a passing score....

Thus, the Petitioner went to the heart of the issue: Proving liability and Proving Injury to the Victims of actual Discrimination."

---

/ The Court of Appeals made clear in Stallworth V Monsanto, 558 F2d 257 (1977) that courts are not supposed to consider the delay or the "disadvantage" to parties under Rule 24(a)-"Intervention of Right" because there is no such Provision under that Rule but only under Rule 24(b) Intervention by Permission. And this is confirmed by reading the Legal Text: Moore's Federal Practice Rule 24(a) because there is no mention or heading under R.24(a) in the entire history of the Rule. But there is for R. 24(b) Intervention by Permission[4] "delay and "predjudice to Parties. Therefore Judge Green erred.

P 2

Again [7,8]..."The Extent of the (disadvantage)..that existing parties to the litigation may suffer...if would-be Intervenors fail to Intervene."

The Petitioner, respectfully submits, that the Luevano Court in its Order of April 9, 1981 Denying the Motion of Samuel B. Wallace to Intervene is in error according to the jurisprudence of Stallworth on the important Issue of Petitioner's, Samuel B. Wallace's, Motion for Intervention of Right. See Judge Green's Order, April 9,1991 in Luevano:

> Paragraph 2."Movant is entited neither to Intervene by right nor by permissions"..."It would predjudice both parties to permit the movant to so enlarge the Content of this cause of Action."

Stallworth V Monsanto Middle of 1st paragraph second column:

"Whether allowing Intervention will delay the progress of the case or(disadvantage)...the rights of original parties is a factor which the District court must consdder in its exercising its Discretion to permit Intervention UNDER SECTION (B)of Rule 24. (actually Rule 24 (b)) (which Provides):

"In exercising its discretion the court shall consider whether the Intervention will unduly delay or (disadvantage)..the adjudication rights of the original parties."

But the Appellate Court in Stallworth V Monsanto at p. 265 points out in the last paragraph:

"Since a provision similar to Rule 24(b) is not found

or included in Section (a) of Rule 24, it is apparent that (disadvanatage)...to existing Parties (here Luevano et al and his Attorneys Seymour et al),

other than that caused by the would-be Intervenor's failure to act promptly

was not a factor meant to be considered where Intervention was sought under (Rule 24) section (a).

"Therefore, to take"as" (disadvantage)that existing parties may incurif Intervention is allowed under the ruberic of

timeliness    would rewrite FCPR Rule 24 by creating an
additional Prerequisite to (Rule 24 (a)(2) Intervention
of Right." Court of Appeals Stallingworth V Monsanto at 265.

I have spent so much time on this point because I would like to
avoid too much unnecessary litigation on this point. Because although
both Parties are in Principle dedicated to Civil Rights in Employment
Cases both Parties in Practice, themselves, violate the law. Thus,
when Petitioner sought to Intervene, he was opposed more vigorously
by the Plaintiffs' Attorneys than by the Defendants. And when Petitioner
sought to become a named Party to the suit having filed a more precise
action involving the PACE in 1976 which was rejected by the District
Court  for Misjoinder of Parties" without Predjudice", the Reply to
Petitioner's request to be represented as a named party was:

"We have agreed to waive classwide Back Pay and Quota
Relief. The case is an extremely complex one, and we
believe that it is reasonable to settle,it on this basis
in light of the improvement in the government's means of
selection for its Job Categories and in light of the
burdens such an improvement will place on the Government.

In the meantime., we do not believe that any purpose would
be served by adding any additional persons as plaintiffs
in the case."........February 18, 1981. Sincerely, Richard T
Seymour.

Therefore Judge Green erred in her Order of April 9, 1981 in that
she considered (Attorneys alleged) Disadvantage to the named Parties which
was more of a legal fiction than fact. That Petitioner was entitled to
Intervention by Right, since if the Court of Appeals in Stallworth is
correct Intervention of Right 24(a)(2) does not require a consideration
of the Advantage or Disadvantage to named Parties except where Timeliness
was at issue. Which in this case, it was not; since, the Petitioner, Samuel B.
Wallace had Intervened or rather had unsuccessfully sought to Intervene
on  February 25,1981. While the Consent Decree abrogating all of the Class
Members Rights to Prove Liability or Injury was made Final on Nov. 19,1981
with Attorney Seymour et al receiving handsome Attorneys Fees and the
named Plaintiffs Jobs and Back Pay. And Class Members received Zero-again.

/ 4

IV. THAT THE INTEREST IS NOT ADEQUATELY REPRESENTED BY THE EXISTING PARTY"


First, lawyers for the Plaintiffs did not express any interest in whether or not their Clients had Passed the PACE Exam, but only that it had a Disparate Impact.

Secondly, Lawyers for Luevano et al abdicated Relief for Class Members who might be able to prove Injury and liability:

> LUEVANO    CONSENT    DECREE (in part):
>
> Page 3: GENERAL TERMS
>
> Paragraph 3:"...this Action is a...Rule 23(b)(2) Class Action"......
>
> The Court Certifies add Defines the Class to include:
>
> All Blacks and Hispanics who have taken the PACE for Hire into Entry-Level Positions on or after May 1975...
>
> Or who, during the term of this Decree, take or may take the PACE and or any Alternative Examining Procedure Developed by an Agency or OPM for Hire..."
>
> ....(and)(cruelly)
>
> Paragraph 6. Page 4:
>
> "THIS DECREE RESOLVES **ALL** OF THE CLAIMS BY PLAINTIFFS AND MEMBERS OF THE PLAINTIFF CLASS OF RACIAL...DISCRIMINATION ARISING
>
> FROM THE IMPLEMENTATION AND USE OF THE PACE EXAMINATION FOR..HIRING BY DEFENDANTS AND MEMBERS OF THE DEFENDANT CLASS."

Obviously, Attorneys for Luevano who won for them and for the named Class Plaintiffs nominal Title VII Back Pay and Good Jobs, did not in fact Represent the Interests of the Unnamed Plaintiff Class Who Received Nothing-Zero under its terms and who were told by the Decree that they could not litigate for their Claims bcause "All Claims were Resolved" according to P. 4 paragraph 6 of the Decree. Despite Title VII.

III. THAT THE PROTECTION OF THE INTERST MAY BE IMPAIRED BY THE DISPOSITION
OF THE CIVIL ACTION."

The Primary Interest and perhaps many Members of the Plaintiff
Class is securing good Jobs that are challenging and monetarily
rewarding. Increasingly this is more difficult for minoritées because
many standard blue collar industries have fled the inner city for
the suburbs of for rural areas. In this Class Member's case his
situation is rather unique. In that he has been doing work at a
high level and producing significant results in some instances
-although without renumeration. That issue is not relevant to the
main issues because the main issue is that Petitioner like many Class
Members has been consistendly denied Employment with the Federal
Government despite demonstrating time after time that he is wecl
qualified. And under Title VII, normally after demonstrating that
Discrimination was why you were not hired, remedies in the form of
the Job you were illegally denied  is achieved by making that Job
available.

But under the Luevano Consent Decree all such remedy to actual
Class Member Victims of Discrimination was Denied:

"THIS DECREE RESOLVES ALL OF THE CLAIMS BY
MEMBERS OF THE PLAINTIFF CLASS"

Obviously, then Attorneys for the named Plaintiffs, Luevano et al.,
did not Represent what would normally be the Interests of the
Class Members who could prove liability and Injury- and who were thus
entitled to Title VII or 42 USC 1981 Relief.

The Court of Appeals discussed this point by indicating that a
Consent Decree or "existence of a Court Order ..(that would) as a
practical matter, impair the Petitioner's ability to vindicate
their interests in a separate proceeding" would meet the criteria
for the Impairment of the would-be Intervenor's Interest discussed by
Moore and found in Cooke V Boorstin.Because under the Prohibitive
Decree, the Stallworth Court at p. 268 citing EEOC V A.T. and T,
506 F2d 735,741-2 (3rd Cir. 1974): [17]...if a ..Federal Judge in a
separate proceeding decided Appellant (or parties) contentions were
Meritoriou;  he would be unable to award them effective Relief without
generating an Injunction that would overlap or conflict with the
Consent Decree or Order.Thus, their Interests would be impaired.

Petitioner's Motion to Vacate the Court's Interlocutory
Order Denying Petitioner's Motion to Intervene as of
Right under Rule 24(a)(2)

The Petitioner, Samuel B. Wallace, Moves the Court under its
inherent powers to change its Interlocutory Orders to vacate its
Order of April 1981 on the grounds that the basis for that Denial
has bewen abrogated by the Supreme Court decision in Martin V
Wil. ks where the Supreme Court ruled that Non-Parties to a
Consent Decree c' an not be bound by "judgment in personam"
in Litigation in which they have not been made Parties.

And on the basis that Attorneys for the Plaintiffs who
in their Consent Decree " resolved the claims of the Class
Members" (See Consent Decree on P.   clearly did not represent
the Interests of Class Members and Objectors who indicated or
believed that they could prove liability and damages.   /

And on the basis that the Consent Decree in its present
form clearly violated the Equal Protection  stanmdards of the
Fifth Amendment to the United States Constitution. /
In that the Decree established two categories of Plaintiffs:
the named Plaintiffs Luevano et al who received Title VII Back
Pay and Jobs; and the unnamed Class Members whose "Claims were
resolved"  by the Consent Decree, where they were in effect barred
from trying their claims on merits and where there was no relief
for victims of Discrimination who could prove liability and injury.

The Petitioner also asserts that he has a viable cause of
action under this Consent Decree, such as it is, because he
believes that he can prove Continuing Acts of discrimination

by the Defendants which include Discriminatory Rejection of his
application for a vacancy as a Technical Publications Writer
after he passed the new nationwide alternative to the PACE Exam
with a Score of 98% and submitted proof of that to the NCI
Personnel Office which again rejected Petitioner's application
for a vacant position as Writer-Editor even though an EEOC
Claim against the same NCI Defendants was still pending and had
not been resolved within the 180 days.

The Petitioner argues that he would be severely disadvantaged
if he were not granted interim relief in the form of a Job which is
fiting because he has been illegally and discriminatorily ˙
" passed over" without prior Notice and Opportunity for Hearing
as required by law. And because the Petitioner also represents a
subclass within the Class of Black and Hispanic Preference Eligible
Veterans who have been similarly Discriminated against. And that
those Preference eligibles should be C ertified as Parties to the
Luevano Consent Decree as well as all other Class Members who
believe that they can prove liability or injury with respect to
the PACE Exam and alternative Examinations and other Discriminatory
Procedures used to bar the Plaintiff Class from Lawful Employment
Opportunities.

Therefore the Petitioner, Samuel B. Wallace, Respectfully
Moves this Court to Vacate its Interlocutory Order Denying
Petitioner's Motion to Intervene and to allow Petitioner to Amend
his Motion to Certify a Class of Class Members who believe that
they can prove liability and injury including Preference Eligibles
Veterans who are members of the Class and who are past or

The Non-statutory Right to Intervene R. 24(a)(2)

Rule 24 (b) has an explicit provision for "avoidance of delay by the predjudicing (disadvantaging) exisitng parties. But this provision is not found in R. 24(a)(2) as the Court of Appeals clearly indicat ed in Stallworth V Monsanto.

Rule 24 (a)(2) is the non-statutory right to intervene rule which exemplified in Martin V Wilkes.

Moore Fed Pract. Comm. Rule 124, P. 24-53, 1991 Suppl.:

Martin V Wilkes,109 S.Ct. 2180 (1989):

Firefighters alleged that Defendants under a Consent Decree were making Discriminatory decisions with respect to promotions on the basis of race.

None of the firefighters had been parties to the original suit. The Defendants moved to dissmiss the firefighters from the action on the grounds

"on the grounds that it was an Impermissible collateral attack on a Consent Decree."

The District Court ruled in favor of Defendants and the firefighters appealed.

The Circuit Court of Appeals for the 11th Circuit held that it explcitily rejected the doctrine of "Impermissible collateral attack on a Consent Decree" and also held that the firefighters Discrimination Claims were not precluded.

Defendants appealed and the Supreme Court in five-four majority decision ruled with Chief Justice Rehnquist writing for the majority first citing the fundamental principle that no one is bound by a judgment in personam in litigation to which he has not been made a party.
The majority concluded that the preclusion of firefighter's claims would amount to a deprivation of their legal rights in a proceeding in which they were not parties.
The decision also rejected by the Supreme Court also rejected explicitly the doctrine of Impermissible Collateral Attack on a Consent Decree on the grounds that that Doctrine ignored both Rule 19 and Rule 24 as well as the Due Process requirements of the 14th Amendment."& .

The Significance of Martin V Wilkes in the Luevano Case,

The facts of Luevano except for race have many things in common with the Wilkes decision. In Luevano the named Plaintiffs secured a Consent Decree but that Consent Decree by its terms "resolved the Claims of the Class Members with respect to illegal Discriminatory use of the PACE Exam by Defendants, OPM et al.

The effect of that Decree as S. Wallace and other Objectors to the Decree pointed out at the Hearing of the Objectors was to actually Discriminate against Class Members who had claims and who could prove liability. Thus, the Decree, itself as written actually was used to Discriminate against Class Members with viable claims.

Petitioner, Samuel B. Wallace, sought to intervene in February 25, 1981, but his Motion to Intervene was rejected under the Implicit Doctrine of Impermissible Collateral Attack of a Consent Decree and under the misapplied ruling that Intervention of Right should be Denied to the would-be Intervenor because "it would "predjudice" the Parties to the Action by raising other points not at isue and not germaine to the suit itself." That Ruling was of course incorrect because as Stallworth V Monsanto indicated in a famous appellate ruling that Disadvantage to Parties should only be considered with respect to the issue of Timeliness. But the Petitioner had actually intervened almost 9 months or so before the Consent Decree was finalized by the Court. Therefore, Petitioner's Motion was timely and his arguments concerning whether the supposed "Victims of Discrimination" should have their claims considered by the courts was valid as subsequent Supreme Court cases would clearly indicate. /

207

RECEIVED

JUN 21   5 01 PM '91

UNITED STATES
DISTRICT COURT
DISTRICT OF COLUMBIA

JUN 2 1 1991

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                   Plaintiffs,      )
                                             )
         v.                             )    C.A. No. 79-0271 (JHG)
                                             )
CONSTANCE NEWMAN, Director,                   )
    U.S. Office of Personnel                  )
Management, et al.,                           )
                                             )
              Defendants.      )

**FILED**

**JUL 1 0 1991**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' REPORT TO THE COURT ON THE USE OF
INDIVIDUAL ACHIEVEMENT RECORD SCORES AS PART OF THE
ADMINISTRATIVE CAREERS WITH AMERICA EXAMINATIONS,
AND ON PRESENTLY KNOWN INFORMATION WITH RESPECT TO
A COMPARISON OF THESE EXAMINATIONS WITH THE FORMER,
JOB-SPECIFIC EXAMINATIONS

A. Introduction

      Plaintiffs make the following report to the Court
concerning their analyses of the defendant Office of Personnel
Management's new Administrative Careers with America examina-
tions, on the use of Individual Achievement Record (or "IAR" or
"biodata") scores as part of those examinations, and on a limited
comparison of the scores achieved on the former job-specific
examinations with those achieved on the ACWA.

      The defendant Office of Personnel Management has
provided computer tapes to plaintiffs showing group-by-group
information on the race of ACWA test-takers for ACWA Groups 1
through 6, on their written test scores, on their IAR scores, and
on their final scores.

Plaintiffs' conclusion as to the use of biodata scores is that the inclusion of biodata scores results in a modest but meaningful reduction in the disparate impact against blacks and Hispanics resulting from the written tests. Accordingly, plaintiffs will oppose any effort to remove or restrict the role of the Individual Achievement Record in the Administrative Careers with America examinations.

Plaintiffs have informed OPM that they wish to see the raw data from the validation studies for the ACWA and biodata scores, to see if there is a different means of using the biodata scores and test scores in order to achieve a greater reduction in disparate impact without compromising whatever validity may be found under the present approach. Plaintiffs trust that the parties will be able to work this out informally.

The question whether the ACWA tests should be allowed to replace the former job-specific examinations is harder to answer on the basis of the presently available information. First, the most relevant analysis is the decretal standard of disparate impact in hiring, but OPM has informed plaintiffs that there have only been a few hundred hires from the ACWA nationwide. This is too small a number on which to make a meaningful comparison of selection rates. Second, the ACWA tests are given for groups of job categories, and it is possible both that the ACWA test-takers in a given group are interested in different types of jobs, and that the scoring patterns of those interested in one job may differ from the scoring patterns of those inter-

ested in another job.  Third, the racial and ethnic composition
of ACWA test-takers for a given group sometimes differs substan-
tially from the racial and ethnic composition of the persons who
previously took the job-specific tests for job categories includ-
ed in that group.  The parties do not yet know whether there are
any differences in the regions in which the two sets of test-
takers were interested, such that some of these differences can
be explained.  Fourth, the ACWA registers are constantly being
replenished, so that it is difficult to say whether persons
obtaining any particular score have a realistic opportunity of
being considered for selection.  Fifth, as with the PACE and the
job-specific tests, regional differences in the numbers of
available jobs to be filled from ACWA registers and in the
numbers of competing applicants make nationwide figures an imper-
fect basis on which to draw conclusions.  Nationwide figures are
the only presently available data.  Sixth, the job-specific
information on which plaintiffs based their analysis was obtained
from mid-1980's administrations of some of the job-specific
examinations.  Seventh, plaintiffs do not have such data for all
examinations.[1]

        For all of these reasons, it is not yet possible to
draw any firm conclusions whether the class herein is helped or
harmed by OPM's decision to replace the job-specific examinations

_____

        [1] Plaintiffs have today requested such data for more recent administra-
tions of all of the job-specific examinations, on a regional basis, augmented
by information on level of education.

with the ACWA.  The limited nationwide information suggests that Hispanics taking the ACWA generally obtained better final scores than Hispanics taking the job-specific examinations in the middle of the 1980's, and that blacks taking the ACWA sometimes obtained better final scores, and sometimes obtained worse final scores, than blacks taking the job-specific examinations in the middle of the 1980's.  Where there were improvements for blacks in ACWA results compared to the results of these job-specific examinations, the improvements tended to be smaller than the improvements for Hispanics.  Nevertheless, this is only partial information and no firm conclusions can yet be drawn.

### B. Analysis of the Effect of Combining Biodata Scores With Written Test Scores

Plaintiffs have set forth in Attachment A hereto their statistical analysis of the information received from their statistician, Dr. Charles R. Mann, as to test-takers who identified themselves as black, white, or Hispanic.  Other races and non-race-identified test-takers were excluded from the analysis.  Thus, the phrase "All Races" refers only to race-identified blacks, whites, and Hispanics.

The analyses plaintiffs performed do not take into account veterans' preference or any other variation in rank order.  They include only persons who have both biodata scores and test scores.

For each of the six ACWA groups, there are five statistical tables in the analysis.  They are described below:

## 1. The First Table in Each Set: Cumulative Numbers of Test-Takers By Test-Score Interval and by Race

This is the basic "building block" on which all future tables depend. The left half of the table shows rank-order information about standardized scores on the written test considered in isolation. The right-hand side of the table shows rank-order information about OPM's actual blending of written-test scores and IAR scores in compiling the final ratings.

Thus, if the written scores were the sole determinant of rank order, one would see only 3 blacks and 7 Hispanics among the top-scoring 264 whites, blacks and Hispanics on the ACWA Group 1 examination. Under OPM's current manner of scoring the results, there are 10 blacks and 6 Hispanics among the top-rated 245 whites, blacks and Hispanics.

If the written scores were the sole determinant of rank order, one would see only 17 blacks and 23 Hispanics among the top-scoring 735 whites, blacks and Hispanics on the ACWA Group 1 examination. Under OPM's current manner of scoring the results, there are 43 blacks and 35 Hispanics among the top-rated 757 whites, blacks and Hispanics.

This table enables us to make a direct comparison between the hypothetical use of written test scores by themselves and OPM's practice of combining written test scores with IAR scores, in terms of the numbers of additional blacks and Hispanics who could be reached for consideration at any given rank level --- top 250, top 500, top 750, etc. --- of the rank-ordered

scores and ratings achieved.

With the exception of the last line, the table is limited to test-passers. The last line of the first table shows every race-identified black, white, or Hispanic who took the test, regardless of their achieving passing or failing scores or ratings. All test-takers are of concern, and plaintiffs do not want to overlook the larger picture and focus exclusively on rank-ordering test-passers.

By contrast, the penultimate line --- the last line in Table 1 with a particular score or rating stated --- shows the number of persons passing the written test (left side) with a grade of 70 or more. Again, this refers to a hypothetical test based on written test scores alone. On the right-hand side of the table, this line shows the number of persons achieving a final rating of 70 or more under OPM's actual practices.[2] Thus, the lowest passing final rating in ACWA Group 1 was 70; 167 blacks and 111 Hispanics passed the test by obtaining this or a higher rating.

In making these comparisons, plaintiffs tried to form units of reasonably similar size, recognizing that units will differ from each other in size because we have no means of breaking tie scores and forcing some persons into a lower-scoring group and others into a higher-scoring group.

---

[2] Plaintiffs used OPM's prescribed means of determining who passed and who failed, in accordance with the transmutation tables provided to plaintiffs by OPM.

Plaintiffs used units of either approximately 250 persons or approximately 500 persons, depending on the numbers of persons passing the tests or final ratings and the numbers of persons achieving a given score or rating. A 250-person break-down is not possible if 500 persons achieve a score of 80, 500 achieve a score of 81, etc. The defendants and the amicus National Treasury Employees Union may create their own tables, with any break points available in the data, by going directly to Dr. Mann's printouts, which have been provided to them.

### 2. The Second Table in Each Set: Cumulative Percentages of Test-Takers By Test-Score Interval and by Race

This set of printouts is drawn for each ACWA group from the data in the first table. For example, the first table shows that 264 race-identified whites, blacks and Hispanics achieved a standardized score of 63 or up. This is 9.3983624% --- 9.4%, for short --- of the 2,809 race-identified whites, blacks and Hispanics who took the ACWA Group 1 test. The second table shows the 9.4% figure for standardized scores of 63 and up for this group. The "Total" line is always 100% of the group in question.

Just as the first table is useful in comparing the numbers of persons by race who achieve or exceed a given score or rating, the second table shows the percentages of all race-identified test-takers of that race who achieved or exceeded that score or rating.

Putting the two tables together, for example, one can see that roughly a thousand of these race-identified test-takers

achieved standard scores of 54 or above on the written test, and that approximately a thousand of these test-takers achieved or exceeded final ratings of 81 or above. Taking the second table one step further, it shows that:

- 6.5% of race-identified black test-takers were among the top-scoring 1,000 on the written test, but 11.5% --- <u>almost</u> <u>double</u> <u>the</u> <u>proportion</u> --- were among the top 1,000 in the final ratings.
- 15.0% of race-identified Hispanic test-takers were among the top-scoring 1,000 on the written test, but 19.1% --- <u>a</u> <u>27%</u> <u>increase</u> --- were among the top 1,000 in the final ratings.

3. <u>The Third Table in Each Set:</u> <u>Black and Hispanic</u>
   <u>Representation Rates at Particular Rank Levels,</u>
   <u>as a Percentage of the White Representation Rate</u>
   <u>at That Rank Level</u>

The third table in each set provides a comparison of black and Hispanic representation rates, at particular rank levels, with white representation rates at that level. It is based on the percentages set forth in the second table, and thus is in turn based on all race-identified test-takers of a particular race.

This analysis is comparable to the <u>Uniform</u> <u>Guidelines</u> analysis of differences in selection rates, for purposes of applying the 80% "rule of thumb".

In ACWA Group 1, for example, the representation rate of blacks among the top 1,000 scorers on the written test is

between one-seventh and one-eighth of the representation rate of whites among the top-scoring 1,000 test-takers of these three races. On the final ratings, the representation rate of blacks among the top-rated 1,000 is more than fourth of the representation rate of whites among the top-rated 1,000.

As with the first and second tables, information for rank order based on written test scores alone appears in the left half of the third table, and information on rank order based on OPM's blended IAR and written-test scores appears in the right half of the table.

### 4. The Fourth Table in Each Set: Comparative Selection Rates

The fourth table in each series no longer has a right-half, left-half dichotomy, because it directly compares the right half with the left half, and shows the representation of blacks and Hispanics at given rank levels on the final ratings as a multiple of the representation of blacks and Hispanics at given rank levels based on written test scores alone.

In the example shown above, blacks did 1.868 times better in making it into the top-ranked 1,000 candidates when ranking was based on a blend of test and IAR scores than when ranking was based on written test scores alone.

### 5. The Fifth Table in Each Set: Further Improvement Needed to Eliminate Adverse Impact

The last table in each series comes back to the central point: what is needed in order to eliminate adverse impact? It is here where plaintiffs have to conclude that, as important as

are the reductions in adverse impact caused by blending of biodata scores with test scores, the remaining adverse impact is enormous.

It seems to plaintiffs that the only conclusion they can reasonably draw is that the improvement resulting from use of the IAR scores is too important to relinquish, but that this is no time to rest on our laurels. For this reason, plaintiffs are interested in exploring other ways of using the biodata, while preserving or enhancing any present relationship between the final ratings and job performance.

C. **Analysis of the Performance of Blacks and of Hispanics on the ACWA With Their Performance on Certain Former Job-Specific Examinations**

Plaintiffs' analysis of the performance of blacks and of Hispanics on the ACWA, compared to their performance on the former job-specific examinations for which plaintiffs have data, is set out in Attachment B hereto. This analysis is subject to all of the problems identified above. The five-table format of the analysis is closely similar to that used in Attachment A for purposes of comparing the results of a hypothetical test based on ACWA written-test scores alone with OPM's actual use of the ACWA based on combined written-test scores and IAR scores.

The threshold problem in preparing this analysis was that much larger groups of applicants take the ACWA than took the job-specific examinations, and there can also be substantial differences in passing rates. After consultation with the other parties and with experts, plaintiffs used ranks of similar level

(<u>e.g.</u>, top 5% of all test-takers on each test, whether passing or failing) but dissimilar size (<u>e.g.</u>, using the top 5% of test-takers means that one is comparing the top 212 test-takers on the Customs Inspector test compared with the top 831 ACWA-takers. This is the approach which made the most sense.

One cannot used similarly-sized groups, because this would compare the top 20% of Customs Inspector test-takers with the top 5% of ACWA test-takers, and the results of the comparison would be distorted.

One cannot use percentages of test-passers, because this would artificially inflate the representation statistics the most for those tests which blacks and Hispanics failed at the highest rates. This, too, would distort the results.

Plaintiffs have stated above their preliminary and partial results. Nothing further will be known until substantial hiring activity has occurred on the ACWA for the jobs in question and the results have been reported to plaintiffs.

Respectfully submitted,

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
    Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.   94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.   94105
(415) 989-9444

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                        Attorneys for Plaintiffs

Dated: July 10, 1991

- 12 -

FILED

JUL 1 0 1991

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

STATISTICAL COMPARISON OF THE EFFECT ON ADVERSE IMPACT OF OPM'S
PRACTICE OF ADDING BIODATA SCORES TO SCORES ON THE WRITTEN TESTS
FOR THE SIX "ADMINISTRATIVE CAREERS WITH AMERICA" EXAMINATIONS

FILED

JUL 1 c 1991

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

July 3, 1991

## Group 1: Health, Safety and Environmental Occupations
### (2,809 test-takers)

| Written Test Scores | | | | | Final Ratings: Test Scores and IAR Scores | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Standard | Cumulative Number of: | | | | Final | Cumulative Number of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 63 | 265 | 255 | 3 | 7 | 96 | 245 | 229 | 10 | 6 |
| 60 | 495 | 470 | 11 | 14 | 90 | 492 | 453 | 22 | 17 |
| 57 | 773 | 730 | 18 | 25 | 85 | 757 | 679 | 43 | 35 |
| 55 | 986 | 920 | 31 | 35 | 81 | 1,003 | 889 | 67 | 47 |
| 53 | 1,218 | 1,116 | 55 | 47 | 77 | 1,278 | 1,104 | 100 | 74 |
| 50 | 1,505 | 1,346 | 91 | 68 | 73 | 1,503 | 1,272 | 141 | 90 |
| 48 | 1,670 | 1,472 | 125 | 73 | 70 | 1,675 | 1,397 | 167 | 111 |
| Total: | 2,809 | 1,978 | 585 | 246 | Total: | 2,809 | 1,978 | 585 | 246 |

Group 1: Health, Safety and Environmental Occupations (continued):

| Written Test Scores | | | | | Final Ratings: Test Scores and IAR Scores | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Written | Cumulative Percentage of: | | | | Final | Cumulative Percentage of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 63 | 9.4% | 12.9% | 0.5% | 2.8% | 96 | 8.7% | 11.6% | 1.7% | 2.4% |
| 60 | 17.6% | 23.8% | 1.9% | 5.7% | 90 | 17.5% | 22.9% | 3.8% | 6.9% |
| 57 | 27.5% | 36.9% | 3.1% | 10.2% | 85 | 26.9% | 34.3% | 7.4% | 14.2% |
| 55 | 35.1% | 46.5% | 5.3% | 14.2% | 81 | 35.7% | 44.9% | 11.5% | 19.1% |
| 53 | 43.4% | 56.4% | 9.4% | 19.1% | 77 | 45.5% | 55.8% | 17.1% | 30.1% |
| 50 | 53.6% | 68.0% | 15.6% | 27.6% | 73 | 53.5% | 64.3% | 24.1% | 36.6% |
| 48 | 59.5% | 74.4% | 21.4% | 29.7% | 70 | 59.6% | 70.6% | 28.5% | 45.1% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

CA 79-271

Group 1: Health, Safety and Environmental Occupations (continued):

### Black and Hispanic Representation Rates at Particular Rank Levels, as a Percentage of the White Representation Rate at That Rank Level

| | Written Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
| | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| Approximate Bands of Test-Takers | Blacks | Hispanics | Blacks | Hispanics |
|---|---|---|---|---|
| Top 250 | 4.0% | 22.1% | 14.8% | 21.1% |
| Top 495 | 7.9% | 24.0% | 16.4% | 30.2% |
| Top 760 | 8.3% | 27.5% | 21.4% | 41.4% |
| Top 1,000 | 11.4% | 30.6% | 25.5% | 42.5% |
| Top 1,250 | 16.7% | 33.9% | 30.6% | 53.9% |
| Top 1,500 | 22.9% | 40.6% | 37.5% | 56.9% |
| Top 1,670 | 28.7% | 39.9% | 40.4% | 63.9% |

Group 1: Health, Safety and Environmental Occupations (continued):

| Approximate Bands of Test-Takers | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same Rank Levels on the Basis of the Written Scores Alone | |
| | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| Top 250 | 3.712 | 0.954 |
| Top 495 | 2.075 | 1.260 |
| Top 760 | 2.568 | 1.505 |
| Top 1,000 | 2.237 | 1.390 |
| Top 1,250 | 1.838 | 1.592 |
| Top 1,500 | 1.640 | 1.401 |
| Top 1,670 | 1.408 | 1.602 |

Group 1: Health, Safety and Environmental Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
|---|---|---|
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
| Top 250 | 677.3% | 474.7% |
| Top 495 | 609.0% | 331.4% |
| Top 760 | 467.0% | 241.3% |
| Top 1,000 | 392.4% | 235.2% |
| Top 1,250 | 326.5% | 185.5% |
| Top 1,500 | 266.8% | 175.8% |
| Top 1,670 | 247.4% | 156.5% |

Group 2: Writing and Public Information Occupations
(4,801 test-takers)

| Written | Written Test Scores | | | | Final | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cumulative Number of: | | | | | Cumulative Number of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 64 | 286 | 276 | 7 | 3 | 98 | 298 | 288 | 6 | 4 |
| 62 | 527 | 509 | 14 | 4 | 95 | 546 | 515 | 20 | 11 |
| 60 | 847 | 811 | 25 | 11 | 92 | 775 | 721 | 35 | 19 |
| 59 | 975 | 928 | 35 | 12 | 90 | 951 | 880 | 48 | 23 |
| 57 | 1,278 | 1,201 | 57 | 20 | 88 | 1,357 | 1,222 | 95 | 40 |
| 56 | 1,459 | 1,365 | 67 | 27 | 87 | 1,592 | 1,425 | 115 | 52 |
| 55 | 1,648 | 1,533 | 79 | 36 | 86 | 1,708 | 1,532 | 120 | 56 |
| 53 | 2,019 | 1,835 | 131 | 53 | 83 | 2,048 | 1,810 | 160 | 78 |
| 52 | 2,210 | 1,992 | 151 | 67 | 81 | 2,273 | 1,992 | 193 | 88 |
| 50 | 2,575 | 2,298 | 193 | 84 | 79 | 2,511 | 2,173 | 233 | 105 |
| 49 | 2,728 | 2,406 | 225 | 97 | 77 | 2,748 | 2,343 | 288 | 117 |
| 47 | 3,053 | 2,654 | 280 | 119 | 74 | 3,058 | 2,569 | 347 | 142 |
| 46 | 3,191 | 2,754 | 312 | 125 | 72 | 3,256 | 2,710 | 393 | 153 |
| 44 | 3,569 | 3,004 | 410 | 155 | 70 | 3,436 | 2,833 | 435 | 168 |
| Total: | 4,801 | 3,534 | 970 | 297 | Total: | 4,801 | 3,534 | 970 | 297 |

Group 2: Writing and Public Information Occupations (continued):

| Written | Written Test Scores | | | | Final | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cumulative Percentage of: | | | | | Cumulative Percentage of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 64 | 6.0% | 7.8% | 0.7% | 1.0% | 98 | 6.2% | 8.1% | 0.6% | 1.3% |
| 62 | 11.0% | 14.4% | 1.4% | 1.3% | 95 | 11.4% | 14.6% | 2.1% | 3.7% |
| 60 | 17.6% | 22.9% | 2.6% | 3.7% | 92 | 16.1% | 20.4% | 3.6% | 6.4% |
| 59 | 20.3% | 26.3% | 3.6% | 4.0% | 90 | 19.8% | 24.9% | 4.9% | 7.7% |
| 57 | 26.6% | 34.0% | 5.9% | 6.7% | 88 | 28.3% | 34.6% | 9.8% | 13.5% |
| 56 | 30.4% | 38.6% | 6.9% | 9.1% | 87 | 33.2% | 40.3% | 11.9% | 17.5% |
| 55 | 34.3% | 43.4% | 8.1% | 12.1% | 86 | 35.6% | 43.4% | 12.4% | 18.9% |
| 53 | 42.1% | 51.9% | 13.5% | 17.8% | 83 | 42.7% | 51.2% | 16.5% | 26.3% |
| 52 | 46.0% | 56.4% | 15.6% | 22.6% | 81 | 47.3% | 56.4% | 19.9% | 29.6% |
| 50 | 53.6% | 65.0% | 19.9% | 28.3% | 79 | 52.3% | 61.5% | 24.0% | 35.4% |
| 49 | 56.8% | 68.1% | 23.2% | 32.7% | 77 | 57.2% | 66.3% | 29.7% | 39.4% |
| 47 | 63.6% | 75.1% | 28.9% | 40.1% | 74 | 63.7% | 72.7% | 35.8% | 47.8% |
| 46 | 66.5% | 77.9% | 32.2% | 42.1% | 72 | 67.8% | 76.7% | 40.5% | 51.5% |
| 44 | 74.3% | 85.0% | 42.3% | 52.2% | 70 | 71.6% | 80.2% | 44.8% | 56.6% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Group 2: Writing and Public Information Occupations (continued):

### Black and Hispanic Representation Rates at Particular Rank Levels, as a Percentage of the White Representation Rate at That Rank Level

| | Written Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
| | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| Approximate Bands of Test-Takers | Blacks | Hispanics | Blacks | Hispanics |
|---|---|---|---|---|
| Top 290 | 9.2% | 12.9% | 7.6% | 16.5% |
| Top 535 | 10.0% | 9.4% | 14.1% | 25.4% |
| Top 800 | 11.2% | 16.1% | 17.7% | 31.4% |
| Top 960 | 13.7% | 15.4% | 19.9% | 31.1% |
| Top 1,310 | 17.3% | 19.8% | 28.3% | 38.9% |
| Top 1,500 | 17.9% | 23.5% | 29.4% | 43.4% |
| Top 1,675 | 18.8% | 27.9% | 28.5% | 43.5% |
| Top 2,030 | 26.0% | 34.4% | 32.2% | 51.3% |
| Top 2,250 | 27.6% | 40.0% | 35.3% | 52.6% |
| Top 2,540 | 30.6% | 43.5% | 39.1% | 57.5% |
| Top 2,735 | 34.1% | 48.0% | 44.8% | 59.4% |
| Top 3,050 | 38.4% | 53.4% | 49.2% | 65.8% |
| Top 3,225 | 41.3% | 54.0% | 52.8% | 67.2% |
| Top 3,500 | 49.7% | 61.4% | 55.9% | 70.6% |

Group 2: Writing and Public Information Occupations (continued):

| Approximate Bands of Test-Takers | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same Rank Levels on the Basis of the Written Scores Alone | |
| | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| Top 290 | 0.821 | 1.278 |
| Top 535 | 1.412 | 2.718 |
| Top 800 | 1.575 | 1.943 |
| Top 960 | 1.446 | 2.021 |
| Top 1,310 | 1.638 | 1.966 |
| Top 1,500 | 1.644 | 1.845 |
| Top 1,675 | 1.520 | 1.557 |
| Top 2,030 | 1.238 | 1.492 |
| Top 2,250 | 1.278 | 1.313 |
| Top 2,540 | 1.277 | 1.322 |
| Top 2,735 | 1.314 | 1.239 |
| Top 3,050 | 1.280 | 1.233 |
| Top 3,225 | 1.280 | 1.244 |
| Top 3,500 | 1.125 | 1.149 |

Group 2: Writing and Public Information Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
|---|---|---|
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
| Top 290 | 1317.5% | 605.1% |
| Top 535 | 706.8% | 393.5% |
| Top 800 | 565.4% | 318.9% |
| Top 960 | 503.2% | 321.5% |
| Top 1,310 | 353.1% | 256.7% |
| Top 1,500 | 340.1% | 230.3% |
| Top 1,675 | 350.4% | 229.9% |
| Top 2,030 | 310.5% | 195.0% |
| Top 2,250 | 283.3% | 190.2% |
| Top 2,540 | 256.0% | 173.9% |
| Top 2,735 | 223.3% | 168.3% |
| Top 3,050 | 203.2% | 152.0% |
| Top 3,225 | 189.3% | 148.9% |
| Top 3,500 | 178.8% | 141.7% |

Group 3: Business, Finance and Managerial Occupations
(13,252 test-takers)

| Written | Written Test Scores | | | | Final | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cumulative Number of: | | | | | Cumulative Number of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 66 | 488 | 460 | 11 | 17 | 99 | 552 | 510 | 22 | 20 |
| 64 | 989 | 924 | 32 | 33 | 97 | 1,045 | 951 | 52 | 42 |
| 63 | 1,358 | 1,256 | 55 | 47 | 94 | 1,579 | 1,426 | 83 | 70 |
| 60 | 2,159 | 1,976 | 110 | 73 | 92 | 2,001 | 1,794 | 120 | 87 |
| 59 | 2,646 | 2,407 | 142 | 97 | 90 | 2,452 | 2,166 | 169 | 117 |
| 58 | 3,142 | 2,848 | 175 | 119 | 88 | 2,938 | 2,553 | 231 | 154 |
| 57 | 3,606 | 3,238 | 227 | 141 | 86 | 3,494 | 2,996 | 302 | 196 |
| 56 | 4,112 | 3,651 | 280 | 181 | 84 | 4,046 | 3,422 | 383 | 241 |
| 55 | 4,672 | 4,089 | 359 | 224 | 82 | 4,610 | 3,862 | 467 | 281 |
| 53 | 5,214 | 4,515 | 449 | 250 | 81 | 4,912 | 4,081 | 521 | 310 |
| 52 | 5,768 | 4,929 | 538 | 301 | 79 | 5,508 | 4,512 | 627 | 369 |
| 51 | 6,286 | 5,291 | 652 | 343 | 77 | 6,126 | 4,962 | 741 | 423 |
| 51 | 6,286 | 5,291 | 652 | 343 | 76 | 6,431 | 5,175 | 808 | 448 |
| 50 | 6,786 | 5,646 | 757 | 383 | 74 | 7,004 | 5,551 | 936 | 517 |
| 48 | 7,763 | 6,282 | 986 | 495 | 72 | 7,548 | 5,915 | 1,068 | 565 |
| 47 | 8,230 | 6,566 | 1,113 | 551 | 70 | 8,103 | 6,249 | 1,231 | 623 |
| Total: | 13,252 | 8,432 | 3,309 | 1,511 | Total: | 13,252 | 8,432 | 3,309 | 1,511 |

Group 3: Business, Finance and Managerial Occupations (continued):

| Written | Written Test Scores | | | | Final | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cumulative Percentage of: | | | | | Cumulative Percentage of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 66 | 3.7% | 5.5% | 0.3% | 1.1% | 99 | 4.2% | 6.0% | 0.7% | 1.3% |
| 64 | 7.5% | 11.0% | 1.0% | 2.2% | 97 | 7.9% | 11.3% | 1.6% | 2.8% |
| 63 | 10.2% | 14.9% | 1.7% | 3.1% | 94 | 11.9% | 16.9% | 2.5% | 4.6% |
| 60 | 16.3% | 23.4% | 3.3% | 4.8% | 92 | 15.1% | 21.3% | 3.6% | 5.8% |
| 59 | 20.0% | 28.5% | 4.3% | 6.4% | 90 | 18.5% | 25.7% | 5.1% | 7.7% |
| 58 | 23.7% | 33.8% | 5.3% | 7.9% | 88 | 22.2% | 30.3% | 7.0% | 10.2% |
| 57 | 27.2% | 38.4% | 6.9% | 9.3% | 86 | 26.4% | 35.5% | 9.1% | 13.0% |
| 56 | 31.0% | 43.3% | 8.5% | 12.0% | 84 | 30.5% | 40.6% | 11.6% | 15.9% |
| 55 | 35.3% | 48.5% | 10.8% | 14.8% | 82 | 34.8% | 45.8% | 14.1% | 18.6% |
| 53 | 39.3% | 53.5% | 13.6% | 16.5% | 81 | 37.1% | 48.4% | 15.7% | 20.5% |
| 52 | 43.5% | 58.5% | 16.3% | 19.9% | 79 | 41.6% | 53.5% | 18.9% | 24.4% |
| 51 | 47.4% | 62.7% | 19.7% | 22.7% | 77 | 46.2% | 58.8% | 22.4% | 28.0% |
| 51 | 47.4% | 62.7% | 19.7% | 22.7% | 76 | 48.5% | 61.4% | 24.4% | 29.6% |
| 50 | 51.2% | 67.0% | 22.9% | 25.3% | 74 | 52.9% | 65.8% | 28.3% | 34.2% |
| 48 | 58.6% | 74.5% | 29.8% | 32.8% | 72 | 57.0% | 70.1% | 32.3% | 37.4% |
| 47 | 62.1% | 77.9% | 33.6% | 36.5% | 70 | 61.1% | 74.1% | 37.2% | 41.2% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Group 3: Business, Finance and Managerial Occupations (continued):

## Black and Hispanic Representation Rates at Particular Rank Levels, as a Percentage of the White Representation Rate at That Rank Level

| Approximate Bands of Test-Takers | Written Test Scores Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Final Ratings (Test Scores and IAR Scores) Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
|---|---|---|---|---|
| | Blacks | Hispanics | Blacks | Hispanics |
| Top 500 | 6.1% | 20.6% | 11.0% | 21.9% |
| Top 1,000 | 8.8% | 19.9% | 13.9% | 24.6% |
| Top 1,450 | 11.2% | 20.9% | 14.8% | 27.4% |
| Top 2,075 | 14.2% | 20.6% | 17.0% | 27.1% |
| Top 2,550 | 15.0% | 22.5% | 19.9% | 30.1% |
| Top 3,075 | 15.7% | 23.3% | 23.1% | 33.7% |
| Top 3,550 | 17.9% | 24.3% | 25.7% | 36.5% |
| Top 4,075 | 19.5% | 27.7% | 28.5% | 39.3% |
| Top 4,650 | 22.4% | 30.6% | 30.8% | 40.6% |
| Top 5,050 | 25.3% | 30.9% | 32.5% | 42.4% |
| Top 5,625 | 27.8% | 34.1% | 35.4% | 45.6% |
| Top 6,200 | 31.4% | 36.2% | 38.1% | 47.6% |
| Top 6,325 | 31.4% | 36.2% | 39.8% | 48.3% |
| Top 6,900 | 34.2% | 37.9% | 43.0% | 52.0% |
| Top 7,650 | 40.0% | 44.0% | 46.0% | 53.3% |
| Top 8,160 | 43.2% | 46.8% | 50.2% | 55.6% |

Group 3: Business, Finance and Managerial Occupations (continued):

|  | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same Rank Levels on the Basis of the Written Scores Alone | |
| --- | --- | --- |
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
| Top 500 | 1.804 | 1.061 |
| Top 1,000 | 1.579 | 1.237 |
| Top 1,450 | 1.329 | 1.312 |
| Top 2,075 | 1.202 | 1.313 |
| Top 2,550 | 1.323 | 1.340 |
| Top 3,075 | 1.473 | 1.444 |
| Top 3,550 | 1.438 | 1.502 |
| Top 4,075 | 1.459 | 1.421 |
| Top 4,650 | 1.377 | 1.328 |
| Top 5,050 | 1.284 | 1.372 |
| Top 5,625 | 1.273 | 1.339 |
| Top 6,200 | 1.212 | 1.315 |
| Top 6,325 | 1.267 | 1.335 |
| Top 6,900 | 1.258 | 1.373 |
| Top 7,650 | 1.150 | 1.212 |
| Top 8,160 | 1.162 | 1.188 |

Group 3: Business, Finance and Managerial Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in | |
|---|---|---|
| Approximate Bands of Test-Takers | Representation Rates at Those Rank Levels | |
|  | Blacks/Whites | Hispanics/Whites |
| Top 500 | 909.7% | 457.0% |
| Top 1,000 | 717.7% | 405.8% |
| Top 1,450 | 674.2% | 365.1% |
| Top 2,075 | 586.7% | 369.5% |
| Top 2,550 | 503.0% | 331.7% |
| Top 3,075 | 433.7% | 297.1% |
| Top 3,550 | 389.3% | 273.9% |
| Top 4,075 | 350.6% | 254.4% |
| Top 4,650 | 324.5% | 246.3% |
| Top 5,050 | 307.4% | 235.9% |
| Top 5,625 | 282.4% | 219.1% |
| Top 6,200 | 262.8% | 210.2% |
| Top 6,325 | 251.3% | 207.0% |
| Top 6,900 | 232.7% | 192.4% |
| Top 7,650 | 217.3% | 187.6% |
| Top 8,160 | 199.2% | 179.7% |

Group 4: Personnel, Administration and Computer Occupations
(13,101 test-takers)

| Written | Cumulative Number of: | | | | Final | Cumulative Number of: | | | |
|---|---|---|---|---|---|---|---|---|---|
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 66 | 503 | 484 | 8 | 11 | 99 | 505 | 478 | 14 | 13 |
| 65 | 934 | 894 | 19 | 21 | 96 | 971 | 896 | 39 | 36 |
| 63 | 1,472 | 1,382 | 45 | 45 | 93 | 1,441 | 1,302 | 69 | 70 |
| 61 | 2,126 | 1,976 | 83 | 67 | 90 | 2,022 | 1,782 | 130 | 110 |
| 60 | 2,532 | 2,321 | 120 | 91 | 88 | 2,497 | 2,173 | 178 | 146 |
| 59 | 2,939 | 2,673 | 151 | 115 | 86 | 2,964 | 2,543 | 246 | 175 |
| 58 | 3,373 | 3,039 | 193 | 141 | 84 | 3,457 | 2,924 | 313 | 220 |
| 57 | 3,837 | 3,406 | 261 | 170 | 82 | 4,014 | 3,338 | 405 | 271 |
| 55 | 4,724 | 4,093 | 384 | 247 | 80 | 4,581 | 3,766 | 490 | 325 |
| 54 | 5,203 | 4,456 | 466 | 281 | 78 | 5,182 | 4,185 | 608 | 389 |
| 53 | 5,660 | 4,783 | 553 | 324 | 77 | 5,482 | 4,398 | 666 | 418 |
| 52 | 6,100 | 5,091 | 645 | 364 | 75 | 6,068 | 4,778 | 808 | 482 |
| 51 | 6,546 | 5,387 | 747 | 412 | 73 | 6,647 | 5,145 | 952 | 550 |
| 50 | 6,951 | 5,660 | 835 | 456 | 72 | 6,946 | 5,321 | 1,037 | 588 |
| 49 | 7,365 | 5,902 | 961 | 502 | 70 | 7,510 | 5,671 | 1,186 | 653 |
| Total: | 13,101 | 7,892 | 3,684 | 1,525 | Total: | 13,101 | 7,892 | 3,684 | 1,525 |

Written Test Scores | Final Ratings: Test Scores and IAR Scores

Group 4: Personnel, Administration and Computer Occupations (continued):

Written Test Scores | Final Ratings: Test Scores and IAR Scores

| Written | Cumulative Percentage of: | | | | Final | Cumulative Percentage of: | | | |
|---|---|---|---|---|---|---|---|---|---|
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 66 | 3.8% | 6.1% | 0.2% | 0.7% | 99 | 3.9% | 6.1% | 0.4% | 0.9% |
| 65 | 7.1% | 11.3% | 0.5% | 1.4% | 96 | 7.4% | 11.4% | 1.1% | 2.4% |
| 63 | 11.2% | 17.5% | 1.2% | 3.0% | 93 | 11.0% | 16.5% | 1.9% | 4.6% |
| 61 | 16.2% | 25.0% | 2.3% | 4.4% | 90 | 15.4% | 22.6% | 3.5% | 7.2% |
| 60 | 19.3% | 29.4% | 3.3% | 6.0% | 88 | 19.1% | 27.5% | 4.8% | 9.6% |
| 59 | 22.4% | 33.9% | 4.1% | 7.5% | 86 | 22.6% | 32.2% | 6.7% | 11.5% |
| 58 | 25.7% | 38.5% | 5.2% | 9.2% | 84 | 26.4% | 37.1% | 8.5% | 14.4% |
| 57 | 29.3% | 43.2% | 7.1% | 11.1% | 82 | 30.6% | 42.3% | 11.0% | 17.8% |
| 55 | 36.1% | 51.9% | 10.4% | 16.2% | 80 | 35.0% | 47.7% | 13.3% | 21.3% |
| 54 | 39.7% | 56.5% | 12.6% | 18.4% | 78 | 39.6% | 53.0% | 16.5% | 25.5% |
| 53 | 43.2% | 60.6% | 15.0% | 21.2% | 77 | 41.8% | 55.7% | 18.1% | 27.4% |
| 52 | 46.6% | 64.5% | 17.5% | 23.9% | 75 | 46.3% | 60.5% | 21.9% | 31.6% |
| 51 | 50.0% | 68.3% | 20.3% | 27.0% | 73 | 50.7% | 65.2% | 25.8% | 36.1% |
| 50 | 53.1% | 71.7% | 22.7% | 29.9% | 72 | 53.0% | 67.4% | 28.1% | 38.6% |
| 49 | 56.2% | 74.8% | 26.1% | 32.9% | 70 | 57.3% | 71.9% | 32.2% | 42.8% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Group 4: Personnel, Administration and Computer Occupations (continued):

Black and Hispanic Representation Rates at Particular Rank Levels, as a Percentage of the White Representation Rate at That Rank Level

| | Written Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
| | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| Approximate Bands of Test-Takers | Blacks | Hispanics | Blacks | Hispanics |
|---|---|---|---|---|
| Top 500 | 3.5% | 11.8% | 6.3% | 14.1% |
| Top 950 | 4.6% | 12.2% | 9.3% | 20.8% |
| Top 1,450 | 7.0% | 16.9% | 11.4% | 27.8% |
| Top 2,075 | 9.0% | 17.5% | 15.6% | 31.9% |
| Top 2,500 | 11.1% | 20.3% | 17.5% | 34.8% |
| Top 2,950 | 12.1% | 22.3% | 20.7% | 35.6% |
| Top 3,425 | 13.6% | 24.0% | 22.9% | 38.9% |
| Top 3,900 | 16.4% | 25.8% | 26.0% | 42.0% |
| Top 4,650 | 20.1% | 31.2% | 27.9% | 44.7% |
| Top 5,200 | 22.4% | 32.6% | 31.1% | 48.1% |
| Top 5,575 | 24.8% | 35.1% | 32.4% | 49.2% |
| Top 6,085 | 27.1% | 37.0% | 36.2% | 52.2% |
| Top 6,600 | 29.7% | 39.6% | 39.6% | 55.3% |
| Top 6,950 | 31.6% | 41.7% | 41.7% | 57.2% |
| Top 7,450 | 34.9% | 44.0% | 44.8% | 59.6% |

Group 4: Personnel, Administration and Computer Occupations (continued):

|  | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same | |
|---|---|---|
| Approximate Bands of Test-Takers | Rank Levels on the Basis of the Written Scores Alone | |
|  | Blacks/Whites | Hispanics/Whites |
| Top 500 | 1.772 | 1.197 |
| Top 950 | 2.048 | 1.710 |
| Top 1,450 | 1.628 | 1.651 |
| Top 2,075 | 1.737 | 1.821 |
| Top 2,500 | 1.584 | 1.714 |
| Top 2,950 | 1.712 | 1.600 |
| Top 3,425 | 1.686 | 1.622 |
| Top 3,900 | 1.583 | 1.627 |
| Top 4,650 | 1.387 | 1.430 |
| Top 5,200 | 1.389 | 1.474 |
| Top 5,575 | 1.310 | 1.403 |
| Top 6,085 | 1.335 | 1.411 |
| Top 6,600 | 1.334 | 1.398 |
| Top 6,950 | 1.321 | 1.372 |
| Top 7,450 | 1.284 | 1.354 |

Group 4: Personnel, Administration and Computer Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in | |
|---|---|---|
| Approximate Bands of Test-Takers | Representation Rates at Those Rank Levels | |
|  | Blacks/Whites | Hispanics/Whites |
| Top 500 | 1593.8% | 710.5% |
| Top 950 | 1072.4% | 480.9% |
| Top 1,450 | 880.8% | 359.4% |
| Top 2,075 | 639.9% | 313.0% |
| Top 2,500 | 569.9% | 287.6% |
| Top 2,950 | 482.6% | 280.8% |
| Top 3,425 | 436.1% | 256.8% |
| Top 3,900 | 384.7% | 238.0% |
| Top 4,650 | 358.8% | 223.9% |
| Top 5,200 | 321.3% | 207.9% |
| Top 5,575 | 308.3% | 203.3% |
| Top 6,085 | 276.0% | 191.5% |
| Top 6,600 | 252.3% | 180.8% |
| Top 6,950 | 239.5% | 174.9% |
| Top 7,450 | 223.2% | 167.8% |

Group 5: Benefits Review, Tax and Legal Occupations
(10,598 test-takers)

| | Written Test Scores | | | | | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| Written Score | Cumulative Number of: | | | | Final Rating | Cumulative Number of: | | | |
| | All Races | Whites | Blacks | Hispanics | | All Races | Whites | Blacks | Hispanics |
| 67 | 435 | 420 | 4 | 11 | 99 | 491 | 457 | 18 | 16 |
| 64 | 990 | 936 | 24 | 30 | 96 | 1,006 | 923 | 42 | 41 |
| 62 | 1,467 | 1,374 | 45 | 48 | 93 | 1,446 | 1,303 | 80 | 63 |
| 60 | 2,021 | 1,870 | 92 | 59 | 90 | 1,922 | 1,707 | 130 | 85 |
| 59 | 2,344 | 2,152 | 119 | 73 | 87 | 2,520 | 2,191 | 201 | 128 |
| 57 | 3,070 | 2,762 | 200 | 108 | 85 | 2,980 | 2,560 | 271 | 149 |
| 56 | 3,429 | 3,053 | 249 | 127 | 82 | 3,586 | 3,011 | 392 | 183 |
| 54 | 4,186 | 3,651 | 374 | 161 | 80 | 4,063 | 3,354 | 497 | 212 |
| 53 | 4,567 | 3,940 | 435 | 192 | 78 | 4,578 | 3,713 | 621 | 244 |
| 52 | 4,974 | 4,232 | 518 | 224 | 76 | 5,056 | 4,030 | 746 | 280 |
| 51 | 5,370 | 4,478 | 632 | 260 | 74 | 5,573 | 4,371 | 885 | 317 |
| 49 | 6,119 | 4,953 | 852 | 314 | 72 | 6,048 | 4,678 | 1,014 | 356 |
| 48 | 6,461 | 5,159 | 957 | 345 | 70 | 6,466 | 4,916 | 1,161 | 389 |
| Total: | 10,598 | 6,629 | 3,159 | 810 | Total: | 10,598 | 6,629 | 3,159 | 810 |

Group 5: Benefits Review, Tax and Legal Occupations (continued):

| | Written Test Scores | | | | | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| Written Score | Cumulative Percentage of: | | | | Final Rating | Cumulative Percentage of: | | | |
| | All Races | Whites | Blacks | Hispanics | | All Races | Whites | Blacks | Hispanics |
| 67 | 4.1% | 6.3% | 0.1% | 1.4% | 99 | 4.6% | 6.9% | 0.6% | 2.0% |
| 64 | 9.3% | 14.1% | 0.8% | 3.7% | 96 | 9.5% | 13.9% | 1.3% | 5.1% |
| 62 | 13.8% | 20.7% | 1.4% | 5.9% | 93 | 13.6% | 19.7% | 2.5% | 7.8% |
| 60 | 19.1% | 28.2% | 2.9% | 7.3% | 90 | 18.1% | 25.8% | 4.1% | 10.5% |
| 59 | 22.1% | 32.5% | 3.8% | 9.0% | 87 | 23.8% | 33.1% | 6.4% | 15.8% |
| 57 | 29.0% | 41.7% | 6.3% | 13.3% | 85 | 28.1% | 38.6% | 8.6% | 18.4% |
| 56 | 32.4% | 46.1% | 7.9% | 15.7% | 82 | 33.8% | 45.4% | 12.4% | 22.6% |
| 54 | 39.5% | 55.1% | 11.8% | 19.9% | 80 | 38.3% | 50.6% | 15.7% | 26.2% |
| 53 | 43.1% | 59.4% | 13.8% | 23.7% | 78 | 43.2% | 56.0% | 19.7% | 30.1% |
| 52 | 46.9% | 63.8% | 16.4% | 27.7% | 76 | 47.7% | 60.8% | 23.6% | 34.6% |
| 51 | 50.7% | 67.6% | 20.0% | 32.1% | 74 | 52.6% | 65.9% | 28.0% | 39.1% |
| 49 | 57.7% | 74.7% | 27.0% | 38.8% | 72 | 57.1% | 70.6% | 32.1% | 44.0% |
| 48 | 61.0% | 77.8% | 30.3% | 42.6% | 70 | 61.0% | 74.2% | 36.8% | 48.0% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Group 5: Benefits Review, Tax and Legal Occupations (continued):

### Black and Hispanic Representation Rates at Particular Rank Levels, as a Percentage of the White Representation Rate at That Rank Level

| Approximate Bands of Test-Takers | Written Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
|---|---|---|---|---|
| | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| | Blacks | Hispanics | Blacks | Hispanics |
| Top 460 | 2.0% | 21.4% | 8.3% | 28.7% |
| Top 1,000 | 5.4% | 26.2% | 9.5% | 36.4% |
| Top 1,455 | 6.9% | 28.6% | 12.9% | 39.6% |
| Top 1,975 | 10.3% | 25.8% | 16.0% | 40.8% |
| Top 2,430 | 11.6% | 27.8% | 19.3% | 47.8% |
| Top 3,025 | 15.2% | 32.0% | 22.2% | 47.6% |
| Top 3,500 | 17.1% | 34.0% | 27.3% | 49.7% |
| Top 4,130 | 21.5% | 36.1% | 31.1% | 51.7% |
| Top 4,570 | 23.2% | 39.9% | 35.1% | 53.8% |
| Top 5,000 | 25.7% | 43.3% | 38.8% | 56.9% |
| Top 5,475 | 29.6% | 47.5% | 42.5% | 59.4% |
| Top 6,080 | 36.1% | 51.9% | 45.5% | 62.3% |
| Top 6,460 | 38.9% | 54.7% | 49.6% | 64.8% |

Group 5: Benefits Review, Tax and Legal Occupations (continued):

| Approximate Bands of Test-Takers | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same Rank Levels on the Basis of the Written Scores Alone | |
|---|---|---|
| | Blacks/Whites | Hispanics/Whites |
| Top 460 | 4.136 | 1.337 |
| Top 1,000 | 1.775 | 1.386 |
| Top 1,455 | 1.875 | 1.384 |
| Top 1,975 | 1.548 | 1.578 |
| Top 2,430 | 1.659 | 1.722 |
| Top 3,025 | 1.462 | 1.488 |
| Top 3,500 | 1.596 | 1.461 |
| Top 4,130 | 1.447 | 1.433 |
| Top 4,570 | 1.515 | 1.349 |
| Top 5,000 | 1.512 | 1.313 |
| Top 5,475 | 1.435 | 1.249 |
| Top 6,080 | 1.260 | 1.200 |
| Top 6,460 | 1.273 | 1.183 |

Group 5: Benefits Review, Tax and Legal Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
| --- | --- | --- |
| Top 460 | 1209.9% | 349.0% |
| Top 1,000 | 1047.3% | 275.1% |
| Top 1,455 | 776.2% | 252.7% |
| Top 1,975 | 625.7% | 245.4% |
| Top 2,430 | 519.5% | 209.2% |
| Top 3,025 | 450.2% | 209.9% |
| Top 3,500 | 366.0% | 201.0% |
| Top 4,130 | 321.6% | 193.3% |
| Top 4,570 | 284.9% | 185.9% |
| Top 5,000 | 257.4% | 175.9% |
| Top 5,475 | 235.4% | 168.5% |
| Top 6,080 | 219.8% | 160.6% |
| Top 6,460 | 201.8% | 154.4% |

Group 6: Law Enforcement and Investigation Occupations
(17,336 test-takers)

| Written Score | Cumulative Number of: | | | | Final Rating | Cumulative Number of: | | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Races | Whites | Blacks | Hispanics | | All Races | Whites | Blacks | Hispanics |
| 68 | 525 | 510 | 5 | 10 | 99 | 602 | 567 | 16 | 19 |
| 66 | 1,001 | 964 | 12 | 25 | 96 | 974 | 915 | 29 | 30 |
| 64 | 1,632 | 1,550 | 36 | 46 | 93 | 1,453 | 1,356 | 43 | 54 |
| 63 | 2,034 | 1,921 | 50 | 63 | 90 | 2,093 | 1,921 | 75 | 97 |
| 62 | 2,432 | 2,287 | 71 | 74 | 88 | 2,535 | 2,303 | 106 | 126 |
| 61 | 2,898 | 2,712 | 92 | 94 | 86 | 3,081 | 2,763 | 148 | 170 |
| 60 | 3,363 | 3,129 | 119 | 115 | 84 | 3,655 | 3,236 | 196 | 223 |
| 59 | 3,911 | 3,608 | 153 | 150 | 83 | 3,977 | 3,488 | 233 | 256 |
| 58 | 4,422 | 4,053 | 197 | 172 | 81 | 4,611 | 3,999 | 307 | 305 |
| 57 | 4,984 | 4,531 | 236 | 217 | 80 | 4,976 | 4,286 | 349 | 341 |
| 56 | 5,506 | 4,964 | 283 | 259 | 79 | 5,370 | 4,593 | 394 | 383 |
| 55 | 6,026 | 5,401 | 327 | 298 | 77 | 6,114 | 5,171 | 493 | 450 |
| 54 | 6,624 | 5,891 | 382 | 351 | 76 | 6,526 | 5,475 | 552 | 499 |
| 53 | 7,177 | 6,315 | 446 | 416 | 75 | 6,938 | 5,773 | 607 | 558 |
| 52 | 7,767 | 6,775 | 513 | 479 | 73 | 7,700 | 6,321 | 729 | 650 |
| 52 | 7,767 | 6,775 | 513 | 479 | 72 | 8,133 | 6,610 | 801 | 722 |
| 51 | 8,354 | 7,202 | 615 | 537 | 71 | 8,592 | 6,926 | 885 | 781 |
| 50 | 8,967 | 7,620 | 711 | 636 | 70 | 8,996 | 7,203 | 945 | 848 |
| Total: | 17,336 | 11,198 | 3,239 | 2,899 | Total: | 17,336 | 11,198 | 3,239 | 2,899 |

Group 6: Law Enforcement and Investigation Occupations (continued):

| | Written Test Scores | | | | | Final Ratings: Test Scores and IAR Scores | | | |
|---|---|---|---|---|---|---|---|---|---|
| Written | Cumulative Percentage of: | | | | Final | Cumulative Percentage of: | | | |
| Score | All Races | Whites | Blacks | Hispanics | Rating | All Races | Whites | Blacks | Hispanics |
| 68 | 3.0% | 4.6% | 0.2% | 0.3% | 99 | 3.5% | 5.1% | 0.5% | 0.7% |
| 66 | 5.8% | 8.6% | 0.4% | 0.9% | 96 | 5.6% | 8.2% | 0.9% | 1.0% |
| 64 | 9.4% | 13.8% | 1.1% | 1.6% | 93 | 8.4% | 12.1% | 1.3% | 1.9% |
| 63 | 11.7% | 17.2% | 1.5% | 2.2% | 90 | 12.1% | 17.2% | 2.3% | 3.3% |
| 62 | 14.0% | 20.4% | 2.2% | 2.6% | 88 | 14.6% | 20.6% | 3.3% | 4.3% |
| 61 | 16.7% | 24.2% | 2.8% | 3.2% | 86 | 17.8% | 24.7% | 4.6% | 5.9% |
| 60 | 19.4% | 27.9% | 3.7% | 4.0% | 84 | 21.1% | 28.9% | 6.1% | 7.7% |
| 59 | 22.6% | 32.2% | 4.7% | 5.2% | 83 | 22.9% | 31.1% | 7.2% | 8.8% |
| 58 | 25.5% | 36.2% | 6.1% | 5.9% | 81 | 26.6% | 35.7% | 9.5% | 10.5% |
| 57 | 28.7% | 40.5% | 7.3% | 7.5% | 80 | 28.7% | 38.3% | 10.8% | 11.8% |
| 56 | 31.8% | 44.3% | 8.7% | 8.9% | 79 | 31.0% | 41.0% | 12.2% | 13.2% |
| 55 | 34.8% | 48.2% | 10.1% | 10.3% | 77 | 35.3% | 46.2% | 15.2% | 15.5% |
| 54 | 38.2% | 52.6% | 11.8% | 12.1% | 76 | 37.6% | 48.9% | 17.0% | 17.2% |
| 53 | 41.4% | 56.4% | 13.8% | 14.3% | 75 | 40.0% | 51.6% | 18.7% | 19.2% |
| 52 | 44.8% | 60.5% | 15.8% | 16.5% | 73 | 44.4% | 56.4% | 22.5% | 22.4% |
| 52 | 44.8% | 60.5% | 15.8% | 16.5% | 72 | 46.9% | 59.0% | 24.7% | 24.9% |
| 51 | 48.2% | 64.3% | 19.0% | 18.5% | 71 | 49.6% | 61.9% | 27.3% | 26.9% |
| 50 | 51.7% | 68.0% | 22.0% | 21.9% | 70 | 51.9% | 64.3% | 29.2% | 29.3% |
| Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Group 6: Law Enforcement and Investigation Occupations (continued):

Black and Hispanic Representation Rates at Particular Rank Levels,
as a Percentage of the White Representation Rate at That Rank Level

| Approximate Bands of Test-Takers | Written Test Scores Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Final Ratings (Test Scores and IAR Scores) Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
|---|---|---|---|---|
| | Blacks | Hispanics | Blacks | Hispanics |
| Top 550 | 3.4% | 7.6% | 9.8% | 12.9% |
| Top 1,000 | 4.3% | 10.0% | 11.0% | 12.7% |
| Top 1,525 | 8.0% | 11.5% | 11.0% | 15.4% |
| Top 2,050 | 9.0% | 12.7% | 13.5% | 19.5% |
| Top 2,475 | 10.7% | 12.5% | 15.9% | 21.1% |
| Top 3,000 | 11.7% | 13.4% | 18.5% | 23.8% |
| Top 3,500 | 13.1% | 14.2% | 20.9% | 26.6% |
| Top 3,950 | 14.7% | 16.1% | 23.1% | 28.4% |
| Top 4,500 | 16.8% | 16.4% | 26.5% | 29.5% |
| Top 5,000 | 18.0% | 18.5% | 28.2% | 30.7% |
| Top 5,425 | 19.7% | 20.2% | 29.7% | 32.2% |
| Top 6,075 | 20.9% | 21.3% | 33.0% | 33.6% |
| Top 6,575 | 22.4% | 23.0% | 34.9% | 35.2% |
| Top 7,050 | 24.4% | 25.4% | 36.4% | 37.3% |
| Top 7,735 | 26.2% | 27.3% | 39.9% | 39.7% |
| Top 7,900 | 26.2% | 27.3% | 41.9% | 42.2% |
| Top 8,475 | 29.5% | 28.8% | 44.2% | 43.6% |
| Top 9,000 | 32.3% | 32.2% | 45.4% | 45.5% |

Group 6: Law Enforcement and Investigation Occupations (continued):

|  | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the Final Ratings (Including IAR Scores), as a Multiple of the Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at the Same Rank Levels on the Basis of the Written Scores Alone | |
| --- | --- | --- |
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
| Top 550 | 2.878 | 1.709 |
| Top 1,000 | 2.546 | 1.264 |
| Top 1,525 | 1.365 | 1.342 |
| Top 2,050 | 1.500 | 1.540 |
| Top 2,475 | 1.483 | 1.691 |
| Top 3,000 | 1.579 | 1.775 |
| Top 3,500 | 1.593 | 1.875 |
| Top 3,950 | 1.575 | 1.765 |
| Top 4,500 | 1.579 | 1.797 |
| Top 5,000 | 1.563 | 1.661 |
| Top 5,425 | 1.505 | 1.598 |
| Top 6,075 | 1.575 | 1.577 |
| Top 6,575 | 1.555 | 1.530 |
| Top 7,050 | 1.489 | 1.467 |
| Top 7,735 | 1.523 | 1.454 |
| Top 7,900 | 1.600 | 1.545 |
| Top 8,475 | 1.496 | 1.512 |
| Top 9,000 | 1.406 | 1.411 |

Group 6: Law Enforcement and Investigation Occupations (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the Final Ratings, at Particular Rank Levels, Which Would Be Necessary to Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
| Approximate Bands of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| Top 550 | 1025.0% | 772.6% |
| Top 1,000 | 912.6% | 789.6% |
| Top 1,525 | 912.1% | 650.1% |
| Top 2,050 | 740.9% | 512.7% |
| Top 2,475 | 628.4% | 473.2% |
| Top 3,000 | 540.0% | 420.8% |
| Top 3,500 | 477.6% | 375.7% |
| Top 3,950 | 433.0% | 352.7% |
| Top 4,500 | 376.8% | 339.4% |
| Top 5,000 | 355.2% | 325.4% |
| Top 5,425 | 337.2% | 310.5% |
| Top 6,075 | 303.4% | 297.5% |
| Top 6,575 | 286.9% | 284.0% |
| Top 7,050 | 275.1% | 267.8% |
| Top 7,735 | 250.8% | 251.8% |
| Top 7,900 | 238.7% | 237.0% |
| Top 8,475 | 226.4% | 229.6% |
| Top 9,000 | 220.5% | 219.9% |

FILED

JUL 1 0 1991

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

STATISTICAL COMPARISON OF THE EFFECT ON MINORITY REPRESENTATION RATES
OF SUBSTITUTING THE "ADMINISTRATIVE CAREERS WITH AMERICA" EXAMINATIONS
FOR THE SIX JOB-SPECIFIC ALTERNATIVE EXAMINING PROCEDURES SPECIFIED BELOW

July 3, 1991

## Social Insurance Occupations, GS-0105 and GS-0993
6,089 Test-Takers

| Percent of Test-Takers | Job-Specific Test Data | | | | |
| | Written Score | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 91.7 | 339 | 318 | 16 | 5 |
| 10% | 89.2 | 652 | 589 | 43 | 20 |
| 15% | 87.5 | 953 | 854 | 70 | 29 |
| 20% | 86.7 | 1,129 | 1,003 | 91 | 35 |
| 25% | 85.0 | 1,494 | 1,287 | 149 | 58 |
| 30% | 83.3 | 1,900 | 1,591 | 218 | 91 |
| 35% | 82.5 | 2,127 | 1,738 | 279 | 110 |
| 40% | 81.7 | 2,389 | 1,928 | 328 | 133 |
| 45% | 80.8 | 2,653 | 2,088 | 399 | 166 |
| 50% | 80.0 | 2,914 | 2,241 | 479 | 194 |
| 55% | 78.3 | 3,429 | 2,481 | 670 | 278 |
| 60% | 77.5 | 3,656 | 2,590 | 748 | 318 |
| 65% | 76.7 | 3,925 | 2,721 | 850 | 354 |
| 70% | 75.8 | 4,176 | 2,807 | 967 | 402 |
| 75% | 74.2 | 4,634 | 2,988 | 1,155 | 491 |
| 80% | 73.3 | 4,846 | 3,060 | 1,245 | 541 |
| 85% | 71.7 | 5,233 | 3,169 | 1,442 | 622 |
| 90% | 70.0 | 5,548 | 3,241 | 1,599 | 708 |
| 100% | Total: | 6,089 | 3,321 | 1,843 | 925 |

## ACWA Group 5: Benefits Review, Tax and Legal
10,598 Test-Takers

| Percent of Test-Takers | Final Ratings for ACWA Group 5 (Test Scores and IAR Scores) | | | | |
| | Final Rating | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 99 | 491 | 457 | 18 | 16 |
| 10% | 96 | 1,006 | 923 | 42 | 41 |
| 15% | 92 | 1,587 | 1,427 | 90 | 70 |
| 20% | 89 | 2,089 | 1,843 | 150 | 96 |
| 25% | 86 | 2,749 | 2,380 | 232 | 137 |
| 30% | 84 | 3,162 | 2,691 | 309 | 162 |
| 35% | 81 | 3,813 | 3,169 | 449 | 195 |
| 40% | 79 | 4,319 | 3,535 | 557 | 227 |
| 45% | 77 | 4,793 | 3,859 | 678 | 256 |
| 50% | 75 | 5,323 | 4,203 | 818 | 302 |
| 55% | 73 | 5,821 | 4,517 | 962 | 342 |
| 60% | 71 | 6,259 | 4,797 | 1,090 | 372 |
| Passers | 70 | 6,466 | 4,916 | 1,161 | 389 |
| Total: | | 10,598 | 6,629 | 3,159 | 810 |

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
FILED
JUL 10 1991

CA 79-271

Social Insurance Occupations, GS-0105 and GS-0993
(continued):

| | | Job-Specific Test Data | | | | | | Final Ratings for ACWA Group 5 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | Cumulative Percentage of: | | | | Percent of Test-Takers | Final Rating | Cumulative Percentage of: | | | |
| | | All Races | Whites | Blacks | Hispanics | | | All Races | Whites | Blacks | Hispanics |
| 5% | 91.7 | 5.6% | 9.6% | 0.9% | 0.5% | 5% | 99 | 4.6% | 6.9% | 0.6% | 2.0% |
| 10% | 89.2 | 10.7% | 17.7% | 2.3% | 2.2% | 10% | 96 | 9.5% | 13.9% | 1.3% | 5.1% |
| 15% | 87.5 | 15.7% | 25.7% | 3.8% | 3.1% | 15% | 92 | 15.0% | 21.5% | 2.8% | 8.6% |
| 20% | 86.7 | 18.5% | 30.2% | 4.9% | 3.8% | 20% | 89 | 19.7% | 27.8% | 4.7% | 11.9% |
| 25% | 85.0 | 24.5% | 38.8% | 8.1% | 6.3% | 25% | 86 | 25.9% | 35.9% | 7.3% | 16.9% |
| 30% | 83.3 | 31.2% | 47.9% | 11.8% | 9.8% | 30% | 84 | 29.8% | 40.6% | 9.8% | 20.0% |
| 35% | 82.5 | 34.9% | 52.3% | 15.1% | 11.9% | 35% | 81 | 36.0% | 47.8% | 14.2% | 24.1% |
| 40% | 81.7 | 39.2% | 58.1% | 17.8% | 14.4% | 40% | 79 | 40.8% | 53.3% | 17.6% | 28.0% |
| 45% | 80.8 | 43.6% | 62.9% | 21.6% | 17.9% | 45% | 77 | 45.2% | 58.2% | 21.5% | 31.6% |
| 50% | 80.0 | 47.9% | 67.5% | 26.0% | 21.0% | 50% | 75 | 50.2% | 63.4% | 25.9% | 37.3% |
| 55% | 78.3 | 56.3% | 74.7% | 36.4% | 30.1% | 55% | 73 | 54.9% | 68.1% | 30.5% | 42.2% |
| 60% | 77.5 | 60.0% | 78.0% | 40.6% | 34.4% | 60% | 71 | 59.1% | 72.4% | 34.5% | 45.9% |
| | | | | | | Passers | 70 | 61.0% | 74.2% | 36.8% | 48.0% |
| 65% | 76.7 | 64.5% | 81.9% | 46.1% | 38.3% | | | | | | |
| 70% | 75.8 | 68.6% | 84.5% | 52.5% | 43.5% | | | | | | |
| 75% | 74.2 | 76.1% | 90.0% | 62.7% | 53.1% | | | | | | |
| 80% | 73.3 | 79.6% | 92.1% | 67.6% | 58.5% | | | | | | |
| 85% | 71.7 | 85.9% | 95.4% | 78.2% | 67.2% | | | | | | |
| 90% | 70.0 | 91.1% | 97.6% | 86.8% | 76.5% | | | | | | |
| 100% | Total: | 100.0% | 100.0% | 100.0% | 100.0% | | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Social Insurance Occupations, GS-0105 and GS-0993
  (continued):

<u>Black and Hispanic Representation Rates, as a Percentage of the White Rate</u>

|  | <u>Job-Specific Test Scores</u> | | | <u>Final Ratings</u><br><u>(Test Scores and IAR Scores)</u> | |
| Percent<br>of Test-<br><u>Takers</u> | Representation Rates for<br>Blacks and Hispanics, as<br><u>Percentage of White Rates</u><br><u>Blacks</u> | <u>Hispanics</u> | | Representation Rates for<br>Blacks and Hispanics, as<br><u>Percentage of White Rates</u><br><u>Blacks</u> | <u>Hispanics</u> |
|---|---|---|---|---|---|
| 5% | 9.1% | 5.6% | | 8.3% | 28.7% |
| 10% | 13.2% | 12.2% | | 9.5% | 36.4% |
| 15% | 14.8% | 12.2% | | 13.2% | 40.1% |
| 20% | 16.3% | 12.5% | | 17.1% | 42.6% |
| 25% | 20.9% | 16.2% | | 20.5% | 47.1% |
| 30% | 24.7% | 20.5% | | 24.1% | 49.3% |
| 35% | 28.9% | 22.7% | | 29.7% | 50.4% |
| 40% | 30.7% | 24.8% | | 33.1% | 52.6% |
| 45% | 34.4% | 28.5% | | 36.9% | 54.3% |
| 50% | 38.5% | 31.1% | | 40.8% | 58.8% |
| 55% | 48.7% | 40.2% | | 44.7% | 62.0% |
| 60% | 52.0% | 44.1% | | 47.7% | 63.5% |
| 65% | 56.3% | 46.7% | | | |
| 70% | 62.1% | 51.4% | | | |
| 75% | 69.7% | 59.0% | | | |
| 80% | 73.3% | 63.5% | | | |
| 85% | 82.0% | 70.5% | | | |
| 90% | 88.9% | 78.4% | | | |

Social Insurance Occupations, GS-0105 and GS-0993
    (continued):

|  | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the Job-Specific Test Scores for the Corresponding Rank | |
| Percent of Test- Takers | Blacks/Whites | Hispanics/Whites |
| --- | --- | --- |
| 5% | 0.912 | 5.076 |
| 10% | 0.726 | 2.982 |
| 15% | 0.896 | 3.293 |
| 20% | 1.045 | 3.403 |
| 25% | 0.981 | 2.912 |
| 30% | 0.976 | 2.399 |
| 35% | 1.028 | 2.216 |
| 40% | 1.079 | 2.122 |
| 45% | 1.071 | 1.902 |
| 50% | 1.060 | 1.892 |
| 55% | 0.918 | 1.540 |
| 60% | 0.916 | 1.440 |

Social Insurance Occupations, GS-0105 and GS-0993
   (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the ACWA Final Ratings, at Particular Rank Levels, Which Would Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 1209.9% | 349.0% |
| 10% | 1047.3% | 275.1% |
| 15% | 755.6% | 249.1% |
| 20% | 585.5% | 234.6% |
| 25% | 488.9% | 212.3% |
| 30% | 415.0% | 203.0% |
| 35% | 336.3% | 198.6% |
| 40% | 302.4% | 190.3% |
| 45% | 271.2% | 184.2% |
| 50% | 244.9% | 170.1% |
| 55% | 223.8% | 161.4% |
| 60% | 209.7% | 157.6% |

Computer Specialist, GS-0334
10,287 Test-Takers

ACWA Group 4: Personnel, Administrative and Computer
13,101 Test-Takers

| Percent of Test-Takers | Written Score | Job-Specific Test Data | | | |
|---|---|---|---|---|---|
| | | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 92 | 703 | 679 | 18 | 6 |
| 10% | 91 | 1,164 | 1,123 | 31 | 10 |
| 15% | 90 | 1,622 | 1,545 | 56 | 21 |
| 20% | 89 | 2,104 | 1,991 | 78 | 35 |
| 25% | 88 | 2,544 | 2,391 | 102 | 51 |
| 30% | 86 | 3,272 | 3,058 | 148 | 66 |
| 35% | 85 | 3,602 | 3,340 | 184 | 78 |
| 40% | 84 | 3,944 | 3,636 | 220 | 88 |
| 45% | 83 | 4,382 | 4,019 | 257 | 106 |
| 50% | 82 | 4,976 | 4,522 | 325 | 129 |
| 55% | 81 | 5,634 | 5,066 | 403 | 165 |
| 60% | 80 | 6,297 | 5,585 | 516 | 196 |
| 65% | 79 | 6,864 | 5,986 | 644 | 234 |
| 70% | 78 | 7,405 | 6,335 | 802 | 268 |
| 75% | 77 | 7,913 | 6,633 | 970 | 310 |
| 80% | 76 | 8,355 | 6,897 | 1,110 | 348 |
| 85% | 75 | 8,818 | 7,121 | 1,296 | 401 |
| 90% | 74 | 9,196 | 7,299 | 1,465 | 432 |
| 95% | 71 | 9,768 | 7,523 | 1,751 | 494 |
| 100% | Total: | 10,287 | 7,678 | 2,046 | 563 |

| Percent of Test-Takers | Final Rating | Final Ratings for ACWA Group 4 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|
| | | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 98 | 721 | 674 | 21 | 26 |
| 10% | 94 | 1,265 | 1,155 | 56 | 54 |
| 15% | 90 | 2,022 | 1,782 | 130 | 110 |
| 20% | 87 | 2,749 | 2,366 | 218 | 165 |
| 25% | 85 | 3,195 | 2,716 | 284 | 195 |
| 30% | 82 | 4,014 | 3,338 | 405 | 271 |
| 35% | 80 | 4,581 | 3,766 | 490 | 325 |
| 40% | 78 | 5,182 | 4,185 | 608 | 389 |
| 45% | 76 | 5,787 | 4,589 | 740 | 458 |
| 50% | 73 | 6,647 | 5,145 | 952 | 550 |
| 55% | 71 | 7,224 | 5,500 | 1,106 | 618 |
| Passers | 70 | 7,510 | 5,671 | 1,186 | 653 |
| | Total: | 13,101 | 7,892 | 3,684 | 1,525 |

Computer Specialist, GS-0334 (continued):

## Job-Specific Test Data

| Percent of Test-Takers | Written Score | All Races | Whites | Blacks | Hispanics |
|---|---|---|---|---|---|
| 5% | 92 | 6.8% | 8.8% | 0.9% | 1.1% |
| 10% | 91 | 11.3% | 14.6% | 1.5% | 1.8% |
| 15% | 90 | 15.8% | 20.1% | 2.7% | 3.7% |
| 20% | 89 | 20.5% | 25.9% | 3.8% | 6.2% |
| 25% | 88 | 24.7% | 31.1% | 5.0% | 9.1% |
| 30% | 86 | 31.8% | 39.8% | 7.2% | 11.7% |
| 35% | 85 | 35.0% | 43.5% | 9.0% | 13.9% |
| 40% | 84 | 38.3% | 47.4% | 10.8% | 15.6% |
| 45% | 83 | 42.6% | 52.3% | 12.6% | 18.8% |
| 50% | 82 | 48.4% | 58.9% | 15.9% | 22.9% |
| 55% | 81 | 54.8% | 66.0% | 19.7% | 29.3% |
| 60% | 80 | 61.2% | 72.7% | 25.2% | 34.8% |
| 65% | 79 | 66.7% | 78.0% | 31.5% | 41.6% |
| 70% | 78 | 72.0% | 82.5% | 39.2% | 47.6% |
| 75% | 77 | 76.9% | 86.4% | 47.4% | 55.1% |
| 80% | 76 | 81.2% | 89.8% | 54.3% | 61.8% |
| 85% | 75 | 85.7% | 92.7% | 63.3% | 71.2% |
| 90% | 74 | 89.4% | 95.1% | 71.6% | 76.7% |
| 95% | 71 | 95.0% | 98.0% | 85.6% | 87.7% |
| 100% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

## Final Ratings for ACWA Group 4 (Test Scores and IAR Scores)

| Percent of Test-Takers | Final Rating | All Races | Whites | Blacks | Hispanics |
|---|---|---|---|---|---|
| 5% | 98 | 5.5% | 8.5% | 0.6% | 1.7% |
| 10% | 94 | 9.7% | 14.6% | 1.5% | 3.5% |
| 15% | 90 | 15.4% | 22.6% | 3.5% | 7.2% |
| 20% | 87 | 21.0% | 30.0% | 5.9% | 10.8% |
| 25% | 85 | 24.4% | 34.4% | 7.7% | 12.8% |
| 30% | 82 | 30.6% | 42.3% | 11.0% | 17.8% |
| 35% | 80 | 35.0% | 47.7% | 13.3% | 21.3% |
| 40% | 78 | 39.6% | 53.0% | 16.5% | 25.5% |
| 45% | 76 | 44.2% | 58.1% | 20.1% | 30.0% |
| 50% | 73 | 50.7% | 65.2% | 25.8% | 36.1% |
| 55% | 71 | 55.1% | 69.7% | 30.0% | 40.5% |
| Passers | 70 | 57.3% | 71.9% | 32.2% | 42.8% |
| Total: | | 100.0% | 100.0% | 100.0% | 100.0% |

Computer Specialist, GS-0334 (continued):

Black and Hispanic Representation Rates, as a Percentage of the White Rate

| Percent of Test- Takers | Job-Specific Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
|---|---|---|---|---|
| | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| | Blacks | Hispanics | Blacks | Hispanics |
| 5% | 9.9% | 12.1% | 6.7% | 20.0% |
| 10% | 10.4% | 12.1% | 10.4% | 24.2% |
| 15% | 13.6% | 18.5% | 15.6% | 31.9% |
| 20% | 14.7% | 24.0% | 19.7% | 36.1% |
| 25% | 16.0% | 29.1% | 22.4% | 37.2% |
| 30% | 18.2% | 29.4% | 26.0% | 42.0% |
| 35% | 20.7% | 31.8% | 27.9% | 44.7% |
| 40% | 22.7% | 33.0% | 31.1% | 48.1% |
| 45% | 24.0% | 36.0% | 34.5% | 51.6% |
| 50% | 27.0% | 38.9% | 39.6% | 55.3% |
| 55% | 29.9% | 44.4% | 43.1% | 58.1% |
| 60% | 34.7% | 47.9% | | |
| 65% | 40.4% | 53.3% | | |
| 70% | 47.5% | 57.7% | | |
| 75% | 54.9% | 63.7% | | |
| 80% | 60.4% | 68.8% | | |
| 85% | 68.3% | 76.8% | | |
| 90% | 75.3% | 80.7% | | |
| 95% | 87.3% | 89.6% | | |

Computer Specialist, GS-0334 (continued):

| Percent of Test-Takers | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the Job-Specific Test Scores for the Corresponding Rank | |
|---|---|---|
| | Blacks/Whites | Hispanics/Whites |
| 5% | 0.671 | 1.657 |
| 10% | 1.003 | 1.992 |
| 15% | 1.149 | 1.723 |
| 20% | 1.343 | 1.505 |
| 25% | 1.399 | 1.277 |
| 30% | 1.431 | 1.427 |
| 35% | 1.348 | 1.402 |
| 40% | 1.371 | 1.457 |
| 45% | 1.440 | 1.436 |
| 50% | 1.470 | 1.422 |
| 55% | 1.443 | 1.309 |

Computer Specialist, GS-0334 (continued):

Percentage Improvement in Comparative Representation Rates
for Blacks/Whites and for Hispanics/Whites on the ACWA
Final Ratings, at Particular Rank Levels, Which Would
Eliminate All Racial Differences in Representation
Rates at Those Rank Levels

| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 1498.2% | 500.9% |
| 10% | 962.8% | 413.3% |
| 15% | 639.9% | 313.0% |
| 20% | 506.6% | 277.1% |
| 25% | 446.4% | 269.1% |
| 30% | 384.7% | 238.0% |
| 35% | 358.8% | 223.9% |
| 40% | 321.3% | 207.9% |
| 45% | 289.5% | 193.6% |
| 50% | 252.3% | 180.8% |
| 55% | 232.1% | 172.0% |

Tax Technician, GS-0526
3,137 Test-Takers

ACWA Group 5: Benefits Review, Tax and Legal
10,598 Test-Takers

| | | Job-Specific Test Data | | | | | | Final Ratings for ACWA Group 5 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | Cumulative Number of: | | | | Percent of Test-Takers | Final Rating | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics | | | All Races | Whites | Blacks | Hispanics |
| 5% | 95.6 | 151 | 140 | 9 | 2 | 5% | 99 | 491 | 457 | 18 | 16 |
| 10% | 94.0 | 317 | 290 | 23 | 4 | 10% | 96 | 1,006 | 923 | 42 | 41 |
| 15% | 93.2 | 447 | 410 | 31 | 6 | 15% | 92 | 1,587 | 1,427 | 90 | 70 |
| 20% | 92.2 | 606 | 541 | 51 | 14 | 20% | 89 | 2,089 | 1,843 | 150 | 96 |
| 25% | 91.2 | 789 | 695 | 76 | 18 | 25% | 86 | 2,749 | 2,380 | 232 | 137 |
| 30% | 90.6 | 916 | 806 | 86 | 24 | 30% | 84 | 3,162 | 2,691 | 309 | 162 |
| 35% | 89.5 | 1,081 | 934 | 117 | 30 | 35% | 81 | 3,813 | 3,169 | 449 | 195 |
| 40% | 88.5 | 1,231 | 1,056 | 140 | 35 | 40% | 79 | 4,319 | 3,535 | 557 | 227 |
| 45% | 87.5 | 1,394 | 1,155 | 196 | 43 | 45% | 77 | 4,793 | 3,859 | 678 | 256 |
| 50% | 86.2 | 1,582 | 1,272 | 259 | 51 | 50% | 75 | 5,323 | 4,203 | 818 | 302 |
| 55% | 84.9 | 1,726 | 1,357 | 313 | 56 | 55% | 73 | 5,821 | 4,517 | 962 | 342 |
| 60% | 83.8 | 1,894 | 1,454 | 381 | 59 | 60% | 71 | 6,259 | 4,797 | 1,090 | 372 |
| | | | | | | Passers | 70 | 6,466 | 4,916 | 1,161 | 389 |
| 65% | 82.8 | 2,020 | 1,513 | 446 | 61 | | | | | | |
| 70% | 81.1 | 2,208 | 1,584 | 550 | 74 | | | | | | |
| 75% | 79.7 | 2,348 | 1,650 | 616 | 82 | | | | | | |
| 80% | 77.8 | 2,509 | 1,705 | 715 | 89 | | | | | | |
| 85% | 76.4 | 2,658 | 1,743 | 813 | 102 | | | | | | |
| 90% | 74.1 | 2,820 | 1,792 | 921 | 107 | | | | | | |
| 100% | Total: | 3,137 | 1,854 | 1,153 | 130 | | Total: | 10,598 | 6,629 | 3,159 | 810 |

Tax Technician, GS-0526 (continued):

|  |  | Job-Specific Test Data | | | | | | Final Ratings for ACWA Group 5 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | Cumulative Percentage of: | | | | Percent of Test-Takers | Final Rating | Cumulative Percentage of: | | | |
|  |  | All Races | Whites | Blacks | Hispanics |  |  | All Races | Whites | Blacks | Hispanics |
| 5% | 95.6 | 4.8% | 7.6% | 0.8% | 1.5% | 5% | 99 | 4.6% | 6.9% | 0.6% | 2.0% |
| 10% | 94.0 | 10.1% | 15.6% | 2.0% | 3.1% | 10% | 96 | 9.5% | 13.9% | 1.3% | 5.1% |
| 15% | 93.2 | 14.2% | 22.1% | 2.7% | 4.6% | 15% | 92 | 15.0% | 21.5% | 2.8% | 8.6% |
| 20% | 92.2 | 19.3% | 29.2% | 4.4% | 10.8% | 20% | 89 | 19.7% | 27.8% | 4.7% | 11.9% |
| 25% | 91.2 | 25.2% | 37.5% | 6.6% | 13.8% | 25% | 86 | 25.9% | 35.9% | 7.3% | 16.9% |
| 30% | 90.6 | 29.2% | 43.5% | 7.5% | 18.5% | 30% | 84 | 29.8% | 40.6% | 9.8% | 20.0% |
| 35% | 89.5 | 34.5% | 50.4% | 10.1% | 23.1% | 35% | 81 | 36.0% | 47.8% | 14.2% | 24.1% |
| 40% | 88.5 | 39.2% | 57.0% | 12.1% | 26.9% | 40% | 79 | 40.8% | 53.3% | 17.6% | 28.0% |
| 45% | 87.5 | 44.4% | 62.3% | 17.0% | 33.1% | 45% | 77 | 45.2% | 58.2% | 21.5% | 31.6% |
| 50% | 86.2 | 50.4% | 68.6% | 22.5% | 39.2% | 50% | 75 | 50.2% | 63.4% | 25.9% | 37.3% |
| 55% | 84.9 | 55.0% | 73.2% | 27.1% | 43.1% | 55% | 73 | 54.9% | 68.1% | 30.5% | 42.2% |
| 60% | 83.8 | 60.4% | 78.4% | 33.0% | 45.4% | 60% | 71 | 59.1% | 72.4% | 34.5% | 45.9% |
|  |  |  |  |  |  | Passers | 70 | 61.0% | 74.2% | 36.8% | 48.0% |
| 65% | 82.8 | 64.4% | 81.6% | 38.7% | 46.9% |  |  |  |  |  |  |
| 70% | 81.1 | 70.4% | 85.4% | 47.7% | 56.9% |  |  |  |  |  |  |
| 75% | 79.7 | 74.8% | 89.0% | 53.4% | 63.1% |  |  |  |  |  |  |
| 80% | 77.8 | 80.0% | 92.0% | 62.0% | 68.5% |  |  |  |  |  |  |
| 85% | 76.4 | 84.7% | 94.0% | 70.5% | 78.5% |  |  |  |  |  |  |
| 90% | 74.1 | 89.9% | 96.7% | 79.9% | 82.3% |  |  |  |  |  |  |
| 100% | Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: |  | 100.0% | 100.0% | 100.0% | 100.0% |

Tax Technician, GS-0526 (continued):

Black and Hispanic Representation Rates, as a Percentage of the White Rate

|  | Job-Specific Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
|---|---|---|---|---|
| Percent of Test-Takers | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
| | Blacks | Hispanics | Blacks | Hispanics |
| 5% | 10.3% | 20.4% | 8.3% | 28.7% |
| 10% | 12.8% | 19.7% | 9.5% | 36.4% |
| 15% | 12.2% | 20.9% | 13.2% | 40.1% |
| 20% | 15.2% | 36.9% | 17.1% | 42.6% |
| 25% | 17.6% | 36.9% | 20.5% | 47.1% |
| 30% | 17.2% | 42.5% | 24.1% | 49.3% |
| 35% | 20.1% | 45.8% | 29.7% | 50.4% |
| 40% | 21.3% | 47.3% | 33.1% | 52.6% |
| 45% | 27.3% | 53.1% | 36.9% | 54.3% |
| 50% | 32.7% | 57.2% | 40.8% | 58.8% |
| 55% | 37.1% | 58.9% | 44.7% | 62.0% |
| 60% | 42.1% | 57.9% | 47.7% | 63.5% |
| 65% | 47.4% | 57.5% | | |
| 70% | 55.8% | 66.6% | | |
| 75% | 60.0% | 70.9% | | |
| 80% | 67.4% | 74.4% | | |
| 85% | 75.0% | 83.5% | | |
| 90% | 82.6% | 85.2% | | |

Tax Technician, GS-0526 (continued):

|  | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the | |
|---|---|---|
| Percent of Test- Takers | Job-Specific Test Scores for the Corresponding Rank | |
|  | Blacks/Whites | Hispanics/Whites |
| 5% | 0.800 | 1.406 |
| 10% | 0.749 | 1.848 |
| 15% | 1.089 | 1.924 |
| 20% | 1.127 | 1.155 |
| 25% | 1.163 | 1.275 |
| 30% | 1.404 | 1.160 |
| 35% | 1.476 | 1.099 |
| 40% | 1.551 | 1.112 |
| 45% | 1.351 | 1.023 |
| 50% | 1.247 | 1.028 |
| 55% | 1.205 | 1.053 |
| 60% | 1.132 | 1.097 |

Tax Technician, GS-0526 (continued):

|  | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the ACWA Final Ratings, at Particular Rank Levels, Which Would Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
|---|---|---|
| Percent of Test- Takers | Blacks/Whites | Hispanics/Whites |
| 5% | 1209.9% | 349.0% |
| 10% | 1047.3% | 275.1% |
| 15% | 755.6% | 249.1% |
| 20% | 585.5% | 234.6% |
| 25% | 488.9% | 212.3% |
| 30% | 415.0% | 203.0% |
| 35% | 336.3% | 198.6% |
| 40% | 302.4% | 190.3% |
| 45% | 271.2% | 184.2% |
| 50% | 244.9% | 170.1% |
| 55% | 223.8% | 161.4% |
| 60% | 209.7% | 157.6% |

Contract Specialist, GS-1102 (Spring 1986)
9,899 Test-Takers

ACWA Group 3: Business, Finance and Management
13,252 Test-Takers

|  | | Job-Specific Test Data | | | |  | | Final Ratings for ACWA Group 3 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | All Races | Whites | Blacks | Hispanics | Percent of Test-Takers | Final Rating | All Races | Whites | Blacks | Hispanics |
| 5% | 90 | 576 | 550 | 19 | 7 | 5% | 98 | 763 | 701 | 34 | 28 |
| 10% | 88 | 1,133 | 1,082 | 35 | 16 | 10% | 95 | 1,389 | 1,262 | 74 | 53 |
| 15% | 87 | 1,491 | 1,404 | 65 | 22 | 15% | 92 | 2,001 | 1,794 | 120 | 87 |
| 20% | 86 | 1,909 | 1,769 | 98 | 42 | 20% | 89 | 2,692 | 2,356 | 207 | 129 |
| 25% | 85 | 2,419 | 2,205 | 161 | 53 | 25% | 87 | 3,190 | 2,759 | 263 | 168 |
| 30% | 84 | 2,946 | 2,656 | 215 | 75 | 30% | 84 | 4,046 | 3,422 | 383 | 241 |
| 35% | 83 | 3,519 | 3,113 | 304 | 102 | 35% | 82 | 4,610 | 3,862 | 467 | 281 |
| 40% | 82 | 4,163 | 3,593 | 428 | 142 | 40% | 80 | 5,211 | 4,305 | 565 | 341 |
| 45% | 82 | 4,163 | 3,593 | 428 | 142 | 45% | 77 | 6,126 | 4,962 | 741 | 423 |
| 50% | 81 | 4,834 | 4,064 | 594 | 176 | 50% | 75 | 6,721 | 5,374 | 864 | 483 |
| 55% | 80 | 5,505 | 4,497 | 787 | 221 | 55% | 73 | 7,278 | 5,743 | 990 | 545 |
| 60% | 79 | 6,143 | 4,906 | 983 | 254 | 60% | Passers | 8,103 | 6,249 | 1,231 | 623 |
| 65% | 79 | 6,143 | 4,906 | 983 | 254 | | | | | | |
| 70% | 78 | 6,769 | 5,257 | 1,213 | 299 | | | | | | |
| 75% | 77 | 7,372 | 5,567 | 1,457 | 348 | | | | | | |
| 80% | 76 | 7,873 | 5,798 | 1,682 | 393 | | | | | | |
| 85% | 75 | 8,306 | 5,993 | 1,884 | 429 | | | | | | |
| 90% | 73 | 9,008 | 6,246 | 2,270 | 492 | | | | | | |
| 100% | Total: | 9,899 | 6,474 | 2,880 | 545 | | Total: | 13,252 | 8,432 | 3,309 | 1,511 |

Contract Specialist, GS-1102 (continued):

|  | Job-Specific Test Data | | | | |  | Final Ratings for ACWA Group 3 (Test Scores and IAR Scores) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | All Races | Cumulative Percentage of: Whites Blacks Hispanics | | | Percent of Test-Takers | Final Rating | All Races | Cumulative Percentage of: Whites Blacks Hispanics | | |
| 5% | 90 | 5.8% | 8.5% | 0.7% | 1.3% | 5% | 98 | 5.8% | 8.3% | 1.0% | 1.9% |
| 10% | 88 | 11.4% | 16.7% | 1.2% | 2.9% | 10% | 95 | 10.5% | 15.0% | 2.2% | 3.5% |
| 15% | 87 | 15.1% | 21.7% | 2.3% | 4.0% | 15% | 92 | 15.1% | 21.3% | 3.6% | 5.8% |
| 20% | 86 | 19.3% | 27.3% | 3.4% | 7.7% | 20% | 89 | 20.3% | 27.9% | 6.3% | 8.5% |
| 25% | 85 | 24.4% | 34.1% | 5.6% | 9.7% | 25% | 87 | 24.1% | 32.7% | 7.9% | 11.1% |
| 30% | 84 | 29.8% | 41.0% | 7.5% | 13.8% | 30% | 84 | 30.5% | 40.6% | 11.6% | 15.9% |
| 35% | 83 | 35.5% | 48.1% | 10.6% | 18.7% | 35% | 82 | 34.8% | 45.8% | 14.1% | 18.6% |
| 40% | 82 | 42.1% | 55.5% | 14.9% | 26.1% | 40% | 80 | 39.3% | 51.1% | 17.1% | 22.6% |
| 45% | 82 | 42.1% | 55.5% | 14.9% | 26.1% | 45% | 77 | 46.2% | 58.8% | 22.4% | 28.0% |
| 50% | 81 | 48.8% | 62.8% | 20.6% | 32.3% | 50% | 75 | 50.7% | 63.7% | 26.1% | 32.0% |
| 55% | 80 | 55.6% | 69.5% | 27.3% | 40.6% | 55% | 73 | 54.9% | 68.1% | 29.9% | 36.1% |
| 60% | 79 | 62.1% | 75.8% | 34.1% | 46.6% | 60% | Passers | 61.1% | 74.1% | 37.2% | 41.2% |
| 65% | 79 | 62.1% | 75.8% | 34.1% | 46.6% |  |  |  |  |  |  |
| 70% | 78 | 68.4% | 81.2% | 42.1% | 54.9% |  |  |  |  |  |  |
| 75% | 77 | 74.5% | 86.0% | 50.6% | 63.9% |  |  |  |  |  |  |
| 80% | 76 | 79.5% | 89.6% | 58.4% | 72.1% |  |  |  |  |  |  |
| 85% | 75 | 83.9% | 92.6% | 65.4% | 78.7% |  |  |  |  |  |  |
| 90% | 73 | 91.0% | 96.5% | 78.8% | 90.3% |  |  |  |  |  |  |
| 100% | Total: | 100.0% | 100.0% | 100.0% | 100.0% |  | Total: | 100.0% | 100.0% | 100.0% | 100.0% |

Contract Specialist, GS-1102 (continued):

<u>Black and Hispanic Representation Rates, as a Percentage of the White Rate</u>

| | <u>Job-Specific Test Scores</u> | | <u>Final Ratings</u><br><u>(Test Scores and IAR Scores)</u> | |
|---|---|---|---|---|
| Percent<br>of Test-<br><u>Takers</u> | Representation Rates for<br>Blacks and Hispanics, as<br><u>Percentage of White Rates</u> | | Representation Rates for<br>Blacks and Hispanics, as<br><u>Percentage of White Rates</u> | |
| | <u>Blacks</u> | <u>Hispanics</u> | <u>Blacks</u> | <u>Hispanics</u> |
| 5% | 7.8% | 15.1% | 12.4% | 22.3% |
| 10% | 7.3% | 17.6% | 14.9% | 23.4% |
| 15% | 10.4% | 18.6% | 17.0% | 27.1% |
| 20% | 12.5% | 28.2% | 22.4% | 30.6% |
| 25% | 16.4% | 28.6% | 24.3% | 34.0% |
| 30% | 18.2% | 33.5% | 28.5% | 39.3% |
| 35% | 22.0% | 38.9% | 30.8% | 40.6% |
| 40% | 26.8% | 46.9% | 33.4% | 44.2% |
| 45% | 26.8% | 46.9% | 38.1% | 47.6% |
| 50% | 32.9% | 51.4% | 41.0% | 50.2% |
| 55% | 39.3% | 58.4% | 43.9% | 53.0% |
| 60% | 45.0% | 61.5% | | |
| 65% | 45.0% | 61.5% | | |
| 70% | 51.9% | 67.6% | | |
| 75% | 58.8% | 74.3% | | |
| 80% | 65.2% | 80.5% | | |
| 85% | 70.7% | 85.0% | | |
| 90% | 81.7% | 93.6% | | |

Contract Specialist, GS-1102 (continued):

Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the <u>Job-Specific Test Scores for the Corresponding Rank</u>

| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 1.592 | 1.474 |
| 10% | 2.055 | 1.334 |
| 15% | 1.638 | 1.454 |
| 20% | 1.798 | 1.083 |
| 25% | 1.480 | 1.190 |
| 30% | 1.567 | 1.172 |
| 35% | 1.404 | 1.043 |
| 40% | 1.249 | 0.942 |
| 45% | 1.421 | 1.013 |
| 50% | 1.247 | 0.975 |
| 55% | 1.117 | 0.907 |

Contract Specialist, GS-1102 (continued):

| Percent of Test-Takers | Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the ACWA Final Ratings, at Particular Rank Levels, Which Would Eliminate All Racial Differences in Representation Rates at Those Rank Levels | |
|---|---|---|
| | Blacks/Whites | Hispanics/Whites |
| 5% | 809.1% | 448.6% |
| 10% | 669.3% | 426.7% |
| 15% | 586.7% | 369.5% |
| 20% | 446.7% | 327.3% |
| 25% | 411.7% | 294.3% |
| 30% | 350.6% | 254.4% |
| 35% | 324.5% | 246.3% |
| 40% | 299.0% | 226.2% |
| 45% | 262.8% | 210.2% |
| 50% | 244.1% | 199.4% |
| 55% | 227.7% | 188.8% |

Internal Revenue Officer, GS-1169
3,900 Test-Takers

ACWA Group 6: Law Enforcement and Investigation
17,336 Test-Takers

| Percent of Test-Takers | Job-Specific Test Data | | | | |
|---|---|---|---|---|---|
| | Written Score | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 93.3 | 262 | 240 | 17 | 5 |
| 10% | 92.2 | 400 | 361 | 29 | 10 |
| 15% | 91.1 | 568 | 504 | 47 | 17 |
| 20% | 90.0 | 807 | 696 | 83 | 28 |
| 25% | 88.9 | 1,069 | 906 | 119 | 44 |
| 30% | 88.9 | 1,069 | 906 | 119 | 44 |
| 35% | 87.8 | 1,341 | 1,111 | 173 | 57 |
| 40% | 86.7 | 1,604 | 1,282 | 240 | 82 |
| 45% | 85.6 | 1,845 | 1,440 | 300 | 105 |
| 50% | 84.4 | 2,079 | 1,594 | 366 | 119 |
| 55% | 84.4 | 2,079 | 1,594 | 366 | 119 |
| 60% | 83.3 | 2,299 | 1,709 | 445 | 145 |
| 65% | 82.2 | 2,489 | 1,808 | 518 | 163 |
| 70% | 81.1 | 2,662 | 1,881 | 600 | 181 |
| 75% | 78.9 | 2,987 | 1,999 | 752 | 236 |
| 80% | 77.8 | 3,108 | 2,049 | 806 | 253 |
| 85% | 75.6 | 3,319 | 2,103 | 935 | 281 |
| 90% | 73.3 | 3,491 | 2,131 | 1,048 | 312 |
| 100% | Total: | 3,900 | 2,193 | 1,285 | 422 |

| Percent of Test-Takers | Final Ratings for ACWA Group 6 (Test Scores and IAR Scores) | | | | |
|---|---|---|---|---|---|
| | Final Rating | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 97 | 831 | 783 | 23 | 25 |
| 10% | 92 | 1,663 | 1,543 | 52 | 68 |
| 15% | 88 | 2,535 | 2,303 | 106 | 126 |
| 20% | 85 | 3,372 | 2,999 | 172 | 201 |
| 25% | 82 | 4,290 | 3,736 | 270 | 284 |
| 30% | 79 | 5,370 | 4,593 | 394 | 383 |
| 35% | 77 | 6,114 | 5,171 | 493 | 450 |
| 40% | 75 | 6,938 | 5,773 | 607 | 558 |
| 45% | 73 | 7,700 | 6,321 | 729 | 650 |
| 50% | 71 | 8,592 | 6,926 | 885 | 781 |
| Passers | 70 | 8,996 | 7,203 | 945 | 848 |
| | Total: | 17,336 | 11,198 | 3,239 | 2,899 |

Internal Revenue Officer, GS-1169 (continued):

| | Job-Specific Test Data | | | | | Final Ratings for ACWA Group 6 (Test Scores and IAR Scores) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test- Takers | Written Score | Cumulative Percentage of: | | | | Percent of Test- Takers | Final Rating | Cumulative Percentage of: | | | |
| | | All Races | Whites | Blacks | Hispanics | | | All Races | Whites | Blacks | Hispanics |
| 5% | 93.3 | 6.7% | 10.9% | 1.3% | 1.2% | 5% | 97 | 4.8% | 7.0% | 0.7% | 0.9% |
| 10% | 92.2 | 10.3% | 16.5% | 2.3% | 2.4% | 10% | 92 | 9.6% | 13.8% | 1.6% | 2.3% |
| 15% | 91.1 | 14.6% | 23.0% | 3.7% | 4.0% | 15% | 88 | 14.6% | 20.6% | 3.3% | 4.3% |
| 20% | 90.0 | 20.7% | 31.7% | 6.5% | 6.6% | 20% | 85 | 19.5% | 26.8% | 5.3% | 6.9% |
| 25% | 88.9 | 27.4% | 41.3% | 9.3% | 10.4% | 25% | 82 | 24.7% | 33.4% | 8.3% | 9.8% |
| 30% | 88.9 | 27.4% | 41.3% | 9.3% | 10.4% | 30% | 79 | 31.0% | 41.0% | 12.2% | 13.2% |
| 35% | 87.8 | 34.4% | 50.7% | 13.5% | 13.5% | 35% | 77 | 35.3% | 46.2% | 15.2% | 15.5% |
| 40% | 86.7 | 41.1% | 58.5% | 18.7% | 19.4% | 40% | 75 | 40.0% | 51.6% | 18.7% | 19.2% |
| 45% | 85.6 | 47.3% | 65.7% | 23.3% | 24.9% | 45% | 73 | 44.4% | 56.4% | 22.5% | 22.4% |
| 50% | 84.4 | 53.3% | 72.7% | 28.5% | 28.2% | 50% | 71 | 49.6% | 61.9% | 27.3% | 26.9% |
| | | | | | | Passers | 70 | 51.9% | 64.3% | 29.2% | 29.3% |
| 55% | 84.4 | 53.3% | 72.7% | 28.5% | 28.2% | | | | | | |
| 60% | 83.3 | 58.9% | 77.9% | 34.6% | 34.4% | | | | | | |
| 65% | 82.2 | 63.8% | 82.4% | 40.3% | 38.6% | | | | | | |
| 70% | 81.1 | 68.3% | 85.8% | 46.7% | 42.9% | | | | | | |
| 75% | 78.9 | 76.6% | 91.2% | 58.5% | 55.9% | | | | | | |
| 80% | 77.8 | 79.7% | 93.4% | 62.7% | 60.0% | | | | | | |
| 85% | 75.6 | 85.1% | 95.9% | 72.8% | 66.6% | | | | | | |
| 90% | 73.3 | 89.5% | 97.2% | 81.6% | 73.9% | | | | | | |
| 100% | Total: | 100.0% | 100.0% | 100.0% | 100.0% | Total: | | 100.0% | 100.0% | 100.0% | 100.0% |

Black and Hispanic Representation Rates, as a Percentage of the White Rate

|  | Job-Specific Test Scores | | Final Ratings (Test Scores and IAR Scores) | |
| --- | --- | --- | --- | --- |
| Percent of Test-Takers | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | | Representation Rates for Blacks and Hispanics, as Percentage of White Rates | |
|  | Blacks | Hispanics | Blacks | Hispanics |
| 5% | 12.1% | 10.8% | 10.2% | 12.3% |
| 10% | 13.7% | 14.4% | 11.7% | 17.0% |
| 15% | 15.9% | 17.5% | 15.9% | 21.1% |
| 20% | 20.4% | 20.9% | 19.8% | 25.9% |
| 25% | 22.4% | 25.2% | 25.0% | 29.4% |
| 30% | 22.4% | 25.2% | 29.7% | 32.2% |
| 35% | 26.6% | 26.7% | 33.0% | 33.6% |
| 40% | 31.9% | 33.2% | 36.4% | 37.3% |
| 45% | 35.6% | 37.9% | 39.9% | 39.7% |
| 50% | 39.2% | 38.8% | 44.2% | 43.6% |
| 55% | 39.2% | 38.8% | 45.4% | 45.5% |
| 60% | 44.4% | 44.1% | | |
| 65% | 48.9% | 46.9% | | |
| 70% | 54.4% | 50.0% | | |
| 75% | 64.2% | 61.4% | | |
| 80% | 67.1% | 64.2% | | |
| 85% | 75.9% | 69.4% | | |
| 90% | 83.9% | 76.1% | | |

Internal Revenue Officer, GS-1169 (continued):

Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the <u>Job-Specific Test Scores for the Corresponding Rank</u>

| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 0.840 | 1.139 |
| 10% | 0.850 | 1.183 |
| 15% | 1.000 | 1.206 |
| 20% | 0.974 | 1.238 |
| 25% | 1.115 | 1.163 |
| 30% | 1.323 | 1.276 |
| 35% | 1.240 | 1.261 |
| 40% | 1.138 | 1.123 |
| 45% | 1.121 | 1.048 |
| 50% | 1.127 | 1.123 |
| 55% | 1.157 | 1.172 |

Internal Revenue Officer, GS-1169 (continued):

Percentage Improvement in Comparative Representation Rates
for Blacks/Whites and for Hispanics/Whites on the ACWA
Final Ratings, at Particular Rank Levels, Which Would
Eliminate All Racial Differences in Representation
Rates at Those Rank Levels

| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 984.7% | 810.8% |
| 10% | 858.3% | 587.4% |
| 15% | 628.4% | 473.2% |
| 20% | 504.3% | 386.3% |
| 25% | 400.2% | 340.6% |
| 30% | 337.2% | 310.5% |
| 35% | 303.4% | 297.5% |
| 40% | 275.1% | 267.8% |
| 45% | 250.8% | 251.8% |
| 50% | 226.4% | 229.6% |
| 55% | 220.5% | 219.9% |

Customs Inspector, GS-1890
4,619 Test-Takers

ACWA Group 6: Law Enforcement and Investigation
17,336 Test-Takers

| | | Job-Specific Test Data | | | |
|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 95.8 | 212 | 202 | 5 | 5 |
| 10% | 93.7 | 446 | 414 | 14 | 18 |
| 15% | 91.6 | 707 | 637 | 28 | 42 |
| 20% | 90.2 | 942 | 830 | 42 | 70 |
| 25% | 88.8 | 1,210 | 1,042 | 72 | 96 |
| 30% | 87.4 | 1,419 | 1,213 | 87 | 119 |
| 35% | 86.0 | 1,672 | 1,388 | 127 | 157 |
| 40% | 85.3 | 1,807 | 1,467 | 142 | 198 |
| 45% | 84.0 | 2,090 | 1,628 | 194 | 268 |
| 50% | 82.6 | 2,369 | 1,798 | 236 | 335 |
| 55% | 81.9 | 2,519 | 1,872 | 266 | 381 |
| 60% | 80.5 | 2,768 | 1,995 | 332 | 441 |
| 65% | 79.1 | 3,036 | 2,125 | 396 | 515 |
| 70% | 77.7 | 3,285 | 2,221 | 461 | 603 |
| 75% | 76.3 | 3,494 | 2,297 | 519 | 678 |
| 80% | 74.9 | 3,689 | 2,355 | 582 | 752 |
| 85% | 72.1 | 3,920 | 2,399 | 666 | 855 |
| 90% | 70.0 | 3,987 | 2,412 | 690 | 885 |
| 100% | Total: | 4,619 | 2,510 | 921 | 1,188 |

| | | Final Ratings for ACWA Group 6 (Test Scores and IAR Scores) | | | |
|---|---|---|---|---|---|
| Percent of Test-Takers | Final Rating | Cumulative Number of: | | | |
| | | All Races | Whites | Blacks | Hispanics |
| 5% | 97 | 831 | 783 | 23 | 25 |
| 10% | 92 | 1,663 | 1,543 | 52 | 68 |
| 15% | 88 | 2,535 | 2,303 | 106 | 126 |
| 20% | 85 | 3,372 | 2,999 | 172 | 201 |
| 25% | 82 | 4,290 | 3,736 | 270 | 284 |
| 30% | 79 | 5,370 | 4,593 | 394 | 383 |
| 35% | 77 | 6,114 | 5,171 | 493 | 450 |
| 40% | 75 | 6,938 | 5,773 | 607 | 558 |
| 45% | 73 | 7,700 | 6,321 | 729 | 650 |
| 50% | 71 | 8,592 | 6,926 | 885 | 781 |
| Passers | 70 | 8,996 | 7,203 | 945 | 848 |
| | Total: | 17,336 | 11,198 | 3,239 | 2,899 |

Customs Inspector, GS-1890 (continued):

|  | Job-Specific Test Data | | | | |  | Final Ratings for ACWA Group 6 (Test Scores and IAR Scores) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Test-Takers | Written Score | Cumulative Percentage of: | | | |  Percent of Test-Takers | Final Rating | Cumulative Percentage of: | | | |
|  |  | All Races | Whites | Blacks | Hispanics |  |  | All Races | Whites | Blacks | Hispanics |
| 5% | 95.8 | 212 | 202 | 5 | 5 | 5% | 97 | 831 | 783 | 23 | 25 |
| 10% | 93.7 | 446 | 414 | 14 | 18 | 10% | 92 | 1,663 | 1,543 | 52 | 68 |
| 15% | 91.6 | 707 | 637 | 28 | 42 | 15% | 88 | 2,535 | 2,303 | 106 | 126 |
| 20% | 90.2 | 942 | 830 | 42 | 70 | 20% | 85 | 3,372 | 2,999 | 172 | 201 |
| 25% | 88.8 | 1,210 | 1,042 | 72 | 96 | 25% | 82 | 4,290 | 3,736 | 270 | 284 |
| 30% | 87.4 | 1,419 | 1,213 | 87 | 119 | 30% | 79 | 5,370 | 4,593 | 394 | 383 |
| 35% | 86.0 | 1,672 | 1,388 | 127 | 157 | 35% | 77 | 6,114 | 5,171 | 493 | 450 |
| 40% | 85.3 | 1,807 | 1,467 | 142 | 198 | 40% | 75 | 6,938 | 5,773 | 607 | 558 |
| 45% | 84.0 | 2,090 | 1,628 | 194 | 268 | 45% | 73 | 7,700 | 6,321 | 729 | 650 |
| 50% | 82.6 | 2,369 | 1,798 | 236 | 335 | 50% | 71 | 8,592 | 6,926 | 885 | 781 |
| 55% | 81.9 | 2,519 | 1,872 | 266 | 381 | Passers | 70 | 8,996 | 7,203 | 945 | 848 |
| 60% | 80.5 | 2,768 | 1,995 | 332 | 441 |  |  |  |  |  |  |
| 65% | 79.1 | 3,036 | 2,125 | 396 | 515 |  |  |  |  |  |  |
| 70% | 77.7 | 3,285 | 2,221 | 461 | 603 |  |  |  |  |  |  |
| 75% | 76.3 | 3,494 | 2,297 | 519 | 678 |  |  |  |  |  |  |
| 80% | 74.9 | 3,689 | 2,355 | 582 | 752 |  |  |  |  |  |  |
| 85% | 72.1 | 3,920 | 2,399 | 666 | 855 |  |  |  |  |  |  |
| 90% | 70.0 | 3,987 | 2,412 | 690 | 885 |  |  |  |  |  |  |
| 100% | Total: | 4,619 | 2,510 | 921 | 1,188 | Total: |  | 17,336 | 11,198 | 3,239 | 2,899 |

Customs Inspector, GS-1890 (continued):

<u>Black and Hispanic Representation Rates, as a Percentage of the White Rate</u>

| Percent of Test-Takers | <u>Job-Specific Test Scores</u><br>Representation Rates for Blacks and Hispanics, as <u>Percentage of White Rates</u><br>Blacks | Hispanics | <u>Final Ratings</u><br><u>(Test Scores and IAR Scores)</u><br>Representation Rates for Blacks and Hispanics, as <u>Percentage of White Rates</u><br>Blacks | Hispanics |
|---|---|---|---|---|
| 5% | 6.7% | 5.2% | 10.2% | 12.3% |
| 10% | 9.2% | 9.2% | 11.7% | 17.0% |
| 15% | 12.0% | 13.9% | 15.9% | 21.1% |
| 20% | 13.8% | 17.8% | 19.8% | 25.9% |
| 25% | 18.8% | 19.5% | 25.0% | 29.4% |
| 30% | 19.5% | 20.7% | 29.7% | 32.2% |
| 35% | 24.9% | 23.9% | 33.0% | 33.6% |
| 40% | 26.4% | 28.5% | 36.4% | 37.3% |
| 45% | 32.5% | 34.8% | 39.9% | 39.7% |
| 50% | 35.8% | 39.4% | 44.2% | 43.6% |
| 55% | 38.7% | 43.0% | 45.4% | 45.5% |
| 60% | 45.4% | 46.7% | | |
| 65% | 50.8% | 51.2% | | |
| 70% | 56.6% | 57.4% | | |
| 75% | 61.6% | 62.4% | | |
| 80% | 67.4% | 67.5% | | |
| 85% | 75.7% | 75.3% | | |
| 90% | 78.0% | 77.5% | | |

Customs Inspector, GS-1890 (continued):

| Percent of Test-Takers | Comparative Representation Rates for Blacks/Whites and Hispanics/Whites at Particular Rank Levels on the ACWA, as a Multiple of the Comparative Rates for Blacks/Whites and Hispanics/Whites on the <u>Job-Specific Test Scores for the Corresponding Rank</u> | |
|---|---|---|
| | Blacks/Whites | Hispanics/Whites |
| 5% | 1.505 | 2.358 |
| 10% | 1.264 | 1.853 |
| 15% | 1.328 | 1.517 |
| 20% | 1.438 | 1.453 |
| 25% | 1.327 | 1.508 |
| 30% | 1.517 | 1.554 |
| 35% | 1.322 | 1.407 |
| 40% | 1.378 | 1.309 |
| 45% | 1.228 | 1.142 |
| 50% | 1.235 | 1.106 |
| 55% | 1.171 | 1.058 |

Customs Inspector, GS-1890 (continued):

Percentage Improvement in Comparative Representation Rates for Blacks/Whites and for Hispanics/Whites on the ACWA Final Ratings, at Particular Rank Levels, Which Would Eliminate All Racial Differences in Representation Rates at Those Rank Levels

| Percent of Test-Takers | Blacks/Whites | Hispanics/Whites |
|---|---|---|
| 5% | 984.7% | 810.8% |
| 10% | 858.3% | 587.4% |
| 15% | 628.4% | 473.2% |
| 20% | 504.3% | 386.3% |
| 25% | 400.2% | 340.6% |
| 30% | 337.2% | 310.5% |
| 35% | 303.4% | 297.5% |
| 40% | 275.1% | 267.8% |
| 45% | 250.8% | 251.8% |
| 50% | 226.4% | 229.6% |
| 55% | 220.5% | 219.9% |

## Certificate of Service

I certify that I have this 10th day of July, 1991, served a copy of plaintiffs' foregoing Report to the Court on the Use of Individual Achievement Record Scores as Part of the Administrative Careers With America Examinations, and on Presently Known Information with Respect to a Comparison of These Examinations With the Former, Job-Specific Examinations on counsel of record for the defendants, and on counsel of record for amicus herein, by messenger, addressed to them as follows:

> John R. Tyler, Esq.
> Federal Programs Branch
> Civil Division
> U.S. Department of Justice
> 10th and Pennsylvania N.W.
>     Room 3724
> Washington, D.C. 20530
>
> James S. Green, Esq.
> Associate General Counsel
> U.S. Office of Personnel Management
> 1900 E Street N.W.
>     Room 7450
> Washington, D.C. 20415
>
> Clint D. Wolcott, Esq.
> National treasury Employees Union
> 1730 K Street N.W.
>     Suite 1101
> Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
Attorney for Plaintiffs

JUL 10 1991

RECEIVED
JUL 10 1991
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

CO-384 New 2/84 ⊕

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON, D.C. 20001

# NOTICE

*Angel T. Luevano,*
Plaintiff(s) *et al.*

vs.

C.A. No. _79-271 JHG_

*Constance Newman,*
Defendant(s) *et al.*

The following material has been filed and assigned these numbers on the docket sheet:

| Number(s) assigned: | Material | Filing Date |
|---|---|---|
| | Deposition(s) | |
| | Transcripts | |
| — | (Bulky Pleadings) | *1-22-93* |
| | Exhibits | |
| | Sealed Material | |

THIS NOTICE IS PLACED IN THE FILE
JACKET TO ACCOUNT FOR NUMBERS ASSIGNED
TO MATERIAL FILED IN THIS CASE BUT
NOT FILED IN THE CASE JACKET

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
Plaintiff, )
)
v. )  Civil Action No. 79-0271 (JHG)
)
CONSTANCE NEWMAN, Director, )
U.S. Office of Personnel )
Management, et al., )
)
Defendants. )
_____)

FILED

MAR 04 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## ORDER

Upon consideration of the joint request for a hearing in this case, it is hereby

ORDERED that there shall be a hearing on the appeals by five claimants under paragraph 21 of the amended consent decree on April 1, 1993 at 4:00 p.m. Eastern Standard Time. Janie L. Collins, Nancy L. Graves, and Beverly Cummings Smith, who have not requested to participate by telephone, shall be present or shall have counsel present in the courtroom at that time. Although the Court does not normally honor requests of parties to participate in hearings via telephone, it will allow Beverly J. Brown and Mary McClarity to do so in this case. Ms. Brown and Ms. McClarity must be available to participate via telephone on the date of the hearing at 4:00 p.m. Eastern Standard Time and a reasonable amount of time thereafter, and the Court will not reschedule this hearing if they, or any other claimants, are unavailable at that time. Should a claimant not participate in the April 1, 1993 hearing, the Court will resolve her appeal on the documentation attached to the joint

request filed January 22, 1993.

It shall be the responsibility of plaintiffs' counsel to forward copies of this Order to the five claimants.


IT IS SO ORDERED.
March 4 , 1993

_Joyce Hens Green_
JOYCE HENS GREEN
United States District Judge

2

ANGEL G. LUEVANO, et al., )
)
   individually and on behalf of )
   all others similarly situated, )
)
                Plaintiffs, )
)
v. ) C. A. No. 79-0271 (JHG)
)
CONSTANCE NEWMAN, Director, ) FILED
   U.S. Office of Personnel )
   Management, et al., )
) MAR 26 1993
)
                Defendants. )

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' SUBMISSION OF ADDITIONAL DOCUMENT AND
ATTACHMENTS FROM JANIE L. COLLINS, A CLASS MEMBER
SEEKING RELIEF UNDER ¶ 21 OF THE CONSENT DECREE

Counsel for plaintiffs have received the attached

document and attachments from Janie L. Collins, a class member in

this case who is appealing from the decision of counsel on both

sides that she does not have a good claim for relief under ¶ 21

of the Amended Consent Decree. Ms. Collins has requested that

this information be provided to the Court. It is attached.

Respectfully submitted,

RICHARD T. SEYMOUR
Lawyers' Committee for Civil
  Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444

By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

                    Attorneys for Plaintiffs

Dated: March 25, 1993

## Certificate of Service

I certify that I have this 25th day of March, 1993, served a copy of Plaintiffs' Submission of Additional Document and Attachments from Janie L. Collins, a Class Member Seeking Relief under ¶ 21 of the Consent Decree on counsel of record for the defendants, on counsel of record for amicus herein, and on Ms. Collins by first-class mail, postage prepaid, addressed to them as follows:

John R. Tyler, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
    Room 3724
Washington, D.C. 20530

Clint D. Wolcott, Esq.
National Treasury Employees Union
1730 K Street N.W.
    Suite 1101
Washington, D.C. 20006

Ms. Janie L. Collins
6638 McArthur
Apt. 25
Oakland, California 94605

RICHARD T. SEYMOUR
Bar No. 28100
    Attorney for Plaintiffs

3-15-93

Mr. Seymour:

Please submit the enclosed papers to the Court for me. I will be unable to attend the hearing.

Thank you.

Very truly yours,

James Collins

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, at. al.,           )
                                     )
        Plaintiff,                   )        Civil Action NO. 79-0271 (JHG)
                                     )
    v.                               )              F I L E D
                                     )
CONSTANCE NEWMAN, Director,          )              MAR 26 1993
U.S. OFFICE of Personnel             )
Management, at. al.,                 )
                                     )        CLERK, U.S. DISTRICT COURT
        Defendants.                  )        DISTRICT OF COLUMBIA
                                     )

DECLARATION OF JANIE L. COLLINS

I, JANIE L. COLLINS, do declare under penalty of perjury that:

1. I came into possession of an article regarding Luevano
v. Camplell, Civil # 79-0271, in the Jet magagine. (The original
article is attached hereto and marked exhibit "A" and made a part
hereof by reference.

2. After reading the sentence "Additional information about
this settlement can also be obtained by visiting any OPM area office
or Federal Job Information Center " in the above-mentioned magazine.
I immediately went to EEOC office in San Francisco, Ca. A clerk
read the sentence and indicated to me that I did   qualify for
funds and instructed me to go to OPM at 450 Goldengate Ave. in
San Francisco, Ca.

3. I reported to OPM regarding the matter.

4. During the meantime, I wrote a letter to the U.S. District
Court in Washington, D.C. regarding the matter.

5. I received a letter from C. AppLegate of OPM dated 5-21-81,
which informed me that I did not qualify for funds. A copy of the

letter from her is attached and marked exhibit "B". The original
is already in the court's file in this matter.

6. During said period of time, I suffered severe emotional
stress and thought that I was making the right decision. A copy
of medical reports are attached hereto as exhibit "C" and made a
part hereof by reference. POssibly original of the reports are on
file already.

7. I am unable to attend the hearing because of illness.

8. I am not aware of the appendix "B" that is referred to
in the first ruling of this case as mentioned in a letter dated
May 18,1992. In the letter it is stated,"While you stated in
your deposition that you had been misled by a May 21, 1981, letter
to you from Christine Applegate of the office of Personnel Manage-
ment into thinking that you could not receive any money in this
case, (Dep. Tr. 32-33), you did receive the detailed notice for
class members before receiving her Letter, (Dep, Tr. 29,
31-32), and this Notice stated clearly that you had to bring
yourself 'to the attention of the Court immediately' if you wanted
to file a claim under ¶a1 of the Consent Decree....You obtained
a copy of the Consent Decree from the Federal Job Information
Center in San Francisco, after receiving Ms. Applegate's May 21,
1981 letter to you." (See exhibit "D" attached hereto marked so
for reference).

9. Had a federal employee not lied to me, I would have
gotten my share of the money because I went to the federal depart-
ment as was told to do by the article in the Jet magazine.
(Exhibit "A")

10. The consent degree labeled exhibit "E" was a form of information that was out *after* the Jet magazine article. I still believed Applegate and felt that the consent decree was mistaken. I believe that I am entitled to feel that way because of a letter from the government office. The consent decree was a document that was lying around and I happened to pick it up. I also felt that Applegate was qualified to represent the truth to me more so that some copy of a consent decree that could have been composed by someone who was just playing around. As I have prior said, I cannot remember the consent decree at this date. It is possible that I mistaken the consent decree for the Jet article when I talked in the hearing by phone. The consent decree was not in my presence on the phone nor was the Jet article that I recently came *across* again. I do not remember any one giving me a copy of the consent decree. That is the reason that I believe that I picked it up in the office if I submitted it for the hearing.

11. I was imprisoned in June 1981 at San Francisco General Hospital Psychiatric Department. I was so upset over the matter. My home *was later* searched by U. S. Secret Service agents who stole most of my valuables. I was again arrested by U. S. Secret Service agent in December 1981 because I called the police department about my being fundled over by officer Ballentine and that made them angry. So you see, I had a lot to encounter with. I am sure that I did not get the consent decree immediately after I received Applegate's letter if I received the consent decree. I don't remember. I do not have a copy of the hospital records but attached

-3-

is a copy of the jail records. I do not have the original and time will not permit me to get it from the clerk of court because they will have to order it due to the length of time that it has been since the occurrance. Also, I can get the hospital records at a much later date. Of course, there is no reason for me to lie and assign a court number to the papers because I am sure that any computer will show it out here in California and you can get it. A copy of the record is attached hereto and labeled as exhibit " F " for reference.

11. The attorneys that I saw were for issues that do not pertain to cases that are long distance and they did not handle my case. I saw no attorney after the imprisonment of me for any civil matter. Also, had I been able to see an attorney regarding this case, there is no proof that the attorney would have helped me or told me my rights. If I knew an attorney today, I would employ him to handle this appeal.

13. The information that is given in paragraph 8, of this writing is not true that I received a "detailed notice" indicating that I must present myself "to the attention of the Court immediately". The Jet article indicated that class members could contact the local Federal Job Information Center. I never received the consent decree prior to writing to C. Applegate or seeing her.

14. Prior to this writing, there is no evidence of the detail notice that Mr. Seymour is referring to. The Jet magazine article is the detail notice.(Exhibit "A")

15. I feel that I have been harmed and would like for this

-4-

appeal to be considered as a law suit on my behalf to award me pay in an amount of $50,000, or a reasonable portion thereof.

16. The information clearly shows that I was prevented from continuing with my claim for a considerable length of time after discovering that a government employee lied to me about the issue. If I am not entitled to back pay of at least $50,000, or a reasonable portion thereof, I ask that I be awarded the $3,000 as a class member.

DATED: March 15, 1993    In Oakland, California



MAHIR ABDUL-HAQQ
Comm. # 979208
NOTARY PUBLIC - CALIFORNIA
Alameda County
My Comm. Expires Nov. 29, 1996

BY: _JANIE L. COLLINS_
66 38 Mc Arthur #25
OAKLAND, CA. 94605
(510) 635-7018

I hereby certify that I have read the foregoing declaration and that all of the statements are true.

JANIE L. COLLINS

Subscribed and sworn to before me that 15th day of March 1993 .

MAHIR ABDUL-HAQQ
Comm. # 979208
NOTARY PUBLIC - CALIFORNIA
Alameda County
My Comm. Expires Nov. 29, 1996

Notary Public in and for the
STATE OF CALIFORNIA

My Commission expires Nov. 29, 1996

-5-

# NOTICE TO ALL BLACKS, AND TO ALL HISPANICS, WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL AND ADMINISTRATIVE CAREER EXAMINATION (PACE) FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS, ON OR AFTER MAY 19, 1975

This is to notify you that a class action lawsuit, *Luevano* v. *Campbell*, Civil Action No. 79-0271 (D.D.C.), involving this examination has been settled, and to inform you how to obtain more detailed information, so that you can decide whether to file an objection to the settlement, and can take advantage of the benefits available to you under the settlement.

The lawsuit was filed in the United States District Court for the District of Columbia under Title VII of the Civil Rights Act of 1964, and alleged that the PACE discriminated against Blacks and against Hispanics (persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin regardless of race). The U.S. Office of Personnel Management ("OPM") denies this allegation. Under the terms of the settlement, the use of the PACE for hiring will be phased out over the next three years, and new examining procedures will be developed for job categories currently covered by the PACE. The government is obligated for several years to use its best good-faith efforts to eliminate any adverse impact as to Blacks and Hispanics caused by use of the PACE, and by the new examining procedures. The four named plaintiffs will receive a total of $35,000 in back pay, and help in obtaining Federal jobs in which they are interested. Class members with pending charges or cases of discrimination against OPM because of the use of the PACE for hiring will also be entitled to $3,000 and help in obtaining suitable Federal jobs. Other class members will not receive back pay. The government has agreed to pay attorneys' fees to counsel for plaintiffs, but

the amount is not yet resolved.

Each class member is entitled to obtain more information about the settlement by writing to the following address:

U.S. Office of Personnel Mgt.
Office of General Counsel
1900 E Street, N.W.
Washington, D.C. 20415

Additional information about this settlement can also be obtained by visiting any OPM area office or Federal Job Information Center.

Class members may file objections to the Decree, if they believe that the settlement is unfair to the class, or to any part of the class. Any objection must be in writing, must refer to the name and number of this case (*Luevano* v. *Campbell*, C.A. No. 79-0271), must state the grounds on which the objection is based, must have attached copies of any document relied upon (except for this Notice) ; and must be received by the Clerk of the U.S. District Court, U.S. Court House, Washington, D.C. 20001, by the close of business on MAY 1, 1981. Objections not clearly identified by the name and number of this case or received after that date will not be considered. Any class member who files an objection may be required to attend a hearing at Courtroom No. 18 at the U.S. Court House in Washington, D.C., at 10:00 a.m. on MAY 27, 1981, unless he or she lives 1,000 or more miles from Washington, D.C., and asks to be excused because of the hardship in traveling such a distance, or unless he or she requests to be excused, and is excused, on other grounds of personal hardship. (The Court may schedule hearings in other cities, if appropriate.)
JAMES F. DAVEY
Clerk, U.S. District Court

# This Week In Black History

*April 19, 1960*—The home of Z. Alexander Looby, Nashville, Tenn., City Councilman and NAACP lawyer, was destroyed by a dynamite bomb. The bomb damaged several other homes in the neighborhood and blew out 147 windows at Meharry Medical College. Several students were cut by flying glass. Looby had been chief counsel for 153 students arrested during two months of sit-in protests against lunch-counter segregation. Looby was not intimidated and continued as counsel for the students.

*April 21, 1940*—James C. Napier, banker and member of the Nash-



*James C. Napier*

ville City Council and founder of the Citizens Savings Bank and Trust Co., died in Nashville at the age of 65. Napier was Registrar of the Treasury under President William H. Taft.

*April 23, 1872*—Charlotte E. Ray, the first Black woman lawyer, was admitted to practice before the Supreme Court of the District of Columbia. She was a graduate of the Howard University School of Law.

**Parks Tribute:** Rosa Parks (l), mother of the civil rights movement, accepts a portrait of herself from actress Marlo Thomas at a tribute sponsored by the District 1199 of the National Union of Hospital and Health Care Employes at New York's Lincoln Center. Mrs. Parks' refusal to yield her seat to a White man and move to the back of a Montgomery, Ala., bus in 1955 sparked the civil rights movement led by the late Dr. Martin Luther King Jr.



*Exb. A*
*CA: 79-271 JHG*

FILED

MAR 26 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**Legal Notice**     **Legal Notice**     **Legal Notice**

## NOTICE TO ALL BLACKS, AND TO ALL HISPANICS, WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL AND ADMINISTRATIVE CAREER EXAMINATION (PACE) FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS, ON OR AFTER MAY 19, 1975

This is to notify you that a class action lawsuit, *Luevano* v. *Campbell*, Civil Action No. 79-0271 (D.D.C.), involving this examination has been settled, and to inform you how to obtain more detailed information, so that you can decide whether to file an objection to the settlement, and can take advantage of the benefits available to you under the settlement.

The lawsuit was filed in the United States District Court for the District of Columbia under Title VII of the Civil Rights Act of 1964, and alleged that the PACE discriminated against Blacks and against Hispanics (persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin regardless of race). The U.S. Office of Personnel Management ("OPM") denies this allegation. Under the terms of the settlement, the use of the PACE for hiring will be phased out over the next three years, and new examining procedures will be developed for job categories currently covered by the PACE. The government is obligated for several years to use its best good-faith efforts to eliminate any adverse impact as to Blacks and Hispanics caused by use of the PACE, and by the new examining procedures. The four named plaintiffs will receive a total of $35,000 in back pay, and help in obtaining Federal jobs in which they are interested. Class members with pending charges or cases of discrimination against OPM because of the use of the PACE for hiring will also be entitled to $3,000 and help in obtaining suitable Federal jobs. Other class members will not receive back pay. The government has agreed to pay attorneys' fees to counsel for plaintiffs, but the amount is not yet resolved.

Each class member is entitled to obtain more information about the settlement by writing to the following address:

U.S. Office of Personnel Mgt.
Office of General Counsel
1900 E Street, N.W.
Washington, D.C. 20415

Additional information about this settlement can also be obtained by visiting any OPM area office or Federal Job Information Center.

Class members may file objections to the Decree, if they believe that the settlement is unfair to the class, or to any part of the class. Any objection must be in writing, must refer to the name and number of this case (*Luevano* v. *Campbell*, C.A. No. 79-0271), must state the grounds on which the objection is based, must have attached copies of any document relied upon (except for this Notice); and must be received by the Clerk of the U.S. District Court, U.S. Court House, Washington, D.C. 20001, by the close of business on MAY 1, 1981. Objections not clearly identified by the name and number of this case or received after that date will not be considered. Any class member who files an objection may be required to attend a hearing at Courtroom No. 18 at the U.S. Court House in Washington, D.C., at 10:00 a.m. on MAY 27, 1981, unless he or she lives 1,000 or more miles from Washington, D.C., and asks to be excused because of the hardship in traveling such a distance, or unless he or she requests to be excused, and is excused, on other grounds of personal hardship. (The Court may schedule hearings in other cities, if appropriate.)

JAMES F. DAVEY
Clerk, U.S. District Court

*Exhibit "A"*

United States of America
# Office of
# Personnel Management

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To  FR:PT:TP:bc                    May 21, 1981                    Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102

FILED

MAR 26 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE examination.

Only the original complainants in the plaintiff class of Luevano vs. Campbell were entitled to monetary compensation and job offers in which they are interested. As a class member, you had the right to file an objection to this settlement if you believed that it was not fair to the class, or to some particular part of the class. To be considered, written objections had to be received by the U.S. District Court in Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions of the settlement which may be of interest to you. If you fill out the attached form you will be put on a mailing list and be informed of the opportunity to apply for Federal jobs under new alternative examining procedures which are being developed. You will also be informed of the opportunity to take training courses intended to provide assistance in preparing for future examinations of the PACE during the interim period while the examination is being phased out. Mailings on these opportunities will take place every six months until the last alternative examining procedure is put into effect. There will be no charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at all Office of Personnel Management Federal Job Information Centers. The Federal Job Information Center closest to you is located at 450 Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

Sincerely,

Christine M. Applegate, Chief
Professional/Trades & Crafts Section

Attachment

Exhibit "B"
CA 79-271 JHG

FILED
MAR 26 1993
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

SAN FRANCISCO GENERAL HOSPITAL

*Efb. C*
*CA: 79-271*   *8  3  79*
*JHG*

Outpatient
PROGRESS RECORD
FHC

COLLINS, JANE
B-613472  2  11-26-43  F
308 EDDY APT 314
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
FHC-21119-61                    A-5613609 Rev.

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE / S-SUBJECTIVE  O-OBJECTIVE  A-ANALYSIS  P-PLANS |
|---|---|---|
| 8-3-79 | | S  C/o back pain, right knee hurting & chest pain |
| | | Wt 195½    B/P ① ζ 130/80    P 80 |
| 8/3 | | #3 Knee / #4 Back pain |
| | S- | Feels no improvement in s×s over past wk. Taken Tylenol č cod. prn, heat pad, firm mattress but s×s persist, though not appreciably worsened either. |
| | O- | ō Δ from 7/27 exam — grossly unreu spine & knee exam |
| | A- | Discussed present findings č pt, and reviewed prior Ortho Clinic app'ts (similarly negative w/u — incl C-spine, T & L spine all unrl However, in view of subjective level of distress and anxiety, do believe continued "disability" is warranted unt'l pt. improved. |
| | P- | ① Disability form completed extended thru 9/2/79 |
| | | ② Pt states she has app't č Job Rehab program in SF early next wk — am encouraging same |
| | | ③ No medication — č/o — |

Exhibit JHG #142

# SAN FRANCISCO GENERAL HOSPITAL

**Outpatient**
PROGRESS RECORD

5 16 00

COLLINS JAMIE
B-613472-2
537 JONES ST 94102
FHC 21118-C1
9/28/80

F 910 Rev. 7-7

(P1)

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE: S – SUBJECTIVE O – OBJECTIVE  A – ANALYSIS  P – PLANS |
|---|---|---|
| 5-16-80 | | S. Painful left arm & hand |
| | | Wt. 200 lbs.  B/P ④ s 130/84  P 90 |
| | | L. H. Lzal. N.W. 2 |
| | | |
| | | Transfer of care Note |
| | | |
| | | #1 HCM |
| | S- | 37 y.o. B ♀ c̄ multiple somatic complaints |
| | | (see below re: specifics). |
| | O- | PAP 1/79 Class I Neg |
| | | G.C. (cervix) 1/79 : Neg. |
| | | PPD : not documented |
| | A- | Clinically stable 37 y.o. B ♀ c̄ many |
| | | complaints (No acute Δ), multiple |
| | | extensive subspecialty w/u's (see below) |
| | | and possible sig nef. emotional/psychogenic |
| | | contribution to her complaints |
| | P- | ① needs PPD, VDRL @ opportune time. |
| | | |
| | | #2 Coccyx pain / also g. knees, shoulder, ha |
| | S- | onset coccygeal pain "after lifting heavy |
| | | mail bag @ post office 1966"; aggravated (?) |
| | | by fall from chair 1973. |
| | O- | xrays: thoracic, sacral, coccyx, thoracolumbar |
| | | (1/29/80) → all WNL. |

Exhibit 4C 4/



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.
TELEX: 205662 SAP UR
FACSIMILE: (202) 842-3211 or (202) 842-0683

May 18, 1992

FILED

MAR 26 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Ms. Janie L. Collins
537 Jones Street
Apt. 8573
San Francisco, California 94102

   Re: <u>Luevano v. Newman</u>

Dear Ms. Collins:

   You have filed a form requesting the Court to rule on
your claim for relief under paragraph 21 of the Amended Consent
Decree in this case. On November 25, 1987, I wrote to you with
the agreement of the government, stating the following agreed
objections to your claim. References to "Dep.Tr." refer to the
transcript of your deposition:

   You did not file a claim under ¶ 21 of the Consent
Decree until your October 11, 1983 letter to the Clerk of
Court. (Dep.Tr. 28-29). The references in that letter to
having written to the Court earlier actually referred to the
card you sent to the Office of Personnel Management to be
placed on the mailing list under ¶ 22 of the Consent De-
cree. (Dep.Tr. 26-27, 43-44; see the copy of the card which
is p. 8 of the attachments to the transcript of your deposi-
tion). While you stated in your deposition that you had
been misled by a May 21, 1981 letter to you from Christine
Applegate of the Office of Personnel Management into think-
ing that you could not receive any money in this case,
(Dep.Tr. 32-33), you did receive the detailed notice for
class members before receiving her letter, (Dep.Tr. 29,
31-32), and this Notice stated clearly that you had to bring
yourself "to the attention of the Court immediately" if you
wanted to file a claim under ¶ 21 of the Consent Decree.
See p. 3 of the Notice. You obtained a copy of the Consent
Decree from the Federal Job Information Center in San Fran-
cisco, after receiving Ms. Applegate's May 21, 1981 letter
to you. (Dep.Tr. 40-41). You read it, but did not do
anything about filing a ¶ 21 claim after the read the Con-
sent Decree. (Dep.Tr. 40-41). You had an attorney working
on another matter for you at the time, but did not tell him
about the Notice or show it to him. (Dep.Tr. 34-35). In
1983, you went through the Notice again, decided that you
would make a claim under ¶ 21 of the Consent Decree, and

Exhibit " D. "
CA: 79-271 JHG

sent your October 11, 1983 letter to the Court.
(Dep.Tr. 36-37).

Accordingly, your September 1980 complaint to the
Office of Personnel Management about racial discrimination
against blacks in the use of the PACE cannot be considered
in this case, because your claim under ¶ 21 was not filed on
time.

Your appeal form states that you were misled by a government
employee as to your rights, and that any default should be
excused because of illness. In your deposition and in some of
your papers, you makes accusations about various government
agencies stealing your papers, so that you cannot back up your
claim of having filed an administrative complaint with OPM.

The government has agreed with us that we should ask
the Court to hold the hearing by telephone, so that none of the
claimants will have to travel to Washington. If you wish to come
to Washington to be present at the hearing, of course you can do
so. We expect that the hearing would take place sometime between
Monday and Friday, at a time between 9:00 A.M. and 5:00 P.M.,
Eastern Daylight Time. This would be from 12:00 noon to 8:00
P.M. Pacific Daylight Time.

I have enclosed a form for you to use to state whether
you want to (a) come to the hearing in person; (b) participate in
the hearing by telephone; or (c) just ask the Court to make a
decision based on the papers, without your participation in the
hearing. We will ask for a hearing date and time when we get the
answers back.

If you want to participate by telephone, you will need
to give us the telephone numbers where you can be reached during
the likely hearing time. Please include any extension numbers,
or any other information necessary to help us reach you.

I have enclosed a business reply envelope. You do not
have to pay any postage to send your form back to me. To sepa-
rate this case from the other cases in which people send us mail,
please write "LUEVANO" on the front of the envelope where it will
not interfere with the address.

Sincerely,

Richard T. Seymour

Enclosure

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAR 26 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　Civil Action No. 79-0271 *JHG*
　　　　　　　　　　　　　　　　　)
ALAN CAMPBELL, Director,　　　　　)
Office of Personnel　　　　　　　　)
Management,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)
_____)

FILED

FEB 26 1981

JAMES F. DAVEY, Clerk

NOTICE TO ALL BLACKS, AND TO ALL HISPANICS,
WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL
AND ADMINISTRATIVE CAREER EXAMINATION (PACE)
FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS
ON OR AFTER MAY 19, 1975

　　　　This Notice is to provide you with the information you
need about the settlement of this lawsuit, and how this settlement
may affect your rights, so that you will be able to take advantage
of the rights given you by the settlement or to file an objection,
if you believe that the settlement is unfair to the class or to
any particular part of the class.

　　　　This lawsuit was filed in the U.S. District Court for the
District of Columbia in January 1979, to enforce the provisions of
Title VII of the Civil Rights Act of 1964. The Complaint alleged
that the U.S. Office of Personnel Management ("OPM") had violated
Title VII of the Civil Rights Act of 1964 by using its
Professional and Administrative Career Examination ("PACE") to
test applicants for approximately 118 entry-level Federal job
categories. OPM's Answer to the Complaint denied that its use of
this test was unlawful.

　　　　This lawsuit has now been settled. The Consent Decree
containing the settlement has been given preliminary approval by
the Court, so that notice of the settlement could be provided to
class members and class members could decide whether they want to

*Exhibit "E" 1 of 2*

...is determined in an enforcement proceding that the examining
procedure has not been properly validated the agency shall be
liable for full relief under Title VII.

The special programs in question include the Outstanding
Scholar program, the College Co-operative Student program, a
bilingual/bicultural certification program, a training program to
help class members who will be taking the PACE in the future,
special recruiting programs targeted at PACE job categories, and
similar programs. If these special programs turn out to be
inadequate to accomplish their purpose in a practical manner, new
programs can be negotiated.

The obligations of agencies to use these special programs to
overcome adverse impact can be enforced under the Decree. There
are detailed provisions governing such situations, backed up by
reporting provisions which guarantee that plaintiffs will have the
necessary information to keep track of these agencies' progress
under the Decree. Class members who believe that they may have
been harmed by a violation of the Decree may also bring their
claims to the plaintiffs' attention, and ask plaintiffs to
prosecute their claims throught the enforcement provisions of the
Decree. If plaintiffs decide not to handle such a claim under the
enforcement provisions of the Decree, the class member may still
proceed with his or her own charge of discrimination or lawsuit.

While this case does not include the use of the PACE for
promotional purposes by some agencies, part of the settlement in
this case requires that all agencies immediately stop using the
PACE for such purposes.

Under the settlement, the four named plaintiffs will
receive a total of $35,000 in back pay among them. Any class
members who have filed charges of discrimination against OPM,
complaining of discrimination in OPM's implementation or use of
the PACE, will be entitled to receive $3,000 in settlement of
their back pay claims if they bring themselves to the attention of
the Court immediately. The way to do so is to send a letter to
the Clerk of Court, U.S. District Court, U.S. Court House,
Washington, D. C. 20001. The plaintiffs and the class members

Exhibit "E" 3082



**State of California**

**Department of Justice**

**George Deukmejian**
(PRONOUNCED DUKE-MAY-GIN)

**Attorney General**

August 6, 1982

350 McALLISTER STR.
SAN FRANCISCO   94
(415) 557-2544

FILED

MAR 26 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Hon. Clifford C. Porter
Clerk,  Court of Appeal
First Appellate District
4154 State Building
San Francisco, California 94102

Re: Janie L. Collins v. San Francisco Superior Court
People of the State of California
(Real Party in Interest)
No. A018381 (Division One)

Dear Mr. Porter:

By petition filed April 19, 1982 (Petition, Exhibit C), Janie L. Collins sought extraordinary relief from the Superior Court, San Francisco, to compel the Municipal Court, San Francisco, to dismiss a complaint dated November 3, 1981, which alleged the commission of two counts of violations of Penal Code section 69 and two counts of violations of Penal Code section 71 (Municipal Court No. 469647).  The Superior Court denied the petition on May 18, 1982 (Petitioner's Exhibit C).

The Municipal Court file shows that on December 11, 1981, a warrant issued pursuant to the original complaint and was served on Ms. Collins outside the county of San Francisco. She appeared in Municipal Court, Department 16, on December 14, 1981 for arraignment.  There, over objection by the district attorney, she was released on her own recognizance. The matter was set for further action on January 8, 1982.  On that date, the matter was continued to January 27, 1982 and thence to March 16, 1982.

On March 16, 1982, Ms. Collins failed to appear and a bench warrant was issued with bail set at $5,000. On April 22, 1982, an arrest warrant was issued for Ms. Collins for a violation of Penal Code section 1320(2) (violation of the release agreement).  Bail on this latter warrant has been set at $25,000.  These warrants are both outstanding and Ms. Collins is a fugitive from justice.  (Bench Warrant No. 247242; Arrest Warrant No. 248681).

*Exhibit "F" 1 of 3*
*CA: 79-271 JHG*

By her petition to this Court, Ms. Collins seeks
extraordinary relief by way of writ of mandate and/or
prohibition on the grounds that her rights to a speedy trial
have been violated and that no competent attorney is
representing her.  It would seem singularly inapposite for this
Court to grant speedy trial relief to a fugitive from justice.
For this reason, the respondent respectfully submits that the
petition be denied.

Very truly yours,

GEORGE DEUKMEJIAN
Attorney General

W. ERIC COLLINS
Deputy Attorney General

WEC:dnp

cc:  Janie L. Collins
     537 Jones St. 8573
     San Francisco, CA

*I, Janie Collins, was arrested on 12-1-81 and stayed in jail for 14 days before being allowed to see a judge*

F/2

# NOTICE OF NEXT SCHEDULED APPEARANCE

DEPARTMENT 16 , 2nd Floor
Hall of Justice
850 Bryant Street
San Francisco, CA. 94103

Phone: (415) 558-1671

Your Public Defender is:

T. Cannata.

who may be contacted in
Rm. 205, Hall of Justice,
at 553-1671

Your next scheduled appearance is in Municipal/Superior Court
on JAN 22 , 198 2 at 8:45, 9:00, 9:30, 11:30 a.m. (cirle
one)

for [ ] preliminary hearing
    [ ] plea and counsel
    [ ] pretrial
    [ ] trial
    [ ] diversion/probation report
    [ ] motion
    [ ] other _____.

    UNLESS SPECIFICALLY EXCUSED, YOUR APPEARANCE IS REQUIRED.

I was suppose to appear on 1-27-82, not
1-22-82

RECEIVED
MAR 2 6 1993
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

CO-384 New 2/84 ⊕

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON, D.C. 20001

# NOTICE

_Angel H. Luevano,_
### Plaintiff(s)  _et al._

vs.

C.A. No. _79-271_
_JHG_

_Constance Newman, et al._
### Defendant(s)

The following material has been filed and assigned these numbers on the docket sheet:

| Number(s) assigned: | Material | Filing Date |
|---|---|---|
| | Deposition(s) | |
| — | Transcripts | _4-22-93_ |
| | Bulky Pleadings | |
| | Exhibits | |
| | Sealed Material | |

**THIS NOTICE IS PLACED IN THE FILE
JACKET TO ACCOUNT FOR NUMBERS ASSIGNED
TO MATERIAL FILED IN THIS CASE BUT
NOT FILED IN THE CASE JACKET**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )      Civil Action No. 79-0271 (JHG)
                                   )
CONSTANCE NEWMAN, Director,        )
U.S. Office of Personnel           )
Management, et al.,                )      
                                   )
                Defendants.        )      APR 22 1993
_____)
                                          CLERK, U.S. DISTRICT COURT
                                          DISTRICT OF COLUMBIA

**ORDER**

This class action, involving a challenge of the implementation and use of the Professional and Administrative Career Examination ("PACE exam") by the Office of Personnel Management ("OPM"), was resolved through an amended consent decree. Paragraph 21 of the amended consent decree provided that if a class member could verify that he or she took the PACE exam and that he or she had filed a charge of discrimination relating to the PACE exam pursuant to 5 C.F.R. Part 300, 5 C.F.R. Part 713, or successor regulations on or before January 15, 1981, the class member would be entitled to a $3,000 payment and OPM's assistance in obtaining a suitable job with the Federal government.

In an Order issued September 1, 1987, the Court set forth procedures for resolving claims of class members seeking relief under ¶ 21 of the amended consent decree. The Order directed, inter alia, that notice be sent to all claimants whom counsel for both sides had agreed were not entitled to relief under ¶ 21, with individualized statements of the reasons for supporting counsel's

determinations.

Presently pending for the Court's resolution are appeals of counsel's findings of ineligibility filed by Beverly J. Brown, Janie L. Collins, Nancy L. Graves, Mary McClarity, and Beverly Cummings Smith. Counsel filed a joint request for a hearing on all five appeals and expressed the wishes of Ms. Brown and Ms. McClarity to participate in the hearing by telephone. Attached to the joint request were copies of letters sent by counsel to the claimants explaining counsel's reasons for their findings of ineligibility and deposition transcripts and other evidence supporting counsel's conclusions. The Court held a hearing in chambers on April 13, 1993. Counsel for both sides to the litigation were present, and Ms. Brown participated by telephone. Although she had been provided ample notice of the time and date of the hearing, there was no answer when the Court twice telephoned Ms. McClarity at the number which she provided.

At the hearing, Ms. Brown stated that she took the PACE exam twice but indicated that she could not remember whether she ever made a written or oral complaint of racial discrimination against the Civil Service Commission's use of the exam. Transcript at 4. Also at the hearing, counsel informed the Court that Ms. Collins had submitted to them additional evidence in support of her claim. Counsel indicated, however, that the evidence presented no information which Ms. Collins had not previously submitted to them and which had not already been forwarded to the Court.

Upon consideration of all written and oral submissions,

2

including representations made by Ms. Brown via telephone at the hearing, it is hereby

ORDERED that counsel's conclusions that all five claimants are ineligible for relief under ¶ 21 of the amended consent decree are affirmed, primarily for the reasons articulated in counsel's joint request for a hearing. In short, Beverly J. Brown is not eligible for relief because it has not been shown that she ever complained orally or in writing about the PACE exam. Janie L. Collins is not eligible for relief because the complaint that she submitted was untimely and because her untimeliness is not sufficiently justified. Nancy L. Graves is not entitled to relief because it has not been sufficiently shown that she took the PACE exam or that she timely filed a complaint. Mary McClarity is not entitled to relief because it has not been sufficiently shown that she took the PACE exam, and Beverly Cummings Smith is not entitled to relief because the complaint upon which she relies to satisfy one of the prerequisites of ¶ 21 of the amended consent decree did not challenge OPM's use of the PACE exam.

IT IS SO ORDERED.
April 22, 1993

_____
JOYCE HENS GREEN
United States District Judge

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                         Plaintiffs,          )
                                             )
         v.                                   )    C. A. No. 79-0271 (JHG)
                                             )
CONSTANCE NEWMAN, Director,                   )
    U.S. Office of Personnel                  )    **F I L E D**
    Management, et al.,                       )
                                             )    SEP 03 1993
                         Defendants.          )
                                                  Clerk, U.S. District Court
                                                  District of Columbia

## P R A E C I P E

PLEASE TAKE NOTICE, that the office of Washington
counsel for plaintiffs, Richard T. Seymour, is moving effective
September 8, 1993.  My new address, telephone number, and tele-
copy number will be:

                    RICHARD T. SEYMOUR
                    Lawyers' Committee for Civil Rights
                        Under Law
                    1450 G Street, N.W., Suite 400
                    Washington, D.C. 20005

Telephone:          (202) 662-8600

Telecopiers:        (202) 783-0857 and 783-0951

                    Respectfully submitted,

                    RICHARD T. SEYMOUR
                    Lawyers' Committee for Civil Rights
                        Under Law
                    1400 'Eye' Street, N.W., Suite 400
                    Washington, D.C. 20005
                    (202) 371-1212[1]

---

[1] Our current address will be good through September 3,
1993, when the move will begin.

CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
   & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
   Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444


By: _____
      RICHARD T. SEYMOUR
      Bar No. 28100

                Attorneys for Plaintiffs

Dated: August 31, 1993

## Certificate of Service

I certify that I have this 31st day of August, 1993, served a copy of the foregoing Praecipe on counsel of record for the defendants, and on counsel of record for <u>amicus</u> herein, by first-class mail, postage prepaid, addressed to them as follows:

John R. Tyler, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
901 E Street, Room 1074
Washington, D.C. 20530

James S. Green, Esq.
Associate General Counsel
U.S. Office of Personnel Management
1900 E Street N.W.
    Room 7450
Washington, D.C. 20415

Clint D. Wolcott, Esq.
National treasury Employees Union
1730 K Street N.W.
    Suite 1101
Washington, D.C. 20006

RICHARD T. SEYMOUR
Bar No. 28100
        Attorney for Plaintiffs

RECEIVED

SEP 3 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　individually and on behalf of　　)
　　all others similarly situated,　 )
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiffs,　　 )
　　　　　　　　　　　　　　　　　　　)
　　　　　　　v.　　　　　　　　　　　)　　C. A. No. 79-0271 (JHG)
　　　　　　　　　　　　　　　　　　　)
JAMES B. KING, Director,　　　　　　 )　　**FILED**
　　U.S. Office of Personnel　　　　　)
　　Management, et al.,　　　　　　　 )　　OCT 25 1994
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　　 )　　Clerk, U.S. District Court
　　　　　　　　　　　　　　　　　　　　　　District of Columbia

JOINT NOTICE TO THE COURT OF CHANGES IN DEFENDANTS'
EXAMINATION PROCESS FOR EXTERNAL HIRES

　　　　　Plaintiffs and defendants jointly represent that the
following information is correct:

A. Background Information

　　　　　1. Since May 1, 1990, the United States has used the
"Administrative Careers With America" ("ACWA") testing program
for positions formerly filled under the Professional and Adminis-
trative Career Examination ["PACE"] and covered by the Amended
Consent Decree herein.[1]  The ACWA examinations cover six groups
of job categories, and include both a written test and the use of
a biodata instrument called the Individual Achievement Record.
These examinations replaced the previous Schedule B hiring
authority, replaced the alternative examinations previously
developed by the Office of Personnel Management ("OPM") for

─────────────────
　　　　　[1] Positions in the General Accounting Office were not af-
fected by these procedures.  See the November 19, 1981 Order
Modifying List of Defendant Class Members, ¶ 3 at pp. 3-4.

particular job categories formerly subject to the PACE, and replaced the alternative examinations currently used by agencies under OPM's delegations of examining authority.

2. The parties to this action reported to the Court on these developments in their April 30, 1990 Joint Status Report on New Testing Program. Subsequent filings shed additional light on the ACWA examinations.

3. On May 10, 1990, plaintiffs filed their Statement of Position on the Office of Personnel Management's New Testing Program, providing certain statistical information and contending that the ACWA examinations were not alternative examining procedures within the meaning of ¶¶ 7 and 13(a) of the Amended Consent Decree because they were not separate procedures designed specifically to examine for each particular job category, that the implementation of the ACWA did not start running for any job category the five-year period for retention of jurisdiction, and that plaintiffs were willing to negotiate with the defendants a modification of the Consent Decree to start this period of time running if the ACWA examinations were successful in eliminating, or in reducing to the greatest practicable extent, adverse impact against blacks and Hispanics in selections for the positions covered by the Consent Decree. The parties have not found it necessary to request the Court to determine this question.

4. The National Treasury Employees' Union filed suit under the Administrative Procedures Act to challenge the use of biodata as part of the ACWA examinations, and to challenge the

replacement of the sixteen job-specific alternative examining procedures developed to replace the PACE for those occupations. National Treasury Employees' Union v. Newman, C.A. No. 90-1165 (JHG).

5. On July 10, 1991, Plaintiffs filed their Report to the Court on the Use of Individual Achievement Record Scores as Part of the Administrative Careers With America Examinations, and on Presently Known Information with Respect to a Comparison of These Examinations With the Former, Job-Specific Examinations. The Report contained extensive statistical information showing that the inclusion of biodata scores resulted in a modest but meaningful reduction in the disparate impact against blacks and Hispanics resulting from the written tests. Accordingly, plaintiffs stated that they would oppose any effort to remove or restrict the role of the Individual Achievement Record in the Administrative Careers with America examinations. The Report was filed in both this action and in National Treasury Employees' Union v. Newman on behalf of *amicus curiae* Angel Luevano *et al.* After the submission of the Report, the NTEU dropped its opposition to the use of biodata as part of the ACWA.

6. One of the items left open in the July 10, 1991 Report was whether there might be "a different means of using the biodata scores and test scores in order to achieve a greater reduction in disparate impact without compromising whatever validity may be found under the present approach." Report at 2.

7. The defendants' plans for future testing procedures

- 3 -

flow in part from the exploration of this possibility. *See* Part C below.

B. Ending the Use of Central Registers

8. Attachment A to this Joint Report is a copy of a study performed by the United States General Accounting Office as a Report to the Chairman, Subcommittee on the Civil Service, Committee on Post Office and Civil Service, U.S. House of Representatives, entitled FEDERAL HIRING / Testing for Entry-Level Administrative Positions Falls Short of Expectations ("GAO Report"). The general conclusions of the Report are as follows:

a. ACWA is not used very much in filling vacancies:

> During fiscal years 1991 and 1992, agencies filled 2,797 vacancies through ACWA while filling another 19,406 vacancies in occupations covered by ACWA at the GS-5 and GS-7 grade levels through other hiring methods. They have filled another 15,002 vacancies internally at these grade levels by reassigning, transferring, reinstating, or promoting government employees into occupations to which ACWA applies.

GAO Report at 3 (footnote omitted). The defendants represent that, from January to June 1993, out of 4,326 appointments to ACWA occupations, only 104 were made using ACWA registers.

b. Agency officials reported to the GAO that they thought the ACWA hiring process was too slow, compared with the alternatives. While agencies receive registers promptly from OPM, it takes several weeks to contact the candidates, get their résumés, interview them,

and verify their qualifications. Many applicants --
who may have been on the ACWA register for up to a year
-- have lost interest in Federal employment by the time
they are contacted. Some fail to respond to inquiries.
GAO Report at 3-4, 7-9.

c. Agency officials also reported to GAO that they
considered the ACWA hiring process to be too inflexi-
ble, making it difficult for them to find qualified
candidates of their choice. *Id.* at 7, 10-11. Of
particular importance is that agency officials believed
that the inflexibility of ACWA harmed their ability to
meet affirmative-action goals. *Id.* at 11-13.

d. A large majority of the applicants contacted by
GAO and providing comments -- 330 out of 340 commenting
applicants-- do not believe that the ACWA hiring proce-
dures meet their needs, considering it ineffective and
frustrating. *Id.* at 3-4, 13-15.

e. The GAO concluded that the plans of the defen-
dant OPM to end the use of central registers and to
have applicants apply directly for specific vacancies,
along with other steps discussed below, would help cure
these problems. *Id.* at 15-16.

9. As a result, OPM is abolishing its system of central
registers for those occupations covered by the Consent Decree
over which it has jurisdiction, and will instead use a system of
communicating the availability of specific positions so that

- 5 -

those who are interested may apply for those particular positions. OPM or the employing agency will conduct the ACWA or other examination and create a register for that particular vacancy, eliminating the problems of stale applications and vanished interest among applicants, increasing the probability that a person interested in a particular opening will in fact be on the register to be considered for that opening, and allowing agencies to recruit applicants in a more effective manner. This process is called "case-examining." OPM is not by this means changing its policy that the use of ACWA, as opposed to other means of selection, will be at the option of the agency.

10. Plaintiffs do not object to OPM's plans to abolish its central register system and replace it with case-examining, and believe that this change may assist in achieving the goals of the Consent Decree. Plaintiffs reserve their right to challenge agencies' use of particular selection procedures, where plaintiffs can show that the use of any particular selection procedure is inappropriate because it does not assist in achieving the goals of the Consent Decree.

11. The parties will work together to ensure that the system of record-keeping and reporting required by the Consent Decree is modified in appropriate ways to make it possible to determine the presence or absence of adverse impact under the case-examining approach, and to ensure that blacks and Hispanics are not disproportionately excluded from the benefit of agency recruitment efforts. The parties expect that they will be able

to reach agreement on these questions. In the event that they are able to reach agreement, they will propose an amendment to the reporting and record-keeping provisions of the Amended Consent Decree to incorporate the agreement.

12. In the event that the parties cannot reach agreement after substantial consultation, they will request the Court to resolve the matter.

C. Changes in the Examinations

13. The defendants represent that, in addition to the problems cited by the GAO, there are further problems with the quality of the candidates selected from the ACWA. The written test was designed to measure only cognitive abilities, and was not designed to measure additional factors, such as communication skills, which are often important for the job being filled.

14. The defendants also represent the following: They intend to modify the ACWA to provide for rating schedules which may be used with or without the written test, in accordance with the March 1994 document, Proposal to Introduce Case Examining for ACWA Occupations, attached hereto as Attachment B. Rating schedules are a form of written examination which evaluate and numerically rate applicants on their relevant training, education, and/or experience. Rating schedules are currently being used, rather than a form of the ACWA written test, in ACWA Group 7. This group includes numerous positions requiring a degree in a specific field of study, such as Archaeologists, Psychiatrists, and Community Planners. Rating schedules are also frequently

used in competition for entry-level positions such as Nurse, Accountant/Auditor, Engineer, Scientist, and Mathematician. The use of rating schedules will allow agencies to assess a wider range of attributes, including those which do not lend themselves to written tests. In general, rating schedules have less adverse impact on minorities than written tests.

15. Plaintiffs represent the following: The professionally-developed biodata forms of which they are aware tend to have less adverse impact against blacks and Hispanics than most written cognitive-ability tests. This is certainly true of the Individual Achievement Record as compared with the ACWA written tests with which it is used. It is possible that some biodata forms or "rating schedules" might have a greater degree of adverse impact than others, or may have a greater degree of adverse impact than most written cognitive-ability tests, because some items may reward types of education, experience or training to which blacks or Hispanics have had little access while not predicting successful job performance. Plaintiffs do not represent that they have seen this occur in any rating schedule prepared by OPM, but mention this possibility to demonstrate the need for careful professional preparation of the rating schedules.

16. The GAO Report concluded overall "that OPM's suggested modifications to ACWA hiring would alleviate many of the drawbacks that limited agencies' use of ACWA", and thought the changes would benefit both applicants and agencies, but

- 8 -

recommended an expansion of OPM's then plans. *Id.* at 16-17, 18.

17. Plaintiffs do not object to OPM's goal to modify the ACWA examinations with rating schedules, and believe that this change may assist in achieving the goals of the Consent Decree. Plaintiffs reserve their right to challenge particular aspects of the OPM's plan or particular selection procedures, where plaintiffs can show that the use of any particular selection procedure is inappropriate because it does not assist in achieving the goals of the Consent Decree.

18. The potential problems plaintiffs now see include completeness of the information OPM is gathering on job content, the definition of the dividing line between those occupations for which a criterion-related validation study will be performed and those occupations in which a content validation study will be performed, the manner in which content validation studies will be performed, the propriety of a content validation study for some job categories, and any reliance on theories of validity generalization.

19. At the same time, the parties recognize that one of the guiding principles of the Consent Decree is that the parties will in the first instance focus their efforts on co-operation in finding ways to eliminate, or reduce to the greatest practicable extent, problems of adverse impact against blacks and Hispanics while serving the government's interest in the selection of qualified employees, rather than on contests in the first instance over the validity of particular examining procedures. To

- 9 -

the extent that adverse impact is eliminated by particular examining procedures, these questions may never need to be resolved.

20. The parties further recognize that a great deal has been achieved under the Consent Decree without having had to litigate any questions of the validity of an examining procedure. The parties will consult during OPM's implementation of rating schedules, in accordance with this guiding principle.

21. The parties expect that they will be able to reach agreement on those questions which cannot be avoided. In the event that they cannot reach agreement after substantial consultation, they will request the Court to resolve the matter.

D. Information to be Provided to Applicants and Agencies

22. Attachment C is a draft letter OPM has developed to send to applicants who are already on the ACWA registers, informing them of these changes.

23. Attachment D is a draft letter OPM has developed to send to agency personnel officers, informing them of these changes.

24. Attachment E is a draft letter OPM has developed to send to OPM Service Centers across the country, informing them of these changes.

E. Future Reporting

25. Without burdening the Court with excessive detail, the parties will keep the Court informed in general of their progress. In the event that the Court wishes to hold a status

conference to discuss these matters in more detail, the parties
will be happy to attend and answer any questions the Court may
have.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

ERIC H. HOLDER, JR.
United States Attorney

ANNE M. GULYASSY

JOHN R. TYLER
PETER D. COFFMAN

Attorneys, U.S. Department
  of Justice
Civil Division
901 E Street N.W.
Room 1074
Washington, D.C. 20530
(202) 514-2356

Of Counsel:

JAMES S. GREEN
KAREN KIMBALL
U.S. Office of Personnel
  Management
1900 E Street N.W.
Room 7540
Washington, D.C. 20415
(202) 606-2234

RICHARD T. SEYMOUR
D.C. Bar No. 28100
Lawyers' Committee for Civil
  Rights Under Law
1450 G St., N.W.,
Suite 400
Washington, D.C. 20005
(202) 662-8600 or 662-8350

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
  & Educational Fund
634 South Spring Street
  11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
  Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

- 11 -

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers'
   Committee for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444


By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100
    Attorney for Plaintiffs


Dated: October 24, 1994

## Certificate of Service

I certify that I have this 24th day of October, 1994,
served a copy of the foregoing Joint Notice to the Court of
Changes in Defendants' Examination Process for External Hires
on counsel of record for _amicus_ herein, by first-class mail,
postage prepaid, addressed to him as follows:

> Clint D. Wolcott, Esq.
> National Treasury Employees Union
> 1730 K Street N.W.
>    Suite 1101
> Washington, D.C. 20006

JOHN R. TYLER
Attorney for Defendants

RECEIVED

OCT 25 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,            )
                                     )
              Plaintiffs,            )
                                     )
         v.                          )    Civil Action No. 79-0271 (JHG)
                                     )
JAMES B. KING, Director,             )    **FILED**
Office of Personnel Management,      )
et al.,                              )    OCT 28 1994
                                     )
              Defendants.            )    Clerk, U.S. District Court
_____)        District of Columbia

SUPPLEMENTAL FILING OF ATTACHMENTS TO INFORM THE
COURT OF CHANGES IN DEFENDANTS' EXAMINATION PROCESS
FOR EXTERNAL HIRES

On October 25, 1994, the parties filed a "Joint Notice To
The Court Of Changes In Defendants' Examination Process For
External Hires," but omitted to file therewith the accompanying
attachments.  Those attachments (Attachments A through E) are
hereby submitted to the Court.

                          Respectfully submitted,

                          FRANK W. HUNGER
                          Assistant Attorney General

                          ERIC H. HOLDER, Jr.
                          UNITED STATES ATTORNEY

                          _____
                          ANNE M. GULYASSY

                          _____
                          JOHN R. TYLER

                          Attorneys, Department of Justice
                          Civil Division - Room 1074
                          901 E Street, N.W.
                          Washington, D.C. 20530
                          Telephone: (202) 514-2356

Date: October 28, 1994

Exh. A

CA: 79-271 JHG

**FILED**

OCT 28 1994

Clerk, U. S. District Court
District of Columbia

# GAO

March 1994

# FEDERAL HIRING

# Testing for Entry-Level Administrative Positions Falls Short of Expectations





**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**General Government Division**

B-249943

March 30, 1994

The Honorable Frank McCloskey
Chairman, Subcommittee on the Civil Service
Committee on Post Office and
    Civil Service
House of Representatives

Dear Mr. Chairman:

This report responds to your request that we review Administrative
Careers With America (ACWA), the federal government's most recent
program to test and qualify applicants for many entry-level jobs. Although
OPM intended ACWA to be a major vehicle for applicants with college
degrees or equivalent experience to obtain entry-level jobs in over 100
professional and administrative occupations, you were concerned that
agencies were infrequently using the program to fill vacancies. Because of
your concerns about ACWA's usage rate, we agreed to

- determine the extent to which ACWA is used in relation to other hiring
  methods,
- determine the reasons for ACWA's usage rate and applicants' perceptions
  about ACWA, and
- review changes planned by the Office of Personnel Management (OPM) as a
  result of ACWA's usage rate.

To determine the extent to which ACWA is used in relation to other hiring
methods, we reviewed OPM reports for calendar years 1991 and 1992 that
showed hiring into ACWA occupations by hiring methods. We also obtained
hiring statistics from OPM's Central Personnel Data File for fiscal years
1991 and 1992, the latest years for which data were available during our
review.

To determine reasons for ACWA's usage rate, we sent questionnaires to 793
randomly selected federal personnel offices asking for opinions regarding
the use of ACWA and other hiring methods. We also reviewed a random
sample of 306 ACWA candidate lists, or certificates, issued by OPM to
agencies during fiscal year 1992 to determine the characteristics of
applicants on the certificates and to analyze agencies' use of these
certificates. To determine the applicants' perceptions of ACWA, we sent
questionnaires to 600 randomly selected applicants who passed an ACWA
examination between July 1 and December 31, 1991. The results of our

GAO/GGD-94-103 Testing Falls Short of Expectations

surveys and our review of ACWA certificates can be projected to the universes from which they were selected.

To determine if OPM plans to modify ACWA, we met with members of an OPM task force that has been studying the use of ACWA and reviewed the task force's proposed changes to ACWA. The task force also gave us information on current hiring procedures under ACWA.

Our methodology is described in greater detail in appendix I.

# Background

Federal managers have several options for filling vacancies. One method is ACWA—OPM's system for testing applicants for entry-level positions in over 100 professional and administrative GS-5 and GS-7 grade levels. OPM established ACWA in 1990 as a result of a judicially approved consent decree.[1] ACWA replaced an examination system that the plaintiffs believed was having an adverse effect on the hiring of minorities.

Unlike the other hiring methods, which are limited to specific types of candidates (such as veterans or current federal employees), the ACWA examination is intended to give all citizens with a college degree or equivalent experience a chance to be objectively considered for federal employment. Because of this consideration, OPM expected ACWA to be a major vehicle for college graduates and other candidates with equivalent experience to obtain federal employment in those occupations and grades to which it applies. However, ACWA's use is not mandatory. Agencies have several options for filling vacancies in addition to ACWA.

Applicants for jobs covered by ACWA take one of six written examinations administered by OPM, depending on the occupational category in which the applicant is seeking employment.[2] No written examination is required for applicants seeking employment in a seventh, largely social science, occupational category. Instead, OPM rates and ranks applicants on the basis of a review of their education and experience.

Applicants receiving a passing score are ranked on an applicant register. Eligible veterans have points added to their passing scores, and eligible

---

[1]Luevano v. Campbell, 93 F.R.D. 68 (D. D.C. 1981).

[2]The six occupational categories for which written tests are required include (1) health, safety, and environmental; (2) writing and public information; (3) business, finance, and management; (4) personnel, administration, and computer; (5) benefits review, tax, and legal; and (6) law enforcement and investigations.

disabled veterans with passing scores are placed above all others on the registers.[3] Applicants can remain on the register for 1 year, unless they are hired or elect to have their names removed. Upon agency request, the names of qualified applicants are taken from the register and placed on a hiring list, or certificate, containing the top-ranked candidates who have qualified for and expressed interest in the type of position, grade, and location being offered by the agency. The agency may then hire one of the top three available candidates on the certificate but may not select a nonveteran if a higher placed veteran is on the certificate. If the agency is dissatisfied with the candidates on the list it may return the certificate to OPM and use another hiring method to obtain an outside candidate, fill the vacancy with a current federal employee, or leave the vacancy unfilled.

Applicants can bypass the examinations and qualify for a federal job on the basis of superior academic achievement. This authority, known as the Outstanding Scholar Program, allows agencies to directly hire people who have an undergraduate grade point average of 3.5 or higher on a 4.0 scale or who have graduated in the upper 10 percent of their undergraduate class.

## Results in Brief

Although OPM expected ACWA to be a major vehicle for filling vacancies in the occupations and grades to which it applies, agencies said they have generally found that alternative hiring methods better meet their needs. During fiscal years 1991 and 1992, agencies filled 2,797 vacancies through ACWA while filling another 19,406 vacancies in occupations covered by ACWA at the GS-5 and GS-7 grade levels through other hiring methods. They have filled another 15,002 vacancies internally at these grade levels by reassigning, transferring, reinstating, or promoting government employees into occupations to which ACWA applies.[4]

Agency hiring officials said they prefer other hiring methods to ACWA for several reasons. They believe that using ACWA certificates is more time-consuming than using other hiring methods. Agencies receive ACWA certificates from OPM soon after they are requested, but the agencies may need/take several weeks to (1) contact the candidates; (2) receive and review their resumes; (3) interview them; and (4) verify past employment, education, and experience. Although these steps are required when

---

[3]Veterans' preference is explained in detail in our report, Federal Hiring: Does Veterans' Preference Need Updating? (GAO-GGD-92-52, Mar. 20, 1992).

[4]Data on internal placements are for calendar years 1991 and 1992. Fiscal year data were not readily available.

agencies use other hiring methods, they can often be completed earlier in the process.

A large number of applicants, many of whom may have lost interest in federal employment during the interim, also fail to respond to agency inquiries or decline consideration for jobs, further delaying the process.

Statutes require agencies to select from the top three candidates on a certificate. Even if a hiring official determines that another candidate on the certificate with an ACWA score close to those in the top three can best meet the needs of the agency, the selection is still limited to the top three. Statutory requirements also provide hiring preference to eligible veterans. Hiring officials said they have found that nonveterans have limited chances of being selected from ACWA certificates and, because most veterans are male, agencies have difficulty meeting affirmative action goals for females through ACWA certificates. Although we found that hiring officials prefer to use hiring methods to which these statutory requirements do not apply, we have not reviewed the relative merits of the requirements, nor have we made any judgments concerning their value. We are reviewing statutory requirements applicable to the federal hiring system as part of another assignment and will assess their impact on hiring in a future report.

Most applicants are frustrated with the ACWA process as well. For example, 72 percent of the applicants responding to our questionnaire said they were dissatisfied with the process for filling vacancies in ACWA occupations. Eighty-five percent of respondents provided us with narrative comments that were negative or expressed frustration about some aspect of the ACWA process.

Applicants said they received little or no information from OPM or other agencies on ACWA hiring patterns. Consequently, in spite of their slim chances of obtaining jobs, 63 percent of questionnaire respondents said they thought their chances of obtaining federal employment were outstanding or good after being notified of their examination scores. From July 1, 1990, through December 31, 1992, over 300,000 ACWA examinations were given; 182,305 applicants passed, and 3,228 were hired.[6]

---

[6]Data pertain only to four of the seven ACWA occupational series for which comparable data on testing and hiring are maintained. About 92 percent of all tests taken were in these four series.

OPM is considering changes to ACWA for all but its seven largest occupations.[6] Applicants would be able to apply for specific vacancies rather than consideration for potential openings. As a result, the number of applicants declining consideration for positions would likely be lower. Further, agencies would help decide the criteria used to score applicants. This should increase agencies' flexibility to select candidates they feel are best suited for their jobs while still providing veterans with preference in hiring. The ACWA examination would also be made optional.

To alleviate the frustration of applicants seeking jobs through ACWA, OPM, in September 1993, started providing information to candidates showing (1) the number of eligible applicants for jobs, (2) the selections made during the past year, (3) the average scores of candidates hired from certificates, and (4) the best opportunities for jobs by occupational specialty and geographic location.

We are making recommendations to OPM that are designed to expand its improvements of ACWA and provide additional information to applicants on obtaining federal employment.

## The Number of ACWA Hires Is Small Relative to Other Hiring Methods

As shown in table 1, ACWA represents a relatively small percentage of the hiring into ACWA occupations at the GS-5 and GS-7 levels. During fiscal years 1991 and 1992, agencies filled 2,797 vacancies from ACWA certificates. Another 19,406 vacancies in ACWA occupations at the GS-5 and GS-7 grade levels were filled through other hiring methods. Additionally, OPM found that 15,002 vacancies were filled through reassignments, transfers, reinstatements, or promotions of government employees during calendar years 1991 and 1992.

---

[6]The seven occupations that are not currently being studied for change by OPM include (1) Internal Revenue Officer, (2) Immigration Inspector, (3) Customs Inspector, (4) Social Insurance Administration, (5) Tax Technician, (6) Social Insurance Claims Examiner, and (7) Contract Specialist.

**Table 1: GS-5, GS-7 Hires Into Occupations Covered by ACWA During Fiscal Years 1991 and 1992 and Internal Placements Into ACWA Occupations During Calendar Years 1991 and 1992**

| Type of appointment | Number of appointments |
| --- | --- |
| ACWA | 2,797 |
| Outstanding Scholar Programs, other direct hire methods | 8,905 |
| Veterans readjustment | 1,194 |
| Temporary | 3,733 |
| Excepted | 5,574 |
| Internal placements | 15,002 |

Source: OPM's Central Personnel Data File.

Nearly 9,000 vacancies were filled through direct hire methods, such as the Outstanding Scholar Program and Bilingual/Bicultural Program. Under the Outstanding Scholar Program, agencies may hire candidates of their choice who are college graduates with a 3.5 or better grade point average or who have graduated in the top 10 percent of their class. These candidates are not required to take the ACWA examination. Agencies may also hire candidates of their choice under the Bilingual/Bicultural Program if the candidates have passed the ACWA examination and if they are proficient in the Spanish language or have knowledge of the Hispanic culture. These appointments must be to positions in which public interaction or job performance would be enhanced by the language skill or cultural knowledge.

Veterans Readjustment Appointments (VRA) were used to fill 1,194 positions. Under VRA, agencies may noncompetitively hire eligible veterans.

Temporary appointments from application files maintained by agencies accounted for 3,733 selections. Agencies may hire temporary employees for periods of up to 4 years without seeking OPM approval but must renew each appointment annually. Although temporary appointments are supposed to be made for work that is temporary in nature, we found in a previous study that agencies frequently filled permanent positions with temporary employees.[7] Agencies have hired temporary employees into permanent positions to (1) expedite the hiring process, (2) avoid ceilings on permanent employment levels, and (3) hire a selected employee who could not be reached on an OPM certificate.

---

[7]Federal Workforce: Selected Sites Cannot Show Fair and Open Competition for Temporary Jobs (GAO/GGD 90-106, Sept. 5, 1990).

Excepted appointments were used to fill 5,574 positions. These appointments are made independent of the ACWA examination and consist of three categories—Schedule A, B, and C—all of which may include hires into ACWA occupations. Schedule A appointments (4,875 of the 5,574 appointments) may be authorized by OPM for certain positions that are not of a confidential or policy determining nature. Examples are vacancies filled by persons who are severely handicapped, legal intern positions, and Presidential Management Interns. Schedule B appointments (618 of 5,574 appointments) were used to fill positions supporting career-related work/study and cooperative education programs. Schedule C appointments (81 of 5,574 appointments) are for positions that are policy-determining or that involve a close and confidential working relationship with the head of an agency or other key appointed officials.

Agencies also filled thousands of vacancies by reassigning, transferring, reinstating, or promoting government employees. These employees are not required to take the ACWA examination. According to OPM, 15,002 internal placements were made into ACWA occupations during calendar years 1991 and 1992. These placements were at the GS-5 and GS-7 grade levels and included only placements where employees were moving from a non-ACWA occupation to an ACWA occupation.

## Reasons for Low Usage of ACWA

Compared to other hiring methods, agency officials responding to our questionnaire felt that ACWA was time-consuming to use. They also felt that ACWA was inflexible, making it difficult to obtain quality candidates or candidates of their choice. In general, applicants were frustrated with ACWA and perceived it as an ineffective hiring method.

## ACWA Is Perceived as Time-Consuming and Difficult to Use Compared to Other Hiring Methods

Questionnaire respondents from federal agencies said that requirements applicable to ACWA have resulted in a process that is more time-consuming and difficult to use than other hiring methods commonly used to fill vacancies in ACWA occupations. When an agency decides to fill a vacancy in an ACWA occupation with an ACWA certificate, the agency must take several steps:

- The agency must first request a certificate from OPM. The request can be faxed to OPM, and the certificate can be faxed back to the agency the same day. A mailed request takes longer. The certificate contains names, addresses, Social Security numbers, telephone numbers, ACWA scores augmented by applicable veterans' preference points, and veterans' status.

- The agency must then contact the applicants, ask about their availability and interest in the job, and request resumes or job applications.
- The agency may arrange for interviews. If an applicant resides in a location other than that in which the hiring official works, the hiring office may ask an agency official in the vicinity where the applicant resides to interview the applicant, or the selecting official may elect to interview the applicant by telephone.
- The agency must verify the applicants' education and experience to ensure they qualify for the job. OPM does not perform this verification before listing applicants on certificates.
- If an agency finds an applicant unacceptable, it can ask OPM to remove the applicant from the certificate. For instance, if an agency determines that an applicant does not have the education or experience required for the position, it can file a formal objection with OPM and wait for a decision. If OPM sustains the objection, the agency can then remove the candidate from the certificate and consider another in place of the candidate.
- A job offer can be made to one of the top three available candidates on the certificate, but not to a nonveteran if a higher placed veteran is available.

The impact of these administrative processes on satisfaction with ACWA is demonstrated by comments we received from respondents to the questionnaire we sent to agency personnel offices. For example:

"ACWA is a time-consuming, burdensome, and inefficient way of filling positions. No matter how quickly you receive the certificate, you have to contact these individuals by mail, allow a reasonable time for them to respond, you have to set up interviews, etc...."

As shown in table 2, although 62 percent of the respondents to our questionnaire said that ACWA was effective in enabling them to obtain candidates in a timely manner, at least 91 percent of the respondents felt the same about other hiring methods.

**Table 2: Percentages of Questionnaire Respondents Reporting Whether Certain Hiring Methods Helped Them Obtain a Candidate in a Timely Manner**

| Hiring method | Effective | Neither effective nor ineffective | Ineffective |
|---|---|---|---|
| ACWA | 62% | 18% | 20% |
| Outstanding Scholar Program | 91 | 5 | 4 |
| Temporary appointments using application files | 94 | 3 | 3 |
| VRA | 91 | 6 | 3 |
| Merit promotion/ internal placements | 92 | 3 | 5 |

Note: Percentages apply only to those responding to our specific questions on timeliness.

Although many of the hiring steps applicable to ACWA apply to noncompetitive hiring methods, an agency can often complete certain tasks before a vacancy occurs when it uses other hiring methods. For example, an agency can recruit candidates eligible for an Outstanding Scholar appointment on a college campus, conduct interviews, and review applications before a vacancy exists. Once a vacancy occurs, the agency can contact all acceptable applicants to see if they are still interested in a federal job and make an immediate offer to anyone still interested.

Using ACWA becomes more time-consuming and difficult if applicants on certificates are not interested in the jobs agencies have to offer. Applicants taking ACWA examinations do not apply for specific job vacancies but apply for consideration for a number of occupations in numerous agencies, often in a wide geographic area. They also apply for consideration for jobs for a period of up to a year. Not surprisingly, many applicants fail to reply to agency communication regarding specific openings or decline consideration for jobs.

The 306 ACWA certificates we reviewed contained the names of 5,431 applicants, 2,770 of whom were contacted by agencies. As shown in table 3, 1,285 candidates (about 46 percent) who were contacted either did not respond to agency communication or declined consideration for jobs.

**Table 3: Almost Half of All Candidates Contacted Were Unavailable for the Position**

| Reasons candidates were unavailable or declined consideration for positions | Number of candidates contacted |
|---|---|
| Failure to respond to communication or communication undeliverable | 685 |
| Location | 156 |
| Grade level | 115 |
| Position | 97 |
| Timing | 72 |
| Agency | 32 |
| Other | 128 |
| **Total** | **1,285** |

## ACWA Offers Agencies Little Flexibility

ACWA offers little flexibility in allowing agencies to select candidates of their choice. Consequently, hiring officials view ACWA as providing candidates who are less qualified or who otherwise fail to meet their expectations.

Statutes pertaining to filling positions in the competitive service, including ACWA, limit agencies to selecting from the top three available candidates on certificates. This process is in contrast to other hiring methods that allow agencies to directly recruit candidates who meet an agency's needs in terms of education, experience, diversity, and other factors. For example, although available candidates may have demonstrated their reasoning ability through the ACWA examination, they may not necessarily possess specific skills or qualifications deemed important by the hiring agency.

Veterans' preference allows eligible veterans to receive an additional 5 or 10 points on their passing examination scores. It also allows disabled veterans with at least a 10-percent compensable disability to be placed above all others on certificates. As a result, veterans' preference may limit an agency's ability to select nonveterans, especially females.

Other hiring methods commonly used to fill vacancies in ACWA occupations allow agencies more flexibility because they do not limit selection to the top three candidates on a certificate or do not require veterans' preference. For instance, a manager filling a vacancy through the Outstanding Scholar Program may select from among any available college graduates with at least a 3.5 college grade point average without regard to veterans' status. When using internal merit promotion hiring lists, a manager may be restricted in the number of candidates from which to

choose but, because veterans' preference does not apply to merit promotion, the manager is not restricted to selecting a veteran. Veterans' preference does apply to temporary selections made from application files, and candidates for VRAs must, of course, be veterans. However, managers are not restricted to only the top three candidates when using these hiring methods.

As shown in table 4, agency officials responding to our questionnaire were less satisfied with ACWA, as compared to other hiring methods, in its ability to help them obtain quality candidates. Comments provided by the officials showed a link between the agencies' quality concerns and ACWA's lack of flexibility.

"We have found good candidates but we cannot reach them. I have told my staffing people to forget ACWA and go for another source. This is unfortunate since we are having to pass some really bright young people...."

"[Our office] has used ACWA, but not recently. Our managers are dissatisfied with receiving only 3 names at a time—all of whom are veterans who cannot be passed. It is highly unlikely that an agency will find the person needed from only 3 candidates. As a result, we now use other, more flexible, methods."

"We have attempted to use ACWA as a hiring mechanism. Apparently, [selecting officials] are not always interested in the candidates with the highest scores. They often want to select the 9th or 10th candidate on the list but are prohibited."

**Table 4: Percentage of Questionnaire Respondents Who Were Satisfied or Dissatisfied With the Quality of Candidates Obtained Through Various Hiring Methods**

| Hiring method | Satisfied | Neither satisfied nor dissatisfied | Dissatisfied |
|---|---|---|---|
| ACWA | 42% | 20% | 38% |
| Outstanding Scholar Program | 89 | 8 | 3 |
| Temporary appointments using application files | 84 | 14 | 2 |
| VRA | 83 | 11 | 6 |
| Merit promotion/ internal placements | 96 | 2 | 2 |

Note: Percentages apply only to those responding to our specific questions on candidate quality.

Hiring officials also believed that ACWA's lack of flexibility prohibits them from selecting candidates that they need to meet affirmative action goals. As shown in table 5, respondents to our questionnaire felt that ACWA was

less effective than other hiring methods in helping them to meet affirmative action goals.

**Table 5: Percentage of Questionnaire Respondents Reporting Whether Certain Hiring Methods Helped Them Meet Affirmative Action Goals**

| Hiring method | Effective | Neither effective nor ineffective | Ineffective |
|---|---|---|---|
| ACWA | 29% | 32% | 39% |
| Outstanding Scholar Program | 64 | 22 | 14 |
| Temporary appointments using application files | 66 | 23 | 11 |
| VRA | 62 | 28 | 10 |
| Merit promotion/ internal placements | 72 | 20 | 8 |

Note: Percentages apply only to those responding to our specific questions on affirmative action goals.

Statutory requirements applicable to competitive positions, including ACWA, can make it difficult for agencies to achieve affirmative action goals for two reasons. First, veterans' preference increases the chance that veterans—who are predominantly male—will be placed at the top of certificates. Second, agencies are limited to the top three candidates on a certificate, which can restrict their ability to meet affirmative action goals.

Although veterans make up a small percentage of applicants passing the ACWA examination (17 percent), most of the candidates at the top of ACWA certificates are veterans (74 percent), as shown in table 6. OPM found a similar situation in a sample of ACWA certificates it reviewed. OPM reviewed the characteristics of candidates who were available and could be selected from certificates, generally the top three available candidates. OPM found that all candidates were veterans on about two thirds of the certificates and that only one third of the certificates contained at least one available female who could be considered for employment.

**Table 6: Comparison of Candidates Passing the ACWA Examination and Candidates Heading Certificates**

| Candidates | Percent passing examination | Percent heading certificates |
|---|---|---|
| Male | 59 | 84 |
| Female | 41 | 16 |
| Disabled veterans | 2 | 59 |
| All veterans | 17 | 74 |
| Nonveteran | 83 | 26 |

Source: Statistics on those passing the examination are from OPM's Staffing Service Center and are based on 41,551 candidates passing ACWA examinations during the 6 months ending December 31, 1991. Statistics on those heading certificates were developed by us from a review of 306 randomly selected certificates issued to agencies by OPM during fiscal year 1992.

Hiring statistics for fiscal years 1991 and 1992 tend to support the belief that ACWA is less effective in helping agencies to meet affirmative action goals for females, as shown in table 7. However, the percentage of minorities hired through ACWA was similar to that of minorities hired through other methods.

**Table 7: Percentage of Hires by Gender, Ethnicity, and Hiring Method for Fiscal Years 1991 and 1992.**

| Hiring method | Percent female | Percent minority |
|---|---|---|
| ACWA | 35 | 20 |
| Outstanding Scholar, other direct hires | 55 | 20 |
| Temporary appointments using application files | 45 | 23 |
| VRA | 12 | 23 |
| Excepted appointments | 52 | 24 |

Source: OPM's Central Personnel Data File.

## The Effect of Low ACWA Usage on Applicants

Applicants were frustrated with ACWA and perceived it as being an ineffective hiring process. OPM and other federal agencies made very little effort to communicate with applicants beyond notifying them of their ACWA examination scores. The lack of communication left applicants, including those with high scores, with no knowledge of their chances of obtaining federal employment.

Applicants with seemingly high scores on their examinations have little chance of having their names placed on certificates. For instance, on 74 percent of the 306 ACWA certificates we reviewed, no one scored lower than 90. Under these circumstances, it is not surprising that applicants

would overestimate their chances of obtaining employment. As shown in table 8, 57 percent of the applicants responding to our questionnaire thought their chances of obtaining federal employment were at least good, even after being notified of their ACWA examination scores. However, only 28 percent of the respondents said they were contacted by an agency after they had passed the ACWA examination; of these only 6 percent were offered jobs.

**Table 8: How Applicants Perceived Their Chances of Obtaining Federal Employment**

| Applicants' perception of obtaining employment | Outstanding or good | Average | Fair or poor |
|---|---|---|---|
| At the time they took the ACWA examination | 63% | 16% | 21% |
| At the time they were notified of their examination score | 57 | 15 | 28 |

Note: Percentages apply only to those responding to our specific questions on perceived chances of obtaining federal employment.

OPM has not furnished applicants with information related to their chances of obtaining employment through ACWA, nor has it provided complete information on other hiring methods used to fill vacancies in ACWA occupations. When applicants inquire about entry-level positions in these occupations, OPM informs them of the ACWA examination. Some OPM offices also explain the requirements for the Outstanding Scholar and Bilingual/Bicultural programs. However, OPM has not informed applicants of the numbers of vacancies filled through various methods.

In addition it has not explained hiring methods, such as the various excepted hiring authorities agencies have, the procedures for obtaining temporary employment, or the methods used to fill vacancies above the GS-7 grade level (about 12 percent of those passing the ACWA examination have graduate degrees and may qualify for jobs above the GS-7 grade level). Furthermore, OPM has not consistently provided applicants with information on the agencies, occupations, or locations offering the best chances of employment through ACWA.

Finally, when OPM notified applicants of their examination scores, it enclosed a pamphlet telling applicants "[w]e cannot give you specific information on employment prospects. Consideration for employment depends on: [y]our qualifications for the job to be filled compared to the qualifications of other eligible applicants; and [t]he number and type of jobs to be filled." This communication from OPM may be the last an

applicant receives unless the applicant's name is placed on a certificate and the hiring agency corresponds with the applicant.

Overall, 72 percent of respondents to our questionnaire said that given their experiences, they were either somewhat dissatisfied or very dissatisfied with the process for filling vacancies in occupations covered by ACWA. Even 42 percent of the applicants who were offered jobs as a result of the ACWA examination expressed dissatisfaction.

We invited respondents to provide narrative comments about their experiences and feelings concerning ACWA. Of 390 applicants responding to our questionnaire, 340 provided comments. Of these, 330 applicants were negative or expressed frustration about some aspect of the ACWA process, such as the lack of information they were provided on their chances of obtaining employment. Applicants were especially frustrated by the lack of communication from OPM or hiring agencies, after they were informed that they had passed the examination. Examples of comments are shown in appendix II.

## OPM's Plans to Modify ACWA

Because OPM was concerned about the low use of ACWA, it established a task force to review the program and recommend changes. The task force held focus group meetings with agencies to determine their experiences with using ACWA and to solicit their recommendations. The task force also reviewed ACWA certificates that had been requested by agencies. OPM's study concentrated on ACWA occupations in which there has been relatively little hiring.

The task force's objective in proposing changes to ACWA was to increase the use of competitive hiring for entry-level candidates and to increase accessibility to all types of external applicants for professional and administrative occupations. For example, OPM did not wish to limit jobs to current federal employees or to external candidates with high college grade point averages. Therefore, for those occupations in which there has been relatively little hiring, OPM is considering eliminating the need for applicants to take the ACWA examination.

Under its proposal, OPM and agencies would advertise specific vacancies as they occur. Applicants would apply for these vacancies, and OPM would examine and score their education, experience, and any other qualifications deemed necessary by the agencies. Qualified applicants would receive scores of 70, 80, or 90 based on their qualifications, and

eligible veterans would receive either 5 or 10 additional points. OPM would then give the agency a certificate containing the names of applicants with scores of at least 90. Those with lower scores would be added to the certificates if the number of applicants was low. The agency could then augment the scores with up to 10 additional points using the results of an interview or some other screening device. For example, the agency could ask applicants to take the ACWA examination and use the results to augment applicants' scores. Although the agency would still be limited to selecting from the top three candidates on a certificate, those applicants should be better matched to the requirements of the position.

Because ACWA was established as a result of a consent decree, OPM officials said they must obtain the approval of the plaintiffs in the decree before making any changes to ACWA. If the plaintiffs agree, OPM officials said they could implement their proposed changes by the end of 1994.

OPM's proposed changes to ACWA would make it easier for agencies to use and give agencies greater flexibility while retaining a hiring system that is open to all qualified applicants who are interested in federal employment.

- The new hiring system would give agencies more flexibility than they now have because agencies could determine the criteria to be used in augmenting candidates' scores.
- Because agencies would decide on the criteria used to augment candidates' scores, they would be less likely to be dissatisfied with the quality of candidates. Although agencies would still be limited to the top three candidates on a certificate, agencies would help decide which candidates were placed in the top three.
- Although veterans would still receive preference, nonveterans, including females, would be better able to compete for jobs. All well-qualified candidates, nonveterans as well as veterans, could receive additional points for qualifications deemed essential by the agency, rather than receiving scores based solely on an examination and veterans' preference points.
- OPM anticipates that the proposed hiring system will take no longer than hiring a candidate through ACWA. Also, fewer candidates would be expected to decline consideration for a job, because candidates would be applying for a specific job opening at a specific location, at a specific point in time.

OPM's proposed hiring system could also benefit candidates. Currently, candidates apply for job consideration and often wait for a year without

hearing from agencies. The new system would eliminate much uncertainty for applicants because they would be applying for specific vacancies and would receive more immediate feedback on the status of their applications.

In September 1993, OPM began assisting applicants by sending ACWA hiring statistics to those on registers. The information is provided by occupational specialty and contains (1) the number of eligible applicants for jobs, (2) the number of selections made during the past year, (3) the average scores of selected candidates, and (4) the best opportunities for jobs by occupational specialty and geographic location. For example, information on business occupations as of August 1, 1993, shows that there were about 15,000 applicants on the register, there had been only 3 hires in the past 10 months, the average score of selected applicants was 92.5, and the best job opportunities were in Washington, D.C. The information does not, however, include statistics on other hiring methods that agencies use to fill vacancies in ACWA occupations.

## Potential for Expanding Proposed Initiative

Although OPM has not yet studied modifications to ACWA for the seven largest occupations, there appears to be high potential for increasing the use of competitive hiring and opening up more jobs to a wider segment of external candidates. For example, according to OPM statistics on hiring into ACWA occupations at the GS-5 and GS-7 grade levels for calendar years 1991 and 1992, only 18 percent of 7,389 hires into these 7 occupations were made through ACWA, while 6,032 hires (about 82 percent) were made through other hiring methods.

We discussed ACWA usage with representatives of four agencies that have hired relatively large numbers of applicants into the larger occupations. They said that they face many of the same problems with ACWA as do other agencies. They said that while they have extensive training programs for new employees and are not overly concerned about specific education or experience for entry-level employees, they typically need employees with good communication skills. These skills are judged in personal interviews. The representatives said they need more discretion in selecting candidates based on interviews. For example, if the top three candidates on an ACWA certificate do poorly in interviews, the agency cannot generally select a lower placed candidate.

They also told us that when they anticipate vacancies to occur over an extended time period, they are not bothered by the length of time it takes

to fill vacancies through ACWA. However, they have been dissatisfied with the large number of candidates on ACWA certificates who are not interested in the jobs they have to offer. They often spend considerable time contacting candidates, only to find that they are not interested. Representatives of one agency said that the problem could be overcome if they could solicit applications for specific vacancies from those who have passed the ACWA examination. Representatives of two of the four agencies said that they use ACWA only as a last resort. They first try to use other hiring methods if candidates are available.

## Conclusions

We believe that OPM's proposed modifications to ACWA hiring would alleviate many of the drawbacks that limited agencies' use of ACWA. The information OPM is providing on ACWA should also lessen the level of frustration for thousands of applicants who are not contacted about openings after they have taken the ACWA examination. The objective of making applicants fully informed of federal employment procedures would be enhanced if similar information were provided on the various alternative hiring methods as well.

However, OPM's proposed modifications will not affect seven of the largest ACWA occupations. These occupations have had substantial hiring through methods other than ACWA. There is, therefore, high potential for OPM to make more jobs available to a wider segment of external candidates if it modifies the hiring methods used for these seven occupations.

## Recommendations to the Director, OPM

To further increase the use of competitive hiring and to be more responsive to the needs of agencies, we recommend that the Director of OPM consider including the seven largest ACWA occupations in its proposals to redesign ACWA. Even if OPM does not make the ACWA examination optional for these seven occupations, as it is proposing to do for others, OPM's ACWA task force should consider allowing agencies to (1) solicit applications for specific vacancies from those who pass the ACWA examination and (2) augment examination scores using criteria established by the agency. If an agency or office expects periodic hiring in a specific occupation, it could solicit applications from those passing the examination and maintain its own registers in augmented score order, still considering veterans' preference.

To further alleviate applicants' frustrations with the hiring process and provide them with complete information on obtaining employment, we

recommend that OPM provide them with information on the other hiring methods that are used to fill vacancies in ACWA occupations.

## Agency Comments

In a February 3, 1994, letter, OPM's Director provided us with comments on a draft of our report. The Director said that the report was helpful and that OPM was implementing our recommendations. Specifically, the Director said that OPM was planning an examination procedure for the seven largest ACWA occupations that will be the same as for the other occupations. The Director also said that OPM is strengthening its job information procedures to provide applicants with more information on alternatives to the ACWA written test. (OPM's comments are shown in app. III.)

As agreed with the Subcommittee, unless you publicly announce its contents earlier, we plan no further distribution of this report until 7 days from the date of this letter. At that time we will send copies of this report to the Director of OPM and will make copies available to others on request.

Major contributors to this report are listed in appendix IV. Please contact me at (202) 512-2928 if you or your staff have any questions concerning this report.

Sincerely yours,

*Nancy R. Kingsbury*

Nancy Kingsbury
Director
Federal Human Resource Management
    Issues

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| Appendix I<br>Scope and<br>Methodology | | 22 |
| Appendix II<br>Examples of<br>Comments Provided<br>by Applicants<br>Responding to Our<br>Questionnaire | | 26 |
| Appendix III<br>Comments From the<br>Office of Personnel<br>Management | | 28 |
| Appendix IV<br>Major Contributors to<br>This Report | | 29 |
| Tables | Table 1: GS-5, GS-7 Hires into Occupations Covered by ACWA During Fiscal Years 1991 and 1992 and Internal Placements into ACWA Occupations During Calendar Years 1991 and 1992 | 6 |
| | Table 2: Percentages of Questionnaire Respondents Reporting Whether Certain Hiring Methods Helped Them Obtain a Candidate in a Timely Manner | 9 |
| | Table 3: Almost Half of All Candidates Contacted Were Unavailable for the Position | 10 |
| | Table 4: Percentage of Questionnaire Respondents Who Were Satisfied or Dissatisfied With the Quality Of Candidates Obtained Through Various Hiring Methods | 11 |

Table 5: Percentage of Questionnaire Respondents Reporting Whether Certain Hiring Methods Helped Them Meet Affirmative Action Goals  12

Table 6: Comparison of Candidates Passing the ACWA Examination and Candidates Heading Certificates  13

Table 7: Percentage of Hires by Gender, Ethnicity, and Hiring Method for Fiscal Years 1991 and 1992.  13

Table 8: How Applicants Perceived Their Chances of Obtaining Federal Employment  14

Table I.1: Population Estimates and Sampling Errors for Percentages Shown in Table 2  23

Table I.2: Population Estimates and Sampling Errors for Percentages Shown in Table 4  24

Table I.3: Population Estimates and Sampling Errors for Percentages Shown in Table 5  24

Table I.4: Population Estimates and Sampling Errors for Percentages Shown in Table 8  25

## Abbreviations

| | |
|---|---|
| ACWA | Administrative Careers With America |
| OPM | Office of Personnel Management |
| VRA | Veterans Readjustment Appointment |

# Scope and Methodology

To determine the number of vacancies filled in professional and administrative occupations through the use of ACWA and other hiring methods, we reviewed hiring statistics in OPM's Central Personnel Data File for fiscal years 1991 and 1992. We also reviewed OPM reports for calendar years 1991 and 1992 that showed hiring into ACWA occupations by hiring method. These reports were based on information extracted from the Central Personnel Data File. We did not verify the accuracy of information contained in the Central Personnel Data File or in OPM's reports.

To determine reasons for ACWA's low usage, we sent questionnaires to a random sample of 793 out of 1,590 federal personnel offices. We obtained our listing of personnel offices from OPM. We asked for personnel and hiring officials' experience with using ACWA and other hiring methods. Four questionnaires were returned undeliverable and 720 were returned completed for a 91-percent response rate. We also reviewed a random selection of 306 ACWA certificates that OPM issued to agencies during fiscal year 1992.

The sample represented 20 percent of an estimated 1,530 certificates issued during that time for 4 of ACWA's 7 occupational categories. To determine applicants' perceptions of ACWA's low usage, we sent questionnaires to a random sample of 600 out of 41,551 applicants who passed ACWA examinations between July 1 and December 31, 1991. We also reviewed information that OPM sends to applicants when they inquire about jobs in ACWA occupations and after they take the ACWA examination. Applicants passing ACWA examinations during the time frame we selected had been placed on OPM's hiring registers at least 1 year before our review. Forty-six of the questionnaires were returned undeliverable and 390 were returned completed for a 70-percent response rate.

The results of our reviews of sampled data can be projected to the universes from which the samples were drawn. All sample surveys are subject to sampling errors that define the upper and lower bounds of the estimate calculated from the survey responses—that is, the confidence interval. All sampling errors for the estimates in this report were calculated at the 95-percent confidence level and are shown in tables I.1 through I.4. This confidence level means that 95 percent of the time the sampling procedure used in this survey will yield a confidence interval that includes the true value we are estimating.

To determine OPM's plans to modify ACWA, we met with representatives of its task force that has been studying ACWA's low use. We evaluated the task

force's proposals to modify the hiring process for ACWA occupations. The task force also provided information on current hiring procedures under ACWA.

We also met with representatives of four agencies that did considerable hiring into the larger ACWA occupations to determine if changes were warranted for those occupations.

We requested written comments on a draft of this report from OPM. OPM agreed with its contents and stated that it was implementing our recommendations.

We conducted our review from April 1992 through September 1993 in accordance with generally accepted government auditing standards.

**Table I.1: Population Estimates and Sampling Errors for Percentages Shown in Table 2**

| Statistic | Population estimate | Sampling error |
|---|---|---|
| ACWA, Effective | 62% | + or - 8% |
| ACWA, Neither effective nor ineffective | 18 | + or - 6 |
| ACWA, Ineffective | 20 | + or - 6 |
| Outstanding Scholar, Effective | 91 | + or - 4 |
| Outstanding Scholar, Neither effective nor ineffective | 5 | + or - 3 |
| Outstanding Scholar, Ineffective | 4 | + or - 3 |
| Temporary, Effective | 94 | + or - 4 |
| Temporary, Neither effective nor ineffective | 3 | + or - 3 |
| Temporary, Ineffective | 3 | + or - 3 |
| VRA, Effective | 91 | + or - 4 |
| VRA, Neither effective nor ineffective | 6 | + or - 3 |
| VRA, Ineffective | 3 | + or - 3 |
| Merit Promotion, Effective | 92 | + or - 3 |
| Merit Promotion, Neither effective nor ineffective | 3 | + or - 2 |
| Merit Promotion, Ineffective | 5 | + or - 2 |

**Table I.2: Population Estimates and Sampling Errors for Percentages Shown in Table 4**

| Statistic | Population estimate | Sampling error |
|---|---|---|
| ACWA, Satisfied | 42% | + or - 7% |
| ACWA, Neither satisfied nor dissatisfied | 20 | + or - 6 |
| ACWA, Dissatisfied | 38 | + or - 7 |
| Outstanding Scholar, Satisfied | 89 | + or - 4 |
| Outstanding Scholar, Neither satisfied nor dissatisfied | 8 | + or - 3 |
| Outstanding Scholar, Dissatisfied | 3 | + or - 2 |
| Temporary, Satisfied | 84 | + or - 5 |
| Temporary, Neither satisfied, nor dissatisfied | 14 | + or - 5 |
| Temporary, Dissatisfied | 2 | + or - 2 |
| VRA, Satisfied | 83 | + or - 5 |
| VRA, Neither satisfied nor dissatisfied | 11 | + or - 4 |
| VRA, Dissatisfied | 6 | + or - 3 |
| Merit Promotion, Satisfied | 96 | + or - 2 |
| Merit Promotion, Neither satisfied nor dissatisfied | 2 | + or - 1 |
| Merit Promotion, Dissatisfied | 2 | + or - 1 |

**Table I.3: Population Estimates and Sampling Errors for Percentages Shown in Table 5**

| Statistic | Population estimate | Sampling error |
|---|---|---|
| ACWA, Effective | 29% | + or - 7% |
| ACWA, Neither effective nor ineffective | 32 | + or - 8 |
| ACWA, Ineffective | 39 | + or - 8 |
| Outstanding Scholar, Effective | 64 | + or - 6 |
| Outstanding Scholar, Neither effective nor ineffective | 22 | + or - 5 |
| Outstanding Scholar, Ineffective | 14 | + or - 4 |
| Temporary, Effective | 66 | + or - 9 |
| Temporary, Neither effective nor ineffective | 23 | + or - 8 |
| Temporary, Ineffective | 11 | + or - 6 |
| VRA, Effective | 62 | + or - 7 |
| VRA, Neither effective nor ineffective | 28 | + or - 6 |
| VRA, Ineffective | 10 | + or - 4 |
| Merit Promotion, Effective | 72 | + or - 4 |
| Merit Promotion, Neither effective nor ineffective | 20 | + or - 4 |
| Merit Promotion, Ineffective | 8 | + or - 3 |

**Table I.4: Population Estimates and Sampling Errors for Percentages Shown in Table 8**

| Statistic | Population estimate | Sampling error |
|---|---|---|
| At the time they took examination, Outstanding or Good | 63% | + or - 5% |
| At the time they took examination, Average | 16 | + or - 4 |
| At the time they took examination, Fair or Poor | 21 | + or - 4 |
| At the time they were notified, Outstanding or Good | 57 | + or - 5 |
| At the time they were notified, Average | 15 | + or - 4 |
| At the time they were notified, Fair or Poor | 28 | + or - 5 |

# Examples of Comments Provided by Applicants Responding to Our Questionnaire

Applicants responding to our questionnaire were invited to provide us narrative comments regarding their experiences and feelings concerning ACWA. Of 390 applicants responding to our questionnaire, 340 provided comments, nearly all of which expressed frustration with ACWA. The following examples are, in our opinion, representative of the 330 applicants/responses that expressed frustration with ACWA:

"I was not informed on how well I had scored in relation to other examinees. I didn't know if I had passed or failed and I was never contacted by a federal agency."

"I received a high mark (94) yet was never contacted by any agency. . . What do you have to do?"

"I feel candidates should be better informed about hiring conditions in the states they apply for jobs in."

"At 97%, I thought I might get a nibble, and got nix!, zippo!"

"[I] Scored 100 on all tests but was never contacted about a job. My experience with the ACWA written test was disgusting."

"After taking the test, no one explained what my score meant, where I stood, I was never contacted by any agency. Either my score was too low or no one was paying attention to the list of people who passed the ACWA."

"I took all six tests. My lowest final grade was 105 (high 109). I am a white male, compensable disabled Vietnam veteran . . . Stop kidding people like me. False hope is worse than no hope at all."

"The fact that I did reasonably well on the test and was never contacted, makes me think the system doesn't work."

"I felt as though, after I passed the test, my name was thrown into a black hole never to surface again."

"It is now my understanding that few federal agencies use the ACWA list to fill vacancies. I scored '97' on two different exams and '89' on another but have not heard from one federal agency in one and one half years."

"I feel testing conditions and receipt of results were excellent, but after I received my results I became very frustrated and have no idea if I was ever considered for a job because of the lack of communication after I received my results. . ."

"There were no clear instructions as to what to do if you passed."

"From what I could determine, agencies in my area . . . are unfamiliar with ACWA. Perhaps I was unrealistic in my expectations, but I felt that my scores, education, work experience and, yes, sex would enhance my chances of employment. Are most appointments made from the 'outstanding scholar' rosters? If so, why bother with a test?"

"I scored relatively high, and received one inquiry one year later. I never heard from the interested agency again. Not one word - yes, no, thanks for your interest, we received your application, etc. The general population of eligible and interested workers has no idea of how to apply for or secure federal government employment."

"I have two recommendations for improving the process. The first . . . would be to provide a step-by-step pamphlet outlining the most likely way to proceed after taking the test. The second would be to provide some statistical analysis of the scores . . . so that applicants could get a feel for where they stand in relation to others."

# Comments From the Office of Personnel Management



**UNITED STATES**
**OFFICE OF PERSONNEL MANAGEMENT**
WASHINGTON, D.C. 20415

FEB - 3 199?

OFFICE OF THE DIRECTOR

Ms. Nancy Kingsbury
Director, Federal Human Resource
  Management Issues
General Government Division
U.S. General Accounting Office
Washington, DC  20548

Dear Ms. Kingsbury:

Thank you for the opportunity to comment on the draft report
FEDERAL HIRING:  Applicant Testing System Falls Short of
Expectations.  We found it very comprehensive and to contain
many worthwhile suggestions.  We also found it extremely
helpful to work with your staff during its factfinding and get
status reports as the project progressed.  This cooperative
effort enabled us to take immediate action.  As noted in the
report, we have already implemented some of the
recommendations and others we are taking action to implement.

Now on p. 20.

As to the first recommendation on page 30 of the draft, we are
planning an examining procedure for the seven largest ACWA
occupations which will be the same as for the other
occupations.

Regarding the second recommendation, we are strengthening our
job information procedures to provide applicants with more
information on alternatives to the ACWA written test.
Delivery methods include posters, brochures, and other written
materials as well as the Federal Job Information computer
touchscreens and the Career America Connection telephone
systems.

Sincerely,

James B. King
Director

CON 131-64-4
July 1988



# Major Contributors to This Report

| | |
|---|---|
| **General Government Division, Washington, D.C.** | Steven J. Wozny, Assistant Director, Federal Human Resource Management Issues<br>James C. Farley Jr., Assignment Manager<br>Robert N. Goldenkoff, Advisor |
| **Denver Regional Office** | Joseph J. Buschy, Evaluator-in-Charge<br>Thomas R. Kingham, Regional Management Representative<br>C. Robin Hodge, Staff Evaluator<br>Felicia A. Turner, Senior Computer Specialist<br>Tammy S. Olmedo, Computer Specialist<br>Cynthia Conroy Schilling, Reports Analyst |
| **Office of the General Counsel, Washington, D.C.** | Jeffrey S. Forman, Senior Attorney |

B

Exh. B
CA: 79-271 JHG

**FILED**

OCT 28 1994

Clerk, U. S. District Court
District of Columbia

# PROPOSAL TO INTRODUCE CASE EXAMINING

# FOR ACWA OCCUPATIONS

March, 1994

# TABLE OF CONTENTS

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Rating Schedules as an Examining Method
    The Behavioral Consistency Method . . . . . . . . . . . . . . . . . . . . . . . 2
    Validity of T & E rating schedules . . . . . . . . . . . . . . . . . . . . . . . . 3
    Adverse impact of T & E rating schedules . . . . . . . . . . . . . . . . . . . . 3
Biographical Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Validity of biographical information . . . . . . . . . . . . . . . . . . . . . . . . 3
    Adverse impact of biographical information . . . . . . . . . . . . . . . . . . . 4
Use of Biodata and the Behavioral Consistency Method . . . . . . . . . . . . . . 4
Project Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TRACK I: OCCUPATIONAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . 4
Phase A: FY 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Task 1: Sample Plan Development
    Step 1: Develop the sampling plan . . . . . . . . . . . . . . . . . . . . . . . . 5
Task 2: Survey Development
    Step 2: Conduct literature review . . . . . . . . . . . . . . . . . . . . . . . . 6
    Step 3: Contract for printing and mailing surveys . . . . . . . . . . . . . . . . 6
    Step 4: Psychologists rate competencies for importance . . . . . . . . . . . . . 7
    Step 5: Refine previously defined occupational groups . . . . . . . . . . . . . 7
    Step 6: Psychologists link competencies and tasks . . . . . . . . . . . . . . . . 7
    Step 7: Subject matter expert review and "mini-" occupational analysis . . . . . 7
    Step 8: Obtain official sample size estimate . . . . . . . . . . . . . . . . . . . 7
    Step 9: Create and pretest the occupational analysis inventory . . . . . . . . . . 7
    Step 10: Print the surveys and make preparations for the mail-out . . . . . . . . 8
    Step 11: Prepare task-competency linkage grids . . . . . . . . . . . . . . . . . 8

Task 3: Data Collection

    Step 12: Select survey sample and prepare mailing addresses . . . . . . . . . . . 8

    Step 13: Mail surveys and respond to telephone inquiries . . . . . . . . . . . . . 8

    Step 14: Administer task-competency linkage grids . . . . . . . . . . . . . . . . 8

    Step 15: Enter survey data into a database . . . . . . . . . . . . . . . . . . . . . . 9

Task 4: Data Analysis

    Step 16: Analyze survey data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Step 17: Develop occupation-specific selection plans . . . . . . . . . . . . . . . . 9

    Step 18: Prepare documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Phase B: FY 95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Task 1: Sample Plan Update

    Step 1: Obtain official sample size estimate . . . . . . . . . . . . . . . . . . . . . 9

Task 2: Survey Printing

    Step 2: Contract for printing and mailing surveys . . . . . . . . . . . . . . . . . 9

    Step 3: Design and print surveys / Make preparations for the mail-out . . . . . 10

Task 3: Data Collection

    Step 4: Select survey sample and prepare mailing addresses . . . . . . . . . . . 10

    Step 5: Mail surveys and respond to survey inquiries . . . . . . . . . . . . . . . 10

    Step 6: Enter survey data into a database . . . . . . . . . . . . . . . . . . . . . . 10

Task 4: Data Analysis

    Step 7: Analyze survey data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Step 8: Prepare documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


TRACK II: RATING SCHEDULE DEVELOPMENT . . . . . . . . . . . . . . . . . 10

Task 1: Accomplishments Database Development

    Step 1: Identify rating competencies to assess with the rating schedule method 11

    Step 2: Collect accomplishments . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Task 2: Accomplishments Scaling Data Collection

    Step 3: Develop Accomplishments Survey . . . . . . . . . . . . . . . . . . . . . . 12

    Step 4: Collect SME accomplishment scaling data . . . . . . . . . . . . . . . . . 12

Task 3: Rating Schedule Assembly

Step 5: Identify accomplishments to include on rating schedules . . . . . . . . . 13

Step 6: Assemble and review occupation-specific rating schedules . . . . . . . 13

Step 7: Prepare documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13


VALIDITY STRATEGIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Meta-Analytic Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Content Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Criterion-related Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Construct Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


OPERATIONAL IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . 15


REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


ATTACHMENT 1: Current Occupational Groupings for the Administrative
                Careers with America Examinations . . . . . . . . . . . . . . 20

ATTACHMENT 2: Project Time Table . . . . . . . . . . . . . . . . . . . . . . . 21

ATTACHMENT 3: Estimated Resource Needs . . . . . . . . . . . . . . . . . . . 24

ATTACHMENT 4: Sampling Plan . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ATTACHMENT 5: MOSAIC Competencies . . . . . . . . . . . . . . . . . . . . 26

ATTACHMENT 6: Sample Rating Sheets from Clerical Technical MOSAIC Study 28

# EXECUTIVE SUMMARY

Recently, the National Performance Review (NPR) recommended that Congress give full authority for competitive examining to agencies and that the Office of Personnel Management (OPM) abolish central registers. Until Congress lifts the ban on delegating examining for common occupations, OPM cannot delegate authority for these positions to the agencies. OPM can, however, include agencies in the examining process and give them more options for rating candidates. OPM is proposing to introduce case examining to replace central registers for Administrative Careers with America (ACWA) occupations. Under case examining, a specific job vacancy would be announced via OPM's Federal Employment Information System, and interested candidates would apply to OPM for a specific job vacancy; agencies would not come to OPM for lists of candidates from standing registers. OPM is also proposing to automate case examining and develop additional examining devices for agency use. Depending on their specific examining needs, agencies will be allowed to use case examining with the current ACWA examination or with the newly developed selection instruments.

One commonly used selection device in case examining has been a rating schedule. Rating schedules typically include questions about competencies such as a candidate's relevant training, education, and experience. Although there are several methods for developing rating schedules, research has shown that rating schedules developed using the Behavioral Consistency Method, which evaluates candidates on their major accomplishments in several job-related areas, produce the highest validities.

Another selection method that has produced good validities with relatively little adverse impact is biographical information (or biodata). The ACWA examination program currently includes a biodata instrument, the Individual Achievement Record (IAR). The IAR asks candidates about their experience, skills, achievements in school, employment, and other activities. Validities for the IAR are well documented.

Based on these findings, it is proposed that rating schedules be developed for all entry level ACWA occupations that include both verifiable biodata items and items developed using a modification of the Behavioral Consistency Method. These new instruments will be available as additional selection tools that agencies can use alone or in combination with the ACWA examinations and/or structured interviews to evaluate ACWA applicants. Thus, agencies will have the ability to assess both cognitive and noncognitive competencies using the ACWA examinations, rating schedules and/or structured interviews.

In addition, the new system will be capable of being automated so that it can be delivered via the Microcomputer Assisted Rating System (MARS). MARS was developed to streamline and automate the examining system.

Due to time constraints for developing and implementing these selection procedures, the project will proceed along two parallel tracks: 1) occupational analysis, and 2) rating schedule development. At key stages, information from the occupational analysis will be fed into the rating schedule development process.

The purpose of the occupational analysis will be to collect additional data on the ACWA occupations that go beyond the cognitive ability domain. The occupational analysis will involve four primary tasks: sample plan development, survey development, data collection, and data analysis. OPM will use the results of the occupational analysis to identify critical competencies for each ACWA occupation, which, in turn, will guide the development of the rating schedules.

A rating schedule for each ACWA occupation will be developed using a modification of the Behavioral Consistency Method. These rating schedules will be implemented in an automated format (i.e., MARS). Accomplishments will be collected in several job-related areas and scaled according to the traditional Behavioral Consistency approach. However, the automation requirement necessitates a modification to the traditional Behavioral Consistency Method. Because it is not possible, in the automated format, for applicants to supply written accomplishments, we are proposing to develop a rating schedule in which scaled accomplishments are presented to applicants, and applicants indicate which accomplishments are applicable to them.

More specifically, we will use the following strategy to develop the rating schedules. OPM psychologists will identify a core set of competencies important for performance in ACWA occupations. Subject matter experts (SMEs) will be asked to provide accomplishments relevant to each competency. OPM will use the results of the job analysis literature review and the data analysis of the occupational analysis inventories to confirm the competencies included on each rating schedule. Then, the competencies identified as important for each occupation and their associated accomplishments will be assembled to produce a rating schedule for each ACWA occupation.

A number of different, but complementary, strategies will be used to determine the validity of the rating schedules. First, rating schedules are typically validated using a content validity model. The content validity of achievements is justified on the basis of the relationship between the content of personal history experience and the content of the occupation. Similarly, the competencies measured in the rating schedules are content valid because they sample the same competencies required for effective performance on the job.

In addition, criterion-related validity studies will be conducted for rating schedules of occupations that have a large number of incumbents or for occupations where a large number of hires is anticipated. The approach will be similar to that used to validate the current ACWA examinations. Specifically, incumbents will be asked to complete the rating schedule for their particular ACWA occupations. Scores on the rating schedule will be correlated with various performance measures, including supervisor ratings, training scores, and measures of job knowledge.

Finally, OPM will conduct a series of studies to assess the construct validity of the dimensions included in the rating schedules. This will involve administering the rating schedule and marker tests to samples of applicants or incumbents. The patterns of the correlations will be examined to determine whether the rating schedules measure the dimensions they were intended to measure. This information, along with the data collected

from the content and criterion approaches, will be used to establish the construct validity of the rating schedules.

It is proposed that OPM close the ACWA registers (i.e., stop accepting applications to take the ACWA examination) in May, 1994. Agencies can continue to use the central registers until September 30, 1994. On October 1, 1994, OPM will terminate the central registers and begin using the new ACWA examining system which will operate in the case examining mode. Applicants who are on the central registers when they are closed in May will be sent a notice of rating at that time and told that they can use these scores under the new examining system for vacancy announcements that use the ACWA examination to rate applicants.

# BACKGROUND

The National Performance Review (NPR; National Performance Review, 1993), the General Accounting Office (GAO), and the Merit Systems Protection Board (MSPB), have suggested changes in staffing procedures of the Federal Government. Two principal recommendations -- that Congress give full authority for competitive examining to agencies (abolishing OPM central registers), and that a wider range of staffing options be available to agencies -- have direct implications for the hiring process for Administrative Careers with America (ACWA) occupations, and are the impetus for the current project.

Even before these recommendations were made, OPM considered providing additional examining options for ACWA occupations. Recent hiring information and feedback from agencies indicated problems with the present central register staffing process. Currently, applicants take an ACWA examination to become eligible for hire for a group of occupations rather than for one job in particular; as a result, applicants decline offers at a disconcertingly high rate because they often are not interested in the specific job they are offered or the geographic location. In addition, applicants sometimes become unrealistically hopeful and then disillusioned when they remain on a central register for a long time without receiving a job offer. In response, OPM announced that it would explore alternative examining procedures within the ACWA examination program (Federal Register, 1992). OPM held focus groups with agency users to get input as to how to make the examining process more efficient and user friendly. The groups identified case examining as a viable alternative to the use of central registers. Under case examining, a specific job vacancy would be announced via OPM's Federal Employment Information System, and interested candidates would apply to OPM for a specific job vacancy. Agencies would not come to OPM for lists of candidates from standing registers. Based on the recommendations of NPR, GAO, and MSPB, and the suggestions of agencies, OPM is proposing to replace central registers with case examining for all ACWA occupations.

Until Congress lifts the ban on delegating examining authority to agencies for occupations which are common across agencies, OPM cannot delegate authority to examine for these positions. However, OPM can include agencies in the examining process and give them more choices of how to examine and rate candidates. OPM proposes to give agencies the choice of using the ACWA examination, which includes a test of job-relevant reasoning abilities and the Individual Achievement Record (IAR), and/or a rating schedule. In addition, agencies may use a structured interview in combination with these procedures. The Outstanding Scholar Program and the Bilingual/Bicultural certification process outlined in the Luevano Consent Decree (Luevano v. King) will also be available for agency use.

The ACWA examination[1] , implemented in 1990, is a proven, valid predictor of job success (see Diané & MacLane, 1994; Pollack & Paskey, 1993; Reilly, 1993a; Reilly, 1993b; Reilly, Nester, McGilvray, & Kelly, 1991). Currently, it is used by OPM to establish central registers for groups of Federal professional and administrative occupations. To fill specific

---

[1] Throughout this proposal, the term ACWA examination will refer to the current ACWA written ability test and the Individual Achievement Record.

positions, using ACWA examination scores, agencies ask OPM for the names of applicants on these registers who have scored well on the examination battery for the corresponding occupational group. The ACWA examination is currently operational in pencil and paper format, and OPM is working on a computerized version of the examination (See Attachment 1 for a list of ACWA occupations). In addition, several structured interviews have been developed by OPM and used for specific ACWA occupations. These interviews could also be used by agencies as a selection device for the appropriate ACWA occupations.

Currently, OPM is undertaking a large-scale research and development effort to develop rating schedules to examine for all entry level ACWA occupations. Although "rating schedule" is a generic term referring to a number of different procedures, most rating schedules evaluate an applicant's relevant training, education, and/or experience (T & E), and assign ratings from 70 to 100 based on the type and amount of this training and experience. The rating schedule approach is currently being used to examine for Group 7 ACWA occupations, which have a minimum qualification of a subject matter degree (see Attachment 1 for a list of Group 7 occupations).

One requirement of any new procedure that OPM develops for agency use when selecting for ACWA positions is that it can be automated and used through OPM's recently developed Microcomputer Assisted Rating System (MARS). MARS is a highly efficient delivery system for presenting staffing options to agencies. Each of OPM's 26 Staffing Service Centers has a MARS unit on site. MARS can store rating schedules for use by OPM offices and can also deliver tests, including the ACWA examination, as well as sample questions for structured interviews.

Rating schedules are conducive to both case examining and delivery via MARS, and are one of the most common assessment vehicles for case examining. This proposal summarizes the method that will be followed to develop the rating schedules. The rating schedules will include features of the Behavioral Consistency Method of rating schedule development as well as verifiable items from the IAR, the scored biodata instrument currently used with the written examination to select individuals into ACWA occupations, and will be delivered in an automated format.

## Rating Schedules as an Examining Method

**The Behavioral Consistency Method.** T & E methods attempt to predict future job performance from a demonstration of past related accomplishments. A rating (score) is assigned through systematic, judgment-based evaluations of information provided by applicants on resumés, applications, or other documents (McDaniel, Schmidt, & Hunter, 1988).

The traditional Behavioral Consistency Method of T & E evaluation, which was developed at OPM (see Schmidt, Caplan, Bemis, Decuir, Dunn, & Antone, 1979), asks candidates to describe their major achievements in several job-related areas. The job-related dimensions have been identified by supervisors as those dimensions that differentiate superior and

2

minimally acceptable performing employees. The achievements provided by the candidates are evaluated using benchmark achievements that have been scaled by SMEs.

**Validity of T & E rating schedules.** The validity of T & E ratings is usually established using a content validity model. The tasks or behaviors measured in the rating schedules are content valid because they sample the kinds of tasks or behaviors required in the occupation. Similarly, the competencies measured in the rating schedules are content valid because they sample the same competencies required for effective performance on the job. However, there are a few reported studies of the predictive validity of these instruments. McDaniel et al. (1988) have conducted the most comprehensive review of the validity of methods relating training and experience in personnel selection. The highest validity was found for the Behavioral Consistency Method (.45). The Behavioral Consistency Method yields useful levels of validity with little variance from study to study, thus, supporting validity generalization. Due to its demonstrated level of criterion-related validity, the Behavioral Consistency Method was chosen as the model to follow when developing rating schedules as complementary or alternative selection procedures to the current ACWA examination.

**Adverse impact[2] of T & E rating schedules.** Very little evidence is available on the adverse impact of rating schedules. Hough (1984) has reported effect sizes of about 1/3 of a standard deviation. This is comparable to the effect size obtained by Gandy, Dye and MacLane (1994) using the IAR, the biodata component of the ACWA examination. Information on the adverse impact of interviews is also very meager, although Reilly and Warech (1988) suggest that the interview will probably have less adverse impact than cognitive ability tests, which typically show an effect size of approximately one standard deviation.

## Biographical Information

In the context of personnel selection, biodata refers to biographical information that is collected as part of a standard application blank or with a special biodata form. Biodata is usually collected directly from applicants via multiple-choice questionnaires. Correct responses on biodata questionnaires are scored according to the extent to which they are correlated with job performance (van Rijn, 1992).

**Validity of biographical information.** Part of the ACWA program development involved an extensive study of biodata. As a result, OPM developed a multiple-choice questionnaire which asks questions about an applicant's experience, skills, achievements in school, employment, and other activities. The study employed a rational-empirical framework in which the biodata content was pre-screened with respect to job-relatedness, privacy, verifiability, and other characteristics of acceptability in a civil service context. Validities of the IAR for predicting job success in ACWA occupations have been well

---

[2] Technically, adverse impact refers to selection ratios. However, in the personnel psychology literature, it often refers to mean differences in performance for groups expressed in standard deviation units.

documented in a large-scale validity study (Gandy et al., 1994; Gandy, Outerbridge, Sharf, & Dye, 1989). The construct validity of the IAR has also been documented (Dye, 1990).

**Adverse impact of biographical information.** As indicated earlier, Gandy et al. (1994) found an effect size of approximately 1/3 standard deviation for the IAR component of the ACWA examination. This small effect size was one of the major reasons the IAR was included as part of the ACWA examination.

## Use of Biodata and the Behavioral Consistency Method

We propose to develop an examining instrument that includes some of the verifiable biodata items that research has shown predict job performance and an application form that is based on the Behavioral Consistency Method. The two methods are similar in that both rely on past accomplishments of the applicant. In addition, they both produce relatively little adverse impact when compared to other selection methods, and past research shows that the IAR is valid for ACWA occupations. MacLane (1991) recently developed a shortened form of the IAR. This inventory will be reviewed to identify verifiable biodata items for inclusion in the proposed rating schedules.

## Project Strategy

Due to time constraints for developing and implementing these selection procedures, the occupational analysis and rating schedule development process will proceed along parallel tracks. Attachment 2 shows the time table for both tracks, and Attachment 3 shows the estimated resource needs for the entire project. At key stages of the occupational analysis, information will be fed into the rating schedule development process.

The occupational analysis (Track I) will proceed in two phases. Because a timely analysis of the entry level data is essential for constructing the rating schedules by the development target dates, Phase A, which involves data collection and analysis for the entry level grades, will be conducted in FY 94. Phase B, to be conducted in FY 95, will consist of the data collection and analysis for grades 9, 11, and 12.

# TRACK I: OCCUPATIONAL ANALYSIS

OPM will collect occupational analysis data on each of the 112[3] professional and administrative occupations currently covered by the ACWA examination program. The purpose of this occupational analysis is to: (1) collect data on the ACWA occupations for developing rating schedules for use with ACWA occupations, and (2) expand the range of

---

[3]This number may vary somewhat from the total number of occupations in the Luevano Consent Decree as a result of the elimination or consolidation of some occupational series.

competencies and grade levels included in the ACWA occupational analysis beyond the cognitive ability domain and journey level.

Whenever possible, OPM will build upon the thorough ACWA occupational analysis conducted in 1990 (O'Leary, Rheinstein, & McCauley, 1991). However, that study focused on the journey grade levels and the cognitive abilities required to perform them. The competencies assessed by the new rating schedules will not be restricted to cognitive abilities. Further, the new rating schedules will be developed for competencies assessed at the entry level grades, typically grades 5 and 7. The present study also affords the opportunity to obtain a broader range of data on the ACWA occupations that can support a variety of human resource management products. Therefore, the new occupational analysis will expand the scope of the ACWA study by focusing on grade levels 5, 7, 9, 11, and 12 and will include a full range of competencies, both cognitive and noncognitive. To do this, OPM will employ the MOSAIC (Multi-purpose Occupational Systems Analysis Inventory -- Closed-Ended) approach to occupational analysis. MOSAIC is an occupational analysis method of gathering data for a variety of human resource management purposes (U.S. Office of Personnel Management, 1992). Unlike many other occupational analysis methods, MOSAIC entails constructing a survey based on an exhaustive literature review of the target occupations and automated reporting of computer statistical analyses for making human resource management decisions.

## Phase A: FY 94

Phase A will consist of four major tasks: sample plan development, survey development, data collection, and data analysis. A time table for the 18 steps in Phase A is presented in Attachment 2.

## Task 1: Sample Plan Development

**Step 1: Develop the sampling plan.** Psychologists at OPM will estimate the sample size for the entire occupational analysis. The psychologists will use the USER computer utility that accesses the Central Personnel Data File to obtain population numbers in each of the five grade levels for each occupation (see Attachment 1).

The plan is to mail surveys to all employees in each occupation/grade-level pair (e.g., GS-560, grade 7) with 100 or fewer incumbents, and to 100 randomly selected employees in each occupation/grade-level with more than 100 incumbents. Where possible, we will inflate this sample, assuming a 50% response rate, to increase the probability that 100 surveys are returned for each occupation with more than 100 incumbents. Attachment 4 presents a more detailed discussion of the sampling strategy and shows the sample sizes for each grade level, collapsed across all the occupations, under this plan. Assuming a variance of 1.0 on 5-point occupational analysis response scales, this plan will ensure that item means will have a 95% confidence interval at $\pm$ .25 for each occupation/grade level. In addition, the sample will include one supervisor per 10 incumbents. Data from supervisors can be a useful complement to incumbent data, particularly because supervisors are in the best position to

judge competencies on two of the scales included in a MOSAIC survey -- "Required for Entry" and "Distinguishing Value."


## Task 2: Survey Development

Step 2: Conduct literature review. A MOSAIC literature review involves the acquisition of lists of tasks and competencies for the occupations under analysis from a wide range of sources. These sources include task and competency documentation from Federal and state agencies, previous MOSAIC studies, competency taxonomies such as those from the SCANS (Secretary's Committee on Achieving Necessary Skills) report (SCANS Report for America 2000, 1992), and the professional literature. While all such sources will be tapped in the present study, perhaps the most important will be the extensive OPM ACWA occupational analysis that was conducted in 1990 (O'Leary, Rheinstein, & McCauley, 1991). Using 43 agencies stipulated by the Luevano consent decree, the ACWA occupational analysis included survey ratings on occupational-specific duties (tasks), 57 generalized work behaviors, and seven cognitive abilities (Verbal Comprehension, General Reasoning, Number Facility, Logical Reasoning, Perceptual Speed, Spatial Orientation, and Visualization) for 95 ACWA occupations. (ACWA occupations with "positive education requirements" were excluded from these analyses; the present study will examine all of the 112 ACWA occupations.) The data included importance ratings on each of the duties, generalized work behaviors, and abilities, plus linkages between abilities and occupation-specific duties and between abilities and behaviors.

OPM will request task lists from the two agencies that employ the most incumbents in each occupation for all grade levels. As these lists arrive, OPM will enter the information for the relevant grade levels into a database. The ACWA tasks, as well as tasks from other important sources (e.g., OPM Position Classification Standards) will be added to the database. Using Alpha Four software (Alpha Software Corporation, 1993), the tasks will be grouped into duty categories. The final task list will consist of a core set of tasks relevant to all ACWA occupations and additional occupation-specific task statements as appropriate.

Concurrent with the development of a task list, OPM will construct a competency list. Although OPM also will ask for competency lists from agencies when requesting task lists, the starting point for the competency list will be a crosswalk between the ACWA abilities and MOSAIC competencies. Attachment 5 presents the MOSAIC competencies used in the Clerical/Technical (U.S. Office of Personnel Management, 1993) and Leadership Effectiveness Survey (Gregory, Armitage, Corts, & Park, 1992) studies. OPM will supplement the resultant list with competencies from the other sources used in the literature review such as the agencies' competency lists, OPM Position Classification Standards, and the SCANS report.

Step 3: Contract for printing and mailing surveys. During this step, OPM will begin negotiations with potential contractors for printing and mailing the surveys. In Phase A of the occupational analysis, survey recipients will respond to the items directly on the surveys, and the responses will be keypunched.

**Step 4: Psychologists rate competencies for importance.** Once the competency list is established, OPM psychologists will rate the competencies for importance to each of the 112 ACWA occupations using existing occupation descriptions. These results will be given to members of the rating schedule development team as an aid in identifying the competencies to include in the rating schedules.

**Step 5: Refine previously defined occupational groups.** To complete the occupational analysis as efficiently as possible, it will be necessary to perform some procedures (e.g., the task-competency linkage ratings) on groups of occupations. However, the seven occupational groups indicated by the original ACWA occupational analysis may be too broad for our purposes. These groups were determined by performing cluster and factor analyses on psychologists' ratings of job descriptions. The seven groups that were ultimately settled upon are good groupings of occupations for purposes of using the ACWA examination, i.e., the cognitive ability test and IAR. Because the present project will expand the number of competencies studied, and, therefore, most likely the number of competencies assessed via the rating schedules, it may be prudent to have finer distinctions among more narrowly defined groups. We shall examine the ACWA data which were used to identify the seven occupational groups to determine if a finer breakdown of groups is warranted.

**Step 6: Psychologists link competencies and tasks.** OPM psychologists will link the tasks to the competencies necessary to perform them. This will provide additional initial support for including the competencies on the rating schedules, and it will help to streamline the task-competency linkage grids that will be administered to SMEs later in the occupational analysis.

**Step 7: Subject matter expert review and "mini-" occupational analysis.** Once the task and competency lists have been drafted, SMEs will review them for comprehensiveness and relevance. OPM will ensure regional representation by working with agency SMEs through the OPM Service Centers. Several SMEs in each occupational group will review the appropriate lists. SMEs will include incumbents and immediate supervisors. OPM will also conduct a small scale ("mini") occupational analysis by having the SMEs rate the tasks and competencies on the same scales that will be used on the final inventory (e.g., Distinguishing Value; see Step 9 for the complete list of scales). These data will also be used to guide the rating schedule development.

**Step 8: Obtain official sample size estimate.** While the task and competency lists are being reviewed by the SMEs, OPM will work with the Office of Workforce Information to determine an official sample size estimate. Although the sample size approximated by OPM psychologists in Step 1 is accurate enough to project cost estimates and negotiate with contractors, an official estimate of the Phase A sample size is needed at this time to establish firmly the number of surveys to be printed. It is unlikely that the sample size estimated here will be meaningfully different from the estimate obtained in Step 1.

**Step 9: Create and pretest the occupational analysis inventory.** After evaluating the SME comments collected in Step 7, OPM will finalize the task and competency lists and prepare the surveys for printing. We anticipate that we will develop several different occupational analysis surveys, one for each occupational group. Each will have a core set of

tasks applicable to all ACWA occupations plus tasks that are specific to the occupations in each group. The inventories will be pretested locally on a representative group of employees.

The scales for rating the tasks and competencies will be consistent with previous MOSAIC studies. Attachment 6 shows two sample MOSAIC task and competency rating sheets. MOSAIC scales also include those scales that are typically used in an occupational analysis conducted using the Behavioral Consistency Method of developing rating schedules. Incumbents will identify the tasks they perform and then rate these on importance and time spent; they will rate the competencies on importance, need for training, and self-rated performance level. Supervisors will rate the tasks on importance and the competencies on importance, required for entry, and distinguishing value.

**Step 10: Print the surveys and make preparations for the mail-out.** A contractor will print the surveys. Only enough surveys for the Phase A mail-out will be printed. Preparations for mail-out include ordering envelopes, writing cover letters, and alerting the appropriate offices.

**Step 11: Prepare task-competency linkage grids.** Because much of the support for the new rating schedules will be provided by content validity evidence, SMEs (supervisors of ACWA incumbents) from the occupational groups will evaluate, in a later step, the extent to which each competency is necessary to perform each task (i.e., they will perform task-competency linkages). OPM will construct task-competency linkage grids for each form of the occupational analysis survey. Both the psychologists' linkage data (from Step 6) and data from the "mini-" occupational analysis (Step 7) will be used to streamline the grids (i.e., OPM will identify and include only a subset of tasks and competencies) so that the SMEs will not be overwhelmed by the assignment.

## Task 3: Data Collection

**Step 12: Select survey sample and prepare mailing addresses.** While the surveys are being printed, the Office of Workforce Information will draw the sample for the GS-5 and GS-7 grade levels. The sample will be put into an ASCII computer file so that the contractor can print the addresses directly on the mail-out envelopes. OPM will check demographic distributions of the sample to ensure proper representativeness of the population.

**Step 13: Mail surveys and respond to telephone inquiries.** A contractor will stuff envelopes and mail the surveys. OPM staff will be available to answer telephone inquiries from survey recipients.

**Step 14: Administer task-competency linkage grids.** OPM will identify small samples of supervisors to fill out the linkage grids developed in Step 11. The SMEs will be supervisors of ACWA incumbents. The supervisors will be identified through the Service Centers to ensure regional representation. OPM will either mail out surveys to SMEs in

each occupational group, making sure that a grid is sent to at least two SMEs in every occupation, or conduct SME groups to complete the grids.

**Step 15: Enter survey data into a database.** The survey responses will be keypunched by a contractor.

## Task 4: Data Analysis

**Step 16: Analyze survey data.** For the purposes of developing the rating schedules, the primary data analysis will involve computing means and standard deviations for the tasks and competencies on each rating scale included in the inventory. Additional analyses of the GS-5 and GS-7 grade level data will be conducted in FY 95 for creating MOSAIC products.

**Step 17: Develop occupation-specific selection plans.** Using the results from the data analyses, OPM will produce a matrix of critical competencies by occupations. This matrix will show the competencies important for performing each of the ACWA occupations and will guide the compilation of the individual competency rating scales into the final rating schedule forms.

**Step 18: Prepare documentation.** OPM will write the occupational analysis technical report for Phase A.

## Phase B: FY 95

The purpose of Phase B is to collect occupational analysis data on grade levels 9, 11, and 12 of the ACWA occupations. These data will be used to develop human resource management products for these occupations. There are four major tasks in Phase B: sample plan update, survey printing, data collection, and data analysis. A time table for the 8 steps in Phase B is presented in Attachment 2.

## Task 1: Sample Plan Update

**Step 1: Obtain official sample size estimate.** OPM psychologists will work with the Office of Workforce Information to calculate an official sample size estimate for determining the number of surveys to be printed.

## Task 2: Survey Printing

**Step 2: Contract for printing and mailing surveys.** During this step, OPM will begin negotiations with potential contractors for printing the Phase B surveys. The booklets in this phase will be scannable. We also will contract for mailing the surveys and scanning them when they are returned. (The delayed mailing for Phase B, in contrast to Phase A, provides time to arrange for developing scannable booklets.)

**Step 3: Design and print surveys/ Make preparations for the mail-out.** A contractor will design the surveys to our specifications. The contractor then will print the surveys. Preparations for mail-out include ordering envelopes, writing cover letters, and alerting the appropriate offices.

## Task 3: Data Collection

**Step 4: Select survey sample and prepare mailing addresses.** The Office of Workforce Information will draw the sample for the GS-9, 11, and 12 grade levels and put it in an ASCII computer file so that the contractor can print the addresses directly on the mail-out envelopes. Demographic distributions for the sample will be checked to ensure proper representativeness of the population.

**Step 5: Mail surveys and respond to survey inquiries.** A contractor will stuff envelopes and mail the surveys. OPM staff will be available to answer telephone inquiries from survey recipients.

**Step 6: Enter survey data into a database.** The survey response sheets will be scanned by the Macon Staffing Service Center.

## Task 4: Data Analysis

**Step 7: Analyze survey data.** The data will be combined with the GS-5 and GS-7 grade level data obtained in Phase A. Standard MOSAIC data analyses will be conducted to produce human resource management products.

**Step 8: Prepare documentation.** OPM will write the occupational analysis technical report for Phase B.

# TRACK II: RATING SCHEDULE DEVELOPMENT

The Behavioral Consistency Method will be used to develop scaled accomplishments suitable for use across the ACWA occupations. During the initial steps of the occupational analysis, OPM psychologists will rate the importance of the competencies for the ACWA occupations and produce a composite list of the important competencies. Accomplishments will be collected for these competencies and scaled by SMEs.

In addition, the occupational analysis data collected from GS-5 and GS-7 level incumbents will be analyzed to confirm the important competencies for each specific ACWA occupation. An automated rating schedule will be developed in which scaled accomplishments are presented to applicants and applicants indicate which accomplishments are applicable to them. Only accomplishments related to important competencies will be included on the rating

schedule for a given occupation. Items from the IAR will also be included with each occupation-specific rating schedule.

Because new procedures for selecting for ACWA positions must be automated, the rating schedules will be designed in a self-rating format. Mabe and West (1981), in an examination of various factors affecting self-ratings, suggest that the most important factor contributing to the validity of self-ratings is the expectation that the self-ratings will be checked objectively. The proposed approach includes features to develop the expectation that the ratings will be checked: (1) a general statement will be included on the application form stating that misrepresentation can lead to dismissal, (2) applicants will be required to submit a resumé along with their applications which can be used to verify their responses to questions on the rating schedule, and (3) applicants will be told that the selecting official may review the information provided on the rating schedule during the selection interview.

To further speed processing, the rating schedules will be implemented nationally through the Microcomputer Assisted Rating System (MARS), an OPM-developed automated system for implementing case examining. MARS can process scannable selection tests and rating schedules.

The major tasks and steps that will be followed to develop rating schedules for each ACWA occupation are described below (also see Attachment 2).

Task 1: Accomplishments Database Development

Step 1: Identify rating competencies to assess with the rating schedule method.
The complete set of competencies generated from the job analysis literature review, along with the competencies currently assessed by the ACWA examination, will be considered for use on the rating schedules. First, the rating data provided by OPM psychologists on the competencies in Step 4 of Phase A of the occupational analysis will be reviewed. Competencies that are consistently rated as important to job performance across occupations will be retained for further consideration.

The surviving competencies will be reviewed for feasibility of assessment. A panel of OPM personnel psychologists experienced in rating schedule development will identify competencies that are suitable for assessment by the rating schedule method. This final set of competencies, the rating competencies, will be the target of rating schedule development activities taking place in later steps.

Step 2: Collect accomplishments. A database of accomplishments will be developed for each rating competency. Potential sources of accomplishments include existing behavioral consistency instruments, ACWA applicants and job incumbents, and supervisors of ACWA job incumbents.

Behavioral consistency instruments have been previously developed for several ACWA occupations. The rating schedules and development documentation will be reviewed for

11

accomplishments relevant to the rating competencies. These accomplishments will form the foundation for the accomplishments database.

A Supplemental Qualifications Statement form will be developed for collecting additional accomplishments for the rating competencies from applicants and incumbents. The task-competency linkage data provided by OPM psychologists in Step 6 of Phase A of the occupational analysis will be used to select illustrative tasks to supplement the competency definitions included on the Supplemental Qualifications Statement and to ensure that the accomplishments that are collected are relevant to important behaviors required by job-related tasks.

The Supplemental Qualifications Statement will be distributed until the central registers are closed in May to ACWA applicants who will provide accomplishments on a voluntary basis. These applicants will be informed that the accomplishments they provide are being collected for test development purposes and will not be scored. Applicant response to the Supplemental Qualifications Statement needs to be large enough to generate 50 accomplishments per competency and represent the six occupational groupings currently used for ACWA testing. The ACWA testing schedules for the six groups will be reviewed to determine if applicants will be available in sufficient number and representativeness. If enough applicants are not available, job incumbents with less than two years of experience in an ACWA occupation will be asked to complete the Supplemental Qualifications Statement. The incumbents will be instructed to provide accomplishments completed prior to employment in an ACWA occupation. In addition, focus groups will be conducted with supervisors of ACWA job incumbents to provide additional accomplishments relevant to a broad range of ACWA jobs.

**Task 2: Accomplishments Scaling Data Collection**

   **Step 3: Develop Accomplishments Survey.** The accomplishments collected in Step 2 will be reviewed by OPM psychologists and rewritten, as necessary, in a general form. Each accomplishment will be stated so that it can be used for all ACWA occupations. Redundant accomplishments will be combined or eliminated. The revised accomplishments database will be formatted as an <u>Accomplishments Survey</u> for SMEs to use in classifying and scaling the accomplishments.

   **Step 4: Collect SME accomplishment scaling data.** SME panels, consisting of supervisors of ACWA incumbents, will be formed to provide accomplishment scaling data. The supervisors will convene at the OPM regional offices, and OPM psychologists will facilitate the groups in completing the <u>Accomplishments Survey</u>.

The group facilitator will familiarize the supervisors with the competencies and their definitions. The supervisors will be instructed to identify the competency best represented by each accomplishment and to assign each accomplishment a proficiency scale value of high, medium, or low.

Task 3: Rating Schedule Assembly

**Step 5: Identify accomplishments to include on rating schedules.** The accomplishment scaling data provided by the SME panels will be analyzed to identify accomplishments consistently classified at the high, medium, or low proficiency level for each competency. OPM psychologists will use the accomplishments that are reliably classified and scaled to develop rating schedule items. Where available, accomplishments from educational experience, work experience, and volunteer work will be included at each proficiency level for each competency.

**Step 6: Assemble and review occupation-specific rating schedules.** The occupation-specific selection plans developed in Step 17 of Phase A of the occupational analysis will be used to determine which competencies to include on the rating schedules for each occupation. A rating schedule will be assembled for each occupation that includes instructions, scaled accomplishments associated with competencies identified as important by the occupational analysis, and selected IAR items. In addition, minimum qualification items will be included on the form. Instructions for recording responses on the Microcomputer Assisted Rating System scannable answer sheet will also be developed.

The rating schedules will be mailed to recent hires and supervisors for their review. The recent hires will be asked to complete the rating schedule and comment on the clarity of the instructions and accomplishments. Supervisors will be asked to rate the relevance of the competencies and the accomplishments to the content of the target occupations they supervise.

**Step 7: Prepare documentation.** A detailed report will be prepared describing the procedures followed to develop the rating schedules and key results.

# VALIDITY STRATEGIES

Discussions of the types of validity suggest that construct validity is the umbrella validity under which other traditional forms of validity fall (Arvey, Nutting, & Landon, 1992; Landy, 1986; Tenopyr, 1977). Thus, a number of different, but complementary, validity strategies will be used.

## Meta-Analytic Studies

Meta-analytic studies of the traditional Behavioral Consistency Method have shown that the procedure produces instruments with useful levels of validity. Moreover, the fact that the distributions of validity coefficients have small corrected standard deviations supports validity generalization (McDaniel et al., 1988). Although the number of studies in the database is somewhat limited, the studies do provide historical support for the validity of the procedure. Meta-analytic studies of biodata support validity generalization of this selection procedure as well (Rothstein, Schmidt, Erwin, Owens, & Sparks, 1990).

## Content Validity

Rating schedules are typically validated using a content validity model. Schmidt et al. (1979) indicated that a content validity strategy is applicable to the development and validation of an examination using the Behavioral Consistency Method. The behaviors sampled in the accomplishments are content valid because they sample the kinds of achievements required to perform in the occupation. Schmidt et al. stated that the purpose of developing competencies is to point out and direct attention to the areas in the background of the applicants where the most valid accomplishments are apt to be found.

The Society for Industrial-Organizational Psychology's Principles for the Validation and Use of Personnel Selection Procedures (1987) supports the use of content validity for accomplishments. Accomplishments can be justified by a similarity between the content of the personal history experience and the content of the occupation, regardless of whether or not the personal history experience and occupation as a whole are similar. As indicated in the Uniform Guidelines on Employee Selection Procedures (Federal Register, 1978), this relationship can be based on the similarity between the competencies or behaviors documented in the accomplishments and those of the occupation rather than between the exact content of the accomplishments and the job. For instance, a person with budgetary experience need not demonstrate experience with the specific budgetary items associated with an occupation for the accomplishments to be content valid, provided the competencies or behaviors in the accomplishments are similar to those required by the job. The rating schedule development process will be based on the content validity model and supporting documentation will be provided.

## Criterion-related Validity

Criterion-related validity studies will be conducted for rating schedules of occupations that have a large number of incumbents or for occupations where a large number of hires are anticipated. The first of these studies will be conducted in late FY 95 and early FY 96. Additional studies will be conducted on an ongoing basis. The studies will be similar to the approach used to validate the ACWA examinations (see Diané & MacLane, 1994; Pollack & Paskey, 1993; Reilly, 1993a; Reilly, 1993b).

First, a study of the technical feasibility of conducting such studies will be completed (see Anderson, 1988). Once the feasibility of the study is established, current incumbents will be asked to complete the rating schedule for a particular ACWA occupation. Scores on the rating schedule will be correlated with various performance measures, including supervisory performance evaluations, job knowledge tests, and/or work samples. The criterion measures will be developed to cover both cognitive and noncognitive performance dimensions to accommodate the range of competencies being covered by the ACWA selection program. Because the dimensions included on the rating schedules will be based on a thorough occupational analysis, OPM anticipates the correlations between rating schedule scores and performance in training or on the job will be significant. Fairness analyses will also be conducted at this time.

## Construct Validity

While the construct foundation of cognitive ability tests is well established (Northrop, 1989), no systematic research has been conducted to establish the construct validity of rating schedules and the attributes measured by them. The development of the rating schedules for the ACWA occupations provides us with a unique opportunity to establish evidence concerning the construct validity of attributes commonly included on rating schedules.

In the employment context, construct validity has traditionally been demonstrated by identifying (through duty-ability linkage in occupational analysis) the abilities that are necessary for successful performance on the job. Once these abilities are identified, measures of such abilities are chosen or developed. Next, evidence is advanced that the measures chosen or developed are indeed measures of the identified job-relevant abilities.

In the case of the ACWA examination, over six decades of psychometric and cognitive research support the psychometric viability of the fundamental abilities measured by the examination (see Northrop, 1989). Such evidence is lacking for many of the attributes measured by traditional rating schedules, even though they are one of the most frequently used selection devices.

We propose to do a series of studies, similar to those undertaken in the construct validation of the IAR (see Gandy, Dye, & MacLane, 1994). Construct validity will be assessed through the use of marker tests which have known psychometric properties. We will hypothesize the relationship between the attributes measured in the rating schedules and the marker tests, and then conduct empirical studies to support or refute these hypotheses. The content and criterion-related validity studies discussed earlier will provide additional construct validity evidence.

# OPERATIONAL IMPLEMENTATION

The change to case examining for ACWA occupations will result in significant changes in the way applicants apply for ACWA occupations. Under the proposed system an applicant will no longer file to take one of the six ACWA examinations to get on a register of qualified candidates. Instead, OPM will announce a specific job vacancy for an agency and invite applicants to apply for that specific vacancy. Examining will only occur if agencies have vacancies.

The proposed change to case examining does not affect the Outstanding Scholar and Bilingual/Bicultural certification options currently in effect for these occupations. That is, agencies may still certify applicants under these programs. Outstanding Scholar applicants do not have to compete via the examination, rating schedule, or structured interview. Bilingual/Bicultural applicants need to obtain a passing score on whatever examination is used. All applicants must still meet the minimum qualifications required for the occupation by the OPM Qualification Standards.

Agencies will have the option of selecting which examination method they will use to examine applicants and will specify, in the job vacancy announcement, the examining method to be used. Vacancies will be announced nationwide via OPM's automated job information system.

The Microcomputer Assisted Rating System (MARS) will be an integral part of the examining process. If agencies select the written examination option, OPM will arrange or assist agencies in scheduling testing sessions. If agencies select the rating schedule option, the examining process will also be administered through the MARS system. Procedures for using the structured interviews will be similar to those used in the present system. OPM staff responsible for implementing the new examining system will work closely with staff developing the examining instruments so that the new system can be operational by October 1, 1994.

# REFERENCES

Alpha Software Corporation (1993). *Alpha Four*. Burlington, MA: Author.

Anderson, C.H. (1988). *Some issues in determining the technical feasibility of criterion-related validity studies*. Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Arvey, R.D., Nutting, S.M., & Landon, T.E. (1992). Validation strategies for physical ability testing in police and fire settings. *Public Personnel Management*, *21*, 301-312.

Diané, C., & MacLane, C.N. (1994). *Criterion-related validity of the Administrative Careers with America group 5 examinations for Social Security Administration claims representatives*. Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Dye, D.A. (1990). *Construct validity of the Individual Achievement Record: Phase I - Development of a confirmatory factor model* (PRD-91-03). Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Federal Register (1978). *Uniform Guidelines on Employee Selection Procedures*, *43*(166), pp. 38295-38309.

Federal Register (1992). *Office of Personnel Management: Administrative Careers with America*, *57*(5), p.724.

Gandy, J.A., Dye, D.A., & MacLane, C.N. (1994). Federal government selection. In G. Stokes, M. Mumford, & W. Owens (Eds.), *Biodata handbook: Theory, research, and use of biographical information for selection and performance prediction* (pp. 275-309). Palo Alto, CA: Consulting Psychological Press.

Gandy, J.A., Outerbridge, A.N., Sharf, J.C., & Dye, D.A. (1989). *Development and initial validation of the Individual Achievement Record (IAR)* (PRD-90-01). Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Gregory, D.J., Armitage, M.A., Corts, D.B., & Park, R.K. (1992). *Occupational Study of Federal Executives, Managers, and Supervisors: Agency Summary Report, Small Agency Council Members*. (Report No. PRD-92-18-13). Washington, DC: U.S. Office of Personnel Management.

Hough, L.M. (1984). Development and validation of the "Accomplishment Record" method of selecting and promoting professionals. *Journal of Applied Psychology*, *69*, 135-146.

Landy, F. J. (1986). Stamp collecting versus science: validation as hypothesis testing. *American Psychologist, 41*, 1183-1192.

Mabe, P.A., & West, S.G. (1981). Validity of self-evaluation of ability: A review and meta-analysis. *Journal of Applied Psychology, 6*, 280-296.

*Luevano v. King, Director of Office of Personnel Management et al.* Civil Action No. 79-0271. U.S. District Court for the District of Columbia. Unpublished consent decree.

MacLane, C.N. (1991). *Development and validation of a Civil Service quality profile* (PRD-92-02). Washington, DC: U.S. Office of Personnel Management, Office of Examination Development.

McDaniel, M.A., Schmidt, F.L., & Hunter, J.H. (1988). A meta-analysis of the validity of methods for rating training and experience in personnel selection. *Personnel Psychology, 41*, 283-312.

National Performance Review (1993). *From red tape to results: Creating a government that works better & costs less.* Washington, DC: Author.

Northrop, L.C. (1989). *The psychometric history of selected ability constructs.* Washington, DC: Office of Personnel Management, Office of Personnel Research and Development.

O'Leary, B.S., Rheinstein, J., & McCauley, D.E. (1991). *Job Analysis for Examination Development in Professional and Administrative Occupations* (Vol. 1; Report No. PRD-92-07). Washington, DC: Office of Personnel Management.

Pollack, D. M., & Paskey, E. M. (1993). *Criterion-related validity of the Administrative Careers with America (ACWA) Group 5 Examination for Tax Auditors* (Report No. PRD-93-14). Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Reilly, R.R. & Warech M.A. (1988). *The validity and fairness of alternative predictors of occupational performance.* Unpublished manuscript, Steven Institute of Technology, Hoboken, NY.

Reilly, S.M. (1993a). *Criterion-related validity of the Administrative Careers with America (ACWA) examination for Group 6 occupations using the predictive model: Prediction of training for customs inspectors (GS-1890).* Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Reilly, S.M. (1993b). *Criterion-related validity of the Administrative Careers with America (ACWA) examination for Group 6 occupations using the predictive model: Prediction of training for customs inspectors (GS-1816).* Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Reilly, S.M., Nester, M.A., McGilvray, B.E., & Kelly, K.L. (1991). *Criterion-related validity of the Administrative Careers with America (ACWA) examination for groups 3 and 4 using the concurrent model* (PRD-91-10). Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

Rothstein, H.H., Schmidt, F.L., Erwin, F.W., Owens, W.A., & Sparks, C.P. (1990). Biographical data in employment selections: Can validities be made generalizable? *Journal of Applied Psychology*, *75*, 175-184.

SCANS Report for America 2000 (1992). *Learning a Living: A Blueprint for High Performance.* U.S. Department of Labor. Washington, D.C.: U.S. Government Printing Office.

Schmidt, F.L., Caplan, J.L., Bemis, S.E., Decuir, R., Dunn, L. & Antone, L. (1979) *The behavioral consistency method of unassembled examining (TM-79-21).* Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development. (NTIS No. PB 268785/AS).

Society of Industrial and Organizational Psychology, Inc. (1987). *Principles for the validation and use of personnel selection procedures (Third Edition).* College Park, MD: Author.

Tenopyr, M.L. (1977). Content-construct confusion. *Personnel Psychology*, *30*, 47-54. van Rijn, P. (1992). Biodata: Potentials and challenges in public sector employee selection. *Personnel Assessment Monographs*, *2*. A publication of the Assessment Council of the International Personnel Management Association.

U.S. Office of Personnel Management (1992). *Occupational Study of Federal Executives, Managers, and Supervisors: An Application of the Multipurpose Occupational Systems Analysis Inventory--Closed-Ended (MOSAIC)* (Report No. PRD 92-21). Washington, DC: Author.

U.S. Office of Personnel Management (1993). [Survey for the Clerical/Technical Study]. Study in progress.



# CURRENT OCCUPATIONAL GROUPINGS FOR THE
## ADMINISTRATIVE CAREERS WITH AMERICA EXAMINATIONS

**Group 1. Health, Safety, and Environmental Occupations**

| Series | Title |
|---|---|
| 0018 | Safety and Occupational Health Management |
| 0023 | Outdoor Recreation Planning |
| 0028 | Environmental Protection Specialist |
| 0673 | Hospital Housekeeping Management |
| 0685 | Public Health Program Specialist |

**Group 2. Writing and Public Information Occupations**

| Series | Title |
|---|---|
| 1001 | General Arts and Information |
| 1035 | Public Affairs |
| 1082 | Writing and Editing |
| 1083 | Technical Writing and Editing |
| 1147 | Agricultural Market Reporting |
| 1412 | Technical Information Services |
| 1421 | Archives Specialist |

**Group 3. Business, Finance, and Management Occupations**

| Series | Title |
|---|---|
| 0011 | Bond Sales Promotion |
| 0106 | Unemployment Insurance |
| 0120 | Food Assistance Program Specialist |
| 0346 | Logistics Management |
| 0393 | Communications Specialist |
| 0501 | Financial Admin. and Programs |
| 0560 | Budget Analysis |
| 0570 | Financial Institution Examining |
| 1101 | General Business and Industry |
| 1102 | Contract Specialist |
| 1103 | Industrial Property Management |
| 1104 | Property Disposal |
| 1130 | Public Utilities Specialist |
| 1140 | Trade Specialist |
| 1145 | Agricultural Program Specialist |
| 1146 | Agricultural Marketing |
| 1149 | Wage and Hour Law Admin. |
| 1150 | Industrial Specialist |
| 1160 | Financial Analysis |
| 1163 | Insurance Examining |
| 1165 | Loan Specialist |
| 1170 | Realty |
| 1171 | Appraising and Assessing |
| 1173 | Housing Management |
| 1176 | Building Management |
| 1910 | Quality Assurance Specialist |
| 2001 | General Supply |
| 2003 | Supply Program Management |
| 2010 | Inventory Management |

**Group 3. Business, Finance, and Management Occupations (continued)**

| Series | Title |
|---|---|
| 2030 | Distribution Facilities and Storage Management |
| 2032 | Packaging |
| 2050 | Supply Cataloging |
| 2101 | Transportation Specialist |
| 2110 | Transportation Industry Analysis |
| 2125 | Highway Safety Management |
| 2130 | Traffic Management |
| 2150 | Transportation Operations |

**Group 4. Personnel, Administration, and Computer Operations**

| Series | Title |
|---|---|
| 0142 | Manpower Development |
| 0201 | Personnel Management |
| 0205 | Military Personnel Management |
| 0212 | Personnel Staffing |
| 0221 | Position Classification |
| 0222 | Occupational Analysis |
| 0223 | Salary and Wage Administration |
| 0230 | Employee Relations |
| 0233 | Labor Relations |
| 0235 | Employee Development |
| 0244 | Labor Management Relations Examining |
| 0246 | Contractor Industrial Relations |
| 0301 | Miscellaneous Administration and Programs |
| 0334 | Computer Specialist (Trainee) |
| 0341 | Administrative Officer |
| 0345 | Program Analysis |
| 1715 | Vocational Rehabilitation |

**Group 5. Benefits Review, Tax, and Legal Occupations**

| Series | Title |
|---|---|
| 0105 | Social Insurance Administration |
| 0187 | Social Services |
| 0270 | Civil Service Retirement |
| 0526 | Tax Technician |
| 0950 | Paralegal Specialist |
| 0962 | Contact Representative |
| 0965 | Land Law Examining |
| 0967 | Passport and Visa Examining |
| 0987 | Tax Law Specialist |
| 0990 | General Claims Examining |
| 0991 | Worker's Compensation Claims Examining |

**Group 5. Benefits Review, Tax, and Legal Occupations (continued)**

| Series | Title |
|---|---|
| 0993 | Social Insurance Claims Examining |
| 0994 | Unemployment Compensation Claims Examining |
| 0996 | Veterans Claims Examining |
| 0997 | Civil Service Retirement Claims Examining |

**Group 6. Law Enforcement and Investigation Occupations**

| Series | Title |
|---|---|
| 0025 | Park Ranger |
| 0080 | Security Administration |
| 0132 | Intelligence |
| 0249 | Wage and Hour Compliance |
| 1169 | Internal Revenue Officer |
| 1801 | Civil Aviation Security Specialist |
| 1810 | General Investigator |
| 1811 | Criminal Investigator |
| 1812 | Game Law Enforcement |
| 1816 | Immigration Inspection |
| 1831 | Securities Compliance Examining |
| 1854 | Alcohol, Tobacco, and Firearms Inspection |
| 1864 | Public Health Quarantine Inspection |
| 1889 | Import Specialist |
| 1890 | Customs Inspector |

**Group 7. Positions with Positive Education Requirements**

| Series | Title |
|---|---|
| 0020 | Community Planning |
| 0101 | Social Science |
| 0110 | Economist |
| 0130 | Foreign Affairs |
| 0131 | Internal Relations |
| 0140 | Manpower Research and Analysis |
| 0150 | Geography |
| 0170 | History |
| 0180 | Psychology |
| 0184 | Sociology |
| 0190 | General Anthropology |
| 0193 | Archaeology |
| 1015 | Museum Curator |
| 1420 | Archivist |
| 1701 | General Education and Training |
| 1720 | Education Program |

SOURCE: From Pollack, D. M. & Paskey, E. M. (1993). Criterion-related validity of the Administrative Careers with America (ACWA) Group 5 Examination for Tax Auditors (Report No. PRD-93-14). Washington, DC: U.S. Office of Personnel Management, Office of Personnel Research and Development.

## TRACK 1: OCCUPATIONAL ANALYSIS, Phase A

| TASK | STEP | BI-WEEKLY STAFF REQUIREMENTS BY MONTH[1] | | | | | | | | | | | | | | | | | | Time[2] | FTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 | | | |
| 1. Sample Plan | 1: Develop Sampling Plan | 2 | | | | | | | | | | | | | | | | | | ½ | .05 |
| 2. Survey Development | 2: Conduct Literature Review | 4 | 4 | 3 | 3 | | | | | | | | | | | | | | | F | .7 |
| | 3: Contract Printing/Mailing | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | ½ | .1 |
| | 4: Psychologists Rate Comps | | 4 | | | | | | | | | | | | | | | | | F | .2 |
| | 5: Refine Occupational Groups | | | 3 | 3 | | | | | | | | | | | | | | | F | .3 |
| | 6: Psychs Link Tasks & Comps | | | | | 6 | 6 | | | | | | | | | | | | | ¼ | .15 |
| | 7: SME Review/"Mini-" OA | | | | | 2 | 2 | | | | | | | | | | | | | F | .2 |
| | 8: Official Sample Estimate | | | | | | 2 | 3 | | | | | | | | | | | | F | .25 |
| | 9: Create/Pretest OA Inventory | | | | | | | 1 | | | | | | | | | | | | ¼ | .0125 |
| | 10: Print Surveys/Misc Prep | | | | | | | | 1 | 1 | | | | | | | | | | F | .1 |
| | 11: Prepare Linkage Grids | | | | | | | | 1 | 1 | | | | | | | | | | ½ | .05 |
| 3. Data Collection | 12: Select Sample | | | | | | | | 1 | 1 | | | | | | | | | | ½ | .05 |
| | 13: Mail Surveys/Phones | | | | | | | | | | 2 | 2 | 2 | 2 | | | | | | F | .4 |
| | 14: Collect Linkage Data | | | | | | | | | | 2 | 2 | | | | | | | | F | .2 |
| | 15: Data Entry | | | | | | | | | | | | 1 | 1 | 1 | | | | | ¼ | .03 |
| 4. Data Analysis | 16: Data Analysis | | | | | | | | | | | | | | | 1 | 1 | | | F | .1 |
| | 17: Develop Selection Plans | | | | | | | | | | | | | | | | 1 | | | F | .05 |
| | 18: Phase A Documentation | | | | | | | | | | | | | | | | | | | | |
| | BI-WEEKLY STAFF TOTAL: | 7 | 9 | 7 | 7 | 8 | 10 | 4 | 3 | 3 | 4 | 4 | 3 | 3 | 1 | 1 | 2 | | | | FTE (total) 2.95 |

[1] The numbers in the top row denote months 1-9; the number of staff needed for each step is indicated in the gray-shaded cells in two-week blocks;
[2] F = fulltime; ½ = halftime; ¼ = quartertime.   [3] One staff person, fulltime for one month = .1 FTE.

| TRACK 2: RATING SCHEDULE DEVELOPMENT, Phase A | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TASK | STEP | BI-WEEKLY STAFF REQUIREMENTS BY MONTH[1] | | | | | | | | | | | | | | | | | | Time[2] | FTE[3] |
| | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 | | | |
| 1. Accomplishments Database | 1: Identify Competencies | | | 2 | | | | | | | | | | | | | | | | F | .1 |
| | 2: Collect Accomplishments | | | | 4 | 4 | 4 | 4 | 4 | | | | | | | | | | | F | 1.0 |
| 2. Accomplishments Scaling | 3: Develop Survey | | | | | | | 3 | 3 | 3 | 3 | | | | | | | | | F | . |
| | 4: Collect Scaling Data | | | | | | | | | 3 | 3 | 3 | 3 | | | | | | | F | .6 |
| 3. Rating Schedule Assembly | 5: Identify Accomplishments | | | | | | | | | | | | | 3 | 3 | 3 | | | | F | .45 |
| | 6: Assemble Rating Schedules | | | | | | | | | | | | | | | 2 | 2 | 2 | | F | .3 |
| | 7: Prepare Documentation | | | | | | | | | | | | | | | | | | | F | .1 |
| | BI-WEEKLY STAFF TOTAL: | 0 | 0 | 2 | 4 | 4 | 4 | 7 | 7 | 6 | 6 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | | FTE (total) 3.15 |

| | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL PROJECT BI-WEEKLY STAFF: (TRACK 1 + TRACK 2) | 7 | 9 | 9 | 11 | 12 | 14 | 11 | 10 | 9 | 10 | 7 | 6 | 6 | 4 | 4 | 4 | 2 | 2 | | FTE (total) 6. |

[1] The numbers in the top row denote months 1-9; the number of staff needed for each step is indicated in the gray-shaded cells in two-week blocks;

[2] F = fulltime; ½ = halftime; ¼ = quartertime.      [3] One staff person, fulltime for one month = .1 FTE.

22

| | | **TRACK 1: OCCUPATIONAL ANALYSIS, Phase B** | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TASK** | **STEP** | **BI-WEEKLY STAFF REQUIREMENTS BY MONTH[1]** | | | | | | | | | | | | | | | | | | **Time[2]** | **FTE[3]** |
| | | 10 | 10 | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 | 16 | 16 | 17 | 17 | 18 | 18 | | |
| 1. Sample Plan | 1: Official Sample Estimate | 1 | | | | | | | | | | | | | | | | | | ¼ | .0125 |
| 2. Survey Printing | 2: Contract Printing/Mailing | 1 | 1 | 1 | | | | | | | | | | | | | | | | ½ | .075 |
| | 3: Design and Print Surveys/ Miscellaneous Preparations | | | | 2 | 2 | 2 | 2 | | | | | | | | | | | | ½ | .2 |
| 3. Data Collection | 4: Select Sample | | | | | | 1 | 1 | | | | | | | | | | | | ½ | .05 |
| | 5: Mail Surveys/Phones | | | | | | | | 2 | 2 | 2 | 2 | | | | | | | | F | .4 |
| | 6: Data Entry | | | | | | | | | | 1 | 1 | 1 | | | | | | | ½ | .075 |
| 4. Data Analysis | 7: Data Analysis | | | | | | | | | | | | | 2 | 2 | 2 | 2 | 2 | | F | .5 |
| | 8: Phase B Documentation | | | | | | | | | | | | | | | | | | | | |
| | BI-WEEKLY STAFF TOTAL: | 2 | 1 | 1 | 2 | 2 | 3 | 3 | 2 | 2 | 3 | 3 | 1 | 2 | 2 | 2 | 2 | 2 | | | FTE (total 1.313 |

[1] The numbers in the top row denote months 10-18; the number of staff needed for each step is indicated in the gray-shaded cells in two-week blocks;

[2] F = fulltime; ½ = halftime; ¼ = quartertime.    [3] One staff person, fulltime for one month = .1 FTE.

# ESTIMATED RESOURCE NEEDS

## STAFF

| | | |
|---|---|---|
| **PRDC Staff** | 6 Personnel Psychologists | 6 FTE |
| **OSPO Staff** | 1 Staffing Specialist for regional coordination and operational guidance | .5 FTE |
| **Additional Staff[4]** | CEG/Regional Staff (Deployed as Needed):<br>6 CEG/Regional staff for 2 to 4 weeks during time-critical project steps | |

## EXPENSES

| | | |
|---|---|---|
| **Travel (21-80-00)** | 3 trips to each regional office | $ 9,500 |
| |     (1) Mini-occupational analysis | |
| |     (2) Task-competency linkages | |
| |     (3) Accomplishment scaling | |
| | 4 trips to Macon | $ 1,600 |

### PHASE A

| | | |
|---|---|---|
| **Survey Printing & Mailing Contract** | Printing (24-20-00) | $ 12,000 |
| | Distribution (by Macon SSC) | $ 8,400 |
| | Return Envelopes and Postage (23-44-00) | $ 10,500 |
| | Keypunching (in-house)[5] | No Fee |

### PHASE B

| | | |
|---|---|---|
| | Printing (24-20-00) | $ 66,000 |
| | Distribution (by Macon SSC) | $ 23,000 |
| | Return Envelopes and Postage (23-44-00) | $ 27,500 |
| | Survey Processing (by Macon SSC) | $ 31,500 |
| **Total Material & Travel Costs** | Total Cost with Phase A only | $ 42,000 |
| | Total Cost of Phase A and Phase B | $190,000 |

---

[4] This extra staff is critical not only for meeting the short deadline, but also for establishing regional involvement which is crucial for ensuring agency acceptance of the new rating schedules.

[5] Keypunching using an outside contractor will cost about $65,000.

# SAMPLING PLAN

These charts show the sample and mail-out requirements for Phase A and Phase B of the occupational analysis by grade level. The sampling plan is to send surveys to all incumbents in each job/grade-level pair (e.g., GS-560, grade 7) with 100 or fewer incumbents, and to 100 incumbents from those pairs with more than 100 incumbents. The corresponding numbers are on the row labeled Incumbent Sample. However, these are the numbers of surveys that should be returned to ensure that the sample results adequately represent the population. The row labeled Incumbent Surveys Mailed shows the number of surveys that must be mailed to achieve the sample numbers assuming a 50% response rate. The number of surveys mailed is not simply double the desired number of returned surveys. This is because some of the occupation/grade-level pairs have fewer than 100 incumbents, while others have between 100 and 200 incumbents. Any pairs with fewer than 100 incumbents cannot be inflated at all; any with between 100 and 200 incumbents can be inflated only up to the total number of incumbents.

We are also planning a supervisor sample of 10% of the number of surveys mailed to incumbents.

## Phase A (FY 94)

|  | GS-5 | GS-7 | TOTAL |
|---|---|---|---|
| Incumbent Population | 14,400 | 36,900 | 51,300 |
| Incumbent Sample | 4,000 | 6,500 | 10,500 |
| % of Population | 28 | 18 | 20 |
| Incumbent Surveys Mailed | 5,800 | 10,900 | 16,700 |
| Supervisor Sample | 580 | 1,090 | 1,670 |
| Total Number of Surveys Mailed | 6,380 | 11,990 | 18,370 |

## Phase B (FY 95)

|  | GS-9 | GS-11 | GS-12 | TOTAL |
|---|---|---|---|---|
| Incumbent Population | 71,900 | 98,200 | 102,400 | 272,500 |
| Incumbent Sample | 8,000 | 8,700 | 9,000 | 25,700 |
| % of Population | 11 | 9 | 9 | 9 |
| Incumbent Surveys Mailed | 14,100 | 15,800 | 16,000 | 45,900 |
| Supervisor Sample | 1,410 | 1,580 | 1,600 | 4,590 |
| Total Number of Surveys Mailed | 15,510 | 17,380 | 17,600 | 50,490 |

# MOSAIC Competencies: Clerical/Technical Study

**Reading** - Learns from written material by determining the main idea or essential message. Recognizes correct English grammar, punctuation, and spelling.

**Writing** - Uses correct English grammar, punctuation, and spelling to communicate thoughts, ideas, information, and messages in writing.

**Listening** - Receives, attends to, interprets, and responds to verbal messages and other cues such as body language in ways that are appropriate to listeners and situations.

**Speaking** - Uses correct English grammar to organize and communicate ideas in words that are appropriate to listeners and situations; uses body language appropriately.

**Arithmetic/Mathematical Reasoning** - Performs computations such as addition, subtraction, multiplication, and division correctly; solves practical problems by choosing appropriately from a variety of mathematical techniques such as formulas and percentages.

**Reasoning** - Discovers or selects rules, principles, or relationships between facts and other information.

**Decision Making** - Specifies goals and obstacles to achieving those goals, generates alternatives, considers risks, and evaluates and chooses the best alternative in order to make a determination, draw conclusions or solve a problem.

**Creative Thinking** - Uses imagination to combine ideas or information in new ways.

**Mental Visualization** - Sees things in the mind by mentally organizing and processing symbols, pictures, graphs, objects, or other information. For example, sees a building from a blueprint, or sees the flow of work activities from reading a work plan.

**Memory** - Recalls information that has been presented previously.

**Eye-Hand Coordination** - Accurately coordinates one's eyes with one's fingers, wrist, or arms to move, carry, or manipulate objects, or to perform other job-related tasks.

**Perceptual Speed** - Sees detail in words, numbers, pictures, and graphs, quickly and accurately.

**Physical Strength and Agility** - Ability to bend, lift, climb, stand, and walk for long periods of time; ability to perform moderately heavy laboring work.

**Stamina** - Performs repetitive tasks effectively over a long period of time, for example, data entry and coding.

**Applies Technology to Tasks** - Selects and understands procedures, machines, or tools that will produce the desired results; identifies or solves problems in machines, computers, or other technologies as they are related to performing tasks.

**Technical Competence** - Knowledge of how to perform one's job. Refers to specialized knowledge that is acquired through formal training or extensive on-the-job experience.

**Organizational Awareness** - Knows how social, political, organizational, and technological systems work and operates effectively within them. This includes the policies, procedures, rules, and regulations of the work or organization.

**Manages and Organizes Information** - Identifies a need; gathers, organizes, and maintains information; determines its importance and accuracy, and communicates it by a variety of methods.

**Manages Resources** - Selects, acquires, stores, and distributes resources such as materials, equipment, or money.

**Manages Human Resources** - Plans, distributes, and monitors work assignments; evaluates work performance and provides feedback to others on their performance.

**Conscientiousness** - Displays a high level of effort and commitment towards performing work; demonstrate responsible behavior.

**Integrity/Honesty** - Displays high standards of ethical conduct and understands the impact of violating these standards on an organization, self, and others; chooses an ethical course of action; is trustworthy.

**Interpersonal Skills** - Shows understanding, friendliness, courtesy, tact, empathy, cooperation, concern, and politeness to others; relates well to different people from varied backgrounds and different situations.

**Self-Esteem** - Believes in own self-worth, maintains a positive view of self, and displays a professional image.

**Self-Management** - Sets well-defined and realistic personal goals; monitors progress and is motivated to achieve; manages own time and deals with stress effectively.

**Flexibility** - Adapts quickly to changes.

**Leadership** - Interacts with others to influence, motivate, and challenge them.

**Teaches Others** - Helps others learn; identifies training needs; provides constructive reinforcement; coaches others on how to perform tasks; acts as a mentor.

**Teamwork** - Encourages and facilitates cooperation, pride, trust, and group identity; fosters commitment and team spirit; works with others to achieve goals.

**Negotiation** - Works with others towards an agreement that may involve exchanging specific resources or resolving differences.

**Customer Service** - Works and communicates with clients and customers (e.g., any individuals who use or receive the services or products that your work unit provides, including individuals who work in your agency or in other agencies or organizations outside the Government) to satisfy their expectations. Committed to quality services.

(continued)

# MOSAIC Competencies: Leadership Effectiveness Study

**Written Communication** - Expresses facts and ideas in writing in a succinct and organized manner.

**Oral Communication** - Expresses ideas and facts to individuals or groups effectively; makes clear and convincing oral presentations; listens to others; facilitates an open exchange of ideas.

**Problem Solving** - Identifies and analyzes problems; uses sound reasoning to arrive at conclusions; finds alternative solutions to complex problems; distinguishes between relevant and irrelevant information to make logical judgments.

**Interpersonal Skills** - Considers and responds appropriately to the needs, feelings, and capabilities of others; adjusts approaches to suit different people and situations.

**Managing Diverse Workforce** - Is sensitive to cultural diversity, race, gender, and other individual differences in the workforce; manages workforce diversity.

**Vision** - Takes a long-term view and initiates organizational change for the future; builds the vision with others; spots opportunities to move the organization toward the vision.

**Creative Thinking** - Develops new insights into situations and applies innovative solutions to make organizational improvements; designs and implements new or cutting-edge programs/processes.

**Flexibility** - Is open to change and new information; adapts behavior and work methods in response to new information, changing conditions, or unexpected obstacles; effectively deals with pressure and ambiguity.

**Decisiveness** - Makes sound and well-informed decisions; perceives the impact and implications of decisions; commits to action, even in uncertain situations, in order to accomplish organizational goals; causes change.

**Leadership** - Inspires, motivates and guides others toward goal accomplishment; coaches, mentors, and challenges subordinates; adapts leadership styles to a variety of situations; models high standards of honesty, integrity, trust, openness, and respect for the individual by applying these values to daily behaviors.

**Conflict Management** - Manages and resolves conflicts, confrontations, and disagreements in a positive and constructive manner to minimize negative personal impact.

**Self-Direction** - Demonstrates belief in own abilities and ideas; is self-motivated and results-oriented; recognizes own strengths and weaknesses; seeks feedback from others and opportunities for self-learning and development.

**Influencing/Negotiating** - Persuades others; develops networks and coalitions; gains cooperation from others to obtain information and accomplish goals; negotiates to find mutually acceptable solutions; build consensus through give and take.

**Planning and Evaluating** - Determines objective and strategies; coordinates with other parts of the organization to accomplish goals; monitors and evaluates the progress and outcomes of operational plans; anticipates potential threats or opportunities.

**Financial Management** - Prepares, justifies, and/or administers the budget for program areas; plans, administers and monitors expenditures to ensure cost-effective support of programs and policies.

**Human Resources Management** - Empowers people by sharing power and authority; develops lower levels of leadership by pushing authority downward and outward throughout the organization; shares rewards for achievement with employees; ensures that staff are appropriately selected, utilized, appraised, and developed, and that they are treated in a fair and equitable manner.

**Client Orientation** - Anticipates and meets the needs of clients; achieves quality end-products; is committed to improving services.

**External Awareness** - Identifies and keeps up-to-date on key agency policies/priorities and economic, political, and social trends which affect the organization; understands where the organization is headed and how to make a contribution.

**Team Building** - Manages group processes; encourages and facilitates cooperation, pride, trust, and group identity; fosters commitment and team spirit; works with others to achieve goals.

**Technology Management** - Integrates technology into the workplace; develops strategies using new technology to manage and improve program effectiveness; understands the impact of technological changes on the organization.

**Internal Controls/Integrity** - Assures that effective internal controls are developed and maintained to ensure the integrity of the organization.

**Technical Competence** - Understands and appropriately applies procedures, requirements, regulations and policies related to specialized expertise, e.g., engineering, physical science, law, or accounting; maintains credibility with others on technical matters.

# SAMPLE TASK RATING SHEET FROM
# CLERICAL/TECHNICAL MOSAIC STUDY

*First, read through the list of tasks and identify the tasks you perform in your present job by darkening the oval in the column labeled "Darken Oval If Performed." Next, read through the list of tasks and rate each task that you perform by using the "Time Spent" scale. Rate only those tasks you perform in your present position.*

*In making these comparisons, it is important that you consider the number of times you perform the task and the amount of time needed to complete the task each time you perform it.*

Compared to all the other tasks that you perform, how much time do you spend performing this task?

**Time Spent**
5. Considerably more than most tasks
4. Somewhat more than most tasks
3. Same as most tasks
2. Somewhat less than most tasks
1. Considerably less than most tasks

**Darken Oval If Performed**

## A. PAPER RECORDS OR FILES

1. Ensures that paper files are current and complete.
2. Develops paper filing or record system.
3. Maintains paper filing or record system.
4. Assembles and labels information for filing.
5. Adds, retrieves, or removes information from paper files or records.
6. Categorizes information for filing.

## B. INFORMATION TRANSCRIPTION AND VERIFICATION

7. Writes down information from one document or record to another.
8. Verifies accuracy and completeness of information on paper or computer documents or records.
9. Corrects mistakes in written or computer documents or records.

## C. INFORMATION MANAGEMENT

10. Compiles information.
11. Classifies or catalogs documents, computer tapes, books, or other information.
12. Organizes information in tables, charts, or graphs.
13. Analyzes and interprets routine information.
14. Analyzes and interprets complex information.
15. Conducts studies or surveys to obtain information.
16. Searches files, documents or other sources for information.

## D. WRITTEN OR ORAL COMMUNICATION

17. Composes simple correspondence or other written work.
18. Composes complex correspondence or other written work.
19. Writes technical reports.
20. Explains technical information orally.
21. Writes letters or other documents requiring specialized knowledge.
22. Proofreads letters or other documents for spelling or typographical errors.
23. Proofreads letters or other documents for grammatical errors.
24. Reviews content of letters or other documents for completeness, correctness or consistency.
25. Prepares materials for publication according to standards.
26. Designs forms.
27. Translates orally from a foreign language to English.

# SAMPLE COMPETENCY RATING SHEET FROM
# CLERICAL/TECHNICAL MOSAIC STUDY

0. This competency is not needed — Importance
1. Not Important
2. Somewhat important
3. Important
4. Very important
5. Extremely Important

Performance Level
6. Do not know
5. Outstanding
4. Above average
3. Average
2. Below average
1. Unsatisfactory

Need for Training
5. Do not know/Not part of my job
4. Considerable training is needed
3. Training is needed
2. Some training is needed (e.g., one-day course, on-the-job training)
1. Training is not needed

**Competency**

1. **READING** – Learns from written material by determining the main idea or essential message. Recognizes correct English grammar, punctuation, and spelling.

2. **WRITING** – Uses correct English grammar, punctuation, and spelling to communicate thoughts, ideas, information, and messages in writing.

3. **LISTENING** – Receives, attends to, interprets, and responds to verbal messages and other cues such as body language in ways that are appropriate to listeners and situations.

4. **SPEAKING** – Uses correct English grammar to organize and communicate ideas in words that are appropriate to listeners and situations; uses body language appropriately.

5. **ARITHMETIC/MATHEMATICAL REASONING** – Performs computations such as addition, subtraction, multiplication, and division correctly; solves practical problems by choosing appropriately from a variety of mathematical techniques such as formulas and percentages.

6. **REASONING** – Discovers or selects rules, principles, or relationships between facts and other information.

7. **DECISION MAKING** – Specifies goals and obstacles to achieving those goals, generates alternatives, considers risks, and evaluates and chooses the best alternative in order to make a determination, draw conclusions or solve a problem.

8. **CREATIVE THINKING** – Uses imagination to combine ideas or information in new ways.

9. **MENTAL VISUALIZATION** – Sees things in the mind by mentally organizing and processing symbols, pictures, graphs, objects, or other information. For example, sees a building from a blueprint, or sees the flow of work activities from reading a work plan.

10. **MEMORY** – Recalls information that has been presented previously.

11. **EYE-HAND COORDINATION** – Accurately coordinates one's eyes with one's fingers, wrist, or arms to move, carry, or manipulate objects, or to perform other job-related tasks.

12. **PERCEPTUAL SPEED** – Sees detail in words, numbers, pictures, and graphs, quickly and accurately.

13. **PHYSICAL STRENGTH AND AGILITY** – Ability to bend, lift, climb, stand, and walk for long periods of time; ability to perform moderately heavy laboring work.

14. **STAMINA** – Performs repetitive tasks effectively over a long period of time, for example, data entry and coding.

15. **APPLIES TECHNOLOGY TO TASKS** – Selects and understands procedures, machines, or tools that will produce the desired results; identifies or solves problems in machines, computers, or other technologies as they are related to performing tasks.

16. **TECHNICAL COMPETENCE** – Knowledge of how to perform one's job. Refers to specialized knowledge that is acquired through formal training or extensive on-the-job experience.

17. **ORGANIZATIONAL AWARENESS** – Knows how social, political, organizational, and technological systems work and operates effectively within them. This includes the policies, procedures, rules, and regulations of the work unit or organization.

18. **MANAGES AND ORGANIZES INFORMATION** – Identifies a need; gathers, organizes, and maintains information; determines its importance and accuracy, and communicates it by a variety of methods.

C

C

Exh. C
CA: 79-271 JHG

DRAFT

FILED

OCT 28 1994

Clerk, U.S. District Court
District of Columbia

Dear Applicant:

The Office of Personnel Management (OPM) is replacing its central inventories of job applicants for positions covered by the Administrative Careers with America (ACWA) examination with a new approach which will take effect on October 14, 1994. You are currently an applicant on the central inventory for entry level administrative positions because you passed the ACWA examination. This letter explains the new approach, why OPM believes the new approach is better than the central inventory, and how the new approach will affect you.

The new approach is called "case examining." This means that OPM announces a specific position when an agency is ready to recruit. Job seekers who want to be considered for the specific position apply to OPM. OPM scores all the applications it receives and issues a list of eligible candidates in rank order to the agency for its consideration.

Case examining is much better than central inventories. Central inventories produce lists of people who are seldom interested in the specific position to be filled. The majority of candidates decline to be considered because they are not interested in the particular location, duties, salary of the position, and in many instances, they are no longer looking for a position with the Federal government. Because agencies expect many candidates to decline, they must contact candidates to ask if they still want to be considered, a step that delays the hiring process. Most agencies have stopped using the central inventories altogether, preferring to fill positions from within their current workforce. Case examining also eliminates the costs of maintaining an everchanging, little-used inventory. Replacing central inventories with case examining is one of the ways OPM is improving the Federal hiring process and meeting the President's goal of a government that works better and costs less.

Due to our new approach, your current eligibility for ACWA positions will remain in effect through the end of your period of eligibility or October 14, 1994, whichever is earlier. To receive consideration for these occupations after that date, you must apply to individually announced job vacancies. Job vacancies will be announced by Federal Employment Information Centers (listing enclosed). The Staffing Service Center in Macon, Georgia, will no longer handle the referral of candidates for positions covered by the Administrative Careers with America examination.

When OPM announces a position you want, you can follow the easy application procedures in the announcement. You can request an application form which will be mailed directly to you. Simply mark your answers to questions about your experience and education and return the completed form to OPM. For positions covered by the ACWA examination, Federal agencies will have a choice of whether or not to require the written test. If the announcement says the applicants must take the written test, you may choose whether to take the test again or simply send a copy of your Notice of Results, which is enclosed with this letter. Please retain the original of this Notice, because after we close the inventories on October 14, 1994, we will not be able to provide duplicate copies.

Information concerning job vacancies may be obtained by calling any Federal Employment Information Center. Or, you may call the Career America Connection at (912) 757-3000, 7 days a week, 24 hours a day. If you have access to a personal computer equipped with a modem and communications software, you may receive the same information by calling the Federal Job Opportunities Bulletin Board at (912) 757-3100. This service is also available 7 days a week, 24 hours a day. If you have a hearing disability, you may call our TDD line at (912) 744-2299. Requests for other information concerning ACWA positions should also be directed to the Federal Employment Information Centers rather than to the Staffing Service Center in Macon.

Thank you for your continued interest in Federal employment.

Sincerely,

Enclosures

D

Ex. D

DRAFT

CA: 79-271 JHG

FILED

OCT 28 1994

Clerk, U.S. District Court
District of Columbia

Letter to Agency Personnel Officers

FROM:     LEONARD R. KLEIN
          ASSOCIATE DIRECTOR FOR
          CAREER ENTRY

Subject:  Changes to the Administrative Careers With America (ACWA)
          Examinations

This is a follow-up to our memorandum dated June 17, 1994, on the
Office of Personnel Management's (OPM) proposal to change the ACWA
0examinations.    This change to the examining process **does not
eliminate** the Outstanding Scholar, Bilingual, or Bicultural special
appointing authorities.   **The new examining procedures will begin
_____ 1994.**

The National Performance Review (NPR) recommends that OPM replace
its central inventories with a new hiring process to give agencies
more flexibility in hiring candidates for their vacancies.    The
changes meet the NPR objectives within the constraints of the
Luevano consent decree and the statutory bar on OPM delegating
examining for common positions to agencies.   Rather than maintain
central inventories, OPM Service Centers will examine locally for
ACWA positions on a case-by-case basis.

The new procedures have several advantages for you.   First, you
will be better able to link your recruitment activities to the
examining process.     Second, you will be able to specify the
qualifications requirements for your positions.    Third, you will
receive certificates within a week of the closing date.   Fourth,
the candidates on the certificate will be interested and available
for your positions.    Fifth, OPM will provide you with a copy of
each candidate's resume.

In addition to these general advantages, we are programming new
features that will soon afford you new flexibilities.     In
approximately six months, you will have the option to use the
written tests for all qualified applicants, for applicants that
score very well on the rating schedule or not at all.   You will
have the option of administering the tests yourself, perhaps in
conjunction with an interview, or you can ask OPM to administer the
tests for you.   We will explain these options to you in greater
detail when they are operational.

Another advantageous feature that will be operational within a few
months is the telephone application system.   This highly effective
system allows applicants to apply by phone.   It eliminates mail
delays and forms management.

We are sending letters to all candidates on the central inventories

describing the new examining procedure. We are providing them with a new copy of their Notice of Results on the written test. When you choose to use the written tests, applicants will have the option to use the Notice in lieu of retaking the test.

OPM Service Centers will use rating schedules developed by our Personnel Research and Development Center using a modified behavioral consistency method. We have loaded these rating schedules into our Micro-Assisted Rating System (MARS) library. Each rating schedule has four parts:

    Part 1:    Minimum Qualifications screen;
    Part 2:    Individual Achievement Record;
    Part 3:    Accomplishments; and
    Part 4:    Sex, Race, and National Origin

While the Service Center, in consultation with you, can modify the minimum qualifications screen, it cannot modify Parts 2 and 3. Part 4, the Sex, Race, and National Origin information is not used in the rating. This is required data collection for statistical purposes under the Luevano consent decree.

You will request ACWA certificates from your local OPM Service Center, just like you request mid-level and senior-level certificates today. The Service Center will consult with you about qualification requirements. The Service Center will announce the examination and supply application materials to those who request them. You are encouraged to distribute application materials to those you recruit. Applicants will apply using the optical scan form C and a resume. When the announcement closes, the Service Center will allow 5 days for mailing before producing your certificate. The Service Center can electronically send you the certificate and the resumes, using the Automated Case Examining System (ACES).

The new ACWA examining process goes a long way to addressing the concerns you shared with us about the old process. As you use this new process, I hope you will take the time to tell us how we can make further improvements. Our Service Centers are committed to providing you quality service.

2

E

DRAFT

FILED

OCT 28 1994

Clerk, U. S. District Court
District of Columbia

1. In this letter we describe the new examining procedures for the positions covered under the Administrative Careers With America (ACWA) examinations. **The new procedures will begin _____ 1994.**

2. This change to the examining process **does not eliminate** the Outstanding Scholar, Bilingual, or Bicultural special appointing authorities.

3. The National Performance Review recommends that central inventories be replaced with a new hiring process to give agencies more flexibility in hiring candidates for their vacancies. The re-invented ACWA examination meets the NPR objectives: it replaces central inventories with case examining administered locally by OPM Service Centers. Case examining means that applicants apply for specific openings, and agencies can link their recruitment activities to examinations for their specific vacancies.

4. Service Centers should not establish local inventories unless an agency has plans to fill a large number of a particular position in the service area over a several month period. ACWA hiring activity to date indicates that this will not usually happen. Exceptions may be: Social Insurance Specialist, Tax Technician, Customs Inspector, Immigration Inspector, and Internal Revenue Officer.

5. Current eligible applicants on the inventories for all ACWA registers will be informed of the new examining approach. They will receive a letter informing them of the changes; a new ACWA Notice of Results, which they may use if they do not want to retake the test if one is used; and a current CE-22, List of Federal Employment Information Centers. Applicants will be informed to keep the original of the Notice of Results because we will not be able to provide duplicates once we terminate the inventories.

6. The Personnel Research and Development Center has developed rating schedules for each occupation covered under the ACWA examinations. The Staffing Management Services Division has loaded those rating schedules in the MARS Rating Schedule Library. Each rating schedule has four parts:

   Part 1:   Minimum Qualifications screen - Questions 1 through 5;
   Part 2:   Individual Achievement Record - Questions 6 through 16;
   Part 3:   Accomplishments - Questions 17 through 156;
   Part 4:   Sex, Race, and National Origin and Primary Geographic Preference - Questions 157 through 159.

Part 1, the minimum qualification questions were developed to determine eligibility for GS-05 and 07 grade levels. It is the

Service Center's obligation to ensure that the requirements established adequately meet the hiring agency's needs. Therefore, the Service Center, working closely with the agency, should revise (add/delete/rewrite) the statements of qualifying general and specialized experience and nonqualifying experience to best reflect the requirements of the job.

**Parts 2, 3, and 4 cannot be modified by the Service Centers.** Parts 2 and 3, the Individual Achievement Record and Accomplishments, are used to rate the individual and produce a numerical rating.

Part 4, Sex, Race, and National Origin, is not used in the rating. This is required data collection for statistical purposes under the Luevano consent decree.

7. Ultimately, we will allow agencies to choose whether they want us to compute ratings based on the rating schedules, the written test, the structured interview or some combination of the above. Furthermore we will eventually accept applications by telephone. The programming to permit all of these options, however, will not be completed until later this fiscal year.

**Initially, Service Centers will examine for ACWA positions using the ACWA rating schedules.** Applicants will complete the Form C which will in turn be processed through MARS to ACES. We will inform Service Centers and agencies when additional options become available.

8. Service Centers should contact the Staffing Management Services Division when they start using the new rating schedules. The Personnel Research and Development Center will verify these early ratings before certificates are issued.

9. In approximately six months, it will be possible to use written tests as part of the case examining process. The written tests will be the current ACWA examinations. Agencies will be able to choose to use the written tests for all qualified applicants or for only those applicants who have identically high scores based on the rating schedule. In other words, agencies will be able to elect to use the written test as an initial screen and break ties or augment ratings based on the rating schedule OR they can use the rating schedule as the initial screen and break tie or augment ratings based on the test scores. Of course, agencies have the option of not using the written tests at all.

Agencies currently have the authority to administer the ACWA tests. Agencies may find it convenient to administer the test in conjunction with the structured interview. Service Centers, however, may be asked to administer tests to applicants in their service areas. If an agency wishes to use the tests, applicants need not take the test if they provide a copy of the ACWA Notice of

2

Results. Applicants may retake the test if they choose.

10. In approximately six months, the Service Centers will have various processing procedures available to assist them in processing the new examining approach for ACWA positions.

a) MARS with the Form C using the Minimum Qualifications and a Task-Based Rating Schedule and ACES.

b) The Integrated Staffing System (ISS) which involves the Telephone Application Processing (TAP), MARS and ACES. The ISS takes a record (applicant information) received through TAPS or the Form C and loads the information to an applicant data file. The Service Centers would "extract" the record from the applicant data file to apply the rating schedule criteria and process through MARS. The certificate will be generated through ACES. This system is currently being designed for the Kansas City Service Center's Department of Commerce Merit Promotion project. This project is scheduled for implementation in October 1994.

c) MARS with the Form C and written test. This process uses the MARS-written test link and minimum qualifications. It is similar to the processing of Treasury Enforcement Agent documents.

11. A generic telephone script was developed to collect applicant information including the minimum qualifications and rating schedule so that it can be processed through MARS. A sample Supplemental Qualification Statement will be developed and loaded to the MARS Library for Service Center use.

The ISS must be installed in a Service Center before the generic telephone script can be used. The ISS is designed to operate on a local area network; however, a stand alone version will be available. Service Centers interested in using TAP to process ACWA or other positions with the generic telephone script should contact Jeff Adair at (912) 744-2092.

12. If you have any questions concerning the process, please feel free to contact Linda Watson at 202-606-1252.

3

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the Supplemental Filing Of Attachments To Inform The Court Of Changes In Defendants' Examination Process For External Hires was made this 28th day of October, 1994 by mailing copies thereof to:

Richard T. Seymour
Lawyers' Committee for Civil
  Rights Under Law
Suite 400, 1450 "G" Street, N.W.
Washington, D.C.  20005

Julius LeVonne Chambers
Charles Stephen Ralston
16th Flr., 99 Hudson Street
New York, N.Y.  10013

John H. Erickson
Erickson, Beasley & Hewitt
8th Flr., 12 Geary Street
San Francisco, CA  94108

E. Richard Larson
Mexican-American Legal Defense
  & Educational Fund
11th Flr., 634 South Spring Street
Los Angeles, CA  90014

Kenneth Kimerling
Puerto Rican Legal Defense
  & Educational Fund
14th Flr., 99 Hudson Street
New York, N.Y.  10013

Eva J. Paterson
San Francisco Lawyers' Committee
  for Urban Affairs
Suite 400, 301 Mission
San Francisco, CA  94105

Clint D. Wolcott
National Treasury Employees Union
Suite 1101, 1730 "K" Street, N.W.
Washington, D.C.  20006

JOHN R. TYLER

RECEIVED

NOV 29 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

RECEIVED

OCT 28 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

OCT 28   4 25 PM '94