UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGEL G. LUEVANO, et al.,<br><br><br>Plaintiffs,<br><br>v.<br><br>CHARLES EZELL, Acting Director, Office of<br>Personnel Management, et al.,<br><br>Defendants. | Civil Action No. 79-0271 |

## <u>MOTION TO TERMINATE THE CONSENT DECREE</u>

The United States of America, including its Office of Personnel Management, moves to terminate the consent decree in the above-captioned case pursuant to Federal Rule of Civil Procedure ("Rule") 60(b).  As explained in the accompanying memorandum, the United States has concluded that the more than four-decade-old consent decree entered in this case (the "*Luevano* Consent Decree" or "Decree") is no longer in the public interest.  The Decree discriminates based on race and blatantly conflicts with Supreme Court caselaw from the decades following the entry of the Decree.  Additionally, the standards in the Decree have proven wholly unworkable and have impeded the President's ability to properly staff the Executive Branch.  For these and the other reasons explained in the accompanying memorandum, the United States requests that the *Luevano* Consent Decree be terminated.

Because the relief sought by this motion would be dispositive of the judgment in this case, the United States has not sought to meet and confer with Plaintiffs before filing this motion per LCvR 7(m).  A proposed order is attached.



RECEIVED

MAR 10 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Dated: March 10, 2025
       Washington, DC

Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

JASON MANION
Counselor to the Associate Attorney General

MAC WARNER
Deputy Assistant Attorney General
Civil Rights Division

ANDREW BRANIFF
Senior Counsel to the Assistant Attorney General
Civil Rights Division

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By:          */s/ Thomas W. Duffey*
     THOMAS W. DUFFEY
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2510

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 79-0271 |
| CHARLES EZELL, Acting Director, Office of Personnel Management, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE UNITED STATES TO TERMINATE THE CONSENT DECREE

Pursuant to Federal Rule of Civil Procedure ("Rule") 60(b), the United States of America ("United States" or "Government"), including its Office of Personnel Management ("OPM"), respectfully submits this memorandum in support of its motion to terminate the consent decree entered in this case (the "*Luevano* Consent Decree" or "Decree") as no longer in the public interest.

## INTRODUCTION

Federal law requires many federal jobs be filled based on merit alone. Beginning in 1974, OPM employed a test to do just that. The Professional and Administrative Career Examination ("PACE") was a challenging, written examination that measured cognitive and other skills. It quickly proved an effective way of predicting future job performance, thereby increasing the efficiency and capability of the federal workforce. But it did not last long. In 1979, Plaintiffs in this case brought a class-action lawsuit, arguing that PACE had a disparate impact on Black and Hispanic applicants. In 1981, in the waning days of the Carter Administration, OPM agreed to settle the case and signed a consent decree, promising to eliminate PACE and to develop an alternative examination that would not cause a disparate impact.

That Decree is the subject of this motion. More than forty years later, the Decree is still in effect. But its requirements have proven impracticable to satisfy. To employ a new civil service exam, OPM must demonstrate that the alternative examining procedure measures merit and does not have an "adverse impact"—defined as any statistically significant difference in appointments between "blacks" or "Hispanics" and "non-Hispanic whites," as compared to the number of applicants of those races who took the PACE exam in the previous year. *Luevano* Consent Decree, 1981 WL 402614, at ¶ 8(b)(1) (Nov. 19, 1981). No other racial groups are described in the Decree.[1] The Decree covers more than one hundred different job categories. Further, the Decree puts the cart before the horse and requires that any test an agency wishes to use must be validated and reviewed by the plaintiffs in this case prior to its implementation. For decades, OPM failed in this Sisyphean task. Today, no uniform civil service test exists. Agencies instead employ a hodgepodge of application procedures with mixed results.

OPM should be relieved of the *Luevano* Consent Decree to return common sense to federal hiring. Both the law and the facts on the ground have changed drastically since 1981. The Decree is unlawful many times over under Supreme Court caselaw dating as far back as 1989.[2] And the Decree has proved completely unworkable in practice. It precludes OPM from implementing heavily researched and predictive tests that would streamline the federal hiring process and lead to a more capable workforce. And its indefinite application permanently cripples the President's

---

[1]     "Hispanics" are defined in the decree as "all individuals of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of race, and does not include individuals of Asian origin as defined in Directive 15, of the Office of Statistical Policy, Department of Commerce, attached hereto as Appendix D." *Luevano* Consent Decree ¶ 8(e).

[2]     *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (establishing strict scrutiny review for race-based state action).

ability to supervise the Executive Branch in contravention of Article II.  Accordingly, the Decree is no longer in the public interest.  The *Luevano* Consent Decree should be vacated.

## BACKGROUND

Since the late nineteenth century, the goal of the federal government has been to hire qualified individuals based on merit.  To fulfill that goal, OPM and its predecessor, the U.S. Civil Service Commission (the "Commission" or "CSC"), have developed a variety of examination procedures over more than a century.  At first, the tests were required to be more "'practical in character' and related to the duties that would be performed." Paul Van Riper, History of the United States Civil Service 100 (1958).  But the Commission quickly started to develop and use general intelligence tests. *See* Carolyn Ban & Patricia W. Ingraham, *Retaining Quality Federal Employees: Life After PACE*, 48 Pub. Admin. Rev. 708, 708 (1988).  In the decades that followed, sophisticated short-answer examinations were used for "both the technical and scientific fields and for 'junior' professional and managerial positions." *Id.*  In 1955, the Commission introduced the first "universal" examination to select college graduates for entry level positions. *Id.*  Finally, in 1974, that universal exam was replaced with PACE. *Id.*

Compared to previous examinations, PACE was heavily researched and designed to test the "knowledges, skills and abilities" that make great federal employees. *See id.*  CSC conducted extensive validation studies of PACE. *Id.*  In 1979, OPM called the PACE the "most thoroughly researched test in the history of Federal civil service examining." *The Impact and Validity of PACE: A Federal Employment Examination*, GAO, at 2 (May 15, 1979).  OPM found that PACE had "a clear relationship between performance on the test and subsequent performance on the job." *Id.*  OPM concluded that the PACE helped the government hire individuals who "perform[ed] better on the job," thereby enhancing productivity. *Id.*

PACE, however, did not survive long. On January 29, 1979, Plaintiffs in this case (individuals and civil rights groups) filed a lawsuit against OPM alleging that its use of PACE discriminated against them in violation of Title VII of the Civil Rights Act of 1964. *Luevano v. Campbell*, 93 F.R.D. 68, 72 (D.D.C. 1981). Plaintiffs also sought to represent a nationwide class of black and Hispanic applicants for federal service. *Id.* Initially, "OPM denied the charges of discrimination and defended PACE as a valid and useful examination." Ban & Ingraham, *supra*, at 709. But then, on January 9, 1981, after two years of litigation, Plaintiffs and OPM jointly moved for "an order granting preliminary approval to a Consent Decree." *Luevano*, 93 F.R.D. at 72. The parties signed the Decree eleven days prior to the change in administration, and the Court accepted the Decree on February 26, 1981. *Luevano*, 93 F.R.D. at 72. Finally, on November 19, 1981, this Court concluded that the Decree provided "fair and adequate relief for the class" and gave it "final approval." *Id.* at 94.

In answering the original complaint, "OPM expressly denied that use of the PACE by OPM . . . violated Title VII, and further denied that the PACE had not been properly validated in accordance with applicable Federal guidelines and Title VII." *Luevano* Consent Decree, 1981 WL 402614, at *2 (Nov. 19, 1981) (hereinafter cited to by paragraph number). Indeed, as stipulated in the Decree, the parties stipulated that "OPM has conducted a construct validation study of the written test portion of the PACE, and has conducted criterion-related studies with respect to 4 of the 118 PACE job categories." *Luevano* Consent Decree ¶ 10(i). Based on these validation efforts, even in agreeing to the Decree, OPM continued to deny "any such allegations in the Complaint and deny that defendants are subject to any liability." *Id.* ¶ 1.

The *Luevano* Consent Decree, as it has become known, put an end to the PACE test and severely restricted OPM's ability to develop any replacement test. First, OPM was "permanently

enjoined from future use of the PACE except" for a wind-down period of three years. *Luevano* Consent Decree ¶ 12(a). One year after the effective date of the Decree, OPM was allowed to use the PACE for only fifty percent of the jobs that had required the PACE. *Id.* ¶ 13(a). Two years after, OPM was required to reduce that number to twenty percent. *Id.* And three years after, OPM was required to cease using the PACE completely. *Id.* OPM did not bother with this wind down period and instead "announced that it was abolishing PACE immediately." Ban & Ingraham, *supra*, at 709.

Second, the *Luevano* Consent Decree directed OPM to develop an alternative examining procedure to the PACE that would "eliminate adverse impact against black and against Hispanics." *Luevano* Consent Decree ¶ 2(a). A test has an "adverse impact," under the Decree, whenever "the difference between the appointment rate for blacks or for Hispanics and the appointment rate for non-Hispanic whites is statistically significant at the .05 level of confidence or, if not so statistically significant, that the appointment rate for blacks or for Hispanics is less than 80% of the appointment rate for non-Hispanic whites." *Id.* ¶ 8(b)(1).

Third, until the alternative examining procedure was instituted, OPM was required to use "all practicable efforts" to eliminate adverse impact by using two specific programs. *Id.* at ¶ 12(b). The Outstanding Scholar Program rendered applicants automatically eligible for direct hire by any Federal agency "without the necessity of taking the PACE or an alternative examining procedure" if they obtained an undergraduate GPA of "3.5 or higher on a 4.0 scale" or "who stand in the upper 10%" of their graduating class. *Id.* ¶ 16(a). The bilingual or bicultural certification process gave preferential treatment to those with "Spanish language proficiency and/or the requisite knowledge of Hispanic culture." *Id.* ¶ 16(b)(1).

Fourth, the *Luevano* Consent Decree imposed prospective requirements for new tests that any government agency sought to develop.  The Decree states "if any government agency seeks during the life of this Decree to develop and validate an alternative examining procedure" for the positions covered by the lawsuit, "the agency shall, as a part of any validity study supporting the use of such a procedure, consider other available examining procedures which would satisfy the agency's need for efficiency and productivity by fairly and validly testing the relative capacity and fitness of applicants to perform on the job, and which would have no adverse impact or less adverse impact than the procedure or procedures primarily being studied."  *Id.* ¶ 12(i).  If no such tests exist, "the agency shall study the validity and adverse impact of such procedure as part of its validity study" and "adopt the selection procedure that results in the least adverse impact while continuing to meet agency needs."  *Id.*  "No alternative examining procedure may be used . . . without all practicable efforts . . . unless the agency has available evidence, based upon an adequate sample, of the impact of the selection procedure upon blacks and upon Hispanics."  *Id.*  Individual agencies would be permitted to use an alternate testing protocol only after establishing validity, meaning that "in an appropriate study, the agency's use of a *particular* examining procedure for *a particular job category* or group of job categories meets all of the applicable standards of the Uniform Guidelines."  *Id.* ¶ 8(i) (emphases added).[3]  And, prior to implementing that test, the agency would be required to "send a notice to plaintiffs of its intention 60 days prior to the date of the intended action, together with a complete copy of the validation study and of the documents which support that study."  *Id.* ¶ 12(e).

---

[3]    The Uniform Guidelines permit multiple types of validity studies, stating: "[f]or the purposes of satisfying these guidelines, users may rely upon criterion-related validity studies, content validity studies or construct validity studies."  29 C.F.R. § 1607.5.

More than forty years later, the *Luevano* Consent Decree still binds OPM and every other executive branch agency.  But OPM has struggled to develop any test that meets the Decree's stringent adverse impact, validity, and notice requirements.  In the first decade after entering into the Decree, OPM developed six different exams that it hoped could replace the PACE.  Ban & Ingraham, *supra*, at 713.  These exams were "developed with significant agency input."  *Id.*  Each was subject to separate and rigorous validation studies.  *Id.*  All selection methods were considered to have good validity, and several were found to have high validity.  *Id.*  But, "[u]nfortunately, the OPM studies also found that those selection methods which were most valid also had the greatest adverse impact."  *Id.*  Thus, OPM was unable to proceed with those exams, even though they showed "no overall unfairness against minorities."  *Id.* at 714.

In 1990, OPM tried yet another test—the Administrative Careers With America ("ACWA") written examination.  Merit Systems Protection Board ("MSPB"), *Reforming Federal Hiring—Beyond Faster and Cheaper*, at 36 (Sept. 2006), available at: https://www. mspb.gov/studies/studies/Reforming_Federal_Hiring_Beyond_Faster_and_Cheaper_224102.pdf. ACWA included "both a cognitive ability multiple-choice section and a biodata self-rating section that helps reduce adverse impact."  *Id.*  The MSPB supported the use of the ACWA written examination because it was "better at predicting future job performance" than the "temporary hiring authorities established under *Luevano*."  *Id.*  But the ACWA written test did not last long either and was rarely used after the mid-1990s.  *Id.*  Again, agencies found, among other problems, that the new test caused an "adverse impact" under the Decree.  *Id.*

Today, some agencies use the ACWA "rating schedule"—"a 156-item multiple-choice, self-rating form" that does not contain a "cognitive ability portion"—even though MSPB has found that it "is far less able to predict future performance."  *Id.* at 36–37.  Otherwise, agencies largely

act on their own, employing a tapestry of different assessment tools for various positions. MSPB, *Improving Federal Hiring Through Better Assessment*, at 4 (July 2018), available at: https://www.mspb.gov/studies/researchbriefs/Improving_Federal_Hiring_Through_Better_Assessment_1534415.pdf. The most used assessment is a simple resume. *Id.* Other common assessments include interviews and biographical questionnaires. *Id.* Very few agencies use job knowledge or cognitive ability tests. *Id.*

## LEGAL STANDARD

Under Rule 60(b), a party may request that a consent decree be modified or vacated. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378–83 (1992); *see also* Fed. R. Civ. P. 60(b)(5)–(6) ("On motion and just terms, the court may relieve a party…from a final judgment" when "applying it prospectively is no longer equitable" or when "any other reason … justifies relief."); *Pigford v. Perdue*, 330 F. Supp. 3d 1, 10 (D.D.C. 2018) ("[A] district court may modify a consent decree pursuant to Rule 60(b)(5)[.]"). A party seeking modification or vacatur "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 377.

Specifically, a consent decree should be vacated when there is change "in either statutory or decisional law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *see also Railway Employees v. Wright*, 364 U.S. 642, 652–653 (1961) (vacating consent decree in light of amendments to the Railway Labor Act); *Rufo*, 502 U.S. at 393 (ordering the district court to consider modification in light of a Supreme Court decision). A court errs if it refuses to modify a "consent decree in light of such changes." *Agostini*, 521 U.S. at 215. And a court should vacate a consent decree if changed legal circumstances have turned the order of the court "into an instrument of wrong." *Sys. Fed'n No. 91, Ry. Emp. Dep't v. Wright*, 364 U.S. 642, 647 (1961) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114–115 (1932)).

A consent decree should also be vacated if it "proves to be unworkable because of unforeseen obstacles" or if changed factual conditions have made compliance "substantially more onerous." *Rufo*, 502 U.S. at 384. A consent decree may be particularly onerous or unworkable if its "fails to include an expiration date." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 598 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

## ARGUMENT

### I.    The *Luevano* Consent Decree Blatantly Conflicts with Current Law

As might be expected with a decree that was entered more than four decades ago, the *Luevano* Consent Decree directly conflicts with multiple Supreme Court decisions from the intervening decades. The Decree discriminates on the basis of race by singling out certain racial groups for preferential treatment and requires the federal government to make hiring decisions using explicit racial classifications. Far from having a compelling interest that might survive strict scrutiny, the Decree's purpose—increasing the number of black and Hispanic hires to make them statistically equivalent to their representation in the population—has been squarely rejected by the Supreme Court. This kind of blatant racial favoritism is not permitted under current Supreme Court precedent, and the Decree has thus become an outdated and misguided instrument.

The stated goal of the *Luevano* Consent Decree was to "eliminate the underrepresentation of minorities in the Federal work force." Under current law, this is discrimination on the basis of race. Since the Decree was approved in 1981, the Supreme Court has held repeatedly that the Equal Protection Applies to discrimination against *any* racial group regardless of minority status. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 222 (1995) ("[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification."); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) ("Racial discrimination [is] invidious in all contexts."); *Students for Fair Admissions, Inc. v. President &*

*Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (explaining that "[e]liminating racial discrimination means eliminating all of it" regardless of race, color, or nationality"). And these Equal Protection Clause standards apply to consent decrees. *See United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1008 (6th Cir. 1992) ("*Croson* simply does not exempt consent decrees from its requirements." (citing *Stuart v. Roache*, 951 F.2d 446, 449 (1st Cir. 1991), and *Davis v. City of San Francisco*, 890 F.2d 1438, 1445 (9th Cir. 1989))); *accord Dean*, 438 F.3d at 454–57.

It is no excuse that the *Luevano* Consent Decree purports to help some racial groups, rather than harming others. At bottom, it discriminates on the basis of race. By favoring the applications of blacks and Hispanics, the Decree disfavors all other racial groups. Like school admissions, hiring in the federal government is a "zero-sum" proposition. "A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Students for Fair Admissions*, 600 U.S. at 218. The Decree requires OPM to test any alternative examination procedures for any impact to blacks and Hispanics with no requirements for any other racial group. *Luevano* Consent Decree ¶ 8(1) (defining "adverse impact" as the "difference between the proportion of blacks or of Hispanics among the appointments from all sources made by an agency for the job category in question, and the proportion of blacks of Hispanics, respectively, among the persons who took the PACE in the prior reporting year).

Following *Students for Fair Admissions*, courts have declined to approve consent decrees on exactly these grounds. *See* Order at 3, *United States v. Cobb County*, Civ. A. No. 24-2010 (N.D. Ga. Jan. 16, 2025), ECF No. 13 (rejecting a consent decree that "would allow for disparate treatment because it provides for priority hiring of the affected African-American claimants over other applicants"). In *Cobb County*, the Court declined to enter a decree because neither party

admitted that in entering the decree there was "strong basis in evidence" to believe it is or will be liable if it fails to engage or participate in the race-conscious, discriminatory action.  *See id.* at 3. The court found this was contrary to the requirements in *Ricci v. DeStefano*, 557 U.S. 557, 581–85 (2009), because the *Cobb County* defendants had "steadfastly denied that its hiring or selection process had any impermissible disparate impact based on race or that it has violated the law in any way."  *Id.* at 4.  The same is true here where OPM expressly denied that its "the use of the PACE . . . violated Title VII, and further denied that the PACE had not been properly validated in accordance with applicable Federal guidelines and Title VII."  *Luevano* Consent Decree ¶ 5. Moreover, the selection of particular races for priority treatment in hiring—here, as in *Cobb County*—is "outright racial balancing," which the Supreme Court has described as "patently unconstitutional."  *Students for Fair Admissions*, 600 U.S. at 206; *see also Grutter v. Bollinger*, 539 U.S. 306, 334 (2003) ("To be narrowly tailored, a race-conscious admissions program cannot use a quota system.").

Whatever its purpose, the *Luevano* Consent Decree requires OPM, when developing an alternative examination system, to classify applicants based on their race.  To eliminate or minimize "adverse impact," the consent decree requires OPM to preemptively measure the effect of any test on black and Hispanic applicants.  *Luevano* Consent Decree ¶ 12(e).  OPM must then adjust its testing procedures according to the requirements of the Decree.  At the same time, OPM was ordered to instill preferential hiring for those with "oral Spanish language proficiency and/or the requisite knowledge of Hispanic culture."  *Id.* ¶ 16(b)(1).

These various requirements would certainly trigger strict scrutiny under current law. *Adarand*, 515 U.S. at 227 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *Parents*

*Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." (cleaned up)); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896)) ("[T]he Constitution . . . forbids . . . discrimination by the General Government, or by the States, against any citizen because of his race.").  Accordingly, the *Luevano* Consent Decree would have to "survive [the] daunting two-step examination" of strict scrutiny.  *Id.*

The *Luevano* Consent Decree certainly fails the strict scrutiny test.  The Supreme Court has identified only two compelling interests that would allow racial classification: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute[;]" and (2) "avoiding imminent and serious risks to human safety in prisons, such as a race riot."  *Id.* at 207.  The Decree relies on neither.  Instead, it seeks to address the "underrepresentation of minorities in the Federal work force," *id.*, a diversity interest which has been squarely rejected by the Supreme Court.  *See Students for Fair Admissions*, 600 U.S. at 206.  And in requiring agencies to achieve this improper compelling interest, the decree uses the types of arbitrary definitions that the Supreme Court has held are unconstitutional.  *Id.* at 216 (holding Harvard's admissions program unconstitutional in part because its definition of Hispanic was "arbitrary").  In the Decree, the term "Hispanic" is similarly "arbitrary" because it is defined by geographic, cultural, and geographic designations as "individuals of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of *race*."  *Luevano* Consent Decree at 8(e)

(emphasis added).  The only racial group that the Decree's definition of "Hispanic" explicitly excludes in the decree are "individuals of Asian origin."  *Id.*

Even if the *Luevano* Consent Decree sought to further a valid compelling interest, it would still completely fail because it is not narrowly tailored.  The narrow tailoring inquiry requires a court to consider: (1) the necessity for relief and the efficacy of alternative remedies, (2) the flexibility and duration of the relief, (3) the relationship of the numerical goals of the relief to the relevant labor market, and (4) the impact of the relief on the rights of third parties. *United States v. Paradise*, 480 U.S. 149, 167 (1987).

The Decree is unworkable and prevents the implementation and development of alternate remedies.  Based on the onerous pre-implementation test validating and certification requirements of the Decree, it has proven to be impossible to determine if alternate testing remedies exist.  Agencies are not permitted to implement a new testing protocol without performing a validity study on the test, which assumes the test has a disparate impact, but at the same time they must provide agency-specific evidence as to the test results for black and Hispanics applicants to that agency on that test.  The Decree is silent on how to perform this task of determining the impact on agency applicants prior to permitting the agency to use the test on agency applicants.

The Decree is more draconian regarding the type of validity studies it requires.  The PACE exam was subject to several types of validity measures, including construct and several criterion-related studies.  The Uniform Guidelines of Government Employment procedures, as cited in the Decree, allow for a multiplicity of different validity testing methods, including construct validity. *See* 28 C.F.R. § 1607.5.  But the Decree rejects the construct validity studies conducted by OPM and instead sets the standard for validity at independent criterion validity studies performed on a

minimum of 118 different job categories performed by each employing agency. *Luevano* Consent Decree ¶ 8.1.

To be narrowly tailored under the second prong, a race-based remedy must be flexible, have a sunset provision, and be of limited duration. *See Students for Fair Admissions*, 600 U.S. at 228. The Supreme Court emphasized this requirement in *Students for Fair Admissions*, when it struck down Harvard's affirmative action programs: "Twenty years later, no end is in sight." *Students for Fair Admissions*, 600 U.S. at 213. The same is true here, except that it is even worse: the *Luevano* Consent Decree was more than forty years ago, and there is still no end in sight. The Supreme Court has recognized that federal decrees intended to remedy civil rights violations are "not intended to operate in perpetuity," but rather are "temporary measure[s] to remedy past discrimination." *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 247-48 (1991). Such institutional reform decrees were never intended to turn the federal court into an "indefinite institutional monitor." *Shakman v. Pritzker,* 43 F.4th 723, 732 (7th Cir. 2022). Thus, courts have found longstanding employment-discrimination consent decrees to have outlived their usefulness as temporary remedies after much shorter time periods than involved here.[4] Indeed, courts have terminated decrees of comparable length for having outlived their usefulness or legitimacy as temporary measures to remedy employment discrimination. *See, e.g., Shakman*, 43 F.4th at 732 (50-year-old consent decree); *United States v. Albrecht*, Civ. A. No. 80-1590, 2022 WL 2253972, at *1 (N.D. Ill. June 16, 2022) (42-year-old decree).

---

[4]     *United States. v. City of Miami*, 2 F.3d 1497, 1507-09 (11th Cir. 1993) (15-year-old consent decree); *Dudley v. City of Macon*, Civ. A. No. 00-0515, 2009 WL 2566987, at *1 (M.D. Ga. Aug. 14, 2009) (28-year-old consent decree); *N. State Law Enf't Officers Ass'n v. Charlotte-Mecklenburg Police Dept.*, 862 F. Supp. 1445, 1460 (W.D.N.C. 1994) (20-year-old consent decree); *Rowe v. Gen. Motors Corp.*, 586 F. Supp. 372, 373-74 (N.D. Ga. 1984) (12-year-old consent decree).

As to prongs three and four of the narrow tailoring analysis, the Decree fails as well. It is silent to eventual hiring goals for black and Hispanic workers, and thus can never end on its own terms.  Similarly, it is silent as to effects on the new testing methods on non-black and non-Hispanic job seekers, thus causing all federal agencies to focus their hiring methods on those two groups at the expense of all other applicants.

In sum, there have been significant changes in the relevant "decisional law" since 1981. *See Agostini*, 521 U.S. at 215.  Under current Equal Protection jurisprudence, the *Luevano* Consent Decree has become a clear "instrument of wrong," whatever its status when it was first entered. *Sys. Fed'n No. 91*, 364 U.S. at 647 (quoting *Swift & Co.*, 286 U.S. at 114–115).  It now unlawfully requires OPM to classify federal employees based on their race and favor some racial groups over others in federal hiring, and it cannot satisfy strict scrutiny.  Finally, the decades-old *Luevano* Consent Decree has now outlasted any usefulness it could ever have had.  For all these reasons, the *Luevano* Consent Decree should be vacated.

## II.    The *Luevano* Consent Decree is Unworkable

The *Luevano* Consent Decree should also be vacated because it has proven wholly unworkable and has become substantially more onerous over time.  *Rufo*, 502 U.S. at 384.  Its unworkability is proven in part by its continued existence four decades later.  Every attempt over those four decades to design an alternative examining procedure that both "eliminate[s] adverse impact against blacks and against Hispanics" as defined by the Decree and "validly and fairly test the relative capacity of applicants to perform the job" has failed.  *Luevano* Consent Decree, ¶¶ 2(a), 2(b); *see Reforming Federal Hiring*, *supra*, at 36–40; MSPB, *Restoring Merit to Federal Hiring: Why Two Special Hiring Programs Should be Ended*, at 33 (Jan. 2000), available at: https://www.mspb.gov/studies/studies/Restoring_Merit_to_Federal_Hiring_Why_Two_Special_Hiring_Programs_Should_Be_Ended_253644.pdf.

The continued existence of the decree is inconsistent with the time limits that appear within the decree. The Court, upon entry of the Decree, intended for its jurisdiction to last for only five years after the cessation of PACE. *Luevano* Consent Decree ¶ 7. The Decree explicitly states that "[t]he period of retention of jurisdiction shall expire, with respect to any job category listed in Appendix A, five years after the cessation of the use of PACE results for the job category and the implementation of an alternative examining procedure for that job category at the GS-5 or GS-7 level." *Id.* We are now 40 years past the cessation of the use of PACE. The decree further states that it may be extended "upon motion for good cause shown." *Id.* No such motions have been made to the Government's knowledge. Further the decree excludes from "good cause" the "absence of examining procedures which have been validated in accordance with Title VII and the Uniform Guidelines for some or all of the PACE occupations at the end of that five year period," as well as "[t]he absence of examining procedures for some or all of the PACE occupations which satisfy the government's long term objective, as stated in paragraph 2(b)." *Id.* We are well beyond any of these time periods and there is no good cause to extend. It is only the unworkability of the Decree that maintains its existence.

In the Decree, the court created the Outstanding Scholar and Bilingual/Bicultural programs as "'temporary' hiring authorities" for the positions formerly covered by the PACE. *See Reforming Federal Hiring*, *supra*, at 36; *Luevano* Consent Decree ¶¶ 14,16. To decrease adverse impact on black and Hispanic candidates, the Outstanding Scholar authority focused primarily on "baccalaureate grade point average (GPA) or class standing," while the Bilingual/Bicultural authority awarded preference to applicants with basic "proficiency in Spanish and English or knowledge of both Anglo and Hispanic cultures." *Restoring Merit to Federal Hiring*, *supra*, at 4. But neither achieved the desired result. Instead, the adverse impact continued. *Id.* at 2 ("[W]hite

women came to be the primary group hired through the Outstanding Scholar Program, and other ethnic and racial groups were hired more often through this method than were African-Americans or Hispanics."); *id.* at ix (finding that "competitive, merit-based hiring tools" hire "Hispanic job candidates in representative numbers" more successfully than programs that give preference to "bilingual or bicultural" candidates).

As explained above, OPM tried six different exams to replace the PACE and these temporary measures in the first decade.  Ban & Ingraham, *supra*, at 713.  Every single one failed. The best exams were also the ones that showed the most adverse impact, even though they showed "no overall unfairness against minorities."  *Id.* at 713–14.  The ACWA exam, OPM's eventual replacement for the PACE, fared similarly.  Although it was "far better at predicting future job performance" than the Outstanding Scholar and Bilingual/Bicultural programs, it fell out of favor among agencies by the mid-1990s amid fears that—as a written test—"it would suffer the same fate as the PACE, namely a court challenge alleging adverse impact."  *Restoring Merit to Federal Hiring*, *supra*, at 22; *Reforming Federal Hiring*, *supra*, at 36 (explaining agencies rejected ACWA because it "[w]as slow, administratively cumbersome, and likely to cause adverse impact").  And despite the ACWA exam's relative success at predicting job performance, agencies still found it too rigid, complaining that it often limited their choices to candidates who "fail[ed] to meet their expectations."  Government Accountability Office, *Federal Hiring: Testing for Entry-Level Administrative Positions Falls Short of Expectations*, at 3–5, 10–11 (Mar. 1994), available at: https://www.gao.gov/assets/ggd-94-103.pdf (enumerating issues with ACWA).  The ACWA exam neither cured the adverse impact at the core of the Decree nor provided agencies an accurate way to predict applicants' future job performance.

The ACWA rating schedule, which replaced the written test, is hardly a test at all.  The "156-item multiple-choice, self-rating form" without "a cognitive ability portion" offered as an "alternative to the written ACWA exam" does not validly test applicants' relative capacities as required by the Decree.  *See Reforming Federal Hiring*, *supra*, at 36.  By relying solely on self-assessments of "life and work experience and training," the rating schedule struggles to distinguish between entry-level candidates, none of whom have "a great deal of experience."  *Restoring Merit to Federal Hiring*, *supra*, at 22.  As a result, many agencies have expressed "dissatisfaction with the quality of candidates referred by OPM from this rating schedule."  *Reforming Federal Hiring, supra*, at 37.

Without a written exam that can pass the *Luevano* Consent Decree's requirements, agencies today are "ultimately responsible for developing and administering their own applicant assessment tools for most positions," leading to mixed results and a lack of uniformity across the Executive Branch.  *Improving Federal Hiring Through Better Assessment*, *supra*, at 4.  This seriously undermines OPM's mandate and the President's ability to oversee the executive branch and ensure that "the Laws be faithfully executed."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020); (quoting U.S. Const. Art. II §1, cl. 1; *id.* at § 3).  The President must not be bound "for the indefinite future" by "a consent decree based upon an interpretation of law that has been rendered incorrect by a subsequent Supreme Court decision."  *Theriault v. Smith*, 523 F.2d 601, 602 (1st Cir. 1975); *see Democratic Nat. Comm*, 671 F. Supp. 2d at 598, 621-22.  The *Luevano* Consent Decree must be vacated to enable the President to pursue his agenda and to allow OPM fulfill its mandate by restoring merit-based opportunity in hiring. *See* Exec. Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunit*y, 90 Fed. Reg. 8633 (Jan. 21, 2025).

## CONCLUSION

For the foregoing reasons, the *Luevano* Consent Decree should be vacated.

Dated: March 10, 2025
      Washington, DC

                                Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

JASON MANION
Counselor to the Associate Attorney General

MAC WARNER
Deputy Assistant Attorney General
Civil Rights Division

ANDREW BRANIFF
Senior Counsel to the Assistant Attorney General
Civil Rights Division

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____*/s/ Thomas W. Duffey*_____
    THOMAS W. DUFFEY
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2510

*Attorneys for the United States of America*