ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

— — —

FILED

DEC 1 1 1984

JAMES F. DAVEY, Clerk

ANGEL G. LUEVANO, ET AL.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

        Plaintiffs,

      v.

DONALD J. DEVINE, ET AL.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.
79-0271

Deposition of DENISE A. RICHARDSON

Washington, D.C.
November 28, 1984

Pages 1 thru 46

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM wdm                                                                1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - x
                                       :
4    ANGEL G. LUEVANO, ET AL.,         :
     INDIVIDUALLY AND ON BEHALF OF     :
5    ALL OTHER SIMILARLY SITUATED      :
                                       :
6            Plaintiffs                 :
                                       :
7        vs.                           :    CIVIL ACTION
                                       :    NO. 79-0271
8    DONALD J. DEVINE, ET AL.,         :
                                       :
9            Defendants                 :
                                       :
10   - - - - - - - - - - - - - - - - - x

11                               Washington, D.C.

12                               Wednesday, November 28, 1984

13   Deposition of:

14                    DENISE A. RICHARDSON

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyer's Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 6:47 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

2

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:   RICHARD T. SEYMOUR, ESQ.
4                  Suite 400
                   1400 I Street, N.W.
5                  Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:   BARBARA L. WARD, ESQ.
8                  Room 3509
                   Civil Division-Federal Programs Branch
9                  10th and Pennsylvania Avenues, N.W.
                   Washington, D.C. 20530

10

11                    C O N T E N T S

12   WITNESS                    EXAMINATION BY:  MR. SEYMOUR    MS. WARD

13    Denise A. Richardson                      3, 40              15

14                       EXHIBITS

15   NUMBER                          FOR IDENTIFICATION

16    Deposition

17   1 (Ltr, Richardson to Ashby, dtd
        11-27-76)                              40

18
     2 (Additional Information form)           41
19
     3 (Richardson ltr to Clerk of Court)      42
20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.   20002
(202) 546-6666

P R O C E E D I N G S

1

Whereupon,

2

DENISE A. RICHARDSON

3

was called as a witness and, having first been duly sworn by

4

the Notary Reporter, was examined and testified as follows:

5

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

6

BY MR. SEYMOUR:

7

Q    Please give your name and address for the record.

8

A    Denise Annette Richardson, and my address is

9

Box 10255, Chicago, 60610.

10

Q    What is your race?

11

A    Black.

12

Q    Ms. Richardson, there is a document which you sent

13

to the court on April the 24th, 1981.  It is a letter to the

14

Honorable James F. Davies, Clerk of the Federal Clerk.  Some

15

of the pages of this on my copy are a little hard to read.

16

Did you make a copy of that letter yourself so that you can

17

read it into the record for us?

18

A    Did I make a copy of that letter?

19

Q    That's right.

20

A    I don't think that I did.

21

Q    Okay.  Can you tell me whether you have ever taken

22

the Professional and Administrative Career Examination other-

23

4

1    wise known as the PACE?

2        A    Yes, I did.

3        Q    When was that?

4        A    That was--well, I took the examination twice.    I

5    took it once after I got out of school in '76 and then August

6    of 1976 to '77.

7        Q    I don't understand.    Could you explain that?

8        A    Okay.  Before I graduated, I went to my college

9    placement office and I was given the application, you know,

10    for the PACE exam, and I got out of school in May of 1976.    I

11    got a letter from the old Civil Service Commission which is

12    now Office of Personnel Management, notifying me to come to

13    take the test during the fall and spring months of 1976 through

14    1977.

15        Q    Do you remember the month when you took the PACE

16    the first time?

17        A    It was in August of 1976.

18        Q    You're sure about that date?

19        A    Yes, I am.

20        Q    When did you take the PACE the second time?

21        A    Well, that was during 1977.

22        Q    Do you remember the month?

23        A    April of 1977.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Q    Are you sure about that date or are you guessing?

2    A    I'm sure about that date as well.

3    Q    What happened the first time you took the PACE in

4  August of 1976?

5    A    I waited approximately three months, two and a half

6  to, like, three months before I was notified by the Civil

7  Service Commission that I was ineligible for all of the

8  occupational titles that I had competed for in the examination.

9    Q    Did the notice tell you that you had failed the test?

10    A    Yes, it did.

11    Q    What happened the second time?

12    A    I also received a notice, you know, the same notice

13  and all that I was ineligible which I had failed the test

14  again.

15    Q    Did you make any complaints of racial discrimination

16  against the pace?

17    A    Yes, I did.

18    Q    When did you make these complaints?

19    A    I made the first complaint--I wrote to the Civil

20  Service Commission in August, after I had taken the first

21  examination, okay, you know, explained to them that I didn't

22  feel that the questions and, well, the content of the test

23  was up to par, you know.  That was my first complaint.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          Well, I think I sent them like a four- to five-page

2    letter and all, you know, that was like August or September

3    of 1976.

4          Q     Did you keep a copy of that letter?

5          A     I kept a copy of that letter, and I think I sent a

6    copy to your offices.  I don't have it in my possession now

7    that I am talking, that I'm speaking to you now, but I think I

8    do have a copy of that, of the first one.

9          Q     Okay.  We have never received a copy of a letter

10   like that from you.

11         MS. WARD:  Ms. Richardson, we do have one letter from

12   you that is three pages long, dated November of '76.

13         BY MR. SEYMOUR:

14         Q     Do you have a copy of that letter before you?

15         A     No, I don't.

16         Q     Let me read some of the letter and we'll whether

17   this is the same one.  We don't have anything dated August,

18   but this is a letter dated November 27th, '76.  It says,

19         "United States Civil Service Commission, 219 South

20   Dearborn, Chicago, Illinois 60604, Attn:  PACE Supervisor,

21   PACE unit, care of Pamela Ashbey.

22         "Dear PACE Examiners:

23         "I am writing this instrument in protest of the

1    Professional Administrative Career Examination.  This test was

2    held at Northwestern University's Division of Continuing

3    Education of Wieboldt Hall, located at 339 East Chicago Avenue,

4    Chicago, Illinois.  It is a pity that such an exam as this

5    should reflect poorly on such a great school as Northwestern

6    University.  At any rate, the specific periods that I am

7    referring to are the month of June through November 1976.  Why

8    June?  You may ask because this was the month in which I re-

9    ceived my official notification from the Civil Service Commis-

10   sion informing me to report to Wieboldt Hall promptly at

11   8:00 a.m. to take this farce of an examination named PACE."

12        The second page goes on, quote, "You may still be

13   pondering the month of November.  Well, let me be the first

14   to set the record straight.  I received the results of the

15   PACE exam during the later part of October-at the beginning

16   of the first part of the month of November.  Therefore, the

17   month of November has been dealt with.  PACE Examiners, this

18   exam was devised to selectively exclude and discriminate

19   against minorities, especially Blacks that registered to take

20   this examination.  You"--this either looks like "shall" or

21   "will".  It seems to be overwritten--"note that this test

22   basic format in terms of many of the questions which were ask-

23   ed of the examination participants were utterly preposterous.

8

1   This was an impossible, preposterous, extensive examination

2   that was totally irrelevant to Black examinees seeking entry

3   level positions in the competitive service.  This test was

4   based on all of it's supposedly psychometrics and methodological

5   validity.  It was based also in terms of it's construct

6   validity.  Lastly, I am also protesting the results of my

7   PACE exam scores.  Whoever heard of anyone scoring a test in

8   this manner.  You have scored in the lower one-half, upper

9   half, middle one-half.

10          "It was as if the scoring techniques were in terms of

11   the class group and size in order to be faced (sic) in an

12   alphabetic fashion.  I am still asserting that this examina-

13   tion was a discriminatory mechanism used by the Civil Service

14   Commission to discriminate against Blacks.  Just before

15   competing in the examination, our group had to fill out forms

16   from the Civil Service Commission stating a lot of census data.

17   These are the forms that the Civil Service Commission uses to

18   discriminate against certain examination participants.

19          "Thanks much,

20          "Denise A. Richardson

21          "# 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."

22          Is that last number your social security number?

23   A     Yes, it is.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      Q   Is that the letter that you thought you sent in in

2  August or September 1976 or is this something different?

3      A   That's basically the letter.  So much has happened,

4  you know, since I registered to take the PACE, and then I took

5  the PACE, in 1976 and all until this period of time, okay.  So

6  that is, in fact, the letter, yes.

7      Q   Did you ever hear anything from the Civil Service

8  Commission or receive anything in writing from them as a result

9  of sending that letter in?

10     A   No, I have not.  I have not heard anything from OPM.

11     Q   As I understand it from the letter, you took the

12  test on the Northwestern University campus.  Is that right?

13     A   Yes, that's right.

14     Q   When you took the test, was there anything posted

15  or was there any leaflet or brochure available for you

16  explaining how to make a complaint of discrimination against

17  the PACE?

18     A   Would you repeat the question?

19     Q   At the time that you took the test, was there

20  anything posted or was there any leaflet or brochure explain-

21  ing how to make a complaint of discrimination against the PACE?

22     A   No, there was not.

23     Q   After you took the PACE, did you ever go down to the

1  Civil Service Commission Office in Chicago--I assume that

2  there was one, do you know if there was?

3      A    Yes, there was an office in the Everette McKinley

4  Dirksen Building where I first registered to take the PACE

5  and all, to get the application forms and all, Room 1322, 219

6  South Dearborn, Room 1322.

7          And after I had, you know, taken the test at Wieboldt

8  Hall on the Saturday, I went down that following Wednesday

9  and I talked to someone--I think she was a personnel specialist

10  and a receptionist concerning, you know, what kind of exam

11  was it and just to complaint about, you know, the testing

12  format.

13          We were only given, like, 15 minutes for a break, you

14  know, that kind of thing.  I was there from, like, 8:00 until,

15  like, 4:00 p.m. that afternoon in this exam.  It was an

16  intensive exam, and I just went to complain about it, period.

17      Q    Was the person that you complained to Pamela Ashby

18  or was it somebody else?

19      A    It was someone other than Pamela Ashby, but I did

20  get an opportunity, during the time that I was down there, to

21  speak directly with Pamela Ashby or the lady said she was

22  Pamela Ashby.  Okay.

23      Q    Was this before or after you received your results?

1    A    That was before I received my results, because I

2    went down to complain about the test, and then after I receiv-

3    ed the notification that I, you know, was ineligible and all,

4    I went down there, you know, back down to Room 1322 in the

5    Everette McKinley Dirksen Building to speak to someone in

6    personnel, and the only thing they told me to do is to, you

7    know, reapply and take the examination again until I pass it.

8    Q    Do you remember about how long it was after you

9    received your test results until you wrote this November 27th,

10   1976 letter?  And again, I ask you not to guess but just state

11   if you recall.

12   A    Would you repeat that again?

13   Q    Let me start over.  The second page of the letter

14   says, quote, "At the beginning of the first part of the month

15   of November," that's when you received your test results.

16   A    Yes.

17   Q    The letter itself is dated November 27th.  Do you

18   remember how long it was after you received your test results

19   when you sent in this letter, how much period of time passed

20   before you sent in this letter?

21   A    I can't recall.  And you don't want me to guess,

22   right?

23   Q    I do not want you to guess.  That's right.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    A    I received my notification maybe a week or so because

2    it was in the month of November that I received my score back.

3    It was about a week or so.

4    Q    Do you remember that or are you guessing there?

5    A    I know it was in the same month that I received my

6    scores back from PACE.  When I received my scores back in the

7    month of November, that's when I wrote the letter.

8    Q    But are you guessing or do you remember that it was

9    just a week between the time that you received your scores

10   back and the time that you wrote the letter?  We just need to

11   hold this to what you actually recall.

12   A    I'm recalling that I received my scores back in

13   November.  Okay.  And I'll say a week, a week or two at the

14   most, and I'm not guessing because it was within that same,

15   you know, time period.

16   Q    Did Pamela Ashby give you the test or how did you

17   come across her name in the first place?

18   A    How did I come across her name?  She was one of the

19   people that was responsible from the Civil  Service Commission

20   and the person responsible for administering the PACE unit.

21   That was my understanding, the examination that was given at

22   Northwestern's Wieboldt Hall.  That's how her name came about.

23   Okay.  And that was the only kind of contact person that I had

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    at that point to, you know, contact concerning, you know, my

2    views, my feelings about the PACE exam.

3        Q    When you went down to the Civil Service Commission

4    office the first time after you had taken the test but before

5    you got your scores, did you see anything posted or did you

6    see any leaflets or brochures telling you how to make a com-

7    plaint of discrimination against a test like the PACE?

8        A    No, I did not.  I saw no brochures, no nothing,

9    no information, no nothing telling that that would be, you

10   know, like, another avenue.  If I had them, I wouldn't have,

11   you know--I would have tried to exhaust that channel before

12   I had actually written to--I would have just tried that channel,

13   okay, in regards to the PACE.

14       Q    When you visited the Civil Service Commission the

15   second time after you had received your notice of scores,

16   did you see any poster or see any leaflet or brochure telling

17   you how to make a complaint of discrimination?  Is your answer

18   the same as it was for the first time?

19       A    Yes.

20       Q    On either of these two visits to the Social Security

21   Commission, did Pamela Ashby or anyone else tell you about

22   the possibility of filing a complaint of discrimination

23   directly with the Appeals Review Board in Washington?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

14

1      A    No, I knew nothing about an Appeals Review Board in

2   Washington.  Now, what I did know is that Washington is the

3   one, is the office that graded the test scores, okay, and I

4   would have to write the Everette McKinley Dirksen Chicago area

5   office.  They would, in turn, contact Washington, D.C., re-

6   garding my complaint.  That is the only instance where I got

7   all the information I got from the Civil Service Commission

8   in Chicago at 219 South Dearborn.

9      Q    You are referring to the Everette McKinley Dirksen

10  Federal Building?

11     A    Yes, at 219 South Dearborn.  That's where I got the

12  initial PACE application, and that's where they sent me the

13  notification as to--could you hold on for a second?

14     Q    Surely.

15     A    Hello.

16     Q    I'm not sure whether you finished the last answer

17  that you were making.

18     A    No.  Someone was at my door.

19     Q    Do you want to have the last few lines of what you

20  said readback to you so you can tell whether you were finished

21  or not.

22     A    Okay.  Would you please?

23          (Whereupon, the reporter read from the record as

1    requested.)

2           THE WITNESS:  That's where I initially picked up

3    the application for me and the notification as to where to

4    report for the PACE exam.

5           BY MR. SEYMOUR:

6    Q    I'm not sure if I've already asked you.  If I have

7    just bear with me.  But did you ever hear back from the

8    Civil Service Commission about this letter?

9    A    I have heard nothing from the old Civil Service

10   Commission, neither from the now Office of Personnel Management.

11   No, I have not.

12   Q    Now, I remember your answer.

13          I have no further questions.

14          EXAMINATION BY COUNSEL FOR THE DEFENDANTS

15          BY MS. WARD:

16   Q    Ms. Richardson, would you please describe the posters

17   which you did see when you went to the federal office building

18   to complain about the PACE?  What signs did you see?

19   A    When I went to the Civil Service Commission what

20   signs?  You know, just general other, how would I say?  Other

21   general, you know, job postings for that particular period of

22   time.

23   Q    What did they say?

16

1    A    What did you say?

2    Q    No.  What did all the other posters say?

3    A    What did the other posters say?

4    Q    Yes.  Did you read them all?  What did they say?

5    A    Okay.  When you say "posters"--

6    Q    I want to know--let's start from the beginning.  You

7    took the PACE for the first time in August of 1976.  You went

8    shortly thereafter, you testified that you went to the Everette

9    McKinley Dirksen Building on South Dearborn Street in Chicago

10   to complain about the exam.

11        Please describe to me each and every poster or sign

12   or any type which you say on that day upon entering the federal

13   building, every sign.

14   A    Okay.  Upon entering the building, there were like

15   general directional signs concerning what floor, I guess--I'm

16   only talking for my own self personally what I thought in

17   terms of, you know, what floor a particular party wanted to

18   go to.

19   Q    Excuse me, Ms. Richardson.

20   A    I was primarily concerned with getting to the Civil

21   Service Commission jobs office.

22   Q    Ms. Richardson, you were only looking for signs,

23   then, which concerned you how to get to the office you were

17

1    looking for.

2          MR. SEYMOUR:  Object to that characterization.

3    That's not an accurate characterization of her testimony.  You

4    asked her for every sign she saw upon entering the building.

5    She began to tell you and you began to interrupt her several

6    times.  She should be allowed to finish her answer.

7          Please continue, Ms. Richardson.

8          THE WITNESS:  Okay.  That was upon my entering.  I'm

9    back up to the question of entering the building, the general

10   directional signs as far as getting to the Civil Service

11   Commission office.  Okay.

12         As I entered into Room 1322, there was, you know,

13   signs, like, it was a job bulletin board, that kind of posters

14   or signs.  Okay.  And I went over to the board.  I observed

15   some other federal types of positions, that kind of thing.  I

16   saw the receptionist.  Then I went to speak to someone concern-

17   ing the PACE exam.

18         That's the only thing that is my observation upon

19   entering Room 1322.

20         BY MS. WARD:

21   Q    Did you make a conscious effort to read each and

22   every sign that was posted?

23   A    I read the signs that was relevant to, you know, my,

18

1    you know, the positions that I saw, yes, each and every one

2    of the positions that were available, okay, for, you know,

3    competitive jobs. That kind of thing, yes, I did.

4         MR. SEYMOUR: Are you referring to vacancy

5    announcements?

6         MS. WARD: Excuse me, Mr. Seymour. Could I finish

7    my questioning, please?

8         MR. SEYMOUR: Well, Ms. Ward, the records of the

9    other transcripts of depositions both today and yesterday

10   will reflect that you've interrupted my questioning and my

11   lines of questioning on some scores of occasions to ask what

12   occurred to you.

13        MS. WARD: And we made an agreement before this

14   that we would not do that, and I abided by that agreement so

15   I'll expect you to.

16        MR. SEYMOUR: That's correct. After the tones of

17   voice that were used in the last deposition and the types of

18   objections that were made, that is correct, we'll proceed more

19   formally this time.

20        BY MS. WARD:

21       Q    Now, Ms. Richardson, you have testified that you

22   looked for those jobs or vacancy announcements which were

23   relevant to you, is that correct?

19

1    A    That was relevant as far as the United States Civil

2    Service Commission that has posted the jobs, yes, that was

3    relevant to me at that particular point.

4    Q    So there were some you didn't look at, is that

5    correct?

6    A    All the job bulletins that was relevant that was on

7    the board I did look at, yes.

8    Q    Did you look at each and every poster anywhere

9    placed in the room other than vacancy announcements?

10    A    Pardon me?

11    Q    If there was a poster for--let's give an example.

12    If there was a post about contributing to the United Way

13    campaign, do you remember reading that poster?

14    A    I remember reading a sign that this is the fire

15    alarm, if that's the kind of poster that you're talking about.

16    Q    I want you to describe each and every poster that

17    you saw.

18    A    Okay.  I saw posters that was posted for the fire

19    exits as well as the job bulletin posted for federal kinds of

20    positions.  Okay.  I did look at the type of positions that

21    was available that was pertaining and relevant to me.  Okay.

22    And after I got finished looking at all the postings

23    that was on the bulletin board, I then proceeded to go over

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

20

1   to the receptionist's desk to log in my complaint about the

2   PACE, and that's it.

3      Q   Did you look at any other posters that were in the

4   room?  Is it possible that you do not remember every poster

5   in the room?

6           MR. SEYMOUR:  Objection to the form of the question.

7           THE WITNESS:  I'm not going to say that I looked at

8   every poster in the room.

9           MR. SEYMOUR:  Ms. Richardson, do not answer, please,

10  until I've finished the objection.  I understand that you may

11  not have heard the objection because of the way the microphone

12  on this thing works but just hold on for a minute.  Okay?

13          THE WITNESS:  Okay.

14          MR. SEYMOUR:  Objection to the form of the question

15  because it assumes a fact not in evidence.  There is no evidence

16  that there were any other posters in the room.

17          MS. WARD:  Answer the question, Ms. Richardson.

18          MR. SEYMOUR:  No.  I instruct the witness not to

19  answer.  If counsel wishes to ask the question--

20          MS. WARD:  Ms. Richardson, this is a deposition under

21  the rules of civil procedure.

22          You have no right to tell a witness not to answer

23  a question.  You can object to the answer if I try to use it

1   at trial or if I try to use it at another time as relevant.

2          You are instructed to answer the question, Ms.

3   Richardson.

4          MR. SEYMOUR:  Ms. Richardson, do not answer the

5   question.

6          I take exception to counsel shouting and haranguing

7   opposing counsel and the witness.  That has no place in this

8   proceeding.

9          MS. WARD:  There has been no shouting.

10         MR. SEYMOUR:  I instruct the witness not to answer

11  the question unless counsel for the government is prepared to

12  lay a foundation for the question by first inquiring whether

13  there were any other things posted.

14         BY MS. WARD:

15   Q    Ms. Richardson, were there any other posters posted

16  in the room?

17         THE WITNESS:  Mr. Seymour, am I supposed to answer

18  that?

19         MR. SEYMOUR:  Yes, answer that question.

20         THE WITNESS:  The only posters that I saw when I

21  entered 1322 was, as I said, the directional signs like fire

22  alarm, exit and the job posting bulletin, and that was it.

23  As far as the other ones, there was none observed.

22

BY MS. WARD:

Q    That was observed?

A    That was not observed.

Q    You did not observe any other posters?

A    No, ma'am.

Q    No one had anything over their desk?

MR. SEYMOUR:    What do you mean by "over the desk", counsel?

BY MS. WARD:

Q    Did any of the people with whom you speak with or any of the people in the room perhaps have children's drawings on the walls, something of that nature?

A    No, there was not.

Q    Tell me, Ms. Richardson, everytime you go into an office or a room, do you always take notice of everything that's posted on ever wall?

A    Repeat that question again.

Q    Let's say you go into an office, any office, any time.  Today, for instance, you went into somebody's office perhaps.  Do you make it a usual practice to make a mental list of everything that is on every wall?

A    Yes.

Q    You do?

1      A    Sometimes, yes.

2      Q    What distinguishes the times you do from the times

3   you don't?

4      A    If I was going to a particular office and someone

5   would give me a pamphlet concerning their agency or something

6   like that, I will take note of my surroundings and all.  Okay.

7   Maybe I might look at the bookcase, that kind of thing, or

8   maybe I just might observe some more, you know, posters, that

9   kind of thing, or I might observe pictures of families on the

10  desk.  Okay.  Now, that is probably at most of the offices

11  that I go into at particular times or at other times as well.

12     Q    Ms. Richardson, this meeting that we are talking

13  about took place in August of 1976.

14     A    Yes.

15     Q    That was a number of years ago.

16     A    Yes.

17     Q    Are you willing to swear unequivocably that there

18  was absolutely no other picture any other place in the room

19  other than the ones, the fire escape, the exit sign and the

20  job vacancy announcements, you are willing to swear to that

21  unequivocably although this meeting took place eight years

22  ago?

23     A    Yes, I am willing to swear unequivocably.

c3s1

1    Q    Fine, Ms. Richardson.  Who gave you Pamela Ashby's

2    name?

3    A    That was when I had went down to the Civil Service

4    Commission, Room 1322, that was given to me by the reception-

5    ist or the personnel specialist in the office because they

6    said that she is a contact person as far as the PACE examining

7    unit in the Chicago region is concerned.  That's how I got

8    her name.

9    Q    What was the name of the personnel specialist with

10    whom you spoke?

11    A    I don't know his name.  I talked to the receptionist

12    and a personnel specialist.  Well, they identified theirself

13    as a personnel specialist.  All the people at that time that

14    I talked with was either a receptionist or "I'm a personnel

15    specialist this" and "I'm a second personnel specialist that",

16    that kind of thing.  Okay.

17    Q    Do you have notes in front of you, Ms. Richardson?

18    A    I have no notes in front of me at all.

19    Q    You have no papers in front of you?

20    A    None whatsoever.

21    Q    Have you consulted with a lawyer concerning this

22    complaint?

23    MR. SEYMOUR:  You mean other than the contact she had--

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1         MS. WARD:  Other than Mr. Seymour and myself.

2         THE WITNESS:  No, I haven't.

3         BY MS. WARD:

4    Q   Have you consulted with anyone other than Mr. Sey-

5 mour and myself concerning this complaint?

6    A   No, I haven't.

7    Q   You've told no one at all of this complaint?

8         MR. SEYMOUR:  You mean other than the context of

9 the Civil Service Commission?

10        MS. WARD:  Other than Mr. Seymour and myself and

11 the people you allege at the Civil Service Commission.

12        THE WITNESS:  That's correct.  I was waiting for

13 them to send me, you know, a response back to my letter, and

14 then I would take the necessary, you know, steps and all.

15        BY MS. WARD:

16    Q   What did you think the necessary steps were?

17    A   I usually do things in terms of steps.  Okay?

18    Q   Okay.

19    A   And I have not heard anything from them.  Now, if

20 they had sent me another decision or something like that, then

21 I would have, you know, consulted an attorney concerning what

22 I could do concerning the PACE exam and all.  But since I

23 have not heard anything from the OPM, with the exception  of

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Mr. Seymour's office, I'm just, you know, on hold until I get

2    a decision.

3        Q    Other than your letter of November 27th, 1976, did

4    you write any other letter to OPM or the old Civil Service

5    Commission other than the letters you've written to Mr. Sey-

6    mour and the court?

7        A    No, I have not.  I was waiting for a response from

8    the first letter and all.

9        Q    On the form that you returned to the court in 1981,

10   and this is the Form for Additional Information for Class

11   Members Who State They Filed Charges of Discrimination,

12   Question Number 1 says, "State each date on which you took

13   the PACE as closely as you can recall."

14        You answered.  "August 4th through the 6th, 1976, a

15   Saturday."

16        A    Yes.

17        Q    Yet today you have testified that you not only took

18   the PACE in August of 1976 but also in April of 1977.  Would

19   you please explain the reason for the differences in your

20   answers at this time?

21        A    Well, as I understand the question, as closely as I

22   can recall, and that was at that point because, as I stated

23   previously to Mr. Seymour's questioning, I had registered

1    first--okay.  Let me just say it this way.  I've taken the

2    PACE exam on more than one occasion, number one.  Okay.  A

3    little before I was to graduate from school and after having

4    graduated from school.  Okay.  Now, I am only dealing with

5    the relevancy of as I can recall which was in August of 1976.

6        Q    But you do recall that you took the pace on another

7    date and you recalled earlier in this deposition that you took

8    the PACE in April of 1977, is that not correct?

9        A    Yes, that's correct.  I did.  I took it in '77 as

10   well.

11       Q    Then why, on this form, which you provided to the

12   court, did you not state that you took the PACE in April of

13   1977?

14       A    Because I was waiting for a response from the old

15   Civil Service Commission that is now OPM regarding my original

16   complaint.  Now, before that original--

17       Q    Ms. Richardson--

18            MR. SEYMOUR:  She is answering the question.

19            THE WITNESS:  --complaint, that has not even been

20   deal with.

21            BY MS. WARD:

22       Q    Are you finished with your answer?

23       A    Yes, okay.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

28

1     Q   On the form, the question states, "State each date

2  on which you took the PACE as closely as you can recall."

3     A   "As closely as you can recall." Yes.  Okay.

4     Q   You stated, "August 4th to 6th, 1976, Saturday."

5  You did not state that you took the PACE, on this form, you

6  did not state that you took the PACE on any other date, is

7  that correct?

8     A   No, not on the form. Right.  No, I did not log that

9  into the form.  That's what I thought you asked at first.  No,

10  I did not log the other.  What did you say, the subsequent?

11     Q   The subsequent.

12     A   No, I did not; no, I did not.  I was only dealing

13  with one.

14     Q   Then you did not answer the question fully or

15  correctly, did you?

16     A   I logged in August of 1976.  That's what I put in.

17     Q   Did you also take the PACE in April of 1977, Ms.

18  Richardson?

19     A   Yes, I did.  I did not put that on the form.

20     Q   You did not put that on the form.

21     A   No, ma'am, I didn't.

22     Q   Then you did not answer the question truthfully,

23  did you?

29

1      A    Yes, I did.

2           MR. SEYMOUR:  Objection.  Fully is one thing.

3    Truthfully is something entirely different.

4           BY MS. WARD:

5      Q    Did you answer the question truthfully?

6      A    Yes, I did.

7      Q    Would you please explain to me why, if you took the

8    PACE in April of 1977 and you remember that you took the PACE

9    in April of 1977 yet you did not put it down in response to a

10   question which says, "State each" and the word "each" is

11   underlined, "date on which you took the PACE,"  you did not

12   list April of 1977 and that was a truthful answer?

13          MR. SEYMOUR:  Objection.

14          BY MS. WARD:

15     Q    Answer the question.

16     A    "As you can recall" okay, and as I stated before,

17   I had not heard anything, which has been a number of years,

18   from the old Civil Service Commission, and I am going to have

19   to stand by this, okay, concerning my first examination.  There-

20   fore, there was no need, at that point, to log in, you know,

21   the other PACE, you know, examination process in, okay.

22     Q    Why was there no need?

23     A    I had not heard anything from the Civil Service

1  Commission for almost eight years from the first subsequent

2  exam, from the first test I took.

3      Q    Did you receive results from the--

4      A    If I hadn't heard anything from them then, I mean,

5  what good would that do?  I was waiting for them to respond

6  to my first complaint, okay.

7      Q    After you took the pace in April of 1977, did you

8  receive results?

9      A    I received results from both exams in '76 and from

10  1977.

11      Q    What did you do after you received the second

12  results in April of 1977?

13      A    I went through the same process that I explained to

14  you previously.

15      Q    Would you explain that process?

16      A    I did the same thing I explained to you previously.

17      Q    You, again, went down to the Civil Service Commission?

18      A    Yes.  They just told me to register and take the

19  test again until I pass it.

20      Q    And what did you say the second time you went to the

21  Civil Service Commission?

22      A    What happened to my first complaint that I had

23  written, number one.  Okay.  And they said I would have to

1    wait for a response to it.  I said, "Don't you think there's

2    been quite a long time?"  And they said, "Well, sometimes

3    things happen like that", you know, that it is a long wait.

4        Again, I asked about the other exam which was the

5    same type of letter, the same response and all, okay, and I

6    decided at that point that I wouldn't go through just the

7    hassle, not the hassle, just go through the whole process all

8    over again with them until I had heard about my original

9    complaint.

10       Q    So you didn't file a complaint after you took the

11   exam a second time?

12       A    I was waiting for the first complaint to be respond-

13   ed to.  That's the point.

14       Q    Did you ever speak with Pamela Ashby?

15       A    I talked with Pamela Ashby over the telephone.

16       Q    Did you not testify earlier that you spoke with

17   Pamela Ashby in person?

18       A    Yes, I did.  I talked to her in person and on the

19   telephone.

20       Q    When did you speak to her in person?

21       A    I spoke to her when I went down to the office in

22   Room 1322.

23       Q    In 1976?

1      A     Yes, in '76.

2      Q     You spoke to Pamela Ashby in 1976 at the Office of

3   Personnel Management or the Civil Service Commission?

4      A     The old Civil Service Commission, yes.

5      Q     What did you say, as close as you can remember, to

6   Ms. Ashby?

7      A     I wanted to know about--she was a part of the PACE

8   examining unit and stuff like that.  I wanted to know, you

9   know, what was the basis of the test format as far as them

10   testing for specific jobs that was classified in the federal

11   service.  Okay.

12        Then I was asking her what tests were covered as far

13   as the PACE exam is concerned those kinds of questions, that

14   kind of thing, how was it graded.  And she said that they had

15   nothing to do with, like, the grades because the grade system

16   was from Washington, D.C., that kind of thing.  Okay.

17      Q     Yes.  So you asked concerning the grading procedures

18   and the format and the validation of the exam at that time

19   of Ms. Ashby?

20      A     Yes.

21      Q     Did you ask anything else?

22      A     Not that I can recall at this point.

23      Q     Okay.  And Ms. Ashby replied to you that the grading

1    and the format of the exam came out of Washington, D.C.?

2        A    Yes.

3        Q    Did Ms. Ashby say anything else to you?

4        A    Just to wait until I hear from the Civil Service

5    Commission concerning my original complaint and to reapply to

6    take the exam again.

7        Q    When was it that you spoke to Ms. Ashby?

8        A    When was it?

9        Q    Yes.

10            MR. SEYMOUR:  Which time, on the phone or in person?

11            THE WITNESS:  You asked me that before, didn't you?

12            MS. WARD:  No.

13            BY MS. WARD:

14        Q    Ms. Richardson, this conversation that we're talking

15    about took place in August of 1976.  You told me that you went

16    to the Civil Service Commission.  You went to Room 1322 and

17    you were introduced to a woman by the name of Pamela Ashby.

18    At that time, you said to Ms. Ashby that you were complaining

19    about the form of the exam, the format, the timing and the

20    validity of the exam, is that correct?

21        A    Yes.

22        Q    Ms. Ashby replied to you that she had nothing to

23    do with these matters, that they were taken care of out of

1    Washington, D.C., correct?

2        A    Yes.

3        Q    What else did she say to you at that time?

4        A    That I'm to wait for my--since I failed the exam and

5    all, that if I wanted to reapply to take the PACE exam, then

6    I have to use form 480 or something like that and reapply and

7    take it all over again, but wait for my decision from the

8    Civil Service Commission from Washington, D.C.

9        Q    What decision were you to wait for from Washington,

10   D.C.?

11       A    Concerning the protest letter that I had written

12   to the Civil Service Commission about my test scores when I

13   got my results back.

14       Q    Ms. Ashby, you wrote that letter in November of 1976

15   and we're talking about a conversation that took place in

16   August of 1976.

17            MR. SEYMOUR:  Objection to the tone of the question.

18            THE WITNESS:  I'm Ms. Richardson.

19            BY MS. WARD:

20       Q    Well, Ms. Richardson, you wrote that letter in

21   November of '76, and we're talking about a conversation that

22   took place in August of '76.  Now, do you want to reconsider

23   your answer?

1    A    Okay.  I want to just say at this point that when I

2  went down to--I did talk to Pamela Ashby, okay, and I went to

3  find out about the PACE examination, okay, and the format of

4  the PACE examination, that kind of thing--

5    Q    Yes.

6    A    --that's all I want to say about that.

7    Q    Okay.  And you talked to her about those things?

8    A    Yes.

9    Q    That's all you want to say about that now?

10    A    Right.

11    Q    Okay.  When did you decide to write the letter of

12  November 1976?

13    A    When I received my notification from the Civil Ser-

14  vice Commission that I was ineligible based on the examination.

15    Q    Who told you to write the letter to Pamela Ashby?

16    MR. SEYMOUR:  Objection.  It assumes a fact not in

17  evidence.

18    MS. WARD:  What fact is not in evidence?

19    MR. SEYMOUR:  That someone told her to write the

20  letter.

21    BY MS. WARD:

22    Q    Did someone tell you to write the letter to Pamela

23  Ashby?

1       A       Denise Richardson did.

2       Q       You are Denise Richardson, are you not?

3       A       Yes, ma'am, I am.

4       Q       So you told yourself to write the letter?

5       A       Yes, ma'am, I did.

6       Q       Why did you decide to write the letter to Pamela

7   Ashby?

8       A       I not only decided to write the letter to Pamela

9   Ashby; I decided to write the letter to the United States

10   Civil Service Commission because she's an employee in the

11   federal service, and I was not only directing my letter to

12   Mrs. Pamela Ashby or Ms. Pamela Ashby but the entire United

13   States Civil Service Commission, care of Pamela Ashby because

14   she is an employee of the federal service.

15       Q       Did you make any call at any time to any person

16   concerning to whom a complaint of discrimination should be

17   directed?  Did you call the EEOC?  Did you call the Civil

18   Service Commission and ask to whom a letter of complaint

19   should be directed?

20       A       No, I did not.

21       Q       Were you a college graduate at that time?

22       A       Yes, I was.  Yes, I am.

23       Q       Did you have a graduate degree at that time?

37

1       A    No, I did not have a graduate degree at that time.

2       Q    What do you have a degree in, Ms. Richardson?

3       A    I an an associate degree in social work and I have

4  a Bachelor's Degree in sociology.

5       Q    When did you first become aware of the provisions of

6  Title VII of the Civil Rights Act of 1964?

7       A    Title VII.  In what year?

8       Q    Yes.  Are you familiar with the provisions of Title

9  VII of the Civil Rights Act of 1964?

10      THE WITNESS:  Mr. Seymour, can I answer vaguely or

11  yes or no.

12      MR. SEYMOUR:  Why don't you say what you know about

13  it?  And then we'll go on to the time.

14      THE WITNESS:  I know vaguely of it since 1974, '75.

15      BY MS. WARD:

16      Q    What did you know?  What do you know about it?

17      A    That there are certain rights or provisions or cer-

18  tain remedies as far as certain population groups in society

19  pertaining to their rights under Title VII.  They have certain

20  rights under Title VII that must be enforced and upheld as

21  far as Title VII is concerned.

22      Q    Have you ever filed any other discrimination complaint

23  other than this one, Ms. Richardson?

1    A    No.

2    Q    Did you, at anytime after you wrote your letter of

3    November 1976, again contact either the Civil Service Commis-

4    sion or the Office of Personnel Management, either one,

5    concerning your letter?

6    A    Well, I called down to 219 South Dearborn, okay, to

7    inquire as to whether or not, you know, what was happening,

8    why I had not heard from them concerning my letter.  Okay.

9    Q    Who did you call?

10   A    Who did I call?

11   Q    Yes.

12   A    I called the office.  I called the Civil Service

13   Commission.

14   Q    Who did you speak with?

15   A    Well, they don't give you a person, just whoever is

16   at the phone will answer the call, and ask you what it is

17   regarding, and I said regarding the PACE exam, and they

18   didn't give me a name.

19   Q    What did you say regarding the PACE exam?

20   A    I wanted to find out why it was taking so long.  Why

21   I have not heard anything concerning my letter that I had

22   wrote to the Civil Service Commission.  Okay.  Someone took

23   down my name and phone number at that time, and said that they

1    would get back in touch with me, and they never did, and then

2    I called them back again, and it was the same, you know,

3    process.  And so I said I'll just have to wait until I hear

4    from them.

5         Q    And you never took any other action other than those

6    now you say two phone calls?

7         A    Right.  Well, I tried to follow up in what I do,

8    and also I was still waiting for the instrument in terms of a

9    letter from my original complaint to come to my address.  And

10   that still wasn't dealt with.

11        Now, if I can't get a letter from the United States

12   Government, Civil Service Commission, then I know--I thought

13   it was almost--it was really frustrating, you know, waiting

14   for a letter and waiting for them to follow up on the phone

15   calls that I had called them.

16        Q    Did you ever contact an attorney concerning this

17   problem?

18        A    You, asked me that before, didn't you?

19        Q    Well, did you?  Did you ever contact an attorney

20   concerning the fact that the Civil Service Commission had not

21   replied to your letter?

22        A    No, I did not, because they had not, you know, the

23   proper procedural as far as the Civil Service Commission was

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

40

1     not followed by the office, okay, and therefore, I did not.

2             MS. WARD:  I have no further questions.

3             MR. SEYMOUR:  Plaintiffs have some additional ques-

4     tions.  I want to place into evidence as Exhibit 1 to the

5     deposition the text of the November 27th, 1976, letter to

6     the Civil Service Commission, to which is attached the envel-

7     ope in which I received it.  Well, let me exclude that.

8     There is no point to that.  But there is also attached a

9     piece of paper which appears to be a photostat of the envelope

10    in which this document was sent to the Civil Service Commission.

11                        (Whereupon, the document was
                          marked Deposition Exhibit No. 1,
12                        for identification.)

13        FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

14        BY MR SEYMOUR:

15    Q    I just mentioned that there was attached to this

16    document what appears to be a photostat of an envelope address-

17    ed to the Civil Service Commission.  It's got your name,

18    Denise A. Richardson, in the upper lefthand corner with the

19    address of 5923 South Paulina, Chicago, Illinois 60636.  Was

20    that the address where you lived in 1976?

21    A    Yes, it was.

22    Q    And the address on the evelope is directed to the

23    Civil Service Commission, 219 South Dearborn, Attn:  PACE

1    Examiners/Supervisor PACE Unit, and Attn: Pamela Ashby.  It's

2    got one of these Pitney-Bowes postage meter stamps, dated

3    November 27, 1976, showing 13 cents in postage.  Is this a

4    copy of the outside of the envelope in which the letter to

5    the Civil Service Commission was enclosed?

6         A    Yes, that's the envelope.

7              MR. SEYMOUR:  We mark as Exhibit 2 to the deposition

8    the Form for Additional Information which Ms. Richardson filled

9    out and dated June 9th, 1981.

10                                 (Whereupon, the document was
                                    marked Deposition Exhibit No. 2,
11                                  for identification.)

12             BY MR. SEYMOUR:

13        Q    Now, there has been a fair amount of discussion

14   about your answer to the first question on the form which

15   asks for each date on which you took the PACE.

16        A    Would you hold in, please?  (Pause.)

17        Q    There has been some discussion about your answer to

18   the first question.  The first question reads, quote, "State

19   each date on which you took the PACE as closely as you can

20   recall," close quote.  The answer states, quote, "August 04-

21   06-1976, Saturday," close quote.

22             Now, you've been asked about the failure to put down

23   1977 on that form.  Did you have any intention to deceive

1   anyone when you failed to put 1977 on that form?

2       A    There is no intention to deceive or defraud anyone,

3   no.

4       Q    Thank you.

5       A    There is no intention.  That is not my intention at

6   all.

7           MR. SEYMOUR:  I ask to have marked as Exhibit 3 to

8   the deposition a copy of Ms. Richardson's letter to James

9   Davies, Clerk of the Court, dated April 24, 1981.  We received

10  that copy from the court.

11                              (Whereupon, the document was
                                marked Deposition Exhibit No. 3,
12                              for identification.)

13          MR. SEYMOUR:  Let's go off the record for a minute.

14          (Discussion off the record.)

15          MR. SEYMOUR:  While we were off the record, we were

16  just discussing the fact that we believed the original of this

17  is with the court record, and it should be more legible than

18  this copy and we can check that.

19          But I do want to point out, for the record, that this

20  letter to the Clerk of Court, dated April 24th, 1981, just

21  about five weeks before you signed the Additional Information

22  form that's Exhibit 2 to the deposition, refers to taking the

23  PACE in June 1977.

BY MR. SEYMOUR:

Q    When you failed to mention taking the PACE in 1976 on this letter to the clerk that's Exhibit 3 to the deposition, was there any intention on your part to deceive anyone?

A    There was no intention to deceive anyone.

Q    Where did you take the PACE in 1977?  Was that out at Northwestern or somewhere else?

A    Okay.  The first exam was given at Wieboldt Hall at 339 East Chicago.  Now, they gave another exam at Wills High School, and that is on Ashland Avenue, but I don't have the correct address, and I don't have the documentation as to the proper address in front of me because they were giving the PACE at different locations throughout the city of Chicago, but those are the only two testing sites that I do know of.

MS. WARD:  Are those the only two times you took the PACE exam, Ms. Richardson?

THE WITNESS:  Yes, ma'am.

BY MR. SEYMOUR:

Q    In 1976 when you sent this letter to the Civil Service Commission in Chicago, did you know at that time from any source that it was possible to file a complaint of discrimination directly with the Appeals Review Board of the Civil Service Commission in Washington, D.C.?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

44

1    A    No, I did not.

2    Q    You testified earlier that on both of your trips into

3    the Civil Service Commission in 1976, one before you got the

4    results of the test and the one after you got the results of

5    the test, you had gone in to complain about the test.

6    A    Yes.

7    Q    If there had been posted any notice of how to file a

8    complaint of discrimination against the PACE, would that have

9    been the thing you would be likely to recall?

10    A    Yes, I would be able to recall that.

11        MR. SEYMOUR:  No further questions.

12        MS. WARD:  I have no further questions.

13        MR. SEYMOUR:  Ms. Richardson, you have the right to

14    make a decision whether you want to see a copy of the deposi-

15    tion transcript and check over it yourself to make sure there

16    are no mistakes or instead just waive signature and rely on

17    the court reporter to get an accurate transcript filed with

18    the court.

19        We ordinarily recommend that people do ask to see it,

20    check it over themselves and sign the signature sheet and that

21    they not waive signature.  I particularly think that that is

22    important in the case of this deposition, but it is your

23    choice to make.

1          Do you want to see the transcript and then sign the

2     sheet or do you want to waive signature and just rely on the

3     court reporter to get it done right?

4          THE WITNESS:  I'll rely on the court reporter.

5          MR. SEYMOUR:  So much for the advice of counsel.

6     Thank you.

7          MS. WARD:  Thank you, Ms. Richardson.

8          (Signature waived.)

9          (Whereupon, at 7:46 p.m., the taking of the

10    deposition concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom
the foregoing deposition was taken, pages   1  through  45
do hereby certify that the witness, DENISE A. RICHARDSON,
whose testimony appears in the foregoing deposition was
duly sworn by me; that the testimony of said witness was
taken by me and thereafter reduced to typewriting by me or
under my direction; that said deposition is a true record of
the testimony given by the witness; that I am neither counsel
for, related to, nor employed by any of the parties to the
action in which this deposition was taken; and further
that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially or
otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

Index page _/_ of _/_

## INDEX OF EXHIBITS

Exhibit pages __/__ thru __//__

Title of Case: _Angel G. Guevano, et.al., vs. Donald J. Devine, et.al.,_

Place: _Washington, D.C._

Date: _November 28, 1984._

_Deposition of Denise A. Richardson/_

| EXHIBIT NUMBER | PAGE NUMBER | EXHIBIT NUMBER | PAGE NUMBER |
|---|---|---|---|
| #1 | 1 | | |
| #2 | 5 | | |
| #3 | 9 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

November 27, 1976

RECEIVED JUN 2 9 1981

United States Civil
Service Commission
219 South Dearborn
Chicago, Illinois 60604
Attn: Pace Supervisor
Pace Unit c/o Carmen
Ashby

Dear Pace Examiner:

I am writing this instrument in protest of the Professional Administrative Career Examination. This test was held at Northwestern University's Division of Continuing Education at Thiebolt Hall - located at 339 E. Chicago Avenue Chicago, Illinois. It is a pity that such an exam as this should reflect poorly on such a great school as Northwestern University - At any rate, the specific periods that I am referring to are the months of June through November 1976 - Why June? You may ask because this was the month in which I received my official notification from the Civil Service Commission informing me to report to Thiebolt Hall promptly at 8:00 am to take this form of an examination named Pace -

Deposition Exhibit No.
Deposition of Richardson
W. McAlister, Reporter
11-28-89

①

You may still be pondering the month of November - well let me be the first to set the record straight - I received the results of the Civil Service Exam during the latter part of October - at the beginning of the first part of the month of November - Therefore - the month of November has been dealt with - Civil Examiners - this exam was devised to selectively exclude and discriminate against minorities, especially Blacks who at registered to take this examination. You shall note that - this test basic format in terms of many of the questions which were asked of the examination participants were utterly preposterous - this was an impossible, pre-posterous, extensive examination that was totally irrelevant to black examinees seeking entry level positions in the Competitive Service - this test was biased in all of it's supposedly Psychometrics, and Methodological validity - It was biased also in terms of it's Construct validity - Lastly - I am also protesting the results of my Civil Exam scores - Who ever heard of anyone scoring a test in this manner - you have scored in the Lower One half Upper half - Middle One half

②

It was as if the scoring
techniques were in terms of
the class group, and size in order
to be faced in an alphabetical
fashion — I am still asserting
that this examination was a
discriminatory mechanism used
by the Civil Service Commission
to discriminate against Blacks.
Just before competing in
the examination our group had
to fill out forms from the Civil
Service Commission stating a
lot of lot of census data. These
are the forms that the Civil
Service Commission uses to discriminate
against certain examination participates —

Thanks much —

Frank A. Richardson
# 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

③



Denise A. Richardson
5923 S. Paulina
Chicago, Illinois 60636



United States Civil Service
Commission
219 South Dearborn
Chicago, Illinois 60604
attn: Pace Examiner/Supervisor
Pace Unit

RECEIVED JUN 2 9 1981

attn: Camela Ashby



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )     Civil Action No. 79-0271
                                   )
ALAN CAMPBELL, Director,           )
     Office of Personnel           )     RECEIVED JUN 1 7 1981
     Management, et al.,           )
                                   )
          Defendants.              )
_____)

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:     Denise Richardson
                  Box 10255
                  Chicago, ILL  60610

1. State each date on which you took the PACE, as
closely as you can recall. _August 04-06-1976_
_Saturday_

2. Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? _Copies will be sent_
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3. What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? _November 26, 1976_
To whom did you send this complaint? _U.S. Civil Service Commission_
_219 S. Dearborn Chgo, IL 60604 Attn: Processor for Pace Unit - Pamela_
_Ashby_What was the address to which you sent the complaint? _U.S._
_Civil Service Commission - 219 South Dearborn_
_Chicago Illinois 60604_
Did you ever receive a response to your complaint? _Nope,_
_whatsoever_
If you did receive a response, what did it say? _____  (3)
_____N/A_____

Deposition Exhibit No. 2
Deposition of Richardson
W. McAllister, Reporter
11-28-84     Attachment B

What was the date of the response? _____

Do you have a copy of your (complaint) and of the responses you

received? *Yes* _____ (PLEASE ATTACH COPIES OF ALL

DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

4. Did you ever file another complaint against the

PACE? *NO* _____ If so, state the dates of each such

complaint: *I'm still waiting for the first response*

To whom did you send these complaints? *Atta' Pace*
*Supervisor - Pace Unit - Civil service*
*Commission Rep. Pamela Ashby*

What was the address to which you sent these complaints?
*United States Civil Service Commission*
*219 South Dearborn - Chicago, Illinois 60604*
*Atta' Pace Supervisor Pace Unit*
*Pamela Ashby*

Did you ever receive any responses to these complaints? *NO*

If you did receive any responses, what did they say? _____

_____

_____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE

TO THESE COMPLAINTS.)

5. Did you ever file a lawsuit in Federal Court under

Title VII of the Civil Rights Act of 1964, challenging the

government's use of the PACE as racially or ethnically discrim-

inatory? _____ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed: _____

_____ City_____ State_____

Name and address of your attorney, if any:

_____

_____

City_____ State_____ Zip _____

Telephone Number: _____

Has this case been decided? _____ If so, what was the

decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY

OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

6.   State your telephone number: *#312 N04 3080*
*RM 312*

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: *June 09/1981*   Signature *Denise A. Richardson*

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>    Rights Under Law
> 520 Woodward Building
> 733 Fifteenth St., N.W.
> Washington, D.C.  20005

*I am sending the Questionnaire
to your office(s) — I shall be forwarding
further documents to you as I receive
them —*

*Yours,*

*Denise A. Richardson*

- 3 -

Denise A. Richardson
Box 10255
Chicago, Illinois 60610



Richard T. Seymour
Lawyers Committee for Civil
Rights under Law
520 Woodward Building
733 Fifteenth St., N.W.
Washington, D.C.    2005



Denise A. Richardson
Box 10255
Chicago, Illinois 60610
312. 951-3697
April 27, 1981

To The Honorable
James F. Davey
Clerk - United States
District Court


This instrument is written in reference
to Suevano-Vs Campbell. Civil Action Suit
No-79-0271 D.D.C). I received a Bachelors
Degree in Sociology from Loyola University
of Chicago-in June Nineteen Seventy Six.
I was informed by a Personal
representative, of the Civil Service Com-
mission, that a Bachelor's degree is a
prerequisite for registering for and
to take the face examination. I Registered
for the face exam at the Civil Service
Commission Offices at 219 South Dearborn.
I then received Correspondence
from their offices informing me
that I was to Report to Wieboldt Hall
of Northwestern University of Chicago,
in the month of June Nineteen Hundred
Seventy Seven I Reported on the day
of the examination, and before testing
was to have begun I went through
all of the necessary procedures of—

filling out more forms, and
handing in my Pace Entrance
receipt, also many of the Pace
examinees were fingerprinted including
myself. Next, while participating
during the examination I decided
to write to the Civil Service Commission –
to protest the Professional Administrative
Career Examination. I wrote to the
Commission, a week from the day
in which I took the examination
to state to them that the Pace exam
discriminated against Black exam
participants. I further noted to
them that the exam was totally
irrelevant to a person performing
competently in a GS-5 or GS-7 level –
    I further related that their was no
job relevancy as far as the Pace Exam
is concerned – I shall further mention
that I did receive a failing notice
my ratings from the Civil Service Commission,
but no response to my protestation
of the format, questions etc. of the
Pace examination. Therefore I am requesting
that my name be joined with one/
other Plaintiffs of this Class Action Suit.
    as of this seeking a remedy
due to the above mentioned situation –

        Thanks much
        Anne A. Richardson
0378-44-4434
SSA #

Richardson, Denise A.



RECEIVED

2 05 PM '84

CLERK

DISTRICT OF COLUMBIA

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

FILED

DEC 1 1 1984

JAMES F. DAVEY, Clerk

ANGEL G. LUEVVANO, ET AL.,           )
INDIVUALLY AND ON BEHALF OF          )
ALL OTHER SIMILARLY SITUATED.        )
                                     )
                    PLAINTIFFS       )        Civil Action
                                     )        No. 79-0271
        VS.                          )
                                     )
DONALD J. DEVINE, ET AL.,            )
                                     )
                    DEFENDANTS       )
                                     )
                                     )

DEPOSITION OF EVA C. OLDHAM

Washington, D. C.
November 27, 1984

Pages 1 thru 12

MILLER REPORTING COMPANY, INC.
507 C Street, N.E.
Washington, D.C. 20002
546-6666

1                      UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - - - - x
                                        :
4       ANGEL G. LUEVANO, ET AL.,       :
        INDIVIDUALLY AND ON BEHALF OF   :
5       ALL OTHER SIMILARLY SITUATED,   :
                                        :
6               Plaintiffs              :
                                        :          CIVIL ACTION
7           vs.                         :          NO. 79-0271
                                        :
8       DONALD J. DEVINE, ET AL.,       :
                                        :
9               Defendants             :
                                        :
10      - - - - - - - - - - - - - - - - x

11                              Washington, D.C.

12                              Tuesday, November 27, 1984

13      Deposition of:

14                         EVA C. OLDHAM

15      a witness, called for examination by counsel for the Defendants,

16      pursuant to notice and agreement of counsel as to time and

17      place in the offices of the Lawyers' Committee for Civil

18      Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19      D.C., beginning at 7:15 p.m., before William D. McAllister,

20      a Notary Public in and for the District of Columbia, when

21      were present on behalf of the respective parties:

22

23

2

1    APPEARANCES OF COUNSEL:

2         On behalf of the Plaintiffs:

3              LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
               BY:  RICHARD T. SEYMOUR, ESQ.
4                   Suite 400
                    1400 I Street, N.W.
5                   Washington, D.C. 20005

6         On behalf of the Defendants:

7              UNITED STATES DEPARTMENT OF JUSTICE
               BY:  BARBARA L. WARD, ESQ.
8                   Room 3509
                    Civil Division-Federal Programs Branch
9                   10th and Pennsylvania Avenues, N.W.
                    Washington, D.C. 20530
10

11                        C O N T E N T S

12   WITNESS              EXAMINATION BY:  MR. SEYMOUR    MS. WARD

13   Eva C. Oldham                              3            --

14

15

16   Exhibits

17     None.

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1                    P R O C E E D I N G S

2    Whereupon,

3                    JAMES W. BYRD

4    was called as a witness, and having first been duly sworn by

5    the Notary Reporter, was examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7            BY MR. SEYMOUR:

8        Q    Please state your name and address for the record.

9        A    I am James W. Byrd, ).O. Box 657, Littleton, North

10   Carolina, the Zip Code 27850.

11       Q    Mr. Byrd, what is your race?

12       A    My race.  I am Black American.

13       Q    Did you ever take the Professional and Administrative

14   Career Examination, called the PACE?

15       A    I think so.

16       Q    When was that?

17       A    Well, it had to be between the year 1970 and '78.

18       Q    Can you pin it down?

19       A    Not really.  I took quite a few federal examinations

20   during that period, and after taking these examinations and

21   not hearing anything from them, I just forgot  about it and

22   tried other things.

23       Q    What job were you applying for?

4

1      A      Well, I'm trained as a security officer and adminis-

2   trator and a clerical worker.

3      Q      Were the tests that you took tests being given by

4   the Office of Personnel Management or before that by the

5   Civil Service Commission or were they tests that were given

6   by the particular agencies?

7      A      The Civil Service Commission I am quite sure of

8   that.

9      Q      Can you describe anything about the tests you re-

10   member taking so that we can pin down this question of whether

11   you ever took the PACE?

12      A      Well, as an interviewer, veterans interviewer I

13   was familiar with job placements and things of that nature

14   and interviewing clients and what type of jobs that they

15   would like and what the situation would be in gaining that

16   type of employment.

17      Q      First of all, is there a particular test that you

18   are thinking of that might have been the PACE and you've just

19   forgotten the name or can you just not remember anything

20   about it?

21      A      Yes, one security job that I tried to, in the

22   security administration was supervising guards, and I recall

23   that I made a pretty high mark in that, between 99 and 95,

1    but I never heard anything from it.

2         Q    The job title was guard supervisor?

3         A    Yes.

4         Q    Is that the only test that you took that you think

5    might have been the PACE?

6         A    No.  I took one as I stated previously, veterans

7    interviewer.

8         Q    When did you take that test?

9         A    It probably was in '74.

10        Q    Do you remember what part of the year?

11        A    Usually, if I recall, those tests were usually in

12    the summer.

13        Q    Are you making a guess there or not?

14        A    Yes, I am.  I'm making a guess.  I don't really

15    recall.

16        Q    When you said "1974", were you also guessing at

17    the year?

18        A    Yes.

19        Q    We don't want you to make any guesses.  Just tell

20    us what you know, and if you don't know the answer to some-

21    thing just tell us and we'll take it from there, okay?

22        A    Okay.  Well, I don't know.

23        Q    Do you remember the title of a job that you were

1    applying for, what they called the job?

2         A    Guard supervisor in one and, two, I recall Veterans

3    Administrator Interviewer, veterans interviewer, and one was

4    clerk, a clerical administrator.

5         Q    If you will hold on a second, I am checking a

6    document.  (Perusing document.)  Mr. Byrd, do you remember

7    the number of the job series, this veterans job?

8         A    No, I don't.  I believe a few years ago I sent to

9    Mr. Seymour some of the records that I had.  I previously

10   lived in New York, and I moved to North Carolina in '78 and

11   a lot of those documents were lost.

12        Q    There is a federal job called Veterans Claims

13   Examining.  Was that the job or was it a different job?

14        A    I don't recall.

15        Q    I may need to come back to that in a minute.  Can

16   you tell me if you remember the pay level for the job that

17   you were applying for when you were trying to get this

18   veterans job?

19        A    Yes, between some kind of number five and seven

20   was the grade level.

21        Q    You still can't pin down when you took that job.

22   It might have been 1974.  It might have been later.  It

23   might have been several years later?

7

1    A    Would you repeat that again?

2    Q    A couple of minutes ago I asked you whether you

3    could remember when you took the job and you guessed at--

4    took the test, excuse me, and you guessed it was the summer

5    of 1974.

6    A    I never was able to get the job.

7    Q    Okay.  Can you try to link up the time when you

8    took the test for this veterans job with anything else that

9    was going on in your life or your family at the time, the

10   birth of a child, somebody getting married that you knew,

11   somebody having a baby that you knew?

12   A    Well, most of the tests that I took for federal

13   jobs, I had retired from a city position as a correction

14   captain.

15   Q    When did you retire?

16   A    I retired in '73.

17   Q    Were these tests that you took before you moved

18   to North Carolina?

19   A    Yes.

20   Q    When did you move to North Carolina?

21   A    1978.

22        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

23        BY MS. WARD:

1  Q Mr. Byrd, do you have any idea of how long after

2 you retired from your city position that you took the exam

3 for the veterans interviewer?

4  A I retired in August.

5  Q August of 1973?

6  A Of 1973.  The test must have been in September.

7  Q So you remember taking this exam immediately after

8 you retired?

9  A Yes, and maybe one or two before I retired.

10  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

11  BY MR. SEYMOUR:

12  Q Did you take the veterans test before you took the

13 test for the guard job or afterwards?

14  A I can't recall that.  I don't know what the line

15 was.

16  Q It might have been before or it might have been

17 after?

18  A Yes.

19  Q One of the documents that you sent me was the

20 top part of a sheet labeled "Personal Qualification Statement".

21  A Yes.

22  Q Was that connected with trying to get the guard job

23 or was it connected with trying to get the veterans job or

1     was it connected with trying to get this Equal Opportunity

2     Specialist job?

3        A     Well, you asked me not to guess, and I would be

4     guessing if I answered that.

5        Q     Okay. That's a perfectly find answer. Let me

6     try coming at this another way. Did you ever make any com-

7     plaint of discrimination after you took the test for this

8     veterans job?

9        A     No, only after I learned it was possible to be

10     placed on the list and get a job, and that must have been in

11     '78 or '79.

12        Q     Can you explain that a little?

13        A     I was only interested in obtaining the position that

14     I had taken the test for, and I did not pursue it when I

15     didn't hear from the results or from the place that I had

16     taken the exam, and well, I had just forgotten about it.

17        Q     How much later was it after you took the test before

18     you made this complaint?

19        A     Oh, it have been at least in '78 or '79.

20        Q     And this is more than two years after you took the

21     test?

22        A     Oh, yes. It was quite awhile, yes. I had just

23     settled in North Carolina.

Q    Is that the only complaint of discrimination you made about the veterans job?

A    Yes.

Q    One of the papers that you sent me was for a guard position at the GS-4 level.  There is also a reference on a sheet to guard jobs at the GS-3 level as well as GS-4.  Is this GS-4 guard position the guard supervisor job that you were talking about?

A    Yes.

MR. SEYMOUR:  Plaintiffs have no further questions.

MS. WARD:  I have no questions either, Mr. Byrd.

MR. SEYMOUR:  Mr. Byrd, you have the right to decide whether you want to see your transcript of your deposition to check it yourself for any possible mistakes in taking down what you said and then to sign a signature sheet or instead to waive your signature and just rely on the court reporter to do a good job in filing it with the court.

In this particular case, I do not think it makes any difference which decision you make but it is your decision to make.  Do you want to see the deposition and check it yourself then sign it or do you want to just rely on the court reporter?

THE WITNESS:  I will rely on the court reporter.

11

1          MR. SEYMOUR:  Okay.  Mr. Byrd, we'll be in touch

2     with you later on when the court rules.

3          MS. WARD:  Thank you, Mr. Byrd.

4          (Signature waived.)

5          (Whereupon, at 7:57 p.m., the taking of the

6     deposition concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MILLER REPORTING CO., INC.**
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 11 do hereby certify that the witness, JAMES W. BYRD, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.



RECEIVED

Dec 11  3 05 PM '84

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

FILED

DEC 1 1 1984

JAMES F. DAVEY, Clerk

ANGEL G. LUEVANO, ET AL., )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHER SIMILARLY SITUATED, )
)
    Plaintiffs, )
) CIVIL ACTION NO.
) 79-0271
v. )
)
DONALD J. DEVINE, ET AL., )
)
    Defendants. )

Deposition of BEVERLY J. BROWN

Washington, D.C.
November 28, 1984

Pages 1 thru 22

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

1               UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - - - x
                           :

4  ANGEL G. LUEVANO, ET AL.,     :
    INDIVIDUALLY AND ON BEHALF OF  :

5  ALL OTHER SIMILARLY SITUATED,  :
                           :

6        Plaintiffs          :
                           :

7    vs.                 :    CIVIL ACTION
                           :    NO. 79-0271

8  DONALD J. DEVINE, ET AL.,     :
                           :

9        Defendants         :
                           :

10  - - - - - - - - - - - - - - - - x

11                      Washington, D.C.

12                      Wednesday, November 28, 1984

13  Deposition of:

14                BEVERLY  J. BROWN

15  a witness, called for examination by counsel for the Defendants,

16  pursuant to notice and agreement of counsel as to time and

17  place in the offices of the Lawyers' Committee for Civil

18  Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19  D.C., beginning at 6:22 p.m., before William D. McAllister,

20  a Notary Public in and for the District of Columbia, when

21  were present on behalf of the respective parties:

22

23

2

1  APPEARANCES OF COUNSEL:

2      On behalf of the Plaintiffs:

3          LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
           BY:  RICHARD T. SEYMOUR, ESQ.
4               Suite 400
                1400 I Street, N.W.
5               Washington, D.C. 20005

6      On behalf of the Defendants:

7          UNITED STATES DEPARTMENT OF JUSTICE
           BY:  BARBARA L. WARD, ESQ.
8               Room 3509
                Civil Division-Federal Programs Branch
9               10th and Pennsylvania Avenues, N.W.
                Washington, D.C. 20530

10

11

12                    C O N T E N T S

13  WITNESS              EXAMINATION BY:  MR. SEYMOUR  MS WARD

14    Beverly J. Brown                    3, 15, 18, 19  15, 17
                                                            19
15

16

17

18  Exhibits

19    None.

20

21

22

23

1                    P R O C E E D I N G S

2    Whereupon,

3                    BEVERLY J. BROWN

4    was called as a witness and, having first been duly sworn by

5    the Notary Reporter, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7              BY MR. SEYMOUR:

8         Q    Please state your name and address for the record.

9         A    Okay.  It's Beverly J. Brown.  The address is 2544

10   Comstock Street, San Diego, California 92111.

11        Q    Please state your race.

12        A    Black.

13        Q    Have you ever taken the Professional and Administra-

14   tive Career Examination otherwise known as the PACE?

15        A    Yes, I have.

16        Q    How many times did you take it?

17        A    Two.

18        Q    When were they?

19        A    Okay.  I don't have the exact months.  I took the

20   first test in '75, and the second test in '76.

21        Q    Where did you take them?

22        A    Through the Dallas Civil Service Commission.

23        Q    At the time that you took those tests, were you a

4

1    federal employee?

2        A    Yes.

3        Q    Was that true both times?

4        A    Both times.

5        Q    Were you taking the test as part of a merit promotion

6    plan?

7            MS. WARD:  Or an upward mobility plan?

8            THE WITNESS:  No.  I took the test on my own.

9            BY MR. SEYMOUR:

10       Q    Were you competing with outside applicants at the

11   time?

12       A    Yes.

13       Q    And looking for jobs at agencies other than the

14   Social Security Administration or were you just looking for a

15   job at Social Security?

16       A    I wasn't working for Social Security then.  I was

17   just looking for a different job, any agency.

18       Q    What happened when you took the test?  Did you pass

19   or fail?

20       A    I failed both tests.

21       Q    Did you ever make any complaint about the test?

22       A    Yes, I did.

23       Q    Please tell us when that happened and what you did.

5

1      A    Okay.  Both times, the first time I took it, I went

2   to the Equal Employment Opportunity Commission and I talked to

3   a Mr. Lupo there.

4          MS. WARD:  Excuse me.  With whom did you speak?

5          THE WITNESS:  Mr. Lupo, L-u-p-o.

6          BY MR. SEYMOUR:

7      Q    Was he located in Dallas?

8      A    Yes, I'm thinking it was the seventh floor.

9      Q    Do you remember the street address of the place

10  that you went and spoke to him?

11     A    1200 Commerce Street, the federal building.

12     Q    And do you remember what Mr. Lupo's job title was?

13     A    No, I don't.

14     Q    Could you tell us as closely as you can remember

15  the words that you used to him and the words that he used to

16  you in the conversation?  Please do not make any guesses or

17  assumptions or try to fill in any gaps, just tell us the best

18  you can remember the words that were used.

19     A    Okay.  I cant remember any of the words that was

20  used in the conversations.  The only thing I can remember is

21  that he referred me to the Civil Service Commission.

22     Q    Do you remember whether you said anything at all

23  about the PACE to him?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    A    That's why I went to see him.  It was about the PACE.

2    Q    What did you say about the PACE to him?  If you don't

3  remember the words, tell us the substance.

4    A    I can't remember any of the words.

5    Q    Can you tell us the substance of what you told him?

6    A    I can remember I did not pass the test.  I went

7  over there to talk to someone at the EEOC office, and the per-

8  son I saw I remember his name because it was an unusual name.

9  It was spelled L-u-p-o.

10       I talked to him.  I can't remember anything in the

11  conversation.  That's been nine years ago, and the only thing

12  I can remember is he referred me to the Civil Service Commis-

13  sion.

14    Q    Did you tell him you wanted to make a complaint

15  against--

16       MS. WARD:  Objection.  You're leading the witness.

17  She's stated she doesn't remember anything about the conversa-

18  tion.

19       MR. SEYMOUR:  Okay.  I'll rephrase the question.

20       Think carefully before you answer.

21       MS. WARD:  Objection.  You are leading the witness.

22       MR. SEYMOUR:  Is counsel objecting to the statement

23  "Think carefully before you answer"?  You haven't heard the

1    question yet.

2           BY MR. SEYMOUR:

3    Q    Now, I repeat.  Think carefully before you answer

4    and state whether you recall whether you said anything to Mr.

5    Lupo about filing any complaint of discrimination concerning

6    the PACE.

7           MS. WARD:  Objection.  You're leading the witness.

8           MR. SEYMOUR:  Please answer the question.

9           THE WITNESS:  Okay.  I can't remember anything in

10   the conversation.  The only thing I can remember is Mr. Lupo

11   telling me to go down to the Civil Service Commission.  I can't

12   remember anything else he said.

13          BY MR. SEYMOUR:

14   Q    Did you go to the Civil Service Commission?

15   A    Yes, I did, on both occasions.  I only went to see

16   Mr. Lupo that one time.  That was the first time.

17   Q    In 1975?

18   A    Yes, when I got my first results back.  That's the

19   only time I saw him.

20   O    Then in 1975 you went to the Civil Service Commission.

21   Do you remember who you spoke with there?

22   A    No, I don't, but each time I went I had to sign a

23   sheet and sign my name on there.

8

1      Q    Do you remember how long it was that you went there

2  after you received the test results?

3      A    No, I don't.  It had to be within a week's time be-

4  cause I went down there as soon as I got my results back.

5      Q    Did you speak with a man or woman there?

6      A    Both times I went I talked to a man.

7      Q    Do you recall what you said to the man?  First, let

8  me ask you about the words that you used.  Do you recall the

9  words?

10      A    Okay.  I can't tell you what was in the conversation

11  because it's been too long.  If I said something, I couldn't

12  remember.

13      Q    Do you recall the substance of what you told him?

14      A    I know I complained about the test because he told

15  me to go across the street to General Counsel.  That's when I

16  went across the street, but I can't tell you the exact words

17  that were used.

18      Q    In the substance of it, what did you say to him about

19  the test?  You said you went to complain about the test.  What

20  kind of complaint was it?

21      A    Okay.  There was another girl in my office that took

22  the test with me, and she passed it, and there were some

23  specific questions that were on the test, and we discussed them

1    in the office.

2         Well, we took the test on a Saturday in a cafeteria,

3    and we discussed the questions in the office that coming

4    Monday.  I don't remember exactly what the questions were but

5    anyway, they were out of proportion.  They were things that

6    you would never do, and I told her there was a couple of things

7    that I, as a Black person, never even heard of that, and she

8    was the one that mentioned discrimination.

9         Q    Is this person that you were speaking to White or

10   Black?

11        A    White.

12        Q    And is this your coworker or someone at the Civil

13   Service Commission?

14        A    No.  She's a coworker.

15        Q    When you went to the Civil Service Commission, did

16   you complain about racial discrimination or were you just

17   making a general protest against the test?

18        MS. WARD:  Objection.  Leading.

19        MR. SEYMOUR:  Please answer the question.

20        THE WITNESS:  Both.  I asked him--well, I can't say

21   exactly what I said, but I could remember asking him if the

22   tests were for different racial groups.  I can't remember

23   exactly what I said.

1    BY MR. SEYMOUR:

2    Q    Do you mean that you cannot remember the words that

3    you said or that you can't remember the substance?

4    A    I can't tell you any of the conversation that I said

5    because I don't remember.  All I can remember is generally

6    what the conversation was about.  I can't tell you anything

7    exactly because I don't remember.

8    Q    Tell me generally what the conversation was about

9    then, as much as you can remember of it.

10    A    There were two specific questions on that test that

11    were on the test that this girl and I discussed.  When I went

12    down to the Civil Service Commission that first time, I remem-

13    ber bringing up these two questions to this person.  It was a

14    man that waited on me.  I brought the questions up to him, but

15    I don't remember what I said or exactly what took place.  I

16    can't pinpoint it.  It's been too long, and then after that,

17    I threw everything away, thinking nothing nothing ever happens.

18    I kept my test scores for a while and then I threw them away.

19    Q    You said that this man told you to go over to the

20    General Counsel's Office?

21    A    Yes, I went over to the Office of the General Counsel

22    which was across the street.  I went over there two times.

23    Q    Do you recall why this man told you to go to the

1  Office of General Counsel?

2      A    To file a complaint, and I signed a paper over there,

3  but I don't know what I signed and I couldn't tell you what was

4  on the paper.

5      Q    Did they give you a copy of the paper?

6      A    I don't remember.   I can't say yes and I can't say

7  no.  I kept everything together for a while and then I threw

8  it away.

9      Q    Do you remember whether the complaint had anything

10  to do with racial discrimination?

11          MS. WARD:  Objection.  Leading the witness.

12          MR. SEYMOUR:  Please answer the question.

13          THE WITNESS:  I think so.  I can't say for sure.  I

14  think so, though.  In fact, I don't remember exactly what was

15  in there.

16          BY MR. SEYMOUR:

17      Q    Who wrote out the paper?  Did you write it out or

18  did someone from--

19      A    No, I didn't write anything out.  I remember signing

20  my name.  I had to sign it two times over at the Civil Service

21  Commission is what it was called then, and I had to sign it

22  over at General Counsel, but I don't remember what I signed.

23      Q    What happened at the General Counsel's Office that

12

1   led to this form being filed out?  Well, why don't you just

2   describe what you remember when you walked into the door of the

3   General Counsel's Office until you got finished there and were

4   leaving?

5      A    I don't remember anything.  I can't remember anything

6   that happened over there.  I remember going over there about

7   the PACE test, and I can't even remember what was in the con-

8   versation.  I know I talked to a man both times.

9      Q    Do you recall anything being said about any next

10  step to be taken?

11     A    I don't remember.

12     Q    Did you ever hear anything from the Civil Service

13  Commission about that document that you signed?

14     A    No, I didn't.  That's what I said.  I never heard

15  anything about it from anybody so I threw everything away.

16     Q    In 1976, you said that you took the PACE again.

17  Did you make another complaint in 1976?

18     A    I made two complaints.  Each time I took the test I

19  went over there.  When I went to EEOC, that is when I saw Mr.

20  Lupo, and I went to the Civil Service Commission, to General

21  Counsel.  That was my first visit.  I didn't go back.

22         When I took the test again in '76, I went down to

23  the Civil Service Commission again.  I didn't go back to EEOC,

13

1    and I had to sign in again to see my test score and go over

2    it, and I went over to General Counsel then.  But I don't know

3    what happened or what was said.

4        Q    When you went back to the Civil Service Commission

5    in 1976, did you go back to make a complaint or did you go

6    back just to see your test scores?

7        A    I can't answer that because I don't know exactly what

8    I said.

9        Q    Do you remember seeing your test scores in 1976?

10       A    I remember he showing me something.  I wanted to find

11   out where my low scores were, and I believe he told me.  I'm

12   not sure.  It's been so long I really can remember.

13       Q    Would it be correct to say that in both 1975 and 1976

14   you are not sure whether you made any complaint of racial

15   discrimination against Blacks in the use of the PACE?

16       A    Well, against myself.  I wouldn't say Blacks.  I was

17   only complaining about my test because I couldn't understand

18   how she could pass that test and I didn't, and we had apparent-

19   ly the same answers.

20       Q    Let me put my question a little bit differently then.

21   Would it be correct to say that, as to both the 1975 visit

22   to the Civil Service Commission and the 1976 visit to the

23   Civil Service Commission, you do not remember making any

14

1  complaint of racial discrimination against yourself because of

2  the PACE, is that right?

3      A    Okay.  I wouldn't call it racial discrimination.  I

4  question I remember I asked, and I don't know how I asked him,

5  the man over at General Counsel, was that by this other girl

6  passing the test, do they have a quote that they have to make

7  for so many Blacks to pass the test and for so many Whites to

8  pass the test, and I don't remember what answer I got, because

9  when we discussed the answers that we used on the test, our

10  answers were so close but yet she passed and I didn't.

11      Q    When you made the remark about whether there was a

12  quota for so many Blacks and so many Whites to pass--

13      A    See, I don't remember exactly how I said it, but I

14  remember phrasing it something like that, and I don't remember

15  what answer I got.

16      Q    Was this a conversation that you are describing that

17  took place at the Civil Service Commission--

18      A    General Counsel.

19      Q    At the General Counsel's Office you said that?

20      A    Yes, at the General Counsel's Office.  The man at

21  the Civil Service Commission referred me over to General Counsel.

22      Q    Do you remember whether you spoke with a lawyer or

23  with someone else in that office?

1    A    It was an attorney I talked to.

2    Q    Was that a man or a woman?

3    A    It was a man both times I went over there.

4           EXAMINATION BY COUNSEL FOR THE DEFENDANTS

5    BY MS. WARD:

6    Q    How do you know it was an attorney?

7    A    Well, the receptionist, there was a receptionist at

8  the desk.  She told me he was an attorney.  If I can just think

9  of his name.  I don't know what his name was, but it was an

10  attorney.  I had all the names and everything written down

11  and I threw everything away.

12    Q    Did you ever contact this person or anybody at the

13  Civil Service Commission after you had this discussion in

14  1976 that we've just been talking about?  Did you ever contact

15  them again?

16    A    I can't say for sure.  I would have to say no because

17  I couldn't say for sure.

18         FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

19    BY MR. SEYMOUR:

20    Q    Do you mean you might have contacted them, you

21  might not have, you just don't know?

22    A    I just don't remember.  It's too long.

23    Q    Can you say for sure whether you ever heard from

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

16

1    the government again about those visits that you made to the

2    General Counsel's Office?

3        A    I say I never heard anything. That's why I threw all

4    the papers away.  I never heard anything, period.

5        Q    When you made these visits to the Civil Service

6    Commission, the first place that you went to, and then later

7    on when you made the visit to the General Counsel's Office,

8    did you receive anything in writing telling you how to go

9    about making a complaint of discrimination?

10       A    No, but I remember signing a paper at the General

11   Counsel's Office, but I don't remember what was on it.  Would-

12   n't they have records of this?  Wouldn't they have a record?

13       Q    When you went to the Equal Employment Opportunity

14   Commission, do you remember receiving anything in writing

15   from them saying how to go about making a complaint of dis-

16   crimination against a test used by the Civil Service Commission?

17       A    No, no, I don't.  All I remember is talking to Mr.

18   Lupo and he referred me down to the commission, and I went

19   down there.  They were downstairs.

20       Q    In the questionnaire that you filed with the court

21   in 1981, you said that you had gone to the OEO first and they

22   sent you to the Civil Service Commission.

23       A    Right.

1          Q     The initials OEO, usually are taken to mean the

2     Office of Economic Opportunity.  Is that where you went or

3     did you go to the --

4          A     No.  It's EEOC.

5          Q     You just used the wrong initials there?

6          A     Yes, right.  It's EEOC.  It was the one that had

7     "commission" at the end of the name and the other one doesn't.

8               FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

9               BY MS. WARD:

10         Q     Ms. Brown, also on this form you say that when you

11    were at the Civil Service Commission both times that someone

12    showed you your test results.  Did that happen both times

13    that someone showed you your test results?  Do you remember?

14         A     Okay.  When I went to the commission the first time,

15    he pulled my results.  Only one time did they go over the low

16    points, and I believe that was the second time I went.

17         Q     The second time.  What did you say happened the

18    first time?

19         A     He pulled my results, but I wanted to know what I

20    was low at, my low scores.  I can't remember.  I remember he

21    pulled the scores.

22         Q     Did he pull the scores both times?

23         A     Yes, he pulled them both times because I had to sign.

18

1    That's why I had to sign in order to get the test results.  I

2    had to sign my name.  But the second time there was something

3    different.  There was something different the second time.

4         FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

5         BY MR. SEYMOUR:

6    Q     What was different?

7    A     I remember that the other girl had taken the test.

8    I can't remember, but there was something different.  It seemed

9    like we went over more in detail the second time.  I can't

10   remember what it was, though.  It was something different.

11   The girl had told me what they asked me when I went down there.

12   Q     You mentioned a few minutes ago that you had had

13   a conversation with the attorney in the General Counsel's

14   Office at the Civil Service Commission and you were asking

15   about whether there was a quota of so many Blacks to pass the

16   test and so many Whites.

17   A     That's the only thing I can remember.

18   Q     Did that happen the first time that you went there

19   or the second time?

20   A     I'm thinking the second time, but see, Joany took the

21   test the first time.  It had to be the first time because she

22   took the test the first time with me.

23   Q     When you say "it had to be the first time", are you

19

1    making a guess?

2        A    Well, it was when she took the test with me, and she

3    took the test I believe it was the first time I took the test

4    when she took it with me.  So it had to be the first time.

5        Q    Do you remember that or are you guessing it?  That's

6    what I am asking.

7        A    Oh, you want to know for sure.

8        Q    That's right.

9            If you don't remember, just tell us you don't remem-

10   ber which time it was.

11       A    I don't remember exactly.

12       FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

13           BY MS. WARD:

14       Q    When you asked the attorney whether there was a

15   quota, do you remember any response?

16       A    I don't remember anything that went on in the

17   conversation.  I remember asking a question.  I can't tell you

18   exactly how I put it, but it was along those lines.  I can't

19   tell you exactly what I said.

20       FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

21           BY MR. SEYMOUR:

22       Q    Do you remember whether the document that you signed

23   the first time was a complaint of some kind or was just some

1    kind of receipt to show that you had been shown your test

2    scores?

3        A    I don't know.  I don't remember.

4        Q    Is your answer the same for the second time or is it

5    different?

6        A    It would have to be the same because I don't remember

7    exactly now what went on exactly.  I remember signing my name

8    both times when I was there.

9            MS. WARD:  I have no more questions, Mr. Seymour.

10           BY MR. SEYMOUR:

11       Q    Do you recall whether the attorney that you spoke

12   with on this occasion when you asked whether there was a quota

13   with a number of Blacks to pass the test, do you remember

14   whether that attorney told you anything about the possibility

15   of filing a complaint directly with the Appeals Review Board

16   of the Civil Service Commission in Washington?

17       A    I don't remember what he said.

18           MR. SEYMOUR:  No further questions.

19           MS. WARD:  I have no further questions.

20           MR. SEYMOUR:  Ma'am, you have the right to either

21   insist upon seeing the transcript of your deposition and check

22   it yourself to make sure that there were no typing errors or

23   the thing, then sign a signature sheet and send it to the

1    court or instead to rely on the court reporter to get the job

2    done right, and then the court reporter will just file the

3    transcript directly with the court.

4         Ordinarily we recommend that people ask to see the

5    transcript and check it themselves and sign the sheet instead

6    of waiving signature but it is your decision to make.  Which

7    do you want to do, see it and sign it, or do you want to

8    rely on the court reporter?

9         THE WITNESS:  Well, I'll rely on the court report,

10   because there is really not that much in there.

11        MR. SEYMOUR:  Thank you very much.

12        MS. WARD:  Thank you.

13        (Signature waived.)

14        (Whereupon, at 6:44 p.m., the taking of the

15   deposition concluded.)

16

17

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 21 do hereby certify that the witness, BEVERLY J. BROWN, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

RECEIVED

DEC 11   3 05 PM '84

JAMES F.
U.S.
DISTRICT OF COLUMBIA



ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

FILED

UNITED STATES DISTRICT COURT

DEC 11 1984

FOR THE DISTRICT OF COLUMBIA

JAMES F. DAVEY, Clerk

|  |  |  |
|---|---|---|
| ANGEL G. LUEVANO, ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED, | ) ) ) ) | |
| PLAINTIFFS | ) ) | Civil Action |
| VS. | ) ) | No. 79-0271 |
| DONALD J. DEVINE, ET AL., | ) ) | |
| DEFENDANTS | ) ) ) | |

DEPOSITION OF JAMES W. BYRD

Washington, D. C.
November 27, 1984

Pages 1 thru 19

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM wdm

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - x
                                     :
4    ANGEL G. LUEVANO, ET AL.,       :
     INDIVIDUALLY AND ON BEHALF OF   :
5    ALL OTHER SIMILARLY SITUATED,   :
                                     :
6            Plaintiffs              :
                                     :    CIVIL ACTION
7        vs.                         :    NO. 79-0271
                                     :
8    DONALD J. DEVINE, ET AL.,       :
                                     :
9            Defendants              :
                                     :
10   - - - - - - - - - - - - - - - - x

11                          Washington, D.C.

12                          Tuesday, November 27, 1984

13   Deposition of:

14              JAMES W. BYRD

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 7:43 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1    APPEARANCES OF COUNSEL:

2       On behalf of the Plaintiffs:

3          LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
         BY:  RICHARD T. SEYMOUR, ESQ.

4              Suite 400
             1400 I Street, N.W.

5              Washington, D.C. 20005

6       On behalf of the Defendants:

7          UNITED STATES DEPARTMENT OF JUSTICE
         BY:  BARBARA L. WARD, ESQ.

8              Room 3509
             Civil Division-Federal Programs Branch

9              10th and Pennsylvania Avenues, N.W.
             Washington, D.C. 20530

10

11                   C O N T E N T S

12   WITNESS                EXAMINATION BY:  MR. SEYMOUR  MS. WARD

13   James W. Byrd                       3, 8        8

14

15

16   Exhibits

17     None.

18

19

20

21

22

23

3

P R O C E E D I N G S

Whereupon,

ARLENE L. WILLIAMS

was called as a witness, and having first been duly sworn by
the Notary Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SEYMOUR:

Q    Please state your name and current address.

A    Arlene L. Williams, 1351 South Masselin Avenue,
Los Angeles, California 90019.

Q    What is your race?

A    I am Black.

Q    Could you tell us about the first time you took the
Professional and Administrative Career Examination, when that
was and where it was and what kind of job you were applying
for?

A    I took the first exam, to the best of my recollec-
tion, in sometime during 1974, and at that time, I was working
for the U.S. Government Printing Office in Los Angeles, and
I took the test during that time because I wanted to get into
the professional level.

I did not pass the test the first time.

Q    Did you take the test at another time?

1        A    I took it twice.

2        Q    Now, the first time that you took the test, before

3    we leave that, can you tell me whether you were taking it as

4    part of an internal promotion plan inside your agency or were

5    you taking it for a job at another agency so that you were

6    competing with outside applicants?

7        A    No, no.  I had filed my papers through the Office

8    of Personnel Management, the Los Angeles office which, I

9    believe, at that time was on Broad Street, and they scheduled

10   me to come in with a bunch of other people, and we took the

11   examine, and I was not successful, the promotional exam for

12   the organization I was working for.

13       Q    Can you tell us about the second time you took the

14   PACE?

15       A    Right.  Okay.  I took the PACE again--you had to

16   wait six months, but I waited, I think, a little longer than

17   six months.  I took it back in March of '77.  Yes, I believe

18   that is it, around March of '77.  Let me find my papers.

19   That was the original score date from that exam.  February of

20   '77, sorry.

21       Q    February '77?

22       A    Yes, I did.

23       Q    Were you working for the Federal Government at that

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    time?

2         A    Yes, I was--oh, no.  In February of '77?

3         Q    That's right.

4         A    No.  In '77, I was working for the State of Califor-

5    nia, Employment Development Department.

6         Q    What happened in February 1977?

7         A    I did not pass the exam again.

8         Q    You received a notice from OPM saying that you had

9    failed to meet the qualifying score?

10        A    Right, dated February '77, Notice of Results,

11   Arlene L. Williams.  "You did not score sufficiently high

12   on the written test to be eligible for consideration."  I

13   asked for the rating to be sent to Philadelphia, and I receiv-

14   ed from the United States Civil Service Commission, Philadel-

15   phia Area Office, 600 Arch Street, Philadelphia, Pennsylvania.

16        But I took the exam here in Los Angeles.

17        Q    All right.  You sent us a copy of a letter dated

18   March 8th, 1977, addressed to the Federal Job Center, 860

19   South Broadway, Los Angeles, California 90014.

20        A    Right.

21        Q    Do you have a copy of that letter before you?

22        A    Yes, I have.

23        Q    All right.  Perhaps it would be better if you read

1    the text of the letter in because the copy that you sent is

2    a little unclear on some words. Could you just read that out

3    and the court reporter will take it down.

4         A    Okay. "Attention: Supervisor Personnel." Do

5    you want me to read the entire letter heading, address and all.

6         Q    Not the heading or address. I've already said

7    that it was sent to the Federal Jobs Center.

8         A    All right. "Attention: Supervisor Personnel.

9         "After taking the PACE exam two times, it is clear

10   this exam is designed to prevent Blacks from achieving pro-

11   fessional employment with the Federal Government. This is the

12   only test I have ever failed in my life and never before have

13   I felt so threatened about a professional level of work based

14   on my education and experience. I have four years, eleven

15   months and twenty-two days of military service in the WACs

16   as a non-commissioned public information officer, SP/5 equals

17   E-5; completed and studied the Russian language one year at

18   the Defense Language School, Presidio of Monterey, California;

19   completed 186 units of college work at Cal State in Los Angeles

20   and have been an achiever all my life. I passed the correc-

21   tional officer exam which lasted two hours and forty-five

22   minutes and was, indeed, difficult but not drastic to eliminate

23   minorities. Such an exam as the PACE is a violation of my

7

1    civil rights precluding me from the right to earn a living,

2    and I want you to know I protest.

3         "Arlene L. Williams."

4    Q    Did you receive an answer to that letter?

5    A    I did not.

6    Q    At that time, it looks to me as if the return

7    address at the top of the letter is 1351 South Masselin

8    Avenue, Los Angeles, California, the same as your current

9    address.  Is that right?

10   A    That's correct.

11   Q    At the time that you sent that letter into the

12   Office of Personnel Management, what did you intend the letter

13   to do or to mean?

14        MS. WARD:  Correct.  The letter was sent to the

15   Federal Jobs Center.

16        THE WITNESS:  I wanted them to know that I am not a

17   low IQ individual, and I've taken a lot of exams.  I've taken

18   state, county, city, federal exams.  This is the only exam

19   that I have never passed, and it did not make sense.

20        So I knew there was nothing wrong with me, and I

21   wanted them to know that I objected to the exam.  The exam to

22   me did not appear to be equitable or fair.  The reason I say

23   this is that there was another individual, a co-worker, a

8

1    former co-worker, whose husband, he and I took the exams the

2    same time.  I even went to the library to get articles and

3    books for interim study, and neither of us ever passed the

4    exam, but I was very angry because I was working in another

5    job, but it was not the career that I wanted to go into.  I

6    wanted to be in the federal service, and I wanted to eventu-

7    ally work somewhere either in the Department of Labor or in

8    the public information capacity.

9        Q    When you went to the Federal Jobs Center to take

10   the examination, did you see bulletins posted telling you how

11   to go about making a complaint of racial discrimination under

12   the Civil Rights Act of 1964?

13       A    None.

14       Q    When you sent in your letter to the Federal Jobs

15   Center in March 1977, did you intend that letter to serve as

16   a complaint of discrimination under the Civil Rights Act of

17   1964?

18            MS. WARD:  Objection.  Leading the witness.

19            THE WITNESS:  I intended the letter to be my protest

20   against an examination that I did not feel was equitable.

21   First of all, I felt that the examine was designed to elimin-

22   ate minorities which I know has not only occurred in the

23   Federal Government but also in other government agencies.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1                The exam was unfair.  What I wanted from them was

2        any kind of remedy that the Office of Personnel Management had

3        to offer.

4                BY MR. SEYMOUR:

5        Q    Did you have any understanding at that time as to

6        whether the letter that you sent would give you any rights

7        later on?

8        A    I hoped that the letter would give me some rights,

9        because I felt not only was I being discriminated against, I

10       also felt that civil rights were being violated.  Anytime an

11       exam is designed to eliminate and not to truly evaluate a

12       person's qualifications and ability, then there has to be

13       discrimination, and I know discrimination is part of the

14       civil rights code.

15       Q    Did you ever take any action to follow up on this

16       letter?

17       A    I made several phone calls.  There was no response.

18       Q    Can you tell us who you called?

19       A    Well, when I say "no response", no one could ever

20       find the letter.  No one ever find the letter.  No one could

21       ever locate the letter.

22       Q    Who did you call when you made these phone calls?

23       A    The only number that we had which was the information

1   number to the Office of Personnel Job Information Center.  All

2   you get to see is the people there at the counter.  So I

3   presume those were the people answering the telephone.  I was

4   not there to see who picked up the telephone.

5       Q     You had worked with the Federal Government in the

6   Government Printing Office before.

7       A     Right.

8       Q     Can you tell us what years you worked for the

9   Printing Office?

10      A     I went to the Printing Office in '72, I'm sorry.  It

11  was either late '72 or very early part of January of '73,

12  and I stayed with them until July '74 when I transferred from

13  the Printing Office to Social Security Administration.

14      Q     Did you work with the Social Security Administration

15  for a period of time after that?

16      A     I worked with them until March 31st of 1975 when

17  the state had called me back.  I was on a promotional list

18  with the State of California, and they called me back at the

19  higher level, at a professional level.  So I went back to

20  them.

21      Q     When you were working with the Federal Government,

22  did you become familiar with the usual means of filing an

23  administrative charge of racial discrimination under Title

1    VII of the Civil Rights Act of 1964?

2    A    I did not because the Government Printing Office

3    main facility is in Washington, D.C.  The reason I did not is

4    because the bookstore here is just an outstation, and I was

5    working as a GS-4, and the personnel representative from the

6    Government Printing Office in Washington, D.C., did come to

7    the office investigating a discriminating complaint by a former

8    employee there.

9        And I asked about promotions.  The only way, he

10    said, I could be promoted in the Government Printing Office

11    would be I would have to be willing to come back to Washing-

12    ton, D.C.  I did not want to go back to Washington, D.C.

13        That was the reason why I had taken the PACE, to go

14    into another agency where I could at least move up, and then

15    eventually Social Security had some openings, and I went over

16    and applied, and I terminated with the Government Printing

17    Office and transferred into the Social Security division.

18    Q    Did you ever see a posting telling you how to file

19    a complaint of racial discrimination under Title VII of the

20    1964 Civil Rights Act either at the Government Printing Office

21    or the Social Security Administration?

22    A    No, I did not.  Our office was a very small, little

23    facility, and there was no posting of anything of this nature

1    in the office.  We just had the bookstore and a little area

2    behind the bookstore that was the office, and upstairs we had

3    a huge storeroom.  That was it.

4        Q    Was there anything that was handed out to you by

5    either the Government Printing Office or the Social Security

6    Administration describing the procedure for filing an admin-

7    istrative complaint of racial discrimination?

8        A    No.

9        MR. SEYMOUR:  Do you have any questions, Ms. Ward?

10        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

11        BY MS. WARD:

12        Q    Ms. Williams, who advised you to write to the Federal

13    Jobs Center concerning the PACE exam after you received your

14    grades?

15        A    I talked to my co-worker's husband, and he and I

16    were both enraged because he is not a low IQ individual

17    either, and we couldn't understand it.  And at the time we went

18    back for the second exam--when I first missed it, I thought

19    well, maybe I had an off day.  Okay.  But after I took it the

20    second time, and when I went back to take it the second time,

21    there were some other people there.  There were some Hispanics

22    and some Blacks there, and they were talking about how many

23    times they had been taking this exam and not passing it.

1          And we had that discussion, went on and took the

2     exam, but I didn't think anything of that.  And then when I

3     got my results, yes, I was outraged.  That was the only place

4     I knew to write to.

5          Q     Did you make any inquiries of anyone concerning

6     where the correct place to write to was?  Did you call a Legal

7     Aid office?

8          A     Did I call Legal Aid?

9          Q     Did you make any type of inquiry of any person

10    concerning the right place to make a Title VII complaint

11    under the Civil Rights Act of 1964?

12         A     I talked to--

13         Q     Your friend's husband, yes, you've said that.  Did

14    you talk to any other person?

15         A     I talked to him.  He's one individual.  Okay.  He

16    did make some calls.  Yes, I did.  I called back down to the

17    personnel office.

18         Q     What personnel office?

19         A     And what we were told was they only administered

20    the test.  They could not do anything about changing or adjust-

21    ing the test.  That was it.

22         Q     What personnel office did you call?

23         A     The Office of Personnel Management on Broadway, the

1    federal office.  That was the only office I knew to call.

2        Q    The last time you worked for the government, accord-

3    ing to your testimony, was 1975.  That was nine years ago.

4        A    That's correct.

5        Q    Is it possible that you might have seen a poster

6    concerning how to file an administrative complaint under

7    Title VII and not remember that a poster was posted and you

8    would not remember that?

9        A    All things are possible.  Is that the end of your

10   question, first of all?

11       Q    Yes.  Is that possible?

12       A    Okay.  It's very possible but very unlikely, also,

13   because I have been very conscientious about my civil rights,

14   about the fact that I am Black, about the fact that everytime

15   I apply for something that is of higher level or is required

16   to be a professional capacity, I have to not only be equal

17   but I have to be better than equal.

18       Q    Did you make the telephone call to the Federal

19   Job Center yourself or did you--

20       A    I made one call myself.  That was the response that

21   I got.

22       Q    That they could not change the exam?

23       A    They could not change the exam.  They had nothing

1    to do with it.  The results were what they were, and that's

2    it.  They only administer the exams.

3        MS. WARD:  I have no other questions.

4    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

5    BY MR. SEYMOUR:

6    Q    I just have one or two other questions.  You said

7    that you made a call yourself.  Did anyone else make a call

8    on behalf of you?

9    A    No.  I didn't ask anyone to make a call on behalf

10   of me.  When I got that response, that's what triggered me

11   to write the letter.

12   Q    A few minutes ago you told me there were several

13   phone calls you made to follow up.  Is it just one phone call

14   instead?

15   A    No, no.  Okay.  Let me hear your question.  Go

16   ahead.  You were reiterating something I stated.

17   Q    You said you made several phone calls to follow up.

18   And a minute ago you said there was just one phone call.  Do

19   I misunderstand you?  Were there several phone calls or was

20   there just one?

21   A    Regarding what?

22   Q    Regarding a followup to your letter that was sent

23   in March 1977 to the Federal Jobs Center?

1        A    Okay.   There were several phone calls.  When you

2    call the federal job information line, first of all, the

3    phone rings a number of times.  Sometimes when whoever answers

4    the phone, "Will you wait?"  They put you on hold.  So I had

5    several experiences like that.

6            Finally, when I did get the one to talk to or some-

7    one who did talk to me, they gave me the statement, like,

8    you know, "you're really a dummy so you didn't pass the test.

9    So what do you want me to do about it?"  It was an attitude.

10   That's what prompted me to write the letter.

11           FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

12           BY MS. WARD:

13       Q    After you wrote the letter, Ms. Williams, did you

14   make any followup phone calls?

15       A    No.  After I wrote the letter, yes, I didn't make

16   any followup phone calls.  I talked to a couple other people

17   who had taken the exam, and I wanted to know -- they had

18   taken it and failed it also.  And I wanted to know from them

19   if they had done anything.

20           And one of the people indicated, yes, they had

21   wrote a letter, and one of them had gone down there and had

22   had a verbal confrontation with the people down there.  And

23   they were just frustrated and felt defeated, and I very much

1    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

2         BY MR. SEYMOUR:

3    Q    Did anyone either from the government or outside the

4    government ever tell you about the possibility of filing your

5    complaint directly with the Appeals Review Board of the U.S.

6    Civil Service Commission?

7    A    No one.

8         MR. SEYMOUR:  I have no further questions.

9         MS. WARD:  I have no further questions.

10        MR. SEYMOUR:  Ms. Williams, you have the right

11   either to insist upon seeing a copy of your deposition to

12   make sure that everything is taken down rightly and then to

13   sign the signature sheet or else to waive signature.  And

14   that's a decision that you have to make.

15        Ordinarily we recommend that people see the copy

16   and sign it so that if there are any corrections that have to

17   be made, they can make them.  But you do have the right just

18   to trust the court reporter if that's what you want to do.

19   Do you want to sign the deposition or do you want to waive

20   signature?

21        THE WITNESS:  I will waive signature based on the

22   fact that I believe that I am dealing with the court, and the

23   court reporter is taking down our statements.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          MR. SEYMOUR:  Okay, ma'am.  Thank you very much.

2          MS. WARD: Thank you, Ms. Williams.

3          (Signature waived.)

4          (Whereupon, at 5:30 p.m., the taking of t he

5  deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 18, do hereby certify that the witness, ARLENE L. WILLIAMS, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

FILED

DEC 11 1984

JAMES E. DAVEY, Clerk

ANGEL G. LUEVANO, ET AL.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

       PLAINTIFFS

   VS.

DONALD J. DEVINE, ET AL.,

       DEFENDANTS

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
No. 79-0271

DEPOSITION OF ARELENE L. WILLIAMS

Washington, D. C.
November 27, 1984

Pages 1 thru 17

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM  wdm

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - x
                                     :
4    ANGEL G. LUEVANO, ET AL.,       :
     INDIVIDUALLY AND ON BEHALF OF   :
5    ALL OTHER SIMILARLY SITUATED,   :
                                     :
6            Plaintiffs              :
                                     :
7        vs.                         :      CIVIL ACTION
                                     :      No. 79-0271
8    DONALD J. DEVINE, ET AL.,       :
                                     :
9            Defendants              :
                                     :
10   - - - - - - - - - - - - - - - - x

11                            Washington, D.C.

12                            Tuesday, November 27, 1984

13   Deposition of:

14           ARLENE L. WILLIAMS

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 5:05 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

2

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:  RICHARD T. SEYMOUR, ESQ.
4                 Suite 400
                  1400 I Street, N.W.
5                 Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:  BARBARA L. WARD, ESQ.
8                 Room 3509
                  Civil Division-Federal Programs Branch
9                 10th and Pennsylvania Avenues, N.W.
                  Washington, D.C. 20530

10

11                    C O N T E N T S

12   WITNESS                EXAMINATION BY MR. SEYMOUR   MS WARD

13   Arlene L. Williams                  3, 15, 17      12, 16

14

15   Exhibits

16     None.

17

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1                        P R O C E E D I N G S

2    Whereupon,

3                          EVA C. OLDHAM

4    was called as a witness and, having first been duly sworn by

5    the Notary Reporter, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7              BY MR. SEYMOUR:

8         Q    Please state your name and address for the record.

9         A    My name is Eva C. Oldham.  My address is 4865 Cuerro

10   Court, Pensacola, Florida.  Zip Code 32506.

11             THE WITNESS:  The parties have stipulated that Ms.

12   Oldham is Hispanic and a class member in this case.

13             Is that right?

14             MS. WARD:  Yes, that is true

15             BY MR. SEYMOUR:

16        Q    Ms. Oldham, how many times did you take the PACE,

17   the Professional and Administrative Career Examination?

18        A    Minimum, twice.

19        Q    When you say "minimum," do you mean that you are not

20   sure and there might be other times?

21        A    Yes, sir.

22        Q    When you took the PACE the first time, were you a

23   federal employee?

1      A     Yes, sir.

2      Q     When you took it the second time, were you a federal

3  employee?

4      A     Yes, sir.

5      Q     Were you taking the PACE the first time as part of

6  a merit promotion plan or to get into an upward mobility

7  program or something like that?

8      A     Yes, sir, I wanted to get into an upward mobility

9  plan where I could get a mid-level job.

10     Q     When you took the PACE the second time, was that also

11  part of a merit promotion plan or to get into upward mobility?

12     A     Yes, sir.

13     Q     Did you ever take the PACE to compete with outside

14  applicants, people who were not employees of the Federal

15  Government but trying to get jobs with the Federal Government?

16     A     I believe one time, sir, I took a test downtown, and

17  there were all different types of people there, not just Civil

18  Service employees.

19     Q     Who was giving that test?

20     A     From what I could understand, it was a department

21  of the Civil Service personnel that were located on the Navy

22  base but they were giving it downtown.

23     Q     Were you working at the Navy base at the time?

1  A  Yes, sir.

2  Q  So this was a Navy test, not the Professional and

3 Administrative Career Examination?

4  A  No, sir, I was led to believe it was the PACE test.

5  Q  Well, let me withdraw that.  Sometimes the PACE

6 examination was given at the same time to two different groups

7 of people.  Sometimes it was given to federal employees for

8 purposes of a merit promotion plan or for upward mobility

9 programs.  At the same time it was given to everybody who want-

10 ed to take it to complete with outside applicants, whether

11 they were federal employees or not but their names were going

12 to go into registers of the Civil Service Commission or Office

13 of Personnel Management.

14  A  Right.

15  Q  Is that the kind of situation that you are describing?

16  A  Downtown, yes, sir.

17  Q  And that happened once?

18  A  Yes, sir.

19  Q  And the other times the test was given on the Navy

20 base?

21  A  Yes, sir.

22  Q  And that was just for upward mobility that you took

23 it at the Navy base?

1    A    I believe it was, sir, yes, sir.

2    Q    Now, when you took it downtown were you taking it

3    just for upward mobility?

4    A    I'm not sure when you say "upward mobility" what

5    it means.  All I know is this test was given to give you a

6    promotional opportunity.  In other words, I was a clerk typist

7    in a low grade, and I wanted to get promoted to a higher grade,

8    And the reason why this test was given was because you could

9    get a mid-level promotion.

10    I think they started at Grade GS-7 and 9.

11    Q    Did you receive a Notice of Results from the Navy

12    or from the Office of Personnel Management or Civil Service

13    Commission or did you receive it from both the Navy and the

14    Civil Service Commission or Office of Personnel Management?

15    A    This is the problem.  I received my notifications,

16    but I have no records of them because in this time I have made

17    several moves and I couldn't be sure, but I believe it was

18    either the OPM or the Civil Service Commission.

19    Q    Was it your understanding when you took that test

20    that you were going to be trying to get jobs for agencies other

21    than the Navy?

22    A    Yes

23    Q    Or was it just for the Navy?

1    A   No.  This was all organizations.

2    Q   Did you understand that there was any passing score

3  that you had to meet when you took the test downtown?

4    A   Not to my recollection.  No, not to my recollection.

5    Q   Did you fill out a form at the time that you applied

6  to take this test downtown indicating what kinds of jobs and

7  what kinds of parts of the country you wanted to work in?

8    A   No.  Just on the questionnaire, it asked what areas

9  you would like to work in, and I just put down any and all.

10  I always do.

11    Q   When was it that you took the test downtown?

12    A   Again, I have no concept of a date.  All I know is

13  that I took the test quite a while back.  I tried to figure

14  out the date and the times on it, and I just couldn't come up

15  with any specific date.  All I know is on or about May of '75.

16    Q   Ma'am, let me read to you from the questionnaire that

17  you filled out and then sent to us.  We sent the questionnaire

18  to you under an order of the court, and right at the bottom

19  you wrote the following statement:

20       "1.  I took the PACE test at NAS Pensacola.  However,

21  they have no records.  They say they are only required to keep

22  records for two years."

23    A   That's right.

1  Q  When it says, "NAS" that means Naval Air Station?

2  A  Pensacola, right.

3  Q  Then it says, quote, "2. The other PACE test I took

4 at the U.S. Civil Service Commission office at Government

5 Street, Pensacola, Florida.  This office is now defunct and I

6 am unable to secure any information concerning this area."

7  A  Right.

8  Q  "I wrote to the EEO commission and Pat Schroeder

9 after I had taken the second PACE test."

10  A  Right.

11  Q  Is there anything more than you can tell us on the

12 question of whether the second PACE test, the one that you

13 took at the Civil Service Commission Office on Government

14 Street in Pensacola, was partly for the purpose of competing

15 with outside applicants for jobs at a number of agencies or

16 was instead just limited to the Navy?

17  A  As far as I can remember, it was not just limited to

18 the Navy.  It was nationwide or worldwide.  In other words,

19 you could go anywhere and be accepted for a job anywhere that

20 you were qualified for, but I could not be too sure on that

21 even, because it's been so long.

22    The funny thing about it is I wrote to Orlando office.

23 I wrote to several different areas to try to search down

1    the paperwork because I felt somebody should have something

2    on the test results, and no one would come up with anything.

3    Finally in March I went over to the Navy base and talked to the

4    EEO counsellor over there and made a statement on it about Mr.

5    James Davies.  I guess you've received that.

6         Q    When you refer to March, is that March of 1981 after

7    you had heard about the settlement of the Luevano case?

8         A    Yes.

9         Q    Did you contact the EEO counsellor at the Navy base

10   or any EEO official of the Civil Service Commission about the

11   PACE test before that?

12        A    Yes, sir, I sure did.  In fact, I thought I sent you

13   a letter.  I've got the copy of my letter in front of me right

14   now.  Would like to hear it?

15        Q    What's the date of the letter you are referring to?

16        A    13 March 1982.

17        Q    What I am asking you about is any complaint you made

18   about the PACE test before you heard about the Luevano settle-

19   ment.

20        A    To the Navy base you mean?

21        Q    To anyone in government.

22        A    Well, other than writing to those two people, I fired

23   off a letter to Washington, D.C., because I had been given a

1    name by the people I worked at the Navy hospital to contact,

2    and I wrote them a letter, too.  But like I said, all my paper-

3    work got all lost other than what I wrote to you in my letter

4    of the 28th of February.

5        Q    Your 28 February 1983 letter?

6        A    Yes.

7        O    You mention in that letter a person named Betty

8    Mickelson.  Who did she work for?

9        A    The letter of the 28th of February?

10       Q    That's right.  Betty Mickelson is mentioned in the

11   third paragraph where it says, "After many contacts with the

12   CCPO office and a Betty Mickelson, they informed me that test

13   results are kept two years."

14       A    Yes, that would be the EEO representative at the

15   naval base, CCPO office.

16       O    Now, later on in that letter, you say that you fired

17   a letter off to the U.S. Equal Employment Office in Washington,

18   D.C.

19       A    Yes.

20       Q    And you also made a reference to that in your April

21   25, 1981, letter to James Davies, the Clerk of the Federal

22   Court here in Washington.

23       A    Right.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1       Q    Where it said, quote, "After my last attempt I wrote

2  two letter, one to a lady that was with the EEO in Washington,

3  D.C. I received her name from a union representative."

4       A    Right.

5       Q    Do you remember the name of the agency where this

6  person worked?

7       A    No, I sure don't.

8       Q    Do you know whether this was an EEO office at the

9  Civil Service Commission, an EEO office at the Navy or the

10  Equal Employment Opportunity Commission?

11      A    No, sir.  All I can say is that I had a name, John

12  Macy, Senior, and I wrote to the office at 1900 E Street,

13  Washington, D.C., but he never wrote me back.  So I don't have

14  too much to go on that neither.

15      Q    What was that name?

16      A    John W. Macy.  That's the last paragraph.

17      Q    John Macy was a former commissioner of the Civil

18  Service Commission.  Is that who you are referring to?

19      A    Yes.  He never answered ne anyway.

20      Q    Do you remember when you sent the letter to Mr. Macy?

21      A    No, I sure don't.

22      Q    Well, are you sure that you did send a letter to

23  Mr. Macy?

1    A    Yes, because I wouldn't have had his name or the

2    address.

3    Q    How does his name come up then?

4    A    I believe the name came up when I was speaking to

5    Mrs. Mickelson.

6    Q    Let me read this sentence in the letter so that the

7    record will be clear, quote, "The one name I have found is a

8    John W. Macy, Senior, 1900 E Street, Washington, D.C. 20415,

9    but I have nothing to show concerning why I wrote him," close

10    quote.  Then it goes on to describe the search of your records

11    that you made without success.

12    A    I have never written to Washington, D.C., concerning

13    anything other than the PACE test and trying to find paperwork

14    and test results, and the names that I have been given and I

15    had enclosed in my letter to you concerned nothing but the

16    CCPO test results, the OPM office and EEO stuff.  That's all

17    I've ever written to Washington for.

18        This is just an assumption on my part, but I believe

19    it is the name that Betty Mickelson gave me that you might

20    contact them.

21    Q    So that would have been the second letter.  One letter

22    when to Patricia Schroeder and the other letter, to the best

23    of your recollection, and that recollection is a little hazy,

13

1    but the best you can recall the other one might have been to

2    John Macy at the Civil Service Commission, is that right?

3        A    Right.

4        Q    Do you remember whether the letter that you sent

5    to this EEO person, whether or not it was John Macy, complained

6    about racial discrimination or ethnic discrimination against

7    Hispanics in use of the PACE?

8        A    No, I can't really say.  I believe the way I worded

9    it was I was more upset about the fact that it was not fair in-

10   sofar as the questions, how they were worded and how they were

11   weighted towards someone with a college degree.

12       Do you have a copy of that letter to Mr. Davies

13   that I wrote?

14       . Q    I have a copy of the letter to Mr. Davies, yes.

15       A    Okay.  That's what I was writing about.  It states

16   there does not only discriminate against Blacks and Hispanics

17   but against all women.  I underlined "all".  I forgot I even

18   had that letter.

19       Q    Do you remember right now whether the letter that

20   you sent to this EEO person who might be John Macy or the

21   letter that you sent to Patrica Schroeder complained that the

22   test was unfair to Blacks or unfair to Hispanics?

23       A    No, I don't believe I did.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      Q    So then there would be no complaints of discrimina-

2    tion before you heard about the settlement in Luevano, is

3    that right?

4      A    Sir, I did not hear about this case on Luevano.

5    Someone contacted me from up there in Washington,D.C., which

6    is another question brought to my mind is how, with these

7    people not being able to find my test results, how did the

8    people in Washington, D.C., contact me or why did they contact

9    me? I did not contact them.

10      Q    Let me state for the record, ma'am, there were a

11    small number of people that received copies of the notice

12    sent to them in the mail because their names and office

13    addresses had been recorded as part of a test study that was

14    being done by the Office of Personnel Management, I think,

15    in April 1978, something like that.

16      A    Oh, and that's how perhaps my name came up.

17      Q    The first word you heard about the Luevano case

18    was when you received this notice in the mail?

19      A    Yes, sir.

20      Q    That means we can fix the date when you took the

21    PACE examination and that it would have had to have been

22    competition with outside applicants because that was what was

23    being studied at the time.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1          But as I understand it, before you received this

2 paper in the mail telling you about the Luevano settlement,

3 you did not make any complaint or racial discrimination or

4 ethnic discrimination against Hispanics in the use of the PACE?

5      A     No, not racial, no.

6      Q     Well, or ethnic discrimination against Hispanics.

7      A     No, not ethnic neither, just that it discriminated

8 against all women.

9      Q     Okay.  Ms. Oldham, sex discrimination is not a part

10 of the lawsuit and is not covered by the settlement so that

11 the only thing that is covered by the case is race discrimin-

12 ation against Blacks and ethnic discrimination against

13 Hispanics.

14      A    Right.  Well, I don't believe I made any statements

15 to that effect, at least, I don't remember that.  Other than

16 the letters I've written to you and to Mr. Davies, I don't

17 believe I made an out and out statement in writing at all.

18         MR. SEYMOUR:  Thank you very much for your answers.

19 I have no further questions.

20         MS. WARD:  I have no questions either, Ms. Oldham.

21         MR. SEYMOUR:  Now, you have the right to ask to see

22 a copy of the deposition transcript to check it over for any

23 mistakes and then to put down any mistakes in typing that are

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    made, and then to sign the document before it goes into court.

2    Or just to rely on the court reporter to do a good job.  You

3    do not have the right to change your testimony when you do

4    that just to point out mistakes that were made in taking

5    down what your testimony actually was.

6         Ordinarily we recommend that people take a look at

7    the answers, make sure that they are correct and then sign the

8    sheet.  But in this particular case, I don't think it will

9    make any difference but it is your decision to make.

10         Do you want to read it and sign it first or just

11    rely on the court reporter?

12         THE WITNESS:  I think I can just rely on the court

13    reporter.

14         MR. SEYMOUR:  Thank you very much.

15         (Signature waived.)

16         (Whereupon, at 7:35 p.m., the taking of the

17    deposition concluded.)

18

19

20

21

22

23

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 16 do hereby certify that the witness, EVA C. OLDHAM, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_William D. McAllister_

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

RECEIVED

DEC 11  3 05 PM '84

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, ET AL.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

      Plaintiffs,

      vs.

DONALD J. DEVINE, ET AL.,

      Defendants.

FILED

JAN 15 1985

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Civil Action No. 79-0271

Deposition of ROLANDO J. MUHLIG

Washington, D.C.
January 9, 1985

Pages 1 thru 20

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM wdm

1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - x
                                      :
4    ANGEL G. LUEVANO, ET AL.,        :
     INDIVIDUALLY AND ON BEHALF OF    :
5    ALL OTHER SIMILARLY SITUATED,    :
                                      :
6              Plaintiffs             :
                                      :
7         vs.                         :    CIVIL ACTION
                                      :    NO. 79-0271
8    DONALD J. DEVINE, ET AL.,        :
                                      :
9              Defendants            :
                                      :
10   - - - - - - - - - - - - - - - - - x

11                             Washington, D.C.

12                             Wednesday, January 9, 1985

13   Deposition of:

14                   ROLANDO J. MUHLIG

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 5:00 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:   RICHARD T. SEYMOUR, ESQ.
4                  Suite 400
                   1400 I Street, N.W.
5                  Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:   BARBARA L. WARD, ESQ.
8                  Room 3509
                   Civil Division-Federal Programs Branch
9                  10th and Pennsylvania Avenue, N.W.
                   Washington, D.C. 20530

10

11                     C O N T E N T S

12                            EXAMINATION BY:

13   WITNESS                    MR. SEYMOUR      MS. WARD

14     Rolando J. Muhlig             3            --

15

16   Exhibits

17     None.

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

```
 1                    P R O C E E D I N G S
 2   Whereupon,
 3                    ROLANDO J. MUHLIG
 4   was called as a witness and, having first been duly sworn by
 5   the Notary Reporter, was examined and testified as follows:
 6            EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 7            BY MR. SEYMOUR:
 8        Q    Please state your name and address for the record.
 9        A    My name is Rolando J. Muhlig, and I live at 930 East
10   33rd Street in Hialeah, Florida.
11        Q    Did there come a time when you took the Professional
12   and Administrative Career Examination, otherwise known as the
13   PACE?
14        A    Yes, sir, I did.
15        Q    About when was that?
16        A    I took it at the beginning of 1975.
17        Q    Did you ever take it a second time?
18        A    I don't even remember right now, sir.  This is going
19   back ten years ago.  I think I did prior to that date, but
20   I'm not sure if it was prior or after, sir.
21        Q    On the form for additional information that you
22   sent in under the court order, you said that you took the
23   PACE as closely as you could recall around September 1975.
```

1   Do you remember right now closely enough so you could say

2   whether it is the beginning of '75 or September or could it be

3   either?

4        A   Could be either, sir.  I'm not really that clear, sir.

5        Q   We do not want you to guess so if there is any ques-

6   tion we ask where you are not sure of the date or not sure of

7   the answer just tell us and we will take it from there, but do

8   not guess.  Is that all right?

9        A   Yes, sir.

10       Q   When you sent in this form for additional information

11   a couple of years ago, you said that you did not keep any

12   papers showing that you took the pace on that occasion.  Have

13   you come across any papers since then that show that you took

14   the PACE then?

15       A   Well, sir, no.  I got very upset because when I

16   received the results, I didn't even score anything, and they

17   just told me that on the PACE that they couldn't even give me

18   a score because I didn't score above whatever, which I forgot

19   already, sir.

20       Q   About how long was it after you took the pace before

21   you received this information?

22       A   I think it was a month or a couple of months, sir,

23   after I took the test in New York.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      Q    At the time you took the test, were you employed by

2  the Federal Government?

3      A    No, sir.  I was working--well, I was working in a

4  CETA position, sir.  I don't know if that could be a federal

5  job.

6      Q    That would have been with a state or local govern-

7  ment, wouldn't it?

8      A    Yes, sir.  I was employed through the City of Yonkers.

9      Q    All right.  Your form for additional information

10  says that you made a complaint of racial discrimination to

11  Civil Service Commission or the Office of Personnel Management,

12  as it later was called, around November 1975.  Do you remember

13  that?

14      A    Yes, sir, I do.  As a matter of fact, I was contacted

15  by the people from ASPIRA, a Puerto Rican group, and we all

16  signed some kind of a paper complaining about, you know, the

17  unfairness of the PACE test.

18      Q    Could you spell ASPIRA?  Is it A-S-P-I-R-A?

19      A    A-S-P-I-R-A, yes, sir.

20      Q    Can you tell us a little about the group?

21      A    Well, the group is a very well known Puerto Rican

22  mainly community group in New York City, sir.  I was connected

23  with them in several occasions, and they were very active with

1  civil rights, sir.

2      Q    You say it was a non-Puerto Rican group?

3      A    No.  A Puerto Rican group, predominantly Puerto

4  Rican group, sir.

5      Q    You are Cuban yourself or Puerto Rican?

6      A    No, sir, I am a Cuban.

7      Q    What did the people from ASPIRA say to you when they

8  contacted you?

9      A    Well, that they were very upset because a number of

10 other Latins had taken the same test and they were very low

11 score or they didn't get anything, the same thing that got to

12 me that I got a paper from the Federal Government or from that

13 place where I took the test and told me I am sorry you were

14 so low in your score that you don't have a score.

15     Q    Had you told anybody from this organization that you

16 were going to take the test?

17     A    Yes, they held a workshop or an orientation in New

18 York City.  I think it was close to Columbia University where

19 I attended later.

20     Q    Was this before or after you took the test?

21     A    Before, sir.

22     Q    Can you tell us what the orientation was about?

23     A    Well, they talked to us and encouraged us to take it,

1  because it was like the only way to really get into the Federal

2  Government because at that time the PACE was being used to get

3  managerial jobs and so forth.

4       Q     Was there anyone from the government there to explain

5  about the test?

6       A     No, sir.  No.  It was an informal briefing or orienta-

7  tion or encouragement, talk for us to go and take it, because

8  when you get put down so many times you say the heck with it

9  and you don't want to be bothered, and this is what really

10  happened to us again.  This is going back ten years ago, sir.

11       Q     Do you remember about how long it was between this

12  meeting and the time that you took the test?

13       A     A few months, sir.  A few months.  Really it's a long

14  time ago.  I have gone through a divorce and a million and one

15  things, sir.  My memory is not that clear.  I had forgotten

16  about this.  I really gave it up.

17       Q     When you had the orientation meeting that ASPIRA had

18  a couple of months before you took the test when you went to

19  that meeting, did ASPIRA have a lawyer there to tell you any-

20  thing about your rights in connection with the test?

21       A     No.  They just encouraged us to take it and go forward

22  and really they told us we didn't have anything to lose.  If

23  we didn't go, we could never have had an opportunity to work

1    for the Federal Government.

2        Q    Is this organization still active in the New York

3    area?

4        A    It should be, sir.  It should be.  I don't really

5    know because I have been away from the city for almost seven

6    years, but I think they should be, sir.

7        Q    Do you remember the names of the persons from ASPIRA

8    that were at that orientation meeting?

9        A    Not really, sir.  No.

10       Q    What we would like to do is to contact them and see

11   if they have a copy of the complaint that you filed, but given

12   the passage of time, it's much easier to do that if we can tell

13   them someone's name that was involved in this program.

14       A    I understand that.  Yes, sir, I do understand that,

15   and I thank you for your concern, but it's been so long and

16   I am not very good with names, sir.  I remember faces and

17   places, but names, I am a really farout person in that aspect.

18       Q    Do you remember whether this particular program of

19   this organization had a name?

20       A    No, sir.  We used to--see, I used to be involved a

21   lot in community affairs with the City of Yonkers.  I was once

22   the, when I worked for the city, I worked as the liaison person

23   for the Latin community and the mayor's office.  So I used to

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    get a lot of information about meetings and things, and I always

2    liked them and I went to a few.  Once I went to Columbia also

3    when they were talking to people about applying at Columbia

4    University, that it wasn't like on the moon, you know, that it

5    was something that we could try to get into, and that really

6    gave me encouragement, and I applied when I finished my college

7    degree, and I have a couple of Master's from teacher's college.

8    So I am very grateful to these people.  They were very--you

9    know, they really talk to you and told you, "Hey, you don't

10   have nothing to lose.  Go ahead and try.  If you miss, you

11   going to be the same place."

12        Q    Was there more than one chapter of this organization?

13        A    It was big, sir.  I don't really know because I was

14   never a member, an active member because I am a Cuban, see.

15   But they were pretty open and everytime that I went to a few

16   of their workshops like the one on universities or graduate

17   school, and I went a few of them, but they must be around, sir,

18   because they were very, very big.

19        As a matter of fact, it was the largest organized

20   Puerto Rican group in New York City.

21        Q    Was this orientation meeting near Columbia University?

22   It was in Manhattan?

23        A    Yes.  We had it right off--I think, as a matter of

1    fact, it was maybe part of the university. I am not clear if

2    I am confusing the ones that I went for graduate school or the

3    one that I just went for the PACE thing, sir.

4        Q    Okay. But either way are you sure that this meeting

5    that you had with ASPIRA was in Manhattan?

6        A    Yes, sir, definitely was very close to Broadway at

7    100 and something, 116, 110th, 112th.

8        Q    One of the lawyers in this case is a lawyer for the

9    Puerto Rican Legal Defense Fund. We will contact him with this

10   information and we'll see if he can track down any records.

11   It may be necessary for either me or him, Mr. Kimerling, to

12   get in touch with you to try to get some more information

13   about the group in order to try to track down the records, but

14   we'll go on now with some other questions.

15       A    All right, sir.

16       Q    Now, when ASPIRA contacted you after you received the

17   test results, do you remember the name of the person who

18   contacted you?

19       A    I don't, sir. I don't. It was Arango or something

20   like that, but I would not like to misguide you, sir.

21       Q    Could you spell that name?

22       A    A-r-a-n-g-o. I think it was Mr. Arango, but I am

23   not sure, sir. Please do not take it for granted because I am

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    not sure.  It is a long time ago.

2    Q    Would that be his last name?

3    A    Yes, yes.  Definitely that is a last name, sir.

4    Q    Was he a lawyer?

5    A    No, no.  He was an activist.  I don't think he was

6    a lawyer.  I'm not sure, but he didn't tell me that he was a

7    lawyer.

8    Q    Did he help you fill out a complaint?

9    A    I signed some kind of declaration which I don't

10   remember, some kind of a sign-in sheet with a heading protest-

11   ing the PACE because it wasn't fair to us.

12    Q    Could you try to say as closely as you can remember

13   the words that were used in this declaration or paper that you

14   signed?

15    A    In general terms, it was processed because we felt,

16   the undersigning people felt that that test wasn't meant for

17   us but it was meant for maybe another group of the population

18   or something like that, you know; that we were not--that it

19   wasn't a test that we had any chance in taking it and scoring

20   any reasonable high score.

21    Q    Did this paper state specifically that you thought

22   the test was unfair to people who were Hispanic?

23    A    Yes, sir; yes, sir.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          MS. WARD:  Objection.

2          THE WITNESS:  In general terms, yes.

3          BY MR. SEYMOUR:

4      Q    Can you tell me as much as you remember of that?

5      A    Well, I already did, sir.  The paper said more or

6  less that we were protesting the test PACE because after

7  taking it we felt that it was very unfair to us and it was

8  not geared to give us Latins a fair chance of getting anywheres

9  along those lines, sir.

10     Q    Did the paper ask that any particular action be

11  taken by the government?

12     A    I don't remember, sir.  I don't recall that, no.  I

13  don't recall.  In all honesty I don't recall that, sir.

14     Q    When you signed this paper, what was your under-

15  standing of what would happen?

16     A    Well, sir, I don't know your ethnic background and

17  I respect everybody, and this is my country and love it very,

18  very much, but there are things that the ruling majority does

19  in order to preserve the power structure, and I didn't think

20  that we were going to get anywheres, but we have the right to

21  talk and protest and picket all within the lawful means of the

22  law.

23     Q    Did anything on this paper say that it was intended

1    as a complaint of discrimination under the federal laws that

2    forbid employment discrimination?

3    A   Well, we were protesting the fact, I guess, based

4    on what I told you, that we felt that we took the PACE test in

5    order to be able to be eligible for employment with the

6    Federal Government, and if this test wasn't fair, according to

7    us, and that is our opinion of it, definitely. Why are you

8    going to take the PACE test if you don't want a job.

9    Q   At the time that you signed this document, did you

10    understand that Title VII of the Civil Rights Act of 1964 gave

11    you a right to file a complaint of discrimination with the

12    Federal Government saying that a test like this was discrimina-

13    tory and that the government would then investigate it, and if

14    you didn't like the results of that investigation, that you

15    would then have the right to file a lawsuit in court challeng-

16    ing the test, did you understand that when you signed the

17    document?

18    A   I didn't know that, sir.

19    Q   You did not know that?

20    A   Didn't know.

21    Q   Did you intend that sending in this document was

22    going to give you any kind of legal rights?

23    MS. WARD:  Objection.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          THE WITNESS:  Well, the only thing, when your rights

2    are violated, that you could do in a democracy is to try to

3    make your voice heard, and I felt personally that maybe if

4    enough people signed it and got to the government, maybe the

5    government or whoever was in charge of this administering of

6    this test was going to maybe fix the injustice for other

7    people coming behind me.

8          MR. SEYMOUR:  Would you state your objection so that

9    if it is cureable it can be cured?

10          MS. WARD:  The questions are leading.

11          BY MR. SEYMOUR:

12     Q    Did you ever sign any other paper before the settle-

13    ment of this lawsuit and the papers that you sent in under the

14    various court orders, did you sign any other papers complaining

15    about the PACE test?

16     A    No, sir, no.

17     Q    This is the only one, then, is that right?

18     A    Yes, sir, yes.  I got into a divorce and I had a lot

19    of personal problems.  I moved out of New York to Miami to be

20    close to my kids, and it really has been very rough, sir.

21    That's why I have gone through so much in my own personal life,

22    and this is ten years ago, that I am blocking many things be-

23    cause, you know, sometimes you really have a lot of things

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1   happening to you at one point in your life.

2      Q   Okay.  How long was it after you signed this document

3   before you left the New York area?

4      A   I left the New York area about a year and a half or

5   two years later, sir.  I left New York in 1978.

6      Q   Did you ever receive any answer to this document

7   that you filed?

8      A   Well, to tell you the truth, sir, I didn't leave any

9   kind of forwarding address.  When I got here, I had a lot of

10   personal problems like I told you, and I moved the first year

11   five times.  That must be a record.

12      When you don't have a steady job and you are all

13   messed up emotionally, you don't think of forwarding addresses

14   or anything else but surviving, sir, and I had a very, very

15   rough year.

16      They didn't have any way to know where I was,

17   definitely know, sir.

18      Q   Did they have a way to know where you were as long

19   as you were in New York?

20      A   Yes, sir, yes, sir.  I guess so.  I was very active.

21   I stayed in the same place for many years, and I was a community

22   activist in the City of Yonkers.

23      Q   Did you live at the same address between the time

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    that you signed the document and the time that you left the

2    New York area a year and a half or so later?

3        A    Yes, sir, I did.

4        Q    During that period of a year and a half or so, did

5    you receive any response to this complaint that you had filed?

6        A    No, sir, no, I didn't.

7        Q    Did you yourself mail this complaint to the Federal

8    Government or did someone else do that?

9        A    No, sir.  I told you that it was like a signing

10   sheet, and I saw a whole lot of names signed with their address-

11   es on it, and I just signed my name and wrote my address on

12   it, sir.

13       Q    Do you remember to whom this statement was addressed?

14   Was there any statement up at the top indicating who was

15   supposed to get it?

16       A    Let me see.  No, sir, no.  It was like an open thing

17   that it could be mailed to anybody really.  It says, "We, the

18   undersigned, protest" blah, blah, blah, blah, whatever, sir.

19       Q    Do  you yourself have any personal knowledge whether

20   this document was ever mailed to the government?

21       A    To tell you the truth, no, sir.  I had a good inter-

22   est for it to be known by somebody of power or somebody decent

23   enough to take action and take another look at this lousy test,

1  but to tell you the truth, no, sir, I don't really know if it

2  was. I feel it was because they went through a lot of, I guess,

3  inconvenience getting signatures from people that they knew

4  that they took the PACE test.

5      But finally to tell you for sure if they did some-

6  thing with it, no, sir, I do not know.

7      Q    I have one further question, and that is that I have

8  asked you a number of times for the names of people that you

9  can recall that were connected with this program of this

10 organization called ASPIRA, and you were not able to remember

11 them.

12     Now that we have been talking for several additional

13 minutes, can you recall any of those names, either the names

14 of the persons who were involved with the original orientation

15 or the names of the persons who contacted you after you

16 received the notice that you failed the test?

17     A    Well, a name came up to me a few minutes ago talking

18 about tests, and the last name is Mr. Aponte, A-p-o-n-t-e. I

19 also spoke with him about this, and he was in the orientation.

20 Yes, he was very active in the workshops that I attended.

21     Q    Do you remember his first name?

22     A    No, sir, I don't.

23     Q    Do you remember Mr. Arango's first name?

1          A    No, sir, I don't want to misguide you.

2          Q    Do you remember where the organization's office was

3    located, the office that you dealt with?

4          A    They were in Manhattan, sir.  I never went to their

5    headquarters, but right now, no, sir, I cannot recall the

6    address of the place.

7               MR. SEYMOUR:  I have no further questions.

8               MS. WARD:  I have no questions, Mr. Muhlig.  Thank

9    you.

10              MR. SEYMOUR:  Thank you very much.

11              THE WITNESS:  Thank you, sir, and I am sorry that it

12   has been so long and I have gone through so much that, gee, I

13   hope that I am able to help somebody else.

14              MR. SEYMOUR:  Let me explain what happens now.  The

15   court reporter is going to prepare a statement of the questions

16   that you were asked and the answers that you gave, and you have

17   a choice to make.  You can either decide that you are going to

18   rely on the court reporter to get is all down right and file

19   with the court or else you can ask to see the transcript before

20   it is filed with the court so that you can check it over and

21   satisfy yourself that there are no mistakes in t the spelling

22   or anything like that.

23              You cannot change the substance of your testimony

1    that you've given here today.  You can just point out any mis-

2    takes that might have been made in taking down what you said

3    here today.

4           Would you prefer to just rely on the court reporter

5    or do you want to see it and sign it first?

6           THE WITNESS:  Sir, I will be very ungrateful if I

7    don't trust you people because I don't know how you were able

8    to trace me because I have an unlisted phone number.  I have

9    moved in this area about 1,700 times, and you took the interest

10   and found me.  So whatever you do is okay with me 100 percent,

11   sir.

12          MR. SEYMOUR:  I am not the one who is going to be

13   taking down the information, and it is a decision that you just

14   need to make.  Ordinarily we recommend that people ask to see

15   the transcript and sign it first.

16          THE WITNESS:  I trust you, sir.

17          MR. SEYMOUR:  So you want to waive signature and the

18   court reporter will just file it directly, is that right?

19          THE WITNESS:  Yes, sir.

20          MR. SEYMOUR:  Thank you very much.

21          (Signature waived.)

22          (Whereupon, at 5:30 p.m., the taking of the deposi-

23   tion concluded.)

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages  1  through 19, do hereby certify that the witness, ROLANDO J. MUHLIG, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires  October 14, 1989.

RECEIVED

Jan 15   2 49 PM '05

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

      Plaintiffs,

      vs.

DONALD J. DEVINE, et al.,

      Defendants.

CIVIL ACTION NO.
79-0271

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

Deposition of RIGOBERTO MORALES TORRES

Washington, D. C.
November 27, 1984

Pages 1 thru 47

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM wdm

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                :
ANGEL G. LUEVANO, ET AL.,       :
INDIVIDUALLY AND ON BEHALF OF   :
ALL OTHER SIMILARLY SITUATED,   :
                                :
        Plaintiffs              :
                                :      CIVIL ACTION
    vs.                         :      NO. 79-0271
                                :
DONALD J. DEVINE, ET AL.,       :
                                :
        Defendants              :
- - - - - - - - - - - - - - - - x

*FILED*

*FEB 7 1985*

*JAMES F. DAVEY, Clerk*

Washington, D.C.

Tuesday, November 27, 1984

Deposition of:

RIGOBERTO MORALES TORRES

a witness, called for examination by counsel for the Defendants,

pursuant to notice and agreement of counsel as to time and

place in the offices of the Lawyers' Committee for Civil

Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

D.C., beginning at 6:04 p.m., before William D. McAllister,

a Notary Public in and for the District of Columbia, when

were present on behalf of the respective parties:

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:   RICHARD T. SEYMOUR, ESQ.
4                  Suite 400
                   1400 I Street, N.W.
5                  Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:   BARBARA L. WARD, ESQ.
8                  Room 3509
                   Civil Division-Federal Programs Branch
9                  10th and Pennsylvania Avenues, N.W.
                   Washington, D.C. 20530

10

11                    C O N T E N T S

12   WITNESS                  EXAMINATION BY   MR. SEYMOUR    MS. WARD

13   Rigoberto Morales Torres                      3            --

14                         EXHIBITS

15   NUMBER                            FOR IDENTIFICATION

16     Deposition

17   1 (CSC FORM 1206-A)                          7
     2 (Ltr, dtd 3-20-78, Morales to Campbell)    26
18   3 (Notice of Results)                        27
     4 (Change form)                              28
19   5 (Packet of documents)                      32

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1                          P R O C E E D I N G S

2     Whereupon,

3                       RIGOBERTO MORALES TORRES

4     was called as a witness and, having first been duly sworn by

5     the Notary Reporter, was examined and testified as follows:

6               EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7               BY MR. SEYMOUR:

8          Q    Please state your name and address for the record.

9          A    My name is Rigoberto Morales Torres.  My address

10    is 6 G 7, Urbanecion Anaida, Ponce, Puerto Rico.  Zip Code

11    00731.

12         Q    On the last letter I sent to you, I had your

13    address as Calle 6 G 7, is that right?

14         A    That's correct.  Right.  I skipped the word "Calle".

15         Q    Can you tell me how many times you took the PACE?

16         A    I took the PACE once, one time.

17         Q    What happened when you took it?

18         A    Well, I took the PACE in the last part of 1978 or

19    the beginning of 1979, and after I completed about half of

20    the test I knew I would not be able to pass the examination.

21         Q    Did you pass the examination?

22         A    Well, after I finished the examination, I received,

23    I'd say about two or three months later, I received a form,

1    a Civil Service Commission Form 1206-A, which is an Explanation

2    of Your PACE Notice of Results.  That's the title of the form

3    that I received from the Civil Service Commission, and they

4    told me to see page 4 on this letter, and that I had a code

5    1A.

6         When I check on page 4, my code 1A means that you did

7    not pass the written test.  That's the information that I

8    received from the Civil Service Commission about two or three

9    months after taking the test.

10        Q    We have one copy of a Notice of Results that you

11   sent to us, dated April 1979.  It shows the test scores as

12   being 80 in all the categories under the PACE.

13        A    Yes, I received that one about six months after I

14   received the first one which was the explanation of the PACE

15   Notice of Results, after this 1A which means I did not pass

16   the examination, about six months after, I received the

17   Notice of Results from PACE, which is dated April 1979.

18        Q    Are you saying that you received one Notice of

19   Results saying that you failed and another one later on saying

20   that you passed after all?

21        A    That's correct.  The first one that I received, it

22   say, "See page 4 1A."  When I turn to page 4 1A, in that

23   Civil Service Commission pamphlet which is the Civil Service

1   Commission Form 1206-A, it says, "1A  You did not pass the

2   written test."

3       Now, after that, like I say, six months after I

4   received a Notice of Results with a score of 80, which still

5   did not qualify me for a job, as I was told, and it is also

6   in the Civil Service Commission form, that you need a score of

7   95 or in the high 90s, and I will read it for you.

8       It says here, "Ratings in the high 90s are generally

9   required for job consideration."  In other words, with the 80s

10   still I would not be able to qualify.

11   Q   What did you just read from?  What is the name of

12   that document?

13   A   The document I am reading from is the original copy

14   that I got from the Freedom of Information Act from the Civil

15   Service Commission in San Juan, Puerto Rico.  The name of

16   the form is Explanation of Your PACE Notice of Results, and

17   then at the bottom, it says CSC Form 1206-A, as in alpha.

18   Q   This is not a document that you sent to me?  This

19   is a different document that you have?

20   A   No, I sent a copy of this document to you in my

21   last letter which was--that you signed for, that somebody in

22   your office signed for.  I sent you a copy of this document.

23   Q   Now, I've got a 1978 document for you called Notice

1   of Rating, but that is Civil Service Commission form 4008.

2       A    That's another one.  That was the second one that I

3   received, but I sent you a copy of this CSC Form 1206-A, 9/77.

4   I guess that is the date that the form was printed, September

5   '77.  And the title is Explanation of Your PACE Notice of

6   Results, and then on the top it says, "1A See page 4."

7       Q    Let me take a second and final check through all

8   the papers.

9       A    This was in the last letter that I sent you.  I

10  sent it insured mail.

11      Q    (Perusing documents.)  Okay.  I have before me a

12  document that has got your name typed on the left side of

13  something with a little page number 5 on it.  It says

14  "Rigoberto Morales Torres" with your address on it, at least

15  on the Xeroxed copy it does.

16      A    Does it say Civil Service Commission at the bottom

17  and page 5?

18      Q    Page 5 has got your name and address typed on it.

19      A    That's right.  That's the one that I got from--

20  that was the first notice that I received from the Civil

21  Service Commission before the Notice of Results of April.

22      Q    Okay.  Up on the top on the first past it has got

23  typed "1A See page 4".

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    A    Right.  1A and see page 4.

2    Q    This is the only notice that you got in 1978?

3    A    Right.  This is what I got from the Civil Service

4    Commission after I took the test and I asked--I put in a

5    complaint with the Civil Service Commission.

6    Q    You say you got this form in 1978 after you put in

7    a complaint?

8    A    I say either the last part of '78 or the first part

9    of '79, but it was before April '79.  It was way before I

10    received the Notice of Results from CSC which was issued in

11    April 1979.  I received this one first.

12    Mr. Seymour, I have the receipt here when I sent

13    you the last one and it is signed by John Edwards, when I

14    sent you those documents.

15    MR. SEYMOUR:  Okay.  Let me make this document

16    Exhibit 1 to the deposition, because I think it might be a

17    little confusing about what it is we are talking about other-

18    wise.

19                                  (Whereupon, the document was
                                    marked Deposition Exhibit No. 1,
20                                  for identification.)

21    BY MR. SEYMOUR:

22    Q    Was there anything that happened between the time

23    that you received this document in 1978 and the time that

1    you received the document dated April 1979 telling you that

2    you had passed with scores of 80?

3        A    Well, what happened in-between both documents was

4    that I wrote a letter protesting about the PACE examination

5    itself, and also when I wrote a letter to President Carter,

6    because it was the Viet Nam Veterans Week, and I wrote the

7    President and I told him that since I was a 30 percent ser-

8    vice-connected Viet Nam veteran, wounded twice in Viet Nam,

9    that the Civil Service Commission was violating its own

10    regulations, because according to the Civil Service Commis-

11    sion regulations, I did not have to take any PACE or any

12    test because I was 30 percent at that time.  Now, I am 50

13    percent, but at the time I was 30 percent, and according to

14    the old Civil Service regulation, I did not have to take the

15    test.  But they told me, "Yes, you have to."

16        So in-between those two, the Explanation of Your

17    PACE Notice of Results and the Notice of Results, April,

18    in-between I sent a letter of protest complaining to the

19    Civil Service Commission.

20        Q    Is it possible that what happened in-between was

21    that the Civil Service Commission had not known until your

22    letter that you were a disabled veteran, and then when they

23    found it out, they just corrected your score?

1    A    I don't think so, because when they told me that I

2    flunked it, that I did not pass the written examination, I

3    already signed papers that I was disabled veteran, and I flunk-

4    ed it even with the supposedly ten points that they gave you.

5    When they change it a a level, you don't know why, because

6    when I took the test, they gave me a paper so they will con-

7    sider the ten points veterans preference when I initially

8    took the test in '78, and I signed a paper that I was wounded

9    twice in Viet Nam and have two Purple Hearts, and for those

10   reasons, they were going to give me ten points.  They knew

11   that in '78.

12        I don't believe that the '80 was because they were

13   going to give me ten points veterans preference because I

14   already had it in the first one when I flunked it.

15    Q    Then when you received your April 1979 Notice of

16   Results, as I understand it, you were told by someone or else

17   you read in some document that your score was not high enough

18   to have a chance to get that job, do I understand you rightly?

19   Is that what you are saying?

20    A    I called the Civil Service Commission here in San

21   Juan, and I says, "Well, I received my Notice of Results,

22   dated April 1979, and now they tell me I got 80."  I was

23   wondering if I would be able to get a job, you know, and the

1    lady who answered the telephone told me--I guess she looked at

2    my record or something, and she said, "Well, you need a

3    score in the high 90s before you are able to take any

4    position in the Federal Government." That was in May of 1979,

5    right after I received the Notice of Results, dated April '79.

6         In the pamphlet that they sent me, it also states

7    here that ratings, and I am quoting for you, "Ratings in the

8    high 90s are generally required for job consideration", in

9    the Federal Government.

10        Q    What are you reading from?

11        A    That is on page 2, "Consideration for Jobs", and

12   it is overprinted.

13        Q    Okay.  Let the record show that Senior Morales is

14   referring to Page 2 of Exhibit 1 to the deposition, that is

15   printed page 2 with a page 2 printed at the bottom.

16        When did you make your first statement to the Civil

17   Service Commission to the effect that you thought the PACE

18   discriminated against Puerto Ricans?

19        A    Can you repeat the question, please?

20        Q    Well, did you ever make a statement to the Civil

21   Service Commission or any of its officials that you thought

22   that the PACE discriminated against Puerto Ricans?

23        A    Yes, sir, I complained, like I said before, right

1   after the test, I complained of racial discrimination, and I

2   also challenged the use of the PACE in my case, and that was

3   in 1978. I also filed a complaint. Later on I filed a com-

4   plaint with the Civil Service Commission in 1978, and the

5   last two were on March 20, 1979, and another one on September

6   1979.

7        But I personally complained to the lady there who

8   gave us the test, and I also told your own regulations, your

9   own Civil Service Commission regulations state that if the

10   service-connected veteran was 30 percent at the time, I did

11   not have to take the test, because there was consideration

12   and a preference given to us veterans, and she said, "No,

13   you have to take it."

14        So after I took the test, and halfway through,

15   like I said, I knew that the test itself was discriminated.

16   I explained myself. Halfway through the test, I say I'll

17   never pass this test.

18        And later on, I figure that based on what the lan-

19   guage in the test and so on, that it was too hard for me to

20   understand, and some of the questions asked in the best was

21   not related to the position that I was looking for or the

22   position offered in the same page 2 of the pamphlet.

23      Q   When you made this complaint to the person who

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

12

1    administered the test, was that at the same day that you took

2    the test or was it at some later time when you came back?

3        A    I took the test at 9:00 in the morning and we fin-

4    ished about 2:00 or 2:30.  That same day I complained of the

5    test to the lady who was there, and the lady told me--her

6    name was Ms. Mattei or something, her name, and she says,

7    "Well, you know, if you have any complaint, you can file a

8    complaint with the Civil Service Commission."

9        Now, I filed a complaint with the Civil Service

10   Commission in 1978, and also on March 20, 1979. Because I

11   didn't get no reply back, I, again, sent another complaint

12   on September 1979.

13       Q    Senior Morales, let's just take one step at a time.

14   Can you repeat for us as closely as you can remember them,

15   the exact words that you said to this woman and then the

16   exact words that she said to you?  I don't want you to try to

17   fill in any gaps, and I understand you might not remember

18   everything perfectly, but try to tell us as closely as you

19   can just what you said to her and just what she said to you,

20   and then we'll go on to these other times.

21       A    Okay.  This is as far as I remember what I told her.

22   I told her that I believe if 100 Puerto Ricans take this

23   test, I remember clearly telling her that 98.9 will flunk the

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    thing, will flunk that test.

2    I also told her that I would like to complain and

3    make an official complaint about that test, and she told me

4    that the Civil Service Commission--or that I can go ahead and

5    send in the complaint that I have about the test to the Civil

6    Service Commission in Washington, D.C., and that is what

7    happened after I took the test.

8    Q    Did she give you any brochure, leaflet or anything

9    else that explained how to go about making a complaint of

10    discrimination against the PACE?

11    A    I asked her, you know, if there is any type of

12    form that I can fill out about this particular test, and she

13    said, "No, there is no for this one, but you can go to the

14    Federal Job Referral Office, and they probably have the forms."

15    But she said she didn't have it.

16    Q    Was the name of this office Federal Job Referral

17    Office, or is that just an approximate name?

18    A    Federal Referral Job Office, something like that.

19    It is a place where they give you forms, you know. I went on

20    in and they give me a Form 98 or something like that. It was

21    just a personal qualification form and so on.

22    Q    Is this part of the Civil Service Commission or

23    part of some agency?

1    A    It's an office of the Civil Service Commission,

2    right.  I don't know if it is now, but it was at the time.

3    Q    What is the next thing that you did after you had

4    this conversation with her?

5    A    Well, after I had the conversation with her, I went

6    to the Job Referral Office.  They sent me a batch of forms,

7    you know, to fill out, but there was none that was a complaint

8    form.

9    Q    How long was it after your conversation with the

10    woman before you went to this Federal Job Referral Office?

11    A    About a week after.

12    Q    What did you tell them at the Federal Job Referral

13    Office?  Again, try to tell us as closely as you can the words

14    that you used in talking to them and the words that they used

15    in talking to you.

16    A    Well, I told them, you know, I just took the PACE,

17    and I don't believe I pass it.  Almost exactly what I told

18    her, that out of 100 Puerto Ricans, 98.9 will flunk the test.

19    And I was looking for a form that she told me that somebody

20    there might have it.

21    And the guy look all over a bunch of little boxes

22    there, and he gave me a batch of forms, you know, some person-

23    al qualification forms, personnel action forms, but he never

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1  gave me the one for the complaint.

2       So what I did, I wrote a letter to the Civil Service

3  Commission.

4    Q    Before we get to the point of your writing the letter,

5  did you tell this person at the Federal Job Referral Center

6  that you wanted to make a complaint of discrimination against

7  the PACE?

8    A    That's correct.  Not exactly discrimination but at

9  the time I told him that for the position that I was looking

10  for or for the position that were offered to all the people who

11  were taking the test that the test itself ain't got nothing

12  to do with the position.

13       And then he asked me, "On what do you base your

14  complaint?"  And I told him that I was basing my complaint

15  on the questions in the PACE examination, that they had no

16  relation whatsoever with the job to which leads from PACE.

17    Q    Did you tell him that you thought that the test

18  was unfair to Puerto Ricans or say anything that suggested--

19    A    I told him that if 100 Puerto Ricans take that test,

20  98.9 will flunk it, and I was basing myself because I have a

21  Bachelor in Business Administration, which I graduated with

22  3.80 and also was magna cum laude in a class of 500.  I say,

23  "If I don't pass it, none of these other guys will pass it.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1   These guys don't even speak English."

2     Q   Now, I understand from what you said that he did not

3   give you any form that was labeled "complaint form" for you to

4   fill out. Did this person--

5     A   He gave me some job qualification form and he said,

6   "Well, go ahead. If you don't do it with the PACE, go head

7   and apply again." I knew I was wasting my time.

8     Q   Senior Morales, please wait until I finish the

9   question. I think we can move ahead a little faster. Now,

10   did he give you any leaflet, brochure or anything else telling

11   you how to go about making a complaint of discrimination under

12   Title VII of the Civil Rights Act of 1964?

13     A   No. The person who was in charge there of the Job

14   Referral Office did not have any form where I could file a

15   complaint. Like the lady there told me, "Go ahead and write

16   the Civil Service Commission in Washington, D.C." And that's

17   exactly what I did.

18     This other guy in the Job Referral Office told me

19   "Why don't you write them a letter?"

20     Q   Did he tell you who that letter should go to at

21   the Civil Service Commission?

22     A   Right. He told me I should send my letter to the

23   Chairman of the Civil Service Commission.

1    Q    Did he ever tell you anything about sending your

2    complaint to the Appeals Review Board of the Civil Service

3    Commission in Washington?

4    A    No.  The address that they gave me and where I sent

5    my mail was to Mr. Alan Campbell, Chairman, Civil Service

6    Commission, Washington, D.C. 20415.

7    Q    Did he give you the address or did you have that

8    from something else?

9    A    I have the address because when I went to see him,

10   he told me that go ahead and write them.  I got the address

11   from the post card that said Civil Service Commission and so

12   on, which these people use for sending notification.

13   Q    Do you remember the name of this man at the Federal

14   Job Referral Center?

15   A    I remember the name of the lady who gave me the test

16   which I complain to.  Her name is Mrs. Mattei.

17   Q    Do you know her first name?

18   A    No.  I just remember the name because she had it in

19   the test.

20   Q    Have you been back since then to this office and

21   seen her still working there?

22   A    I haven't seen her since 1979.

23   Q    Have you been back to the office so that you know

1   whether or not she still is there?

2       A    I never been to the office, no, where she works.  I

3   talked to people at the Civil Service Commission, the OPM, but

4   not the lady, Mrs. Mattei.

5       Q    Was she an employee of the Civil Service Commission?

6       A    She was in charge of giving the test in our area here

7   in Ponce.

8       Q    And this Federal Job Referral Center, was that also

9   in Ponce?

10      A    No, the Job Referral Office is in San Juan.

11      Q    So you went from Ponce to San Juan and then had the

12   conversation with this man?

13      A    Right.

14      Q    Do you have any idea whether the man was a supervisor

15   or what his job title was?

16      A    No.  It seemed to me like he was one of those--how

17   do you call them?--university veterans.  It seems like he was

18   a Viet Nam veteran.  He was wearing a fatigue jacket.  I think

19   that he was a university student, but that he was a veteran or

20   something.

21      Q    A unversity student who was a veteran?

22      A    Right, it seems to me because, you know, one of those

23   part-time employees that they employ at the Veterans Adminis-

1    tration and all the federal offices here in San Juan.

2        Q    Did this man offer to have you speak with an Equal

3    Employment Opportunity counsellor or anybody like that at the

4    office in San Juan?

5        A    Did I visit?

6        Q    No.  Did this man that you spoke to that you thought

7    was a university student who was a veteran maybe working part-

8    time, did he offer to have you speak with an Equal Employment

9    Opportunity counsellor?

10       A    He was the only one at the office.  After he gave me a

11   bunch of forms, personal qualifications statement and a bunch

12   of forms, but not the one that I was looking for, I left

13   the place.  I left the office there.

14       Q    The office in San Juan?

15       A    Yes, the office in San Juan.  I came back to Ponce.

16   See, San Juan is about 45 miles from Ponce.

17       Q    Are you saying that this man was the only one who

18   seemed to be working in the office at the time?

19       A    He was the only one in that office, yes, when I went

20   looking for those forms, but anyway after I got through with

21   him and I came back, that's when I wrote the letter, the first

22   letter of my complaint.  I guess that was before I received

23   the Notice of Result of April.  That was on March 20, 1979.

1        And after I sent that letter--

2    Q    Just a second.  What happened on March 20th, 1979?

3    A    Okay.  On March 20, 1979, I sent a letter of com-

4    plaint to the chairman of the Civil Service Commission, Mr.

5    Alan Campbell, in Washington, D.C., and the Zip Code 20415.

6    Now, after I sent that letter, that's when I received the

7    Notice of Results with an 80.

8        After I sent my letter--I will repeat again--after I

9    sent my letter of complaint of what I thought about the

10   racial discrimination because I was complaining in my letter

11   to Mr. Campbell as a veteran first and also complaining of

12   racial discrimination, and that I was challenging the use of

13   the PACE in 1978.

14       Now, after I sent that letter to Mr. Campbell, I

15   received, almost a month--

16   Q    Senior Morales, let me interrupt you right there.

17   How long was it between the time that you sent to the Federal

18   Job Referral Center in San Juan and the time that you sent

19   this letter off to Alan Campbell?

20   A    Okay.  After I could not get the correct form, the

21   correct Civil Service Commission form to file a complaint, I

22   cam back to Ponce.  I look at the forms that this guy gave me.

23   There was none of the forms that I use as a complaint because

1  all of them were personal qualification forms and another one

2  was for a background investigation and so on, all the forms

3  that the Civil Service Commission uses.  But there was no one

4  for me to make a complaint.

5       That's why, after I returned to Ponce, to my home,

6  that I wrote a letter to Mr. Campbell which was dated March

7  20, 1979.  I should say about a month after writing that

8  letter to Mr. Campbell I received a new Notice of Results,

9  April 1979.

10      Q    Senior Morales, what I am trying to find out is how

11  long after you came back from this visit to San Juan was it

12  before you wrote this letter to Mr. Campbell?  Was it a couple

13  of weeks, a couple of days?

14      A    The day I left there in San Juan about 11:30.  I

15  was home around 3:00.  And I wrote the letter the same day

16  when I could not find that this man had the forms, the com-

17  plaint forms, the regular complaint forms.  When I got back

18  home, I said, "Well, since I don't have the forms to fill out,

19  I am going to write him a letter."

20      And using the lettle postcard that they gave me

21  that had the address of the commission on it, it wrote to Mr.

22  Campbell after I returned from the Job Referral Office to my

23  home.  Do you understand?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1       Q    Okay.  Now, at the beginning of your deposition you

2   said that you thought that you took the PACE for the first time

3   in late 1978 or early 1979.

4       A    That's correct.

5       Q    The letter on the first line says that you received

6   the U.S. Civil Service Commission Notice of Rating, dated

7   January 28, 1978, and October 1, 1978, both of which were

8   attached.

9           Now, I got a copy of the January 28, 1978, Notice

10   of Rating for the job of accountant and auditor, Job Number

11   425.  It's not a notice of PACE results.

12       A    Right, it is not.

13       Q    Was the other one, the October 1978, a notice of

14   PACE results or was it something different?

15       A    Right.  The form 1206-A.  I sent you a copy of all

16   the paperwork or the forms that I received from the Civil

17   Service Commission.  The Notice of Rating, I sent you a copy

18   of that, too, that was before I took the PACE, way before I

19   took the PACE.  Remember, I took the PACE the last part of

20   1978 or the beginning of 1979.

21           If you check the records at the Civil Service

22   Commission, you will come out with the correct date but I

23   don't remember.  I know it was either late 1978 or early 1979.

1     Q   Now, several times you referred to things happening

2    in 1978 in connection with the PACE.  Is it possible that those

3    were all early 1979?

4     A   Right.

5     Q   Now, your letter refers, the letter you wrote to

6    Alan Campbell on March the 20th, 1979, refers to something

7    dated October 1st, 1978.  Now, that was about five months, five

8    or six months before your letter.

9     A   Right.

10     Q   Wait a second.  Ms. Ward has just shown me a Notice

11    of Rating, dated October the 12th--

12     A   But this is a rating dated January 28th, 1978.  I

13    sent you a copy of that.  That was before I took the PACE.

14    That was January 1978.  That was for auditor or accountant.

15     Q   Senior Morales, Ms. Ward has just located in her

16    papers a copy of a Notice of Rating, dated October 12, 1978,

17    for the job of accountant and auditor, saying that your

18    qualification statement has been reviewed and you cannot be

19    referred to federal agencies.

20       Again, this is not a Notice of PACE Results.

21     A   No, it is not a Notice of PACE Results.  That is a

22    Notice of Rating.

23     Q   So both of these documents that are being referred to

1    in the first two lines of your March 20th, 1979, letter are

2    just notices of ratings and don't have anything to do with the

3    PACE results, is that right?

4        A    No, they have nothing to do with the PACE results.

5    That was the position that they were going to consider me

6    because I was in the top class, and they were going to consider

7    me for auditor or accountant.

8        But then they wrote me in the same day Notice of

9    Rating that says there that I was not qualified because of my

10   education.  They said in the letter they won't put me for that

11   because I was the highest in my class.  This has nothing to do

12   with the PACE.

13       Q    Okay.  Senior Morales, let me call your attention--

14   first of all, do you have this March 20th, 1979, letter in

15   front of you?

16       A    The March?

17       Q    March 20th, 1979, is the date at the top.  It is the

18   letter to Alan Campbell.

19       A    Right.  I have the carbon copy with me.

20       Q    Okay.  Let me just quote the fourth paragraph in the

21   letter for the record of the deposition, and then I'll ask you

22   a couple of questions about it.

23       The fourth paragraph reads as follows, quote, "I

1    also want to file a formal protest with your office because

2    the PACE examination is highly discriminatory against us

3    Puerto Ricans as it violates the 10th Amendment of our Consti-

4    tution, our civil rights, and the federal regulations on

5    equal employment opportunities for minorities," and that's

6    the end of the quotation.

7        At the time that you wrote this letter, had you al-

8    ready taken the PACE or were you planning on taking the PACE

9    in the future?

10       A    No, at that time on March 20, maybe I am not explain-

11   ing myself.  Sir, I want to refer you to CSC Form 1206-A.

12       Q    That does not have a date on it, but I am asking you

13   now, from your memory, did you write this--

14       A    When I took the test, three months later I received

15   an Explanation of Your PACE Notice of Results which have in

16   the top portion "1A See page 4".

17       Q    Okay.  That's Exhibit 1 to the deposition, but my

18   question is different.

19       A    I already took the PACE by March 20, 1979.  I already

20   took the PACE.  I did not receive the Notice of Results of the

21   PACE which they changed to the 80 until April, but I had

22   already taken the PACE.

23       MR. SEYMOUR:  The Plaintiffs offer the copy of this

1    March 20th, 1979, letter to Mr. Campbell as Exhibit 2 to the

2    deposition.  I state for the record that I do not see any

3    purpose in attaching the two notices of ratings.

4           MS. WARD:  I agree.

5                              (Whereupon, the document was mark-
                                ed Deposition Exhibit No. 2, for
6                               identification.)

7           BY MR. SEYMOUR:

8      Q    After you sent in the March 20th, 1979, letter, did

9    you receive any response from the government?

10     A    After I sent in the March 20, 1979, letter, I did not

11   receive any answer to that letter.  So again in the same

12   year, in September 1979, I sent another letter to Mr. Campbell,

13   and this time I received a reply.  I won't call it a reply.

14           What it was, it was a Civil Service Commission Form

15   52 which is a Request for Personnel Action, and also I received,

16   with Mr. Campbell's picture on top, a letter, because in my

17   last letter of September 1979, I brought to his attention, too,

18   that I was a service connected veteran and they were violating

19   their own regulations by making me take the PACE examination.

20           And all I got back was this that I sent you a copy

21   that is signed by Mr. Campbell.  He said here, one of the

22   paragraphs in this letter said, "The ultimate goal of civil

23   service reform is to improve the delivery of service to the

1    American public," and so on.

2            That was a personnel action form.  That was the only

3    reply that I got to my letter that I received to my letter of

4    September 1979.

5        Q    Okay.  I'll ask you about the letter of September

6    1979 in a couple of minutes but let me go back.  You sent in

7    this letter on March 1979.  In April 1979, you were sent a

8    Notice of Results, putting your score down as 80 in all these

9    PACE categories.

10            Let me make a copy of that as Exhibit 3 to the

11    deposition.

12                            (Whereupon, the document was mark-
                              ed Deposition Exhibit No. 3,
13                            for identification.)

14            BY MR. SEYMOUR:

15        Q    Among the documents that you sent us is a Statement

16    of Changes or Corrections that you wanted to make to your

17    record, and it has a date stamp on it saying it was received

18    at about 11:30 in the morning on July 28th, 1979, by the

19    Office of Personnel Management, San Juan Area Office.  Do

20    you have that paper in front of you?

21        A    Well--

22            MR. SEYMOUR:  Why don't you look for it, and I'll

23    ask the court reporter to mark it as Exhibit 4 to the deposition.

1          (Whereupon, the document was mark-
2      ed Deposition Exhibit No. 4,
       for identification.)

3          THE WITNESS:  It is a form with a "received"?

4          BY MR. SEYMOUR:

5      Q    It is a form with a received stamp, and the received

6      stamp is dated July 28, 1979.

7      A    Right.  Yes.  That was the complaint that I make

8      about the--after they gave me an 80--are you with me?

9      Q    I'm here.

10     A    After they gave me that, they changed from that I

11     flunked the test, and then all of a sudden in April they gave

12     me an 80, I sent them a note.  Like I said here, "Reference

13     Form 1206, Notice of Results, Issued April 1979 and CSC Form

14     1206-A," which was the form that we already talked about,

15     "does not make any sense to me.  As I understand it, I must

16     make a rating in the high 90s to be considered for a job."

17         And I says here, "I was initially given a 1A

18     Inelegible Code."  So I couldn't understand why the people

19     were coming up with an 80 when they told me before that I

20     flunked it.

21         And then I told the Civil Service Commission that

22     "I stand by my letter to the Chairman CSC, that the PACE

23     discriminate against Puertorricans specially Puertorrican

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Vietnam veteran who fought for the US in Vietnam, and now to

2    get a job all you get is harrasment, discrimination, and an

3    enteranl run around."

4    That is the way I felt when I went to the referral

5    office.

6    Q    Senior Morales, did you type this information on

7    the form at the Civil Service Commission office or did you

8    type it somewhere else?

9    A    You see, there was a mistake on my social security

10    number.  I make a correction for my social security number

11    which is at the top portion of the note.  They sent me a copy

12    back that they receive it, and I sent it back to them with

13    my comments, because it says, "If you have additional changes

14    you wish to make to your records, describe below:"  And I

15    described the way I felt.

16    Q    Did you take that in in person or did you mail it?

17    A    What's that again?

18    Q    Did you take that document in in person to the

19    Office of Personnel Management office in San Juan or did you

20    mail this in?

21    A    Right.  First, they send it to you blank to make

22    the correction or you add anything and send it back to them.

23    Q    Did you mail it in or did you take it in in hand?

1    A    No, I mail it to them.  See, when I got it, the correc-

2    tion on my social security was already made, and the stamp was

3    in, and what it says here.  "If you have any additional changes

4    you wish to make to your records, describe below:"  What I

5    did there, was I said they were violating their own regulation

6    of veterans, making us take the test and so on, and then they

7    said you need the 90s and so on.  I was really mad.  I was

8    frustrated, and I wrote them this, and I said it to them.

9    Q    Did you hear anything back from them about the state-

10    ment about discrimination at the bottom of the form?

11    A    Did I hear anything from them?

12    Q    Did you hear anything from the Office of Personnel

13    Management back--

14    A    Yes, you have a copy of the letter that they wrote

15    me back, that they was trying to get me a job, that they

16    understood and so on and so forth, and that happened all the

17    way from that date up to today.

18    Q    But they did not respond about your complaint of

19    discrimination?

20    A    No.  They knew that I was going to join the class

21    action suit in the States.  They knew here in Puerto Rico,

22    the Office of Personnel Management which changed the name at

23    that time from Civil Service Commission to OPM, that I was

1    looking into about joining the Luevano suit, and after that

2    they wrote me a letter that they were going to get me a job

3    in the Immigration Service.  Then they wrote me that they

4    were going to get me a job in the Internal Revenue Service

5    and so, but that was a bunch of hogwash because they never

6    did nothing for me.

7        Q    You are speaking right now about things that happen-

8    ed after the Luevano settlement?

9        A    Right, because I was so frustrated after all the

10   garbage, you know, and writing the letters, and I even wrote

11   not only to the Civil Service Commission but I wrote letters

12   of complaint to the Equal Employment Opportunity Office in

13   Washington, D.C., and the man there was a little bit more

14   decent than these other people.

15       At least I got a reply back from Mr. Tony Gallegos

16   who was an Equal Employment Opportunity officer.  Of course,

17   his letter was two years later in 1982 when I receive it, but

18   the people in OPM never answered me back my letters.  All

19   they sent me was a bunch of letters about the new Civil

20   Service Commission Reform Act and so on.

21       Q    Senior Morales, let me ask a couple more questions

22       First, I ask the court reporter to mark a set of

23   six pages comprising different documents, the top part of which

1    is a letter from Senior Morales, dated March 14th, 1982, as

2    Exhibit 5 to the deposition.

3                                    (Whereupon, the document was mark-
                                     ed Deposition Exhibit No. 5,
4                                    for identification.)

5            BY MR. SEYMOUR:

6        Q    Now, the second page of this document appears to

7    be an original letter, dated September 20th, 1979, to the

8    United States Civil Service Commission.  Do you have that

9    letter in front of you or a copy of that letter?

10       A    September?

11       Q    September 20th, 1979, letter.

12       A    No.  You know what happened to that letter, sir?

13   I send the copy to the Civil Service Commission.  I send you

14   original, and I kept a yellow copy.  That's what happened to

15   that letter, the one of September 1979.

16       Q    Okay.  I note for the record--

17       A    You will be able to check all these papers and

18   documents by requesting them from the Civil Service or the OPM

19   office because they have to have the copies there.

20       Q    I note for the record that the third page in this

21   packet of information sent with the letter is the original

22   of the April 1979 Notice of Results on the PACE examination,

23   and the other documents attached to it were attached to the

1    original letter.

2    Did you hear anything back from the government about

3    the complaint of discrimination you made in the September 20th,

4    1979, letter to the Civil Service Commission?

5    A    Yes, sir.  I also send you a letter that I received

6    from the Civil Service Commission years later.  I send you

7    the only copy that I had, and it was from the legal section

8    of the Civil Service Commission.

9    Q    Senior Morales, can you give me the date of the

10    letter.  You've sent me a lot of documents, and if you can

11    tell me the date of the letter that you are referring to we

12    can find our copy and then go ahead.

13    A    Let me see if I can find a copy of the letter.  Here

14    it is.  Okay.  This letter is from the United States Office

15    of Personnel Management, Washington, D.C. 20415, dated

16    October 26th.  Do you have a copy available?

17    Q    October 26th what year?

18    A    I cannot read it because it was stamped, and the

19    date didn't come out too good, and it wasn't even signed,

20    although it has a signature block here of Mr. Richard B. Post,

21    Assistant Director for Staffing.

22    Q    Hold on a minute and let us try to find a copy of

23    that.  What is the month and day again?

1    A    The month is October 26, and then it says, "In

2    reply refer to FS."  It is from the United States Office of

3    Personnel Management.

4         MS. WARD:  What year?

5         THE WITNESS:  I can bearly see it.  It was stamped.

6    The date was not typed.  It was stamped, and all it says is

7    October 26th, and I can read back to you if you want to know

8    what that letter says.

9         MR. SEYMOUR:  Hold on a minute while we finish going

10   through all these papers.  (Pause.)

11        THE WITNESS:  Here is another one, sir, from the

12   Civil Service Commission.

13        MS. WARD:  I have a letter here dated October 26th.

14   It looks like 1981, but it's not very clear.  It's signed by

15   Richard Post.

16        THE WITNESS:  That's the letter.

17        MS. WARD:  It says, "Dear Mr. Morales:

18        "This will acknowledge your recent inquiry to the

19   President about federal employment.  These civil service

20   matters are under the jurisdiction of our Hato Rey Office.  As

21   that office is in the best position to reply to your inquiry,

22   we have forwarded your letter to them so that you may be ad-

23   vised in the matter without delay."  Is that the letter?

1        THE WITNESS:  Yes.  I received that letter after

2   the letter that I sent them in September 1979.

3        BY MR. SEYMOUR:

4    Q    Now, Richard Post's letter seems to be responding

5   to a letter that you had sent to the President of the United

6   States.

7    A    Yes, but like I say, sir, I wrote the President of

8   the United States in reference to what President Carter called

9   to help Viet Nam veterans get jobs and so on.  You remember

10  that was in 1979 and '80, and I wrote him a letter.  I am a

11  Viet Nam veteran.  I was twice wounded in combat.  How about

12  giving me a break?  Let me get to work.  I went to school

13  after I got back from Viet Nam.  I got my college degree.

14        MS. WARD:  Senior Morales, please try to just answer

15  the question that we ask.

16        BY MR. SEYMOUR:

17   Q    Senior Morales, the letter that you wrote to the

18  President, did that have anything to say about discrimination

19  against Puerto Ricans or was it primarily about veterans

20  rights?

21   A    Right.  Viet Nam veterans, employment for Viet Nam

22  veterans, federal employment for Viet Nam veterans.

23        MR. SEYMOUR:  I see no reason to make this an exhibit

36

1      for the deposition record.

2                    THE WITNESS:  What Mr. Post is referring to in this

3      letter is my letter to the President about federal employment

4      for Viet Nam veterans.

5                    MS. WARD:  Thank you.

6                    BY MR. SEYMOUR:

7      Q      Did you ever receive any response, written or oral,

8      from the Civil Service Commission or the Office of Personnel

9      Management to your September 1979 letter to the Civil Service

10     Commission, the letter which is on Page 2 of deposition

11     Exhibit 5?

12     A      No, I never received.  What I got was like I told you

13     before.  After my September 1979 letter all I got back was a

14     letter signed by Mr. Campbell telling me about the new reform

15     act, and also as an enclosure to that letter he sent me a form

16     which was a personnel action form.  I ain't got no sure for it.

17     Q      When you refer to a letter from Mr. Campbell, are you

18     referring to a printed brochure with his picture on it?

19     A      Right, the same one.  That's what I got.  And then a

20     form, personnel action form.  That's all I received to my

21     letters.

22     Q      A blank form for you to fill out?

23     A      Right.  And that wasn't until 1981, October 26th,

1    that they give me an answer to my complaint to President Carter

2    and also on September 15--

3        Q    Senior Morales, just hold it for a minute.

4            Let Plaintiff state for the record that, again, we

5    see no reason to make that brochure or the attached form a

6    part of the record.

7            MS. WARD:    Fine.

8            BY MR. SEYMOUR:

9        Q    Senior Morales, you mentioned a number of instances

10   in which you have told people who were employed by the Civil

11   Service Commission or Office of Personnel Management orally

12   that you thought that the PACE discriminated against Puerto

13   Ricans, and we've gone into at some length all of these

14   written communications making reference to discrimination

15   agains Puerto Ricans by use of the PACE.

16           At any time has any official of the old Civil

17   Service Commission or of the Office of Personnel Management

18   ever told you outloud or in writing about the possibility of

19   filing a complaint directly with the Appeals Review Board of

20   the Civil Service Commission to complain  about the PACE?

21       A    No, sir, because, like I said, all I received from

22   the personnel office, the Civil Service Commission office, was

23   the letter signed by Mr. Campbell with his picture on the top

1    and which explained the new Civil Service Reform Act in which

2    supposedly all veterans were going to get a better break or

3    something like that.  That's all I received from the Civil

4    Service Commission besides the letter signed by Mr. Post.

5        Q    When you visited--

6        A    I believe the reason that Mr. Post sent me that

7    letter, because it was a letter that he had to answer, but the

8    other one they did never answer me

9        Q    Senior Morales, when you took the PACE examination

10   or when you visited the Federal Job Referral Center in San

11   Juan or any office, the Office of Personnel Management or

12   Civil Service Commission in Ponce, did you ever see a poster

13   up telling you how to file a complaint of discrimination

14   under Title VII of the Civil Rights Act of 1964?

15       A    Yes, sir, I saw one in the U.S. Post Office.  It

16   says if you feel that your discriminated from a federal job

17   write your, and then it has an address, Equal Employment

18   Opportunity Office or Chairman, Equal Employment Opportunity

19   Office, Washington,D.C., and I did wrote the letter to Mr.

20   Tony Gallegos.

21       Q    When was it that you saw this poster at the Post

22   Office?

23       A    I see it everytime I go to the Post Office.

1    Q    When was it you saw it for the first time?  Do you

2    remember if it was before you took the PACE or after you took

3    the PACE?

4    A    After I took the PACE.  I seen it before.  It's

5    almost in every Post Office, you know.  I guess it is for,

6    like, all the postal employees that they have those things

7    on the wall there.

8    Q    Have you ever been a postal employee?

9    A    Never.  I wish I was.  I'd probably be making money.

10   Q    Did you ever see anything in such a poster telling

11   you about the opportunity to file a complaint of descrimination

12   with the Appeals Review Board of the Civil Service Commission?

13   A    No, I never seen that.  The first time that I saw

14   it was when I read about the Luevano/Campbell case.

15   Q    Was your contact with the Equal Employment Oppor-

16   tunity Commission and Commissioner Gallegos there a contact

17   made after you learned of the settlement in the Luevano case?

18   A    No, I don't remember, but I know Mr. Gallegos wrote

19   me in 1982.  By that time, I already sent a letter in the

20   U.S. District Court.

21   Q    Mr. Davies, the Clerk of the Court.

22   A    The District Court.  I wrote him a letter.

23   Q    And you sent us a copy of that letter.  Again,

1    Plaintiffs see no reason to make the letter a part of the

2    record.

3        A    That was to Mr. James F. Davies, Clerk, U.S. District

4    Court.  And then that was Mr. Davies sent me back--I don't

5    know what you call that.  It is Appendix B to the order grant-

6    ing preliminary approval to the consent decree.

7        Q    Senior Morales, this poster that you saw in the

8    Post Office, and I want to ask you to think carefully about

9    this answer and try to remember before you answer.

10       A    Right.

11       Q    Was this a general poster just telling the general

12   public what they should do if they thought there was dis-

13   crimination, get in touch with the Equal Employment Opportunity

14   Commission or was it something that was specifically directed

15   to federal employees and described specifically the process

16   for federal employees to follow?

17       A    Right now, Mr. Seymour, I would not be able to tell

18   you that was for the postman or for the public who used the

19   Post Office.  Now, I was interested in writing to somebody,

20   and I was writing everybody and his mother, because I knew

21   that the PACE was discriminating against Puerto Ricans, and I

22   wanted to write everybody.

23           I wrote the President.  I wrote Rosalyn Carter.  I

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1   wrote the Equal Employment Opportunity Offices.  I wrote Mr.

2   Alan Campbell.  I wrote everybody.

3       Q   Was this poster--

4       A   I found out in the paper there was a case in court.

5   I wrote a letter to Mr. Davies somebody.

6       Q   Senior Morales, was this poster one of these posters

7   with colored ink that starts out "Equal Employment Opportunity

8   is federal law" or words to that effect?

9       A   Well, the poster, I couldn't tell you exactly how

10   it says but as far as my mind can remember, it is if you feel

11   you have been discriminated because, and then they have a

12   bunch of letters of racial, ethnic, and then they had the

13   address.  Chairman, Equal Employment Opportunity Office,

14   Washington, D.C.

15       And since I was writing everybody because I wanted

16   to be heard, I knew that the Civil Service Commission was

17   violating its own regulations by making me take the PACE--

18       Q   Senior Morales--

19       MS. WARD:  Senior Morales, please answer only the

20   question that you are asked.

21       THE WITNESS:  Do you want me to explain, please?

22       MS. WARD:  No, I don't want you to explain anything.

23   I want you to only answer the question that is asked.  Do not

1    run on.

2              THE WITNESS:  Okay.  I saw a poster that says if

3    you have any complaints about employment in the Federal Govern-

4    ment or words to that effect, and it have an address, that you

5    mail to the Chairman, Civil Service Commission, Washington,

6    D.C., and I wrote a letter, and I got an answer back from

7    Mr. Tony Gallegos.

8              BY MR. SEYMOUR:

9         Q    Senoir Morales, this poster, did it have the address

10   of the Civil Service Commission or did it have the address of

11   the Equal Employment Opportunity Commission or did it have

12   the address of an EEO office for some other federal agency?

13        A    Equal Employment Opportunity.  It said, "Chairman,

14   Equal Employment Opportunity."

15        Q    Opportunity Commission?

16        A    Yes, sir.

17             MR. SEYMOUR:  I have no further questions.

18             MS. WARD:  I have no questions either.

19             MR. SEYMOUR:  Senior Morales, under the law, you have

20   the right to make a decision whether you want to see a trans-

21   cript of this deposition before it is filed in court so that

22   you have a chance to check over it personally and see whether

23   there were any typing mistakes that were made in putting down

c3s1

1    what you said.

2        Or you can waive your signature and just rely on the

3    court report to get the thing filed accurately in court.

4    Ordinarily we recommend that people see the depositions them-

5    selves and check them over so that they have a chance to put

6    down any errors that might have been made in taking down the

7    testimony.  It is your decision.  Would you like to read

8    the deposition or do you waive signature?

9        THE WITNESS:  I would like to say a few words before.

10   Since I have not been able to explain fully what my complete

11   problem with the PACE is, I would like to make a statement.

12       MR. SEYMOUR:  Is this a very short statement?

13       THE WITNESS:  Yes, a very short statement.

14       MR. SEYMOUR:  Okay.

15       THE WITNESS:  Okay.  The first time I heard about

16   the Luevano/Campbell case was when I found out that in the

17   notice it says, "Notice to all Black and to Hispanics who took

18   the U.S. Government Professional and Administrative Career

19   Examination for hire into the federal job program after May

20   1975."

21       Okay.  I took it after 1975.  So I filed my complaint

22   or I wanted to join the civil action.  Second, why did I find

23   the PACE discriminatory?  Okay.

1      MR. SEYMOUR:  Senior Morales, there is really no need

2  to get into that because the case has already been settled.

3  Senior Morales, trust me.  There is no need for you to get into

4  that.  The case has already been settled.  The consent decree

5  has been signed by the court so that the question of the PACE

6  being discriminatory or not being discriminatory, that is

7  behind us now.

8      THE WITNESS:  Right.

9      MR. SEYMOUR:  Okay.  Now, you need to tell us whether

10  you want to see the transcript and signature sheet or whether

11  you want to waive signature and rely on the court reporter to

12  get it done right.

13      THE WITNESS:  Okay.  I rely on the court, sure, but

14  is it possible that I could get a written transcript after

15  they get through or something?

16      MR. SEYMOUR:  Do you want to see your transcript and

17  check over it yourself for any mistakes before you file it?

18      THE WITNESS:  After they type or something, will I

19  be able to get a copy?

20      MR. SEYMOUR:  Yes.

21      THE WITNESS:  That will be fine.

22      MR. SEYMOUR:  Okay. He does not waive signature.

23  Thank you very much, Senior Morales.  We'll let you know when

1    the court rules on it.

2         THE WITNESS: Okay. Thank you. And I want to

3    excuse myself with the lady there. It looks like she got mad

4    or something but it is hard when you got a telephone pressed

5    to your hear.

6         MR. SEYMOUR: I understand.

7         MS. WARD: That's fine. Thank you.

8         (Signature not waived.)

9         (Whereupon, at 7:10 p.m., the talking of the

10   deposition concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

RECEIVED DEC 2 7 1984

December 20, 1984

Licenciado Richard T. Seymour
Lawyers Committee for Civil Rights Under Law
Washington,  District of Columbia   20005

RE:  <u>Luevano  v.  Campbell</u>

Dear Mr. Seymour :

Reference the transcript of my deposition in the case.

I have read the whole transcript of my deposition carefully.  No changes are necessary.

I find the transcript of my deposition to be true and correct.

Thank you for the copy of the transcript provided.

Very Truly Yours,

Rigoberto Morales Torres

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 45 do hereby certify that the witness, RIGOBERTO MORALES TORRES, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
DISTRICT OF COLUMBIA

My commission expires October 14, 1989.

Index page __1__ of __1__

## INDEX OF EXHIBITS

Exhibit pages ___1___ thru ___12___

Title of Case: _Angel G. Luevano, et al., vs. Donald J. Devine, et al.,_

Place: _Washington, D.C._

Date: _November 27, 1984_

_Deposition of Rigoberto Morales Torres)_

| EXHIBIT NUMBER | PAGE NUMBER | EXHIBIT NUMBER | PAGE NUMBER |
|---|---|---|---|
| #1 | 1 | | |
| #2 | 4 | | FILED |
| #3 | 5 | | FEB 7 1985 |
| #4 | 6 | | JAMES F. DAVEY, Clerk |
| #5 | 7 | | |

ence points. Although you indicated you were not available for GS-5 positions, you are eligible for GS-5 positions based on your test performance. We have added your name to our list of GS-5 eligibles for the occupational specialties and numerical ratings shown. If you do not wish to receive consideration for GS-5 positions, please notify the PACE Servicing Area Office shown on your Notice of Results.

IS  You are not eligible for GS-7 positions because you did not earn a rating of 90 on the written test, before the addition of any veteran preference points.

IT  Your application does not show that you meet the minimum education and experience requirements for GS-7 positions. However, you are eligible for GS-5 positions. Although you indicated you are not available for GS-5 positions, we have added your name to our list of GS-5 eligibles for the occupational specialties and numerical ratings shown. If you do not wish to receive consideration for GS-5 positions, please notify the PACE Servicing Area Office shown on your Notice of Results.

## For More Information

If you have general questions about Federal employment or about Federal jobs which are not filled through PACE, contact the Federal Job Information Center in your area. A toll-free telephone number is listed in the white pages of most telephone directories under "U.S. Government".

If you have specific questions about your PACE Notice of Results, contact your PACE Servicing Area Office at the address shown on the front of your Notice of Results. Be sure to include your social security number with your inquiry.

Rigoberto Morales Torres
6 G- 7, Urb. Anaida
Ponce, Puerto Rico      00731



## U.S. Civil Service Commission

## Locations of PACE Servicing Area Offices

| Geographical Area Covered | |
|---|---|
| **Atlanta Area Office**<br>U.S. Civil Service Commission<br>Federal Office Building<br>275 Peachtree Street, N.E.,<br>Atlanta, Georgia 30303 | Alabama; Florida; Georgia; Kentucky (except Henderson, Boone, Campbell and Kenton Counties); Mississippi; North Carolina; South Carolina; Tennessee; Crittenden County, Arkansas; Floyd and Clark Counties, Indiana. |
| **Boston Area Office**<br>U.S. Civil Service Commission<br>3 Center Plaza<br>Boston, Massachusetts 02108 | Connecticut; Maine; Massachusetts; New Hampshire; Rhode Island; Vermont. |
| **Chicago Area Office**<br>U.S. Civil Service Commission<br>E. M. Dirksen Bldg., Room 1322<br>219 South Dearborn Street<br>Chicago, Illinois 60604 | Illinois (except Madison and St. Clair Counties); Indiana (except Clark and Floyd Counties); Scott County, Iowa; Michigan; Minnesota (except Clay County); Ohio (except Belmont, Jefferson, and Lawrence Counties); Wisconsin; Henderson, Boone, Campbell, and Kenton Counties, Kentucky. |
| **Dallas Area Office**<br>U.S. Civil Service Commission<br>1100 Commerce Street, 6th Floor<br>Dallas, Texas 75202 | Arkansas (except Crittenden County); Louisiana; New Mexico; Oklahoma; Texas. |
| **Denver Area Office**<br>U.S. Civil Service Commission<br>U.S. Post Office Building<br>18th and Stout Streets<br>Denver, Colorado 80202 | Colorado; Montana; North Dakota; South Dakota; Utah; Wyoming; Clay County, Minnesota. |
| **Honolulu Area Office**<br>U.S. Civil Service Commission<br>300 Ala Moana Blvd.<br>Honolulu, Hawaii 96850 | Hawaii; Guam; Pacific Ocean Area. |
| **New York Area Office**<br>U.S. Civil Service Commission<br>26 Federal Plaza<br>New York, N.Y. 10007 | New York; New Jersey (except Camden County). |
| **Philadelphia Area Office**<br>U.S. Civil Service Commission<br>William J. Green, Jr., Federal Bldg.<br>600 Arch Street<br>Philadelphia, Pennsylvania 19106 | Delaware; Maryland (except Prince Georges, Charles, and Montgomery Counties); Pennsylvania; Virginia (except Arlington, Fairfax, Loudoun, Stafford, Prince William, and King George Counties); West Virginia; Belmont, Jefferson and Lawrence Counties, Ohio; Camden County, New Jersey. |
| **San Francisco Area Office**<br>U.S. Civil Service Commission<br>P.O. Box 36122<br>450 Golden Gate Avenue<br>San Francisco, California 94102 | Arizona; California; Nevada. |
| **San Juan Area Office**<br>U.S. Civil Service Commission<br>U.S. Courthouse and Federal<br>Office Bldg.<br>Carlos A. Chardon Street<br>San Juan, Puerto Rico 00918 | Puerto Rico; Virgin Islands. |
| **Seattle Area Office**<br>U.S. Civil Service Commission<br>Federal Building, 26th Floor<br>915 2nd Avenue<br>Seattle, Washington 98174 | Alaska; Idaho; Oregon; Washington. |
| **St. Louis Area Office**<br>U.S. Civil Service Commission<br>1520 Market Street<br>St. Louis, Missouri 63103 | Iowa (except Scott County); Kansas; Missouri; Nebraska; Madison and St. Clair Counties, Illinois. |
| **Washington, D.C. Area Office**<br>U.S. Civil Service Commission<br>1900 E Street, N.W.<br>Washington, D.C. 20415 | Washington Metropolitan Area (District of Columbia; Charles, Montgomery, and Prince Georges Counties, Maryland; the cities of Alexandria, Fairfax, and Falls Church, Virginia; and Arlington, Fairfax, Loudoun, Stafford, Prince William, and King George Counties, Virginia); overseas areas (except Pacific Ocean Area). |

# Explanation of Your PACE Notice of Results

The enclosed Notice of Results is a record of your performance on the PACE written test and the results of our review of your PACE application forms. It is important that you keep this notice.

If you received numerical ratings under any of the six specialty codes on the front of your Notice of Results, you are eligible for consideration for jobs in those specialties at the grades indicated.

If you did not receive a numerical rating, you have been rated ineligible. Please see page 4 of this pamphlet for an explanation of the codes on your Notice of Results. An ineligible rating will not affect eligible ratings you may already have on the PACE or other examinations.

**Any inquiries you make of your PACE Servicing Area Office concerning your PACE eligibility must include your social security number.**

## How PACE Scores Are Determined

There are five weighted parts to the written test. Only right answers are counted. The five test parts are weighted in different ways to obtain a rating for each of six occupational categories, which correspond to the six "specialties" on your Notice of Results. Numerical ratings are assigned based on test score, outstanding scholarship, and veteran preference, if applicable. You must pass the written test and meet the minimum qualifications requirements, as stated in the PACE announcement, before veteran preference points can be added. It is possible to earn ratings for some occupational specialties and not for others as test parts are weighted differently for the different specialties.

Passing scores range from 70 to 100 before the addition of veteran preference points. Applicants who

Deposition Exhibit No. 1
Deposition of So. Morales
W. McAllister, Reporter
11-27-84

score below 70 are rated ineligible and are not assigned numerical ratings.

All ratings shown on your Notice of Results are tentative. Verification of your experience and education, scholastic achievement, and any veteran preference claimed will be required at the time of your selection.

## Jobs Filled from PACE

Listed below are the principal position types filled within each of the six specialties on your Notice of Results.

Specialty 001: Social Insurance Administration and Claims Examining, Criminal Investigating, Immigration Inspection, Passport and Visa Examining, Customs Inspection, Social Services, Management Analysis, Personnel Management, Public Health Program Specialist, Veteran Claims Examining, Public Information Specialist.

Specialty 002: Tax Technician, Budget Administration, Economist, Contract and Procurement, Internal Revenue Officer, General Supply.

Specialty 003: Computer Specialist.

Specialty 004: Contact Representative.

Specialty 005: Writing and Editing.

Specialty 006: Alcohol, Tobacco, and Firearms Inspection.

## Consideration for Jobs

We are not able to give you definite information on your prospects for job consideration, which depend on:

- your rating in particular occupational specialties and how many people have ratings higher than you in each specialty. Ratings in the high 90s are generally required for job consideration.
- the number of jobs to be filled.
- how relevant your education and experience are to the duties of the position being filled.

You will be considered for jobs for which you are qualified and available when your name is reached on the referral list. If your name is referred to an agency, your qualifications will be carefully considered by the appointing officer in the agency. You may be asked to report for an interview.

By law, an agency hiring official may choose from among the top three applicants referred for a particular job, provided the selection meets veteran preference laws and Civil Service regulations.

If you are selected, you will be notified by the agency. If you are not selected, your name will be placed back on the list of eligibles for future consideration.

2

## Length of Eligibility

Your eligibility expires in the month shown on the front of your Notice of Results. You will receive employment consideration through the end of that month unless you accept a Federal job earlier.

If you accept a permanent job, your name will be removed from the list of eligibles.

If you accept a temporary job, you will not be considered for other temporary jobs until we are notified that you are again available. You will continue to receive consideration for permanent jobs regardless of temporary jobs you may accept.

If you decline a job offer or fail to reply to a written communication, your name will be removed from the list of eligibles until you specify the conditions under which you are willing to accept appointment.

To extend your eligibility for one year, return your Notice of Results to your servicing area office two months before your eligibility expires. Use the reverse side of the Notice to request an extension of your eligibility and to enter any new availability or qualifications information into your file. A new Notice of Results will then be sent to you indicating your new period of eligibility.

## Making Changes to Your Application

If you wish to change any of the information contained in your record, you should:

- Enter the changes in the numbered box on the back of your Notice of Results which corresponds to that item on the front.
- Send the notice to the area office whose address is shown on the front of your Notice of Results. We suggest you keep a copy of your Notice for your reference while your requested changes are being processed.

An updated Notice of Results will be sent to you after the requested changes have been processed.

You may, if you wish, have your name transferred from the list in one PACE Servicing Area Office to that in another PACE Servicing Area Office. To do this you should contact the office which presently holds your eligibility.

If you are unable to accept any job offers for an extended period of time, you should request in writing that your name be suspended from the list until you are again able to accept employment.

## Message Codes

MK  Your PACE test scores take into account your claim of outstanding scholarship for all undergraduate coursework (a 3.50 grade point

3

average on a 4.0 scale or standing in the upper 10 percent of your undergraduate class). Should you be selected for a position, you will be required to provide the hiring agency with proof of your outstanding scholarship before you may report for work.

ML  Your PACE test scores take into account your claim of superior academic achievement for all undergraduate coursework (a 2.90 grade point average on a 4.0 scale, standing in the upper one-third of your undergraduate class, or membership in a national honorary scholastic society). Should you be selected for a position, you will be required to provide the hiring agency with proof of your superior academic achievement before you may report to work.

MM  You are eligible based upon your indication that you will complete the required education in the near future. If you are selected for a position, you may not begin work until you prove to the appointing agency that you have completed your education.

## Ineligible Ratings

The letter codes on your Notice of Results are keyed to the list of messages below.

You were rated only on the information you submitted. If you were rated ineligible because of your education or experience, please review your qualifications against the qualifications requirements in the PACE announcement.

Although you may reapply to take the PACE written test, most individuals who retake the test do not improve their scores more than a few points. Because very high PACE ratings are generally required for job consideration, we do not encourage you to recompete on this examination. Instead, you may wish to contact your nearest Federal Job Information Center for information on other Federal employment opportunities. A toll-free telephone number for the nearest Center is listed in the white pages of most telephone directories under "U.S. Government".

## Meanings of Ineligible Codes

IA  You did not pass the written test.

ID  You do not meet the minimum education and experience requirements for PACE positions.

IO  No determination of your eligibility could be made because you left the examination room without completing the written test.

IR  You are not eligible for GS-7 positions because you did not earn a rating of 90 in the written test, before the addition of any veteran prefer-

4

## IMPORTANT MESSAGE TO ELIGIBLES

IF YOU HAVE RECEIVED AN ELIGIBLE NOTICE OF RATING, IT MEANS THAT: Your name has been placed on the list of persons who have been rated eligible as listed on the reverse side of this form. This list is maintained by the office whose name and address appears at the top of the form.

### JOB CONSIDERATION

You will be considered for jobs when a Federal agency requests names of qualified candidates if:

1. You are among the best qualified; and

2. You are available for the geographic area where the position exists.

Lists of the best qualified candidates are referred to agencies which may select any one of the top three persons referred as long as the selection is made in compliance with veteran preference laws and civil service regulations.

As a result of this rating, you may receive inquiries or offers for related positions or those at a lower grade than you indicated you would accept. Your availability for such positions and grade levels will in no way affect your eligibility as listed on this notice of rating.

### IF YOU WERE NOT ASSIGNED A NUMERICAL RATING:

No determination has been made of your relative ranking for any position at this time. Your qualifications will be reviewed when agencies request names to fill jobs for which you are qualified. You will then be ranked according to the specific requirements of the job and, if among the top ranked eligibles, your name will be referred for consideration. Any veterans preference points to which you are entitled will be added prior to referral.

### PROSPECTS

Your prospects for being appointed depend upon labor market conditions, agency needs for people with your particular background of experience and/or education, and your relative standing on the list of eligibles.

### REMAINING ACTIVE

If your name is referred to an agency and you are selected, your name will be removed from all lists of eligibles covered by the announcement. If you are not selected, your name will be placed back on the list for further consideration. If you are not available for employment when contacted or you fail to reply to a communication, your name will be removed until we receive a satisfactory explanation and a statement of conditions under which you will accept employment. If you will be unavailable for any period of time, you should request that

your name be temporarily suspended. Requests for restoration to the list or changes in availability will be made without acknowledgement.

If you accept a temporary job, you will not be considered for other *temporary* employment until we are notified that you are again available. You will continue to receive consideration for permanent positions regardless of temporary employment.

### EXTENDING YOUR PERIOD OF CONSIDERATION:

You will receive active consideration for referral to departments and agencies in accordance with your standing on the list of eligibles for the length of time noted on the front of this form. You must notify the issuing office *within the last month* of this period if you want your name retained on the lists of eligibles for an additional period. At the same time, you may supply information concerning any additional experience or training you may have obtained. Standard Form 172 may be used for this purpose. In addition, should you obtain experience/training during your period of consideration which significantly improves your qualifications for the positions for which you filed, you may forward this information to the issuing office for consideration.

### TRANSFERRING ELIGIBILITY

Under certain conditions you may have your eligibility transferred from one Civil Service Area Office to another. Requests for transfer should be made in writing to the office which issued the notice of rating.

### FILING RESTRICTIONS

Under some announcements the number of Area Offices where you may apply is limited. Be sure to read the announcement under which you applied before filing with other Area Offices.

### MEDICAL REQUIREMENTS

Your eligibility is subject to meeting the medical requirements of the position(s). This determination will be made at the time of appointment.

---

#### KEEPING CURRENT

YOU MUST INFORM THE ISSUING OFFICE OF ANY CHANGES IN YOUR ADDRESS OR AVAILABILITY. SEND NEW INFORMATION ALONG WITH THE TITLE OF THE ANNOUNCEMENT, THE RATING RECEIVED, AND ANY IDENTIFICATION NUMBER, TO THE ISSUING AREA OFFICE LISTED ON THE REVERSE SIDE.

---

**REMARKS:**



March 20, 1979

Mr. Alan K. Campbell
Commissioner
US Civil Service Commissioner
Washington, DC    20415

Sir:

Reference US Civil Service Commission Notice of Rating, dated January 28, 1978
and October 1, 1978, see both notices, attached.

I do not aggree with the CSS reasons for disqualification, because I know that
I meet the basic requirement of experience and education as specified in the
requirement.

I want to strongly protest the Notice of Pace Results and the Inelegible Code
IA given to me, because the CSC did not took in consideration my 20 points ve-
teran preference, as I was twice wounded in Vietanan and was awarded two Purple
Hearts, this is a violation of your own CSC Regulations.

I also want to file a formal protest with your office, because the PACE examina-
tion is highly discriminatory against us Puertorricans, as it violates the 10th
amendment of our Constitution, our Civil Rights and the Federal Regulations on
Equal Employment Opportunities for minorities.

I will appreciate if you acknowledge receipt of this letter.

Sincerely,

Rigoberto Morales Torres

Enclosures: Notices of Rating

④

Deposition Exhibit No. 2
Deposition of Sr. Morales
W. McAllister, Reporter
11-27-84

DATE ISSUED: APRIL 1979
BATCH NUMBER: NP4114
SOCIAL SECURITY NUMBER: 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
DATE ELIGIBILITY EXPIRES: AUGUST 1980

2)⌐

RIGOBERTO  MORALES TORRES
6G #7 URB. ANAIDA
- PONCE  PR        00731

Your Application for Federal Employment for the occupation shown below has been processed and is on file with the U. S. Civil Service Commission. This notice provides information contained in your record as it appears in our file. You should carefully review this information to assure that it is correct. If any information is incorrect or has changed since you submitted your application, use the back of this form to notify the area office shown above. Your qualifications and any veteran preference claimed are subject to verification. **Refer to the enclosed Explanation of Notice of Results for important information regarding your eligibility and interpretation of ratings and message codes.**

3) DATE OF AVAILABILITY: AUGUST 1979
4) FULL-TIME EMPLOYMENT: YES
5) PART-TIME EMPLOYMENT: 20 OR FEWER HOURS PER WEEK
6) TEMPORARY EMPLOYMENT: NOT AVAILABLE FOR TEMPORARY EMPLOYMENT
7) TRAVEL AVAILABILITY: 1 TO 5 NIGHTS TRAVEL PER MONTH
8) GEOGRAPHIC PREFERENCE: (REFER TO YOUR GEOGRAPHIC CODE LISTING TO INTERPRET LOCALITY CODES)
   ZONE OF FIRST PREFERENCE: CARIBBEAN      LOCATIONS 02 03 04 05 06 08 09 10

   ZONE OF ADDITIONAL AVAILABILITY:
9) VETERAN PREFERENCE: 10 POINTS-CP
   OCCUPATIONAL SUPPLEMENT: 0001 PACE

| GRADE | SPECIALTIES | 001 | 002 | 003 | 004 | 005 | 006 |
|-------|-------------|-----|-----|-----|-----|-----|-----|
| GS-05 |             | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 |
| GS-07 |             | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 |

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

MESSAGE CODE  MK PX

③

Deposition Exhibit No. 3
Deposition of Sr. Morales
W. McAllister, Reporter
11-22-84

All eligible ratings are tentative and are subject to meeting any medical or suitability determinations which may be required at such time as you are considered for appointment.

CSC FORM 1206
MARCH, 1977

**1**

SOCIAL SECURITY NO. (SSN)

5 1 2 ... 4 0 ... 2 3 0 4

THIS IS TO REQUEST ☐ EXTENSION OF MY ELIGIBILITY

☒ CHANGE/CORRECTION TO MY RECORD

**2**      COMPLETE ONLY THOSE ITEMS TO BE CHANGED

TITLE (TLE)   FIRST NAME   (FNM)   MI   LAST NAME   (LNM)   LAST NAME SUFFIX (SFX)

MAILING ADDRESS (HOUSE NO. STREET AND APT. NO. IF ANY)   (ADR)

CITY   (CTY)   STATE CODE (STE)   ZIP CODE   (ZIP)   FOREIGN COUNTRY OF RESIDENCE   (CRS)

**3 DATE AVAILABLE FOR EMPLOYMENT**

(DAV)   MO   YR

**4 FULL-TIME EMPLOYMENT (FTE)**

Are you available for full-time employment (40 hrs. per week)?

☒ YES   ☐ NO

**5 PART-TIME EMPLOYMENT (Fewer than 40 hrs. per week) (PTE)**

☐ Not available for part-time employment

☐ 20 or fewer hours per week

☐ 21 to 31 hours per week

☒ 32 to 39 hours per week

**6 TEMPORARY AVAILABILITY (TMP)**

☐ Not available for temporary employment

AVAILABLE FOR POSITIONS OF

☐ Less than 1 month duration

☐ 1 to 4 months duration

☒ 5 to 12 months duration

RECEIVED
JUL 28 1979
OFFICE OF PERSONNEL MANAGEMENT
SAN JUAN
AREA OFFICE

**8 GEOGRAPHIC PREFERENCE** (Refer to Geographic Code Listing)

If you make any change in ANY zone or locality, be sure to list all the zones and localities for which you wish to be considered. Write in the name of the zone and the location codes associated with that zone. YOU WILL RECEIVE CONSIDERATION ONLY FOR THE ZONES AND LOCATIONS YOU ENTER.

OFFICE USE ONLY

FIRST PREFERENCE (ZFP)   LOCALITIES

ADDITIONAL AVAILABILITY

**7 TRAVEL AVAILABILITY (TRV)**

INDICATE THE NUMBER OF NIGHTS PER MONTH YOU ARE WILLING TO BE AWAY FROM HOME IN A TRAVEL STATUS

☒ Not available for overnight travel

FILED

AVAILABLE FOR

☐ 1 to 5 nights travel per month   FEB 7 1995

☐ 6 to 10 nights travel per month

☐ 11 or more nights travel per month   JAMES F. DAVEY, Clerk

**9 VETERAN PREFERENCE (VET)**

(REFER TO FEDERAL EMPLOYMENT APPLICATION INSTRUCTIONS FOR DEFINITION OF CODES)

1 NONE   2 5-PT   3 10 PT   4 10 PT   5 10 PT

If you have additional changes you wish to make to your record, describe below:

Reference Form 1206, Notice of Results, Issued April 1979 and CSC Form 1206 - A, page 2 Consideration for Job, does not make any sense to me. As I understand it, I must make a rating in the high 90s to be considered for a job. I was initially given a 1A Ineligible Code.

(6)

I stand by my letter to the Chairman CSC, that the PACE discriminate against Puertorricans specially Puertorrican Vietnan veteran who fought for the US in Vietnan, and now to get a job all you get is harrasment, discrimination, and an eternal run around. I know for a fact that 3/4 of todays permanent Federal employees were not subject to the PACE. Why us ?

Deposition Exhibit No. 4
Deposition of Sr. Morales
W. McAllister, Reporter 11-29-84

March 14, 1982

Mr. Richard T. Seymour
Lawyers Committee for Civil Rights under Law
520 Woodward Building
Washington, DC  20005

RE: CA No. 79-0271
Luevano vs Campbell

**FILED**

**FEB 7 1985**

~~JAMES F. DAVEY, Clerk~~

Dear Lawyer Seymour:

Today I received a Notice to Former Class Members affected by the Gov.
use of PACE, signed by United States District Judge Joyce Hens Green.

I was affected by PACE and by the decision of the Honorable Judge Green.
I am Hispanic (Puertorrican) and my rights were not protected as far as
personal monetary or injunctive relief arising from the internal use of
the PACE.  For this reason I am filing this charges of discrimination.

I dont have access to an Equal Employment Opportunity Counsellor, that
is why I am writting to you as Counsel for plaintiffs.

I took the PACE examination in 1979, and the old CSC send my results back
with "1A" not a passing score.  I complained to CSC of the discriminatory
nature of PACE, specially to Service Connected Veterans.  They (CSC) them
change my scores.  See attached document of PACE results.

Although my "1A" were changed to "80s" I was told by CSC personnel that
I needed a Score of at least 95, to qualify for federal employment.

The end results were that they (OPM) never gave me a chance for a Career
Conditioned or Permanent job opportunity with the Federal Government.

For the reasons stated above, I strongly believes that I am entitled to
receive the $3,000.00  and help in finding a suitable federal job.

Sincerely

Rigoberto Morales Torres

Enclosures:  Letter dated September 20, 1979, pointing the discriminatory
             nature of PACE.
             Notice of results April 1979  See Code MK MM   (but no Job)

(7)

Deposition Exhibit No. 5
Deposition of Sr. Morales
W. McAllister, Reporter  11-27-84

September 20, 1979

United States
Civil Service Commission
Washington D C   20415

Dear Sir:

I took the PACEX examination at the U.S. Post office in Ponce,
Puerto Rico last april.  I was informed of the results which were
symbol 1A, in other words that I flunk the test.  I want to formally
complaint that the test does not relate whatsoever to the position
I am seeking in the Federal Government is a Claim Representative in
the Social Security office or as an Inspector in the U.S. Custom
Services.  As a puertorrican I have never had the chance to practice
Shakesperian English, the ehglish portion of the test was unbelievable.
The remaining portions of the test is nothing related to a GS 5 posi-
tion in the Federal Government.  I dont believe a Puertorican  with
a PHD can pass this test.  I honestly believe the test is very discri-
minatory to people who have attended schools in Puerto Rico.  Can this
test be given in Spanish?  We are U.S. citizens too.

Hoping to hear from you soon.

I remain.

Rigoberto Morales Torres
Calle 6 G 7 Urb. Anaida
Ponce, Puerto Rico   00731

⑧

UNITED STATES ... ICE COMMISSION
PUERTO RICO AREA OFFICE
US COURTHOUSE & FED. OFFICE BLDG.
HATO REY, PR      00915

DATE ISSUED:  APRIL 1979
1) BATCH NUMBER:  NP4114                2)
   SOCIAL SECURITY NUMBER:  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           RIGOBERTO   MORALES TORRES
   DATE ELIGIBILITY EXPIRES:  AUGUST 1980          6G #7 URB. ANAIDA
                                                   - PONCE  PR        00731

Your Application for Federal Employment for the occupation shown below has been processed and is on file with the U. S. Civil Service Commission. This notice provides information contained in your record as it appears in our file. You should carefully review this information to assure that it is correct. If any information is incorrect or has changed since you submitted your application, use the back of this form to notify the area office shown above. Your qualifications and any veteran preference claimed are subject to verification. **Refer to the enclosed Explanation of Notice of Results for important information regarding your eligibility and interpretation of ratings and message codes.**

3)  DATE OF AVAILABILITY:  AUGUST 1979
4)  FULL-TIME EMPLOYMENT:  YES
5)  PART-TIME EMPLOYMENT:  20 OR FEWER HOURS PER WEEK
6)  TEMPORARY EMPLOYMENT:  NOT AVAILABLE FOR TEMPORARY EMPLOYMENT
7)  TRAVEL AVAILABILITY:  1 TO 5 NIGHTS TRAVEL PER MONTH
8)  GEOGRAPHIC PREFERENCE: (REFER TO YOUR GEOGRAPHIC CODE LISTING TO INTERPRET LOCALITY CODES)
    ZONE OF FIRST PREFERENCE:  CARIBBEAN        LOCATIONS 02 03 04 05 06 08 09 10

    ZONE OF ADDITIONAL AVAILABILITY:
    VETERAN PREFERENCE:  10 POINTS-CP
    OCCUPATIONAL SUPPLEMENT:  0001 PACE

| GRADE | SPECIALTIES | 001 | 002 | 003 | 004 | 005 | 006 |
|-------|-------------|-----|-----|-----|-----|-----|-----|
| GS-05 |             | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 |
| GS-07 |             | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 |

MESSAGE CODE    MK    MM



All eligible ratings are tentative and are subject to meeting any medical or suitability determinations which may be required at such time as you are considered for appointment.

CSC FORM 1206
MARCH, 1977

ANY CHANGES OR CORRECTIONS TO YOUR RECORD

**1**

SOCIAL SECURITY NO. (SSN)

5 1 2 | 4 0 | 2 3 0 4

THIS IS TO REQUEST
☐ EXTENSION OF MY ELIGIBILITY
☒ CHANGE/CORRECTION TO MY RECORD

**2** COMPLETE ONLY THOSE ITEMS TO BE CHANGED

TITLE (TLE) | FIRST NAME (FNM) | MI | LAST NAME (LNM) | LAST NAME SUFFIX (SFX)

MAILING ADDRESS (HOUSE NO., STREET AND APT. NO., IF ANY) (ADR)

CITY (CTY) | STATE CODE (STE) | ZIP CODE (ZIP) | FOREIGN COUNTRY OF RESIDENCE (CRS)

**3 DATE AVAILABLE FOR EMPLOYMENT**

[ ] [ ] (DAV)
MO   YR

**4 FULL-TIME EMPLOYMENT (FTE)**

Are you available for full-time employment (40 hrs. per week)?

☐ YES   ☐ NO

**5 PART-TIME EMPLOYMENT (Fewer than 40 hrs. per week) (PTE)**

☐ Not available for part-time employment
☐ 20 or fewer hours per week
☐ 21 to 31 hours per week
☒ 32 to 39 hours per week

**6 TEMPORARY AVAILABILITY (TMP)**

☐ Not available for temporary employment

AVAILABLE FOR POSITIONS OF

☐ Less than 1 month duration
☐ 1 to 4 months duration
☒ 5 to 12 months duration

RECEIVED
MAY 9 1979
OFFICE OF PERSONNEL MANAGEMENT
SAN JUAN AREA OFFICE

**7 TRAVEL AVAILABILITY (TRV)**

INDICATE THE NUMBER OF NIGHTS PER MONTH YOU ARE WILLING TO BE AWAY FROM HOME IN A TRAVEL STATUS

☐ Not available for overnight travel

AVAILABLE FOR

☐ 1 to 5 nights travel per month
☐ 6 to 10 nights travel per month
☐ 11 or more nights travel per month

**8 GEOGRAPHIC PREFERENCE** (Refer to Geographic Code Listing)

If you make any change in ANY zone or locality, be sure to list all the zones and localities for which you wish to be considered. Write in the name of the zone and the location codes associated with that zone. YOU WILL RECEIVE CONSIDERATION ONLY FOR THE ZONES AND LOCATIONS YOU ENTER.

| | OFFICE USE ONLY | LOCALITIES |
|---|---|---|
| ZONE OF FIRST PREFERENCE (ZFP) | | |
| ZONE OF ADDITIONAL AVAILABILITY (ZAV) | | |

**9 VETERAN PREFERENCE (VET)**

(REFER TO FEDERAL EMPLOYMENT APPLICATION INSTRUCTIONS FOR DEFINITION OF CODES)

☐ 1 NONE ☐ 2 5-PT ☐ 3 10 PT ☐ 4 10 PT ☐ 5 10 PT

If you have additional changes you wish to make to your record, describe below:

I will like to be considered for any position available in the Geographic Code Listing, with particular preference in the following positions:

1. Veteran Claim Examining   2. Customs Inspection   3. Contact Representative  ⑩
4. Alcohol, Tobacco and Firearm Inspections.   5. General Supply

~~#6~~ - 11 - 08 - 03 - ㊸ ㊹      Added = ~~#6~~ - 43-44

18 - 28 - 37 - 39 - 46

score below 70 are rated ineligible and are not as-signed numerical ratings.

All ratings shown on your **Notice of Results** are tentative. **Verification of your experience and education, scholastic achievement, and any veteran preference claimed will be required at the time of your selection.**

## Jobs Filled from PACE

Listed below are the principal position types filled within each of the six specialties on your Notice of Results.

**Specialty 001:** Social Insurance Administration and Claims Examining, Criminal Investigating, Immigration Inspection, Passport and Visa Examining, Customs Inspection, Social Services, Management Analysis, Personnel Management, Public Health Program Specialist, Veteran Claims Examining, Public Information Specialist.

**Specialty 002:** Tax Technician, Budget Administration, Economist, Contract and Procurement, Internal Revenue Officer, General Supply.

**Specialty 003:** Computer Specialist.

**Specialty 004:** Contact Representative.

**Specialty 005:** Writing and Editing.

**Specialty 006:** Alcohol, Tobacco, and Firearms Inspection.

## Consideration for Jobs

We are not able to give you definite information on your prospects for job consideration, which depend on:

- your rating in particular occupational specialties and how many people have ratings higher than you in each specialty. **Ratings in the high 90s are generally required for job consideration.**
- the number of jobs to be filled.
- how relevant your education and experience are to the duties of the position being filled.

You will be considered for jobs for which you are qualified and available when your name is reached on the referral list. If your name is referred to an agency, your qualifications will be carefully considered by the appointing officer in the agency. You may be asked to report for an interview.

By law, an agency hiring official may choose from among the top three applicants referred for a particular job, provided the selection meets veteran preference laws and Civil Service regulations.

If you are selected, you will be notified by the agency. If you are not selected, your name will be placed back on the list of eligibles for future consideration.

## Length of Eligibility

Your eligibility expires in the month shown on the front of your Notice of Results. You will receive employment consideration through the end of that month unless you accept a Federal job earlier.

**If you accept a permanent job,** your name will be removed from the list of eligibles.

**If you accept a temporary job,** you will not be considered for other temporary jobs until we are notified that you are again available. You will continue to receive consideration for permanent jobs regardless of temporary jobs you may accept.

**If you decline a job offer or fail to reply to a written communication, your name will be removed from the list of eligibles** until you specify the conditions under which you are willing to accept appointment.

To extend your eligibility for one year, return your Notice of Results to your servicing area office two months before your eligibility expires. Use the reverse side of the Notice to request an extension of your eligibility and to enter any new availability or qualifications information into your file. A new Notice of Results will then be sent to you indicating your new period of eligibility.

## Making Changes to Your Application

If you wish to change any of the information contained in your record, you should:

- Enter the changes in the numbered box on the back of your Notice of Results which corresponds to that item on the front.
- Send the notice to the area office whose address is shown on the front of your Notice of Results. We suggest you keep a copy of your Notice for your reference while your requested changes are being processed.

An updated Notice of Results will be sent to you after the requested changes have been processed.

You may, if you wish, have your name transferred from the list in one PACE Servicing Area Office to that in another PACE Servicing Area Office. To do this you should contact the office which presently holds your eligibility.

If you are unable to accept any job offers for an extended period of time, you should request in writing that your name be suspended from the list until you are again able to accept employment.

## Message Codes

MK  Your PACE test scores take into account your claim of outstanding scholarship for all undergraduate coursework (a 3.50 grade point

average on a 4.0 scale or standing in the upper 10 percent of your undergraduate class). Should you be selected for a position, you will be required to provide the hiring agency with proof of your outstanding scholarship before you may report for work.

ML  Your PACE test scores take into account your claim of superior academic achievement for all undergraduate coursework (a 2.90 grade point average on a 4.0 scale, standing in the upper one-third of your undergraduate class, or membership in a national honorary scholastic society). Should you be selected for a position, you will be required to provide the hiring agency with proof of your superior academic achievement before you may report to work.

MM  You are eligible based upon your indication that you will complete the required education in the near future. If you are selected for a position, you may not begin work until you prove to the appointing agency that you have completed your education.

## Ineligible Ratings

The letter codes on your Notice of Results are keyed to the list of messages below.

You were rated only on the information you submitted. If you were rated ineligible because of your education or experience, please review your qualifications against the qualifications requirements in the PACE announcement.

Although you may reapply to take the PACE written test, most individuals who retake the test do not improve their scores more than a few points. Because very high PACE ratings are generally required for job consideration, we do not encourage you to recompete on this examination. Instead, you may wish to contact your nearest Federal Job Information Center for information on other Federal employment opportunities. A toll-free telephone number for the nearest Center is listed in the white pages of most telephone directories under "U.S. Government".

## Meanings of Ineligible Codes

IA  You did not pass the written test.

ID  You do not meet the minimum education and experience requirements for PACE positions.

IO  No determination of your eligibility could be made because you left the examination room without completing the written test.

IR  You are ineligible for GS-7 positions because you did not earn a rating of 90 in the written test, before the addition of any veteran prefer-





' LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 27, 1981

Mr. Rigoberto Morales Torres
6 G# 7, Urb. Anaida
Ponce, Puerto Rico 00731

Re:  Luevano v. Campbell

Dear Mr. Torres:

Both sides have filed papers with the Court urging
that the Consent Decree be given final approval and that the
objections be denied.  We expect that the judge will decide
this question in the next month or two.  When the judge hands
down her decision, it should be reported fairly widely in the
press.  (We do not know if the Court will order that a notice
be sent to all the objectors).

The only question before the Court is whether the Consent
Decree should be given final approval as it stands.  The Court
has the power to accept it entirely, or to reject it entirely.
It does not have the power to make changes in the Consent Decree.
If the Court does not give final approval to the Consent Decree,
the result will be resumption of litigation; I think it is very
unlikely that we will be able to reach any agreement with the
Government which is better, from your standpoint, than the
existing agreement.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb

12

RECEIVED

Feb 7   3 22 PM '95

JURET S. CLERK, TEPS
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANGO, ET AL.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED           )
                                        )
                      PLAINTIFFS        )   Civil Action
                                        )   No. 79-0271
          VS.                           )
                                        )
DONALD J. DEVINE, ET AL.,               )
                                        )
                      DEFENDANTS        )
                                        )

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

DEPOSITION OF MICHAEL MC DONALD

Washington, D. C.
November 27, 1984

Pages 1 thru 24

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

E-R-R-A-T-A  S-H-E-E-T

To the deposition of _____ MICHAEL McDONALD _____.

The deponent having a right to make any changes deemed necessary

hereby makes the following changes into the deposition and states

the reasons for each change accordingly.

PAGE NO.    LINE NO.    CHANGE (State Reason for change after each)

3    11    6954 North Sheridan Road
             ( NOT CARRITON ROAD )

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

_____
DEPONENTS' SIGNATURE

WDM wdm

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - x
                                     :
4    ANGEL G. LUEVANO, ET AL.,       :
     INDIVIDUALLY AND ON BEHALF OF   :
5    ALL OTHER SIMILARLY SITUATED,   :            FILED
                                     :
6            Plaintiffs              :
                                     :          FEB 7 1985
7        vs.                         :    CIVIL ACTION
                                     :    NO. 79-0271
8    DONALD J. DEVINE, ET AL.,       :    JAMES F. DAVEY, Clerk
                                     :
9            Defendants              :
                                     :
10   - - - - - - - - - - - - - - - - x

11                          Washington, D.C.

12                          Tuesday, November 27, 1984

13   Deposition of:

14               MICHEAL MC DONALD

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 8:00 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:  RICHARD T. SEYMOUR, ESQ.
4                Suite 400
                 1400 I Street, N.W.
5                Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:  BARBARA L. WARD, ESQ.
8                Room 3509
                 Civil Division-Federal Programs Branch
9                10th and Pennsylvania Avenues, N.W.
                 Washington, D.C. 20530

10

11                    C O N T E N T S

12   WITNESS              EXAMINATION BY:  MR. SEYMOUR   MS. WARD

13   Michael McDonald                        3, 17          17

14

15                        EXHIBITS

16   NUMBER                           FOR IDENITFICATION

17     Deposition

18   1 (Ltr, dtd 4-17-81, Gore to Devine)         11

19   2 (Ltr, dtd 4-16-82, Gore to Seymour)        11

20

21

22

23

1                    P R O C E E D I N G S

2     Whereupon,

3                         MICHAEL MC DONALD

4     was called as a witness and, having first been duly sworn by

5     the Notary Reporter, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7              BY MR. SEYMOUR:

8         Q    Mr. McDonald, please state your name and address

9     for the record.

10        A    My name is Michael McDonald, and my address is

11    6954 North Carriton Road, Chicago, Illinois 60606.

12        Q    Are you in Apartment 102 at that address?

13        A    That is correct.

14        Q    How many times have you taken the Professional and

15    Administrative Career Examination, ordinarily called the PACE?

16        A    To my knowledge, only one time.

17        Q    Do you remember when that was?

18        A    If my memory serves me correctly, I believe it was

19    in the spring of 1979.

20        Q    At that time, were you an employee of the Federal

21    Government?

22        A    No, I was not.

23        Q    Please tell us what happened when you took the PACE?

1     A    Well, I believe I took the PACE examination in Nash-

2    ville, and after receiving my scores, I was upset because

3    I could not understand why the results were the way they were,

4    and I was under the impression that I may have even been

5    discriminated against because of the nature of the questions

6    or even possibly the format at the time.

7        And I felt that basis for discrimination was on my

8    race, and I went to my congressman's office, Congressman Albert

9    Gore, Junior, his district office in Murfreesboro, Tennessee,

10    and talked with one of his staff assistants about examination

11    and made a complaint about the exam and about my results.

12        And it was my intention to just go on record as not

13    being pleased with the results and wanting to have some kind

14    of recourse.

15    Q    Do you remember the name of the staff assistant?

16    A    Not offhand.  I think his names was Jim Haile or

17    James Haile.

18    Q    H-a-i-l-e?

19    A    Yes, sir.

20    Q    By the way I forgot to ask you at the beginning what

21    your race was?

22    A    I am Black.

23    Q    Okay.  How long after you took the test did you make

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    this complaint?

2        A    I'm not exactly sure.  I think I took the examina-

3    tion like in March or April or 1979.  I believe I came into

4    Congressman Gore's district office in June of that same year,

5    1979, which would have probably been, I guess, two or three

6    months after the examination.

7        Q    Representative Gore has sent a letter to us with a

8    copy to you, saying that his files show that you sent to the

9    district office on June 29th, 1979.  Does that date sound

10   about right to you?

11       A    Yes, it does.

12       Q    And did you make that visit after you had received

13   the results of the PACE test showing that you not passed?

14       A    Yes, I did make that visit after I had received my

15   official test scores for the PACE examination.

16       Q    Do you remember how long it was after you received

17   your official test scores before you went to Representative

18   Gore's office?

19       A    I'm not exactly sure of the exact time span.  I do

20   know that I took the exam in the spring of 1979, but I don't

21   know the exact time lapse between my receiving the test scores

22   and then going to Congressman Gore's office to file a complaint

23   based on race discrimination.

1    Q    Are you able to remember enough to say whether it
2    was a matter of days, a matter of weeks or a matter of months?
3    A    I believe it was a matter of weeks.  It could have
4    been as much as four to six weeks, but I don't believe it was
5    more than two months.
6    Q    When you say it might have been as much as four to
7    six weeks, are you guessing there?  We want to limit your
8    answers to what you actually recall, and if you don't remem-
9    ber, just tell us you don't remember.
10    A    Okay.  Well, for the record, I do not recall.  I
11    do not remember.
12    Q    Is there anything that happened that led to your
13    going to Representative Gore's office?  You received the test
14    results, and then apparently some period of time passed before
15    you went there.  So is there anything that led to your
16    decision to go there?
17    A    I cannot recall any external forces or individuals
18    or even, I guess, government agencies which may have had an
19    impact or effect on my decision to go and see the congressman.
20    I think it was just a matter that I was really upset about
21    it.  I didn't have a job at the time.  I was searching
22    frantically for employment, and I felt like my only recourse
23    as far as the Federal Government was concerned was to go and

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    see my congressman, and that's what I did.

2        Q    Please tell us in words that are as close as you

3    can remember to the words that you used to Mr. Haile in

4    Representative Gore's office just what you said to him and

5    what he said to you.  Do not try to fill in any gaps but just

6    tell us as closely as you can remember what the words were.

7        A    Well, it has been awhile.  I can try to recall

8    basically what I said to Mr. Haile was that I had taken the

9    PACE examination during the spring of 1979 and I had received

10   my test results and I wasn't pleased with them.

11       And I told him that I felt that the examination was

12   discriminatory to me, for whatever reasons, because of my

13   background, because there was a lot of information on the

14   test that I have never even seen before or heard before, and

15   I felt like a lot of it just was really based on my race or

16   things that I just would not have any knowledge about.

17       I told him that I wanted to file some kind of

18   complaint or to inquire about my rights, and then Mr. Haile

19   informed me that he would contact--I don't know if it was

20   the Civil Service Commission.  I believe it was the Office of

21   Personnel Management, the regional office in Atlanta, Georgia,

22   and try to file a complaint on my behalf.

23       And, in fact, he called while I was in the office,

1  and he talked with someone.  I don't know who it was, but he

2  was talking with them and explaining to them what I wanted to

3  do, and once he got off the phone, he said that the Atlanta

4  office was going to send some type of documents or what-have-

5  you to me through their office, and then he would get back with

6  me.

7       But what they sent me was some kind of report related

8  to a congressional study that was done on the PACE examination

9  and how it discriminated against certain groups of people.

10  The information that they sent me didn't relate to an applica-

11  tion or a complaint form to file out in reference to the

12  examination.

13       That was the last correspondence I had with their

14  office until I guess probably 1981 or 1982.

15       Q    When you refer to 1981 or 1982, are you referring

16  to the period of time after you learned about the settlement

17  in the Luevano case?

18       A    That is correct.

19       Q    Now, were you present in the same room where Mr.

20  Haile was making the telephone call to this person with the

21  Office of Personnel Management so that you could hear his

22  end of the conversation?

23       A    No, I was not.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      Q      Did he go into a different office and make a call

2  from there?

3      A      He went into a different office.  The door was open

4  but I could not hear the conversation.  I could see him talk-

5  ing on the phone, but I was like in a reception area, and he

6  went to an area, I guess, that was more private, but I could

7  see him talking on the phone.  I couldn't hear what he was

8  saying.

9      Q      Did he say anything t you when he came out?

10      A      No more than he had talked with someone in the

11  Atlanta regional office about my complaint and that they were

12  going to be sending some type of forms or information to him

13  on my behalf, and I guess we would just resolve the matter

14  from there.

15          What those documents were I wasn't sure, and like

16  I said, what I did receive was some kind of report or congress-

17  ional study about the PACE examination.

18      Q      Do you still have the documents that you received

19  from OPM?

20      A      The study?

21      Q      No.  The documents you received in response to this

22  call that Mr. Haile made on your behalf?

23      A      Yes, I do.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1       Q     Do you have those handy right now?

2       A     Yes, I do.

3       Q     Could you please get them and just read off the

4   titles of whatever documents there are?

5       A     Okay.  Would you prefer that I do it in chronological

6   order?

7       Q     Why don't you start with any letter of transmittal

8   that there is?

9       A     Okay.  I'm sorry.  I thought I had a document from

10  OPM.  The only communication I have which makes any kind of

11  reference to OPM is from Congressman Gore's office.

12      Q     What's the date of what it is that you are referring

13  to?

14      A     Okay.  The date on the first letter is April 16th,

15  1982.  I'm sorry.  The first letter is April 17th, 1981, and

16  that correspondence is from Congressman Gore, addressed to

17  Mr. Donald Devine, the Director, Office of Personnel Manage-

18  ment, Washington, D.C.  Would you like for me to read the

19  letter?

20      Q     We have a copy of it here.  It was ultimately filed

21  with the court.

22            Why don't I make a copy of the April 17th, 1981,

23  letter unsigned from Representative Gore's office to Mr.

1  Devine, the Director of OPM and the attached letter that Mr.

2  McDonald wrote to the Clerk of the District Court on April

3  20th, 1981, Exhibit 1 to this deposition.  And the letter from

4  Representative Gore to me, dated April 16th, 1982, will be

5  Exhibit 2 to the deposition.

                              (Whereupon, the documents were
6                              marked Deposition Exhibits Nos.
7                              1 and 2 for identification.)

8          BY MR. SEYMOUR:

9      Q    Do you have anything else with you that would show

10  what OPM sent to you as a result of Representative Gore's

11  contact or at least his office's contact with OPM?

12     A    No, I do not.

13     Q    There was a congressional hearing conducted in 1979

14  on the PACE by the Civil Service Subcommittee of the House

15  Committee on the Post Office and Civil Service, and the

16  transcript of that hearing was ultimately prepared.  Did OPM

17  send you that transcript or did they send you something else?

18     A    That may have been the document that they sent to

19  me.  I don't recall if it was a congressional study or in-

20  dependent study, but it was not any type of forms or documen-

21  tation related to my complaint.  It was just an overall study

22  of the PACE examination I guess for a five- or ten-year period

23  or what-have-you.

1    Q    How long was the study?

2    A    Pages?

3    Q    That's right.

4    A    I don't recall.  I'm not exactly sure.

5    Q    Was there anything else that came with it in the

6    package from OPM?

7    A    The information that I received from OPM was forward-

8    ed to Congressman Gore's office, and Congressman Gore's office

9    forwarded it to me with a cover letter on official congression-

10   al stationery.

11   Q    But was there anything else with that cover letter

12   apart from this study that you mentioned?

13   A    No, there was not.

14   Q    Do you have the cover letter from Representative

15   Gore's office?

16   A    No, I do not.

17   Q    Mr. McDonald, Ms. Ward from the Justice Department

18   has reminded me that there was also a report prepared by the

19   General Accounting Office on the PACE, and that came out in a

20   blue covered booklet in 1979.  Is it possible that that was

21   what you received from OPM?

22   A    Since I don't recall exactly what documentation I

23   received, it is possible that the GAO report could have been

13

1    what I received.

2        Q    Fair enough.  When you went into Representative Gores

3    office and Mr. Haile made the telephone call to the OPM office

4    in Atlanta, did you have any understanding that anything that

5    happened in that call was the same thing as filing a complaint

6    of discrimination against the PACE or was it just a kind of a

7    protest?

8        A    I don't think that I believed that my going into

9    Congressman Gore's office and just simply talking to them would

10   be more than a protest, but I felt by trying to get something

11   done beyond that would have been filing a formal complaint,

12   and it was my understanding that the purpose of the phone call

13   was to make some type of documentation or record of my official

14   complaint.

15            So in essence, my coming into the office was basic-

16   ally a protest but I did want to go further than just talk

17   with Congressman Gore's staff assistant about it and go on

18   record and file a formal complaint, and it was my belief that

19   I had accomplished that purpose once he had talked with OPM's

20   regional office in Atlanta,  Georgia.

21       Q    Did Mr. Haile say anything about that understanding

22   to you or did he say anything after he came out from the

23   phone call that gave you that understanding?

14

1    A    No, he did not.  What I recall him saying simply
2    was that he had talked with OPM, and they were responsible
3    for taking complaints, and he had talked with someone about
4    my situation and had either filed a complaint--I don't know if
5    those were the words but that by talking with OPM, the situa-
6    tion would be resolved.

7         I don't know what his exact words were to this per-
8    son.  I didn't hear the conversation.  So I don't know that
9    I would have anything to go on by saying that he led me to
10   believe that what he had done was sufficient enough to file a
11   complaint.

12        But I was left with the impression, once I left the
13   office, that I didn't have to do anything else, that I would
14   be hearing from them, and I would, I guess, have to go through
15   some type of administrative hearing or what-have-you to
16   just advocate my position but that never materialized.

17   Q    When you say "advocate your position", can you
18   explain what you mean?

19   A    I thought that once I heard something from OPM, that
20   there would be some type of administrative hearing where I
21   would have opportunity to simply tell them that I felt the
22   examination discriminated against me based on my race and I
23   didn't think the examination was fair.  I felt like it denied

c4sl

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    me the opportunity to enter into Federal Government employment

2    hiring system, and because I hadn't been given that opportun-

3    ity, I had been injured. I didn't have a job at the time. I

4    didn't even have any, I guess, prospects of getting a job, and

5    I wanted to let them know that this particular test had pre-

6    vented me from gaining employment.

7    And I felt like my being Black had a lot to do with

8    it and was the main issue.

9    Q    Deposition Exhibit 2 is the April 16th, 1982, letter

10   from Representative Gore to me. That letter says that you

11   came to the office on June 29th, 1979. Do you remember about

12   how long it was between that June 29th, 1979, visit and the

13   information that was sent to you by OPM through Representative

14   Gore's office?

15   A    I'm not exactly sure.

16   Q    Do you know whether it was a matter of weeks, a

17   matter of days or a matter of months?

18   A    I believe it was a matter of weeks.

19   Q    After you received this information from OPM, 'did

20   you get in touch with Representative Gore's office again

21   about this complaint that you had made to him?

22   A    No, I did not.

23   Q    Did you ever contact OPM directly to say that you

1   thought that there was something racially discriminatory about

2   the PACE before you heard about the Luevano settlement?

3       A   No, I did not. I did not make an effort to contact

4   them after I had gone into Congressman Gore's office, and like

5   I said earlier, I was under the impression that the next

6   communication I would hear or would received would be directly

7   from OPM or either Congressman Gore's office in reference to

8   my complaint.

9       Q   When you took the PACE examination, was there any

10   poster that told you how to file a complaint of discrimination

11   in the Federal Government?

12       A   I don't recall seeing one in the examination room

13   or at the facility where the exam was administered.

14       Q   You took the test, I think you said, in Nashville.

15   Was that at an OPM office or was it someplace else?

16       A   I was under the impression it was at a federal office

17   building or possibly at the federal courthouse in Nashville.

18   I'm not exactly sure but it was in Nashville, Tennessee.

19       Q   Did Representative Gore's office ever tell you that

20   you could file a complaint about the PACE directly with the

21   Office of Federal Sector Appeals, I think it is called, in the

22   Equal Employment Opportunity Commission or file a complaint

23   about the PACE with the Merit Systems Protection Board?

1    A    No, they did not.

2    Q    Did you ever acquire that information on your own?

3    A    No, I did not.

4        MR. SEYMOUR:  No further questions.

5        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6        BY MS. WARD:

7    Q    I have one or two questions, Mr. McDonald.  After

8    you received the information from OPM or the Civil Service

9    Commission which Congressman Gore's office had forwarded on

10   to you and it did not contain the complaint form that you were

11   waiting for, did you call up Congressman Gore's office or go

12   back and contact them about this?

13   A    No, I did not.

14   Q    Did you call OPM or the Civil Service Commission and

15   contact them about this?

16   A    No, I did not.

17   Q    Did you contact anyone about that?

18   A    No, I did not.

19       MS. WARD:  I don't have any other questions.

20     FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

21       BY MR. SEYMOUR:

22   Q    After you received this information from OPM, was

23   it your believe that this concluded the matter, that it was at

1    an end or did you think that there was something that was

2    still going on?

3         A    I'm sorry.  I did not hear the first part of your

4    question.  Would you repeat it, please?

5         Q    When you received this information from OPM, whatever

6    was contained in it, did you come to any conclusion about

7    whether this was the end of the matter or whether you would

8    be hearing something further from them in the future?

9         A    The fact of the matter is that I was trying to find

10   a job, and I didn't have the time or the money to be placing

11   calls, I mean long distance, because I wasn't in Murfreesboro,

12   to try to find out the exact status of the situation.

13        I did not think that the communication I received

14   from Congressman Gore's office was final resolution of the

15   matter.  I expected to hear something else, but once I didn't

16   hear anything after a couple of weeks, I just assume that they

17   were not going to do anything else about it, and that if any-

18   thing happened, I would probably receive some other communica-

19   tion from  OPM directly, but that never materialized either.

20        Like I said, just to be honest, I didn't have a job.

21   I didn't have the resources to be calling or to be going to

22   Murfreesboro or what-have-you to find out the situation.  I

23   was just trying to find a job period.

Q    Would it be correct, then, to say that after you received that information you did not think that OPM was going to do anything more about your complaint of racial discrimination and you just decided to let the matter ride?

A    I felt like once the phone call had been placed and once I was told that I would probably be hearing something --well, I wasn't told that but I believed that I would be hearing something, I didn't feel like there was anything else I could do.

I mean, I wasn't even sure that the Congressman's office believed my complaint, and I was under the impression, and I really believed that the Federal Government wasn't going to just come out and say that a test that they were administering to a certain group of people was discriminatory. So I didn't put a whole lot of weight on my complaint. I didn't expect them to do anything about it except just throw it in a file and that would be it.

If that happened, I don't know. But at that time, I had to think about finding a job, and I knew I wasn't going to get one with the Federal Government, not based on those scores. So the energies that I utilized at that time was to find a job.

To answer your question, no, I didn't think that

1  anything else was going to happen with it, but at the same time,

2  I was still hoping that something would come through.  What?

3  I dont know.

4       Q    Did you, and I want you to think carefully about

5  this question before you answer it--at the time that you re-

6  ceived this package of information from OPM through Representa-

7  tive Gore's Office, did you know then that people who made

8  complaints of racial discrimination that were not acted on

9  satisfactorily to them had a right to go to federal court and

10  bring a lawsuit challenging the practice that they were com-

11  plaining about?

12       A    No, I didn't have any knowledge about such, you know,

13  recourse.  In fact, I wasn't even sure that going to Congress-

14  man Gore's office was going to lead to any kind of solution.

15  So, no, I wasn't aware of any type of legal action I could

16  take through the judicial system.

17       Q    Were you aware at that point that there was a law

18  that forbad racial discrimination in federal employment?

19       A    I was aware of just the basic civil rights statutes.

20  I wasn't able to say then that I could single out, you know,

21  federal laws in that relate to employment, hiring at the

22  federal level.

23       I mean, I have that understanding now, but I didn't

1   have it at the time that I took the examination and at the

2   time that I filed the commmplaint or went into the office and

3   attempted to file a complaint.

4       Q    By the way, what are you doing now?

5       A    I'm a first-year law student at the John Marshall

6   Law School in Chicago.

7       Q    Congratulations.  I have no further questions.

8           MS. WARD:  I have no further questions either.

9           MR. SEYMOUR:  You do have the right to decide whether

10  you want to see the copy of the transcript and check over it

11  yourself for any possible errors and then sign the signature

12  sheet before it is filed with the court or instead to decide

13  to rely on the court report and waive signature.

14          Ordinarily, we suggest that it is better for the

15  person to take a look at the deposition transcript themselves

16  and mark down any errors.  It is important to realize that you

17  cannot change your testimony.  All you can do is point out

18  mistakes that might have been made in putting down what you

19  actually said during the court of the deposition, things like

20  typographical errors and so on.

21          Do you want to see it and sign it or do you want to

22  waive your signature and just rely on the court reporter?

23          THE WITNESS:  What would be the ramifications for

1  waiving that right?

2       MR. SEYMOUR:  It doesn't really matter which you do.

3  The only purpose of seeing it and signing it first is to guard

4  against typographical errors and that sort of thing.

5       THE WITNESS:  How long will it take to receive a

6  copy of the transcript?

7       MR. SEYMOUR:  The transcript will be ready in about

8  ten days.  Add mailing time to that and you got about two

9  weeks or so.  It will not have any effect either way on the

10  time when the judge is able to decide the claims.

11       THE WITNESS:  I would have the opportunity to review

12  or at least see a copy of the transcript.

13       MS. WARD:  That's fine.

14       MR. SEYMOUR:  Thank you.

15       (Signature not waived.)

16       (Whereupon, at 8:30 p.m., the taking of the

17  deposition concluded.)

18

19

20

21

22

23

1    CERTIFICATE OF DEPONENT

2    I hereby certify that I have read and examined the

3    foregoing transcript, and with corrections made by me, if any,

4    the same is a true record of the testimony given by me.

5    *Please see Signature on Errata*

6    *Sheet in front of Transcript*

    Michael McDonald

7    Subscribed and sworn to before me this 4th day

8    of *January* 1985.

9

10    Notary Public in and for the

11    *Dixie D. Kelly*

12    *Macoupin County*

    *July 2, 1986*
    My commission expires

13

14

15

16

17

18

19

20

21

22

23

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 23 do hereby certify that the witness, MICHAEL MC DONALD, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

*William D. McAllister*

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

FOURTH DISTRICT

1131 LONGWORTH OFFICE BUILDING
TELEPHONE: (202) 225-4231

COMMITTEES:
INTERSTATE AND
FOREIGN COMMERCE

SCIENCE AND
TECHNOLOGY

# CONGRESS OF THE UNITED STATES
## HOUSE OF REPRESENTATIVES
### WASHINGTON, D.C. 20515

April 17, 1981

Mr. Don Devine, Director
Office of Personnel Management
1900 E Street, N.W.
Washington, D.C. 20415

Dear Mr. Devine:

I am writing in the interest of Mr. Michael McDonald, 402 South Second Street, Clarksville, TN 37040 in regard to the class action suit, Luevano V. Campbell.

Mr. McDonald was told by an OPM attorney that to be considered part of the class that he must have submitted a complaint after taking the PACE examination. After he took the exam in 1979, he came into my District Office in Murfreesboro, Tennessee, to complain about discrimination and his resulting test scores. Even though I have no correspondence to submit, there are notes on file in my office to substatiate his complaint. I hope you will enter this letter into an appropriate file to verify that Mr. McDonald did make a complaint in 1979.

Thank you for your attention to this matter. All correspondence should be sent to me to 123 East Main Street, Murfreesboro, TN 37130.

Sincerely,

Albert Gore, Jr.
Member of Congress

ul

Deposition Exhibit No. 1
Deposition of McDonald
W. McAllister, Reporter
11-29-84

406 South Second St.
Clarksville, Tennessee 37040
April 30, 1979

Clerk Of the U.S. District Court
U.S. Courthouse
Washington, D.C. 20001

Luevano vs Campbell #79-0271

It is my wish to make formal objection to the civil lawsuits involving the PACE examination I took the exam in 1979, only to receive results in which I considered to be below my expected performance. Subsequently, I filed a complaints with U.S. Congressman Albert Gore Jr.'s Office. This dispute was based on my believing the examination to be discriminatory toward myself as a man of Negro (black) descent.

I strongly feel that I am entitled to a adequate level of relief. Therefore I do not wish to have my rights waived or forfeited by the pending settlement agreement. I would also ask the courts to review the facts in the preceding paragraph, promptly providing a disposition on this formal objection. Thank you for the opportunity to share this information.

Michael H. Donald

**ALBERT GORE, JR.**
FOURTH DISTRICT
TENNESSEE

1131 LONGWORTH OFFICE BUILDING
TELEPHONE: (202) 225-4231

COMMITTEES:
INTERSTATE AND
FOREIGN COMMERCE

SCIENCE AND
TECHNOLOGY



# CONGRESS OF THE UNITED STATES
## HOUSE OF REPRESENTATIVES
### WASHINGTON, D.C.  20515

April 16, 1982

Mr. Richard T. Seymour
Lawyers' Committee for Civil Rights Under Law
Suite 520
733 Fifteenth Street, Northwest
Washington, D.C. 20005

Dear Mr. Seymour:

Thank you for your recent letter requesting information about Mr. Michael McDonald's complaint to our office regarding the PACE exam.

Our files show that Mr. McDonald went to the District Office on June 29, 1979, to complain that the PACE exam discriminated against him because of race.  Mr. Jim Haile who was a staff assistant for me at that time called Ms. Betty Tondee at the OPM office in Atlanta and filed a complaint in Mr. McDonald's behalf by telephone.  This call was made in June 1979 and was made with the intent to notify the Office of Personnel Management of Mr. McDonald's complaint.  Mr. Haile felt that the call was sufficient notice to OPM and did not follow up with any type of written complaint from our office.

Mr. McDonald came back into the District Office in 1981 to discuss the PACE exam again.  At that time, I sent a letter to Mr. Don Devine, Director of the Office of Personnel Management, to explain what had happened in 1979.

I hope this information is helpful, and please do not hesitate to contact me again if I can be of further assistance.

Sincerely,

*Albert Gore Jr.*

Albert Gore, Jr.
Member of Congress

ul

xc: Mr. Michael McDonald

Deposition Exhibit No. 2
Position of McDonald
W. McAllister, Reporter
11-22-84

RECEIVED

FEB 7  3 22 PM '85

JAMES           CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

     Plaintiffs,

     vs.

DONALD J. DEVINE, et al.,

     Defendants.

CIVIL ACTION NO.
79-0271

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

Deposition of RUBEN CONDE DEL VALLE

Washington, D. C.
November 27, 1984

Pages 1 thru 17

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

E-R-R-A-T-A    S-H-E-E-T

To the deposition of _____ RUBEN CONDE DEL VALLE _____ .

The deponent having a right to make any changes deemed necessary

hereby makes the following changes into the deposition and states

the reasons for each change accordingly.

PAGE NO.    LINE NO.    CHANGE (State Reason for change after each)

3          10         SEÑOR - (IT is SEÑOR, NOT SENIOR)

8          19-20      "I thought they would paid" - (grammatical error)

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

_____

DEPONENTS' SIGNATURE

WDM wdm

1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - x
                                     :
4    ANGEL G. LUEVANO, ET AL.,       :
     INDIVIDUALLY AND ON BEHALF OF   :
5    ALL OTHER SIMILARLY SITUATED,   :
                                     :
6            Plaintiffs              :
                                     :           CIVIL ACTION
7        vs.                        :           NO. 79-0271
                                     :
8    DONALD J. DEVINE, ET AL.,       :
                                     :
9            Defendants              :
                                     :
10   - - - - - - - - - - - - - - - - x

11                          Washington, D.C.

12                          Tuesday, November 27, 1984

13   Deposition of:

14                   RUBEN CONDE DEL VALLE

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 5:35 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:  RICHARD T. SEYMOUR, ESQ.
4                 Suite 500
                  1400 I Street, N.W.
5                 Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:  BARBARA L. WARD, ESQ.
8                 Room 3509
                  Civil Division-Federal Programs Branch
9                 10th and Pennsylvania Avenues, N.W.
                  Washington, D.C. 20530

10

11                    C O N T E N T S

12   WITNESS                 EXAMINATION BY MR. SEYMOUR    MS. WARD

13   Ruben Conde Del Valle                    3            --

14

15

16   Exhibits

17     None.

18

19

20

21

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1                    P R O C E E D I N G S

2    Whereupon,

3                      RUBEN CONDE DEL VALLE

4    was called as a witness and, having been duly sworn by the

5    Notary Reporter, was examined and testified as follows:

6                    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7                    BY MR. SEYMOUR:

8        Q    Please state your name for the record.

9        A    My name is Ruben Conde del Valle.

10       Q    And we should call you Senior Conde, is that right?

11       A    Yes, Senior Conde.

12       Q    Could you please state your address for the record?

13       A    My personal address, Frailed EE-3, Manceones del

14   Carolina, Carolina, Puerto Rico 00630.

15       Q    We had your street address down as Yunquesito D-(9).

16   Has that changed?

17       A    I lost that house.  I am now in another house.

18       Q    Could you spell the name of the street?

19       A    Frailed, F-r-a-i-l-e-d.

20       Q    Frailed EE-3.

21       A    EE-3, yes.  The block number is EE and the number

22   of the house, 3.

23       Q    Can you tell me how many times you took the

1    Professional and Administrative Career Examination?

2         A    I just took it one time after May 19, 1975, at

3    San Juan, Puerto Rico.

4         Q    At that time, were you working for the Federal

5    Government?

6         A    At that time, no, I didn't work at that time for

7    the Federal Government.

8         Q    What was the result of the examination?

9         A    I failed to pass the examination.

10        Q    How long after you took the test were you told you

11   had failed to pass?

12        A    What was that, please?

13        Q    How long after you took the test were you told that

14   you had failed?

15        A    I was told by them, by the personnel.  When did I

16   receive the notice, did you say?

17        Q    How long was that after the test?

18        A    Well, I after the test I received, I don't know.  I

19   think about--I don't remember too much.  It was about five

20   months or four after I took the test.  They sent me a letter

21   that I was failing.

22        Q    You're not exactly sure how long it was?

23        A    I am not exactly sure.  No, I don't remember now.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Q    If you don't remember, just tell us and we'll take

2    it from there.

3    A    Okay.

4    Q    Now, the form that you sent into the court said

5    that you made a complaint about the use of the PACE to

6    Civil Service Commission officials at San Juan, Puerto Rico.

7    Please tell us as closely as you can remember what you said

8    to them and what they said to you.

9    A    Okay.  I made a complaint of discrimination to the

10   officer who gave me the PACE examination.  When I took the

11   PACE at San Juan, I explained and complained to her that the

12   test was covered at too many levels for objectivity and that

13   it was prejudicial to Puerto Ricans and that the OPM, the

14   personnel office, was violating my rights.

15        Then she took notice of my complaint and told me

16   to wait for an answer from Washington.  Six months later I

17   visited again the OPM office at San Juan and asked to an

18   officer there of what had happened with my complaint.

19        He told me--at that time it was a man.  He told me

20   that I had to wait for an answer from Washington office, the

21   main office at Washington.   And the answer to my complaint

22   never came.

23        Then I almost lost my faith when I heard for the

1    first time of the settlement in the year 1981 by the newspaper

2    here in Puerto Rico.

3    Q    First of all, do you remember the name of the woman

4    that you complained to the first time?

5    A    That was the officer that gave me the test.  I really

6    don't remember her name, but it was an officer there that was

7    giving the test to everybody there in San Juan.

8    Q    Did you complain the same day you took the test or

9    after you received the results of the test?

10    A    I complained the same day.  When I took the test,

11    as soon as I finish it, when I was giving to her the test, I

12    complained and explained to her that that test was really

13    discriminatory against the Puerto Ricans.

14    Q    Do you know what this woman wrote down when you

15    made the compaint?

16    A    Well, I know that she took notice of my complaints,

17    and everything that I told to her at that time, she wrote

18    something on paper, and she has a notebook and told me to wait

19    for answer from the center office at Washington.

20    Q    Did she ask you to sign what she put down?

21    A    She just took notice.  She didn't tell me to sign

22    anything.

23    Q    Did she let you read what she had written down?

1     A    She didn't let me read what she put down.

2     Q    Did she ask for your name and address when she put

3  this information down?

4     A    She had already my name and my address before.   When

5  I took the test, she passed the paper where we put the names

6  and the addresses.

7     Q    Did she put her information down on this piece of

8  paper that had your name and address on it or somewhere else?

9     A    She put it in, like, a notebook that she had, taking

10  notes, and she put it there.

11     Q    Did you ever talk to this woman again about that

12  complaint?

13     A    Well, since then, I went to my home town.   Since I

14  was talking with an honorable officer, I was believing that

15  the officials in the Federal Government, all of them that I

16  know are very good men, very honorable persons.   So I went to

17  my home.

18          But six months later then I visited again the OPM

19  office.

20     Q    But did you ever talk to this particular woman

21  again about your complaint?

22     A    When I visited again the OPM office, she was not

23  there.   I don't know where she was.   I talked with a man who

1    I think was a supervisor.

2        Q    When you say you think he was a supervisor, what

3    makes you think the man was a supervisor?

4        A    Because I went at the front desk.  They told me to

5    go inside the office, and I went inside the office, back, and

6    I had to wait.  The officer there was talking with somebody

7    else, and I went back to his office and I explained that I

8    was waiting for the answer in my complaint.

9        Q    Do you remember the name of the man you spoke with?

10       A    I really don't remember.  I just know that it was

11   a supervisor there or second in charge possibly because the

12   director was a woman, and he was the second in charge, I think.

13       Q    Did you ever speak to this man again about your

14   complaint?

15       A    Well, he told me he can do nothing there.  I have

16   to wait for answer from Washington.  He didn't know how long

17   it would take for answering me, and I have to wait.  So then

18   I almost lost my faith, and I went to my home and forget about

19   that for a period of months.  I lost my faith there.  I didn't

20   think they paid no more attention to me.  They were just

21   taking me the fool, fooling with me.

22        So I really lost my faith.  So I didn't know that I

23   had to put the complaint in writing at that time.  That's why

1  didn't put my complaint in writing.  I was believing that I

2  was talking with persons and they would do the same thing as

3  they should do.  So I didn't put the complaint in writing at

4  that time.

5      Q    At the place where you took the test, did you see

6  any poster up on the wall explaining the steps that you should

7  take in order to make a complaint of discrimination under

8  Title VII of the Civil Rights Act of 1964?

9      A    No, sir, I didn't see any sign there.

10     Q    When you returned to the office, the Civil Service

11  Commission Office in San Juan, did you see such a poster at

12  that time or did you see any brochures or leaflets that

13  explained this information?

14     A    No, I didn't see those posters there at anyplace

15  there, and nobody told me that I had to put my complaint in

16  writing.

17     Q    When you spoke to this woman or when you spoke to

18  the man later on that you thought was a supervisor, did either

19  of them tell you that you could make a complaint directly to

20  the Appeals Review Board of the U.S. Civil Service Commission

21  in Washington?

22     A    He just told me that he didn't know how long it

23  would take to answer my complaint.  So he just told me that I

1    had to wait.

2    Q    Did anyone ever tell you who this complaint in

3    Washington was being sent to or who it had been sent to?

4    A    Pardon?

5    Q    Did anyone ever tell you who this complaint had

6    gone to in Washington?

7    A    I think when I took the examination and when I gave

8    my complaint to the woman who gave the test, she wrote a note

9    and she told me that that was sent back to Washington to the

10    central office.

11    Q    But she didn't say who in the central office or

12    what kind of unit in the central office would handle it?

13    A    The central office.  I just wait for a long period

14    for the answer so I went there six months later.  After that,

15    I just lost my faith.  I didn't think that my complaint was

16    already, you know, forget it for somebody or nobody was paying

17    attention to my complaint.

18    Q    Did you ever return to the Civil Service Commission

19    office again to talk with them about this complaint?

20    A    After the second time you are asking me?

21    Q    That's right.

22    A    Well, after the second time I visited again the

23    Civil Service Commission looking for jobs.

1    Q    Just a second.  When you say "the second time", do

2    you mean the time that you talked with the man that you

3    thought was the supervisor or are you talking about a differ-

4    ent time?

5    A    No.  I mean, after the second time, I visited too

6    many times the OPM office in San Juan.  But I had already

7    lost my faith at that point.  I was looking for a job, see,

8    but other jobs.

9    Q    Was the time that you talked to the man you thought

10   was a supervisor the last time you talked to people at the

11   Civil Service Commission in San Juan about your complaint?

12   You may have gone there for other things, but that was the

13   last time you talked to them about the complaint?

14   A    That was when I talked with the supervisor.

15   Q    That was the last time?

16   A    Yes, sir.

17   Q    And then you went there later on for other reasons?

18   A    For other reasons.

19   Q    Okay.  Did you ever call or write anyone in Wash-

20   ington about your complaint before you heard about the settle-

21   ments in the Luevano case?

22   A    No, sir.  That was my fault because I lost my faith

23   with here, and I think that it was not the thing so I didn't

1    call to the central office at Washington to complain, to make

2    a complaint against those officers here.  So I believed that

3    they already had for the good of my case.  And I didn't put

4    too much attention to that.

5        Q    In the document that you sent to us that the court--

6    we sent you a questionnaire that the court had ordered that

7    we send, and the questionnaire said, on page 2, that you did

8    file other complaints against the PACE and you mention several

9    dates--November 1st, 1980; April 21st, 1981; May 15th, 1981;

10   and June 10th, 1981; and that you had sent these complaints

11   to the U.S. Office of Personnel Management, Office of the

12   General Counsel.

13       A    That was six months after.  When I talked in May

14   and November, that was the second time back.

15       Q    Well, let me say what I think might have gone on.

16   Are all these dates that you mentioned in that form you filed

17   with the court dates when you think that you sent something

18   into Washington after you heard about the Luevano case?

19       A    Well, yes, after I heard from the settlement, yes,

20   this time that I wrote the letter was in April 21,1981, to the

21   United States Office of Personnel Management.

22       Q    Now, you sent me a letter on June 23, 1982.  I had

23   sent you a letter before saying that I did not think you had a

1   good claim because you had not made your complaint in writing

2   but had just made your complaint orally, and I think you

3   were referring to that a little bit earlier in what you said,

4   but I'd like to quote one of the paragraphs and make sure I

5   understand that.

6       You said, quote, "It is not correct that I have never

7   done anything further about my oral complaints as you said in

8   your letter."

9       A    Yes, that was a letter that I sent to you on June

10  23, 1982.

11      Q    That's right.  Do you have a copy of that letter

12  before you?

13      A    Yes, I have a copy here.

14      Q    Okay.  Let me finish reading this passage into the

15  record so that the court will know what we are talking about.

16  Continuing with the quotation, "You must know that after I

17  made the oral complaints, I have wrote a lot of letters to

18  the Office of Personnel Management connected with my oral

19  complaints, and they had never answered my letters."  That's

20  the end of the quote.

21      A    The letter that I say here was one that I have

22  before me.  One on April 21, 1981.  I have a copy here.

23      Q    So those letters that you were referring to in that

1   June 23, 1982, letter were the letters that you sent about

2   the Luevano settlement?

3      A   Yes, sir, that's correct.  The other letter was

4   May 16, 1981.

5      Q   Now, when you took the PACE examination, they had

6   your name and your address at the time?

7      A   Si.

8      Q   How long was it before your address changed?

9      A   How long was what?

10      Q   Well, how long did you continue to stay at that

11   address after you took the PACE?

12      A   I stayed at that address about two years or three

13   after I took the test.  Then I moved to the other.  About

14   three or four years after.  Then I moved to the address

15   I live now.  The house I live at now I have almost two years.

16      MR. SEYMOUR:  I have no further questions.

17      MS. WARD:  I have no questions.

18      MR. SEYMOUR:  Thank you very much, Senior Conde.

19   Let me explain what will happen now.  You have a right to make

20   the decision whether you want to see a copy of the transcript

21   and write down any mistakes you think there might be in it,

22   and then sign the signature page before it goes into the

23   court or instead just trust to the court reporter to have

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    everything accurate before it is filed with the court.

2         Ordinarily we recommend that people ask to see a

3    copy of the transcript in advance so they can check it per-

4    sonally for errors before the thing is sent into the court,

5    but it is your decision to make.  Do you want to see it and

6    sign it or do you want to waive signature?

7         THE WITNESS:  Well, the best way that you think.

8    If you want to send to me, whatever you like to.

9         MR. SEYMOUR:  Okay.  I generally think that people

10   should see it before they sign it.  Remember that the sheet

11   that will be included with it for the correction of any mis-

12   takes are just for the correction of any mistakes that the

13   court reporter might have made.  You can't change your testi-

14   mony in it.  You can simply refer to typing errors, things

15   like that.

16         THE WITNESS:  Okay.

17         MR. SEYMOUR:  Thank you very much.

18         MS. WARD:  Thank you, sir.

19         (Signature not waived.)

20         (Whereupon, the taking of the deposition concluded

21   at 5:56 p.m.)

22

23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

CERTIFICATE OF DEPONENT

I hereby certify that I have read the foregoing pages 1 through 15 of my deposition testimony taken in this proceeding and with the exception of changes and/or corrections, if any, find them to be a true and correct transcription thereof.

_Ruben Conde del Valle_
Sr. Ruben Conde Del Valle

_December 26, 1984_
Date

-0-

CERTIFICATE OF NOTARY PUBLIC

Affidavit No, 4185

Subscribed and sworn to before me this the 26th day of _December_ , 1984.

_Rosa Noemi Bell_
Notary Public in and for the

My commission expires:

no expiration date

-0-

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 15 do hereby certify that the witness, RUBEN CONDE DEL VALLE, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.

RECEIVED

FEB 7   3 22 PM '85

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

ANGEL G. LUEVANO, ET AL.,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED,

        Plaintiffs,

    v.

DONALD J. DEVINE, ET AL.,

        Defendants.

CIVIL ACTION NO.
79-0271

FILED

FEB 7 1985

JAMES F. DAVEY, Clerk

Deposition of JANIE L. COLLINS

Washington, D.C.
November 28, 1984

Pages 1 thru 51

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

WDM wdm

1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - x
                                   :
4    ANGEL G. LUEVANO, ET AL.,     :
     INDIVIDUALLY AND ON BEHALF OF :
5    ALL OTHER SIMILARLY SITUATED, :
                                   :
6            Plaintiffs            :
                                   :
7        vs.                       :        CIVIL ACTION
                                   :
8    DONALD J. DEVINE, ET AL.,     :        NO. 79-0271
                                   :
9            Defendants            :
                                   :
10   - - - - - - - - - - - - - - - x

11                          Washington, D.C.

12                          Wednesday, November 28, 1984

13   Deposition of:

14               JANIE L. COLLINS

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 5:10 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
            BY:  RICHARD T. SEYMOUR, ESQ.

4                Suite 400
                1400 I Street, N.W.

5                Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
            BY:  BARBARA T. WARD. ESQ.

8                Room 3509
                Civil Division-Federal Programs Branch

9                10th and Pennsylvania Avenues, N.W.
                Washington, D.C. 20530

10

11                C O N T E N T S

12  WITNESS               EXAMINATION BY:  MR. SEYMOUR   MS. WARD

13  Janie L. Collins               3, 27, 29    24, 28, 34
                                    35, 42, 44    36, 44, 45

14

15                    EXHIBITS

16  NUMBER                      FOR IDENTIFICATION

17   Deposition

18  1 (Form For Additional Information and
     attached letter)                 47

19

20  2 (Ltr fr law clerk to Seymour and
     attachments)                   48

21  Post hearing exhibit attached.

22

23

1                    P R O C E E D I N G S

2    Whereupon,

3                       JANIE L. COLLINS

4    was called as a witness and, having first been duly sworn by

5    the Notary Reporter, was examined and testified as follows:

6           EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7           BY MR. SEYMOUR:

8        Q    Please state your name and address for the record.

9        A    My name is Janie Collins.  The address, 537 Jones

10   Street, Number 8573, San Francisco 94102.

11       Q    Ms. Collins, have you ever taken the Professional

12   and Administrative Career Examination, otherwise known as the

13   PACE?

14       A    Have I ever taken it?

15       Q    That's right.

16       A    Yes, I have taken it.  Yes, I did take the examina-

17   tion.

18       Q    Did you take it more than once?

19       A    No, I didn't.

20       Q    When was that one time?

21       A    That one time was approximately in August of 1980.

22   If not in August, it was around that date.

23       Q    Do you remember about how long it was before you

4

1    received the results of that test?

2        A    Not very long.  It was within, I would say, about a

3    month.

4        Q    What were the results?

5        A    I did not pass the examination.

6        Q    What did you do after you received the results of the

7    examination?

8        A    After I received the results of the examination, I

9    rewrote the United States personnel office in San Franciso,

10   complaining about the examination.

11       Q    When you say "rewrote", do you mean that you wrote

12   earlier to them?

13       A    Yes, I had written earlier to them.

14       Q    Why don't you tell us what you said the first time

15   you wrote to them?

16       A    It was basically that I felt the examination was not

17   up to standard.  I felt there was not validity, and it was

18   not a reliable test due to the fact that some of the questions

19   that it asked was not really a test of an ability of what a

20   person really knows in that it was more or less just asking

21   questions concerning matters that were not really testing the

22   person's ability and that if a person had not been exposed to

23   certain situations, they would not answer the question as the

1   answer was to be, you know, and I felt that that was unfair,

2   that the test had no validity at all.

3      Q   Was there anything else in that letter?

4      A   Well, I just complained about it that I felt like

5   it was unfair, and more or less that basically was the com-

6   plaint I sent to them in that I felt it was unfair that the

7   test was not testing ability, not my ability anyway.

8      Q   Did this letter say anything about the test being

9   unfair to Blacks or discriminating Blacks or Hispanics?

10      A   Yes, I felt that way.  When I say that if you're not

11   exposed to certain things, like I did mention to them that I

12   was not exposed to the parents that were doctors, you know,

13   and that Black people and the lower class people are not really

14   exposed to doctors and lawyers as parents, you know, and that

15   their potential is not really tested--the ability that Blacks

16   or Hispanics, that this would be unfair to them to ask them

17   questions that they are not exposed to daily, you know.

18      Q   When did you write this letter?

19      A   This letter was written within a week after I took

20   the exam.

21      Q   Before you received the results?

22      A   Yes, I wrote to them before I even received the

23   results.

1    Q    And who did you sent the letter to?

2    A    Just to personnel department in San Francisco.

3    Q    Personnel department of what agency?

4    A    Personnel department, the people that had given me

5    the test, you know, the application for the test.

6    Q    Were you a federal employee at the time you took

7    the test?

8    A    No, I wasn't.

9    Q    Were you sending a letter to the United States

10    Office of Personnel Management?

11    A    I guess so.  I guess this would also be for unemploy-

12    ment, you know.  When you are seeking employment and they give

13    the applications.  That's where I sent it to.  450 Golden Gate.

14    Q    In San Francisco?

15    A    Right.

16    Q    First of all, do you have a copy of the letter that

17    you sent off at that time?

18    A    If I do, I did send it to you.  Yes, I do have a

19    copy.

20    Q    We have a copy of a letter that you attached to your

21    questionnaire, this form for additional information, and it is

22    dated September 1980.  I believe that's the earliest.

23    A    I guess that's the one.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Q    Is that the letter that you are referring to?

2    A    Yes, this is one of the letters I am referring to.

3    Q    Is that the first letter that you sent to the

4  Office of Personnel Management or was there another letter

5  that you sent?

6    A    I sent another one.  This is the second letter.

7    Q    That's the second letter?

8    A    Right.

9    Q    Let me keep going through these materials and see

10  if I see one.

11    A    You don't have to go through the materials because

12  I don't even have the first letter that I sent.  I had a

13  robbery in my house and a lot of my legal papers come up miss-

14  ing so not even I have the letter, that letter, the first

15  letter that I sent.

16    Q    All right.  Could you tell us, in the same words you

17  used in the letter as closely as you can remember them, exact-

18  ly what was said?  I do not want you to make any guesses or

19  assumptions or fill in any gaps about things you do not remem-

20  ber, but I would like to have in your own words what you said

21  to them.

22    A    Okay.  I did tell them about two questions on the

23  test that I did not like and I felt like it was not a test of

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    a person's knowledge and that this test should not be used.

2    Number one, I told them about a question being asked on the

3    test was something like complete the statement, and the state-

4    ment was actually referring to a medical person, a doctor, and

5    it amounted to it could either go one or two ways.

6          It could be a cleaning woman who was wiping a floor

7    or it could be a doctor who was working on a wound, a person's

8    wound.  And I told them, like, Black people are not that exposed

9    to doctors as parents or as sisters or brothers, and therefore,

10   when you are not being exposed to a doctor, you won't think

11   that this is the measurement of a doctor or if this person has

12   the education to be a doctor or to be employed as a doctor.

13         I looked at it as it being someone, a cleaning woman

14   because I was exposed to a cleaning woman whose occupation

15   was a cleaning person, you know, and because of that particular

16   question as a person who mops floors everyday for a living or

17   a person who is going to clean a wound, cleaning is cleaning.

18   You didn't say precisely what they were cleaning.  You just

19   said put the sentence together.

20         And it added up it was ambiguous.  It could either

21   of two ways, as a person who was trying for a job as a cleaning

22   woman or one who wants to be a doctor, you know, applied for a

23   position as a doctor.

1          And I said, well this is more or less like it's not

2    really testing some people's ability.  Some people are, you

3    know, exposed to this and some people are not.  There are

4    groups of people who are not exposed to the higher people who

5    have those positions.

6          That's it basically.

7          MS. WARD:  Ms. Collins, that's your letter of Septem-

8    ber.  What does the first letter that you wrote say?

9          THE WITNESS:  The first letter was basically the

10    same thing.  It didn't vary.  If it did, it was basically just

11    the same thing.

12          BY MR. SEYMOUR:

13    Q    When you gave us this description of what the first

14    letter contained a couple of minutes ago, were you looking at

15    your September 1980 letter at the time or were you just testi-

16    fying based upon your memory of the first letter?

17    A    Right now?

18    Q    Yes.

19    A    Right now I'm not even looking at the letter.  I'm

20    just telling you what I did say on the first letter, and the

21    other letter the same.

22          MR. SEYMOUR:  I should point out for the record that

23    throughout these depositions sometimes counsel will attempt

1  to interject something but because of the voice-activated

2  microphone the deponent cannot always hear what counsel says

3  unless the claimant happens to pause at the same time that

4  counsel is speaking.

5      BY MR. SEYMOUR:

6      Q    As I understand it, you sent this letter in within a

7  week or so after you took the test, then you got the results

8  in less than a month which would have placed it sometime in

9  September 1980 that you received the results, maybe late August

10  1980.  And at that time, did you send in this September 1980

11  statement to the Office of Personnel Management, addressed

12  to the U.S. Personnel Office at 450 Golden Gate?

13      A    Right.

14      Q    Do you remember about how many days or weeks it was

15  after you received the test results that you sent in the state-

16  ment to the U.S. Personnel Office on Golden Gate Avenue?

17      A    Not very long.

18      Q    Do you know if it would have been a matter of days

19  or a matter of weeks?  If you do not remember, just tell us.

20      A    It would have been like a matter of weeks.

21      Q    Did you receive any answer from the government to

22  your first letter?

23      A    I never received any answer.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1     Q     Did you receive any answer from the government to

2     your second letter?

3     A     The second letter, I did receive--I don't think I

4     did.  I didn't receive any answer from them until--no, I didn't.

5     Q     Is there something that you are thinking of that

6     you did receive but you're not sure if it was the answer to

7     the letter?

8     A     Yes, I did receive a letter from them at a later--

9     oh, yes, I did receive a letter from them in May of '81, but

10    this was long after I had written to them.  It was in regards

11    to the--after the lawsuit had come about.

12    Q     Are you referring to a letter from the United States

13    Office of Personnel Management, dated May 21, 1981, signed

14    by Christine Applegate?

15    A     Right.

16    Q     And that refers to the Luevano settlement.  You also

17    sent in a couple of documents relating to a proceeding that

18    you had against the City of San Francisco. That does not have

19    any connection to this case, does it?

20    A     No.

21    Q     That was a separate case that you had in the U.S.

22    District Court in San Francisco and tried to take an appeal

23    to the 9th Circuit.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

A     Right.

Q     Did anyone from the government ever call you to talk about either of the letters that you had sent in complaining about the PACE?  You already said that you didn't receive an answer in writing.  But did anyone call you and talk with you about it?

A     No, they didn't.

Q     Did you ever take any action to follow up on your second letter?

A     No, I didn't.

Q     At the place where you took the PACE examination, did you see any poster, leaflet or brochure telling you how to go about filing a complaint of discrimination?

A     No, I didn't.  You mean the examination room?

Q     That's right.  Examination room or wherever you got the papers to fill out the application.

A     I don't recall that.  I don't recall seeing one.

Q     Has anyone on behalf of the government either before then or after then ever informed you that you could send a complaint to either the Merit Systems Protection Board or the Office of Federal Sector Appeals at the United States Equal Employment Opportunity Commission to complain  about a test like the PACE?

1     A   Will you repeat the last part of your question

2  please?

3     Q   Did anyone from the government ever inform you be-

4  fore or after August and September 1980 that you could file a

5  complaint about a test like the PACE directly with the Merit

6  Systems Protection Board or with the Office of Federal Sector

7  Appeals at the United States Equal Employment Opportunity

8  Commission?

9     A   No one told me that, but I did go to the Equal

10  Employment, that portion of it, and I talked to someone there,

11  and they told me that after the lawsuit, they told me that

12  I was to contact you in Washington and that I was to receive

13  money that I had nothing else to do, that they wouldn't even

14  interfere because the case had been won, they said.  I did go

15  there in San Francisco, and that's what I was told.

16     Q   Is that the visit or contact that is described in

17  this letter of Christine Applegate, dated May 21st, 1981?

18     A   I suppose so.  Wait a minute.

19     Q   Could you find that letter?  You do have a copy of

20  the letter before you, don't you?

21     A   No, I don't find that one.  Oh, yes, I do.  Okay.

22     Q   Is that the communication that you were referring

23  to when you said that somebody said you were entitled to relief?

14

1       A    No, no.  I'm not referring to this communication.

2  No.  Dated May 21, '81.

3       Q    What other communication are you referring to?  Was

4  it in writing or was it outloud?

5       A    This was oral.  I went into the office and I never

6  got this in writing.  This was orally done.

7       Q    What office did you go into?  You said it was an

8  Equal Employment office.  Was that Equal Employment Opportunity

9  Commission or was it some part of the Office of Personnel

10 Management dealing with equal employment opportunity?

11      A    No.  It was the Equal Employment--it was the last one

12 that you called.  It was not dealing with personnel, and I

13 talked to a lady there, and she reviewed the--as a matter of

14 fact, she looked at the case and told me to contact Washington

15 about the matter.

16      Q    Was this after after you heard about the settlement

17 in the Luevano case?

18      A    Right.

19      Q    And this was the U.S.--

20      A    I told her.  I'm sorry.  Go ahead.

21      Q    Was this the U.S. Equal Employment Opportunity

22 Commission?

23      A    It was.  That's what it was.

1  Q Do you remember the street of the address of the

2 office that you went to?

3  A I don't remember the street or the address. I do

4 remember that they have moved into another building.

5  Q Do you remember the name of the building?

6  A I think it is the state building or it look like a

7 state building.

8  Q The one that you went to?

9  A Right. Well, not the one that I went to originally.

10 The first time I saw them was in a building I can't recall

11 now where it was at, the first time I went there. And they

12 moved. That's what happened.

13  Q Let me ask you a few questions about information you

14 put down on the questionnaire that we sent out to you last

15 year. The questionnaire was sent out pursuant to an order

16 from the court, and you answered that, well, let me read you

17 the following question and then read you your answer. Then

18 I'll ask you about it.

19   Question Number 2 says, quote, "Do you have any

20 papers showing that you took the PACE at the time or times

21 stated above, or telling you the results of your taking the

22 test?" And then your answer said, quote, "U.S. Secret Service

23 agent stole it out of my room."

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1          Can you explain that?

2     A    Okay.  I thought that you were talking about the

3  results of the examination.

4     Q    That's right.  A paper showing that you took the

5  examination, when you said you did, and showing what the

6  results of the test were.

7     A    Right.  That would be the results of the examina-

8  tion and the card and stuff like that telling you when to come

9  and place.  Okay.  They were stolen out of my room.  All of

10  my papers, most of my papers, legal papers was taken and

11  stolen, and the only way that I can prove that I did take the

12  examination would be for you to contact them, and I could also

13  prove it through the welfare department of San Francisco that

14  I called them during intermission of the PACE exam, I called

15  them and told them that I couldn't keep an appointment with

16  them because of the fact that I was taking the examination,

17  and I spoke to the manager there at the welfare office.

18     Q    What welfare office would that be?  Do you know the

19  address?

20     A    Yes, it's on Mission Street in San Francisco.  I'm

21  not sure of the correct address.  I think it is 1180 Mission

22  Street.

23     Q    Do you remember the name of the manager?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    A   The main welfare office in San Francisco, and

2  the supervisor there, his first name is Tom. I don't recall

3  his last name.

4    Q   Do you remember his last name?

5    A   I don't recall his last name. No.

6    Q   Was this your regular welfare case worker that you

7  spoke to?

8    A   No. He was the main supervisor. My regular welfare

9  case worker was off that day. So therefore the supervisor

10  took over.

11    Q   If it becomes important to check that record, we

12  would have to have your written consent to see your welfare

13  records. Would there be any problem with your giving us the

14  consent?

15    A   No.

16    Q   What is your Social Security Number?

17    A   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.

18    Q   Now, getting back to this question about the papers

19  being stolen out of your room, are you referring to the place

20  where you lived?

21    A   Right.

22    Q   What makes you think it was a Secret Service agent

23  that stole the papers?

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C. 20002
(202) 546-6666

1    A    Well, what makes me think that is because later I

2   kept missing papers, and I had had some dealings with them and

3   I kept missing papers and very important papers.  So I ended

4   up calling the police and reported the matter, and it was never

5   stated that I filed a wrong report, you know, against them

6   for doing it.

7    Q    So you don't really have any basis for saying it

8   was the Secret Service.  That was just a guess?

9    A    Well, it was more than a guess or a hunch.  I just

10   feel that they really did take the papers, you know.  I don't

11   have any proof.  I can't say I have any proof that here he is.

12   He took my papers, but the papers came up missing, and not

13   only those but so many other papers.

14        I feel like the Secret Service knew all into it be-

15   cause on another occasion the police came to my apartment and

16   some of the neighbors said that they went in and robbed the

17   apartment, and I felt like that either the San Francisco Police

18   Department or someone did get it, because there were witnesses,

19   too, on another occasion when papers some up missing.

20        MS. WARD:  Is there some reason, Ms. Collins, why

21   you believe the Secret Service would be interested in what

22   your results to the PACE exam were?

23        THE WITNESS:  Yes, I do feel like they would be

1    interested in knowing.

2            MS. WARD:  Why?

3            THE WITNESS:  And stopping it, too, you know, what-

4    ever.  I had been involved in other court cases where every-

5    time I get ready to present some evidence the papers come up

6    missing, and it just forced me into calling the Oakland, when

7    I moved, to call the Oakland Police Department.

8            MS. WARD:  You said that you had some prior dealings

9    with the Secret Service.  What were those prior dealings?

10           THE WITNESS:  I don't think that would have anything

11   to do with this examination, the PACE examination, the prior

12   dealings that I had with them.

13           MS. WARD:  Well, you've made an allegation--

14           THE WITNESS:  It involved something else.  Another

15   matter.  As a matter of fact, it involved an forgery on another

16   matter altogether different than this one.

17           MS. WARD:  Well, you've made an allegation that the

18   Secret Service, because of its prior dealings with you in

19   another matter which you refuse to tell us about, took papers

20   which are crucial to this matter.

21           THE WITNESS:  Right.

22           MS. WARD:  I'm afraid I have to ask you--

23           THE WITNESS:  The reason why I had prior dealings

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    with them was due to a forgery on another case.

2          MS. WARD:  Do you refuse to answer the question?

3          THE WITNESS:  And therefore, I feel like they had

4    reason to come in and just gather up all them other papers.

5    As a matter of fact, I could talk all day feeling that they

6    did it, that they could come in and rob my house and whatever,

7    but that would consume a lot of time.

8          BY MS. SEYMOUR:

9      Q    Ma'am, did the Secret Service accuse you of forgery

10    in the past?

11     A    No.  I'm accusing them.

12     Q    You accused them of forging something else?

13     A    Right.

14     Q    What was it they were supposed to have forged?

15     A    Letters.

16     Q    Letters saying what?

17     A    Well, I wouldn't like to answer that question.  It's

18    just too much.  As a matter of fact, even now I have a welfare

19    problem now where I am indicating that it has been forged and

20    stuff like that.

21     Q    Well, ma'am, you've raised the matter in court.

22    You filed these statements about the Secret Service stealing

23    papers as part of the official court records in this case,

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    and then you brought up the Secret Service problem in answer

2    to questions that we talked about today.  You did swear to tell

3    the whole truth at the beginning of the deposition, and as

4    the lawyer for the Plaintiffs and the class in Luevano, I

5    have to tell you that you really are required to give that

6    answer unless you have some grounds to believe that the answer

7    would tend to incriminate you.

8       A    In answer to what, your last question?

9       Q    That's right.

10      A    Will you repeat that last question?

11      Q    What did these letters that you accused the Secret

12   Service of forging say?

13      A    What did they say?  It has got nothing to do with

14   the PACE examination, and the ones that now that I'm accusing

15   them of forgering just happened about six months ago, and it

16   has got nothing, absolutely nothing to do with the PACE.

17           This PACE examination is civil, and that is directly

18   criminal, what they would have something to do with.  Now, like

19   I have written on this paper that they took, they stole it out

20   of my room, and I'm still believing that they stole it out of

21   my room.  I have filed a complaint with the police department,

22   and the police department has not come back on me saying that

23   they did not, and as a matter of fact, they even told me why

1  don't I put in a lawsuit against them, but I can't prove that

2  they stole the papers.   That's the reason I have not put in a

3  lawsuit against them.   If I had proof of it, I would be more

4  than happy to do so.

5       Q    Ma'am, your statement to the court was signed on

6  January 24th, or it could be the 29th, I suppose, but it looks

7  on here more like January 24, 1984, and that written statement

8  with that date on it, complained about the Secret Service

9  stealing papers.

10       Does that refresh your mind about when these problems

11  of yours with the Secret Service began?

12       A    Oh, the problems began like in '78, I think.

13       Q    With the Secret Service?

14       A    Right.

15       Q    Were there some problems with the Secret Service

16  before these letters that you accused them of forging?

17       A    Right.

18       Q    What did those problems involve?

19       A    Those problems does not involve anything that would

20  have anything to do with this examination and the Question

21  Number 2 that you asked on this questionnaire.   It just doesn't

22  have anything to do with it.

23       And furthermore, if you really want to know what it

1   does involve, it involves I was raped by one, you know, and

2   like I say, it doesn't really have anything to do this, and I

3   don't think that they would like for me to expose all of the

4   information.

5          It might be incriminating to me to do so because I

6   might be having to fear for my life by telling you all of this

7   information that doesn't really have anything to do with the

8   PACE examination, and I don't have no bodyguards.

9          MR. SEYMOUR:   Hold on just a minute, ma'am.

10         BY MR. SEYMOUR:

11   Q     Ms. Collins, I just have a couple of questions and

12   then the lawyer for the government will have some questions.

13   What is your race?

14   A     Black, Negro, whatever.

15   Q     What is your level of education?

16   A     Perhaps about three and a half years of college.

17   Q     Meaning you started the third year but did not

18   finish it or started the fourth year but did not finish it?

19   A     Right.

20   Q     What school was that?

21   A     Roosevelt University in Chicago.

22   Q     Could you tell me what your course of study was there?

23   A     Psychology.

24

1      Q    When you took the PACE examination, were you apply-

2  ing for a particular type of job?

3      A    Yes, I was.

4      Q    What type of job were you applying for?

5      A    Something that would have to do with psychology,

6  working in that field.

7      Q    Do you recall the name of the job?  Before you take

8  the PACE, you fill out this questionnaire asking you for the

9  jobs that you're interested in.  So you put down the name and

10  the job series, what jobs you are interested in and the parts

11  of the country you are interested in working in.  Do you

12  remember doing that?

13      A    Right.

14      Q    Do you remember the names of the jobs that you put

15  down?

16      A    If I'm not mistaken, it had to do something with

17  management and counseling.

18      Q    Is that as closely as you remember it?

19      A    That's as close as I can remember.

20      MR. SEYMOUR:  No further questions.

21      EXAMINATION BY COUNSEL FOR THE DEFENDANTS

22      BY MS. WARD:

23      Q    Ms. Collins, I have in front of me the letter of

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.   20002
(202) 546-6666

1  May 21st, 1981, to you which is signed by Christine M. Apple-

2  gate, the Chief of the Professional/Trades & Crafts Section

3  of OPM.  Do you have that letter?

4      A    Yes, I do.

5      Q    Ms. Applegate refers to your letter of May 2nd, 1981,

6  regarding the PACE examination.  Do you have that letter?

7      A    No, I don't have that letter.

8      MS. WARD:  Mr. Seymour, do we have that letter in

9  our files?

10      MR. SEYMOUR:  No.

11      MS. WARD:  The government doesn't have that letter

12  either nor do the Plaintiffs.

13      MR. SEYMOUR:  Let me do a quick search here to see.

14      BY MS. WARD:

15      Q    Other than your letter that you wrote immediately

16  after your took the exam--you said you wrote that letter

17  about one week after the exam, then you wrote a second letter

18  in September of 1980 which we do have, and then you wrote this

19  letter of May 2nd, is that correct?  Those are the three

20  letters which you wrote regarding the PACE examination?

21      A    Does that conclude it you said?

22      Q    Yes.  Are those the only three letters that you

23  wrote concerning the PACE examination?

1      A    Yes, it is.

2      Q    Those are the only three.

3      A    Right.

4      Q    You wrote no other letters concerning the PACE

5   examination?

6      A    I don't recall. Oh, I wrote to you.

7      MR. SEYMOUR:  You mean other than in connection with

8   the Paragraph 21 claim procedure.

9      BY MS. WARD:

10     Q    So we only have three letters.  You wrote the letter

11  the week after the examination.  You wrote another letter in

12  September, and you wrote this third letter of May 2nd, 1981.

13  Is that correct?  When was the next time you wrote a letter

14  concerning either an objection to the PACE consent decree or

15  the PACE examination at all?

16     A    I wrote to you.

17     Q    When you say "you", who do you mean?  Richard Seymour?

18     A    I wrote to Washington.

19     Q    Who in Washington did you write to?

20     A    Let me see.  I wrote, I don't know where; but anyway

21  there was an address someplace here.  Yes.  1900 E Street,

22  Northwest, Washington, D.C.

23     Q    When did you write to 1900 E Street, Washington, D.C.?

1      A     This was around the date of May 2nd.  I wrote this

2  letter--oh, no, it wasn't around--it could have been, yes.

3  It could have been very much near that date.

4      Q     Do you have a copy of the letter that you wrote?

5      A     No, I don't have a copy of the letter.  I received,

6  if I am not mistaken, from you--I don't think it came from

7  San Francisco.  I think it came from Washington--the Appendix

8  B to the Order Granting Preliminary Approval to the Consent

9  Decree.  This I received from Washington.  Right.

10      Q     So you received a copy of Appendix B.  Did you write

11  to the court in response to that receiving of Appendix B?

12      A     No, no.  I wrote to the court about PACE, and this

13  is what they sent to me, Appendix B.

14      FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

15          BY MR. SEYMOUR:

16      Q     Ma'am, did you write to the court or did you write

17  to the Office of Personnel Management at 1900 E Street in order

18  to get this copy of Appendix B?

19      A     I wrote to 1900, if I'm not mistaken.  I wrote to

20  1900 E Street, Northwest.

21      Q     All right.  And the Appendix B that you are referring

22  to, is that a notice to class members, about five pages long?

23      A     Right.

1          MR. SEYMOUR:  Let me state for the record that that

2    is an appendix to the order granting final approval, not an

3    appendix to the consent decree itself.  Please continue,

4    Ms. Ward.

5        FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6          BY MS. WARD:

7        Q    Did you ever write an objection to the United States

8    District Court concerning the settlement of the Luevano case?

9        A    I feel that I did.  I can't say for sure I did but

10   I think I did.

11         MR. SEYMOUR:  Let's take just a two-minute break

12   from the deposition while I check the files because I have

13   copies here of all the comments that were filed.  I don't think

14   there were any but I am happy to do a double-check on that, but

15   I would like the deposition not to continue while I am off

16   checking.  Is that all right?

17         THE WITNESS:  Okay.

18         (Pause.)

19         MR. SEYMOUR:  Ms. Collins, I've justed checked the

20   record of all the comments and objections that were filed with

21   the court in 1981, and there was nothing that was filed with

22   the court by you at that time.

23         I seem to remember, however, that you wrote a letter

1    to the court about a year ago, late summer or early fall, may-

2    be October of 1983, and that, as a result of that letter,

3    the Clerk of the Court got in touch with us and asked us to

4    get in touch with you, and then after that, you filed your

5    claim under Paragraph 21 of the Consent Decree, saying that

6    you had made this complaint of racial discrimination against

7    the PACE way back in 1980.  Does that sound right to you?

8         THE WITNESS:  That sounds about right.  I know there

9    was something I've seen, you know, that I had written.  I

10    couldn't recall exactly, but that sounds correct.

11         FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

12         BY MR. SEYMOUR:

13    Q    So that the first time that you wrote to the court

14    was about a year ago in 1983?

15    A    Right.  That's probably right.  I'm sure it's right.

16    If you found that, then that's right.  It sounds right anyway.

17    Q    And it was back in early 1981 that you received this

18    five-page notice to class members, is that right?

19    A    Right.

20         MR. SEYMOUR:  Please continue, Ms. Ward.

21         MS. WARD:  I have no further questions.

22         BY MR. SEYMOUR:

23    Q    I have a few questions at this point.  When you

1    Q    When you received the five-page notice to class

2    members back in May of 1981, did you read through the whole

3    thing?

4    A    Yes, I did.  Wait a minute.  I'm trying to recall.

5    Maybe I did receive it just in May and as soon as I received

6    it, I think I wrote back to the San Francisco office and was

7    telling them my interpretation of it, of the Appendix B, and

8    that is when they wrote and told me--maybe it's not, but any-

9    way, I felt like they were misinterpreting the letter as I was

10   misinterpreting it.  One of us had to be misinterpreting the

11   letter.

12   Q    Let me start from the beginning, ma'am.  How did you

13   hear about the settlement of the Luevano case the first time?

14   A    I heard about it through the Jet magazine.

15   Q    You saw the public notice that was published in Jet

16   magazine?

17   A    Right.

18   Q    And when you saw the public notice, did you send off

19   for this detailed form of notice at that time?

20   A    Would you please repeat the question?

21   Q    The notice in Jet magazine said that if you wanted

22   to have more details, you could right to the Office of Person-

23   nel Management, 1900 E Street, Northwest, Room 5H30, Washington,

1   D.C.  Did you write to the Office of Personnel Management to

2   get the more detailed form of notice as soon as you saw the

3   summary notice in Jet magazine?

4       A    I don't recall doing that.  I wrote directly to

5   San Francisco, and that's when I went to the EEOP office or

6   whatever it is, EEOC or whatever.  That is when I went there,

7   and I felt like they could handle the situation more so than

8   me, and they told me that there was else more for them to do

9   but just sit back and wait.

10          That's more or less what I did when I got it.  I

11   wrote San Francisco, again, about it.  That's when I went to

12   the office.

13      Q    Well, the thing I am trying to pin down is whether

14   you got this May 21st, 1981, letter from the Office of Person-

15   nel Management, the one that is signed by Christine Applegate

16   before you received the detailed notice about the settlement

17   or after you received the detailed notice about the settle-

18   ment.  Which was it?

19      A    The detailed notice, you mean Appendix B?

20      Q    That's right.

21      A    Okay.  Now, let me think about that.  The May 21,

22   1981, letter is in response to the Appendix B because here

23   she is saying in here second paragraph, "Only the original

1   complainants in the plaintiff class of Luevano versus

2   Campbell were entitle to..."  I had said something to her

3   from reading this Appendix B, my interpretation of it was is

4   that I had written to you earlier and you ignored my letters,

5   and now you see what you have got here now, this Appendix B.

6   I sent them a copy of it.

7       And she is telling me, explaining to me that only

8   the original complainants in the plaintiff class, rather,

9   of Luevano versus Campbell were entitled to money and that I

10  was really misinterpreting this Appendix B.  That is what she

11  is talking about.

12      Q   So first you got Appendix B.  Then you got in touch

13  with them.  Did you tell them in this letter of May 2nd, 1981,

14  that you wanted to make a claim?

15      A   No, no.  I told them, well, I told them about what

16  I had already done, that I had written to them about the

17  letter.  Yes, I did tell them that I had already complained

18  about it, yes, you are right.  That's what I did.

19      O   Please tell us in the same words you used in your

20  letter of May 2, 1981, as closely as you can remember them

21  but without trying to fill in any gaps or make any guesses

22  or assumes about what you said, just tell us as closely as

23  you can remember the words you used in that letter to the

1    government.

2        A    Okay.  I told them that I had written to them twice

3    and that they hadn't contacted me about the complaint that I

4    had sent in to them.  This complaint, too, was more or less

5    a claim, because I had planned on suing them.  I was in the

6    process of getting an attorney to sue them.

7        I told them about it then.  I told them that I was

8    entitled to receive money without having to go through a law-

9    suit, based on the Appendix B that I had received through the

10   mail, and I attached a copy of the Appendix B.

11       O    Then you got back this letter dated May 21st, 1981.

12   And what did you do after you received this letter?

13       A    After I received this letter.  I had no more con-

14   tact with the San Francisco office.  I think this is when I

15   contacted the courts, yes, I'm pretty sure.  I didn't contact

16   the San Francisco office any more.

17       Q    Your contact with the court was two and a half years

18   later, back in the late summer or early fall of 1983.

19       A    Yes, that's true.  I happened to come across--I

20   felt like the San Francisco letter that I had misinterpreted

21   the Appendix B, and I didn't contact them any more, and I felt

22   like if I wanted to, maybe--as a matter of fact, I even felt

23   like I couldn't sue the government any more for this or do

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1  anything about it. So I believed them with this letter, May

2  21, '81. I believed them.

3  But then one day, after papers are being stolen and

4  everything, I came across what was the rest of the papers, and

5  I read this Appendix B again, and I felt like I was interpret-

6  ing the letter right, and she was misinterpreting it, and I

7  wrote the court. That is true. There was a time there be-

8  cause I did no more. I felt like I had no grounds to do any-

9  thing because I was believing her.

10  Q    You had mentioned a lawyer earlier, about getting a

11  lawyer to help you sue the government about this. Did you

12  show this May 21st, 1981, letter to the lawyer?

13  A    No, I had not gotten this letter at that time.

14  FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

15  BY MS. WARD:

16  Q    When did you first contact an attorney, Ms. Collins?

17  A    I did not contact--well, I had an attorney handling

18  another suit for me, and I had thought of telling him about

19  this, but I did not tell him about it. I had said I had

20  planned to do so.

21  Q    So you had legal counsel but you did not discuss

22  this matter with him?

23  A    No, I didn't.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

35

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SEYMOUR:

Q    Did you have the lawyer at the same time that you received--the lawyer on the other case--did you have that lawyer at the same time that you received this letter or was this a different period of time?

A    This was during the same period of time.

Q    Can you tell us what the subject matter of the other case was?  Did it have anything to do with civil rights?

A    No.  It was a product liability case.

Q    Do you know whether this other lawyer handled problems involving employment discrimination cases against the Federal Government?

A    I didn't know at that time, no, but I think he does.

Q    Are you saying that you found that out later on?

A    Right.

Q    How much later on?

A    Not very much later on.  As a matter of fact, I think he told me he handled all types of legal matters.

Q    Is there any reason why you did not talk to the lawyer about it after you found out that the person did handle employment discrimination cases?

A    Yes, there was a reason I didn't talk to him about

1    which is because I believed Ms. Applegate that I had misinter-

2    preted the Appendix B.

3        Q    A few moments ago you said that you found a copy of

4    Appendix B again and you made a reference to papers being

5    stolen once more.

6        A    Right.

7        Q    Are you saying that you found the copy of Appendix

8    B and your old PACE papers or are you saying someting different?

9        A    Oh, no.  What I am saying is that I had a file, and

10   as I was going through the file one day, I discovered Appendix

11   B.  The other part of my material is gone.  I can't get it

12   back.  I wish someone would bring it back.

13           But I did come across it as I was going through my

14   files, and I reread it, and I began to feel like I was right

15   and that Ms. Applegate was wrong.  But, no, I didn't come

16   across the other papers.

17       FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

18           BY MS. WARD:

19       Q    When was it that you came across these papers?

20       A    It probably was in '83, whenever I wrote to the

21   court.  This is when I began to initiate the proceedings over

22   again because I believed myself to be right.

23       Q    So you found the papers in 1983.  You reread--

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1     A    Excuse me.  The papers were never lost.  What it is

2  is that I just decided to go through this file and look through

3  it again, you know.

4     Q    So you changed your mind and you decided that you

5  would initiate a complaint with the court, then, in February

6  of '83 after you rereviewed Appendix B.

7     A    Right.

8     Q    You, however, had Appendix B in your possession when

9  you received the letter from Ms. Applegate.

10     A    Right.

11     Q    That's why you wrote to Ms. Applegate?

12     A    Right.

13     Q    Why did you not write to the court?

14     A    Prior to writing to Ms. Applegate?

15     Q    Yes.

16     A    Or after writing to her.  What do you mean?

17     Q    Prior to writing to Ms. Applegate.  From whom did

18  you receive Ms. Applegate's name?

19     A    Pardon me?

20     Q    Who told you to write to Ms. Applegate?

21     A    Who told me to write to her?  I didn't write to her

22  directly.  She's just the one who answered the letter.  I just

23  wrote it to the Office of Personnel Management in San Francisco.

Q    Did the notice in Jet magazine tell you to write to the Office of Personnel Management in San Francisco?

A    Well, I don't recall really what Jet magazine said.

Q    Did Appendix B tell you to write to the Office of Personnel Management in San Franciscso?

A    I do not recall.

Q    Do you remember why you chose to write to the Office of Personnel Management in San Francisco?

A    Yes, because I had written prior to them prior to even receiving the Appendix B, and I had written to them right after I took the examination. So, therefore, that's why I wanted to continue this matter with them.

And I felt like since it was local, you know, that they could, if necessary, they were the ones to contact you because I had already contacted them.

Q    Ms. Collins, on this case that you filed against the City of San Francisco, is that a race discrimination complaint?

A    Right.

Q    Did you file a claim of racial discrimination against the City of San Francisco?

A    No.

Q    You've never filed a claim of racial discrimination against the City of San Francisco?

39

1      A    No.

2      Q    Did you not just answer me that the court papers

3 which you sent to us attached to your complaint have to do with

4 a claim against the City of San Francisco for race discrimina-

5 tion?

6      A    I don't recall about the race discrimination.

7      Q    Okay.  In your case which is entitled Janie Collins

8 versus the City of San Francisco, why did you sue the city?

9      A    Oh, that had nothing to do with race discrimination,

10 and at that time, I don't recall why I sued the City of San

11 Francisco.  And to my knowledge, I have never filed a race

12 discrimination against anybody except writing to the personnel

13 department in the federal, you know.

14      Q    Do you remember why you sued the San Francisco

15 General Hospital?

16      A    Why did I sue them?

17      Q    Yes.

18      A    Oh, that wouldn't have to do anything with race

19 discrimination, I don't think.

20      Q    What did it have to do with?

21      A    I don't have that case in front of me at this time.

22 Therefore, I wouldn't like to say why.  I don't have it in

23 front of me right now.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      Q    You don't remember why you sued the county of San

2  Francisco General Hospital?

3      A    Oh, well, I think I had about 15 causes of action.

4      Q    Do you remember generally what they came out of?

5      A    False arrest and imprisonment.

6      Q    After you received the letter from Ms. Applegate

7  which informed you that copies of the consent decree were

8  available at the Office of Personnel Management, Federal Job

9  Information Center, at 450 Golden Gate Avenue, did you ever

10 go to the Federal Job Information Center at 450 Golden Gate

11 Avenue?

12     A    Right, I did.

13     Q    Did you get a copy of the consent decree?

14     A    Yes, I did.

15     Q    When did you got to the Federal Job Information

16 Center?

17     A    Immediately after I got this letter.

18     Q    So immediately after receiving Ms. Applegate's letter

19 in May of 1981, you went to the Federal Job Information Center

20 and you asked for and received a copy of the consent decree?

21     A    Right.

22     Q    Did you read it?

23     A    Yes, I did.

1    Q    Did you take any further action after you read it?

2    A    Action I took after I read it.

3    Q    What was the next thing that you did?

4    A    I did write once again--no, I don't know.  I didn't

5    take any further action, not until I wrote the court.

6    Q    Not until you wrote the court in February of 1983?

7    A    Right.

8    MR. SEYMOUR:    Let me state for the record that the

9    February 2nd, 1983, date referred to by counsel should

10    actually be February 2nd, 1984.

11    BY MS. WARD:

12    Q    Do that was the next time you wrote to the court,

13    then, in early February 1984?

14    A    1984?

15    Q    Early February 1984?

16    A    I suppose so.  I don't have the letter here.

17    Q    Well, I have in front of me a three-page form that

18    is a Form for Additional Information for Class Members Who

19    State That They Filed Charges of Discrimination.  And then it

20    says "Class Member" and it has your name Ms. Janie L. Collins.

21    And then it has a number of questions on which you state that

22    you took the PACE in August of 1980, that you have no informa-

23    tion concerning the PACE exam or your taking it because the

1    U.S. Secret Service stole it.

2        A    Right, yes, okay.

3        Q    Okay.  That form is dated January 24th, 1984.

4        A    Right.

5        Q    So that's the next communication you had with the

6    court?

7        A    That's the next one?  I thought I wrote like another

8    letter to the court.

9        Q    Do you have a copy of that other letter?

10       A    No, I don't.  Maybe I got confused and sent it

11   to the E Street address or something.

12           MS. WARD:  Mr. Seymour, do you have any other

13   questions?

14       FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

15           BY MR. SEYMOUR:

16       Q    I have just a few other questions.  Ms. Collins, I

17   have a copy of a letter that you had sent to the court, dated

18   October the 11th, 1983, labeled up at the top--wait a second,

19   I was just going through the court file to see if I can find

20   a copy of the paper.  (Pause.)

21           The document is styled Second Request up at the top,

22   and it says--this is a letter to the Clerk of the Court that

23   begins "Dear Sirs", quote, "I made a complaint of discrimination

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    about the PACE test prior to the court decision in Washington,

2    D.C.  I wrote to the employment office in San Francisco,

3    California, about the test and had planned on suing.

4        "I wrote the court in Washington, D.C., and I, again,

5    wrote personnel office in San Francisco.  I never heard from

6    the court but I did receive a letter from San Francisco.  A

7    copy of the letter is enclosed."

8        And then there is attached to that letter a copy of

9    the card or sheet that you sent into the Office of Personnel

10   Managment asking to be put on the mailing list for information

11   about alternative examining procedures and a copy of the May

12   21st, 1981, letter you received from Christine Applegate as

13   well as a copy of Appendix B that you testified earlier you

14   had received.

15       Does that refresh your memory about when it was

16   that you contacted the court in 1983?

17       A    Right.  That does, yes.

18       Q    Now, that letter does say that you wrote to the court

19   in Washington, D.C., earlier than October 11th, '83.  Try to

20   remember as closely as you can when any such earlier letter

21   would have been sent to the court.

22       A    The earlier letter would have been sent as soon as

23   I heard of the lawsuit, the winning of the lawsuit.  That

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    is when I wrote the court.

2        FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

3            BY MS. WARD:

4        Q    Was that when you saw the advertisement in Jet magazine?

5        A    Right.  It was nearing that time.

6        Q    Would that communication have been addressed to 1900

7    E Street?

8        A    I guess so.  I can't recall.

9        FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

10           BY MR. SEYMOUR:

11       Q    Let me read to you from Appendix B, page 3, and this

12   is one of the sheets that were attached to your letter that

13   you sent into the court.  Quote, "Under the settlement, the

14   four named Plaintiffs will receive a total of $35,000 in back

15   pay among them.  Any class members who have filed charges of

16   discrimination against OPM, complaining of discrimination in

17   OPM's implementation or use of the PACE, will be entitled to

18   receive $3,000 in settlement of their back pay claims if they

19   bring themselves to the attention of the court immediately.

20   The way to do so is to send a letter to the Clerk of Court,

21   U.S. District Court, U.S. Courthouse, Washington, D.C. 20001."

22           So that letter has the address that you were supposed

23   to have written to to make a claim of discrimination or to

1    make a claim under Paragraph 21 of the consent decree.

2        A    Right, and that's where I sent the letter.

3        Q    Are you saying that you sent a letter to that address

4    and you also sent a letter to the Office of Personnel Manage-

5    ment at 1900 E Street?

6        A    Right.

7        FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

8        BY MS. WARD:

9        Q    Or did you sent a letter to the OPM office in San

10   Francisco?

11       A    I sent one there, too.

12       Q    Name the places where you sent a letter.  And where

13   is the letter?

14       A    I have had communications with the courts in Washing-

15   ton, and the E Street address and San Francisco.

16       Q    Now, where is the copy of the letter that you wrote

17   to the court after you received Appendix B?

18       A    The letter that I wrote, I do not have it.

19       Q    You do not have it.  Is there any reason why, that

20   you can think of why we do not have it?

21       A    There is no reason I can think of why you do not have

22   it.

23       Q    Can you tell us what you said in that letter to the

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1  court in reponse to Appendix B?

2      A    No more than I had already complained and that I had

3  already sent one into San Francisco prior to my hearing of

4  the results of the court case.

5      Q    Was it a letter that you wrote back?

6      A    A letter that I wrote to them?

7      Q    Yes.

8      A    Yes.

9      Q    Do I take it that the first time you filled out

10  this form that we talked about just a few minutes ago, Ms.

11  Collins, the one that's dated January 24th, 1984, where you

12  had to fill in the answers to specific questions, it's a

13  three-page form, do you know which one I am talking about?

14      A    Yes.

15      Q    Okay.  The one that has Form for Additional Informa-

16  tion From Class Members Who State They Filed Charges of

17  Discrimination, and then it has Class Member and your name

18  and then a series of questions.  Do you know what form I am

19  talking about?

20      A    Yes, I do.

21      Q    Was this the first time you filed out this form when

22  you sent it--

23      A    It was the first.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          Q     It was the first time in January of 1984, that was

2     the first time you filled out that form?

3          A     Right.

4                MS. WARD:   Thank you.

5                MR. SEYMOUR:   Plaintiffs make a copy of that form,

6     actually it is the original, signed by her of that form with

7     her attached September 1980 letter to the U.S. Personnel

8     Office Exhibit 1 to the deposition.

9                               (Whereupon, the document was
                                marked Deposition Exhibit 1,
10                              for identification.)

11               MR. SEYMOUR:   The Plaintiffs make as Exhibit 2 to the

12    deposition a letter of October 18th, 1983, from the Law

13    clerk for Judge Green in this case to me, telling me that you

14    had written to the court and enclosing a copy of your letter

15    and the attachments to your letter.

16               Now, attached to the law clerk's letter is your

17    October 11th, 1983, letter to the court, marked Second Request

18    up at the top; a copy of the sheet that you sent to the

19    Office of Personnel Management asking to be placed on a

20    mailing list; a copy of the May 21st, 1981, letter of Christine

21    Applegate to you; and a copy of two pages from Appendix B to

22    the Order Granting Preliminary Approval to the Consent Decree,

23    and that six-page set of documents will be Exhibit 2 to the

1   deposition.

2                          (Whereupon, the document was
                           marked Deposition Exhibit No. 2,
3                          for identification.)

4        MR. SEYMOUR:  Ma'am we'll make one final check of

5   the record to see if there is anything that can be found

6   about that.  If there is, we'll need to be back in touch with

7   you again to ask you some more questions about whatever it is

8   that we do find.

9        Can you tell me whether you will continue to be

10  available at this number over the next week or two?

11       THE WITNESS:  Yes, I will.

12       MR. SEYMOUR:  And what times of day are you most

13  likely to be reachable there?  Is this your home number or

14  is it a relative's number right now?

15       THE WITNESS:  This is a friend's number.  I won't

16  say now that I will be here.  I'll contact you.  I'll let

17  you know tomorrow in the mail where I will be and you tele-

18  phone number you can contact me at.

19       MR. SEYMOUR:  That will be fine.  Do you have any

20  further questions at this time?

21       MS. WARD:  I have no further questions at this time.

22  Thank you.

23       MR. SEYMOUR:  Ms. Collins, you have a right to

1   decide whether you want to see the transcript of your deposi-
2   tion and check it yourself for any possible mistakes in putting
3   down what you said, and then to sign a signature sheet that
4   will be sent along to you or instead just to waive your signa-
5   ture and trust the court reporter to get the job done correctly.
6   In most cases, we recommend that people check the transcript
7   of the depositions themselves and sign the sheet.

8           I do want to emphasize that this is a chance only to
9   correct things like typing errors. You cannot change your
10  testimony in it. You can only point out a mistake that was
11  made in taking down what it was that you actually said today.
12  But it is your decision to make.

13          Do you want to see the transcript and sign the sheet
14  or do you want to waive signature and trust to the court
15  reporter to get it done right?

16          THE WITNESS:   I would like to see the transcript.
17          MR. SEYMOUR:   Thank you very much.
18          MS. WARD:   Thank you.
19          (Signature not waived.)
20          (Whereupon, at 6:19 p.m., the taking of the deposition
21  concluded.)
22
23

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

### CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and with corrections made by me, if any, the same is a true record of the testimony given by me.

_Janie L. Collins_
JANIE L. COLLINS

Subscribed and sworn to before me this 9th day of January, 1985.

OFFICIAL SEAL
CAROL J BARTON
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My comm. expires JAN 8, 1988

_Carol J. Barton_
Notary Public in and for the
STATE OF CALIFORNIA

My commission expires  1/8/88

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1  through 49 do hereby certify that the witness, JANIE L. COLLINS, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 1, 1989.

Index page _1_ of _1_

## INDEX OF EXHIBITS

Exhibit pages _1_ thru _14_

Title of Case: _Angel G. Luevano, et. al., VS. Donald J. Devine, et. al.,_

Place: _Washington, D.C._

Date: _November 28, 1984._

_Deposition of Janie L. Collins._

FEB 17 1985

JAMES F. DAVEY, Clerk

| EXHIBIT NUMBER | PAGE NUMBER | EXHIBIT NUMBER | PAGE NUMBER |
|---|---|---|---|
| #1 | 1 | | |
| #2 | 6 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

RECEIVED FEB 2 1984

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
            Plaintiffs,                      )
                                             )
        v.                                   )    Civil Action No. 79-0271
                                             )
ALAN CAMPBELL, Director,                     )
    Office of Personnel                      )
    Management, et al.,                       )
                                             )
            Defendants.                      )
_____     )

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:    Ms. Janie L. Collins
                 537 Jones Street, Apt. 8573
                 San Francisco, California 94102

1.  State each date on which you took the PACE, as
closely as you can recall. _____
_____ August, 1980

2.  Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? U.S. Secret Service agent stole it out
of my room.
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3.  What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? Sept, 1980
To whom did you send this complaint? U.S. Personnel office
450 Golden Gate - San Francisco, CA.
What was the address to which you sent the complaint? _____
450 Golden Gate - San Francisco, CA.
_____

Did you ever receive a response to your complaint? Yes, After
                                    a second notice
If you did receive a response, what did it say? _____
Denied that the winning case applied to me
After I asked them to compensate me as a result of my

Deposition Exhibit No. 1
Deposition of Collins
W. McAllister, Reporter
11-28-04

(1)

filling a previous complaint with them

What was the date of the response? _May 21, 1981_

Do you have a copy of your complaint and of the responses you received? _yes_____ (PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

4.  Did you ever file another complaint against the PACE? _No_____ If so, state the dates of each such complaint: _____

To whom did you send these complaints? _____

_____

_____

What was the address to which you sent these complaints?

_____

_____

_____

_____

Did you ever receive any responses to these complaints? _____
If you did receive any responses, what did they say? _____

_____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THESE COMPLAINTS.)

5.  Did you ever file a lawsuit in Federal Court under Title VII of the Civil Rights Act of 1964, challenging the government's use of the PACE as racially or ethnically discrim-inatory? _NO_____ If so, please state the following:
Name of the case: _____ No.: _____
Court in which the case was filed:_____

_____ City_____State_____

Name and address of your attorney, if any:

_____

_____

City                      State          Zip

Telephone Number: _____

Has this case been decided? _____ If so, what was the decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

6.  State your telephone number: _____ *none* _____

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: _1-24-84_   Signature: *Janie L. Collins*

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>   Rights Under Law
> 520 Woodward Building
> 733 Fifteenth St., N.W.
> Washington, D.C.  20005

SiRs:
I am having problems out of San Francisco FBI and
United states Secret Service agent stealing records out
of my room and out of Court files. I can prove this
matter. I was forced to call the police & report
the matter. Police was aware of their Conduct,
Just to prove the problems I am having out of them,
I filed a docketing statement in U.S. Circuit Court
9th Cir. in S.F. CA. The District Attorney & FBI
stole the docketing statement and now the
Appeal is dismiss. A copy of the first page
of the D/statement is attached alone with
the Letter stating that I never filed one
and a copy of the dismissal. I have to walk
around with my papers in a piece of luggage.

(3)

*Janie L. Collins*
JANiE L. Collins

- 3 -

Sept,      '80                    537 Jones #8573
                                  San Francisco, CA94102

To: U.S. Personnel Office — 450 Golden Gate — San Francisco, CA

I, Janie L. Collins feel that the Pace Exam. that I took in San Francisco is unfair to negro people. Reasons being, one question in particular shows no validity + reliability for measurement of mental knowledge because the question is ambiguous. It appears that you are desiring to measure the skill for a Doctor; but the question can also be used to measure the skill of a plain simple unskill house cleaning woman after one place the sentences (statements) in order.

EX:
(1.) spill the solution    ② put a solution on it
③ Clean the area           ④ Lay substance on it

Due to the fact that I am new in the area; I have few friends. One of my best friends is a female house cleaner; therefore, I naturally looked at the sentence as being a cleaning woman who happened to have to clean an area where a solution had been spilled. I thought her to have to put a solution (cleansing agent) on the floor to clean it and afterward layed a coat of wax on the floor. After I finished putting the sentences together, I thought to myself, Do a Cleaning woman have to go to school 4 years and take this type of test to clean a house? At that moment, I immediately

④

thought about a doctor. I became disgusted and felt the test to be unfair for me a negro black woman. I had waisted my time on the question that was ambiguous and should be not be included on any sort of test. My parents and friends are not doctors. There are few black doctors in the U.S.A.

I am no dummy. The test is unfair.

May I hear from you soon regarding this matter.

Thank you in advance.

Very truly yours,

JANE L. Collins

⑤

Name: Janie Collins
Address: 537 Jones #8573
San Francisco, CA 94102
City & State: CA    Zip: 94102




**BUSINESS REPLY MAIL**
FIRST CLASS    PERMIT NO. 14036    WASHINGTON, D.C. 20005

POSTAGE WILL BE PAID BY ADDRESSEE

Lawyers' Committee for Civil Rights
    Under Law
Richard T. Seymour
520 Woodward Building
733 Fifteenth Street, Northwest
Washington, D.C. 20005

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



FILED
FEB 7 1985
JAMES F. DAVEY, Clerk

United States District Court
for the District of Columbia
Washington, D. C. 20001

October 18, 1983

Chambers of
Joyce Hens Green
United States District Judge

Richard T. Seymour, Esq.
Lawyers' Committee for Civil Rights Under Law
733 15th Street, N.W.
Washington, D.C.  20005

      Re: <u>Luevano v. Campbell</u>, C.A. No. 79-0271

Dear Mr. Seymour:

    Judge Green has asked me to forward to you the enclosed letter
from Ms. Janie L. Collins, who claims to be a class member entitled
to benefit under the consent decree in this case.  Ms. Collins
refers to a prior letter to the Court, but we have no record of
any such communication.  In support of her claim, Ms. Collins has
attached to her letter the first two pages of the February 26, 1981
notice to potential class members; she did not include the remainder
of the notice.  Please advise the Court of her status under the
settlement.

                Sincerely,

                Kim Sievwright

                Kim Sievwright
                Law Clerk

cc:  Barbara Wood, Esq.
     Civil Division
     U.S. Department of Justice
     Washington, D.C.  20530
     (with enclosures)

     Ms. Janie L. Collins
     537 Jones Street, #8573
     San Francisco, California  94102

Deposition Exhibit No. 2
Deposition of Collins
W. McAllister, Reporter
11-28-84

537 Jones #8573
San Francisco, CA
94102
October 11, 1983

Clerk of Court
U.S. District Court
U.S. Court House
Washington, D.C. 2001

Dear Sir:
I made a complaint of discrimination about the race test prior to the Court decision in Washington, D.C. I wrote to the employment office in San Francisco, CA about the test and had planned on suing.

I wrote the Court in Washington, DC. and I again wrote personnel office in San Francisco. I never heard from the Court but I did receive a letter from San Francisco. A copy of the letter is enclosed. The letter states that only plaintiffs in the case of Luevano v. Campbell are entitled to $3,000 benefits. That is not what the Court order stated. The Court order stated that "any Class member" could and is entitled to the $3,000. I can well assume that the San Francisco office lied because they knew that I filed a discrimination complaint and they received it and don't want to pay off.

I am asking that the court award me the $3,000.00 that is due me. I do feel that I am entitled to more money and that I should be paid an additional amount for having to wait for an answer from this Court which I have never received.

I also asked to be put on the mailing list and I have never received any correspondence from you.

May I hear from you soon regarding this matter.
Thank you in advance for an answer.

Very truly yours, ⑦

JANIE L. COLLINS

U.S. Office of Personnel Management
Office of the General Counsel
Room 5H30
P.O. Box 7559
Washington, D.C.  20044


Dear Sir or Madam:

I am a class member in the case of <u>Luevano</u> v. <u>Campbell</u>, and I request to be put on the mailing list for information about alternative examining procedures and test training programs.  I understand that this will not involve any charge to me.

PRINT NAME: _Janie L. Collins_

PRINT ADDRESS: _537 Jones #8573_

CITY _San Francisco_

STATE _California_        ZIP _94102_

United States of America
## Office of
## Personnel Management

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To  FR:PT:TP:bc                    May 21, 1981                    Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102

Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE examination.

Only the original complainants in the plaintiff class of Luevano vs. Campbell were entitled to monetary compensation and job offers in which they are interested. As a class member, you had the right to file an objection to this settlement if you believed that it was not fair to the class, or to some particular part of the class. To be considered, written objections had to be received by the U.S. District Court in Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions of the settlement which may be of interest to you. If you fill out the attached form you will be put on a mailing list and be informed of the opportunity to apply for Federal jobs under new alternative examining procedures which are being developed. You will also be informed of the opportunity to take training courses intended to provide assistance in preparing for future examinations of the PACE during the interim period while the examination is being phased out. Mailings on these opportunities will take place every six months until the last alternative examining procedure is put into effect. There will be no charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at all Office of Personnel Management Federal Job Information Centers. The Federal Job Information Center closest to you is located at 450 Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

Sincerely,

Christine M. Applegate
Christine M. Applegate, Chief
Professional/Trades & Crafts Section

Attachment

APPENDIX B TO THE ORDER GRANTING
PRELIMINARY APPROVAL TO THE CONSENT DECREE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,        )
                                 )
              Plaintiffs,        )
                                 )
         v.                      )        Civil Action No. 79-0271
                                 )
ALAN CAMPBELL, Director,         )              FILED
Office of Personnel              )
Management,                      )
                                 )        FEB 26 1981
              Defendant.         )
                                 )        JAMES F. DAVEY, Clerk

NOTICE TO ALL BLACKS, AND TO ALL HISPANICS,
WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL
AND ADMINISTRATIVE CAREER EXAMINATION (PACE)
FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS
ON OR AFTER MAY 19, 1975

This Notice is to provide you with the information you
need about the settlement of this lawsuit, and how this settlement
may affect your rights, so that you will be able to take advantage
of the rights given you by the settlement or to file an objection,
if you believe that the settlement is unfair to the class or to
any particular part of the class.

This lawsuit was filed in the U.S. District Court for the
District of Columbia in January 1979, to enforce the provisions of
Title VII of the Civil Rights Act of 1964. The Complaint alleged
that the U.S. Office of Personnel Management ("OPM") had violated
Title VII of the Civil Rights Act of 1964 by using its
Professional and Administrative Career Examination ("PACE") to
test applicants for approximately 118 entry-level Federal job
categories. OPM's Answer to the Complaint denied that its use of
this test was unlawful.

This lawsuit has now been settled. The Consent Decree
containing the settlement has been given preliminary approval by
the Court, so that notice of the settlement could be provided to
class members and class members could decide whether they want to

is determined in an enforcement proceding that the examining
procedure has not been properly validated the agency shall be
liable for full relief under Title VII.

The special programs in question include the Outstanding
Scholar program, the College Co-operative Student program, a
bilingual/bicultural certification program, a training program to
help class members who will be taking the PACE in the future,
special recruiting programs targeted at PACE job categories, and
similar programs. If these special programs turn out to be
inadequate to accomplish their purpose in a practical manner, new
programs can be negotiated.

The obligations of agencies to use these special programs to
overcome adverse impact can be enforced under the Decree. There
are detailed provisions governing such situations, backed up by
reporting provisions which guarantee that plaintiffs will have the
necessary information to keep track of these agencies' progress
under the Decree. Class members who believe that they may have
been harmed by a violation of the Decree may also bring their
claims to the plaintiffs' attention, and ask plaintiffs to
prosecute their claims throught the enforcement provisions of the
Decree. If plaintiffs decide not to handle such a claim under the
enforcement provisions of the Decree, the class member may still
proceed with his or her own charge of discrimination or lawsuit.

While this case does not include the use of the PACE for
promotional purposes by some agencies, part of the settlement in
this case rquires that all agencies immediately stop using the
PACE for such purposes.

Under the settlement, the four named plaintiffs will
receive a total of $35,000 in back pay among them. Any class
members who have filed charges of discrimination against OPM,
complaining of discrimination in OPM's implementation or use of
the PACE, will be entitled to receive $3,000 in settlement of
their back pay claims if they bring themselves to the attention of
the Court immediately. The way to do so is to send a letter to
the Clerk of Court, U.S. District Court, U.S. Court House,
Washington, D. C. 20001. The plaintiffs and the class members

-- 1 --



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 4, 1984

Ms. Janie L. Collins
537 Jones Street, Apt. 8573
San Francisco, Calif.  94102

Re:  Luevano v. Campbell

Dear Ms. Collins:

This morning, I received your December 1, 1984 letter.  I have spoken with Ms. Ward, and we are sorry that we cannot consider your deposition incomplete.  At the beginning of the deposition, you swore to tell the whole truth.  You never said, during the course of your deposition, that you did not want to answer anything fully because friends of yours were in the room.  If you had told us this, we could have made other arrangements.  We did not even know that other persons were present.  In any event, it seems to us that you could have asked your friends to let you answer in privacy.

It is correct that you let us know, a few days before you were to move, that you would be moving and that your home telephone number would no longer be available.  However, the attorney for the government was not able to schedule the time for your deposition during those few days.

I am sending a copy of your letter to me, and a copy of this response, to the court reporter to be attached to the transcript of your deposition.  In this way, the Court will know about the problem you raise.

Very truly yours,

Richard T. Seymour

Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.

Lawyers Committee
for Civil Rights under Law
1400 Eye St NW suite 400
Washington, D.C. 20005

537 Jones St #8573
San Francisco, CA 94102
Dec 1, 1984

Dear Sirs: (Mr. Seymours)

You questioned me extensively about U.S. Secret Service having stole legal papers out of my room as I had indicated to you, I was at a friends house and could not answer your questions fully. Although, I felt obligated to answer part of the questions regarding the matter. My friend and her guests heard me answer the questions regarding the issue. As a result of their hearing the answers, it created some anxiety and doubt in them about me. I cannot live in this world alone, I need friends and associates. My few true friends are the ones who have put bread on my table when federal police made attempts in having me to starve to death. God knows I am not lying.

(13)

I had given you a telephone number to call me earlier. You refused to do so. If you had called during that period of time, you would have found me at home

alone and I could & would have answered your questions fully to the best of my ability.

I feel that you could have come to California to get answers to your questions or have me to come to Washington, D.C, after not calling me at the time I had access to a phone in my own residence.

If you desire answers fully to your questions from me, either you come to California or pay my expense to come to Washington, D.C, I don't object to answering your questions to the fullest extent. And until I answer to the fullest extent that I desire I ask that you consider the deposition taken from me on Wednesday Nov 28, 1984 as being incomplete due to special circumstance.

May I hear from you soon regarding this matter.

Thank you in advance for your co-operation.

Very truly yours

JANIE L. COLLINS

(2)

(14)

RECEIVED

FEB 7  3 22 PM '85

JAMES  F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

F I L E D

MAY 8  1987

CLERK, U. S. DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGEL G. LUEVANO, et al., | ) |
| individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C. A. No. 79-0271 |
| CONSTANCE HORNER, Director, U.S. Office of Personnel Management, et al., | ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' MOTION FOR A DETERMINATION THAT THE USE OF SCHEDULE B AUTHORITY FOR HIRING DOES NOT CONSTITUTE AN "ALTERNATIVE EXAMINING PROCEDURE" WITHIN THE MEANING OF THE CONSENT DECREE, AND MOTION FOR INJUNCTIVE RELIEF**

Plaintiffs hereby move for a determination that the use of Schedule B authority for hiring does not constitute an "alternative examining procedure" within the meaning of the Consent Decree, and that the five-year period for retention of jurisdiction set forth in ¶ 7 of the Consent Decree did not start running with the promulgation of such authority in 1982, or with its implementation for any job category formerly subject to the PACE. Plaintiffs further move for the entry of an injunction requiring the immediate conversion of Schedule B appointees to competitive status, and ordering the defendants to enquire, at each facility of each agency which has used Schedule B authority, whether there have been, or will be, layoffs of Schedule B

appointees.[1]  The grounds of this Motion are as follows:

    1. The Consent Decree in this action went into effect on January 18, 1982.  While the defendants have reserved the right to change their position, on February 6, 1987, the defendants informed plaintiffs that their present position is (1) that Schedule B is an "alternative examining procedure" within the meaning of the Consent Decree; (2) that the last possible date

---

[1] Plaintiffs had originally prepared this Motion for filing on March 26, 1987, and had intended simultaneously to file a memorandum in National Treasury Employees Union v. Horner, C.A. No. 84-2573 (D.D.C.), in connection with the government's motion for a stay pending appeal.  The defendants herein requested us not to file our Motion at that time, so that the parties herein could have further discussions on Schedule B and other issues. On March 30, we provided the defendants with a copy of the Motion, Memorandum, and proposed form of Order we had intended to file.  No agreement was reached, and plaintiffs again prepared to file this Motion on April 27, 1987.  The defendants requested us to delay the filing for a week while they worked on a proposal, and plaintiffs agreed.  Almost two weeks have passed and the proposal is not yet ready.  The government has told us that at least the outlines of a proposal should be available in another week, and plaintiffs cannot be sure that this schedule will be met, or just when a complete proposal will be ready, or how long it would take to negotiate an acceptable agreement, or even if it will be possible to reach a negotiated agreement.

    Plaintiffs remain willing to discuss these issues with the government, but in light of the factors discussed in ¶¶ 1, 19-23 and 30 below, and in light of the enormous amount of time which has already been devoted to unsuccessful efforts to resolve these issues, we  cannot justify further delay in the filing of this Motion.

    With minor revisions, this Motion and its supporting papers are the same as those provided to the government on March 30, 1987.  The primary changes involve the inclusion of citations to the Federal Personnel Manual in ¶ 10, an updating of the ongoing difficulties with the Navy's efforts to lay off Schedule B employees at its Jacksonville, Florida facilities, and the addition of a request for injunctive relief against the Navy. See ¶¶ 19-23 below.

for use of the PACE was November 9, 1982;[2] (3) that the mere
announcement of the availability of Schedule B authority in 1982,
before the authority had been used for any job categories, was
sufficient to "establish" Schedule B as an alternative examining
procedure within the meaning of the Consent Decree; and (4) that
the period of retention of the Court's jurisdiction will there-
fore expire on November 9, 1987, as to all job categories other
than those which had already been covered by alternative exam-
ining procedures as of November 9, 1982.

      2. It is in the best interests of all parties, and of
the class, to resolve as soon as possible the question whether
these positions of the defendants are correct.

      3. Paragraph 7 of the Consent Decree, at p. 6, provides
for this Court's retention of jurisdiction:

>       7. In order to ensure compliance with
> the terms of this Decree, to provide a framework
> for implementation of this Decree, and to receive
> reports concerning the government's actions
> hereunder, the Court shall retain jurisdiction
> over this case.  The period of retention of
> jurisdiction shall expire, with respect to any job
> category listed in Appendix A, five years after
> the cessation of the use of PACE results for the
> job category and the implementation of an alterna-
> tive examining procedure for that job category at
> the GS-5 or GS-7 level.  This period of time may
> be extended for any such job category by agreement
> of the parties, or upon motion for good cause
> shown.  The absence of examining procedures which
> have been validated in accordance with Title VII
> and the Uniform Guidelines for some or all of the
> PACE occupations at the end of that five year
> period shall not by itself constitute cause for
> extension of the period for retention of jurisdic-
> tion.  The absence of examining procedures for

_____

[2] There is no dispute as to this date.

some or all of the PACE occupations which satisfy
the government's long term objective, as stated in
paragraph 2(b), shall not constitute cause for
extension of the period for retention of juris-
diction.

4. The Consent Decree allowed, but did not require,
phased-out use of the PACE for competitive external hiring for
the first three years after the Consent Decree went into effect.[3]
OPM decided instead to abolish the PACE for external competitive
hiring as of August 31, 1982. All registers of eligibles
compiled under the PACE were abolished or withdrawn as of
November 8, 1982.[4] OPM's official description of this change is
contained in Federal Personnel Manual ["FPM"] Letter 213-21,
dated September 9, 1982, reproduced at Attachment A.

5. Several provisions of the Consent Decree refer to
"alternative examining procedures":

(a) Paragraph 2(a) of the Consent Decree, at
p. 3, states in pertinent part:

... It is the purpose of this Consent Decree to
eliminate adverse impact against blacks and
against Hispanics as provided herein during the
period of retention of the Court's jurisdiction,
and to establish alternative examining procedures
which are consistent with Title VII, for those job
categories which are subject to the PACE require-
ment (a list of which is appended hereto as
Appendix A). The parties intend that this
agreement be construed to effectuate the foregoing

---

[3] See ¶¶ 13-16 at pp. 25-30.

[4] OPM has informed us that some mistakes might have been
made in isolated cases, but official use of the PACE ended on the
date stated. For the purposes of this case, use of the PACE
should be considered to have ended as of November 8, 1982.

- 4 -

policies and purposes.

(b) Paragraph 2(b) of the Consent Decree, at p. 3, states:

> In accord with the underlying policies of Title VII and the Civil Service Reform Act, the government has decided to eliminate the PACE as an examining procedure, and to adopt as a long term objective the development for PACE occupations listed in Appendix A of appropriate alternative examining procedures.[5] It is the purpose of this Decree to further the policies described above by providing for the elimination of the PACE, and for the development of alternative examining procedures which will eliminate adverse impact against blacks and against Hispanics as much as feasible and which validly and fairly test the relative capacity of applicants to perform the jobs listed in Appendix A.

(c) Paragraph 8(j) of the Consent Decree, at p. 15, states:

> (j) The phrase "alternative examining procedure" shall mean the group of factors, including test scores and any other criteria which are considered, and the relative use made of each such factor, in making an appointment decision with respect to an applicant (as that term is defined in ¶ 8(b)(4)), for employment at the GS-5 or GS-7 level in a job category listed in Appendix A.

(d) Paragraph 9 of the Consent Decree, at p. 15, refers to "alternative examining procedures" as

---

[5] The governmental objective stated in the foregoing sentence is a governmental purpose which is not enforceable by the plaintiffs. For example, it was contemplated by the parties that the defendants might put into effect an alternative examining procedure which had not been validated according to the Uniform Guidelines. As long as the government made all practicable efforts to eliminate adverse impact, the government's obligations under the Consent Decree would have been met and the mere absence of a validation study meeting the standards of the Uniform Guidelines would not by itself be grounds for extending the period for retention of jurisdiction as to that job category.

"competitive procedures":

> 9. Any adverse impact which results from the requirements of the Veteran's Preference Act, 5 U.S.C. § 3318, will be taken into account and may constitute a defense to the determination of adverse impact with respect to any competitive procedures. It shall also be a defense if adverse impact is attributable to the fact that persons taking the PACE or alternative examining procedures did not possess the basic minimum qualifications, four-year college degree or equivalent work experience (or any different level of education or experience subsequently required) for appointment to a job category covered by PACE. ...

(e) Paragraphs 12(c) to 12(k) of the Consent Decree, at pp. 20-25, allow an agency to cease using all practicable efforts to eliminate adverse impact caused by an alternative examining procedure, and to rely on the validity of the alternative examining procedure as a defense to the adverse impact, if certain conditions are met. These paragraphs also provide for the conduct of proceedings in the event an agency makes such a decision.

(f) Paragraph 13(a) of the Consent Decree, at p. 25, states in pertinent part:

> 13(a). No later than three years after the effective date of this Decree, every job category which is presently subject to the PACE requirement shall, <u>when filled by competitive examination</u>, be filled on the basis of an examining procedure which is designed to examine for that particular job category. Some PACE job categories have relatively few vacancies and OPM may develop an alternative examining procedure for a group of such job categories. In all other cases, separate procedures shall be developed for each PACE occupation by OPM, or by the various agencies, in conjunction with OPM, for those jobs

- 6 -

which are generally utilized by their own
agencies.  ...

(Emphasis supplied).

(g) Several provisions of the Consent Decree
refer to the validity of an alternative examining
procedure for interim use or for final use, under the
Uniform Guidelines on Employee Selection Procedures, 29
C.F.R. Part 1607.  These include the above provisions,
as well as ¶ 17(g) at p. 34, ¶ 17(h) at pp. 34-35,
¶ 18(b) at p. 37, and ¶ 26 at p. 42.

(h) Paragraph 25 of the Consent Decree, at
pp. 41-42, refers to an "alternative examining proce-
dure" as a "competitive procedure".

6. The above provisions of the Consent Decree make
clear that the term "alternative examining procedure" meant a
competitive examining procedure.  The Consent Decree itself
states in ¶ 1, on p. 2, that the settlement "does not resolve the
claims of any class member involving the use of the PACE or of
PACE scores for any purpose other than competitive external
hiring."  By necessary implication, the claims resolved by the
case are claims of competitive external hiring.

7. Before this Court granted final approval to the
Consent decree, the parties jointly submitted evidentiary
materials to the Court clearly indicating that the alternative
examining procedures contemplated by the Consent Decree would be
competitive procedures.  The July 17, 1981 Affidavit of Richard
B. Post, then the Acting Associate Director of the Staffing

- 7 -

Services Group, U.S. Office of Personnel Management, stated:

> 4. The process of developing an alternative examination for a specific occupation includes conducting an analysis of the job requirements, identifying the specific types of alternatives that are appropriate measures of the job requirements, developing a plan for the structure of each measure, and preparing the specific measures. In addition, it is necessary to develop associated materials such as sample questions to acquaint the applicants with the examination, and directions for conducting the measure if it is an instrument that will require a staff person to administer it to a group of assembled applicants. It is usually necessary to pilot test the alternative examination to ensure that it is operational in terms of such considerations as understandable instructions, appropriate timing, correct keying of answers, etc. ...

See the August 25, 1981 Joint Submission of Factual Materials to Supplement the Record on the Question of Final Approval of the Proposed Consent Decree. A copy of Mr. Post's Affidavit is attached as Attachment B.

8. When this Court granted final approval to the Consent Decree, it interpreted the Consent Decree as requiring competitive alternative examining procedures. For example, finding 32 of the November 19, 1981 Order granting final approval stated in pertinent part:

> ... To develop alternative examining procedures for these PACE occupations which would be consistent with the professional and legal requirements imposed upon all Federal hiring examinations would require a substantial period of time. Each replacement examination must undergo a careful technical development process which will require extensive professional staff, time, and expense. ...

Luevano v. Campbell, 93 F.R.D. 68, 79. The Court expressly relied on Mr. Post's Affidavit. Id.; findings 34-35, 93 F.R.D.

- 8 -

at 80.

9. Instead of developing specific competitive alterna-
tive examining procedures for each of the job categories formerly
covered by the PACE, OPM decided to establish a new "Schedule B
authority" for most of these job categories.  Under it, agencies
needing to hire external applicants could apply for and obtain
OPM's permission to do their own hiring under overall OPM
guidelines.

10. The Office of Personnel Management's delegations of
Schedule B authority to agencies are ordinarily limited to short
periods of time, such as 60 days, or are limited to the time
required to fill a specific number of vacancies, or are limited
by both time and number of vacancies.  Attachment C to this
Motion is a sample copy of an authorization granted on June 9,
1983 to the U.S. Department of Energy, allowing the use of
Schedule B authority for 60 days, for filling ten positions at
the agency's Richland, Washington office in the job category of
Administrative Assistant (Trainee), GS-341.  Attachment D to this
Motion is a copy of Appendices E and F to Chapter 213 of the
Federal Personnel Manual.[6]  Page 213-E-4 in FPM Appendix E states
in pertinent part:

> b. Length of the requested authoriza-
> tion.  Each Schedule B authority will be approved
> for use during a specified time period.  Authori-

---

[6] These documents were attached as pages 13-21 of the
Addendum to Plaintiffs' Memorandum of Points and Authorities in
Support of Motion for Summary Judgment in National Treasury
Employees Union v. Horner, C.A. No. 84-2573 (D.D.C.), appeals
pending.

- 9 -

ties covering three or fewer positions will be
authorized for 60 days unless the agency can show
based on past recruiting experience that a longer
period will be necessary.  Requests covering a
larger number of positions may be approved for a
longer period.  ...

Page 213-F-3 of FPM Appendix F states in pertinent part:

G. Termination of This Appointing Authority---This
Schedule B appointing authority will be terminated
immediately upon the agency's filling the maximum
number of positions authorized herein or deciding
not to fill the remaining positions ... .

11. The manner in which selections are made by agencies

pursuant to their Schedule B authority varies from agency to

agency, from job category to job category within agencies, and

from location and time to location and time within the same

agency for the same job category.

12. The Office of Personnel Management has not reviewed,

or purported to review, the procedures used by any agency at any

location to select Schedule B applicants to hire for any job

category.  Counsel for defendants represented in a January 30,

1984 letter to counsel for plaintiffs:

(f) While OPM does not involve itself in
an agency's method of arriving at a decision
concerning Schedule B appointments or the proce-
dures used to evaluate candidates, appointments
under Schedule B are subject to the minimum
Qualification Standards published by OPM for the
occupation and grade level.

Letter at 2.  A copy of the letter is attached as Attachment E.

13. No effort has been made by any defendant agency to

validate, pursuant to the Uniform Guidelines on Employee Selec-

tion Procedures, 43 Fed. Reg. 38290, the manner in which any

agency has made selections under Schedule B authority for any job

- 10 -

category.[7]

14. Under the Schedule B authority approved by OPM, a Schedule B appointee must compete with outsiders for vacancies at the Grade 9 level.  If the Schedule B appointee is not selected in the competition, he or she will remain in the Grade 7 position he or she is then occupying, and will be able to continue competing for each further Grade 9 vacancy as it occurs.  There is no limit to the number of times a Schedule B appointee may compete.[8]

15. Federal employees hired into job categories formerly covered by the PACE have been given a status inferior to that given to employees previously hired under that discriminatory examination.

(a) First, applicants formerly hired under the PACE enjoyed career Civil Service status immediately after the conclusion of their probationary periods.  Applicants hired under Schedule B do not obtain career Civil Service status unless they compete with outside applicants and present employees for positions at the GS-9 level, and succeed in the competition.

(b) Second, applicants formerly hired under the PACE were able to use their career Civil Service

---

[7] Information obtained from counsel for OPM.

[8] Information obtained from counsel for OPM.

status to be transferred or reassigned to other job
categories for which they had the necessary qualifi-
cations and thus had substantial career flexibility,
which can be important in light of changing job
opportunities.  Applicants hired under Schedule B may
be promoted or reassigned only to other job categories
covered by Schedule B authority.  Again, the less
favorable treatment does not end unless and until the
Schedule B appointee succeeds in the competition for a
promotion to the GS-9 level and is thereby converted to
Civil Service status.

(c) _Third_, applicants formerly hired under
the PACE could take full advantage of the "career
ladders" in the jobs into which they were hired.  A
"career ladder" runs from the entry-level job up to
what is called the "journeyman level".  The "journeyman
level" may vary from agency to agency depending on its
needs, but can be as high as GS-13 for some jobs at
some agencies.  Where there is a career ladder,
employees on the ladder do not have to compete for
promotions up to the journeyman level.  They receive
their promotions to grades 7, 9, 11, 12 and 13---
depending on the top of the career ladder in question
---on the completion of a set amount of time in grade
if their performance has been satisfactory and if they
have demonstrated by such performance their ability to

- 12 -

handle more complex duties.  Applicants hired under
Schedule B cannot go past Grade 7 on the career ladders
for their jobs.  They have to compete to get to Grade
9, and only after succeeding in the competition can
they resume their career ladders.

(d) <u>Fourth</u>, applicants hired under Schedule B
have retention rights and bump-back rights different
from, and inferior to, those of competitive-service
employees.

16. The government had assured plaintiffs that there
would be no differences, other than the differences in promotions
and conversion to competitive status outlined above, between the
treatment given to Schedule B appointees and the treatment
previously given to PACE appointees.  Counsel for defendants
represented in her January 30, 1984 letter to counsel for plain-
tiffs:

> II. The government continues to adhere
> to its initial agreement that Schedule B appoin-
> tees will be treated the same as appointees from
> the PACE register.  It is our present belief that
> despite the necessity of a competitive promotion
> to GS-9, there will be no discernable overall
> difference in the treatment of Schedule B-PACE
> appointees and those prior competitively appointed
> PACE employees.

Attachment E at 3.

17. Plaintiffs request the Court to take judicial
notice of the proceedings, evidence, and findings in <u>National
Treasury Employees Union v. Horner</u>, C.A. No. 84-2573 (D.D.C.),
<u>appeal pending</u>, with respect to the operation of Schedule B and

- 13 -

the inferiority of the status enjoyed by persons appointed to their jobs under Schedule B.

18. From the pleadings and responses to discovery in the _National Treasury Employees Union_ case, plaintiffs first learned that Schedule B employees have retention rights, in the event of a reduction in force, inferior to those enjoyed by the persons previously appointed under the PACE.  The government has assured plaintiffs that the difference was theoretic, because there had not been any reduction in force affecting Schedule B appointees to positions formerly covered by the PACE, and there would not be such a reduction in force.

19. In March 1987, however, plaintiffs learned of a planned layoff of approximately 11 Schedule B appointees---and only of Schedule B appointees---at the Naval Supply Center of the Naval Air Station in Jacksonville, Florida.  Four of the black Schedule B appointees scheduled to be laid off, LaVerne M. Clark, Veronica D. Tinsley, Bernard Tutson, and Lanita Williams-Wells, have provided Affidavits and copies of their notices of termination which are attached hereto as Attachments F, G, H, and I.  At the time plaintiffs learned of the planned layoffs, they were scheduled to take effect on March 31, 1987 with respect to most of these appointees.  A few of the Schedule B appointees such as Randy S. Britt were given temporary appointments in order to delay their layoffs.  Mr. Britt is black, and his pay was reduced from Grade 7, Step 3 ($ 19,582.00 per year) to Grade 4, Step 10 ($ 17,226.00 per year) when he took the temporary appointment.

- 14 -

The pay cut was effective as of March 16, 1987.  A month later, his pay was restored to the Grade 7, Step 3 level.  In the interim, Mr. Britt lost approximately $ 196.33 (one-twelfth of the annual difference of $ 2,356.00 in these pay rates).  A copy of Mr. Britt's Notification showing his change to temporary status, and a copy of his attorney's letter, are attached hereto as Attachment J.

      20.  Plaintiffs brought the Jacksonville situation to the attention of counsel for the defendants, and were informed on March 26, 1987 that the layoffs would be cancelled.  Instead, the appointees were given new notices which merely postponed their layoffs to April 27, 1987.  Ms. Tinsley's notice, for example, is attached as Attachment K.  The Navy informed the Schedule B appointees who had been given temporary appointments, such as Randy Britt, that by taking the temporary appointments they forfeited their rights under Schedule B.  Mr. Britt would thus lose his job a maximum of one year from the date of his temporary appointment, or by March 14, 1988 at the latest.

      21.  Counsel for plaintiffs raised these new matters involving the Navy facilities in Jacksonville with counsel for the defendants.  Defense counsel subsequently informed counsel for plaintiffs that the Navy's planned layoffs would now in fact be cancelled, and that the Schedule B appointees who had taken temporary appointments would now in fact be restored to Schedule B status.  On May 6, 1987, however, plaintiffs learned that the Navy had merely informed the Schedule B appointees at its

- 15 -

Jacksonville facilities that their layoffs have been "suspended until further notice", and that these appointees were in fear of the layoffs being put back into effect as soon as pressure from Washington was off.  Copies of the Navy's notices to some of these Schedule B appointees are attached hereto as Attachments L, M, N, and O.

22. On May 6, 1987, plaintiffs also learned that the Navy has not restored the Schedule B appointees taking temporary appointments to Schedule B status, and that the Navy has not restored the pay they lost when they took the temporary appointments.  See the letter of W. Benjamin Kyle, Mr. Britt's attorney, reproduced in Attachment J; see Mr. Britt's Affidavit, attached hereto as Attachment P.

23. Counsel for defendants has assured plaintiffs that the phrase "suspended until further notice" means the same thing as "cancelled", and that the layoffs have in fact been cancelled. In light of the above history, plaintiffs cannot accept this assurance.  The Navy is apparently trying to reserve the right to go ahead with the layoffs when the "heat" is off, and apparently intends to continue on temporary status those Schedule B appointees who took temporary appointments to postpone layoffs, in order to eliminate their jobs as well.  Injunctive relief against the Navy is required.  If the defendants are willing to enter into a Stipulation and Consent Order cancelling the layoffs and restoring to Schedule B status, with back pay and benefits, those Schedule B appointees who took temporary appointments, plaintiffs

- 16 -

will withdraw their request for an injunction against the Department of the Navy.

24. Plaintiffs do not know whether there have been other layoffs of Schedule B appointees because of their inferior status, or whether there will be such layoffs in the future. There is no reason to believe that every Schedule B appointee has personal knowledge that his or her rights are covered by this case, or that he or she has personal knowledge of the attorneys to contact if he or she is facing this sort of problem.

25. Plaintiffs request that the Court order defendants to enquire of each agency given Schedule B authority, at each and every separate facility which has used such authority at any time from 1982 to date, to find out if there have been other such layoffs or if there are any such layoffs now pending. The Jacksonville incidents have made clear that such layoffs may well have occurred without their having come to the attention of OPM or of counsel for defendants. If the results of the survey show that such problems have occurred or are about to occur, plain-tiffs will request further relief appropriate to the problems discovered.

26. On many occasions, plaintiffs have requested the defendants to set up a system which would monitor the progress of Schedule B appointees, so that counsel on both sides would know if any problems arose. The defendants have rejected these suggestions. It is possible that other difficulties may have arisen for Schedule B appointees, because of their inferior

- 17 -

status, without counsel for either side being aware of the
problems.

27. The only means of curing the problems arising from
the noncompetitive status of Schedule B appointees not yet
converted to competitive status, whether or not presently known
to counsel for the parties, is to convert them to competitive
status forthwith.

28. Counsel for plaintiffs and counsel for defendants
have discussed the various problems concerning the use of
Schedule B hiring authority, at meetings and in correspondence,
on innumerable occasions.  While it is possible that an agreement
may yet be reached, three factors require that this Motion be
filed at this time: (1) the government's present position that
the period of retention of jurisdiction will cease on November 5,
1987, seven and a half months from now; (2) our recent awareness
of the planned Jacksonville layoffs arising from the inferior
status of Schedule B appointees and our lack of definitive
evidence that other layoffs have never occurred or would never
occur, thus putting plaintiffs on notice that important rights
may be in the process of being lost daily; and (3) the stay of
the Order in the National Treasury Employees Union case, which
means that the NTEU Order will not protect the rights of Schedule
B appointees who are class members.  For these reasons, plain-
tiffs respectfully request that the Court act on this Motion as
soon as possible.

29. Plaintiffs do not wish to restrict the defendants

- 18 -

from saving what is good in the Schedule B approach, by modifying the procedure in a manner which resolves all of plaintiffs' concerns. Such a modification would have to include (a) making Schedule B hiring decisions competitively; (b) giving Schedule B hires the same status, rights, and privileges formerly accorded to PACE hires; (c) giving Schedule B hires the same retention rights, in the event of a reduction in force, as those formerly accorded to PACE hires; and (d) giving Schedule B hires the same opportunities for noncompetitive "career ladder" promotions as were formerly accorded to PACE hires. See plaintiffs' proposed form of Order.

30. For an enormous amount of time, plaintiffs have unsuccessfully attempted to reach an agreement with the defendants on the broad Schedule B questions raised in this Motion. Plaintiffs will continue to seek an agreement with the defendants notwithstanding the filing of this Motion, and it may be that the imminence of a judicial decision may lead to an agreement which could not otherwise have been reached. For these reasons as well, plaintiffs urge that consideration of this Motion not be stayed pending any further discussions among the parties. Such a stay would effectively postpone any agreement, rather than bringing an agreement about.

WHEREFORE, plaintiffs pray that their Motion be granted, and:

(a) that the Court determine that the use of Schedule B hiring authority is not an "alternative

- 19 -

examining procedure" within the meaning of the Consent Decree;

(b) that the Court determine that the five-year period for retention of jurisdiction set forth in ¶ 7 of the Consent Decree did not start running with the promulgation of Schedule B authority in 1982, or with its implementation for any job category formerly subject to the PACE;

(c) that the Court enter a mandatory injunction requiring the immediate conversion of Schedule B appointees to competitive status;

(d) that the Court enter a prohibitory injunction restraining the defendant class member U.S. Department of the Navy from laying off any Schedule B appointee at its Jacksonville, Florida facilities without prior approval of this Court, based on a motion by defendants, an opportunity for plaintiffs to respond, and an adequate evidentiary record;

(e) that the Court enter a mandatory injunction requiring the defendant class member U.S. Department of the Navy to reinstate in Schedule B status, with full back pay and other benefits, all present and former Schedule B appointees at its Jacksonville, Florida facilities who took temporary appointments to postpone the dates of their layoffs or separations from employment; and

- 20 -

    (f) that the Court order defendants to enquire of each agency given Schedule B authority, at each facility given such authority at any time from 1982 to date, to find out if there have been other such layoffs or if there are any such layoffs now pending, and to report the results of the survey to plaintiffs and to the Court.

    Respectfully submitted,

    WILLIAM L. ROBINSON
    RICHARD T. SEYMOUR
    Lawyers' Committee for Civil
     Rights Under Law
    1400 'Eye' St., N.W., Suite 400
    Washington, D.C. 20005

    JULIUS LeVONNE CHAMBERS
    CHARLES STEPHEN RALSTON
    GAIL J. WRIGHT
    99 Hudson Street, 16th Floor
    New York, New York 10013

    BARRY L. GOLDSTEIN
    ELAINE R. JONES
    806 - 15th Street, N.W., #940
    Washington, D.C. 20005

    E. RICHARD LARSON
    THERESA BUSTILLOS
    Mexican-American Legal Defense
     & Educational Fund
    634 South Spring Street
    11th Floor
    Los Angeles, California 90014

    JOHN H. ERICKSON
    Erickson, Beasley & Hewitt
    12 Geary Street
    Eighth Floor
    San Francisco, Calif.  94108

                                        KENNETH KIMERLING
                                        Puerto Rican Legal Defense and
                                            Educational Fund
                                        99 Hudson Street, 14th Floor
                                        New York, New York 10013

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
625 Market Street, Suite 1208
San Francisco, Calif.  94105

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612


                        By: _Richard T. Seymour_
                            Attorneys for Plaintiffs  28100

Dated:  May 8, 1987


                            - 22 -

CA 79-271

FILED

MAY 8  1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

ATTACHMENT A

• Advance Edition Limited • Advance Edition Limited

Office of Personnel Management

# Federal Personnel Manual System

FPM Letter 213- 32        Advance Edition 8/31/82

FPM Letter 213-32

> Published in advance
> of incorporation in FPM
>
> Chapter 213
> **RETAIN UNTIL SUPERSEDED**

SUBJECT: Abolition of the Professional and Administrative
Career Examination (PACE); Cancellation of the
PACE Register; New Authority for Professional
and Administrative Career (PAC) Appointments

Washington, D. C. 20415
September 9, 1982

Heads of Departments and Independent Establishments:

1. This letter announces the abolition of the Professional and Administrative Career Examination (PACE), the cancellation of the PACE register, and the establishment of a Schedule B authority for certain appointments to professional and administrative career (PAC) positions.

2. On November 19, 1981, a decree was entered by the United States District Court for the District of Columbia in the civil action known as Luevano v. Devine and numbered as No. 79-271. The decree became effective on January 18, 1982. The decree, inter alia, requires elimination of the use of the PACE and has as its purpose the elimination of adverse impact, if any, in the appointment of blacks and Hispanics to positions formerly covered by the PACE. Defendants in that lawsuit, and subject to the decree, are the heads of the following agencies in the Legislative and Executive Branches of the United States Government:

Office of Personnel Management
Department of Agriculture
Department of Commerce
Department of Defense
Department of the Air Force
Department of the Army
Department of the Navy
Department of Education
Department of Energy
Department of Health and Human Services
Department of Housing and Urban Development
Department of the Interior
Department of Justice
Department of Labor
Department of State
Department of Transportation
Department of the Treasury
ACTION
Civil Aeronautics Board
Commission on Civil Rights
Consumer Product Safety Commission
Environmental Protection Agency
Equal Employment Opportunity Commission

Federal Communications Commission
Federal Deposit Insurance Corporation
Federal Emergency Management Agency
Federal Home Loan Bank Board
Federal Labor Relations Authority
Federal Maritime Commission
Federal Mediation and Conciliation Service
Federal Trade Commission
General Services Administration
Interstate Commerce Commission
Merit Systems Protection Board
National Aeronautics and Space
 Administration
National Labor Relations Board
Office of Management and Budget
Securities and Exchange Commission
Selective Service System
Small Business Administration
Veterans Administration
General Accounting Office
Government Printing Office
Library of Congress
Smithsonian Institution

3. The following occupations at the GS-5 and GS-7 levels, formerly covered by the PACE, are subject to the decree, and are hereby designated as PAC positions:

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| 011 | Bond Sales Promotion | 246 | Contractor Industrial Relations |
| 018 | Safety Management | 249 | Wage and Hour Compliance Specialist |

**Inquiries:** Noncompetitive Staffing Branch, Staffing Group, (202)632-6000

**Code:** 213 - Excepted Service

**Distribution:** FPM (advance edition limited)

Advance Edition Limited • Advance Edition Limited • Advance Edition Limited • Advance Edition Limited

FPM Letter 213-32     (2)

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| 020 | Community Planning | 301 | General Clerical and Administrative |
| 023 | Outdoor Recreation Specialist | 330 | Digital Computer Systems |
| 025 | Park Management | | Administration |
| 027 | Crop Insurance Administration (except for fieldman and field specialist positions) | 334 | Computer Specialist (Trainee) |
| | | 341 | Administrative Officer |
| | | 343 | Management Analysis |
| 028 | Environmental Protection | 345 | Program Analysis |
| 080 | Security Administration | 346 | Logistic Management |
| 101 | Social Science | 391 | Communications Management |
| 105 | Social Insurance Administration | 393 | Communications Specialist |
| 106 | Unemployment Insurance | 501 | General Accounting Clerical and Administrative |
| 110 | Economist | | |
| 120 | Food Assistance Program Specialist | 504 | Budget and Accounting |
| | | 526 | Tax Technician |
| 130 | Foreign Affairs | 560 | Budget Administration |
| 131 | International Relations | 570 | Financial Institution Examining |
| 132 | Intelligence | 673 | Hospital Housekeeping Management |
| 140 | Manpower Research and Analysis | 685 | Public Health Program Specialist |
| 142 | Manpower Development | 950 | Paralegal Specialist |
| 150 | Geography | 954 | Legal Assistance |
| 170 | History | 960 | Adjudicating |
| 180 | Psychology | 962 | Contact Representative |
| 184 | Sociology | 965 | Land Law Examining |
| 187 | Social Sciences | 967 | Passport and Visa Examining |
| 190 | General Anthropology | 986 | Legal Clerical and Administrative |
| 193 | Archeology | 987 | Tax Law Specialist |
| 201 | Personnel Management | 990 | General Claims Examining |
| 205 | Military Personnel Management | 991 | Workmen's Compensation Claims Examining |
| 212 | Personnel Staffing | | |
| 221 | Position Classification | 993 | Social Insurance Claims Examining |
| 222 | Occupational Analyst | 994 | Unemployment Compensation Claims Examining |
| 223 | Salary and Wage Administration | | |
| 230 | Labor Management and Employee Relations | 996 | Veterans Claims Examining |
| | | 997 | Civil Service Retirement Claims Examining |
| 233 | Labor Relations | | |
| 244 | Labor Management Relations Examining | 1701 | General Education and Training |
| | | 1715 | Vocational Rehabilitation (for positions at GS-7 only) |
| 1001 | General Arts and Information (Fine and Applied Arts positions are excluded) | | |
| | | 1720 | Education Research and Program Specialist |
| 1015 | Museum Curator | 1810 | General Investigating |
| 1081 | Public Information | 1811 | Criminal Investigating (except for Treasury Enforcement Agents) |
| 1082 | Writing and Editing | | |
| 1083 | Technical Writing and Editing | 1812 | Game Law Enforcement (GS-5) |
| 1101 | General Business and Industry | 1816 | Immigration Inspection |
| 1102 | Contract and Procurement | 1831 | Securities Examining Compliance |
| 1103 | Industrial Property Management | 1854 | Alcohol, Tobacco, and Firearms Inspection |
| 1104 | Property Disposal | | |
| 1130 | Public Utility Specialist | 1860 | Public Health Inspection |
| 1135 | Transportation Industry Analysis | 1864 | Public Health Quarantine Inspection |
| | | 1640 | Facilities Management |
| 1140 | Trade Specialist | 1654 | Printing Management |
| 1145 | Agricultural Program Specialist | 1889 | Import Specialist |
| 1147 | Agricultural and Fisheries Marketing Reporter | 1910 | Quality Assurance Specialist |
| | | 2001 | General Supply |

FPM Letter 213-32    (3)

| Series | Title | Series | Title |
|--------|-------|--------|-------|
| 1149 | Wage and Hour Law Administration | 1421 | Archives Specialist |
| 1150 | Industrial Specialist | 2003 | Supply Program Management |
| 1152 | Production Control Specialist | 2010 | Inventory Management |
| 1160 | Financial Analysis | 2030 | Distribution Facilities and Storage Management |
| 1163 | Insurance Examining | 2032 | Packaging Specialist |
| 1165 | Loan Specialist | 2050 | Supply Cataloging |
| 1169 | Internal Revenue Officer | 2101 | General Transportation |
| 1170 | Realty | 2111 | Transportation Rate and Tariff Examiner |
| 1171 | Appraising and Assessing | | |
| 1173 | Housing Management | 2125 | Highway Safety Management |
| 1176 | Building Management | 2130 | Traffic Management |
| 1410 | Librarian (for certain trainee positions at GS-5) | 2135 | Highway Safety Management Examining |
| 1412 | Technical Information Services | 2144 | Cargo Scheduling |
| 1420 | Archivist | 2150 | Transportation Operations |

4. Several PAC positions in certain agencies, previously filled by use of PACE registers, and thus subject to the decree in Luevano v. Devine, were removed from PACE coverage prior to the effective date of the decree. These positions are presently filled pursuant to delegated examining agreements under which appointing agencies have examining authority. Until further notice, such positions, as set forth below, will continue to be competitively filled by the agencies having appropriate delegated examining authority and are not subject at this time to the Schedule B authority set forth herein. These positions in agencies not having such delegated examining authority are subject to the Schedule B authority set forth herein.

GS-105-5        Social Insurance Claims Representative
                (Department of Health & Human Services)
GS-570-5        Bank Examiner (Federal Deposit Insurance Corporation)
GS-570-5        Home Loan Bank Board Examiner (Federal Home Loan Bank Board)
GS-1145-5/7     Agriculture Program Specialist (Department of Agriculture)
GS-1810-5/7     General Investigator (OPM; Department of Defense)
GS-1816-5       Immigration Inspector (Department of Justice)
GS-1910-5       Quality Assurance Specialist (Department of Defense)

In addition, the following PAC positions were removed from PACE examination coverage prior to the effective date of the consent decree and are presently filled through alternative competitive examinations announced by OPM. These positions also are not subject at this time to the Schedule B authority set forth herein.

GS-110-5/7      Economist
GS-334-5/7      Computer Specialist (Trainee)
GS-1654-5/7     Printing Management Specialist
GS-1810-5/7     General Investigator
GS-1811-5/7     Criminal Investigator
GS-1812-5       Game Law Enforcement Agent
                (Fish and Wildlife)

OPM may, at its discretion, add to or remove occupations from the lists of occupations set forth above. Occupations added to these lists would be filled by alternative competitive examinations and the Schedule B authority set forth herein would no longer be authorized. Occupations deleted from these lists would become subject to the Schedule B authority set forth herein and such Schedule B authority would continue until further notice.

FPM Letter 213-32   (4)

5. Effective __August 31, 1982,__   OPM abolishes PACE. As a result, a PACE register is no longer available for the referral of individuals to PAC positions. Effective 60 days from the date of the regular edition (not advance edition limited) of this letter all outstanding PACE certificates are cancelled and must be returned immediately to OPM. Selections of individuals from these outstanding certificates are valid provided the agency has given the selectees written confirmation of selection before the 60-day period expires.

6. Until further notice, OPM will not establish any registers of eligible applicants for PAC positions. Because of reductions in Federal governmental activities and spending, most agencies will substantially reduce external hiring. Instead, agencies generally will fill whatever vacancies arise either through internal placement; reinstatement of individuals with civil service status; or through priority placement programs. Agencies will be expected to use these sources, to the fullest extent, to fill vacancies and to continue to request referral of qualified candidates from lists maintained under the Displaced Employee Program (DEP) and Interagency Placement Assistance Program (IPAP) when filling PAC positions through external hiring. A list of OPM area offices maintaining these lists for PAC positions appears as Attachment 3.

7. OPM recognizes, however, that agencies may experience vacancies in PAC positions that can be filled only through external hiring at the GS-5 or GS-7 level. In the absence of OPM registers of eligible applicants for such positions, agencies under such circumstances must have a special authority to make external appointments to these positions. To permit the appointment of individuals to PAC positions in these cases, OPM is providing a new Schedule B authority, at 5 CFR § 213.3202(1), which agencies can request. Creation of the authority has been accomplished by amendment of Part 213, Title 5, Code of Federal Regulations, as set out in 47 FR 38257 (Federal Register dated August 31, 1982).

8. Requests for approval to make appointments under Schedule B to PAC positions pursuant to 5 CFR §213.3202(1) must be chanelled through the requesting agency's headquarters to: Noncompetitive Staffing Branch, Staffing Group, Room 6A12, 1900 E Street, N.W., Washington, D.C. 20415 (telephone: 202-632-6000). Instructions on how to request this authority, the conditions that must be met before approval will be granted, and a copy of a sample appointment authority agreement are contained in Attachments 1 and 2 to this letter.

9. Appointments under this authority are subject to the minimum qualifications standards published by the Office of Personnel Management for the occupation and grade level, except for a written test requirement. In addition, under this authority there are:

   (a) A new PAC Outstanding Scholar Program, under which agencies may directly hire, without regard to a list of eligibles (except for displaced Federal employees), college graduates who obtained a grade point average of 3.5 or higher on a 4.0 scale for all undergraduate courses completed toward a baccalaureate degree, or who stand in the upper 10% of a baccalaureate graduating class (or of a major university subdivision such as a college of arts and sciences) (see 5 CFR §213.3202(1));

   (b) A PAC Bilingual/Bicultural Program, under which agencies may directly hire, without regard to a list of eligibles (except for displaced Federal employees), applicants who have the required level of oral Spanish language proficiency and/or the requisite knowledge of Hispanic culture, and are otherwise qualified, for PAC positions in which interaction with the public or job performance would be enhanced by having bilingual and/or bicultural skills (see 5 CFR §213.3202(1)).

FPM Letter 213-32          (5)

10.  In making appointments, promotions, and reassignments under the Schedule B authority set forth at 5 CFR §213.3202(1), the following applies:

(a)  The provisions of 5 CFR Part 302, Subparts C and D, with respect to accepting and rating applications, selection and appointment are waived, except that agencies must observe the principle of veteran preference as far as administratively feasible.

(b)  A PAC incumbent appointed under the Schedule B authority set forth at 5 CFR §213.3202(1) may be promoted or reassigned only to other PAC positions at GS-5/7 in series for which Schedule B authority is appropriate, and only after at least 3 months has elapsed since the individual's initial Schedule B appointment.

(c)  Schedule B PAC appointees may be appointed to positions at GS-9 or above or assigned to positions in the competitive service, only upon a demonstration that the employee satisfies the appropriate qualification requirements for such appointment, determined by an examination, consisting of an evaluation of the employee's qualifications as demonstrated by prior and current job experience and education, under civil service laws, rules, and regulations, including the Federal Personnel Manual.  In addition, nothing herein prohibits Schedule B PAC appointees from competing in any other selection process for which they may individually be eligible.

11.  Agencies may continue to make appointments to PAC positions under the Cooperative Education Program (see 5 CFR §213.3202(a)-(d)); the Federal Junior Fellowship Program (see 5 CFR §213.3202(f)); and the Veterans Readjustment Appointment (VRA) Authority (see 5 CFR §307).  Participants in such programs may be converted to competitive status in accordance with the terms of those programs.  However, the PACE may no longer be used in determining employees' qualifications for such conversion unless its use is required by law.  Similarly, the PACE may not be used to qualify participants in the graduate-level cooperative education program for initial Schedule B appointments to PAC positions under 5 CFR §213.3202(b).

12.  An agency shall request all applicants for appointment under Schedule B authorities to a PAC position to complete Applicant RSN Data Forms available through OPM offices.  The agency shall establish and maintain files of such forms and shall furnish to OPM such information and reports, at such times and in such manner, as OPM may require.

13.  With respect to discipline, training, and opportunities to compete for promotions and other appointments, an incumbent of a Schedule B PAC position shall be accorded the same rights, privileges, and opportunities that are accorded to an incumbent of the same position in the competitive service who has the same grade, step, tenure, and veteran status.

14.  An incumbent of a Schedule B PAC position, upon completion of a trial period of one year after initial appointment in a PAC position, is covered by the provisions of Subchapter II of Chapter 75, title 5, United States Code, and implementing regulations in Part 752, title 5, Code of Federal Regulations, pertaining to removal, suspension for more than 14 days, reduction in grade or pay, or placement on a furlough of 30 days or more.

15.  An incumbent of a Schedule B PAC position shall have retention rights in the event of a reduction in force in accordance with the provisions of Subchapter 1 of Chapter 35, title 5, United States Code, and implementing regulations in Part 351, Title 5, Code of Federal Regulations.

Donald J. Devine
Director

GUIDELINES AND INSTRUCTIONS FOR REQUESTING
SCHEDULE B AUTHORITY TO FILL PAC POSITIONS, GS-5/7
UNDER SECTION 213.3202(l)

## A. General Instructions

Agencies may request authority to fill by Schedule B appointment one or more
PAC positions at the GS-5 or 7 level for which outside hiring is necessary to
complement priority placement and merit promotion programs. All requests will
be submitted through the agency's headquarters to OPM's central office,
regardless of the geographic location of the position(s) to be filled. Requests
should be addressed to the Noncompetitive Staffing Branch, Staffing Group,
Room 6A12, 1900 E Street, N.W. Washington, D.C. 20415. To expedite the
authorization, the request may include a signed agreement as shown in
Attachment 2.

It is expected that agencies generally will fill PAC vacancies either through
internal placement, reinstatement of individuals with civil service status, or
through priority placement programs. Agencies are expected to use these
sources to the fullest extent possible to fill PAC vacancies. If an agency plans
to fill one to three PAC positions in a specific location, it should have completed
consideration of priority placement candidates and conducted appropriate
recruitment through established recruiting sources before requesting Schedule B
authority. On the other hand, if the agency is recruiting to fill a large number of
identical positions in numerous locations over several months, the request may
be submitted at a reasonable point after the agency has begun serious recruiting
efforts.

Each authority to make Schedule B appointments to PAC positions will be
granted for a definite period (usually 60 days) determined by the number of
positions to be filled and the probable difficulty of locating qualified candidates.
An authority granted in connection with a large-scale hiring program will
generally be in effect longer than 60 days. However, an agency having such an
authority will receive referrals of priority placement candidates from OPM's
Displaced Employee Program (DEP) and Interagency Placement Assistance
Program (IPAP) lists at approximately 60-day intervals.

## B. Utilization of Qualified Status Candidates

Before requesting authority to fill a PAC position by Schedule B appointment,
the agency must give the same consideration to priority placement candidates as
would be required before obtaining certification from a competitive register, and
must also give appropriate consideration to candidates available for promotion,
reassignment, transfer, or reinstatement to PAC positions.

Attachment 1 to FPM Letter 213-32        (2)

1. <u>Priority placement candidates</u>. The agency must ascertain that no qualified candidates (or an insufficient number of candidates in relation to the number of vacancies) are available on its repromotion or reemployment priority lists, are entitled to special consideration to correct previous lost promotion consideration, or are available on OPM's DEP and IPAP lists. With regard to availability of candidates on OPM's DEP and IPAP lists, the agency will be expected to contact the area office having examining jurisdiction over each position and location for which Schedule B authority is to be requested and to request the names of candidates who possess the knowledges, skills and abilities required by the position. The request for Schedule B authority should then be initiated as soon as possible after determining that no, or an insufficient number of DEP or IPAP candidates are available. (If the names of any DEP or IPAP candidates are referred by an area office, the agency must consider such candidates and report to the area office on the results of their consideration in accordance with instructions applicable to DEP and IPAP referrals.) If the request is to fill a large number of vacancies over a period of time, the OPM area office will refer to the agency the names of additional DEP/IPAP candidates at regular intervals as they become available.

2. <u>Other status candidates</u>. Appropriate consideration of candidates for promotion, reassignment, reinstatement, or transfer will depend upon the quality of those candidates, the level of competition usually generated through the agency's merit promotion program for similar positions, the need for fresh viewpoints in the organization, and any other relevant factors. The area of consideration and filing period for status candidates will be as provided in the agency's merit promotion policy. If the agency is filling many vacancies over an extended time period, appropriate consideration of status candidates should be provided throughout that period.

C. <u>Information to be Included in Request for Schedule B Authority</u>.

1. <u>Identification of position(s)</u>. State the title, series, grade level and geographic location of the position(s) for which authority is needed. If authority is requested for more than one position, state the total number of positions to be filled. If the positions are at more than one grade level or location, information on the number to be filled should be provided for each grade level and location.

2. <u>Use made of DEP and IPAP lists</u>. State the area office(s) contacted, with date of contact; the number of DEP/IPAP applicants provided, if any, and status (i.e., number appointed, number selected, number of declinations, and number of nonselected); and reasons for nonselections.

3. <u>Use made of merit promotion program, reemployment and repromotion priority lists and other souces of status candidates</u>. Describe results of or plans to make use of these sources. (Candidates already available on reemployment and repromotion priority lists must have been considered before submitting the request.) Include the actual (or estimated) number of PAC positions which will be filled from all internal sources (e.g., priority placement programs, merit promotion program, cooperative education program).

Attachment 2 to FPM Letter 213-32

AUTHORITY TO APPOINT UNDER
SCHEDULE B 213.3202(l)*

Under the conditions described below, the United States Office of Personnel Management (hereinafter "OPM") authorizes _____ (hereinafter the "agency") to fill under Schedule B section 213.3202(l) a maximum of _____ professional and administrative career (PAC) positions as follows:

Position Title:

Series:

Grade(s):

Number of Positions:

Agency Organizational Unit:

Geographic Location(s):

Agency Contact:

OPM authorizes use of 5 CFR 213.3202(l) to permit the agency to engage in external hiring to fill such entry level position(s) with professional and administrative career appointees. This authorization is based on the agency's demonstration that external hiring is appropriate and in view of the unavailability of an OPM professional and administrative career register. The authority to appoint under 5 CFR 213.202(l) is effective from _____ to _____, unless terminated or superseded earlier as provided in III F below. If the above designated positions are not filled during the effective period of this authority, the agency must request renewal of the Schedule B authorization if external hiring under 5 CFR 213.3202(l) is still needed.

Section I. OPM Responsibilities

OPM will:

A. Provide guidance, direction, and technical assistance to agency personnel in administering the Schedule B authority.

B. Monitor and evaluate the agency's use of Schedule B appointing authority through the use of:

*This Authority should be attached to a letter from agency headquarters explaining the need for Schedule B authority. See Attachment 1 to FPM Letter 213-32 for instructions.

Attachment 2 to FPM Letter 213-32    (2)

    1.  agency reports;

    2.  data from OPM's Central Personnel Data File;

    3.  OPM on-site general personnel evaluations; and,

    4.  other available information such as employee, congressional, or union comments.

Section II.  Agency Responsibilities.

The agency will:

A.  Provide sufficient staff resources to ensure that the Schedule B authority is administered effectively and efficiently.

B.  Ensure that any personnel action taken under the Schedule B authority conforms with applicable requirements of civil service laws, rules, and regulations.

C.  Upon referral by OPM area offices of qualified candidates from lists maintained under the Displaced Employee Program (DEP) and Interagency Placement Assistance Program (IPAP), afford priority consideration to such candidates in accordance with the provisions of III H below.

D.  Maintain for a period of at least 2 years beyond the expiration of the consent decree in Luevano v. Devine the following minimum records for any personnel action taken under 5 CFR 213.3202(l) and make the records available at any time OPM may request them:

    1.  name of appointee;

    2.  date of appointment; and

    3.  all applications and relevant documents needed to permit reconstruction of the personnel action.

E.  Provide any training needed by agency personnel in carrying out their duties under the provisions of 5 CFR 213.3202(l).

Section III.  Conditions of this Appointing Authority.

A.  Appointing Official--The authority to make individual appointments to PAC positions designated above is granted to the head of the agency and may be redelegated.

B.  Appointment--Schedule B appointing authority is limited to use when a PAC position is to be filled by new appointment of a candidate who is not eligible

for noncompetitive appointment in the competitive service. The agency will continue to make career or career-conditional appointments to PAC positions filled by reassignment, promotion, demotion, or transfer of employees already in the competitive service, by reinstatement of former competitive employees (including those referred from reemployment priority, DEP, and IPAP lists), or by conversion of excepted employees (cooperative education students, severely physically handicapped, veterans readjustment appointees, etc.) or noncompetitive appointment of other categories of applicants who are eligible to acquire competitive status under the provisions of law or Executive order. When appointments are made under Schedule B 213.3202(l), the following criteria apply:

1. appointments to these positions are subject to the basic qualifications standards published by the Office of Personnel Management for the occupation and grade level, except for a written test requirement; and

2. the provisions of 5 CFR Part 302, Subparts C and D, with respect to accepting and rating applications, selection and appointment are waived, except that the agency must observe veteran preference, as far as administratively feasible.

C. Promotion and Position Change--A PAC incumbent appointed under 5 CFR 213.3202(l) may be placed in other excepted positions under authorities applicable to such positions. In addition, a PAC incumbent of any position covered by 5 CFR 213.3202(l) may be promoted or reassigned to other PAC positions at GS-5/7 in series for which the Schedule B authority is appropriate after 3 months have elapsed since the employee's initial appointment under 5 CFR 213.3202(l). To qualify for promotion or reassignment under the Schedule B authority, the incumbent must meet OPM's qualification standards for the position and must have served at least 1 year at GS-5 before promotion to GS-7. Schedule B PAC appointees may be appointed to positions at GS-9 or above or assigned to positions in the competitive service, only upon a demonstration that the employee satisfies the appropriate qualification requirements for such appointment, determined by an examination, consisting of an evaluation of the employee's qualifications as demonstrated by prior and current job experience and education, under civil service laws, rules, or regulations, including the Federal Personnel Manual. Appointments and position changes made under the Schedule B authority for PAC positions will be processed in accordance with the usual procedures applicable to such actions in the excepted service (see the appropriate tables in FPM Supplement 296-33), except that both the Schedule B authority, 5 CFR 213.3202(l), and the specific authorization from OPM must be shown as authority for the actions.

D. With respect to discipline, training, and opportunities to compete for promotions and other appointments, an incumbent of a Schedule B PAC position shall be accorded the same rights, privileges, and opportunities that are accorded to an incumbent of the same position in the competitive service, who has the same grade, step, tenure, and veteran status.

Attachment 2 to FPM Letter 213-32     (4)

E. Adverse Action--An incumbent of a Schedule B PAC position, upon completion of a trial period of 1 year after initial appointment to a PAC position, is covered by the provisions of Subchapter II of Chapter 75, title 5, United States Code, and implementing regulations in Part 752, Title 5, Code of Federal Regulations, pertaining to removal, suspension for more than 14 days, reduction in grade or pay, or placement on a furlough of 30 days or less.

F. Reduction in Force--An incumbent of a Schedule B PAC position will have retention rights in the event of a reduction in force in accordance with the provisions of Subchapter I of Chapter 35, title 5, United States Code, and implementing regulations in Part 351, Title 5, Code of Federal Regulations.

G. Termination of This Appointing Authority--This Schedule B appointing authority will be terminated immediately upon the agency's filling the maximum number of positions authorized herein or deciding not to fill the remaining positions, or upon OPM's finding that the agency has failed to comply with essential provisions of 5 CFR 213.3202(l) or this authorization.

H. Concurrent Consideration of Priority Placement Candidates--Eligibles referred from OPM's DEP and IPAP lists will be afforded priority consideration in accordance with instructions applicable to DEP and IPAP referrals. (If this authorization will be in effect for more than 60 days, additional referrals will be made at 60-day intervals of qualified DEP/IPAP candidates added to the lists during that period.) Results of these referrals will be reported to the area office(s) which referred the names in accordance with instructions issued by those offices. Eligibles referred from DEP lists must be reinstated to the PAC positions under competitive appointments unless objections to such eligibles are sustained by the area office.

I. Data Collection--An agency shall request all applicants for appointment to a PAC position to complete Applicant RSN Data Forms available through OPM offices. The agency shall establish and maintain files of such forms and shall furnish to OPM such information and reports, at such times and in such manner, as OPM may require. Specific instructions for collecting this information are attached.

J. Submission of Reports--Required data collection reports shall be submitted through the agency's headquarters to the Noncompetitive Staffing Branch, Staffing Group, OPM, Room 6A12, 1900 E Street, N.W., Washington, D.C. 20415.

_____     _____     _____     _____
Signature                   Date        Signature                   Date

OPM Official                            Agency Official

| OPM Regional Offices | Examining Jurisdiction | PACE Serving Area Offices |
|---|---|---|
| Eastern Regional Office<br>26 Federal Plaza<br>New York, New York 10278 | New York; New Jersey (except Camden County) | New York Area Office<br>26 Federal Plaza<br>Room 2909<br>New York, New York 10278 |
| | Puerto Rico | Puerto Rico Area Office<br>Federico Degetau Federal Bldg.<br>Carlos E. Chardon Street<br>Hato Rey, Puerto Rico 00918 |
| Great Lakes Regional Office<br>230 South Dearborn Street<br>Chicago, Illinois 60604 | Illinois (except Madison and St. Clair Counties); Indiana (except Clark and Floyd Counties; Scott County, Iowa; Michigan; Minnesota (except Clay County); Ohio (except Belmont, Jefferson and Lawrence Counties); Wisconsin; Henderson, Boone, Campbell, and Kenton Counties, Kentucky | Chicago Area Office<br>Dirksen Building<br>219 South Dearborn Street<br>Chicago, Illinois 60604 |
| Mid-Atlantic Regional Office<br>William J. Green, Jr. Federal Building<br>600 Arch Street<br>Philadelphia, Pennsylvania 19106 | Delaware; Maryland (except Prince Georges, Charles, and Montgomery Counties); Pennsylvania; Virginia (except Arlington, Fairfax, Loudoun, Stafford, Prince William and King George Counties); West Virginia; Belmont, Jefferson and Lawrence Counties, Ohio; Camden County, New Jersey | Philadelphia Area Office<br>William J. Green, Jr. Fed. Bldg.<br>600 Arch Street<br>Philadelphia, PA 19106 |
| Mid-Continent Regional Office<br>300 Old Post Office Building<br>815 Olive Street<br>St. Louis, Missouri 63101 | Iowa (except Scott County); Kansas; Missouri; Nebraska; Madison and St. Clair Counties, Illinois | St. Louis Area Office<br>300 Old Post Office Building<br>815 Olive Street<br>St. Louis, Missouri 63101 |
| New England Regional Office<br>John J. McCormack Post Office and Courthouse<br>Boston, Massachusetts 02109 | Connecticut; Maine; Massachusetts, New Hampshire; Rhode Island; Vermont | Boston Area Office<br>3 Center Plaza<br>Boston, Massachusetts 02108 |
| Northwest Regional Office<br>Federal Building<br>915 Second Avenue<br>Seattle, Washington 98174 | Alaska | Anchorage Area Office<br>Federal Bldg. & U.S. Courthouse<br>700 C Street, P.O. Box 22<br>Anchorage, Alaska 99513 |
| | Idaho, Oregon, Washington | Seattle Area Office<br>Federal Building<br>915 Second Avenue<br>Seattle, Washington 98174 |
| Rocky Mountain Regional Office<br>Denver Federal Center, Bldg. 20<br>Denver, Colorado 80225 | Colorado; Montana; North Dakota; South Dakota; Utah; Wyoming; Clay County, Minnesota | Denver Area Office<br>1845 Sherman Street<br>Denver, Colorado 80203 |
| Southeast Regional Office<br>75 Spring Street, S.W.<br>Atlanta, Georgia 30303 | Alabama; Florida; Georgia; Kentucky (except Henderson, Boone, Campbell and Kenton Counties); Mississippi; North Carolina; South Carolina; Tennessee; Crittenden County, Arkansas; Floyd and Clark Counties, Indiana | Atlanta Area Office<br>Richard B. Russell Fed. Bldg.<br>75 Spring Street, S.W.<br>Atlanta, Georgia 30303 |
| Southwest Regional Office<br>1100 Commerce Street<br>Dallas, Texas 75242 | Arkansas (except Crittenden County); Louisiana; New Mexico; Oklahoma; Texas | Dallas Area Office<br>1100 Commerce Street<br>Room 6B4<br>Dallas, Texas 75242 |
| Western Regional Office<br>525 Market Street<br>23rd Floor<br>San Francisco, California 94105 | Hawaii; Guam; Pacific Ocean Area | Honolulu Area Office<br>Federal Building, Room 1310<br>300 Ala Moana Boulevard<br>Honolulu, Hawaii 96850 |
| | Arizona; California; Nevada | San Francisco Area Office<br>Federal Building, Room 1001<br>450 Golden Gate Avenue<br>San Francisco, California 94102 |
| Washington, D.C. Area Office<br>1900 E Street, N.W.<br>Washington, D.C. 20415 | Washington Metropolitan Area (District of Columbia; Charles, Montgomery and Prince Georges Counties, Maryland; the cities of Alexandria, Fairfax and Falls Church, Virginia; and Arlington, Fairfax, Loudoun, Stafford, Prince William and King George Counties, Virginia; overseas areas (except Pacific Ocean area) | Washington, D.C. Area Office<br>Clerical and Career Entry Branch<br>P.O. Box 52<br>Washington, D.C. 20044 |

ATTACHMENT  B

IN THE UNITED STATES

DISTRICT COURT FOR

THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.    )
                            )
        Plaintiffs,         )
                            )
            v.              )        CIVIL ACTION NO. 79-0271
                            )
ALAN K. CAMPBELL, Director, )
U.S. Office of Personnel    )
Management, et al.          )
                            )
_____Defendants._____ )

AFFIDAVIT

I, Richard B. Post, being duly sworn, hereby depose and say:

1. I am the Acting Associate Director, Staffing Services Group, U.S. Office of Personnel Management. The Staffing Services Group has the responsibility for the development and implementation of the procedures used to examine applicants for Federal employment.

2. I am aware of the proposed Consent Decree in the case of Luevano v. Campbell and the requirement of that Decree that the Professional and Administrative Career Examination (PACE) be phased out of operational use over a three year period.

3. The PACE is used for filling entry-level positions in over one hundred occupations and is one of the most widely used examinations in the Federal inventory. The immediate replacement of PACE with new examining procedures for the numerous occupations involved would be a psychometric and administrative impossibility.

4. The process of developing an alternative examination for a specific occupation includes conducting an analysis of the job requirements, identifying the specific types of alternatives that are appropriate measures of the job requirements, developing a plan for the structure of each measure, and preparing the specific measures. In addition, it is necessary to develop associated materials such as sample questions to acquaint the applicants with the examination, and directions for conducting the measure if it is an instrument that will require a staff person to administer it to a group of assembled applicants. It is usually necessary to pilot test the alternative examination

-2-

to ensure that it is operational in terms of such considerations as understandable instructions, appropriate timing, correct keying of answers, etc. For some measures, special precautions must be taken so that examinees do not acquire prior knowledge of the specific questions in the examinations. In such cases, several different versions of the measure must be prepared to reduce the possibility of compromise.

5.  Once a new examination is developed these new examining procedures must be disseminated to OPM offices around the nation in order to make these examinations operational.  New vacancy announcements, applications and other necessary forms, and processing procedures must be developed and produced. This often requires extensive drafting and printing requirements as well as distribution considerations.  Instructions to OPM staff on the operational aspects of implementing and scoring the procedures must also be undertaken.

6.  The development process also must include instructions on and the actual processing of applications and the development of new registers of eligibles.  Much of that work must be done manually due to limited automatic data processing capabilities.

7.  Professionally sound psychometric and operational requirements based on present staff and budget constraints would not allow for the development and implementation of all the new procedures at the same time.  A systematic and phased-in development and implementation process for the new replacement examinations is thus reasonable and necessary.

Respectfully submitted,

RICHARD B. POST
Acting Associate Director
Staffing Services Group

Subscribed to and sworn before me this _17th_ day of _July_, 1981, in the City of Washington, District of Columbia.

NOTARY PUBLIC

My Commission Expires March 14, 1985

ATTACHMENT  C



United States
## Office of
# Personnel Management

Washington, D.C. 20415

– 9

In Reply, Refer To

Your Reference

Mr. J. M. Schulman
Director of Personnel
Department of Energy
Washington, D.C. 20585

Dear Mr. Schulman:

This refers to your letter of May 18, 1983, requesting that the Richland Operations Office, Richland, Washington, be authorized to fill ten positions of Administrative Assistant (Trainee), GS-341-7, by Schedule B appointments under 5 CFR 213.3202(l).

Based upon the information provided in your letter and in discussion with OPM's Northwest Regional Office, we find that your request meets the criteria for use of the Schedule B appointing authority. Accordingly the Richland Operations Office is authorized to engage in external recruiting and make appointments under the Schedule B authority for these positions. This authorization will be in effect for 60 days.

Section III. I. of the Authority to Appoint provides that the agreeing agency will comply with the data collection requirements of the Luevano v. Devine decree. Under the decree, you are required to collect and report the number of applicants who identified themselves with each of the following groups: (1) Black; (2) Hispanic; (3) Non-Hispanic White; and (4) Other. Attachments 1 through 5 of your Authority to Appoint are the Schedule B PAC Authority Race and National Origin Data Collection and Reporting Procedures and forms for collecting and reporting the required data. We have enclosed a set of instructions and camera-ready forms for the Richland office's use. That office should reproduce copies of the forms from those originals. OPM will not stock these forms for distribution.

A report of the data collected in connection with this authorization will be required on January 31, 1984. Please use the identification number PAC-83-33 on all reports submitted in connection with this authorization.

Sincerely,

Donald J. Devine
Director

Enclosure

CON 114-24-2

MAY 2 7 1983

ACTION SUMMARY

Subject:    Schedule B Authority for Professional and Administrative
            Career (PAC) Positions--Department of Energy

From:       Richard B. Post
            Associate Director                          PAC-83-33
            Staffing Group                              BOHLING

To:         Donald J. Devine
            Director                                    S/CAT 1-41/3


ISSUE:  By letter of May 18, 1983, the Department of Energy has requested that
OPM authorize it to fill ten positions of Administrative Assistant (Trainee), GS-
341-7, at its Richland Operations Office in Richland, Washington, by Schedule B
appointment under 5 CFR 213.3202(l).

ANALYSIS AGAINST CRITERIA IN FPM LETTER 213-32:

Consideration of priority placement candidates.  The agency states that there
are no qualified candidates on its repromotion or reemployment priority lists or
on OPM's Displaced Employee Program or Interagency Placement Assistance
Program lists.  The Northwest Regional Office verified the lack of DEP/IPAP
candidates.

Consideration of other status candidates.  The agency states that it advertised
the positions through its local merit promotion program, extending consideration
to status candidates throughout the Richland-Pasco-Kennewick area.  No quali-
fied status candidates applied.

Application of veterans preference.  Qualified candidates will be ranked into
three categories:  outstanding; highly qualified; and qualified.  Within each
category, veterans will float to the top of the list.  The selecting official may
select any eligible referred in a single category or any preference eligible if the
referral includes candidates from more than one category.  Selection of a
nonveteran when a preference eligible in a higher category is available must be
approved by the Director of Personnel, DOE.

Length of requested authorization.  DOE is seeking use of Schedule B authority
for 60 days.

DISCUSSION AND FINDING:  We find the agency's request meets the criteria for
use of the Schedule B appointing authority.  There are no qualified priority

2

placement candidates or status candidates available for the positions.   The agency's request for authority to recruit additional candidates from outside sources is justified.

RECOMMENDATION:    That you approve the authorization of Schedule B appointment under 5 CFR 213.3202(l) for ten positions of Administrative Assistant (Trainee), GS-341-7, at DOE's Richland Operations Office, Richland, Washington.  If you agree, your signature will be needed on both the attached authorization and on the letter to the agency.

ACTION:

/_t_/ Approve        /‾/  Disapprove

_____
Donald J. Devine                    6/8/83
Director


Attachments

## AUTHORITY TO APPOINT UNDER
## SCHEDULE B 213.3202(1)

Under the conditions described below, the United States Office of Personnel Management (hereinafter "OPM") authorizes the Richland Operations Office (hereinafter the "agency") to fill under Schedule B section 213.3202(1) a maximum of 10 professional and administrative career (PAC) positions as follows:

Position Title: Administrative Assistant

Series: GS-341

Grade(s): GS-7

Number of Positions: 10

Agency Organizational Unit: Personnel and Management Evaluation Division

Geographic Location(s): Richland, Washington

Agency Contact: John D. Bateman

OPM authorizes use of 5 CFR 213.3202(1) to permit the agency to engage in external hiring to fill such entry level position(s) with professional and administrative career appointees. This authorization is based on the agency's demonstration that external hiring is appropriate and in view of the unavailability of an OPM professional and administrative career register. The authority to appoint under 5 CFR 213.3202(1) is effective from June 9, 1983 to August 6,1983 unless terminated or superseded earlier as provided in III G below. If the above designated positions are not filled during the effective period of this authority, the agency must request renewal of the Schedule B authorization if external hiring under 5 CFR 213.3202(1) is still needed.

Section I. OPM Responsibilities

OPM will:

    A. Provide guidance, direction, and technical assistance to agency personnel in administering the Schedule B authority.

    B. Monitor and evaluate the agency's use of Schedule B appointing authority through the use of:

        1. agency reports;

        2. data from OPM's Central Personnel Data File;

        3. OPM on-site general personnel evaluations; and,

        4. other available information such as employee, congressional, or union comments.

-4-

G.  Termination of This Appointing Authority--This Schedule B appointing
    authority will be terminated immediately upon the agency's filling the
    maximum number of positions authorized herein or deciding not to fill
    the remaining positions, or upon OPM's finding that the agency has
    failed to comply with essential provisions of 5 CFR 312.3202(i) or
    this authorization.

H.  Concurrent Consideration of Priority Placement Candidates--Eligibles
    referred from OPM's DEP and IPAP lists will be afforded priority considera-
    tion in accordance with instructions applicable to DEP and IPAP referrals.
    (If this authorization will be in effect for more than 60 days, additional
    referrals will be made at 60-day intervals of qualified DEP/IPAP candi-
    dates added to the lists during that period.)  Results of these referrals
    will be reported to the area office(s) which referred the names in accord-
    ance with instructions issued by those offices.  Eligibles referred from
    DEP lists must be reinstated to the PAC positions under competitive
    appointments unless objections to such eligibles are sustained by the
    area office.

I.  Data Collection--An agency shall request all applicants for appointment
    to a PAC position to complete Applicant RSN Data Forms available through
    OPM offices.  The agency shall establish and maintain files of such forms
    and shall furnish to OPM such information and reports, at such times and
    in such manner, as OPM may require.  Specific instructions for collecting
    this information are attached.

J.  Submission of Reports--Required data collection reports shall be submitted
    through the agency's headquarters to the Noncompetitive Staffing Branch,
    Staffing Group, OPM, Room 6A12, 1900 E Street, N.W., Washington, D.C.
    20415.


_____  6/8/83
Signature                        Date

OPM  Official


_____  5/18/8.
Signature                        Date

Agency Official

213–E–1

# Appendix E.

Filling Positions at GS–5 and GS–7 Under Schedule B Authority 213.3202(1)

## E–1. PURPOSE AND COVERAGE

a. **Legal authority.** The Schedule B appointing authority is established pursuant to the decree entered on November 19, 1981, by the United States District Court for the District of Columbia in the civil action known as *Luevano* v. *Devine* and numbered as No. 79–271. The decree became effective on January 18, 1982. Among other provisions, the decree required elimination of the use of the Professional and Administrative Career Examination (PACE), formerly used to fill a variety of positions at GS–5 and GS–7, and has as its purpose the elimination of adverse impact, if any, in the appointment of Blacks and Hispanics to positions formerly covered by the PACE.

b. **Agencies covered.** Defendants in the lawsuit, and subject to the decree, are the heads of the following agencies in the Legislative and Executive Branches of the United States Government:

—Office of Personnel Management
—Department of Agriculture
—Department of Commerce
—Department of Defense
—Department of the Air Force
—Department of the Army
—Department of the Navy
—Department of Education
—Department of Energy
—Department of Health and Human Services
—Department of Housing and Urban Development
—Department of the Interior
—Department of Justice
—Department of Labor
—Department of State
—Department of Transportation
—Department of the Treasury
—ACTION
—Civil Aeronautics Board
—Commission on Civil Rights
—Consumer Product Safety Commission
—Environmental Protection Agency
—Equal Employment Opportunity Commission
—Federal Communications Commission
—Federal Deposit Insurance Corporation
—Federal Emergency Management Agency
—Federal Home Loan Bank Board
—Federal Labor Relations Authority
—Federal Maritime Commission
—Federal Mediation and Conciliation Service
—Federal Trade Commission
—General Services Administration
—Interstate Commerce Commission
—Merit Systems Protection Board
—National Aeronautics and Space Administration
—National Labor Relations Board
—Office of Management and Budget
—Securities and Exchange Commission
—Selective Service System
—Small Business Administration
—Veterans Administration
—General Accounting Office
—Government Printing Office
—Library of Congress
—Smithsonian Institution

c. **Position coverage.** (1) Positions covered by the decree. The following occupational series at the GS–5 and GS–7 levels, formerly covered by the PACE are subject to the decree and are designated as professional and administrative career (PAC) positions. Except as provided in paragraphs (2) and (3) below, positions in the following series are subject to Schedule B authority 213.3202(1):

—GS–011    Bond Sales Promotion
—GS–018    Safety Management
—GS–020    Community Planning
—GS–023    Outdoor Recreation Specialist
—GS–025    Park Management
—GS–028    Environmental Protection
—GS–080    Security Administration
—GS–101    Social Science
—GS–105    Social Insurance Administration
—GS–106    Unemployment Insurance

13

—GS–110   Economist
—GS–120   Food Assistance Program Specialist
—GS–130   Foreign Affairs
—GS–131   International Relations
—GS–132   Intelligence
—GS–140   Manpower Research and Analysis
—GS–142   Manpower Development
—GS–150   Geography
—GS–170   History
—GS–180   Psychology
—GS–184   Sociology
—GS–190   General Anthropology
—GS–193   Archeology
—GS–201   Personnel Management
—GS–205   Military Personnel Management
—GS–212   Personnel Staffing
—GS–221   Position Classification
—GS–222   Occupational Analyst
—GS–223   Salary and Wage Administration
—GS–235   Employee Development
—GS–244   Labor Management Relations Examining
—GS–246   Contractor Industrial Relations
—GS–249   Wage and Hour Compliance Specialist
—GS–301   General Clerical and Administrative
—GS–334   Computer Specialist (Trainee)
—GS–341   Administrative Officer
—GS–343   Management Analysis
—GS–345   Program Analysis
—GS–346   Logistic Management
—GS–393   Communications Specialist
—GS–501   General Accounting Clerical And Administrative
—GS–526   Tax Technician/Auditor
—GS–560   Budget Administration
—GS–570   Financial Institution Examining
—GS–673   Hospital Housekeeping Management
—GS–685   Public Health Program Specialist
—GS–950   Paralegal Specialist
—GS–962   Contract Representative
—GS–965   Land Law Examining
—GS–967   Passport and Visa Examining
—GS–987   Tax Law Specialist
—GS–990   General Claims Examining
—GS–991   Workmen's Compensation Claims Examining
—GS–993   Social Insurance Claims Examining
—GS–994   Unemployment Compensation Claims Examining
—GS–996   Veterans Claims Examining

—GS–997   Civil Service Retirement Claims Examining
—GS–1001  General Arts and Information (Fine and Applied Arts positions are excluded)
—GS–1015  Museum Curator
—GS–1035  Public Affairs
—GS–1082  Writing and Editing
—GS–1083  Technical Writing and Editing
—GS–1101  General Business and Industry
—GS–1102  Contract and Procurement
—GS–1103  Industrial Property Management
—GS–1104  Property Disposal
—GS–1130  Public Utility Specialist
—GS–1140  Trade Specialist
—GS–1145  Agricultural Program Specialist
—GS–1146  Agricultural Marketing
—GS–1147  Agricultural and Fisheries Marketing Reporter
—GS–1149  Wage and Hour Law Administration
—GS–1150  Industrial Specialist
—GS–1160  Financial Analysis
—GS–1163  Insurance Examining
—GS–1165  Loan Specialist
—GS–1169  Internal Revenue Officer
—GS–1170  Realty
—GS–1171  Appraising and Assessing
—GS–1173  Housing Management
—GS–1176  Building Management
—GS–1412  Technical Information Services
—GS–1420  Archivist
—GS–1421  Archives Specialist
—GS–1654  Printing Management
—GS–1701  General Education and Training
—GS–1715  Vocational Rehabilitation (for positions at GS–7 only)
—GS–1720  Education Research and Program Specialist
—GS–1810  General Investigating
—GS–1811  Criminal Investigating (except Treasury Enforcement Agents)
—GS–1812  Game Law Enforcement (GS–5)
—GS–1816  Immigration Inspection
—GS–1831  Securities Examining Compliance
—GS–1854  Alcohol, Tobacco, and Firearms Inspection
—GS–1864  Public Health Quarantine Inspection
—GS–1889  Import Specialist
—GS–1890  Customs Inspection
—GS–1910  Quality Assurance
—GS–2001  General Supply
—GS–2003  Supply Program Management

—GS–2010   Inventory Management
—GS–2030   Distribution Facilities and Storage Management
—GS–2032   Packaging Specialist
—GS–2050   Supply Cataloging
—GS–2101   General Transportation
—GS–2110   Transportation Industry Analysis
—GS–2111   Transportation Rate and Tariff Examiner
—GS–2125   Highway Safety Management
—GS–2130   Traffic Management
—GS–2144   Cargo Scheduling
—GS–2150   Transportation Operations

Some of these occupational series include technical and clerical positions as well as positions formerly covered by the PACE. Positions in those series are PAC positions if they met the criteria formerly established for PACE coverage, i.e., if they are normally classified at two-grade intervals, if GS–5 and GS–7 are the normal entry levels, and if the positions have a career ladder to GS–9 or above.

(2) Positions filled through alternative competitive examinations. The following PAC positions were removed from PACE examination coverage prior to the effective date of the consent decree and are presently filled through alternative competitive examinations announced by OPM:

—GS–110   Economist
—GS–334   Computer Specialist (Trainee)
—GS–1654   Printing Management Specialist
—GS–1810   General Investigator
—GS–1811   Criminal Investigator
—GS–1812   Game Law Enforcement Agent (Fish and Wildlife) (covered by alternative examination at GS–5 only)

If the alternative examinations for the positions listed above are discontinued, the positions would become subject to the Schedule B authority. Conversely, if alternative examinations are developed for any positions, those positions would be removed from coverage of the Schedule B authority and would be filled by the alternative examinations.

(3) Positions filled pursuant to delegated examining authorities. In addition to the occupations for which OPM has developed alternative examinations, several PAC positions in certain agencies were removed from coverage of the PACE prior to the effective date of the decree and are filled pursuant to delegated examining agreements under which the appointing agencies have examining authority. Until further notice, such positions, as set forth below, will continue to be competi-

tively filled by the agencies having appropriate delegated examining authority and are not subject to the Schedule B authority. Should the delegated examining authority be withdrawn, these positions will become subject to the Schedule B authority. In addition, positions in these occupations in agencies not having such delegated examining authority are subject to the Schedule B authority. Positions currently covered by delegated examining authority are:

—GS–570   Bank Examiner, GS–5 (Federal Deposit Insurance Corporation)
—GS–570   Home Loan Bank Board Examiner, GS–5 (Federal Home Loan Bank Board)
—GS–1145   Agriculture Program Specialist, GS–5 and GS–7 (Department of Agriculture)
—GS–1810   General Investigator, GS–5 and GS–7 (OPM; Department of Defense)
—GS–1816   Immigration Inspector, GS–5 (Department of Justice).

d. **Actions covered by Schedule B authority.** Schedule B authority 213.3202(1) is used *only* when a PAC position is filled by placement of an individual who could not be properly placed in the position under a competitive appointment. Generally, Schedule B authority will be appropriate for new appointment of a person who does not have competitive status or eligibility for noncompetitive appointment in the competitive service, or for position change of a person initially appointed under the Schedule B authority. PAC positions which are filled through priority placement programs or through internal placement of employees already in the competitive service, reinstatement of individuals with civil service status, or noncompetitive appointment under any of the special appointing authorities discussed in chapter 315 are filled by competitive appointment. An individual with competitive status or noncompetitive appointment eligibility may be given a Schedule B appointment only if the individual could not be properly selected for the position through applicable merit promotion or appointment procedures in the competitive service.

## E–2. REQUESTING SCHEDULE B APPPOINTING AUTHORITY

Agencies wishing to engage in external recruiting and make appointments to PAC positions at GS–5 and GS–7 under 5 CFR 213.3202(1) must obtain prior authorization from OPM. Requests for such authorization must be submitted through the requesting agency's headquarters to the Noncompetitive Staffing Branch,

Inst. 314
June 25, 1984

Staffing Group, Office of Personnel Management, 1900 E Street, N.W., Washington, D.C. 20415. Requests must include the following information.

a. **Specific position coverage.** Each request for Schedule B authorization must include a signed copy of the Authority to Appoint (see Appendix F) showing the total number of positions requested, their titles, series, grades, and geographic locations and, if appropriate, whether appointments will be part-time, intermittent, seasonal, or not to exceed a certain date. If the authority will cover a large number of positions to be filled in connection with a long-term recruiting program, the request should also include estimates of the number and type of positions to be filled at each location for which coverage is requested. If the request is approved, OPM may, however, authorize the agency to shift Schedule B slots among the listed series and locations as long as Schedule B hiring is confined to the approved series and locations and does not exceed the total number of positions authorized.

b. **Length of the requested authorization.** Each Schedule B authority will be approved for use during a specified time period. Authorities covering three or fewer positions will be authorized for 60 days unless the agency can show based on past recruiting experience that a longer period will be necessary. Requests covering a larger number of positions may be approved for a longer period. Agencies requesting such authority should provide sufficient information on such factors as the number of positions to be filled, previous recruiting experience, or scheduling of training needed by new appointees to support the requested length of Schedule B appointing authority.

c. **Consideration of priority placement candidates.** The agency must afford consideration to those on its repromotion and reemployment priority lists in accordance with applicable regulations and agency policy. It must request referral of candidates from Displaced Employee Program (DEP) and Interagency Placement Assistance Program (IPAP) lists maintained by the OPM office(s) serving the location(s) for which the agency is recruiting and must afford consideration to those candidates in accordance with DEP/IPAP instructions. In the case of DEP candidates, this means the agency must either select the candidates, have its objection to them sustained by the referring area office, or withdraw its request for Schedule B appointing authority. If Schedule B authority is requested for three or fewer positions, consideration of priority placement candidates must be completed before the request is submitted. The request must state the results of refer-

rals from the agency's reemployment and repromotion priority lists; the OPM office(s) contacted, with date of contact; the number of DEP or IPAP candidates provided, if any, and status (i.e., number appointed, number selected, number of declinations, and number nonselected); and reasons for nonselections. If Schedule B authority is requested for four or more positions to be filled over an extended time period, the information about consideration of priority placement candidates may be provided for those positions for which active recruiting has begun. The agency need not have requested referral of DEP and IPAP candidates for positions for which it has not begun active recruitment, but the Schedule B authority, if approved, will be granted with the condition that such referrals will be requested as soon as active recruiting begins for any position. OPM offices will refer additional DEP and IPAP candidates, if any, at 60-day intervals after the initial request throughout the life of the Schedule B authority. The agency may consider these candidates concurrently with candidates recruited for Schedule B appointment, but must maintain enough vacancies to permit placement of DEP candidates, to whom objections are not sustained. Should the agency complete recruiting for particular positions or fill all authorized positions before the schedule expiration date of its Schedule B authority, the agency will notify the appropriate OPM offices to cease referrals of DEP and IPAP candidates.

d. **Consideration of other status candidates.** The agency will be expected to show in its request for Schedule B authority either that it has announced the vacancy within the area of consideration prescribed in its merit promotion plan for that position and grade level or that it had good reason (e.g., having exhausted the candidate supply through recent announcement for comparable positions, or poor response to previous announcement) for determining that use of the merit promotion program would be unproductive. The request should include the actual or estimated number of PAC positions which will be filled from internal sources (e.g., priority placement programs, merit promotion program, cooperative education program) and, if the request is for long-term Schedule B authority, should include provision for periodic reannouncement and/or acceptance of applications from candidates for competitive appointment for the duration of the recruiting program. Occasionally, candidates who have competitive status or are eligible for noncompetitive appointment will file in response to recruiting for Schedule B appointments. An agency cannot refuse to accept

these applications. If these candidates can be processed and are selected through appropriate merit staffing or merit promotion procedures, they *must* be given competitive appointments. If, however, they cannot be properly selected for competitive appointment (if, for example, they are not among the best qualified candidates for promotion), they may be considered through Schedule B procedures. Status candidates considered in this manner should be advised that they must give up their competitive appointments if they are selected for Schedule B appointment. Conversion of any competitive employees to Schedule B appointments must be processed in accordance with the instructions for such conversions found in chapter 302.

e. **Application of veterans preference.** Although Schedule B appointments to PAC positions are excepted from the full procedural requirements for appointments in the excepted service described in chapter 302, the procedures adopted by agencies for filling PAC positions must result in the granting of preference to veterans equivalent to that provided for by the Veterans Preference Act. Agencies may provide such preference without assigning candidates numerical scores or adhering to a rule of three. They may, for example, assign adjective ratings instead of numerical scores and refer candidates for selection by categories. Whatever system an agency uses, however, must give practical effect to veterans preference and must include provisions for approval of objections to or passover of preference eligibles at a higher level within the agency under conditions comparable to those imposed under competitive examinations. Requests for Schedule B appointing authority for PAC positions must include a statement of the manner in which the agency will apply veterans preference.

### E–3. MAKING APPOINTMENTS UNDER SCHEDULE B/PAC AUTHORITY

a. **Time limits.** The effective dates of a Schedule B appointing authority represent the time during which an agency may make written employment commitments. Schedule B appointees need not actually enter on duty before the authority expires. Rather, entry on duty should be set in accordance with applicable agency policy, allowing time as needed for completion of required education, relocation, etc.

b. **Special appointing programs.** Two special appointing programs are established for use under the Schedule B appointing authority:

—PAC Outstanding Scholar Program, under which agencies may appoint college graduates who obtained a grade point average of 3.5 or higher on a 4.0 scale for all undergraduate courses completed toward a baccalaureate degree, or who stand in the upper ten percent of a baccalaureate graduating class (or of a major university subdivision such as a college of arts and sciences); and

—PAC Bilingual/Bicultural Program, under which agencies may appoint applicants who have the required level of oral Spanish language proficiency and/or the requisite knowledge of Hispanic culture, and are otherwise qualified, for PAC positions in which interaction with the public or job performance would be enhanced by having bilingual and/or bicultural skills.

These special appointment programs apply *only* when OPM has approved Schedule B authority for particular positions. However, agencies having approved Schedule B authorities, may make appointments under the Outstanding Scholar and Bilingual/Bicultural Programs without regard to the list of eligibles established under the procedures adopted for filling PAC positions.

c. **Data collection.** An agency shall request all eligible applicants for appointment under Schedule B authorities to a PAC position to complete race and national origin data forms which will be furnished when Schedule B authority is approved. The agency shall establish and maintain files of such forms in accordance with instructions provided upon approval of Schedule B authority. Reports of data collected will be required on January 31 of each year.

### E–4. CONDITIONS OF EMPLOYMENT UNDER 5 CFR 213.3202(1)

a. **Qualifications for PAC positions.** PAC incumbents appointed under the Schedule B authority must meet OPM's qualification standards for the position and must have served at least one year at GS–5 before promotion or conversion to GS–7.

b. **Promotion and position change.** There is no limit to the length of time a person may serve under a Schedule B PAC appointment since these appointments are considered to be nontemporary. However, a PAC incumbent appointed under the Schedule B authority may be promoted or reassigned only to other PAC positions at GS–5/7 in series for which the Schedule B authority is appropriate, and only after at least three months has elapsed since the individual's initial Sched-

ule B appointment. Schedule B PAC appointees with personal competitive status and reinstatement eligibility may be considered through merit promotion procedures for any positions for which they qualify. Other Schedule B PAC appointees may be appointed to positions at GS-9 or above or assigned to positions in the competitive service only through competitive examination or in accordance with appropriate authority provided in the civil service laws, rules, and regulations. However, with respect to discipline, training, and opportunities to compete for promotions and other appointments, an incumbent of a Schedule B PAC position shall be accorded the same rights, privileges, and opportunities that are accorded to an incumbent of the same position in the competitive service who has the same grade, step, tenure, and veteran status. This means that Schedule B PAC employees may not be excluded from competition for positions limited to status candidates if they are otherwise within the announced area of consideration for those positions. Schedule B PAC employees may apply under the merit promotion program for any positions for which they qualify. If they apply for PAC positions at GS-5/7 for which the Schedule B authority is appropriate, they may be considered and selected through normal merit promotion procedures and reassigned or promoted un-

der the Schedule B authority. If they apply for positions in the competitive service, they may be ranked and referred under merit promotion procedures but, if tentatively selected, must be within reach and referred and certified through the appropriate competitive examination before they may be placed in the other position. A Schedule B PAC employee may also be converted at the same or higher grade level to non-PAC positions which are in the *excepted service*, if the applicable appointment authority requirements are met. (See chapter 302 for procedures applicable to such selections.)

c. **Adverse action.** An incumbent of a Schedule B PAC position, upon completion of a trial period of one year after initial appointment in a PAC position, is covered by the provisions of Subchapter II of Chapter 75, title 5, United States Code, and implementing regulations in Part 752, title 5, Code of Federal Regulations, pertaining to removal, suspension for more than 14 days, reduction in grade or pay, or placement on a furlough of 30 days or more (See chapter 752).

d. **Reduction in force.** An incumbent of a Schedule B PAC position shall have retention rights in the event of a reduction in force in accordance with the provisions of Subchapter I of Chapter 35, title 5, United States Code, and implementing regulations in Part 351, title 5, Code of Federal Regulations (see chapter 351).

213–F–1

# Appendix F.

Authority to Appoint Under Schedule B 213.3202(1)

Under the conditions described below, the United States Office of Personnel Management (hereinafter "OPM") authorizes _____ (hereinafter the "agency") to fill under Schedule B section 213.3202(1) a maximum of _____ professional and administrative career (PAC) positions as follows:

**Position Title:**

**Series:**

**Grade(s):**

**Number of Positions:**

**Agency Organizational Unit:**

**Geographic Location(s):**

**Agency Contact:**

OPM authorizes use of 5 CFR 213.3202(1) to permit the agency to engage in external hiring to fill such entry level position(s) with professional and administrative career appointees. This authorization is based on the agency's demonstration that external hiring is appropriate and in view of the unavailability of an OPM professional and administrative career register. The authority to appoint under 5 CFR 213.202(1) is effective from _____ to _____, unless terminated or superseded earlier as provided in III G below. If the above designated positions are not filled during the effective period of this authority, the agency must request renewal of the Schedule B authorization if external hiring under 5 CFR 213.3202(1) is still needed.

**Section I.** OPM Responsibilities

OPM will:
A. Provide guidance, direction, and technical assistance to agency personnel in administering the Schedule B authority.
B. Monitor and evaluate the agency's use of Schedule B appointing authority through the use of:
1. agency reports;
2. data from OPM's Central Personnel Data File;
3. OPM on site general personnel evaluations; and,
4. other available information such as employee, congressional, or union comments.

**Section II.** Agency Responsibilities.

The agency will:
A. Provide sufficient staff resources to ensure that the Schedule B authority is administered effectively and efficiently.

19

B. Ensure that any personnel action taken under the Schedule B authority conforms with applicable requirements of civil service laws, rules, and regulations.

C. Upon referral by OPM area offices of qualified candidates from lists maintained under the Displaced Employee Program (DEP) and Interagency Placement Assistance Program (IPAP), afford priority consideration to such candidates in accordance with the provisions of III H.

D. Maintain for a period of at least 2 years beyond the expiration of the consent decree in *Luevano v. Devine* the following minimum records for any personnel action taken under 5 CFR 3.3202(1) and make the records available at any time OPM may request them:

  1. name of appointee;

  2. date of appointment; and

  3. all applications and relevant documents needed to permit reconstruction of the personnel action.

E. Provide any training needed by agency personnel in carrying out their duties under the provisions of 5 CFR 213.3202(1).

**Section III. Conditions of this Appointing Authority.**

A. Appointing Official—The authority to make individual appointments to PAC positions designated above is granted to the head of the agency and may be redelegated.

B. Appointment—Schedule B appointing authority is limited to use when a PAC position is to be filled by new appointment of a candidate who is not eligible for noncompetitive appointment in the competitive service. The agency will continue to make career or career-conditional appointments to PAC positions filled by reassignment, promotion, demotion, or transfer of employees already in the competitive service, by reinstatement of former competitive employees (including those referred from reemployment priority, DEP, and IPAP lists), or by conversion of excepted employees (cooperative education students, severely physically handicapped, veterans readjustment appointees, etc.) or noncompetitive appointment of other categories of applicants who are eligible to acquire competitive status under the provisions of law or Executive order. When appointments are made under Schedule B 213.3202(1), the following criteria apply:

  1. appointments to these positions are subject to the basic qualifications standards published by the Office of Personnel Management for the occupation and grade level, except for a written test requirement; and

  2. the provisions of 5 CFR Part 302, Subparts C and D, with respect to accepting and rating applications, selection and appointment are waived, except that the agency must observe veteran preference, as far as administratively feasible.

C. Promotion and Position Change—A PAC incumbent appointed under 5 CFR 213.3202(1) may be placed in other excepted positions under authorities applicable to such positions. In addition, a PAC incumbent of any position covered by 5 CFR 213.3202(1) may be promoted or reassigned to other PAC positions at GS–5/7 in series for which the Schedule B authority is appropriate after 3 months have elapsed since the employee's initial appointment under 5 CFR 213.3202(1). To qualify for promotion or reassignment under the Schedule B authority, the incumbent must meet OPM's qualification standards for the position and must have served at least 1 year at GS–5 before promotion to GS–7. A Schedule B incumbent of a PAC position may be appointed to a competitive position, including a position at GS–9 or above in the same series, only when the appointment can be made through an appropriate competitive examination authorized by OPM or under such other authority as may be provided in the civil service laws, rules, and regulations. Appointments and position changes made under the Schedule B authority for PAC positions will be processed in accordance with the usual procedures applicable to such actions in the excepted service (see the appropriate tables in FPM Supplement 296–33), except that both the Schedule B authority, 5 CFR 213.3202(1), and the specific authorization from OPM must be shown as authority for the actions.

D. With respect to discipline, training, and opportunities to compete for promotions and other appointments, an incumbent of a Schedule B PAC position shall be accorded the same rights, privileges, and opportunities that are accorded to an incumbent of the same position in the competitive service, who has the same grade, step, tenure, and veteran status.

E. Adverse Action—An incumbent of a Schedule B PAC position, upon completion of a trial period of 1 year after initial appointment to a PAC position, is covered by the provisions of Subchapter II of Chapter 75, Title 5, United States Code, and implementing regulations in Part 752, Title 5, Code of Federal Regulations, pertaining to removal, suspension for more than 14 days, reduction in grade or pay, or placement on a furlough of 30 days or less.

F. Reduction in Force—An incumbent of a Schedule B PAC position will have retention rights in the event of a reduction in force in accordance with the provisions of Subchapter I of Chapter 35, Title 5, United States Code, and implementing regulations in Part 351, Title 5, Code of Federal Regulations.

G. Termination of This Appointing Authority—This Schedule B appointing authority will be terminated immediately upon the agency's filling the maximum number of positions authorized herein or deciding not to fill the remaining positions, or upon OPM's finding that the agency has failed to comply with essential provisions of 5 CFR 213.3202(1) or this authorization.

H. Concurrent Consideration of Priority Placement Candidates—Eligibles referred from OPM's DEP and IPAP lists will be afforded priority consideration in accordance with instructions applicable to DEP and IPAP referrals. (If this authorization will be in effect for more than 60 days, referrals of DEP/IPAP candidates must be requested from the appropriate OPM office(s) as soon as active recruiting begins for any position, if these referrals were not sought before Schedule B authority was requested. Additional referrals will be made at 60-day intervals after the first referral of qualified DEP/IPAP candidates added to the lists during that period.) Results of these referrals will be reported to the area office(s) which referred the names in accordance with instructions issued by those offices. Eligibles referred from DEP lists must be reinstated to the PAC positions under competitive appointments unless objections to such eligibles are sustained by the area office. While priority placement and Schedule B candidates may be considered concurrently, the agency must maintain enough vacancies to place DEP eligibles to whom objections are not sustained.

I. Data Collection—The agency must comply with the race and national origin data collection requirements of the PACE consent decree and with any requests for additional information which OPM may need to evaluate use of this authority. Specific instructions for collecting this information are attached.

J. Submission of Reports—Required data collection reports shall be submitted through the agency's headquarters to the Staffing Policy Analysis Division, Staffing Group, OPM, Room 6A12, 1900 E Street, N.W., Washington, D.C. 20415.

---

| Signature | Date | Signature | Date |

OPM Official                        Agency Official

ATTACHMENT  E



**U.S. Department of Justice**

---

PB:BWard:klp

Telephone:
(202) 633-3781

Richard Seymour, Esq.
Lawyers' Committee for
  Civil Rights Under Law
733 15th Street, N.W.
Washington, D.C.  20005

1/30/84

Re:  Luevano v. Devine
     Use of Schedule B Authority

Dear Rick:

This letter responds to your prior letter regarding the
use of Schedule B Authority as the appointment method for
positions covered by the Consent Decree. The paragraphs below
correspond to the numbered paragraphs of your letter.

I(a)  No PACE Certificate of Eligibles were issued by OPM
after the final Schedule B regulations were issued on August
31, 1982.  However, for sixty days after the OPM FPM Letter
explaining the changes, i.e. November 8, 1982, agencies were
permitted to make appointments from those certificates issued
prior to August 31.

(b) The OPM regulations, authorizing appointments to PACE
positions under Schedule B were published on August 31, 1982, (47
Fed. Reg. 3827).  No additional Certificates of Eligibles were
issued thereafter and no existing Certificate could be used
after November 8, 1982. Thus, Schedule B became immediately
effective.  The Schedule B regulations also provide that
agencies must request from OPM the authority to use their
Schedule B hiring authority prior to making a Schedule B
appointment.

(c), (d) & (e)  OPM's FPM Letter 213 (provided to Barry
Goldstein by letter dated August 27, 1982) provides that OPM
may, in its discretion, add to or remove occupations from the
list of occupations for which an alternative examining procedure
is administered.  On April 15, 1982, examining for GS-1910
Quality Assurance position was no longer delegated to the
Department of Defense, and it is now subject to Schedule B
appointment authority.

- 2 -

(f)  While OPM does not involve itself in an agency's method of arriving at a decision concerning Schedule B appointments or the procedures used to evaluate candidates, appointments under Schedule B are subject to the minimum Qualification Standards published by OPM for the occupation and grade level.

(g)  The number of Schedule B authorizations changes as employment needs vary.  As of September 1, 1983, some sixty authorizations were issued to 19 agencies covering 6100 positions.  It is correct that some of these authorized Schedule B positions may not be used.

(h)  While a "career ladder" promotion from GS-5 to GS-7 usually takes place at the completion of the first year of employment, many factors can be encountered that would make the promotion occur later than one year or not at all, e.g. such as promotion freezes, unsatisfactory job performance, budget considerations etc. The same situation can be expected with respcect to advancement from a GS-5 to GS-7 for Schedule B appointees. You are correct that information on individual promotions is not now reported and that it would be difficult to make statistical reports on such promotion rates.

(i)  GS-7 Schedule B appointees will have to compete for competitive service GS-9 positions.  However, while it will be a competitive process, it should be noted that these GS-7 Schedule B appointees will have the benefit of specialized experience and training gained during their employment, and should generally be able to compete successfully with any other applicants.

(j)  Subject to the limitations outlined in response to para. I(h), agency practices on the promotions of employees from GS-7 to GS-9 vary and, at many agencies, more than one year is necessary before promotion from GS-7 to GS-9.  You are correct that in so called "career ladder" job categories PACE appointees, in contrast to Schedule B PAC appointees, are not required to compete with others in order to be promoted from GS-7 to GS-9.

(k)  While appointment to a GS-9 will be competitive, it may be that at the time a Schedule B appointee seeks conversion to a GS-9, there will be no other candidates on the Mid-level competitive register.  If, however, there are candidates on that register, then the Schedule B appointee will have to compete for

- 3 -

appointment to the GS-9 position.  Again, it is important to
remember that the incumbent will have the benefit of the
specialized training and experience gained during his/her
employment.

(l)  Any evaluation of candidates for competitive GS-9
positions will necessarily be limited by the OPM established
Qualification Standards for GS-9 positions in the various job
categories.  However, it is conceivable that an agency or OPM
could establish a "paper and pencil" test as a part of the
competitive process.  Although the Treasury Department has been
delegated the power to decide on the means of competition, to
our knowledge Treasury has not adopted a "paper and pencil"
test.

(m)  The Junior Federal Assistant exam is a written test
for GS-4 level positions, thus the situations are not
analagous.  However, it is OPM's present expectation that
applicants will be evaluated by other than a "paper-pencil
test."  Rather, it is expected that agencies will consider such
factors as education, prior work experience, etc.

(n)  In addition to the possibility that some Schedule B
appointees will not prevail in the competition for competitive
GS-9 positions, it is also possible that at the time a Schedule
B appointee seeks conversion to a competitive position, he/she
might be hampered by promotion or hiring freezes, etc.

(o)  While the appointment of a GS-7 Schedule B employee
to a competitive GS-9 position is considered an accession and
accessions are reported to OPM, the present reporting
system does not indicate that the accession  involved a Schedule
B appointee.

II.  The government continues to adhere to its initial
agreement that Schedule B appointees will be treated the same
as appointees from the PACE register.  It is our present
belief that despite the necessity of a competitive promotion to
GS-9, there will be no discernable overall difference in the
treatment of Schedule B-PACE appointees and those prior
competively appointed PACE employees.

III.  See para. II above.

- 4 -

IV.  No member of the government team present at our August meeting has any recollection that the "agreements" described by Para. (a), (b), (e), (f) and (g) were reached.  Rather, while these matters were raised and discussed, it was decided that further consideration would be given to these issues and that they would be discussed at our next meeting.

(c)-(d) While the government has agreed to provide the information required by paragraph 26 of the Consent Decree with respect to the use of Schedule B, no agreeement was reached that paragraph 8(j) would govern the content of the report.

V.  The government is aware of plaintiffs' position with respect to the inclusion of GS-9 competitive procedures as a part of the AEP.

Very truly yours,

Barbara

Barbara Ward
Trial Attorney
Federal Programs Branch
Civil Division

cc:  James Green, Esq.

ATTACHMENT  F

STATE OF FLORIDA )
                         §§
COUNTY OF DUVAL )

### AFFIDAVIT OF LAVERNE M. CLARK

Before me personally appeared, LAVERNE M. CLARK, who after first being duly sworn, depose and states that:

1. She is a Black Citizens of the United States and resident of the State of Florida; presently residing at 5627 Gilchrist Road, Jacksonville, Duval County, Florida 32218.

2. She was employed on January 30, 1984, in the Excepted Service as a Supply Systems Analyst GS-5, Schedule B-PAC position.

3. She has been advised and on the basis of information and belief asserts that she and other similarly situated Schedule B-PAC employees who were issued Notices of Termination on January 30, 1987, because of a Reduction in Forces are the only other persons issued Notices of Termination and would not have been issued Notices of Termination effective March 31, 1987, provided she and other Schedule B-PAC Employees would have been converted previously to Competitive Employee Status prior to the date of proposed termination.

FURTHER, Affiant saith naught.

_Laverne M. Clark_
AFFIANT


SWORN AND SUBSCRIBED to before me this 24th day of March, 1987.

_Joel V. Bressler_
NOTARY PUBLIC

Notary Public, State of Florida at Large.
My Commission Expires June 6, 19__
Bonded Thru Troy Fain Insurance Co.

MY COMMISSION EXPIRES:



# DEPARTMENT OF THE NAVY

**NAVAL SUPPLY CENTER**
**JACKSONVILLE, FLORIDA 32212**

IN REPLY REFER TO:

25 March 1985

Ms. Laverne Clark
Traffic Division
Physical Distribution Department
Naval Supply Center
Jacksonville, FL  32212-0097

Dear Ms. Clark,

Congratulations on your promotion as Supply Systems Analyst, GS-2003-07.  Your
promotion to this position recognizes the potential you have shown for
increased responsibilities in the Traffic Division, Physical Distribution
Department of the Naval Supply Center Jacksonville.

We are proud of you and are pleased that you have been selected for this
important position.  You have earned the confidence and respect of your
co-workers and leaders here and we look forward to even greater achievement in
your new position.

Sincerely,

H. D. WEATHERSON
Captain, SC, USN
Commanding Officer

# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212-0097

IN REPLY REFER TO:
12450
303
3 Feb 86

From: Transportation Officer, Naval Supply Center, Jacksonville, FL 32212-0097
To:   Laverne Clark

Subj: LETTER OF APPRECIATION

1.  Mrs. Clark had been assigned to the Traffic Division Office in the Physical Distribution Department, Naval Supply Center, Jacksonville, Florida from 30 January 1984 to 31 January 1986.  During that time, she grasped her duties wholeheartedly and did an outstanding job in performing her duties as a Supply Systems Analyst.

2.  Her easy going personality and willingness to take on any assigned task helped immensely in fulfilling the duties of her position, along with her "can-do" attitude.  She followed instructions and performed her job assignments in an outstanding manner, always meeting deadlines and assisting or performing duties any place she was assigned.

3.  Her pleasant manner, good grooming, and ability to work with co-workers were above reproach.

4.  Special recognition is acknowledged for Mrs. Clark's outstanding manner in displaying her talents by participating in gathering data/information for the GE Survey Program.  Her perseverance and dedicated efforts contributed greatly to this Project.

5.  I would highly recommend Mrs. Clark for any position for which she may be qualified, as she would be a great asset and an overall super employee.

D. L. KRUML

12351
Code 22
30 Jan 1987

From: Commanding Officer, Naval Supply Center, Jacksonville, FL 32212-0097
To:   LaVerne M. Clark

Subj: REDUCTION-IN-FORCE NOTIFICATION

Ref:  (a) FPM 351
      (b) 5 CFR Part 351

Encl: (1) Merit Systems Protection Board Information

1. ACTION. The Naval Supply Center is undergoing a reorganization and
reduction-in-force, based on the FY 87 Business Plan, to streamline
managerial and staff functions. The retention rights of all employees have
been carefully reviewed. I regret to inform you that you will be separated
effective 31 March 1987.

Your separation does not reflect on your service or conduct. You may use
this notice to assure prospective employers that this action was not taken
for personal cause.

2. RETENTION INFORMATION. You are currently employed in the excepted
service as a Supply Systems Analyst, GS-2003-7, $18,970.00 per annum. Your
competitive area is Naval Supply Center, Jacksonville, Florida. Your
competitive level is 7653, and your retention subgroup is 2B. Your RIF
service computation date (SCD) is 20 December 1982; however, 16 years has
been subtracted from your SCD based on performance (1986 - Outstanding,
1985 - Highly Satisfactory, 1984 - Presumptive Satisfactory), and your
adjusted SCD is calculated as 20 December 1966.

3. STATUS. Unless otherwise notified, you will be in an active duty status
during the notice period.

4. LEAVE. You are entitled to a lump-sum payment, on separation, for all
accumulated annual leave. Accumulated annual leave consists of the regular
carry-over balance from the previous year plus unused restored annual leave.

5. COUNSELING SERVICE. You have a right to see references (a) and (b),
which contain the regulations and instructions governing reduction-in-
force. You may also see the Retention Registers and other records which
have a bearing on your case. You may be entitled to severance pay,
unemployment benefits, or other considerations depending on your individual
circumstances and these items will be discussed with you during this notice
period. The references, Retention Registers and records are located in the
Consolidated Civilian Personnel Office, NASJAX. You may see this
information and discuss the action planned in your case by contacting
Mrs. Linda Provencal at 772-2320/3449.

Subj: REDUCTION-IN-FORCE NOTIFICATION

6. <u>APPEAL RIGHTS</u>. You may appeal this action to the Merit Systems Protection Board. If you elect to do so the appeal may be filed anytime during the period beginning with the day after the effective date of the action until not later than 20 calendar days after the effective date. Enclosure (1) provides information pertaining to the appeal process and a copy of the Appeal Form.

7. <u>CIVIL SERVICE EMPLOYMENT OPPORTUNITIES</u>. You may apply and receive consideration for any temporary positions that are announced. Copies of announcements will be available in the EEO Office at the Naval Supply Center or in the Civilian Employment Office (Bldg. 857), located outside the main entrance to the Naval Air Station. You may also apply to the Office of Personnel Management (OPM) for any positions included in their vacancy listing. This listing will also be available in the offices identified above.

8. Every reasonable effort will be made to assist you in your attempts to find continued employment. If you have questions, please contact Mrs. Provencal at extension 2320/3449.

D. J. HARR
Acting

ATTACHMENT  G

STATE OF FLORIDA )
                 §§
COUNTY OF DUVAL  }

### AFFIDAVIT OF VERONICA D. TINSLEY

Before me personally appeared, VERONICA D. TINSLEY, who after first being duly sworn, depose and states that:

1. She is a Black Citizens of the United States and resident of the State of Florida; presently residing at 2125 Barry Drive, South, Jacksonville, Duval County, Florida 32218.

2. She was employed on April 22, 1984, in the Excepted Service as a Supply Systems Analyst GS-5, Schedule B-PAC position.

3. She has been advised and on the basis of information and belief asserts that she and other similarly situated Schedule B-PAC employees who were issued Notices of Termination on January 30, 1987, because of a Reduction in Forces are the only other persons issued Notices of Termination and would not have been issued Notices of Termination effective March 31, 1987, provided she and other Schedule B-PAC Employees would have been converted previously to Competitive Employee Status prior to the date of proposed termination.

FURTHER, Affiant saith naught.

_Veronica D. Tinsley_
AFFIANT

SWORN AND SUBSCRIBED to before me this 24th day of March, 1987.

_Joel V. Bressler_
NOTARY PUBLIC

Notary Public, State of Florida at Large
My Commission Expires June 6, 19 88
Bonded Thru Troy Fain Insurance Inc.
MY COMMISSION EXPIRES:



## DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212-0097

IN REPLY REFER TO
12351
Code 22
30 Jan 1987

From:  Commanding Officer, Naval Supply Center, Jacksonville, FL 32212-0097
To:    Veronica D. Tinsley

Subj:  REDUCTION-IN-FORCE NOTIFICATION

Ref:   (a) FPM 351
       (b) 5 CFR Part 351

Encl:  (1) Merit Systems Protection Board Information

1.  ACTION.  The Naval Supply Center is undergoing a reorganization and
reduction-in-force, based on the FY 87 Business Plan, to streamline
managerial and staff functions.  The retention rights of all employees have
been carefully reviewed.  I regret to inform you that you will be separated
effective 31 March 1987.

Your separation does not reflect on your service or conduct.  You may use
this notice to assure prospective employers that this action was not taken
for personal cause.

2.  RETENTION INFORMATION.  You are currently employed in the excepted
service as a Supply Systems Analyst, GS-2003-7, $18,358 per annum.  Your
competitive area is Naval Supply Center, Jacksonville, Florida.  Your
competitive level is 7656, and your retention subgroup is 2B.  Your RIF
service computation date (SCD) is 22 April 1985; however, 15 years has been
subtracted from your SCD based on performance (1986 - Highly Satisfactory,
1985 - Highly Satisfactory, 1984 - Presumptive Satisfactory), and your
adjusted SCD is calculated as 22 April 1970.

3.  STATUS.  Unless otherwise notified, you will be in an active duty status
during the notice period.

4.  LEAVE.  You are entitled to a lump-sum payment, on separation, for all
accumulated annual leave.  Accumulated annual leave consists of the regular
carry-over balance from the previous year plus unused restored annual leave.

5.  COUNSELING SERVICE.  You have a right to see references (a) and (b),
which contain the regulations and instructions governing reduction-in-
force.  You may also see the Retention Registers and other records which
have a bearing on your case.  You may be entitled to severance pay,
unemployment benefits, or other considerations depending on your individual
circumstances and these items will be discussed with you during this notice
period.  The references, Retention Registers and records are located in the
Consolidated Civilian Personnel Office, NASJAX.  You may see this
information and discuss the action planned in your case by contacting
Mrs. Linda Provencal at 772-2320/3449.

Subj:  REDUCTION-IN-FORCE NOTIFICATION

6.  APPEAL RIGHTS.  You may appeal this action to the Merit Systems
Protection Board.  If you elect to do so the appeal may be filed anytime
during the period beginning with the day after the effective date of the
action until not later than 20 calendar days after the effective date.
Enclosure (1) provides information pertaining to the appeal process and a
copy of the Appeal Form.

7.  CIVIL SERVICE EMPLOYMENT OPPORTUNITIES.  You may apply and receive
consideration for any temporary positions that are announced.  Copies of
announcements will be available in the EEO Office at the Naval Supply Center
or in the Civilian Employment Office (Bldg. 857), located outside the main
entrance to the Naval Air Station.  You may also apply to the Office of
Personnel Management (OPM) for any positions included in their vacancy
listing.  This listing will also be available in the offices identified
above.

8.  Every reasonable effort will be made to assist you in your attempts
to find continued employment.  If you have questions, please contact
Mrs. Provencal at extension 2320/3449.

                              D. O. HARR
                              Acting

Standard Form 50-B
Rev. January 1984
U.S. Office of Personnel Management
FPM Chapter 296

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | | | 2 SSN | 3. Position Sensitivity (Opt) | 4. Date of Birth |
|---|---|---|---|---|---|---|---|
| TINSLEY VERONICA D | | | | | 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 | NCRSENS | 09-14-51 |

| 5. Veteran Preference | | | | | 6. Serv. Comp. Date (Leave) | 7. Tenure | 8. Retirement |
|---|---|---|---|---|---|---|---|
| 1 | 1—None<br>2—5 Pt. | 3—10 Pt. Disab.<br>4—10 Pt. Comp. | 5—10 Pt. Other<br>6—10 Pt./30% Comp. | | 04-22-85 | 2 | C |

| 9. FEGLI | | 10. FLSA | | 11. Sex | 12. Citizenship | 13. Comp. Level (Opt) |
|---|---|---|---|---|---|---|
| D | BASIC LIFE PLUS STANDARD OPTION | N | E—Exempt<br>N—Nonexempt | F | 1 | 1—US<br>8—Other | 7653 |

| 14. Effective Date | 15. Annuitant Indicator | | 16. Work Schedule | | 17. (Reserved for OPM Use) |
|---|---|---|---|---|---|
| 04-27-86 | 9 | 1—Reempl Ann-CS  3—RETM  5—RETM & CS<br>2—RETO  4—RETO & CS  9—Not Applicable | F | F—Full-time  G—FT Seasonal<br>P—Part-time  O—PT Seasonal<br>I—Intermittent  J—INT Seasonal | |

| 18-A. NOAC | 18-B. Nature of Action | 19-A. NOAC | 19-B. Nature of Action |
|---|---|---|---|
| 702 | PROMOTION | | |

| 18-C. Auth Code | 18-D. Authority | 19-C. Auth Code | 19-D. Authority |
|---|---|---|---|
| YLN | SCH B, 213.3202(L) | | |

| 18-E. Auth Code | 18-F. Authority | 19-E. Auth Code | 19-F. Authority |
|---|---|---|---|
| | | | |

| 20. FROM: Position Title and Number | 27. TO: Position Title and Number |
|---|---|
| GENERAL SUPPLY SPECIALIST<br>MZD4379001 | SUPPLY SYSTEMS ANALYST<br>MZD4746002 |

| 21. Name and Location of Employing Office | 28. Name and Location of Employing Office |
|---|---|
| DISTRIBUTION DEPARTMENT<br>STORAGE DIVISION<br>NAVAL SUPPLY CENTER, JAX, FLORIDA | DISTRIBUTION DEPARTMENT<br>PRODUCTION CONTROL AND PLANNING STAFF<br>NAVAL SUPPLY CENTER, JAX, FLORIDA |

| 22. Pay Plan & Occupational Code | 23. Grade or Level | 24. Step or Rate | 25. Salary | 26. Pay Basis | 29. Pay Plan & Occupational Code | 30. Grade or Level | 31. Step or Rate | 32. Salary | 33. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| GS 2001 | 05 | 02 | $14,370.01 | PA | GS 2003 | 07 | 01 | $17,824.00 | PA |

| 34. Duty Station | 35. Position Occupied | 36. Appropriation Code (Optional) |
|---|---|---|
| JACKSONVILLE<br>DUVAL                               FL | 1—Competitive  3—SES General<br>2—Excepted  4—SES Career Reserved | |

37. Remarks     CODE 'C' IN BLOCK 8 INDICATES EL... ...CT-55')
CODE 'F' IN BLOCK 16 INDICATES FULL-TIME ...OY NOT IN A SEASONAL/ON-CALL PROGRAM.

CAREER LADDER POSITION - FULL PERFORMANCE LEVEL
CONGRATULATIONS ON YOUR PROMOTION.

POS STS:P
LOC ID:C50400772004 CFI:91 DT LAST POS REV:3684 COST CTR:          SAS:0 SPID:

| 38 Approval | | 39. FPMIS Data | | | | |
|---|---|---|---|---|---|---|
| A. Title of Approving Official | B. Date | A. Supv. or Nonsupv. Ind | B. VEV IND | C. PRD | D. Barg. Unit Status | E. Functional Class |
| FOR THE APPOINTING OFFICER | 05-03-86 | 8 | N | 0 | 7253 | |
| C. Signature/Authentication of Approving Official | | F. Educational Level | G. Year Degree Attained | H. Academic Discipline | I. Agency Code | |
| Katheryn M Martin | | 13 | 84 | 2209 | NV23 | |
| DESIGNATED APPOINTING OFFICIAL<br>NAS JACKSONVILLE FL | | J. Location Code | | | K. SON | |
| | | 12-1510-051 | | | 2271 | |
| 40. Employing Department or Agency | | L. | M. | N. UIC | O. ... CD | P. | Q. |
| DEPARTMENT OF THE NAVY | | | | 51256 | TO40000 | | |

5 Part
50-307                                          1—Employee Copy                    Previous Edition Usable
                                                                                    NSN 7540-01-110-4907

# Certificate Of Award

## The Naval Supply Center, Jacksonville, Florida

## Awards This Certificate To:

VERONICA D. TINSLEY

## In Recognition Of:

YOUR PARTICIPATION IN THE BUY OUR SPARES SMART PROGRAM RESULTING IN
SAVINGS TO THE FEDERAL GOVERNMENT.

MAR 24 1987
DATE

COMMANDING OFFICER

TO: Consolidated Civilian Personnel Office (Code 125)     DATE: Jan 28, 1987

*I recommend that award consideration be given for the special achievement, herein described which was performed by the employee, or group of employees named below.*

| RECOMMENDED BY | POSITION (Shop., Dept., or Div.) AND NAME OF ACTIVITY |
|---|---|
| SHARON K. SCHER | Contracting Officer<br>Code 202.1, Fleet Contracting Center<br>NSC Jacksonville, FL 32228-0308 |

| EMPLOYEE (Name: Last, First, M.I.; and Social Security Number) | POSITION (Shop, Dept. or Div.) | GRADE | ANNUAL BASE PAY |
|---|---|---|---|
| TINSLEY, VERONICA | Contract Specialist | GS-07 | 18358 |
| | | | |
| | | | |

*(Attach a list for additional employees)*

## 1. BASIS FOR AWARD RECOMMENDATION

| | | DATE(S) OF ACHIEVEMENT |
|---|---|---|
| ☐ SUSTAINED SUPERIOR PERFORMANCE | ☒ SPECIAL ACT OR SERVICE | |
| | BOSS "Good News" | Oct 1, 1986 |

## 2. ESTIMATE OF BENEFITS

A. INTANGIBLE BENEFITS:
☐ SAFETY   ☐ IMPROVED METHOD   ☐ MORALE   ☐ OTHER (Specify)

VALUE: ☐ MODERATE   ☒ SUBSTANTIAL   ☐ HIGH   ☐ EXCEPTIONAL

EXTENT OF APPLICATION: ☐ LIMITED   ☒ EXTENDED   ☐ BROAD   ☐ GENERAL

B. TANGIBLE BENEFITS (In table below compute labor saving at actual cost.)

| ITEM | LABOR | | | MATERIAL | | | TOTAL (Labor and materials) |
|---|---|---|---|---|---|---|---|
| | MAN-HRS. PER | DOLLARS PER | TOTAL | UNITS PER | COST PER UNIT | TOTAL | |
| FORMER METHOD | See attached memorandum | | $603,416.34 | 0 | $0 | $0 | $603,416.34 |
| NEW METHOD | | | 189,320.00 | 0 | 0 | 0 | 189,320.00 |
| SAVINGS | | | 414,096.34 per annum | | | | 414,096.34 per annum |

3. DESCRIPTION OF ACHIEVEMENT. *(The description need not be lengthy but should clearly show how the employee exceeded job responsibility.)*

See attached memorandum concerning the breakout from a Sole Source Situation.
Recommend award of $~~130.00~~. $140.00

| APPROVED BY (Name and title) | DATE |
|---|---|
| *Thomas B. Wheel*<br>THOMAS B. WHEEL, Director, Fleet Contracting Center | 4 Feb 87 |

ENCL (2)
Page 1 of 3

Breakout From Sole Source To Competition:

Florida Towing Company had been the sole offeror for Tug and Towing Services since 1979 and has consequently held the Tug and Towing contracts for NAVSTA Mayport, FL. since that time.



The previous contracts, dating back to 1981, required the contractor to furnish a maximum of four (4) 1800 HP tugs with a response time within four (4) hours on weekdays and six (6) hours on weekends if needed. Florida Towing Co. was the only firm that could provide Tug Service in accordance with the Government's requirement.

Lacking response from other firms, it was determined that a major bar to competition under the prior contracts was the need to have four (4) tugs available in the response area. Most firms simply could not afford the necessary investment in equipment for which there was no guarantee of reimbursement or captilization.

A study was completed prior to the issuance of the solicitation for the FY86 Tug and Towing Services concerning the number times four (4) tugs were actually needed versus the occasions when only one,two,or three were required, and the necessary response times. It was determined that the requirement for four (4) tugs within four (4) hours were unnecessary in the majority of cases.

As a result,the requirement under the solicitation for FY86 was revised , incorporating by individual line items the actual number of tugs required vice the maximum number of tugs needed, i.e. one item called for one (1) tug with response time within four (4) hours while another item called for two (2) tugs with response time greater than sixteen (16) hours etc. thereby giving contractors with only one, two, or three tugs an opportunity to respond.

Even after revising the requirement, to make the contract for Tug and Towing Services subject to mutiple awards, Florida Towing Co. remained the sole offeror. It was suspected that not many firms owned 1800HP tugs.

Although only one offer was received under the solicitation for FY86, the Solicitation for FY87, with the inclusion of individual line items for three (3) and five tugs, was issued utilizing the same format.

The Government provided the solicitation for FY87 services to a total of 58 firms plus twelve (12) written requests for proposals were received. There were two offers received: Florida Towing Co. and McAllister Towing of Florida. The movement of McAllister Towing of Florida into the Mayport, FL. area finally provided for a competitive atmosphere.

Before the acceptance of offers for FY87, it was determined that different companies would have different report times and distances to travel, depending on their berthing locations, thus have different report charges. Therefore, to further enhance competition, travel time to various locations along the St. Johns River was incorporated into the solicitation for FY87 under individual line items. Previous contracts placed travel time under one line item. 

After Best and Final offers were received and subsequently evaluated based on advantages and disadvantages to the Government, an award was made to Florida Towing Co. for an estimated amount of $189,320.

When comparing the FY86 Tug Services contract with the FY87 Tug Services contract it was realized that a substantial saving occurred in the hourly rate charges and the travel time charges to various locations along the St. Johns River, i.e. the hourly rate for one tug went from $250.00 to $86.00 and the travel time charge to Mayport, FL. dropped from $1,054.11 to $168.00. FY87 requirements utilizing FY86 prices would cost $603,416.34.

As a result of the competitive environment created by the movement of McAllister Towing of Florida into the Mayport, FL. area, and the revised pricing structure used, the estimated total savings to the Government is $414,096.34.

ATTACHMENT  H

SUBMITTED ON BEHALF
OF


BERNARD TUTSON

SUB-GROUP 2B, 12351

CODE: 22

JANUARY 30, 1987

## FORMAL COMPLAINT OF WRONGFUL EMPLOYEE PERSONNEL ACTION AND DISCRIMINATION

The Employee contends the Agency has engaged in wrongful employee personnel actions which has caused and continues to cause damages, and has discriminated against him for no reason except for his race, Black.

The employee was employed on January 30, 1984, in the excepted service as a Supply Systems Analyst, GS-5, Schedule B-PAC Position, and on or before January 30, 1987, the Employee had attained the competitive level of 7653; retention Sub-Group of 2-B, RIF Computation Data (SCD) as of January 30, 1984, of sixteen (16) years when subtracted from him SCD as a consequence of him performance as follows: 1986 Presumptive Satisfactory; 1985 Outstanding and 1984 a Highly Satisfactory.  The Employee's adjusted SCD is calculated at April 30, 1968.  The Employee as a consequence of the record he attained as a GS-5 was promoted to Grade and level of GS-7, step 3.

On January 30, 1987, the Agency gave the employee essentially a Notice Of Termination effective March 31, 1987; asserting the reasons therefor to be Reorganization and Reduction-In-Force.

Employee contends the Agency's Personnel Action in terminating him from his employment violated substantive and procedural rights as follows:

1. The Agency intentionally disregarded the established procedure concerning RIF'S/Reorganization by targeting this Employee being a Schedule "B" PAC Employee, instead of proceeding in the prescribed inverse manner which would have touched (1) temporary employees (2) intermittent employees, (3) excepted employees, including this employee, and (4) competitive service as required by statutory procedure.

2. The Employee could have been reassigned back to an excepted area or a competitive area, but was intentionally and purposely kept on detail so as to make it easier for him to be terminated RIF/Reorganization.

3. Caucasian Employees, who were hired in with this Complainant and similarly situated Black Complainant, were initially placed in the higher position of contract negotiator. All Black employees were assigned to the positions of Small Purchase Agent; an inferior position, with the exception of two (2) Black employees.

4. The Agency's conduct is in violation of 5 U. S. C. §§ 3501 et. seq., providing that incumbent employees of Schedule "B" PAC positions shall have retention rights as provided by 5 U.S.C. §§502 et seq.

5.    The Agency's conduct is in contravention of the spirit and letter of <u>Luevane vs. Devine</u>, and paragraph II on page twenty (20) of the Court's Order of February 27, 1987.

6.    Employee was improperly targeted for separation through misrepresentation by Agency such that if the Agency would have given Employee true and timely information concerning his job status, he could have made appropriate adjustments and plans to seek other employment or investigated other areas of work with Agency. This misrepresentation was evidenced by giving Employee assurance of continues employment through instruction from NAVSUP.

7.    Employee has been detailed beyond the prescribed time limit and in violation of the regulations promulgated by OPM pertaining to detailing.

8.    Employee termination has had a disperate impact on Employee as a Black employee and has discriminated against him in his employment. All Schedule "B'S" were considered "excepted" personnel as a matter of policy.

9.    Notwithstanding Employee's attainment of a highly qualified score on a competitive examination while continuously being detailed to an untrained position, Employee was denied the opportunity for conversion to career conditional status for no reason except for his race.

BERNARD TUTSON

Dated: 3/19/87

# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212-0097

IN REPLY REFER TO:
12351
Code 22
30 Jan 1987

From:  Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:    Bernard Tutson

Subj:  REDUCTION-IN-FORCE NOTIFICATION

Ref:   (a) FPM 351
       (b) 5 CFR Part 351

Encl:  (1) Merit Systems Protection Board Information

1.  ACTION.  The Naval Supply Center is undergoing a reorganization and
reduction-in-force, based on the FY 87 Business Plan, to streamline
managerial and staff functions.  The retention rights of all employees have
been carefully reviewed.  I regret to inform you that you will be separated
effective 31 March 1987.

Your separation does not reflect on your service or conduct.  You may use
this notice to assure prospective employers that this action was not taken
for personal cause.

2.  RETENTION INFORMATION.  You are currently employed in the excepted
service as a Supply Systems Analyst, GS-2003-7. $18,970.00 per annum.  Your
competitive area is Naval Supply Center, Jacksonville, Florida.   Your
competitive level is 7653, and your retention subgroup is 2B.  Your RIF
service computation date (SCD) is 30 January 1984; however, 16 years has
been subtracted from your SCD based on performance (1986 - Presumptive
Satisfactory; 1985 - Outstanding, 1984 - Highly Satisfactory), and your
adjusted SCD is calculated as 30 January 1968.

3.  STATUS.  Unless otherwise notified, you will be in an active duty status
during the notice period.

4.  LEAVE.  You are entitled to a lump-sum payment, on separation, for all
accumulated annual leave.  Accumulated annual leave consists of the regular
carry-over balance from the previous year plus unused restored annual leave.

5.  COUNSELING SERVICE.  You have a right to see references (a) and (b),
which contain the regulations and instructions governing reduction-in-
force.  You may also see the Retention Registers and other records which
have a bearing on your case.  You may be entitled to severance pay,
unemployment benefits, or other considerations depending on your individual
circumstances and these items will be discussed with you during this notice
period.  The references, Retention Registers and records are located in the
Consolidated Civilian Personnel Office, NASJAX.  You may see this
information and discuss the action planned in your case by contacting
Mrs. Linda Provencal at 772-2320/3449.

Subj:  REDUCTION-IN-FORCE NOTIFICATION

6.  APPEAL RIGHTS.  You may appeal this action to the Merit Systems
Protection Board.  If you elect to do so the appeal may be filed anytime
during the period beginning with the day after the effective date of the
action until not later than 20 calendar days after the effective date.
Enclosure (1) provides information pertaining to the appeal process and a
copy of the Appeal Form.

7.  CIVIL SERVICE EMPLOYMENT OPPORTUNITIES.  You may apply and receive
consideration for any temporary positions that are announced.  Copies of
announcements will be available in the EEO Office at the Naval Supply Center
or in the Civilian Employment Office (Bldg. 857), located outside the main
entrance to the Naval Air Station.  You may also apply to the Office of
Personnel Management (OPM) for any positions included in their vacancy
listing.  This listing will also be available in the offices identified
above.

8.  Every reasonable effort will be made to assist you in your attempts
to find continued employment.  If you have questions, please contact
Mrs. Provencal at extension 2320/3449.

D. J. HARR
Acting

ATTACHMENT I

STATE OF FLORIDA )
                  §§
COUNTY OF DUVAL   )

### AFFIDAVIT OF LANITA WILLIAMS-WELLS

Before me personally appeared, LANITA WILLIAMS-WELLS, who after first being duly sworn, depose and states that:

1. She is a Black Citizens of the United States and resident of the State of Florida; presently residing at 11517 Manatee Drive, Jacksonville, Duval County, Florida 32218.

2. She was employed on January 30, 1984, in the Excepted Service as an Inventory Management Specialist, GS-5, Schedule B-PAC position.

3. She has been advised and on the basis of information and belief asserts that she and other similarly situated Schedule B-PAC employees who were issued Notices of Termination on January 30, 1987, because of a Reduction in Forces are the only other persons issued Notices of Termination and would not have been issued Notices of Termination effective March 31, 1987, provided she and other Schedule B-PAC Employees would have been converted previously to Competitive Employee Status prior to the date of proposed termination.

FURTHER, Affiant saith naught.

_Lanita T. Williams-Wells_
AFFIANT

SWORN AND SUBSCRIBED to before me this 24th day of March, 1987.

_Joel V. Presele_
NOTARY PUBLIC

Notary Public, State of Florida at Large
My Commission Expires June 6, 1988
Bonded Thru Troy Fain Insurance Inc.
MY COMMISSION EXPIRES:



**DEPARTMENT OF THE NAVY**

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212-0097

IN REPLY REFER TO:

12351
Code 22
30 Jan 1987

From: Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:   Lanita V. Williams-Wells

Subj: REDUCTION-IN-FORCE NOTIFICATION

Ref:  (a) FPM 351
      (b) 5 CFR Part 351

Encl: (1) Merit Systems Protection Board Information

1. <u>ACTION</u>.  The Naval Supply Center is undergoing a reorganization and reduction-in-force, based on the FY 87 Business Plan, to streamline managerial and staff functions.  The retention rights of all employees have been carefully reviewed.  I regret to inform you that you will be separated effective 31 March 1987.

Your separation does not reflect on your service or conduct.  You may use this notice to assure prospective employers that this action was not taken for personal cause.

2. <u>RETENTION INFORMATION</u>.  You are currently employed in the excepted service as a Inventory Management Specialist, GS-2010-7, $18,970 per annum. Your competitive area is Naval Supply Center, Jacksonville, Florida.  Your competitive level is 7064, and your retention subgroup is 2B.  Your RIF service computation date (SCD) is 9 July 1983; however, 14 years has been subtracted from your SCD based on performance (1987 - Presumptive Satisfactory, 1986 - Satisfactory, 1985 - Highly Satisfactory), and your adjusted SCD is calculated as 9 July 1969.

3. <u>STATUS</u>.  Unless otherwise notified, you will be in an active duty status during the notice period.

4. <u>LEAVE</u>.  You are entitled to a lump-sum payment, on separation, for all accumulated annual leave.  Accumulated annual leave consists of the regular carry-over balance from the previous year plus unused restored annual leave.

5. <u>COUNSELING SERVICE</u>.  You have a right to see references (a) and (b), which contain the regulations and instructions governing reduction-in-force.  You may also see the Retention Registers and other records which have a bearing on your case.  You may be entitled to severance pay, unemployment benefits, or other considerations depending on your individual circumstances and these items will be discussed with you during this notice period.  The references, Retention Registers and records are located in the Consolidated Civilian Personnel Office, NASJAX.  You may see this information and discuss the action planned in your case by contacting Mrs. Linda Provencal at 772-2320/3449.

Subj:  REDUCTION-IN-FORCE NOTIFICATION

6.  <u>APPEAL RIGHTS</u>.  You may appeal this action to the Merit Systems
Protection Board.  If you elect to do so the appeal may be filed anytime
during the period beginning with the day after the effective date of the
action until not later than 20 calendar days after the effective date.
Enclosure (1) provides information pertaining to the appeal process and a
copy of the Appeal Form.

7.  <u>CIVIL SERVICE EMPLOYMENT OPPORTUNITIES</u>.  You may apply and receive
consideration for any temporary positions that are announced.  Copies of
announcements will be available in the EEO Office at the Naval Supply Center
or in the Civilian Employment Office (Bldg. 857), located outside the main
entrance to the Naval Air Station.  You may also apply to the Office of
Personnel Management (OPM) for any positions included in their vacancy
listing.  This listing will also be available in the offices identified
above.

8.  Every reasonable effort will be made to assist you in your attempts
to find continued employment.  If you have questions, please contact
Mrs. Provencal at extension 2320/3449.

                              D. W. HARR
                              Acting

# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212

IN REPLY REFER TO:

25 March 1985

Ms. Lanita Williams
Commodity Analysis Branch
Inventory Control Department
Naval Supply Center
Jacksonville, FL 32212-0097

Dear Ms. Williams,

Congratulations on your promotion as Inventory Management Specialist, GS-2010-07. Your promotion to this position recognizes the potential you have shown for increased responsibilities in the Commodity Analysis Branch, Inventory Control Department of the Naval Supply Center Jacksonville.

We are proud of you and are pleased that you have been selected for this important position. You have earned the confidence and respect of your co-workers and leaders here and we look forward to even greater achievement in your new position.

Sincerely,

H. D. WEATHERSON
Captain, SC, USN
Commanding Officer

14 Nov 1985

Mrs. Wells has worked in code 101.2 since April 1934.  In that time she has
repeatedly proved to be a very valuable employee within the branch.

She is dedicated to getting the job done effectively and efficiently and is
well liked by her peers and supervisors.  She is and would be a very positive
asset to any position in which she was placed.

MARY BOYER
Supervisory Inventory
Management Specialist 101.2

ATTACHMENT  J

**W. Benjamin Kyle, P.A.**

——————————— *Attorney and Counselor-at-Law* ———————————

1248 WEST EDGEWOOD AVENUE
JACKSONVILLE, FLORIDA 32208
(904) 764-2441

April 27, 1987

Richard Seymour, Esquire
Lawyers Committe For Civil Rights
Under Law
1400 "Eye" North West, Suite 400
Washington, D. C. 2005

              RE:  PAC Employee Adversely Affected By RIF
                   Naval Supply Center, Jacksonville,
                   Florida:  Additional Information
                   Subject:  Randy S. Britt

Dear Mr. Seymour:

    We have acquired additional documents and information that will be of major support in preparing the necessary brief.

    1.  Mr. Randy S. Britt present temporary status is Supply Systems Analyst 2003 Series 7.

    2.  Temporary duty began on March 15, 1987.

    3.  Mr. Britt did receive a pay cut when switched from the premanent position of Supply Systems Analyst to the Temporary postion of purchasing Agent.  Later he was assigned to the temporary position of contract Specialist.  Thereafter, he was re-assign to the temporary position of Supply Systems Analyst. His Salary of $19,582.00 was reduced to $17,226.00 annually, a reduction in the amount of $2,250.00.  After one (1) month his salary was increased back to the original amount of $19,582.00 annually.

    4.  Mr. Britt was told by his supervisor that a reduction in force (RIF) was taking place; effective March 30, 1987, and he would be terminated; his temporary status was not to exceed one (1) year.

Page Two
April 27, 1987
RE:  Randy S. Britt

    5.  The following benefits have been lost by Mr. Britt as a
result of being placed in a temporary status:

        A.  Total time and Grade in position.
        B.  Career status withdrawn.
        C.  Seniority
        D.  Veterans readjustment training lost.
            (Its is presently being advertised.)
            Supervisor informed Mr. Britt that
            slots were not available.
        E.  Lost Tenure.

    All above information can be verified by transmittal action in
personnel jacket.

    If additional information is needed do not hesitate to call on
us.

Very truly yours,

W. Benjamin Kyle

WBK/ih



Standard Form 50-B
Rev. November 1985
U.S. Office of Personnel Management
FPM Chapter 296

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) BRITT RANDY S | | 2. SSN 2:2-17-5239 | 3. Position Sensitivity (Opt) NONSENS | 4. Date of Birth 12-01-50 |
|---|---|---|---|---|
| 5. Veteran Preference X | 1—None  2—5 Pt.  3—10 Pt. Disab.  4—10 Pt. Comp.  5—10 Pt. Other  6—10 Pt./30% Comp. | 6. Serv. Comp. Date (Leave) 11-12-81 | 7. Tenure 2 | 8. Retirement K |

| 9. FEGLI X | BASIC LIFE PLUS ADDITIONAL OPTION WITH 5 TIMES PAY & STD OPTION | | 10. FLSA N | | 11. Sex M | 12. Citizenship 1 1—US 8—Other | 13. Comp. Level (Opt) 02 98 |
|---|---|---|---|---|---|---|---|

| 14. Effective Date 05-15-87 | 15. Annuitant Indicator 9    1—Reempl Ann-CS  2—RETO  3—RETM  4—RETO & CS  5—RETM & CS  9—Not Applicable | 16. Work Schedule F    1—Full-time  F—Full-time  P—Part-time  I—Intermittent  G—FT Seasonal  O—PT Seasonal  J—INT Seasonal  H—FT On Call  R—PT ON Call | 17. (Reserved for OPM Use) |
|---|---|---|---|

| 18-A. NOAC 515 | 18-B. Nature of Action CONV TO APPT NTE 05-14-88 | 19-A. NOAC | 19-B. Nature of Action |
|---|---|---|---|
| 18-C. Auth Code NC | 18-D. Authority REG 316.402(b)(4) | 19-C. Auth Code | 19-D. Authority |
| 18-E. Auth Code | 18-F. Authority | 19-E. Auth Code | 19-F. Authority |

| 20. FROM: Position Title and Number SUPPLY SYSTEMS ANALYST    MZD4123005 | 27. TO: Position Title and Number PURCHASING AGENT    MIC1343001 |
|---|---|
| 21. Name and Location of Employing Office PROGRAM MANAGEMENT DIRECTORATE QUALITY ASSURANCE DIVISION QUALITY CONTROL BRANCH NAVAL SUPPLY CENTER, JAX, FLORIDA | 28. Name and Location of Employing Office SUPPLY DEPARTMENT CONTROL DIVISION PURCHASE BRANCH NAVAL AIR STATION JACKSONVILLE FL |

| 22. Pay Plan & Occupational Code GS | 23. Grade or Level 2005 | 24. Step or Rate 07 | 25. Salary 03 $19,582.00 | 26. Pay Basis PA | 29. Pay Plan & Occupational Code GS | 30. Grade or Level 1105 | 31. Step or Rate 04 | 32. Salary 10 $17,226.00 | 33. Pay Basis PA |
|---|---|---|---|---|---|---|---|---|---|

| 34. Duty Station JACKSONVILLE DUVAL    FL | 35. Position Occupied 1    1—Competitive  2—Excepted  3—SES General  4—SES Career Reserved | 36. Appropriation Code (Optional) |
|---|---|---|

37. Remarks
CODE "K" IN BLOCK 8 INDICATES FERS & FICA
CODE "F" IN BLOCK 16 INDICATES FULL-TIME EMPLMT NOT IN A SEASONAL/ON-CALL PROGRAM.

PAYROLL - THIS IS A CHANGE OF APPOINTING OFFICE (CAO) ACTION
THIS ACTION CHANGES YOUR CHECK PREFIX NUMBER. FROM C50400
THIS APPOINTMENT IS TEMPORARY. IT IS PROJECTED YOU WILL BE SEPARATED
ON OR BEFORE THE "NOT TO EXCEED" DATE SHOWN ABOVE. THIS APPOINTMENT
DOES NOT PROVIDE ELIGIBILITY FOR OTHER FEDERAL EMPLOYMENT, NOR DOES IT
INDICATE YOU WILL BE SELECTED FOR PERMANENT EMPLOYMENT.
REASON FOR TEMPORARY APPOINTMENT: FLUCTUATING WORKLOAD.
HEALTH BENEFITS COVERAGE CONTINUES.

POS STS:P
OC ID:A0510076045 CFI:90 DT LAST POS REV:3793 COST CTR:    SAS:0 SPID:00

| 38. Approval | | 39. FPMIS Data | | | | |
|---|---|---|---|---|---|---|
| A. Title of Approving Official FOR THE APPOINTING OFFICER | B. Date 03-15-87 | A. Supv. or Nonsupv. Ind. 8 | B. VEV IND V | C. PRO D | D. Barg. Unit Status 2122 | E. Functional Class. |
| C. Signature/Authentication of Approving Official *Kathryn M. Martin* DESIGNATED APPOINTING OFFICIAL 8 NAS JACKSONVILLE FL | | F. Educational Level 13 | G. Year Degree Attained 00 | H. Academic Discipline 2201 | I. Agency Code NV60 | |
| 40. Employing Department or Agency DEPARTMENT OF THE NAVY | | J. Location Code 12-1510-031 | | | K. SON 2271 | |
| | | UIC N. 00207 | ORG CD 1943000 | | P. | Q. BLD |

5 Part    1—Employee Copy    Previous Edition Usable

Standard Form 50 - B
Rev. January 1982
US Office of Personnel Management
FPM Chapter 296

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. SSN | 3. Position Sensitivity (Opt.) | 4. Date of Birth |
|---|---|---|---|---|
| BRITT RANDY S | | 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 | NCRSENS | 12-11-50 |

| 5. Veteran Preference | | 6. Serv. Comp. Date (Leave) | 7. Tenure | 8. Retirement |
|---|---|---|---|---|
| 4 | 1—None  2—5 Pt.  3—10 Pt. Disab.  4—10 Pt. Comp.  5—10 Pt. Other  6—10 Pt./30% Comp. | 11-12-81 | 2 | K  1-CS  3-FS  5-Other  2-FICA  4-None  6-CS Spec |

| 9. FEGLI | 10. FLSA | 11. Sex | 12. Citizenship | 13. Comp. Level (Opt.) |
|---|---|---|---|---|
| BASIC LIFE PLUS ADDITIONAL OPTION WITH 5 TIMES PAY & STD OPTION  X | N  E-Exempt  N-Nonexempt | M | X  1-US  8-Other | |

| 14. Effective Date | 15. Annuitant Indicator | 16. Work Schedule | 17. (Reserved for OPM Use) |
|---|---|---|---|
| 01-01-87 | 9  1-Reempl Ann-CS  2-RETO  3-RETM  4-RETO & CS  5-RETM & CS  9-Not Applicable | F  F—Full-time  P—Part-time  I—Intermittment  G—FT Seasonal  Q—PT Seasonal  J—INT Seasonal | |

| 18-A. NOAC | 18-B. Nature of Action | | 19-A. NOAC | 19-B. Nature of Action |
|---|---|---|---|---|
| 730 | DETAIL NTE | 03-31-87 | | |

| 18-C. Auth Code | 18-D. Authority | 19-C. Auth Code | 19-D. Authority |
|---|---|---|---|
| VLM | 5 U.S.C. 3341 | | |

| 18-E. Auth Code | 18-F. Authority | 19-E. Auth Code | 19-F. Authority |
|---|---|---|---|
| | | | |

| 20. FROM: Position Title and Number | 27. To: Position Title and Number |
|---|---|
| SUPPLY SYSTEMS ANALYST        NZD4123003 | CONTRACT SPECIALIST        NZD4925004 |

| 21. Name and Location of Employing Office | 28. Name and Location of Employing Office |
|---|---|
| PROGRAM MANAGEMENT DIRECTORATE  QUALITY ASSURANCE DIVISION  QUALITY CONTROL BRANCH  NAVAL SUPPLY CENTER, JAX, FLORIDA | CONTRACTING DIRECTORATE  CONTRACTS AND PURCHASING DIVISION  NARF SUPPORT BRANCH  NAVAL SUPPLY CENTER, JAX, FLORIDA |

| 22. Pay Plan & Occupational Code | 23. Grade or Level | 24. Step or Rate | 25. Salary | 26. Pay Basis | 29. Pay Plan & Occupational Code | 30. Grade or Level | 31. Step or Rate | 32. Salary | 33. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| GS 2003 | 07 | 03 | $19,582.00 | PA | GS 1102 | 07 | 03 | $19,582.00 | PA |

| 34. Duty Station | | | 35. Position Occupied | 36. Appropriation Code (Optional) |
|---|---|---|---|---|
| JACKSONVILLE  DUVAL | | FL | 1  1-Competitive  3-SES General  2-Excepted  4-SES Career Reserved | |

| 37. Remarks |
|---|
| CODE "K" IN BLOCK 8 INDICATES FERS & FICA  CODE "F" IN BLOCK 16 INDICATES FULL-TIME EMPLMT NOT IN A SEASONAL/ON-CALL PROGRA |

POS STS:P
LOC ID:C5040076045 CFI:91 DT LAST POS REV:8691 COST CTR:        SAS:0 SPID:80

| 38. Approval | | 39. FPMIS Data | | | | |
|---|---|---|---|---|---|---|
| A. Title of Approving Official  FOR THE APPOINTING OFFICER | B. Date  02-19-87 | A. Supv. or Nonsupv. Ind. | B. VEV IND  9 | C. PRD  0 | D. Barg. Unit Status  2256 | E. Functional Class |
| C. Signature/Authentication of Approving Official  Kathryn M. Martin  5 | | F. Ed. Level  15 | G. Year Degree Attained  80 | H. Academic Discipline  2201 | | I. Agency Code  NV23 |
| DESIGNATED APPOINTING OFFICIAL  NAS JACKSONVILLE FL | | J. Location Code | | 12-1510-031 | | K. SON  2271 |
| 40. Employing Department or Agency  DEPARTMENT OF THE NAVY | | N. UIC  68836 | | O.D.G. CD  2010100 | | Q. |

| 5 Part |
|---|
| 50-303 |

1 - Employee Copy

Previous Editions Unusable
NSN 7540-01-110-4907

STATE OF FLORIDA )
                          §§
COUNTY OF DUVAL   )

## AFFIDAVIT OF RANDY S. BRITT

Before me personally appeared, RANDY S. BRITT, who after first being duly sworn, depose and states that:

1.  He is a Black Citizens of the United States and resident of the State of Florida; presently residing at 2359 Oak Street, Apartment #5, Jacksonville, Duval County, Florida 32204.

2.  He has had aviation supply experience with the United States Navy performing duties as storekeeper, which covered many aspects of supply operations, procurement, receipts, inspection, storage, issues, Navy regulations technical references and material identifications.

3.  He was employed on January 30, 1984, in the Excepted Service as an Inventory Management Specialist, GS-5, Schedule B-PAC position.

4.  He has been advised and on the basis of information and belief asserts that he and other similarly situated Schedule B-PAC employees who were issued Notices of Termination on January 30, 1987, because of a Reduction in Forces, are the only other persons issued Notices of Termination, and he would not have been issued a Notices of Termination effective March 31, 1987, provided he and other Schedule B-PAC Employees would have been converted previously to Competitive Employee Status prior to the

date of proposed termination.

FURTHER, Affiant saith naught.

_____
AFFIANT

SWORN AND SUBSCRIBED  to before me this 30th day of March,
1987.

_____
NOTARY PUBLIC

Notary Public, State of Florida
My Commission Expires Feb. 6, 1988

_____
MY COMMISSION EXPIRES:

ATTACHMENT K

# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212

IN REPLY REFER TO

12351
Code 22
27 Mar 1987

From:  Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:    Veronica D. Tinsley

Subj:  REDUCTION-IN-FORCE NOTIFICATION

Ref:   (a) NSC ltr 12351 Code 22 of 30 Jan 87

1.  Reference (a) is amended to change the effective date of your separation
to 30 April 1987.

H. J. HUFFMAN

ATTACHMENT L



# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212

IN REPLY REFER TO:
12351
Code 22
24 Apr 1987

From: Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:   LaVerne M. Clark

Subj: REDUCTION-IN-FORCE NOTIFICATION

Ref:  (a) NSC ltr 12351 Code 22 of 30 Jan 87
      (b) NSC ltr 12351 Code 22 of 27 Mar 87

1.  The reduction-in-force announced in reference (a), and modified by
reference (b), is suspended until further notice.

H. J. HUFFMAN

ATTACHMENT  M



# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212

IN REPLY REFER TO:
12351
Code 22
24 Apr 1987

From:  Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:    Veronica D. Tinsley

Subj:  REDUCTION-IN-FORCE NOTIFICATION

Ref:   (a) NSC ltr 12351 Code 22 of 30 Jan 87
       (b) NSC ltr 12351 Code 22 of 27 Mar 87

1.  The reduction-in-force announced in reference (a), and modified by
reference (b), is suspended until further notice.

H. J. HUFFMAN

ATTACHMENT  N



# DEPARTMENT OF THE NAVY

NAVAL SUPPLY CENTER
JACKSONVILLE, FLORIDA 32212

IN REPLY REFER TO:

12351
Code 22
24 Apr 1987

From:  Commanding Officer, Naval Supply Center, Jacksonville, FL  32212-0097
To:    Lanita V. Williams-Wells

Subj:  REDUCTION-IN-FORCE NOTIFICATION

Ref:   (a) NSC ltr 12351 Code 22 of 30 Jan 87
       (b) NSC ltr 12351 Code 22 of 27 Mar 87

1.  The reduction-in-force announced in reference (a), and modified by
reference (b), is suspended until further notice.

H. J. HUFFMAN

ATTACHMENT  O

# MEMORANDUM

**DATE:** 4 MAY 87

**FROM:** **EXECUTIVE OFFICER**

**TO:** Distribution

**SUBJ:** SCHEDULE B AUTHORITY FOR HIRING

**Encl:** (1) OFFICE OF CIVILIAN PERSONNEL MANAGEMENT msg 291648Z APR 87

1. Enclosure (1) is provided for information.

D. C. HARR

Distribution:
OE
03
200
201
202
203
204
A. WILLIAMS
L. CLARK
S. CARROLL
C. KING
C. LASTER
S. PALMER
R. SLONECKER
V. TINSLEY
B. TUTSON
L. WILLIAMS-WELLS
R. GILLETTE

U N C L A S S I F I E D

ADMINISTRATIVE MESSAGE

ROUTINE

R 291648Z APR 87 ZYB PSN 790499J38

FM OFFCPM ARLINGTON VA

TO AIG NINE NINE FOUR FOUR

UNCLAS //N12332//

SUBJ:  SCHEDULE B AUTHORITY FOR HIRING PAC OCCUPATIONS

A.  OFFCPM ARLINGTON VA 031910Z APR 87

1.  REF A PROVIDED INFORMATION AND GUIDANCE ON THE UNITED STATES
DISTRICT COURT'S ACTION CONCERNING THE USE OF SCHEDULE B
PROFESSIONAL AND ADMINISTRATIVE CAREER (PAC) APPOINTING AUTHORITY
AND CONVERSION OF EMPLOYEES SERVING ON EXCEPTED APPOINTMENTS MADE
UNDER THE AUTHORITY.

2.  ON 30 MARCH 1987, THE DISTRICT COURT GRANTED A STAY REQUESTED BY
OPM.  AS A CONSEQUENCE, THE COURT'S ORDER WILL NOT BE EFFECTIVE
UNTIL SUCH TIME AS THE MATTER IS RULED UPON BY THE COURT OF APPEALS.
ACTIVITIES HAVING SCHEDULE B PAC AUTHORITY MAY CONTINUE TO USE THEIR
AUTHORITY TO HIRE FOR COVERED PAC POSITIONS.

3.  THE DISTRICT COURT ALSO ORDERED THAT PERSONS HIRED UNDER
SCHEDULE B PAC WERE TO BE CONVERTED TO THE COMPETITIVE SERVICE.
THIS PART OF THE ORDER IS ALSO STAYED.  CONVERSION OF SCHEDULE B PAC
APPOINTEES WILL CONTINUE THROUGH THE COMPETITIVE APPOINTMENT PROCESS.

4.  DURING THE PERIOD OF THE APPEAL YOU SHOULD CONDUCT SCHEDULE B
PAC BUSINESS AS IT HAS BEEN CONDUCTED PRIOR TO THE DISTRICT COURT
DECISION.  A REQUEST HAS BEEN SUBMITTED BY OFFCPM-21 TO OPM
REQUESTING THAT PAC HIRING AUTHORITIES 86-16, 18, 25, 27, AND 35 BE
EXTENDED FOR AN INDEFINITE PERIOD AND FOR AN UNLIMITED NUMBER OF

DLVR:NAVAIREWORKFAC JACKSONVILLE FL(12)...ACT

150(1)...ACT FOR NAS JACKSONVILLE FL(2)                        01622/ 3/0303
    01(1)

XO(1)...ACT FOR NSC JACKSONVILLE FL(3)                         12332/ 1/0005
    40(1) 44(1)

                                            RTD:000-000/COPIES:0017

    790499/119          1 OF 2   MATA1156 119/19:26Z      291648Z APR 87
CSN:AUIA03492                          119/19:26Z           OFFCPM ARLINGT

U N C L A S S I F I E D   U

POSITIONS.  INFORMATION CONCERNING ACTION TAKEN ON THE REQUEST FOR
EXTENSION WILL BE DIRECTED TO THE CONCERNED HEADQUARTERS UPON
RECEIPT.  FURTHER INFORMATION WILL BE PROVIDED WHEN AVAILABLE.

4.  OFFCPM POC IS ALAN HOFFMAN OR SUE MANES, AUTOVON 226-4921 OR AC
(202) 696-4921.

BT

291648Z APR 87
OFFCPM ARLINGT



ATTACHMENT  P

STATE OF FLORIDA )
            §§
COUNTY OF DUVAL )

FILED

MAY 8 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### AFFIDAVIT OF RANDY S. BRITT

Before me personally appeared, RANDY S. BRITT, who after first being duly sworn, depose and states that:

1.   He is a Black Citizens of the United States and resident of the State of Florida; presently residing at 2359 Oak Street, Apartment #5, Jacksonville, Duval County, Florida 32204.

2.   He was employed on January 30, 1984, as an Inventory Management Specialist, GS-5, Schedule B-PAC position.

3.   He was issued a Notice of Termination on January 30, 1987, to be effective on March 31, 1987, and to avoid termination he accepted a transfer to a temporary position as purchasing agent.

4.   Notwithstanding the Court's Ordered by the United States District Court, District of Columbia, he has been refused the opportunity to return to his original position as a Schedule – "B", PAC Employee.

5.   Moreover, he has been, and continue to be, denied benefits as follows:

a.   Recapture of veteran's readjustment training loss as a consequent of the denial of the opportunity to return to his PAC position;

b.   Loss of career status;

c.   Loss of Seniority;

d.   Loss of time and grade in position;

e.   Loss of chances for Upward Mobility utilizing

training and experience acquired.

6.   As evidence of the activities insistence in denying me the opportunity to return to my position as a Schedule - "B", PAC Employee is the fact that I am no longer given copies of the memoranda pertaining to PAC Employees pertaining to their status as a consequent of the Court's Order.

FURTHER, Affiant saith naught.

_____
AFFIANT

SWORN AND SUBSCRIBED   to before me this 7th day of May, 1987.

_____
NOTARY PUBLIC

Notary Public, State of Florida
My Commission Expires Feb. 6, 1988

_____
MY COMMISSION EXPIRES:

## Certificate of Service

I certify that I have this 8th day of May, 1987, served a copy of plaintiffs' foregoing Motion, its attachments, the Memorandum in support, and the proposed form of Order on counsel of record for the defendants by causing copies to be hand-delivered to them at the following addresses:

Barbara L. Ward, Esq.
Federal Programs Branch
Civil Division
U.S. Department of Justice
10th and Pennsylvania N.W.
        Room 3509
Washington, D.C. 20530

James S. Green, Esq.
U.S. Office of Personnel Management
1900 E Street N.W.
        Room 7450
Washington, D.C. 20415


RICHARD T. SEYMOUR
        Attorney for Plaintiffs



MAY 8 - 1987

RECEIVED

MAY 8  4 07 PM '87

JAMES F. DAVEY, CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
individually and on behalf of )
all others similarly situated, )
)
Plaintiffs, )
)
v. )    C. A. No. 79-0271
)
CONSTANCE HORNER, Director, )
U.S. Office of Personnel )
Management, et al., )
)
Defendants. )

FILED

MAY 8 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR A DETERMINATION THAT
THE USE OF SCHEDULE B AUTHORITY FOR HIRING DOES NOT
CONSTITUTE AN "ALTERNATIVE EXAMINING PROCEDURE"
WITHIN THE MEANING OF THE CONSENT DECREE, AND IN
SUPPORT OF THEIR MOTION FOR INJUNCTIVE RELIEF

A. Introduction

There is no question that the defendants' use of

Schedule B hiring authority has been successful, at most agen-

cies, in increasing the hires of blacks and of Hispanics. The

following statistics are taken from the Office of Personnel

Management's Report A1 for 1982, 1983, 1984, and 1985:[1]

| | 1982 Hires | 1983 Hires | 1984 Hires | 1985 Hires | Total |
|---|---|---|---|---|---|
| Schedule B Hires: | 6 | 2,059 | 4,020 | 4,114 | 10,199 |
| --Whites: | 0 | 1,356 | 2,741 | 2,919 | 7,016 |
| --Blacks: | 6 | 503 | 952 | 893 | 2,354 |
| ----% Black | 100% | 24.4% | 23.7% | 21.7% | 23.1% |
| --Hispanics: | 0 | 200 | 327 | 302 | 829 |
| ----% Hispanic | 0% | 9.7% | 8.1% | 7.3% | 8.1% |

[1] These documents are provided to counsel for plaintiffs
pursuant to the government's reporting obligations under the
Consent Decree.  The latest hiring data provided to plaintiffs
are for calendar 1985.

At the outset, plaintiffs wish to give the defendants credit for this major improvement over the results of the PACE.

Unfortunately, plaintiffs do not know, and the government's decision not to develop a system for "tracking" Schedule B appointees means that the government itself does not know, how many of these appointees have been promoted to the Grade 9 level, how many of these appointees are still employed with the government, or whether unexpected problems have trimmed these numbers.

The questions raised by plaintiffs' Motion involve the construction of the Consent Decree, the ability of the Court to take judicial notice of the proceedings in <u>National Treasury Employees Union v. Horner</u>, C.A. No. 84-2573 (D.D.C.), <u>appeal pending</u>, and a basic question of Title VII remedial law.  The following portions of this Memorandum discuss these three issues.

B.  <u>The Meaning of the Consent Decree</u>

Plaintiffs' Motion adequately sets forth the reasons why plaintiffs contend that the plain meaning of the Decree is that the "alternative examining procedures", the implementation of which will start the period for retention of jurisdiction running, are only procedures which are competitive.  The Motion also adequately discusses the materials provided to the Court prior to final approval of the Decree which support this interpretation, and the findings of this Court in the Order granting final approval to the Consent Decree which also support this interpretation.

The consequences of an acceptance of the use of

- 2 -

Schedule B authority as an alternative examining procedure would be complicated.  Schedule B was not "implemented" at the same time for every job category; it was put into effect at one location of one agency on one day, at another location of the same agency on another day, and at a different agency on a third day.  There would have to be different periods of retention of jurisdiction for each location of each agency at which Schedule B authority was put into effect.

The complications do not end there.  OPM's delegation of Schedule B authority for particular job categories at particular locations of particular agencies were ordinarily limited to short periods of time, such as 60 days.  For purposes of the period of retention of jurisdiction, such separate time periods would have to be "tacked" together, for each separate job category at each separate facility of each separate agency, to determine when the five-year period was up for that job category at that facility of that agency.  There would be literally thousands of different termination dates for the period of retention of jurisdiction.

Moreover, OPM's decision to split into two parts the procedure for hiring applicants into the career Civil Service in PACE occupations ---deferring until a second round of competition for the GS-9 level the entry into competitive status which had formerly occurred after just one round of competition at the GS-5 or GS-7 level---means that both halves of the procedure would have to be included within the meaning of "implementation" of an

- 3 -

alternative examining procedure.  Thus, the period of retention
of jurisdiction would start running only when an agency implemen-
ted the second half of the procedure, and actually began promo-
ting Schedule B appointees to grade 9 and converting them to
career status.  Only after such promotions and conversions would
they be in the same shoes as former PACE appointees; only then
would they be in their rightful place.[2]

The existence of these complications is a further

---

[2] The defendants cannot be heard to deny that competitive
status and the opportunity for noncompetitive "career ladder"
promotions going beyond the grade 7 level are a proper part of
this lawsuit.  The availability of such "career ladder" promo-
tions without having to compete for them has always been one of
the most important attractions in the job categories formerly
subject to the PACE, and has been an important part of this
lawsuit from the beginning.  Paragraph 10 of the Complaint herein
alleged in pertinent part:

> Employees selected by the PACE are frequently
> placed in "career ladder" positions and subsequen-
> tly promoted to higher, non-supervisory levels
> without competition.

Plaintiffs' September 29, 1980 Motion for Class Determination
stated in paragraph 5 at p. 3:

> In each case entry into career-oriented administr-
> ative or professional positions is via PACE, and
> subsequent promotions to the top of the career
> ladder are non-competitive and not based on
> testing.

The Consent Decree itself states in ¶ 1, on p. 2, that the
settlement "does not resolve the claims of any class member
involving the use of the PACE or of PACE scores for any purpose
other than competitive external hiring."  By necessary implica-
tion, the claims resolved by the case are claims of <u>competitive</u>
external hiring.

- 4 -

indication that a temporary stopgap measure such as Schedule B,[3] where each agency develops its own standards for making selections, is not the kind of "implementation" of an alternative examining procedure contemplated by the Consent Decree.

Further, it is clear that one of the major items of relief for which plaintiffs settled the case was the opportunity to comment on the defendants' development of new examining procedures, and possibly to influence, in a lasting way, the manner in which the government will develop tests. Our hope was that this relief might make it unnecessary to bring other lawsuits against other tests, by showing OPM how to avoid tests which fall afoul of Title VII. See findings 32-33, Luevano v. Campbell, 93 F.R.D. 68, 79-80 (D.D.C., 1981). Because so few tests have been developed, plaintiffs have not yet received this part of the relief to which the Consent Decree entitles them. If the period of retention of jurisdiction expires without such tests having been developed, plaintiffs will never receive the benefit of this relief.

Paragraph 6(d) of the Consent Decree expressly authorizes the Court to construe, or to amend, the Consent Decree

---

[3] Plaintiffs regard the use of Schedule B authority as a temporary stopgap, and have so regarded it since the defendants first broached the matter to plaintiffs in 1982. The defendants have for some time stated that they regarded the use of Schedule B authority as a long-term measure, except with respect to the occupations for which OPM has developed or was developing competitive examining procedures. Plaintiffs learned from the government within the past couple of months that the government had stopped developing new competitive examinations for further job categories formerly covered by the PACE.

in a manner which will effectuate its purposes.  See Conclusion
of Law No. 24, 93 F.R.D. at 92-93.  This authority should now be
exercised.

> B.  This Court May Take Judicial Notice of the
>     Proceedings Held in Another Case Before the
>     Court

Rule 201(b) of the Federal Rules of Evidence allows the
Court to take judicial notice of facts where the facts are
"capable of accurate and ready determination by resort to sources
whose accuracy cannot reasonably be questioned."  Rule 201(d)
provides that "A court shall take judicial notice if requested by
a party and supplied with the necessary information."

No purpose would be served by requiring the parties in
this action to duplicate the record compiled in the National
Treasury Employees Union case.  Indeed, plaintiffs' request for
judicial notice may not be opposed by the government.

> C.  Class Members Hired Under a Replacement for a
>     Discriminatory Test Should Not Be Treated Less
>     Favorably than Those Hired Under the Discriminatory
>     Test

There is no longer room for reasonable doubt whether
Federal employees hired in an excepted-service status such as
Schedule B occupy a status significantly inferior to that
occupied by competitive-status employees.  Allen v. Heckler, 250
U.S.App.D.C. 402, 780 F.2d 64, 66 (D.C.Cir., 1985); National
Treasury Employees Union v. Devine, C.A. No. 84-2573 (D.D.C.,
October 15, 1986), appeal pending.

OPM's decision that persons hired under Schedule B
authority will be given treatment less favorable than that given

- 6 -

to persons formerly hired under the PACE raises a serious legal question.   The Uniform Guidelines on Employee Selection Procedures state in pertinent part:

> ... Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination.   Thus, the persons who were in the class of persons discriminated against during the period the user followed the discriminatory practices should be allowed the opportunity to qualify under less stringent selection procedures previously followed, unless the user demonstrates that the increased standards are required by business necessity. ...

29 C.F.R. § 1607.11 (1986).   The courts have accepted this regulation and its similar predecessor regulation.   <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 434, 45 L.Ed.2d 280, 306 (1975).   <u>Blake v. City of Los Angeles</u>, 595 F.2d 1367, 1382 (9th Cir., 1979), <u>cert. den</u>., 446 U.S. 928, 64 L.Ed.2d 281 (1980) ("The fact that the LAPD hired thousands of male police officers between 1968 and 1973 without using any pre-employment physical suggests that the practice is not essential to safe and efficient job performance"); <u>Laffey v. Northwest Airlines</u>, 185 U.S.App.D.C. 322, 567 F.2d 429, 456-57 (D.C.Cir., 1976), <u>cert. den.</u>, 434 U.S. 1086, 55 L.Ed.2d 792 (1978) ("We recognize that Title VII discourages the use of even nondiscriminatory but newly-promulgated employee-selection criteria where there is a history of discriminatory treatment of some employees who would continue to be hurt by the new criteria.").

The Navy's repeated plans to lay off its Schedule B

- 7 -

appointees in Jacksonville, and only those Jacksonville employees who are Schedule B appointees, and its treatment of Schedule B appointees who have taken temporary appointments to postpone the dates of their layoffs, present this question in a particularly intense form.  To put it bluntly, the Navy has been discriminating against Schedule B appointees, including class members herein, precisely because of their Schedule B status.  Plaintiffs have gone as far as they can with informal conciliation and persuasion, and now need an Order of this Court protecting the rights of these class members.

<u>Conclusion</u>

For these reasons, and for those stated in plaintiffs' Motion, plaintiffs pray that their Motion be granted.

Respectfully submitted,

WILLIAM L. ROBINSON
RICHARD T. SEYMOUR
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W., Suite 400
Washington, D.C. 20005

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
GAIL J. WRIGHT
99 Hudson Street, 16th Floor
New York, New York 10013

BARRY L. GOLDSTEIN
ELAINE R. JONES
806 - 15th Street, N.W., #940
Washington, D.C. 20005

- 8 -

E. RICHARD LARSON
THERESA BUSTILLOS
Mexican-American Legal Defense
    & Educational Fund
634 South Spring Street
11th Floor
Los Angeles, California 90014

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108

KENNETH KIMERLING
Puerto Rican Legal Defense and
    Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers' Committee
for Urban Affairs
625 Market Street, Suite 1208
San Francisco, Calif.  94105

RUSSELL GALLOWAY
Legal Aid Society of Alameda County
2357 San Pablo Avenue
Oakland, Calif.  94612


By: _____

            Attorneys for Plaintiffs

Dated:  May 8, 1987

- 9 -



MAY 8 - 1987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
    individually and on behalf of )
    all others similarly situated, )
)
                  Plaintiffs, )
)
             v. )    C. A. No. 79-0271 (JHG)
)
CONSTANCE NEWMAN, Director, )
    U.S. Office of Personnel )
    Management, et al., )
)
             Defendants. )

**FILED**

**JAN 22 1993**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

JOINT REQUEST THAT THE COURT SCHEDULE A HEARING ON
APPEALS BY FIVE CLAIMANTS UNDER PARAGRAPH 21 OF THE
AMENDED CONSENT DECREE, AND THAT THE COURT ALLOW TWO
CLAIMANTS TO PARTICIPATE BY TELEPHONE

        Pursuant to ¶ 21 of the Amended Consent Decree, and

pursuant to the September 1, 1987 Order Amending Procedure for

Resolving Claims Under Paragraph 21 of the Consent Decree,

plaintiffs and defendants jointly request that the Court set a

date, and a time in the late afternoon, for the hearing of five

"appeals" to the district court by claimants who were dissatis-

fied with the resolution of their claims by counsel on both

sides.

        Copies of the papers relevant to their appeals, includ-

ing the transcripts of their depositions for those of these

claimants who were deposed, are attached hereto.

        None of the five claimants live close to Washington,

but two of the five claimants, Beverly J. Brown in San Diego,

California and Mary McClarity, in Buchanan, Georgia, wish to

participate personally in the hearing.  The amounts at stake ---
a liquidated payment of $ 3,000 and asistance in finding a
Federal job --- are not large, and the parties believe that
requiring claimants who desire to participate in the hearing to
travel to Washington would be unduly expensive in light of the
amounts at stake and the likelihood of recovery.  Moreover, Ms.
Brown is hospitalized.  The parties therefore jointly request
that the Court allow claimants to participate by telephone as
their cases are reached.  They would be notified of the date and
time of the hearing, and would be able to participate only if
they are available at the telephone when they are called.


A.  Background of the Claims Under Paragraph 21

        Paragraph 21 of the Amended Consent Decree provides as
follows:

            21. OPM has searched its records, and has
        been unable to identify any non-plaintiff class
        members who have filed charges of discrimination
        against OPM, whether under 5 C.F.R. Part 300, 5
        C.F.R. Part 713, or successor regulations, arising
        from the competitive use of the PACE, and whose
        charges are still pending in the administrative or
        judicial process.  The parties and the Court rec-
        ognize that the above-mentioned class members may
        bring themselves to the attention of the Court as
        a result of the notice to be issued in this case.
        On verification that they took the PACE and filed
        the charge, and upon execution of the appropriate
        release, OPM shall pay to each such class member
        the amount of $ 3000 in full settlement of all
        their individual claims arising from competitive
        use of the PACE, and shall assist them to obtain
        suitable jobs with the Federal government in ac-
        cordance with the process set forth in ¶ 20.

Paragraph 20 involves the required efforts by OPM to assist some

- 2 -

of the named plaintiffs in obtaining suitable Federal jobs,
including specifications of the job series and geographic area of
interest, but does not refer to the conditions of obtaining
relief under ¶ 21.

The appeals of these claimants involve only the ques-
tion of their entitlement to relief under ¶ 21.

The Order of September 1, 1987 provided for notice to
be sent to all claimants whom counsel for both sides had agreed
were not entitled to relief under ¶ 21.  Attachment 1 hereto is
an explanation sent at the same time to such claimants by agree-
ment of the parties.

The Order of September 1, 1987 also provided for
individualized statements of the reasons for counsel's determina-
tions to be sent to the claimants whom counsel agreed were not
entitled to relief.  These were sent on November 25, 1987, with
the text having been agreed by both sides.  For some reason, the
file copies have been misplaced for all but Janie Collins, so
plaintiffs have reprinted the letters for the others from the
computer file.  The appeal forms of the claimants responded to
these statements.

Counsel had determined that one claimant, Nancy L.
Graves, was not entitled to relief because she had not submitted
her answers to the questionnaires previously sent to paragraph 21
claimants with the approval of the Court.  Her appeal form
stated that she had never received it.  By agreement of the
parties, in May 1992 she was given a second opportunity to

- 3 -

complete the questionnaire, and has now done so.  The ground for the parties' determination that she is not entitled to relief has therefore changed to the substance of what she stated on her questionnaire.

B. <u>Summary of the Situations of the Five Claimants Who Filed Timely Appeals</u>

    1. <u>Beverly J. Brown</u>

        Ms. Brown lives in San Diego, California and wishes to participate in the hearing by telephone at (619) 268-3517.

        The documents relating to Ms. Brown's claim are attached hereto as Attachment 2.  The letter of explanation for the rejection of her claim stated in pertinent part:

        1.  After you failed the PACE in 1975, you spoke to a Mr. Lupo at the Equal Employment Opportunity Commission in Dallas, but all you remember about the conversation is that he referred you to the Civil Service Commission.  You cannot remember whether you complained to him about the PACE. (Dep.Tr. 6-7).

        2.  When you met with the attorney in the Office of General Counsel of the Civil Service Commission in Dallas, you are not sure that you made even an oral complaint of racial discrimination.  While you recall asking whether there was a quota limiting the number of black applicants and the number of white applicants passing the test, you do not remember how you asked this question and it is not possible for you to say whether this was just a request for information, or was instead understood by both you and the attorney with whom you spoke to be an oral complaint of discrimination.  (Dep.Tr. 13-14).

        3.  Because you do not remember what Civil Service Commission personnel---including the attorney---said to you in 1975 and 1976, you cannot be sure whether you were informed of the proper manner of making a written complaint of racial discrimination against the Civil Service Commission's use of the PACE.  (Dep.Tr. 20).

- 4 -

4.   While you remember signing a document at the Civil Service Commission, you do not remember what the document said.   It is likely that the document was simply a form which had to be signed in order for you to see your test scores.   You apparently came away from the Civil Service Commission office with some papers, but you threw them away and cannot now remember what they said. (Dep.Tr. 16-20).

5.   You do not remember if you ever contacted the Civil Service Commission again about this matter, so you cannot say if the Commission ever gave you further informa-tion. (Dep.Tr. 15).

Her appeal form states that she went to the EEOC to complain about the PACE.

## 2.   Janie L. Collins

The documents relating to Ms. Collins' claim are at-tached hereto as Attachment 3.   The letter of explanation for the rejection of her claim stated in pertinent part:

You did not file a claim under ¶ 21 of the Consent Decree until your October 11, 1983 letter to the Clerk of Court.   (Dep.Tr. 28-29).   The references in that letter to having written to the Court earlier actually referred to the card you sent to the Office of Personnel Management to be placed on the mailing list under ¶ 22 of the Consent De-cree.   (Dep.Tr. 26-27, 43-44; see the copy of the card which is p. 8 of the attachments to the transcript of your deposi-tion).   While you stated in your deposition that you had been misled by a May 21, 1981 letter to you from Christine Applegate of the Office of Personnel Management into think-ing that you could not receive any money in this case, (Dep.Tr. 32-33), you did receive the detailed notice for class members before receiving her letter, (Dep.Tr. 29, 31-32), and this Notice stated clearly that you had to bring yourself "to the attention of the Court immediately" if you wanted to file a claim under ¶ 21 of the Consent Decree. See p. 3 of the Notice.   You obtained a copy of the Consent Decree from the Federal Job Information Center in San Fran-cisco, after receiving Ms. Applegate's May 21, 1981 letter to you.   (Dep.Tr. 40-41).   You read it, but did not do anything about filing a ¶ 21 claim after the read the Con-sent Decree.   (Dep.Tr. 40-41).   You had an attorney working on another matter for you at the time, but did not tell him about the Notice or show it to him.   (Dep.Tr. 34-35).   In 1983, you went through the Notice again, decided that you

- 5 -

> would make a claim under ¶ 21 of the Consent Decree, and
> sent your October 11, 1983 letter to the Court.
> (Dep.Tr. 36-37).
>
> Accordingly, your September 1980 complaint to the
> Office of Personnel Management about racial discrimination
> against blacks in the use of the PACE cannot be considered
> in this case, because your claim under ¶ 21 was not filed on
> time.

Her appeal form states that she was misled by a government

employee as to her rights, and that any default should be excused

because of illness.  In her deposition and in some of her papers,

she makes accusations about various government agencies stealing

her papers, with the result that she cannot back up her claim of

having filed an administrative complaint with OPM.

   3. <u>Nancy L. Graves</u>

        The documents relating to Ms. Graves' claim are at-

tached hereto as Attachment 4.  The  letter of explanation for

the rejection of her claim stated in pertinent part:

> On April 10, 1981, you wrote to the Clerk, to say that
> you had charges pending against OPM's use of the PACE.  You
> did not provide any other information.  You never answered
> my June 5, 1981 request for further information, although I
> warned you that failure to answer would result in the for-
> feiture of your claim.

Her appeal form states that she never received the request for

further information.  On May 18, 1992, she was sent another copy

of the questionnaire, which she filled out and returned.  Her

questionnaire states that she took the PACE in 1967, that she has

no papers showing that she took the PACE, that she does not know

when she filed a complaint of racial or ethnic discrimination

with the U.S. Civil Service Commission or U.S. Office of Person-

- 6 -

nel Management challenging the use of the PACE, that she does not
know to whom she sent such a complaint, that she never received a
response, that she does not have a copy of the complaint, and
that she never filed another complaint against the PACE.

The parties agree that the PACE did not exist in 1967
or for several years thereafter, having been first administered
in 1974, that any complaint filed at that time could not have
been filed against the PACE, that the class in this lawsuit does
not go back to 1967 applicants, that Ms. Graves has not shown
enough information to show that any complaint was filed, that any
rights as to a 1967 test would have been extinguished long before
the settlement of this case.

### 4. Mary McClarity

Ms. McClarity wishes to participate in the hearing by
telephone at (706) 646-9901. She is available Mondays through
Fridays only between 4:00 P.M. and 5:00 P.M. Eastern time. The
documents relating to Ms. McClarity's claim are attached hereto
as Attachment 5. The letter of explanation for the rejection of
her claim stated in pertinent part:

> Your Additional Information statement says that you
> think you took the PACE from 1961 to 1965. The PACE was not
> given for the first time until 1974. What you took was
> probably one of the earlier tests, such as the Federal
> Service Entrance Examination or one of its predecessors. In
> any event, the statute of limitations does not allow this
> case to reach back that far.

Her appeal form states that she cannot remember the years cor-
rectly because it has been so long since she took the test, and
that her interpretation of previous correspondence was that she

would get relief.   The previous correspondence is included in the enclosed package.

    5. <u>Beverly Cummings Smith</u>

       The documents relating to Ms. Smith's claim are at-tached hereto as Attachment 6.  The letter of explanation for the rejection of her claim stated in pertinent part:

> You did not file a complaint with the Office of Person-nel Management, challenging use of the PACE for competitive external hiring, before the cutoff date of January 15, 1981.  Your March 3, 1980 complaint of discrimination in-volved the Air Force's internal use of the PACE in promo-tions.  See my letter of March 30, 1982 to you, your April 21, 1982 response, and my April 30, 1982 letter returning your papers to you.

Her appeal form states that regulations required her to file her complaint against the Air Force, and that the PACE was the same discriminatory test whether used for internal or external purpos-es.

       WHEREFORE, the plaintiffs and the defendants herein pray that their request be granted, that a hearing be scheduled for the appeals of the five unsuccessful claimants under ¶ 21 of the Amended Consent Decree, that Ms. Brown and Ms. McClarity be allowed to participate by telephone, and that the time of the

hearing be set for the late afternoon in light of the restric-
tions on the availability of these claimants to participate by
telephone.

Respectfully submitted,

STUART M. GERSON
Assistant Attorney General

JAY B. STPHENS
United States Attorney


_____
ANNE M. GULYASSY


_____
JOHN R. TYLER

Attorneys, U.S. Department
   of Justice
Civil Division
Room 1074
901 E Street N.W.
Washington, D.C. 20530
(202) 514-2356


Of Counsel:

JAMES S. GREEN
KAREN KIMBALL
U.S. Office of Personnel
   Management
1900 E Street N.W.
Room 7540
Washington, D.C. 20415
(202) 606-2234

RICHARD T. SEYMOUR
      D.C. Bar No. 28100
Lawyers' Committee for Civil
   Rights Under Law
1400 'Eye' St., N.W.,
Suite 400
Washington, D.C. 20005
(202) 371-1212

JULIUS LeVONNE CHAMBERS
CHARLES STEPHEN RALSTON
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 219-1900

JOHN H. ERICKSON
Erickson, Beasley & Hewitt
12 Geary Street
Eighth Floor
San Francisco, Calif.  94108
(415) 781-3040

E. RICHARD LARSON
Mexican-American Legal Defense
   & Educational Fund
634 South Spring Street
   11th Floor
Los Angeles, California 90014
(213) 629-2512

KENNETH KIMERLING
Puerto Rican Legal Defense and
   Educational Fund
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 219-3360

- 9 -

Of Counsel:

EVA J. PATERSON
San Francisco Lawyers'
    Committee for Urban Affairs
301 Mission, Suite 400
San Francisco, Calif.  94105
(415) 989-9444


By: _____
    RICHARD T. SEYMOUR
    Bar No. 28100

    Attorneys for Plaintiffs


Dated: January 22, 1993

- 10 -



CA: 79-271 JHG

FILED

JAN 22 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### EXPLANATION OF CLAIMS FILED UNDER
### PARAGRAPH 21 OF THE CONSENT DECREE

You have filed a claim under ¶ 21 of the Consent Decree.  This paragraph provides for payments of $ 3,000, and special help in finding a suitable Federal job, for each class member in this case who had an active discrimination claim in the administrative process at the time of the settlement, and who would have been able on January 15, 1981 to file an independent lawsuit in the Federal Court to challenge discrimination in the use of the PACE, but whose right to file suit was taken away by the settlement.

The only class members eligible for this relief are blacks and Hispanics who had filed their own administrative charges of racial or ethnic discrimination against the U.S. Civil Service Commission or U.S. Office of Personnel Management before January 15, 1981, and whose charges were still active as of that date.

There were two ways to file charges: <u>First</u>, a charge could be filed with the Appeals Review Board of the Civil Service Commission under 5 C.F.R. Part 300 (after 1978, with the Merit Systems Protection Board).  <u>Second</u>, a charge could be filed with the Civil Service Commission under 5 C.F.R. Part 713 (after 1978, with the Office of Personnel Management under 29 C.F.R. Part 1613).

Paragraph 21 is not a general back pay provision.  It is <u>not</u> intended to provide back pay to class members as a routine matter.  It is intended <u>only</u> to provide back pay to the small handful of blacks and Hispanics who took their own legal action under the civil rights laws to challenge the use of the PACE in hiring before ever hearing about this lawsuit and its settle- ment.  This provision was expressly approved by the Court---over the objections of a number of class members---when the Court granted final approval to the settlement.  The decision of the Court granting final approval is reported in volume 93, Federal Rules Decisions, at p. 68.  The discussion on this point appears at pp. 81-82 and p. 90.  I have attached the first page of the decision, and these three pages, so that you can see the Court's ruling.  The full text is available in any law library.

Based on the facts described in the accompanying letter to you, both sides believe that you would not have been able to file an independent lawsuit against the Office of Personnel Management as of January 15, 1981.  Both sides have agreed that your claim should be dismissed.  The enclosed Notice will tell you what you should do if you want to appeal to the Court, and ask the Court to accept your claim.

vant to the subject matter of the action. *American Ben. Life Ins. Co. v. Ille,* 87 F.R.D. 540, 541, 542 (E.D.Okla., 1978).

[7] In the instant case, PRWRA has failed to sustain its burden of showing the necessity for the issuance of the requested protective order.

Accordingly, the Court ORDERS that PRWRA's motions for protective orders, be and are hereby DENIED, and Mitsui's motion to compel designation of witness(es) and for award of expenses, is hereby GRANTED; and FURTHER ORDERS Mitsui to file a memorandum of the attorneys' fees and expenses.

IT IS SO ORDERED.



Angel G. LUEVANO, et al., Plaintiffs,

v.

Alan CAMPBELL, Director, Office of Personnel Management, et al., Defendants.

Civ. A. No. 79–0271.

United States District Court, District of Columbia.

Nov. 19, 1981.

Consent decree was proposed in class employment discrimination action brought against the government challenging use of the PACE examination. The District Court, Joyce Hens Green, J., held that consent decree which called for phaseout of the examination over a three-year period and for back pay to certain plaintiffs who had timely filed administrative claims would be approved, even though it did not provide for classwide back pay, even though it did not provide for quotas, even though it did not contain an admission of liability by the government, and even though it did not

provide for resolution of the claims of some class members.

Decree approved.

**1. Federal Civil Procedure ⊜1700**

Class members who filed statements which were ambiguous as to their intent to object to settlement, who were informed that if they did not submit a timely clarification they would be deemed to have waived their opportunity to make any objection, and who did not file a timely clarification would be deemed either to not object to the settlement or to have waived any objection to the settlement.

**2. Officers and Public Employees ⊜11.3**

Three-year schedule for elimination of professional and administrative career examination by the Office of Personnel Management and implementation process for new examination procedure, along with the use by the Office of all practicable efforts to eliminate the adverse impact of the PACE examination during the interim period, was reasonable.

**3. Federal Civil Procedure ⊜2397**

Fact that some members of class would not receive back pay or assistance in obtaining federal employment because they had not filed an independent administrative claim of discrimination concerning use by the Office of Personnel Management of a particular examination did not render proposed consent decree, which called for back pay as well as assistance in finding suitable federal employment to some members and which called for elimination of the examination, unreasonable where, even if the examination had not had any adverse impact against blacks or Hispanics, it would be expected as a statistical matter that 95% of those applicants would not have been hired for any job covered by the examination.

**4. Federal Civil Procedure ⊜1699**

Persons whose time for filing discrimination claim against federal government as a result of use of PACE examination had expired by the time that they learned of lawsuit could not have relied on class action

the effective date of the Decree, an agency may cease its "all practicable efforts" obligation when (1) the replacement examining procedure or procedures have been used for actual hiring for the job category in question for at least a two-year period; and (2) the agency has adequate evidence of the relative impact of the procedure upon blacks and upon Hispanics as compared with non-Hispanic whites. If an agency elects to cease "all practicable efforts" to eliminate adverse impact resulting from the replacement examining procedure, the agency would be liable for full relief under Title VII if the Court determines that the procedure was not properly validated, as that term has been defined in the Consent Decree.

39. Moreover, the Consent Decree provides for recordkeeping requirements to enable plaintiffs to determine whether adverse impact against class members results from use of the PACE or the alternative examining procedures. (Decree, ¶¶ 24–25). Defendants have also agreed to provide plaintiffs with detailed statements describing their efforts to maximize their use of the special programs established in the Consent Decree. (Decree, ¶ 24(c)). This Court will receive reports as to the defendants' compliance with the Consent Decree. (Decree, ¶ 7). Plaintiffs would be entitled under the Consent Decree to reasonable attorneys' fees for their services in monitoring the Decree. (Decree, ¶ 32). If plaintiffs allege that such procedures are not valid and the parties are unable to resolve this issue informally, the Decree provides for judicial resolution of this issue in enforcement proceedings before the Court (Decree, ¶ 17) without the need for plaintiffs first to exhaust administrative remedies as otherwise required by Title VII. Plaintiffs will be entitled to reimbursement of their reasonable attorneys' fees in the event they prevail before the Court. (Decree, ¶ 33). The Court finds, therefore, that the recordkeeping requirements and the enforcement mechanism set forth in the Decree will be

fully adequate to ensure that the obligations assumed by defendants under the Consent Decree are properly implemented.

40. The Consent Decree provides for $35,000 in monetary relief to be allocated among the four named plaintiffs, as well as for the referral of two of these plaintiffs to agencies for specific PACE occupations in which they have indicated an interest and for which they are qualified. (Decree, ¶ 20). This is far less than the maximum aggregate loss of earnings which they would have claimed if the PACE had been judicially determined to be unlawful and they had been determined to be entitled to backpay.[6] Any unnamed class members who have filed timely administrative charges of discrimination against the PACE and whose charges are still pending in the administrative or judicial process will be entitled to $3,000 as well as to assistance in finding suitable Federal employment in full settlement of their outstanding claims. (Decree, ¶ 21). A number of class members have brought themselves to the attention of the Court as claimants for the relief provided in ¶ 21 of the Consent Decree, and their claims are being investigated by counsel. (See the Order of June 8, 1981).

[3]  41. Some class members have objected to the Consent Decree on the grounds that all class members should be entitled to back pay and to assistance in obtaining Federal employment even though they had not filed an independent administrative complaint of discrimination concerning the PACE, as provided by the Consent Decree. The Court does not find this objection persuasive. As set forth above, for the period of time relevant to this litigation, only 4.9% of all applicants who took the PACE were actually appointed to PACE occupations. (Finding No. 8). In other words, over 95% of all PACE applicants were not selected for PACE positions. (Outtz deposition, Tr. 23). Thus, even if the PACE had not had any adverse impact

---

6. Attached to Mr. Seymour's affidavit is a calculation showing that for just two of the four plaintiffs, their monetary relief would be $117,-       506.75 through the period of retention of jurisdiction if all issues were resolved in their favor.

against blacks or against Hispanics, it could be expected as a statistical matter that 95% of all white PACE applicants, 95% of all black PACE applicants, as well as 95% of all Hispanic applicants, would not have been hired for any PACE occupations. (Outtz deposition, Tr. 23–24).

42. Thus, if the PACE had not had any adverse impact against blacks and Hispanics, it could be expected as a statistical matter that, at most, 4.9% of the estimated 100,000 class members, or approximately 4,900 black and Hispanic PACE applicants, would have been hired for PACE positions. If this lawsuit had gone to trial and use of the PACE had been finally determined to be unlawful, only 4,900 class members, to the extent they could have been identified, would then have been entitled to claim backpay and/or Federal employment. Conversely, 95% of the estimated 100,000 class members, or approximately 95,000 black and Hispanic PACE applicants, would not have been hired for PACE positions even if there had been no adverse impact from the PACE. To the extent that the class members who would have been hired for PACE occupations could be identified, 95,000 class members would not have had any claim of entitlement to backpay and/or Federal employment, even if the PACE had been determined to be unlawful.

43. If the PACE had been judicially determined to be unlawful during the liability phase of this litigation, the process of identifying which 4,900 of the estimated 100,000 class members would be entitled to individual relief would have been an immensely time-consuming and expensive process. (Outtz deposition, Tr. 26–32). This process would have been further complicated by the fact that applicants under the PACE system did not apply for a specific occupation out of the 118 occupations for which the PACE was used as an examining device, but applied only for broad types of jobs. Those PACE applicants who passed the PACE were simply entitled to have their names placed on the register in score order, to be considered by agencies as agency needs dictated that they filled any of the 118 PACE occupations. Finding Nos. 4–7.

Moreover, since there are a number of other factors beyond the applicant's rating which may be considered by OPM or by the hiring agency in filling vacancies in PACE occupations, even applicants with high ratings had no assurance of selection for or appointment to a PACE position. Finding No. 7. Thus, even after undergoing the time-consuming and expensive process of attempting to determine which 5% of the 100,000 class members would have a claim for backpay and/or Federal employment, there exists the prospect that the results would have been inaccurate.

44. The implementation of any backpay formula which attempted to identify that part of the class who would most likely have received jobs in the absence of any adverse impact from the PACE would involve the same kinds of factors and qualifications as those discussed in Finding No. 43, and would therefore also involve a time-consuming and complex resolution process fraught with similar prospects of inaccuracy.

45. Under these circumstances, and in light of the significant injunctive relief afforded all class members by the Consent Decree, the Court finds that the failure of the Decree to provide backpay and assistance in finding suitable Federal employment to all class members was a reasonable compromise by the parties.

G. *Class Members Who Allegedly Relied Upon the Luevano Class Action And Did Not Therefore File Claims Against the PACE*

[4] 46. The Consent Decree provides that any unnamed class members who have filed timely claims of discrimination against the PACE and whose charges are still pending in the administrative or judicial process will be entitled to $3,000 as well as assistance in finding suitable Federal employment in full settlement of their outstanding claims. (Decree, ¶ 21). Six class members (Anthony Baird, Sharon Hargrove, Sandra Newhill, Iris Rogers, Cynthia Sheppard and John Sheppard) have filed written statements with the Clerk of the Court objecting

**90**                         **93 FEDERAL RULES DECISIONS**

[18] 17. For several reasons, the Court concludes that the provision of $35,000 in monetary relief to the named plaintiffs, while classwide backpay has been waived, should not defeat final approval of the settlement. *First,* it is clear that there was no improper collusion in this case. The Consent Decree is the product of twenty-three months of hard bargaining in which the parties developed a number of creative ways to safeguard the interests of the class in a manner avoiding conflict with the interests of the government. The Court was kept sufficiently apprised of the progress of settlement negotiations to be satisfied of their "arm's-length character." *Second,* only a sixth of one percent of the class members have filed any objections to this settlement. Of the 153 objectors, few objected to the provision for monetary relief to the named plaintiffs; the vast majority simply wished to receive the $3,000 liquidated amount for class members with pending charges of discrimination. *See* conclusion 17 below. *Third,* plaintiffs have negotiated monetary relief for part of the class, as indicated above. Class members with pending charges of racial or ethnic discrimination arising from OPM's use of the PACE for competitive hiring will receive $3,000 in monetary relief without having to prove any actual earnings loss if their charges were filed before January 15, 1981.[11] This compensates these class members for the loss of their right to file an independent lawsuit seeking potentially greater individual relief, and avoids the risks of inconsistent adjudications or conflicting remedial orders. *Cf. Lo Re,* 19 FEP Cases at 1371; *Women's Committee,* 76 F.R.D. at 182. While such class members may not opt out of this settlement, they are nonetheless placed in a preferred position for having

"felt strongly enough about [their] claim of discrimination to have taken this affirmative step." *Women's Committee, supra. Fourth,* since the relief for the class is fair and adequate taken apart from the relief for the named plaintiffs, and since the relief for the named plaintiffs is a reasonable compromise of their claims when considered apart from the relief for the class, a settlement combining both reasonable compromises is undeniably reasonable. A plaintiff should not be penalized for having agreed to take on the mantle of class representation. An individual settlement could most likely have been reached in this case far more quickly than the twenty-three month period it took to hammer out the class relief, and a class representative's willingness to delay individual relief in order to obtain relief for the class should not be made the occasion for requiring the representative to waive individual consideration of his or her claims. As the Sixth Circuit stated in *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 420 (6th Cir., 1974), "[w]e also think there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victim of discrimination." Similarly, in *Bryan v. Pittsburgh Plate Glass Co.,* 59 F.R.D. 616, 617 (W.D. Pa., 1973), *aff'd,* 497 F.2d 799 (3rd Cir. 1974), *cert. den.,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh. den.,* 420 U.S. 313, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975), the courts approved a settlement in which "special awards" in the aggregate amount of $17,500 were provided "to those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class."[12]

---

11. The January 15, 1981 cutoff date serves as a rule-of-thumb separating those class members who filed their own charges of discrimination completely independently of the Notice in this case—these persons are the intended beneficiaries of paragraph 21 of the Consent Decree providing for these payments—and persons who are likely to have filed such charges as a result of their having learned of the January 15, 1981 preliminary approval of this settlement through the news media or through notice.

The January 15, 1981 date was contained in attachments to the Orders of May 19, 1981 and June 8, 1981, herein. The use of January 15, 1981 as the cutoff date is entirely proper.

12. This case does not directly involve the *Thornton* and *Bryan* rationale, because the named plaintiffs here are not receiving monetary compensation independent of backpay for their services in obtaining class relief, but the approach of these cases helps demonstrate the

Cardinal®



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of          )
    all others similarly situated,         )
                                             )
                Plaintiffs,      )
                                             )   C. A. No. 79-0271
        v.                                 )
                                             )
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                )
    Management, et al.,                     )
                                             )
             Defendants.          )

JAN 26 1988

FILED
JAN 22 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### APPEAL BY CLASS MEMBER FROM
### OBJECTION TO BACK PAY CLAIM

PRINT NAME:   Beverly J. Brown

     If you want to have the Court consider your back pay claim and overrule the objection to your claim, fill out this form to the best of your knowledge and mail or deliver it to Mr. Seymour at the address shown in the attached Notice.  Please print all information.  If the space provided is not enough, you may attach additional sheets.  Mr. Seymour must receive this form by January 29, 1988, or your appeal will not be considered.

     1. Is the statement of facts in Mr. Seymour's objection letter accompanying this form:

          (a) right? _____

          (b) wrong in some respect? __XX__  If so,

     explain what is wrong in the statement of facts:
The reason I went to the EEOC Office was to complain about the
PACE Test.  It has been to many years and I cannot remember
the contents of the conversation, the only thing I remember
is that Mr. Emmanuel Lupo referred me to the Civil Service
Commission and I remember signing my name to some paper
which I got from a man at the counter.  After I went to
the Civil Service Commission I went to the Office of General Counsel.

The only reason I went to these different offices was to complain.  The years have passed and I cannot remember the contents of any of the conversations.  I moved out-of-state and never heard from them again.

 

2. State why you think the objection should be dismissed by the Court, and why you think you should share in the back pay award:  After I had taken the test both times I discussed some of the questions with this lady, her name is Donie, she took the test both times I took.  The questions on the test did not relate to any job.  The questions were far-fetched, things that I as a black person would not even think of.  I think I should share in the award because I took the test two different times. The Civil Service Commission should have records showing that I took the tests.  I know I would not have went to three different offices unless I had a legitimate complaint.

 

Print your name:_____Beverly J. Brown_____

Print your mailing address:_2544 Comstock St., San Diego, CA  92111

- 2 -

City  San Diego          State  CA       Zip  92111

Social Security Number:  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

Telephone number (home): Area Code  619   Number  268-3517

                  (work): Area Code  619   Number  576-2832

These statements are made under the penalties for perjury.

Signature:  *Beverly J. Brown*

Date:  01-21-88

NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

    1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-
SIDERED.

    2. THIS FORM MUST BE MAILED TO:

        Richard T. Seymour
        Lawyers' Committee for Civil Rights Under Law
        1400 'Eye' Street N.W.
        Suite 400
        Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY JANUARY 29, 1988, IT
WILL NOT BE CONSIDERED.

<u>LETTER REPRINTED FROM COMPUTER FILE</u>



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.
TELEX: 205662 SAP UR
FACSIMILE: (202) 842-3211 or (202) 842-0683

November 25, 1987

Ms. Beverly J. Brown
2544 Comstock Street
San Diego, California 92111

Re: Luevano v. Horner: Your Claim Under
<u>Paragraph 21 of the Consent Decree</u>

Dear Ms. Brown:

You have filed a claim under ¶ 21 of the Consent Decree. The enclosed Explanation contains detailed information about this provision, and about your rights.

The lawyers on both sides of the case have now completed their work on all of the claims filed under ¶ 21. Both sides have agreed that you do <u>not</u> have a good claim under ¶ 21, for the following reasons, based primarily on the transcript of your deposition:

1. After you failed the PACE in 1975, you spoke to a Mr. Lupo at the Equal Employment Opportunity Commission in Dallas, but all you remember about the conversation is that he referred you to the Civil Service Commission. You cannot remember whether you complained to him about the PACE. (Dep.Tr. 6-7).

2. When you met with the attorney in the Office of General Counsel of the Civil Service Commission in Dallas, you are not sure that you made even an oral complaint of racial discrimination. While you recall asking whether there was a quota limiting the number of black applicants and the number of white applicants passing the test, you do not remember how you asked this question and it is not possible for you to say whether this was just a request for information, or was instead understood by both you and the attorney with whom you spoke to be an oral complaint of discrimination. (Dep.Tr. 13-14).

3. Because you do not remember what Civil Service Commission personnel---including the attorney---said to you in 1975 and 1976, you cannot be sure whether you were informed of the proper manner of making a written complaint of racial discrimination against the Civil Service Commission's use of the
Ms. Beverly J. Brown

November 25, 1987
Page Two---


PACE.  (Dep.Tr. 20).

     4.  While you remember signing a document at the Civil Service Commission, you do not remember what the document said. It is likely that the document was simply a form which had to be signed in order for you to see your test scores.  You apparently came away from the Civil Service Commission office with some papers, but you threw them away and cannot now remember what they said. (Dep.Tr. 16-20).

     5.  You do not remember if you ever contacted the Civil Service Commission again about this matter, so you cannot say if the Commission ever gave you further information. (Dep.Tr. 15).

                   Sincerely,


                   Richard T. Seymour

Case 1:79-cv-00271-RBW   Document 10   Filed 01/29/79   Page 486 of 728

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

ANGEL G. LUEVANO, ET AL., )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHER SIMILARLY SITUATED, )
)
               Plaintiffs, )
) CIVIL ACTION NO.
       v. ) 79-0271
)
DONALD J. DEVINE, ET AL., )
)
             Defendants. )

Deposition of BEVERLY J. BROWN

Washington, D.C.
November 28, 1984

Pages 1 thru 22

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

M wdm

1            UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - x
                                    :
4    ANGEL G. LUEVANO, ET AL.,      :
     INDIVIDUALLY AND ON BEHALF OF  :
5    ALL OTHER SIMILARLY SITUATED,  :
                                    :
6          Plaintiffs               :
                                    :
7       vs.                         :    CIVIL ACTION
                                    :    NO. 79-0271
8    DONALD J. DEVINE, ET AL.,      :
                                    :
9          Defendants               :
                                    :
10   - - - - - - - - - - - - - - - x

11                          Washington, D.C.

12                          Wednesday, November 28, 1984

13   Deposition of:

14                  BEVERLY  J. BROWN

15   a witness, called for examination by counsel for the Defendants,

16   pursuant to notice and agreement of counsel as to time and

17   place in the offices of the Lawyers' Committee for Civil

18   Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19   D.C., beginning at 6:22 p.m., before William D. McAllister,

20   a Notary Public in and for the District of Columbia, when

21   were present on behalf of the respective parties:

22

23

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

    LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    BY:   RICHARD T. SEYMOUR, ESQ.
        Suite 400
        1400 I Street, N.W.
        Washington, D.C. 20005

On behalf of the Defendants:

    UNITED STATES DEPARTMENT OF JUSTICE
    BY:   BARBARA L. WARD, ESQ.
        Room 3509
        Civil Division-Federal Programs Branch
        10th and Pennsylvania Avenues, N.W.
        Washington, D.C. 20530


C O N T E N T S

| WITNESS | EXAMINATION BY: | MR. SEYMOUR | MS WARD |
|---|---|---|---|
| Beverly J. Brown | | 3, 15, 18, 19 | 15, 17 19 |

Exhibits

  None.

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
hington, D.C.  20002
) 546-6666

P R O C E E D I N G S

Whereupon,

BEVERLY J. BROWN

was called as a witness and, having first been duly sworn by the Notary Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SEYMOUR:

Q    Please state your name and address for the record.

A    Okay.  It's Beverly J. Brown.  The address is 2544 Comstock Street, San Diego, California 92111.

Q    Please state your race.

A    Black.

Q    Have you ever taken the Professional and Administrative Career Examination otherwise known as the PACE?

A    Yes, I have.

Q    How many times did you take it?

A    Two.

Q    When were they?

A    Okay.  I don't have the exact months.  I took the first test in '75, and the second test in '76.

Q    Where did you take them?

A    Through the Dallas Civil Service Commission.

Q    At the time that you took those tests, were you a

1    federal employee?

2        A    Yes.

3        Q    Was that true both times?

4        A    Both times.

5        Q    Were you taking the test as part of a merit promotion

6    plan?

7        MS. WARD:  Or an upward mobility plan?

8        THE WITNESS:  No.  I took the test on my own.

9        BY MR. SEYMOUR:

10        Q    Were you competing with outside applicants at the

11    time?

12        A    Yes.

13        Q    And looking for jobs at agencies other than the

14    Social Security Administration or were you just looking for a

15    job at Social Security?

16        A    I wasn't working for Social Security then.  I was

17    just looking for a different job, any agency.

18        Q    What happened when you took the test?  Did you pass

19    or fail?

20        A    I failed both tests.

21        Q    Did you ever make any complaint about the test?

22        A    Yes, I did.

23        Q    Please tell us when that happened and what you did.

A    Okay.  Both times, the first time I took it, I went
to the Equal Employment Opportunity Commission and I talked to
a Mr. Lupo there.

MS. WARD:  Excuse me.  With whom did you speak?

THE WITNESS:  Mr. Lupo, L-u-p-o.

BY MR. SEYMOUR:

Q    Was he located in Dallas?

A    Yes, I'm thinking it was the seventh floor.

Q    Do you remember the street address of the place
that you went and spoke to him?

A    1200 Commerce Street, the federal building.

Q    And do you remember what Mr. Lupo's job title was?

A    No, I don't.

Q    Could you tell us as closely as you can remember
the words that you used to him and the words that he used to
you in the conversation?  Please do not make any guesses or
assumptions or try to fill in any gaps, just tell us the best
you can remember the words that were used.

A    Okay.  I cant remember any of the words that was
used in the conversations.  The only thing I can remember is
that he referred me to the Civil Service Commission.

Q    Do you remember whether you said anything at all
about the PACE to him?

1     A    That's why I went to see him.  It was about the PACE.

2     Q    What did you say about the PACE to him?  If you don't

3  remember the words, tell us the substance.

4     A    I can't remember any of the words.

5     Q    Can you tell us the substance of what you told him?

6     A    I can remember I did not pass the test.  I went

7  over there to talk to someone at the EEOC office, and the per-

8  son I saw I remember his name because it was an unusual name.

9  It was spelled L-u-p-o.

10     I talked to him.  I can't remember anything in the

11  conversation.  That's been nine years ago, and the only thing

12  I can remember is he referred me to the Civil Service Commis-

13  sion.

14     Q    Did you tell him you wanted to make a complaint

15  against--

16     MS. WARD:  Objection.  You're leading the witness.

17  She's stated she doesn't remember anything about the conversa-

18  tion.

19     MR. SEYMOUR:  Okay.  I'll rephrase the question.

20     Think carefully before you answer.

21     MS. WARD:  Objection.  You are leading the witness.

22     MR. SEYMOUR:  Is counsel objecting to the statement

23  "Think carefully before you answer"?  You haven't heard the

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
hington. D.C.  20002
?) 546-6666

1    question yet.

2                BY MR. SEYMOUR:

3        Q    Now, I repeat.  Think carefully before you answer

4    and state whether you recall whether you said anything to Mr.

5    Lupo about filing any complaint of discrimination concerning

6    the PACE.

7                MS. WARD:  Objection.  You're leading the witness.

8                MR. SEYMOUR:  Please answer the question.

9                THE WITNESS:  Okay.  I can't remember anything in

10   the conversation.  The only thing I can remember is Mr. Lupo

11   telling me to go down to the Civil Service Commission.  I can't

12   remember anything else he said.

13               BY MR. SEYMOUR:

14       Q    Did you go to the Civil Service Commission?

15       A    Yes, I did, on both occasions.  I only went to see

16   Mr. Lupo that one time.  That was the first time.

17       Q    In 1975?

18       A    Yes, when I got my first results back.  That's the

19   only time I saw him.

20       Q    Then in 1975 you went to the Civil Service Commission.

21   Do you remember who you spoke with there?

22       A    No, I don't, but each time I went I had to sign a

23   sheet and sign my name on there.

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
ington, D.C.  20002
\ 546-6666

1      Q    Do you remember how long it was that you went there

2  after you received the test results?

3      A    No, I don't.  It had to be within a week's time be-

4  cause I went down there as soon as I got my results back.

5      Q    Did you speak with a man or woman there?

6      A    Both times I went I talked to a man.

7      Q    Do you recall what you said to the man?  First, let

8  me ask you about the words that you used.  Do you recall the

9  words?

10      A    Okay.  I can't tell you what was in the conversation

11  because it's been too long.  If I said something, I couldn't

12  remember.

13      Q    Do you recall the substance of what you told him?

14      A    I know I complained about the test because he told

15  me to go across the street to General Counsel.  That's when I

16  went across the street, but I can't tell you the exact words

17  that were used.

18      Q    In the substance of it, what did you say to him about

19  the test?  You said you went to complain about the test.  What

20  kind of complaint was it?

21      A    Okay.  There was another girl in my office that took

22  the test with me, and she passed it, and there were some

23  specific questions that were on the test, and we discussed them

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
hington, D.C.  20002
`) 546-6666

1    in the office.

2            Well, we took the test on a Saturday in a cafeteria,

3    and we discussed the questions in the office that coming

4    Monday.  I don't remember exactly what the questions were but

5    anyway, they were out of proportion.  They were things that

6    you would never do, and I told her there was a couple of things

7    that I, as a Black person, never even heard of that, and she

8    was the one that mentioned discrimination.

9        Q    Is this person that you were speaking to White or

10   Black?

11       A    White.

12       Q    And is this your coworker or someone at the Civil

13   Service Commission?

14       A    No.  She's a coworker.

15       Q    When you went to the Civil Service Commission, did

16   you complain about racial discrimination or were you just

17   making a general protest against the test?

18           MS. WARD:  Objection.  Leading.

19           MR. SEYMOUR:  Please answer the question.

20           THE WITNESS:  Both.  I asked him--well, I can't say

21   exactly what I said, but I could remember asking him if the

22   tests were for different racial groups.  I can't remember

23   exactly what I said.

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
shington, D.C.  20002
2) 546-6666

BY MR. SEYMOUR:

Q    Do you mean that you cannot remember the words that you said or that you can't remember the substance?

A    I can't tell you any of the conversation that I said because I don't remember.  All I can remember is generally what the conversation was about.  I can't tell you anything exactly because I don't remember.

Q    Tell me generally what the conversation was about then, as much as you can remember of it.

A    There were two specific questions on that test that were on the test that this girl and I discussed.  When I went down to the Civil Service Commission that first time, I remember bringing up these two questions to this person.  It was a man that waited on me.  I brought the questions up to him, but I don't remember what I said or exactly what took place.  I can't pinpoint it.  It's been too long, and then after that, I threw everything away, thinking nothing nothing ever happens. I kept my test scores for a while and then I threw them away.

Q    You said that this man told you to go over to the General Counsel's Office?

A    Yes, I went over to the Office of the General Counsel which was across the street.  I went over there two times.

Q    Do you recall why this man told you to go to the

1   Office of General Counsel?

2       A    To file a complaint, and I signed a paper over there,

3   but I don't know what I signed and I couldn't tell you what was

4   on the paper.

5       Q    Did they give you a copy of the paper?

6       A    I don't remember.  I can't say yes and I can't say

7   no.  I kept everything together for a while and then I threw

8   it away.

9       Q    Do you remember whether the complaint had anything

10  to do with racial discrimination?

11          MS. WARD:  Objection.  Leading the witness.

12          MR. SEYMOUR:  Please answer the question.

13          THE WITNESS:  I think so.  I can't say for sure.  I

14  think so, though.  In fact, I don't remember exactly what was

15  in there.

16          BY MR. SEYMOUR:

17      Q    Who wrote out the paper?  Did you write it out or

18  did someone from--

19      A    No, I didn't write anything out.  I remember signing

20  my name.  I had to sign it two times over at the Civil Service

21  Commission is what it was called then, and I had to sign it

22  over at General Counsel, but I don't remember what I signed.

23      Q    What happened at the General Counsel's Office that

1    led to this form being filed out?  Well, why don't you just

2    describe what you remember when you walked into the door of the

3    General Counsel's Office until you got finished there and were

4    leaving?

5        A    I don't remember anything.  I can't remember anything

6    that happened over there.  I remember going over there about

7    the PACE test, and I can't even remember what was in the con-

8    versation.  I know I talked to a man both times.

9        Q    Do you recall anything being said about any next

10   step to be taken?

11       A    I don't remember.

12       Q    Did you ever hear anything from the Civil Service

13   Commission about that document that you signed?

14       A    No, I didn't.  That's what I said.  I never heard

15   anything about it from anybody so I threw everything away.

16       Q    In 1976, you said that you took the PACE again.

17   Did you make another complaint in 1976?

18       A    I made two complaints.  Each time I took the test I

19   went over there.  When I went to EEOC, that is when I saw Mr.

20   Lupo, and I went to the Civil Service Commission, to General

21   Counsel.  That was my first visit.  I didn't go back.

22            When I took the test again in '76, I went down to

23   the Civil Service Commission again.  I didn't go back to EEOC,

1    and I had to sign in again to see my test score and go over

2    it, and I went over to General Counsel then.  But I don't know

3    what happened or what was said.

4        Q    When you went back to the Civil Service Commission

5    in 1976, did you go back to make a complaint or did you go

6    back just to see your test scores?

7        A    I can't answer that because I don't know exactly what

8    I said.

9        Q    Do you remember seeing your test scores in 1976?

10        A    I remember he showing me something.  I wanted to find

11    out where my low scores were, and I believe he told me.  I'm

12    not sure.  It's been so long I really can remember.

13        Q    Would it be correct to say that in both 1975 and 1976

14    you are not sure whether you made any complaint of racial

15    discrimination against Blacks in the use of the PACE?

16        A    Well, against myself.  I wouldn't say Blacks.  I was

17    only complaining about my test because I couldn't understand

18    how she could pass that test and I didn't, and we had apparent-

19    ly the same answers.

20        Q    Let me put my question a little bit differently then.

21    Would it be correct to say that, as to both the 1975 visit

22    to the Civil Service Commission and the 1976 visit to the

23    Civil Service Commission, you do not remember making any

1    complaint of racial discrimination against yourself because of

2    the PACE, is that right?

3        A    Okay.  I wouldn't call it racial discrimination.  I

4    question I remember I asked, and I don't know how I asked him,

5    the man over at General Counsel, was that by this other girl

6    passing the test, do they have a quote that they have to make

7    for so many Blacks to pass the test and for so many Whites to

8    pass the test, and I don't remember what answer I got, because

9    when we discussed the answers that we used on the test, our

10   answers were so close but yet she passed and I didn't.

11       Q    When you made the remark about whether there was a

12   quota for so many Blacks and so many Whites to pass--

13       A    See, I don't remember exactly how I said it, but I

14   remember phrasing it something like that, and I don't remember

15   what answer I got.

16       Q    Was this a conversation that you are describing that

17   took place at the Civil Service Commission--

18       A    General Counsel.

19       Q    At the General Counsel's Office you said that?

20       A    Yes, at the General Counsel's Office.  The man at

21   the Civil Service Commission referred me over to General Counsel

22       Q    Do you remember whether you spoke with a lawyer or

23   with someone else in that office?

1    A    It was an attorney I talked to.

2    Q    Was that a man or a woman?

3    A    It was a man both times I went over there.

4    EXAMINATION BY COUNSEL FOR THE DEFENDANTS

5    BY MS. WARD:

6    Q    How do you know it was an attorney?

7    A    Well, the receptionist, there was a receptionist at

8 the desk.  She told me he was an attorney.  If I can just think

9 of his name. I don't know what his name was, but it was an

10 attorney.  I had all the names and everything written down

11 and I threw everything away.

12    Q    Did you ever contact this person or anybody at the

13 Civil Service Commission after you had this discussion in

14 1976 that we've just been talking about?  Did you ever contact

15 them again?

16    A    I can't say for sure.  I would have to say no because

17 I couldn't say for sure.

18    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

19    BY MR. SEYMOUR:

20    Q    Do you mean you might have contacted them, you

21 might not have, you just don't know?

22    A    I just don't remember.  It's too long.

23    Q    Can you say for sure whether you ever heard from

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
hington, D.C.  20002

1    the government again about those visits that you made to the

2    General Counsel's Office?

3        A    I say I never heard anything. That's why I threw all

4    the papers away.  I never heard anything, period.

5        Q    When you made these visits to the Civil Service

6    Commission, the first place that you went to, and then later

7    on when you made the visit to the General Counsel's Office,

8    did you receive anything in writing telling you how to go

9    about making a complaint of discrimination?

10        A    No, but I remember signing a paper at the General

11    Counsel's Office, but I don't remember what was on it.  Would-

12    n't they have records of this?  Wouldn't they have a record?

13        Q    When you went to the Equal Employment Opportunity

14    Commission, do you remember receiving anything in writing

15    from them saying how to go about making a complaint of dis-

16    crimination against a test used by the Civil Service Commission?

17        A    No, no, I don't.  All I remember is talking to Mr.

18    Lupo and he referred me down to the commission, and I went

19    down there.  They were downstairs.

20        Q    In the questionnaire that you filed with the court

21    in 1981, you said that you had gone to the OEO first and they

22    sent you to the Civil Service Commission.

23        A    Right.

1      Q    The initials OEO, usually are taken to mean the

2 Office of Economic Opportunity.  Is that where you went or

3 did you go to the --

4      A    No.  It's EEOC.

5      Q    You just used the wrong initials there?

6      A    Yes, right.  It's EEOC.  It was the one that had

7 "commission" at the end of the name and the other one doesn't.

8           FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

9           BY MS. WARD:

10      Q    Ms. Brown, also on this form you say that when you

11 were at the Civil Service Commission both times that someone

12 showed you your test results.  Did that happen both times

13 that someone showed you your test results?  Do you remember?

14      A    Okay.  When I went to the commission the first time,

15 he pulled my results.  Only one time did they go over the low

16 points, and I believe that was the second time I went.

17      Q    The second time.  What did you say happened the

18 first time?

19      A    He pulled my results, but I wanted to know what I

20 was low at, my low scores.  I can't remember.  I remember he

21 pulled the scores.

22      Q    Did he pull the scores both times?

23      A    Yes, he pulled them both times because I had to sign.

1   That's why I had to sign in order to get the test results.   I

2   had to sign my name.   But the second time there was something

3   different.   There was something different the second time.

4           FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

5           BY MR. SEYMOUR:

6       Q     What was different?

7       A     I remember that the other girl had taken the test.

8   I can't remember, but there was something different.   It seemed

9   like we went over more in detail the second time.   I can't

10  remember what it was, though.   It was something different.

11  The girl had told me what they asked me when I went down there.

12      Q     You mentioned a few minutes ago that you had had

13  a conversation with the attorney in the General Counsel's

14  Office at the Civil Service Commission and you were asking

15  about whether there was a quota of so many Blacks to pass the

16  test and so many Whites.

17      A     That's the only thing I can remember.

18      Q     Did that happen the first time that you went there

19  or the second time?

20      A     I'm thinking the second time, but see, Joany took the

21  test the first time.   It had to be the first time because she

22  took the test the first time with me.

23      Q     When you say "it had to be the first time", are you

1    making a guess?

2       A    Well, it was when she took the test with me, and she

3    took the test I believe it was the first time I took the test

4    when she took it with me.  So it had to be the first time.

5       Q    Do you remember that or are you guessing it?  That's

6    what I am asking.

7       A    Oh, you want to know for sure.

8       Q    That's right.

9            If you don't remember, just tell us you don't remem-

10   ber which time it was.

11      A    I don't remember exactly.

12      FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

13          BY MS. WARD:

14      Q    When you asked the attorney whether there was a

15   quota, do you remember any response?

16      A    I don't remember anything that went on in the

17   conversation.  I remember asking a question.  I can't tell you

18   exactly how I put it, but it was along those lines.  I can't

19   tell you exactly what I said.

20      FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

21          BY MR. SEYMOUR:

22      Q    Do you remember whether the document that you signed

23   the first time was a complaint of some kind or was just some

1   kind of receipt to show that you had been shown your test

2   scores?

3          A     I don't know.   I don't remember.

4          Q     Is your answer the same for the second time or is it

5   different?

6          A     It would have to be the same because I don't remember

7   exactly now what went on exactly.   I remember signing my name

8   both times when I was there.

9          MS. WARD:   I have no more questions, Mr. Seymour.

10          BY MR. SEYMOUR:

11          Q     Do you recall whether the attorney that you spoke

12   with on this occasion when you asked whether there was a quota

13   with a number of Blacks to pass the test, do you remember

14   whether that attorney told you anything about the possibility

15   of filing a complaint directly with the Appeals Review Board

16   of the Civil Service Commission in Washington?

17          A     I don't remember what he said.

18          MR. SEYMOUR:   No further questions.

19          MS. WARD:   I have no further questions.

20          MR. SEYMOUR:   Ma'am, you have the right to either

21   insist upon seeing the transcript of your deposition and check

22   it yourself to make sure that there were no typing errors on

23   the thing, then sign a signature sheet and send it to the

1    court or instead to rely on the court reporter to get the job

2    done right, and then the court reporter will just file the

3    transcript directly with the court.

4         Ordinarily we recommend that people ask to see the

5    transcript and check it themselves and sign the sheet instead

6    of waiving signature but it is your decision to make.  Which

7    do you want to do, see it and sign it, or do you want to

8    rely on the court reporter?

9         THE WITNESS:  Well, I'll rely on the court report,

10   because there is really not that much in there.

11        MR. SEYMOUR:  Thank you very much.

12        MS. WARD:  Thank you.

13        (Signature waived.)

14        (Whereupon, at 6:44 p.m., the taking of the

15   deposition concluded.)

16

17

18

19

20

21

22

23

22

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom the foregoing deposition was taken, pages 1 through 21 do hereby certify that the witness, BEVERLY J. BROWN, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 14, 1989.



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

September 28, 1984

Ms. Beverly J. Brown
5188 Balboa Arms Drive
Apt. D-7
San Diego, California 92117

Re:  Luevano v. Campbell
C.A. No. 79-0271 (D.D.C.)

Dear Ms. Brown:

You made a claim under ¶ 21 of the Consent Decree in this
case, requesting $ 3,000 in back pay and help in finding a Federal
job, based on your claim that you filed an administrative complaint
of racial or national-origin discrimination under Title VII of the
Civil Rights Act of 1964, challenging the Civil Service Commission's
or Office of Personnel Management's use of the PACE for hiring.

We have met with the government several times about your
claim and the other claims that were filed, and both sides agree
that we need to obtain more information from you. The Court has
entered an order which allows us to take a sworn statement---called
a "deposition"---from you over the telephone. A court reporter, a
lawyer from the Justice Department, and I will all be on the line
with you.

We want to schedule your statement at a convenient time,
and need to know the telephone numbers where you can be reached
during the day and early evening. I have enclosed a form for you
to fill out and return to me. A reply envelope is also enclosed.

We need your co-operation in order to go ahead with your
claim. If we do not hear back from you, we will have to recommend
to the Court that your claim be dismissed.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb
Enclosures

April 9, 1982

Mr. Richard T. Seymour
Lawyer's Committee For
Civil Rights Under Law
733 Fifteenth Street, Northwest
  Suite 520
Washington, D.C.  20005

Re:  Luevano v. Campbell
     C.A. No. 79-0271 (D.D.C.)

Dear Mr. Seymour:

I took the PACE Test two times and I made a written complaint with
the Civil Service Commission in Dallas.

I went to the EEO office first and they referred me to the Civil
Service Commission.

I don't have the exact dates but I took the test two times and
went to the Civil Service Commission both times and had to sign
papers, so the Commission should have a record of that plus my
test scores.

I made four visits to the Commission and on each visit I had to
sign a sign-in sheet stating the reason for my visit. On two
visits, the person in CCS pulled my test and went over it with me.
I also had to go over the Office of General Counsel. I don't
remember if I was referred there or just went. At the Office
of General Counsel I had to sign some papers and they called
me back to sign papers again. I talked to an attorney at
Office of General Counsel, and I don't remember his name.
The Office of General Counsel should have record of my visits
and the forms I signed.

I moved to California and I never heard a word since.
I was a Federal employee when I took the tests and I am still
a Federal employee.

Sincerely,

Beverly J. Brown



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

March 30, 1982

Beverly J. Brown
5188 Balboa Arms Drive
Apt. #D7
San Diego, California 92117

Re: <u>Luevano v. Campbell</u>

Dear Ms. Brown:

Now that the Consent Decree has gone into effect, it
is time to turn to the claims of class members who state that
they filed charges of discrimination with the U.S. Civil Service
Commission or with the U.S. Office of Personnel Management,
alleging that the Professional and Administrative Career Examina-
tion discriminated against them because of their race or ethnic
status.

Please send me, as soon as possible, a written statement
setting down as much as you can remember of the exact statements
made in your 1975 complaint to the Dallas Area Office of the
U.S. Civil Service Commission.

Sincerely,

Richard T. Seymour

RTS/lb



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET. NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 5, 1981

Beverly Brown
5188 Balboa Arms Dr., #D7
San Diego, Calif. 92117

Re: Luevano v. Campbell
    C.A. No. 79-0271 (D.D.C.)

Dear *Ms. Brown*,

        I am one of the lawyers for the blacks and Hispanics
who filed this lawsuit. I am writing this letter to you with
the approval of the Court. You have stated that you filed an
administrative charge of discrimination with the U.S. Civil
Service Commission (subsequently called the U.S. Office of
Personnel Management), challenging the government's use of
the Professional and Administrative Career Examination (the
"PACE") as racially or ethnically discriminatory. If you can
prove that you filed such a charge on or before January 15,
1981, and that it is still alive either in the administrative
process or in Court, you would be entitled to an award of
$3,000 in back pay and to help in finding a suitable Federal
job.

        We need to obtain more information from you, so that
the government can check its records on your complaint. The
enclosed form will help us to find these records and to deter-
mine whether you are entitled to this relief. Please fill it
out right away, and attach copies of all of the documents you
possess about your complaint of discrimination, any responses
you received or additional information you sent in, and about
any court case you may have filed. Send them to me right away.
If I do not receive the form from you within thirty days after
the date stated on this letter, you will forfeit any right to
back pay which you might otherwise have had. DO NOT TAKE A
CHANCE WITH YOUR RIGHTS. FILL OUT THE FORM AND SEND IT IN
WITHIN THE NEXT DAY OR TWO. If you do not have all of the
necessary documents yourself and you have to request some of
them from other persons, send in the form without waiting for
the documents but state on the form that you will send the
documents along in a few days.

June 5, 1981
Page Two

        Your claim for the special relief of $3,000 and help
in finding a Federal job may be successful or unsuccessful,
depending on the facts.  We need to know right away whether
you want to make a conditional objection to the Consent Decree,
so that you would have no objection if you later turn out to
be entitled to this relief, and would have an objection if it
later turns out that you are not entitled to this relief.
Please write me at once, stating whether you want to see the
Consent Decree go into effect either way, or if you want to
object to it unless you obtain the $3,000 in back pay and help
in finding a suitable Federal job.  IF YOU HAVE ANY OTHER
OBJECTION, PLEASE WRITE TO ME RIGHT AWAY.  You can use the
attached form for objections.  Any objections you have will be
considered by the Court if I receive them by June 15, 1981.
There will be a hearing for further objections on June 16, 1981,
at 10:00 A.M. in Courtroom 18, United States Court House, Third
and Constitution, N.W., Washington, D. C.  (Before the hearing
the courtroom will be open at 9:00 A.M. for a meeting between
class members and the lawyers for the plaintiffs.)  You do not
have to attend the hearing, but are welcome to do so.  If you
do intend to attend the hearing, be sure to be in the courtroom
by 9:00 A.M. for the meeting.

        If you have any questions please call me at (202) 628-
6700.

                          Sincerely,

                          Richard T. Seymour

RTS/ra

RE. LUEVANO V. CAMPBELL

Civil Action No 79-0271

(D.D.C.)

April 29, 1981

Clerk of the Court

I am a black female.
I took the PACE Test in 1975 and again in 1976 in the Dallas Area.

I filed a complaint in 1976 with the Dallas Area Civil Service
Commission      in 1996, and I also went to the OEO Office.
I have since moved to San Francisco, Los Angeles and now
San Diego.  I have never heard anything from the Dallas Area
Office.

I completed forms at the Dallas Civil Service Commission.  I
also had them pull my test to show me what categories my scores
were low in.

Beverly Brown
5188 Balboa Arms Drive #D7
San Diego, CA  92117

work 714-560-7354
home 714-268-3517

I am a current government employee.
When I took the PACE Test I was
employed with the U.S. Dept of Commerce
in Dallas.



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*Exh. 3*

ANGEL G. LUEVANO, <u>et al.</u>,  )
   individually and on behalf of  )
   all others similarly situated,  )
               Plaintiffs,  )
                   )
        v.  )
                   )
CONSTANCE HORNER, Director,  )
   U.S. Office of Personnel  )
   Management, <u>et al.</u>,  )
           Defendants.  )



JAN 19 1988

C. A. No. 79-0271 *JHG*

**FILED**

*JAN 22 1993*

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

APPEAL BY CLASS MEMBER FROM
OBJECTION TO BACK PAY CLAIM

PRINT NAME: <u>Janie L. Collins</u>

    If you want to have the Court consider your back pay claim and overrule the objection to your claim, fill out this form to the best of your knowledge and mail or deliver it to Mr. Seymour at the address shown in the attached Notice.  Please <u>print</u> all information.  If the space provided is not enough, you may attach additional sheets.  Mr. Seymour must receive this form by <u>January 29, 1988</u>, or your appeal will not be considered.

    1. Is the statement of facts in Mr. Seymour's objection letter accompanying this form:

        (a) right? _____

        (b) wrong in some respect? __yes__ If so,

    explain what is wrong in the statement of facts:

The attorney that I had working on another matter for me specialized in industrial accidents cases for state claims. He told me that he did not handle any federal claims. Today, I am having to handle a case against the U. S. post office myself because I cannot find an attorney to handle federal cases. That case is 22 years old. After receiving the consent decree, I did go to the EEOC office in San Francisco and was told by a female employee there that I had won. She was very encouraging. She

-1-

also indicated two by two on I documented the EEOC 9/79 heage 568 of the
already win in ⬤ case. I can't remember ⬤ she to ld me to contact
the federal Job Information Center or not. If I do remember correctly,
I contacted said department because I felt that an attorney was needed
~~for me to present myself to the courts.~~ I also wanted advice or someone to
contact the court on my behalf since the plaintiff's in the Luevano
~~case was represented by attornies. Insted,~~ Applegate lied to me. I don't
remember receiving another consent decree after her letter. If I made
~~such statement in my deposition, it's simply because I~~ had no good
conception of what information you were referring to. My reason for
~~presenting myself~~ to the courts late and no longer ~~believing~~ Applegate
is because one day as I was looking through my papers, I came accross
the consent decree that ~~I already had.~~ I reread it and Applegate's
letter and decided that she was wrong. ~~During~~ the period of time when I
received the consent decree. ~~I was very ill with my head, back,~~ R. Knee
~~ett.I~~ sufferred lapse of memory. All illnesses due to industrial accident
I was too ill and ~~in severe pain to distinguish right from wrong.~~ I
~~was confused. I was~~ much too ill to realize that Applegate was a lier.
(See medical information attached hereto as exhibit "A") ~~Every~~ attorney
~~that I saw questioned me about the post office and I sought their help~~
to be told by them that they do not handle federal cases, ~~I was~~ not
~~successful in finding~~ an attorney to handle a federal case for me.

    2. State why you think the objection should be dis-

see page 3 →

missed by the Court, and why you think you should share in the

back pay award: (1) Because there is some misunderstanding as stated
above. (2) Because there is new evidence presented which could not be
presented prior due to my illness and loss of memory.(3) When I did
~~have episodes of good health,~~ and was able to comprehend what I read
regarding the matter and to distinguish a lier from truth. I immediately
~~contacted the courts and explained my position.~~ (4)The test was biased
toware black people. I waisted my time taking it, been disgusted every
~~since,still wondering about the government,~~was able and desired to work
in a light position, young and energetic, need the funds to pay bills,
~~I am a member of the group whom the test was biased against.~~
Applegate is a racist person against black people. That is the reason
~~that she lied to me. You have a copy of her letter.~~ She holds a
position with the federal government and it is against the law for
~~said department to hire such people; and,~~they should see to it that
I am compensated damages because of her lying to me. She used her
~~position to do such. I ask that this court consider the matter,~~
compensate me damages. Prior to Mr Seymour's letter, I was not sure
~~that Applegate was wrong. It is now sustained that she lied to me.~~
She could have spoken to an attorney prior to her lying to me. I
~~took the test at the Federal Job Information Center and depended~~ on
her information because of such conduct. As long as people like
Applegate in in power, ~~there will~~ always be racial bias and a fool
like her earning her way to hell. If an attorney is needed in this
matter involving Applegate, ~~please refer me to one.~~ I would
Like the names of the attornies that took the Luevano case
into court.
Print your name: Janie L. Collins

Print your mailing address: 537 Jones St # 8573

                 - 2 -

I did try to find an attorney to handle the matter who always refused to talk to me about any federal issue. Also due to my illness at the time of my receiving the consent decree, I placed a lot of weight on Applegate and the EEOC to act on my behalf by contacting the court for me if I was entitled to benefits. But Applegate (only) lied to me and took advantage of my poor health. It is true that I can read and write but when one gets as sick as I was, there is no such thing as comprehension and understanding what one reads. What I did not know was that Mr. Seymour would handle the matter for me. Even if I did understand what I read, it would have been better if the decree had told me that an attorney was waiting for me to aid me in the court; and, I would have no further problem regarding the matter. I knew that I was too ill to be facing judges in legal matters. During my depostiton, I did inform Mr. Seymour that my home had been robbed by U. S. Secret Service agents and FBI who often times took my legal papers. Many time I thought that I had mailed off a letter or didn't mail it. They would have gone into my room and taken the material while I was away. I called the police to them on two occasions. Police agreed that they were guilty; I submitted a report. A copy of my loss is attached. I do not have the police report but the case number is on the loss report. (See exhibit "B".) I now feel that I am entitled to the maximum benefits since Finding out that Applegate Lied to me.

-3-

City San Francisco,      State California Zip 94102

Social Security Number: 338-38- 8010

Telephone number (home): Area Code _____ Number _____

(work): Area Code _____ Number _____

These statements are made under the penalties for perjury.

Signature: _Janie L. Collins_____

Date: _January 11, 1988_

NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

     1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-
SIDERED.

     2. THIS FORM MUST BE MAILED TO:

          Richard T. Seymour
          Lawyers' Committee for Civil Rights Under Law
          1400 'Eye' Street N.W.
          Suite 400
          Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY JANUARY 29, 1988, IT
WILL NOT BE CONSIDERED.

I saw a Dr. Millington, Mandell, Von Rogov, and doctors at San Francisco General Hospital for my back, Right knee and head aches. All of the doctors felt that I was mentally disturbed and sufferred no physical problems.(See Ex. A $1-9$ )

Not until 3/18/81 was it discovered that I sufferred a tare,"football knee",in the right knee when Dr. Vaughan ordered X-rays on the knee (Ex $A$ $10$ ).

On January, 1966, Dr Alan Wright's xrays taken of me revealed that I suffer a coccydenia and spinal bifida in the back (Ex $A-11$  ). Dr Alden and Weitz felt me physically ill(Ex$A12-13$  ) with the coccydenia and spinal bifida.

On March, 1980, after doctors at San Francisco General hospital lied and said that I was the picture of health according to their x ray, I was fortunately enough to steal the x ray off of the mirrow light to discover that it shows a spinal bifida(Ex $14$  ) as Dr Wright said in 1966. San Francisco General doctors intentionally lied by indicating that I did not have a spinal bifida or a coccydenia.

A spinal bifida is: Condition in which there is a defect in the development of the spinal column. 
Dennison medical Dictionary

I saw a Dr Jackson and Wardell for headaches (Ex$A15-16$ ).

I saw a Dr. at presbyterian hosptial for seizures of the brian, forgetfulness and poor consentration and comprehension. (See Ex $A17$  ). All of my illness was due to physical trauma due to an industrial accident.

So you see, I was very ill physically and also forgetful and unable to comprehend well during said period of time when Applegate lied to me (due to a head injury).

There is also a possibility that if $I$ did not believe Applegate and did write correspondance +left it in my room,. U. S. secret service agents took it and kept it. On one occasion, I wrote a Letter,left it in my room, returned,+it was gone. I thought that I had mailed it off on another date and forgot it. Later in court, the letter came up from their attorney. I had Later decided that I did not want to mail the Letter after writing It and Leaving out of my room.

$\frac{A}{O}$

Case 1:79-cv-00271-RBW Document 30 Filed 01/29/79 Page 523 of 728

GEORGE H. MILLINGTON, M. D.
2250 A WOODSIDE ROAD
POST OFFICE BOX 4194
WOODSIDE, CALIFORNIA 94062
(415) 851-1291

ORTHOPAEDIC SURGERY

October 8, 1980

City & County of San Francisco
Compensation Division
San Francisco City & County
Employees' Retirement System
1150 Bush Street
San Francisco, California 94109
Attention: Robert W. Racobs
Claims Adjuster

and

John Riordan
Attorney At Law
Civic Center Building
507 Polk Street, Suite 200
San Francisco, California 94102

> Re: Janie Collins vs. City & County of San
>     Francisco. WCAB CASE NO.: 79 SF 278449

Gentlemen:

The above captioned applicant was examined by me at my offices in Woodside at approximately 2:00P.M. on Tuesday, 8/19/80 relative to residuals of injuries she reportedly sustained during the course of her work activities as a payroll clerk for the City & County of San Francisco. The applicant stated that at the time of the initial incident that she had been employed for "one day". Prior employment included work at the Emporium (sales clerk); Hollywood Mat & Graphics (bookkeeper); and Burgher King, Miami, Florida (account clerk - 6 months) and Western Electric (Sunnyvale - 6 months).

At the time of this evaluation I was in possession of a medical file that was furnished by Mr. Racobs consisting of photocopied records from Andrew Giovannini, M.D.; Floyd D. Fortuin, M.D.; and photocopied records from San Francisco General Hospital. Also included was an assortment of loose records commencing chronologically with a work release form dated 4/11/79 completed by Peter A. VonRogov, M.D. and concluding with a Doctor's Certificate completed by Phil Wood, M.D. dated 8/3/79. Also included within the contents of this assemblage of records was a Doctor's First Report Of Work Injury relative to an examination at the Francisco Treatment Room on 1/22/79, a narrative report from Peter Mandell, M.D. (2/5/79) and several supplemental reports from Dr. Mandell the latest of which was dated 4/16/79. There was a hand written document from a Carol Knight (payroll clerk) adressed to Mr. Encabo dated 2/23/79; and other documents pertaining to her reported work injury including state-

rig__ gre__ toe th__ __ __tributes to the effects of either of two incidents occurring on 1/18/79 or 1/19/79.

A hand written document from one of her co-workers-Carol Knight, payroll clerk, dated 2/23/79, would indicate that the applicant's only injury of which she complained at that time was to her left hand.

I note from James Davis Terry indicates that he observed "shaking and holding her wrist/ arm". He confirmed that he assisted her to her feet.

A letter from Richard Kucirek, Principal Payroll Clerk, dated 2/16/79, described the incident reportedly occurring on 1/19/79 and the events that followed.

Based upon the results of this examination including an extensive detailed interrogation of the applicant and a review of the submitted file it would appear that the applicant has little if any in the way of disabling residuals referable to any of the multiple structures described above resulting from either of the two work incidents described as having occurred on 1/18/79 or 1/19/79. By the applicant's own admission and by documentation within the medical file it would appear that the chief site of "injury" at the time of the initial incident was the region of the left wrist.

If indeed she did sustain any other injuries they certainly were no more than straining injuries as documented in the report of the initial examination by Peter Mandell, M.D.

The extent of her complaints referable to the left index finger and right great toe are such that they would not constitute rateable factors for determination of disability. There were no positive objective findings referable to either of these structures.

The problems with the right knee might well be a manifestation of a straining injury superimposed upon some degree of degenerative changes. The greater portion of the documentation within the San Francisco General file referred to other areas (wrists and back). I would conclude that the extent of her disablement referable to the right knee is adequately described as approximating a level of slight with activities necessitating prolonged standing, repetitive climbing of several flights of stairs or excessively prolonged walking.

The complaints referable to the right eye problem are outside of my field of expertise; but based upon information available to me at this time it would appear that the consensus of opinion was that her right eye problem is unrelated to any industrial incident.

I do not believe that this applicant requires any further treatment to cure or relieve from the effects of any injury that she could or might have sustained to the multiple parts of the body described earlier in the body of this report.

It would seem reasonable to conclude that she made a satisfactory convalescence from any spraining injuries that she could or might have sustained to either her left wrist or right knee within a month of the date of her initial evaluation by Peter Mandell, M.D. (2/1/79).

It should be noted that Dr. Mandell on his initial report reports "some bruis-

A2

WCAB CASE NO.  79 SF 278449

ing and pain in the left forearm, wrist and hand"; and also "some swelling of the left wrist and hand". My examination failed to disclose any positive objective findings that would indicate disability referable to any portion of the left upper extremity. Likewise, it should be noted that the applicant herself voiced no complaints referable to any portion other than the left index finger.

I believe that settelment of this claim by virtue of a compromise and release on the basis that the subjective complaints set forth relative to the condition of the right knee constitutes a realistic and fair settelment of any claim that this applicant might have against the City & County Of San Francisco.

Very truly yours,

George H. Nillington, M.D.

Attachments: Back & Spine (Routine Measurements) Sheet
Routine Upper Extremity Measurement Sheet
Routine Measurements (Lower Extremity) Sheet
Your complete medical file (CCSF)

Distribution:  Original & photocopy - WCAB - San Francisco
Photocopy - CCSF, Attn: Robert W. Racobs, Claims Adjester
Photocopy - John Riordan, Esq.
Photocopy - our file

GHM/drn

## SAN FRANCISCO GENERAL HOSPITAL

**Outpatient**
**PROGRESS RECORD**

(P1)

5 16 80

COLLINS JAMIE
B-673472-2 11/7/C/
537 JONES ST 24122
FKC 21118-C1
9/28/80 A-6:5:5:30

F 910 Rev. 7-

| DATE TIME | PROBLEM NUMBER | FORMAT:  PROBLEM NUMBER AND TITLE:   S – SUBJECTIVE   O – OBJECTIVE   A – ANALYSIS   P – PLANS |
|---|---|---|
| 5-16-80 | | S- Painful left arm & hand (both) |
| | | Wt. 200 lbs.  B/P ① ⅋ 120/54  P 90 |
| | | L. H. Szal. N.W. 2 |
| | | |
| | | Transfer of care Note |
| | | |
| | | #1 HCM |
| | S- | 37 yo. B♀ c̄ multiple somatic complaints |
| | | (see below re: specifics) |
| | O- | PAP 1/79  Class I Neg |
| | | G.C. (cervix) 1/79 : Neg |
| | | PPD : not documented |
| | A- | Clinically stable 37 yo. B♀ c̄ many |
| | | complaints (No acute Δ) ; multiple |
| | | extensive subspecialty w/u's (see below) |
| | | and possible signif. (emotional / psychogenic |
| | | contribution to her complaints) |
| | P- | ① needs PPD, VDRL @ opportune time. |
| | | |
| | | #2 Coccyx pain / also of knees, shoulder, hi |
| | S- | onset coccygeal pain "after lifting heavy |
| | | mail bag @ post office 1966"; aggravated(?) |
| | | by fall from chair 1973. |
| | O- | xrays : thoracic, sacral, coccyx, thoracolumbar |
| | | (1/29/80) → all WNL. |

SAN FRANCISCO GENERAL HOSPITAL

**Outpatient**

PROGRESS RECORD

F 910 Rev. 7-75

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE: S – SUBJECTIVE  O – OBJECTIVE  A – ANALYSIS  P – PLANS |
|---|---|---|
| | xray's | (con't) |
| | | Cervical Spine 4/30/79 → fusion of lateral masses |
| | | of C₂-C₃ but c̄ nl ROM on flex & ext. |
| | | No degen Δ's. |
| | A- | 37 y.o. B ♀ c̄ variable aches/pains (mainly |
| | | coccygeal), also in back, shoulder with |
| | | no apparent (objective) clinical findings and |
| | | essentially Normal xray studies. |
| | | Pt has been evaluated ~~repeatedly~~ several times in |
| | | Orthopedics clinic (see chart notes) with |
| | | no findings of note ; most recently 1/24/80 |
| | | @ which time xrays were taken (see above). |
| | | Pt also eval in Neurology clinic |
| | | 5-7-79 for Δo @ hand pain, paresthesias |
| | | again s̄ signif. findings (incl. nl EMG — |
| | | partially completed). |
| | | Overall, Ms. Collins has presented |
| | | c̄ unremitting complaints which have |
| | | had No satisfactory resolution despite |
| | | intensive & extensive w/u. Currently |
| | | is being seen in Alternative Therapies |
| | | Unit, which she feels is "helping a little". |
| | | Have discussed psychiatric referral, but |
| | | she so far has not agreed to this. |
| | P- | ① Alt. Therapies Unit. — ongoing acupuncture |

**Orthopedic Outpatient**
**PROGRESS RECORD**

COLLINS, JANIE
8-613472 2 11-26-43 F
308 EDDY APT 314
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
FHC-21116-01          A 5613609

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE: 1 2/ |S|-/ SUBJECTIVE   O — OBJECTIVE   A — ANALYSIS   P — PLANS |
|---|---|---|

ORTHOPEDIC CLINIC

JAN 24 1980

3640 blq seen many times in this clinic as well as FHC c̄ chronic low back + coccyx x 18 yrs, and R knee x 5 y pain exac by cold weather, as well as upper back pain since c̄ contu a few yrs ago, exac by flexion. Been livd by PT - postural obesity + lack of exercise factors called a key factor in pain. Has not b very active in pursuing above factor remedies. Here from FP f eval for disability. No Δsexsn strength or pain c̄ ↑ x knees

PE  Pleasant, moderately obese blq, lordotic posture, RR(M)tu re x̄ flexion 2° to pain thor. spine.

Coccyx - no deformity palp. No localz tenderness. Knees - bilat crepitus bu s̄ erythem, edema or tenderness.

Imp ① Low Back pain - multifac - Obesity mu weakness, ? arthritis, ② Upper back pain ? etiol ? arthritis ③ Knee pain prob ard

Plan ① Remedial measures (weight + exercise b ② Naprosyn 3 wk supply Ex Age ③ RTC 1 wk - will take T sp + coccyx view today. Search for L s erev, taken

4. History
Pt. Discovery: R. All pain in both shoulders ... of ... (continuing) of Severe

S. Age 37  Ha neck, back, coccyx, L Hand, R. Knee, Chest.
4. Sex F

5. What are your findings (include results of x-rays, laboratory tests, etc
   Pt complains of R knee pain secondary to work injury. No objective findings.

6. Diagnosis and Concurrent Conditions
   Subjective right knee pain with possible subclinical arthritis

7. When did symptoms First Appear? Give Date:
   Approximately June 1978

8. When did patient first consult you for this condition?
   1/22/81

9. Do you believe condition is in any way related to the history as given
   ___ yes ___ no   Relationship to injury uncertain.

10. What permanent effects, if any, | 11. Period of Disability (Mo.,day,year)
    do you anticipate?  None      | Total:  none    Partial:  none

12. If patient was hospitalized, Name of | 13. Period of hospitalization
    Hospital:  NA                        | From              To

| 14. Date of Services | Description of surgical or medical Service Rendered  clinic visit | Charges |
|---|---|---|
| 1/22/81 | | |
| | | |
| | | |
| | | |
| | | |
| | | |

15. Is patient still under your care for this condition:  Yes  ___  No ___

16. General Remarks And Recommendations For Future Care, If Indicated.
    Pt has multiple musculo-skeletal complaints which do not correspond, at this writing,
    to substantiated pathology on x-ray or in blood tests. Prognosis uncertain.

| Date | Physician's Name (print) | Physician's Signature | Identification |
|---|---|---|---|
| 3 Feb 81 | Beverlie Kane, MD | Beverlie Kane M.D. | CSL G41005 |

| Street | City or Town | State | Zip Code |
|---|---|---|---|
| SF Gen Hosp | SF, CA | | 94110 |

821-8010
Phone No.

EX A7

SAN FRANCISCO GENERAL HOSPITAL

**Outpatient**
**PROGRESS RECORD**
8  3  79  FHC

COLLINS, JANIE
B-613472 2 11-26-43 F
308 EDDY APT 314
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
FHC-2111-S-GT        A-5613479

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE / S – SUBJECTIVE   O – OBJECTIVE   A – ANALYSIS   P – PLANS |
|---|---|---|
| 8-3-79 | | S  C/o back pain, right knee hurting, chest pain |
| | | Wt 195½      B/P Ⓛ  $\frac{120}{80}$      P 80 |
| 8/3 | | #3 Knee / #4 Back pain |
| | | S- Feels no improvement in sx over past wk. Taken Tylenol c̄ cod. prn, heat pad, firm mattress but sos persist, though not appreciably worsened either. |
| | | O- ō Δ from 7/27 exam — grossly unrem. spine & knee exam |
| | | A- Discussed present findings c̄ pt, and reviewed prior Ortho Clinic appt's (similarly negative w/u — incl C-spine, T & L spine all unrem. However, in view of subjective level of distress and anxiety, do believe continued "disability" is warranted unt.'l pt. improved |
| | | P- ① Disability form completed extended thru 9/2/79 |
| | | ② Pt states she has appt c̄ Job Rehab program in SF early |

EX- A8

SAN FRANCISCO GENERAL HOSPITAL

Outpatient

PROGRESS RECORD

Smith   JAMIE
S# 613472
BD 11.26.43

F 910 Rev. 7

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE: S – SUBJECTIVE O – OBJECTIVE A – ANALYSIS P – PLANS |
|---|---|---|
| NEUROLOGY CLINIC NOV 26 1979 | | Referred to Neurology from ER |
| | | Says has many problems. |
| | | Wt. 196   BP 110/80   T 96 |
| in April | | Took tetracycline for 3 days developed |
| | | headache, inability talking, walking |
| | | Pt. depressed has multiple complaints |
| | | See note from FHx – followed by Dr. Woods |
| | | Meds – Indocin  Codeine + Tylenol |
| | | Maalox  Allergies – Tetracycline |
| | | Exam — many subjective complaints |
| | | no objective signs |
| | | Imp — no neuro dysfunction |
| | | prob. psycho physiologic reaction |
| | | 2° to depression |
| | | Disp — Dr. Woods should manage |
| | | problem |
| | | c/rm — Jurovin — |

EX A9

105541 PF                    OP          3-17-81
Mrs. Janie Collins           DOB: 11-26-43   C.Vaughan, M.D.

CLINICAL HISTORY:  RIGHT KNEE PAIN.

RIGHT KNEE ARTHROGRAM:  Under sterile technique 7 cc. of contrast
was place in the right knee joint.  Multiple spot and overhead
films demonstrate no evidence of meniscal tear.  However, there
is a linear contrast collection at the junction of the medial
meniscus and the medial collateral ligament suggesting avulsion
of the meniscus from the ligament.  The lateral meniscus demonstrates
some filling of the lymphatics but no evidence of tear.

CONCLUSION:      AVULSION OF THE MEDIAL MENISCUS FROM THE MEDIAL
                 COLLATERAL LIGAMENT.  NO OTHER ABNORMALITY.

RECd1 3-18-81                    Robert E. Clark, M.D.

Exhibit A/0

Case 1:79-cv-00271-TFH   Document 18   Filed 01/22/79   Page 533 of 728

| U.S. DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION BUREAU OF EMPLOYEES' COMPENSATION | ATTENDING PHYSICIAN'S REPORT |
|---|---|

**1. NAME OF INJURED EMPLOYEE** (Last, first, middle)
Collins, Janie L.

**2. HOME MAILING ADDRESS** (Number, street, city, state, zip code)
P.O. Box 2224 – San Jose CA 95709

**3. DATE AND HOUR OF INJURY** (Mo., day, year)
2-66 –   ☒AM  ☐PM

**4. PERIOD COMPENSATION IS CLAIMED AS A RESULT OF PAY LOSS** (Mo., day, year)
Feb, 1966  FROM 2-1966  TO Present

**5. WHAT HISTORY OF INJURY** (Including disease caused by the employment) DID EMPLOYEE GIVE YOU?
Patient states she was lifting a mail bag on her job, and pain developed, In the coccyxgl areal

**6. WHAT ARE YOUR FINDINGS** (Include results of x-rays, laboratory tests, etc.)?
X-rays reveal an Occult Spina Bifida

**7. WHAT IS YOUR DIAGNOSIS?**
Coccydyina

**8. DO YOU BELIEVE THIS DISABILITY IS IN ANY WAY RELATED TO THE HISTORY OF THE INJURY AS GIVEN ABOVE?**
(Please explain your answer if there are doubts)
☒XXES   ☐NO

**9. DID INJURY REQUIRE HOSPITALIZATION?**   ☒X YES   ☐NO
IF YES, DATE OF ADMISSION (Mo., day, year)
DATE OF DISCHARGE   Feb 1966  Dr. Barnes

**10. IS ADDITIONAL HOSPITALIZATION REQUIRED?**
☐YES   ☐NO

**11. OPERATIONS** (If any, describe type)

**12. DATE OPERATIONS PERFORMED** (Mo., day, year)

**13. WHAT** (Other) TYPE OF TREATMENT DID YOU PROVIDE?
Patient received diathermy treatments, medication for pain

**14. WHAT PERMANENT EFFECTS, IF ANY, DO YOU ANTICIPATE?**

**15. DATE OF FIRST EXAMINATION** (Mo., day, year)
8/1/66

**16. DATES OF TREATMENT** (Mo., day, year)
8/15/66, 9/12/66, 10/3/66, 11/10/66, 2/2/87, 5/18/67

**17. DATE OF DISCHARGE FROM TREATMENT** (Mo., day, year)

**18. PERIOD OF DISABILITY** (If termination date unknown – so indicate) (Mo., day, year)
TOTAL DISABILITY: FROM  Feb 66  present
PARTIAL DISABILITY: FROM   TO

**19. DATE EMPLOYEE ABLE TO RESUME** (Mo., day, year)
LIGHT WORK
REGULAR WORK

**20. IF EMPLOYEE IS ABLE TO RESUME WORK, HAS HE BEEN ADVISED?** ☐YES ☐NO IF YES, FURNISH DATE ADVISED.

**21. IF EMPLOYEE IS ABLE TO RESUME ONLY LIGHT WORK, INDICATE THE EXTENT OF HIS PHYSICAL LIMITATIONS AND THE TYPE OF WORK HE COULD REASONABLY PERFORM WITH THESE LIMITATIONS.**
Patient at that time is totally disabled. The patient now is residing in San Jose Ca, She is under a physician there.

**22. GENERAL REMARKS AND RECOMMENDATIONS FOR FUTURE CARE, IF INDICATED.**

**23. SIGNATURE OF PHYSICIAN**
Alan Wright

**24. ADDRESS** (Number, street, city, state, zip code)
2015 E. 79th Street

**25. DATE OF REPORT** (Mo., day, year)
10/15/79

All

**CA-20**
Rev. July 1970

| U.S. DEPARTMENT OF LABOR | ATTENDING PHYSICIAN'S REPORT |
|---|---|
| EMPLOYMENT STANDARDS ADMINISTRATION BUREAU OF EMPLOYEES' COMPENSATION | |

**1. NAME OF INJURED EMPLOYEE** *(Last, first, middle)*
CHIN, Janie L.

**2. HOME MAILING ADDRESS** *(Number, street, city, state, zip code)*
537 Jones #8573 - San Francisco Ca 94102

**3. DATE AND HOUR OF INJURY** *(Mo., day, year)*
February 1966 - There after the cond. tion continued to worsen □ AM □ PM

**4. PERIOD COMPENSATION IS CLAIMED AS A RESULT OF PAY LOSS** *(Mo. day, year)*
FROM Feb. 1966 TO Present

**5. WHAT HISTORY OF INJURY** *(including disease caused by the employment)* **DID EMPLOYEE GIVE YOU?**
Feb. 1966 - Working South Suberben P.O. - Chicago - lifting many mail bags. Developed law back pain. Off work 4 years. Pain becoming worse.

**6. WHAT ARE YOUR FINDINGS** *(Include results of x-rays, laboratory tests, etc.)?*
Tenderness of coccyx. — Pain also at lumbar-sacral joint.

**7. WHAT IS YOUR DIAGNOSIS?**
Sprain of ligaments associated with coccyx and 5th disc.

**8. DO YOU BELIEVE THIS DISABILITY IS IN ANY WAY RELATED TO THE HISTORY OF THE INJURY AS GIVEN ABOVE?** Please Give medical reasons.
☒ YES   □ NO   Type & location of pain appropriate

**9. DID INJURY REQUIRE HOSPITALIZATION?**  ☒ YES  □ NO
IF YES, DATE OF ADMISSION *(Mo., day, year)* Feb. 1966
DATE OF DISCHARGE  2 weeks later

**10. IS ADDITIONAL HOSPITALIZATION REQUIRED?**
□ YES   ☒ NO

**11. OPERATIONS** *(If any, describe type)*
NONE

**12. DATE OPERATIONS PERFORMED** *(Mo., day, year)*

**13. WHAT** *(Other)* **TYPE OF TREATMENT DID YOU PROVIDE?**
Reassurance and Vitamin B₁ injections

**14. WHAT PERMANENT EFFECTS, IF ANY, DO YOU ANTICIPATE?**
Continuing pain

**15. DATE OF FIRST EXAMINATION** *(Mo., day, year)*
-31-80

**16. DATES OF TREATMENT** *(Mo., day, year)*
Every 2 weeks

**17. DATE OF DISCHARGE FROM TREATMENT** *(Mo., day, year)*

**18. PERIOD OF DISABILITY** *(If termination date unknown — so indicate)* *(Mo., day, year)*
TOTAL DISABILITY: FROM 2-66 TO 2-67
PARTIAL DISABILITY: FROM 2-67 TO NOW

**19. DATE EMPLOYEE ABLE TO RESUME** *(Mo., day, year)*
LIGHT WORK 2-67
REGULAR WORK

**20. IF EMPLOYEE IS ABLE TO RESUME WORK, HAS HE BEEN ADVISED?** □ YES □ NO IF YES, FURNISH DATE ADVISED.

**21. IF EMPLOYEE IS ABLE TO RESUME ONLY LIGHT WORK, INDICATE THE EXTENT OF HIS PHYSICAL LIMITATIONS AND THE TYPE OF WORK HE COULD REASONABLY PERFORM WITH THESE LIMITATIONS.**
No heavy lifting

**22. GENERAL REMARKS AND RECOMMENDATIONS FOR FUTURE CARE, IF INDICATED.**

**23. SIGNATURE OF PHYSICIAN**
John Alden M.D.

**24. ADDRESS** *(Number, street, city, state, zip code)*
490 Post

**25. DATE OF REPORT** *(Mo., day, year)*
11-17-80

Q EX A 12    CA-2??

| U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>OFFICE OF WORKERS' COMPENSATION PROGRAMS | **ATTENDING PHYSICIAN'S REPORT** |
|---|---|

**1. NAME OF INJURED EMPLOYEE** *(Last, first, middle)*

Collins, Janie L.

**2. HOME MAILING ADDRESS** *(Number, street, city, state, zip code)*

537 Jones St. San Francisco, CA  94102

**3. DATE AND HOUR OF INJURY** *(Mo., day, year)*

1966   ☐ AM   ☐ PM

**4. PERIOD COMPENSATION IS CLAIMED AS A RESULT OF PAY LOSS** *(Mo., day, year)*

FROM Feb, 1966 to Present

**5. WHAT HISTORY OF INJURY** *(including disease caused by the employment)* **DID EMPLOYEE GIVE YOU?**

Suffered injury to coccyx in 1966 while lifting

**6. WHAT ARE YOUR FINDINGS** *(Include results of x-rays, laboratory tests, etc.)?*

X-rays of the lumbar spine and sacrococcygeal region were negative for fracture.

**7. WHAT IS YOUR DIAGNOSIS?**

Coccygodynia

**8. DO YOU BELIEVE THIS DISABILITY IS IN ANY WAY RELATED TO THE HISTORY OF THE INJURY AS GIVEN ABOVE?** *(Please explain your answer if there are doubts)*

☒ YES   ☐ NO

**DID INJURY REQUIRE HOSPITALIZATION?** ☐ YES   ☒ NO

IF YES, DATE OF ADMISSION *(Mo., day, year)*

DATE OF DISCHARGE

**10. IS ADDITIONAL HOSPITALIZATION REQUIRED?** ☒ YES   ☐ NO

**11. OPERATIONS** *(If any, describe type)*

Coccygodynia

**12. DATE OPERATIONS PERFORMED** *(Mo., day, year)*

*See # 22*

**13. WHAT** *(Other)* **TYPE OF TREATMENT DID YOU PROVIDE?**

Referred to Dr. Jeffrey Pearl

**14. WHAT PERMANENT EFFECTS, IF ANY, DO YOU ANTICIPATE?**

**15. DATE OF FIRST EXAMINATION** *(Mo., day, year)*

07/05/79

**16. DATES OF TREATMENT** *(Mo., day, year)*

10/8/79

**17. DATE OF DISCHARGE FROM TREATMENT** *(Mo., day, year)*

**18. PERIOD OF DISABILITY** *(If termination date unknown - so indicate)* *(Mo., day, year)*

TOTAL DISABILITY: FROM        TO

PARTIAL DISABILITY: FROM        TO

**19. DATE EMPLOYEE ABLE TO RESUME** *(Mo., day, year)*

LIGHT WORK

REGULAR WORK

**20. IF EMPLOYEE IS ABLE TO RESUME WORK, HAS HE BEEN ADVISED?** ☐ YES   ☐ NO   IF YES, FURNISH DATE ADVISED.

**21. IF EMPLOYEE IS ABLE TO RESUME ONLY LIGHT WORK, INDICATE THE EXTENT OF HIS PHYSICAL LIMITATIONS AND THE TYPE OF WORK HE COULD REASONABLY PERFORM WITH THESE LIMITATIONS.**

Light work, only.

**22. GENERAL REMARKS AND RECOMMENDATIONS FOR FUTURE CARE, IF INDICATED.**

Patient was referred to Jeffrye Pearl, M.D., for treatment for the Coccygodynia

**23. SIGNATURE OF PHYSICIAN**

X *[signature]* Ernest M. Weitz, M.D.

**24. ADDRESS** *(Number, street, city, state, zip code)*

2320 Sutter St. San Francisco, CA 94115

**25. DATE OF REPORT** *(Mo., day, year)*

7/1/80

Rev. Feb. 1975

Ex A/3

Notice the tail bone rising up
A Spinal Bifida

Patient's Name and Address
Janie Collins - 537 Pines #8873  San Francisco, CA 94102

Age 36   History of Occurrence as described by patient
Sex F.   Recurrent Headache!

What are your findings(include results of x-rays, laboratory tests, ets)?
OE neg

Diagnosis and Concurrent Conditions
Recurrent Headache

When did systems First Appear? Give Date:   2-26-80

When did patient first consult you for this condition?   2-26-80

Do you believe condition is in any way related to the history as given a?
yes   no

0. What permanent effects, if any, do you anticipate?   11. Period of Disability (Mo.,day,year)
Total:   Partial:

2. If patient was hospitalized, Name of Hospital:   13. Period of hospitalization
From   To

| 4. Date of Services | Description of surgical or medical Service Rendered | Charges |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

5. Is patient still under your care for this condition:   (Yes)   No

6. General Remarks And Recommendations For Future Care, If Indicated.
Referred to Dr H Scheon
neurologist

| Date | Physician's Name(print) | Physician's Signature | Identification |
|---|---|---|---|
| 2/24/80 | Oscar Jackson | | |

Street   City or Town   State   Zip Code
1352 Haight   S.F.   94117

Phone No.

Exhibit A15

Orthopedic Outpatient
**PROGRESS RECORD**

F 910

| DATE TIME | PROBLEM NUMBER | FORMAT: PROBLEM NUMBER AND TITLE:  S — SUBJECTIVE  O — OBJECTIVE  A — ANALYSIS  P — PLANS |
|---|---|---|

ORTHOPEDIC CLINIC
ALTERNATIVE THERAPIES UNIT

5-6-80   New pt:

S: Referral from Dr. Woods FHC for Tx of Chronic backpain x 1 year since industrial accident 4/79. she fell off chair and now has constant pain in back (Thoracic Spine) ® knee + ® wrist

Is now taking · Tylenol codeine #3 - 2-3/week
            End Naprosyn- bid
            Trilisate (choline-magnesium trisalicylate)

also has pain in coccyx injury 15 years ago while working for Postal

also c/o reaction to tetracycline 4/79 c Symptoms of "my mind goes blank, dyspnea, loss of speech" and (severe headaches) - is taking phenobarb for this problem —

O: Back- T-spine- muscle spasm © side T-4-8
    coccyx- tender to palpation
    Spine -neck normal ROM
        o signs of inflammation
    Knee- o signs of inflammation

Exhibit A 16

# Presbyterian Hospital of
# Pacific Medical Center

P.O. BOX 7999, SAN FRANCISCO, CA 94120
CLAY AT BUCHANAN STREET
SAN FRANCISCO (415) 563-4321

PATIENT'S NAME  Coltas                    HISTORY NUMBER  327147

Neurology Clinic

JAN -9 1981     Visit to see - Her periods
of lapses of attention. Trunk,
twisted seizures.

EEG reported normal
(patient was on Phenobarbital dose).

K/D Pb gr 5.5    #100 - III - H.S. I
1 ⅔ Clonopin 0.5 mg #160 - T AM - II - H.S.

Rx /mss.

[signature]

Orthopedic Clinic

JAN 27 1981     [signature]

Neurology Clinic

FEB 1 3 1981    [signature]

Neurology Clinic

FEB 27 1981    [signature]

PRINT OR TYPE THE INFORMATION.
IF ADDITIONAL SPACE IS NEEDED TO LIST ITEMS
OR FOR COMMENTS, USE THE BACK OF THIS FORM.

**ADDITIONAL LOSS REPORT FORM**
San Francisco Police Department
Supplemental Incident Report

INCIDENT REPORT NO. 802 363 802

| ADDRESS OR LOCATION WHERE INCIDENT OCCURRED | DATE OF INCIDENT | | |
|---|---|---|---|
| 493 Eddy St. — San Francisco, CA. | MONTH Dec DAY 30 YEAR 80 | | |

| NAME | | | RACE | SEX | DATE OF BIRTH | | |
|---|---|---|---|---|---|---|---|
| LAST Collins FIRST Janie MIDDLE L | | | Blk | F | MONTH 11 DAY 26 YEAR 43 | | |

| RESIDENCE ADDRESS | | | | | RESIDENCE PHONE | |
|---|---|---|---|---|---|---|
| 493 Eddy St CITY San Francisco STATE CA | | | | 94102 ZIP CODE | AREA CODE | PHONE NO. |

| BUSINESS ADDRESS OR SCHOOL ATTENDED | | | | BUSINESS PHONE | |
|---|---|---|---|---|---|
| CITY STATE | | | ZIP CODE | AREA CODE | PHONE NO. |

### LIST OF ADDITIONAL ITEMS

| | ARTICLE | BRAND | MODEL | SERIAL NO. | CALIBER | COLOR | $ VALUE |
|---|---|---|---|---|---|---|---|
| 1. | CB + Radio | General Electric | — | — | — | White + Blk | |
| 2. | Record player | General Electric | | — | | Gray | |
| 3. | Sweather | | | | | | |
| 4. | Luggage | x | | | | | |
| 5. | T.V. Telstar Home | | | | | | |
| 6. | Money | — | | | | | $B - 850.00 |
| 7. | Toys | | | | | | |
| 8. | Radio | | | | | | |
| 9. | Type Writer — Remington | | | | | | |
| 10. | Legal Letters | | | | | | |
| 11. | Papers (Legal) | | | | | | |
| 12. | | | | | | | |
| 13. | | | | | | | |
| 14. | | | | | | | |
| 15. | | | | | | | |

**COMMENTS**

IT IS A MISDEMEANOR TO MAKE A FALSE REPORT OF
A CRIME (SEC. 148.5 CALIFORNIA PENAL CODE)

Ex B4/1

MAIL COMPLETED FORM TO:
SAN FRANCISCO POLICE DEPARTMENT
ICSS — ROOM 475, HALL OF JUSTICE
850 BRYANT STREET
SAN FRANCISCO, CALIFORNIA 94103

| SIGNATURE | DATE |
|---|---|
| Janie L. Collins | |

I was forced to file another police
report on April 30, 1982 in Oakland, CA,
A U.S. Secret Service agent was
caught by me coming out of my
room with my legal papers.
police agreed that he was a U.S. Secret
Service agent. I was forced to move
as a result of his conduct,


Janie L. Collins

8/2



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 400 ● 1400 EYE STREET, NORTHWEST ● WASHINGTON, D.C. 20005 ● PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

November 30, 1987

Ms. Janie L. Collins
537 Jones Street
Apt. 8573
San Francisco, California 94102

Re: Luevano v. Horner: Your Claim Under
Paragraph 21 of the Consent Decree

Dear Ms. Collins:

You have filed a claim under ¶ 21 of the Consent
Decree.  The enclosed Explanation contains detailed information
about this provision, and about your rights.

The lawyers on both sides of the case have now com-
pleted their work on all of the claims filed under ¶ 21.  Both
sides have agreed that you do not have a good claim under ¶ 21,
for the following reasons:

You did not file a claim under ¶ 21 of the Consent
Decree until your October 11, 1983 letter to the Clerk of Court.
(Dep.Tr. 28-29).  The references in that letter to having written
to the Court earlier actually referred to the card you sent to
the Office of Personnel Management to be placed on the mailing
list under ¶ 22 of the Consent Decree.  (Dep.Tr. 26-27, 43-44;
see the copy of the card which is p. 8 of the attachments to the
transcript of your deposition).  While you stated in your
deposition that you had been misled by a May 21, 1981 letter to
you from Christine Applegate of the Office of Personnel Manage-
ment into thinking that you could not receive any money in this
case, (Dep.Tr. 32-33), you did receive the detailed notice for
class members before receiving her letter, (Dep.Tr. 29, 31-32),
and this Notice stated clearly that you had to bring yourself "to
the attention of the Court immediately" if you wanted to file a
claim under ¶ 21 of the Consent Decree.  See p. 3 of the Notice.
You obtained a copy of the Consent Decree from the Federal Job
Information Center in San Francisco, after receiving Ms. Apple-
gate's May 21, 1981 letter to you.  (Dep.Tr. 40-41).  You read
it, but did not do anything about filing a ¶ 21 claim after the
read the Consent Decree.  (Dep.Tr. 40-41).  You had an attorney
working on another matter for you at the time, but did not tell
him about the Notice or show it to him.  (Dep.Tr. 34-35).  In

Ms. Janie L. Collins
November 30, 1987
Page Two---

1983, you went through the Notice again, decided that you would
make a claim under ¶ 21 of the Consent Decree, and sent your
October 11, 1983 letter to the Court.  (Dep.Tr. 36-37).

Accordingly, your September 1980 complaint to the
Office of Personnel Management about racial discrimination
against blacks in the use of the PACE cannot be considered in
this case, because your claim under ¶ 21 was not filed on time.

Sincerely,

Richard T. Seymour

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                     )
                                              )
    individually and on behalf of             )
    all others similarly situated,            )
                                              )
                    Plaintiffs,               )
                                              )
            v.                                )    C. A. No. 79-0271
                                              )
CONSTANCE HORNER, Director,                   )
    U.S. Office of Personnel                   )
    Management, et al.,                        )
                                              )
                    Defendants.               )

## NOTICE

You are receiving this Notice because there is an objection to your back pay claim.  The grounds for the objection are stated in the accompanying letter.  Both the plaintiffs and the defendants have agreed that, based on the information in their possession, the objection is proper.

If you wish to appeal from the decision of the parties, you must fill out the accompanying Appeal Form, and Mr. Seymour must receive it, at the office of the Lawyers' Committee for Civil Rights Under Law, 1400 'Eye' Street, N.W., Suite 400, Washington, D.C. 20005, by the close of business on January 29, 1988.  Mr. Seymour must receive it by that day, or your appeal will not be considered.  Mailing it by that day is not sufficient.

To wind up this procedure, it is necessary to have a firm deadline for the receipt of appeals.  There will be no exceptions to the deadline, and no excuses for failure to meet it

will be accepted.

The appeal form must be completely filled in, and it must be signed, or it will not be considered.

*Nancy M. Mayer*  *for*

JAMES F. DAVEY, CLERK
United States District Court
U.S. Courthouse
3rd & Constitution Ave., N.W.
Washington, D.C. 20001

Dated: November 30, 1987

United States District Court
for the District of Columbia
A TRUE COPY

JAMES E. DAVEY, CLERK,

By _____
                    Deputy Clerk

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                    )
   individually and on behalf of   )
   all others similarly situated,  )
                                    )
               Plaintiffs,  )
                                    )
       v.                           )    C. A. No. 79-0271
                                    )
CONSTANCE HORNER, Director,         )
   U.S. Office of Personnel         )
   Management, et al.,              )
                                    )
           Defendants.  )

### APPEAL BY CLASS MEMBER FROM OBJECTION TO BACK PAY CLAIM

PRINT NAME: _____

      If you want to have the Court consider your back pay claim and overrule the objection to your claim, fill out this form to the best of your knowledge and mail or deliver it to Mr. Seymour at the address shown in the attached Notice.  Please print all information.  If the space provided is not enough, you may attach additional sheets.  Mr. Seymour must receive this form by January 29, 1988, or your appeal will not be considered.

      1. Is the statement of facts in Mr. Seymour's objection letter accompanying this form:

          (a) right? _____

          (b) wrong in some respect? _____ If so, explain what is wrong in the statement of facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    2. State why you think the objection should be dis-

missed by the Court, and why you think you should share in the

back pay award:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Print your name:_____

Print your mailing address:_____

- 2 -

City _____ State _____ Zip _____

Social Security Number: _____

Telephone number (home): Area Code _____ Number _____

                  (work): Area Code _____ Number _____

These statements are made under the penalties for perjury.


              Signature: _____


Date: _____


NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

     1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-
SIDERED.

     2. THIS FORM MUST BE MAILED TO:

          Richard T. Seymour
          Lawyers' Committee for Civil Rights Under Law
          1400 'Eye' Street N.W.
          Suite 400
          Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY <u>JANUARY 29, 1988</u>, IT
WILL NOT BE CONSIDERED.     -


- 3 -



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 17, 1984

Ms. Janie Collins
537 Jones Street, #8573
San Francisco, Calif.  94102

                Re:  Luevano v. Campbell

Dear Ms. Collins:

        I have enclosed a copy of the transcript of your deposition
in this case.  Please read it carefully.  If any changes are neces-
sary in order to make the transcript an accurate statement of what
you said during your deposition, please mark the changes on the
errata sheet enclosed with this letter.  When you have finished,
take the Certificate and the errata sheets to a notary public,
sign them in front of the notary, and make sure that the notary
puts his or her seal on the documents.  Then mail the Certificate
and errata sheets back to me in the enclosed reply envelope.

        If there are no changes to make, you can forget about the
errata sheets.  In any event, the copy of the transcript is yours
to keep.

        I would like to have the sheets back to me in ten days, so
I would appreciate your taking care of this as quickly as possible.
We will let you know when the Court takes action.

                                Very truly yours,

                                Richard T. Seymour

RTS/lb
Enclosures

## E-R-R-A-T-A  S-H-E-E-T

To the deposition of _____ JANIE L. COLLINS _____ .

The deponent having a right to make any changes deemed necessary

hereby makes the following changes into the deposition and states

the reasons for each change accordingly.

PAGE NO.    LINE NO.    CHANGE (State Reason for change after each)

_____

DEPONENTS' SIGNATURE



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 4, 1984

Ms. Janie L. Collins
537 Jones Street, Apt. 8573
San Francisco, Calif.  94102

Re:  <u>Luevano v. Campbell</u>

Dear Ms. Collins:

This morning, I received your December 1, 1984 letter.  I have spoken with Ms. Ward, and we are sorry that we cannot consider your deposition incomplete.  At the beginning of the deposition, you swore to tell the whole truth.  You never said, during the course of your deposition, that you did not want to answer anything fully because friends of yours were in the room.  If you had told us this, we could have made other arrangements.  We did not even know that other persons were present.  In any event, it seems to us that you could have asked your friends to let you answer in privacy.

It is correct that you let us know, a few days before you were to move, that you would be moving and that your home telephone number would no longer be available.  However, the attorney for the government was not able to schedule the time for your deposition during those few days.

I am sending a copy of your letter to me, and a copy of this response, to the court reporter to be attached to the transcript of your deposition.  In this way, the Court will know about the problem you raise.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.

Lawyers Committee
for Civil Rights Under Law
1400 Eye St NW Suite 400

Washington, D.C. 20005

557 Jenes #8573
San Francisco, CA 94102
Dec 1, 1984

Dear Sirs: (Mr. Seymours)

You questioned me extensively about U.S. Secret Service having stole legal papers out of my room as I had indicated to you; I was at a friends house and could not answer your questions fully. Although, I felt obligated to answer part of the quest ions regarding the matter. My friend (and her guests) heard me answer the questions regarding the issue. As a result of their hearing the answers, it created some anxiet and doubt in them about me. I cannot live in this world alone, I need friends and associates. My few true friends are the ones who have put bread on my table when federal police made attempts in having me to starve to death. God Knows I am not lying.

I had given you a telephone number to call me earlier. You refused to do so. If you had called during that period of time, you would have found me at home

alone and I could + would have answered your questions fully to the best of my ability.

I feel that you could have come to California to get answers to your questions or have me to come to Washington, D.C., after not calling me at the time I had access to a phone in my own residence.

If you desire answers fully to your questions from me, either you come to California or pay my expense to come to Washington, D.C., I don't object to answering your questions to the fullest extent. And until I answer to the fullest extent that I desire I ask that you consider the deposition taken from me on Wednesday Nov 28, 1984 as being incomplete due to special circumstances.

May I hear from you soon regarding this matter.

Thank you in advance for your co-operation.

Very truly yours

②

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - -

ANGEL G. LUEVANO, ET AL.,               )
INDIVIDUALLY AND ON BEHALF OF           )
ALL OTHER SIMILARLY SITUATED,           )
                                        )
                   Plaintiffs,          )
                                        )        CIVIL ACTION NO.
          v.                            )          79-0271
                                        )
DONALD J. DEVINE, ET AL.,               )
                                        )
                   Defendants.          )

Deposition of JANIE L. COLLINS

Washington, D.C.
November 28, 1984

Pages 1 thru 51

**MILLER REPORTING COMPANY, INC.**
507 C Street, N.E.
Washington, D.C. 20002
546-6666

M wam                                                                          1

1                 UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - - - x
                                      :
4       ANGEL G. LUEVANO, ET AL.,     :
        INDIVIDUALLY AND ON BEHALF OF :
5       ALL OTHER SIMILARLY SITUATED, :
                                      :
6               Plaintiffs            :
                                      :
7           vs.                       :        CIVIL ACTION
                                      :
8       DONALD J. DEVINE, ET AL.,     :        NO. 79-0271
                                      :
9               Defendants            :
                                      :
10      - - - - - - - - - - - - - - - x

11                           Washington, D.C.

12                           Wednesday, November 28, 1984

13      Deposition of:

14                      JANIE L. COLLINS

15      a witness, called for examination by counsel for the Defendants,

16      pursuant to notice and agreement of counsel as to time and

17      place in the offices of the Lawyers' Committee for Civil

18      Rights Under Law, Suite 400, 1400 I Street, N.W., Washington,

19      D.C., beginning at 5:10 p.m., before William D. McAllister,

20      a Notary Public in and for the District of Columbia, when

21      were present on behalf of the respective parties:

22

23

1    APPEARANCES OF COUNSEL:

2        On behalf of the Plaintiffs:

3            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:  RICHARD T. SEYMOUR, ESQ.
4                 Suite 400
                  1400 I Street, N.W.
5                 Washington, D.C. 20005

6        On behalf of the Defendants:

7            UNITED STATES DEPARTMENT OF JUSTICE
             BY:  BARBARA T. WARD. ESQ.
8                 Room 3509
                  Civil Division-Federal Programs Branch
9                 10th and Pennsylvania Avenues, N.W.
                  Washington, D.C. 20530

10

11                     C O N T E N T S

12   WITNESS              EXAMINATION BY:  MR. SEYMOUR   MS. WARD

13   Janie L. Collins                     3, 27, 29   24, 28, 34
                                          35, 42, 44   36, 44, 45

14

15                          EXHIBITS

16   NUMBER                          FOR IDENTIFICATION

17    Deposition

18   1 (Form For Additional Information and
        attached letter)                      47
19
20   2 (Ltr fr law clerk to Seymour and
        attachments)                          48

21   Post hearing exhibit attached.

22

23

3

P R O C E E D I N G S

Whereupon,

JANIE L. COLLINS

was called as a witness and, having first been duly sworn by the Notary Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SEYMOUR:

Q    Please state your name and address for the record.

A    My name is Janie Collins.  The address, 537 Jones Street, Number 8573, San Francisco 94102.

Q    Ms. Collins, have you ever taken the Professional and Administrative Career Examination, otherwise known as the PACE?

A    Have I ever taken it?

Q    That's right.

A    Yes, I have taken it.  Yes, I did take the examination.

Q    Did you take it more than once?

A    No, I didn't.

Q    When was that one time?

A    That one time was approximately in August of 1980. If not in August, it was around that date.

Q    Do you remember about how long it was before you

1  received the results of that test?

2      A    Not very long.  It was within, I would say, about a

3  month.

4      Q    What were the results?

5      A    I did not pass the examination.

6      Q    What did you do after you received the results of the

7  examination?

8      A    After I received the results of the examination, I

9  rewrote the United States personnel office in San Franciso,

10  complaining about the examination.

11      Q    When you say "rewrote", do you mean that you wrote

12  earlier to them?

13      A    Yes, I had written earlier to them.

14      Q    Why don't you tell us what you said the first time

15  you wrote to them?

16      A    It was basically that I felt the examination was not

17  up to standard.  I felt there was not validity, and it was

18  not a reliable test due to the fact that some of the questions

19  that it asked was not really a test of an ability of what a

20  person really knows in that it was more or less just asking

21  questions concerning matters that were not really testing the

22  person's ability and that if a person had not been exposed to

23  certain situations, they would not answer the question as the

1  answer was to be, you know, and I felt that that was unfair,

2  that the test had no validity at all.

3      Q   Was there anything else in that letter?

4      A   Well, I just complained about it that I felt like

5  it was unfair, and more or less that basically was the com-

6  plaint I sent to them in that I felt it was unfair that the

7  test was not testing ability, not my ability anyway.

8      Q   Did this letter say anything about the test being

9  unfair to Blacks or discriminating Blacks or Hispanics?

10      A   Yes, I felt that way.  When I say that if you're not

11  exposed to certain things, like I did mention to them that I

12  was not exposed to the parents that were doctors, you know,

13  and that Black people and the lower class people are not really

14  exposed to doctors and lawyers as parents, you know, and that

15  their potential is not really tested--the ability that Blacks

16  or Hispanics, that this would be unfair to them to ask them

17  questions that they are not exposed to daily, you know.

18      Q   When did you write this letter?

19      A   This letter was written within a week after I took

20  the exam.

21      Q   Before you received the results?

22      A   Yes, I wrote to them before I even received the

23  results.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Q    And who did you sent the letter to?

2    A    Just to personnel department in San Francisco.

3    Q    Personnel department of what agency?

4    A    Personnel department, the people that had given me

5    the test, you know, the application for the test.

6    Q    Were you a federal employee at the time you took

7    the test?

8    A    No, I wasn't.

9    Q    Were you sending a letter to the United States

10    Office of Personnel Management?

11    A    I guess so.  I guess this would also be for unemploy-

12    ment, you know.  When you are seeking employment and they give

13    the applications.  That's where I sent it to.  450 Golden Gate.

14    Q    In San Francisco?

15    A    Right.

16    Q    First of all, do you have a copy of the letter that

17    you sent off at that time?

18    A    If I do, I did send it to you.  Yes, I do have a

19    copy.

20    Q    We have a copy of a letter that you attached to your

21    questionnaire, this form for additional information, and it is

22    dated September 1980.  I believe that's the earliest.

23    A    I guess that's the one.

1  Q  Is that the letter that you are referring to?

2  A  Yes, this is one of the letters I am referring to.

3  Q  Is that the first letter that you sent to the

4 Office of Personnel Management or was there another letter

5 that you sent?

6  A  I sent another one.  This is the second letter.

7  Q  That's the second letter?

8  A  Right.

9  Q  Let me keep going through these materials and see

10 if I see one.

11  A  You don't have to go through the materials because

12 I don't even have the first letter that I sent.  I had a

13 robbery in my house and a lot of my legal papers come up miss-

14 ing so not even I have the letter, that letter, the first

15 letter that I sent.

16  Q  All right.  Could you tell us, in the same words you

17 used in the letter as closely as you can remember them, exact-

18 ly what was said?  I do not want you to make any guesses or

19 assumptions or fill in any gaps about things you do not remem-

20 ber, but I would like to have in your own words what you said

21 to them.

22  A  Okay.  I did tell them about two questions on the

23 test that I did not like and I felt like it was not a test of

a person's knowledge and that this test should not be used.
Number one, I told them about a question being asked on the
test was something like complete the statement, and the state-
ment was actually referring to a medical person, a doctor, and
it amounted to it could either go one or two ways.

It could be a cleaning woman who was wiping a floor
or it could be a doctor who was working on a wound, a person's
wound. And I told them, like, Black people are not that exposed
to doctors as parents or as sisters or brothers, and therefore,
when you are not being exposed to a doctor, you won't think
that this is the measurement of a doctor or if this person has
the education to be a doctor or to be employed as a doctor.

I looked at it as it being someone, a cleaning woman
because I was exposed to a cleaning woman whose occupation
was a cleaning person, you know, and because of that particular
question as a person who mops floors everyday for a living or
a person who is going to clean a wound, cleaning is cleaning.
You didn't say precisely what they were cleaning. You just
said put the sentence together.

And it added up it was ambiguous. It could either
of two ways, as a person who was trying for a job as a cleaning
woman or one who wants to be a doctor, you know, applied for a
position as a doctor.

1        And I said, well this is more or less like it's not

2    really testing some people's ability.  Some people are, you

3    know, exposed to this and some people are not.  There are

4    groups of people who are not exposed to the higher people who

5    have those positions.

6        That's it basically.

7        MS. WARD:  Ms. Collins, that's your letter of Septem-

8    ber.  What does the first letter that you wrote say?

9        THE WITNESS:  The first letter was basically the

10   same thing.  It didn't vary.  If it did, it was basically just

11   the same thing.

12       BY MR. SEYMOUR:

13   Q    When you gave us this description of what the first

14   letter contained a couple of minutes ago, were you looking at

15   your September 1980 letter at the time or were you just testi-

16   fying based upon your memory of the first letter?

17   A    Right now?

18   Q    Yes.

19   A    Right now I'm not even looking at the letter.  I'm

20   just telling you what I did say on the first letter, and the

21   other letter the same.

22       MR. SEYMOUR:  I should point out for the record that

23   throughout these depositions sometimes counsel will attempt

1    to interject something but because of the voice-activated

2    microphone the deponent cannot always hear what counsel says

3    unless the claimant happens to pause at the same time that

4    counsel is speaking.

5            BY MR. SEYMOUR:

6        Q    As I understand it, you sent this letter in within a

7    week or so after you took the test, then you got the results

8    in less than a month which would have placed it sometime in

9    September 1980 that you received the results, maybe late August

10   1980.  And at that time, did you send in this September 1980

11   statement to the Office of Personnel Management, addressed

12   to the U.S. Personnel Office at 450 Golden Gate?

13       A    Right.

14       Q    Do you remember about how many days or weeks it was

15   after you received the test results that you sent in the state-

16   ment to the U.S. Personnel Office on Golden Gate Avenue?

17       A    Not very long.

18       Q    Do you know if it would have been a matter of days

19   or a matter of weeks?  If you do not remember, just tell us.

20       A    It would have been like a matter of weeks.

21       Q    Did you receive any answer from the government to

22   your first letter?

23       A    I never received any answer.

1    Q    Did you receive any answer from the government to

2  your second letter?

3    A    The second letter, I did receive--I don't think I

4  did.  I didn't receive any answer from them until--no, I didn't.

5    Q    Is there something that you are thinking of that

6  you did receive but you're not sure if it was the answer to

7  the letter?

8    A    Yes, I did receive a letter from them at a later--

9  oh, yes, I did receive a letter from them in May of '81, but

10  this was long after I had written to them.  It was in regards

11  to the--after the lawsuit had come about.

12    Q    Are you referring to a letter from the United States

13  Office of Personnel Management, dated May 21, 1981, signed

14  by Christine Applegate?

15    A    Right.

16    Q    And that refers to the Luevano settlement.  You also

17  sent in a couple of documents relating to a proceeding that

18  you had against the City of San Francisco. That does not have

19  any connection to this case, does it?

20    A    No.

21    Q    That was a separate case that you had in the U.S.

22  District Court in San Francisco and tried to take an appeal

23  to the 9th Circuit.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1      A      Right.

2      Q      Did anyone from the government ever call you to talk

3  about either of the letters that you had sent in complaining

4  about the PACE? You already said that you didn't receive an

5  answer in writing. But did anyone call you and talk with you

6  about it?

7      A      No, they didn't.

8      Q      Did you ever take any action to follow up on your

9  second letter?

10     A      No, I didn't.

11     Q      At the place where you took the PACE examination,

12  did you see any poster, leaflet or brochure telling you how

13  to go about filing a complaint of discrimination?

14     A      No, I didn't. You mean the examination room?

15     Q      That's right. Examination room or wherever you got

16  the papers to fill out the application.

17     A      I don't recall that. I don't recall seeing one.

18     Q      Has anyone on behalf of the government either before

19  then or after then ever informed you that you could send a

20  complaint to either the Merit Systems Protection Board or the

21  Office of Federal Sector Appeals at the United States Equal

22  Employment Opportunity Commission to complain about a test

23  like the PACE?

1    A    Will you repeat the last part of your question please?

3    Q    Did anyone from the government ever inform you be-fore or after August and September 1980 that you could file a complaint about a test like the PACE directly with the Merit Systems Protection Board or with the Office of Federal Sector Appeals at the United States Equal Employment Opportunity Commission?

9    A    No one told me that, but I did go to the Equal Employment, that portion of it, and I talked to someone there, and they told me that after the lawsuit, they told me that I was to contact you in Washington and that I was to receive money that I had nothing else to do, that they wouldn't even interfere because the case had been won, they said.  I did go there in San Francisco, and that's what I was told.

16    Q    Is that the visit or contact that is described in this letter of Christine Applegate, dated May 21st, 1981?

18    A    I suppose so.  Wait a minute.

19    Q    Could you find that letter?  You do have a copy of the letter before you, don't you?

21    A    No, I don't find that one.  Oh, yes, I do.  Okay.

22    Q    Is that the communication that you were referring to when you said that somebody said you were entitled to relief?

IILLER REPORTING CO., INC.
20 Massachusetts Avenue, N.E.
Vashington, D.C.  20002
(202) 546-6666

14

1       A    No, no.  I'm not referring to this communication.

No.  Dated May 21, '81.

3       Q    What other communication are you referring to?  Was

4   it in writing or was it outloud?

5       A    This was oral.  I went into the office and I never

6   got this in writing.  This was orally done.

7       Q    What office did you go into?  You said it was an

8   Equal Employment office.  Was that Equal Employment Opportunity

9   Commission or was it some part of the Office of Personnel

10  Management dealing with equal employment opportunity?

11      A    No.  It was the Equal Employment--it was the last one

12  that you called.  It was not dealing with personnel, and I

13  talked to a lady there, and she reviewed the--as a matter of

14  fact, she looked at the case and told me to contact Washington

15  about the matter.

16      Q    Was this after after you heard about the settlement

17  in the Luevano case?

18      A    Right.

19      Q    And this was the U.S.--

20      A    I told her.  I'm sorry.  Go ahead.

21      Q    Was this the U.S. Equal Employment Opportunity

22  Commission?

23      A    It was.  That's what it was.

1     Q   Do you remember the street of the address of the

2  office that you went to?

3     A   I don't remember the street or the address.  I do

4  remember that they have moved into another building.

5     Q   Do you remember the name of the building?

6     A   I think it is the state building or it look like a

7  state building.

8     Q   The one that you went to?

9     A   Right.  Well, not the one that I went to originally.

10  The first time I saw them was in a building I can't recall

11  now where it was at, the first time I went there.  And they

12  moved.  That's what happened.

13     Q   Let me ask you a few questions about information you

14  put down on the questionnaire that we sent out to you last

15  year.  The questionnaire was sent out pursuant to an order

16  from the court, and you answered that, well, let me read you

17  the following question and then read you your answer.  Then

18  I'll ask you about it.

19     Question Number 2 says, quote, "Do you have any

20  papers showing that you took the PACE at the time or times

21  stated above, or telling you the results of your taking the

22  test?"  And then your answer said, quote, "U.S. Secret Service

23  agent stole it out of my room."

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1          Can you explain that?

2          A    Okay.  I thought that you were talking about the

3    results of the examination.

4          Q    That's right.  A paper showing that you took the

5    examination, when you said you did, and showing what the

6    results of the test were.

7          A    Right.  That would be the results of the examina-

8    tion and the card and stuff like that telling you when to come

9    and place.  Okay.  They were stolen out of my room.  All of

10    my papers, most of my papers, legal papers was taken and

11    stolen, and the only way that I can prove that I did take the

12    examination would be for you to contact them, and I could also

13    prove it through the welfare department of San Francisco that

14    I called them during intermission of the PACE exam, I called

15    them and told them that I couldn't keep an appointment with

16    them because of the fact that I was taking the examination,

17    and I spoke to the manager there at the welfare office.

18          Q    What welfare office would that be?  Do you know the

19    address?

20          A    Yes, it's on Mission Street in San Francisco.  I'm

21    not sure of the correct address.  I think it is 1180 Mission

22    Street.

23          Q    Do you remember the name of the manager?

1      A    The main welfare office in San Francisco, and

2  the supervisor there, his first name is Tom.  I don't recall

3  his last name.

4      Q    Do you remember his last name?

5      A    I don't recall his last name.  No.

6      Q    Was this your regular welfare case worker that you

7  spoke to?

8      A    No.  He was the main supervisor.  My regular welfare

9  case worker was off that day.  So therefore the supervisor

10  took over.

11      Q    If it becomes important to check that record, we

12  would have to have your written consent to see your welfare

13  records.  Would there be any problem with your giving us the

14  consent?

15      A    No.

16      Q    What is your Social Security Number?

17      A    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.

18      Q    Now, getting back to this question about the papers

19  being stolen out of your room, are you referring to the place

20  where you lived?

21      A    Right.

22      Q    What makes you think it was a Secret Service agent

23  that stole the papers?

ILLER REPORTING CO., INC.
20 Massachusetts Avenue, N.E.
Vashington, D.C.  20002
202) 546-6666

1    A    Well, what makes me think that is because later I

2    kept missing papers, and I had had some dealings with them and

3    I kept missing papers and very important papers.  So I ended

4    up calling the police and reported the matter, and it was never

5    stated that I filed a wrong report, you know, against them

6    for doing it.

7    Q    So you don't really have any basis for saying it

8    was the Secret Service.  That was just a guess?

9    A    Well, it was more than a guess or a hunch.  I just

10   feel that they really did take the papers, you know.  I don't

11   have any proof.  I can't say I have any proof that here he is.

12   He took my papers, but the papers came up missing, and not

13   only those but so many other papers.

14        I feel like the Secret Service knew all into it be-

15   cause on another occasion the police came to my apartment and

16   some of the neighbors said that they went in and robbed the

17   apartment, and I felt like that either the San Francisco Police

18   Department or someone did get it, because there were witnesses,

19   too, on another occasion when papers some up missing.

20        MS. WARD:  Is there some reason, Ms. Collins, why

21   you believe the Secret Service would be interested in what

22   your results to the PACE exam were?

23        THE WITNESS:  Yes, I do feel like they would be

1    interested in knowing.

2           MS. WARD:  Why?

3           THE WITNESS:  And stopping it, too, you know, what-

4    ever.  I had been involved in other court cases where every-

5    time I get ready to present some evidence the papers come up

6    missing, and it just forced me into calling the Oakland, when

7    I moved, to call the Oakland Police Department.

8           MS. WARD:  You said that you had some prior dealings

9    with the Secret Service.  What were those prior dealings?

10           THE WITNESS:  I don't think that would have anything

11    to do with this examination, the PACE examination, the prior

12    dealings that I had with them.

13           MS. WARD:  Well, you've made an allegation--

14           THE WITNESS:  It involved something else.  Another

15    matter.  As a matter of fact, it involved an forgery on another

16    matter altogether different than this one.

17           MS. WARD:  Well, you've made an allegation that the

18    Secret Service, because of its prior dealings with you in

19    another matter which you refuse to tell us about, took papers

20    which are crucial to this matter.

21           THE WITNESS:  Right.

22           MS. WARD:  I'm afraid I have to ask you--

23           THE WITNESS:  The reason why I had prior dealings

1   with them was due to a forgery on another case.

2       MS. WARD:  Do you refuse to answer the question?

3       THE WITNESS:  And therefore, I feel like they had

4   reason to come in and just gather up all them other papers.

5   As a matter of fact, I could talk all day feeling that they

6   did it, that they could come in and rob my house and whatever,

7   but that would consume a lot of time.

8       BY MS. SEYMOUR:

9       Q   Ma'am, did the Secret Service accuse you of forgery

10  in the past?

11      A   No.  I'm accusing them.

12      Q   You accused them of forging something else?

13      A   Right.

14      Q   What was it they were supposed to have forged?

15      A   Letters.

16      Q   Letters saying what?

17      A   Well, I wouldn't like to answer that question.  It's

18  just too much.  As a matter of fact, even now I have a welfare

19  problem now where I am indicating that it has been forged and

20  stuff like that.

21      Q   Well, ma'am, you've raised the matter in court.

22  You filed these statements about the Secret Service stealing

23  papers as part of the official court records in this case,

21

1    and then you brought up the Secret Service problem in answer

2    to questions that we talked about today.  You did swear to tell

3    the whole truth at the beginning of the deposition, and as

4    the lawyer for the Plaintiffs and the class in Luevano, I

5    have to tell you that you really are required to give that

6    answer unless you have some grounds to believe that the answer

7    would tend to incriminate you.

8        A    In answer to what, your last question?

9        Q    That's right.

10       A    Will you repeat that last question?

11       Q    What did these letters that you accused the Secret

12   Service of forging say?

13       A    What did they say?  It has got nothing to do with

14   the PACE examination, and the ones that now that I'm accusing

15   them of forgering just happened about six months ago, and it

16   has got nothing, absolutely nothing to do with the PACE.

17           This PACE examination is civil, and that is directly

18   criminal, what they would have something to do with.  Now, like

19   I have written on this paper that they took, they stole it out

20   of my room, and I'm still believing that they stole it out of

21   my room.  I have filed a complaint with the police department,

22   and the police department has not come back on me saying that

23   they did not, and as a matter of fact, they even told me why

1    don't I put in a lawsuit against them, but I can't prove that

2    they stole the papers.  That's the reason I have not put in a

3    lawsuit against them.  If I had proof of it, I would be more

4    than happy to do so.

5        Q    Ma'am, your statement to the court was signed on

6    January 24th, or it could be the 29th, I suppose, but it looks

7    on here more like January 24, 1984, and that written statement

8    with that date on it, complained about the Secret Service

9    stealing papers.

10            Does that refresh your mind about when these problems

11   of yours with the Secret Service began?

12       A    Oh, the problems began like in '78, I think.

13       Q    With the Secret Service?

14       A    Right.

15       Q    Were there some problems with the Secret Service

16   before these letters that you accused them of forging?

17       A    Right.

18       Q    What did those problems involve?

19       A    Those problems does not involve anything that would

20   have anything to do with this examination and the Question

21   Number 2 that you asked on this questionnaire.  It just doesn't

22   have anything to do with it.

23            And furthermore, if you really want to know what it

1    does involve, it involves I was raped by one, you know, and

2    like I say, it doesn't really have anything to do this, and I

3    don't think that they would like for me to expose all of the

4    information.

5            It might be incriminating to me to do so because I

6    might be having to fear for my life by telling you all of this

7    information that doesn't really have anything to do with the

8    PACE examination, and I don't have no bodyguards.

9            MR. SEYMOUR:  Hold on just a minute, ma'am.

10           BY MR. SEYMOUR:

11   Q     Ms. Collins, I just have a couple of questions and

12   then the lawyer for the government will have some questions.

13   What is your race?

14   A     Black, Negro, whatever.

15   Q     What is your level of education?

16   A     Perhaps about three and a half years of college.

17   Q     Meaning you started the third year but did not

18   finish it or started the fourth year but did not finish it?

19   A     Right.

20   Q     What school was that?

21   A     Roosevelt University in Chicago.

22   Q     Could you tell me what your course of study was there?

23   A     Psychology.

MILLER REPORTING CO., INC.
320 Massachusetts Avenue, N.E.
Washington, D.C.  20002
(202) 546-6666

1    Q    When you took the PACE examination, were you apply-

2    ing for a particular type of job?

3    A    Yes, I was.

4    Q    What type of job were you applying for?

5    A    Something that would have to do with psychology,

6    working in that field.

7    Q    Do you recall the name of the job?  Before you take

8    the PACE, you fill out this questionnaire asking you for the

9    jobs that you're interested in.  So you put down the name and

10    the job series, what jobs you are interested in and the parts

11    of the country you are interested in working in.  Do you

12    remember doing that?

13    A    Right.

14    Q    Do you remember the names of the jobs that you put

15    down?

16    A    If I'm not mistaken, it had to do something with

17    management and counseling.

18    Q    Is that as closely as you remember it?

19    A    That's as close as I can remember.

20    MR. SEYMOUR:  No further questions.

21    EXAMINATION BY COUNSEL FOR THE DEFENDANTS

22    BY MS. WARD:

23    Q    Ms. Collins, I have in front of me the letter of

1   May 21st, 1981, to you which is signed by Christine M. Apple-

2   gate, the Chief of the Professional/Trades & Crafts Section

3   of OPM.  Do you have that letter?

4      A   Yes, I do.

5      Q   Ms. Applegate refers to your letter of May 2nd, 1981,

6   regarding the PACE examination.  Do you have that letter?

7      A   No, I don't have that letter.

8      MS. WARD:  Mr. Seymour, do we have that letter in

9   our files?

10      MR. SEYMOUR:  No.

11      MS. WARD:  The government doesn't have that letter

12   either nor do the Plaintiffs.

13      MR. SEYMOUR:  Let me do a quick search here to see.

14      BY MS. WARD:

15      Q   Other than your letter that you wrote immediately

16   after your took the exam--you said you wrote that letter

17   about one week after the exam, then you wrote a second letter

18   in September of 1980 which we do have, and then you wrote this

19   letter of May 2nd, is that correct?  Those are the three

20   letters which you wrote regarding the PACE examination?

21      A   Does that conclude it you said?

22      Q   Yes.  Are those the only three letters that you

23   wrote concerning the PACE examination?

1        A    Yes, it is.

2        Q    Those are the only three.

3        A    Right.

4        Q    You wrote no other letters concerning the PACE

5    examination?

6        A    I don't recall. Oh, I wrote to you.

7             MR. SEYMOUR:  You mean other than in connection with

8    the Paragraph 21 claim procedure.

9             BY MS. WARD:

10       Q    So we only have three letters.  You wrote the letter

11   the week after the examination.  You wrote another letter in

12   September, and you wrote this third letter of May 2nd, 1981.

13   Is that correct?  When was the next time you wrote a letter

14   concerning either an objection to the PACE consent decree or

15   the PACE examination at all?

16       A    I wrote to you.

17       Q    When you say "you", who do you mean?  Richard Seymour?

18       A    I wrote to Washington.

19       Q    Who in Washington did you write to?

20       A    Let me see.  I wrote, I don't know where; but anyway

21   there was an address someplace here.  Yes.  1900 E Street,

22   Northwest, Washington, D.C.

23       Q    When did you write to 1900 E Street, Washington, D.C.?

1     A     This was around the date of May 2nd.  I wrote this

2  letter--oh, no, it wasn't around--it could have been, yes.

3  It could have been very much near that date.

4     Q     Do you have a copy of the letter that you wrote?

5     A     No, I don't have a copy of the letter.  I received,

6  if I am not mistaken, from you--I don't think it came from

7  San Francisco.  I think it came from Washington--the Appendix

8  B to the Order Granting Preliminary Approval to the Consent

9  Decree.  This I received from Washington.  Right.

10     Q     So you received a copy of Appendix B.  Did you write

11  to the court in response to that receiving of Appendix B?

12     A     No, no.  I wrote to the court about PACE, and this

13  is what they sent to me, Appendix B.

14     FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

15         BY MR. SEYMOUR:

16     Q     Ma'am, did you write to the court or did you write

17  to the Office of Personnel Management at 1900 E Street in order

18  to get this copy of Appendix B?

19     A     I wrote to 1900, if I'm not mistaken.  I wrote to

20  1900 E Street, Northwest.

21     Q     All right.  And the Appendix B that you are referring

22  to, is that a notice to class members, about five pages long?

23     A     Right.

1          MR. SEYMOUR:  Let me state for the record that that

2     is an appendix to the order granting final approval, not an

3     appendix to the consent decree itself.  Please continue,

4     Ms. Ward.

5          FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6               BY MS. WARD:

7          Q     Did you ever write an objection to the United States

8     District Court concerning the settlement of the Luevano case?

9          A     I feel that I did.  I can't say for sure I did but

10    I think I did.

11         MR. SEYMOUR:  Let's take just a two-minute break

12    from the deposition while I check the files because I have

13    copies here of all the comments that were filed.  I don't think

14    there were any but I am happy to do a double-ckeck on that, but

15    I would like the deposition not to continue while I am off

16    checking.  Is that all right?

17         THE WITNESS:  Okay.

18         (Pause.)

19         MR. SEYMOUR:  Ms. Collins, I've justed checked the

20    record of all the comments and objections that were filed with

21    the court in 1981, and there was nothing that was filed with

22    the court by you at that time.

23         I seem to remember, however, that you wrote a letter

1    to the court about a year ago, late summer or early fall, may-

2    be October of 1983, and that, as a result of that letter,

3    the Clerk of the Court got in touch with us and asked us to

4    get in touch with you, and then after that, you filed your

5    claim under Paragraph 21 of the Consent Decree, saying that

6    you had made this complaint of racial discrimination against

7    the PACE way back in 1980.  Does that sound right to you?

8            THE WITNESS:  That sounds about right.  I know there

9    was something I've seen, you know, that I had written.  I

10    couldn't recall exactly, but that sounds correct.

11        FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

12            BY MR. SEYMOUR:

13        Q    So that the first time that you wrote to the court

14    was about a year ago in 1983?

15        A    Right.  That's probably right.  I'm sure it's right.

16    If you found that, then that's right.  It sounds right anyway.

17        Q    And it was back in early 1981 that you received this

18    five-page notice to class members, is that right?

19        A    Right.

20            MR. SEYMOUR:  Please continue, Ms. Ward.

21            MS. WARD:  I have no further questions.

22            BY MR. SEYMOUR:

23        Q    I have a few questions at this point.  When you

30

1      Q    When you received the five-page notice to class

2  members back in May of 1981, did you read through the whole

3  thing?

4      A    Yes, I did.  Wait a minute.  I'm trying to recall.

5  Maybe I did receive it just in May and as soon as I received

6  it, I think I wrote back to the San Francisco office and was

7  telling them my interpretation of it, of the Appendix B, and

8  that is when they wrote and told me--maybe it's not, but any-

9  way, I felt like they were misinterpreting the letter as I was

10  misinterpreting it.  One of us had to be misinterpreting the

11  letter.

12      Q    Let me start from the beginning, ma'am.  How did you

13  hear about the settlement of the Luevano case the first time?

14      A    I heard about it through the Jet magazine.

15      Q    You saw the public notice that was published in Jet

16  magazine?

17      A    Right.

18      Q    And when you saw the public notice, did you send off

19  for this detailed form of notice at that time?

20      A    Would you please repeat the question?

21      Q    The notice in Jet magazine said that if you wanted

22  to have more details, you could right to the Office of Person-

23  nel Management, 1900 E Street, Northwest, Room 5H30, Washington,

1    D.C.   Did you write to the Office of Personnel Management to

2    get the more detailed form of notice as soon as you saw the

3    summary notice in Jet magazine?

4         A    I don't recall doing that.  I wrote directly to

5    San Francisco, and that's when I went to the EEOP office or

6    whatever it is, EEOC or whatever.  That is when I went there,

7    and I felt like they could handle the situation more so than

8    me, and they told me that there was else more for them to do

9    but just sit back and wait.

10         That's more or less what I did when I got it.   I

11    wrote San Francisco, again, about it.  That's when I went to

12    the office.

13         Q    Well, the thing I am trying to pin down is whether

14    you got this May 21st, 1981, letter from the Office of Person-

15    nel Management, the one that is signed by Christine Applegate

16    before you received the detailed notice about the settlement

17    or after you received the detailed notice about the settle-

18    ment.  Which was it?

19         A    The detailed notice, you mean Appendix B?

20         Q    That's right.

21         A    Okay.  Now, let me think about that.  The May 21,

22    1981, letter is in response to the Appendix B because here

23    she is saying in here second paragraph, "Only the original

1   complainants in the plaintiff class of Luevano versus

2   Campbell were entittle to..."  I had said something to her

3   from reading this Appendix B, my interpretation of it was is

4   that I had written to you earlier and you ignored my letters,

5   and now you see what you have got here now, this Appendix B.

6   I sent them a copy of it.

7        And she is telling me, explaining to me that only

8   the original complainants in the plaintiff class, rather,

9   of Luevano versus Campbell were entitled to money and that I

10  was really misinterpreting this Appendix B.  That is what she

11  is talking about.

12       Q    So first you got Appendix B.  Then you got in touch

13  with them.  Did you tell them in this letter of May 2nd, 1981,

14  that you wanted to make a claim?

15       A    No, no.  I told them, well, I told them about what

16  I had already done, that I had written to them about the

17  letter.  Yes, I did tell them that I had already complained

18  about it, yes, you are right.  That's what I did.

19       O    Please tell us in the same words you used in your

20  letter of May 2, 1981, as closely as you can remember them

21  but without trying to fill in any gaps or make any guesses

22  or assumes about what you said, just tell us as closely as

23  you can remember the words you used in that letter to the

1    government.

2        A    Okay.  I told them that I had written to them twice

3    and that they hadn't contacted me about the complaint that I

4    had sent in to them.  This complaint, too, was more or less

5    a claim, because I had planned on suing them.  I was in the

6    process of getting an attorney to sue them.

7            I told them about it then.  I told them that I was

8    entitled to receive money without having to go through a law-

9    suit, based on the Appendix B that I had received through the

10   mail, and I attached a copy of the Appendix B.

11       Q    Then you got back this letter dated May 21st, 1981.

12   And what did you do after you received this letter?

13       A    After I received this letter.  I had no more con-

14   tact with the San Francisco office.  I think this is when I

15   contacted the courts, yes, I'm pretty sure.  I didn't contact

16   the San Francisco office any more.

17       Q    Your contact with the court was two and a half years

18   later, back in the late summer or early fall of 1983.

19       A    Yes, that's true.  I happened to come across--I

20   felt like the San Francisco letter that I had misinterpreted

21   the Appendix B, and I didn't contact them any more, and I felt

22   like if I wanted to, maybe--as a matter of fact, I even felt

23   like I couldn't sue the government any more for this or do

1    anything about it.  So I believed them with this letter, May

2    21, '81.  I believed them.

3            But then one day, after papers are being stolen and

4    everything, I came across what was the rest of the papers, and

5    I read this Appendix B again, and I felt like I was interpret-

6    ing the letter right, and she was misinterpreting it, and I

7    wrote the court.  That is true.  There was a time there be-

8    cause I did no more.  I felt like I had no grounds to do any-

9    thing because I was believing her.

10       Q    You had mentioned a lawyer earlier, about getting a

11   lawyer to help you sue the government about this.  Did you

12   show this May 21st, 1981, letter to the lawyer?

13       A    No, I had not gotten this letter at that time.

14       FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

15           BY MS. WARD:

16       Q    When did you first contact an attorney, Ms. Collins?

17       A    I did not contact--well, I had an attorney handling

18   another suit for me, and I had thought of telling him about

19   this, but I did not tell him about it.  I had said I had

20   planned to do so.

21       Q    So you had legal counsel but you did not discuss

22   this matter with him?

23       A    No, I didn't.

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SEYMOUR:

Q    Did you have the lawyer at the same time that you received--the lawyer on the other case--did you have that lawyer at the same time that you received this letter or was this a different period of time?

A    This was during the same period of time.

Q    Can you tell us what the subject matter of the other case was?  Did it have anything to do with civil rights?

A    No.  It was a product liability case.

Q    Do you know whether this other lawyer handled problems involving employment discrimination cases against the Federal Government?

A    I didn't know at that time, no, but I think he does.

Q    Are you saying that you found that out later on?

A    Right.

Q    How much later on?

A    Not very much later on.  As a matter of fact, I think he told me he handled all types of legal matters.

Q    Is there any reason why you did not talk to the lawyer about it after you found out that the person did handle employment discrimination cases?

A    Yes, there was a reason I didn't talk to him about

1    which is because I believed Ms. Applegate that I had misinter-

2    preted the Appendix B.

3        Q    A few moments ago you said that you found a copy of

4    Appendix B again and you made a reference to papers being

5    stolen once more.

6        A    Right.

7        Q    Are you saying that you found the copy of Appendix

8    B and your old PACE papers or are you saying someting different?

9        A    Oh, no.  What I am saying is that I had a file, and

10   as I was going through the file one day, I discovered Appendix

11   B.  The other part of my material is gone.  I can't get it

12   back.  I wish someone would bring it back.

13       But I did come across it as I was going through my

14   files, and I reread it, and I began to feel like I was right

15   and that Ms. Applegate was wrong.  But, no, I didn't come

16   across the other papers.

17       FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

18       BY MS. WARD:

19       Q    When was it that you came across these papers?

20       A    It probably was in '83, whenever I wrote to the

21   court.  This is when I began to initiate the proceedings over

22   again because I believed myself to be right.

23       Q    So you found the papers in 1983.  You reread--

A    Excuse me.  The papers were never lost.  What it is is that I just decided to go through this file and look through it again, you know.

Q    So you changed your mind and you decided that you would initiate a complaint with the court, then, in February of '83 after you rereviewed Appendix B.

A    Right.

Q    You, however, had Appendix B in your possession when you received the letter from Ms. Applegate.

A    Right.

Q    That's why you wrote to Ms. Applegate?

A    Right.

Q    Why did you not write to the court?

A    Prior to writing to Ms. Applegate?

Q    Yes.

A    Or after writing to her.  What do you mean?

Q    Prior to writing to Ms. Applegate.  From whom did you receive Ms. Applegate's name?

A    Pardon me?

Q    Who told you to write to Ms. Applegate?

A    Who told me to write to her?  I didn't write to her directly.  She's just the one who answered the letter.  I just wrote it to the Office of Personnel Management in San Francisco.

ER REPORTING CO., INC.
Massachusetts Avenue, N.E.
hington, D.C.  20002
\ 546-6666

Q    Did the notice in Jet magazine tell you to write to the Office of Personnel Management in San Francisco?

A    Well, I don't recall really what Jet magazine said.

Q    Did Appendix B tell you to write to the Office of Personnel Management in San Franciscso?

A    I do not recall.

Q    Do you remember why you chose to write to the Office of Personnel Management in San Francisco?

A    Yes, because I had written prior to them prior to even receiving the Appendix B, and I had written to them right after I took the examination. So, therefore, that's why I wanted to continue this matter with them.

And I felt like since it was local, you know, that they could, if necessary, they were the ones to contact you because I had already contacted them.

Q    Ms. Collins, on this case that you filed against the City of San Francisco, is that a race discrimination complaint?

A    Right.

Q    Did you file a claim of racial discrimination against the City of San Francisco?

A    No.

Q    You've never filed a claim of racial discrimination against the City of San Francisco?

A    No.

Q    Did you not just answer me that the court papers which you sent to us attached to your complaint have to do with a claim against the City of San Francisco for race discrimination?

A    I don't recall about the race discrimination.

Q    Okay.  In your case which is entitled Janie Collins versus the City of San Francisco, why did you sue the city?

A    Oh, that had nothing to do with race discrimination, and at that time, I don't recall why I sued the City of San Francisco.  And to my knowledge, I have never filed a race discrimination against anybody except writing to the personnel department in the federal, you know.

Q    Do you remember why you sued the San Francisco General Hospital?

A    Why did I sue them?

Q    Yes.

A    Oh, that wouldn't have to do anything with race discrimination, I don't think.

Q    What did it have to do with?

A    I don't have that case in front of me at this time. Therefore, I wouldn't like to say why.  I don't have it in front of me right now.

1      Q      You don't remember why you sued the county of San

2   Francisco General Hospital?

3      A      Oh, well, I think I had about 15 causes of action.

4      Q      Do you remember generally what they came out of?

5      A      False arrest and imprisonment.

6      O      After you received the letter from Ms. Applegate

7   which informed you that copies of the consent decree were

8   available at the Office of Personnel Management, Federal Job

9   Information Center, at 450 Golden Gate Avenue, did you ever

10  go to the Federal Job Information Center at 450 Golden Gate

11  Avenue?

12     A      Right, I did.

13     Q      Did you get a copy of the consent decree?

14     A      Yes, I did.

15     Q      When did you got to the Federal Job Information

16  Center?

17     A      Immediately after I got this letter.

18     O      So immediately after receiving Ms. Applegate's letter

19  in May of 1981, you went to the Federal Job Information Center

20  and you asked for and received a copy of the consent decree?

21     A      Right.

22     O      Did you read it?

23     A      Yes, I did.

1    Q   Did you take any further action after you read it?

2    A   Action I took after I read it.

3    Q   What was the next thing that you did?

4    A   I did write once again--no, I don't know.  I didn't

5 take any further action, not until I wrote the court.

6    Q   Not until you wrote the court in February of 1983?

7    A   Right.

8    MR. SEYMOUR:  Let me state for the record that the

9 February 2nd, 1983, date referred to by counsel should

10 actually be February 2nd, 1984.

11    BY MS. WARD:

12    Q   Do that was the next time you wrote to the court,

13 then, in early February 1984?

14    A   1984?

15    Q   Early February 1984?

16    A   I suppose so.  I don't have the letter here.

17    Q   Well, I have in front of me a three-page form that

18 is a Form for Additional Information for Class Members Who

19 State That They Filed Charges of Discrimination.  And then it

20 says "Class Member" and it has your name Ms. Janie L. Collins.

21 And then it has a number of questions on which you state that

22 you took the PACE in August of 1980, that you have no informa-

23 tion concerning the PACE exam or your taking it because the

LER REPORTING CO., INC.
Massachusetts Avenue, N.E.
shington, D.C.  20002
2) 546-6666

1    U.S. Secret Service stole it.

2        A    Right, yes, okay.

3        Q    Okay.  That form is dated January 24th, 1984.

4        A    Right.

5        Q    So that's the next communication you had with the

6    court?

7        A    That's the next one?  I thought I wrote like another

8    letter to the court.

9        Q    Do you have a copy of that other letter?

10        A    No, I don't.  Maybe I got confused and sent it

11    to the E Street address or something.

12        MS. WARD:  Mr. Seymour, do you have any other

13    questions?

14        FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

15        BY MR. SEYMOUR:

16        Q    I have just a few other questions.  Ms. Collins, I

17    have a copy of a letter that you had sent to the court, dated

18    October the 11th, 1983, labeled up at the top--wait a second,

19    I was just going through the court file to see if I can find

20    a copy of the paper.  (Pause.)

21        The document is styled Second Request up at the top,

22    and it says--this is a letter to the Clerk of the Court that

23    begins "Dear Sirs", quote, "I made a complaint of discrimination

1    about the PACE test prior to the court decision in Washington,

2    D.C.  I wrote to the employment office in San Francisco,

3    California, about the test and had planned on suing.

4         "I wrote the court in Washington, D.C., and I, again,

5    wrote personnel office in San Francisco.  I never heard from

6    the court but I did receive a letter from San Francisco.  A

7    copy of the letter is enclosed."

8         And then there is attached to that letter a copy of

9    the card or sheet that you sent into the Office of Personnel

10   Managment asking to be put on the mailing list for information

11   about alternative examining procedures and a copy of the May

12   21st, 1981, letter you received from Christine Applegate as

13   well as a copy of Appendix B that you testified earlier you

14   had received.

15        Does that refresh your memory about when it was

16   that you contacted the court in 1983?

17        A    Right.  That does, yes.

18        Q    Now, that letter does say that you wrote to the court

19   in Washington, D.C., earlier than October 11th, '83.  Try to

20   remember as closely as you can when any such earlier letter

21   would have been sent to the court.

22        A    The earlier letter would have been sent as soon as

23   I heard of the lawsuit, the winning of the lawsuit.  That

1    is when I wrote the court.

2         FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

3            BY MS. WARD:

4    Q    Was that when you saw the advertisement in Jet magazine?

5    A    Right.  It was nearing that time.

6    Q    Would that communication have been addressed to 1900

7    E Street?

8    A    I guess so.  I can't recall.

9         FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

10           BY MR. SEYMOUR:

11    Q    Let me read to you from Appendix B, page 3, and this

12    is one of the sheets that were attached to your letter that

13    you sent into the court.  Quote, "Under the settlement, the

14    four named Plaintiffs will receive a total of $35,000 in back

15    pay among them.  Any class members who have filed charges of

16    discrimination against OPM, complaining of discrimination in

17    OPM's implementation or use of the PACE, will be entitled to

18    receive $3,000 in settlement of their back pay claims if they

19    bring themselves to the attention of the court immediately.

20    The way to do so is to send a letter to the Clerk of Court,

21    U.S. District Court, U.S. Courthouse, Washington, D.C. 20001."

22         So that letter has the address that you were supposed

23    to have written to to make a claim of discrimination or to

1    make a claim under Paragraph 21 of the consent decree.

2        A    Right, and that's where I sent the letter.

3        Q    Are you saying that you sent a letter to that address

4    and you also sent a letter to the Office of Personnel Manage-

5    ment at 1900 E Street?

6        A    Right.

7        FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

8        BY MS. WARD:

9        Q    Or did you sent a letter to the OPM office in San

10    Francisco?

11        A    I sent one there, too.

12        Q    Name the places where you sent a letter.  And where

13    is the letter?

14        A    I have had communications with the courts in Washing-

15    ton, and the E Street address and San Francisco.

16        Q    Now, where is the copy of the letter that you wrote

17    to the court after you received Appendix B?

18        A    The letter that I wrote, I do not have it.

19        Q    You do not have it.  Is there any reason why, that

20    you can think of why we do not have it?

21        A    There is no reason I can think of why you do not have

22    it.

23        Q    Can you tell us what you said in that letter to the

court in reponse to Appendix B?

A    No more than I had already complained and that I had already sent one into San Francisco prior to my hearing of the results of the court case.

Q    Was it a letter that you wrote back?

A    A letter that I wrote to them?

Q    Yes.

A    Yes.

Q    Do I take it that the first time you filled out this form that we talked about just a few minutes ago, Ms. Collins, the one that's dated January 24th, 1984, where you had to fill in the answers to specific questions, it's a three-page form, do you know which one I am talking about?

A    Yes.

Q    Okay.  The one that has Form for Additional Information From Class Members Who State They Filed Charges of Discrimination, and then it has Class Member and your name and then a series of questions.  Do you know what form I am talking about?

A    Yes, I do.

Q    Was this the first time you filed out this form when you sent it--

A    It was the first.

1       Q     It was the first time in January of 1984, that was

2   the first time you filled out that form?

3       A     Right.

4            MS. WARD:   Thank you.

5            MR. SEYMOUR:   Plaintiffs make a copy of that form,

6   actually it is the original, signed by her of that form with

7   her attached September 1980 letter to the U.S. Personnel

8   Office Exhibit 1 to the deposition.

9                              (Whereupon, the document was
                               marked Deposition Exhibit 1,
10                             for identification.)

11           MR. SEYMOUR:   The Plaintiffs make as Exhibit 2 to the

12  deposition a letter of October 18th, 1983, from the Law

13  clerk for Judge Green in this case to me, telling me that you

14  had written to the court and enclosing a copy of your letter

15  and the attachments to your letter.

16           Now, attached to the law clerk's letter is your

17  October 11th, 1983, letter to the court, marked Second Request

18  up at the top; a copy of the sheet that you sent to the

19  Office of Personnel Management asking to be placed on a

20  mailing list; a copy of the May 21st, 1981, letter of Christine

21  Applegate to you; and a copy of two pages from Appendix B to

22  the Order Granting Preliminary Approval to the Consent Decree,

23  and that six-page set of documents will be Exhibit 2 to the

1   deposition.

(Whereupon, the document was
marked Deposition Exhibit No. 2,
for identification.)

4   MR. SEYMOUR:  Ma'am we'll make one final check of

5   the record to see if there is anything that can be found

6   about that.  If there is, we'll need to be back in touch with

7   you again to ask you some more questions about whatever it is

8   that we do find.

9   Can you tell me whether you will continue to be

10   available at this number over the next week or two?

11   THE WITNESS:  Yes, I will.

12   MR. SEYMOUR:  And what times of day are you most

13   likely to be reachable there?  Is this your home number or

14   is it a relative's number right now?

15   THE WITNESS:  This is a friend's number.  I won't

16   say now that I will be here.  I'll contact you.  I'll let

17   you know tomorrow in the mail where I will be and you tele-

18   phone number you can contact me at.

19   MR. SEYMOUR:  That will be fine.  Do you have any

20   further questions at this time?

21   MS. WARD:  I have no further questions at this time.

22   Thank you.

23   MR. SEYMOUR:  Ms. Collins, you have a right to

1   decide whether you want to see the transcript of your deposi-

2   tion and check it yourself for any possible mistakes in putting

3   down what you said, and then to sign a signature sheet that

4   will be sent along to you or instead just to waive your signa-

5   ture and trust the court reporter to get the job done correctly.

6   In most cases, we recommend that people check the transcript

7   of the depositions themselves and sign the sheet.

8       I do want to emphasize that this is a chance only to

9   correct things like typing errors. You cannot change your

10  testimony in it. You can only point out a mistake that was

11  made in taking down what it was that you actually said today.

12  But it is your decision to make.

13      Do you want to see the transcript and sign the sheet

14  or do you want to waive signature and trust to the court

15  reporter to get it done right?

16          THE WITNESS:  I would like to see the transcript.

17          MR. SEYMOUR:  Thank you very much.

18          MS. WARD:  Thank you.

19          (Signature not waived.)

20          (Whereupon, at 6:19 p.m., the taking of the deposition

21  concluded.)

22

23

LER REPORTING CO., INC.
) Massachusetts Avenue, N.E.
shington, D.C.  20002
)2) 546-6666

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and with corrections made by me, if any, the same is a true record of the testimony given by me.

_____

JANIE L. COLLINS

Subscribed and sworn to before me this _____ day of _____, 198 .

_____

Notary Public in and for the

My commission expires

CERTIFICATE OF NOTARY PUBLIC

I, William D. McAllister, the officer before whom
the foregoing deposition was taken, pages 1   through 49
do hereby certify that the witness, JANIE L. COLLINS,
whose testimony appears in the foregoing deposition was
duly sworn by me; that the testimony of said witness was
taken by me and thereafter reduced to typewriting by me or
under my direction; that said deposition is a true record of
the testimony given by the witness; that I am neither counsel
for, related to, nor employed by any of the parties to the
action in which this deposition was taken; and further
that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially or
otherwise interested in the outcome of the action.

William D. McAllister, CM
Notary Public in and for the
District of Columbia

My commission expires October 1, 1989.

Index page _1_ of _1_

## INDEX OF EXHIBITS

Exhibit pages _1_ thru _14_

Title of Case: _Angel M. Luevano, et. al., vs. Donald J. Devine, et. al.,_

Place: _Washington, D.C._

Date: _November 28, 1984._

_Deposition of Janie L. Collins._

| EXHIBIT NUMBER | PAGE NUMBER | EXHIBIT NUMBER | PAGE NUMBER |
|---|---|---|---|
| #1 | 1 | | |
| #2 | 6 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,    )
       )
    Plaintiffs,    )
       )
v.        )    Civil Action No. 79-0271
       )
ALAN CAMPBELL, Director,    )
  Office of Personnel    )
 Management, et al.,    )
       )
    Defendants.    )
_____)

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:   Ms. Janie L. Collins
        537 Jones Street, Apt. 8573
        San Francisco, California 94102

1. State each date on which you took the PACE, as
closely as you can recall. _____
_____ *August, 1980* _____

2. Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? *U.S. Secret Service agent stole it out*
*of my room.*
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3. What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? *Sept, 1980*
To whom did you send this complaint? *U.S. Personnel office*
*450 Golden Gate - San Francisco, CA.*
What was the address to which you sent the complaint? _____
*450 Golden Gate - San Francisco, CA.*

Did you ever receive a response to your complaint? *yes. After*
*a second notice*
If you did receive a response, what did it say? _____
*Denied that the winning case applied to me*
*after I asked them to compensate me as a result of my*

Deposition Exhibit No.
Deposition of Collins
W. McAllister, Reporter
11-78-04

*filing a previous complaint with them.*

What was the date of the response? _May 21, 1981_

Do you have a copy of your complaint and of the responses you

received? _yes_ (PLEASE ATTACH COPIES OF ALL

DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

    4. Did you ever file another complaint against the

PACE? _No_ If so, state the dates of each such

complaint: _____

To whom did you send these complaints? _____

_____

_____

What was the address to which you sent these complaints?

_____

_____

_____

_____

Did you ever receive any responses to these complaints? _____

If you did receive any responses, what did they say? _____

_____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE

TO THESE COMPLAINTS.)

    5. Did you ever file a lawsuit in Federal Court under

Title VII of the Civil Rights Act of 1964, challenging the

government's use of the PACE as racially or ethnically discrim-

inatory? _No_ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed: _____

_____ City _____ State _____

Name and address of your attorney, if any:

_____

_____

City _____ State _____ Zip _____

Telephone Number: _____

Has this case been decided? _____ If so, what was the

decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY

OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

- 2 -

6.  State your telephone number: _None_

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: _1-24-84_   Signature: _Janie L. Collins_

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>   Rights Under Law
> 520 Woodward Building
> 733 Fifteenth St., N.W.
> Washington, D.C.  20005

SiRs:
I am having problems out of San Francisco FBI and
United States Secret Service Agent stealing records out
of my room and out of Court files. I can prove this
matter. I was forced to Call the police & report
the matter. Police was aware of their conduct,
Just To prove the problems I am having out of them,
I Filed a docketing statement in U.S. Circuit Court
9th Cir. in S.F. CA. The District Attorney & FBI
Stole the docketing statement and now the
appeal is dismiss. A Copy of the first page
of the D/statement is attached alone with
the Letter Stating that I never filed one
and a Copy of the dismissal. I have to walk
around with my Papers in a piece of Luggage. ③

_Janie L. Collins_
JANIE L Collins

- 3 -

Jones #8523
San Francisco, CA 94102

Sept, '80

To: U.S. Personnel office —450 Golden Gate —San Francisco, CA

I Janie L. Collins feel that the Pace Exam. that I took in San Francisco is unfair to negro people. As one being one question in particular shows validity + reliability for measurement of mental knowledge because the question is ambigious. It appears that you are desiring to measure the skill for a Doctor; but, the question can also be used to measure the skill of a plain simple unskill house Cleaning woman after one place the sentences (statements) in order.

ex:
(1) spill the solution    ③ put a solution on it
② Clean the area         ④ Lay substance on it

Due to the fact that I am new in the area, I have few friends. One of my best friends is a Remole house cleaner; therefore, I naturally looked at the sentence as being a Cleaning woman who happened to have to clean an area where a solution had been spilled. I thought her to have to put a solution cleansing agent on the floor to clean it and afterward layed a coat of wax on the floor. After I finished putting the sentences together, I thought to myself, do a Cleaning woman have to go to school 4 years and take this type of test to clean a house? At that moment, I immediately

(4)

taught about a doctor. It allows the question to
set the test to be unfair for me a negro black
man. I had waisted my time as the question
that was ambiguous and should not be
included on any sort of test. My parents
no friends are not doctors. There are few black
doctors in the U.S.A.

I am no dummy. The test is unfair.
May I hear from you soon regarding this
matter.

Thank you in advance.

Very truly yours,

*JAMIE L. Collins*

Name _Janie Collins_
Address _537 Jones #8523_
_San Francisco, CA 94102_
City & State _CA_  _94102_
Zip

 

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

## BUSINESS REPLY MAIL
FIRST CLASS   PERMIT NO. 14036   WASHINGTON, D.C. 20005

POSTAGE WILL BE PAID BY ADDRESSEE

Lawyers' Committee for Civil Rights
  Under Law
Richard T. Seymour
520 Woodward Building
733 Fifteenth Street, Northwest
Washington, D.C. 20005

United States District Court
for the District of Columbia
Washington, D. C. 20001

October 18, 1983

Chambers of
Joyce Hens Green
United States District Judge

Richard T. Seymour, Esq.
Lawyers' Committee for Civil Rights Under Law
733 15th Street, N.W.
Washington, D.C.  20005

        Re:  Luevano v. Campbell, C.A. No. 79-0271

Dear Mr. Seymour:

    Judge Green has asked me to forward to you the enclosed letter
from Ms. Janie L. Collins, who claims to be a class member entitled
to benefit under the consent decree in this case.  Ms. Collins
refers to a prior letter to the Court, but we have no record of
any such communication.  In support of her claim, Ms. Collins has
attached to her letter the first two pages of the February 26, 1981
notice to potential class members; she did not include the remainder
of the notice.  Please advise the Court of her status under the
settlement.

                                Sincerely,

                                Kim Sievwright

                                Kim Sievwright
                                Law Clerk

cc:  Barbara Wood, Esq.
     Civil Division
     U.S. Department of Justice
     Washington, D.C.  20530
     (with enclosures)

     Ms. Janie L. Collins
     537 Jones Street, #8573
     San Francisco, California  94102

Deposition Exhibit No. 2
Deposition of Collins
W. McAllister, Reporter

537 Jones #8573
San Francisco, CA
94102
October 11, 1983

Clerk of Court
U.S. District Court
U.S. Court House
Washington, D.C. 2001

Dear Sirs:

I made a complaint of discrimination about the Pace test prior to the Court decision in Washington, D.C. I wrote to the employment office in San Francisco, CA about the test and had planned on suing.

I wrote the court in Washington, D.C. and I again wrote the personnel office in San Francisco. I never heard from the Court but I did receive a letter from San Francisco. A copy of the letter is enclosed. The letter states that only plaintiffs in the case of Luevano v. Campbell are entitled to $3,000 benefits. That is not what the Court order stated. The Court order stated that "any Class member" could and is entitled to the $3,000.

I can well assume that the San Francisco office lied because they knew that I filed a discrimination complaint and they received it and don't want to pay off.

I am asking that the court award me the $3,000 that is due me. I do feel that I am entitled to more money and that I should be paid an additional amount for having to wait for an answer from this Court which I have never received.

I also asked to be put on the mailing list which I have never received any correspondence from you.

May I hear from you soon regarding this matter.

Thank you in advance for an answer.

Very truly yours,

JAMIE L. COLLINS

U.S. Office of Personnel Management
Office of the General Counsel
Room 5H30
P.O. Box 7559
Washington, D.C. 20044

Dear Sir or Madam:

I am a class member in the case of <u>Luevano</u> v. <u>Campbell</u>, and I request
to be put on the mailing list for information about alternative examining
procedures and test training programs. I understand that this will not
involve any charge to me.

PRINT NAME: Janie L. Collins

PRINT ADDRESS: 537 Jones #8573

CITY San Francisco

STATE California    ZIP 94602



United States of America
## Office of
## Personnel Management

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To FR:PT:TP:bc                    May 21, 1981                    Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102

Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE examination.

Only the original complainants in the plaintiff class of Luevano vs. Campbell were entitled to monetary compensation and job offers in which they are interested. As a class member, you had the right to file an objection to this settlement if you believed that it was not fair to the class, or to some particular part of the class. To be considered, written objections had to be received by the U.S. District Court in Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions of the settlement which may be of interest to you. If you fill out the attached form you will be put on a mailing list and be informed of the opportunity to apply for Federal jobs under new alternative examining procedures which are being developed. You will also be informed of the opportunity to take training courses intended to provide assistance in preparing for future examinations of the PACE during the interim period while the examination is being phased out. Mailings on these opportunities will take place every six months until the last alternative examining procedure is put into effect. There will be no charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at all Office of Personnel Management Federal Job Information Centers. The Federal Job Information Center closest to you is located at 450 Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

Sincerely,

Christine M. Applegate, Chief
Professional/Trades & Crafts Section

Attachment

APPENDIX B TO THE ORDER GRANTING
PRELIMINARY APPROVAL TO THE CONSENT DECREE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
              Plaintiffs,          )
                                   )
       v.                          )    Civil Action No. 79-0271
                                   )
ALAN CAMPBELL, Director,           )              FILED
Office of Personnel                )
Management,                        )         FEB 26 1981
                                   )
              Defendant.           )    JAMES F. DAVEY, Clerk
_____)

NOTICE TO ALL BLACKS, AND TO ALL HISPANICS,
WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL
AND ADMINISTRATIVE CAREER EXAMINATION (PACE)
FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS
ON OR AFTER MAY 19, 1975

    This Notice is to provide you with the information you
need about the settlement of this lawsuit, and how this settlement
may affect your rights, so that you will be able to take advantage
of the rights given you by the settlement or to file an objection,
if you believe that the settlement is unfair to the class or to
any particular part of the class.

    This lawsuit was filed in the U.S. District Court for the
District of Columbia in January 1979, to enforce the provisions of
Title VII of the Civil Rights Act of 1964. The Complaint alleged
that the U.S. Office of Personnel Management ("OPM") had violated
Title VII of the Civil Rights Act of 1964 by using its
Professional and Administrative Career Examination ("PACE") to
test applicants for approximately 118 entry-level Federal job
categories. OPM's Answer to the Complaint denied that its use of
this test was unlawful.

    This lawsuit has now been settled. The Consent Decree
containing the settlement has been given preliminary approval by
the Court, so that notice of the settlement could be provided to
class members and class members could decide whether they want to

...is determined in an enforcement proceding that the examining
procedure has not been properly validated the agency shall be
liable for full relief under Title VII.

The special programs in question include the Outstanding
Scholar program, the College Co-operative Student program, a
bilingual/bicultural certification program, a training program to
help class members who will be taking the PACE in the future,
special recruiting programs targeted at PACE job categories, and
similar programs.  If these special programs turn out to be
inadequate to accomplish their purpose in a practical manner, new
programs can be negotiated.

The obligations of agencies to use these special programs to
overcome adverse impact can be enforced under the Decree.  There
are detailed provisions governing such situations, backed up by
reporting provisions which guarantee that plaintiffs will have the
necessary information to keep track of these agencies' progress
under the Decree.  Class members who believe that they may have
been harmed by a violation of the Decree may also bring their
claims to the plaintiffs' attention, and ask plaintiffs to
prosecute their claims throught the enforcement provisions of the
Decree.  If plaintiffs decide not to handle such a claim under the
enforcement provisions of the Decree, the class member may still
proceed with his or her own charge of discrimination or lawsuit.

While this case does not include the use of the PACE for
promotional purposes by some agencies, part of the settlement in
this case rquires that all agencies immediately stop using the
PACE for such purposes.

Under the settlement, the four named plaintiffs will
receive a total of $35,000 in back pay among them.  Any class
members who have filed charges of discrimination against OPM,
complaining of discrimination in OPM's implementation or use of
the PACE, will be entitled to receive $3,000 in settlement of
their back pay claims if they bring themselves to the attention of
the Court immediately.  The way to do so is to send a letter to
the Clerk of Court, U.S. District Court, U.S. Court House,
Washington, D. C.  20001.  The plaintiffs and the class members

.. 1 ..

**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 4, 1984

Ms. Janie L. Collins
537 Jones Street, Apt. 8573
San Francisco, Calif.  94102

Re:  Luevano v. Campbell

Dear Ms. Collins:

This morning, I received your December 1, 1984 letter.  I have spoken with Ms. Ward, and we are sorry that we cannot consider your deposition incomplete.  At the beginning of the deposition, you swore to tell the whole truth.  You never said, during the course of your deposition, that you did not want to answer anything fully because friends of yours were in the room.  If you had told us this, we could have made other arrangements.  We did not even know that other persons were present.  In any event, it seems to us that you could have asked your friends to let you answer in privacy.

It is correct that you let us know, a few days before you were to move, that you would be moving and that your home telephone number would no longer be available.  However, the attorney for the government was not able to schedule the time for your deposition during those few days.

I am sending a copy of your letter to me, and a copy of this response, to the court reporter to be attached to the transcript of your deposition.  In this way, the Court will know about the problem you raise.

Very truly yours,

Richard T. Seymour

RTS/lb

cc:  Barbara L. Ward, Esq.

Lawyers Committee
for Civil Rights under Law
1400 Eye St NW suite 400

507 Jervis St #3573
San Francisco, CA 94102
Dec 1, 1984

Washington, D.C. 20005

Dear Sirs: (Mr. Seymours)

You questioned me extensively about
U.S. Secret Service having stole legal papers
out of my room as I had indicated to you,
I was at a friends house and could not
answer your questions fully. Although, I
felt obligated to answer part of the ques-
tions regarding the matter. My friend and
her guests heard me answer the questions
regarding the issue. As a result of their
hearing the answers, it created some anxiet
and doubt in them about me. I cannot
live in this world alone, I need friends
and associates. My few true friends are
the ones who have put bread on my table
when federal police made attempts in
having me to starve to death. You
Know I am not lying.                    (13)

        I had given you a telephone number
to call me earlier. You refused to do
so. If you had called during that period
of time, you would, found me at home

close and resolved + answered your questions fully to the best of my ability.

I feel that you could have come to California to get answers to your questions or have me to come to Washington, D.C. after not calling me at the time I had access to a phone in my own residence.

If you desire answers fully to your questions from me, either you come to California or pay my expense to come to Washington, D.C., I don't object to answering your questions to the fullest extent. And until I answer to the fullest extent that I desire I ask that you consider the deposition taken from me on Wednesday Nov. 28, 1984 as being incomplete due to special circumstances. (4)

May I hear from you soon regarding this matter.

Thank you in advance for your co-operation.

Very truly yours

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and with corrections made by me, if any, the same is a true record of the testimony given by me.



JANIE L. COLLINS

Subscribed and sworn to before me this 9th day of January, 1985.

OFFICIAL SEAL
CAROL J BARTON
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My comm. expires JAN 8, 1988

Notary Public in and for the
STATE OF CALIFORNIA

My commission expires 1/8/88



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

December 17, 1984

Ms. Janie Collins
537 Jones Street, #8573
San Francisco, Calif.  94102

Re:  <u>Luevano v. Campbell</u>

Dear Ms. Collins:

I have enclosed a copy of the transcript of your deposition
in this case.  Please read it carefully.  If any changes are neces-
sary in order to make the transcript an accurate statement of what
you said during your deposition, please mark the changes on the
errata sheet enclosed with this letter.  When you have finished,
take the Certificate and the errata sheets to a notary public,
sign them in front of the notary, and make sure that the notary
puts his or her seal on the documents.  Then mail the Certificate
and errata sheets back to me in the enclosed reply envelope.

If there are no changes to make, you can forget about the
errata sheets.  In any event, the copy of the transcript is yours
to keep.

I would like to have the sheets back to me in ten days, so
I would appreciate your taking care of this as quickly as possible.
We will let you know when the Court takes action.

Very truly yours,

Richard T. Seymour

RTS/lb
Enclosures

## E-R-R-A-T-A  S-H-E-E-T

To the deposition of _____ JANIE L. COLLINS _____.

The deponent having a right to make any changes deemed necessary

hereby makes the following changes into the deposition and states

the reasons for each change accordingly.

**PAGE NO.**   **LINE NO.**   **CHANGE** (State Reason for change after each)

DEPONENTS' SIGNATURE

**United States of America**
## Office of
**Personnel Management**

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To FR:PT:TP:bc                    May 21, 1981                    Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102

Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE examination.

Only the original complainants in the plaintiff class of Luevano vs. Campbell were entitled to monetary compensation and job offers in which they are interested.  As a class member, you had the right to file an objection to this settlement if you believed that it was not fair to the class, or to some particular part of the class.  To be considered, written objections had to be received by the U.S. District Court in Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions of the settlement which may be of interest to you.  If you fill out the attached form you will be put on a mailing list and be informed of the opportunity to apply for Federal jobs under new alternative examining procedures which are being developed.  You will also be informed of the opportunity to take training courses intended to provide assistance in preparing for future examinations of the PACE during the interim period while the examination is being phased out.  Mailings on these opportunities will take place every six months until the last alternative examining procedure is put into effect.  There will be no charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at all Office of Personnel Management Federal Job Information Centers.  The Federal Job Information Center closest to you is located at 450 Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

Sincerely,

Christine M. Applegate, Chief
Professional/Trades & Crafts Section

Attachment

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
P. O. Box 547
San Francisco, CA 94101

Court of Appeals Docket Number
_____
(if known)

*filed* ?
*May 26 Am*
*11.5*

1983 MAY 26  AM 11: 52

CIVIL APPEALS
DOCKETING STATEMENT

FILED _____
DOCKETED _____
DATE   INITIAL

Case Name: _Janie L. Collins_____

District Court or Agency: _U.S. Northern – San Francisco_
District Court/Agency Docket No.: _C82-3519_  District Judge: _E. F. Lynch_
Party or Parties filing appeal/petition: _Janie L. Collins – Plaintiff_

**Timeliness of Appeal or Petition for Enforcement or Review**
(1)  Date of entry of judgment or order appealed from: _4-15-83_

(2)  Date notice of appeal or petition filed: _5-16-83_

(3)  Authority fixing time limit for filing notice of appeal or petition:
Fed. R. App. P. 4(a)(1) _✓____  Fed. R. App. P. 4(a)(3); ____
Fed. R. App. P. 4(a)(4) _____  Fed. R. App. P. 4(a)(5): ____
Service date of any motion listed in Fed. R. App. P. 4(a)(4): ____
Other (specify) _____

(4)  Time limit for filing notice of appeal or petition: _30 days_

**Appeal From District Court**
(1)  Is the order appealed from a final order (i.e., does it dispose of
the <u>action</u> as to <u>all</u> claims by <u>all</u> parties)? _Yes_

(2)  If the order is not a final disposition, did the district court
direct the entry of judgment in accordance with Fed. R. Civ. P.
54(b)? _____

(3)  If not final, is the order properly appealable as an injunction under
28 U.S.C. § 1292(a)(1)? _____

(4)  If none of the above applies, what is the basis for seeking appellate
review? _____

**Review of Agency Decision**
If the appeal is from an agency decision, what statute or other authority
grants this court power to review that decision? _____

**Nature of Disposition Below:**
( ) Bench Trial                    (✓) Dismissal:
( ) Jury Verdict                   (✓) Lack of Jurisdiction
(✓) Summary Judgment               (✓) Failure to State a Claim
( ) Agency Order                   ( ) Failure to Prosecute
( ) Default Judgment               ( ) Other
( ) Grant/Denial of Injunction     ( ) Other (specify) _____

**Length of Trial or Hearing:** Equivalent of _____/_____ full days.

**Related Cases:** List all related cases pending in this Court of Appeals as
defined in Ninth Circuit Rule 13(b)(4): _____

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### P.O. Box 547
### SAN FRANCISCO, CALIFORNIA 94101

DATE: August 15, 1983

TO:     Janie Collins, Pro Per

FROM:   Clerk's Office, U.S. Court of Appeals for the Ninth
        Circuit

SUBJECT: Failure to Prosecute Appeal
         U.S. Court of Appeals Docket Number  83-1987
         Short Title  Janie Collins vs. City of San Francisco et al

        Our records indicate that you have failed to do the following
in a timely manner:

[  ] Pay the U.S. Court of Appeals docket fee in this case
[  ] Designate and order (including arrangements for payment)
     the court reporter's trial transcript
[  ] File an opening brief (including excerpt of record) in this
     court which meets the standards of FRAP and our Local Rules
[  ] Designate the trial court clerk's transcript
[XX] File the Civil Appeals Docketing Statement

Local Rule 19(b) provides:

     "When an appellant fails to timely file
     the record, pay the docket fee, file a
     brief, or otherwise comply with the rules
     requiring processing the appeal to hearing,
     the clerk will enter an order dismissing
     the appeal. The clerk will notify each
     appellant in writing of this provision of
     the rules."

        Unless, within fourteen days from the date of this letter,
the above referenced deficiencies are corrected, this appeal may
be subject to immediate dismissal under Rule 19(b) of the Local
Rules of the Ninth Circuit. If you are in default due to the
untimeliness of filing a brief, you must also submit a "motion for
leave to file a late brief." This office is of course not at
liberty to predict how the court will act upon such a motion.

CA9 - 010 (8/1/79)

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 13 1984

PHILLIP B. WINBERRY
CLERK, U.S. COURT OF APPEALS

JANIE L. COLLINS,

               Plaintiff-Appellant,

vs.

CITY OF SAN FRANCISCO POLICE DEPT.;
JACK BALLENTINE; COUNTY OF SAN
FRANCISCO GENERAL HOSPITAL; et al.,

               Defendants-Appellees.

C.A. NO. 83-1987

D.C. No. Cv-82-3519
Northern California

O R D E R

A review of the file in the above captioned case has
revealed that the appellant has failed to perfect the appeal
as prescribed by the Federal Rules of Appellate Procedure.

Pursuant to Rule 19(b) of the Rules of the Ninth Circuit,
this appeal is dismissed for failure to comply with the rules
requiring processing the appeal to hearing.

A certified copy of this order sent to the district court
shall act as and for the mandate of this court.

FOR THE COURT:

Phillip B. Winberry
Clerk of Court

BY: _Eliza Lau_
Eliza Lau
Deputy Clerk

**Office of
Personnel Management**

Sacramento Area Office
1029 "J" Street, Room 202
Sacramento, California 95814

In Reply Refer To:                                    Your Reference:

December 14, 1982

Janie L. Collins
537 Jones #8573
San Francisco, CA  94102

Dear Ms. Collins:

We regret to inform you that we are unable to locate your original
application for Biological Technician 0404-T.

In order for you to receive proper consideration, it will be necessary
for you to complete the enclosed Standard Form 171 and Supplemental
Qualifications Statement - Biological Technician.  Please leave this
letter attached to your papers.

Please accept our apologies for any inconvience this may cause.

Sincerely yours,

John R. Krabbenhoft
Chief, Staffing Services

Encl:



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

November 19, 1984

Ms. Janie L. Collins
537 Jones Street
Apt. 8573
San Francisco, Calif. 94102

                    Re:  <u>Luevano v. Campbell</u>

Dear Ms. Collins:

        I have tried to reach you on the telephone, at every number
we had for you.  Your old home telephone number---(415) 452-2057---
has a recording attached to it saying that your number has been
changed to (213) 567-7875.  The man at that number says that noone
there has ever heard of you.

        I am trying to arrange the day and time of your deposition.
We have agreed with the government to take it <u>next week</u>.  The
available days are Tuesday, Wednesday, and Thursday, November 27,
28, and 29.  We will be making calls between 5:00 P.M. and 7:00 P.M.
EST.  We can make calls earlier or later, if necessary.

        We <u>must</u> have a number where you can be reached, so that we
can arrange a specific time for the deposition.  Please call me
collect at area code 202, 371-1212.  If I am not there when you call,
ask for Susan Damplo, my assistant.

        Keep trying until you reach me.  You will lose your claim
if I do not hear from you.

                                Sincerely,

                                Richard T. Seymour

RTS/lb



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400  •  1400 EYE STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

September 28, 1984

Ms. Janie L. Collins
537 Jones Street
Apt. 8573
San Francisco, California 94102

                    Re:  Luevano v. Campbell
                         C.A. No. 79-0271 (D.D.C.)

Dear  Ms. Collins:

        You made a claim under ¶ 21 of the Consent Decree in this
case, requesting $ 3,000 in back pay and help in finding a Federal
job, based on your claim that you filed an administrative complaint
of racial or national-origin discrimination under Title VII of the
Civil Rights Act of 1964, challenging the Civil Service Commission's
or Office of Personnel Management's use of the PACE for hiring.

        We have met with the government several times about your
claim and the other claims that were filed, and both sides agree
that we need to obtain more information from you.  The Court has
entered an order which allows us to take a sworn statement---called
a "deposition"---from you over the telephone.  A court reporter, a
lawyer from the Justice Department, and I will all be on the line
with you.

        We want to schedule your statement at a convenient time,
and need to know the telephone numbers where you can be reached
during the day and early evening.  I have enclosed a form for you
to fill out and return to me.  A reply envelope is also enclosed.

        We need your co-operation in order to go ahead with your
claim.  If we do not hear back from you, we will have to recommend
to the Court that your claim be dismissed.

                                    Sincerely,

                                    Richard T. Seymour

                                    Richard T. Seymour

RTS/lb
Enclosures

RECEIVED FEB 2 1983

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,               )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )        Civil Action No. 79-0271
                                        )
ALAN CAMPBELL, Director,                )
  Office of Personnel                   )
  Management, et al.,                   )
                                        )
            Defendants.                 )
_____)

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:    Ms. Janie L. Collins
                 537 Jones Street, Apt. 8573
                 San Francisco, California 94102

1. State each date on which you took the PACE, as closely as you can recall. _____
_____ August, 1980 _____

2. Do you have any papers showing that you took the PACE at the time or times stated above, or telling you the results of your taking the test? *U.S. Secret Service agent stole it out of my room.*
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3. What is the date of the first complaint of racial or ethnic discrimination challenging the use of the PACE which you filed with the U.S. Civil Service Commission or the U.S. Office of Personnel Management? *Sept., 1980*
To whom did you send this complaint? *U.S. Personnel office*
*450 Golden Gate — San Francisco, CA.*

What was the address to which you sent the complaint? _____
*450 Golden Gate — San Francisco, CA.*
_____

Did you ever receive a response to your complaint? *yes, After a second notice*
If you did receive a response, what did it say?
*Denied that the winning case applied to me After I asked them to compensate me as a result of my*

Deposition Exhibit No. 1
Deposition of Collins
W. McAllister, Reporter
11-18-84

*filing a previous complaint with them.*

What was the date of the response? _May 21, 1981_

Do you have a copy of your complaint and of the responses you received? _Yes_ (PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

4. Did you ever file another complaint against the PACE? _No_ If so, state the dates of each such complaint: _____

To whom did you send these complaints? _____

_____

What was the address to which you sent these complaints?

_____

_____

_____

Did you ever receive any responses to these complaints? _____

If you did receive any responses, what did they say? _____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THESE COMPLAINTS.)

5. Did you ever file a lawsuit in Federal Court under Title VII of the Civil Rights Act of 1964, challenging the government's use of the PACE as racially or ethnically discriminatory? _No_ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed: _____

_____ City _____ State _____

Name and address of your attorney, if any:

_____

_____

City _____ State _____ Zip _____

Telephone Number: _____

Has this case been decided? _____ If so, what was the decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

- 2 -

6.  State your telephone number: _none_

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: 1-24-84   Signature: _Janie L Collins_

Mail this form and a copy of all attachments immediately to:



Richard T. Seymour
Lawyers' Committee for Civil
Rights Under Law
520 Woodward Building
733 Fifteenth St., N.W.
Washington, D.C.  20005

SiRs:

I am having problems out of San Francisco FBI and United States Secret Service Agent stealing records out of my room and out of Court files. I can prove this matter. I was forced to Call the police & report the matter Police was aware of their Conduct, Just To prove the problems I am having out of them, I filed a docketing Statement in U.S. Circuit Court 9th Cir. In S.F. CA. The District Attorney & FBI stole the docketing statement and now the appeal is dismiss. A copy of the first page of the D/statement is attached alone with the Letter Stating that I never filed one and a copy of the dismissal I have to walk around with my Papers in a piece of Luggage,

_Janie L Collins_

- 3 -



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520  •  733 FIFTEENTH STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

January 13, 1984

Ms. Janie L. Collins
537 Jones Street, Apt. 8573
San Francisco, California 94102

             Re:  <u>Luevano v. Campbell</u>

Dear Ms. Collins:

        I am one of the attorneys for plaintiffs in this lawsuit.
This is in reply to your letters to the Court.

        We do not have any record of a letter to the Court prior
to your October 11 letter.  I have checked the comments and objec-
tions filed by class members in connection with the final
approval of the Consent Decree, and have not found any objection
or comment by you.  I have checked our records of claims for
relief under ¶ 21 of the Consent Decree, and have not found any
claim from you.  I have checked our file of letters from class
members concerning the case, and have not found any letter from
you.  If you filed a comment or objection, or sent a letter to
the Court or to us, under a different name because of a change
of marital status or for some other reason, please let me know
the other name you used.

        Your letter to the Court stated your belief that every
class member is entitled to $ 3,000 under the Consent Decree.
This is not correct.  The Consent Decree provides for payments
to class members if, and <u>only</u> if, they meet the standards of ¶ 21
of the Consent Decree by having filed a complaint of discrimina-
tion based on race or national origin, challenging use of the
PACE for hiring, under the equal employment opportunity regula-
tions in effect at the time.  To be eligible for these payments,
the class member's complaint must still have been filed before
January 15, 1981 and must still have been active on that date.
This is because the provision was intended to compensate only
those class members who had an independent right to file their
own Title VII lawsuit on that date, without relying on the
charges in this case, and who lost that right because of the
Consent Decree herein.

Ms. Janie L. Collins
January 13, 1984
Page 2

If you have not already filed a claim for relief under ¶ 21 of the Consent Decree, there is a serious question whether a claim can now be accepted. The May 21, 1981 letter to you from the San Francisco office of the Office of Personnel Management enclosed a copy of Appendix B to the February 26, 1981 Order granting Preliminary Approval to the Consent Decree. That Appendix stated at the bottom of p. 2:

> Any class members who have filed charges of discrimination against OPM, complaining of discrimination in OPM's implementation or use of the PACE, will be entitled to receive $ 3,000 in settlement of their back pay claims _if they bring themselves to the attention of the Court immediately._ The way to do so is to send a letter to the Clerk of Court, U.S. District Court, U.S. Court House, Washington, D.C. 20001.

(Emphasis supplied). Thus, you were on notice shortly after May 21, 1981, of the need to make such a claim promptly.

We have today agreed with the Government that you should be sent a copy of the enclosed questionnaire, so that you will have an opportunity to state the facts concerning your claim. The government reserves the right to challenge your claim as untimely, but both sides agree that it makes sense to find out what the facts are first. If your claim does not meet the standards of ¶ 21 of the Consent Decree, there would be no need to ask the Court to resolve the question of timeliness.

Please fill out the enclosed form, attach to it a clear, legible copy of all the documents described, and send it back to me right away. I have enclosed a postage-paid reply envelope for your use. Our office is moving in early February, so we need to receive your reply before then.

Very truly yours,

Richard T. Seymour

RTS/lb
Enclosures

cc: Hon. Joyce Hens Green
Barbara L. Ward, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
Plaintiffs, )
)
v. )      Civil Action No. 79-0271
)
ALAN CAMPBELL, Director, )
Office of Personnel )
Management, et al., )
)
Defendants. )
)

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:    Ms. Janie L. Collins
537 Jones Street, Apt. 8573
San Francisco, California 94102


1. State each date on which you took the PACE, as
closely as you can recall. _____

_____

2. Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? _____
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3. What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? _____
To whom did you send this complaint? _____

_____

What was the address to which you sent the complaint? _____

_____

_____

Did you ever receive a response to your complaint? _____
If you did receive a response, what did it say? _____

_____

_____

What was the date ⬤ the response? _____

Do you have a copy of your complaint and of the responses you
received? _____ (PLEASE ATTACH COPIES OF ALL
DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

    4.  Did you ever file another complaint against the
PACE? _____ If so, state the dates of each such
complaint: _____

To whom did you send these complaints? _____
_____

What was the address to which you sent these complaints?

_____
_____
_____

Did you ever receive any responses to these complaints? _____
If you did receive any responses, what did they say? _____
_____
_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE
TO THESE COMPLAINTS.)

    5.  Did you ever file a lawsuit in Federal Court under
Title VII of the Civil Rights Act of 1964, challenging the
government's use of the PACE as racially or ethnically discrim-
inatory? _____ If so, please state the following:

Name of the case: _____ No.: _____
Court in which the case was filed: _____
_____ City _____ State _____

Name and address of your attorney, if any:

_____
_____
_____ City _____ State ____ Zip _____

    Telephone Number: _____

Has this case been decided? _____ If so, what was the
decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY
OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

6. State your telephone number: _____

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: _____ Signature: _____

Mail this form and a copy of all attachments immediately to:

Richard T. Seymour
Lawyers' Committee for Civil
    Rights Under Law
520 Woodward Building
733 Fifteenth St., N.W.
Washington, D.C.  20005

United States District Court
for the District of Columbia
Washington, D. C. 20001

Chambers of
Joyce Hens Green
United States District Judge

October 18, 1983

Richard T. Seymour, Esq.
Lawyers' Committee for Civil Rights Under Law
733 15th Street, N.W.
Washington, D.C.  20005

Re:  Luevano v. Campbell, C.A. No. 79-0271

Dear Mr. Seymour:

Judge Green has asked me to forward to you the enclosed letter from Ms. Janie L. Collins, who claims to be a class member entitled to benefit under the consent decree in this case.  Ms. Collins refers to a prior letter to the Court, but we have no record of any such communication.  In support of her claim, Ms. Collins has attached to her letter the first two pages of the February 26, 1981 notice to potential class members; she did not include the remainder of the notice.  Please advise the Court of her status under the settlement.

Sincerely,

Kim Sievwright

Kim Sievwright
Law Clerk

cc:  Barbara Wood, Esq.
     Civil Division
     U.S. Department of Justice
     Washington, D.C.  20530
     (with enclosures)

     Ms. Janie L. Collins
     537 Jones Street, #8573
     San Francisco, California  94102

Deposition Exhibit No. 2
Deposition of Collins
W. McAllister, Reporter

537 Jones #8573
San Francisco, CA
94102
October 11, 1983

Clerk of Court
U.S. District Court
U.S. Court House
Washington, D.C. 2001

Dear Sirs:

I made a complaint of discrimination about the race test prior to the court decision in Washington, D.C. I wrote to the employment office in San Francisco, CA about the test and had planned on suing.

I wrote the court in Washington, D.C. and I again wrote personnel office in San Francisco. I never heard from the court but I did receive a letter from San Francisco. A copy of the letter is enclosed. The letter states that only plaintiffs in the case of Luevano v. Campbell are entitled to $3,000 benefits. That is not what the court order stated. The court order stated that "any class member" could and is entitled to the $3,000.

I can well assume that the San Francisco office lied because they knew that I filed a discrimination complaint and they received it and don't want to pay off.

I am asking that the court award me the $3,000.00 that is due me. I do feel that I am entitled to more money and that I should be paid an additional amount for having to wait for on answer from this court which I have never received.

I also asked to be put on the mailing list and I have never received any correspondence from you.

May I hear from you soon regarding this matter.

Thank you in advance for an answer.

Very truly yours,

Janie L. Collins

U.S. Office of Personnel Management
Office of the General Counsel
Room 5H30
P.O. Box 7559
Washington, D.C. 20044


Dear Sir or Madam:

I am a class member in the case of <u>Luevano</u> v. <u>Campbell</u>, and I request
to be put on the mailing list for information about alternative examining
procedures and test training programs. I understand that this will not
involve any charge to me.

PRINT NAME: Janie L. Collins

PRINT ADDRESS: 537 Jones #8573

CITY San Francisco

STATE California    ZIP 94102

United States of America
# Office of
## Personnel Management

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To   FR:PT:TP:bc

May 21, 1981

Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102

Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE examination.

Only the original complainants in the plaintiff class of Luevano vs. Campbell were entitled to monetary compensation and job offers in which they are interested. As a class member, you had the right to file an objection to this settlement if you believed that it was not fair to the class, or to some particular part of the class. To be considered, written objections had to be received by the U.S. District Court in Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions of the settlement which may be of interest to you. If you fill out the attached form you will be put on a mailing list and be informed of the opportunity to apply for Federal jobs under new alternative examining procedures which are being developed. You will also be informed of the opportunity to take training courses intended to provide assistance in preparing for future examinations of the PACE during the interim period while the examination is being phased out. Mailings on these opportunities will take place every six months until the last alternative examining procedure is put into effect. There will be no charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at all Office of Personnel Management Federal Job Information Centers. The Federal Job Information Center closest to you is located at 450 Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

Sincerely,

Christine M. Applegate, Chief
Professional/Trades & Crafts Section

Attachment

United States of America
## Office of
## Personnel Management

San Francisco Area Office
P. O. Box 7405
San Francisco, California 94120

In Reply Refer To FR:PT:TP:bc                    May 21, 1981                    Your Reference

Ms. Janie L. Collins
537 Jones Street, #8573
San Francisco, CA  94102


Dear Ms. Collins:

This is in response to your letter of May 2, 1981 regarding the PACE
examination.

Only the original complainants in the plaintiff class of Luevano vs.
Campbell were entitled to Monetary compensation and job offers in which
they are interested. As a class member, you had the right to file an
objection to this settlement if you believed that it was not fair to
the class, or to some particular part of the class. To be considered,
written objections had to be received by the U.S. District Court in
Washington, D.C. by May 1, 1981.

As a class member, you are, however, still entitled to other provisions
of the settlement which may be of interest to you. If you fill out the
attached form you will be put on a mailing list and be informed of the
opportunity to apply for Federal jobs under new alternative examining
procedures which are being developed. You will also be informed of
the opportunity to take training courses intended to provide assistance
in preparing for future examinations of the PACE during the interim
period while the examination is being phased out. Mailings on these
opportunities will take place every six months until the last alter-
native examining procedure is put into effect. There will be no
charge to class members for this service.

Copies of the complete Consent Decree are available for inspection at
all Office of Personnel Management Federal Job Information Centers. The
Federal Job Information Center closest to you is located at 450
Golden Gate Avenue, Room 1001.

If you need additional information, feel free to contact us again.

                    Sincerely,

                    Christine M. Applegate, Chief
                    Professional/Trades & Crafts Section


Attachment

537 James St. #8573
San Francisco, CA 94102
Nov. 6, 1984

Lawyers' Committee for Civil Right
1400 Eye St, NW Suite 400
Washington, D.C. 20005.

Dear Sir:
    I wrote to you recently informing you as to dates that
you could reach me. I even called your office several
times and gave you a number where you could reach
me.
    I never received a call from this office. At this time,
I feel that written deposition should be sent to me
because I have no phone, if you still desire to question me.
    This is not the first time that I have disagreed
with tests and methods of administring them. I at-
tempted to sue the County of Los Angeles, CA in 1976
Case #C157606 because of the person in charge not
locking the door to the testing room and allowed me
to come inside after instructions had been given. The
instructions were not repeated after I entered the
room. She had given instruction + information stating that
the first portion of the test was designed for
accountants and that it carried Little weight percentage.
I am not an accountant and worked on the
first portion of the test insted of working on
the other portions of the test. I missed passing
the test by 2 points. I attempted to sue &
the judge gave me 3 chances to strighten
the complaint out against the ob-
-1-

for both me & the Government that I did not qualify for
a Level 5 position when tested. I wanted them to Know
that the test was not properly designed as the reason
I didn't pass it.

I am asking that this Committee award me
$100,000.00 in addition to the $3000.00. Reason for
amount asked for is because of the time that
has passed and because the San Francisco office Lied to
me in their letter dated 5-21-81. The original
Letter from them is enclosed. I have already
mailed to you a duplicate copy of said Letter.
May I hear from you soon regarding
this matter.

Thank you in advance,

Very truly yours,

JANIE L. Collins

P.S. Even if you disagree that I should not be
Compensated no more than $3,000, then send
it.  Coll

-3-

87 Jones #8523
San Francisco, CA 94102

Sept, '80

To: U.S. Personnel Office — 450 Golden Gate — San Francisco, CA

I, Janie L. Collins feel that the Pace Exam that I took in San Francisco is unfair to negro people. Reasons being one question in particular shows no validity + reliability for measurement of mental knowledge because the question is ambigious. It appears that you are desiring to measure the skill for a doctor; but, the question can also be used to measure the skill of a plain simple unskill house Cleaning woman after one place the sentences (statements) in order.

Ex:
(1.) spill the solution     (3) put a solution on it
(2) Clean the area          (4) Lay substance on it

Due to the fact that I am new in the area, I have few friends. One of my best friends is a female house cleaner; therefore, I naturally looked at the sentence as being a cleaning woman who happened to have to clean an area where a solution had been spilled. I thought her to have to put a solution Cleansing agent on the floor to clean it and afterward layed a coat of wax on the floor. After I finished putting the sentences together, I thought to myself, do a cleaning woman have to go to school 4 years and take this type of test to clean a house? At that moment, I immediately

thought about a Doctor. I've become disgusted and felt the test to be unfair for me a negro Black woman. I had waisted my time on the question that was ambiguous and should not be included on any sort of test. My Parents and Friends are not Doctors. There are few Black Doctors in the U.S.A.

I am no dummy. The test is unfair.

May I hear from you soon regarding this matter.

Thank you in advance.

Very truly yours,

J. L. Coll

JANIE L. Collins

4



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,        )
                                 )
        Plaintiffs,              )
                                 )
        v.                       )    Civil Action No. 79-0271 *JHG*
                                 )
ALAN CAMPBELL, Director,         )    FILED
  Office of Personnel            )
  Management, et al.,            )    JUN  5 1981
                                 )
        Defendants.              )
                                      JAMES F. DAVEY, Clerk

*Exh. 4*

*FILED*

*JAN 22 1993*

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:


        1.  State each date on which you took the PACE, as
closely as you can recall.  _____ *1967* _____

_____

        2.  Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? ____ *No.* ____
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

        3.  What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? *Unknown*
To whom did you send this complaint? *Do Not Know*

_____

What was the address to which you sent the complaint? _____
*Unknown*

_____

Did you ever receive a response to your complaint? *No*
If you did receive a response, what did it say? _____

_____

_____

What was the date of the response? _____ *Unknown* _____

Do you have a copy of your complaint and of the responses you received? _____ *No* _____ (PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

    4. Did you ever file another complaint against the PACE? _____ *No* _____ If so, state the dates of each such complaint: _____

To whom did you send these complaints? _____

_____

_____

What was the address to which you sent these complaints?

_____

_____

_____

_____

Did you ever receive any responses to these complaints? _____

If you did receive any responses, what did they say? _____

_____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THESE COMPLAINTS.)

    5. Did you ever file a lawsuit in Federal Court under Title VII of the Civil Rights Act of 1964, challenging the government's use of the PACE as racially or ethnically discriminatory? _____ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed:_____

_____ City_____State_____

Name and address of your attorney, if any:

_____

_____

City_____ State____ Zip_____

Telephone Number: _____

Has this case been decided? _____ If so, what was the decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

6.  State your telephone number:  _816-363-1374_

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date:  _5/27/92_   Signature:  _Nancy L. Graner_

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>     Rights Under Law
> ~~520 Woodward Building~~  1400 'Eye' Street N.W.,
> ~~733 Fifteenth Street N.W.~~ Suit 400
> Washington, D.C.  20005

Please use the enclosed business reply envelope.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
   individually and on behalf of )
   all others similarly situated, )
)
               Plaintiffs, )
)
        v. )
)
CONSTANCE HORNER, Director, )
   U.S. Office of Personnel )
   Management, et al., )
)
           Defendants. )

RECEIVED DEC 2 1 1987

C. A. No. 79-0271

APPEAL BY CLASS MEMBER FROM
OBJECTION TO BACK PAY CLAIM

PRINT NAME: _Nancy L. GRaves_

     If you want to have the Court consider your back pay
claim and overrule the objection to your claim, fill out this
form to the best of your knowledge and mail or deliver it to Mr.
Seymour at the address shown in the attached Notice.  Please
print all information.  If the space provided is not enough, you
may attach additional sheets.  Mr. Seymour must receive this form
by January 29, 1988, or your appeal will not be considered.

     1. Is the statement of facts in Mr. Seymour's objection
letter accompanying this form:

           (a) right? _____

           (b) wrong in some respect? __X__ If so,

     explain what is wrong in the statement of facts:

_I did NOT Receive the 6-5-81 Request for_
_fURTHER INfoRMATioN._

2. State why you think the objection should be dismissed by the Court, and why you think you should share in the back pay award: I think the objection should be dismissed by the Court, and that I should share in the back pay award. The PACE Test was discriminatory and I feel I was discriminated against by OPM in that the test was biased. If at the time I took the test., I had been successful, I would have been advanced in my career, to a higher position. Since I did not pass the test successfully, I have been stifled in my career as a result of the biased PACE Exam of OPM.

Print your name: _Nancy L. Graves_

Print your mailing address: _5845 Blue Hills Road_
_Kansas City, Missouri 64110_

- 2 -

City _Kansas City_____ State _MO___ Zip _64110___

Social Security Number: _591- 62- 7237_____

Telephone number (home): Area Code _816__ Number _363-1374__

(work): Area Code _816__ Number _926- 7123__

These statements are made under the penalties for perjury.

Signature: _Nancy L. Graves_____

Date: _12-3-87_____

NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

     1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-SIDERED.

     2. THIS FORM MUST BE MAILED TO:

          Richard T. Seymour
          Lawyers' Committee for Civil Rights Under Law
          1400 'Eye' Street N.W.
          Suite 400
          Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY JANUARY 29, 1988, IT WILL NOT BE CONSIDERED.

- 3 -

LETTER REPRINTED FROM COMPUTER FILE



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.
TELEX: 205662 SAP UR
FACSIMILE: (202) 842-3211 or (202) 842-0683

November 25, 1987

Ms. Nancy L. Graves
5845 Blue Hills Road
Kansas City, Missouri 64110

Re: Luevano v. Horner: Your Claim Under
Paragraph 21 of the Consent Decree

Dear Ms. Graves:

You have filed a claim under ¶ 21 of the Consent Decree. The enclosed Explanation contains detailed information about this provision, and about your rights.

The lawyers on both sides of the case have now completed their work on all of the claims filed under ¶ 21. Both sides have agreed that you do not have a good claim under ¶ 21, for the following reasons:

On April 10, 1981, you wrote to the Clerk, to say that you had charges pending against OPM's use of the PACE. You did not provide any other information. You never answered my June 5, 1981 request for further information, although I warned you that failure to answer would result in the forfeiture of your claim.

Sincerely,

Richard T. Seymour



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

Nancy Graves
5845 Blue Hills Road
Kansas City, Missouri  64110

June 5, 1981

Re:  Luevano v. Campbell
     C.A. No. 79-0271 (D.D.C.)

Dear *Ms. Graves,*

        I am one of the lawyers for the blacks and Hispanics
who filed this lawsuit.  I am writing this letter to you with
the approval of the Court.  You have stated that you filed an
administrative charge of discrimination with the U.S. Civil
Service Commission (subsequently called the U.S. Office of
Personnel Management), challenging the government's use of
the Professional and Administrative Career Examination (the
"PACE") as racially or ethnically discriminatory.  If you can
prove that you filed such a charge on or before January 15,
1981, and that it is still alive either in the administrative
process or in Court, you would be entitled to an award of
$3,000 in back pay and to help in finding a suitable Federal
job.

        We need to obtain more information from you, so that
the government can check its records on your complaint.  The
enclosed form will help us to find these records and to deter-
mine whether you are entitled to this relief.  Please fill it
out right away, and attach copies of all of the documents you
possess about your complaint of discrimination, any responses
you received or additional information you sent in, and about
any court case you may have filed.  Send them to me right away.
If I do not receive the form from you within thirty days after
the date stated on this letter, you will forfeit any right to
back pay which you might otherwise have had.  DO NOT TAKE A
CHANCE WITH YOUR RIGHTS.  FILL OUT THE FORM AND SEND IT IN
WITHIN THE NEXT DAY OR TWO.  If you do not have all of the
necessary documents yourself and you have to request some of
them from other persons, send in the form without waiting for
the documents but state on the form that you will send the
documents along in a few days.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

June 5, 1981
Page Two


Your claim for the special relief of $3,000 and help
in finding a Federal job may be successful or unsuccessful,
depending on the facts.  We need to know right away whether
you want to make a conditional objection to the Consent Decree,
so that you would have no objection if you later turn out to
be entitled to this relief, and would have an objection if it
later turns out that you are not entitled to this relief.
Please write me at once, stating whether you want to see the
Consent Decree go into effect either way, or if you want to
object to it unless you obtain the $3,000 in back pay and help
in finding a suitable Federal job.  IF YOU HAVE ANY OTHER
OBJECTION, PLEASE WRITE TO ME RIGHT AWAY.  You can use the
attached form for objections.  Any objections you have will be
considered by the Court if I receive them by June 15, 1981.
There will be a hearing for further objections on June 16, 1981,
at 10:00 A.M. in Courtroom 18, United States Court House, Third
and Constitution, N.W., Washington, D. C.  (Before the hearing
the courtroom will be open at 9:00 A.M. for a meeting between
class members and the lawyers for the plaintiffs.)  You do not
have to attend the hearing, but are welcome to do so.  If you
do intend to attend the hearing, be sure to be in the courtroom
by 9:00 A.M. for the meeting.

If you have any questions please call me at (202) 628-
6700.

Sincerely,

Richard T. Seymour

RTS/ra

5845 BLUE HILLS ROAD
KANSAS CITY, MISSOURI  64110
10 APRIL 1981

CLERK OF COURT
U.S. DISTRICT COURT
U.S. COURT HOUSE
WASHINGTON, D.C.  20001

DEAR SIR:

MY NAME IS NANCY L. GRAVES, AND I HAVE FILED CHARGES OF
DISCRIMINATION AGAINST OPM, COMPLAINING OF DISCRIMINATION
AGAINST OPM, IN OPM'S IMPLEMENTATION OR USE OF THE PACE EXAM
AND THEREFORE FEEL THAT I AM ENTITLED TO $3000.00 IN SETTLEMENT
OF CLAIM.  I AM A CLASS MEMBER IN THE CASE OF LUEVANO V.
CAMPBELL.

NANCY L. GRAVES

816-363-1265  or 816-926-7294

5

Cardinal®

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                )
                                         )
    individually and on behalf of        )
    all others similarly situated,       )
                                         )
                        Plaintiffs,      )
                                         )
        v.                               )     C. A. No. 79-0271
                                         )
CONSTANCE HORNER, Director,              )
    U.S. Office of Personnel             )
    Management, et al.,                  )
                                         )
                        Defendants.      )

DEC 0 8 1987

Exh. 5

JHG

F I L E D

JAN 22 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

APPEAL BY CLASS MEMBER FROM
OBJECTION TO BACK PAY CLAIM

PRINT NAME: Mary McClarity

If you want to have the Court consider your back pay
claim and overrule the objection to your claim, fill out this
form to the best of your knowledge and mail or deliver it to Mr.
Seymour at the address shown in the attached Notice.  Please
print all information.  If the space provided is not enough, you
may attach additional sheets.  Mr. Seymour must receive this form
by January 29, 1988, or your appeal will not be considered.

        1. Is the statement of facts in Mr. Seymour's objection
letter accompanying this form:

                (a) right? _____

                (b) wrong in some respect? __✓__ If so,

        explain what is wrong in the statement of facts:

I think the statement should be made in
my behalf because I can't remember if I stated a
date or year. It's been several years and you

didn't write me at any time stating that I wasn't
among the plantiff in this suit. You wrote to
me and stayed in contac, with me stating
how the case was progressing through the
years. You asked us to appear in D.C. Court
to witness the case, I wasn't able to go in
person. I wrote a letter concerning the problem you
were facing in the case, you were fighting for our
rights. As a citizen of America, and the justice we are now
about to receive from the back pay award.

2. State why you think the objection should be dis-
missed by the Court, and why you think you should share in the
back pay award: because As I stated at no time
did I Receive my letter saying I wasn't Eligible
to receive my share of the plaintiff settlement that is
now being made. As a plantiff in this case I feel that
I should still be considered as a plaintiff. you gave
my name to the management to send me
updated jobs in the Govt. that were open to
me. I would like to thank you for that. I
would like now to receive my part of this
settlement you have made in our behalf.

Print your name: Mery L. McClavity
Print your mailing address: P.O. BOX 334 Bucharaz, PA
3°113

- 2 -

3 Korea St.

City Buchanan _____ State Ga. _____ zip 30113

Social Security Number: 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

Telephone number (home): Area Code 404  Niece Number 646-8304

(work): Area Code 404  Number 646-3846

These statements are made under the penalties for perjury.

Signature: _Mr. Mary T. Rieling_

Date: Dec. 3, 87

**NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:**

1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-SIDERED.

2. THIS FORM MUST BE MAILED TO:

Richard T. Seymour
Lawyers' Committee for Civil Rights Under Law
1400 'Eye' Street N.W.
Suite 400
Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY <u>JANUARY 29, 1988</u>, IT WILL NOT BE CONSIDERED.

LETTER REPRINTED FROM COMPUTER FILE



**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.
TELEX: 205662 SAP UR
FACSIMILE: (202) 842-3211 or (202) 842-0683
November 25, 1987

Ms. Mary L. McClarity
3 Korea Street, Box 424
Buchanan, Georgia 30113

> Re: Luevano v. Horner: Your Claim Under
> Paragraph 21 of the Consent Decree

Dear Ms. McClarity:

You have filed a claim under ¶ 21 of the Consent Decree. The enclosed Explanation contains detailed information about this provision, and about your rights.

The lawyers on both sides of the case have now completed their work on all of the claims filed under ¶ 21. Both sides have agreed that you do <u>not</u> have a good claim under ¶ 21, for the following reasons:

Your Additional Information statement says that you think you took the PACE from 1961 to 1965. The PACE was not given for the first time until 1974. What you took was probably one of the earlier tests, such as the Federal Service Entrance Examination or one of its predecessors. In any event, the statute of limitations does not allow this case to reach back that far.

Sincerely,

Richard T. Seymour

This is a copy
of the letter I sent
you

3 Korea St Bay 424
Buckhorn, Pa 30143

RECEIVED SEP 2 3 1982

Dear Mr. Seymour

I'm writing this note to let
you know I will not be able to attend
the next week court but I would like for
you to know the Law should be change
for the better the people all people it's
shouldn't have to have a law for the
blacks & Hispanic people. we should
be consider as American Citizens and
not by Race, to me the Laws is made
for the white people only because we
have to go to Court for our right
if we get them, but the white don't
even have to go for a law to be change
for their right.

it made to sick to think we
as people have a differ number to show
what race we belong to.

This should be change complet
to for everone to be an American
Citizen and not by Code, if the Low was
for all people them it's would be like
this. you wouldn't be in Court now for us

if the law that were made yrs
ago for all, Do what saw Con to
Change This norm afale we have as
People I don't like it a bitter. Let
you know how it turn out


Mary L. McClisty
3 Kame St Box 4 24
Buchan Ga 30113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,           )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )     Civil Action No. 79-0271
                                    )
ALAN CAMPBELL, Director,            )
   Office of Personnel              )
   Management, et al.,              )
                                    )
          Defendants.               )
_____)

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:

1.   State each date on which you took the PACE, as
the years were these
closely as you can recall. *1961 to 1965*

2.   Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test?  *I couldn't find the letter till now I
suppose, they said my score were not
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)  high enough*

3.   What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? _____

To whom did you send this complaint? *To you*

What was the address to which you sent the complaint? *Same*
_____

Did you ever receive a response to your complaint? *Yes*

If you did receive a response, what did it say? _____
_____

                                                  Attachment B

What _____ the date of the response? _____

Do you have a copy of your complaint and of the responses you

received? _Yes_ _____ (PLEASE ATTACH COPIES OF ALL

DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

    4.  Did you ever file another complaint against the

PACE? _no_ _____ If so, state the dates of each such

complaint: _____

To whom did you send these complaints? _____

_____

_____

What was the address to which you sent these complaints?

_____

_____

_____

_____

Did you ever receive any responses to these complaints? _____

If you did receive any responses, what did they say? _____

_____

_____

_____

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE

TO THESE COMPLAINTS.)

    5.  Did you ever file a lawsuit in Federal Court under

Title VII of the Civil Rights Act of 1964, challenging the

government's use of the PACE as racially or ethnically discrim-

inatory? _no_ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed:_____

_____ City_____State_____

Name and address of your attorney, if any:

_____

_____

City_____State_____Zip_____

    Telephone Number: _____

Has this case been decided? _Yes_ If so, what was the

decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY

OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

- 2 -

6. State your telephone number (  4) 646-5560
a friend phone

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date: 9-18-82   signature: Mrs Mary L. McClinty

I have been Correspondence with you for
two years on this matter.

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>   Rights Under Law
> 520 Woodward Building
> 733 Fifteenth St., N.W.
> Washington, D.C.  20005

I am send you the dating the time
you wrote to me about the lawsuite. if you
file my notice then you can check the file and
find all my letter I wrote to you. thank for
answer my letter and soon as the did.

Mrs Mary L. McClinty
3 Korea St. Bx 337
Buchanan, Ba 31113

- 3 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          :

                    Plaintiffs,    :

          v.                        :        Civil Action No. 79-0271

ALAN CAMPBELL, et al.,             :

          Defendants.              :

NOTICE TO FORMER CLASS MEMBERS WHO MAY HAVE BEEN
AFFECTED BY THE GOVERNMENT'S INTERNAL USE OF THE
PROFESSIONAL AND ADMINISTRATIVE CAREER EXAMINATION
(PACE) FOR PROMOTIONS, SELECTIONS FOR UPWARD MOBILITY
OR INTERN PROGRAMS, AND FOR SIMILAR PURPOSES

This Notice is being provided to you because, from the
wording of the statement(s) you filed with the Court, it is
possible that you may have been affected by the government's
internal, noncompetitive use of the Professional and
Administrative Career Examination (PACE) for promotions,
selections for Upward Mobility or Intern programs, and for similar
purposes.  For the purposes of the settlement of this action, the
Court has decided to limit the class to blacks and Hispanics
affected by the use of the PACE for competitive external hiring,
and does not include those individuals who were federal employees
and took the PACE for promotion, upward mobility, or other similar
purposes.

     If you have been affected by the internal use of the PACE,
you are hereby notified that the Consent Decree in this action
forbids the government to make any further use of the PACE for
these internal purposes, and forbids the government to attempt to
defend the validity of its use of the PACE for such purposes in
any administrative or judicial proceeding.  The Consent Decree, as
you should already know, does not provide any personal monetary or
injunctive relief to anyone because of the internal use of the
PACE.

     While this case was pending, you were not required to take
any action in order to protect any right you may have had to
personal monetary or injunctive relief arising from the internal
use of the PACE.  Now that the Court has decided to exclude claims
of discrimination in internal use of the PACE from this case, you
must take prompt action to file your own charges of discrimination

because of such internal use, if you believe that you have a claim for relief against the government arising from the internal use of the PACE.

While it is not required that you be represented by a lawyer at any stage of the proceeding, and you are entitled to represent yourself, it is nonetheless strongly recommended that you consult an attorney immediately to ascertain if you have any claim for relief in this regard and, if so, to insure full protection for those rights.

Government regulations provide that the first step you must take is to make an "informal complaint" in writing to an Equal Employment Opportunity Counsellor at the agency (or the agency which is its successor) at which you were affected by such an internal use of the PACE, and to file a formal complaint within 15 days after you receive the Notice of Final Interview from the EEO Counsellor if the matter has not been resolved by then. Your time limit for contacting the EEO Counsellor starts running the day you receive this notice, and its length (anywhere from a few days to 90 days) depends on the circumstances of your case.

Blacks and Hispanics harmed by past use of the PACE for competitive external hiring do not have any right to file a new complaint of discrimination. They are bound by the settlement of this case. If they filed a Title VII charge of discrimination under 5 C.F.R. Part 300 or under 5 C.F.R. Part 713 (now 29 C.F.R. Part 1613) before January 15, 1981, and if that charge is still in the administrative or judicial process and they notify counsel for plaintiffs of these facts, they may be entitled to receive $3,000 in back pay or help in finding a suitable Federal job. The persons who have previously notified the Court or counsel for plaintiffs of these facts are having their claims investigated right now.

If you have any questions, you may call or write counsel for plaintiffs:

Richard T. Seymour
Lawyers' Committee for Civil Rights Under Law
520 Woodward Building
733 Fifteenth Street, N.W.
Washington, D.C.   20005
Tel. (202) 628-6700

This the _19<sup>t</sup>_ day of _November_ , 1981.

JOYCE HENS GREEN
United States District Judge

HOW TO TELL IF YOU TOOK THE PACE FOR "COMPETITIVE" PURPOSES
(WHICH MEANS THAT YOU HAVE NO RIGHT TO FILE A CHARGE OF
DISCRIMINATION) OR FOR "INTERNAL" OR "NONCOMPETITIVE" PURPOSES
(WHICH MEANS THAT YOU MAY HAVE A RIGHT TO FILE A CHARGE OF
DISCRIMINATION)

| Competitive Purposes (No Right to File a Charge of Discrimination) | Internal, or Noncompetitive, Purposes (May Have a Right to File a Charge) |
|---|---|
| The PACE was given only for selection into GS-5 and GS-7 jobs. | The PACE was given for consideration for jobs, and also for consideration for intern programs and training programs such as Upward Mobility. |
| Most persons taking the test were not then employed by the government. | Most persons taking the test were then employees of the agency having a job to be filled. |
| Minimum passing score of 70. | No minimum passing score. |
| Test-takers always received an official "Notice of Results" from the U.S. Office of Personnel Management (or the former U.S. Civil Service Commission). Candidates who did not achieve a score of 70 or more were not told their numerical score, but were given a sheet saying that their scores were "1A", and the reverse side of the sheet explained that this was not a passing score. | Test-takers did not receive an official "Notice of Results" from OPM or CSC. Their scores were simply added to the other criteria used by the agency with the job or program. The agency with the job or program frequently reported the numerical score to the test-taker. There were no sheets saying that a score was "1A". |
| Passing candidates were ranked on the basis of test score. | Test scores could only be used as one of two or more criteria for ranking. |
| Passing candidates were placed on civil service registers. | Civil service registers were not used. |
| Successful candidates could be competing for more than one job category at more than one agency. | Normally, successful candidates competed for one training program (such as Upward Mobility) or one job category at one agency. The agency in question was usually the agency where they already worked, although there could be inter-agency transfers. |
| The process of getting a position through use of the PACE was not part of the agency's merit promotion program. | The process of getting a job, or of getting into a training program, was part of the agency's merit promotion program. |



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET. NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 4, 1981

Mary L. McClority
3 Korea St., Box 424
Buchanan, GA  30113

          Re:  Luevano v. Campbell
               C.A. No. 79-0271 (D.D.C.)

Dear *Ms. McClority*.

        I am one of the attorneys for the blacks and Hispanics
who filed this lawsuit against the government.  I am writing
this letter to you with the approval of the Court, to explain
that your objection or comment was received by the Court after
the May 1 deadline for objections.

        The ideas expressed in your statement will, however, be
considered by the Court because a number of other class members
made similar statements before the deadline.  The Court must
decide whether the Consent Decree is fair to the class and should
be approved, or whether it is inadequate and should be rejected.
One of the basic elements in this decision will be the question
whether the basic trade-off in the Consent Decree--our agreement
to drop our original demand for classwide back pay and racial
quotas in hiring in return for the government's agreement to
end use of the PACE and to develop fairer selection standards
for use in the future--is proper.

        The fact that your statement was not received on time
would not affect any relief to which you might be entitled under
the Consent Decree, because the only persons entitled to $3,000
in back pay and help in finding a Federal job are those class

June 4, 1981
Page Two

members who filed a formal complaint of racial or ethnic dis-
crimination against use of the PACE for hiring (not for promotions)
before January 15, 1981. To be considered, the complaint must
have been filed under Title VII of the Civil Rights Act of 1964
through either of the administrative routes available to you--a
5 C.F.R. Part 300 complaint filed directly with the Board of
Appeals and Review of the U.S. Civil Service Commission or the
U.S. Office of Personnel Management, or a 5 C.F.R. Part 713 (later
called a 29 C.F.R. Part 1613) complaint filed with the same agency.
To be considered, such a complaint must have remained alive, and
still be pending either in the administrative process or in Court.
If you did not file such a formal complaint, the settlement will
not provide any money, or special help in finding a Federal job,
for you. You would receive the generalized relief in the Consent
Decree--the gradual elimination of the PACE and the development of
new examining procedures which will be designed to examine for par-
ticular job categories. This is in contrast to the PACE, which
is a broad test used for 118 job categories. The attorneys for
plaintiffs believe that the development of selection procedures
tied to actual job requirements will result in a better selection
rate for blacks and Hispanics. In addition, special training pro-
grams will be established in a number of cities to help class
members and others get better scores on the PACE during the phase-
out period for the PACE. The Decree also provides for special re-
cruitment and hiring programs to reduce or eliminate adverse impact
in hiring against blacks and Hispanics.

        I have enclosed a copy of a Notice which is more detailed
than the one which appeared in newspapers across the country. You
may or may not have seen this Notice before. This should answer
any questions you may have about the Consent Decree.

        The second and final fairness hearing on the proposed Con-
sent Decree will be held at 10:00 A.M. on June 16, 1981, in Court-
room 18, United States Court House, Third and Constitution N.W.,
Washington, D.C. You are invited to attend and observe this hear-
ing, if you so desire. While you would not have the right to
speak at the hearing, I will be happy to note your presence for
the information of the Court. If only a small number of persons
appear at that hearing and time is available, it is possible that
the Court may allow you to make a brief oral statement. If you
desire to attend, please show up at 9:00 A.M. in the same courtroom,

June 4, 1981
Page Three

for a meeting between class members and the lawyers for the plain-
tiffs. You will have a chance to ask questions at the meeting.
Because we would like to know in advance how many persons will
attend, please call my assistant, Ms. Rose, before June 15 and
tell her your name and that you plan to attend the hearing. The
telephone number is (202) 628-6700.

Sincerely,

Richard T. Seymour

RTS:vap

APPENDIX B TO THE ORDER GRANTING
PRELIMINARY APPROVAL TO THE CONSENT DECREE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
                Plaintiffs, )
)
        v.                   )    Civil Action No. 79-0271
)
ALAN CAMPBELL, Director,     )              FILED
Office of Personnel          )
Management,                  )              FEB 26 1981
)
                Defendant.   )
                             )    JAMES F. DAVEY, Clerk

NOTICE TO ALL BLACKS, AND TO ALL HISPANICS,
WHO TOOK THE U.S. GOVERNMENT'S PROFESSIONAL
AND ADMINISTRATIVE CAREER EXAMINATION (PACE)
FOR HIRE INTO ENTRY-LEVEL FEDERAL JOBS
ON OR AFTER MAY 19, 1975

This Notice is to provide you with the information you
need about the settlement of this lawsuit, and how this settlement
may affect your rights, so that you will be able to take advantage
of the rights given you by the settlement or to file an objection,
if you believe that the settlement is unfair to the class or to
any particular part of the class.

This lawsuit was filed in the U.S. District Court for the
District of Columbia in January 1979, to enforce the provisions of
Title VII of the Civil Rights Act of 1964. The Complaint alleged
that the U.S. Office of Personnel Management ("OPM") had violated
Title VII of the Civil Rights Act of 1964 by using its
Professional and Administrative Career Examination ("PACE") to
test applicants for approximately 118 entry-level Federal job
categories. OPM's Answer to the Complaint denied that its use of
this test was unlawful.

This lawsuit has now been settled. The Consent Decree
containing the settlement has been given preliminary approval by
the Court, so that notice of the settlement could be provided to
class members and class members could decide whether they want to

object to the settlement. This Notice will first describe the provisions of the Decree, and will then describe the procedures for making objections to the settlement.

The settlement requires government agencies to develop "alternative examining procedures" for the various job categories for which the PACE was formerly used. It will not be possible to develop such procedures for all of these job categories at the same time, and the settlement accordingly sets forth a schedule for the development of such procedures. During the period of time covered by the schedule, the PACE may still be used, but its use will steadily decline. The schedule requires complete elimination of the PACE for hiring into entry-level Federal job categories no later than three years after the effective date of this Decree.

The parties to this lawsuit recognize that use of the PACE has had adverse effect on blacks and on Hispanics. The Decree establishes clear guidelines and some special definitions for determining whether the PACE or an alternative selection procedure, has resulted in adverse impact against blacks or against Hispanics, and requires Federal agencies to make "all practicable efforts" to ensure that their use of the selection procedure, during the period in which the Court will keep its jurisdiction in this case, will not result in adverse impact as defined in the Decree. The period for which the Court will retain its jurisdiction over a specific job category formerly covered by the PACE will be five years after the implementation of an alternative examining procedure for that job category. During this period, Federal agencies will be required to make all practicable efforts through the use of special programs established or recognized by the Decree, to overcome any adverse impact against blacks or against Hispanics caused by the selection procedures in question. At any time after three years from the effective date of the Decree, an agency with a job category formerly subject to the PACE may cease all practicable efforts to eliminate adverse impact if the replacement examining procedure or procedures have been used for actual hiring for at least a two-year period and the agency has completed a validation study. However if it

2.

is determined in an enforcement proceeding that the examining procedure has not been properly validated the agency shall be liable for full relief under Title VII.

The special programs in question include the Outstanding Scholar program, the College Co-operative Student program, a bilingual/bicultural certification program, a training program to help class members who will be taking the PACE in the future, special recruiting programs targeted at PACE job categories, and similar programs. If these special programs turn out to be inadequate to accomplish their purpose in a practical manner, new programs can be negotiated.

The obligations of agencies to use these special programs to overcome adverse impact can be enforced under the Decree. There are detailed provisions governing such situations, backed up by reporting provisions which guarantee that plaintiffs will have the necessary information to keep track of these agencies' progress under the Decree. Class members who believe that they may have been harmed by a violation of the Decree may also bring their claims to the plaintiffs' attention, and ask plaintiffs to prosecute their claims throught the enforcement provisions of the Decree. If plaintiffs decide not to handle such a claim under the enforcement provisions of the Decree, the class member may still proceed with his or her own charge of discrimination or lawsuit.

While this case does not include the use of the PACE for promotional purposes by some agencies, part of the settlement in this case requires that all agencies immediately stop using the PACE for such purposes.

Under the settlement, the four named plaintiffs will receive a total of $35,000 in back pay among them. Any class members who have filed charges of discrimination against OPM, complaining of discrimination in OPM's implementation or use of the PACE, will be entitled to receive $3,000 in settlement of their back pay claims if they bring themselves to the attention of the Court immediately. The way to do so is to send a letter to the Clerk of Court, U.S. District Court, U.S. Court House, Washington, D. C. 20001. The plaintiffs and the class members

who have filed such charges of discrimination shall also be
entitled to help in obtaining suitable Federal jobs. Otherwise,
no class member will receive back pay under the settlement.

Any class member who writes to the address set forth below
will be put on a mailing list, will be informed of the opportunity
to qualify for Federal jobs under the new alternative examining
procedures which are being developed, and will also be informed
of the opportunity to take a training course intended to provide
assistance in preparing to take future administrations of the
PACE during the interim period described above. Mailings on
these opportunities will take place every six months until the
last alternative examining procedure is put into effect, and shall
be without charge to class members. If you want to be put on the
mailing list, fill out the form attached to this Notice and mail
it to:

> U.S. Office of Personnel Management
> Office of General Counsel
> 1900 E Street, N.W.
> Washington, D.C. 20415

As a class member, you have the right to file an objection
to this settlement if you believe that it is not fair to the
class, or to some particular part of the class. To be considered,
an objection must be in writing, it must refer to the name and
number of this case (Luevano v. Campbell, C. A. No. 79-0271),
it must state the grounds on which the objection is based, it
must have copies of all of the documents you rely on (except
for this Notice) attached to it, and it must be received by
the Clerk of the U.S. District Court, U.S. Court House,
Washington, D.C. 20001, by the close of business on MAY 1,
1981. Objections not clearly identified by the name and number
of this case or received after that date will not be considered.

If you file an objection, you will also have to appear at
the hearing on the objections, which is scheduled for 10:00 a.m.
on   MAY 27, 1981   in Courtroom 18, U.S. Court House, Third
and Constitution Avenue, N.W., Washington, D.C. 20001. You
may request to be excused from the requirement of attending this



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

September 15, 1982

Mrs. Mary McClarity
3 Korea Street, Box 337
Buchanan, Georgia 30113

Re:  <u>Luevano v. Campbell</u>

Dear Mrs. McClarity:

Today I received your undated letter asking when you
would receive your check in this case.

You will not receive any money in the settlement of
this case.  The only class members who will receive any money
in this case are blacks and Hispanics who filed their own
charges of discrimination against use of the PACE on or
before January 15, 1981.  To be successful in claiming this
money, the complaints had to allege racial discrimination,
they had to be filed in the U.S. Civil Service Commission or
the U.S. Office of Personnel Management, and they had to have
been filed completely independently of this lawsuit.

The reason for this requirement is that these payments
are intended to provide compensation only for those class
members who took their own steps to enforce their rights,
completely independently of this lawsuit, and who would have
had their own right to go to court before the case was settled.
The settlement binds them and takes away the right they would
otherwise have had to go to court in their own case.

If you believe that you qualify for the $ 3,000 payment
and for help in finding a Federal job, please fill out the
enclosed form, attach copies of your complaint and of any
response OPM has made to it, attach copies of your PACE test
results and all of the other papers requested, and send it
back to me immediately.  Do not forget to attach copies of the
papers.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb

mrs Mary L. McClarity
3 Korea St Bx 337
Buchoron, Bx 30113

Dear Richard,

I have been waiting for months
to recieve my check on the settlement
were made in Luenona & Champsbell you
sent me a Certifide letter tell me the
settlement were finish, but I haven't
heard from you sent. Write ad let me
know Some.

Mr. Richard F Seymour

3 Korea St.
P.O. Box 337
Buchanan, Ga 30113

Dear Mrs Seymour,

The reason I wrote and ask you about were I stood in this settlement is because I have been writing to you on this matter for over two year and you have formed information on the progress you have made on the suite. You have sent me lost of material on the settlement and the dates it was settled and when the finished date would be. You stating in one letter to me, itt I could get no less than 3000.00 dollar on the settlement. When you when to the courtroom in W.C. I told you I was able to be there, but I wrote you a letter to be read in my behalf for me on how I feel about the way black and other

races are brent in American today.

So you see I have given you all this information concerning me in this statement and I was just writer you to see to when I would get my money from the settlement.

You sent me a certification letter stating that the settlement were over and it to 60 days to come complete. So this it what I need to know. when will I get the money.

Please answer at once, if you have the time.

Mrs Mary L. McCloth

Mrs Mary L. McClarity
3 Kora St. Box 337
03 achon Va 30113



Mr. Richard J. Seymour

Suite 520, 733 Fifteenth St N.W.

Washington, D.C. 20005



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

February 22, 1982


Ms. Mary McClarity
P. O. Box 337
Buchanan, Georgia 30113

      Re:  <u>Luevano v. Campbell</u>

Dear Ms. McClarity:

     Thank you for your February 18 letter.  The Consent Decree went into effect on January 18, 1982.

     I have enclosed a copy of the Consent Decree and of Judge Green's order granting final approval to the Consent Decree.

               Sincerely,

               Richard T. Seymour

RTS/lb

Enclosures



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

October 28, 1981

Ms. Mary L. McClarity
3 Korea Street, Box 424
Buchanon, Georgia 30113

Re: <u>Luevano v. Campbell</u>

Dear Ms. McClarity:

Both sides have filed papers with the Court urging that the Consent Decree be given final approval and that the objections be denied. We expect that the judge will decide this question in the next month or two. When the judge hands down her decision, it should be reported fairly widely in the press. (We do not know if the Court will order that a notice be sent to all the objectors).

The only question before the Court is whether the Consent Decree should be given final approval as it stands. The Court has the power to accept it entirely, or to reject it entirely. It does not have the power to make changes in the Consent Decree. If the Court does not give final approval to the Consent Decree, the result will be resumption of litigation; I think it is very unlikely that we will be able to reach any agreement with the Government which is better, from your standpoint, than the existing agreement.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb

6



6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al., )
)
   individually and on behalf of )
   all others similarly situated, )
)
                Plaintiffs, )
)
       v. )   C. A. No. 79-0271
)
CONSTANCE HORNER, Director, )
   U.S. Office of Personnel )
   Management, et al., )
)
              Defendants. )

FEB 02 1988   *RECEIVED*

*EARLIER COPY RECEIVED 1/28/88* JHG

*Exh. 6*

**FILED**

JAN 22 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

APPEAL BY CLASS MEMBER FROM
OBJECTION TO BACK PAY CLAIM

PRINT NAME:   BEVERELY CUMMINGS SMITH

      If you want to have the Court consider your back pay
claim and overrule the objection to your claim, fill out this
form to the best of your knowledge and mail or deliver it to Mr.
Seymour at the address shown in the attached Notice. Please
print all information. If the space provided is not enough, you
may attach additional sheets. Mr. Seymour must receive this form
by January 29, 1988, or your appeal will not be considered.

      1. Is the statement of facts in Mr. Seymour's objection
letter accompanying this form:

        (a) right?   __X__

        (b) wrong in some respect? _____ If so,
explain what is wrong in the statement of facts:

_____

_____

_____

2. State why you think the objection should be dis-
missed by the Court, and why you think you should share in the
back pay award: The objection should be dismissed by the court, and I
should share in the back pay award for the following reasons:

1. Being an government employee (Department of the Air Force), I was required
to file my complaint through the internal channels in a timely manner or risk
having my complaint rejected at any phase.

2. My personnel office was following the guidance of OPM while using the
PACE test in the selection and promotion process.

3. The PACE test, whether administered by a local government personnel office
or OPM, was the SAME discriminatory test that affected my federal employment.

Print your name: BEVERELY CUMMINGS SMITH

Print your mailing address: 4228 GATEWAY DRIVE - MONTGOMERY, AL  36108

City _____ State _____ Zip _____

Social Security Number: __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_____

Telephone number (home): Area Code __205__ Number __288-6421__

                (work): Area Code __205__ Number __279-9841__

These statements are made under the penalties for perjury.

Signature: _Beverly C. Smith_____

Date: __22 JANUARY 1988__

NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

      1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-
SIDERED.

      2. THIS FORM MUST BE MAILED TO:

          Richard T. Seymour
          Lawyers' Committee for Civil Rights Under Law
          1400 'Eye' Street N.W.
          Suite 400
          Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY **JANUARY 29, 1988**, IT
WILL NOT BE CONSIDERED.

- 3 -

NO          001

## DATAFAX TRANSMISSION

| (office symbol, grade, and last name) | DATE |
|---|---|
| Richard Seymour | 28 Jan 88 |

**PLEASE CALL TELEPHONE EXTENSION _____ FOR PICK UP.**

**REMARKS**

Lawyers Committee Civil Rights
Under Law

Suite 400, 1400 Eye St. N.W.

Washington D.C. 20005

RECEIVED JAN 28 1988

| FROM (Office symbol, grade, and last name) | EXTENSION |
|---|---|
| Beverly Smith | 279-5457 |

**THIS TRANSMISSION CONSISTS OF 4 PAGES.** (Count this form as a page)

| DATE AND TIME TRANSMISSION COMPLETED | INITIALS |
|---|---|

AF FORM 182
JUL 83

01. 28. 88   01:43 PM   P01

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,                    )
                                             )
    individually and on behalf of            )
    all others similarly situated,           )
                                             )
                        Plaintiffs,          )
                                             )
            v.                               )    C. A. No. 79-0271
                                             )
CONSTANCE HORNER, Director,                  )
    U.S. Office of Personnel                 )
    Management, et al.,                       )
                                             )
                        Defendants.          )

RECEIVED
JAN 2 8 1988

## APPEAL BY CLASS MEMBER FROM
## OBJECTION TO BACK PAY CLAIM

PRINT NAME:  ___BEVERLY CUMMINGS SMITH_____

        If you want to have the Court consider your back pay
claim and overrule the objection to your claim, fill out this
form to the best of your knowledge and mail or deliver it to Mr.
Seymour at the address shown in the attached Notice.  Please
print all information.  If the space provided is not enough, you
may attach additional sheets.  Mr. Seymour must receive this form
by January 29, 1988, or your appeal will not be considered.

        1. Is the statement of facts in Mr. Seymour's objection
letter accompanying this form:

                (a) right?  ___X___

                (b) wrong in some respect?  _____  If so,

        explain what is wrong in the statement of facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**2. State why you think the objection should be dismissed by the Court, and why you think you should share in the back pay award:** The objection should be dismissed by the court, and I should share in the back pay award for the following reasons:

1. Being an government employee (Department of the Air Force), I was required to file my complaint through the internal channels in a timely manner or risk having my complaint rejected at any phase.

2. My personnel office was following the guidance of OPM while using the PACE test in the selection and promotion process.

3. The PACE test, whether administered by a local government personnel office or OPM, was the SAME discriminatory test that affected my federal employment.

_____

_____

_____

_____

**Print your name:** BEVERELY CUMMINGS SMITH

**Print your mailing address:** 4228 GATEWAY DRIVE - MONTGOMERY, AL   36108

- 2 -

City _____ State _____ Zip _____

Social Security Number: ___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___

Telephone number (home): Area Code _205_ Number __288-6421__

(work): Area Code _205_ Number __279-9841__

These statements are made under the penalties for perjury.

Signature: _Beverly C. Smith_

Date: __22 JANUARY 1988__

NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

     1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CON-SIDERED.

     2. THIS FORM MUST BE MAILED TO:

         Richard T. Seymour
         Lawyers' Committee for Civil Rights Under Law
         1400 'Eye' Street N.W.
         Suite 400
         Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY JANUARY 29, 1988, IT WILL NOT BE CONSIDERED.

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                    )
    individually and on behalf of   )
    all others similarly situated,  )
                                    )
                    Plaintiffs,     )
                                    )
        v.                          )      C. A. No. 79-0271
                                    )
CONSTANCE HORNER, Director,         )
    U.S. Office of Personnel        )
    Management, et al.,             )
                                    )
                    Defendants.     )



RECEIVED
JAN 2 8 1988

APPEAL BY CLASS MEMBER FROM
OBJECTION TO BACK PAY CLAIM

PRINT NAME: _____

        If you want to have the Court consider your back pay

claim and overrule the objection to your claim, fill out this

form to the best of your knowledge and mail or deliver it to Mr.

Seymour at the address shown in the attached Notice.  Please

print all information.  If the space provided is not enough, you

may attach additional sheets.  Mr. Seymour must receive this form

by January 29, 1988, or your appeal will not be considered.

        1. Is the statement of facts in Mr. Seymour's objection

letter accompanying this form:

            (a) right? _____X_____

            (b) wrong in some respect? _____  If so,

        explain what is wrong in the statement of facts:

_____

_____

_____

2. **State why you think the objection should be dismissed by the Court, and why you think you should share in the back pay award:** The objection should be dismissed by the court, and I should share in the back pay award for the following reasons:

1. Being an government employee (Department of the Air Force), I was required to file my complaint through the internal channels in a timely manner or risk having my complaint rejected at any phase.

2. My personnel office was following the guidance of OPM while using the PACE test in the selection and promotion process.

3. The PACE test, whether administered by a local government personnel office or OPM, was the SAME discriminatory test that affected my federal employment.

**Print your name:** BEVERELY CUMMINGS SMITH

**Print your mailing address:** 4228 GATEWAY DRIVE - MONTGOMERY, AL   36108

- 2 -

City _____ State _____ Zip _____

Social Security Number: __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_____

Telephone number (home): Area Code __205__ Number __288-6421___

(work): Area Code __205__ Number __279-9841___

These statements are made under the penalties for perjury.


Signature: _____


Date: __22 JANUARY 1988___


NOTE TO CLASS MEMBERS DESIRING TO TAKE AN APPEAL:

1. THIS FORM MUST BE SIGNED, OR IT WILL NOT BE CONSIDERED.

2. THIS FORM MUST BE MAILED TO:

Richard T. Seymour
Lawyers' Committee for Civil Rights Under Law
1400 'Eye' Street N.W.
Suite 400
Washington, D.C. 20005

UNLESS MR. SEYMOUR RECEIVES THIS FORM BY JANUARY 29, 1988, IT WILL NOT BE CONSIDERED.

- 3 -

<u>LETTER REPRINTED FROM COMPUTER FILE</u>



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 400 • 1400 EYE STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 371-1212

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.
TELEX: 205662 SAP UR
FACSIMILE: (202) 842-3211 or (202) 842-0683

November 25, 1987

Ms. Beverly A. Cummings Smith
4228 Gateway Drive
Montgomery, Alabama 36108

> Re: Luevano v. Horner: Your Claim Under
> <u>Paragraph 21 of the Consent Decree</u>

Dear Ms. Smith:

You have filed a claim under ¶ 21 of the Consent Decree. The enclosed Explanation contains detailed information about this provision, and about your rights.

The lawyers on both sides of the case have now completed their work on all of the claims filed under ¶ 21. Both sides have agreed that you do <u>not</u> have a good claim under ¶ 21, for the following reasons:

You did not file a complaint with the Office of Personnel Management, challenging use of the PACE for competitive external hiring, before the cutoff date of January 15, 1981. Your March 3, 1980 complaint of discrimination involved the Air Force's internal use of the PACE in promotions. See my letter of March 30, 1982 to you, your April 21, 1982 response, and my April 30, 1982 letter returning your papers to you.

Sincerely,

Richard T. Seymour



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

April 30, 1982

Ms. Beverely J. Cummings Smith
4228 Gateway Drive
Montgomery, Alabama 36108

Re:  Luevano v. Campbell

Dear Ms. Smith:

Thank you for your April 21 response to my March 30 letter.

As you requested, I am returning your papers to you.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb

Enclosure

4228 Gateway Drive
Montgomery, AL  36108
April 21, 1982


Richard T. Seymour
Lawyers' Committee
For Civil Rights Under Law
733 15th Street N.W.
Washington, D. C.  20005

Dear Mr. Seymour:

Reference is made to your letter dated March 30, 1982, paragraph 4.

The charge of discrimination against the Air Force regarding the PACE
filed at Bolling AFB on November 21, 1980, was part of the original
complaint process.

If my papers are of no further use to you, please return them so that
I may submit them to the AFGE attorney.

Thank you for your tolerance.

Sincerely,

Beverely J. Cummings Smith

mos



LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

March 30, 1982

Ms. Beverely J. Cummings
4228 Gateway Drive
Montgomery, Alabama 36108

Re: <u>Luevano v. Campbell</u>

Dear Ms. Cummings:

You have sent me information on the March 3, 1980 formal
complaint of racial discrimination with respect to use of the
PACE in selection for Computer Programmer Trainee positions
at Maxwell AFB, Alabama.  This is an internal, noncompetitive
use of the PACE, and does not qualify for the $3,000 payment
and special help in finding a suitable Federal job.

You should have received from the Court within the last
few weeks a Notice sent by certified mail, telling blacks and
Hispanics affected by internal uses of the PACE of a new
opportunity to file charges against such uses.  This applies to you.

The American Federation of Government Employees has filed
two class-action lawsuits on behalf of blacks, challenging the
Air Force's use of the PACE for promotions, selection for training
and Upward Mobility programs, and so forth.  You should get in
touch with the attorney handling the case right away.

Joseph F. Henderson, Esq.
American Federation of Government Employees
1325 Massachusetts Avenue, N.W., Room 300
Washington, D. C. 20005
(202) 737-8700, ext. 398

Your papers state that you also filed a charge of discrimi-
nation against the PACE at Bolling AFB on November 21, 1980.  Was
this a new complaint, or the date of your request for a decision
without a hearing on the March 1980 complaint?  Please let me
know as soon as possible.  If it involved a new complaint, please
send me a copy.  Please let me know if you would like to have your
other papers back.

Sincerely,

Richard T. Seymour

Richard T. Seymour

RTS/lb

4228 Gateway Drive
Montgomery, AL  36108
June 12, 1981

RECEIVED JUN 1 6 1981

Richard T. Seymour
Lawyers' Committee for Civil
 Rights Under Law
520 Woodward Building
733 Fifteenth Street, N.W.
Washington, DC  20005

Dear Attorney Seymour:

Supporting documentation to my claim of discrimination in regards to the
PACE test will be forwarded to your office under separate cover.

Sincerely,

Beverly J. Cummings
Beverly J. Cummings

Enclosures:  2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,          )
                                   )
        Plaintiffs,                )
                                   )
    v.                             )    Civil Action No. 79-0271
                                   )
ALAN CAMPBELL, Director,           )    **RECEIVED JUN 1 6 1981**
    Office of Personnel            )
    Management, et al.,            )
                                   )
        Defendants.                )
_____

FORM FOR ADDITIONAL INFORMATION FROM CLASS
MEMBERS WHO STATE THAT THEY FILED CHARGES OF
DISCRIMINATION WITH THE U.S. CIVIL SERVICE
COMMISSION OR OFFICE OF PERSONNEL MANAGEMENT,
ALLEGING THAT THE PACE DISCRIMINATED AGAINST
THEM BECAUSE OF THEIR RACE OR ETHNIC STATUS,
ON OR BEFORE JANUARY 15, 1981

Class Member:    Beverly J. Cummings
                 4228 Gateway Drive
                 Montgomery, AL  36108

1. State each date on which you took the PACE, as
closely as you can recall. __September, 1979__
**Note: No minimum passing score was required.**

2. Do you have any papers showing that you took the PACE
at the time or times stated above, or telling you the results
of your taking the test? __Yes__
(PLEASE ATTACH COPIES OF EACH SUCH DOCUMENT.)

3. What is the date of the first complaint of racial
or ethnic discrimination challenging the use of the PACE which
you filed with the U.S. Civil Service Commission or the
U.S. Office of Personnel Management? __30 January 1980__
To whom did you send this complaint? __3800 ABG/CAO, Maxwell AFB, AL 36112__

What was the address to which you sent the complaint? _____
__Michael Woodard, 3800 ABG/CAO, Building 1, Maxwell AFB, AL  36112__

Did you ever receive a response to your complaint? __Yes__
If you did receive a response, what did it say? __My response__
__was that no discrimination was found.__

What was the date of the response? ___22 February 1980___

Do you have a copy of your complaint and of the responses you received? _____Yes_____ (PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THIS COMPLAINT.)

    4. Did you ever file another complaint against the PACE? ___Yes___ If so, state the dates of each such complaint: __3 March 1980__ and 21 November 1980_____

To whom did you send these complaints? _3800 ABG/CAO, Building 1,_ Maxwell AFB, AL  36112_____

What was the address to which you sent these complaints? _3800 ABG/CAO, Building 1, Maxwell AFB, AL  36112 and AFCARA/ARB, Bldg 5681,_ 3rd Floor, Rm. S-7, Bolling AFB, DC  20332 respectively._____

Did you ever receive any responses to these complaints? _Yes___ If you did receive any responses, what did they say? _____ A response from the complaint filed 3 March 1980 found no evidence of discrimination.  The complaint filed 21 November 1980 is still ongoing.

(PLEASE ATTACH COPIES OF ALL DOCUMENTS YOU HAVE WHICH RELATE TO THESE COMPLAINTS.)

    5. Did you ever file a lawsuit in Federal Court under Title VII of the Civil Rights Act of 1964, challenging the government's use of the PACE as racially or ethnically discriminatory? ___No___ If so, please state the following:

Name of the case: _____ No.: _____

Court in which the case was filed:_____

_____ City_____ State_____

Name and address of your attorney, if any:

_____

_____

City_____ State_____ Zip _____

Telephone Number: _____

Has this case been decided? _____ If so, what was the decision? _____

(PLEASE ATTACH A COPY OF THE COMPLAINT IN YOUR CASE, A COPY OF ANY ORDERS ENTERED BY THE COURT, AND A COPY OF ANY DECISION.)

6. State your telephone number: (205) 279-4480 Office
                                 (205) 284-1215 (Home)

I HAVE ANSWERED THE ABOVE QUESTIONS TRUTHFULLY TO THE BEST OF MY
KNOWLEDGE AND ABILITY.

Date:  12 June 1981    Signature: _Beverly J. Cummings_

Mail this form and a copy of all attachments immediately to:

> Richard T. Seymour
> Lawyers' Committee for Civil
>   Rights Under Law
> 520 Woodward Building
> 733 Fifteenth St., N.W.
> Washington, D.C.  20005

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, <u>et al.</u>,        )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )    Civil Action No. 79-0271
                                        )    RECEIVED JUN 1 6 1981
ALAN CAMPBELL, Director,                )
    Office of Personnel                 )
    Management, <u>et al.</u>,          )
                                        )
            Defendants.                 )
_____         )

FORM FOR CLASS MEMBERS WHO BELIEVE THEY FILED
COMPLAINTS OF DISCRIMINATION AGAINST THE PACE,
TO STATE WHETHER THEY HAVE CONDITIONAL OR OTHER
OBJECTIONS TO THE CONSENT DECREE

Class Member:

> Beverly J. Cummings
> 4228 Gateway Drive
> Montgomery, AL 36108

Date: _12 June 1981_ Signature: _Beverly J. Cummings_

1. You have now been given a copy of the more detailed form of notice. In light of this information, are you willing to let the settlement go into effect? Check each of the following answers which applies to you:

_____    Yes, I am willing to let the settlement
            go into effect.

___x___     No. I object to the settlement and do
            not want it to go into effect unless I
            receive $3,000 in back pay and/or help
            in finding a Federal job.

___x___     No. I have other objections to the
            settlement which I have described
            below: __The decree should have included those__

__persons who filed complaints regarding the use of the PACE test to their__

__respective agencies because of misguided information.__

_____

                                        <u>Attachment C</u>

_____

_____

_____

_____

_____

_____

_____

3.  If the attorneys for plaintiffs receive your
filled-out form by June 15, 1981, your objection will be
considered whether or not you attend the hearing scheduled
for 10:00 A.M. on June 16, 1981, at Courtroom 18 in the
U.S. Court House in Washington, D.C.  We need to know how
many people will attend this hearing.  This is important for
your own convenience.  Check one of the following answers:

_____    I will attend the hearing.

___x___    I will not attend the hearing.

4.  If you plan to attend the hearing, state whether
you will have a lawyer to represent you at the hearing.
(You are not required to have a lawyer.)  Check one of the
following answers:

_____    I will not have a lawyer with me
            at the hearing.

_____    I will have a lawyer with me at the
            hearing.  The lawyer's name, address,
            and telephone number are:

_____

_____

_____

_____

_____

Mail this form immediately to:

          Richard T. Seymour
          Lawyers' Committee for Civil
            Rights Under Law
          520 Woodward Building
          733 Fifteenth Street, N.W.
          Washington, D.C.  20005

4228 Gateway Drive
Montgomery, AL  36108
April 28, 1981

Clerk of the U.S. District Court
U.S. Court House
Washington, DC  20001

(Luevano v. Campbell, C. A. No. 79-0271)

In September, 1979, I was administered OPM's Test 500 (PACE)
at Maxwell AFB, AL for entry into a Computer Programer Trainee
position, GS5 (potential GS11).  Because my resulting test
score was low and weighted heavier than other factors, I was
not certified for the position.  Subsequently, I filed a dis-
crimination complaint based on race against the agency.  At
that time, I was not informed that the complaint should have
been against OPM.

In reference to the above case, I offer the following objec-
tion to the Decree:  The settlement should have included class
members who have filed PACE complaints against their respec-
tive agencies due to misguided information.

Due to hospitalization of the undersigned at the time of the
legal notice, this objection may not reach your office by
COB 1 May 1981.

Sincerely,

Beverely J. Cummings
Beverely J. Cummings

                                    1 Atch
                                    Complaint of Discrimination

nos





**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520  •  733 FIFTEENTH STREET, NORTHWEST  •  WASHINGTON, D.C. 20005  •  PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 5, 1981

Beverly J. Cummings
4228 Gateway Drive
Montgomery, AL 36108

Re: Luevano v. Campbell
    C.A. No. 79-0271 (D.D.C.)

Dear *Ms. Cummings,*

I am one of the lawyers for the blacks and Hispanics
who filed this lawsuit. I am writing this letter to you with
the approval of the Court. You have stated that you filed an
administrative charge of discrimination with the U.S. Civil
Service Commission (subsequently called the U.S. Office of
Personnel Management), challenging the government's use of
the Professional and Administrative Career Examination (the
"PACE") as racially or ethnically discriminatory. If you can
prove that you filed such a charge on or before January 15,
1981, and that it is still alive either in the administrative
process or in Court, you would be entitled to an award of
$3,000 in back pay and to help in finding a suitable Federal
job.

We need to obtain more information from you, so that
the government can check its records on your complaint. The
enclosed form will help us to find these records and to deter-
mine whether you are entitled to this relief. Please fill it
out right away, and attach copies of all of the documents you
possess about your complaint of discrimination, any responses
you received or additional information you sent in, and about
any court case you may have filed. Send them to me right away.
If I do not receive the form from you within thirty days after
the date stated on this letter, you will forfeit any right to
back pay which you might otherwise have had. DO NOT TAKE A
CHANCE WITH YOUR RIGHTS. FILL OUT THE FORM AND SEND IT IN
WITHIN THE NEXT DAY OR TWO. If you do not have all of the
necessary documents yourself and you have to request some of
them from other persons, send in the form without waiting for
the documents but state on the form that you will send the
documents along in a few days.

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

June 5, 1981
Page Two

       Your claim for the special relief of $3,000 and help
in finding a Federal job may be successful or unsuccessful,
depending on the facts.  We need to know right away whether
you want to make a conditional objection to the Consent Decree,
so that you would have no objection if you later turn out to
be entitled to this relief, and would have an objection if it
later turns out that you are not entitled to this relief.
Please write me at once, stating whether you want to see the
Consent Decree go into effect either way, or if you want to
object to it unless you obtain the $3,000 in back pay and help
in finding a suitable Federal job.  IF YOU HAVE ANY OTHER
OBJECTION, PLEASE WRITE TO ME RIGHT AWAY.  You can use the
attached form for objections.  Any objections you have will be
considered by the Court if I receive them by June 15, 1981.
There will be a hearing for further objections on June 16, 1981,
at 10:00 A.M. in Courtroom 18, United States Court House, Third
and Constitution, N.W., Washington, D. C.  (Before the hearing
the courtroom will be open at 9:00 A.M. for a meeting between
class members and the lawyers for the plaintiffs.)  You do not
have to attend the hearing, but are welcome to do so.  If you
do intend to attend the hearing, be sure to be in the courtroom
by 9:00 A.M. for the meeting.

       If you have any questions please call me at (202) 628-
6700.

                        Sincerely,

                        Richard T. Seymour

RTS/ra



**LAWYERS' COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

SUITE 520 • 733 FIFTEENTH STREET, NORTHWEST • WASHINGTON, D.C. 20005 • PHONE (202) 628-6700

CABLE ADDRESS: LAWCIV, WASHINGTON, D.C.

June 5, 1981

Beverly J. Cummings
4228 Gateway Drive
Montgomery, Alabama   36108

Re:  Luevano v. Campbell

Dear Ms. Cummings:

In your response to the enclosed questionnaire, please
make clear whether you had to achieve a passing score of 70
on the PACE and compete with outside applicants.

It would be <u>very</u> helpful to have a copy of all PACE
results you have received.

Sincerely,

Richard T. Seymour

Enclosure

RTS:rc

4228 Gateway Drive
Montgomery, AL  36108
April 28, 1981

Clerk of the U.S. District Court
U.S. Court House
Washington, DC  20001

(Luevano v. Campbell, C. A. No. 79-0271)

In September, 1979, I was administered OPM's Test 500 (PACE)
at Maxwell AFB, AL for entry into a Computer Programer Trainee
position, GS5 (potential GS11).  Because my resulting test
score was low and weighted heavier than other factors, I was
not certified for the position.  Subsequently, I filed a dis-
crimination complaint based on race against the agency.  At
that time, I was not informed that the complaint should have
been against OPM.

In reference to the above case, I offer the following objec-
tion to the Decree:  The settlement should have included class
members who have filed PACE complaints against their respec-
tive agencies due to misguided information.

Due to hospitalization of the undersigned at the time of the
legal notice, this objection may not reach your office by
COB 1 May 1981.

Sincerely,

Beverely J. Cummings
Beverely J. Cummings

mos

                                        1 Atch
                                        Complaint of Discrimination



RECEIVED

JAN 2 2 1993

CLERK, U S. DISTRICT COURT
DISTRICT OF COLUMBIA

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL G. LUEVANO, et al.,         .      Docket No. CA 79-0271
                                  .
              Plaintiff           .      Washington, D. C.
                                  .      April 13, 1993
        vs.                       .      12:00 Noon
                                  .
CONSTANCE NEWMAN, et al.,         .      **FILED**
                                  .
              Defendant           .      APR 2 2 1993
. . . . . . . . . . . . . . .     .
                                      Clerk, U.S. District Court
                TRANSCRIPT OF HEARING   District of Columbia
        BEFORE THE HONORABLE JOYCE HENS GREEN
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:         Richard T. Seymour, Esquire
                            Lawyers' Committee for Civil
                               Rights Under Law
                            1400 Eye Street, N.W.
                            Washington, D. C. 20005

For the Defendants:         John R. Tyler, Esquire
                            U. S. Department of Justice

Participating via
   telephone:               Beverly J. Brown, Claimant

Official Court Reporter:    Gordon A. Slodysko
                            4806-A  U.S. Courthouse
                            Washington, D. C. 20001
                            (202) 273-0404

        Computer-Aided Transcription of Stenographic Notes

2

P R O C E E D I N G S

(In Chambers)

VOICE ON TELEPHONE:  Hello?

THE COURT:  Ms. Beverly J. Brown?

VOICE ON TELEPHONE:  Okay.

THE COURT:  Ms. Brown, this is Joyce Green, from Washington, D. C.  I'm a Judge of the United States District Court for --

VOICE ON TELEPHONE:  This is not her.  Just a minute.

THE COURT:  This is not her.  Thank you.

MS. BROWN:  Hello.

THE COURT:  Hello.  Ms. Brown?

MS. BROWN:  Yes.

THE COURT:  Is this Beverly J. Brown?

MS. BROWN:  Yes, it is.

THE COURT:  Yes, Ms. Brown.  I'm Judge Joyce Hens Green.  I'm calling from Washington, D. C., and I am a Judge of the United States District Court for the District of Columbia.  And this is in reference to the claim that you made concerning the PACE examination and the consent order.

MS. BROWN:  Yes.

THE COURT:  I'm talking to the right Ms. Brown?

MS. BROWN:  Right.

THE COURT:  Yes.  And you knew that this telephone call was coming in today, did you not, ma'am?

3

MS. BROWN:  Yes, I did.

THE COURT:  And we are using this means to accommodate your request for a hearing on this matter.  I understood that you had agreed that you would be ready to do it telephonically as we are doing it right now.

MS. BROWN:  Right.  Right.

THE COURT:  Right.  And with me right here in chambers at this moment, we have Mr. Richard T. Seymour, who is of the Committee of Lawyers for Civil Rights, and John R. Tyler, of the United States Department of Justice, who represent both the Plaintiffs and Defendant in this case.  They may have some questions for you or not.

Now, ma'am, I have read your deposition and the submissions that have come in from you when you first communicated with Mr. Seymour and he communicated with you in response to the consent order, and have read whatever papers we have concerning you.  Please tell me why you believe you are entitled to relief.

MS. BROWN:  Well, I took the test twice.

THE COURT:  Well, you took the test twice, and it is important that we have some specific knowledge as to whether you remember whether you complained to anyone in writing or orally about the PACE examination.  And I have read your deposition, which indicates that you do not have a memory of this or of any of the specifics.  Am I correct?

4

MS. BROWN:  Yeah, you're correct.

THE COURT:  Right.  You remember taking the examination twice, and I think you have told us that you went like four times to the office in Dallas?

MS. BROWN:  Right.

THE COURT:  Right.  But you don't remember whether you ever made a written complaint of racial discrimination against the Civil Service Commission's use of the PACE examination or whether you even made an oral complaint.  You know you received some papers, but you're not absolutely certain what those papers were.

MS. BROWN:  I don't remember.

THE COURT:  Would that be a fair statement?

MS. BROWN:  Pardon?

THE COURT:  I say, would that be a fair statement?  I'm just trying to summarize what I think I read.  If I'm wrong, please be sure and tell me so.

MS. BROWN:  No.  That would be a fair statement.

THE COURT:  Right.

As you know, the maximum relief that could have been obtained in this case if we were satisfied that you had followed the appropriate procedures would be $3,000 and a right to have some assistance by the Federal Government in obtaining employment with the Federal Government.  We really have to know, with some verification, that you did take the PACE examination

5

and that you did file some kind of charge which was a pending

claim at the time that this consent order came into effect.  Is

there anything more, any other information you can give us other

than what I have recited, other than what you gave in your

deposition, other than what you have written to any of the

lawyers in this case?  Any other specifics that you could give

us?

MS. BROWN:  No.  There's no more specifics I can give.

All I know is I went down to the office after I took the test.

THE COURT:  And which office would that have been?

MS. BROWN:  The Civil Service office.

THE COURT:  And that would be in Dallas?

MS. BROWN:  Yeah, in Dallas.

THE COURT:  Now, you say you took the test twice, so

would that have been after you took the test the first time, or

both times?

MS. BROWN:  Both times.

THE COURT:  Both times.  And in what year did you take

the examinations?

MS. BROWN:  I don't remember.

THE COURT:  All right.  Would you remember if it was

more than ten years ago?

MS. BROWN:  Oh, yeah, it was more than ten years ago.

THE COURT:  All right.  What kind of work are you doing

now, ma'am?

6

MS. BROWN:  I'm unemployed now.

THE COURT:  Unemployed.  All right.

Do you have any questions, Mr. Seymour?

MR. SEYMOUR:  No, Your Honor.

THE COURT:  All right.  Do you have any questions, Mr. Tyler?

MR. TYLER:  No, Your Honor.

THE COURT:  All right.

All right, Ms. Brown.  We'll take one more moment to have you think and see if you can think of anything else, because in a week or two I am going to be making a decision on this, and I want to be sure that we've covered everything and not that I get some paper after we've had our conversation and an opportunity to discuss it.  So I'm more than happy to take a moment or two if you think that you will be able to think of any more specifics.

MS. BROWN:  No, I can't.  All I know is I took the test two times and I went down to the Civil Service office.

THE COURT:  All right.  Let me make sure that we have your right address, Ms. Brown.  It's still Beverly J. Brown at 2544 Comstock, C-O-M-S-T-O-C-K, in San Diego, California, the 92111 ZIP Code?

MS. BROWN:  That's correct.

THE COURT:  Very good.  Ma'am, we'll be in touch with you in the next few weeks.  And in the meantime, I wish you good

7

luck.

MS. BROWN:  Okay.  Thanks a lot.

THE COURT:  Good-bye.

MS. BROWN:  Good-bye.

(Telephone conversation concluded)

THE COURT:  Okay.  Let me move, before we make the call to Ms. McClarity -- oh, Ms. McClarity, I remember her very well. All right.

THE LAW CLERK:  Did you say she has a different area code?

MR. SEYMOUR:  Area Code 404.

THE COURT:  All right.  It is still 646-9901.

MR. SEYMOUR:  That's right.

(Telephone number dialed and rung without response)

THE COURT:  Do you want to dial it again.  Hang up, dial it again.  We'll try one more time.

I might say, I'm reminded of Ernest Hemingway, the bell tolls.

MR. SEYMOUR:  I spoke with Ms. McClarity's relative at the telephone number we're trying to reach her at on Thursday and told him about the change in the hearing time, and I received a subsequent message back from Ms. McClarity saying that she would be there at this time.  She has no home phone. This is a relative's phone.

THE COURT:  And may the record show that this is

8

Tuesday, just after the Easter holiday, Tuesday, April 13, 1993.

(Telephone number dialed and rung without response)

MR. SEYMOUR:  I called at 11:30 this morning, Your Honor, to make sure that she was going to be there, and there was also no answer at that time.

THE COURT:  It's rung about six times so far.  We'll let it go about 15 times.

(Telephone continued to ring at the number dialed)

THE COURT:  Let the record show we rang about 15 times or 16 times and there was no response.  And Mr. Seymour had just indicated that it's now 10 after 12:00 and he had called around 11:30 today and had similarly received no response.  Under the circumstances, we afforded Ms. McClarity her opportunity to have a hearing telephonically.  She was apprised of this and has not appeared.  Under the circumstances, we will now rule upon her matter within the next week or two with the information that is at hand.

The hearing is concluded.

MR. TYLER:  Your Honor, one matter, and it concerns Ms. Collins.  Mr. Seymour just reminded me of this.  She had asked Mr. Seymour to submit additional evidence on her behalf respecting this matter.

THE COURT:  Ms. Collins is one of the other applicants who wanted a hearing only through paper and had not requested a telephonic hearing.  That's Janie Collins?

1        MR. TYLER:  That's correct, Your Honor.

2        THE COURT:  All right.  Yes, sir.

3        MR. TYLER:  And the Government has had opportunity to

4 review these additional papers and we see absolutely nothing new

5 in any of the information that she has asked for the Court to

6 review.  And for the same reasons that have been previously

7 stated to her by counsel on behalf of the respective parties,

8 the Government continues to believe that she is not entitled to

9 any relief under Paragraph 21 of the consent decree.

10        THE COURT:  All right.  And, Mr. Seymour, do you have

11 any position that you are taking on these latest submissions?

12        MR. SEYMOUR:  We're in agreement with the Government,

13 Your Honor.

14        THE COURT:  You're in accord.  All right.

15        Has that been conveyed to Ms. Collins, that is, your

16 present position in light of her subsequent submission?

17        MR. TYLER:  No, Your Honor.

18        THE COURT:  All right.  We can then convey it as part

19 of our overall expression on the merits of her claim when we

20 write this in the next short time.

21        MR. TYLER:  Thank you, Your Honor.

22        THE COURT:  So we will note that.

23        And I will ask Mr. Slodysko, my court reporter, if I

24 can have a copy of this brief transcript so that I will be able

25 to address not only the two that we had afforded the telephonic

1    hearing to, and the one, of course, with which we had been

2    successful in having a telephonic hearing, but also whatever you

3    mentioned just now concerning Ms. Collins and your considera-

4    tion, both you and Mr. Seymour, of the more recent submissions

5    and supplementation that she had made, but that you continue to

6    hold to the same view, that there isn't merit in the claim.

7           MR. TYLER:  Thank you, Your Honor.

8           THE COURT:  We shall do that.

9           MR. SEYMOUR:  It will be served upon -- we served upon

10   Ms. Collins a copy of the document submitting additional

11   information.  Inasmuch as that document did not alter the

12   position of the parties in the case, I think she would fairly

13   infer that there was no change.

14          THE COURT:  Fine.  Good.  I thank you both very much

15   for coming here today.  I know it's an imposition in some ways,

16   but I hope that the parties will feel that they have received

17   the type of hearings that they have requested.  Thank you, all.

18       (Proceedings concluded at 12:13 p.m.)

19

20

21                  CERTIFICATE OF REPORTER

22   I hereby certify that the foregoing is a correct transcript from

23   the record of proceedings in the above-entitled matter.

24

25                           Official Court Reporter

RECEIVED

APR 22 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA