IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., <br><br> *Plaintiffs*, <br> v. <br><br> CHARLES EZELL, Acting Director, Office of Personnel Management, et al., <br><br> *Defendants*, <br><br> and <br><br> AMERICAN MOMENT, <br><br> *Proposed Defendant-Intervenor*, <br><br> and <br><br> FEDS FOR FREEDOM, <br><br> *Proposed Defendant-Intervenor*. | Case No. 1:79-cv-00271-RBW <br><br> Judge Reggie B. Walton |

**MOTION OF AMERICAN MOMENT AND FEDS FOR FREEDOM TO TERMINATE THE CONSENT DECREE**

Proposed Defendant-Intervenors American Moment and Feds for Freedom move to terminate the Consent Decree in this case.[1] As explained in the accompanying memorandum of law, the Consent Decree entered in this case more than four decades ago should be terminated. The Proposed Defendant-Intervenors support the Office of Personnel Management's motion to terminate the Consent Decree and offer additional grounds to justify its end.

---

[1] American Moment and Feds for Freedom moved to intervene. If their motion to intervene is denied, they request that this Court treat the memorandum of law accompanying this motion to terminate the Consent Decree as an amicus brief in support of Defendants.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL G. LUEVANO, et al., | |
| *Plaintiffs*, | Case No. 1:79-cv-00271-RBW |
| v. | Judge Reggie B. Walton |
| CHARLES EZELL, Acting Director, Office of Personnel Management, et al., | |
| *Defendants*, | |
| and | |
| AMERICAN MOMENT, | |
| *Proposed Defendant-Intervenor*, | |
| and | |
| FEDS FOR FREEDOM, | |
| *Proposed Defendant-Intervenor*. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TERMINATE THE CONSENT DECREE**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

ARGUMENT .................................................................................................................................. 4

    I.    THE CONSENT DECREE VIOLATES TITLE VII ....................................................................... 4

    II.    DISPARATE-IMPACT LIABILITY IS UNCONSTITUTIONAL ........................................................ 7

    III.    THE CONSENT DECREE HARMS CURRENT AND FUTURE FEDERAL EMPLOYEES ...................11

CONCLUSION............................................................................................................................. 12

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) ...................................................................................................7, 8, 10

*Agostini v. Felton*,
   521 U.S. 203 (1997) ..................................................................................................................4

*In re Birmingham Reverse Discrimination Emp. Litig.*,
   833 F.2d 1492 (11th Cir. 1987) ................................................................................................5

*Bolling v. Sharpe*,
   347 U.S. 497 (1954) ..................................................................................................................7

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ..................................................................................................................9

*Cleveland Firefighters for Fair Hiring Pracs. v. City of Cleveland*,
   669 F.3d 737 (6th Cir. 2012) ....................................................................................................5

*Dean v. City of Shreveport*,
   438 F.3d 448 (5th Cir. 2006) ....................................................................................................5

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971) ..................................................................................................................6

*Luevano v. Campbell*,
   93 F.R.D. 68 (D.D.C. 1981) ..................................................................................................3, 6

*Miller v. Johnson*,
   515 U.S. 900 (1995) ................................................................................................................10

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) ..................................................................................................................9

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ...............................................................................................2, 4, 5, 6, 8, 9

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ..............................................................................................................2, 7

*Schuette v. Caol. to Def. Affirmative Action, Integration, and Immigrant Rts. and*
   *Fight for Equality by Any Means Necessary (BAMN)*, 572 U.S. 291 (2014) ...........................8

*Shaw v. Reno*,
    509 U.S. 630 (1993)..................................................................................................7

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    600 U.S. 181 (2023).............................................................................2, 5, 8, 9, 10, 11

*Sys. Fed'n No. 91, Ry. Emps.' Dep't v. Wright*,
    364 U.S. 642 (1961).........................................................................................1, 4, 7

*United States v. Brennan*,
    650 F.3d 65 (2d Cir. 2011)...............................................................................4, 5, 6

*United States v. Cobb County*,
    1:24-cv-2010 (N.D. Ga. Jan. 16, 2025)....................................................................5

**Statutes**

42 U.S.C. § 2000e-2(a) ...................................................................................................2

42 U.S.C. § 2000e-2(k) ...................................................................................................2

42 U.S.C. § 2000e-2(k)(1)(A)(i) .....................................................................................6

**Other Authorities**

David H. Autor & David Scarborough, *Does Job Testing Harm Minority
    Workers? Evidence from Retail Establishments*, 123 Q.J. Econ. 219 (2008)..........12

Fed. R. Civ. P. 60(b)(5)..............................................................................................4, 11

Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*,
    117 Harv. L. Rev. 493 (2003) ................................................................................11

U.S. Census Bureau, *Educational Attainment in the United States*, https://www.census.gov/
    data/tables/2022/demo/educational-attainment/cps-detailed-tables.html. ..............12

U.S. Gov't Accountability Off., *The Impact and Validity of PACE: A Federal
    Employment Examination* (May 15, 1979) ..............................................................7

## INTRODUCTION

For 44 years, the Consent Decree in this case has impeded the Office of Personnel Management ("OPM")'s ability to use employment tests to fill jobs based on quantifiable aptitude. The Consent Decree requires federal agencies considering an employment test to conduct extensive studies and guard against any "adverse impact" on certain racial groups. As a result, "[v]ery few agencies use job knowledge or cognitive ability tests," and the most frequently used assessment tool is a "simple resume." OPM Mot. to Terminate at 8, ECF No. 2.

These consequences directly harm current and future federal employees. Proposed Defendant-Intervenor American Moment endeavors to help young people, especially those without college degrees, to serve in government. *See* Nick Solheim Decl., Ex. A. When cognitive employment tests are replaced by resumes, talented young people without traditional credentials struggle to obtain federal employment, and the federal government misses out on qualified individuals who might have otherwise been identified. Likewise, current federal employees such as those represented by Proposed Defendant-Intervenor Feds for Freedom suffer dignitary harms when their employer sets hiring policies based on race. *See* Marcus Thornton Decl., Ex. B.

The Consent Decree must be vacated because "significant changes in law" make clear that it is an "instrument of wrong." *Sys. Fed'n No. 91, Ry. Emps.' Dep't v. Wright*, 364 U.S. 642, 647 (1961) (quotation omitted). First, this Court entered the Consent Decree without finding that the federal government's prior use of the Professional and Administrative Career Examination ("PACE") likely violated the prohibition on disparate impact under Title VII of the Civil Rights Act of 1964. The Supreme Court has since held that Title VII prohibits race-conscious acts like those required by the Consent Decree unless there is a "strong basis in evidence" that the employer

1

would otherwise face liability for disparate impact under Title VII. *Ricci v. DeStefano*, 557 U.S. 557, 563 (2009). No such evidence exists here.

Second, the Plaintiffs claimed that OPM's prior use of the PACE was illegal *only* because of its disparate impact under Title VII. Subsequent case law, however, makes clear that disparate-impact liability is unconstitutional. Because disparate-impact liability "place[s] a racial thumb on the scales, often requiring employers to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes," *id.* at 594 (Scalia, J., concurring), it violates the equal protection requirements of the Fifth Amendment, which prohibits "all governmentally imposed discrimination based on race," *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023) (cleaned up). Developments in the law preclude disparate-impact liability, making "legal what the decree was designed to prevent" and illegal what the decree requires. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992).

Third, the Consent Decree is not in the public interest because it has distorted hiring and promotion decisions throughout the federal government. Terminating the decree will permit a more efficient, fair, and merit-based federal hiring process.

For these reasons, as well as those set forth in OPM's motion, the Consent Decree must be terminated.

## BACKGROUND

Title VII prohibits employment discrimination based on race. This includes both intentional discrimination, known as "disparate treatment," 42 U.S.C. § 2000e-2(a), and practices that are not intended to discriminate but have a "disparate impact" on protected groups and cannot be justified as job-related and consistent with business necessity, *id.* § 2000e-2(k).

In 1979, Plaintiffs in this case (individuals and civil rights groups seeking to represent a nationwide class) sued OPM, alleging that its use of the PACE violated Title VII. *Luevano v. Campbell*, 93 F.R.D. 68, 72 (D.D.C. 1981). Plaintiffs argued *only* that using the PACE violated Title VII because of the "disproportionately adverse effect of the PACE on Blacks and Hispanics." Compl. ¶ 14, *Luevano*, 93 F.R.D. 68 (No. 79-0271), https://perma.cc/5SN6-M9Z5.

OPM agreed to settle the case, even while denying that its use of the PACE violated Title VII. *See* Consent Decree ¶ 1, *Luevano*, 93 F.R.D. 68, 1981 WL 402614 ("Consent Decree"). The Consent Decree (1) permanently enjoined use of the PACE after a wind-down period, (2) required OPM to develop an alternative examination procedure that would eliminate "adverse impact against Blacks and against Hispanics," (3) required the use of two specific programs (Outstanding Scholars and Bilingual/Bicultural) to mitigate adverse impact, (4) required any new employment tests to be subjected to validity studies that would, among other things, measure disparate impact against blacks and Hispanics, and (5) required any hiring agency to consider whether any other procedures would satisfy its objectives with "no adverse impact or less adverse impact" than the primary test under review. *Id.* ¶¶ 2(a), 12(a)–(b), (i), 13(a), 16(a)–(b).

On March 10, 2025, OPM moved to terminate the Consent Decree. ECF No. 2. OPM explains that the Consent Decree discriminates on the basis of race because it requires employer agencies to measure new tests for their disparate impact specifically on blacks and Hispanics, but not for other racial groups, and to evaluate whether an alternative with less disparity exists. *Id.* at 10. OPM continues that such a race-conscious approach violates Title VII because there was no "strong basis in evidence" that the employer would be liable under Title VII if it failed to take those race-conscious actions. *Id.* at 10–11. OPM further claims that this race-conscious action by

3

the government is subject to strict scrutiny and cannot survive that test. *Id.* at 11–15. Finally, OPM lays out how the Consent Decree has become totally unworkable. *Id.* at 15–18.

## ARGUMENT

Consent decrees that require "continuing enforcement of rights the statute no longer gives" must be vacated. *Sys. Fed'n No. 91*, 364 U.S. at 652. The Consent Decree is just such a decree. First, it violates Title VII because it requires OPM to take race-conscious remedial action without the "strong basis in evidence" of liability that could justify such action under *Ricci v. DeStefano*, 557 U.S. 557. Second, the entire premise of this lawsuit is that OPM's employment tests in the 1970s might have been illegal for resulting in a disparate impact against certain racial groups, yet recent equal protection decisions indicate that disparate-impact liability *itself* is unconstitutional. Both problems with the Consent Decree became clear after "subsequent changes" in "decisional law," and this Court must "modify" the "consent decree in light of such changes." *Agostini v. Felton*, 521 U.S. 203, 215 (1997). Moreover, the Consent Decree causes significant harm to present and future federal employees and is no longer in the public interest. It should be terminated because it "is no longer equitable." Fed. R. Civ. P. 60(b)(5).

### I. THE CONSENT DECREE VIOLATES TITLE VII

The Supreme Court clarified in *Ricci* that, under Title VII, an employer can undertake race-based remedial action to avoid disparate-impact liability only if it has a "strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute." *Ricci*, 557 U.S. at 563; *see United States v. Brennan*, 650 F.3d 65, 109 (2d Cir. 2011). Importantly, "the standard is objective, not subjective, and it therefore focuses on the strength of the *evidence of liability*, not the strength of the employer's *fear of litigation*." *Brennan*, 650 F.3d at 110; *see Ricci*, 557 U.S. at 585.

4

The same standard applies to consent decrees. In "the eyes of the law," a voluntary consent decree requiring race-conscious action "is nothing more than a voluntary affirmative action program." *Dean v. City of Shreveport*, 438 F.3d 448, 464 (5th Cir. 2006); *see In re Birmingham Reverse Discrimination Emp. Litig.*, 833 F.2d 1492, 1501 (11th Cir. 1987); *see also Cleveland Firefighters for Fair Hiring Pracs. v. City of Cleveland*, 669 F.3d 737, 741 (6th Cir. 2012). Therefore, courts must apply *Ricci* and reject consent decrees that order race-conscious action to avoid a disparate impact when the "Defendant has steadfastly denied that its hiring or selection process had any impermissible disparate impact" and no fact-finding revealed that liability was likely. Order at 4, *United States v. Cobb County*, 1:24-cv-2010 (N.D. Ga. Jan. 16, 2025), ECF No. 13, https://perma.cc/3A9W-CZ7H.

In this case, the Consent Decree ordered race-conscious action to avoid the unintentional disparate impact alleged by the Plaintiffs. As *Ricci* established, the decision to cease use of an exam because of the racial breakdown of results is "race-based action" that "discriminates" based on race. 557 U.S. at 562–63, 579–80, 584. After all, hiring is "zero-sum," so changing a policy to benefit "some applicants" but not others "necessarily advantages the former group at the expense of the latter." *Students for Fair Admissions*, 600 U.S. at 218–19. Further, the Consent Decree compelled future race-conscious action by requiring OPM to measure any alternative exam for disparate impact on blacks and Hispanics, but not any other racial group. *See* OPM Mot. to Terminate at 10 (citing Consent Decree ¶ 8(1)). Accordingly, this Consent Decree complies with Title VII only if there were a "strong basis in evidence that," without this race-based action, OPM "would have been liable under the disparate-impact statute." *Ricci*, 557 U.S. at 563.

Neither this Court nor the parties ever objectively determined that OPM's use of the PACE was likely illegal. To the contrary, "OPM expressly denied that use of the PACE by OPM …

5

violated Title VII, and further denied that the PACE had not been properly validated in accordance with applicable Federal guidelines and Title VII." Consent Decree ¶ 1. Even while agreeing to the Consent Decree, OPM continued to deny "any such allegations in the Complaint and deny that defendants are subject to any liability." *Id.* This Court also never found that the use of the PACE was likely unlawful when it approved the negotiated settlement between the parties. *See Luevano*, 93 F.R.D. at 72–74. Indeed, this Court concluded that "[b]ased on the present record, it is not possible to state that either side could have been completely confident of victory." *Id.* at 87. That is a far cry from finding the "strong basis in evidence" that *Ricci* requires.

To be sure, the statistical breakdown of PACE results by race was known when this Court entered the Consent Decree. *See* Consent Decree ¶ 10(h). But "a threshold showing of a significant statistical disparity … is far from a strong basis in evidence that [OPM] would have been liable under Title VII." *Ricci*, 557 U.S. at 587. Disparate-impact liability under Title VII requires the additional findings that the test is not "job related for the position in question" and is not "consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (noting the "touchstone" for disparate-impact liability "is business necessity").

In addition, no factual findings in the Consent Decree provided "objectively strong evidence of non-job-relatedness or a less discriminatory alternative." *Brennan*, 650 F.3d at 113; *see Luevano*, 93 F.R.D. at 72–74 (recounting the court's factual findings before entering the Consent Decree). Indeed, to the extent evidence existed, it showed that the PACE *was* job-related and consistent with business necessity. As OPM points out, the PACE was thoroughly researched to ensure validity and job-relatedness. *See* OPM Mot. to Terminate at 3. In 1979, the Government Accountability Office called the PACE the "most thoroughly researched test in the history of

Federal civil service examining." U.S. Gov't Accountability Off., *The Impact and Validity of PACE: A Federal Employment Examination* 2 (May 15, 1979), https://perma.cc/GK3M-3GF2.

On this record, the Consent Decree violates Title VII as clarified by *Ricci*. The Consent Decree thus provides to Plaintiffs "rights the statute no longer gives" and must be vacated. *Sys. Fed'n No. 91*, 364 U.S. at 652.

## II.     DISPARATE-IMPACT LIABILITY IS UNCONSTITUTIONAL

This Court should also terminate the Consent Decree because "the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 388. The Plaintiffs sought to prevent OPM from using the PACE, on the theory that it violated Title VII's prohibition of policies causing unjustified disparate impacts. But even if OPM's test had such an impact, disparate-impact liability itself violates the Fifth Amendment, as clarified by recent Supreme Court decisions.

The Fifth Amendment prohibits the federal government from discriminating based on race. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215–16 (1995); *Bolling v. Sharpe*, 347 U.S. 497 (1954). There are no "benign" racial classifications, because such distinctions "'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 642–43 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). Racial and ethnic classifications "stimulate our society's latent race consciousness," *id.* at 643 (quoting *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 173 (1977) (Brennan, J., concurring in part)), "perpetuat[e] the very racial divisions the polity seeks to transcend," *Schuette v. Caol. to Def. Affirmative Action, Integration, and Immigrant Rts. and Fight for Equality by Any Means Necessary (BAMN)*, 572 U.S. 291, 308 (2014), and "delay the time when race will become … truly irrelevant," *Adarand*, 515 U.S. at 229. Accordingly, "all racial

7

classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Id.* at 227.[2]

Disparate-impact liability requires employers to classify employees and job applicants based on race. As Justice Scalia explained, it "affirmatively *requires* [race-based] actions when a disparate-impact violation *would* otherwise result," even though the Constitution prohibits the government "from discriminating on the basis of race." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring). He further observed that disparate impact liability "requires consideration of race on a wholesale, rather than retail, level," which stands in contrast to the Court's admonition that governments must "treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* at 595 (quotation omitted). Therefore, disparate-impact liability must satisfy strict scrutiny, which requires a compelling governmental interest and narrow tailoring to that end. *See Students for Fair Admissions*, 600 U.S. at 206–07.

Race-based disparate impact liability under Title VII fails strict scrutiny because it lacks a compelling governmental interest. The two most logical justifications for disparate-impact liability—diversity and remedying past societal discrimination—were recently rejected by the Supreme Court as not compelling. In *Students for Fair Admissions*, the Court made clear that diversity for its own sake is insufficient. *Id.* at 219–20. And the Court likewise reaffirmed that "[a]n effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* at 226 (quoting *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)); *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731–32 (2007); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989). Accordingly, just as a general "racial imbalance … without more"

---

[2] The equal protection component of the Fifth Amendment is coterminous with the Fourteenth Amendment's Equal Protection Clause. *Adarand*, 515 U.S. at 217.

does not justify race-based action in schools, *Parents Involved*, 551 U.S. at 721 (quotation omitted), it cannot justify race-based action in employment, either.

Neither of the two compelling interests the Court has recognized as justifying race-based action—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and "avoiding imminent and serious risks to human safety in prisons, such as a race riot"—would likely ever justify disparate impact cases under Title VII. *Students for Fair Admissions*, 600 U.S. at 207. Disparate-impact liability "sweep[s] too broadly" to serve the interest of remediating specified instances of past, intentional discrimination. *Ricci*, 557 U.S. at 595 (Scalia, J., concurring). Indeed, Plaintiffs never claimed the Consent Decree would remediate past, *intentional* discrimination by OPM. Instead, they claimed only that OPM policies resulted in a disparate impact on certain racial groups, even though the practices did not facially discriminate based on race and were not adopted to favor one race over another. And disparate-impact liability in the workplace has nothing to do with preventing race riots in prisons.

Disparate-impact liability is also not narrowly tailored. It turns on statistical analysis considering racial categories as general groups. But in *Students for Fair Admissions*, the Court rejected those very categories as "imprecise," "overbroad," "arbitrary or undefined," and "underinclusive." 600 U.S. at 216. Thus, reliance on those categories to achieve diversity led to a "mismatch between the means [the universities] employ and the goals they seek." *Id.* at 217. Moreover, like the affirmative action policies at Harvard, disparate-impact liability under Title VII has "no end … in sight." *Id.* at 213. To be narrowly-tailored, racial classifications must have "a logical end point." *Id.* at 221 (quotation omitted). Disparate-impact liability—like the Consent Decree itself—is missing an end point.

9

Moreover, disparate-impact liability under Title VII violates equal protection doctrine for the additional reason that it relies on unconstitutional stereotyping and treats employees as members of a racial group, not as individuals. "[T]he Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*," *Adarand*, 515 U.S. at 227, and "the Government must treat citizens as individuals, not as simply components of a racial class," *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quotation omitted); *see Students for Fair Admissions*, 600 U.S. at 231 (emphasizing that universities must assess an applicant "based on his or her experiences as an individual—not on the basis of race"). By its very nature, disparate-impact liability requires employers (and courts) to distinguish between racial groups using statistical data and make decisions to avoid statistical disparities across those groups. To avoid liability, employers must ensure that their policies do not lead to an imbalance in outcomes across racial groups, inevitably pressuring employers to adopt *de facto* racial quotas. By requiring employers to evaluate outcomes based on race and respond accordingly, disparate-impact liability furthers "stereotypes that treat individuals as the product of their race," which is "contrary" to the "'core purpose' of the Equal Protection Clause." *Students for Fair Admission*, 600 U.S. at 221.

Disparate-impact liability also violates the Constitution because it requires race to "be used as a 'negative.'" *Id.* at 218. Like university admissions, an employee's race "may never be used against him" in an employment process. *Id.* But employment is often "zero-sum," so providing a benefit "to some applicants" based on race "but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19. Disparate-impact liability requires that employers provide such a race-based benefit to certain employees over others, as it "is a race-conscious mechanism designed to reallocate opportunities from some racial groups to others." Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 494 (2003)

(cited in *Ricci*, 557 U.S. at 594–95). Because disparate-impact liability forces employers to make help certain groups over others because of race, it violates the principle that government may not "intentionally allocate preference" on that basis. *Students for Fair Admissions*, 600 U.S. at 220.

Accordingly, disparate-impact liability is unconstitutional, so the Consent Decree predicated on it must be vacated.

### III.    THE CONSENT DECREE HARMS CURRENT AND FUTURE FEDERAL EMPLOYEES

In addition to its legal problems, the Consent Decree should be terminated because it "is no longer equitable." Fed. R. Civ. P. 60(b)(5). The experiences of Proposed Defendant-Intervenors illustrate the damage caused by the Consent Decree. American Moment, a nonprofit organization committed to helping young people serve in government, and Feds for Freedom, whose membership includes over 9,000 federal employees, have endeavored to join this lawsuit because of the distorting effects of this Consent Decree for the federal workforce. *See* Solheim Decl., Ex. A; Thornton Decl., Ex. B.

Terminating the Consent Decree will enable agencies to make hiring and promotion decisions based on aptitude, rather than mere credentials. And as a result, the hiring process will more fairly include any American with talents that can help the civil service, not just those with typical resumes. As OPM's motion explained, after the Consent Decree enjoined the use of the PACE and placed barriers in the way of replacement tests, agencies naturally moved away from using tests that identify talent in candidates without traditional credentials and replaced them primarily with resume reviews. *See* OPM Mot. to Terminate at 7–8. But for candidates with unconventional backgrounds, such as those without a college degree, this shift makes it nearly impossible to break through the hiring process.

11

For this reason, the use of employment tests may often *reduce* racial disparities compared to reliance on resumes. According to U.S. Census Bureau data for Americans over 25 years old in 2022, approximately 26.1 percent of non-Hispanic whites and 32.6 percent of Asians had a bachelor's degree, compared to only 17.1 percent of blacks and 14.5 percent of Hispanics. *See* U.S. Census Bureau, *Educational Attainment in the United States*, Table 3, https://www.census.gov/data/tables/2022/demo/educational-attainment/cps-detailed-tables.html (last revised Feb. 10, 2023). A resume-focused hiring process, which will naturally focus on credentials such as a college diploma, thus places many black and Hispanic applicants at a disadvantage. That means there is "little reason to suspect that … job tests are *more* biased against minorities than are informal screens," meaning the "presumed equality-efficiency trade-off" from using employment tests is "largely irrelevant in practice." David H. Autor & David Scarborough, *Does Job Testing Harm Minority Workers? Evidence from Retail Establishments*, 123 Q.J. Econ. 219, 269 (2008).

Terminating the Consent Decree will help the federal government draw from a broader pool of talented individuals that tests can identify, while also making civil service hiring and promotion decisions fairer and more merit-based.

## CONCLUSION

For the foregoing reasons, the Consent Decree should be vacated.

Dated: May 15, 2025                  Respectfully submitted,

<u>/s/ R. Trent McCotter</u>
R. TRENT MCCOTTER (DC BAR # 1011329)
JARED M. KELSON (DC BAR # 241393)
ANDREW W. SMITH (DC BAR # 90026919)
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com
jkelson@boydengray.com
asmith@boydengray.com

NICHOLAS R. BARRY*
JACOB P. MECKLER (D.C. BAR # 90005210)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003
202-964-3721
Nicholas.Barry@AFLegal.org
Jacob.Meckler@AFLegal.org

*Pro hac vice motion forthcoming

13

**CERTIFICATE OF SERVICE**

I certify that on May 15, 2025, the foregoing was filed electronically with the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: May 15, 2025                      */s/ R. Trent McCotter*
                                                       R. Trent McCotter